**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| POLICEMEN'S ANNUITY & BENEFIT FUND OF CHICAGO, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>NAVIENT CORPORATION, JOHN F. REMONDI, JOHN KANE, SOMSAK CHIVAVIBUL, WILLIAM M. DIEFENDERFER, III, ANN TORRE BATES, DIANE SUITT GILLELAND, LINDA MILLS, BARRY A. MUNITZ, STEVEN L. SHAPIRO, JANE J. THOMPSON, BARRY L. WILLIAMS, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., J.P. MORGAN SECURITIES LLC, RBC CAPITAL MARKETS, LLC, BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBS SECURITIES INC., and WELLS FARGO SECURITIES, LLC,<br><br>     Defendants. | Civil Action No. _____<br><br><u>CLASS ACTION</u><br><br><br>**JURY TRIAL DEMANDED** |

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

Plaintiff Policemen's Annuity & Benefit Fund of Chicago ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Navient Corporation ("Navient" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Navient; and (d) other public information regarding the Company.

## INTRODUCTION

1.      This class action is brought on behalf of all persons or entities that: (1) purchased Navient's publicly traded securities between April 17, 2014 and February 5, 2016, inclusive (the "Class Period"); (2) purchased securities in or traceable to the Company's public offering of $500 million in principal amount of 5.000% Senior Notes due 2020 and $500 million in principal amount of 5.875% Senior Notes due 2024 conducted on or around November 6, 2014 (the "2014 Debt Offering"); and (3) purchased securities in or traceable to the Company's public offering of $500 million in principal amount of 5.875% Senior Notes due 2021 conducted on or around March 27, 2015 (the "2015 Debt Offering" and, together with the 2014 Debt Offering, the "Offerings").

2.      The claims asserted herein are alleged against certain of the Company's executive officers, Navient's Board of Directors, including the directors that signed the Registration Statement for the Offerings, and the underwriters of the Offerings (collectively, "Defendants"), and arise under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.      Navient – one of the nation's largest servicers of student loans – was formed in 2014 in a spin off from Sallie Mae.  The Company manages nearly $300 billion in student loans for more than 12 million customers.  This includes Navient's own portfolio of private education loans, which are education loans to students that bear the full credit risk of the customer without any backstop or guarantee from the Government.

4.      Prior to the start of the Class Period, Navient drew scrutiny from federal regulators regarding the Company's loan servicing business.  Specifically, Navient was accused of overcharging borrowers by processing borrowers' monthly student loan payments in a way

designed to maximize late fees and overcharging active-duty military service members on their student loans for nearly a decade.  These allegations led to consent orders with the Department of Justice ("DOJ") and the Federal Deposit Insurance Corporation ("FDIC").

5.      From the start of the Class Period, the Company repeatedly reassured investors of Navient's dedication to compliance and its strong compliance culture.  The Company also regularly touted the quality of Navient's student loan portfolio, and continuously reported better than expected earnings, which the Company attributed to decreasing provisions for loan losses.  As a result of these misrepresentations, Navient securities traded at artificially inflated prices during the Class Period.

6.      The truth began to be revealed on February 27, 2015, when the U.S. Department of Education announced that it had terminated its relationship with Navient's wholly-owned subsidiary Pioneer Credit Recovery ("Pioneer"), a collection agency that specializes in debt collection for federal, state and municipal governments.  The Department of Education found that Pioneer misled an "unacceptably high" number of borrowers regarding ways to improve their credit report and about the waiver of certain collection fees, resulting in larger fees for Pioneer to the detriment of those borrowers.  The loss of this contract, which generated $127 million for Navient in just two years, caused the price of Navient shares to decline by $1.89 per share, or 8.8%.

7.      Then, on July 13, 2015, the Company announced a substantial cut to its prior financial guidance for 2015.  According to the Company, the changes to the guidance reflected higher default trends for its private education loan portfolio.  On this news, shares of Navient declined $1.94 per share, or 10.6%.

{FG-W0405224.}

8.      Just weeks later, on August 24, 2015, Navient disclosed that its subsidiary, Navient Solutions, Inc. ("NSI"), received a formal notification that the Consumer Financial Protection Bureau ("CFPB") intends to initiate an enforcement action based on continued violations of consumer protection laws.   In the letter, the CFPB warned that it may seek restitution, civil monetary penalties, and corrective action stemming from NSI's customer billing statement disclosures and process for assessing late fees.   As a result of these disclosures, the price of Navient stock fell $1.02, or 7.8%.

