**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al*., Individually and On Behalf of All Others Similarly Situated, | Case No. 1:16-cv-112-GMS |
| | <u>CLASS ACTION</u> |
| Plaintiffs, | |
| v. | |
| NAVIENT CORPORATION, *et al*., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ............................................................. 1

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS .............................................. 3

      A.    The Loan Servicing Industry .................................................. 3

      B.    Navient's Business and Financial Operations........................................... 6

            1.    Loan delinquency rates and provisions for loan losses are important metrics bearing on Navient's financial performance. ............................................................. 6

            2.    Navient's compliance with laws and regulations was critical to its business. ................................................. 8

      C.    Summary of Defendants' Misconduct ...................................... 9

            1.    Defendants Misrepresented Loan Delinquency Rates and, Relatedly, Navient's Provisions for Loan Losses. ......................... 9

            2.    Navient misled investors regarding its compliance with applicable laws and regulations. .................................. 17

            3.    Navient's improper loan servicing practices further led to the lowering of the credit rating on the Company's debt............ 22

            4.    Defendants failed to disclose material information with respect to its credit facilities. ...................................... 24

            5.    Remondi and Chivavibul made misrepresentations in certifications filed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). ............................................................. 26

III.  JURISDICTION AND VENUE ....................................................... 27

IV.   THE EXCHANGE ACT PARTIES....................................................... 27

      A.    Plaintiffs............................................................. 27

      B.    Exchange Act Defendants................................................. 29

            1.    Navient...................................................... 29

            2.    Officer Defendants........................................... 30

V.    ALLEGATIONS SPECIFIC TO THE EXCHANGE ACT CLAIMS ................ 31

      A.    The Exchange Act Defendants Made False or Misleading Statements of Material Fact Throughout the Class Period. .................... 31

            1.    Statements Regarding Risk Management, Delinquencies, Loan Loss Provisions, and Earnings........................................... 31

# TABLE OF CONTENTS
## (continued)

Page

2.  Statements Regarding Legal and Regulatory Compliance .......... 62

3.  SOX Certifications ...................................................................... 65

B.  Previously Withheld Information Began to Emerge in Late February 2015, But the Exchange Act Defendants Continued to Misstate and Omit Material Facts. .......................................... 67

C.  Navient Violated Applicable SEC Rules By Failing to Adequately Disclose Required Information Related to its Liquidity and Financing Arrangements ........................................ 92

D.  Navient Violated U.S. Generally Accepted Accounting Principles ("GAAP") By Failing to Adequately Account for Loan Losses.............. 95

E.  Former Navient Employees Confirm that the Exchange Act Defendants Knowingly or Recklessly Engaged in the Misconduct Detailed in this Complaint. ..................................... 99

F.  Additional Support for the Exchange Act Defendants' Scienter ........... 104

G.  Plaintiffs and Other Class Members Relied on the Exchange Act Defendants' Misrepresentations ........................................... 105

H.  The Exchange Act Defendants Cannot Find Refuge within the PSLRA's "Safe Harbor" or under the "Bespeaks Caution" Doctrine................................................................................ 106

I.  The Exchange Act Defendants' Misstatement and Omissions Caused Plaintiffs' and Other Class Members' Losses. ...................... 112

VI.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.............................. 113

VII.  ALLEGATIONS SPECIFIC TO SECURITIES ACT CLAIMS ..................... 115

A.  Securities Act Defendants.................................................... 116

1.  Navient.................................................................... 116

2.  Individual Securities Act Defendants ....................... 116

3.  Underwriter Defendants........................................... 117

B.  The Offering Documents Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Offering Documents Not Misleading. ................................................. 118

VIII.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................ 126

IX.  CLASS ACTION ALLEGATIONS ................................................. 131

X.  PRAYER FOR RELIEF ................................................................ 133

**TABLE OF CONTENTS**
**(continued)**

**Page**

JURY TRIAL DEMANDED ................................................................................................ 134

**TERMS FOR DEFENDANTS NAMED IN THE COMPLAINT**

| TERM | DEFINITION |
|---|---|
| **Exchange Act Defendants** | Navient Corporation (referenced in the Complaint as "Navient" or the "Company"); John F. ("Jack") Remondi; and Somsak Chivavibul |
| **Securities Act Defendants** | Navient; Remondi; Chivavibul; William M. Diefenderfer, III; Ann Torre Bates; Diane Suitt Gilleland; Linda Mills; Barry A. Munitz; Steven L. Shapiro; Jane J. Thompson; Barry L. Williams; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; J.P. Morgan Securities LLC; RBC Capital Markets, LLC; Barclays Capital Inc.; Goldman, Sachs & Co.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; RBS Securities Inc.; and Wells Fargo Securities, LLC |
| **Individual Securities Act Defendants** | Remondi; Chivavibul; Diefenderfer; Bates; Gilleland; Mills; Munitz; Shapiro; Thompson; and Williams |
| **Officer Defendants** | Remondi and Chivavibul |
| **Director Defendants** | Diefenderfer; Bates; Gilleland; Mills; Munitz; Shapiro; Thompson; and Williams |
| **Underwriter Defendants** | Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; J.P. Morgan Securities LLC; RBC Capital Markets, LLC; Barclays Capital Inc.; Goldman, Sachs & Co.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; RBS Securities Inc.; and Wells Fargo Securities, LLC |

Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund bring this class action on behalf of themselves and other similarly situated investors against Navient, its President and Chief Executive Officer John F. (Jack) Remondi, Chief Financial Officer Somsak Chivavibul, and others for violations of the federal securities laws.  Plaintiffs, through their counsel, have conducted an investigation into the facts supporting the allegations in this Complaint.  These allegations derive from numerous documentary sources[1]  as well as interviews with former Navient employees referenced in this Complaint as confidential witnesses ("CWs").  Plaintiffs believe discovery will elicit further evidentiary support for their allegations.

## I.    NATURE OF THE ACTION

1.    This case arises from false or misleading statements made between April 17, 2014 and December 28, 2015, inclusive (the "Class Period"), with respect to Navient's loan servicing activities, in particular its pervasive and continual practice of concealing from investors the actual level of delinquent or near-delinquent accounts in its portfolio of private education loans.  Specifically, Navient manipulated loan forbearances—temporary reprieves of distressed borrowers' payment obligations—to avoid having to classify loans as delinquent, which masked the true level of troubled accounts in the Company's private education loan portfolio and allowed the Company to report artificially low delinquency rates and, relatedly, provisions for loan losses.  Further, because loan loss provisions were recorded as expenses on Navient's income

---

[1] Those sources consist of (i) filings with the U.S. Securities and Exchange Commission ("SEC") by Navient and related entities; (ii) government reports concerning Navient or related entities; (iii) news articles; (iv) securities analysts' reports about Navient; (v) wire and press releases; (vi) public conference calls concerning Navient; and (vii) additional information readily obtainable on the Internet.

statements, reporting artificially low provisions allowed the Company to report artificially high net interest income.

2.      Navient engaged in additional misconduct that, while distinct from the delinquency and loan loss issues described above, reflects the Company's overall lack of commitment to integrity and compliance with applicable standards for loan servicing. Specifically, as revealed during the Class Period, (i) the U.S. Department of Education ("DOE") determined that Navient's wholly owned subsidiary Pioneer Credit Recovery ("Pioneer") misled borrowers regarding a federal loan rehabilitation program; and (ii) the Consumer Financial Protection Bureau ("CFPB"), which exercises regulatory oversight over the private student loan industry and student loan services, is considering taking legal action against the Company's wholly owned subsidiary Navient Solutions, Inc. ("NSI"), which during the Class Period "service[d] substantially all of the education loans held by the Company, as well as a portfolio of education loans held by Sallie Mae Bank,"[2] regarding NSI's disclosures and assessment of late fees.

3.      As detailed below, Navient's improper loan-servicing practices were contrary to Defendants' representations throughout the Class Period, including in connection with the Company's debt offerings in 2014 and 2015, as identified below (the "2014 Debt Offering" and "2015 Debt Offering," respectively, and collectively, the "Offerings").  In short, Defendants portrayed Navient as a safe, prudent loan servicer that engaged in a careful assessment of the risk level of its private education loan portfolio, employed systematized risk-management procedures, and complied with laws and regulations governing the loan-servicing industry.  The reality, however, was far different.

---

[2] Navient 2014 Form 10-K filed on February 27, 2015 ("2014 Form 10-K"), at 26.

2

4.      The withheld facts ultimately came to light through several partial disclosures, causing significant damages to Plaintiffs and other Navient investors.  Having lost more than $13 million due to Defendants' misconduct, Plaintiffs bring this action to recover those losses and the millions more suffered by other Class members.

5.      Plaintiffs bring two sets of claims in this Complaint, premised on distinct theories of liability:  *First*, Plaintiffs assert fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), as well as SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), against Navient and the other Exchange Act Defendants arising from those Defendants' knowing or reckless issuance of false or misleading statements of material fact in connection with investors' transactions in Navient securities during the Class Period.  *Second*, Plaintiffs assert non-fraud claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77l, and 77o) against Navient and the other Securities Act Defendants arising from untrue statements of material fact in, or omissions of material fact from, the Shelf Registration Statement, prospectuses, and prospectus supplements issued in connection with Navient's 2014 and 2015 Debt Offerings.  Navient and the Individual Securities Act Defendants (i.e., the Company's officers and directors) are strictly liable for those untrue statements or misleading omissions; the Underwriter Defendants are liable as well, because they cannot satisfy their burden to demonstrate they acted reasonably.

6.      The theories of liability asserted in this Complaint, as well as the factual support for Plaintiffs' claims, are summarized below in Section II and further detailed in Section V.

## II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.     The Loan Servicing Industry

7.      The loan servicing industry impacts the lives of millions of Americans.  A September 2015 report resulting from a public inquiry launched in May 2015 by the CFPB and

3

leaders from the DOE and the Treasury Department noted more than 41 million Americans collectively owed more than $1.2 trillion in student loan debt as of the third quarter of 2015, making it the second-largest class of consumer debt (behind mortgages).[3]  Loan servicers manage borrowers' accounts, process monthly payments, manage enrollment in alternative repayment plans, and communicate directly with borrowers, including those in distress, and thus are a "a critical link between borrowers and lenders."[4]

   8. Reflecting both their significance to borrowers and the potential for abuse in loan servicing, servicers generally must comply with applicable federal and state consumer financial laws and regulations, and for certain older federal student loans, regulations promulgated by the DOE and authorized by the Higher Education Act ("HEA").[5]

   9. The CFPB has found "existing evidence—including recent actions by federal regulators and law enforcement agencies—suggests that current servicing practices may not meet

---

[3] Student loan servicing: Analysis of public input and recommendations for reform, Consumer Financial Protection Bureau, September 2015 ("CFPB Report"), at 8, *available at* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.  The report reflects input from (i) "more than 30,000 comments submitted by the public," including more than 8,000 from "individual consumers sharing unique experiences related to student loan servicing" and more than 22,000 comments "from members of the public calling for strong standards to protect student loan borrowers in repayment"; (ii) more than 110 membership organizations in 35 states and the District of Columbia, "submitting comments on behalf of millions of people belonging to organizations representing student loan borrowers, workers, students, communities of color, senior citizens, young people, members of the faith community, and stakeholders in the higher education sector"; (iii) 20 state attorneys general and banking regulators; and (iv) more than 50 organizations "including trade associations representing large depository institutions and specialty student loan market participants, individual participants in the student loan market including banks, credit unions, incumbent student loan servicers, specialty student loan refinance providers, credit counselors, and other providers of consumer financial products and services."  *Id.* at 14.

[4] *Id.* at 3.

[5] *Id.*

the needs of borrowers or loan holders."[6]  The CFPB has received complaints from tens of thousands of borrowers concerning troubling loan servicing practices similar to those described herein that commenters indicate have "create[d] barriers for borrowers experiencing financial hardship who are seeking to avoid default, and may cause significant credit reporting harm."[7] Indeed, "[a] number of commenters draw parallels to mortgage servicing problems experienced by homeowners in the run up to, during, and in the immediate aftermath of the financial crisis," as "[m]acroeconomic conditions declined, unemployment rose, and household balance sheets deteriorated."  As millions of American families struggled to manage mortgage payments and faced foreclosure, federal agencies and financial institutions "deployed mortgage loss mitigation initiatives designed to help borrowers avoid foreclosure," but "[a]s foreclosures spread from borrowers with sub-prime and exotic mortgages to a broader segment of American homeowners, policymakers, consumer advocates, and leaders in the mortgage industry identified certain mortgage servicing practices as a significant source of distress for a growing share of homeowners."[8]  The CFPB further stated that over the previous two years, "senior government officials, federal regulators, state law enforcement agencies, consumer advocates, and others have suggested that the steps taken by policymakers to strengthen servicing protections for homeowners may offer an instructive analogy for policymakers and market participants with regard to the student loan servicing market."[9]

---

[6] *Id.* at 12.  Unless otherwise indicated, all internal citations have been omitted from this Complaint and all emphasis added.

[7] *Id.* at 3-4.

[8] *Id.* at 12.

[9] *Id.* at 13.

B.      **Navient's Business and Financial Operations**

1.      **Loan delinquency rates and provisions for loan losses are important metrics bearing on Navient's financial performance.**

10.      Navient, formed through a 2014 spin-off from SLM Corporation ("Sallie Mae"), is one of the country's largest servicers of student loans, managing nearly $300 billion in loans for more than 12 million customers.  In its 2014 Form 10-K filed with the SEC on February 27, 2015 ("2014 Form 10-K"), the Company stated it held "the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program ('FFELP')," which are insured or guaranteed by state or not-for-profit agencies based on guaranty agreements among the DOE and those agencies, as well as "the largest portfolio of Private Education Loans," i.e., loans to students or their families "that bear the full credit risk of the customer and any cosigner."

11.      Navient services its own portfolio of education loans as well as loans owned by banks, credit unions, non-profit education lenders and the DOE;[10] the Company is one of four large servicers to the DOE under the Department's Direct Student Loan Program.[11]  The Company also provides asset recovery services on its own portfolio (consisting of education loans and other asset classes), and for guaranty agencies, higher-education institutions, the DOE, and other federal clients, as well as states, courts, and municipalities.[12]

12.      Navient's operations are divided into four reportable segments:  (1) FFELP Loans, (2) Private Education Loans, (3) Business Services, and (4) Other.[13]  This case concerns

---

[10] *See* 2014 Form 10-K at 3.

[11] *Id.*

[12] *Id.*

[13] Navient Form 10-Q for 1st Quarter 2014 ("Q1 2014 Form 10-Q") at 54.  Unless otherwise indicated, quarterly financial results are referenced as "Q1 2014," "Q2 2014," etc.

6

the Private Education Loans segment, in which the Company "acquire[s], finance[s], service[s] and historically originated Private Education Loans."[14]  In that segment, the Company "earn[s] net interest income on the Private Education Loan portfolio (after provisions for loan losses) as well as servicing fees, primarily late fees."[15]

13.     During the Class Period, Navient stated its operating results were "primarily driven by net interest revenue from our student loan portfolios (which include financing costs), provision for loan losses, the revenues and expenses generated by our service businesses, and gains and losses on subsidiary sales, loan sales and debt repurchases."[16]  Indeed, in its 2014 Form 10-K, Navient described net income from interest on student loans as "the primary source of cash flow generated by Navient's portfolios of FFELP Loans and Private Education Loans."[17]

14.     Navient identified, among its "key financial measures," provisions for loan losses as well as "charge-offs and delinquencies."[18]  Provisions for loan losses, the Company explained, "represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios."[19]  Those provisions were recorded as an expense on the Company's income statements.

15.     Additionally, Navient identified the "key credit quality indicators" for private education loans as "school type, FICO scores, existence of a cosigner, the loan status and loan seasoning."[20]  While school type and FICO score "are assessed at origination" of the loan, the

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 54-55.

[17] 2014 Form 10-K at 15.

[18] Q1 2014 Form 10-Q at 55.

[19] *Id.* at 7.

[20] *Id.* at 10.  "Seasoning" refers to the number of months in which a payment has been made.

7

other indicators "can change and are incorporated quarterly into the allowance for loan losses calculation."[21]  Delinquencies, the Company further acknowledged, "are an important indicator of the potential future credit performance for Private Education Loans."[22]

16.     Navient also stated that if actual loan performance was worse than currently estimated, "it could materially affect" the estimate of the allowance for loan losses and the related provisions for loan losses in the Company's statements of income "and as a result adversely affect Navient's results of operations."[23]  In other words, materially higher delinquencies could require that Navient increase its allowance for loan losses and provisions for loan losses, which in turn could reduce the Company's income.

17.     Given the impact of loan loss provisions on Navient's financials, delinquency rates were important to investors' assessment of the Company's securities.

### 2.     Navient's compliance with laws and regulations was critical to its business.

18.     Operating in a heavily regulated industry, Navient's compliance with applicable laws and regulations was critical to its business.

19.     The regulations to which Navient was subject included (as reported in the Company's 2014 Form 10-K):

   i.   "various laws governing unfair, deceptive or abusive acts or practices";

   ii.  the Truth-In-Lending Act and Regulation Z issued by the Federal Reserve Banks, which "governs disclosure of credit terms to consumer borrowers";

---

[21] *Id.*

[22] 2014 Form 10-K at 18.

[23] *Id.*

    iii.  the Fair Credit Reporting Act and Regulation V issued by the CFPB, which "governs the use and provision of information to consumer reporting agencies";

    iv.  the Equal Credit Opportunity Act and Regulation B issued by the CFPB, which "prohibits discrimination on the basis of race, creed or other prohibited factors in extending credit";

    v.  the Servicemembers Civil Relief Act ("SCRA"), which "applies to all debts incurred prior to commencement of active military service (including education loans) and limits the amount of interest, including certain fees or charges that are related to the obligation or liability"; and

    vi.  the Telephone Consumer Protection Act, which "governs communication methods that may be used to contact customers."[24]

20.    Unfavorable regulatory action by the CFPB or other regulators could have a materially negative impact on Navient's financial condition or prospects.

**C.**    **Summary of Defendants' Misconduct**

    **1.**    **Defendants Misrepresented Loan Delinquency Rates and, Relatedly, Navient's Provisions for Loan Losses.**

21.    During the Class Period Navient engaged in a widespread and continual practice of concealing from investors the actual level of delinquent or near-delinquent accounts in its portfolio of private education loans.  As confirmed by former Navient employees, the accounts of borrowers who experienced difficulty meeting their payment obligations were recorded as current by means of an excessive and indiscriminate—not "careful," as the Company

---

[24] *Id.* at 13.

represented—use of forbearances, regardless of whether doing so would ultimately serve the borrowers' interests.

22.     Indeed, a former Collections Supervisor who worked at Navient before and during part of the Class Period ("CW 1") recounted that Collections' "objective all of the time was to keep an account current" through using forbearances or other means of postponing payments borrowers were unable to make.  Accordingly, CW 1 explained, "[y]ou would never see us have a goal where it was 'Let's see how much money we can collect this month.'  It was how much can we postpone?  How many forbearances can we slap on [an] account."  CW 1 stated this management directive was conveyed by CW 1's supervisor but came from Troy Standish, Navient District Manager/Senior Vice President of Default Prevention, who reported to John Kane, Navient Group President: Asset Recovery and Business Services.  As a result of those practices, CW 1 explained, borrowers were misled and their accounts "were just growing and growing and growing."

23.     A former Navient Collections Department Supervisor who worked at the Company before and during part of the Class Period and supervised up to 25 Collections Agents ("CW 2") similarly recounted that Christi Hewes, Navient Director of Operations, instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the accounts would show up as "current" on Navient's books, "even though putting [borrowers] into our forbearance for 12 months drastically capitalizes a lot more interest and increases their loan substantially."

24.     Navient senior management knew or recklessly disregarded these improper practices.  A former Navient Collections Support Manager who worked at the Company before and during part of the Class Period ("CW 3") recounted that Navient Collections Department

10

directors, including collection directors of Navient subsidiaries Pioneer and General Revenue

Corporation ("General Revenue"), participated in regular telephonic status meetings with upper

management, including Remondi and Chivavibul.  CW 3 stated John Kane and Director of

Collections Jason Benepe also attended those meetings, which were led by Jeff Mersmann, who

has served as Navient's Vice President of Operations from April 2014 and as Vice President of

Operations at Pioneer since 1997.  CW 3 recounted that those meetings occurred weekly,

monthly, and quarterly.  Before each meeting, CW 3 explained, CW 3 e-mailed "very in-depth"

reports to Mersmann showing (i) delinquency rates, (ii) revenue, (iii) borrowers participating in a

loan-rehabilitation program, (iv) any borrowers who fell out of compliance with rehabilitation

requirements due to missing a loan payment, (v) the number of borrowers who had consolidated

loans, and (vi) the number of borrowers who attempted to consolidate their loans but were unable

to do so.  (CW 3 further recounted that the numbers in the quarterly reports were compared with

the numbers for the same quarter of the previous year.)  CW 3 explained that the reports were

generated through several programs or systems: (i) Excel, both automatically and through

employee input; (ii) Clearview (personalized reports); and (iii) Sharepoint.  The reports, CW 3

recounted, collectively provided Company-wide information.  CW 3 stated that after the reports

were provided to Mersmann, Mersmann presented the numbers to Kane.

   25. Further, Navient management cultivated an incentive structure that encouraged

the widespread use of forbearances and related practices to mask the Company's true exposure to

delinquent accounts.

   26. According to CW 1, for example, employee bonuses went to the collections

agents who processed the most forbearances in a month or sent out the most deferment

paperwork in a month, in addition to collecting the most payments.  CW 1 stated bonuses were

contingent on however many accounts were processed by the agent each month, whether in the form of forbearance or payment.  Bonus payments for agents, CW 1 recounted, started at $300 monthly and went up to $1500 monthly, with management setting a goal each month specific to a particular performance category:  For example, management might set a goal of $22 million in forbearances for the month, spurring collection agents to achieve that amount of forbearances in total.  CW 1 explained that to achieve a good performance rating, agents had just five and a half minutes per phone call with borrowers, during which agents ran down a list of questions concerning family size, whether the borrower worked part or full time, and whether the borrower received assistance, before sending off paperwork to qualify for a deferral due to unemployment; if there were no questions, the agent ended the call at that point.  Further, CW 1 recounted, while the paperwork was in process the loan was put into forbearance.  According to CW 1, "[i]t's not like [the borrower] was getting any information" during these calls about the impact on their balances.

27.     CW 2 similarly recounted that while CW 2 was at Navient, Collections Agents were incentivized by management, in order to be counted "number one by the number of loans [they] had," to "put … [customers] in something that makes them look like they're up to date for a longer period of time, even though by doing that every month the company is making like millions of dollars simply by the interest rate capitalizing," and "if an agent [had] 50 accounts, that [was] the mindset for those 50 accounts."  CW 2 related that it "was negative for the customer.  If the customer call[ed] in requesting the good thing"—i.e., a relatively short forbearance—"we were coached [by management] to coach our agents to do the bad thing" and convince the customer to obtain a longer one.

28.     Thus, as indicated by their nature and confirmed by CWs, the above activities were not sporadic or initiated by rogue low-level employees, but rather reflected systemic policies directed by senior management.

29.     The regular practice of manipulating loan status to conceal delinquent or near-delinquent accounts was significant in light of the importance of delinquency rates and provisions for loan losses (which delinquency rates affected) to Navient's current financial condition and likelihood of achieving its reported financial targets.

30.     Those activities, and the Exchange Act Defendants' knowing or reckless disregard of them, contradicted those Defendants' repeated representations during the Class Period intended to assure investors of the integrity of the Company's loan-servicing standards and the adequacy of its loan loss provisions.

31.     Navient touted, for example, its "superior default prevention performance and industry leading asset recovery services,"[25] representing in its 2014 Form 10-K that the combined portfolio of loans serviced by the Company "experienced a Cohort Default Rate 40 percent lower than the national rate released by ED [i.e., the Department of Education] in September 2014."  Navient further stated it "believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal servicing and risk mitigation practices, as well as our careful use of forbearance and our loan modification programs."

32.     Relatedly, the Information Statement included in Navient's Form 10 filed shortly after its spin-off from Sallie Mae (the "April 2014 Information Statement") highlighted

---

[25] 2014 Form 10-K at 4.

13

"Navient's Strengths," including "[s]trong cash flow generation with ample debt service coverage." In the same regard, noting the Company "primarily earn[s] net interest income on the Private Education Loan portfolio (after provisions for loan losses)," the 2014 Form 10-K represented "[t]his segment is expected to generate significant amounts of cash as the portfolio amortizes." The Company further stated it "possesses a number of competitive advantages that distinguishes it from its competitors," including a "[l]arge, high quality asset base generating significant and predictable cash flows." Navient repeated those sentiments throughout the rest of the Class Period.

33.     Defendants likewise assured investors that Navient's provisions for loan losses were sufficient, and Navient's periodic SEC filings and related announcements of periodic earnings and guidance included statements regarding the rates of delinquency within the Company's loan portfolio, which Defendants repeatedly represented as declining from quarter to quarter due to the Company's efforts to prevent defaults. During a July 17, 2014 earnings call with analysts and investors to discuss its Q2 2014 results and provide earnings guidance for 2014, Remondi emphasized improving performance in Navient's private education loan segment attributable, in significant part, to the Company's "default prevention efforts," stating "[o]ur private loan segment continues to benefit from improving credit metrics, delinquencies and defaults continue to fall hitting six year lows, and driving down credit costs." Remondi further stated the Company's loan-servicing associates "work closely with borrowers to find repayment solutions that not only keep borrowers out of default, but help them make real progress in repaying their debt balances." He added, "Yes, the Great Recession led to higher default rates, but the improving economy and our default prevention efforts are producing significant improvements." During a November 12, 2014 presentation to the Bank of America Merrill

14

Lynch Banking & Financial Services Conference ("BofA-Merrill Conference"), Remondi stated

the student loans owned by the Company had "very strong credit metrics" and the portfolio had

"a far more predictable and stable earnings stream and credit profile."

