# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al*., Individually and On Behalf of All Others Similarly Situated,<br><br>              Plaintiffs,<br><br>        v.<br><br>NAVIENT CORPORATION, *et al*.,<br><br>              Defendants. | Case No. 1:16-cv-112-GMS |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

Steven E. Fineman (admitted *pro hac vice*)
Joy A. Kruse (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Michael J. Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
jakruse@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

[Additional counsel listed on signature page]

*Counsel for Lead Plaintiff the Lord Abbett Funds and Lead Counsel for the Proposed Class*

**MORRIS AND MORRIS LLC COUNSELORS AT LAW**

Patrick F. Morris (Del. Bar No. 3015)
Karen L. Morris (Del. Bar No. 2899)
R. Michael Lindsey (Del. Bar No. 2711)
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Telephone: (302) 426-0400
Facsimile: (302) 426-0406
pmorris@morrisandmorrislaw.com
kmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

*Liaison Counsel for Lead Plaintiff the Lord Abbett Funds and the Proposed Class*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.   Navient's Business............................................................................... 3

    B.   Defendants Misrepresented Navient's Delinquency Rates, Loan Loss Provisions, and Net Interest Income. ................................................... 4

    C.   Defendants Misrepresented the Company's Legal Compliance. ........... 6

    D.   Defendants Misrepresented the Risks Impacting Navient's Credit Facilities. ........................................................................................... 7

ARGUMENT ......................................................................................................... 8

I.    PLAINTIFFS SUFFICIENTLY PLEAD EXCHANGE ACT CLAIMS ......... 8

    A.   Plaintiffs Plead Falsity with Particularity. ......................................... 8

        1.   Defendants misrepresented their "default prevention efforts," the quality of PELs, and their forbearance practices. ...................... 9

        2.   Defendants misstated Navient's loss reserves and net interest income. ............................................................................... 10

        3.   Defendants misrepresented their legal compliance................... 15

        4.   Defendants misrepresented the adequacy of Navient's credit facilities. ......................................................................... 16

    B.   Plaintiffs' Allegations Raise a Strong Inference of Scienter. ............. 17

        1.   The CW allegations support a strong inference of scienter. .................... 17

        2.   Remondi's July 2015 remarks strengthen the scienter inference............ 19

        3.   Defendants' alleged GAAP violations, in addition to Remondi's and Chivavibul's SOX certifications, bolster the scienter inference. ...... 21

        4.   Navient's unlawful loan-servicing practices strongly indicate scienter. ............................................................................... 22

    C.   A Strong Inference of Scienter Exists as to Navient Regardless of Whether It Exists as to Remondi or Chivavibul. .............................................. 23

    D.   Plaintiffs Sufficiently Plead Section 20(a) Claims. ........................... 24

II.    PLAINTIFFS SUFFICIENTLY PLEAD SECURITIES ACT CLAIMS....................... 24

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*AJZN, Inc. v. Yu,*
  2015 WL 331937 (D. Del. Jan. 26, 2015) ............................................................... 9

*Aldridge v. A.T. Cross Corp.,*
  284 F.3d 72 (1st Cir. 2002) ................................................................................. 11

*Asher v. Baxter Int'l Inc.,*
  377 F.3d 727 (7th Cir. 2004) .............................................................................. 21

*Baker v. MBNA Corp.,*
  2007 WL 2009673 (D. Del. July 6, 2007) ........................................................... 23

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,*
  394 F.3d 126, 160 (3d Cir. 2004) ....................................................................... 25

*CIT Grp., Inc. Sec. Litig.,*
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................................. 14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014) ............................................................................... 16

*Fait v. Regions Fin. Corp.,*
  655 F.3d 105 (2d Cir. 2011) ............................................................................... 13

*Gaer v. Educ. Mgmt. Corp.,*
  2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) ..................................................... 17

*GSC Partners CDO Fund v. Washington,*
  368 F.3d 228 (3d Cir. 2004) ............................................................................... 22

*In re Advanta Corp. Sec. Litig.,*
  180 F.3d 525 (3d Cir. 1999) ............................................................................... 15

*In re Aetna, Inc. Sec. Litig.,*
  617 F.3d 272 (3d Cir. 2010) ............................................................................... 15

*In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.,*
  2008 WL 3405580 (E.D. Pa. Aug. 11, 2008) ..................................................... 11

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................. 25

*In re BISYS Sec. Litig.,*
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................. 24

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997) ............................................................................. 12

*In re Enzymotec Sec. Litig.,*
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) ......................................................... 14

*In re Hutchinson Tech., Inc. Sec. Litig.,*
  536 F.3d 952 (8th Cir. 2008) .............................................................................. 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ................................................................. 16

*In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013) .......................................................... 23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ............................................................................. 17

*In re PMA Capital Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005) ..................................................... 11

*In re Providian Fin. Corp. Sec. Litig.*,
152 F. Supp. 2d 814 (E.D. Pa. 2001) .................................................... 11, 15, 22

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706 (D. Del. 2000) ............................................................. 20, 21

*In re Salomon Analyst Metromedia Litig.*,
373 F. Supp. 2d 235 (S.D.N.Y. 2005) .............................................................. 17

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) ........................................................ 10, 19

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ........................................................................ 17, 24

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) ............................................................................... 14

*In re Wilmington Trust Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014) .............................................................. 12, 24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................... *passim*

*Johansson v. Ferrari*,
2015 WL 5000848 (D. Del. Aug. 20, 2015) ..................................................... 12

*Klein v. Autek Corp.*,
147 F. App'x 270 (3d Cir. 2005) ...................................................................... 22

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011) ...................................................... 19

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ........................................................................... 16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ........................................................................... 21

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................... 15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................... 18

**TABLE OF AUTHORITIES**
(continued)

Page

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
 834 F.3d 481 (3d Cir. 2016)..................................................................... 14

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
 951 F. Supp. 2d 479 (S.D.N.Y. 2013)........................................................ 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 135 S. Ct. 1318 (2015)............................................................................... 13

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000)....................................................................... 12

*Percoco v. Deckers Outdoor Corp.*,
 2013 WL 3584370 (D. Del. July 8, 2013) ................................................. 20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
 89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................... 22

*Pollio v. MF Global, Ltd.*,
 608 F. Supp. 2d 564 (S.D.N.Y. 2009)....................................................... 23

*Rahman v. Kid Brands, Inc.*,
 736 F.3d 237, (3d Cir. 2013)..................................................................... 23

*Sapir v. Averback*,
 2016 WL 554581 (D.N.J. Feb. 10, 2016) ................................................. 22

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
 2015 WL 3833849 (M.D. Pa. June 22, 2015).......................................... 12, 13, 14

*Seaman v. Cal. Bus. Bank*,
 2013 WL 5890726 (N.D. Cal. Oct. 30, 2013)........................................... 14

*Shapiro v. UJB Fin. Corp.*,
 964 F.2d 272 (3d Cir. 1992)...................................................................... 12, 15

*Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*,
 2014 WL 4180331 (D. Del. Aug. 21, 2014) ............................................. 23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008)...................................................................... 23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)................................................................................... 11, 21

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016)...................................................................... 13

*Underland v. Alter*,
 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ............................................ 12

*Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*,
 176 F. Supp. 3d 387 (D. Del. 2016)........................................................... 20

