**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al*., Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NAVIENT CORPORATION, *et al*.,<br><br>        Defendants. | Case No. 1:16-cv-112-GMS<br><br><u>CLASS ACTION</u><br><br><br><br><u>JURY TRIAL DEMANDED</u> |

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ............................................................... 2

    A.   Claims Under the Securities Exchange Act of 1934 .................................. 2

    B.   Claims Under the Securities Act of 1933 ................................. 9

II.  JURISDICTION AND VENUE ................................................. 10

III. EXCHANGE ACT PARTIES ............................................................ 10

    A.   Plaintiffs ................................................................. 10

    B.   Exchange Act Defendants ...................................................... 11

        1.   Navient ............................................................... 11

        2.   Officer Defendants .................................................... 12

IV.  DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S FORBEARANCE PRACTICES, THE CREDIT QUALITY OF ITS LOAN PORTFOLIOS, AND ITS FINANCIAL RESULTS ................. 13

    A.   Defendants Made False or Misleading Statements to Investors Regarding Forbearances, Loan Credit Quality, and Related Financial Results ................................. 13

        1.   False or Misleading Statements Regarding Forbearance ............ 13

        2.   False or Misleading Statements Concerning the "High Quality" of Navient's Loan Portfolio and, Relatedly, the Low Level of Delinquencies and Charge-Offs ........................... 20

        3.   False or Misleading Statements Regarding Navient's Loan Loss Provisions and Financial Results ........................................ 22

        4.   False or Misleading SOX Certifications by Remondi and Chivavibul .............................................................................. 26

    B.   Defendants Made the False or Misleading Statements Regarding Forbearances, Loan Credit Quality, and Navient's Financial Results with Scienter ........................................................................ 27

        1.   The available facts demonstrate Defendants' conscious misbehavior or recklessness ........................................................ 28

        2.   Defendants also had the motive and opportunity to conceal the significant risk of default posed by the cohort of borrowers exiting deferment in 2014, as well as Navient's pervasive and systemic practice of placing borrowers into forbearance ................................................................................. 31

i

**TABLE OF CONTENTS**
**(continued)**

Page

C.     Defendants' Misrepresentations Regarding Forbearances, Loan Credit Quality, and Navient's Related Financial Results Caused Losses to Investors. .................................................................... 32

V.     DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S COMPLIANCE WITH LEGAL AND REGULATORY REQUIREMENTS .............................................................................. 36

    A.     Defendants Made False or Misleading Statements Regarding Compliance to Investors. ........................................................... 36

       1.     Navient provided inadequate notice to borrowers regarding annual recertifications for IDR plans. ......................................... 37

       2.     Navient misadvised borrowers regarding the prerequisites to allowing them to release their cosigners from responsibility for the loan payments. ........................................... 38

       3.     Navient misrepresented the amounts delinquent borrowers needed to pay to become current on their loans. ......................... 39

       4.     Navient repeatedly made payment processing errors and lacked adequate systems to address and prevent their recurrence. ................................................................................. 40

       5.     Navient mishandled the accounts of military borrowers, even after the Company paid $60 million to the DOJ for that very misconduct. ................................................................. 41

       6.     Pioneer and GRC deceived borrowers regarding the federal loan rehabilitation program. ......................................................... 43

    B.     Defendants Made the False or Misleading Statements Regarding Compliance with Scienter. ....................................................... 45

    C.     Defendants' Misrepresentations Regarding Legal Compliance Caused Investors Losses. ....................................................... 47

VI.     DEFENDANTS DEFRAUDED INVESTORS BY CONCEALING VITAL FACTS REGARDING NAVIENT'S ABILITY TO FUND ITS OPERATIONS ........................................................................... 51

    A.     Defendants Made False or Misleading Statements to Investors Regarding Navient's Liquidity and Financing Arrangements. ................ 51

    B.     Defendants Made the Misrepresentations Regarding Navient's Credit Facilities with Scienter. ................................................ 55

# TABLE OF CONTENTS
### (continued)

Page

C.    Defendants' Misrepresentations Regarding Navient's Credit Facilities Caused Investors Losses.............................................................. 55

VII.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ........ 56

VIII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT................................. 58

IX.    PLAINTIFFS' SECURITIES ACT CLAIMS ...................................................... 59

    A.    Summary of the Claims ............................................................................. 59

    B.    Securities Act Parties ............................................................................... 60

        1.    Plaintiffs..................................................................................... 60

        2.    Securities Act Defendants............................................................ 61

    C.    The Offering Documents Contained Untrue Statements of Material Fact or Omitted Material Facts Necessary to Make Those Statements Not Misleading. ...................................................................... 63

        1.    The 2014 Offering Materials contained untrue or misleading statements of material fact......................................... 63

        2.    The 2015 Offering Documents contained untrue or misleading statements of material fact......................................... 65

X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT............................... 67

XI.    CLASS ACTION ALLEGATIONS ................................................................... 72

XII.    PRAYER FOR RELIEF .................................................................................... 73

JURY TRIAL DEMANDED .................................................................................................. 74

Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund ("Plaintiffs" or the "Lord Abbett Funds") bring this class action on behalf of themselves and all other similarly situated investors against Navient Corporation ("Navient" or the "Company"), one of the country's largest servicers of student loans, as well as its President and Chief Executive Officer John F. ("Jack") Remondi, Chief Financial Officer Somsak Chivavibul, Chief Operating Officer John M. Kane, and others for violations of the federal securities laws.  As detailed below, Defendants made numerous false or misleading statements of material fact between April 17, 2014 and December 28, 2015, inclusive ("Class Period"), with respect to Navient's business operations and financial results. Defendants' statements or omissions caused the price of Navient securities to be artificially inflated, and caused significant damages to purchasers of Navient stock and notes when they ultimately learned facts revealing that Defendants' prior representations were false or misleading when made.  The Lord Abbett Funds, who suffered more than $13 million in damages due to Defendants' misconduct, seek a recovery through this action on behalf of themselves and other injured investors.

The allegations in this Complaint derive from Plaintiffs' investigation (through their counsel) of (1) filings with the U.S. Securities and Exchange Commission ("SEC") regarding Navient and related entities; (2) government reports, news articles, securities analysts' reports, wire and press releases, transcripts of public conference calls regarding Navient, and other readily obtainable information; (3) information provided to Plaintiffs by former Navient employees, each of whom worked at the Company for part or all of the Class Period and interacted directly with borrowers as well as Navient management; and (4) facts set forth in

actions brought by the U.S. Consumer Financial Protection Bureau ("CFPB") and the attorneys

general of Washington, Illinois, and Pennsylvania against Navient, which are the product of

extensive investigations by those entities and cite to, among other things, internal Navient

documents.[1]

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all entities and individuals

who (1) purchased Navient's publicly traded securities during the Class Period; (2) purchased

notes in or traceable to the Company's public offering conducted on or about November 6, 2014

(the "2014 Debt Offering"); or (3) purchased notes in or traceable to the Company's public

offering conducted on or about March 27, 2015 (the "2015 Debt Offering").

2.    Defendants' misconduct gives rise to two sets of claims, as summarized

immediately below.

### A.    Claims Under the Securities Exchange Act of 1934

3.    Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), as well as SEC Rule 10b-5 (17

C.F.R. § 240.10b-5), against Navient, CEO Jack Remondi, CFO Somsak Chivavibul, and COO

John Kane (collectively, the "Exchange Act Defendants") for knowingly or recklessly making

false or misleading statements in connection with investors' purchase or sale of Navient stock

and notes.[2]  Defendants' misrepresentations related to (1) Navient's practices regarding

---

[1] Those cases are, respectively, (i) *Consumer Financial Protection Bureau v. Navient Corp., et al.*, No. 3:17-cv-00101-RDM (M.D. Pa. filed Jan. 18, 2017); (ii) *State of Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (King Cnty. Super. Ct. filed Jan. 18, 2017); (iii) *People of the State of Illinois v. Navient Corp., et al.*, No. 2017 CH 00761 (Cir. Ct. Cook Cnty. Ch. Div. filed Jan. 18, 2017); and (iv) *Commonwealth of Pennsylvania v. Navient Corp., et al.*, No. 3:17-cv-01814-RDM (M.D. Pa. filed Oct. 5, 2017).

[2] Unless otherwise indicated, "Defendants" refers to the Exchange Act Defendants.

forbearances (which were supposed to be temporary reprieves of borrowers' payment obligations) and more broadly the credit quality of the Company's loan portfolios, as well as the Company's related determinations of "provisions for loan losses," reserves maintained to address potential "charge-offs" the Company is forced to take when it deems loans uncollectible; (2) Navient's compliance with governing laws and regulations; and (3) Navient's ability to borrow funds through credit facilities that were critical to its ability to purchase Federal Family Education Loan Program ("FFELP") loans.

### Forbearance practices, loan credit quality, and loan loss provisions

4.      Defendants repeatedly assured investors during the Class Period that forbearances were meant to afford temporary (not long-term) relief to borrowers, and that Navient engaged in a careful, borrower-specific evaluation of whether to grant forbearances.  *See* ¶¶ 33-49; App'x at Section I.  But in fact there was a pervasive and systemic practice at Navient, directed by senior management, of *regularly and indiscriminately* granting forbearances to struggling borrowers.  Those undisclosed forbearance practices had three objectives.

5.      *First*, Defendants aimed to avoid having to classify those borrowers as delinquent or in default, which would raise a red flag to analysts and investors that Navient's loan portfolios were exposed to higher levels of risk than Defendants disclosed, and that the Company was in turn a riskier investment than Defendants portrayed to the market.

6.      *Second*, misusing forbearances also allowed Defendants to manipulate Navient's financial results.  *See* ¶¶ 50-63.  In particular, Defendants misrepresented Navient's provisions for loan losses, an indicator of the level of risk to which the Company's loan portfolios were exposed.

7.      Increases in delinquencies, defaults, and charge-offs cause the Company to increase its loan loss provisions, whereas favorable delinquency and default trends correspond with lower provisions.  The provision for loan losses "increases the related allowance for loan losses," i.e., the total reserve set aside to address charge-offs.[3]  Navient records those provisions as an expense on its income statement, so lower provisions allow the Company to report higher income, resulting in higher earnings per share ("EPS").  By overusing forbearances, Navient artificially kept delinquencies, defaults, and charge-offs lower than they should have been, which in turn allowed the Company to report artificially low loan loss provisions as well as correspondingly high net income and EPS.

8.      *Third*, Navient placed borrowers into forbearance in lieu of counseling and enrolling them in alternative repayment programs, including income-driven repayment ("IDR") plans.[4]  In doing so, Navient avoided (at borrowers' expense) the higher operational costs associated with properly counseling and enrolling borrowers in such plans.  That is, it would take significantly more time, and thus employee resources, to shepherd a borrower through the process of getting into an alternative repayment plan than simply to place her into forbearance.  That, in turn, would necessitate hiring more personnel to meet the needs of Navient's customer base.  *See* ¶¶ 43-44.  By eschewing its stated commitment to promote borrowers' best interests, Navient artificially kept its operational costs lower than they should have been.

9.      Defendants' misrepresentations caused investors to value the Company higher than they otherwise would have, in turn causing the price of Navient securities to be artificially

---

[3] Form 10 Registration Statement (Apr. 10, 2014) ("April 2014 Information Statement") at 64.

[4] An IDR plan sets the borrower's monthly student loan payment at an amount intended to be affordable based on the borrower's monthly income and family size.  *See, e.g.*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.  The U.S. Department of Education ("DOE"), for example, offers several types of IDR plans, including the "Pay As You Earn," or "PAYE," plan, and the Income-Based Repayment, or "IBR," plan.  *See id.*

inflated during the Class Period.  But the fraud was ultimately revealed through several disclosures of information contradicting Defendants' prior statements.  Among other things, on July 13, 2015, Navient—after having reported decreases in loan loss provisions for every prior quarter of the Class Period—suddenly announced it would need to increase its provision for loans in the "Private Education Loans" (or "PEL") segment (i.e., loans originated from private sources rather than the government) by $46 million, or *31.7%*.  Defendants revealed that a group of borrowers (i.e., "cohort") who had returned to school during the "Great Recession" of 2007-2008, and who represented *$2.5 billion* in loans, had demonstrated difficulty repaying their loans.  That disclosure was followed by Remondi's revelation during a July 22, 2015 earnings call that those borrowers "were struggling to begin with," i.e., even before they went back to school.  And on September 29, 2015, the CFPB issued a report (the "CFPB Report") detailing, among other widespread problems in the loan-servicing industry, that loan servicers were placing borrowers into forbearance in lieu of alternative repayment plans.  Those disclosures caused significant drops in the prices of Navient securities, damaging investors.  *See* ¶¶ 84-91.

### *Legal and regulatory compliance*

10.     Defendants also repeatedly assured investors that Navient was diligent in complying with applicable laws and regulations.  *See* ¶¶ 92-94.  While compliance would naturally be of great concern to investors in a loan-servicer, it was even more important to Navient investors in light of the scrutiny the Company faced from the CFPB and other agencies relating to the loan-servicing and collection practices of Navient's wholly-owned subsidiaries Navient Solutions, LLC (f/k/a Navient Solutions, Inc.) ("Navient Solutions"), Pioneer Credit Recovery, Inc. ("Pioneer"), and General Revenue Corporation ("GRC").  In April 2014, Navient Solutions received a Civil Investigative Demand ("CID") from the CFPB relating to allegations

that Navient was processing monthly student loan payments in a manner designed to maximize late fees and had provided inadequate disclosures regarding the assessment of late fees.  And on May 13, 2014, Navient announced it had entered into an agreement with the U.S. Department of Justice ("DOJ") and the Federal Deposit Insurance Corporation ("FDIC") to settle allegations that Navient Solutions violated the Servicemembers Civil Relief Act ("SCRA") by charging borrowers who served in the military more than the legally mandated 6% cap applicable to those borrowers, and failed to sufficiently inform borrowers about late fees incurred on loans owned or originated by Sallie Mae Bank between 2005 and 2014.  In light of regulators' enhanced scrutiny of Navient, Defendants' continued assurances during the Class Period about the Company's compliance with governing laws and regulations were all the more important to investors.

11.     But while Defendants represented to investors that Navient maintained a "robust compliance culture driven by a 'customer-first' approach,"[5] the Company and its subsidiaries were actually engaged in a series of unfair and deceptive practices, including (1) misleading borrowers about the availability of IDR plans; (2) misadvising borrowers about the availability of releases of cosigners of borrowers' loans; (3) misleading delinquent borrowers regarding the amounts they needed to pay to become current on their loans; (4) failing to disclose or properly address systemic processing errors and the inadequate systems in place to deal with those errors; (5) charging borrowers who had served in the military high interest rates on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between Navient Solutions and the DOJ for that very practice; and (6) deceiving borrowers regarding attributes of the federal loan rehabilitation program, which affords borrowers in default the opportunity to "rehabilitate" their loans and remove them from default status.  *See* ¶¶ 96-119.  Those unfair and

---

[5] *E.g.*, 2014 Form 10-K at 4.

deceptive practices are the subject of actions filed by the CFPB and state attorneys general (*see supra* at 2 n.1) asserting claims under the Consumer Financial Protection Act ("CFPA"), the Fair Debt Collection Practices Act ("FDCPA"), and state consumer protection laws.  The Government Complaints assert, based in part on internal Navient documents, that the Company engaged in those practices systemically and repeatedly for years, including during much of the Class Period in this case.

12.     Investors ultimately learned the truth about Navient's pervasive failures to comply with governing legal and regulatory requirements through a series of disclosures beginning on February 27, 2015 and ending on October 14, 2015, which revealed the existence of rampant misconduct in the loan-servicing industry, and at Navient in particular.  *See* ¶¶ 125-35.  Each of those disclosures was met with surprise by the market, and each was followed by a material drop in the prices of Navient securities.  *See* ¶¶ 127, 129, 131-32, 135.

### Navient's borrowing capacity

13.     Defendants emphasized to investors that Navient's ability to fund its operations depended in part on the Company's ability to access funds through credit facilities, including those maintained with the Federal Home Loan Bank of Des Moines ("FHLB-DM").  But Defendants' representations regarding Navient's credit facilities failed to apprise investors of the true likelihood that FHLB-DM would terminate its facilities in light of a rule proposed by the Federal Housing Finance Agency ("FHFA") in *September 2014* (which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities from gaining membership with a Federal Home Loan Bank ("FHLB")—and thus access credit on extraordinarily favorable

terms—through the use of a "captive insurer." *See* ¶¶ 136-39.[6]  Sallie Mae formed a captive

insurer, HICA Education Loan Corporation ("HICA"), to become a "member" of FHLB-DM,

effectively exploiting a loophole that would be closed by the proposed rule.  The proposed rule

thus threatened Navient's ability to obtain low-cost credit to fund its operations.  And

Defendants, unlike investors, plainly were aware of the proposed rule and the impact its adoption

could have on Navient.