9.      On January 7, 2016, Generation Progress issued a report recommending that state governments tighten oversight of the student loan servicing industry by, among other things, enacting new laws to protect student loan borrowers and to specifically task state officials with helping borrowers resolve complaints against student loan companies.   These disclosures caused the price of Navient shares to fall $0.66 per share, or 6%, from $10.93 to $10.27.

10.     Finally, on February 6, 2016, U.S. presidential candidate Hillary Clinton directed public attention to the CFPB's investigation of Navient, stating that Navient's "behavior is outrageous" and that the Company has been "misleading people" and "doing some really terrible things."   As a result of this disclosure, the price of Navient shares fell $0.57, or 5.99%, to close at $8.94 on the next trading day, February 8, 2016.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77k and

77l.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Navient maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.  Plaintiff

14.     Plaintiff Policemen's Annuity & Benefit Fund of Chicago is a pension plan based in Chicago, Illinois that provides retirement benefits for active and retired police officers of the City of Chicago.  As of year-end 2014, Plaintiff managed assets of approximately $3 billion on behalf of over 25,000 active members, retirees, and beneficiaries.  Plaintiff purchased Navient securities on the public market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  Plaintiff also purchased Navient senior notes on or traceable to the 2014 Debt Offering and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.  Corporate Defendant

15.     Defendant Navient is a Delaware corporation with its principal executive offices located at 123 Justison Street, Wilmington, Delaware.  The Company's common stock trades on

NASDAQ under ticker symbol "NAVI."  Navient currently has over 362 million shares of stock outstanding.  The Company's securities trade on an efficient market.

## C.  Officer Defendants

16.     Defendant John F. Remondi ("Remondi") was, at all relevant times, Chief Executive Officer ("CEO") of Navient.  Defendant Remondi signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

17.     Defendant John Kane ("Kane") was, at all relevant times, Group President, Asset Recovery and Business Services of Navient.

18.     Defendant Somsak Chivavibul ("Chivavibul") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of Navient.  Defendant Chivavibul signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

19.     Defendants Remondi, Kane, and Chivavibul are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with Navient, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**D. Director Defendants**

20.     Defendant William M. Diefenderfer, III ("Diefenderfer") is, and was at all relevant times, Chairman of the Board of Directors of Navient.  Defendant Diefenderfer signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

21.     Defendant Ann Torre Bates ("Bates") is, and was at all relevant times, a Director of Navient.  Defendant Bates signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

22.     Defendant Diane Suitt Gilleland ("Gilleland") is, and was at all relevant times, a Director of Navient.  Defendant Gilleland signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

23.     Defendant Linda Mills ("Mills") is, and was at all relevant times, a Director of Navient.  Defendant Mills signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

24.     Defendant Barry A. Munitz ("Munitz") is, and was at all relevant times, a Director of Navient.  Defendant Munitz signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

{FG-W0405224.}

25.     Defendant Steven L. Shapiro ("Shapiro") is, and was at all relevant times, a Director of Navient.  Defendant Shapiro signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

26.     Defendant Jane J. Thompson ("Thompson") is, and was at all relevant times, a Director of Navient.  Defendant Thompson signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

27.     Defendant Barry L. Williams ("Williams") is, and was at all relevant times, a Director of Navient.  Defendant Williams signed the Registration Statement for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

28.     Defendants Diefenderfer, Bates, Gilleland, Mills, Munitz, Shapiro, Thompson, and Williams are collectively referred to herein as the "Director Defendants."

**E.  Underwriter Defendants**

29.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

30.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

8

31.      Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

32.      Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

33.      Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

34.      Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Offerings as specified herein.   As an underwriter of the Offerings, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

35.      Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

36.      Defendant RBS Securities Inc. ("RBS") was an underwriter of the 2014 Debt Offering as specified herein.  As an underwriter of the 2014 Debt Offering, RBS was responsible

for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2014 Debt Offering Materials.

37.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the 2015 Debt Offering as specified herein.  As an underwriter of the 2015 Debt Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2015 Debt Offering Materials.

38.    Credit Suisse, Deutsche Bank, J.P. Morgan, RBC, Barclays, Goldman Sachs, Merrill Lynch, RBS, and Wells Fargo are collectively referred to herein as the "Underwriter Defendants."