34.    The above statements, like others detailed in Section V below, were—in light of

the facts discussed above—false or misleading when made.

35.    The false or misleading nature of the Exchange Act Defendants' Class Period

representations regarding the quality of loans in Navient's private student loan portfolio, the

integrity of the Company's practices with respect to delinquencies and defaults, and the

delinquency rates and loan loss provisions the Company reported was revealed in part on July

13, 2015.  After trading closed that day, Navient disclosed in an earnings release that it was

reducing its guidance for 2015 due primarily to the poor performance of its private education

loan portfolio.  Specifically, Navient reduced its "Core Earnings" guidance from $0.56 per share

to $0.40 per share for Q2 2015, and from $2.20 per share to $1.85 per share for fiscal 2015, a

decrease of more than 15%.[26]  Navient explained that private education loans issued to borrowers

who returned to school during the recession and who deferred loan payments until fiscal 2014

were "experiencing unfavorable credit trends compared to loans that exited deferment in prior

years" and therefore required that the Company increase its loan loss provision for the Private

Education Loan segment by *$46 million, or 31.7%, to $191 million*—reducing Core Earnings

and profits.

36.    In response to an analyst's inquiry during a July 22, 2015 earnings conference

call, Remondi revealed that the higher default rate leading to the increase in loan loss reserves

---

[26] As discussed more fully in ¶ 90 below, "Core Earnings" is a non-GAAP metric reflecting adjustments to GAAP financial results for certain items Navient characterizes as "either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management."  *See, e.g.*, 2014 Form 10-K at 46.

15

derived in part from "a higher percentage of these borrowers **who had demonstrated difficulty in making payments** when they were in repayment prior to returning to school than in prior cohorts," which "indicat[ed] that **they were struggling to begin with**."  Remondi also disclosed that Navient had seen an unfavorable trend among the higher-risk private education loan borrowers, noting those borrowers entered and exited deferment multiple times and did not complete their degree.  Remondi further acknowledged "[t]he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher and I think that's what we're seeing [in] this particular cohort."

37.     Remondi's statements during the July 22, 2015 conference call revealed that the developments leading to the Company's disappointing quarterly results were previously known or available to the Exchange Act Defendants.  That is, because the affected borrowers already "had demonstrated difficulty in making payments," indicating "they were struggling to begin with," the Exchange Act Defendants were or should have been aware of those trends.

38.     That is particularly so given that, as supported by CW 3's statements, Remondi, Chivavibul, and other senior Navient executives had access to regular reports detailing delinquency rates and other metrics bearing on the quality of the Company's private student loan portfolio and, in turn, the Company's loan loss provisions during the Class Period.

39.     Investors' reactions to the July 13 and 22, 2015 disclosures confirm they revealed previously withheld material information to the market:

a.     The price of Navient common stock fell $1.94 per share, or 10.6%, from its closing price of $18.36 on July 13, 2015, to close at $16.42 on July 14, 2015, on unusually high trading volume.  During the same period, Navient 5.875% Senior Notes due 2021 declined

16

1.75 or 1.75%; Navient 5.875% Senior Notes due 2024 declined $2.25, or 2.41%; and Navient 5% Senior Notes declined $2.30 or 2.33%.

b.      The price of Navient common stock fell $0.37 per share, or 2.2%, from its closing price of $16.60 on July 21, 2015, to close at $16.23 on July 22, 2015.  During the same period, Navient 5.875% Senior Notes due 2024 declined $3.25 or 3.51%; and Navient 5% Senior Notes declined $1.56, or 1.64%.

40.      As purchasers of Navient stock or notes, Plaintiffs and other Class members were damaged as a result of the drop in the prices of Navient securities caused by the above partial revelations of the Exchange Act Defendants' misconduct.

**2.      Navient misled investors regarding its compliance with applicable laws and regulations.**

41.      Navient also misled investors regarding its compliance with laws and regulations governing loan servicing, as revealed by announcements of actual or potential government action.

42.      *First*, on February 27, 2015, the DOE announced it would terminate its contracts with Navient's wholly owned subsidiary Pioneer and four other private collection agencies following a review by the Department's Federal Student Aid office ("FSA"), which "found that agents of [Pioneer and the other subject entities] made materially inaccurate representations to borrowers about the loan rehabilitation program."[27]  Under the program, a borrower can rehabilitate a defaulted federal loan only once, and upon doing so the default status is removed from the loan and the borrower regains eligibility for loan benefits that were available before defaulting, such as deferment, forbearance, repayment plan choices, loan forgiveness, eligibility

---

[27] *U.S. Department of Education to End Contracts with Several Private Collection Agencies*, U.S. Department of Education, Feb. 27, 2015, *available at* http://www.ed.gov/news/press-releases/us-department-education-end-contracts-several-private-collection-agencies.

for additional federal student aid, and removal of the default record on the borrower's credit

history.  The agencies "were found to have given inaccurate information at unacceptably high

rates about" the program—in particular, they "gave borrowers misleading information about the

benefits to the borrowers' credit report and about the waiver of certain collection fees."[28]

43.     Further, before the market opened on the next trading day, March 2, 2015, *Inside*

*Higher Ed* published an article about the DOE's cancellation of contracts with Pioneer and the

other collection agencies, noting the decision was part of a "crackdown" on Navient and

reporting that Representative Chris Collins, a Republican who represents the upstate New York

district where Pioneer operates, told *The Buffalo News* that the DOE's decision to end Pioneer's

contract "would lead to the loss of about 400 jobs at the company.[29]

44.     *Second*, after the market closed on August 24, 2015, Navient disclosed in an SEC

Form 8-K that Navient's wholly owned subsidiary NSI recently received a letter from the CFPB

stating that its Office of Enforcement was "considering recommending that the CFPB take legal

action against NSI" relating to "NSI's disclosures and assessment of late fees and other matters"

and further stating "that, in connection with any action, the CFPB may seek restitution, civil

monetary penalties and corrective action against NSI."

45.     On September 29, 2015, the CFPB issued its Report (discussed above) that was

highly critical of student loan servicing companies such as Navient.  The Report, which drew

from a voluminous record compiled in response to an inquiry into student loan servicing

practices launched by the CFPB in conjunction with the DOE and the Treasury Department,

discussed complaints of widespread loan servicing problems.

---

[28] *Id.*

[29] Michael Stratford, *Feds Fire 5 Debt Collectors*, Inside Higher Ed., Mar. 2, 2015, *available at* https://www.insidehighered.com/news/2015/03/02/us-ends-contract-5-debt-collectors-citing-misrepresentations-borrowers.

46.     On October 14, 2015, the CFPB released its Annual Report of the CFPB Student

Loan Ombudsman for 2015, analyzing approximately 6,400 private student loan complaints

submitted to the Bureau between October 1, 2014 and September 30, 2015, a 23% increase

compared to 2014.  Complaints concerning Navient accounted for 1,724, or ***approximately 26%***,

of the total complaints submitted.  According to the report, private student loan borrowers

complained of servicing problems, "including lack of access to timely and accurate information

on availability or eligibility criteria to enroll in alternative repayment programs."

47.     The revelations in the CFPB reports, as detailed in ¶¶ 7-9, 46 above, belied the

Exchange Act Defendants' numerous Class Period representations touting the Company's

"robust compliance culture driven by a 'customer first' approach."[30]  The April 2014 Information

Statement, for example, represented that the Company "invest[s] in rigorous training programs,

internal and external auditing, escalated service tracking and analysis, and customer research to

enhance our compliance and customer service."  Similarly, Navient's April 17, 2014 SEC Form

8-K included as an exhibit to an April 2014 presentation titled "Navient Investor Roadshow," in

which the Company said it "[d]emonstrated FFELP compliance and preserved federal loan

guarantee" and possessed the "[o]perational and technical expertise and capacity to adapt to [a]

new regulatory environment."  During his November 12, 2014 presentation to the BofA-Merrill

Conference, Remondi likewise claimed "we have a strong compliance culture, an infrastructure,

a control infrastructure around our business" and attributed Navient's "superior performance" to

its contact with customers and counseling them to enroll in an appropriate repayment program.

---

[30] Q1 2014 Form 10-Q at 38.

48.     Those revelations of improper loan-servicing activities are consistent with former

Navient employees' accounts of additional compliance failures during the Class Period, which

reflected a culture of non-compliance at Navient.

49.     CW 3 recounted Navient's systemic mishandling of loans of active

servicemembers.  Under the SCRA—which, as described below, the U.S. Department of Justice

("DOJ") and other federal agencies accused Navient of violating, resulting in a $60 million

settlement—members of the military are eligible for certain benefits and protections, including a

6% interest-rate cap on their student loans.  According to CW 3, "[t]here were no processes in

place to properly handle the military borrower accounts."  CW 3 noted that "when you were told

that a borrower is in the active military, they are deployed or something like that, at that point the

borrower should be noted" but that "there was nothing in [Navient's] system to follow such

protocol."  Rather, CW 3 explained, "all of the collectors were directed to try to get authorization

to speak to somebody else to collect on the debt still as regular" such as having the borrower's

spouse make payments, instead of actually handling the account in accordance with regulations.

CW 3 recounted raising the issue with a Senior Collections Manager before the Class Period but

the Senior Collections Manager indicated they had no accounts of active military borrowers.

CW 3 then raised the same issue with the Senior Collections Manager's superior, as well as Jeff

Mersmann, both of whom claimed they had not received any requests with respect to active

military borrowers and indicated they felt they had nothing to worry about.

50.     CW 3 recalled that Navient's mishandling of military borrowers' loans came to a

head years later, in or around September 2014, because the Company had received complaints

about its servicing of such accounts.  CW 3's boss at the time, a Senior Collections Support

Manager for General Revenue and Pioneer, met with CW 3 and the Collections Support Manager

for Pioneer and, in September 2014, they worked on a "back office project setting up a process where Navient borrowers were actually scanned to see if they were active military." CW 3 indicated a third-party agency was hired to assist in setting up the process and Navient paid for and checked a certain website for active military members. According to CW 3, "the practice was just getting started." CW 3 recalled one account with Texas Guaranty involving an active military borrower who had a "cease and desist for collection," yet, "every single month, I would redeem the account again and the interest rate would be right back up to I believe it was 12.5 percent." CW 3 further explained, "The system just wasn't set to deal with it, so every month I was fighting with our IT department on this borrower[.]" CW 3 indicated Navient had not completely resolved the problems in managing active military accounts by the time CW 3 departed the Company *in February 2015*, i.e., long after it settled with the DOJ.

51.     CW 1 also recounted that Navient did not apply deferments and forbearances to the accounts of military borrowers on time.

52.     CW 3 further stated Navient's training department instructed Collections personnel to explain loan consolidation in an unclear manner to borrowers.

53.     Investors' reactions to the disclosures in ¶¶ 42-45 above confirm they revealed previously withheld material information to the market:

     a.     In response to the disclosures on February 27 and March 2, 2015, the price of Navient common stock declined $1.89 per share, or 8.8%, from its close of $21.40 on February 27, 2015 to close at $19.51 on March 2, 2015, on unusually heavy trading volume of more than 10 million shares. During the same period, Navient 5.875% Senior Notes due 2024 declined $1.52, or 2%, and Navient 5% Senior Notes declined $2.00, or 2%.

21

b.      In response to the discloses on August 24, 2015, the price of Navient

common stock fell $1.02 per share, or 7.8%, from its closing price of $13.06 on August 24, 2015,

to close at $12.04 per share on August 25, 2015, on unusually heavy trading volume.

c.      Following the CFPB report's release on September 29, 2015, the price of

Navient's common stock fell $0.53 per share, or 4.4%, from its closing price of $12.16 on

September 28, 2015, to close at $11.63 on September 29, 2015, on unusually heavy trading

volume.  Navient's stock price continued to fall over the next two trading days to close at $10.96

per share on October 1, 2015.  Around the same period, Navient's 5% Senior Note declined

$5.75, or 6.35%, from its close of $90.50 on September 28, 2015 to close at $84.75 on

September 29, 2015.  The 5% Senior Notes continued to decline over the next trading sessions

for a total decline of $10.50, or 11.6%, from its close of $90.50 on September 28, 2015 to close

at $80.00 on October 2, 2015.  Additionally, the price of Navient's 5.875% Senior Notes due

2021 fell $2.38, or 2.75%, from its close of $86.25 on September 29, 2015 to close at $83.875 on

September 30, 2015; and the price of Navient's 5.875% Senior Notes due 2021 declined $10.20,

or 11.9% from its close of $86.25 on September 29, 2015, to close at $75.958 on October 2,

2015.

54.      As purchasers of Navient stock or notes, Plaintiffs and other Class members were

damaged as a result of the drop in the prices of Navient securities caused by the above partial

revelations of the Exchange Act Defendants' misconduct.

### 3.      Navient's improper loan servicing practices further led to the lowering of the credit rating on the Company's debt.

55.      In addition to the partial corrective disclosures identified above, the risks posed

by Navient's improper loan servicing practices materialized in the lowering of the credit rating

on debt issued by the Company.

56.     On December 21, 2015, Standard & Poor's Rating Services ("S&P") issued a report revising its outlook on Navient to negative from stable and lowering its senior unsecured debt rating to BB- from BB, "reflect[ing] Navient's significant unsecured debt maturities coming due over the next five years relative to its unencumbered assets, including $1.2 billion in 2016, $1.8 billion in 2017, and $2.8 billion in 2018."  Lowering the senior unsecured debt rating "reflect[ed] [S&P's] expectation that Navient's tangible unencumbered assets, which were $9.9 billion as of Sept. 30, 2015, for the next several years likely will remain less than its outstanding unsecured debt, which was $15.8 billion as of the same date."  S&P cited Navient's "significant unsecured debt maturities coming due over the next five years relative to its unencumbered assets"—which, according to the Company's Q3 2015 Form 10-Q, "consist[ed] primarily of Private Education Loans and other assets."  The collective value of those Private Education Loan assets was significantly lower than Defendants had led the market to believe, as reflected in the ***31.7% increase*** in the Company's loan loss provisions that was disclosed in July 2015.

57.     Following that news, the price of Navient common stock fell approximately 1.8% over two trading days to close at $11.70 on December 21, 2015.  During the same period, Navient 5.875% Senior Notes due 2021 declined $0.63, or 0.68%; Navient 5.875% Senior Notes due 2024 declined $3.38 or 3.95%; and Navient 5% Senior Notes due 2020 declined $1.13, or 1.27%.

58.     As purchasers of Navient stock or notes, Plaintiffs and other Class members were damaged as a result of the drop in the prices of Navient securities caused by the above partial revelation of the Exchange Act Defendants' misconduct.

### 4. Defendants failed to disclose material information with respect to its credit facilities.

59.     Defendants also failed to disclose information regarding Navient's credit

facilities.

60.     On October 20, 2015, Navient issued a release announcing its financial results for

the quarter ended September 30, 2015, including disclosing a significant reduction in the

capacity of the Company's credit facilities.  Specifically, the Company announced that as of

September 30, 2015, June 30, 2015 and September 30, 2014, the maximum additional capacity

under those facilities was $10.1 billion, $11.5 billion and $11.0 billion, respectively, whereas for

the three months ended September 30, 2015, June 30, 2015 and September 30, 2014, the average

maximum additional capacity under the facilities was $11.0 billion, $12.2 billion, and $10.8

billion, respectively.  For the nine months ended September 30, 2015 and 2014, the average

maximum additional capacity under the facilities was $12.0 billion and $11.6 billion,

respectively.

61.     On December 28, 2015—the last day of the Class Period—Navient filed an SEC

Form 8-K revealing that on December 22, 2015, the Company's wholly owned subsidiary HICA

Education Loan Corporation ("HICA") received a notice from the Federal Home Loan Bank of

Des Moines ("FHLB-DM") stating "availability under the FHLB-DM Credit Facilities would be

reduced from approximately $10.7 billion to approximately $5.0 billion for the period from

December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for

advances maturing after October 31, 2016."  Navient explained that the FHLB-DM Credit

Facilities and other credit facilities support the Company's acquisition of FFELP loans and that

FHLB-DM's action "will result in a reduction of aggregate borrowing availability under the

FHLB-DM Credit Facilities and the other credit facilities available to the Company and its

24

subsidiaries as of the date of this Current Report from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof." In other words, as a result of the FHLB-DM action, Navient will be able to borrow only an additional $2.5 billion under its existing credit lines of which Navient has already drawn down 87%, likely resulting in an adverse impact on the liquidity, capital resources and borrowing costs for Navient.

62.    Navient's claims in its Form 8-K that the FHLB-DM action was "due to an internal policy change in the formula the FHLB-DM uses to set a borrower's maximum borrowing limit" was misleading as it was inconsistent with the explanation the Company later provided in its 2015 Form 10-K, filed with the SEC on February 25, 2016, that the FHLB-DM action was related to the January 2016 publication by the Federal Home Finance Agency's ("FHFA") of a final rule (which rule was initially proposed and published in the Federal Register in September 2014) preventing non-eligible entities from gaining membership with a Federal Home Loan Bank ("FHLBank") through the use of a captive insurer.[31]  As described below, a number of media outlets reported that FHLB-DM's action was linked to widely publicized criticism from Senator Elizabeth Warren beginning in 2013 that government-sponsored banks such as FHLB-DM should not lend taxpayer-backed funds—whose use was intended to make

---

[31] *See* Navient Form 10-K for year ending December 31, 2016 at 92; *see also FHFA Issues Final Rule on Federal Home Loan Bank Membership*, FHFA website, Jan. 12, 2016, *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Issues-Final-Rule-on-Federal-Home-Loan-Bank-Membership.aspx, and Federal Housing Finance Agency, *Member of Federal Home Loan Banks, Final Rule*, 12 CFR 1263, RIN 2590-AA39, *available at* https://www.fhfa.gov/SupervisionRegulation/Rules/RuleDocuments/Membership%20Final%20Rule%20to%20Fed%20Reg.pdf ("FHFA published a proposed rule in the Federal Register on September 12, 2014.[]  It proposed to make two fundamental changes to the Bank membership regulation, as well as several other substantive, but less fundamental, changes, and numerous non-substantive revisions to clarify various existing regulatory provisions.").

1319916.1

homeownership more affordable—at favorable terms to student loan companies, especially when the savings were not being passed on to student loan borrowers.

63.     The FHLB-DM credit facilities were a significant source of low-cost borrowings for Navient to acquire FFELP loans.  The facilities had a material impact on and were integral to the Company's liquidity and financial performance because of the favorable net interest margin. Navient failed to adequately disclose to investors, however, that the government's intense scrutiny of the facilities which began in 2013, together with the FHFA's proposed rule in 2014 to amend FHLBank membership requirements and the overall decline in the Company's performance created a significant risk that the amounts available under such credit facilities would be reduced and Navient's borrowing costs would dramatically rise, thereby adversely affecting the Company's liquidity, capital resources, and financial performance.

64.     In response to the news on December 28, 2015, Navient's stock price fell $1.15 per share, or 9.1%, from its closing price of $12.61 on the previous trading day (December 24, 2015) to close at $11.46 per share, on unusually high trading volume.

65.     As a result of the misconduct summarized above and further detailed below, Defendants are liable under the federal securities laws.

### 5.     Remondi and Chivavibul made misrepresentations in certifications filed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

66.     As further detailed below, Remondi and Chivavibul signed statements included in Navient's periodic SEC filings attesting that, among other things, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

26

67.     The statements set forth in the SOX certifications were, in light of the facts discussed above, false or misleading when made.

68.     The false or misleading nature of the SOX certifications was revealed through the partial disclosures identified above.

69.     As a result of the misconduct summarized above and further detailed below, Defendants are liable under the federal securities laws

## III.     JURISDICTION AND VENUE

70.     This Court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

71.     Venue is proper in this District in accordance with Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22(a) of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1391(b).  Navient is headquartered in this District and many of the acts and practices alleged in this Complaint occurred in substantial part in this District.

72.     In connection with the misconduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.     THE EXCHANGE ACT PARTIES

### A.     Plaintiffs

73.     Plaintiff Lord Abbett Affiliated Fund, Inc. is a diversified, open-end management-investment company registered under the Investment Company Act of 1940, as amended ("Investment Company Act").  The Fund was organized in 1934 and was reincorporated under Maryland law in 1975.

27

74.     Plaintiff Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund is diversified, open-end management-investment company registered under the Investment Company Act.  The Fund is a series of Lord Abbett Equity Trust, a Delaware statutory trust organized on May 1, 2001.

75.     Plaintiff Lord Abbett Bond-Debenture Fund, Inc. is an open-end management-investment company registered under the Investment Company Act.  The Fund was organized in 1970 and was incorporated under Maryland law in 1976.

76.     Plaintiff Lord Abbett Investment Trust – Lord Abbett High Yield Fund is a diversified investment company registered under the Investment Company Act.  The Fund is a series of the Lord Abbett Investment Trust, a Delaware statutory trust organized on August 16, 1993.

77.     The Lord Abbett Funds were managed during the Class Period by (and continue to be managed by) Lord, Abbett & Co. LLC ("Lord, Abbett & Co."), located at 90 Hudson Street, Jersey City, NJ 07302.  Lord, Abbett & Co. caused each of the Lord Abbett Funds to transact in Navient securities during the Class Period, and each of the Funds owned the securities it acquired, respectively, through those transactions.

78.     By Order entered on June 30, 2016 (Dkt. No. 32), this Court appointed the Lord Abbett Funds as Lead Plaintiff in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA").  As set forth in the Funds' certification filed in connection with their motion for appointment as Lead Plaintiff (Dkt. No. 14 (Ex. 1)), Plaintiffs purchased Navient common stock and notes during the Class Period and, as a result of Defendants' misconduct alleged in this Complaint, suffered losses in connection with those purchases.

B.    **Exchange Act Defendants**

1.    **Navient**

79.    On May 29, 2013, Sallie Mae announced it would separate into two distinct publicly-traded entities—an education loan management business named "Navient" and a consumer banking business named "SLM BankCo."  The separation was effected through the distribution of the common stock of Navient, which was formed to hold the assets and liabilities associated with Sallie Mae's education loan management business (the "Spin-Off").  All existing secured and unsecured debt of Sallie Mae became the obligations of Navient.

80.    In preparation for the Spin-Off, on April 10, 2014, Sallie Mae filed on Form 10 with the SEC a final amendment to Navient's registration statement to be used to conduct the Spin-Off.  The April 10, 2014 filing included as an exhibit an Information Statement to be used by investors in valuing Navient's publicly-traded securities.  The Information Statement explained that Navient would be treated as the "accounting successor" to Sallie Mae and, as a result, "the historical financial statements of Existing SLM will become the historical financial statements of Navient."

81.    On April 10, 2014 the Sallie Mae board of directors approved the Spin-Off and on April 17, 2014, Navient's stock began trading on the NASDAQ under the symbol "NAVI" on a "when-issued" basis.  On April 30, 2014, the Spin-Off was completed via a distribution by Sallie Mae of all the shares of common stock of Navient to the shareholders of Sallie Mae common stock, on a one-to-one basis, as of the close of business on April 22, 2014.  Navient became an independent, publicly traded company, with its common stock trading "regular way" on the NASDAQ beginning on May 1, 2014.  On October 16, 2014, Navient merged with its wholly owned subsidiary Navient, LLC (a subsidiary created for purposes of effectuating the Spin-Off),

29

with Navient as the surviving corporation.  At the time of the Spin-Off, Navient was servicing more than $300 billion in student loans for more than 12 million borrowers.

82.     As of March 31, 2015, Navient had more than 389 million shares issued and outstanding.  The Company also has publicly traded debt that trades under various ticker symbols on the NASDAQ.

## 2.     Officer Defendants

83.     Defendant John F. (Jack) Remondi served at all relevant times as Navient's President and CEO, as well as a director and a member of the Navient board's Executive Committee.  Remondi served as Sallie Mae's President and CEO from May 2013 to April 2014, President and Chief Operating Officer from January 2011 to May 2013, and Vice Chairman and Chief Financial Officer from January 2008 to January 2011.  Remondi previously worked at Nellie Mae as its CFO before the company was acquired by Sallie Mae in 1999.  Remondi continued to work at Sallie Mae in various positions, leaving in 2005 to become a portfolio manager of PAR Capital Management, a Boston-based private investment management firm, and later rejoined Sallie Mae in 2008 as Vice Chairman and CFO and was named CEO in 2013, after having held the role of President and COO and leading the company's loan servicing, collections, information and communications divisions.

84.     Defendant Somsak Chivavibul served at all relevant times as Navient's Executive Vice President and CFO.  Chivavibul joined Sallie Mae in 1992 and worked in various positions at the company.  He previously worked at Ernst & Young and is an accountant.  As stated on Navient's website, Chivavibul is "responsible for directing finance, accounting, treasury, and investor relations."[32]  He "was involved with many of most important events at Sallie Mae from

---

[32] *See* https://www.navient.com/about/who-we-are/leadership/somsak-chivavibul/.

the privatization of Sallie Mae from its government sponsored enterprise status to the recent

spin-off of Navient from Sallie Mae," and "[i]n the process, [he] developed extensive experience

in business and transaction modeling, corporate and portfolio acquisitions, financial analysis and

management reporting."[33]

## V.      ALLEGATIONS SPECIFIC TO THE EXCHANGE ACT CLAIMS

### A.      The Exchange Act Defendants Made False or Misleading Statements of Material Fact Throughout the Class Period.