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
 2015 WL 3755218 (E.D. Pa. June 16, 2015) ........................................... 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Zazzali v. Alexander Partners, LLC*,
    2013 WL 5416871 (D. Del. Sept. 25, 2013).........................................................................24

**STATUTES**

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................................................14

Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund ("Plaintiffs" or the "Lord Abbett Funds"), serving collectively as the Court-appointed Lead Plaintiff in this consolidated action, respectfully submit their brief in opposition to the motion by defendant Navient Corporation ("Navient" or the "Company") and the individual defendants to dismiss the Consolidated Amended Class Action Complaint ("Complaint") under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1]

## PRELIMINARY STATEMENT

The facts of this case are straightforward and compelling:  Throughout the nearly two-year Class Period (from April 17, 2014 to December 28, 2015), Defendants portrayed Navient as a prudent loan servicer that engaged in a careful assessment of the risk level of its private education loan portfolio, complied with governing laws and regulations, and maintained adequate credit facilities.  But that depiction masked serious, and continual, misconduct. Contrary to Navient's assurance of its "careful use of forbearance" (i.e., granting a borrower temporary relief from payment obligations), Defendants directed that personnel in the Company's Collections department ("Collections") excessively and indiscriminately apply forbearances to the accounts of borrowers experiencing difficulty repaying their private education loans ("PELs").  That practice, relayed to Collections agents directly from senior executives, allowed Navient to misleadingly record those accounts as "current" on its books, in

---

[1] This brief also responds to the joinder filed by the Underwriter Defendants (identified in ¶¶ 272-74 of the Complaint).  Plaintiffs generally incorporate terms and abbreviations as used in the Complaint, including "Exchange Act Defendants" and "Securities Act Defendants" (identified in ¶¶ 79-84 and ¶¶ 261-74 of the Complaint, respectively), but for convenience use "Defendants" to refer to defendants Navient, John F. (Jack) Remondi, and Somsak Chivavibul.  Additionally, "¶ __" refers to paragraphs of the Complaint.  Unless otherwise indicated, all internal citations and quotation marks have been omitted from this brief, and all emphasis has been added.

turn allowing it to report artificially low delinquency rates and other related metrics.  Defendants

ultimately revealed the true extent of risk in the PEL portfolio, in striking fashion.  Having

reported decreases in loan loss provisions for *every prior quarter during the Class Period*,

Navient suddenly announced on July 13, 2015 that repayment difficulties affecting *$2.5 billion*

in PELs caused the Company to increase its provision for those loans by *31.7%.*  Just three

months earlier, in reporting a decrease in that provision, CEO Jack Remondi stated "[p]rivate

credit quality . . . continued to improve."  ¶ 167.  The Company's July 2015 disclosure sent the

price of Navient stock down more than 10%, with the price of Navient notes also falling.

Defendants misled investors in other ways as well.  While touting its "robust compliance

culture driven by a 'customer first' approach," Navient was violating the law through its wholly

owned subsidiaries, including by charging tens of thousands of military borrowers unlawfully

high interest on their loans and seeking default judgments against them, in what the Department

of Justice ("DOJ") alleged during the Class Period was a "nationwide pattern or practice" of

violating the Servicemembers Civil Relief Act ("SCRA").  Additionally, in failing to disclose the

improper forbearance practices and violations of law, Defendants misrepresented Navient's true

costs and risk exposure and thus concealed the extent to which a reduction in the amount

available under its credit facilities, which ultimately occurred, could impact the Company.

Having lost more than $13 million due to Defendants' misconduct (*see* D.I. 15, at 10-11),

the Lord Abbett Funds—significant institutional investors managed by Lord, Abbett & Co.

LLC—seek to recover losses on behalf of themselves and other investors in Navient stock and

notes, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act")

as well as Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act").

Plaintiffs' Complaint specifies the challenged misrepresentations and explains why the Exchange

Act Defendants either knew or recklessly disregarded that those statements were false or misleading when made, and why the Securities Act Defendants are strictly liable (or liable due to negligence) for statements made in connection with Navient's 2014 and 2015 note offerings (the "Offerings").  Defendants should not be "puzzle[d]" as to the bases for Plaintiffs' claims; they are plain from the pleading.

In the end, Defendants' motion is long on catchphrases—"strike suits," "puzzle pleading," "fraud by hindsight"—but otherwise falls short.  Defendants often disregard Rule 12 principles by ignoring Plaintiffs' allegations or attacking them piecemeal, and erroneously attempt to marry Plaintiffs' Exchange Act claims to their independent, non-fraud Securities Act claims.  Defendants' arguments should be rejected, and this case should proceed to discovery.

## STATEMENT OF FACTS

### A.    Navient's Business

Formed through a 2014 spin-off from SLM Corporation ("Sallie Mae"), Navient is among the country's largest servicers of student loans.  ¶ 10.  Through its Private Education Loans segment, the Company acquires, finances, and services (and formerly originated) PELs, for which it bears the full risk of non-payment.  ¶¶ 10, 12, 89, 104, 132, 136.  Navient's operating results during the Class Period were "primarily driven by," among other things, (i) net interest revenue from its loan portfolios and (ii) its provisions for loan losses, which "represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios."  ¶¶ 13-14.[2]  Loan loss provisions were recorded as an expense on Navient's balance sheet and stood, along with charge-offs (i.e., charging the unrecoverable portion of an uncollectible loan against the Company's

_____

[2] Unless otherwise indicated, quotations in this section are from Defendants' statements, as referenced in the Complaint.

allowance for loan losses) and delinquencies by borrowers, among the Company's "key financial measures."  ¶ 14.  Higher delinquencies could necessitate an increase in Navient's loss reserves, which could reduce its income.  ¶¶ 15-16.  Management accordingly "focuse[d] on delinquencies as well as the progression of loans from early to late stage delinquency."  ¶¶ 89, 138.

### B.   Defendants Misrepresented Navient's Delinquency Rates, Loan Loss Provisions, and Net Interest Income.

Throughout the Class Period, Defendants touted Navient's "default prevention efforts" as well as the quality of its PELs, and reported on delinquency rates, charge-off rates, loan loss provisions, and net interest income.  *E.g.*, ¶¶ 31, 33, 86, 88, 111, 134, 136-37, 145.  Additionally, in certifications under the Sarbanes-Oxley Act of 2002 ("SOX"), Remondi and Chivavibul attested to the truthfulness and accuracy of the financial information presented in Navient's SEC filings.  ¶¶ 66, 151-53, 172.  Defendants also assured investors of their "careful use of forbearance" (¶ 31), which they described as "a recovery tool . . . applied based on a customer's unique situation" and aimed at, *inter alia*, "mitigating the overall risk of the portfolio."  2014 Form 10-K (D.I. 40-1 Ex. 2) at 85.  Because forbearances "may have the effect of delaying default emergence as customers are granted a temporary waiver from having to make payments on their loans" (¶ 238), misuse of forbearances could conceal Navient's actual exposure to the risk of delinquency or default.

Contrary to their representations, Defendants excessively and indiscriminately applied forbearances to delinquent or near-delinquent accounts, thereby engineering artificially low delinquency rates, charge-off rates, and loan loss provisions, as well as artificially high net interest income.  ¶¶ 1, 21-34, 217-20, 225-26.  Further, by misusing forbearances, Defendants violated their duties under GAAP to (i) adequately account for losses on delinquent and defaulted PELs of higher-risk borrowers within the group that caused Navient to increase its loan

loss provision by 31.7% in July 2015; and (ii) adequately monitor and update credit quality indicators pertaining to those loans, evaluate the risk characteristics of those borrowers, or consider those borrowers' historical payment experience in determining the Company's allowance for loan losses.  ¶¶ 35, 183, 207-16.