14.     The truth regarding the credit facilities was revealed to investors on December 28,

2015, when Navient disclosed that FHLB-DM would reduce—by more than 50%—the

Company's ability to borrow under the credit facilities maintained with FHLB-DM.  That news

drove the price of Navient stock down more than 9%.

### *Collective impact of Defendants' fraud on investors*

15.     In all, including the substantial effect of declines attributable to corrective

disclosures, Navient stock went down more than 46.4%, from $21.40 per share on February 27,

2015 to $11.46 per share on December 28, 2015, the last day of the Class Period.

16.     The following chart demonstrates the significant negative impact on the price of

Navient shares upon the disclosure of Defendants' misconduct:

---

[6] A captive insurer is an insurance company formed to allow the organizing company to insure
itself against risks that are too expensive to insure on the regular insurance market.



### B. Claims Under the Securities Act of 1933

17. Plaintiffs also assert non-fraud claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77l, and 77o) against Navient, Remondi, Chivavibul, and Navient's directors, as well as the underwriters of the 2014 and 2015 Debt Offerings (collectively, the "Securities Act Defendants," as further identified in ¶¶ 169-90).

18. Those claims arise from untrue statements of material fact in, or omissions of material fact from, the Shelf Registration Statement, prospectuses, and prospectus supplements issued in connection with the Debt Offerings, which incorporated by reference many of the misrepresentations summarized above and detailed in ¶¶ 33-35, 50-51, 54-56, 65, 93-94, 136-38

below regarding Navient's forbearance practices, loan credit quality, and related financial

results; legal and regulatory compliance; and credit facilities.[7]

## II.      JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action in accordance

with 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and

Section 22 of the Securities Act, 15 U.S.C. § 77v.

20.     Personal jurisdiction exists over Defendants in accordance with Section 27 of the

Exchange Act and Section 22 of the Securities Act, as well as the Fifth Amendment of the

United States Constitution.

21.     Venue is proper in this District in accordance with Section 27 of the Exchange

Act, Section 22(a) of the Securities Act, and 28 U.S.C. § 1391(b).  Navient is headquartered in

this District and many of the acts and practices alleged in this Complaint occurred in substantial

part in this District.

22.     In connection with the misconduct alleged in this Complaint, Defendants directly

or indirectly used the means and instrumentalities of interstate commerce, including the U.S.

mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     EXCHANGE ACT PARTIES

### A.      Plaintiffs

23.     Plaintiff Lord Abbett Affiliated Fund, Inc. is a diversified, open-end management-

investment company registered under the Investment Company Act of 1940, as amended.

---

[7] Sections IV-VI, and IX.C.  below detail the false or misleading statements giving rise to
Plaintiffs' Exchange Act and Securities Act claims, categorized by subject matter.  Plaintiffs also
attach to this Complaint an Appendix that (i) identifies each statement, (ii) summarizes why it
was false or misleading when made, and (iii) identifies the subsequent disclosure associated with
it.

24.     Plaintiff Lord Abbett Bond-Debenture Fund, Inc. is an open-end management-investment company registered under the Investment Company Act.

25.     Plaintiff Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund is diversified, open-end management-investment company registered under the Investment Company Act.  The Fund is a series of Lord Abbett Equity Trust, a Delaware statutory trust.

26.     Plaintiff Lord Abbett Investment Trust – Lord Abbett High Yield Fund is a diversified investment company registered under the Investment Company Act.  The Fund is a series of the Lord Abbett Investment Trust, a Delaware statutory trust.

27.     The Lord Abbett Funds' investments are managed by Lord, Abbett & Co. LLC ("Lord, Abbett & Co."), located at 90 Hudson Street, Jersey City, NJ 07302.  Lord, Abbett & Co. caused each of the Lord Abbett Funds to transact in Navient securities during the Class Period, and each of the Funds owned the securities it acquired, respectively, through those transactions.

28.     By order of June 30, 2016 (Dkt. 32), this Court appointed the Lord Abbett Funds as Lead Plaintiff in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA").  As set forth in the Funds' certification filed in connection with their motion for appointment as Lead Plaintiff (Dkt. 14 (Ex. 1)), Plaintiffs purchased Navient stock and notes during the Class Period and suffered losses in connection with those purchases.

   **B.     Exchange Act Defendants**

      **1.     Navient**

29.     On May 29, 2013, Sallie Mae announced it would separate into two distinct publicly-traded entities—an education loan management business named "Navient" and a consumer banking business named "SLM BankCo."  Navient's separation from Sallie Mae was effected through the distribution of Navient common stock (the "Spin-Off").  On April 30, 2014, the Spin-Off was completed via a distribution by Sallie Mae of all the shares of common stock of

11

Navient to the shareholders of Sallie Mae common stock.  Navient stock trades on the NASDAQ under the symbol "NAVI."

### 2.      Officer Defendants

30.      Defendant John F. (Jack) Remondi served at all times relevant to this Complaint as Navient's President and CEO, as well as a director and a member of the Navient board's Executive Committee.  Remondi served as Sallie Mae's President and CEO from May 2013 to April 2014, President and COO from January 2011 to May 2013, and Vice Chairman and CFO from January 2008 to January 2011.  Remondi signed numerous Navient SEC filings and made other statements on the Company's behalf during the Class Period.  *See generally* App'x.

31.      Defendant Somsak Chivavibul served at all times relevant to this Complaint as Navient's Executive Vice President and CFO.  Chivavibul joined Sallie Mae in 1992 and worked in various positions at the company.  He previously worked at Ernst & Young and is an accountant.  Chivavibul signed numerous Navient SEC filings during the Class Period.  *See generally* App'x.

32.      Defendant John Kane served at all times relevant to this Complaint as Navient's COO and Group President, Asset Recovery and Business Services.  Kane made statements on Navient's behalf at least during the Credit Suisse Group Financial Services Forum on February 11, 2015 ("Credit Suisse Forum").  *See* ¶ 93; App'x at Section II.

IV.     **DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S FORBEARANCE PRACTICES, THE CREDIT QUALITY OF ITS LOAN PORTFOLIOS, AND ITS FINANCIAL RESULTS**

A.     **Defendants Made False or Misleading Statements to Investors Regarding Forbearances, Loan Credit Quality, and Related Financial Results.**

1.     **False or Misleading Statements Regarding Forbearance**

33.     Defendants made numerous representations to investors throughout the Class Period regarding Navient's forbearance "philosophy" and practices.  In the April 2014 "Information Statement" issued in connection with the Spin-Off, Navient stated (1) "[f]orbearance as a collection tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments"; (2) "[o]ur forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan"; and (3) "[w]e continue to see improvement in credit quality and continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio."

34.     Substantially similar representations appear in Navient's Form 10-Qs for Q1 2014 (issued on May 9, 2014); Q2 2014 (issued on August 1, 2014); Q3 2014 (issued on October 30, 2014); and Q1 2015 (issued on April 30, 2015).  *See* App'x at Section I.1.[8]

35.     Navient's forbearance practices were addressed in detail in its 2014 Form 10-K filed on February 27, 2015:

> Navient believes the credit risk of the Private Education Loans it owns is *well managed* through the *rigorous underwriting practices* and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal

---

[8] For the Court's convenience, Plaintiffs often do not list each substantially similar representation in this Complaint, but rather address them in the Appendix.

servicing and risk mitigation practices, as well as *our careful use of forbearance* and our loan modification programs.[9]

36.     The statements recounted in ¶¶ 33-35 above were false or misleading when made, because Navient engaged in a systemic practice of indiscriminately placing borrowers into forbearance—sometimes multiple, consecutive forbearances—regardless of the impact it would have on those customers and without regard to borrowers' particular circumstances.  By doing so, Navient avoided having to record those accounts, particularly for PEL borrowers, as delinquent or in default, which would have signaled to investors that the Company was exposed to greater risk in its loan portfolios than it was reporting.  Further, as detailed in ¶¶ 43-44 below, by placing FFELP borrowers into forbearance rather than enroll them in appropriate IDR plans, Navient avoided the increased costs that the latter entailed, in particular because it took substantially more time and paperwork for employees to counsel borrowers about, and enroll them in, IDR plans than to simply stick them into forbearance.

37.     Former Navient employees with direct knowledge of Navient's undisclosed forbearance practices have recounted them in detail.  A former Navient employee who worked as a Collections Supervisor from early 2014 until April 2015 ("CW 1"), for example, explained that the Collections Department's "objective all of the time was to keep an account current" through using forbearances or other means of postponing payments borrowers were unable to make.  Accordingly, CW 1 said, "[y]ou would never see us have a goal where it was 'Let's see how much money we can collect this month.'  It was how much can we postpone?  How many forbearances can we slap on [an] account."  CW 1 stated this management directive was conveyed by CW 1's supervisor but came from Navient District Manager/Senior Vice President

---

[9] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations and quotation marks have been omitted.

of Default Prevention Troy Standish, who reported to Defendant John Kane.  As a result of those practices, CW 1 explained, borrowers were misled and their accounts "were just growing and growing and growing."

38.     CW 1's account is corroborated by a former Navient Collections Department Supervisor who worked at the Company from mid-2010 until October 2014 and supervised 25 Collections Agents ("CW 2").  CW 2 recounted that Navient Director of Operations Christi Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as "current" on Navient's books, "even though putting [borrowers] into our forbearance for 12 months drastically capitalizes a lot more interest and increases their loan substantially."

39.     CW 2 explained, moreover, that while CW 2 was at Navient, collections agents were incentivized by management, in order to be counted "number one by the number of loans [they] had," to "put … [customers] in something that makes them look like they're up to date for a longer period of time, even though by doing that every month the company is making like millions of dollars simply by the interest rate capitalizing," and "if an agent [had] 50 accounts, that [was] the mindset for those 50 accounts."  CW 2 related that it "was negative for the customer.  If the customer call[ed] in requesting the good thing"—i.e., a relatively short forbearance—"we were coached [by management] to coach our agents to do the bad thing" and convince the customer to obtain a longer one.

40.     CW 1 recounted that to achieve a good performance rating, agents had just five and a half minutes per phone call with borrowers, during which agents ran down a list of questions concerning family size, whether the borrower worked part or full time, and whether the borrower received assistance, before sending off paperwork to qualify for a deferral due to

unemployment; if there were no questions, the agent ended the call at that point.  Further, CW 1

explained, while the paperwork was in process the loan was put into forbearance.  According to

CW 1, "[i]t's not like [the borrower] was getting any information" during those calls about the

impact on their balances.

41.     A former Navient Department of Education Specialist II who worked at Navient's

Delaware headquarters from June 2014 until after the Class Period ("CW 3") similarly recounted

that Navient provided incentives to personnel for getting customers off the phone in the fastest

amount of time.  CW 3 indicated that CW 3 was pushed to work as fast as CW 3 could.  CW 3

stated, "It was preached there to get someone off the phone as soon as possible."  CW 3 recalled

that if CW 3 failed to get someone off the phone quickly, it was looked down upon by Navient

management.  CW 3 further noted there was a lot of miscommunication toward the borrowers

about forbearance; CW 3 indicated that a lot of borrowers did not know what they were entitled

to, and that Navient customer service representatives were responsible for the

miscommunications.

42.     The CFPB and state attorneys general likewise report that Navient's

compensation policies incentivized its employees to place federal-loan borrowers into

forbearance without adequately exploring IDR plans with those borrowers and, in some cases,

without even mentioning such plans.

43.     Because Navient compensated its customer service representatives based in part

on average call time, employees were dissuaded from engaging in longer, time-consuming

conversations with borrowers to determine the most-appropriate alternative payment plan for

each borrower, or assist them in completing the required enrollment application or annual

recertification forms.  By contrast, it typically took only a few minutes over the phone, without

any paperwork, for a Navient representative to enroll a borrower in forbearance.  Navient thus pressured its employees to churn out forbearances rather than take more time to determine what options would work best in light of borrowers' specific circumstances.

44.     Additionally, because a borrower seeking to enroll in an IDR plan must submit a paper or online application and include certain income tax documentation with it, the enrollment process sometimes requires multiple, lengthy conversations with the borrower.  In its complaint the CFPB reports "[t]his is especially true considering that more than half of Navient borrowers who enroll in [IDR] plans for the first time report that they could not navigate the application process on their own."[10]  Enrollment in forbearance, by contrast, can often be completed over the phone within minutes, and generally without submitting any paperwork.  Further, a borrower enrolled in an IDR plan must also complete an annual recertification form to document her current income and family size, which is then used to adjust her payment amount.  Processing that renewal paperwork further increases the time Navient employees must devote to borrowers who enroll in IDR plans.  As the CFPB explains, "[a]s the volume of [IDR] plan applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs."[11]  Navient thus avoided those necessary operating costs by improperly placing borrowers into forbearance.

45.     The Illinois AG reports in its complaint that a review of 200 sample calls answered by Navient representatives "revealed that despite Navient's assurances to borrowers that it would offer assistance regarding repayment options, when on the phone with borrowers it

---

[10] CFPB Compl. ¶ 44.

[11] *Id.* ¶ 46.

offered deferments or forbearances without mentioning any other options over 50% of the time."[12]

46.     The CFPB reports in its complaint that as a result of Navient's undisclosed forbearance practices, between January 2010 and March 2015 the number of federal-loan borrowers the Company enrolled in forbearance far exceeded the number of borrowers enrolled in IDR repayment plans.[13]   The CFPB further states that Navient's customer service representatives regularly responded to federal-loan borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available IDR plans, notwithstanding that more than 50% of Navient's borrowers who needed relief and were eligible for IDR plans actually qualified for a $0 monthly payment and thus did not need to enroll in forbearance.[14]   Indeed, the CFPB reports that between January 1, 2010 and March 31, 2015, (1) nearly 25% of borrowers who ultimately enrolled in IBR (as noted earlier, a type of IDR plan) with a $0 payment were enrolled in voluntary forbearance within the 12-month period before they enrolled in IBR; and (2) nearly 16% of borrowers who ultimately enrolled in PAYE (another IDR plan) with a $0 payment were enrolled in voluntary forbearance within the 12-month period before they enrolled in PAYE.[15]

47.     Making things worse, Navient enrolled many borrowers in multiple, consecutive forbearances, even though the borrowers had clearly demonstrated a long-term inability to repay their loans.  The Pennsylvania AG reports in its complaint that between January 1, 2010 and March 31, 2015 Navient enrolled over *1.5 million federal-loan borrowers* in two or more consecutive forbearances totaling at least 12 months; approximately one million of those

---

[12] Ill. Compl. ¶ 279.
[13] CFPB Compl. ¶ 50.
[14] *Id.* ¶ 51.
[15] *Id.* ¶ 52.

borrowers were enrolled in three or more consecutive forbearances, where each forbearance period lasted an average of six months, and more than 520,000 of the borrowers were enrolled in four or more consecutive forbearances.[16]

48.     Additionally, the September 2015 CFPB Report confirms that the improper use of forbearances was prevalent with respect to *both* private and federal loans.  The Report resulted from a public inquiry by the CFPB, DOE, and U.S. Treasury Department commenced in May 2015, which drew "more than 30,000 comments describing specific student loan servicing practices that may be contributing to student debt stress, and offering specific recommendations for ways to improve student loan servicing, encourage borrower success, and mitigate defaults."[17]  The CFPB recounted that comments from individual borrowers and organizations representing public service workers "note that servicers of both private and federal student loans may not inform borrowers experiencing financial hardship about available alternative repayment plans," and instead "may advise borrowers *to postpone payments through forbearance* or deferment or instruct borrowers that the only available option is to pay the full amount due."

49.     The pervasive and systemic use of forbearances at Navient, which Defendants did not publicly disclose, belied their representations to investors (as recounted in ¶¶ 33-35 above) that (1) Navient engaged in a "careful use of forbearance," (2) Navient applied forbearances "based on a customer's unique situation," (3) the Company's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan," and (4) Navient "continue[d] to see . . . continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio."  Those statements accordingly were false or misleading when made.

---

[16] Pa. Compl. ¶¶ 122-23.

[17] *See* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

>    2.    **False or Misleading Statements Concerning the "High Quality" of
>           Navient's Loan Portfolio and, Relatedly, the Low Level of
>           Delinquencies and Charge-Offs**

50.     Defendants made numerous statements throughout the Class Period touting the

purportedly high quality of Navient's loan portfolio and, relatedly, the low level of delinquencies

by borrowers and charge-offs by Navient.  In an April 16, 2014 press release announcing Q1

2014 financial results for Sallie Mae (of which Navient remained a part until the Spin-Off was

completed on April 30, 2014), Remondi stated, "We're . . . pleased that this quarter set a six-

year-record low in delinquencies, reflecting our strong underwriting and customer support."