## BACKGROUND

39.    Formed in April 2014 in a spin off from student-loan behemoth Sallie Mae, Navient is one of the largest loan management, servicing, and asset recovery companies in the nation.  Navient services more than $300 billion in student loans on behalf of over 12 million customers.  In addition to serving as a third-party loan servicer, Navient owns a portfolio of student loans valued at over $125 billion.  Given this significant credit exposure, the quality of Navient's loan portfolio is crucial to its success.

40.    Accounting rules require Navient to hold in reserve cash equivalent to a portion of the value of its loan portfolio in order to reflect the risk of loss, whether as a result of default or delinquency.  Navient is required to regularly set aside a provision for loan losses to establish such loan loss reserves; increasing these provisions offsets net income on a dollar-for-dollar basis.  Since 2012, the Company's provision for loan losses has steadily decreased from $946 million in 2012 to only $539 million in 2014, representing a decrease of about 43%.  The reduction in the loan loss provision resulted in a commensurate boost to reported net income.  Significantly, Navient attributed the steep decline in its loan loss reserves to the overall

improvement in credit quality, delinquency, and charge-off trends leading to decreases in expected future loan losses.

41.    Navient's reduction of the Company's loan loss reserves enabled Navient to report earnings that came within pennies of analysts' earnings expectations.  Indeed, as the chart below shows, Navient's reported results nearly met or exceeded analysts' expectations in every quarter of the Class Period:

| Reporting Period | Reported Diluted Earnings Per Share ("EPS") | Analyst Consensus Expectations | Margin By Which Navient Appeared To Beat (Miss) Expectations | Diluted EPS Without Quarterly Reduction in Provision For Loan Losses | Margin By Which Navient Would Have Missed Expectations |
|---|---|---|---|---|---|
| Q2 2014 | $0.56 | $0.54 | $0.02 | $0.46 | ($0.08) |
| Q3 2014 | $0.52 | $0.51 | $0.01 | $0.41 | ($0.10) |
| Q4 2014 | $0.53 | $0.54 | ($0.01) | $0.47 | ($0.07) |
| Q1 2015 | $0.48 | $0.50 | ($0.02) | $0.44 | ($0.06) |

42.    As investors later learned, these reported results were materially false, and resulted from the Company's manipulation of its loan loss reserves.  Rather than experiencing improved credit quality and reduced delinquencies, Navient knew that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency.  As reflected in the above chart, had Navient not reduced its loan loss provision each quarter, the Company would have missed analysts' earnings estimates by a material amount.

43.    The loan servicing industry is highly regulated and has come under intense scrutiny by U.S. regulators in the aftermath of the financial crisis.  For example, since at least 2013, the FDIC, the DOJ, and several state regulators have been investigating Navient – and its

predecessor – for violations of the Servicemembers Civil Relief Act ("SCRA") and the Federal Trade Commission Act ("FTCA").

44.     The SCRA provides a wide range of protections for military service members, including postponing or suspending certain civil obligations, such as student loan payments, to enable service members to devote full attention to their military service and relieve stress on their family members.  Among those protections, the SCRA sets a six percent cap on the interest that can accrue on any credit obligation – including student loans – for active duty or deployed service members.

45.     More expansive than the SCRA, the FTCA broadly prohibits, among other things, any unfair or deceptive acts or practices in or affecting commerce.  In April 2014, NSI – a wholly owned subsidiary of Navient – received a Civil Investigative Demand ("CID") from the CFPB as part of its investigation relating to allegations that Navient was processing borrowers' monthly student loan payments in a way designed to maximize late fees and provided inadequate disclosures relating to the assessment of those fees.  As a result of these investigations, Navient's compliance with federal and state regulations was critically important to investors.

46.     On May 2, 2014, NSI entered into consent orders with the FDIC and the DOJ to resolve matters related to violations of the FTCA and SCRA.  Specifically, the FDIC accused NSI of overcharging borrowers by processing borrowers' monthly student loan payments in a way designed to maximize late fees.  Under the terms of the consent order, NSI was required to pay a total of $33.3 million in civil monetary penalties, as well as establish a reserve account to provide restitution.  With respect to the alleged violations of the SCRA, NSI entered into a consent order with the FDIC and the DOJ relating to allegations that Navient violated the SCRA by overcharging active-duty troops on their student loans for nearly a decade.  Significantly, the

DOJ found that a staggering 93 percent of service members were charged more than the statutory six percent interest rate cap on their student loans while on active-duty or deployed.  Under the terms of the consent order, NSI was required to pay an additional $60 million into a settlement fund to compensate wronged service members.