85.     The Exchange Act Defendants repeatedly made false or misleading statements of

material fact during the Class Period.  These statements fall into three general categories:  (i)

statements in SEC filings or other public documents reporting the level of delinquencies in the

Company's loan portfolio as well as Navient's provisions for loan losses and the Company's

earnings, which often included representations touting Navient's risk-management practices as

well as its commitment to "customer success" and "default prevention"; (ii) representations

attesting to the Company's compliance with laws and regulations; and (iii) certifications by

Remondi and Chivavibul pursuant to Sections 302 and 906 of SOX.[34]  For the reasons

summarized in Section I above and detailed further in Section V below, those statements were

false or misleading when made, which the Exchange Act Defendants knew or recklessly

disregarded.

### 1.      Statements Regarding Risk Management, Delinquencies, Loan Loss Provisions, and Earnings

86.     From the start of the Class Period, the Exchange Act Defendants touted Navient's

purported commitment to "customer success" through facilitating "default prevention."  The

---

[33] *Id.*

[34] While Plaintiffs have attempted to categorize the subject misrepresentations mostly for ease of reference, the misrepresentations sometimes do not fall solely into one category.  Accordingly, these categorizations are not intended to limit the scope of any of the misrepresentations.

April 2014 Information Statement issued in connection with the Spin-Off stated, in a section

titled "Navient's Approach to Assisting Students and Families in Repaying their Education

Loans," that Navient placed an emphasis on "providing service with accuracy, courtesy,

consistency and empathy" and that "[i]f we fall short, we make it a priority to correct our

mistake, and we make it a priority to prevent it from happening again."  Navient further

represented that "[t]o help customers manage" the "realities" of transitioning from school to full

repayment, the Company "makes customer success and default prevention top priorities," adding

"[c]ontact and counseling keep customers on track, and we believe we go beyond what is

required in our efforts to assist customers with past-due student loan payments."

87.     Navient repeated substantially similar representations in its Q1 2014 Form 10-Q

issued on May 9, 2014.

88.     During a July 17, 2014 conference call with analysts and investors to discuss its

Q2 2014 results and to provide earnings guidance for 2014, Defendant Remondi emphasized

improving performance in Navient's private education loan segment attributable, in significant

part, to Navient's "default prevention efforts":

> ***Our private loan segment continues to benefit from improving
> credit metrics, delinquencies and defaults continue to fall*** hitting
> six year lows, and driving down credit costs.  ***Our loan servicing
> associates work closely with borrowers to find repayment
> solutions that not only keep borrowers out of default, but help
> them make real progress in repaying their debt balances***.
>
> * * *
>
> In addition, each week we help nearly 1,200 borrowers rehabilitate
> their loans.  Our expertise and efforts allow us to identify high-risk
> customers, and enroll them in repayment programs they can
> manage and avoid default.  9 out of 10 times when we connect
> with a borrower who is having difficulty repaying their loans, we
> provide a solution such as an income-driven repayment program
> that gets them back on track, and avoiding default.

32

\* \* \*

> Yes, the Great Recession led to higher default rates, but the improving economy and ***our default prevention efforts are producing significant improvements***.

89.     The April 2014 Information Statement also claimed that (i) Navient's allowance for loan losses was maintained at a "sufficient" level to cover expected charge-offs, (ii) management monitors and "focuses on delinquencies" and the progression of such loans, (iii) losses in private education loans are determined by specific risk characteristics, and (iv) Navient's Loan Loss Reserve Committee oversees the sufficiency of Navient's loan loss reserves:

### Provisions for Loan Losses

Management estimates and maintains an allowance for loan losses at a level sufficient to cover charge-offs expected over the next two years, plus an additional allowance to cover life-of-loan expected losses for loans classified as a troubled debt restructuring ("TDR"). The provision for loan losses increases the related allowance for loan losses. Generally, the allowance/or loan losses rises when charge-offs are expected to increase and falls when charge-offs are expected to decline. Our loss exposure and resulting provision for losses is small for FFELP Loans because we generally bear a maximum of three percent loss exposure on them. We bear the full credit exposure on our Private Education Loans. Our provision for losses in our FFELP Loans segment was $52 million in 2013 compared with $72 million in 2012. Losses in our Consumer Lending segment are determined by risk characteristics such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months in active repayment), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. Our provision for loan losses in our Consumer Lending segment was $787 million in 2013 compared with $1.0 billion in 2012.

### Charge-Offs and Delinquencies

When we conclude a loan is uncollectible, the unrecoverable portion of the loan is charged against the allowance for loan losses in the applicable segment. Charge-off data provides relevant information with respect to the performance of our loan portfolios.

33

Management focuses on delinquencies as well as the progression
of loans from early to late stage delinquency.  The Consumer
Lending segment's charge-off rate was 2.8 percent of loans in
repayment in 2013 compared with 3.4 percent of loans in
repayment in 2012.  Delinquencies are a very important indicator
of potential future credit performance.  Private Education Loan
delinquencies as a percentage of Private Education Loans in
repayment decreased from 9.3 percent at December 31, 2012 to 8.3
percent at December 31, 2013.

\*       \*       \*

**Risk Management Roles and Responsibilities**

\*       \*       \*

Loan Loss Reserve Committee.  Our Loan Loss Reserve
Committee will oversee the sufficiency of our loan loss reserves
and will consider current or emerging issues affecting delinquency
and default trends which may result in adjustments in our
allowances for loan losses.

90.     During the Class Period, Navient also reported strong financial results driven

primarily by net interest income received from its student loan portfolios.  In addition to

reporting earnings and other financial and operating information under GAAP, the Company

reported earnings on a non-GAAP "Core Earnings" basis, which it described as follows:

"Core Earnings" are not a substitute for reported results under
GAAP.  We use "Core Earnings" to manage each business
segment because "Core Earnings" reflect adjustments to GAAP
financial results for three items, discussed below, that are either
related to the Spin-Off or create significant volatility mostly due to
timing factors generally beyond the control of management.
Accordingly, we believe that "Core Earnings" provide
management with a useful basis from which to better evaluate
results from ongoing operations against the business plan or
against results from prior periods.  Consequently, we disclose this
information because we believe it provides investors with
additional information regarding the operational and performance
indicators that are most closely assessed by management.  When
compared to GAAP results, the three items we remove to result in
our "Core Earnings" presentations are:

34

1. The financial results attributable to the operations of the consumer banking business (SLM BankCo) prior to the Spin-Off and related restructuring and reorganization expense incurred in connection with the Spin-Off. For GAAP purposes, Navient reflected the deemed distribution of SLM BankCo on April 30, 2014. For "Core Earnings," we exclude the consumer banking business as if it had never been a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014;

2. Unrealized mark-to-market gains/losses resulting from our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness; and

3. The accounting for goodwill and acquired intangible assets.

Old SLM's definition of "Core Earnings" did not exclude the financial results attributable to the operations of the consumer banking business and related restructuring and reorganization expense incurred in connection with the Spin-Off.  In the second quarter of 2014, in connection with the Spin-Off, Navient included this additional adjustment as a part of "Core Earnings" to allow better comparability of Navient's results to pre-Spin-Off historical periods.  All prior periods in this Annual Report on Form 10-K have been restated to conform to Navient's revised definition of "Core Earnings."[35]

91. On April 16, 2014, Sallie Mae, of which Navient remained a part until the Spin Off transaction was completed on April 30, 2014, issued a press release announcing its financial results for its first quarter ended March 31, 2014.  The press release emphasized improved performance of its Private Education Loans portfolio, claiming "***Private Education Loan Charge-off Rates Down from the Year-Ago Quarter to 2.8 Percent,***" and "***Private Education Loan 90-Day Delinquency Rate Drops to Percent, Lowest Level Since 2008.***"

92. Sallie Mae described the improved performance of its Private Education Loans portfolio and reported an increase in Core Earnings in Q1 2014 in that segment compared with

---

[35] 2014 Form 10-K at 46.

the same period a year ago, which Sallie Mae attributed primarily to a decrease in its loan loss

provisions:

> Quarterly core earnings were $118 million, compared with $87 million in the year-ago quarter.  The increase is primarily the result of a $50 million decrease in the provision for private education loan losses.
>
> First-quarter 2014 private education loan portfolio results vs. first-quarter 2013 included:
>
> • Loan originations of $1.5 billion, up 8 percent.
>
> • Delinquencies of 90 days or more of 3.4 percent of loans in repayment, down from 3.9 percent.
>
> • Total delinquencies of 6.9 percent of loans in repayment, down from 7.8 percent.
>
> • Loans in forbearance of 3.7 percent of loans in repayment and forbearance, up from 3.4 percent.
>
> • Annualized charge-off rate of 2.8 percent of average loans in repayment, down from 3.0 percent.
>
> • Provision for private education loan losses of $175 million, down from $225 million.
>
> • Core net interest margin, before loan loss provision, of 4.34 percent, up from 4.15 percent.
>
> • The portfolio balance, net of loan loss allowance, was $38.2 billion, up 2 percent.

93.     Remondi stated in the release, "We're also pleased that this quarter set a six-year-

record low in delinquencies, reflecting our strong underwriting and customer support."

94.     The release also discussed the capacity of the company's "FFELP Loans – other

facilities" secured credit facilities:

> As of March 31, 2014, December 31, 2013 and March 31, 2013, the maximum additional capacity under these facilities was $12.7 billion, $10.6 billion and $9.8 billion, respectively.  For the three months ended March 31, 2014, December 31, 2013 and March 31,

36

2013, the average maximum additional capacity under these facilities was $12.3 billion, $11.1 billion and $10.8 billion, respectively.

95.     On April 17, 2014, Sallie Mae held a conference call with analysts and investors during which Chivavibul reiterated the financial results reported in the press release issued on the same day.  Additionally, Remondi commented favorably on the performance of the company's Private Education Loan segment:

> We saw 90-day delinquencies fall to 3.4% from 4.1% at year end and 3.9% a year ago.  And as Joe [De Paulo (Executive Vice President, Banking and Finance)] said charge-offs fell to an annualized rate of 2.8%.  As a result we are able to lower our provision for future loan losses to $175 million down from $225 million in the year ago quarter.

96.     On May 9, 2014, Navient—whose stock began trading regularly on NASDAQ on April 30, 2014 after completion of the Spin-Off—filed a Form 10-Q with the SEC for Q1 2014, reiterating the financial results reported on April 16, 2014 and, again, emphasizing improvements in the performance of its Private Education Loan portfolio.  The Company noted its provisions for loan losses "declined $56 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs."

97.     Navient further represented in the Form 10-Q that its provisions for loan losses "represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios," and the Company believed its allowance for loan losses was "appropriate to cover probable losses incurred in the loan portfolios."

98.     The Form 10-Q also disclosed that Navient's wholly owned subsidiary NSI (f/k/a Sallie Mae Inc.) had received Civil Investigative Demands ("CIDs") from the CFPB as part of an

37

1319916.1

investigation regarding allegations relating to Navient's disclosures and assessment of late fees.

According to Navient, it had recently commenced discussions with the CFPB regarding those

issues.

99.     Also on May 9, 2014, Navient provided the following update in an SEC Form 8-K

regarding government and regulatory actions and proceedings against Navient-related entities,

including NSI:

> As previously reported, Sallie Mae Bank remains subject to a cease
> and desist order originally issued in August 2008 by the FDIC and
> the Utah Division of Financial Institutions.  In July 2013, the FDIC
> first notified Sallie Mae Bank of plans to replace its order with a
> new formal enforcement action (the "Bank Order") that more
> specifically addresses certain cited violations of Section 5 of the
> Federal Trade Commission Act, including the customer billing
> disclosures and assessments of certain late fees, as well as alleged
> violations under the Servicemembers Civil Relief Act ("SCRA").
> In November 2013, the FDIC indicated an additional enforcement
> action would be issued against NSI in its capacity as a servicer of
> education loans for Sallie Mae Bank and other financial
> institutions.
>
> Based on our discussions with the FDIC, we believe the FDIC
> intends to require certain late fee refunds to be made by NSI and
> Sallie Mae Bank with respect to loans owned or originated by
> Sallie Mae Bank from November 28, 2005 until the effective date
> of the agreement. To fulfill this requirement, NSI would fund a
> $30 million restitution reserve account.
>
> In order to treat all customers in a similar manner, NSI expects to
> voluntarily make restitution of certain late fees to all other
> customers whose loans were neither owned nor originated by
> Sallie Mae Bank on the same basis and in the same manner as that
> which would be required by the FDIC. These refunds are estimated
> at $42 million.
>
> With respect to alleged civil violations of the SCRA, NSI and
> Sallie Mae Bank remain engaged in discussions regarding a
> comprehensive settlement, remediation and civil settlement plan
> with the DOJ, in its capacity as the agency having primary
> authority for enforcement of such matters. The DOJ inquiry covers
> all loans owned by either Sallie Mae Bank or serviced by NSI from
> November 28, 2005 until the effective date of the settlement.

38

> Based on our settlement discussions with the DOJ, NSI would be required to fund a $60 million settlement fund, which would represent the total amount of compensation due to service members under the DOJ agreement.
>
> Previous regulatory requirements and guidance from the Department of Education regarding compliance with the SCRA statute provide that customers must provide both a copy of the military orders calling a person to active duty and a written request to receive the 6 percent interest rate cap available for active duty service members. The terms of the potential settlement with the DOJ, which remain subject to approval by the Department of Education, would provide new guidance on what a service member must do to receive the SCRA benefit and would apply this new approach retroactively to November 2005.  The proposed settlement would assess a penalty for past non-compliance with this new approach.  This new approach would reduce the documentation required, thereby easing the burden on service members.

100.    On May 13, 2014, the DOJ issued a press release announcing at $60 million

settlement of allegations that NSI, SLM DE Corporation (now known as Navient DE

Corporation), and Sallie Mae Bank charged military servicemembers excessive rates on student

loans, in violation of the SCRA:

> The Department of Justice today announced the federal government's first lawsuit filed against owners and servicers of student loans for violating the rights of servicemembers eligible for benefits and protections under the Servicemembers Civil Relief Act (SCRA).  The United States' complaint alleges that three defendants, collectively known as Sallie Mae, engaged in a nationwide pattern or practice, dating as far back as 2005, of violating the SCRA by failing to provide members of the military the six percent interest rate cap to which they were entitled.  The three defendants are Sallie Mae Inc. (now known as Navient Solutions Inc.), SLM DE Corporation (now known as Navient DE Corporation), and Sallie Mae Bank.  The complaint further alleges that defendants Sallie Mae Inc. and SLM DE Corporation also violated the SCRA by improperly obtaining default judgments against servicemembers.
>
> In addition to the complaint, the department filed a proposed settlement of the lawsuit which will require Sallie Mae to pay $60 million to compensate servicemembers for the alleged SCRA

39

> violations.  The department estimates that about 60,000
> servicemembers will receive compensation under the settlement.
> The settlement and complaint have been filed in the U.S. District
> Court for the District of Delaware and the settlement is pending
> approval in that court.

101.    According to the DOJ's press release, the settlement was the result of a joint

effort with the DOE, FDIC, and CFPB, which had shared servicemember complaints it had

received with the DOJ.  The release further noted the CFPB was conducting its own ongoing

investigation of Navient.

102.    On the same day, the FDIC announced a separate but related settlement with NSI

and Sallie Mae Bank "for unfair and deceptive practices related to student loans" in violation of

Section 5 of the Federal Trade Commission Act and the SCRA:

> This action results from an examination of Sallie Mae by the FDIC
> regarding Sallie Mae's compliance with federal consumer
> protection statutes, including Section 5 and SCRA, and a
> companion investigation by the Department of Justice (DOJ)
> related to the treatment of servicemembers. As part of the
> settlement, Sallie Mae stipulated to the issuance of Consent
> Orders, Orders for Restitution, and Orders to Pay Civil Money
> Penalty (collectively, FDIC orders).  The FDIC orders require
> these entities to pay civil money penalties totaling $6.6 million, to
> pay restitution of approximately $30 million to harmed borrowers
> and to fund a $60 million settlement fund with the DOJ to provide
> remediation to servicemembers. The DOJ has also taken separate
> action against the entities with regard to violations of the SCRA.

103.    On July 16, 2014, the Company issued a press release announcing its financial

results for the quarter ended June 30, 2014, its first quarter as an independent, publicly traded

company.  In the release, Navient emphasized improved performance of its Private Education

Loans portfolio, claiming "***Delinquency and Charge-Off Rates on Private Education Loan***

***Portfolio [were] Down to Lowest Levels Since 2008***."  Navient further reported "continued

improvement in student loan portfolio credit quality with 90-plus day delinquencies on its federal

and private loan portfolio declining to the lowest levels since 2008."

40

104.    In the release, Navient also provided details on the performance of its Private

Education Loans segment and reported an increase in Core Earnings in Q2 2014 in that segment

compared to the same period the previous year, which the Company attributed primarily to a

decrease in its loan loss provision:

**Private Education Loans**

In the private education loans segment, Navient acquires, finances
and services private education loans.

Quarterly core earnings were $86 million compared with $61
million in the year-ago quarter. The increase is primarily the result
of a $44 million decrease in the provision for private education
loan losses.

Core earnings second-quarter 2014 private education loan portfolio
results vs. second-quarter 2013 are as follows:

- Delinquencies of 90 days or more of 3.2 percent of loans in
  repayment, down from 4.0 percent.

- Total delinquencies of 7.1 percent of loans in repayment,
  down from 8.4 percent.

- Annualized charge-off rate of 2.5 percent of average loans
  in repayment, down from 3.0 percent.

- Student loan spread of 4.10 percent, unchanged from the
  year-ago quarter.

- Provision for private education loan losses of $145 million,
  down from $189 million.

- The portfolio balance, net of loan loss allowance, was
  $30.3 billion, down from $31.8 billion.

105.    The release also discussed the capacity of Navient's FFELP Loans – other

facilities:

As of June 30, 2014, March 31, 2014 and June 30, 2013, the
maximum additional capacity under these facilities was $10.7
billion, $12.7 billion and $11.9 billion, respectively.  For the three
months ended June 30, 2014, March 31, 2014 and June 30, 2013,

41

the average maximum additional capacity under these facilities was $11.8 billion, $12.3 billion and $11.1 billion, respectively. For the six months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $12.0 billion and $10.9 billion, respectively.

106.    Remondi stated in the release:

Navient's first earnings release demonstrates that strong financial performance and industry-leading customer success go hand in hand.  Our approach to loan servicing continues to help more customers successfully manage their student loan payments and avoid the consequences of default, as reflected in the improving credit quality of the loans we service. . . .  Looking ahead, Navient is well positioned to grow as more institutions turn to us for loan servicing and asset recovery solutions that focus on customer success and compliance.

107.    During a July 17, 2014 earnings call, Chivavibul reiterated Navient's financial results announced in the press release issued earlier that day, and forecasted that the Company was on track to achieve 2014 Core Earnings of $2.05 per share.

108.    On August 1, 2014, Navient filed its Form 10-Q with the SEC for Q2 2014, which reiterated the financial results reported on July 16, 2014 and, again, emphasized improvements in the performance of its Private Education Loans, noting its provisions for loan losses "declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs."

109.    Additionally, the Form 10-Q contained identical language about the "appropriate" level of Navient's Allowance for Loan Losses, its legal compliance, and its approach in assisting students and families in repaying loans as set forth in Navient's Q1 2014 Form 10-Q (described in ¶¶ 87, 96-97, 145).

110.    After the market closed on August 4, 2014, Navient filed an SEC Form 8-K attaching as an exhibit a presentation titled "2014 2nd Quarter Investor Deck," which included slides stating that in Navient's Private Education Loans Segment, its provision for loan losses for

Q2 2014 was $145 million, a slight increase from $136 million in Q1 2014, but substantially less than $189 million from the same Q2 period a year ago.  The presentation also included the following slide concerning its private education loans, including the amount of such loans in repayment and that were delinquent:

## Private Education Loans Segment
## Credit Quality "Core Earnings" Basis

| | Private Education Loan Portfolio | | | |
| | June 30, 2014 | | June 30, 2013 | |
| | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment | $3,375 | | $3,599 | |
| Loans in forbearance | 1,201 | | 1,156 | |
| Loans in repayment and percentage of each status | | | | |
| Loans current | 25,202 | 92.9% | 26,141 | 91.6% |
| Loans delinquent 31-60 days | 670 | 2.5% | 774 | 2.7% |
| Loans delinquent 61-90 days | 391 | 1.4% | 486 | 1.7% |
| Loans delinqent greater than 90 days | 873 | 3.2% | 1,144 | 4.0% |
| Total Private Education Loans in repayment | 27,136 | 100% | 28,545 | 100% |
| Total Private Education Loans, gross | $31,712 | | $33,300 | |
| | | | | |
| Percentage of Private Education Loans in repayment | | 85.6% | | 85.7% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 7.1% | | 8.4% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 4.2% | | 3.9% |

NAVIENT.                    Confidential and proprietary information © 2014 Navient Solutions, Inc. All rights reserved.          13

111.    On September 8, 2014, Remondi made a presentation on Navient at the Barclays Global Financial Services Conference ("Barclays Conference"), during which he described Navient's $30 billion private education loan portfolio as "well-seasoned" and possessing "very strong credit metrics."  The "seasoned portfolio" was "particularly important," Remondi added, "as the majority of delinquency and defaults occur early in the life cycle of repayment," and "[s]o, as portfolios season, you see continued improvement in credit trends."  He further stated:

43

> In our private education space, we are the only national player with a large-scale repayment solution program that helps customers who are struggling to make payments to get back on track, and one of the hallmarks of this program is that 80% of the customers who move through this program do so successfully and during that 12-month period that they're in it, they are able to reduce their average debt balance by 3%.  Obviously one of the key differentials between our private education programs and some of the Federal programs is just that. In the Federal programs, borrowers are oftentimes negatively amortizing during repayment solutions and in the private education space we really work to help ours reduce their debt overall.

> One of the statistics we're most proud of in this space is that when we connect with a delinquent customer, 90% of the time we are able to work with that customer to get them engaged and enrolled in a repayment program that keeps them out of default.

112.    On July 18, 2014, Navient filed a registration statement on Form S-3 with the SEC to register for a future public offering of an unspecified amount of debt securities, shares of common stock, shares of preferred stock, warrants to purchase debt securities, common stock, preferred stock or units of two or more of those types of securities, and units from time (the "Shelf Registration Statement").  The Shelf Registration Statement included a prospectus and expressly incorporated by reference the following:  (i) Navient's Form 10 Registration Statement in connection with the Spin-Off; (ii) Navient's Q1 2014 Form 10-Q; (iii) Form 8-Ks filed on April 16, 2014, April 17, 2014, May 2, 2014, May 9, 2014, May 14, 2014, May 16, 2014, and July 16, 2014; and (iv) any future filings with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Exchange Act (excluding information deemed to be furnished and not filed with the SEC) until the termination of the offering.

113.    The Q2 2014 Form 10-Q also disclosed that NSI had received CIDs from the CFPB "as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters."  Navient further revealed it also received CIDs issued by the State of Illinois Office of Attorney General and the State of

44

Washington Office of Attorney General "and continue[d] to cooperate with multiple state Attorneys General in connection with these investigations." According to Navient, "the investigation was initiated to ascertain whether any practices declared to be unlawful under the Consumer Fraud and Deceptive Business Practices Act have occurred or are about to occur."

114. On October 15, 2014, Navient issued a press release announcing its financial results for the third quarter ended September 30, 2014. The press release emphasized that the Q3 2014 results "show[ed] continued improvements in delinquencies and defaults since a year ago" and improved performance of Navient's Private Education Loan portfolio, claiming that "*Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008*." Additionally, Navient reported in the release that core earnings for the quarter were $218 million (0.52 diluted earnings per share), compared with $259 million ($0.58 diluted earnings per share) for the year-ago quarter. Navient explained that the decrease in core earnings was the result of a $39 million reduction in asset recovery revenue, as well as a $48 million reduction in net interest income, partially offset by a $47 million *decrease* in provisions for loan losses.

115. With respect to Navient's Private Education Loans segment, the release stated:

> Core earnings for the segment were $98 million in third-quarter 2014, compared with the year-ago quarter's $75 million, which is primarily the result of a $46 million decrease in the provision for private education loan losses.

> Core earnings third-quarter 2014 private education loan portfolio results vs. third- quarter 2013 are as follows:

> - Delinquencies of 90 days or more of 3.4 percent of loans in repayment, down from 4.2 percent.

> - Total delinquencies of 7.9 percent of loans in repayment, down from 9.8 percent.

> - Annualized charge-off rate of 2.3 percent of average loans in repayment, down from 2.9 percent.

45

- Student loan spread of 4.06 percent, down from 4.12 percent.

- Provision for private education loan losses of $130 million, down from $176 million.

116.    The release also discussed the capacity of the Company's FFELP Loans – other

facilities:

> As of September 30, 2014, June 30, 2014, and September 30, 2013, the maximum additional capacity under these facilities was $11.0 billion, $10.7 billion and $11.2 billion, respectively.  For the three months ended September 30, 2014, June 30, 2014, and September 30, 2013, the average maximum additional capacity under these facilities was $10.8 billion, $11.8 billion and $11.4 billion, respectively.  For the nine months ended September 30, 2014 and 2013, the average maximum additional capacity under these facilities was $11.6 billion and $11.1 billion, respectively.