Former Navient employees who worked there before and during the Class Period and carried out the Company's forbearance practices have confirmed those practices were systematized, continuous, and directed by senior executives, including Senior Vice President of Default Prevention Troy Standish (who reported to John Kane, Navient Group President: Asset Recovery and Business Services) and Director of Operations Christi Hewes.  ¶¶ 21-28.  CW 1, a former Collections Supervisor, recounted that Collections' objective was "[H]ow much can we postpone?  How many forbearances can we slap on [an] account."  ¶ 22.  CW 2, a former Collections Supervisor who oversaw up to 25 Collections agents, stated Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the accounts would show up as current on Navient's books.  ¶¶ 23, 27.  The pressure to misuse forbearances was enhanced by Navient's bonus system (¶¶ 25-27), which, CW 1 explained, conditioned bonuses on the number of accounts Collections agents processed each month, whether through forbearance or payment; management, CW 1 added, set a goal each month specific to a particular performance category, such as $22 million in forbearances (¶ 26).  CW 2 offered similar observations.  ¶ 27. Additionally, CW 3, a former Navient Collections Support Manager, recounted that Remondi, Chivavibul, and others participated in regular meetings led by Navient Vice President of Operations Jeff Mersmann for which CW 3 prepared "very in-depth" reports of Company-wide data detailing delinquency rates and related information.  ¶ 24.

The impact of Defendants' undisclosed forbearance practices was revealed on July 13, 2015, when Navient reduced its guidance for 2015 due primarily to poor performance among borrowers representing more than $2.5 billion in loans, necessitating a 31.7% increase in the Company's loan loss provision for the PEL segment—the first increase during the entire Class Period—which reduced profits and other key financial metrics.  ¶ 35.  Remondi then acknowledged during a July 22, 2015 earnings call that the higher default rate leading to the increased loan loss provision derived in part from "a higher percentage of these borrowers who had demonstrated difficulty in making payments when they were in repayment prior to returning to school than in prior cohorts," which "indicat[ed] that they were struggling to begin with."  ¶ 36.  Navient's share price declined sharply following Defendants' disclosures, including falling 10.6% from July 13 to July 14, 2015; the prices of Navient notes also dropped.  ¶¶ 39-40.

### C.      Defendants Misrepresented the Company's Legal Compliance.

Defendants emphasized Navient's "robust compliance culture driven by a 'customer first' approach" (¶ 47), as well as its "control infrastructure" (¶¶ 47, 130), and touted the Company's "internal and external auditing" and "escalated service tracking and analysis" (¶ 47).  But those representations were false or misleading, as the Company was repeatedly violating the law.  *E.g.*, ¶¶ 41-54, 144-50.  On May 13, 2014, the DOJ announced a $60 million settlement ("DOJ Settlement") of allegations that wholly-owned Navient subsidiaries "engaged in a nationwide pattern or practice, dating as far back as 2005, of violating the SCRA by failing to provide members of the military the six percent interest rate cap to which they were entitled" and improperly obtaining default judgments against military borrowers; approximately 60,000 servicemembers were expected to receive compensation under the settlement.  ¶ 100 (quoting DOJ release).  The same day, the FDIC announced a related settlement (¶ 102) arising from Navient subsidiaries' (i) "unfair and deceptive practices related to student loans" in violation of

the Federal Trade Commission Act (*id.*), including "[m]isrepresenting and inadequately disclosing in [the subsidiaries'] billing statements how borrowers could avoid late fees";[3] and (ii) violations of the SCRA.  The settlement required those entities to pay $6.6 million in civil monetary penalties and $30 million in restitution to harmed borrowers and to fund the DOJ Settlement.  ¶ 102.  On February 27, 2015, the DOE announced it would terminate its contracts with a wholly owned Navient subsidiary that "gave borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees."  ¶ 42 (quoting DOE release).  Revelations relating to Navient's unlawful practices caused the prices of Navient stock and notes to drop significantly.  ¶¶ 53, 158, 170, 188, 193.

Former Navient employees described the Company's deficient or nonexistent processes with respect to military borrowers.  CW 3, for example, explained "[t]here were no processes in place to properly handle the military borrower accounts"; CW 3 raised the issue with CW 3's superiors, including Jeff Mersmann, who brushed it off.  ¶ 49.  Indeed, CW 3, who ultimately worked with others on a "back office project setting up a process where Navient borrowers were actually scanned to see if they were active military," recounted that Navient had not completely resolved the problems in managing active military accounts when CW 3 left the Company *in February 2015*, nine months after the DOJ Settlement.  ¶ 50.  CW 1 likewise recounted that Navient failed to timely apply deferments and forbearances to servicemembers' accounts.  ¶ 51.

### D.    Defendants Misrepresented the Risks Impacting Navient's Credit Facilities.

Defendants also failed to disclose the actual level of risk Navient faced with respect to its credit facilities, which, the Company revealed on October 20, 2015, were reduced significantly. ¶ 60.  And on December 28, 2015, Navient revealed that one of its wholly owned subsidiaries had received a notice from the Federal Home Loan Bank of Des Moines ("FHLB-DM") stating

---

[3] *See* Exhibit 1 of Declaration of Michael J. Miarmi, filed herewith.

availability under its credit facilities would be reduced dramatically.  ¶ 61.  Navient's stock price

dropped by 9.1% in response to the latter disclosure.  ¶ 64.  Defendants first attributed FHLB-

DM's action to "an internal policy change in the formula the FHLB-DM uses to set a borrower's

maximum borrowing limit," but later pointed to the January 2016 publication by the Federal

Home Finance Agency ("FHFA") of a final rule, initially proposed and published in September

2014, preventing non-eligible entities such as Navient from gaining de facto membership with a

Federal Home Loan Bank through the use of a captive insurer.  ¶ 62.  Further, several media

outlets reported that FHLB-DM's action was linked to criticism from U.S. Senator Elizabeth

Warren beginning in 2013 that government-sponsored banks should not lend taxpayer-backed

funds at favorable terms to student loan companies.  *Id.*

    In light of their undisclosed forbearance practices, which caused Navient's financials to

be misstated, as well as their legal violations, Defendants understood that any substantial

reduction in the amount available for borrowing under Navient's credit facilities would impact

the Company more severely than investors were led to expect.  ¶¶ 59-63.  Defendants thus failed

to apprise investors of the extent to which such a reduction—precipitated by the government's

scrutiny of the credit facilities beginning in 2013, together with the FHFA's proposed rule in

2014 and the overall decline in Navient's performance—could impact the Company's financial

condition, including its liquidity and capital resources.  *Id.*

## **ARGUMENT**

## I.    **PLAINTIFFS SUFFICIENTLY PLEAD EXCHANGE ACT CLAIMS**

### A.    **Plaintiffs Plead Falsity with Particularity.**

    Plaintiffs' allegations are sufficiently particularized.  The Complaint identifies specific

challenged statements (¶¶ 31-34, 86-97, 103-17, 119-42, 144-49, 151-53, 236-42) and describes

why they were false or misleading when made (¶¶ 21-30, 35-38, 49-52, 100-02, 143, 146-47,

150, 154, 156, 177, 180-84, 186, 192, 194, 217-26, 243).  Plaintiffs accordingly plead the "who,

what, when, where and how" of the misconduct, as the PSLRA requires.  *Institutional Inv'rs*

*Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).[4]

> **1.  Defendants misrepresented their "default prevention efforts," the
> quality of PELs, and their forbearance practices.**

Defendants touted, *inter alia*, their "default prevention efforts," the strong quality of

PELs in Navient's portfolio, and their "careful use of forbearance."  *See supra* p. 4.  In fact,

Defendants misused forbearances to conceal the level of delinquent or near-delinquent accounts

in the Company's PEL portfolio.  ¶¶ 1, 21-34, 217-20, 225-26.  It is therefore "reasonable to

infer" the challenged statements were false or misleading when made.  *Avaya*, 564 F.3d at 266.