Navient reiterated those sentiments in a "Roadshow" presentation attached to a Form 8-K filed

the next day (April 17, 2014), which (1) emphasized Navient's "[l]arge, high quality asset base,"

including its "[s]easoned portfolio" of Private Education Loans"; and (2) highlighted, in a section

titled "Leveraging Core Strengths to Drive Growth," "Default Prevention and Asset Recovery,"

specifying "[d]elinquency and charge-offs significantly below national average" and "[i]ndustry

leading asset recovery and private credit loss mitigation capabilities."

51.     Defendants made substantially similar statements regarding loan-credit quality for

the remainder of the Class Period.  *See, e.g.*, (1) Q2 2014 earnings press release (July 16, 2014)

(reporting "continued improvement in student loan portfolio credit quality with 90-plus day

delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008");

(2) Q2 2014 Form 10-Q (filed on Aug. 1, 2014) (noting provisions for PEL losses "declined $36

million primarily as a result of the overall improvement in Private Education Loans' credit

quality, delinquency and charge-off trends leading to decreases in expected future charge-offs");

(3) 3Q 2014 earnings press release (Oct. 15, 2014) (stating financial results "show[ed] continued

improvements in delinquencies and defaults since a year ago" and improved performance of

Navient's Private Education Loan portfolio, claiming that "Charge-Off Rates on Private

Education Loan Portfolio Improve[d] to Lowest Levels Since 2008"); (4) Q4 & FY 2014 press release (Jan. 21, 2015) (stating "2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008").[18]

52.    The statements recounted in ¶¶ 50-51 were false or misleading when made because Defendants failed to disclose that Navient was regularly and indiscriminately placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolios and artificially depressing the number of delinquencies, defaults, and charge-offs.  *See* ¶¶ 36-49, 55-56.  The quality of Navient's loan portfolios was therefore not as Defendants described it to investors.

53.    Indeed, even regardless of Navient's forbearance practices, the statements made from January 21, 2015—when Defendants began reporting Navient's financial results for Q4 2014 and full-year 2014—onward were false or misleading when made because by then (at the latest) Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default.  Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into in-school deferment). Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers.  Yet Defendants inexplicably waited until July 2015 to disclose that issue to investors and increase the Company's provision—in the meantime

---

[18] *See also* App'x at Section I.2 (including (i) Q1 2014 Form 10-Q (filed on May 9, 2014); (ii) Q2 2014 earnings call (July 17, 2014); (iii) Remondi presentation at Barclays Global Financial Services Conference (Sept. 8, 2014); (iv) Remondi presentation at Bank of America-Merrill Lynch Conference (Nov. 12, 2014); (v) Q4 & FY 2014 earnings call (Jan. 22, 2015); (vi) 2014 Form 10-K (Feb. 27, 2015); (vii) Q1 2015 earnings press release (Apr. 21, 2015); (viii) Q1 2015 earnings call (Apr. 22, 2015); and (ix) Q1 2015 Form 10-Q (Apr. 30, 2015).

repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.

### 3. False or Misleading Statements Regarding Navient's Loan Loss Provisions and Financial Results

54. During the Class Period, Defendants also touted Navient's relatively low loan loss provisions for PELs, which decreased each quarter (and for the full year) as compared with the corresponding prior year quarter (and full year). The table below tracks the loss provision for PELs, net income on a GAAP (Generally Accepted Accounting Principles) and "Core Earnings" basis, and diluted EPS on a GAAP and Core Earnings basis, as reported by Defendants each quarter of the Class Period before Q2 2015 (when Defendants announced an increase in the PEL loss provision):[19]

| Reporting Period | Loss Provision for PELs | Net Income (GAAP Basis / Core Earnings Basis) | Diluted EPS (GAAP Basis / Core Earnings Basis) |
|---|---|---|---|
| **Q1 2014** (period ending Mar. 31, 2014) | $136M, down from Q1 2013 | $284M / $227M | $0.64 / $0.51 |
| **Q2 2014** (period ending June 30, 2014) | $145M, down from Q2 2013 | $307M / $241M | $0.71 / $0.56 |
| **Q3 2014** (period ending Sept. 30, 2014) | $130M, down from Q3 2013 | $359M / $218M | $0.85 / $0.52 |

---

[19] Navient defines "Core Earnings" as a non-GAAP figure reflecting adjustments to GAAP financial results for certain items Navient characterizes as "either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management." *See, e.g.*, 2014 Form 10-K at 46.

| Reporting Period | Loss Provision for PELs | Net Income (GAAP Basis / Core Earnings Basis) | Diluted EPS (GAAP Basis / Core Earnings Basis) |
|---|---|---|---|
| **Q4 2014/FY 2014** (period ending Dec. 31, 2014) | Q4: $128M, down from Q4 2013 <br><br> FY: $539M, down from $722M for FY 2013 | Q4: $263M / $217M <br><br> FY: $1.1B / $818M | Q4: $0.64 / $0.53 <br><br> FY: $2.69 / $1.93 |
| **Q1 2015** (period ending Mar. 31, 2015) | $120M, down from Q1 2014 | $292M / $194M | $0.72 / $0.48 |

55.     Those figures were materially misstated.  Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan loss provisions.  Those artificially low provisions, in turn, caused Core Earnings for the PEL segment and net income—both of which depended to a material degree on the level of loan loss provisions—to be artificially inflated, resulting in artificially inflated EPS.

56.     Navient's PEL loss provision, net income, and diluted EPS for Q4 2014 were misstated for the additional and independent reason that by then (at the latest) Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default.  Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers.  *See* ¶¶ 53, 61-63.  Expert consulting analysis obtained by Plaintiffs already demonstrates that had the additional loan loss provisions Navient recorded in Q2 2015 been recognized in Q4 2014, the Company's reported net income attributable to Navient Corporation would have fallen 14%—from $217 million to approximately $187 million—on a Core Earnings basis, and 11%—from $263 million to approximately $233

23

million—on a GAAP basis.  Further, GAAP-reported diluted earnings per common share attributable to Navient Corporation would have been reduced by $0.08 per share for Q4 2014, resulting in diluted earnings per common share of $0.56 for the quarter.  On a Core Earnings basis, Navient's reported diluted earnings per common share attributable to Navient Corporation would have been reduced by $0.08 per share (from $0.53 per share), resulting in diluted earnings per common share of $0.45 for Q4 2014, significantly below analysts' consensus forecast for that quarter.  The amount by which Navient's Q4 2014 financial results were overstated thus was quantitatively material.

57.     Defendants' failure to timely adjust Navient's loan loss provision to account for that significant group of struggling borrowers also violated GAAP, which required that the Company account for incurred and inherent credit losses in its allowance for loan losses and related loan loss provisions at the end of each quarter.

58.     The Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 450 concerning "Contingencies," together with ASC 310 concerning "Receivables," set forth the primary accounting guidance with respect to the recognition of allowances for loan losses that are both probable and estimable.[20]  Specifically, ASC 450 defines a "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[21]  When a loss contingency exists, the likelihood that a future event or events will occur or fail to occur, and thereby confirm the loss or impairment of

---

[20] These accounting standards were principally developed from the FASB's pre-codification accounting principles established under Statements of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS No. 5"), and SFAS No. 114, *Accounting by Creditors for Impairment of a Loan*.

[21] FASB ASC Master Glossary.

an asset or the incurrence of a liability, ranges from "probable" to "reasonably possible" to "remote."  Under GAAP, (1) "probable" means the future event or events "are likely to occur"; (2) "reasonably possible" means the chance of the future event or events occurring "is more than remote but less than likely"; and (3) "remote" means the chance of the future event or events occurring "is slight."[22]

59.     GAAP required that Navient account for loan losses inherent in its loan portfolio by recording a provision (a current-period expense) and corresponding allowance for loan loss if (1) information available prior to the issuance of Navient's financial statements indicated it was "probable" that the Company's loans had been impaired based on past events and conditions existing at the date of the financial statements; and (2) the amount of probable loss could be reasonably estimated.[23]

60.     Even if particular uncollectible loans may not be identifiable,[24] GAAP requires that Navient account for them.[25]  SEC guidance affirms this GAAP requirement.[26]

61.     The risk that Navient would not collect contractual principal and interest due from its PEL borrowers involved uncertainty as to possible losses, for which the Company was required to account.

---

[22] *Id.*

[23] *See* ASC 450-20-05-03; ASC 310-10-35-8; ASC 310-10-35-18.

[24] *See* ASC 310-10-35-9.

[25] ASC 310-10-35-22 (the conditions were not intended to be so rigid that they required virtual certainty before a loss was to be accrued).  GAAP further establishes accounting requirements for individual loans evaluated for impairment (as opposed to large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment).  *See* ASC 310.

[26] *See* ASC 310-10-S99-4 ("An estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued when, based on information available prior to the issuance of the financial statements, it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated[.]")

62.     Contrary to those principles, Navient failed to properly account for losses on more than $2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014 (*see* ¶¶ 53, 55-56).  As Remondi revealed during Navient's Q2 2015 earnings call on July 22, 2015, that cohort of borrowers presented unique characteristics in that they returned to school years earlier, during the "Great Recession" (in or around *2008*), "moved in and out of school multiple times" (some without earning a degree) and exited deferment status in 2014.  Remondi also disclosed that historically, those borrowers were "struggling to begin with" in making their loan payments.  Further, Remondi recognized that typically, "[t]he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher" and acknowledged the subject cohort of higher-risk PEL borrowers indeed reflected that trend.  *See* ¶ 87.

63.     Accordingly, by no later than Q4 2014, by which time the $2.5 billion in delinquent and defaulted PELs had exited deferment, Navient should have increased its provision for PEL losses to account for the higher likelihood that those struggling borrowers would default.  Navient's failure to do so constituted a violation of GAAP.  The loan loss provisions Navient reported at least for Q4 2014, full-year 2014, and Q1 2015 were therefore misstated, which in turn caused the Company's net income and EPS for those periods to be misstated.

### 4.     False or Misleading SOX Certifications by Remondi and Chivavibul

64.     Navient's series of undisclosed and improper practices also rendered Remondi's and Chivavibul's SOX certifications false or misleading when made.

65.     In those certifications under Sections 302 and 906 of SOX, which appeared in Navient's Form 10-Qs and 10-K during the Class Period (*see* App'x at Section I.4), Remondi and Chivavibul represented that, among other things:

1) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report";

2) "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Navient] as of, and for, the periods presented in this report";

3) "[Navient]'s other certifying officer [i.e., Remondi or Chivavibul] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to [Navient]'s auditors and the audit committee of [Navient]'s board of directors (or persons performing equivalent functions) . . . "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Navient]'s internal control over financial reporting"; and

4) "The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

66.    Those certifications were false or misleading when made, in light of Navient's undisclosed forbearance practices and the resulting manipulation of Navient's financial results. *See* ¶¶ 33-63.  Further, the certifications included in Navient's 2014 Form 10-K and Q1 2015 Form 10-Q were false or misleading even regardless of those forbearance practices, as by that time it was clear to Defendants that they should increase the provision for PEL loans to reflect the demonstrably high risk of default posed by the cohort of borrowers who exited deferment in 2014 and had been, as Remondi admitted in July 2015, struggling even before they entered deferment around 2008.

**B.     Defendants Made the False or Misleading Statements Regarding Forbearances, Loan Credit Quality, and Navient's Financial Results with Scienter.**

67.    Defendants made the numerous statements recounted above knowing, or at least recklessly disregarding, that they were false or misleading when made.  The allegations set forth in ¶¶ 68-83 demonstrate Defendants' scienter, for several reasons.

27

### 1.    The available facts demonstrate Defendants' conscious misbehavior or recklessness.

68.    *First*, the egregiousness, pervasiveness, and duration of Navient's undisclosed forbearance practices strongly indicate senior management knew of and approved those practices or could only have disregarded them by consciously turning a blind eye to them.

69.    Indeed, CW 1 and CW 2 recount a policy *directed by senior executives* that applied *throughout Navient's Collections Department.  See* ¶¶ 37-40.  CW 2 specified that Navient Director of Operations Christi Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as "current" on Navient's books.  And CW 1 recounted that the management directive to prioritize forbearances was conveyed by CW 1's supervisor and came from Navient District Manager/Senior Vice President of Default Prevention Troy Standish, who reported to Defendant John Kane.  At minimum, the actions of Hewes and Standish alone, which can be imputed to Navient, establish the Company's scienter.

70.    The Government Complaints similarly describe the pervasiveness and systematic nature of Navient's forbearance practices.  *See* ¶¶ 42-48.  That Navient put 1.5 million federal-loan borrowers into multiple forbearances is not a fact senior management could ignore.

71.    *Second*, Navient maintained incentive policies that encouraged the improper forbearance practices.  *See* ¶¶ 39, 41-44.  Senior executives clearly would have known about such widespread practices spawned by Company policies that were implemented by management.

72.    *Third*, there was nothing more critical to Navient's financial results and prospects than the prudent management of student loans.  Navient's pervasive practice of placing

borrowers into forbearance materially impacted the Company's financial results and thus went to the Company's core operations.

73.     *Fourth*, as noted above (*see* ¶¶ 52, 55) and further detailed below, misusing forbearances allowed Navient to artificially understate the levels of delinquencies, defaults, and charge-offs in its loan portfolios, as borrowers in forbearance were still considered "current" on their accounts.  Understating delinquencies, defaults, and charge-offs allowed Navient in turn to artificially understate its provisions for loan losses (particularly for PELs)—a key financial metric for the Company.  And because loan loss provisions were recorded as an expense on Navient's income statement, artificially depressing them allowed Navient to report artificially inflated net income and EPS.  That manipulation of core financial information would have required the knowledge (or reckless disregard) of Navient's senior executives.

74.     Further, Defendants' manipulation of Navient's financial results allowed the Company to meet (or come very close to) analysts' EPS estimates during the Class Period.  As the following chart—which incorporates expert consulting analysis obtained by Plaintiffs— demonstrates, had Navient not recorded decreases in its loan loss provisions for Q2 2014 and Q3 2014, it would not have met analysts' consensus estimates for EPS, or in the case of Q4 2014 and Q1 2015, would have missed them by significantly more than it did.  The strong connection between Navient's loan loss provisions and its ability to meet market expectations indicates Defendants' manipulation of loan loss provisions and related financial results was purposeful.

| Reporting Period | Analyst Consensus EPS Estimate | Reported Diluted EPS | Diluted EPS without Quarterly Decrease in Loan Loss Provisions |
|---|---|---|---|
| **Q2 2014** | $0.54 | $0.56 | $0.49 |

| | | | |
|---|---|---|---|
| **Q3 2014** | $0.51 | $0.52 | $0.44 |
| **Q4 2014** | $0.54 | $0.53 | $0.46 |
| **Q1 2015** | $0.50 | $0.48 | $0.41 |

75.     *Fifth*, as noted above, Remondi admitted during Navient's July 22, 2015 earnings call that the cohort of borrowers whose difficulties in repaying their loans caused Navient to increase its loan loss provision by 31.7% had previously "demonstrated difficulty in making payments," indicating "they were struggling to begin with." *See* ¶ 87.  Remondi thus confirmed that Navient was aware long before Q2 2015 that those borrowers, who represented $2.5 billion in loans, were experiencing repeated difficulties paying back their loans.  Yet Defendants failed to timely apprise investors of that serious situation, instead continuing to report—and vociferously tout—low loan loss provisions.

76.     Remondi's acknowledgment is consistent with information provided by a former Navient Collections Support Manager who worked in that position from spring 2010 until February 2015 ("CW 4").  CW 4 recounted that Navient Collections Department directors, including collection directors of Navient subsidiaries Pioneer and GRC, participated in weekly, monthly, and quarterly telephonic status meetings with upper management, including Remondi and Chivavibul.  CW 4 stated John Kane also attended those meetings, which were led by Jeff Mersmann.

77.     CW 4 explained that before each meeting, CW 4 e-mailed "very in-depth" reports to Mersmann showing (1) delinquency rates, (2) revenue, (3) borrowers participating in a loan-rehabilitation program, (4) any borrowers who fell out of compliance with rehabilitation requirements due to missing a loan payment, (5) the number of borrowers who had consolidated

loans, and (6) the number of borrowers who attempted to consolidate their loans but were unable to do so.  CW 4 further recounted that the numbers in the quarterly reports were compared with the numbers for the same quarter of the previous year, and that the reports collectively provided Company-wide information.[27]  CW 4 stated that after the reports were provided to Mersmann, Mersmann presented the numbers to Kane.

78.     CW 4's account is also consistent with Navient's statement to investors that management "focuse[d] on delinquencies as well as the progression of loans from early to late stage delinquency."[28]

79.     The above facts afford a strong inference that Remondi and Chivavibul knew of or recklessly disregarded the serious issues plaguing the large cohort of borrowers (representing $2.5 billion in loans) about which Defendants did not inform investors until July 2015.