47.     In the wake of the disclosures of the Company's misconduct and the penalties levied by the FDIC and DOJ, Navient repeatedly assured investors that the Company was in full compliance with all regulations.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

48.     The Class Period begins on April 17, 2014 when Navient common stock began trading on the NASDAQ.  On April 16, 2014, after the market closed, Navient—which was still part of Sallie Mae—issued a press release announcing its financial results for the first quarter ended March 31, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported quarterly earnings on its private student loan portfolio were "$118 million, compared with $87 million in the year-ago quarter."  The Company attributed this increase to "a $50 million decrease in the provision for private education loan losses," meaning the Company had materially reduced its loan loss reserves.  Indeed, Navient reported that its provision for private education loan losses fell to $175 million, down 22% from $225 million in the prior year quarter.

49.     The statements and omissions set forth in ¶48 were materially false and misleading because Navient and the Officer Defendants knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

13

50. On July 16, 2014, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2014. In the press release, which was also filed with the SEC on Form 8-K, the Company reported quarterly earnings on its private student loan portfolio were "$86 million compared with $61 million in the year-ago quarter." The Company attributed this increase to "a $44 million decrease in the provision for private education loan losses," meaning the Company had materially reduced its loan loss reserves. Indeed, Navient reported that its provision for private education loan losses fell to $145 million, down 23% from $189 million in the prior year quarter.

51. The following day, Navient held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Remondi assured investors of the Company's dedication to compliance. Specifically, Remondi stated that the Company's private loan portfolio "require[s] a unique level of regulatory – they have a unique set of regulatory rules and compliance associated with them, compared to other consumer assets. We are obviously well-structured to provide, and comply with those rules."

52. The statements and omissions set forth in ¶¶50-51 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers. Navient and the Officer Defendants also knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

14

53.     On August 1, 2014, Navient filed with the SEC its Form 10-Q for the second quarter of 2014, confirming the financial results announced by the Company in its July 16 press release.  The Form 10-Q was signed by Defendant Chivavibul and contained certifications by Defendants Remondi and Chivavibul that attested to the purported accuracy and completeness of the 10-Q.  In the quarterly report, the Company touted its "robust compliance culture driven by a 'customer first' approach."

54.     On August 4, 2014, the Company posted to its website a presentation titled "2014 2nd Quarter Investor Deck," which confirmed the financial results announced by the Company in its July 16 press release.  In the presentation, which was also filed with the SEC on Form 8-K, the Company assured investors of the quality of its private student loan portfolio, stating that its "Private Education Loans Segment" included a "High Quality Portfolio."

55.     The statements and omissions set forth in ¶¶53-54 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.  Navient and the Officer Defendants also knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

56.     On September 8, 2014, Remondi represented the Company at the Barclays Global Financial Services Conference.  During the conference, Remondi continued to reassure investors of Navient's dedication to compliance.  Specifically, Remondi stated that "no consumer lending

business or servicing business is complete without a strong compliance culture, which we bring to the equation as well."  Remondi also stated that Navient's "strong compliance culture is what makes us successful in this space as well" and later touted "a very strong compliance culture."

57.     The statements and omissions set forth in ¶56 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

58.     On September 16, 2014, the Company issued a press release titled "Pioneer Credit Recovery to host employment events this month."  In the press release, Navient stated that its "family of asset recovery companies, including Pioneer, is one of the largest, most responsible, most compliant, and top performing operations in the country."

59.     The statements and omissions set forth in ¶58 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

60.     On October 15, 2014, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported quarterly earnings on its private student loan portfolio were "$98 million in third-quarter 2014, compared with the year-ago quarter's $75 million."  The Company attributed this increase to "a $46 million decrease in the provision for private education loan losses."  Indeed, Navient reported that its provision for private education

loan losses fell to $130 million, down 26% from $176 million in the prior year quarter.  In the press release, Remondi stated that Navient was experiencing "improved credit performance," and that "[p]rivate credit charge-offs set a new record low since 2008."

61.     On October 30, 2014, Navient filed with the SEC its Form 10-Q for the third quarter of 2014, confirming the financial results announced by the Company in its October 15 press release.  The Form 10-Q was signed by Defendant Chivavibul and contained certifications by Defendants Remondi and Chivavibul that attested to the purported accuracy and completeness of the 10-Q.  In the quarterly report, the Company touted its "robust compliance culture driven by a 'customer first' approach."