117.    In the release, Defendant Remondi stated "[t]his quarter again demonstrated

improved credit performance" and "[p]rivate credit charge-offs set a new record low since 2008,

and our education campaign assisted more federal and private loan customers to enroll in the

repayment option that best meets their needs."

118.    On October 16, 2014, the CFPB issued a report on private student loan complaints

prepared by a student loan ombudsman, a position within the CFPB established by the Dodd-

Frank Wall Street Form and Consumer Protection Act.[36]   The report, entitled "Annual Report of

the CFPB Student Loan Ombudsman," analyzed more than 5,300 private student loan complaints

submitted to the CFPB between October 1, 2013 and September 30, 2014, *1,996 (or*

*approximately 37%) of which concerned Sallie Mae/Navient.*  According to the report, the

majority of complaints concerned the lack of repayment options and flexibility in times of

---

[36] *See Annual Report of the CFPB Student Loan Ombudsman*, CFPB, Oct. 16, 2014, *available at* http://files.consumerfinance.gov/f/201410_cfpb_report_annual-report-of-the-student-loan-ombudsman.pdf.

distress.  Significantly, "[m]any complaints indicate[d] that borrowers sought to negotiate a modified repayment plan during a period of financial distress, but lenders and services provided no options, leading the borrowers to default."

119.   On the same day, October 16, 2014, Navient held a conference call with investors and provided additional positive commentary about the Company's then-present business metrics, including the purported strong performance of its Private Education Loan segment that justified the reduction in the loan loss provision.  Defendant Chivavibul reiterated the Company's financial results announced the previous day and raised Navient's earnings guidance for 2014, stating that the Company was on track to achieve Core earnings of $2.10 per share.

120.   During the call, Defendant Remondi commented on the servicing of Navient's Private Education Loan portfolio, stating, in relevant part, as follows:

> We also think we bring the same level of performance to the private loan side of the sector. And we have more flexibility of working with borrowers in that space to help them, struggling borrowers in particular, to help them manage their loan payments. And that program and initiative has been extremely successful for us at helping borrowers stay on track, and more importantly reduce their principal balance.

121.   Additionally, Remondi engaged in the following exchange with an analyst who questioned Navient's response to the CFPB report issued earlier the same day:

> SANJAY SAKHRANI: Okay. I guess finally, just I thought CFPB put out something on private student loans today.  And I was wondering what your observations were on that, and if you had any comments on kind of the regulatory environment? Thank you.
>
> JACK REMONDI: Yes. So we -- I think one of the things we've been doing in our private student loan business is first of all we always take and seek input from our customers. So whether the complaint comes in from the CFPB or we are talking with customers through our call centers and through our customer advocacy centers, we try and make changes and improvements to the process to make it easier for customers.

47

122.    During the call, in response to a question from an analyst regarding the DOE's pending decision to renew contract with loan collection firms, Remondi claimed that the Department had "not provided any guidance on that" but that Navient expected a decision soon.

123.    On October 30, 2014, Navient filed its Form 10-Q with the SEC for Q3 2014, which reiterated the financial results reported on October 15, 2014, and, again, emphasized improvements in the performance of Navient's Private Education Loan portfolio, noting its provisions for loan losses "decreased $67 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs."

124.    The Q3 2014 Form 10-Q also contained substantially the same statements concerning the "appropriate" level of Navient's allowance for loan losses, the Company's legal compliance, and its approach in assisting students and families in repaying loans as those included in Navient's Q1 2014 Form 10-Q (described in ¶¶ 87, 96-97-145 above).

125.    On November 3, 2014, the Company filed with the SEC a preliminary prospectus supplement pursuant to Rule 424(b)(5) Preliminary Prospectus Supplement that supplemented the prospectus it filed on July 18, 2014 in connection with its automatic shelf registration.  The prospectus supplement indicated Navient's intent to sell a still undisclosed amount of Senior Notes due 2020 and 2024 pursuant to the Shelf Registration Statement, subject to a pricing amendment.  The prospectus supplement also expressly incorporated by reference:  (i) Navient's Form 10 Registration Statement in connection with the Spin-Off; (ii) Navient's Q1 2014, Q2 2014, and Q3 2014 Forms 10-Q; (iii) Form 8-Ks filed on April 17, 2014, May 2, 2014, May 9, 2014, May 14, 2014, May 16, 2014, August 19, 2014, and October 17, 2014; and (iv) all

documents Navient subsequently files with the SEC pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act prior to the completion of the offering.

126.    On November 4, 2014, Navient filed with the SEC a Free Writing Prospectus pursuant to Rule 433 containing a Pricing Term Sheet for the 2014 Debt Offering indicating that Navient would offer $500,000,000 of the 5.0% Senior Notes and $500,000,000 of the 5.875% Senior Notes due 2024 at a public offering price of 99.365% and 99.075%, respectively.  The Pricing Term Sheet also indicated that the Senior Notes had received ratings from debt rating agencies of "Ba3/ BB/ BB, by Moody's/ S&P/ Fitch."  The Pricing Term Sheet supplemented the Prospectus Supplement dated November 3, 2014 issued by Navient relating to its Prospectus dated July 18, 2014.

127.    On the same day, November 4, 2014, Navient filed a Form 8-K with the SEC which included as an exhibit a presentation entitled "2014 3rd Quarter Investor Deck" that included slides stating, in pertinent part, that in Navient's Private Education Loans Segment, its Provision for loan losses for Q3 2014 was $130 million, a significant decrease from $145 million in Q2 2014 and from $176 million for the same Q3 period a year ago.  The presentation also included the following slide concerning its Private Education Loans segment, including the amount of such loans in repayment and that are delinquent:

49

## Private Education Loans Segment
## Credit Quality "Core Earnings" Basis

| ($'s in millions) | Private Education Loan Portfolio | | | |
| | September 30, 2014 | | September 30, 2013 | |
| | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment | $3,436 | | $3,850 | |
| Loans in forbearance | 1,258 | | 1,103 | |
| Loans in repayment and percentage of each status | | | | |
| Loans current | 24,963 | 92.1% | 25,389 | 90.2% |
| Loans delinquent 31-60 days | 732 | 2.7% | 929 | 3.3% |
| Loans delinquent 61-90 days | 468 | 1.8% | 627 | 2.3% |
| Loans delinqent greater than 90 days | 929 | 3.4% | 1,187 | 4.2% |
| Total Private Education Loans in repayment | 27,092 | 100% | 28,132 | 100% |
| Total Private Education Loans, gross | $31,786 | | $33,085 | |
| | | | | |
| Percentage of Private Education Loans in repayment | | 85.2% | | 85.0% |
| | | | | |
| Delinquencies as a percentage of Private Education Loans in repayment | | 7.9% | | 9.8% |
| | | | | |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 4.4% | | 3.8% |

Confidential and proprietary information © 2014 Navient Solutions, Inc. All rights reserved.

NAVIƎNT    13

128.     On November 5, 2014, Navient filed with the SEC its final Prospectus

Supplement pursuant to Rule 424(b)(2) in connection with the 2014 Debt Offering in which the

Company sold $500 million of its 5.000% Senior Notes due 2020 and $500 million of its 5.875%

Senior Notes due 2024.  Navient raised more than $992 million in gross proceeds in the 2014

Debt Offering.  The final Prospectus expressly incorporated by reference the following:  (i)

Navient's Form 10 Registration Statement in connection with the Spin-Off; (ii) Navient's Q1

2014, Q2 2014, and Q3 2014 Forms 10-Q; (iii) Form 8-Ks filed on April 17, 2014, May 2, 2014,

May 9, 2014, May 14, 2014, May 16, 2014, August 19, 2014, and October 17, 2014; and (iv) any

future filings with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Exchange Act

1319916.1

(excluding information deemed to be furnished and not filed with the SEC) prior to the completion of offering of all securities covered by the Prospectus.

129.    On November 12, 2014, Remondi made a presentation on Navient at the BofA-Merrill Lynch Conference.  During his presentation, Remondi touted the "high-quality" and "improving performance" of Navient's private education loans, claiming they were "predictable" and had  a "stable earnings stream and credit profile":

> On the private education side of the equation, we own a portfolio of $30 billion of student loans.  ***These loans have very strong credit metrics.  There is a high-quality improving performance in these metrics***, particularly as the economy is improving.
>
> * * *
>
> And I think one of the pieces that makes this a bit of a unique story is that more and more of our portfolio is moving past the peak-to-fall periods of a typical education loan period, which is years 1 through 3 after leaving school.  What that means ***is you end up with a portfolio of loans that has a far more predictable and stable earnings stream and credit profile.***
>
> Some more statistics on the private education loan portfolio. When we look at the credit performance of this asset class, it is really driven by the portfolio segments.
>
> We risk-weight these or risk-classify these in terms of three buckets: low, moderate, and high.  We actually exited the – as a combined Company, we exited the lending in the high credit area back in 2008, so this is more or less a legacy portfolio.  What you can see -- as a static pool you can actually see that default curve that I mentioned a couple minutes ago, that losses are concentrated in the first few years of repayment and then come down significantly after that.
>
> ***We are seeing improving credit trends here***, which is leading to increasing earnings and cash flows.  And one of the big drivers of this, in our view, is the economy.  We are seeing both in the federal and in the private loan space better job opportunities and employment prospects for our customer segment, the 25- to 34-year-olds; and as a result of that, ***they are having greater success repaying their loans.***

51

130.    During the conference, Remondi also claimed "we have a strong compliance culture, an infrastructure, a control infrastructure around our business" and attributed Navient's "superior performance" to its contact with customers and counseling them to enroll in an appropriate repayment program:

> Now, you might ask: What are we doing that's driving this superior performance? In our view, it is really two things: it's about contact with customers who are struggling, and the ability to counsel them through a process to get them enrolled into a repayment program that they can afford.
>
> \* \* \*
>
> We segment our customer base to provide targeted attempts that the customer is more likely to reply to. So we have different strategies for different types of customers based on where they are in their repayment cycle, how many payments they have made, the amount of debt that they owe, where they went to -- whether they graduated or didn't graduate, as some examples there.
>
> We're also doing it by helping customers enroll in payment programs rather than simply deferring any payments at all. So we have a higher percentage of our customers enrolled in income-driven repayment programs authorized under the federal programs than do others and, consequently, a lower percentage of customers using deferral products, like forbearance as an example.
>
> In private credit, we bring that same kind of approach. Our approach here is a little bit different in that we're not running against a design program of the federal programs; we have created our own solutions for customers.
>
> One of the things that we have been very, very successful at is helping borrowers who are struggling find a solution that not only keeps them out of default but helps them successfully reduce their debt balance. Actively we will work with customers, and that includes modifying their loan terms to help them be successful.
>
> One of our more important programs is a rate-reduction program. This is where we would take a delinquent customer who we establish contact with. We would actually re-underwrite the loan based on their current cash flows and capabilities; match it up against their loan balances; and set a payment amount that they can afford.

52

It is a 12-month program that we enroll the customers in. 80% of our customers who enroll in this program -- remember, they are all delinquent when they enter the program -- successfully complete the 12-month program and on average they reduce their principal balance by 3%.

So it is a meaningful program for the customer and one that creates not simply a deferral of their obligations, where the balance is now larger when they exit the program than when they entered. They are actually successfully completing the program and reducing their debt balance.

131.    After trading closed on January 21, 2015, Navient issued a press release announcing its financial results for Q4 2014 (the quarter ending December 31, 2014) and the full year 2014.  Navient emphasized the improved performance of its Private Education Loans portfolio, claiming that "***2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008***."

132.    In the release, Navient also provided details on the performance of its Private Education Loan segment and reported an increase in core earnings in Q4 2014 in that segment compared with the same period the previous year, which the Company attributed primarily to a decrease in its loan loss provision:

**Private Education Loans**

In its private education loans segment, Navient acquires, finances and services private education loans.

Core earnings for the segment were $92 million in fourth-quarter 2014, compared with the year-ago quarter's $86 million.  This increase is primarily the result of a $24 million decrease in the provision for private education loan losses.

Core earnings fourth-quarter 2014 private education loan portfolio results vs. fourth- quarter 2013 are as follows:

- Delinquencies of 90 days or more of 3.8 percent of loans in repayment, down from 4.7 percent.

- Total delinquencies of 8.1 percent of loans in repayment, down from 9.3 percent.

- Annualized charge-off rate of 2.5 percent of average loans in repayment, down from 3.3 percent.

- Student loan spread of 3.99 percent, down from 4.04 percent.

- Provision for private education loan losses of $128 million, down from $152 million.

Full-year core earnings for this segment were $351 million, compared with $269 million in 2013.  This increase was primarily the result of a $183 million decrease in the provision for loan losses.

133.    The release also discussed the capacity of the Company's FFELP Loans – other facilities:

As of December 31, 2014, September 30, 2014, and December 31, 2013, the maximum additional capacity under these facilities was $13.2 billion, $11.0 billion and $10.6 billion, respectively.  For the three months ended December 31, 2014, September 30, 2014 and December 31, 2013, the average maximum additional capacity under these facilities was $14.0 billion, $10.8 billion and 11.1 billion, respectively.  For the years ended December 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.2 billion and $11.1 billion, respectively.

134.    Additionally, Remondi stated in the release that "2014 marked the successful launch of Navient as an industry leader in loan management, servicing and asset recovery," and that "[w]e enable millions of customers to successfully manage their education loan repayment, helping them capture the value of their higher education."  He further commented that in 2014, "[w]e continued to meet our commitment to create shareholder value as we announced $13 billion in portfolio acquisitions and realized year-over-year improvements in credit quality. . . . Looking ahead to 2015—our first full year as Navient—we are ready to continue our track record of success."

54

135.     On January 22, 2015, Navient conducted a conference call with analysts and investors during which Chivavibul reiterated the financial results announced the previous day and Navient's Core EPS guidance of $2.20 for 2015.  Additionally, during the call Remondi emphasized that the Company then "[saw] continued opportunities to increase the expected cash flows from [its] federal and ***private loan portfolios as credit continue[d] to improve*** and [Navient] benefit[ed] from lower financing costs and low interest rates," and that it was "confident in [its] ability to generate core earnings per share of $2.20 in 2015 and to generate ongoing EPS growth in the years beyond."  Remondi also claimed that nationwide, "Navient is leading the way with more customers enrolled in affordable repayment programs, and dramatically lower default rates, compared to the national average."

136.     After the market closed on February 27, 2015, Navient filed its 2014 Form 10-K, which reiterated the financial results Navient announced on January 21, 2015.  Navient also indicated that "the net interest margin recorded in the FFELP Loans segment is relatively stable."  The 2014 Form 10-K also described Navient's "Strengths and Opportunities":

> **Strengths and Opportunities**
>
> Navient possesses a number of competitive advantages that distinguishes it from its competitors, including:
>
> ***Large, high quality asset base generating significant and predictable cash flows.*** At December 31, 2014, Navient's $134.3 billion student loan portfolio is 75 percent funded to term and is expected to produce consistent and predictable cash flows over the remaining life of the portfolio. Navient's $104.5 billion portfolio of FFELP Loans bears a maximum 3 percent loss exposure due to the federal guarantee. Navient's $29.8 billion portfolio of Private Education Loans bears the full credit risk of the borrower and cosigner. Navient expects that cash flows from its FFELP Loan and Private Education Loan portfolios will significantly exceed future debt service obligations.
>
> * * *

55

> ***Superior operating performance.*** Navient has demonstrated
> superior default prevention performance and industry leading asset
> recovery services. The combined portfolio of federal loans
> serviced by Navient experienced a Cohort Default Rate 40 percent
> lower than the national rate released by ED in September 2014. We
> are consistently a top performer in our asset recovery business as
> well.

137.    The 2014 Form 10-K further touted Navient's approach to assisting students and

their families in repaying student loans, claiming that "Navient makes customer success and

default prevention top priorities," has been a "partner in ED [i.e., Department of Education]'s

campaign to inform federal student loan customers about income-driven repayment plans, and

has "played a leadership role in helping customers understand their options and make an

informed choice":

> **Navient's Approach to Assisting Students and Families in
> Repaying their Education Loans**
>
> Navient services loans for more than 12 million DSLP Loan,
> FFELP Loan and Private Education Loan customers (including
> cosigners), including 6.2 million customer accounts serviced under
> Navient's contract with ED. ***In this work, we help our customers
> experience success through proactive outreach and emphasis on
> identifying the payment plan that best fits their budget and
> financial goals.***
>
> We understand managing repayment of education loans is critical
> for students to achieve their educational goals, recognize their full
> earning potential and develop a strong credit profile.
>
>          * * *
>
> To help customers manage these realities, ***Navient makes
> customer success and default prevention top priorities***. We
> customize our outreach using data-driven approaches that draw
> from our more than 40 years of experience in helping customers
> successfully manage their loans. As a result, in 2014, our
> customers experienced higher records of repayment success as
> evidenced by lower delinquencies and defaults.
>
> ***We have been a partner in ED's campaign to inform federal
> student loan customers about income-driven repayment plans***,

56

and have ***played a leadership role in helping customers understand their options and make an informed choice***.

We also find that customers who have fallen behind benefit from outreach and assistance. In fact, nine times out of ten when we can reach federal loan customers who have missed payments, we can identify a solution to help them avoid default.

We also offer free resources to help customers and the general public build knowledge on personal finance topics. In October 2014, we launched new online resources to encourage financial literacy and to help customers understand their repayment options and enroll in the plan that is best for them[.]

138.    The 2014 Form 10-K also claimed (i) Navient's allowance for loan losses was "sufficient" to cover expected charge-offs and that losses in its Private Education Loans segment are determined by specific risk characteristics; (ii) Navient's management "focuses on delinquencies" and the progression of delinquent loans; and (iii) Navient "maintains comprehensive risk management practices" to ensure "all significant risk inherent in our business is identified, measured, monitored, evaluated, controlled and reported"; and (iv) the Company's Credit and Loan Loss Committee oversees the sufficiency of Navient's loan loss reserves:

**Provisions for Loan Losses**

***Management estimates and maintains an allowance for loan losses at a level sufficient to cover charge-offs expected over the next two years, plus an additional allowance to cover life-of-loan expected losses for loans classified as a troubled debt restructuring ("TDR").*** The provision for loan losses increases the related allowance for loan losses. Generally, the allowance for loan losses rises when future charge-offs are expected to increase and falls when future charge-offs are expected to decline. . . . Losses in our Private Education Loans segment are determined by risk characteristics, such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months a payment has been made by a customer), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. Our "Core Earnings" provision for loan losses in our Private Education Loans segment was $539 million in 2014 compared with $722 million in 2013.

57

**Charge-Offs and Delinquencies**

When we conclude a loan is uncollectible, the unrecoverable portion of the loan is charged against the allowance for loan losses in the applicable segment. Charge-off data provides relevant information with respect to the performance of our loan portfolios. ***Management focuses on delinquencies as well as the progression of loans from early to late stage delinquency.*** The Private Education Loans segment's "Core Earnings" charge-off rate was 2.6 percent of loans in repayment in 2014 compared with 3.1 percent of loans in repayment in 2013. Delinquencies are a very important indicator of the potential future credit performance. Private Education Loan delinquencies as a percentage of Private Education Loans in repayment decreased from 9.3 percent at December 31, 2013 to 8.1 percent at December 31, 2014 on a "Core Earnings" basis. . .

\*        \*        \*

**Risk Management**

**Our Approach**

The loan servicing and collection services Navient provides, as well as the financial markets in which Navient operates, continue to undergo dramatic competitive, technological and regulatory changes. Identifying, understanding, and effectively managing the risks inherent in our business are critical to our continued success. Navient has risk oversight, management and assessment responsibilities assigned and documented at various levels within our organization and coordinated across our organization. ***We maintain comprehensive risk management practices to identify, measure, monitor, evaluate, control, and report on our significant risks.***

**Risk Management Philosophy**

Navient's risk management philosophy is to ensure all significant risk inherent in our business is identified, measured, monitored, evaluated, controlled and reported. In furtherance of these goals, Navient: (i) maintains a comprehensive and uniform risk management framework; (ii) follows a "three lines of defense" structure based upon: (1) accountability and ownership at the business area level for risks inherent in their activities (first line of defense); (2) supporting areas, such as Human Resources, Legal, Compliance, Finance and Accounting, Information-Technology and Information Security, monitor, guide and advise the business

58

areas in their respective areas of expertise (second line of defense); and (3) Internal Audit reviews both business and support areas to ensure compliance with applicable laws, regulations and internal policies and procedures (third line of defense); (iii) provides appropriate reporting tools to management and our board of directors and their respective committees; and (iv) trains our employees on our risk management processes and philosophy.

**Risk Oversight, Roles and Responsibilities**

The Navient board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements. We escalate to our board of directors any significant departures from established tolerances and parameters and review new and emerging risks with them.

* * *

Credit and Loan Loss Committee. Our Credit and Loan Loss Committee is an executive management-level committee chaired by our Chief Risk and Compliance Officer to oversee our credit and portfolio management monitoring and strategies, the sufficiency of our loan loss reserves and current or emerging issues affecting delinquency and default trends which may result in adjustments in our allowances for loan losses.

139.     The 2014 Form 10-K also described Navient's accounting policy and methods concerning its allowance for loan losses used to prepare its financial statements, claiming that (i) Navient evaluated certain risk characteristics of its Private Education Loan portfolio, (ii) it determined probable credit losses in the portfolio based on the most recent 12 months of actual collection experience; and (iii) as of December 31, 2014, ten percent of Navient's private student loans were not in repayment and Navient's loss estimate for those loans was low:

**Allowance for Loan Losses**

* * *

***We determine the collectability of our Private Education Loan portfolio by evaluating certain risk characteristics.*** We consider

59

school type, credit score (FICO), existence of a cosigner, loan status and loan seasoning as the key credit quality indicators because they have the most significant effect on our determination of the adequacy of our allowance for loan losses.… *Loan status affects the credit risk because generally a past due loan is more likely to result in a credit loss than an up-to-date loan. Additionally, loans in a deferred payment status have different credit risk profiles compared with those in current pay status.… We monitor and update these credit quality indicators in the analysis of the adequacy of our allowance for loan losses on a quarterly basis.*

* * *

*To estimate the probable credit losses incurred in the loan portfolio at the reporting date, we use historical experience of customer payment behavior in connection with the key credit quality indicators and incorporate management expectation regarding macroeconomic and collection procedure factors. Our model is based upon the most recent 12 months of actual collection experience* as the starting point and applies expected macroeconomic changes and collection procedure changes to estimate expected losses caused by loss events incurred as of the balance sheet date. Our model places a greater emphasis on the more recent default experience rather than the default experience for older historical periods, as we believe the recent default experience is more indicative of the probable losses incurred in the loan portfolio today. Similar to estimating defaults, we use historical customer payment behavior to estimate the timing and amount of future recoveries on charged-off loans.… *We believe that our model reflects recent customer behavior, loan performance, and collection performance, as well as expectations about economic factors.*

* * *

Certain Private Education Loans do not require customers to begin repayment until six months after they have graduated or otherwise left school. Consequently, our loss estimates for these programs are generally low while the customer is in school.  *At December 31, 2014, 10 percent of the principal balance in the higher education Private Education Loan portfolio was related to customers who are in an in-school/grace/deferment status and not required to make payments. As this population of customers leaves school, they will be required to begin payments on their loans, and the allowance for loan losses may change accordingly.*

60

140.    The 2014 Form 10-K further disclosed that Navient's subsidiary, Pioneer,

received no new account placements from the DOE after Pioneer's collection contract expired on

February 21, 2015:

> Since 1997, Navient has provided asset recovery services on
> defaulted student loans to ED [i.e., the Department of Education].
> This contract expired by its terms on February 21, 2015 and our
> Pioneer Credit Recovery subsidiary received no new account
> placements under the contract. We are engaged with ED to learn
> more about their decision and address any questions or concerns
> they may have. In addition, we have submitted a response to ED's
> request for proposals (RFP) in relation to a new contract for similar
> services. There can be no assurances that Pioneer will be awarded
> an extension of the existing contract, a new contract under the RFP
> or what volume of accounts might be placed with Pioneer. In 2014,
> asset recovery revenue from ED totaled $65 million, compared to
> $62 million in the prior year and our 2015 earnings guidance
> includes approximately $48 million of revenue from this contract.

141.    The Form 10-K also described Navient's FFELP Loans – other facilities,

borrowing conditions, and available liquidity:

> We have various secured borrowing facilities that we use to
> finance our FFELP Loans. Liquidity is available under these
> secured credit facilities to the extent we have eligible collateral and
> available capacity. The maximum borrowing capacity under these
> facilities will vary and is subject to each agreement's borrowing
> conditions. These include but are not limited to the facility's size,
> current usage and the availability and fair value of qualifying
> unencumbered FFELP Loan collateral. Our borrowings under these
> facilities are non-recourse. The maturity dates on these facilities
> range from January 2016 to February 2019. The interest rate on
> certain facilities can increase under certain circumstances. The
> facilities are subject to termination under certain circumstances. As
> of December 31, 2014, there was approximately $15.4 billion
> outstanding under these facilities, with approximately $16.5 billion
> of assets securing these facilities. As of December 31, 2014, the
> maximum unused capacity under these facilities was $13.2 billion.
> As of December 31, 2014, we had $1.9 billion of unencumbered
> FFELP Loans.