Plaintiffs' allegations are buttressed by the accounts of two former Navient Collections

Supervisors and a former Navient Collections Support Manager, each of whom communicated

with borrowers and carried out the undisclosed forbearance practices directed by senior

executives.  ¶¶ 22-24, 26-27, 49-52, 217-20, 225-26.  These witnesses' accounts corroborate

each other and are consistent with Remondi's acknowledgment on July 22, 2015 that the

negative trends that ultimately forced Navient to increase its loan loss provision by 31.7% were

evident well before July 2015.  ¶¶ 36-38, 182-84.  The CW allegations accordingly satisfy the

PSLRA.  *See Avaya*, 564 F.3d at 263 (allegations sufficient where plaintiffs "adequately

described the duration of each CW's employment, the time period during which the CWs

acquired the relevant information and how each CW had access to such information").

Indeed, similar claims against Navient's predecessor Sallie Mae have withstood

dismissal.  Plaintiffs in *In re SLM Corp. Sec. Litig.* alleged that Sallie Mae and two of its officers

---

[4] In *AJZN, Inc. v. Yu*, which Defendants cite, this Court dismissed a Section 10(b) claim where
plaintiff "fail[ed] to identify *any* statement by the defendants."  2015 WL 331937, at *5 (D. Del.
Jan. 26, 2015).  That case bears no resemblance to this one.

"understated loan loss allowances for PELs" in violation of GAAP and SEC regulations, allowing defendants "to overstate Sallie Mae's earnings," and that Sallie Mae "changed its forbearance policy to hide PEL defaults." 740 F. Supp. 2d 542, 549-51 (S.D.N.Y. 2010). Plaintiffs alleged, "[b]ased largely on the testimony of former low- and mid-level employees from Sallie Mae's collection offices," that (i) applying forbearances "permitted Sallie Mae to characterize the loan as 'current'" and so "by shifting delinquent loans into forbearance, Sallie Mae avoided accounting for them as delinquent or in default"; and (ii) Sallie Mae "authorized forbearances for PELs indiscriminately and in contravention of its policy that forbearance increase the likelihood the loan could be collected." *Id.* at 551. Plaintiffs further alleged the fraud was revealed through corrective disclosures beginning when Sallie Mae's CEO announced the company was increasing its private loan loss reserves. *Id.* at 553. Defendants characterized the allegations as fraud by hindsight and questioned the reliability of "low-level employee[s]." D.I. 105, Case No. 1:08-cv-01029-WHP (S.D.N.Y.), at 9, 11-12. But the court held plaintiffs sufficiently alleged falsity, explaining, *inter alia*, "[t]he CWs were positioned, albeit at low levels, to have knowledge of how Sallie Mae implemented its forbearance policy." 740 F. Supp. 2d at 555 n.5. The allegations here are likewise well-pleaded.

### 2.     Defendants misstated Navient's loss reserves and net interest income.

Plaintiffs further allege that by concealing the extent to which Navient was susceptible to non-payments and defaults, Defendants manipulated loan loss reserves, and Remondi and Chivavibul signed false or misleading SOX certifications.  ¶¶ 86-143, 151-54, 172.  Defendants contend (i) Plaintiffs plead "fraud by hindsight"; (ii) Defendants had no duty to provide more information than they did regarding delinquencies or related matters; (iii) statements regarding loss reserves merit special treatment as "opinions"; and (iv) the PSLRA's safe harbor provision renders certain statements inactionable.  Defendants are wrong, for the following reasons.

10

*First*, Plaintiffs do not assert in "hindsight" that because Navient's loan loss provision increased in July 2015, "it must have been" artificially low before then. Plaintiffs instead detail Defendants' efforts to misuse forbearances to artificially record distressed accounts as current and in turn misreport key financial metrics. ¶¶ 21-34, 49-52, 217-20, 225-26. Defendants simply fail to "consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[5] Defendants also erroneously contend Plaintiffs must provide, without discovery, an accounting of the amounts by which Navient misstated its financials.[6] Plaintiffs allege Defendants' systemic misuse of forbearances ultimately caused Navient to suddenly increase its loan loss provision *by 31.7%*, after having reported *decreases* in the provision for each previous quarter during the Class Period. ¶¶ 96, 108, 123, 138, 143, 171, 173. Those allegations, along with the significant impact the undisclosed activities had on the Company, permit a plausible inference that Navient misstated its delinquency and charge-off rates and related financials.[7] Further, contrary to Defendants' suggestion, neither a restatement of Navient's financials nor a public rebuke by its auditors is necessary to plead falsity.[8]

---

[5] *See also In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) (claim that financial statements "were materially false because PMA understated loss reserves and failed to maintain adequate internal controls" was actionable because "if true, it would mean that PMA underestimated their liabilities and expenses"). Cases holding that a past statement of loan loss reserves is not rendered false simply because of a subsequent increase in reserves (*see* Defs.' Br. 9-10) do not apply here, as Plaintiffs allege contemporaneous facts rendering Defendants' statements false or misleading when made. *See supra* pp. 4-6.

[6] *See In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*, 2008 WL 3405580, at *1, *8 n.2 (E.D. Pa. Aug. 11, 2008) (upholding Section 10(b) claim against auditor based on company's use of forbearance and deferment agreements notwithstanding that plaintiffs did not allege, *inter alia*, "what the delinquency and discount rates should have been").

[7] *See In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) ("in making all reasonable inferences in the plaintiffs' favor, it must be inferred that the misconduct was more than isolated and contributed significantly to Providian's financial performance").

[8] *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("The company argues that because it has never restated any of its financials or otherwise indicated any error in the . . . financial statements, and because its financial statements were audited by an independent

*Second*, having emphasized Navient's forbearance practices, delinquency rates, and related matters, Defendants put those subjects "in play" and thus assumed a duty to speak truthfully about them.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992). Defendants' assertion (at 12) that they had no duty to speak about "borrowers who exited deferment during the Class Period [and] had difficulty repaying their loans" is therefore incorrect, and their reliance on cases addressing the duty to "update" statements is misplaced. [9]

*Third*, Defendants' statements regarding loan loss reserves were not "opinions."  Indeed, the court in *Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services, Inc.*, which Defendants cite, observed "statements about the adequacy of loan loss reserves are not . . . always entitled to the protections afforded to an opinion or belief of management," noting a case where, as here, plaintiffs "alleged that the Defendants disclosed a methodology by which it claimed loan loss reserves were calculated, but failed to conform to that methodology, and consequently understated its loan loss reserves."  2015 WL 3833849, at *23 (M.D. Pa. June 22, 2015) ("*SEPTA*") (citing *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011)); *accord In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 453 (D. Del. 2014).  Further, Plaintiffs have pleaded falsity even if Defendants' statements regarding loan loss reserves are

---

accounting firm, no inference of accounting error, and so no inference of scienter, can be drawn. We disagree.").