**2.      Defendants also had the motive and opportunity to conceal the significant risk of default posed by the cohort of borrowers exiting deferment in 2014, as well as Navient's pervasive and systemic practice of placing borrowers into forbearance.**

80.     Defendants also had significant motivations for concealing the significant problems plaguing the cohort of borrowers who exited deferment in 2014, as well as the rampant and indiscriminate use of forbearances at the Company.

81.     Given the uncertainties that Navient would achieve success as a standalone entity no longer under the Salle Mae umbrella as of April 2014, Defendants had a motive to conceal the improper forbearance practices, as well as the ongoing impact of those practices on Navient's financial results.

---

[27] CW 4 explained that the reports were generated through several programs or systems: (i) Excel, both automatically and through employee input; (ii) Clearview (personalized reports); and (iii) Sharepoint.

[28] April 2014 Information Statement at 64.

82.     Defendants were particularly motivated to conceal the negative trends in the cohort of borrowers ultimately addressed in Navient's July 2015 disclosures—i.e., those Remondi acknowledged on July 22, 2015 "had been struggling to begin with"—rather than account for those trends in determining the Company's Q4 2014 financial results (at the latest). The same day Navient filed its 2014 Form 10-K, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program.  Further, before the market opened on the next trading day, March 2, 2015, *Inside Higher Ed* reported that the DOE's action was part of a "crackdown" on Navient.  *See* ¶ 126.[29]  Defendants accordingly had a strong motive not to disclose the striking information regarding the $2.5 billion worth of loans that they knew were experiencing major difficulties, so as not to compound the impact on the Company of the negative news regarding Pioneer (which itself caused the prices of Navient securities to drop).

83.     As senior executives of Navient, Remondi and Chivavibul plainly had the opportunity to defraud investors.

   **C.    Defendants' Misrepresentations Regarding Forbearances, Loan Credit Quality, and Navient's Related Financial Results Caused Losses to Investors.**

84.     Defendants' July 2015 disclosures regarding the increase in the provision for loan losses for Q2 2015, as well as the CFPB Report published on September 29, 2015, revealed, at least in part, the reality Defendants had been concealing from investors.

---

[29] *See* Michael Stratford, *Feds Fire 5 Debt Collectors*, Inside Higher Ed. (Mar. 2, 2015) https://www.insidehighered.com/news/2015/03/02/us-ends-contract-5-debt-collectors-citing-misrepresentations-borrowers.

85.     As discussed above, the price of Navient shares dropped significantly following the Company's disclosure on July 13, 2015 that it was increasing the provision for PEL losses by 31.7%, or $46 million, due to repayment issues among a cohort of borrowers who had exited in-school deferment in 2014.  *See* ¶ 9.  Specifically, the price of Navient common stock fell $1.94 per share, or 10.6%, from its closing price of $18.36 on July 13, 2015 to close at $16.42 on July 14, 2015, on extraordinary trading volume of more than 8.5 million shares.  During the same period, Navient 5.875% Senior Notes due 2021 declined 1.75%, Navient 5.875% Senior Notes due 2024 declined 2.41%, and Navient 5% Senior Notes declined 2.33%.

86.     After the market closed on July 21, 2015, Navient issued a press release announcing its financial results for Q2 2015, in line with its earlier guidance.  Navient reported GAAP net income of $182 million ($0.47 diluted earnings per share) in Q2 2015, compared with $307 million ($0.71 diluted earnings per share) for the same quarter the previous year, as well as Core Earnings for the quarter of $154 million ($0.40 diluted earnings per share), compared with $241 million ($0.56 diluted earnings per share) for the same quarter the previous year.  Navient also reported disappointing performance of its PEL portfolio, noting Core Earnings were $22 million for the quarter, compared with $86 million in the same quarter the previous year.  Navient attributed the disappointing earnings in significant part to the 31.7% increase in its provision for PEL losses in Q2 2015.

87.     As noted earlier, during a related earnings call the next day (July 22, 2015), Defendants revealed additional, highly significant information regarding the increase in Navient's increased loan loss provision.  Remondi first quantified the total amount of troubled loans that exited deferment since 2014, leading to the increased provision:  "It's the $2.5 billion that exited in 2014, $1.7 billion that will exit in 2015, and we expect that number . . . for 2016

exits to be under $1 billion." Further, in responding to an analyst's question as to what made the cohort that exited deferment in 2014 "different from 2012 and 2013," Remondi revealed that Navient "had a higher percentage of these borrowers who had demonstrated difficulty in making payments when they were in repayment prior to returning to school than in prior cohorts," adding, "[s]o that gives you an example of an indication that they were struggling to begin with." Remondi further disclosed that a portion of borrowers in that cohort had entered and exited deferment multiple times and did not complete their degrees, which he acknowledged generally results in a higher incidence of delinquency and default. Following that news, the price of Navient common stock fell 2.2% from its closing price of $16.60 on July 21, 2015 to close at $16.23 on July 23, 2015. During the same period, Navient 5.875% Senior Notes due 2024 declined 3.51% and Navient 5% Senior Notes declined 1.64%.

88.     Navient's July 2015 disclosures that a cohort of borrowers representing $2.5 billion in loans had been struggling so mightily, and for an extended period of time, revealed to the market that Defendants' prior representations regarding the credit quality of loans in Navient's PEL portfolio was far weaker than Defendants had represented to investors. Accordingly, as discussed in ¶¶ 53, 56, 63 above, Navient should have increased its loan loss reserves no later than Q4 2014 to account for the significantly heightened risk of loss those borrowers entailed.

89.     Further, while the July 2015 disclosures did not explicitly mention forbearances, on information and belief—given the information provided by the CFPB, the attorneys general of three states, and former Navient employees—Navient placed a substantial number of those borrowers into forbearance after they exited deferment in 2014. Indeed, placing those borrowers into forbearance helped allow Navient to conceal from investors the heightened risk of default

posed by those borrowers, as by doing so the Company avoided classifying them as delinquent or in default.  Accordingly, the July 2015 disclosures revealed information about Navient's undisclosed forbearance practices, and the true level of risk to which the Company's loan portfolio was exposed, that the market did not previously know.

90.     Additional information regarding Navient's forbearance practices was revealed through the CFPB Report issued on September 29, 2015.  The Report referenced comments from individual student loan borrowers and organizations representing public service workers indicating that servicers of both private and federal student loans did not inform borrowers experiencing financial hardship about available alternative repayment plans, but instead *advised borrowers to postpone payments through forbearance* or deferment or instruct borrowers that the only available option was to pay the full amount due.  The facts detailed in the CFPB Report plainly applied to (among others) Navient, one of the country's largest loan servicers.

91.     Following the CFPB Report's release, the price of Navient's common stock fell 4.4% from its closing price of $12.16 on September 28, 2015 to close at $11.63 on September 29, 2015, on extraordinary trading volume of more than 8.5 million shares.  Navient's stock price continued to fall over the next two trading days, on unusually heavy trading volume, closing at $10.96 per share on October 1, 2015.  Around the same period, Navient's 5% Senior Notes declined 6.35%, from its close of 90.50 on September 28, 2015 to close at 84.75 on September 29, 2015.  The 5% Senior Notes continued to decline over the next trading sessions for a total decline of 11.6%, from its close of 90.50 on September 28, 2015 to close at 80.00 on October 2, 2015.  And Navient's 5.875% Senior Notes due 2021 fell 2.75% from their close of 86.25 on September 29, 2015 to close at 83.875 on September 30, 2015.  Navient's 5.875% Senior Notes

due 2021 continued to fall over the next trading days for a total decline of 11.9% from their close

of 86.25 on September 29, 2015 to close at 75.958 on October 2, 2015.

## V.   DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S COMPLIANCE WITH LEGAL AND REGULATORY REQUIREMENTS

### A.   Defendants Made False or Misleading Statements Regarding Compliance to Investors.

92.     Navient operates in a heavily regulated industry, rendering compliance with

applicable laws and regulations critical to the Company's business.  Navient was subject to, *inter

alia*, the SCRA, CFPA, FDCRA, and other federal and state consumer protection and privacy

laws.

93.     In public statements to investors, Defendants emphasized Navient's "robust

compliance driven culture driven by a 'customer first' approach," its "demonstrated compliance

infrastructure," and "operational and technical expertise and capacity to adapt to [a] new

regulatory environment," and represented that the Company "demonstrated FFELP compliance

and preserved federal loan guarantee."  *E.g.*, Apr. 17, 2014 Form 8-K.  Defendants reiterated

those sentiments repeatedly throughout the Class Period, including emphasizing (in the 2014

Form 10-K) Navient's "rigorous training programs, internal and external auditing, escalated

service tracking and analysis, and customer research to enhance [its] compliance and customer

service."[30]  Defendants' representations included John Kane's statements on Navient's behalf at

the Credit Suisse Forum on February 11, 2015, emphasizing the "very, very strong compliance

culture at Navient across the entire Company, across all levels of management," and adding: "So

we take that very seriously.  We keep our thumb obviously on the changing compliance

---

[30] *See also* App'x at Section II (including (i) Remondi presentation at November 2014 BofA-Merrill Lynch Conference); (ii) Q1 2015 Form 10-Q (Apr. 30, 2015)).

landscape and we look to make updates to our processes, procedures and work activities to comply."

94.     Defendants also specifically addressed Navient's purported efforts to inform borrowers about IDR plans:  "We have been a partner in [the DOE]'s campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice."[31]

95.     The statements referenced in ¶¶ 93-94 were false or misleading when made, in light of the rampant unfair and deceptive practices at Navient detailed below.

### 1.     Navient provided inadequate notice to borrowers regarding annual recertifications for IDR plans.

96.     Navient engaged in a pervasive practice of providing inadequate notice to borrowers regarding annual recertifications of their IDR plans, in violation of federal and state law.

97.     A federal student loan borrower enrolled in an IDR plan is required to recertify his income and family size each year to qualify for an affordable payment and remain on the plan.  The CFPB reports in its complaint that between mid-2010 and at least March 2015, Navient provided inadequate notice to federal student loan borrowers who consented to receive electronic communications of an electronic renewal notice (more than 75% consented).[32]  During that period, Navient merely sent those borrowers an email with a hyperlink to the Company's website, which required borrowers to log in with their user ID and password to view the renewal notice.[33]  Navient's email, however, did not indicate in its subject line or in its contents the

---

[31] 2014 Form 10-K at 4.
[32] CFPB Compl. ¶¶ 66-67.
[33] *Id.* ¶ 68.

purpose of the notice, and therefore many borrowers disregarded or did not view the email.[34]  As

a result, between July 2011 and at least March 2015, more than 60% of borrowers did not timely

renew enrollment in their IDR plan; Defendants were aware of that fact, because Navient tracked

the number of borrowers who click on the hyperlink in the emails.[35]

98.     Failing to complete the IDR plan recertification process had financially dire

consequences for a borrower, including an increase in payment amount and the addition of any

accrued, unpaid interest to the principal balance of the loan.

99.     The CFPB and State AGs assert that as a result of those practices, Navient

violated the CFPA and state consumer protection laws.  The rampant misconduct at Navient

contradicted Defendants' statements to investors about the Company's diligence in complying

with governing laws and regulations—including that Navient had a "robust compliance driven

culture driven by a 'customer first' approach," a "demonstrated compliance infrastructure," and

"operational and technical expertise and capacity to adapt to [a] new regulatory environment,"

and that it "demonstrated FFELP compliance and preserved federal loan guarantee."  Those

statements accordingly were false or misleading when made.

> **2.     Navient misadvised borrowers regarding the prerequisites to allowing them to release their cosigners from responsibility for the loan payments.**

100.    Throughout the Class Period, Navient encouraged borrowers to enlist persons to

cosign their loans in order to qualify for Navient's private loans and to receive lower interest

rates.  Navient also touted the availability of a so-called "cosigner release," which enticed

parents, grandparents, friends, and other persons to become cosigners, with the understanding

that they could be released from their obligation if certain prerequisites were satisfied.  But

---

[34] *Id.* ¶¶ 68-71.

[35] *Id.* ¶¶ 72-74.

Navient set up undisclosed hurdles that made obtaining a cosigner release very difficult, in violation of federal and state law.

101.    The CFPB reports in its complaint that until at least mid-2015 Navient treated the lack of payment by a borrower in response to a $0 bill as a result of a previous month's overpayment as a failure to make a "consecutive, on-time principal and interest payment" that month, which Navient required for the borrower to be eligible to apply to release her cosigner from liability on the loan.[36]  Navient then reset the borrower's progress toward the "consecutive, on-time principal and interest payments" requirement to zero months.[37]  By doing so, Navient unfairly delayed cosigner release for borrowers who had already made progress towards satisfying Navient's published eligibility requirements.  As the Illinois AG summarizes those practices in its complaint, "Navient uses deceptive and misleading information about what borrowers must do to obtain cosigner release," thereby "leaving borrowers in the dark" on how to get such relief for persons who were enticed by Navient to cosign loans.[38]

102.    The CFPB and State AGs assert that as a result of those practices, Navient violated the CFPA and state consumer protection laws.  Those improper practices rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

> **3.    Navient misrepresented the amounts delinquent borrowers needed to pay to become current on their loans.**

103.    Throughout the Class Period, Navient employees regularly represented during collection calls to delinquent borrowers and cosigners that to bring their accounts current they

---

[36] CFPB Compl. ¶ 90.  Since January 21, 2014, Navient has required that the borrower make 12 consecutive payments; the Company previously required borrowers to make between 12 and 48 consecutive payments.  *Id.* ¶ 86.

[37] *Id.* ¶ 90.

[38] Ill. Compl. ¶ 404.

would need to pay the "present amount due," i.e., the past-due amount plus the current amount

due.  Navient thus improperly and misleadingly sought to collect from borrowers a higher

amount than necessary to bring the borrower's account current, in violation at least of state law.

104.    The Washington AG reports in its complaint, based on "recorded phone calls

between Defendants [i.e., Navient, Navient Solutions, Pioneer, and GRC] and borrowers," that

"Defendants follow the training manuals and request the Present Amount Due from past due

borrowers instead of asking for the amount that would bring them current."[39]  Further, "[u]ntil

borrowers catch on to the fact that the amount Defendants are seeking is more than the amount

they are delinquent, Defendants do not attempt to explain that the Present Amount Due captures

the next month's payment and may not be due immediately on the day of the call."[40]  The

Washington AG further states that borrowers who paid the "Present Amount Due" were not

aware it was possible to pay a lesser amount to become current on their account.[41]

105.    The State AGs assert that as a result of those practices, Navient violated state

consumer protection laws.  Those improper practices rendered Defendants' statements to

investors about the Company's diligence in complying with governing laws and regulations false

or misleading when made.

### 4.    Navient repeatedly made payment processing errors and lacked adequate systems to address and prevent their recurrence.

106.    Throughout the Class Period, Navient repeatedly misallocated or misapplied loan

payments primarily made by borrowers and cosigners who paid by mailing a check or through an

external bill payment system, in violation of federal and state law.

---

[39] Wash. Compl. ¶ 5.191.

[40] *Id.*

[41] *Id.* ¶ 5.193.

107.    The CFPB reports in its complaint that those processing errors included misallocating payments intended or designated for a specific loan(s) among some or all of a borrower's other loans, misallocating lump-sum payments to all loans in a borrower's account instead of a specific loan as intended to pay it off, disregarding borrower or cosigner instructions on how to divide payments among loans, or incorrectly allocating payments made by cosigners to loans they did not cosign.[42]

108.    The CFPB further reports that those errors resulted in part from Navient's failure to implement adequate processes and procedures to sufficiently address a wide range of payment processing errors and to prevent them from recurring.[43]  Navient's errors in processing payments received from borrowers and cosigners, the CFPB observes, "have resulted in borrowers and cosigners incurring improper late fees, increased interest charges, the furnishing of inaccurate negative information to consumer reporting agencies, and the loss of certain benefits."[44]

109.    The CFPB and State AGs assert that as a result of those practices, Navient violated the CFPA and state consumer protection laws.  Those improper practices rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

 5.    **Navient mishandled the accounts of military borrowers, even after the Company paid $60 million to the DOJ for that very misconduct.**

110.    Navient also charged unlawfully high interest rates to student borrowers who had served in the military, even after reaching a settlement to resolve allegations by the DOJ regarding that practice.

---

[42] CFPB Compl. ¶ 101.

[43] *Id.* ¶¶ 98, 103-12.

[44] *Id.* ¶ 108.