62.     On November 4, 2014, the Company posted to its website a presentation titled "2014 3rd Quarter Investor Deck," which confirmed the financial results announced by the Company in its October 15 press release.  In the presentation, which was also filed with the SEC on Form 8-K, the Company assured investors of its "[s]trong compliance infrastructure."

63.     The statements and omissions set forth in ¶¶60-62 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.  Navient and the Officer Defendants also knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

64.     Days later, Navient sought to raise $1 billion in capital through the 2014 Debt Offering.  Navient conducted the 2014 Debt Offering pursuant to a shelf registration statement and prospectus, filed with the SEC on Form S-3 on July 18, 2014 (the "Registration Statement"). The Registration Statement was supplemented through a Preliminary Prospectus Supplement, filed with the SEC on Form 424B5 on November 3, 2014, and a Prospectus Supplement, filed with the SEC on Form 424B2 on November 5, 2014 (collectively, the "2014 Debt Offering Materials").

65.     The 2014 Debt Offering Materials incorporated by reference Navient's July 16, 2014 press release announcing its financial results for the second quarter ended June 30, 2014, which was also filed with the SEC on Form 8-K.  For all of the reasons stated above, ¶¶50-51, Navient and the Officer Defendants made materially false and misleading statements and omissions in that document.

66.     On November 12, 2014, Remondi represented the Company at the Bank of America Merrill Lynch Banking & Financial Services Conference.  During the conference, Remondi acknowledged the stringent compliance requirements surrounding the student loan industry and assured investors that Navient satisfies those requirements.  Specifically, Remondi stated that "we have a strong compliance culture, an infrastructure, a control infrastructure around our business.  Certainly, the bar has risen in terms of the requirements of compliance today in the consumer world."  Remondi also stated that "we had built into our processes a system control structure that allows us to monitor and maintain compliance with a growing set of – increasing set of regulations and rules."  Finally, Remondi touted Navient's "consistent track record of delivering superior performance and a strong compliance culture."

{FG-W0405224.}

67.     The statements and omissions set forth in ¶66 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

68.     On December 9, 2014, Remondi represented the Company at the Goldman Sachs Financial Services Conference.  During the conference, Remondi continued to assure investors that the Company's compliance systems and controls satisfy the requirements of Navient's government clients.   Specifically, Remondi stated that the Company has "a very strong compliance culture and the systems and controls that come with that so that we can actually – if a state is hiring us or a local government is hiring us, they can feel confident that we actually can do the work and do it in a very compliant fashion."

69.     The statements and omissions set forth in ¶68 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

70.     On January 21, 2015, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2014.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported quarterly earnings on its private student loan portfolio were "$92 million in fourth-quarter 2014, compared with the year-ago quarter's $86 million."  The Company attributed this increase to "a $24 million decrease in the provision for private education loan losses."   Indeed, Navient reported that its provision for

private education loan losses fell to $128 million, down 15% from $152 million in the prior year quarter.

71.     The statements and omissions set forth in ¶70 were materially false and misleading because Navient knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

72.     On February 11, 2015, Kane represented the Company at the Credit Suisse Group Financial Services Forum.  During the conference, Kane continued to assure that the Company has "a very, very strong compliance culture at Navient across the entire Company, across all levels of management. So we take that very seriously. We keep our thumb obviously on the changing compliance landscape and we look to make updates to our processes, procedures and work activities to comply."

73.     The statements and omissions set forth in ¶72 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

74.     On February 27, 2015, the Department of Education announced that it terminated its relationship with Pioneer Credit Recovery ("Pioneer"), a wholly owned subsidiary of Navient, because Pioneer made materially inaccurate representations to borrowers about its loan rehabilitation program.  In particular, Pioneer misled an "unacceptably high" number of borrowers regarding ways to improve their credit report and about the waiver of certain

collection fees, resulting in a windfall for Pioneer to the detriment of those borrowers. That same day, Navient admitted for the first time that months earlier, in November 2014, Pioneer received a CID from the CFPB relating to rehabilitation loans and collection of defaulted student debt, the exact same issue cited by the Department of Education as the basis for terminating Pioneer.