142.    Additionally, the Form 10-K revealed that in November 2014 Pioneer "received a

CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to

rehabilitation loans and collection of defaulted student debt."  Navient also disclosed that in

December 2014 NSI received a subpoena from the New York Department of Financial Services

as part of its inquiry "with regard to whether persons or entities have engaged in fraud or

misconduct with respect to a financial product or service under New York Financial Services

Law or other laws."

143.    The statements in ¶¶ 86-97, 103-117, 119-42 concerning Navient's financial

results, Private Education Loan segment, loan loss provisions, customer approach, risk-

management practices, and the state of the Company's credit facilities were false and misleading

when made because (as discussed in Section I above and further detailed in Section V.B.-I.

below) the Exchange Act Defendants knew or recklessly disregarded that:  (i) Navient and its

subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation

program and, in doing so, jeopardized Navient's contingency collection contract with the DOE

(*see* ¶¶ 42-43); (ii) Navient and its subsidiaries were engaged in improper and unlawful loan

servicing and debt collection practices, including overcharging borrowers who were active-duty

military service members (*see* ¶¶ 44-52); (iii) a significant number of higher-risk private student

loan borrowers who exited deferment during the Class Period had difficulty repaying their loans

(*see* ¶¶ 35-38); (iv) Navient failed to properly account for likely losses in its Private Education

Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-

33, 56); and (v) a significant portion of Navient's low interest rate credit facilities were at risk of

being eliminated or reduced, thereby increasing Navient's borrowing costs (*see* ¶¶ 59-65).

## 2.    Statements Regarding Legal and Regulatory Compliance

144.    On April 17, 2014, Navient filed a Form 8-K with the SEC that included as an

exhibit a presentation entitled "Navient Investor Roadshow," dated April 2014, in which Navient

claimed that it had a ***"[r]obust compliance driven culture driven by a 'customer first'***

*approach*," and that it "*[d]emonstrated FFELP compliance and preserved federal loan guarantee*." Navient also claimed that it had the "[o]perational and technical expertise and capacity to adapt to [a] new regulatory environment[.]"

145. In a section entitled "Navient's Strengths and Opportunities" in Navient's Q1 2014 Form 10-Q filed on May 9, 2014, Navient also touted, among other things, its legal compliance:

> **Superior operating performance**. Navient has demonstrated superior default prevention performance and industry leading asset recovery services. Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average. ***Navient prides itself in a robust compliance culture driven by a "customer first" approach***.

146. On May 13, 2014, *The New York Times* reported that Navient and Sallie Mae had agreed to pay $97 million to settle actions by the DOJ and the FDIC alleging that the companies charged military service members excessive interest and fees on student loans.[37] According to the *Times*, the DOJ's action alleged that beginning in 2005, the companies failed to cap interest on loans to military personnel at 6 percent, the maximum interest rate to which they were entitled under the SCRA. The DOJ also asserted that the companies improperly obtained default judgments against service members. The FDIC action reportedly alleged that the companies improperly advised military members as to requirements under the SCRA and, further, the companies applied payments in a way that maximized late fees and did not properly disclose on borrowers' statements how the fees could be avoided.

---

[37] Tara Siegel Bernard, *Sallie Mae to Pay Fine Over Loans to Troops*, N.Y. Times, May 13, 2014.

147.    On May 13, 2014, Navient issued a press release concerning the settlement with the DOJ and the FDIC in which Remondi was quoted as stating that "[w]e offer our sincere apologies to the servicemen and servicewomen who were affected by our processing errors and thus did not receive the full benefits they deserve," and that "[o]ver the past several years we have implemented changes in our procedures and training programs to prevent these mistakes from happening again."  In the press release, which was included as an exhibit to Navient's Form 8-K filed with the SEC on May 14, 2014, Navient also assured that it had taken steps to "enhance its service to military customers" as follows, in relevant part:

> Since 2009, Navient, previously operating as Sallie Mae, has taken steps to enhance its service to military customers, including:
>
> •    Created a specialized customer service team and toll-free number (855-284-4879) to serve military customers, staffed by specially trained team members—many of whom are veterans or have family connections to the military.
>
> •    Launched a special, comprehensive website for service members at navient.com/military.
>
> •    Worked with the U.S. Department of Education and other federal loan servicers to publish resources to help service members learn more about their benefits under SCRA.
>
> •    Implemented expedited processing and proactive outreach to better assist service members and their families to meet the requirements for SCRA benefits.

148.    Additionally, during the Barclays Conference, Remondi also touted Navient's compliance culture, stating that "no consumer lending business or servicing business is complete without a strong compliance culture, which we bring to the equation as well."

149.    Further, the 2014 Form 10-K reiterated Navient's "[c]ommitment to compliance and customer centricity," further representing that the Company "fosters a robust compliance culture driven by a 'customer first' approach" and "invest[s] in rigorous training programs,

64

internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service."

150.    The statements in ¶¶ 144-49 concerning Navient's compliance with governing laws and regulations were false and misleading when made because (as detailed in Section V.B.-I. below) the Exchange Act Defendants knew or recklessly disregarded that:  (i) Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE (*see* ¶¶ 42-43); and (ii) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52).

### 3.    SOX Certifications

151.    The Q1 2014 Form 10-Q also included certifications pursuant to Sections 302 and 906 of SOX by Defendants Remondi and Chivavibul.  The Section 302 certifications were identical but for Defendants' names and titles listed, and provided, in pertinent part:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> \* \* \*
>
> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

152.    The Section 906 certifications were also identical but for Defendants' names and titles listed therein and stated, with respect to each Defendant, that they certify:

(1) the [Q1 2014 Form 10-Q] Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

153.    The Q2 2014 Form 10-Q, Q3 2014 Form 10-Q, and 2014 Form 10-K also included SOX certifications pursuant to Sections 302 and 906 of SOX by Remondi and Chivavibul that were nearly identical to the certifications described in ¶¶ 151-52.

154.    The statements in the SOX certifications signed by Remondi and Chivavibul were false or misleading when made because (as detailed in Section V.B.-I. below) the Exchange Act Defendants knew or recklessly disregarded that:  (i) Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE (*see* ¶¶ 42-43); (ii) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52); (iii) a significant number of higher-risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans (*see* ¶¶ 35-38); (iv) Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-33, 56); and (v) a significant portion of Navient's low interest rate credit facilities were at risk of being eliminated or reduced, thereby increasing Navient's borrowing costs (*see* ¶¶ 59-65).

**B.**     **Previously Withheld Information Began to Emerge in Late February 2015, But the Exchange Act Defendants Continued to Misstate and Omit Material Facts.**

155.    Beginning in late February 2015, material information the Exchange Act Defendants had been withholding entered the market through a series of partial disclosures. These Defendants nonetheless continued to misstate or omit material facts, causing the price of Navient securities to be artificially inflated for the remainder of the Class Period.

156.    On February 27, 2015, the same day Navient filed its 2014 Form 10-K, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "providing inaccurate information to borrowers."[38]  The DOE reported that its Federal Student Aid office (FSA), which administers and oversees the federal student financial assistance programs authorized under Title IV of the Higher Education Act of 1965, performed a review of all private collection agencies with which the FSA works and found that "agents of the [five terminated] companies made materially inaccurate representations to borrowers about the loan rehabilitation program, which is an option that can create benefits to defaulted borrowers after they have made nine on-time payments in a period of 10 months."  Pioneer and the other four collection agencies "were found to have given inaccurate information at unacceptably high rates about these benefits."  In particular, those agencies "gave borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees."

---

[38] *U.S. Department of Education to End Contracts with Several Private Collection Agencies*, U.S. Department of Education, Feb. 27, 2015 (press release), *available at* http://www.ed.gov/news/press-releases/us-department-education-end-contracts-several-private-collection-agencies.

157.    Before the market opened on the next trading day, March 2, 2015, *Inside Higher Ed* published an article about the DOE's cancellation of contracts with Pioneer and the other collection agencies, noting the decision was part of a "crackdown" on Navient:[39]

### Crackdown on Navient

The department's decision is a victory for a collation of student and consumer advocates, unions and some Senate Democrats who have been particularly critical of the agency's relationship with Navient, which was spun off last year from Sallie Mae.

The company last May paid $97 million to settle allegations by the federal government that it overcharged military service members.

\* \* \*

The company said that **it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013**.

Representative Chris Collins, a Republican who represents the upstate New York district where Navient-owned Pioneer Credit Recovery operates, told *The Buffalo News* that **the decision to end the contract would lead to the loss of about 400 jobs at the company**.

158.    In response to the news on February 27, 2015 and March 2, 2015, the price of Navient common stock declined $1.89 per share, or 8.8%, from its close of $21.40 on February 27, 2015 to close at $19.51 on March 2, 2015, on unusually heavy trading volume of more than 10 million shares.  During the same period, Navient 5.875% Senior Notes due 2024 declined $1.52, or 2%, and Navient 5% Senior Notes declined $2.00, or 2%.

159.    After the market closed on March 2, 2015, Navient filed an SEC Form 8-K attaching as an exhibit a presentation titled "2014 4th Quarter Investor Deck," which included slides stating Navient's provision for loan losses for Q4 2014 with respect to its Private

---

[39] Michael Stratford, *Feds Fire 5 Debt Collectors*, Inside Higher Ed., Mar. 2, 2015, *available at* https://www.insidehighered.com/news/2015/03/02/us-ends-contract-5-debt-collectors-citing-misrepresentations-borrowers.

Education Loans segment was $128 million, a significant decline from $152 million for the same period a year ago, and $539 million for full year 2014, far less than $722 million for full year 2013.  The presentation also included the following slide concerning private education loans, including the amount of such loans in repayment and that were delinquent:



## Private Education Loans Segment
## Credit Quality "Core Earnings" Basis

| ($'s in millions) | Private Education Loan Portfolio | | | |
|---|---|---|---|---|
| | December 31, 2014 | | December 31, 2013 | |
| | Balance | % | Balance | % |
| Loans in-school/grace/deferment | $3,053 | | $3,954 | |
| Loans in forbearance | 1,059 | | 1,085 | |
| Loans in repayment and percentage of each status | | | | |
| Loans current | 24,761 | 91.9% | 24,835 | 90.7% |
| Loans delinquent 31-60 days | 734 | 2.7% | 773 | 2.8% |
| Loans delinquent 61-90 days | 436 | 1.6% | 503 | 1.8% |
| Loans delinqent greater than 90 days | 1,018 | 3.8% | 1,287 | 4.7% |
| Total Private Education Loans in repayment | 26,949 | 100% | 27,398 | 100% |
| Total Private Education Loans, gross | $31,061 | | $32,437 | |
| | | | | |
| Percentage of Private Education Loans in repayment | | 86.8% | | 84.5% |
| | | | | |
| Delinquencies as a percentage of Private Education Loans in repayment | | 8.1% | | 9.3% |
| | | | | |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.8% | | 3.8% |

**NAVIENT.**

Confidential and proprietary information © 2015 Navient Solutions, Inc. All rights reserved.   12

160.     The statements in ¶ 159 concerning Navient's Private Education Loan segment and loan loss provisions were false and misleading when made because (as discussed in Section I above and further detailed in Section V.B.-I. below) the Exchange Act Defendants knew but failed to disclose:  (i) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52); (ii) a significant number of higher risk private student

69

loan borrowers who exited deferment during the Class Period had difficulty repaying their loans (*see* ¶¶ 35-38); and (iii) Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-33, 56).

161.    On March 25, 2015, the Company filed with the SEC a preliminary prospectus supplement pursuant to Rule 424(b)(5) that supplemented the prospectus filed with the SEC on July 18, 2014 in connection with the Company's automatic shelf registration.  The preliminary prospectus supplement indicated Navient's intent to sell an undisclosed amount of Senior Notes pursuant to the Shelf Registration Statement, subject to a pricing amendment.  The prospectus supplement also expressly incorporated by reference:  (i) Navient's Form 10 Registration Statement in connection with the Spin-Off; (ii) Navient's 2014 Form 10-K; (iii) Navient's Q1 2014 Form 10-Q; (iv) Form 8-Ks filed on January 26, 2015 and March 10, 2015; and (v) all documents Navient subsequently filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the completion of the offering.

162.    On the same day, March 25, 2015, Navient filed with the SEC a Free Writing Prospectus pursuant to Rule 433 containing a Pricing Term Sheet indicating that it will offer for sale $500 million of the 5.875% Senior Notes due 2021 at a public offering price of 99.379%. The Pricing Term Sheet stated that the Senior Notes due 2021 had received ratings from debt rating agencies of "Ba3/ BB/ BB, by Moody's/ S&P/ Fitch."

163.    On March 26, 2015, Navient filed with the SEC a final prospectus supplement pursuant to Rule 424(b)(2) in connection with the 2015 Debt Offering.  The final prospectus supplement incorporated by reference the same information and documents as was incorporated in the preliminary prospectus filed March 25, 2015.  On the same day, Navient conducted the

70

2015 Debt Offering by selling $500 million of the 5.875% Senior Notes, raising more than $492.5 million in gross proceeds for the Company.

164.    The statements issued in connection with the 2015 Debt Offering, including documents incorporated by reference therein, were materially false and misleading because (as discussed in Section I above and further detailed in Section V.B.-I. below) the Exchange Act Defendants knew or recklessly disregarded that:  (i) Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE (*see* ¶¶ 42-43); (ii) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52); (iii) a significant number of higher-risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans (*see* ¶¶ 35-38); (iv) Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-33, 56); and (v) a significant portion of Navient's low interest rate credit facilities were at risk of being eliminated or reduced, thereby increasing Navient's borrowing costs (*see* ¶¶ 59-65).

165.    After trading closed on April 21, 2015, Navient issued a press release announcing its Q1 2015 financial results (for the quarter ended March 31, 2015).  In the release, Navient reported GAAP net income of $292 million ($0.72 diluted earnings per share) for Q1 2015, compared with $219 million ($0.49 diluted earnings per share) for the same period the previous year.  Navient also reported core earnings of $194 million ($0.48 diluted earnings per share) for the quarter, compared with $142 million ($0.33 diluted earnings per share) for the same period the previous year.

71

166.    With respect to its Private Education Loan segment, Navient reported that the

increase in core earnings was attributable, in significant part, to a decrease in its loan loss

provision:

> Core earnings for the segment were $77 million in first-quarter
> 2015, compared with the year-ago quarter's $74 million.  This
> increase is primarily the result of a ***$16 million decrease in the
> provision for private education loan losses***, a $6 million increase
> in servicing fees and a $9 million reduction in expenses.  This was
> partially offset by a $26 million decrease in net interest income due
> to a decline in the net interest margin and the balance of the
> portfolio.
>
> > Core earnings first-quarter 2015 private education loan
> > portfolio results vs. first- quarter 2014 are as follows:
>
> - Delinquencies of 90 days or more of 3.6 percent of loans in
>   repayment, down from 3.9 percent.
>
> - Total delinquencies of 6.9 percent of loans in repayment,
>   down from 7.8 percent.
>
> - Annualized charge-off rate of 2.9 percent of average loans
>   in repayment, down from 3.3 percent.
>
> - Net interest margin of 3.74 percent, down from 3.91
>   percent.
>
> - Provision for private education loan losses of $120 million,
>   down from $136 million.
>
> At March 31, 2015, Navient held $29.0 billion of private education
> loans, compared with $30.9 billion of private education loans held
> at March 31, 2014.

167.    Remondi stated in the release, "Private credit quality also continued to improve,

leading to a lower loan loss provision."

168.    Navient further stated, with respect to the capacity of its FFELP Loans – other

facilities:

> As of March 31, 2015, December 31, 2014 and March 31, 2014,
> the maximum additional capacity under these facilities was $12.5

72

billion, $13.2 billion and $12.7 billion, respectively.  For the three months ended March 31, 2015, December 31, 2014 and March 31, 2014, the average maximum additional capacity under these facilities was $12.9 billion, $14.0 billion and $12.3 billion, respectively.

169.    On April 22, 2015, Navient conducted a conference call with analysts and investors, during which Chivavibul reiterated Navient's Q1 2015 financial results announced the previous day and stated Navient still "expect[ed] core EPS to be $2.20 in 2015."  Remondi emphasized the improvement in the performance of Navient's Private Education Loan portfolio, noting that "[o]n the credit front, [Navient] continue[d] to see delinquency rates and [its] outlook for future expected charge-offs on [its] private portfolio improve" and highlighting that "the 90-day delinquency rate on [its] private loan portfolio fell to 3.6% at March 31 from 3.9% a year ago."  Remondi also engaged in the following exchange with an analysts who asked about the DOE's termination of Pioneer, claiming "we don't see similar kinds of issues or findings [as the DOE]":

> DAVID HOCHSTIM, ANALYST, BUCKINGHAM RESEARCH: Thanks. I was wondering, is there anything more you can say about the Department of Ed collections contract loss and kind of relating what they did to what you got in your reviews, a better explanation?
>
> JACK REMONDI: Yes. So as we've said, they did not provide us -- they simply decided not to extend our contract, they did not terminate it. As a result of that, the view has been that they have not needed to provide us with the detailed information behind some of their statements. We continue to press for that. I think the filing in federal courts delayed a little bit or impacts the ability to share that information.
>
> * * *
>
> We know that when we look at our own work here and when we look at the reviews that the Department of Ed conducted over the

73

past year and a half, we don't see similar kinds of issues or findings.[40]

170.    On April 24, 2015, before the market opened, an article in *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by authorities in Massachusetts "over allegations the company mistreated distressed borrowers."  Following this news, the price of Navient common stock fell $0.21 per share, or approximately 1%, from its closing price of $20.49 on April 23, 2015, to close at $20.28 per share on April 24, 2015.

171.    On April 30, 2015, Navient filed its Form 10-Q with the SEC for Q1 2015, which reiterated the financial results reported on April 21, 2015 and again emphasized improvements in the performance of Navient's Private Education Loan segment, representing that its provisions for loan losses declined $60 million and that "contributing to the decrease was the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs."  The Form 10-Q also contained substantially the same statements concerning the "appropriate" level of its Allowance for Loan Losses, its legal compliance, and approach in assisting students and families in repaying loans as set forth in Navient's Q1 2014 Form 10-Q (described in ¶¶ 87, 96-96, 145 above).

172.    The Q1 2015 Form 10-Q also included certifications pursuant to Sections 302 and 906 of SOX by each of Remondi and Chivavibul that were nearly identical to the certifications described in ¶¶ 151-52 above.

---

[40] Remondi's reference to "the filing in federal courts" was likely to the action brought by Pioneer and others against the DOE, alleging that the Department's decision to terminate their contracts was arbitrary and violated government procurement rules.  *See* Michael Stratford, *Fired, Then Rehired,* Inside Higher Ed, Mar. 23, 2016, *available at* https://www.insidehighered.com/news/2016/03/23/education-department-rehires-two-debt-collectors-it-accused-misleading-student-loan

173.    The statements in ¶¶ 171-72 were false and misleading when made because (as discussed in Section I and further detailed in Section V.B.-I. below) the Exchange Act Defendants knew but failed to disclose:  (i) Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE (*see* ¶¶ 42-43); (ii) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52); (iii) a significant number of higher risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans (*see* ¶¶ 35-38); (iv) Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-33, 56); and (v) a significant portion of Navient's low interest rate credit facilities were at risk of being eliminated or reduced, thereby increasing Navient's borrowing costs (*see* ¶¶ 59-65).

174.    On May 1, 2015, Navient filed an SEC Form 8-K attaching as an exhibit a presentation titled "2015 1st Quarter Investor Deck," which included slides stating the provision for loan losses with respect to Navient's Private Education Loan segment was $120 million for Q1 2015, down from $128 million in Q4 2014, and a significant decrease from $136 million for same Q1 period the previous year.  The presentation also included the following slide concerning Navient's Private Education Loans segment, including the amount of such loans in repayment and that were delinquent:

75

## Private Education Loans Segment
## Credit Quality "Core Earnings" Basis

| ($'s in millions) | Private Education Loan Portfolio | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2015 | | March 31, 2014 | |
| | Balance | % | Balance | % |
| Loans in-school/grace/deferment | $2,894 | | $4,090 | |
| Loans in forbearance | 1,030 | | 1,205 | |
| Loans in repayment and percentage of each status | | | | |
| Loans current | 24,451 | 93.1% | 24,912 | 92.2% |
| Loans delinquent 31-60 days | 528 | 2.0% | 634 | 2.4% |
| Loans delinquent 61-90 days | 341 | 1.3% | 416 | 1.5% |
| Loans delinqent greater than 90 days | 940 | 3.6% | 1,068 | 3.9% |
| Total Private Education Loans in repayment | 26,260 | 100% | 27,030 | 100% |
| Total Private Education Loans, gross | $30,184 | | $32,325 | |
| | | | | |
| Percentage of Private Education Loans in repayment | | 87.0% | | 83.6% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 6.9% | | 7.8% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.8% | | 4.3% |

NAVIENT.                                                        Confidential and proprietary information © 2015 Navient Solutions, Inc. All rights reserved.    11

175.    The statements in ¶ 174 concerning Navient's Private Education Loan segment and loan loss provision were false and misleading when made because (as discussed above and further detailed below) the Exchange Act Defendants knew but failed to disclose: (i) Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members (*see* ¶¶ 44-52); (ii) a significant number of higher risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans (*see* ¶¶ 35-38); and (iii) Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated (*see* ¶¶ 21-33, 56).

76

1319916.1

176.   On July 7, 2015, the CFPB published a report on its website titled "Overseas &

Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform."[41]  The

CFPB disclosed that it had continued to receive complaints about student loan servicing from

servicemembers after the 2014 settlement between federal regulators and Navient and Sallie

Mae.  Specifically, the CFPB indicated that since it published a report in October 2012 on

complaints it had received from military borrowers about student loan servicers and shared those

complaints with the DOJ and other federal regulators (which subsequently resulted in the $60

million settlement with Navient and Sallie Mae), "the Bureau has received more than 1,300

complaints from military borrowers related to the servicing or collection of student loans."

177.   After trading closed on July 13, 2015, Navient shocked the market when it issued

a press release previewing its earnings for Q2 2015 (the quarter ending June 30, 2015) and

reducing its guidance for 2015.  Specifically, Navient reduced its Core Earnings guidance from

$0.56 per share to $0.40 per share for Q2 2015, and from $2.20 per share to $1.85 per share for

fiscal 2015, *a decrease of nearly 16%*, which the Company attributed primarily to poor

performance of its Private Educational Loans portfolio.  Navient explained that private education

loans issued to borrowers who returned to school during the recession and who deferred loan

payments until fiscal 2014 were "experiencing unfavorable credit trends compared to loans that

exited deferment in prior years," requiring Navient to increase its loan loss provision for the

segment by *$46 million, or 31.7%, to $191 million* which in turn reduced Core Earnings and

profits:

---

[41] Hollister Petraeus and Seth Frotman, *Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform*, CFPB website, July 2015, *available at* http://files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

While the majority of the private education loan portfolio continues to perform as expected and is experiencing positive credit trends, *a segment of higher risk private education loan borrowers who returned to school during the recession deferred repayment on their existing loans and exited deferment status in 2014. These loans are experiencing unfavorable credit trends compared to loans that exited deferment in prior years.* In addition, loan balances exiting deferment increased to $2.5 billion in 2014, as compared to $1.8 billion in 2013 and $2.1 billion in 2012. For 2015, these figures are projected to decline to $1.7 billion. As a result, *the company increased its provision for these loans and now projects a private education loan loss provision of $191 million for the quarter and $575 to $600 million for the year.* As of June 30, 2015, the company's private education loan portfolio totaled $28.1 billion.

As a result of the recent performance in its long-term recovery rate on defaulted loans, the company changed its recovery rate assumption on charged-off loans to 21 percent. The company reduced the balance of the receivable for partially charged-off loans by $330 million to reflect this update. Because this item was previously reserved for, this change did not impact the loan loss provision.

178.    Navient also disclosed it was taking an approximately $29 million restructuring charge in the Q2 2015 in order to "simplify and streamline its management structure."  Remondi stated in the release that "our restructuring initiative reflect[ed] changes post-separation to improve the operating efficiency and effectiveness of [Navient's] organization[.]"

179.    Following the news on July 13, 2015, the price of Navient common stock fell $1.94 per share, or 10.6%, from its closing price of $18.36 on July 13, 2015, to close at $16.42 on July 14, 2015, on unusually high trading volume.  During the same period, Navient 5.875% Senior Notes due 2021 declined $1.75, or 1.75%; Navient 5.875% Senior Notes due 2024 declined $2.25, or 2.41%; and Navient 5% Senior Notes declined $2.30, or 2.33%.

180.    After the market closed on July 21, 2015, Navient issued a press release announcing its financial results for Q2 2015, in line with its earlier guidance.  Navient reported GAAP net income of $182 million ($0.47 diluted earnings per share) in Q2 2015, compared with

$307 million ($0.71 diluted earnings per share) for the same quarter the previous year, as well as

Core Earnings for the quarter of $154 million ($0.40 diluted earnings per share), compared with

$241 million ($0.56 diluted earnings per share) for the same quarter the previous year.  The

Company attributed the decreases "primarily" to "a $70 million decrease in net interest income

and a $43 million increase in provision for loan losses."

181.    In the release, Navient reported disappointing performance of its private

education loan portfolio, noting Core Earnings were $22 million for the quarter, compared with

$86 million in the same quarter the previous year.  The disappointing earnings were reportedly

attributable, in significant part, **_to a 31.7% increase, or $46 million_**, in Navient's provision for

loan losses in Q2 2015:

> In addition, there was a $46 million increase in the provision for
> private education loan losses. This increase in provision was
> primarily the result of an increase in the amount of loans exiting
> deferment status in 2014 over prior years and those loans
> experiencing unfavorable credit trends compared to loans that
> exited deferment in prior years. This segment of borrowers
> returned to school during the recession, deferred payment on their
> existing loans, and exited deferment status in 2014.
>
> * * *
>
> Provision for private education loan losses of $191 million, up
> from $145 million.