[9] In *Oran v. Stafford*, for example, the court determined defendant had no duty to update its *prior statements* where defendants "were simply silent on the subject" giving rise to plaintiffs' claim. 226 F.3d 275, 286 (3d Cir. 2000).  Similarly, in *Johansson v. Ferrari*, this Court dismissed a Section 10(b) claim arising from defendant's alleged "failure to update" investors concerning the directors' evaluation of potential strategic alternatives for the company, because the company "never disclosed a fundamental change to the nature of its business."  2015 WL 5000848, at *3, *4 (D. Del. Aug. 20, 2015).  The undisclosed forbearance practices in this case, by contrast, rendered Defendants' statements false or misleading *when made*, and Defendants were anything but silent on issues related to those practices.  Additionally, *In re Burlington Coat Factory Securities Litigation* turned on the principle, inapplicable here, that "disclosure of a specific earnings forecast does not contain the implication that the forecast will continue to hold good even as circumstances change."  114 F.3d 1410, 1433 (3d Cir. 1997).

treated as opinions, because (i) as detailed in Sections I.B-C below, Plaintiffs' allegations raise a strong inference that Defendants knew of or recklessly disregarded the undisclosed forbearance scheme and so did not honestly hold those "opinions"; and (ii) regardless of Defendants' scienter, Plaintiffs "identify particular (and material) facts going to the basis for [Navient]'s opinion . . . whose omission makes the opinion statement[s] at issue misleading to a reasonable person reading the statement[s] fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326, 1332 (2015).[10]

The confidential witnesses in *SEPTA*, on which Defendants rely, "ha[d] no firsthand knowledge" of the bank's alleged improper practices in underwriting loans and setting loan loss reserves. 2015 WL 3833849, at *26. The CWs here, by contrast, directly participated in the undisclosed forbearance practices and were instructed by senior executives to carry them out. *E.g.*, ¶¶ 21-28. Further, while plaintiff in *SEPTA* did "not rel[y] on any documentation—internal or otherwise—in making its claims regarding the operation of the Loan Committee" (2015 WL 3833849, at *26), CW 3 identifies specific reports detailing data pertinent to Plaintiffs' claims (¶ 24). And in *SEPTA*, "contrary to Plaintiff's contention that the Defendants failed to follow their own loan loss reserve methodology by failing to accurately reflect in the Offering Documents the weakness of the loan portfolio," the offering documents disclosed that, "in light of the . . . internal review of its loan portfolio, the Bank's loan loss reserve was *increased by approximately*

---

[10] Defendants' reliance on *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), is thus doubly misplaced: *First*, plaintiffs in *Fait*, unlike here, did not allege defendants engaged in a pervasive practice that contradicted their stated methodology for determining loss reserves. *See id.* at 108 (defendants allegedly disregarded "adverse trends in the mortgage and housing markets"). *Second*, the legal standard applied in *Fait*—that "in order for the alleged statements regarding the adequacy of loan loss reserves to give rise to liability . . ., plaintiff must allege that defendant's opinions were both false and not honestly believed" (*id.* at 113)—has been "altered" by *Omnicare*. *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

*44%* during 2009." 2015 WL 3833849, at *27. This case is a far cry from *SEPTA*.[11]

*Fourth*, the PSLRA's safe harbor does not protect any purported "forward-looking statements" by Defendants (Defs.' Br. 14). As the "risk factors" Defendants cite did not warn of the undisclosed forbearance practices (¶¶ 234-43), they do not constitute "meaningful cautionary statements," as the PSLRA requires (15 U.S.C. § 78u-5(c)(1)(A)(i)). *See Avaya*, 564 F.3d at 254 ("Cautionary language must be extensive and specific."). The safe harbor also does not apply because Plaintiffs allege Defendants' "caution" *further misled* investors by portraying the risks Navient faced as turning on management's ability to estimate future performance and make subjective judgments, not on misusing forbearances. *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 502 n.23 (3d Cir. 2016) (presence of meaningful cautionary language "does not necessarily foreclose the possibility that knowing falsity *within* the cautionary language could undermine a claim to protection by the safe harbor") (emphasis in original).[12]

---

[11] *Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.* is similarly inapposite, as plaintiff there "identifie[d] no internal reports possessed by defendants, communications among Student Loan Corp. employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the multi-factor migration analysis they said they did." 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013). The Complaint identifies both internal reports and firsthand accounts from CWs attesting to Navient's practice regarding loan forbearances, as directed by senior executives. ¶¶ 21-28. *In re CIT Group, Inc. Securities Litigation*—in which plaintiffs "provided no additional facts," aside from the ultimate increase in the company's loan loss reserves, "from which to infer that defendants did not believe that reserves were adequate or had no reasonable basis for such a belief"—likewise bears no resemblance to this case. 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004). Nor does *Seaman v. California Business Bank*, where plaintiffs' claim that the bank made misrepresentations regarding its loss reserves rested merely on "the fact that two of its loans were in default," assist Defendants. 2013 WL 5890726, at *5 (N.D. Cal. Oct. 30, 2013).

[12] *See also In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (where plaintiffs alleged that because warned-of risks had "already come to pass," it was "unreasonable to make generalized warnings"). Nor does the judicially created "bespeaks caution" doctrine apply, because "[i]f . . . defendants knowingly or recklessly misrepresented" financial metrics, "it follows that defendants' cautionary statements about the *future* did not render those misrepresentations immaterial." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) (emphasis in original).

### 3.     Defendants misrepresented their legal compliance.

Plaintiffs also sufficiently allege that contrary to Defendants' statements regarding their compliance with governing laws and regulations, Navient (through its wholly owned subsidiaries) was committing serious violations.  ¶¶ 100-02, 146-47.  Having emphasized the Company's "robust compliance culture driven by a 'customer first' approach" and its "control infrastructure" (¶¶ 47, 130, 144-45, 149), Defendants now disclaim those statements as immaterial "puffery."  Defendants also contend they cannot be held liable because they disclosed government investigations and settlements.  Both arguments lack merit.