111.     Specifically, on May 13, 2014, the DOJ announced a $60 million settlement—the result of a joint effort with the FDIC, DOE, and CFPB—of allegations that Navient Solutions, SLM DE Corporation (n/k/a Navient DE Corporation), and Sallie Mae Bank charged military servicemembers excessive rates on student loans, in violation of the SCRA.  The government's complaint asserted that defendants "engaged in a nationwide pattern or practice, dating as far back as 2005, of violating the SCRA by failing to provide members of the military the six percent interest rate cap to which they were entitled."[45]  The complaint further asserted that Sallie Mae Inc. and SLM DE Corporation "also violated the SCRA by improperly obtaining default judgments against servicemembers."[46]  The DOJ estimated about 60,000 servicemembers would receive compensation under the settlement.

112.     CW 4 recounted, however, that Navient's systemic mishandling of loans of active servicemembers continued *well after* the DOJ settlement.  According to CW 4, "[t]here were no processes in place to properly handle the military borrower accounts."  CW 4 noted that "when you were told that a borrower is in the active military, they are deployed or something like that, at that point the borrower should be noted" but that "there was nothing in the system to follow such protocol."  Rather, CW 4 explained, "all of the collectors were directed to try to get authorization to speak to somebody else to collect on the debt still as regular," such as having a spouse make payments, instead of actually handling the account in accordance with regulations.

113.     CW 4 recalled that Navient's mishandling of military borrowers' loans came to a head years later, *in or around September 2014*, because Navient had received complaints about its servicing of such accounts.  CW 4's boss at the time, a Senior Collections Support Manager

---

[45] *See* https://www.justice.gov/opa/pr/justice-department-reaches-60-million-settlement-sallie-mae-resolve-allegations-charging.

[46] *Id.*

for GRC and Pioneer, met with CW 4 and the Collections Support Manager for Pioneer and in September 2014 they worked on a "back office project setting up a process where Navient borrowers were actually scanned to see if they were active military." CW 4 indicated that a third party agency was hired to assist in setting up the process and that Navient paid for and checked a certain website for active military members. According to CW 4, "the practice was just getting started." CW 4 recalled one account with Texas Guaranty involving an active military borrower who had a "cease and desist for collection," yet, "every single month, I would redeem the account again and the interest rate would be right back up to I believe it was 12.5 percent. . . The system just wasn't set to deal with it, so every month I was fighting with our IT department on this borrower[.]" CW 4 indicated that Navient had not completely resolved the problems in managing active military accounts by the time CW 4 departed Navient *in February 2015*, long after the Company had settled with the DOJ.

114.    CW 1 also recounted that Navient did not apply deferments and forbearances to the accounts of military borrowers on time.

115.    Accordingly, Navient *continued to violate the SCRA* well after its settlement with the DOJ in or around May 2014 for that very misconduct. Those legal violations rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

### 6.    Pioneer and GRC deceived borrowers regarding the federal loan rehabilitation program.

116.    From 2009 until 2014, Navient's wholly owned subsidiaries Pioneer and GRC made material misrepresentations to borrowers about the federal loan rehabilitation program, in violation of federal and state law. Specifically, they disregarded instructions issued by the DOE mandating that debt collectors such as Pioneer must not state or imply to borrowers who

complete rehabilitation (after having defaulted on their loans) that default information reported by the original lender will be removed from the borrower's credit report after rehabilitation.

117.    The DOE instructs that adverse information reported by the original lender will not be expunged or excluded from credit reports before the seven-year period that runs from the lender's report of that default, even if the loan is rehabilitated.  The CFPB reports that nonetheless, in calls with borrowers from at least January 2012 through December 2014, Pioneer collectors systematically stated or implied to borrowers that *all* negative information—including pre-default delinquencies—would be removed from the borrowers' credit reports after rehabilitation.[47]  As the Washington AG reports in its complaint, those deceptive representations were reflected in scripts that Pioneer representatives used between at least 2012 and 2014.[48]  The CFPB also reports that customer service representatives' statements to borrowers regarding the removal of information from their credit reports were consistent with Pioneer's training guides, which included the following talking points:

> You have qualified for a rehabilitation program.  What you will need to do is make a minimum of 9 qualifying monthly payments. After all payments are made, a new lender will pay off the Department of Education for you.  You will then in turn owe the new lender, which means you will no longer be in Federal Default. All of the collection fees will be removed at the time of the sale. Also it will be completely deleted from your credit report as though it never happened."[49]

118.    Pioneer collectors also routinely misrepresented in calls with borrowers that all collection fees assessed by the DOE on defaulted loans (approximately 25% of principal amount due) would be forgiven, when in fact *20% of each rehabilitation payment made by a borrower goes towards satisfying collection fees.*  Specifically, after a borrower makes her ninth

---

[47] CFPB Compl. ¶¶ 126-33.
[48] Wash. Compl. ¶ 5.207.
[49] CFPB Compl. ¶ 124.

rehabilitation payment, collection fees assessed to her account are waived by the DOE. Accordingly, by the time borrowers complete the rehabilitation program, they have paid down a significant portion of their collection fees, and the amount of fees to be forgiven is significantly less than Pioneer initially misrepresented would be forgiven.

119.     The CFPB and State AGs assert that as a result of those practices, Navient violated the FDCPA and state consumer protection laws.  Those legal violations rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

**B.     Defendants Made the False or Misleading Statements Regarding Compliance with Scienter.**

120.     Defendants knew or recklessly disregarded that their representations concerning Navient's legal compliance were false or misleading when made.  Given the pervasiveness of improper loan-servicing activities at Navient, it is inconceivable that the Company's senior executives, including Remondi, Chivavibul, and Kane, were unaware of them.  Particularly so given that, as with forbearances and related issues, legal compliance was at the core of Navient's operations.  Indeed, it was necessary to the Company's very survival, given the particular significance of legal compliance to a heavily regulated entity like Navient.

121.     Additionally, as detailed in the Government Complaints, these improper loan-servicing practices were not the sporadic actions of rogue employees, but rather highly systematized, including through the use of scripts.  *See* ¶¶ 42-47, 97, 101, 104, 117-18.  Such a streamlined process for dealing with borrowers could not have been implemented without the knowledge and approval of senior management.

122.     Further, there was significant overlap among executives at Navient, Navient Solutions, Pioneer, and GRC.  Since 2014, (1) Remondi, Chivavibul, and Kane have served,

Case 1:16-cv-00112-GMS   Document 59   Filed 11/17/17   Page 50 of 100 PageID #: 2039

respectively, as CEO, CFO, and COO of both Navient and Navient Solutions; (2) Timothy

Hynes has served as Chief Risk Officer of both entities; and (3) Stephen O'Connell has served as

Senior Vice President and Treasurer of both entities.  Additionally, Jack Frazier, the current

Director and former President of Pioneer, also serves as Senior Vice President of Navient; and

Jeff Mersmann, the current President of Pioneer, also serves as Navient's Vice President of

Operations.  It is therefore apparent that Remondi, Chivavibul, and Kane knew about the

misconduct occurring at Navient Solutions, Pioneer, and GRC, or that they were reckless in

disregarding it.

124.    That is particularly true in light of CW 4's statement that Navient Collections

Department directors, including collection directors of Navient subsidiaries Pioneer and GRC,

participated in regular telephonic status meetings with upper management, including Remondi,

Chivavibul, and Kane, which were led by Jeff Mersmann.  *See* ¶¶ 76-77.  Accordingly, if

widespread misconduct was occurring at Navient—and it was—Navient's senior executives

knew about it.

124.    Further, the same motivations that compelled Defendants to misrepresent the

credit quality of Navient's loans, as well as its forbearance practices, loan loss provisions, and

related financial results, drove them to conceal Navient's improper loan-servicing and debt-

collection practices.  *See* ¶¶ 80-82.  Defendants, in short, were under significant pressure to

establish Navient as a sustainable entity independent of Sallie Mae, which motivated them to

conceal from investors the truth about the misconduct pervading the Company.  Defendants'

motivation was particularly acute given that they were forced to disclose in May 2014—just as

Navient had become an independent entity—the DOJ settlement regarding SCRA violations;

Defendants did not want to allow more negative attention on the Company.

C.     **Defendants' Misrepresentations Regarding Legal Compliance Caused Investors Losses.**

125.    Navient's rampant misconduct in servicing student loans ultimately was revealed to the market through a series of partial disclosures beginning in February 2015.  Defendants nonetheless continued to misstate or omit material facts, causing the price of Navient securities to be artificially inflated for the remainder of the Class Period.

126.    On February 27, 2015, the same day Navient filed its 2014 Form 10-K, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program,[50] i.e., the very misconduct detailed in ¶¶ 82, 117-18 above.  This disclosure was followed the next day by revelations regarding the financial impact the DOE's action would have on Navient. *Inside Higher Ed*'s March 2, 2015 article, which referred to a "crackdown" on Navient, noted the Company "said that it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013"—i.e., approximately $127 million for just two years—and that Representative Chris Collins, who represents the upstate New York district where Pioneer operates, "told The Buffalo News that the decision to end the contract would lead to the loss of about 400 jobs at the company."[51]

127.    The disclosures on February 27 and March 2, 2015 revealed to investors that Defendants' prior representations concerning Navient's legal compliance were a far cry from the reality at the Company.  Accordingly, following those disclosures, the price of Navient securities fell sharply.  The price of Navient stock declined 8.8% from its close of $21.40 on February 27,

---

[50] *See* https://www.ed.gov/news/press-releases/us-department-education-end-contracts-several-private-collection-agencies.

[51] Stratford, *supra*.

2015 to close at $19.51 on March 2, 2015 (the next trading day), on unusually heavy trading volume of more than 10 million shares.  During the same period, Navient 5.875% Senior Notes due 2024 declined 2%, and Navient 5% Senior Notes declined 2%.

128.    Despite those partial disclosures, Defendants denied any wrongdoing and continued to mislead the market regarding Navient's purported compliance with applicable laws. During Navient's Q1 2015 earnings call on April 22, 2015, for example, Remondi at least misleadingly stated the DOE "simply decided not to extend [Pioneer's] contract" and did not "terminate" it, adding, "[w]e know that when we look at our own work here and when we look at the reviews that the Department of Ed conducted over the past year and a half, we don't see similar kinds of issues or findings."

129.    On April 24, 2015, *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by authorities in Massachusetts "over allegations the company mistreated distressed borrowers."[52] On that news, the price of Navient stock fell 2.1% from its close of $20.28 on April 24 to close at $19.85 on the next trading day, April 27, 2015.

130.    On July 7, 2015, the CFPB published a report on its website titled "Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform."[53]  The CFPB disclosed that it had continued to receive complaints about student loan servicing from servicemembers after the 2014 settlement between federal regulators and Navient and Sallie

---

[52] *See* Shahien Nasiripour, Student Loan Giant Navient Bemoans Cost Of Mounting Government Probes, *The Huffington Post* (April 24, 2015), https://www.huffingtonpost.com/2015/04/24/navient-government-investigations_n_7131914.html.

[53] Hollister Petraeus and Seth Frotman, *Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform*, CFPB website, July 2015, *available at* http://files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

Mae. Specifically, the CFPB indicated that since it published a report in October 2012 on complaints it had received from military borrowers about student loan servicers and shared those complaints with the DOJ and other federal regulators (which subsequently resulted in the $60 million settlement with Navient and Sallie Mae), "the Bureau has received more than 1,300 complaints from military borrowers related to the servicing or collection of student loans."

131.    The CFPB's report is consistent with CW 4's account that Navient's improper handling of servicemembers' accounts continued well after the May 2014 DOJ settlement. *See* ¶¶ 112-15. The report further revealed to investors that Navient's representations regarding legal compliance were false or misleading when made. Following the announcement of the report, the price of Navient stock fell 2.1%, from $18.97 to $18.57 per share.

132.    After the market closed on August 24, 2015, Navient disclosed in an SEC Form 8-K that on August 19, 2015 Navient Solutions received a letter from the CFPB stating the Bureau's Office of Enforcement was considering taking legal action against Navient Solutions regarding its disclosures and assessment of late fees. Navient nonetheless represented that Navient Solutions "continues to believe that its acts and practices relating to student loans are lawful and meet industry standards and, where applicable, the statutory or contractual requirements of [Navient Solutions]'s other regulators." Navient's partial (though still misleadingly incomplete) disclosure of potential regulatory action regarding some of the very practices detailed in this Complaint (*see* ¶¶ 10-12, 93, 117-18, 125-28) further alerted investors to the truth regarding the raft of improper loan-servicing practices at the Company, in stark contrast to Defendants' representations regarding legal compliance. Accordingly, the price of Navient common stock fell 7.8%, from its closing price of $13.06 on August 24, 2015 to close at

$12.04 per share on August 25, 2015, on unusually heavy trading volume of more than nine

million shares.

133.   The truth regarding Navient's legal compliance was further revealed through the

CFPB Report issued on September 29, 2015.  In addition to shedding light on Navient's

widespread use of forbearances (*see* ¶¶ 36-49), the Report recounted:

> 1)   Comments from individual student loan borrowers
> described how they encountered servicing problems or
> practices that discouraged utilization of alternative
> repayment plans, including income-driven repayment
> plans. A number of comments described how some
> borrowers may end up in default when they are unable to
> obtain an alternative repayment plan. Comments also
> described how some servicing practices subsequently can
> result in payment shock, lost benefits, and increased
> interest charges for borrowers enrolled in these plans.
>
> 2)   Commenters detailed problems related to customer service,
> including issues for borrowers seeking to resolve servicing
> errors.  Commenters described how those problems create
> barriers for borrowers experiencing financial hardship who
> are seeking to avoid default, and may cause significant
> credit reporting harm.
>
> 3)   Commenters described how payment processing and
> servicing-transfer practices create problems for borrowers
> trying to repay student debt.  Public comments from
> individual borrowers described how those practices cause
> payment processing problems, increase interest charges and
> late fees, prolong repayment, and create confusion for
> student loan borrowers.[54]

134.   The CFPB Report further disclosed that "[s]ervicemembers consistently report

difficulties obtaining the SCRA interest rate cap of six percent," specifically, "that servicers

continue to improperly process these requests and do not clearly convey information about the

application process and other requirements."  The CFPB also reported "[s]ervicemembers state

that they were guided into military deferments or forbearance and were not told that their total

---

[54] *See* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

loan debt would balloon at the end of their military service due to accrued interest."  Indeed, the

CFPB recounted, "[s]ervicemembers also note that the servicers guide them into forbearance or

deferment, *even when the borrower is actively seeking information and assistance concerning*

*other forms of repayment*."

135.    The very practices reported by the CFPB are discussed in ¶¶ 36-49, 96-118 above,

and Defendants previously failed to disclose them to investors.  The prices of Navient stock and

notes declined significantly in response to the information revealed through the CFPB Report.

*See* ¶¶ 90-91.[55]

## VI.    DEFENDANTS DEFRAUDED INVESTORS BY CONCEALING VITAL FACTS REGARDING NAVIENT'S ABILITY TO FUND ITS OPERATIONS

### A.    Defendants Made False or Misleading Statements to Investors Regarding Navient's Liquidity and Financing Arrangements.

136.    Navient needed ready access to liquidity to fund its operations, including its

purchases of student loans.  More specifically, as stated in Navient's 2014 Form 10-K, it

"requires liquidity to meet cash requirements such as day-to-day operating expenses, required

payments of principal and interest on borrowings, and distributions to stockholders."  The

Company relied in material part on credit facilities, including those maintained with FHLB-DM,

which provided billions of dollars in borrowing capability.  The FHLB-DM credit facilities were

highly important to Navient, as those facilities—which were meant to afford "members" of

FHLBs access to low-cost credit—offered terms far more favorable than the Company got from

---

[55] The CFPB Report's findings were further bolstered by the Annual Report of the CFPB Student
Loan Ombudsman for 2015, released on October 14, 2015.  The report analyzed approximately
6,400 private student loan complaints submitted to the CFPB between October 1, 2014 and
September 30, 2015, an increase of 23% compared to 2014.  Complaints concerning Navient
accounted for 1,724, or approximately 26%, of the total complaints submitted.  According to the
report, private student loan borrowers complained of servicing problems, "including lack of
access to timely and accurate information on availability or eligibility criteria to enroll in
alternative repayment programs."

other sources.  *See* ¶¶ 13, 137.  In the first six months of 2013, for example, Sallie Mae enjoyed a

0.28% interest rate when borrowing from FHLB-DM, making it the company's lowest-cost

source of funds outside of debt tied to derivatives, and from 2010 to 2012 FHLB-DM lent Sallie

Mae money at rates that on average were at most 0.35%.[56]  Sallie Mae and Navient thus were

able to borrow billions of dollars at extremely low rates from FHLB-DM.