75.     These disclosures caused the price of Navient shares to decline by $1.89 per share, or 8.8%, from $21.40 to $19.51. These disclosures provided investors with the first indication that the Company failed to comply with governing rules and regulations and that Navient did not have adequate compliance systems or controls, and had misled investors regarding the Company's strong regulatory compliance.

76.     Several analysts expressed shock in response to these disclosures. For instance, analysts at Janney Capital Markets, stated that the "announcement from the [Department of Education] is surprising" given that Navient claimed to have "invested a significant amount of financial resources to ensure compliance with regulations." In addition, analysts at Barclays downgraded Navient stock because the "full extent of the regulatory risk as well as the impact is uncertain at this point."

77.     To assuage investors' concern over the lost contract and the Company's failure to comply with regulations relating to its loan serving business, the Company continued to tout its commitment to compliance. Specifically, on February 27, 2015, the Company filed its annual report on Form 10-K for the year ended December 31, 2014, confirming the financial results announced by the Company in its January 21 press release. The Form 10-K was signed by Defendant Chivavibul and contained certifications by Defendants Remondi and Chivavibul that attested to the purported accuracy and completeness of the 10-K.

78.     In the annual report, the Company reassured investors that it "fosters a robust compliance culture driven by a 'customer first' approach" and that it "invest[s] in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service."

79.     In the annual report, the Company also stated that its "Credit and Loan Loss Committee," which is chaired by Navient's Chief Risk and Compliance Officer, "oversees . . . the sufficiency of our loan loss reserves and current or emerging issues affecting delinquency and default trends which may result in adjustments in our allowances for loan losses."

80.     The statements and omissions set forth in ¶¶78-79 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.  Navient and the Officer Defendants also knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

81.     On or about March 27, 2015, Navient sought to raise $500 million in capital through the 2015 Debt Offering.  Navient conducted the 2015 Debt Offering pursuant to the Registration Statement.  The Registration Statement was supplemented through a Preliminary Prospectus Supplement, filed with the SEC on Form 424B5 on March 25, 2015 and a Prospectus Supplement filed with the SEC on Form 424B2 on March 26, 2015 (the "2015 Debt Offering Materials" and, together with the 2014 Debt Offering Materials, the "Offering Materials").

{FG-W0405224.}

82.     The 2015 Debt Offering Materials incorporated by reference Navient's July 16, 2014 press release announcing its financial results for the second quarter ended June 30, 2014, which was also filed with the SEC on Form 8-K, and its annual report on Form 10-K for the year ended December 31, 2014.  For all of the reasons stated above, ¶¶50-51, 78-79, Navient and the Officer Defendants made materially false and misleading statements and omissions in those documents.

83.     On April 21, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported quarterly earnings on its private student loan portfolio were "$77 million in first-quarter 2015, compared with the year-ago quarter's $74 million."  The Company attributed this increase to, among other things, "a $16 million decrease in the provision for private education loan losses."  Indeed, Navient reported that its provision for private education loan losses fell to $120 million, down about 12% from $136 million in the prior year quarter.

84.     The following day, Navient held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Remondi assured investors that Navient has "a very strong internal compliance program to monitor our activities in this particular space and have built systems and controls that help us do a great job for our clients, while maintaining a strong compliance profile."  Remondi also touted the Company's "close working relationship with the CFPB," which allows Navient to "make sure we understand those rules, talk about where there are areas for potential borrower confusion or impact, and make sure we're adjusting our activities accordingly so that it's a network in compliance and doing a better job for our clients."

{FG-W0405224.}

85.     On April 30, 2015, Navient filed with the SEC its Form 10-Q for the first quarter of 2015, confirming the financial results announced by the Company in its April 21 press release. The Form 10-Q was signed by Defendant Chivavibul and contained certifications by Defendants Remondi and Chivavibul that attested to the purported accuracy and completeness of the 10-Q. In the quarterly report, the Company touted its "robust compliance culture driven by a 'customer first' approach."

86.     The statements and omissions set forth in ¶¶83-85 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.  Navient and the Officer Defendants also knew or should have known that a large portfolio of loans was at high risk for future loss because the borrowers on those loans had a known history of delinquency, and, as a result, the Company was experiencing a decrease in the quality of its private education loan portfolio.