182.    On July 22, 2015, Navient conducted a conference call with analysts and investors

and provided additional details on the Company's surprising revelation concerning increased

delinquency and default rates among higher risk private education loan borrowers who had

exited and were expected to exit deferment.  Remondi quantified the total amount of such

troubled loans that exited deferment since 2014:  "It's the $2.5 billion that exited in 2014, $1.7

billion that will exit in 2015, and we expect that number . . . for 2016 exits to be under $1

billion."

183.     During the call, Remondi fielded several questions from analysts about the higher

risk private education loan borrowers, including the following exchange during which he

revealed those borrowers "***were struggling to begin with***" and "had demonstrated difficulty in

making payments where they were in repayment prior to returning to school" (but Navient

nevertheless failed to timely and adequately account for such risk of loss):

> ERIC BEARDSLEY: Okay. And just not to beat a dead horse, but
> just on the cohort of the 2014 loans to exit deferment, what made
> them different from 2012 and 2013? Were there any characteristics
> that were particularly different that led to the higher default rate?
>
> JACK REMONDI: I think the two biggest things are the ones I
> mentioned, which is that ***we had a higher percentage of these
> borrowers who had demonstrated difficulty in making payments
> when they were in repayment prior to returning to school*** than in
> prior cohorts. So that gives you an example of an indication that
> ***they were struggling to begin with***. And the second piece is the
> statistic that said that more of these customers had moved in and
> out of school multiple times, not just two, but more than two times.
> Those were the primary differences.

184.     Remondi further disclosed during the call that Navient had seen an unfavorable

trend among the higher risk private education loan borrowers, who entered and exited deferment

multiple times and did not complete their degrees—which Remondi acknowledged generally

results in a higher incidence of delinquency and default:

> What we saw here is a second group of return to school which is
> borrowers who, this isn't true for the entire $2.5 billion of course,
> but ***borrowers who did not obtain their undergraduate degree
> went back, took more classes, reentered repayment and went
> back again.***  So, these customers took longer to either obtain an
> undergraduate degree or maybe did not obtain it at all.  ***The
> incidence of delinquency and default on borrowers who take
> more time to get an undergraduate degree is certainly higher and
> I think that's what we're seeing this particular cohort.  Generally
> speaking, every year it takes someone to graduate increases their
> debt load by about 10%.***  So if you're going from four years to six
> years, you have -- not only has it taken you longer to get to the
> point of where you're going to generate higher income, but you've
> got more -- you have a higher debt burden as well.  I would

80

describe this pool and the losses coming more from customers who
didn't complete their degree.

185.   Following the news on July 21, 2015, the price of Navient common stock fell

$0.37 per share, or 2.2%, from its closing price of $16.60 on July 21, 2015, to close at $16.23 on

July 23, 2015.  During the same period, Navient 5.875% Senior Notes due 2024 declined $3.25,

or 3.51%, and Navient 5% Senior Notes declined $1.56, or 1.64%.

186.   After the market closed on August 24, 2015, Navient disclosed in an SEC Form 8-

K that its wholly-owned subsidiary NSI had recently received a letter from the CFPB stating the

Bureau's Office of Enforcement was considering taking legal action against NSI regarding its

disclosures and assessment of late fees:

> On August 19, 2015, Navient Solutions, Inc. ("NSI"), a wholly-
> owned subsidiary of Navient Corporation (the "Company," "we"
> or "us"), received a letter from the CFPB notifying NSI that, in
> accordance with the CFPB's discretionary Notice and Opportunity
> to Respond and Advise ("NORA") process, the CFPB's Office of
> Enforcement is considering recommending that the CFPB take
> legal action against NSI.  The NORA letter relates to a previously
> disclosed investigation into NSI's disclosures and assessment of
> late fees and other matters and states that, in connection with any
> action, the CFPB may seek restitution, civil monetary penalties and
> corrective action against NSI.
>
> The purpose of a NORA Letter is to ensure that a party being
> investigated by the CFPB has the opportunity to present its
> positions to the CFPB before an enforcement action is
> recommended or commenced, in the form of a written statement
> setting forth any reasons of law or policy why the party believes
> the CFPB should not take legal action against it. NSI continues to
> believe that its acts and practices relating to student loans are
> lawful and meet industry standards and, where applicable, the
> statutory or contractual requirements of NSI's other regulators. As
> such, NSI intends to make a NORA submission to the CFPB.
>
> The Company is committed to resolving any potential concerns.
> However, it is currently unable to predict the timing or outcome of
> the NORA process. The Company cannot provide any assurance
> that the CFPB will not ultimately take legal action against NSI or
> that the outcome of any such action, if brought, will not have a

> material adverse effect on the Company. It is also not possible at
> this time to estimate a range of potential exposure, if any, for
> amounts that may be payable in connection with these matters and,
> as a result, reserves have not been established.

In response to this disclosure, the price of Navient common stock fell $1.02 per share, or 7.8%,

from its closing price of $13.06 on August 24, 2015, to close at $12.04 per share on August 25,

2015, on unusually heavy trading volume.

187.    On September 29, 2015, the CFPB issued its Report (*see* ¶¶ 7-9 above) criticizing

student loan servicing companies such as Navient.  The Report, which drew from more than

30,000 public comments in response to an inquiry into student loan servicing practices launched

by the Bureau in conjunction with the DOE and the Treasury Department, discussed reports of

widespread loan servicing problems and abusive practices similar to those that, as described

above, were employed by Navient, including:

> •    Comments from individual student loan borrowers describe how they
> encounter servicing problems or practices that discourage utilization of alternative
> repayment plans, including income-driven repayment plans. A number of comments
> describe how some borrowers may end up in default when they are unable to obtain an
> alternative repayment plan. Comments also describe how some servicing practices
> subsequently can result in payment shock, lost benefits, and increased interest charges for
> borrowers enrolled in these plans.

> •    Commenters detail problems related to customer service, including issues
> for borrowers seeking to resolve servicing errors. Commenters describe how these
> problems create barriers for borrowers experiencing financial hardship who are seeking
> to avoid default, and may cause significant credit reporting harm.

> •    Commenters describe how payment processing and servicing transfer
> practices create problems for borrowers trying to repay student debt. Public comments
> from individual borrowers describe how these practices cause payment processing
> problems, increase interest charges and late fees, prolong repayment, and create
> confusion for student loan borrowers. Loan servicers also comment that the complexity
> of the student loan programs may contribute to these problems.

188.    Following the CFPB Report's release, the price of Navient's common stock fell

$0.53 per share, or 4.4%, from its close price of $12.16 on September 28, 2015, to close at

$11.63 on September 29, 2015, on unusually heavy trading volume. Navient's stock price continued to fall over the next two trading days, closing at $10.96 per share on October 1, 2015. Around the same period, Navient's 5% Senior Notes declined $5.75, or 6.35%, from its close of $90.50 on September 28, 2015 to close at $84.75 on September 29, 2015. The 5% Senior Notes continued to decline over the next trading sessions for a total decline of $10.50, or 11.6%, from its close of $90.50 on September 28, 2015 to close at $80.00 on October 2, 2015. Moreover, Navient's 5.875% Senior Notes due 2021 fell $2.38, or 2.75%, from its close of $86.25 on September 29, 2015 to close at $83.875 on September 30, 2015. Navient's 5.875% Senior Notes due 2021 continued to fall over the next trading days for a total decline of $10.20, or 11.9% from its close of $86.25 on September 29, 2015 to close at $75.958 on October 2, 2015.

189.     On October 14, 2015, the CFPB released its Annual Report of the CFPB Student Loan Ombudsman for 2015 ("2015 CFPB Ombudsman Report"). The report analyzed approximately 6,400 private student loan complaints submitted to the CFPB between October 1, 2014 and September 30, 2015, an increase of 23% compared to 2014. Complaints concerning Navient accounted for 1,724, or *approximately 26%*, of the total complaints submitted. According to the report, private student loan borrowers complained of servicing problems, "including lack of access to timely and accurate information on availability or eligibility criteria to enroll in alternative repayment programs."

190.     On October 20, 2015, the Company issued a release announcing its financial results for Q3 2015 (the quarter ending September 30, 2015), including the capacity of its FFELP Loans – other facilities:

> As of September 30, 2015, June 30, 2015 and September 30, 2014, the maximum additional capacity under these facilities was $10.1 billion, $11.5 billion and $11.0 billion, respectively. For the three months ended September 30, 2015, June 30, 2015 and September

83

30, 2014, the average maximum additional capacity under these
facilities was $11.0 billion, $12.2 billion and $10.8 billion,
respectively.  For the nine months ended September 30, 2015 and
2014, the average maximum additional capacity under these
facilities was $12.0 billion and $11.6 billion, respectively.

191.   The statements in ¶ 190 concerning Navient's credit facility capacity were false

and misleading when made because the Exchange Act Defendants knew but failed to disclose

that a significant portion of the Company's low-rate credit facilities were at risk of being reduced

or eliminated and would cause the Company to face higher borrowing costs.

192.   On October 21, 2015, Navient conducted a conference call with analysts and

investors to discuss its Q3 2015 financial results.  During the conference call, Remondi provided

additional details on the CFPB's investigation of Navient (which, as described above, led to a

potential enforcement action against NSI), noting several items were previously covered through

settlements with other regulators, including the FDIC settlement resolving allegations that

Navient violated the SCRA and other federal laws regarding the treatment of servicemembers.

Remondi's comments indicated that despite the settlements, which supposedly resolved

Navient's allegedly unlawful loan servicing and debt collection practices, Navient continued to

improperly service the loans of military borrowers.

193.   On December 21, 2015, S&P revised its outlook on Navient to negative from

stable and lowering its senior unsecured debt rating to 'BB-' from 'BB.'  The report stated the

revision "reflects Navient's significant unsecured debt maturities coming due over the next five

years relative to its unencumbered assets, including $1.2 billion in 2016, $1.8 billion in 2017,

and $2.8 billion in 2018."  S&P further stated, "Lowering the senior unsecured debt rating

reflects our expectation that Navient's tangible unencumbered assets, which were $9.9 billion as

of Sept. 30, 2015, for the next several years likely will remain less than its outstanding unsecured

debt, which was $15.8 billion as of the same date."  Following this news, the price of Navient

common stock fell approximately 1.8% over two trading days to close at $11.70 on December 21, 2015.  During the same period, Navient 5.875% Senior Notes due 2021 declined $0.63, or 0.68%; Navient 5.875% Senior Notes due 2024 declined $3.38 or 3.95%; and Navient 5% Senior Notes due 2020 declined $1.13, or 1.27%.

194.    Finally, on December 28, 2015, Navient filed an SEC Form 8-K revealing that on December 22, 2015, the Company's wholly-owned subsidiary HICA Education Loan Corporation (as defined above, HICA), received a notice from the Federal Home Loan Bank of Des Moines (as defined above, FHLB-DM) indicating "availability under the FHLB-DM Credit Facilities would be reduced from approximately $10.7 billion to approximately $5.0 billion for the period from December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for advances maturing after October 31, 2016."  Navient explained that the FHLB-DM Credit Facilities and other credit facilities support the Company's acquisition of FFELP loans and that FHLB-DM's action "will result in a reduction of aggregate borrowing availability under the FHLB-DM Credit Facilities and the other credit facilities available to the Company and its subsidiaries as of the date of this Current Report from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof."  In other words, Navient would be able to borrow only an additional $2.5 billion under its existing credit lines of which the Company already had drawn down 87%, likely resulting in an adverse impact on the liquidity, capital resources, and borrowing costs for the Company.  This represented a dramatic decrease from the maximum additional capacity under the FFELP Loan-other facilities Navient reported as of September 30, 2015 ($10.1 billion), and in prior quarters, as described in ¶¶ 94, 105, 116-133, 141, 168, 190.

85

195.     Navient's statement in the Form 8-K that the FHLB-DM action was "due to an internal policy change in the formula the FHLB-DM uses to set a borrower's maximum borrowing limit" was misleading as it was inconsistent with the explanation the Company later provided in its 2015 Form 10-K, filed with the SEC on February 25, 2016, that the FHLB-DM action was related to the January 2016 publication by the Federal Home Finance Agency's ("FHFA") of a final rule (which rule was initially proposed and published in the Federal Register in September 2014) preventing non-eligible entities from gaining membership with a Federal Home Loan Bank ("FHLBank") membership through the use of a captive insurer.[42]  As described below, a number of media outlets reported that FHLB-DM's action was linked to widely publicized criticism from Senator Elizabeth Warren beginning in 2013 that government-sponsored banks such as FHLB-DM should not lend taxpayer-backed funds—whose use was intended to make homeownership more affordable—at favorable terms to student loan companies, especially when the savings were not being passed on to student loan borrowers.

196.     The FHLB-DM credit facilities were a significant source of low-cost borrowings for Navient to acquire FFELP loans.  The facilities had a material impact on the Company's liquidity and financial performance because of the favorable net interest margin, which Navient publicly touted during the Class Period was "relatively stable."  Navient failed to adequately disclose to investors, however, that the government's intense scrutiny of the facilities, together

---

[42]     *See* Navient Form 10-K for year ending December 31, 2016, at 92; *see also FHFA Issues Final Rule on Federal Home Loan Bank Membership*, FHFA website, Jan. 12, 2016, *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Issues-Final-Rule-on-Federal-Home-Loan-Bank-Membership.aspx, and Federal Housing Finance Agency, *Member of Federal Home Loan Banks, Final Rule*, 12 CFR 1263, RIN 2590-AA39, *available at* https://www.fhfa.gov/SupervisionRegulation/Rules/RuleDocuments/Membership%20Final%20Rule%20to%20Fed%20Reg.pdf ("FHFA published a proposed rule in the *Federal Register* on September 12, 2014.[]  It proposed to make two fundamental changes to the Bank membership regulation, as well as several other substantive, but less fundamental, changes, and numerous non-substantive revisions to clarify various existing regulatory provisions.").

with the FHFA's proposed rule regarding FHLBank membership, created a significant risk that the facilities would be reduced and Navient's liquidity and capital resources would be affected, interest margins would decline, borrowing costs would dramatically rise, thereby adversely affecting the Company's financial performance.

197.    Navient's deteriorating financial condition during the Class Period also contributed to this risk.  For example, Navient reported that its unrestricted cash balances declined significantly during the Class Period.  As of December 31, 2013, Navient's cash and equivalents held as of December 31, 2013 was $5.19 billion, and declined to $1.44 billion as of December 31, 2014 and $1.59 billion as of December 31, 2015:



198.    Likewise, net interest margin from private education loans and FFELP loans also declined.





199.   In response to the news on December 28, 2015, Navient's stock price fell $1.15 per share, or 9.1%, from its closing price of $12.61 on the previous trading day, December 24, 2015, to close at $11.46 per share on December 28, 2015, on unusually high trading volume.

1319916.1

200.     On December 31, 2015, *The Huffington Post* published an article recounting

Senator Warren's public inquiry and criticism of Navient's FHLB-DM credit facilities[43]

beginning in 2013 and other developments that led to the FHLB-DM's significant reduction of

the facilities:

> Last week, the Massachusetts Democrat achieved a quiet victory
> after the Federal Home Loan Bank of Des Moines restricted Sallie
> Mae offshoot and student loan giant Navient Corp.'s access to
> ultra-cheap funds — causing stock in the company to plummet and
> demonstrating the unique ability of one of the Senate's most liberal
> lawmakers to influence the bottom line of one of the nation's
> largest publicly traded companies.
>
> * * *
>
> It wasn't until 2013 that Navient's reliance on the Federal Home
> Loan Bank of Des Moines for cut-rate cash drew public attention.
>
> Sallie Mae, Navient's parent company until its spinoff in 2014,
> enjoyed the use of taxpayer-backed funds "at favorable terms,"
> despite the fact that it "does not originate a noteworthy level of
> mortgages" — a point that its regulator, the Consumer Financial
> Protection Bureau, said was "worth noting" in a May 2013 report
> on the affordability of student loans.
>
> A month later, Warren launched a public campaign condemning
> Sallie Mae for taking advantage of taxpayer-subsidized funds to
> reduce its costs without passing along those savings to student loan
> borrowers.
>
> Federal Home Loan Banks, created by Congress in 1932 during the
> Great Depression, aim to make homeownership more affordable by
> lending cheaply to financial companies that in turn pledge home
> mortgages as collateral.
>
> But since 1999, the Des Moines branch has been lending against
> government-insured student loans made under the bank-based

---

[43]     *See* Letter from U.S. Senator Elizabeth Warren to the Federal Housing Finance Agency,
dated June 24, 2013, *available at*
http://www.warren.senate.gov/files/documents/20130624FHFALetter.pdf; and Letter from
Senator Warren to John (Jack) F. Remondi, President and Chief Executive Officer of SLM
Corporation, dated June 25, 2013, *available at*
http://www.warren.senate.gov/files/documents/SallieMaeLtr.pdf.

Federal Family Education Loan program, despite its lack of connection to home loans.

Student lenders loved the FFEL program because they could generate easy profits: Loan owners reaped the rewards of borrowers' payments but didn't have to shoulder the full cost of loan defaults, a burden that fell to taxpayers under an arrangement created by the federal government.

And while the Des Moines bank's loans were designed to be limited to financial firms that made home loans — not to student lenders — Sallie Mae obtained membership in the bank's network through a subsidiary.

Congressional Democrats and the Obama administration ultimately killed the FFEL program in 2010, mandating that all new federal student loans originating after June of that year would be made directly by the Department of Education. As a result, the amount of outstanding FFEL loans has fallen 30 percent over the past five years to $363.6 billion, federal data show.

But Sallie Mae, and later, Navient, maintained membership in the Des Moines bank's network and kept tapping the bank for low-cost, taxpayer-subsidized loans even though there were no new federal loans it could make.

\* \* \*

The arrangement was highly beneficial to Sallie Mae, which could borrow money at bargain prices even after it was no longer able to originate new government-insured loans after June 2010.

For example, in the first six months of 2013, Sallie Mae enjoyed a 0.28 percent interest rate when borrowing from the Des Moines bank, making it the student lender's lowest-cost source of funds outside of debt tied to derivatives. From 2010 to 2012, the Des Moines bank lent Sallie Mae money at rates that on average were no higher than 0.35 percent.

In effect, Sallie Mae and Navient have been able to borrow billions of dollars at what Warren said were "astonishingly low rates" from a taxpayer-backed lender for next to nothing, purely to fuel the student loan giant's growth.

As it borrowed, Sallie Mae was also making loans to students at interest rates up to 40 times the rate the company paid to borrow from the Federal Home Loan Bank of Des Moines.

90

To Warren, the fact that taxpayers were subsidizing Sallie Mae and Navient's profits was bad enough. But there also was an urgent public policy concern arising from the company's relationship with the Des Moines bank: The government-backed lender and its regulator risked undermining their homeownership mission "by helping finance more student loan debt."

In April 2013, researchers at the Federal Reserve Bank of New York published an explosive report: For the first time in at least a decade, data showed that young Americans with student debt were less likely than their unburdened peers to have home mortgages.

\* \* \*

That year, Sallie Mae stopped disclosing details of its Des Moines credit line, following criticism from Warren and intense news coverage. Navient has continued the practice of keeping investors in the dark about how much it borrows from the Des Moines bank and its rate of interest.

\* \* \*

Navient's cost to borrow — a measure of financial markets' confidence in the company's ability to pay its bills — for short periods of time has more than tripled since last year, according to the company's latest quarterly report to investors.

Through the first nine months of 2014, it cost Navient about twice as much to borrow for long periods of time versus for short-term loans. During the same period this year, the company paid more for short-term debt than it cost to borrow long-term.

Navient's lenders are charging the company more as Navient has become more reliant on borrowed money to fund itself. Its level of equity relative to its total assets stood at 3.2 percent on average during the first nine months of 2014. That measure has fallen to 2.8 percent this year, according to the company's latest quarterly report.[44]

---

[44]    Shahien Nasiripour, *How Elizabeth Warren Beat a Student Loan Giant*, The Huffington Post, Dec. 31, 2015, *available at* http://www.huffingtonpost.com/entry/elizabeth-warren-student-loan-giant_us_568412fbe4b06fa68881b03f

1319916.1

### C.   Navient Violated Applicable SEC Rules By Failing to Adequately Disclose Required Information Related to its Liquidity and Financing Arrangements

201.   SEC Regulation S-X, Rule 5-02-22 concerning "Bonds, Mortgages, and Other Long Term Debt, Including Capitalized Leases," requires disclosure of the following information on the face of the balance sheets or related notes concerning a registrant's long-term debt, including the "conditions under which commitments may be withdrawn":

**Long-Term Debt**

22. Bonds, mortgages and other long-term debt, including capitalized leases.

(a) State separately, in the balance sheet or in a note thereto, each issue or type of obligation and such information as will indicate (see § 210.4-06):

(1) The general character of each type of debt including the rate of interest; (2) the date of maturity, or, if maturing serially, a brief indication of the serial maturities, such as "maturing serially from 1980 to 1990"; (3) if the payment of principal or interest is contingent, an appropriate indication of such contingency; (4) a brief indication of priority; and (5) if convertible, the basis. For amounts owed to related parties, see § 210.4-08(k).

(b) The amount and terms (including commitment fees and *the conditions under which commitments may be withdrawn*) of unused commitments for long-term financing arrangements that would be disclosed under this rule if used shall be disclosed in the notes to the financial statements if significant.

202.   In addition, SEC Regulation S-K, Rule 303 pertaining to Management's Discussion and Analysis of Financial Condition and Results of Operations requires a registrant to disclose the following about its liquidity and capital resources:

(1) Liquidity. *Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.* If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency.

92

Also identify and separately describe internal and external sources of liquidity, and briefly discuss any material unused sources of liquid assets.

(2) Capital resources.

\* \* \*

(ii) *Describe any known material trends, favorable or unfavorable, in the registrant's capital resources. Indicate any expected material changes in the mix and relative cost of such resources*. The discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements.

203.    In addition, the SEC provided the following interpretive guidance on the liquidity and capital resource disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations:

In addition, in the context of liquidity and capital resources, if the registrant's financial statements do not adequately convey the registrant's financing arrangements during the period, or the impact of those arrangements on liquidity, because of a known trend, demand, commitment, event or uncertainty, additional narrative disclosures should be considered and may be required to enable an understanding of the amounts depicted in the financial statements.[45]

204.    Navient's disclosures regarding its long-term debt, liquidity, and capital resources violated SEC disclosure requirements.  As described in ¶¶ 59-65, during the Class Period, Navient failed to adequately disclose the amounts and terms of the FHLB-DM credit facilities. For example, the 2014 Form 10-K described Navient's credit facilities generally and vaguely, indicating that it has "various secured borrowing facilities that we use to finance our FFELP Loans," that "[l]iquidity is available . . . to the extent we have eligible collateral and available capacity," that maximum borrowing capacity "will vary and is subject to each agreement's borrowing conditions[,]" such as "the facility's size, current usage and the availability and fair

---

[45] SEC Release No. 33-9144: *Commission Guidance on Presentation of Liquidity and Capital Resource Disclosures in Management's Discussion and Analysis*, Sept. 17, 2010.

value of qualifying unencumbered FFELP Loan collateral[,]" and that as of December 31, 2014, "the maximum unused capacity under these facilities was $13.2 billion." The 2014 Form 10-K failed to describe or define "eligible" collateral or "qualifying" unencumbered FFELP Loans under the terms of the facilities. Significantly, the 2014 Form 10-K and Navient's other SEC filings during the Class Period omitted details about the FHLB-DM facility agreement contained in SLM Corporation's Form 10-K's prior the Spin-Off. In its Form 10-K for the year ending December 31, 2013, for example, SLM Corporation indicated that under the terms credit facility agreement, the FHLB-DM will provide advances "backed by *Federal Housing Finance Agency approved collateral which includes FFELP Loans,*" and that the "facility is available *as long as we maintain membership with FHLB-DM.*"[46] The 2014 Form 10-K also failed to specify the terms under which the FHLB-DM credit facilities could be reduced or withdrawn. It also omitted mention of the government's increased scrutiny of the credit facilities and the FHFA's proposed rule to amend FHLBank membership eligibility requirements as material trends and/or risks that could result in the reduction in the facilities and Navient's liquidity.

205.   For the same reasons, similar disclosures in Navient's Forms 10-Q concerning its "FFELP-Loan—other facilities," as described in ¶¶ 94, 105, 116, 168, 190, were inadequate.

206.   Navient was aware of, or recklessly disregarded, the FHFA's proposed rule to amend FHLBank membership requirements and that the new rule, or a substantially similar version thereof, could lead to a significant reduction in the FHLB-DM credit facilities and increase Navient's borrowing costs. The FHFA published the proposed rule in the Federal Register in September 2014 and Navient should have disclosed the risks it represented before December 2015.

---

[46] SLM Corporation Form 10-K for the year ended December 31, 2012, filed with the SEC on February 26, 2013, at F-50.

### D.    Navient Violated U.S. Generally Accepted Accounting Principles ("GAAP") By Failing to Adequately Account for Loan Losses

207.    During the Class Period, student loans were the primary source of Navient's credit risk and related credit losses.  Under GAAP, Navient was required to account for incurred and inherent credit losses in its allowance for loan losses and related provisions at the end of each financial reporting quarter.