"Puffery" consists of information "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality."  *Shapiro*, 964 F.2d at 280.  Dismissal on that ground is by far the exception rather than the rule, as "the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Id.*  In evaluating materiality, context is key, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), and the context here favors Plaintiffs.  Compliance with legal and regulatory requirements is critical to Navient's very existence, and Defendants repeatedly violated the law, impacting at least tens of thousands of borrowers.  ¶¶ 18-20, 41-54.  Further, Remondi attributed Navient's "superior performance" to its contact with customers and efforts to enroll them in appropriate repayment programs.  ¶¶ 47, 130.  These circumstances distinguish Defendants' representations from the "oblique references to . . . pricing policy" in *In re Aetna, Inc. Securities Litigation*, 617 F.3d 272, 284 (3d Cir. 2010), and the "expressions of optimism for the future" in *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 539 (3d Cir. 1999), which Defendants cite.  Dismissal is unwarranted.[13]

_____

[13] *See Providian*, 152 F. Supp. 2d at 824-25 (while Providian did not have a duty "to disclose mere speculations of investigation or litigation or generally to disparage [its] business practices,"

Additionally, in asserting their disclosures about government investigations immunize them from liability, Defendants misconstrue Plaintiffs' allegations.  Plaintiffs do not contend Defendants failed to disclose information about the *investigations* that ultimately resulted in allegations that Navient violated the law; rather, Defendants are liable for repeatedly touting the Company's compliance efforts, including its "customer first approach," while those violations were occurring.  Plaintiffs' allegations are supported not merely by announcements of government investigations, as in the cases Defendants cite,[14] but rather by *actions the government ultimately brought and settled*.  Plaintiffs' allegations are further corroborated by CWs' statements, particularly CW 3's account of Navient's failure to implement procedures for handling servicemembers' accounts (¶¶ 49-51).  Plaintiffs' claims should proceed.

### 4.      Defendants misrepresented the adequacy of Navient's credit facilities.

Plaintiffs also sufficiently allege that by failing to disclose their forbearance practices and compliance violations, Defendants were artificially minimizing Navient's true costs and risk exposure.  ¶¶ 59-64, 194-96.  That misconduct exacerbated the impact on the Company of Senator Warren's statements criticizing it and of the FHFA's rule (which Defendants knew about since it was proposed in 2014) affecting the lending of credit by Federal Home Loan Banks to "non-eligible" entities such as Navient.  *Id.*  Defendants' conflicting explanations for FHLB-

where statements "attributed Providian's good fortunes to its 'customer focused approach,'" it was "obligated to disclose information concerning the source of its success").  Navient's specific representations concerning legal compliance, an issue going to the core of its operations, are far removed from statements that a bank "held its employees to the highest ethical standards and complied with all applicable laws," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014), on which Defendants rely.  And plaintiffs in *In re Lions Gate Entertainment Corp. Securities Litigation*, unlike here, alleged defendants failed "to provide details" regarding currently pending claims or legal proceedings whose existence the company disclosed.  165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016).

[14] *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008).  *Loos* and *Meyer*, moreover, address loss causation—an issue Defendants do not challenge on this motion—not falsity.

16

DM's decision to reduce the amount available under its credit facilities bolster the reasonable inference that Defendants' prior statements regarding credit facilities were false or misleading. ¶¶ 62, 195, 200. That "the risk of losing inexpensive credit is common to all borrowers" (Defs.' Br. 17) is irrelevant, given Plaintiffs' allegations.[15] Plaintiffs sufficiently plead falsity.[16]

## B. Plaintiffs' Allegations Raise a Strong Inference of Scienter.

Plaintiffs' Exchange Act allegations raise a "strong" inference of Defendants' scienter— one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. To that end, the Complaint details "strong circumstantial evidence of conscious misbehavior or recklessness," *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006), based on facts collectively revealing a Company that, contrary to its representations to investors, was not careful and prudent in managing the risks of servicing student loans, but rather concealed the extent to which it was exposed to risk. Plaintiffs have met their burden under the PSLRA.

### 1. The CW allegations support a strong inference of scienter.

Plaintiffs "explain 'how or why' their confidential source[s] would have the knowledge alleged," *Avaya*, 564 F.3d at 266, and why their allegations strongly indicate Defendants at least

---

[15] Defendants' cases are inapposite. Unlike in *In re Morgan Stanley Information Fund Securities Litigation*, Plaintiffs' allegations are not premised on common market risks such as "systemic risks relating to the potential that a company's stock price is inflated by biased research coverage," but rather Defendants' failure to disclose the extent to which Navient was exposed to risk given its undisclosed forbearance practices and other misconduct. 592 F.3d 347, 363 (2d Cir. 2010). And unlike in *Gaer v. Education Management Corp.*, Plaintiffs do not allege Defendants failed to timely inform investors about the "regulatory process" resulting in the FHFA's rule, but rather failed to adequately apprise investors of the extent to which their improper loan-servicing activities heightened the potential impact of such a regulatory change on the Company. 2011 WL 7277447, at *24 (W.D. Pa. Aug. 30, 2011).

[16] *See In re Salomon Analyst Metromedia Litig.*, 373 F. Supp. 2d 235, 240 (S.D.N.Y. 2005) (Lynch, J.) (because defendants "chose to provide *some* information about the credit facility," plaintiffs adequately alleged individual's "failure to disclose the restrictions and risks related to the credit facility" rendered certain of his reports "materially misleading") (emphasis in original).

recklessly disregarded the improper forbearance practices.[17]  Defendants contend (at 21) the CW

allegations do not suffice because the witnesses directly worked with or supervised "a small

portion of Navient's employee base," did not remain at the Company through the end of the

Class Period, did not have "any direct or indirect contact" with the individual defendants, and did

not have "salient" contact with senior Navient personnel.  Those challenges are unavailing.

 CW 1 and CW 2 recount a policy *directed by senior executives* that applied *throughout

Navient's Collections department*.  ¶¶ 21-28, 217-20, 225-26.  Particularly given the significance

of delinquencies and forbearances to Navient's bottom line, as well CW 3's account of "very

detailed reports" providing Company-wide information to Remondi, Chivavibul, and others

bearing on the matters at issue here, these specific allegations suggest Defendants at least

recklessly disregarded the misconduct.[18]  That Plaintiffs do not allege direct contact between the

CWs and Remondi or Chivavibul does not undermine their claims.  *See Avaya*, 564 F.3d at 268

(scienter sufficiently pleaded as to several statements notwithstanding that "none of the CWs

claimed to have had any connection to or communication with" the individual defendants).[19]

Indeed, the CWs' statements are consistent with those of other former employees attesting to *the*

---

[17] Defendants point to a minor inconsistency in CW 3's account of meetings among Navient senior executives during the Class Period, i.e., that Director of Collections Jason Benepe, who Navient notes left the Company before the Class Period, participated in those meetings.  That mistake is understandable, as CW 3 worked at Navient both before and during the Class Period (¶ 24) and thus may have accurately remembered Benepe attending meetings while he was at the Company, just not during the Class Period.  In any event, that single mistake does not lessen the force of CW 3's specific and detailed allegations, which corroborate the other CWs' accounts.

[18] *See W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at *16 (E.D. Pa. June 16, 2015) (CWs provided "evidence of at least reckless behavior" where, *inter alia*, one witness, "who served as a senior manager in debt collection strategy, alleged that management dictated that rollovers were not to be considered when setting loan loss reserves").

[19] Defendants' reliance on *Metzler Investment GMBH v. Corinthian Colleges, Inc.* is misplaced, because the complaint there "point[ed] only to disagreement and questioning within Corinthian" about the challenged revenue recognition practice and failed to "tie" that practice or Corinthian's restatements to plaintiffs' general theory of liability.  540 F.3d 1049, 1069 (9th Cir. 2008).