137.    The FHLB-DM credit facilities were particularly important to Navient given that

Navient's cost of borrowing, which reflected the financial markets' confidence in the Company's

ability to pay its bills, for short periods of time had more than tripled since 2014.[57]

138.    Navient's SEC filings consistently discussed the amounts of capacity available

under its credit facilities.  *E.g.*, Q1 2014 Form 10-Q (May 9, 2014) ("As of March 31, 2014 and

December 31, 2013, the maximum additional capacity under these facilities was $12.7 billion

and $10.6 billion, respectively.  For the three months ended March 31, 2014 and 2013, the

average maximum additional capacity under these facilities was $12.3 billion and $10.8 billion,

respectively.").[58]  Additionally, Navient stated in its 2014 Form 10-K:

> We have various secured borrowing facilities that we use to
> finance our FFELP Loans.  Liquidity is available under these
> secured credit facilities to the extent we have eligible collateral and
> available capacity.  The maximum borrowing capacity under these
> facilities will vary and is subject to each agreement's borrowing
> conditions.  These include but are not limited to the facility's size,
> current usage and the availability and fair value of qualifying
> unencumbered FFELP Loan collateral. . . . The facilities are
> subject to termination under certain circumstances.

---

[56] *See* Shahien Nasiripour, *How Elizabeth Warren Beat a Student Loan Giant*, The Huffington Post, Dec. 31, 2015, *available at* http://www.huffingtonpost.com/entry/elizabeth-warren-student-loan-giant_us_568412fbe4b06fa68881b03f.

[57] *See id.*

[58] *See also* App'x at Section III.

139.     Those statements were false or misleading when made because, despite reporting

the available capacity on the facilities and acknowledging they were "subject to termination

under certain circumstances," Navient failed to disclose the true likelihood that FHLB-DM

would in fact terminate the facilities in light of a rule proposed by the FHFA in September 2014

(which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities

from gaining membership with a FHLB—and thus access credit on extraordinarily favorable

terms—through the use of a captive insurer.  Defendants accordingly misled investors regarding

the risk that Navient's borrowing costs would rise suddenly and dramatically and thereby affect

the Company's liquidity and financial performance.

140.     Further, Defendants' failure to apprise investors of that serious risk to the

Company's business violated SEC rules mandating such disclosure.

141.     SEC Regulation S-X, Rule 5-02-22, concerning "Bonds, Mortgages, and Other

Long Term Debt, Including Capitalized Leases," required that Navient disclose certain

information regarding its long-term debt, including "[t]he amount and terms (including

commitment fees and *the conditions under which commitments may be withdrawn*) of unused

commitments for long-term financing arrangements that would be disclosed under this rule if

used shall be disclosed in the notes to the financial statements if significant."

142.     Additionally, SEC Regulation S-K, Rule 303, pertaining to "Management's

Discussion and Analysis of Financial Condition and Results of Operations," required that

Navient (1) "[i]dentify any known trends or any known demands, commitments, events or

uncertainties that will result in or that are reasonably likely to result in the [Company]'s liquidity

increasing or decreasing in any material way"; and (2) "[i]f a material deficiency is identified,

indicate the course of action that the [Company] has taken or proposes to take to remedy the

deficiency"; and (3) "[d]escribe any known material trends, favorable or unfavorable, in the [Company]'s capital resources," including "[i]ndicat[ing] any expected material changes in the mix and relative cost of such resources."

143.    The SEC also provides the following interpretive guidance on the liquidity and capital resource disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations":

> [I]f the registrant's financial statements do not adequately convey the registrant's financing arrangements during the period, or the impact of those arrangements on liquidity, because of a known trend, demand, commitment, event or uncertainty, additional narrative disclosure should be considered and may be required to enable an understanding of the amounts depicted in the financial statements.[59]

144.    By failing to inform investors of the serious risk to Navient posed by the FHFA's proposed rule to amend FHLB membership eligibility requirements, Defendants violated SEC Regulation S-K, because the proposed rule presented a material trend or risk that could result in the reduction in the FHLB-DM credit facilities and thus seriously impair Navient's liquidity. Defendants also violated SEC Regulation S-X, Rule 5-02-22, as the FHFA's proposed rule bore on "the conditions under which" the FHLB-DM credit facilities "may be withdrawn."

145.    Defendants were aware of the FHFA's proposed rule to amend FHLB membership requirements and knew that the new rule, or a substantially similar version of it, could lead to a significant reduction in the FHLB-DM credit facilities and increase Navient's borrowing costs.  The rule was proposed in September 2014, and Navient should have disclosed the risks it entailed well before December 2015.

---

[59] SEC Release No. 33-9144: *Commission Guidance on Presentation of Liquidity and Capital Resource Disclosures in Management's Discussion and Analysis*, Sept. 17, 2010, *available at* https://www.sec.gov/rules/interp/2010/33-9144.pdf.

146.     Further, as senior Navient executives with intimate knowledge of the Company's financing arrangements and the potential impact of material changes in those financing arrangements on the Company's ability to fund its operations, Defendants had far more knowledge of the potential impact of the FHFA's proposed rule than investors did.

**B.      Defendants Made the Misrepresentations Regarding Navient's Credit Facilities with Scienter.**

147.     Navient's senior executives clearly would have been aware of the potential impact of the FHFA's proposed rule, given its centrality to the FHLB-DM credit facilities to Navient's ability to fund its operations.  At the very least, Defendants were reckless in disregarding the potential impact the proposed rule could have on the Company.

148.     Further, as with Defendants' knowledge of issues relating to the cohort of borrowers who had exited deferment in 2014, as well as Navient's pervasive and systematic forbearance practices and its rampant violations of federal and state law, Defendants were highly motivated to conceal negative information threatening the Company's liquidity.  *See* ¶¶ 80-82, 124.

**C.      Defendants' Misrepresentations Regarding Navient's Credit Facilities Caused Investors Losses.**

149.     The true level of risk to which Navient's credit facilities with FHLB-DM were exposed was revealed to the market on December 28, 2015, when the Company announced in a Form 8-K that on December 22, 2015 its wholly owned subsidiary HICA received a notice from FHLB-DM stating "availability under the FHLB-DM Credit Facilities would be reduced from approximately $10.7 billion to approximately $5.0 billion for the period from December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for advances maturing after October 31, 2016."

150.     Navient explained that FHLB-DM's action would "result in a reduction of aggregate borrowing availability under the FHLB-DM Credit Facilities and the other credit facilities available to the Company and its subsidiaries as of the date of this [Form 8-K] from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof."  In other words, as a result of the significant reduction of the FHLB-DM credit facilities, Navient would be able to borrow only an additional $2.5 billion under existing credit lines of which the Company already had drawn down 87%, likely resulting in an adverse impact on the Company's liquidity and borrowing costs.  In its 2015 Form 10-K filed on February 25, 2016, Navient confirmed what the market already understood, i.e., that FHLB-DM's action related to the FHFA's rule (which became final in January 2016 but was initially proposed and published in the Federal Register in *September 2014*) preventing non-eligible entities (now defined to include Navient) from gaining membership with a FHLB through the use of a captive insurer.

151.     In response to the news disclosed on December 28, 2015, Navient's stock price fell 9.1% from its closing price of $12.61 on the previous trading day, December 24, 2015, to close at $11.46 per share on December 28, 2015, on unusually high trading volume of more than 9.3 million shares.  Investors accordingly suffered significant losses as a result of Navient's failure to inform them of the truth regarding the likelihood that the Company's borrowing capacity under the FHLB-DM's credit facilities would be drastically reduced.

## VII.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

152.     At all relevant times, the markets for Navient publicly-traded securities were efficient markets for the following reasons, among others:

(a)     Navient publicly-traded securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      as a regulated issuer, Navient filed periodic public reports with the SEC and the NASDAQ;

(c)      Navient regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)      Navient claimed to be a well-capitalized and seasoned issuer able to utilize the more truncated Shelf Registration Statement for its Class Period debt offerings; and

(e)      Navient was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

153.    As a result of the foregoing, the market for Navient publicly-traded securities promptly digested current information regarding Navient from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Navient publicly traded securities during the Class Period suffered similar injury through their purchase of Navient publicly-traded securities at artificially inflated prices and a presumption of reliance applies.

154.    Additionally, throughout the Class Period, Plaintiffs and other Class members justifiably expected Defendants to disclose material information regarding Navient as required by law and SEC regulations.  Plaintiffs and other Class members would not have purchased Navient securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Reliance by Plaintiffs and other Class

members should therefore be presumed with respect to Defendants' omissions of material information, as established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## VIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Exchange Act Defendants**

155.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth in this paragraph.

156.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified in ¶¶ 33-35, 50-51, 54, 56, 64-66 above, which they knew or recklessly disregarded were false or misleading in that they contained misstatements of material fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    The Exchange Act Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Navient's publicly traded securities during the Class Period.

158.    Plaintiffs and other Class members suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navient publicly traded securities. Plaintiffs and other Class members would not have purchased Navient publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Exchange Act Defendants' false or misleading statements.

159.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Navient publicly traded securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Officer Defendants

160.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth in this paragraph.

161.     Defendants Remondi, Chivavibul, and Kane (collectively, the "Officer Defendants") acted as controlling persons of Navient within the meaning of Section 20(a) of the Exchange Act, as alleged in this Complaint.  By reason of their positions as officers of Navient and their ownership of Navient stock, the Officer Defendants had the power and authority to cause Navient to engage in the wrongful conduct detailed in this Complaint.  Further, as detailed in this Complaint, the Officer Defendants were culpable participants in the misconduct.  The Officer Defendants are accordingly liable under Section 20(a) of the Exchange Act.

## IX.     PLAINTIFFS' SECURITIES ACT CLAIMS

### A.     Summary of the Claims

162.     During the Class Period, Navient conducted (1) an offering on or around November 6, 2014, consisting of $500 million in principal amount of 5.000% Senior Notes due 2020 and $500 million in principal amount of 5.875% Senior Notes due 2024 (as defined above, the 2014 Debt Offering); and (2) an offering on or around March 27, 2015, consisting of $500 million in principal amount of 5.875% Senior Notes due 2021 (as defined above, the 2015 Debt Offering).

163.    The offering materials in connection with the 2014 Debt Offering ("2014 Offering

Materials") included (1) the Form S-3 Shelf Registration Statement and Prospectus filed on July

18, 2014 ("July 2014 Registration Statement"); (2) the Rule 424(b)(5) Preliminary Prospectus

Supplement filed on November 3, 2014; (3) the Rule 433 Free Writing Prospectus filed on

November 4, 2014; and (4) the Rule 424(b)(2) Prospectus Supplement filed on November 5,

2014.

164.    The offering materials in connection with the 2015 Debt Offering ("2015 Offering

Materials") included (1) the July 2014 Registration Statement; (2) the Rule 424(b)(5)

Preliminary Prospectus Supplement filed on March 25, 2015; (3) the Rule 433 Free Writing

Prospectus filed on March 25, 2015; and (4) the Rule 424(b)(2) Prospectus Supplement filed on

March 26, 2015.

165.    Each of the Securities Act Defendants (identified below) is statutorily liable under

Section 11 of the Securities Act for untrue or misleading statements of material fact contained in

the 2014 Offering Materials and the 2015 Offering Materials.  Plaintiffs also assert claims under

Section 12(a)(2) of the Securities Act against the Underwriter Defendants (identified below),

which were "sellers" of the notes issued in connection with the 2014 and 2015 Debt Offerings

(as contemplated by Section 12(a)(2)), as well as control person liability claims under Section 15

of the Securities Act against the Individual Securities Act Defendants.

166.    Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims,

which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

## B.    Securities Act Parties

### 1.    Plaintiffs

167.    Plaintiff Lord Abbett Bond-Debenture Fund, Inc. purchased notes in or traceable

to Navient's 2014 Debt Offering.

168.   Plaintiff Lord Abbett Investment Trust – Lord Abbett High Yield Fund purchased notes in or traceable to Navient's 2015 Debt Offering.

## 2.   Securities Act Defendants

### Navient

169.   Defendant Navient issued each of the securities sold in the Offerings.

### Remondi and Chivavibul

170.   Defendant Remondi signed the Shelf Registration Statement for the Offerings.

171.   Defendant Chivavibul signed the Shelf Registration Statement for the Offerings.

### Director Defendants

172.   Defendant William M. Diefenderfer, III served at all relevant times as Chairman of the Board of Directors of Navient.

173.   Defendant Ann Torre Bates served at all relevant times as a Director of Navient.

174.   Defendant Diane Suitt Gilleland served at all relevant times as a Director of Navient.

175.   Defendant Linda Mills served at all relevant times as a Director of Navient.

176.   Defendant Barry A. Munitz served at all relevant times as a Director of Navient.

177.   Defendant Steven L. Shapiro served at all relevant times as a Director of Navient.

178.   Defendant Jane J. Thompson served at all relevant times as a Director of Navient.

179.   Defendant Barry L. Williams served at all relevant times as a Director of Navient.

180.   Defendants Diefenderfer, Bates, Gilleland, Mills, Munitz, Shapiro, Thompson, and Williams (collectively, the "Director Defendants") signed the 2014 Registration Statement. The Director Defendants, together with Remondi and Chivavibul, are referenced collectively as the "Individual Securities Act Defendants."

### Underwriter Defendants

181.    Credit Suisse Securities (USA) LLC, headquartered at 11 Madison Avenue, New York, NY 10010, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

182.    Deutsche Bank Securities Inc., headquartered at 60 Wall Street, New York, NY 10005, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

183.    J.P. Morgan Securities LLC, headquartered at 383 Madison Avenue, New York, NY 10179, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

184.    RBC Capital Markets, LLC, headquartered at 60 South 6th Street, Minneapolis, Minnesota 55402, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

185.    Barclays Capital Inc., headquartered at 745 Seventh Avenue, New York, NY 10020, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

186.    Goldman, Sachs & Co., headquartered at 200 West Street, New York, NY 10282, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

187.    Merrill Lynch, Pierce, Fenner & Smith Incorporated, headquartered at One Bryant Park, New York, NY 10036, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

188.    Defendant RBS Securities Inc. ("RBS"), headquartered at 600 Washington Boulevard, Stamford, CT 06901, served as an underwriter for the 2014 Debt Offering.

189.    Defendant Wells Fargo Securities, LLC ("Wells Fargo"), headquartered at 550 South Tryon Street, Charlotte, NC 28202, served as an underwriter for the 2015 Debt Offering.

190.    The entities identified in ¶¶ 181-89 above are referenced collectively as the "Underwriter Defendants."  The Underwriter Defendants, Director Defendants, Remondi, Chivavibul, and Navient are referenced collectively as the "Securities Act Defendants."

**C.    The Offering Documents Contained Untrue Statements of Material Fact or Omitted Material Facts Necessary to Make Those Statements Not Misleading.**

191.    As set forth below, the Securities Act Defendants are subject to liability for a series of untrue statements or omissions of material fact in the Offering Materials issues in connection with the Offerings.

**1.    The 2014 Offering Materials contained untrue or misleading statements of material fact.**

192.    The 2014 Debt Offering Prospectus and Prospectus Supplements (each of which formed a part of the 2014 Registration Statement) incorporated by reference, among other things, (1) Navient's April 2014 Information Statement filed in connection with the Spin-Off; (2) Navient's Q1 2014, Q2 2014, and Q3 2014 Form 10-Qs; and (3) Navient's Form 8-Ks filed on April 17, 2014, May 2, 2014, May 9, 2014, May 14, 2014, May 16, 2014, August 19, 2014, and October 17, 2014.

193.    As detailed in Sections IV.A., V.A., and VI.A. above, each of those documents contained false or misleading statements of material fact, as supported by the since-revealed facts concerning Navient's improper practices.  The statements recounted above from those documents—which were incorporated by reference into the 2014 Offering Documents—were false or misleading when made, for at least three reasons.

194.    *First*, the 2014 Offering Materials (including documents they incorporated) failed to disclose that Navient was pervasively and systemically placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolios and artificially

depressing the number of delinquencies, defaults, and charge-offs.  *See* ¶¶ 33-53.  The quality of

Navient's loan portfolios was therefore not as the Company described it to investors, and

Navient's statements regarding its forbearance practices were likewise false or misleading when

made.  *See* ¶¶ 50-53.  Further, Navient's undisclosed forbearance practices caused its loan loss

provisions to be artificially understated, which in turn resulted in artificially inflated net interest

and EPS for the reporting periods preceding the 2014 Debt Offering, i.e., Q1 2014, Q2 2014, and

Q3 2014.  *See* ¶¶ 54-63.

195.    *Second*, the 2014 Offering Materials failed to disclose the rampant violations of

federal and state law by Navient and its subsidiaries during the Class Period.  As detailed above,

Navient (1) misled borrowers about the availability of IDR plans; (2) misadvised borrowers

about the availability of releases of cosigners of borrowers' loans; (3) misled delinquent

borrowers regarding the amounts they needed to pay to become current on their loans; (4) failed

to disclose or properly address systemic processing errors and the inadequate systems in place to

deal with those errors; (5) charged borrowers who had served in the military high interest rates

on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between

Navient Solutions and the DOJ for that very practice; and (6) deceived borrowers regarding

attributes of the federal loan rehabilitation program.  *See* ¶¶ 96-118.  Those unfair and deceptive

practices rendered Defendants' repeated representations to investors regarding Navient's

compliance with governing laws and regulations false or misleading when made.  *See* ¶¶ 92-95.