87.     On July 13, 2015, the Company issued a press release, pre-announcing its second quarter earnings and updated guidance for 2015, both of which were substantially lower than investors had been led to expect.  Specifically, Navient reported quarterly earnings of $0.40 per share, which is far short of the $0.56 per share investors had anticipated.  The Company also slashed its full-year 2015 earnings guidance from $2.20 per share to only $1.85 per share, representing a decline of about 16%.  Contrary to Navient's and the Officer Defendants' prior statements regarding the quality of its private student loan portfolio, the Company attributed the poor quarterly financial results to, among other things, higher than expected losses on its private

student loans.  Navient disclosed that its provisions for delinquent loans had nearly doubled to $191 million for the quarter, and would increase by nearly 50% for the year, which the Company attributed to an increase in the amount of loans exiting deferment status in 2014 and those loans experiencing unfavorable credit trends.  By comparison, Navient's provision for loan losses at the start of the Class Period was only $145 million.

88.    When pressed on what made those loans exiting deferment different than prior years, the Company admitted that a higher percentage of the borrowers exiting deferment had demonstrated difficulty in making payments on prior loans.  In other words, this pool of loans exiting deferment was comprised of borrowers that were significantly less creditworthy than the Company had represented or accounted for by reducing its loan loss provisions.  The Company also disclosed a sharp increase in operating expenses, due in part to increased regulatory compliance costs.

89.    These disclosures caused the price of Navient shares to fall $1.94 per share, or 10.6%, from $18.36 to $16.42.

90.    On August 24, 2015, Navient disclosed that its NSI subsidiary received a Notice and Opportunity to Respond and Advise ("NORA") letter, which is meant to provide advance notice of a potential enforcement action.  Despite the Company's repeated assurances regarding "robust" compliance, the CFPB's enforcement staff has seemingly found enough evidence indicating that Navient violated – and possibly continues to violate – consumer protection laws and regulations.  In the letter, the CFPB warned Navient that it may seek restitution, civil monetary penalties, and corrective action stemming from NSI's customer billing statement disclosures and process for assessing of late fees.

91.     These disclosures caused the price of Navient shares to fall $1.02 per share, or 7.8%, from $13.06 to $12.04.

92.     On October 30, 2015, Navient filed with the SEC its Form 10-Q for the third quarter of 2015.   The Form 10-Q was signed by Defendant Chivavibul and contained certifications by Defendants Remondi and Chivavibul that attested to the purported accuracy and completeness of the 10-Q.   In the quarterly report, the Company touted its "robust compliance culture driven by a 'customer first' approach."

93.     The statements and omissions set forth in ¶92 were materially false and misleading because Navient and the Officer Defendants knew or should have known that: (1) the Company and its subsidiaries were misleading distressed borrowers regarding loan remediation; (2) the Company and its subsidiaries were engaged in improper debt-collection practices; and (3) the Company was not compliant with regulations governing student loan servicers.

94.     Then, on January 7, 2016, Generation Progress—an advocacy organization with close ties to the Obama administration—issued a report recommending that state governments toughen oversight of the student loan servicing industry.   In the report, Generation Progress urged states to enact new laws designed to protect student loan borrowers and to specifically task state officials with helping borrowers resolve complaints against student loan companies.   The report also recommends that state officials require student loan servicers to obtain licenses from each state in which they operate.   Licensing requirements would enable regulators to punish bad actors by revoking their licenses to operate in a particular state.   As the largest servicer of government-backed student loans and given Navient's past misconduct, the report was clearly aimed at curtailing Navient's non-compliance with consumer protection laws designed to protect student loan borrowers.

95.     These disclosures caused the price of Navient shares to fall $0.66 per share, or 6%, from $10.93 to $10.27.

96.     On February 6, 2016, U.S. presidential candidate Hillary Clinton directed public attention to the subject of the CFPB's investigation of Navient during a speech at a student town hall meeting, stating that she was "appalled" by Navient's "outrageous" behavior, and that the Company has been "misleading people" and "doing some really terrible things."

97.     These disclosures caused the price of Navient shares to decline by $0.57, or 5.99%, to close at $8.94 on the following trading day, February 8, 2016.

## LOSS CAUSATION

98.     During the Class Period, as detailed herein, Navient and the Officer Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Navient securities and operated as a fraud or deceit on the Class.   Later, when Navient's and the Officer Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on February 27, 2015, July 13, 2015, August 24, 2015, January 7, 2016, and February 6, 2016 the price of Navient securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Navient securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased: (1) the publicly traded securities of Navient during the Class Period; (2) securities in or traceable to the Company's 2014 Debt Offering; or (3) securities in or traceable to the Company's 2015 Debt Offering (the

"Class").  Excluded from the Class are Defendants and their families, directors, and officers of Navient and their families and affiliates.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Navient has over 362 million shares of common stock outstanding, owned by hundreds or thousands of investors.