208.    The Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 450 concerning "Contingencies," together with ASC 310 concerning "Receivables," set forth the primary accounting guidance with respect to the recognition of allowances for loan losses that are both probable and estimable.[47]  Specifically, ASC 450 defines a "loss contingency" as follows:

> *an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur[.]*[48]

209.    When a loss contingency exists, the likelihood that a future event or events will occur, or fail to occur, and thereby confirm the loss or impairment of an asset or the incurrence of a liability ranges from "probable" to "reasonably possible" to "remote."  GAAP defines those terms as follows:

> Probable – The future event or events are likely to occur.

> Reasonably possible – The chance of the future event or events occurring is more than remote but less than likely.

---

[47] These accounting standards were principally developed from the FASB's pre-codification accounting principles established under Statements of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS No. 5"), and SFAS No. 114, *Accounting by Creditors for Impairment of a Loan*.

[48] FASB ASC Master Glossary.

> Remote – The chance of the future event or events occurring is slight.[49]

210.    Under GAAP, Navient was required to account for loan losses inherent in its loan portfolio by recording a provision (a current period expense) and corresponding allowance for loan loss if both of the following conditions were met:

> a.      Information available prior to the issuance of Navient's financial statements indicated that it was "probable" that its loans had been impaired based on past events and conditions existing at the date of the financial statements; and

> b.      The amount of probable loss could be reasonably estimated.[50]

Even if a particular uncollectible loans may not be identifiable,[51] Navient must accrue for such loan losses.[52]  The SEC has issued guidance affirming this GAAP requirement.[53]

211.    The risk that Navient would not collect contractual principal and interest due from its private education loan borrowers (*i.e.*, loan losses) involved uncertainty as to possible losses and, therefore, constituted a loss contingency that required accounting recognition by Navient.

212.    Under GAAP, Navient was required to consider all available information, prior to the issuance of its financial statements, pertaining to estimated losses in its student loan portfolios, including its Private Education Loans portfolio.

---

[49] *Id.*

[50] *See* ASC 450-20-05-03, ASC 310-10-35-8 and ASC 310-10-35-18.

[51] ASC 310-10-35-9.

[52] ASC 310-10-35-22 (the conditions were not intended to be so rigid that they required virtual certainty before a loss was to be accrued).  GAAP further establishes accounting requirements for individual loans evaluated for impairment (as opposed to large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment).  *See* ASC 310.

[53] ASC 310-10-S99-4 ("An estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued when, based on information available prior to the issuance of the financial statements, it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated[.]")

213.    In connection therewith, Navient's management, including Remondi and Chivavibul, was responsible for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied methodology for determining its allowance for loan losses and related provisions.[54]   The methodology should have required management's review of current information and related risks relevant to evaluating the credit losses inherent in the Company's Private Education Loan portfolio, including an evaluation of trends in loan volume by major categories, especially categories experiencing rapid growth, and in delinquencies and restructured loans.[55]   Indeed, relevant accounting guidance recognizes that loan delinquency statistics are "the most common indicators of the level of inherent losses in pools."[56]

---

[54] AICPA Audit and Accounting Guide, *Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies* (the "AICPA Guide"), ¶ 9.04.  According to the AICPA Guide, ¶ 9.05, the methodology should include the following "common elements":

a.    A detailed and regular analysis of the loan portfolio and off balance sheet financial instruments with credit risk;

b.    Procedures for timely identification of problem credits;

c.    Consistent use and application;

d.    Consideration of all known relevant internal and external factors that may affect collectibility;

e.    Consideration of the particular risks inherent in the different kinds of lending;

f.    Consistent use of current, relevant, and reliable data;

g.    Good documentation with clear explanations of the supporting analyses and rationale; and

h.    Identification of all subsequent events that provide additional evidence about conditions that existed at the balance sheet date.

[55] AICPA Guide, ¶ 9.69.

[56] Bank Accounting Advisory Series, Office of the Comptroller of the Currency, October 2014, at 104.

1319916.1

214.     During the Class Period, Navient assured investors that its accounting policy relating to the determination of its allowance for credit losses in its Private Education Loans portfolio, as described in ¶¶ 138-39, was robust and that Navient evaluated certain risk characteristics and used historical experience of customer payment behavior, among other things, to estimate probable credit losses.  Navient also maintained that its allowance for loans losses and related provisions complied with GAAP and were sufficient to absorb losses incurred in its loan portfolios at each of its financial reporting dates.  (¶¶ 14, 89, 138-39).

215.     Contrary to those assurances, Navient failed to adequately account for losses on more than $2.5 billion in delinquent and defaulted private education loans of higher risk borrowers who exited deferment in 2014.  Navient failed to adequately monitor and update credit quality indicators pertaining to those loans, evaluate the risk characteristics of that cohort of borrowers, or consider historical payment experience by those borrowers in determining its allowance for loan losses.  As Remondi revealed during Navient's Q2 2015 earnings conference call, that cohort of borrowers presented unique characteristics in that they returned to school several years earlier, during the Great Recession (in or around *2008*), "moved in and out of school multiple times," some without earning a degree, and then exited deferment status in 2014. Remondi also disclosed that historically, those borrowers were "***struggling to begin with***" in making their loan payments.  Further, Remondi recognized that typically, "[*t*]*he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher*" and acknowledged that that cohort of higher risk private education loan borrowers was indeed typical of that trend.

216.     Accordingly, by no later than the filing of its 2014 Form 10-K, by which time the $2.5 billion in delinquent and defaulted private education loans had exited deferment, Navient's

reported allowance for loan losses and related provisions were understated, in violation of

GAAP, and its public statements concerning same were materially false and misleading.

> **E.** **Former Navient Employees Confirm that the Exchange Act Defendants Knowingly or Recklessly Engaged in the Misconduct Detailed in this Complaint.**

217.    The very nature of the misconduct described above indicates it could not have

occurred without the knowledge, or at least reckless disregard, of Navient senior executives,

including Defendants Remondi and Chivavibul.  Further, information provided by former

Navient employees confirms that the Exchange Act Defendants' improper practices reflected

systemic policies directed by senior management.  For example, CW 1, a former Collections

Supervisor who worked at Navient before and during part of the Class Period, recounted a

practice at Navient of trying to postpone borrowers' payments to keep them from showing up on

the Company's records as delinquent, regardless of the effect of those postponements on the

borrowers' accounts.  CW 1 stated Collections' "objective all of the time was to keep an account

current" through using forbearances or other means of postponing payments borrowers were

unable to make.  Accordingly, CW 1 explained, "[y]ou would never see us have a goal where it

was 'Let's see how much money we can collect this month.'  It was how much can we postpone?

How many forbearances can we slap on [an] account."  CW 1 stated this management directive

was conveyed by CW 1's supervisor but came from Navient District Manager/Senior Vice

President of Default Prevention Troy Standish, who reported to John Kane, Navient Group

President: Asset Recovery and Business Services.  As a result of those practices, CW 1

explained, borrowers were misled and their accounts "were just growing and growing and

growing."

218.    CW 1's account is corroborated by CW 2, a former Navient Collections

Department Supervisor who worked at the Company before and during part of the Class Period

and supervised 25 Collections Agents.  CW 2 recounted that Navient Director of Operations

Christi Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances

than they initially requested, as that would result in a longer period during which the account

would show up as "current" on Navient's books, "even though putting [borrowers] into our

forbearance for 12 months drastically capitalizes a lot more interest and increases their loan

substantially."

219.    Additionally, information provided by CW 3, a former Navient Collections

Support Manager who worked at the Company before and during part of the Class Period,

confirms that Remondi, Chivavibul, and other senior Navient executives closely monitored

issues relating to, among other things, the number of borrowers who fell out of compliance with

loan-rehabilitation requirements due to missing a loan payment.

220.    As discussed above, CW 3 recounted that Navient Collections Department

directors, including collection directors of Navient subsidiaries Pioneer and General Revenue,

participated in regular telephonic status meetings with upper management, including Remondi

and Chivavibul.  CW 3 stated John Kane and Director of Collections Jason Benepe also attended

those meetings, which were led by Jeff Mersmann, who has served as Navient's Vice President

of Operations from April 2014 and as Vice President of Operations at Pioneer since 1997.  Those

meetings occurred weekly, monthly, and quarterly.  Before each meeting, CW 3 explained, CW

3 e-mailed "very in-depth" reports to Mersmann showing (i) delinquency rates, (ii) revenue, (iii)

borrowers participating in a loan-rehabilitation program, (iv) any borrowers who fell out of

compliance with rehabilitation requirements due to missing a loan payment, (v) the number of

borrowers who had consolidated loans, and (vi) the number of borrowers who attempted to

consolidate their loans but were unable to do so.  (CW 3 further recounted that the numbers in

the quarterly reports were compared with the numbers for the same quarter of the previous year.) CW 3 explained that the reports were generated through several programs or systems: (i) Excel, both automatically and through employee input; (ii) Clearview (personalized reports); and (iii) Sharepoint. The reports, CW 3 recounted, collectively provided Company-wide information. CW 3 stated that after the reports were provided to Mersmann, Mersmann presented the numbers to Kane.

221.    CW 3 also described Navient's systemic mishandling of loans of active servicemembers. Under the SCRA—which, as described above, the DOJ and other federal agencies alleged that Navient violated, resulting in a $60 million settlement—members of the military are eligible for certain benefits and protections, including a six percent interest rate cap on their student loans. According to CW 3, "[t]here were no processes in place to properly handle the military borrower accounts." CW 3 noted that "when you were told that a borrower is in the active military, they are deployed or something like that, at that point the borrower should be noted" but that "there was nothing in the system to follow such protocol." Rather, CW 3 explained, "all of the collectors were directed to try to get authorization to speak to somebody else to collect on the debt still as regular," such as having a spouse make payments, instead of actually handling the account in accordance with regulations. CW 3 recounted raising the issue with a Senior Collections Manager before the Class Period, but the Senior Collections Manager indicated they had no accounts of active military borrowers. CW 3 then raised the same issue with the Senior Collections Manager's superior, as well as Jeff Mersmann, both of whom claimed they had not received any requests with respect to active military borrowers and indicated they had nothing to worry about.

222.    CW 3 recalled that Navient's mishandling of military borrowers' loans came to a head years later, in or around September 2014, because Navient had received complaints about its servicing of such accounts.  CW 3's boss at the time, a Senior Collections Support Manager for General Revenue Corporation and Pioneer, met with CW 3 and the Collections Support Manager for Pioneer and, in September 2014, they worked on a "back office project setting up a process where Navient borrowers were actually scanned to see if they were active military."  CW 3 indicated that a third party agency was hired to assist in setting up the process and Navient also paid for and checked a certain website for active military members.  According to CW 3, "the practice was just getting started."  CW 3 recalled one account with Texas Guaranty involving an active military borrower who had a "cease and desist for collection," yet, "every single month, I would redeem the account again and the interest rate would be right back up to I believe it was 12.5 percent. . . The system just wasn't set to deal with it, so every month I was fighting with our IT department on this borrower[.]"  CW 3 indicated that Navient had not completely resolved the problems in managing active military accounts by the time CW 3 departed Navient, ***in February 2015***, long after the Company settled with the DOJ.

223.    CW 1 also recalled that Navient did not apply deferments and forbearances to the accounts of military borrowers on time.

224.    CW 3 further recounted that Navient's training department instructed Collections personnel to explain loan consolidation in an unclear manner to borrowers.

225.    Former Navient employees also described how the Company's bonus system encouraged some of the above practices.  As discussed above, CW 1 recounted that employee bonuses went to the collections agents who processed the most forbearances in a month or sent out the most deferment paperwork in a month, in addition to collecting the most payments, and

that bonuses were contingent on however many accounts were processed by the agent each month, whether in the form of forbearance or payment.  Bonus payments for agents, CW 1 noted, started at $300 monthly and went up to $1500 monthly, with management setting a goal each month specific to a particular performance category:  For example, management might set a goal of $22 million in forbearances for the month, spurring collection agents to achieve that amount of forbearances in total.  CW 1 explained that to achieve a good performance rating, agents had just five and a half minutes per phone call with borrowers, during which agents ran down a list of questions concerning family size, whether the borrower worked part or full time, and whether the borrower received assistance, before sending off paperwork to qualify for a deferral due to unemployment; if there were no questions, the agent ended the call at that point.  Further, CW 1 recounted, while the paperwork was in process the loan was put into forbearance.  According to CW 1, "[i]t's not like [the borrower] was getting any information" during these calls about the impact on their balances.

226.    CW 2 similarly recounted that while CW 2 was at Navient, Collections Agents were incentivized by management, in order to be counted "number one by the number of loans [they] had," to "put … [customers] in something that makes them look like they're up to date for a longer period of time, even though by doing that every month the company is making like millions of dollars simply by the interest rate capitalizing," and "if an agent [had] 50 accounts, that [was] the mindset for those 50 accounts."  CW 2 related that it "was negative for the customer.  If the customer call[ed] in requesting the good thing"—i.e., a relatively short forbearance—"we were coached [by management] to coach our agents to do the bad thing" and convince the customer to obtain a longer one.

103

F.    **Additional Support for the Exchange Act Defendants' Scienter**

227.    As senior officers of Navient during the Class Period, the Officer Defendants are liable as direct participants in all of the misconduct detailed in this Complaint.  Through their positions of control and authority, as well as Remondi's ownership of 1,351,695 shares of Navient common stock and 417,606 shares of vested in-the-money stock options, as well as Chivavibul's ownership of 284,114 shares of Navient stock and 7,361 shares of vested in-the-money stock options, the Officer Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of the Form 10-Ks, Form 10-Qs, press releases, and other public statements, as set forth above.

228.    As discussed in ¶¶ 151-54, 172 above, Remondi and Chivavibul signed SOX certifications during the Class Period attesting to these Defendants' responsibility for, and knowledge of, disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Navient's internal control over financial reporting.

229.    Remondi and Chivavibul also had the requisite experience and expertise to understand and prepare Navient's financial statements.  According to Navient's website, Remondi studied economics and, prior to joining Navient, served as CFO of Nellie Mae where he "had to learn all aspects of the business, including loan origination and processing and all the federal rules associated with the business."  Also as stated on Navient's website, Chivavibul is an accountant who previously worked at Ernst & Young before joining Navient, where he currently serves as its CFO.  Accordingly, the Officer Defendants possessed the training and experience to understand that Navient's financial statements were misstated.

230.    Additionally, Navient benefited from the fraud by conducting the 2014 and 2015 Debt Offerings, selling $1.5 billion of debt at prices and terms augmented by securing corporate debt ratings based on materially overstated business metrics and financial performance.

104

231.    Navient was also aware of increasing public scrutiny of its FHLB-DM credit facilities, including by Senator Warren.  As widely reported, in June 2013, Senator Warren sent a letter to Remondi (then CEO of SLM Corporation) inquiring about SLM's use of the FHLB-DM credit facilities.

### G.    Plaintiffs and Other Class Members Relied on the Exchange Act Defendants' Misrepresentations.

232.    At all relevant times, the markets for Navient publicly-traded securities were efficient markets for the following reasons, among others:

(a)    Navient publicly-traded securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Navient filed periodic public reports with the SEC and the NASDAQ;

(c)    Navient regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Navient claimed to be a well-capitalized and seasoned issuer able to utilize the more truncated Shelf Registration Statement for its Class Period debt offerings; and

(e)    Navient was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

233.    As a result of the foregoing, the market for Navient publicly-traded securities promptly digested current information regarding Navient from all publicly available sources and

reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Navient publicly traded securities during the Class Period suffered similar injury through their purchase of Navient publicly-traded securities at artificially inflated prices and a presumption of reliance applies.

### H.   The Exchange Act Defendants Cannot Find Refuge within the PSLRA's "Safe Harbor" or under the "Bespeaks Caution" Doctrine.

234.    The PSLRA's "safe harbor" provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Navient who knew that those statements were false when made.

235.    Defendants likewise cannot rely on the "bespeaks caution" doctrine that may apply where, unlike here, sufficient cautionary language accompanies the challenged representations.  Defendants did not provide sufficient cautionary language to render the subject representations immaterial.

106

236.   Indeed, as relevant to both the PSLRA's "safe harbor" and the common-law "bespeaks caution" doctrine, the "risk factors" and other purportedly cautionary statements in the SEC filings and other materials disseminated to the market only further masked the misconduct.

237.   For example, the 2014 Form 10-K contained the following general, purportedly cautionary language:

> Statements that are not historical facts, including statements about our beliefs, opinions, or expectations and statements that assume or are dependent upon future events, are forward-looking statements. Forward-looking statements are subject to risks, uncertainties, assumptions and other factors that may cause actual results to be materially different from those reflected in such forward-looking statements. These factors include, among others, the risks and uncertainties set forth in Item 1A "Risk Factors" and elsewhere in this Annual Report on Form 10-K and our subsequent filings with the Securities and Exchange Commission ("SEC"); increases in financing costs; limits on liquidity; increases in costs associated with compliance with laws and regulations; changes in accounting standards and the impact of related changes in significant accounting estimates; any adverse outcomes in any significant litigation to which we are a party; credit risk associated with our exposure to third parties, including counterparties to our derivative transactions; and changes in the terms of student loans and the educational credit marketplace (including changes resulting from new laws and the implementation of existing laws). We could also be affected by, among other things: changes in our funding costs and availability; reductions to our credit ratings or the credit ratings of the United States of America; failures of our operating systems or infrastructure, or those of third-party vendors; risks related to cybersecurity including the potential disruption of our systems or potential disclosure of confidential customer information; damage to our reputation; failures to successfully implement cost-cutting initiatives and adverse effects of such initiatives on our business; failures or delays in the planned conversion to our servicing platform of the recently acquired Wells Fargo portfolio of Federal Family Education Loan Program ("FFELP") loans or any other FFELP or Private Education Loan portfolio acquisitions; risks associated with restructuring initiatives, risks associated with the recently completed separation of Navient and SLM Corporation into two, distinct publicly traded companies, including failure to achieve the expected benefits of the separation; changes in the demand for educational financing or in

107

financing preferences of lenders, educational institutions, students and their families; changes in law and regulations with respect to the student lending business and financial institutions generally; increased competition from banks and other consumer lenders; the creditworthiness of our customers; changes in the general interest rate environment, including the rate relationships among relevant money-market instruments and those of our earning assets versus our funding arrangements; changes in general economic conditions; our ability to successfully effectuate any acquisitions and other strategic initiatives; and changes in the demand for debt management services. The preparation of our consolidated financial statements also requires management to make certain estimates and assumptions including estimates and assumptions about future events. These estimates or assumptions may prove to be incorrect. All forward-looking statements contained in this report are qualified by these cautionary statements and are made only as of the date of this document. We do not undertake any obligation to update or revise these forward-looking statements to conform the statement to actual results or changes in our expectations.

238.    In addition, in the section titled "Risk Factors," the 2014 Form 10-K generally

described a number of purported risks affecting Navient's business, including the following

general statements concerning the impact of economic conditions and the creditworthiness of its

borrowers on Navient's earnings:

> Navient's earnings are dependent on the expected future creditworthiness of its student loan customers, especially with respect to its Private Education Loan portfolio. High unemployment rates and the failure of its in-school borrowers to graduate are two of the most significant macroeconomic factors that could increase loan delinquencies, defaults and forbearance or the use or performance of its payment modifications programs, or otherwise negatively affect performance of its FFELP Loan and Private Education Loan portfolios. Forbearance programs may have the effect of delaying default emergence as customers are granted a temporary waiver from having to make payments on their loans. Therefore, deterioration in the economy could adversely affect the credit quality of its borrowers. Higher credit-related losses and weaker credit quality could negatively affect Navient's business, financial condition and results of operations and limit funding options, including Navient's access to the capital markets, which could also adversely impact its liquidity position.

239.   The 2014 Form 10-K also purported to warn of the risks relating to the cost and availability of funding:

> The capital markets have from time to time experienced periods of significant volatility. This volatility can dramatically and adversely affect financing costs when compared to historical norms. Additional factors that could make financing more expensive or unavailable to Navient include, but are not limited to, financial losses, events that have an adverse impact on Navient's reputation, changes in the activities of Navient's business partners, events that have an adverse impact on the financial services industry generally, counterparty availability, changes affecting Navient's assets, corporate and regulatory actions, absolute and comparative interest rate changes, ratings agencies' actions, general economic conditions and the legal, regulatory and tax environments governing funding transactions. If financing becomes more difficult, expensive or unavailable, Navient's business, financial condition and results of operations could be materially and adversely affected.

240.   The 2014 Form 10-K also stated as follows with respect to Navient's liquidity risk:

> Navient must effectively manage the liquidity risk to which it is exposed. Navient requires liquidity to meet cash requirements such as day-to-day operating expenses, required payments of principal and interest on borrowings, and distributions to stockholders. Navient's primary sources of liquidity are its current cash and investment portfolio, operating cash flows provided by operating activities, repayment of principal on unencumbered student loan assets, distributions from its securitization trusts (including servicing fees which are priority payments within the trusts) and issuance of additional unsecured debt. Navient may also draw down on its secured FFELP and Private Education Loan facilities or issue term asset-backed securities ("ABS"). Navient may maintain too much liquidity, which can be costly, or may be too illiquid, which could result in financial distress during times of financial stress or capital market disruptions.

241.   In addition, the 2014 Form 10-K generally stated that loan defaults could impact Navient's earnings and may be higher than estimated in its allowance for loan losses:

> The evaluation of Navient's allowance for loan losses is inherently subjective, as it requires estimates that may be subject to

109

significant changes. As of December 31, 2014, Navient's
allowance for FFELP Loan and Private Education Loan losses was
approximately $93 million and $1.9 billion, respectively. During
the year ended December 31, 2014, Navient recognized provisions
for FFELP Loan and Private Education Loan losses, on a "Core
Earnings" basis, of $40 million and $539 million, respectively. The
provision for loan losses reflects the activity for the applicable
period and provides an allowance at a level that management
believes is appropriate to cover probable losses inherent in the loan
portfolio. However, future defaults can be higher than anticipated
due to a variety of factors outside of Navient's control, such as
downturns in the economy, regulatory or operational changes and
other unforeseen future trends. Losses on Private Education Loans
are also determined by risk characteristics such as school type,
loan status (in-school, grace, forbearance, repayment and
delinquency), loan seasoning (number of months in which a
payment has been made), underwriting criteria (e.g., credit scores),
a cosigner and the current economic environment. General
economic and employment conditions, including employment rates
for recent college graduates, during the recent recession led to
higher rates of student loan defaults. Although default rates have
decreased recently as economic conditions have improved, they
remain higher than pre-recession levels. If actual loan performance
is worse than currently estimated, it could materially affect
Navient's estimate of the allowance for loan losses and the related
provision for loan losses in Navient's statements of income and as
a result adversely affect Navient's results of operations.

242.    With respect to potential changes in laws, regulation, and regulatory policy, the

2014 Form 10-K stated:

Navient's businesses are subject to numerous state and federal
laws and regulations and changes to such laws and regulations or
changes in existing regulatory guidance or their interpretation
could adversely impact Navient's business and results of
operations if it is not able to adequately mitigate the impact of such
changes.

The Company's FFELP Loan business has been affected
extensively by changes in law, most notably by the legislation
Congress passed in 2010 to eliminate new FFELP Loans.

The Company's Private Education Loan business may also be
impacted by changes in law, regulations or regulatory policy. For
example, the CFPB's 2014 Report recommended that Congress
consider: (i) making changes to the U.S. Bankruptcy Code's

110

treatment of private education loans in order to motivate lenders to more constructively work with borrowers struggling to make payments, (ii) making reforms to the disclosures and guidelines that apply to borrower repayment options and loan modification programs and (iii) assessing the impact of tax treatment of principal forgiveness on loan modification activity. In the future, Congress or the Administration may act on these recommendations or choose to take actions beyond or unrelated to the CFPB's recommendations to further regulate the private student loan market or dictate the terms and conditions applicable to private student loans. Additionally, even in the absence of Congress or the Administration pursing the CFPB's recommendations, the CFPB may use its regulatory authority and enforcement actions to make substantial changes on its own to the private student loan or loan servicing markets and we believe that the CFPB has shown through its actions that it is willing to do so. The taking of any such actions may adversely impact the profitability and growth of Navient's business and/or significantly alter the costs and manner in which Navient conducts this business.

In addition, the Dodd-Frank Act contains comprehensive provisions that govern the practices and oversight of financial institutions (including large non-bank financial institutions) and other participants in the financial markets. . . .

243.    Those purportedly cautionary statements were inadequate—and, indeed, were themselves false or misleading—because they failed to disclose the ***then-existing*** misconduct alleged in this Complaint.  That is, Defendants' language speaking to the purported ***potential*** that certain future events or circumstances could negatively impact the Company did not caution investors that at least some of those events or circumstances ***already had*** materialized and Defendants were concealing them.  Further, those purported cautionary statements were not meaningful because they failed to specify important factors that could cause actual results to be materially different from those reflected in any purportedly forward-looking statements.  In addition, Defendants' purportedly cautionary language did not accompany the challenged statements and were insufficient to render Defendants' misrepresentations immaterial.

111

I.   **The Exchange Act Defendants' Misstatement and Omissions Caused Plaintiffs' and Other Class Members' Losses.**

244.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and other Class members.  Throughout the Class Period, the prices of Navient's publicly traded securities were artificially inflated due to Defendants' materially false and misleading statements and omissions, and Plaintiffs and other Class members suffered damages when the previously withheld information described in this Complaint was ultimately revealed to the market.