*same type of misconduct* at Sallie Mae in a case that withstood dismissal.  *See SLM*, *supra*
pp. 9-10.  That Defendants maintained a bonus program directly tied to the improper forbearance
practices (¶¶ 26-27, 225-26) further strengthens the inference that those practices were persistent
and mandated by senior executives.  The CW allegations, considered with the other allegations
discussed below, thus afford a strong inference of scienter.[20]

### 2.    Remondi's July 2015 remarks strengthen the scienter inference.

The inference of Defendants' scienter is strengthened by Remondi's July 2015 revelation
that the group of borrowers whose difficulties in repaying their loans caused Navient to increase
its loan loss provision by 31.7% had previously "demonstrated difficulty in making payments,"
indicating "they were struggling to begin with."  ¶ 36.  Remondi's acknowledgment enhances the
reliability of the CW allegations, because it confirms he and other Navient senior executives had
access to information informing them of negative trends with respect to significant "cohorts" of
borrowers as they developed.  This fits, for example, with CW 3's account of the "very detailed
reports" CW 3 prepared for Vice President of Operations Jeff Mersmann to present at meetings
with Remondi, Chivavibul, and other senior executives, showing delinquency data and other
information.  ¶¶ 24, 38, 220.  Indeed, Navient itself stated management "focuse[d] on
delinquencies as well as the progression of loans from early to late stage delinquency."  ¶ 138.
Those facts afford a strong inference that Remondi and Chivavibul knew of or recklessly
disregarded the improper forbearance practices.[21]

---

[20] The court in *SLM* held plaintiffs' allegations regarding the CEO's motive and opportunity to
commit fraud gave rise to a strong inference of scienter as to him, and thus also as to Sallie Mae.
740 F. Supp. 2d at 557-58.  While the court held plaintiffs did not sufficiently allege strong
circumstantial evidence of conscious misbehavior or recklessness by the CFO (*id.* at 559), the
facts of this case are stronger, given the numerous bases for scienter discussed above and below.

[21] *See Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 WL
2444675, at *12 (D. Del. June 14, 2011) (scienter sufficiently pleaded where, *inter alia*,

That those practices affected Navient's "core operations" bolsters the inference of scienter. As Defendants' ability to manage delinquencies and assess risk was essential to Navient's success (*e.g.*, ¶¶ 14-16, 31, 89), this case falls comfortably within the universe of decisions inferring that senior executives know of, or would be reckless in disregarding, misconduct going to the core of their company's business. *See, e.g.*, *Avaya*, 564 F.3d at 271 ("perceived importance of margins" supported inference that CFO "was paying close attention to these numbers").[22]

In response, Defendants cite (at 19) Remondi's statements, "just one quarter prior to the announcement that Navient would be increasing its allowance," that the borrowers who would soon cause the Company to increase its loss provision were performing well compared with prior cohorts. Those statements, Defendants contend, suggest Remondi had no knowledge before the second quarter of 2015 that those borrowers would experience difficulty repaying their loans. But the close proximity between Remondi's positive statements in April 2015 to the dramatic increase in the Company's loss provision just a few months later supports an inference of *culpability*, not innocence.[23] That is particularly so given the striking nature of the ultimate disclosure: Having for five quarters reported decreases in loan loss provisions, with Remondi

---

defendants stated they "closely monitor[ed]" relevant information and CWs "corroborate[d] that the Defendants had access to sales data and internal reports, and had meetings and calls with company insiders about the performance of the business") (first alteration in original).

[22] *See also In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 724-25 (D. Del. 2000) (as "[m]aintaining adequate loan loss reserves was purportedly critical to the financial integrity of the Company," if company's reserves actually declined as a percentage of net income during a time when its loan loss rate was increasing, "then the individual defendants' conduct may amount to more than a failure to assess risks or to recognize a negative trend in the industry"). Unlike in *Percoco v. Deckers Outdoor Corp.*, which Defendants cite, Plaintiffs do not rely on the core operations inference "alone." 2013 WL 3584370, at *5 (D. Del. July 8, 2013).

[23] *See Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) ("temporal proximity of the misrepresentations in relation to the truth's revelation" may be considered in assessing scienter).

touting the credit quality of PELs throughout that time, Navient then suddenly announced a *31.7% increase* in the loss provision relating to *$2.5 billion* in loans.  The sharp drops in the prices of Navient securities following Defendants' July 2015 disclosures further indicate their prior statements failed to apprise investors of the relevant facts.  ¶ 39.[24]  Defendants nonetheless claim they could not have known about the undisclosed facts prior to the second quarter of 2015.  That proffered inference is certainly not *more* plausible than the opposing one.

Defendants also attempt to introduce facts beyond the Complaint by stating (at 22), without any citation to the record, Remondi and Chivavibul accumulated shares of stock during the Class Period and sold stock only "for tax purposes."  Those unsubstantiated assertions are not among the "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions."  *Tellabs*, 551 U.S. at 322.  In any event, the absence of significant stock sales by Remondi or Chivavibul during the Class Period does not undermine scienter.  *See Avaya*, 564 F.3d at 269 (inference turns "not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter").[25]  Defendants do not raise any nonculpable inference more compelling than the inference of scienter.

### 3.    Defendants' alleged GAAP violations, in addition to Remondi's and Chivavibul's SOX certifications, bolster the scienter inference.

"When combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of recklessness."  *Reliance*, 91 F. Supp. 2d

---

[24] *See also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("Baxter . . . contend[s] that the full truth had reached the market . . . . If this is so, however, it is hard to understand the sharp drop in the price of its stock.").

[25] *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (reliance on CEO's lack of financial benefit "confuse[d] expected with realized benefits," as he "may have thought that there was a chance that the situation . . . would right itself").

at 724. Plaintiffs allege that by engaging in the undisclosed forbearance practices detailed in the Complaint, Defendants violated GAAP. ¶¶ 207-16. Plaintiffs' GAAP allegations take on even greater force given Remondi's and Chivavibul's numerous SOX certifications during the Class Period. Those combined allegations support scienter.[26]

### 4. Navient's unlawful loan-servicing practices strongly indicate scienter.

The government's allegations against Navient subsidiaries further support a scienter inference. ¶¶ 100-02, 146-47. The inference that Remondi and Chivavibul at least recklessly disregarded those violations, including what the DOJ described as a "nationwide pattern or practice" of violating the SCRA, *is at least equally plausible* as the competing inference that they were simply negligent—particularly as those practices related to Navient's core operations.[27] The inference of fraud is bolstered by CW 3's account of Navient's failure to establish a policy for addressing military borrowers' accounts, even after the DOJ Settlement. ¶¶ 49-50, 221-22.

Given the "array of circumstantial evidence giving rise to a strong inference that [Defendants'] . . . statements were at least reckless," *Avaya*, 564 F.3d at 269, Defendants' "fraud by hindsight" refrain rings hollow.[28] Plaintiffs sufficiently plead scienter.

---

[26] *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015) (allegations raised inference that executive "either knew or had access to information about . . . large sales increases with loosened terms, and thus possessed information contrary to her public statements in the SOX Certifications regarding the adequacy of Orthofix's revenue recognition practices").

[27] *See Providian*, 152 F. Supp. 2d at 825 (scienter inferred where plaintiffs "allege[d] that Providian's illegal or fraudulent practices permeated core aspects of Providian's business and were so pervasive that [the CEO and CFO] must have known or were reckless in not knowing").