196.    *Third*, despite reporting the available capacity on its credit facilities and

acknowledging they were "subject to termination under certain circumstances," Navient failed to

disclose the true likelihood that FHLB-DM would in fact terminate its facilities with Navient in

light of the rule proposed by the FHFA in September 2014 (which was ultimately adopted as a

final rule in January 2016) preventing non-eligible entities from gaining membership with a

FHLB—and thus access credit on extraordinarily favorable terms—through the use of a captive

insurer.  *See* ¶¶ 13, 136-39, 144-45.  Navient accordingly misled investors regarding the risk that

the Company's borrowing costs would rise suddenly and dramatically and thereby affect the

Company's liquidity and financial performance.  *See* ¶¶ 139, 144-45, 150.  Further, Navient's

failure to apprise investors of that serious risk to its business violated SEC rules mandating such

disclosure.  *See* ¶¶ 140-44.  Navient's Class Period statements regarding its credit facilities

accordingly were false or misleading when made.  *See* ¶¶ 138-39.

> **2.     The 2015 Offering Documents contained untrue or misleading statements of material fact.**

197.     The 2015 Debt Offering Prospectus and Prospectus Supplements (each of which

formed a part of Shelf Registration Statement) incorporated by reference, among other things, (1)

the April 2014 Information Statement; (2) Navient's Q1 2014, Q2 2014, and Q3 2014 Form 10-

Qs; (3) Navient's Form 8-K filed on January 26, 2015; and (4) Navient's 2014 Form 10-K filed

on February 27, 2015.

198.     As detailed in Section Sections IV.A., V.A., and VI.A. above, each of those

documents contained false or misleading statements of material fact, as supported by the since-

revealed facts concerning Navient's improper practices.  The statements recounted above from

those documents—which were incorporated by reference into the 2015 Offering Documents—

were false or misleading when made, for at least four reasons.

199.     *First*, the 2015 Offering Materials (including documents they incorporated) failed

to disclose that Navient was pervasively and systemically placing borrowers into forbearance,

thereby masking the true level of risk in the Company's loan portfolios and artificially

depressing the number of delinquencies, defaults, and charge-offs.  *See* ¶¶ 33-53.  The quality of

Navient's loan portfolios was therefore not as the Company described it to investors, and Navient's statements regarding its forbearance practices were likewise false or misleading when made.  *See* ¶¶ 50-53.  Further, Navient's undisclosed forbearance practices caused its loan loss provisions to be artificially understated, which in turn resulted in artificially inflated net interest and EPS for the reporting periods preceding the 2014 Debt Offering, i.e., Q1 2014, Q2 2014, Q3 2014, and Q4 & FY 2014.  *See* ¶¶ 54-63.

200.    *Second*, even regardless of Navient's forbearance practices, the statements made from January 21, 2015—when Defendants began reporting Navient's financial results for Q4 2014 and full-year 2014—onward were false or misleading when made because by then (at the latest) Navient should have known that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default.  Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into in-school deferment).  Accordingly, when those borrowers exited deferment in 2014, Navient should have increased its provision for PEL loans to account for the risk of default posed by those borrowers.  Yet Defendants failed to disclose that issue to investors and increase the Company's provision until July 2015—in the meantime repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.  Those representations accordingly were false or misleading when made.  *See* ¶¶ 53, 62-63.

201.    *Third*, the 2015 Offering Materials failed to disclose the rampant violations of federal and state law by Navient and its subsidiaries during the Class Period.  *See* ¶¶ 96-118. Those unfair and deceptive practices rendered Defendants' repeated representations to investors

regarding Navient's compliance with governing laws and regulations false or misleading when made.  *See* ¶¶ 92-95.

202.    *Fourth*, Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate its facilities with Navient in light of the FHFA's proposed rule discussed above. *See* ¶¶ 13, 136-39, 144-45.  Navient accordingly misled investors regarding the risk that the Company's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance.  *See* ¶¶ 139, 144-45, 150.  Navient's failure to apprise investors of that serious risk to its business also violated SEC rules.  *See* ¶¶ 140-44. Navient's Class Period statements regarding its credit facilities accordingly were false or misleading when made.  *See* ¶¶ 138-39.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**Violations of Section 11 of
the Securities Act Against All Securities Act Defendants**

203.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

204.    This cause of action is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants, and is predicated on the Securities Act Defendants' strict liability for making false and misleading statements in the 2014 Offering Materials and/or the 2015 Offering Materials.  Liability under this Count is predicated on Remondi's, Chivavibul's, and the Director Defendants' signing of the 2014 Registration Statement, all of the Securities Act Defendants' (except Wells Fargo) respective participation in the 2014 Debt Offering, which were conducted pursuant to the 2014 Offering Materials, and all of the Securities Act Defendants'

(except RBS) respective participation in the 2015 Debt Offering, which was conducted pursuant to the 2015 Offering Materials.

205.    The 2014 Offering Materials and the 2015 Offering Materials were materially inaccurate or misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, or omitted to state material facts required to be stated in those documents.

206.    Remondi, Chivavibul, and the Director Defendants served as officers and/or directors of Navient at times relevant to this claim, and/or signed the 2014 Registration Statement.

207.    Navient caused the 2014 Offering Materials and the 2015 Offering Materials to be issued to investors in connection with the offering and sale of the notes associated with the 2014 Debt Offering and the 2015 Debt Offering, respectively.

208.    The Securities Act Defendants owed to Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the 2014 Offering Materials and the 2015 Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in those documents not misleading.  The Securities Act Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the 2014 Offering Materials and the 2015 Offering Materials, and did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements in those

68

documents not misleading.  The Securities Act Defendants accordingly are liable under Section 11.

209.     Plaintiffs and other Class members acquired notes pursuant to the false or misleading 2014 Registration Statement in connection with the 2014 Offering and the 2015 Offering.

210.     At the time they acquired those notes, Plaintiffs and other Class members did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact in, or omissions of material fact from, the 2014 Offering Materials or the 2015 Offering Materials.

211.     Plaintiffs and other Class members suffered damages.  The value of the notes has declined substantially, following and because of the Securities Act Defendants' violations.

212.     By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Securities Act Defendants.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants

213.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

214.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of Plaintiffs and all other members of the Class who purchased Navient securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering and who were damaged thereby.

215.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

216.     The Underwriter Defendants were statutory sellers of Navient securities that were registered in the Offerings pursuant to the 2014 Registration Statement and sold by means of the Offering Materials.  By means of the 2014 Offering Materials, the Underwriter Defendants (except for Wells Fargo) sold $1 billion in principal amount of notes through the 2014 Debt Offering to members of the Class.  By means of the 2015 Offering Materials, the Underwriter Defendants (except for RBS) sold $500 million in principal amount of notes through the 2015 Debt Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Debt Offerings by means of the materially false or misleading Offering Materials.

217.     The Offering Materials contained untrue statements of material fact or omitted facts necessary to make the statements not misleading, as set forth in this Complaint.

218.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering, and who were damaged thereby pursuant to Section 12(a)(2).

## COUNT V

### For Violation of Section 15 of the Securities Act
### (Against Navient and the Individual Securities Act Defendants)

219.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

220.    This count is asserted under Section 15 of the Securities Act against Navient and the Individual Securities Act Defendants.

221.    Navient and each of the Individual Securities Act Defendants was, by virtue of its, his, or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Navient and each of the Individual Securities Act Defendants had the power and influence to cause Navient to engage in the acts described in this Complaint, and exercised that power and influence.

222.    Additionally, each of the Individual Securities Act Defendants was, by virtue of his or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Each of the Individual Securities Act Defendants had the power and influence to cause Navient to engage in the acts described in this Complaint, and exercised that power and influence.

223.    Navient and the Individual Securities Act Defendants' control, ownership, and position made them privy to, and provided them with knowledge of, the material facts concealed from Plaintiffs and other Class members.

224. By virtue of the non-fraudulent conduct alleged in this Complaint, Navient and the Individual Securities Act Defendants are liable to Plaintiffs and other Class members for damages suffered as a result of that conduct.

## XI.    CLASS ACTION ALLEGATIONS

225. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased (1) the publicly traded securities of Navient during the Class Period; (2) securities in or traceable to the Company's 2014 Debt Offering; and/or (3) securities in or traceable to the Company's 2015 Debt Offering (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226. The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Navient publicly traded securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of in this Complaint.

228.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Navient;

(c)    whether the price of Navient publicly traded securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages, as well as the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining this action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and other Class

members by reason of the acts and transactions alleged in this Complaint;

C.      Awarding Plaintiffs and other Class members pre-judgment and post-judgment

interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


November 17, 2017                          **MORRIS AND MORRIS LLC**
                                           **COUNSELORS AT LAW**

                                           By: */s/ Patrick F. Morris*

                                           Karen L. Morris (Del. Bar No. 2899)
                                           Patrick F. Morris (Del. Bar No. 3015)
                                           R. Michael Lindsey (Del. Bar No. 2711)
                                           4023 Kennett Pike, #254
                                           Wilmington, DE 19807
                                           Telephone: (302) 426-0400
                                           kmorris@morrisandmorrislaw.com
                                           pmorris@morrisandmorrislaw.com
                                           rmlindsey@morrisandmorrislaw.com

                                           *Liaison Counsel for Lead Plaintiff the Lord*
                                           *Abbett Funds and the Proposed Class*

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

Steven E. Fineman (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Michael J. Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

Richard M. Heimann (admitted *pro hac vice*)
Bruce W. Leppla (admitted *pro hac vice*)
Sharon M. Lee (*pro hac vice* application
forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com
slee@lchb.com

*Counsel for Lead Plaintiff the Lord Abbett Funds
and Lead Counsel for the Proposed Class*

# APPENDIX

### TO SECOND AMENDED CLASS ACTION COMPLAINT[1]

I.   **STATEMENTS REGARDING FORBEARANCES; LOAN CREDIT QUALITY, DELINQUENCIES AND CHARGE-OFFS; LOAN LOSS PROVISION AND FINANCIAL RESULTS; SOX CERTIFICATIONS[2]**

1. **Statements Regarding Forbearance**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Forbearances | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **April 10, 2014 Amended Registration Statement ("April 2014 Information Statement")**<br><br>Maker(s) of Statements:  Navient; Remondi (signed) | (1) "Forbearance as a collection tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments."<br><br>(2) "Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan."<br><br>(3) "[W]e continue to see improvement in credit quality and continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL]" | Statements (1) – (4) were false or misleading when made because Navient engaged in a systemic and pervasive practice of placing borrowers into forbearance—sometimes multiple, consecutive forbearances—regardless of the impact it would have on those customers and without accounting for borrowers' particular circumstances.  By doing so, Navient avoided having to record those accounts, particularly for PEL borrowers, as delinquent or in default, which would have signaled to investors that the Company was exposed to greater risk in its loan portfolios than it was reporting.  As a result of Navient's undisclosed forbearance practices, Navient's | These statements correspond with three disclosures:<br><br>*First*, on July 13, 2015, Navient announced it would need to increase its provision for its PEL loans segment by $46 million, or 31.7%, and that a cohort of borrowers who had returned to school during the "Great Recession" of 2007-2008, and who represented $2.5 billion in loans, had demonstrated difficulty repaying their loans.  Following that news (the "July 13, 2015 Disclosure"), the price of Navient common stock fell $1.94 per share, or 10.6%, from its closing price of $18.36 on July 13, 2015 to close at |

---

[1] All references in this Appendix to "¶ __" are to paragraphs of the Complaint.

[2] This Appendix does not reference the 2014 Offering Materials issued in connection with the 2014 Debt Offering or the 2015 Offering Materials in connection with the 2015 Debt Offerings.  As stated in the Complaint, the Offering Materials incorporate many of the false or misleading statements listed in this Appendix, thereby rendering the Offering Materials false or misleading as well.  *See* ¶¶ 192-202.

| | | | |
|---|---|---|---|
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | loan loss provisions and related financial results were materially misstated.<br><br>Statements (4) – (6) are false or misleading for the additional and | $16.42 on July 14, 2015, on extraordinary trading volume of more than 8.5 million shares. During the same period, Navient 5.875% Senior Notes due 2021 declined 1.75%, Navient 5.875% |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | independent reason that by the time Navient reported its Q4 2014 financial results (at the latest), Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion | Senior Notes due 2024 declined 2.41%, and Navient 5% Senior Notes declined 2.33%.  *See* ¶¶ 9, 85. |

| | | | |
|---|---|---|---|
| **Q3 2014 Form 10-Q issued on October 30, 2014**<br><br><u>Maker(s) of Statements</u>:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | in PELs that exited deferment in 2014 posed a high risk of default.  Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into deferment).  Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers.  Yet Defendants inexplicably waited until July 2015 to disclose that issue to investors and increase the Company's provision—in the meantime repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.  *See* ¶¶ 9, 53, 56, 63, 75, 87. | *Second*, on July 22, 2015, during a Navient earnings call, Remondi revealed that the subject borrowers "were struggling to begin with." Remondi further disclosed that a portion of borrowers in that cohort had entered and exited deferment multiple times and did not complete their degrees, which he acknowledged generally results in a higher incidence of delinquency and default.  Following that news (the "July 22, 2015 Disclosure"), the price of Navient common stock fell 2.2% from its closing price of $16.60 on July 21, 2015 to close at $16.23 on July 23, 2015.  During the same period, Navient 5.875% Senior Notes due 2024 declined 3.51% and Navient 5% Senior Notes declined 1.64%.  *See* ¶ 87.<br><br>*Third*, on September 29, 2015, the CFPB issued a report detailing widespread problems in the loan-servicing industry, including that loan servicers of both private and federal student loans may not inform borrowers experiencing financial hardship about available alternative repayment plans, but |

| | | | |
|---|---|---|---|
| 2014 Form 10-K issued on February 27, 2015<br><br><u>Maker(s) of Statements</u>:  Navient; Remondi (signed); Chivavibul (signed) | (4) "Navient believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal servicing and risk mitigation practices, as | | instead may advise borrowers to postpone payments through forbearance or deferment or instruct borrowers that the only available option is to pay the full amount due.  Following the CFPB Report's release (the "September 29, 2015 Disclosure"), the price of Navient's common stock fell 4.4% from its closing price of $12.16 on September 28, 2015 to close at $11.63 on September 29, 2015, on extraordinary trading volume of more than 8.5 million shares.  *See* ¶¶ 90-91. |

| | | | |
|---|---|---|---|
| | well as our careful use of forbearance and our loan modification programs.<br><br>(5) Navient's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan"<br><br>(6) "[e]xceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of collection of the loan."the likelihood of collection of the loan." | | |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements as (1), (2), and (3) above) | | |

2.     <u>Statements Regarding Loan Credit Quality, Delinquencies, and Charge-Offs</u>