101.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)  Whether Navient and the Officer Defendants violated the Exchange Act;

    (b)  Whether Defendants violated the Securities Act;

    (c)  Whether Defendants omitted and/or misrepresented material facts;

    (d)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (e)  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (f)  Whether the prices of Navient securities were artificially inflated;

    (g)  Whether Defendants' conduct caused the members of the Class to sustain damages; and

    (h)  The extent of damage sustained by Class members and the appropriate measure of damages.

102.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

103.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

{FG-W0405224.}

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

105.    Navient's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

106.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Navient who knew that the statement was false.  None of the historic or present tense statements made by Navient or the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Navient or the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

107.    At all relevant times, the market for Navient's securities was an efficient market for the following reasons, among others:

(a)    Navient stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Navient filed periodic public reports with the SEC and NASDAQ;

(c)    Navient regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of

{FG-W0405224.}

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Navient was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

108.    As a result of the foregoing, the market for Navient securities promptly digested current information regarding Navient from all publicly available sources and reflected such information in the price of Navient securities.   Under these circumstances, all purchasers of Navient securities during the Class Period suffered similar injury through their purchase of Navient securities at artificially inflated prices and the presumption of reliance applies.

109.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Navient's and the Officer Defendants' material omissions. Because this action involves Navient's and the Officer Defendants' failure to disclose material adverse information regarding the Company's failure to comply with consumer protection laws—information that Navient and the Officer Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of Navient's compliance with federal regulations and the quality of its private student loan portfolio, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against the Company and the Officer Defendants

110.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

111.    During the Class Period, Navient and the Officer Defendants (the "Section 10(b) Defendants") carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Navient securities at artificially inflated prices.

112.    The Section 10(b) Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Navient securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

114.    During the Class Period, the Section 10(b) Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

{FG-W0405224.}

115.    The Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.    The Section 10(b) Defendants engaged in this misconduct to conceal Navient's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navient securities.   Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Navient securities had been artificially inflated by the Section 10(b) Defendants' fraudulent course of conduct.

117.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

118.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants**

119.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

120.    The Officer Defendants acted as controlling persons of Navient within the meaning of Section 20(a) of the Exchange Act.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Navient, the Officer Defendants

32

had the power and ability to control the actions of Navient and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

**For Violations of Section 11 of the Securities Act Against All Defendants Except Kane**

121.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

122.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Navient securities sold pursuant or traceable to the Offerings, and who were damaged thereby.

123.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

124.    Liability under this Count is predicated on the Officer Defendants' (except for Kane) and the Director Defendants' signing of the Registration Statement for the Offerings, all Defendants' (except for Kane and Wells Fargo) respective participation in the 2014 Debt Offering, which were conducted pursuant to the 2014 Debt Offering Materials, and all Defendants' (except for Kane and RBS) respective participation in the 2015 Debt Offering, which was conducted pursuant to the 2015 Debt Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

{FG-W0405224.}

125.    Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

126.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

## COUNT IV

### For Violations of Section 12(a)(2) of the
### Securities Act Against the Underwriter Defendants

127.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

128.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of all members of the Class who purchased or otherwise acquired Navient securities in and/or traceable to the Offerings and who were damaged thereby.

129.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

130.    The Underwriter Defendants were statutory sellers of Navient securities that were registered in the Offerings pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the 2014 Debt Offering Materials, the Underwriter Defendants (except for Wells Fargo) sold $1 billion in principal amount of notes through the 2014 Debt

{FG-W0405224.}

Offering to members of the Class.  By means of the 2015 Debt Offering Materials, the Underwriter Defendants (except for RBS) sold $500 million in principal amount of notes through the 2015 Debt Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Offerings by means of the materially false and misleading Offering Materials.

131.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

132.    Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

133.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby pursuant to Section 12(a)(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 26, 2016

**FRIEDLANDER & GORRIS, P.A.**

*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
Christopher P. Quinn (Bar No. 5823)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
jgorris@friedlandergorris.com
cquinn@ friedlandergorris.com

*Liaison Counsel for Plaintiff Policemen's
 Annuity & Benefit Fund of Chicago*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff Policemen's Annuity &
Benefit Fund of Chicago*

{FG-W0405224.}