245.    The true facts became known by investors and the market through a series of partial disclosures, some by third parties and some by Defendants themselves, beginning on or around February 27, 2015.  By making contemporaneous additional misstatements or by failing to reveal the falsity of all statements at one time, however, the prices of Navient's publicly traded securities were artificially inflated throughout the Class Period.

246.    Loss causation exists because (i) the disclosures discussed above corrected the previous statements by Defendants that were false or misleading as detailed above; and/or (ii) the above misstatements or omissions concealed a condition or event that later occurred.

247.    As to the latter basis for loss causation, i.e., the "materialization of the risk" principle, the losses Plaintiffs and other Class members suffered following the disclosures regarding Navient's delinquency rates, unfavorable financial results, regulatory actions or investigations, lowered credit ratings, and lowered borrowing capacity under its credit facilities were within the zone of risk concealed by the misstatements or omissions.  Further, the concealed facts, when ultimately disclosed, negatively affected the value of Navient securities, such that the losses by Plaintiffs and other Class members were foreseeable to Defendants.  The subjects of the misstatements or omissions caused Plaintiffs' and other Class members' losses.

248.    As the true facts become known or the risks that had been concealed by Defendants materialized, the price of Navient's publicly traded securities declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiffs and the members of the Class.

249.    The declines in the prices of Navient's publicly traded securities and the resulting losses are directly attributable to the disclosure of information or materialization of risks that were previously misstated or concealed by Defendants.  Had Plaintiffs and other Class members known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased Navient securities at artificially inflated prices.

250.    From the time that the truth about Defendants' wrongful conduct first emerged until the time the market learned of Navient's true financial condition, the price of Navient common stock declined in a series of steps from $21.40 per share (the closing price on February 27, 2015) to $11.46 per share on December 28, 2015, the last day of the Class Period—a total decline of over 46.4%—as the market processed the previously undisclosed information.  Each disclosure or materialization of previously concealed risks removed a portion of the artificial inflation from the price of Navient's publicly traded securities caused by Defendants' prior material misstatements and omissions, and directly caused Plaintiffs and other Class members to suffer damages.

## VI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Exchange Act Defendants**

251.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

252.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

253.    The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly-traded securities during the Class Period.

254.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navient publicly traded securities. Plaintiffs and the Class would not have purchased Navient publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Exchange Act Defendants' false or misleading statements.

255.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Navient publicly traded securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of
the Exchange Act Against the Officer Defendants**

256.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

257.     The Officer Defendants acted as controlling persons of Navient within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers of Navient and their ownership of Navient stock, the Officer Defendants had the power and authority to cause Navient to engage in the wrongful conduct complained of herein.  Further, as detailed in this Complaint, the Officer Defendants were culpable participants in the misconduct.  The Officer Defendants are accordingly liable under Section 20(a) of the Exchange Act.

## VII.    ALLEGATIONS SPECIFIC TO SECURITIES ACT CLAIMS

258.     In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert claims under the Securities Act.  These claims are asserted against the Securities Act Defendants:  Navient, the Officer Defendants, the Director Defendants, and the Underwriter Defendants.

259.     Each of the Securities Act Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in Navient's Offering Materials in connection with the Offerings.  Plaintiffs also asserts claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants and control person liability claims under Section 15 of the Securities Act against the Individual Securities Act Defendants.

260.     Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

115

A.    **Securities Act Defendants**

    1.    **Navient**

261.    Defendant Navient issued each of the securities sold in the Offerings.

    2.    **Individual Securities Act Defendants**

        a.    **Officer Defendants**

262.    Defendant Remondi signed the Shelf Registration Statement for the Offerings.

263.    Defendant Chivavibul signed the Shelf Registration Statement for the Offerings.

        b.    **Director Defendants**

264.    Defendant William M. Diefenderfer, III served at all relevant times as Chairman of the Board of Directors of Navient.  Diefenderfer signed the Shelf Registration Statement for the Offerings.

265.    Defendant Ann Torre Bates served at all relevant times as a Director of Navient. Bates signed the Shelf Registration Statement for the Offerings.

266.    Defendant Diane Suitt Gilleland served at all relevant times as a Director of Navient.  Gilleland signed the Shelf Registration Statement for the Offerings.

267.    Defendant Linda Mills served at all relevant times as a Director of Navient.  Mills signed the Shelf Registration Statement for the Offerings.

268.    Defendant Barry A. Munitz served at all relevant times as a Director of Navient. Munitz signed the Shelf Registration Statement for the Offerings.

269.    Defendant Steven L. Shapiro served at all relevant times as a Director of Navient. Shapiro signed the Shelf Registration Statement for the Offerings.

270.    Defendant Jane J. Thompson served at all relevant times as a Director of Navient. Thompson signed the Shelf Registration Statement for the Offerings.

271.    Defendant Barry L. Williams served at all relevant times as a Director of Navient. Williams signed the Shelf Registration Statement for the Offerings.

### 3.    Underwriter Defendants

272.    The following Defendants served as underwriters for each of the Offerings:

a)  Credit Suisse Securities (USA) LLC ("Credit Suisse"), headquartered at 11 Madison Avenue, New York, NY 10010;

b)  Deutsche Bank Securities Inc. ("Deutsche Bank"), headquartered at 60 Wall Street, New York, NY 10005;

c)  J.P. Morgan Securities LLC ("J.P. Morgan"), headquartered at 383 Madison Avenue, New York, NY 10179;

d)  RBC Capital Markets, LLC ("RBC"), headquartered at 60 South 6th Street, Minneapolis, Minnesota 55402;

e)  Barclays Capital Inc. ("Barclays"), headquartered at 745 Seventh Avenue, New York, NY 10020;

f)  Goldman, Sachs & Co. ("Goldman Sachs"), headquartered at 200 West Street, New York, NY 10282; and

g)  Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), headquartered at One Bryant Park, New York, NY 10036.

273.    Defendant RBS Securities Inc. ("RBS"), headquartered at 600 Washington Boulevard, Stamford, CT 06901, served as an underwriter for the 2014 Debt Offering.

274.    Defendant Wells Fargo Securities, LLC ("Wells Fargo"), headquartered at 550 South Tryon Street, Charlotte, NC 28202, served as an underwriter for the 2015 Debt Offering.

**B.**  **The Offering Documents Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Offering Documents Not Misleading.**

275.    As set forth below, the Securities Act Defendants made a series of materially

untrue statements and omissions of material facts in the Offering Materials in connection with

the Offerings.  The "Offering Materials" are defined collectively as the offering materials

described in the table below:[57]

| Offering | Included Offering Materials | Date Filed |
|----------|-----------------------------|------------|
| 2014 Debt Offering | Form S-3 Shelf Registration Statement and Prospectus | July 18, 2014 |
| | Rule 424(b)(5) Preliminary Prospectus Supplement | November 3, 2014 |
| | Rule 433 Free Writing Prospectus | November 4, 2014 |
| | Rule 424(b)(2) Prospectus Supplement | November 5, 2014 |
| 2015 Debt Offering | Form S-3 Shelf Registration Statement and Prospectus | July 18, 2014 |
| | Rule 424(b)(5) Preliminary Prospectus Supplement | March 25, 2015 |
| | Rule 433 Free Writing Prospectus | March 25, 2015 |
| | Rule 424(b)(2) Prospectus Supplement | March 26, 2015 |

276.    Specifically, during the Class Period, Navient conducted the following offerings:

(a) the 2014 Debt Offering on or around November 6, 2014 of:  (i) $500 million in principal

amount of 5.000% Senior Notes due 2020 (the "5% Senior Note"), and (ii) $500 million in

---

[57] The offering materials in connection with the 2014 Debt Offering (including all materials incorporated therein by reference) are referred to as the "2014 Offering Materials," and the offering materials in connection with the 2015 Debt Offering (including all materials incorporated therein by reference) are referred to as the "2015 Offering Materials."

principal amount of 5.875% Senior Notes due 2024 (the "5.875% Senior Note due 2024"); and

(b) the 2015 Debt Offering on or around March 27, 2015 of $500 million in principal amount of

5.875% Senior Notes due 2021 (the "5.875% Senior Note due 2021").

277.    The 2014 Debt Offering was conducted pursuant to aforementioned Form S-3

Shelf Registration Statement (the "Shelf Registration Statement") and Prospectus, filed with the

SEC on July 18, 2014, a Preliminary Prospectus Supplement, filed with the SEC on November 3,

2014, a Free Writing Prospectus, filed with the SEC on November 4, 2014, and a Prospectus

Supplement, filed with the SEC on November 5, 2014.  The Shelf Registration Statement was

signed by Defendants Remondi, Chivavibul, Diefenderfer, Bates, Gilleland, Mills, Munitz,

Shapiro, Thompson, and Williams.

278.    The 2014 Debt Offering Prospectus and Prospectus Supplements, each of which

formed a part of the Shelf Registration Statement, incorporated by reference, *inter alia*,

Navient's Form 10 Registration Statement in connection with the Spin-Off, Navient's Q1, Q2,

and Q3 2014 Forms 10-Q, Navient's Forms 8-K filed on April 17, 2014, May 2, 2014, May 9,

2014, May 14, 2014, May 16, 2014, August 19, 2014, and October 17, 2014.

279.    In the 2014 Debt Offering Prospectus and Prospectus Supplement, Navient

described its business as follows:

> We service our own portfolio of education loans, as well as those
> owned by banks, credit unions, nonprofit education lenders and the
> Department of Education. We are one of four large servicers to the
> Department of Education under its Direct Student Loan Program
> ("DSLP"). We provide asset recovery services on our own
> portfolio (consisting of both education loans as well as other asset
> classes), and for guaranty agencies (which serve as intermediaries
> between the U.S. federal government and FFELP lenders and are
> responsible for paying claims on defaulted FFELP Loans), the
> Department of Education and other clients.

280.     Navient also represented in its 2014 Debt Offering Prospectus and Prospectus

Supplements that its principal assets, as of September 30, 2014, consisted of, among other things:

- $30.5 billion in Private Education Loans, with a student loan spread[58] of 4.06 percent for the quarter ended September 30, 2014 on a 'Core Earnings' basis and a weighted average life of 7.1 years;

- *a leading student loan servicing platform* that services loans for more than 12 million DLSP Loan, FFELP Loan and Private Education Loan customers[.]

281.     The 2014 Debt Offering Prospectus and Prospectus Supplements also reported

that as of September 30, 2014, its allowance for loan losses in its Private Education Loans

segment was $1.959 billion, overall net income of $359 million, and diluted earnings per share of

$0.85.

282.     The 2014 Debt Offering Prospectus and Prospectus Supplements incorporated by

reference Navient's Form 10 Registration Statement, which contained representations concerning

Navient's strengths, approach to assisting students and families in repaying education loans, and

maintenance and sufficiency of its allowance for loan losses.  *See* ¶ 86.

283.     Moreover, in a section entitled "Risk Factors" in its 2014 Debt Offering

Prospectus and Prospectus Supplements, Navient should have disclosed, but failed to, risk

factors including its improper and unlawful loan servicing and debt collection practices, increase

in loan defaults and delinquencies among higher risk borrowers of private student loans, or the

risk that its credit facilities would be reduced, as described in ¶¶ 125-26, 128, 143.

---

[58] According to Navient's 2014 Form 10-K, the earnings generated by the spread earned between the interest income Navient receives on its student loan portfolio assets and the interest expense on debt funding those loans is the most significant portion of the Company's net interest income.

284.    Those undisclosed risk factors made the 2014 Debt Offering more risky and
speculative than Navient represented in the 2014 Offering Prospectus and Prospectus
Supplements.  Navient's failure to adequately disclose those risks violated Item 503 of SEC
Regulation S-K concerning "Prospectus summary, risk factors, and ratio of earnings to fixed
charges," which requires the following "risk factors" disclosures in an issuer's prospectus:

> (c) Risk factors. Where appropriate, provide under the caption
> "Risk Factors" a discussion of the most significant factors that
> make the offering speculative or risky. This discussion must be
> concise and organized logically. Do not present risks that could
> apply to any issuer or any offering. Explain how the risk affects the
> issuer or the securities being offered. Set forth each risk factor
> under a subcaption that adequately describes the risk. The risk
> factor discussion must immediately follow the summary section. If
> you do not include a summary section, the risk factor section must
> immediately follow the cover page of the prospectus or the pricing
> information section that immediately follows the cover page.
> Pricing information means price and price-related information that
> you may omit from the prospectus in an effective registration
> statement based on § 230.430A(a) of this chapter. The risk factors
> may include, among other things, the following:
>
> (1) Your lack of an operating history;
>
> (2) Your lack of profitable operations in recent periods;
>
> (3) Your financial position;
>
> (4) Your business or proposed business; or
>
> (5) The lack of a market for your common equity securities or
> securities convertible into or exercisable for common equity
> securities.

285.    In addition, the 2014 Debt Offering Prospectus and Prospectus Supplements
incorporated by reference Navient's Q1, Q2 and Q3 2014 Forms 10-Q, each of which also
contained representations concerning Navient's strengths, approach to assisting students and
families in repaying education loans, maintenance and sufficiency of its allowance for loan
losses, as well as Navient's financial results during the relevant quarter and that the information

121

in the Forms 10-Q fairly presented, in all material respects, the financial condition of Navient and all material weaknesses and any fraud were disclosed. *See* ¶¶ 87, 96-97, 108-09, 123-24, 151-54.

286.     The 2014 Debt Offering Prospectus and Prospectus Supplements also incorporated by reference certain of Navient's Forms 8-K that contained representations concerning Navient's culture of compliance, approach with customers, expertise in adapting to new regulations, and enhanced service to military customers. *See* ¶¶ 144, 147.

287.     The 2014 Debt Offering Materials contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading. Specifically, contrary to the representations in the 2014 Debt Offering Materials, the true facts were that:

a.     Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE, as discussed in ¶¶ 42-43;

b.     Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members as discussed in ¶¶ 44-52;

c.     a significant number of higher risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans, as discussed in ¶¶ 35-38;

d.     Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated, as discussed in ¶¶ 21-33, 56;

       e.      a significant portion of Navient's low interest rate credit facilities were at risk of being eliminated or reduced, thereby increasing Navient's borrowing costs, as discussed in ¶¶ 59-65.

288.    The 2015 Debt Offering was conducted pursuant to aforementioned Shelf Registration Statement and Prospectus, filed with the SEC on July 18, 2014, a Preliminary Prospectus Supplement, filed with the SEC on March 25, 2015, a Free Writing Prospectus, filed with the SEC on March 25, 2015, and a Prospectus Supplement, filed with the SEC on March 26, 2015.  As described herein, the Shelf Registration Statement was signed by Defendants Remondi, Chivavibul, Diefenderfer, Bates, Gilleland, Mills, Munitz, Shapiro, Thompson, and Williams.

289.    The 2015 Debt Offering Prospectus and Prospectus Supplements, each of which formed a part of Shelf Registration Statement, incorporated by reference, *inter alia*, Navient's Form 10 Registration Statement in connection with the Spin-Off, Navient's 2014 Form 10-K, Navient's Q1, Q2, and Q3 2014 Forms 10-Q, and Navient's Forms 8-Ks filed on January 26, 2015 and March 10, 2015.

290.    In the 2015 Debt Offering Prospectus and Prospectus Supplement, Navient described itself and its business as follows:

> We are the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in student loans, we support the educational and economic achievements of more than 12 million customers. A growing number of government and higher education clients rely on us for proven solutions to meet their financial goals.
>
>         \* \* \*
>
> We service our own portfolio of education loans, as well as those owned by banks, credit unions, nonprofit education lenders and the Department of Education. We are one of four large servicers to the

Department of Education under its Direct Student Loan Program ("DSLP"). We also provide asset recovery services on our own portfolio (consisting of both education loans as well as other asset classes), guaranty agencies, higher education institutions, the Department of Education and other federal clients, as well as states, courts, and municipalities.

As of December 31, 2014, our principal assets consisted of:

•    $29.8 billion in Private Education Loans, with a student loan spread of 4.04 percent for the year ended December 31, 2014 on a "Core Earnings" basis and a weighted average life of 7.0 years;

•    a leading student loan servicing platform that services loans for more than 12 million DSLP Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts serviced under our contract with the Department of Education

291.    The 2015 Debt Offering Prospectus and Prospectus Supplements also reported that for the year ended December 31, 2014, allowance for loan losses in its Private Education Loans segment of $1.916 billion, overall net income of $1.149 billion, and diluted earnings per share of $2.69.

292.    Moreover, in a section entitled "Risk Factors" in its 2015 Debt Offering Prospectus and Prospectus Supplements, Navient omitted any mention concerning its improper and unlawful loan servicing and debt collection practices, increase in loan defaults and delinquencies among higher risk borrowers of private student loans, or the risk that its credit facilities would be reduced, as described in ¶¶ 161-64 above.

293.    Navient's risk disclosures in its 2015 Debt Offering Prospectus and Prospectus Supplements also violated Item 503 of SEC Regulation S-K, described in ¶ 284.

294.    The 2015 Debt Offering Prospectus and Prospectus Supplements incorporated by reference Navient's Form 10 Registration Statement, which, as described above, contained

representations concerning Navient's strengths, approach to assisting students and families in repaying education loans, and maintenance and sufficiency of its allowance for loan losses.  *See* ¶ 86.

295.    In addition, the 2015 Debt Offering Prospectus and Prospectus Supplements incorporated by reference Navient's Q1, Q2 and Q3 2014 Forms 10-Q, each of which, as described above, also contained representations concerning Navient's strengths, approach to assisting students and families in repaying education loans, maintenance and sufficiency of its allowance for loan losses, as well as Navient's financial results during the relevant quarter and that the information in the Forms 10-Q fairly presented, in all material respects, the financial condition of Navient and all material weaknesses and any fraud were disclosed.  *See* ¶¶ 87, 96-97, 108-09, 123-24, 151-54.

296.    The 2015 Debt Offering Prospectus and Prospectus Supplements also incorporated by reference Navient's 2014 Form 10-K which contained representations concerning Navient's asset base and its ability to generate significant and predicable cash flows, Navient's culture of compliance, approach to assisting students and families in repaying education loans, and maintenance and sufficiency of its allowance for loan losses, as well as Navient's financial results during the relevant period and that the information in the 2014 Form 10-K fairly presented, in all material respects, the financial condition of Navient and all material weaknesses and any fraud were disclosed.

297.    The 2015 Offering Materials contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.  Specifically, contrary to the representations in the 2014 Offering Materials, the true facts were that:

125

a.      Navient and its subsidiaries were misleading borrowers about the benefits of a federal student loan rehabilitation program and, in doing so, jeopardized Navient's contingency collection contract with the DOE, as discussed in ¶¶ 42-43;

b.      Navient and its subsidiaries were engaged in improper and unlawful loan servicing and debt collection practices, including overcharging borrowers who were active-duty military service members as discussed in ¶¶ 44-45;

c.      a significant number of higher risk private student loan borrowers who exited deferment during the Class Period had difficulty repaying their loans, as discussed in ¶¶ 35-38;

d.      Navient failed to properly account for likely losses in its Private Education Loan portfolio and, as a result, its reported financial results were artificially inflated, as discussed in ¶¶ 21-33, 56;

e.      a significant portion of Navient's low interest rate credit facilities were at risk of being eliminated or reduced, thereby increasing Navient's borrowing costs, as discussed in ¶¶ 59-65.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**Violations of Section 11 of
the Securities Act Against All Securities Act Defendants**

298.    Plaintiffs repeat and reallege the allegations set forth in ¶¶ 258-97 above as if set forth fully herein, only to the extent such allegations do not allege fraud, scienter, or the intent of Defendants to defraud Plaintiffs and other Class members.

299.    This cause of action is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants, and is predicated on the Securities Act Defendants' strict

126

liability for making false and misleading statements in the 2014 Offering Materials and/or the 2015 Offering Materials.  Liability under this Count is predicated on the Officer Defendants' and the Director Defendants' signing of the Shelf Registration Statement for the Offerings, all of the Securities Act Defendants' (except Wells Fargo) respective participation in the 2014 Debt Offering, which were conducted pursuant to the 2014 Offering Materials, and all of the Securities Act Defendants' (except RBS) respective participation in the 2015 Debt Offering, which was conducted pursuant to the 2015 Offering Materials.

300.    The 2014 Offering Materials and the 2015 Offering Materials were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.  To the extent any of the false or misleading statements at issue are deemed to be statements of opinion or belief, the Securities Act Defendants did not actually hold those opinions at the time the statements were made or did not have a reasonable basis for those opinions at the time the statements were made.

301.    Each of the Officer and Director Defendants served as an officer or director of Navient and/or signed the Shelf Registration Statement, as detailed in ¶¶ 262-71 above.

302.    Navient caused the 2014 Offering Materials and the 2015 Offering Materials to be issued to investors in connection with the offering and sale of the 5% Senior Notes, 5.875% Senior Notes due 2024, and the 5.875% Notes due 2021, as detailed in ¶¶ 275-78, 288-89 above.

303.    The Securities Act Defendants owed to Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the 2014 Offering Materials and the 2015 Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts

required to be stated in order to make the statements contained therein not misleading.  The Securities Act Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the 2014 Offering Materials and the 2015 Offering Materials and did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  As such, the Securities Act Defendants are liable.

304.    By reason of the conduct herein alleged, each of the Securities Act Defendants violated Section 11 of the Securities Act.

305.    Plaintiffs and other Class members acquired 5% Senior Notes, 5.875% Senior Notes due 2024, and/or 5.875% Senior Notes due 2021 pursuant to the materially false and misleading Shelf Registration Statement in connection with the 2014 Offering and 2015 Offering.

306.    At the time they acquired 5% Senior Notes, 5.875% Senior Notes due 2024, and/or 5.875% Senior Notes due 2021, Plaintiffs and other Class members did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the 2014 Offering Materials and/or the 2015 Offering Materials.

307.    Plaintiffs and other Class members suffered damages.  The value of the 5.0% Senior Notes, 5.875% Senior Notes due 2024, and 5.875% Senior Notes due 2021 has declined substantially, subsequent to, and due to, the Securities Act Defendants' violations.

128

308.    By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Securities Act Defendants.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants

309.    Plaintiffs repeat and reallege the allegations set forth in ¶¶ 258-308 above as if set forth fully herein, only to the extent such allegations do not allege fraud, scienter, or the intent of Defendants to defraud Plaintiffs and other Class members.

310.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of Plaintiffs and all other members of the Class who purchased Navient securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering and who were damaged thereby.

311.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

312.    The Underwriter Defendants were statutory sellers of Navient securities that were registered in the Offerings pursuant to the Shelf Registration Statement and sold by means of the Offering Materials.  By means of the 2014 Offering Materials, the Underwriter Defendants (except for Wells Fargo) sold $1 billion in principal amount of notes through the 2014 Debt Offering to members of the Class.  By means of the 2015 Offering Materials, the Underwriter Defendants (except for RBS) sold $500 million in principal amount of notes through the 2015

129

Debt Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Offerings by means of the materially false and misleading Offering Materials.

313.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

314.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering, and who were damaged thereby pursuant to Section 12(a)(2).

## COUNT V

### For Violation of Section 15 of the Securities Act
### (Against Navient and the Individual Securities Act Defendants)

315.    Plaintiffs repeat and reallege the allegations set forth in ¶¶ 258-314 above as if set forth fully herein, only to the extent such allegations do not allege fraud, scienter, or the intent of Defendants to defraud Plaintiffs and other Class members.

316.    This count is asserted against Navient and the Individual Securities Act Defendants and is based on Section 15 of the Securities Act.

317.    Each of Navient and the Individual Securities Act Defendants was, by virtue of its, his, or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Each of Navient and the Individual Securities Act Defendants had the

130

power and influence and exercised the same to cause Navient to engage in the acts described in this Complaint.

318.    Additionally, each of the Individual Securities Act Defendants was, by virtue of his or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Each of these Individual Securities Act Defendants had the power and influence and exercised the same to cause Navient to engage in the acts described in this Complaint.

319.    Navient and the Individual Securities Act Defendants' control, ownership, and position made them privy to, and provided them with knowledge of, the material facts concealed from Plaintiffs and other Class members.

320.    By virtue of the conduct alleged herein, Navient and the Individual Securities Act Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and other Class members for damages suffered as a result.

## IX.    CLASS ACTION ALLEGATIONS

321.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased: (1) the publicly traded securities of Navient during the Class Period; (2) securities in or traceable to the Company's 2014 Debt Offering; and/or (3) securities in or traceable to the Company's 2015 Debt Offering (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

322.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Navient publicly-traded securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

323.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

324.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

325.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Navient;

(c)      whether the price of Navient publicly-traded securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

326.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

1319916.1

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

September 28, 2016

**MORRIS AND MORRIS LLC**
**COUNSELORS AT LAW**

By:  /s/ Patrick F. Morris

Karen L. Morris (Del. Bar No. 2899)
Patrick F. Morris (Del. Bar No. 3015)
R. Michael Lindsey (Del. Bar No. 2711)
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Telephone: (302) 426-0400
Facsimile: (302) 426-0406
kmorris@morrisandmorrislaw.com
pmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

*Liaison Counsel for Lead Plaintiff the Lord*
*Abbett Funds and the Proposed Class*

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**

Steven E. Fineman (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Joy A. Kruse (admitted *pro hac vice*)
Michael J. Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
jakruse@lchb.com
mmiarmi@lchb.com

134

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
Richard M. Heimann (admitted *pro hac vice*)
Bruce W. Leppla (admitted *pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com

*Counsel for Lead Plaintiff the Lord Abbett Funds
and Lead Counsel for the Proposed Class*