[28] Defendants again rely on inapposite cases. *Compare, e.g., Sapir v. Averback*, 2016 WL 554581, at *10 (D.N.J. Feb. 10, 2016) (complaint "fail[ed] to cite a single document or witness that corroborates allegations of scienter") *with* ¶¶ 21-28, 48-52 (citing witnesses and documents). *See also Klein v. Autek Corp.*, 147 F. App'x 270, 277-78 (3d Cir. 2005) (non-precedential) (rejecting "blanket" and "bald" assertions that defendants "knew" the truth); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (no inference of scienter where defendants' pre-offering statements could not "be connected directly to any misleading statement

### C.    A Strong Inference of Scienter Exists as to Navient Regardless of Whether It Exists as to Remondi or Chivavibul.

Plaintiffs' allegations raise a strong inference of Navient's scienter even independent of Remondi or Chivavibul.  While the Third Circuit has "neither . . . accepted nor rejected" the corporate (or collective) scienter doctrine, *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013), numerous other courts have expressly endorsed it.[29]  Further, in *Baker v. MBNA Corp.*, this Court upheld claims against MBNA based on allegations that it violated GAAP and "ignored a number of red flags indicating potential problems with its financial reports," and then separately analyzed claims against corporate officers.  2007 WL 2009673, at *6-7 (D. Del. July 6, 2007).  The corporate scienter principle applies here.

Plaintiffs allege Navient implemented a longrunning and systemic policy of misusing forbearances to conceal delinquent or near-delinquent accounts, which was conveyed directly to Collections personnel by high-ranking executives.  Indeed, while they need not identify specific corporate actors who carried out the fraud,[30] Plaintiffs allege that at least two individuals whose actions can be imputed to Navient—Vice President of Default Prevention Troy Standish and Director of Operations Christi Hewes—*directly participated in* the improper forbearance

---

in the offering circular"); *Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*, 2014 WL 4180331, at *3 (D. Del. Aug. 21, 2014) (claim dismissed where plaintiff alleged that "if [defendants] had performed proper due diligence, they would have uncovered the deception"); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009) (dismissing where plaintiff "baldly allege[d] that defendants 'knew' but failed to disclose certain general 'true facts'" but complaint was "entirely bereft of any facts to support such allegations").

[29] *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant").

[30] *See In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, 2013 WL 396117, at *14 (D.N.J. Jan. 30, 2013) (observing there is "no binding authority holding that a corporation's liability under § 10(b) for its alleged false statements and omissions is circumscribed by the imputed scienter of identifiable corporate agents").

scheme.  ¶¶ 22-23, 217-18.  The allegations raise a strong inference of Navient's scienter.[31]  That

its subsidiaries committed legal violations affecting tens of thousands of borrowers and resulting

in government settlements further supports a strong inference "that someone whose intent could

be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.

### D.   Plaintiffs Sufficiently Plead Section 20(a) Claims.

Plaintiffs also sufficiently plead Section 20(a) claims against Remondi and Chivavibul.

As Defendants do not challenge Plaintiffs' allegations that Remondi and Chivavibul "controlled

[Navient]," the only dispute is whether the Complaint sufficiently pleads an underlying Section

10(b) violation in which they culpably participated.  *Zazzali v. Alexander Partners, LLC*, 2013

WL 5416871, at *11 (D. Del. Sept. 25, 2013) (stating elements of Section 20(a) claim).  As

detailed in Sections I.A-C above, it does.  The Section 20(a) claims should proceed.

## II.   PLAINTIFFS SUFFICIENTLY PLEAD SECURITIES ACT CLAIMS

Independent of their Exchange Act claims, Plaintiffs plead claims under the Securities

Act, which do not require scienter.  *Suprema Specialties*, 438 F.3d at 270.  Defendants contend,

however, these claims "sound in fraud" and must therefore satisfy Rule 9(b).  They are wrong, as

the Securities Act Defendants "are accused in separate claims of the same complaint of having

violated Section 11, Section 12(a)(2), and Section 10(b)," and "ordinary negligence is expressly

pled in connection with" the Securities Act claims.  *Id.* at 272-73.[32]

---

[31] *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (allegations that "BISYS management, including the Company's regional vice president, intentionally pressur[ed] sales representatives to artificially increase the amount of revenues booked from insurance policies" were "clearly . . . sufficient to give rise to a strong inference that BISYS intentionally overstated its revenues") (alteration in original).

[32] *See also Wilmington Trust*, 29 F. Supp. 3d at 452 ("[T]he 2009 10–K filing materially understated WTC's past due loan amounts and the reserve.  WTC misrepresented its underwriting and asset review practices.  These are sufficient allegations of materially false and misleading statements to survive a motion to dismiss [as to plaintiffs' Securities Act claims].").

That Plaintiffs' Securities Act claims arise from the same undisclosed forbearance practices and legal violations as their Exchange Act claims does not, as Defendants suggest, automatically trigger Rule 9(b).  By setting forth the Securities Act claims separately from the Exchange Act claims, alleging the former are premised on the Securities Act Defendants' strict liability or negligence for making untrue statements of material fact in documents issued in connection with the Offerings (¶¶ 258-60, 298-320), and disclaiming allegations of fraud as to the Securities Act claims (*id.*), the Complaint goes far beyond the "one-sentence disavowment of fraud" deemed insufficient in *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004), on which Defendants rely.[33]  The Securities Act claims are therefore subject only to Rule 8, which Plaintiffs' allegations readily satisfy.

Alternatively, Plaintiffs submit that if the Court determines the Securities Act claims sound in fraud, their allegations satisfy Rule 9(b).  *See supra* pp. 8-17.  If the Court determines otherwise, it should allow Plaintiffs to replead these claims to sound in negligence.[34]

## CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.  If, however, the Court determines Plaintiffs' allegations are deficient, it should grant them leave to replead.

---

[33] Plaintiffs' reference to statements of opinion or belief in the Complaint's Securities Act section (¶ 300) also does not trigger Rule 9(b), as Plaintiffs allege Defendants *either* "did not actually hold those opinions at the time the statements were made" *or* "did not *have a reasonable basis* for those opinions at the time the statements were made," i.e., were negligent.  In any event, few if any of the challenged statements constitute opinions.

[34] *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 501 (S.D.N.Y. 2004) ("when faced with a § 11 claim that sounds in fraud but fails to meet the requirements of Rule 9(b), a court may dismiss the claim with leave to replead a § 11 claim based on negligence or strict liability unless repleading would be futile"); *cf. also Chubb*, 394 F.3d at 164 (observing district court previously afforded plaintiffs leave "to either plead section 11 . . . claims without averring fraud or to meet the requisite particularity requirements").

December 29, 2016

**MORRIS AND MORRIS LLC
COUNSELORS AT LAW**

By: */s/ Patrick F. Morris*

Patrick F. Morris (Del. Bar No. 3015)
Karen L. Morris (Del. Bar No. 2899)
R. Michael Lindsey (Del. Bar No. 2711)
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Telephone: (302) 426-0400
Facsimile: (302) 426-0406
pmorris@morrisandmorrislaw.com
kmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

*Liaison Counsel for Lead Plaintiff the Lord
Abbett Funds and the Proposed Class*

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

Steven E. Fineman (admitted *pro hac vice*)
Joy A. Kruse (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Michael J. Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
jakruse@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

Richard M. Heimann (admitted *pro hac vice*)
Bruce W. Leppla (admitted *pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com

*Counsel for Lead Plaintiff the Lord Abbett Funds
and Lead Counsel for the Proposed Class*