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Loan Credit Quality, Delinquencies, and Charge-Offs | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 earnings press release issued on April 16, 2014**<br><br><u>Maker(s) of Statement</u>:  Navient; Remondi | (7) We're . . . pleased that this quarter set a six-year-record low in delinquencies, reflecting our strong underwriting and customer support." | Statements (7) – (24) were false or misleading when made because Defendants failed to disclose that Navient was pervasively and systemically placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolio and artificially depressing the number of delinquencies, defaults, and charge-offs.  The quality of Navient's loan portfolios was therefore not as Defendants described it to investors. | <ul><li>July 13, 2015 Disclosure;</li><li>July 22, 2015 Disclosure; and</li><li>September 29, 2015 Disclosure</li></ul> |
| **Navient Investor Road show presentation , attached as exhibit to Form 8-K issued on April 17, 2014**<br><br><u>Maker(s) of Statements</u>:  Navient | (8) Referred to Navient's "[l]arge, high quality asset base," including its "[s]easoned portfolio" of Private Education Loans"<br><br>(9) Highlighted "[d]elinquency and charge-offs significantly below national average"<br><br>(10) Highlighted "[i]ndustry leading asset recovery and private credit loss mitigation capabilities" | | |
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br><u>Maker(s) of Statements</u>:  Navient; Chivavibul (signed) | (Substantially similar statements to (7), (8), (9), and (10) above) | | |
| **Q2 2014 earnings press release issued on July 16, 2014**<br><br><u>Maker(s) of Statement</u>:  Navient | (11) "continued improvement in student loan portfolio credit quality with 90-plus day delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008" | | |

| | | | |
|---|---|---|---|
| **Q2 2014 earnings call on July 17, 2014**<br><br>Maker(s) of Statement:  Navient; Remondi | (12) "Our private loan segment continues to benefit from improving credit metrics, delinquencies and defaults continue to fall hitting six year lows, and driving down credit costs." | | |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (13) "[provisions for PEL losses] declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs" | | |
| **Q3 2014 earnings press release issued on October 15, 2014**<br><br>Maker(s) of Statements:  Navient | (14) "[financial results] show[ed] continued improvements in delinquencies and defaults since a year ago"<br><br>(15) "Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008" | | |
| **Remondi presentation at Barclays Global Financial Services Conference on September 8, 2014**<br><br>Maker(s) of Statement:  Navient; Remondi | (16) Describing Navient's $30 billion private education loan portfolio as "well-seasoned" and possessing "very strong credit metrics" | | |

| | | | |
|---|---|---|---|
| **Remondi presentation at Bank of America-Merrill Lynch Conference on November 12, 2014**<br><br>Maker(s) of Statements:  Navient; Remondi | (17) "On the private education side of the equation, we own a portfolio of $30 billion of student loans.  These loans have very strong credit metrics.  There is a high-quality improving performance in these metrics, particularly as the economy is improving." | | |
| **Q4 and FY 2014 earnings press release issued on January 21, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (18) "2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008"<br><br>(19) Remondi stated that in 2014 Navient "realized year-over-year improvements in credit quality." | | |
| **Q4 and FY 2014 earnings call on January 22, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (20) Remondi emphasized that Navient "[saw] continued opportunities to increase the expected cash flows from [its] federal and private loan portfolios as credit continue[d] to improve and [Navient] benefit[ed] from lower financing costs and low interest rates." | | |
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed), Chivavibul (signed) | (21) Highlighted, among Navient's "Strengths and Opportunities," a "[l]arge, high quality asset base generating significant and predictable cash flows" | | |

| | | | |
|---|---|---|---|
| **Q1 2015 earnings press release issued on April 21, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (22) Remondi stated "[p]rivate credit quality . . . continued to improve, leading to a lower loan loss provision." | | |
| **Q1 2015 earnings call on April 22, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (23) Remondi stated that "[o]n the credit front, [Navient] continue[d] to see delinquency rates and [its] outlook for future expected charge-offs on [its] private portfolio improve." | | |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (24) Navient represented that its provisions for loan losses declined $60 million and that "contributing to the decrease was the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs." | | |

**3.** **Statements Regarding Loan Loss Provisions and Financial Results**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Loan Loss Provisions and Financial Results | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (25) Loss Provision for PELs: $136 M, down from Q1 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $219M / $163M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.64 / $0.51 | Statements (25) – (29) were false or misleading when made because Defendants failed to disclose Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan loss provisions.  Navient failed to account for losses on more than $2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014.  Navient's reported allowance for loan losses and related provisions accordingly were understated, in violation of GAAP. Navient's artificially low provisions, in turn, caused Core Earnings for the PEL segment and net income—both of which depended to a material degree on the level of loan loss provisions— to be artificially inflated, resulting in inflated EPS. | • July 13, 2015 Disclosure;<br><br>• July 22, 2015 Disclosure; and<br><br>• September 29, 2015 Disclosure |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (26) Loss Provision for PELs: $145 M, down from Q2 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $307M / $241M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.71 / $0.56 | | |
| **Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (27) Loss Provision for PELs: $130 M, down from Q3 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $359M / $218M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.85 / $0.52 | | |

| | | | |
|---|---|---|---|
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed); Chivavibul (signed) | (28) Loss Provision for PELs:<br><br>*Q4 2014*:  $128M, down from Q4 2013<br>*FY 2014*:  $539M, down from $722M for FY 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):<br><br>*Q4 2014*:  $263M / $217M<br>*FY 2014*:  $1.1B / $818M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):<br><br>*Q4 2014*:  $0.64 / $0.53<br>*FY 2014*:  $2.69 / $1.93 | | |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (29) Loss Provision for PELs:<br>$120 M, down from Q1 2014<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $182M / $154M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.47 / $0.48 | | |

**4.** __Statements in SOX Certifications__

| Document/"Maker(s)" of the Statement(s) | Statements in SOX Certifications | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Certifications Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), attached to Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (30) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"<br><br>(31) "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Navient] as of, and for, the periods presented in this report"<br><br>(32) "[Navient]'s other certifying officer [i.e., Remondi or Chivavibul] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to [Navient]'s auditors and the audit committee of [Navient]'s board of directors (or persons performing equivalent functions) . . . "[a]ny fraud, whether or not material, that involves management or other employees who have a significant | Statements (30) – (33) were false or misleading when made, in light of Navient's undisclosed forbearance practices and the resulting manipulation of Navient's financial results. *See* ¶¶ 33-63. Further, the certifications included in Navient's 2014 Form 10-K and Q1 2015 Form 10-Q were false or misleading for the additional and independent reason that by that time it was clear to Defendants that they should increase the provision for PEL loans to reflect the demonstrably high risk of default posed by the cohort of borrowers who exited deferment in 2014 and had been, as Remondi admitted in July 2015, struggling even before they entered deferment around 2008. | • July 13, 2015 Disclosure;<br><br>• July 22, 2015 Disclosure; and<br><br>• September 29, 2015 Disclosure |

| | | | |
|---|---|---|---|
| | role in [Navient]'s internal control over financial reporting" <br><br> (33) "The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company." | | |
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q2 2014 Form 10-Q issued on August 1, 2014** <br><br> <u>Maker(s) of Statements</u>: <br> Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |

| | | | |
|---|---|---|---|
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |
| **Certification Pursuant to Sections 302 and 906 of SOX, attached to 2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |

## II.     STATEMENTS REGARDING LEGAL COMPLIANCE

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Legal Compliance | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Navient Investor Roadshow presentation, attached as exhibit to Form 8-K issued on April 17, 2014**<br><br>Maker(s) of Statements:  Navient | (34) Highlighting "[Navient's] robust compliance driven culture driven by a 'customer first' approach,"<br><br>(35) Referring to "[Navient's]operational and technical expertise and capacity to adapt to [a] new regulatory environment,"<br><br>(36) Citing "[Navient's] demonstrated FFELP compliance and preserved federal loan guarantee." | Statements (34) – (43) were false or misleading when made, because Navient and its subsidiaries were actually engaged in a series of unfair and deceptive practices, including (1) misleading borrowers about the availability of IDR plans; (2) misadvising borrowers about the availability of releases of cosigners of borrowers' loans; (3) misleading delinquent borrowers regarding the amounts they needed to pay to become current on their loans; (4) failing to disclose or properly address systemic processing errors and the | These statements correspond with six disclosures:<br><br>*First*, on February 27, 2015, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program, i.e., the very misconduct detailed in ¶¶ 82, 117-18. |
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed); Chivavibul (signed) | (37) "[Navient's] rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance [its] compliance and customer service."<br><br>(38) "We have been a partner in [the DOE]'s campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice." | inadequate systems in place to deal with those errors; (5) charging borrowers who had served in the military high interest rates on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between Navient Solutions and the DOJ for that very practice; and (6) deceiving borrowers regarding attributes of the federal loan rehabilitation program, which affords borrowers in default the opportunity to "rehabilitate" their loans and remove them from default status. *See* ¶¶ 96-118.  Those unfair and deceptive practices are the subject | *Second*, on March 2, 2015, *Inside Higher Ed* referred to the loss of the Pioneer contract as part of a "crackdown" on Navient, noted the Company "said that it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013"—i.e., approximately $127 million for just two years—reported that Representative Chris Collins, who represents the upstate New York district where Pioneer operates, "told The Buffalo News that the decision to end the contract would lead to the loss of about 400 jobs at the company." |
| **Remondi presentation at Bank of** | (39) "We're also doing it by | deceptive practices are the subject | |

| | | | |
|---|---|---|---|
| **America-Merrill Lynch Conference on November 12, 2014**<br><br>Maker(s) of Statements: Navient; Remondi | helping customers enroll in payment programs rather than simply deferring any payments at all.  So we have a higher percentage of our customers enrolled in income-driven repayment programs authorized under the federal programs than do others and, consequently, a lower percentage of customers using deferral products, like forbearance as an example."<br><br>(40) "In private credit, we bring that same kind of approach.  Our approach here is a little bit different in that we're not running against a design program of the federal programs; we have created our own solutions for customers."<br><br>(41) "One of the things that we have been very, very successful at is helping borrowers who are struggling find a solution that not only keeps them out of default but helps them successfully reduce their debt balance. Actively we will work with customers, and that includes modifying their loan terms to help them be successful." | of actions filed by the CFPB and state attorneys general (*see* Compl. at 2 n.1) asserting claims under the Consumer Financial Protection Act ("CFPA"), the Fair Debt Collection Practices Act ("FDCPA"), and state consumer protection laws. The Government Complaints assert, based in part on internal Navient documents, that the Company engaged in those practices systemically and repeatedly for years, including during much of the Class Period in this case. | The price of Navient stock declined 8.8% from its close of $21.40 on February 27, 2015 to close at $19.51 on March 2, 2015 (the next trading day), on unusually heavy trading volume of more than 10 million shares.  During the same period, Navient 5.875% Senior Notes due 2024 declined 2%, and Navient 5% Senior Notes declined 2%.<br><br>*Third*, on April 24, 2015, *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by authorities in Massachusetts "over allegations the company mistreated distressed borrowers."  On that news, the price of Navient stock fell 2.1% from its close of $20.28 on April 24 to close at $19.85 on the next trading day, April 27, 2015.<br><br>*Fourth*, on July 7, 2015, the CFPB published a report on its website titled "Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform."  The CFPB disclosed that it had continued to receive complaints about student loan servicing from servicemembers after the 2014 settlement between federal regulators and Navient and |
| **Q1 2015 Form 10-Q issued on Apr. 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (42) Navient again stated it "fosters a robust compliance culture driven by a 'customer first' approach," adding, "[w]e invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer | | |

16

| | | | |
|---|---|---|---|
| | research to enhance our compliance and customer service." | | Sallie Mae.  Specifically, the CFPB indicated that since it published a report in October 2012 on complaints it had received from military borrowers about student loan servicers and shared those complaints with the DOJ and other federal regulators (which subsequently resulted in the $60 million settlement with Navient and Sallie Mae), "the Bureau has received more than 1,300 complaints from military borrowers related to the servicing or collection of student loans." Following the announcement of the report, the price of Navient stock fell 2.1%, from $18.97 to $18.57 per share. |
| **Q2 2015 Form 10-Q issued on Aug. 3, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | Substantially similar to (42) above | | |
| **Kane presentation at Credit Suisse Group Financial Services Forum on February 11, 2015**<br><br>Maker(s) of Statements: Navient; Kane | (43) "very, very strong compliance culture at Navient across the entire Company, across all levels of management," adding, "[s]o we take that very seriously.  We keep our thumb obviously on the changing compliance landscape and we look to make updates to our processes, procedures and work activities to comply." | | |

*Fifth*, after the market closed on August 24, 2015, Navient disclosed in an SEC Form 8-K that on August 19, 2015 Navient Solutions received a letter from the CFPB stating the Bureau's Office of Enforcement was considering taking legal action against Navient Solutions regarding its disclosures and assessment of late fees. Following that news, the price of Navient common stock fell 7.8%, from its closing price of $13.06 on August 24, 2015 to close at $12.04 per share on August 25, 2015, on unusually heavy trading volume of more than nine million shares.

*Sixth*, the CFPB Report issued on

| | | | September 29, 2015 referred to (in addition to the forbearance issue referenced above), (i) comments from individual student loan borrowers described how they encountered servicing problems or practices that discouraged utilization of alternative repayment plans, including income-driven repayment plans; (ii) comments detailing problems related to customer service, including issues for borrowers seeking to resolve servicing errors; (iii) Comments describing how payment processing and servicing-transfer practices create problems for borrowers trying to repay student debt; and (iv) "[s]ervicemembers consistently report difficulties obtaining the SCRA interest rate cap of six percent," i.e., "that servicers continue to improperly process these requests and do not clearly convey information about the application process and other requirements." The CFPB further recounted, "Servicemembers also note that the servicers guide them into forbearance or deferment, even when the borrower is actively seeking information and assistance concerning other forms of repayment." |
|---|---|---|---|

### III.   STATEMENTS REGARDING LIQUIDITY AND FINANCING ARRANGEMENTS

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Liquidity and Financing Arrangements | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (44)  "As of March 31, 2014 and December 31, 2013, the maximum additional capacity under these facilities was $12.7 billion and $10.6 billion, respectively.  For the three months ended March 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.3 billion and $10.8 billion, respectively." | Statements (44) – (51) were false and misleading when made because Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate the facilities in light of a rule proposed by the FHFA in September 2014 (which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities from gaining membership with a FHLB—and thus access credit on extraordinarily favorable terms—through the use of a captive insurer.  Defendants accordingly misled investors regarding the risk that Navient's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance.  Further, Defendants' failure to apprise investors of that serious risk to the Company's business violated SEC rules mandating such disclosure. | On December 28, 2015, the true level of risk to which Navient's credit facilities with FHLB-DM were exposed was revealed to the market when the Company announced in a Form 8-K that on December 22, 2015 its wholly owned subsidiary HICA received a notice from FHLB-DM stating "availability under the FHLB-DM Credit Facilities would be reduced from approximately $10.7 billion to approximately $5.0 billion for the period from December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for advances maturing after October 31, 2016."<br><br>Navient explained that FHLB-DM's action would "result in a reduction of aggregate borrowing availability under the FHLB-DM Credit Facilities and the other credit facilities available to the Company and its subsidiaries as of the date of this [Form 8-K] from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof."  In other words, as a result of the significant reduction of the FHLB- |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (45)  "As of June 30, 2014 and 2013, the maximum additional capacity under these facilities was $10.7 billion and $11.9 billion, respectively.  For the three months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $11.8 billion and $11.1 billion, respectively." | | |
| **Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (46)  "As of September 30, 2014 and 2013, the maximum additional capacity under these facilities was $11.0 billion and $11.2 billion, respectively.  For the three months ended September 30, 2014 and 2013, the average maximum additional capacity under these facilities was $10.8 billion and $11.4 billion, respectively." | | |

| 2014 Form 10-K issued on February 27, 2015<br><br>Maker(s) of Statements: Navient; Remondi (signed); Chivavibul (signed) | (47) "[Navient] requires liquidity to meet cash requirements such as day-to-day operating expenses, required payments of principal and interest on borrowings, and distributions to stockholders."<br><br>(48) We have various secured borrowing facilities that we use to finance our FFELP Loans. Liquidity is available under these secured credit facilities to the extent we have eligible collateral and available capacity. The maximum borrowing capacity under these facilities will vary and is subject to each agreement's borrowing conditions. These include but are not limited to the facility's size, current usage and the availability and fair value of qualifying unencumbered FFELP Loan collateral. . . . The facilities are subject to termination under certain circumstances | | DM credit facilities, Navient would be able to borrow only an additional $2.5 billion under existing credit lines of which the Company already had drawn down 87%, likely resulting in an adverse impact on the Company's liquidity and borrowing costs.<br><br>In response to the news disclosed on December 28, 2015, Navient's stock price fell 9.1% from its closing price of $12.61 on the previous trading day, December 24, 2015, to close at $11.46 per share on December 28, 2015, on unusually high trading volume of more than 9.3 million shares. Investors accordingly suffered significant losses as a result of Navient's failure to inform them of the truth regarding the likelihood that the Company's borrowing capacity under the FHLB-DM's credit facilities would be drastically reduced.<br><br>Further, in its 2015 Form 10-K filed on February 25, 2016, Navient confirmed what the market already understood, i.e., that FHLB-DM's action related to the FHFA's rule (which became final in January 2016 but was initially proposed and published in the Federal Register in *September 2014*) preventing non-eligible entities (now defined to include Navient) from gaining membership |

| | | | |
|---|---|---|---|
| | | | with a FHLB through the use of a captive insurer. |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (49) "As of March 31, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $12.5 billion and $13.2 billion, respectively.  For the three months ended March 31, 2015 and 2014, the average maximum additional capacity under these facilities was $12.9 billion and $12.3 billion, respectively." | | |
| **Q2 2015 Form 10-Q issued on August 3, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (50) "As of June 30, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $11.5 billion and $13.2 billion, respectively.  For the three months ended June 30, 2015 and 2014, the average maximum additional capacity under these facilities was $12.2 billion and $11.8 billion, respectively." | | |
| **Q3 2015 Form 10-Q issued on October 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (51) "As of September 30, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $10.1 billion and $13.2 billion, respectively.  For the three months ended September 30, 2015 and 2014, the average maximum additional capacity under these facilities was $11.0 billion and $10.8 billion, respectively." | | |