IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LORD ABBETT AFFILIATED FUND, INC., et al., Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 16-112-MN CONSOLIDATED |
| NAVIENT CORPORATION, *et al.*, | ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Patrick F. Morris, Karen L. Morris, and R. Michael Lindsey, MORRIS AND MORRIS LLC, Wilmington, DE; Steven E. Fineman, Daniel P. Chiplock, and Michael J. Miarmi, LIEFE CABRASER HEIMANN & BERNSTEIN, LLP, New York, NY; Richard M. Heimann, Bruce W. Leppla, LIEFE CABRASER HEIMANN & BERNSTEIN, San Francisco, CA; Sharon M. Lee, LIEFE CABRASER HEIMANN & BERNSTEIN, Seattle, WA – Attorneys for Plaintiffs.

Kelly E. Farnan, RICHARDS LAYTON & FINGER, P.A., Wilmington, DE; Peter A. Wald, LATHAM & WATKINS LLP, San Francisco, CA; Abid R. Qureshi, Christopher S. Turner, LATHAM & WATKINS LLP, Washington, D.C.; Christopher R. Harris, LATHAM & WATKINS LLP, New York, NY – Attorneys for Navient Corporation and the Individual Defendants.

Kevin G. Abrams, John M. Seaman, ABRAMS & BAYLISS LLP, Wilmington, DE; Adam S. Hakki, Daniel C. Lewis, and Anthony D. Marinello, SHEARMAN & STERLING LLP – Attorneys for Defendants Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Barclays Capital Inc., Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS Securities Inc., and Wells Fargo Securities, LLC.

January 29, 2019
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE:**

Defendant Navient Corporation ("Navient") is one of the country's largest servicers of student loans. (D.I. 59 at ¶ 90). The Individual Defendants are officers and/or directors of Navient.[1] (*Id.* at ¶¶ 30-32, 172-80). The Underwriter Defendants served as underwriters on two debt offerings made by Navient between April 17, 2014 and December 28, 2015 ("the Class Period").[2] (*Id.* at ¶¶ 181-90). (Navient, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants.") Lead plaintiffs, referred to collectively as the Lord Abbett Funds, allege that Defendants made false and misleading disclosures during the Class Period.[3] Specifically, the Second Amended Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("the Securities Act"). (*Id.* at ¶¶ 155-61, 203-24).

Pending before the Court is Defendants' motion to dismiss the Second Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and pursuant to the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). (D.I. 63). The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 15 U.S.C. § 78aa (jurisdiction for violations of the Exchange Act), and 15 U.S.C.

---

[1]     The Individual Defendants are John F. Remondi, Somsak Chivavibul, John Kane, William M. Diefenderfer, III, Ann Torre Bates, Diane Suitt Gilleland, Linda Mills, Barry A. Munitz, Steven L. Shapiro, Jane J. Thompson, and Barry L. Williams.

[2]     The Underwriter Defendants are Barclays Capital Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., J.P. Morgan Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBC Capital Markets LLC, RBS Securities Inc., and Wells Fargo Securities LLC.

[3]     The Lord Abbett Funds are comprised of the Lord Abbett Affiliated Fund, Inc., the Lord Abbett Equity Trust-Lord Abbett Calibrated Mid Cap Value Fund, the Lord Abbett Bond-Debenture Fund, Inc., and the Lord Abbett Investment Trust-Lord Abbett High Yield Fund.

§ 77v (jurisdiction for violations of the Securities Act). For the following reasons, the motion to dismiss is granted-in-part and denied-in-part.

## I. <u>BACKGROUND</u>

Navient is a loan management, servicing, and assert recovery business. (D.I. 65-1, Ex. 1 at 6). Navient's stock price went from a high of $21.40 on February 27, 2015 to a low of $11.46 on December 28, 2015, the last day of the Class Period. (D.I. 59 at ¶¶ 15-16). Several plaintiffs sued alleging that the loss in stock price can be attributed to false and misleading disclosures made by Defendants during the Class Period. On July 1, 2016, those actions were consolidated, and, on September 28, 2016, Plaintiffs filed an Amended Complaint in the consolidated class action. (D.I. 36). Defendants moved to dismiss the Amended Complaint for failure to state a claim (D.I. 38), and the Court granted the motion to dismiss because the Amended Complaint improperly relied on puzzle pleading that failed to set forth a "short and plain" statement of their claims. (D.I. 55 at 6-7; D.I. 56). On November 17, 2017, Plaintiffs filed the Second Amended Complaint (D.I. 59) (referred to hereinafter as "the Complaint"), which is the subject to the current motion to dismiss. (D.I. 63). To minimize repetition, the Court will discuss relevant background facts with each group of statements at issue in Defendants' motion when it discusses whether the Complaint states a claim with respect to each group of statements.

## II. <u>STANDARD OF REVIEW</u>

### A. **Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must accept all well-pleaded factual allegations in a complaint as true and draw all reasonable inferences in favor

of the plaintiff.  *In re Rockefeller Ctr. Prop., Inc. Sec. Litig*., 311 F.3d 198, 215 (3d Cir. 2002).

The Court's review is limited to the allegations in the complaint, exhibits attached to the complaint,

documents incorporated by reference, and items subject to judicial notice.  *Siwulec v. J.M.*

*Adjustment Serv., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012).

### B.    Rule 9(b) & the PSLRA

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b)

and the PSLRA.  *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  Rule 9(b)

requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b).  Put another way, Rule 9(b) requires that a plaintiff set forth "the who, what,

when, where and how" of the alleged fraud.  *In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 534

(3d Cir. 1999).  Under the PSLRA, plaintiffs must: (1) "specify each statement alleged to have

been misleading and the reason or reasons why the statement is misleading;" and (2) "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 321 (2007) (internal citations

and punctuation omitted) (quoting 15 U.S.C. § 78u–4(b)(1) and 15 U.S.C. § 78u–4(b)(2)).

### C.    Claims that Sound in Fraud

When Securities Act claims "are grounded in fraud rather than negligence," the heightened

pleading standard of Rule 9(b) applies.  *Cal. Public Employees' Ret. Sys. v. Chubb Corp*., 394 F.3d

126, 161 (3d Cir. 2004).  It does not, however, appear that the Securities Act claims of the

Complaint are grounded in a theory of fraud.  In addressing Plaintiffs' First Amended Complaint,

which was dismissed, the Court applied a heightened pleading standard to Plaintiffs' Securities

Act claims, because the Securities Act claims incorporated allegations from the Exchange Act

claims that Defendants "knew or recklessly disregarded" Navient's "improper practices."

(*See* D.I. 55 at 6 (citing D.I. 36 at ¶ 24)). The Complaint does not repeat this problem. Finally, even if Rule 9(b) did apply, Defendants have done no more than make a one-sentence conclusory argument that the Securities Act claims are not pleaded with particularity. (D.I. 64 at 24). This is not enough for the Court to reach the same conclusion it did previously. Thus, the Court's decision not to apply Rule 9(b) to the Securities Act claims does not affect the outcome of this motion.

## III.  <u>DISCUSSION</u>

Counts 1 and 2 of the Complaint assert claims under Sections 10(b) and 20(a) of the Exchange Act, respectively. (D.I. 59 at ¶¶ 155-61). Counts 3, 4, and 5 assert violations of Sections 11, 12(a)(2), and 15 of the Securities Act, respectively. (*Id*. at ¶¶ 213-24). Liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act is predicated on first finding liability under Section 10(b) of the Exchange Act and Sections 11 or 12 of the Securities Act.[4] Consistent with that framework, Defendants have confined their arguments on the motion to dismiss to whether the Complaint pleads a claim under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act.

The Court will first set out of the elements of a claim under the relevant statutory sections. It will then elaborate on the standards for pleading the elements on which Defendants have focused their motion, to wit, materiality, falsity, and scienter. Finally, the Court will address whether the Complaint meets those standards. The Complaint has arranged the purportedly false and misleading statements into three groups: compliance, credit facilities, and loans. The "loan" topic

---

[4]    Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a person, including a corporation, who has committed a Section 10(b) violation. *City of Edinburgh Council v. Pfizer, Inc*., 754 F.3d 159, 177 (3d Cir. 2014) (citation omitted); 15 U.S.C. § 78t(a). Section 15 of the Securities Act provides for joint and several liability on any individual who controls a violator of Sections 11 or 12. 15 U.S.C. § 77o; *In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 284 (3d Cir. 2006).

is further divided into four subgroups: the quality of the loan portfolio, forbearance practices, loan loss provisions, and SOX certifications. Defendants have set forth several arguments as to why allegations regarding each group and subgroup of statements fails to adequately plead materiality, falsity, and/or scienter.

## A. The Relevant Statutory Sections

### 1. Exchange Act Claims: § 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b). Thus, to state a claim for violation of Section 10(b) and Rule 10b-5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc*., 552 U.S. 148, 157 (2008); *In re DVI, Inc. Sec. Litig*., 639 F.3d 623, 630–31 (3d Cir. 2011). Defendants' motion to dismiss focuses on the elements of materiality and scienter.

### 2. Securities Act Claim: Sections 11 and 12(a)(2)

Section 11 of the Securities Act imposes liability where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or

omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability where a prospectus or oral communication "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *Id*. at § 77l(a)(2). Thus, under both Section 11 and Section 12(a)(2), a plaintiff must show a material misstatement or omission, but Section 11 focuses on registration statements and Section 12(a)(2) focuses on prospectuses and oral communications. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004). "Fraud . . . is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)" unless the Securities Act claims are grounded in fraud. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006). As the Court has already determined, for the reasons explained above, that Plaintiffs' Securities Act claims are not grounded in fraud, the only element at issue for these claims is materiality.

### B.     Standards for Pleading Materiality, Falsity, and Scienter

#### 1.     Materiality

A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (alteration in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The statement or omission must have "significantly altered the total mix of information made available.'" *Aetna*, 617 F.3d at 283 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). A statement is not material if it involves "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism." *Aetna*, 617 F.3d at 283 (quoting *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872

(3d Cir. 2000)). "Such statements 'constitute no more than puffery and are understood by reasonable investors as such.'" *Aetna*, 617 F.3d at 283 (quoting *In re Advanta*, 180 F.3d at 538).

### 2. Falsity

Materiality and falsity are separate elements with distinct requirements. *See*, *e.g.*, *Emps. Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1168 (10th Cir. 2018) (explaining that "materiality is an element of the claim in addition to falsity"). To establish falsity, the PSLRA requires a complaint to plead with particularity the "the reasons why" the statements were false or misleading when made. *Avaya*, 564 F.3d at 252; *Chubb*, 394 F.3d at 142 (explaining that falsity requires a complaint to plead "the 'true facts' purporting to show *how* or *why* those statements are false" (emphasis in original)). Thus, materiality goes to why a statement is important, and falsity goes to why a statement is untrue or misleading.

### 3. Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," *i.e.*, that defendants acted with "scienter." 15 U.S.C. § 78u–4(b)(2)(A); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013). Scienter is defined as a "'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (quoting *Avaya*, 564 F.3d at 252). Recklessness is "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (quoting *In re Advanta*, 180 F.3d at 535).

"A 'strong inference' of scienter is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Avaya*, 564 F.3d at 267 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S.Ct. 2499, 2504-05 (2007). "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Avaya*, 564 F.3d at 267 (emphasis in original) (quoting *Tellabs*, 127 S.Ct. at 2509). Finally, the inference of scienter "must be more than merely reasonable or permissible but need not be irrefutable." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc*., 442 F. App'x 672, 675 (3d Cir. 2011) (internal punctuation and citation omitted).

## C.     Compliance

The Complaint alleges that Defendants made materially false or misleading statements regarding Navient's compliance with legal and regulatory requirements. (D.I. 59 at ¶ 93). Specifically, it alleges that in public statements to investors, Navient purported to have a "robust compliance driven culture," a "very, very strong compliance culture," "demonstrated compliance infrastructure," and "rigorous training programs." (*Id*.). Consistent with cases addressing similar statements, the Court finds that the compliance statements on which Plaintiffs' Complaint rest are not material, but instead constitute inactionable puffery. *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc*., 572 F. App'x 713, 716 (11th Cir. 2014) (statements about "rigorous" processes and "effective" training were not material because those terms "do not assert specific [and] verifiable facts" on which reasonable investors would rely); *In re Sanofi Sec. Litig*., 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (statement that company "maintain[s] an effective compliance organization" is corporate puffery); *In re Ocwen Fin. Corp. Sec. Litig*., 2015 WL 12780960, at *7 (S.D. Fla. Sept. 4, 2015) (statement that company had "'robust' compliance controls" is puffery);

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (description of compliance program as "robust" or "best-of-class" is puffery); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at \*24 (S.D.N.Y. Sept. 28, 2010) (statement that company is "maintaining a very strong internal control environment" is inactionable puffery).

The Court is not persuaded by the cases Plaintiffs cited to show that the compliance statements are material, because the financial statements evaluated in those cases are not sufficiently analogous to the legal compliance statements Plaintiffs allege here. *See* D.I. 67 at 14-16 (citing *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (statement that the company's loan loss reserves are "adequate") and *In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) (statement that the company "'consistently' applied 'rigorous loan underwriting standards'")). It could be argued that "adequate" and "rigorous," in a financial context, imply a quantifiable amount of money, whereas the same words in a compliance context do not infer a quantifiable amount of compliance. Accordingly, Plaintiffs' cases are not illuminating on the issue of whether Defendants' compliance statements are material. Defendants' motion to dismiss the portion of Plaintiffs' claims based on the compliance statements is granted. The portion of Plaintiffs' Securities Act claims, and Exchange Act claims based on compliance statements is dismissed with prejudice.

### D.     Credit Facilities

The Complaint alleges that Navient made false or misleading statements when it reported the borrowing capacity under its credit facilities, because Navient failed to disclose the likelihood that the Federal Home Loan Bank of Des Moines ("FHLB-DM") would terminate Navient's access to those credit facilities in light of a proposed rule by the Federal Housing Finance Agency ("the FHFA"). (D.I. 59 at ¶¶ 138-39). In September 2014, the FHFA proposed a rule that would prevent

entities from using a "captive insurer" to gain membership to a Federal Home Loan Bank like FHLB-DM. (*Id.* at ¶ 13). Navient's predecessor Sallie Mae formed a captive insurer which Navient then used to access the FHLB-DM's credit facility. (*Id.*). Thus, the proposed rule, which was adopted as a final rule in January 2016, impacted Navient's ability to obtain low-cost credit to fund its operations. (*Id.*). On December 28, 2015, Navient disclosed that the FHLB-DM would reduce the company's ability to borrow under its credit facility by more than 50%, a change the Complaint alleges is material because the low-cost credit available under the FHLB-DM was not available from other sources. (*Id.* at ¶ 13). Defendants argue that the Complaint fails to adequately plead materiality and scienter with respect to the credit facility statements. (D.I. 64 at 16-17; D.I. 69 at 15). Each element is addressed in turn below.

### 1.    Materiality

The Complaint alleges that, under SEC Regulations, Navient had a duty to disclose the "serious risk" that the FHLB-DM would terminate Navient's access to the credit facility due to the FHFA's proposed rule. (D.I. 59 at ¶ 139-142). Specifically, it alleges that Navient violated its duty under SEC Regulation S-X, Rule 05-02-22, to disclose the "conditions under which commitments may be withdrawn." (*Id.* at ¶ 141). It also alleges that Navient violated its duty under SEC Regulation S-K, Rule 303, to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the [company]'s liquidity increasing or decreasing in any material way." (*Id.* at ¶ 142).

Defendants' motion to dismiss does not discuss Rule 05-02-22 or Rule 303 or whether these rules do in fact impose a duty to disclose the FHFA's proposed rule regarding captive insurers. While Defendants mentioned that the proposed rule was public information, they do not explain the significance of that fact or provide citations to case law showing that it is proper

grounds for dismissal. (*See* D.I. 69 at 9). Defendants also suggest that the risk was in fact disclosed when the 2014 Form 10-K stated that "regulatory actions" are one of many "factors that could make financing more expensive or unavailable to Navient." (*See* D.I. 64 at 17). But Defendants did not explain, with citation to case law, how this statement was more than mere boilerplate and provided adequate warning with respect to the proposed FHFA rule. Finally, Defendants rely on *Gaer v. Education Management Corp.* to suggest that, as a matter of law, a company is "not obligated to predict months in advance about the final regulations that eventually issued." *See* D.I. 64 at 17 (citing *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447, at *2 (W.D. Pa. Aug. 30, 2011)). But this reliance is misplaced, because the quote is taken out of context.

The court in *Gaer* essentially held that a company did not have to predict, at the time of its initial public offering ("IPO"), that the Department of Education would adopt a final rule over a year later, when the only activity before the IPO was an announcement that the Department of Education planned to form a negotiated rulemaking committee, that committee eventually failed to produce any rules, and the rules finally adopted came about after a stop and start process. *Gaer*, 2011 WL 7277447, at *2-*5, *23. Defendants have not shown that a similar start and stop process hindered its ability to disclose any risk from the FHFA's proposed rule. More importantly, the court in *Gaer* ultimately rejected the plaintiff's argument because the company "did warn investors about the potential impact that the rulemaking might have." [5] *Id.* at *23. Therefore, Defendants have failed to show that the credit facility statements are not material. Defendants' motion to

---

[5]        The other cases cited by Defendants are equally unhelpful. In *Matrixx Initiatives, Inc. v. Siracusano*, the U.S. Supreme Court held that plaintiffs stated a claim for relief based on a pharmaceutical company's failure to disclose reports of adverse medical events. 563 U.S. 27, 30 (2011). In *In re Morgan Stanley Info. Fund Sec. Litig.*, the court addressed whether the defendants had an affirmative obligation in registration statements and prospectuses filed on Form N-1A to disclose conflicts of interests. 592 F.3d 347, 351 (2d Cir. 2010).

dismiss the portion of the Securities Act claims based on the credit facility statements is denied. Dismissal of the Exchange Act claims based on the credit facility statements will depend on whether Defendants have shown that the Complaint fails to adequately plead scienter.

### 2. Scienter

To plead scienter with respect to the credit facility statements, the Complaint relies on: (i) the "core operations doctrine" and (ii) motive and opportunity. (D.I. 59 at ¶¶ 147-148). Under the core operations doctrine, when the misrepresentations and omissions involve "'core matters' of central importance" to the company and its principle executives, an inference of scienter may arise. *Avaya*, 564 F.3d at 268. It is not enough, however, to allege that the misrepresentations and omissions involve core matters, because "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter." *Rahman*, 736 F.3d at 246-47 (quoting *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)). There must also be "some additional allegations of specific information conveyed to management and related to fraud." *Rahman*, 736 F.3d at 237 (quoting *Metzler*, 540 F.3d at 1068).

To show motive and opportunity, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *GSC Partners*, 368 F.3d at 237 (quoting *In re Advanta*, 180 F.3d at 535). In addition, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners*, 368 F.3d at 237 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Here, Plaintiffs' allegations related to the FHFA's proposed rule are insufficient to give rise to a strong inference of scienter. The Complaint does no more than make the conclusory allegation that the FHLB-DM credit facility was "central[]" to Navient's ability to fund its operations. (D.I. 59 at ¶ 147). The Complaint does not allege, as required, that specific information regarding the impact of the proposed FHA rule was conveyed to management. Thus, there is no inference of scienter as to the credit facility statements based on the core operations doctrine. Similarly, the Complaint makes a single conclusory allegation that "Defendants were highly motivated to conceal negative information threatening the Company's liquidity." (*Id*. at ¶ 148). It does not, however, allege, as required, any "concrete and personal benefit to the individual defendants resulting from this fraud." *See GSC Partners*, 368 F.3d at 237. Thus, the Complaint does not give rise to any inference of scienter, let alone a strong one, based on motive and opportunity. Given the foregoing, the Court grants Defendants' motion to dismiss the portion of the Exchange Act claims based on the credit facility statements for failure to adequately plead the element of scienter. Those claims are dismissed without prejudice.

### E.     Loans

The Complaint alleges that Defendants made material statements regarding Navient's loans that were false and misleading. It divides the allegations regarding the materiality of Navient's loans into four subsections. The first section addresses the "high quality" of Navient's loan portfolio, including the "low level" of delinquencies and charge-offs. (D.I. 59 at ¶¶ 50-53). The second section addresses statements regarding Navient's forbearance practices. (*Id*. at ¶¶ 33-49). The third section addresses Navient's loan loss provisions. (*Id*. at ¶¶ 54-63). The last section addresses SOX certifications signed by Navient's chief executive officer ("CEO") and chief financial officer ("CFO"). (*Id*. at ¶¶ 64-66). Finally, the Complaint sets forth the scienter

allegations as to the loan statements collectively in a separate section. (*Id*. at ¶¶ 67-93). The Court will discuss the materiality and/or falsity of each group of loan statements separately before addressing the scienter allegations collectively.

### 1. Loan Portfolio Quality: Charge-Offs and Delinquencies

Plaintiffs allege that Defendants made misrepresentations regarding the "quality" of Navient's loan portfolio, including the number of delinquencies and charge-offs.[6] (D.I. 59 at ¶¶ 50-51). This subsection of the Complaint attacks two types of statements: statements characterizing Navient's loan portfolio and statements reporting on the portfolio's performance. The first type includes statements that the company has "strong underwriting and customer support," a "[l]arge, high quality asset base," and a "[s]easoned portfolio." (*Id*.). The second type includes statements that the company "set a six year-record low in delinquencies" and "show[ed] continued improvements in delinquencies and defaults since a year ago." (*Id*.).

For reasons not clear to the Court, Defendants does not address the materiality (or falsity) of the loan quality statements. Defendants' opening brief combined the arguments on materiality of the loan quality statements and loan loss provisions under the broader heading of "financial results," but ultimately the arguments and cases cited focused on loan loss provisions. (D.I. 64 at 7, 10-14). As a result, there is no argument, with citations to supporting case law, addressing the materiality of Navient's loan quality statements. Because materiality is the only element at issue with respect to the Securities Act claims, Defendants have not shown that the Complaint fails to plead a Securities Act claim based on the loan quality statements. Defendants' motion to dismiss the portion of the Securities Act claims based on the loan quality statements is denied. Unless

---

[6] A loan is delinquent when a scheduled payment is past due. (D.I. 65-1, Ex. 1 at 11). A "charge-off" occurs when a loan is considered uncollectible. (D.I. 65-1, Ex. 2 at 40).

Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the loan quality statements.

### 2. Forbearance Practices

Defendants argue that the Complaint fails to adequately plead the falsity of Defendants' forbearance statements.[7] (D.I. 64 at 7-10). The Complaint alleges that the following forbearance statements were false or misleading when made: (1) Navient engaged in a "careful use of forbearance," (2) Navient applied forbearances "based on a customer's unique situation," (3) the company's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan," and (4) Navient "continue[d] to see . . . continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio." (D.I. 59 at ¶ 49). The Complaint alleges that those forbearance statements were false or misleading when made, because "Navient engaged in a systemic practice of indiscriminately placing borrowers into forbearance," which allowed Navient to avoid recording those accounts as delinquent or in default. (*Id*. at ¶ 36).

To show how or why those forbearance statements were false, the Complaint relies on: (i) statements from three confidential witnesses; (ii) the allegations in complaints filed against Navient by the Consumer Financial Protection Bureau ("CFPB"), the Attorney General of Illinois, and the Attorney General of Pennsylvania; and (iii) a September 2015 report by the CFPB resulting from a public inquiry by the CFPB, Department of Education, and the U.S. Treasury Department.

---

[7]     Forbearance means the borrower is granted a period of time where no payments have to be made or the company accepts a smaller than scheduled payment. (D.I. 65-1, Ex. 2 at 85). Forbearance does not grant any reduction in the total repayment obligation. (*Id*.). While in forbearance, interest continues to accrue. (*Id*.).

(D.I. 59 at ¶¶ 37-48). Defendants attack the Complaint's reliance on confidential witnesses and government complaints as sources to show the alleged falsity of the forbearance statements. (D.I. 64 at 8-10). Defendants further argue that even if the Complaint may appropriately rely on these types of sources, the allegations from those sources are insufficient to show falsity. (*Id*.). Accordingly, the Court will first address the appropriateness of relying on confidential witness and government complaints, and then address whether those allegations do in fact adequately plead falsity.

### a.      Confidential Witnesses

If a complaint relies on allegations from confidential witnesses, then the complaint must describe the confidential witness with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Rahman*, 736 F.3d at 244 (quoting *Chubb*, 394 F.3d at 146). To assess the probability that confidential witnesses have personal knowledge, the Court should consider: (i) "the positions formerly held by each [confidential witness]," (ii) "the duration of each [confidential witnesses'] employment," (iii) "the time period during which the [confidential witnesses] acquired the relevant information," (iv) and "how each confidential witness had access to such information." *Avaya*, 564 F.3d at 263. Where these facts are "found wanting," then the Court must "steeply" discount the confidential witnesses' allegations. *Id*. at 263. Finally, even if the confidential-witness allegations are not discounted, those allegations may still "fail either to establish the falsity of a statement, or to give rise to a strong inference of scienter." *Id*. at 263 n.33 (citing *Metzler*, 540 F.3d at 1069 n.13).

Here, the Complaint relies on allegations from three confidential witnesses to plead the falsity of Navient's statements regarding its forbearance practices. (D.I. 59 at ¶¶ 37-41). CW1 worked at Navient as a collections supervisor from early 2014 until April 2015. (*Id*. at ¶ 37). CW1

alleged, among other things, that "the Collections Department's 'objective all of the time was to keep an account current' through using forbearances." (*Id*.). According to the Complaint, this policy directive was conveyed to CW1 by her supervisor but came from Navient District Manager/Senior Vice President of Default Prevention Troy Standish, who reported to defendant John Kane, the Chief Operating Officer of Navient. (*Id*. at ¶¶ 32, 37). CW1 further explained that Navient encouraged employees to place borrowers into forbearance, which took less time than other options, by giving agents who wanted "to achieve a good performance rating, just five and a half minutes per phone call with borrowers." (*Id*. at ¶ 40).

CW2 is a former Navient collections department supervisor who worked at the company from mid-2010 until October 2014 and supervised 25 collections agents. (*Id*. at ¶ 38). According to CW2, "Navient Director of Operations Christi Hewes instructed CW2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as 'current' on Navient's books." (*Id*. at ¶ 38). CW2 also corroborated CW1's allegations regarding employee incentives to put borrowers into forbearance by stating that in order to be rated "number one," agents had to put borrowers "in something that makes them look like they're up to date for a longer period of time." (*Id*. at ¶ 39). So even if a borrower requested a short forbearance, the supervisors were coached by management to coach the agents to convince the borrower to obtain a longer forbearance. (*Id*.).

Finally, CW3 is a former Navient Department of Education Specialist II who worked at Navient's Delaware headquarters from June 2014 until after the Class Period. (*Id*. at ¶ 41). CW3 further corroborated allegations that "Navient provided incentives to personnel for getting customers off the phone in the fastest amount of time" and that borrowers relied on Navient customer service representatives to understand their options with respect to forbearance. (*Id*.).

The Court finds that the Complaint describes each CW with sufficient particularity to support the probability that the CW has personal knowledge of Navient's forbearance practices. Defendants assert that the CWs' allegations should be steeply discounted, because they are "all low-level former employees" and "were not employed for the full class period." (D.I. 64 at 8). But other courts have not discounted a CW's allegations just because those characteristics were present. *See Avaya*, 564 F.3d at 265-66 (concluding that allegations from CWs who were "relatively low level former employees" showed that certain forecast-related statements were false); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (concluding that the "CWs were positioned, albeit at low levels, to have knowledge of how Sallie Mae implemented its forbearance policy."); *Id.* at 245 n.1, 260, 266 (relying on allegations based on CWs who worked at the company until March and November 2004, even though the class period was October 2004 to April 2005).

In addition, the Complaint does not rest solely on allegations from purportedly "low-level" employees who worked at Navient for less than the full class period. It alleges the direct involvement of the CWs supervisors, alleges that at least one of the CWs is only a few levels removed from one of the individual defendants in this case, and alleges that the actions taken by the CWs were guided by incentive programs, employee rating programs, and scripts. (D.I. 59 at ¶¶ 37-41). It is reasonable to infer that those programs and scripts would have been prepared and approved by employees who are not low-level. Finally, at least one CW was employed at any point during the Class Period. For the foregoing reasons, the Court does not agree with Defendants that the allegations of the CWs should be discounted.

### b. Government Complaints

To corroborate the confidential witness statements, the Complaint incorporates allegations from government complaints filed in other cases. Defendants assert that this is not permitted. Specifically, Defendants contend that "courts deeply discount, or decline to consider altogether, untested allegations imported from third-party complaints." (D.I. 64 at 9). The Court cannot determine whether this is correct, because the few cases Defendants cite do not appear relevant to the issue before the Court. (*Id*. at 9-10).

First, Defendants rely on the court's statement in *Gaer*, "the fact that the government may join in a *qui tam* suit does not demonstrate that the suit has merit." (*Id*. at 9 n.9 (quoting *Gaer*, 2011 WL 7277447, at *10)). This, however, is not *a qui tam* action, the government complaints incorporated into Plaintiffs' Complaint are not *qui tam* actions, and Plaintiffs are not relying on the fact that the government has brought an action to bolster the merits of their own suit. Instead, Plaintiffs rely on specific factual allegations in the government complaint, which must under Fed. R. Civ. P. 11 be based on a reasonable inquiry, to corroborate similar factual allegations in its own complaint.

Second, Defendants rely on *RSM Productions* where a district court in the Second Circuit granted a motion to strike, because "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009). As an initial matter, Second Circuit case law is not binding on this Court. In addition, Defendants are not asking the Court to strike the government allegations incorporated into the Complaint. Finally, there is some doubt that *RSM Production* correctly summarizes Second Circuit case law. *See*, *e.g*.,

*Sec. & Exchange Comm'n. v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010) (a later case from the same circuit denying a defendant's motion to strike because "[t]here is no absolute rule barring a private plaintiff from relying on government pleadings . . . to meet the Rule 9(b) and PSLRA thresholds"). Given the foregoing, Defendants have not presented any binding or persuasive authority on the issue of whether Plaintiffs may rely on allegations in government complaints to adequately plead falsity. Therefore, the Court will not at this time "deeply discount or decline to consider altogether" those allegations.

### c.        Sufficiency of the Falsity Allegations

Defendants argue that the Complaint fails to adequately plead the falsity of the forbearance statements. (*Id*. at 9). The Court, however, is not convinced. The CWs' allegations, taken as true and read in the light most favorable to plaintiff, contribute to an overall picture that the forbearance statements were false when made. The CWs allege that – per the incentive programs, employee rating programs, scripts, and guidance from supervisors – the CWs and other collections agents in similar positions were not "careful" about the use of forbearance, did not apply forbearance "based on a customer's unique situation," and did not limit either the number of forbearance months granted consecutively or the total number of forbearance months granted over the life of the loan," but instead placed borrowers into forbearance indiscriminately and for the longest possible periods of time. In addition, Defendants addressed the sufficiency of the falsity allegations taken from the government complaints in a single unhelpful sentence. (*See* D.I. 64 at 9 (stating that "[t]hese mundane allegations neither support the bombastic conclusions with which Plaintiffs pair them, nor show any systemic policy of forbearance misuse")). Accordingly, Defendants have not shown that the Complaint fails to adequately plead the falsity of the forbearance statements. For these reasons, Defendants motion to dismiss the parts of the Securities Act claims based on the

forbearance statements is denied.  Unless Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the forbearance statements.

### 3.      Loan Loss Provisions

For each quarter from Q1 2014 to Q1 2015, Navient reported the amount of its loan loss provisions for its Private Education Loans ("PELs").[8]  (D.I. 59 at ¶ 54).  Navient also reported an amount for the full year of 2014.  (*Id*.).  The Complaint alleges that the loan loss provisions were materially misstated, because "Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan loss provisions."  (*Id*. at ¶ 55).  The Complaint also alleges that Navient "failed to properly account for losses on more than $2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014."  (*Id*. at ¶ 62).   According to Defendants, the Complaint fails to adequately plead the falsity of the loan loss provisions for three reasons: (i) the lack of allegations that the loan loss model was manipulated; (ii) the improper reliance on hindsight; and (iii) the failure to meet the pleading requirements for statements of opinion. (D.I. 64 at 10-14).  Each argument is addressed in turn.

First, Defendants assert that successful challenges to loan loss provisions require a plaintiff to allege "facts showing that the defendant misapplied or manipulated its [loan loss] model" to achieve a particular accounting outcome.  (D.I. 64 at 12 (citing *Southeastern Pennsylvania Transp. Authority v. Orrstown Fin. Serv., Inc*., 2015 WL 3833849, at *23-24, *27 (M.D. Pa. June 22,

---

[8]      A "loan loss allowance" is the amount of money that Navient has set aside to cover the total amount of charge-offs expected over the next two years. (D.I. 65-1, Ex. 2 at 40).  The provision for loan losses increases the related allowance for loan losses.  (*Id*.).  Generally, the allowance for loan losses rises when future charge-offs are expected to increase and falls when future charge-offs are expected to decline.  (*Id*.).

2015); *In re NAHC, Inc. Sec. Litig.*, 306 F .3d 1314, 1330 (3d Cir. 2002)). Assuming Defendants are correct as to the law, and the Court cannot be certain of that because the cases Defendants cite do not say that manipulation is a requirement, the Complaint alleges that Navient's systemic use of forbearance artificially depressed Navient's loan loss provisions. (D.I. 59 at ¶ 55). Read in the light most favorable to Plaintiffs, that appears to be an allegation of manipulation. Defendants do not explain why this allegation of manipulation is insufficient without getting into an evidentiary challenge that is improper on a motion to dismiss. Specifically, Defendants argue that systemic use of forbearance cannot be a form of manipulation, because Navient's loan loss model "is designed to prevent precisely [that] kind of manipulation." (D.I. 64 at 12). Because this issue cannot be resolved on a motion to dismiss, the Court is not convinced that the Complaint fails to adequately plead falsity based on the manipulation of the loan loss model.

Second, Defendants assert that the Complaint improperly relies on hindsight to show the falsity of the loan loss provisions. (D.I. 64 at 10-11). Specifically, the increase to the loan loss provision in July 2015 does not show that the earlier loan loss provisions were false or misleading. (*Id.*). Defendants are correct that a complaint may not rely on hindsight to show falsity. *See*, *e.g.*, *Orrstown*, 2015 WL 3833849, at *23 ("[T]he fact that a company's loan loss reserves are subsequently increased does not mean that the reserves were knowingly understated at some earlier time."). But it does not appear that the Complaint here is relying on the increase in July 2015 to show that the earlier amounts were false or misleading.

Instead, the Complaint alleges that Defendants knew or recklessly disregarded information which should have caused an increase to the loan loss provisions at some point earlier than July 2015. Specifically, the Complaint alleges that Remondi, the CEO of Navient, indicated during Navient's Q2 2015 earnings call that a cohort of borrowers exiting deferment in 2014 exhibited

characteristics long before 2014 that normally lead to a higher incidence of delinquencies and charge-offs. (D.I. 59 at ¶ 62). Remondi stated that "[t]he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher," and this cohort had reflected that trend when they "'moved in and out of school multiple times' (some without earning a degree)," and historically had been "struggling to begin with." (*Id.* (quoting D.I. 65-1, Ex. 4 at 11-12)). The Complaint suggests that the Defendants ignored those red flags.[9] Thus, Defendants have not shown that the Complaint improperly relies on hindsight.

Finally, Defendants argue that loan losses provisions are statements of opinion and, therefore, the claims based on the loan losses provisions should be dismissed for failing to comply with the pleading requirements of *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 135 S.Ct. 1318 (2015) ("*Omnicare*"). (D.I. 64 at 13). In *Omnicare*, the Supreme Court held that under § 11 of the Securities Act, a defendant may be liable for a false statement of opinion if: (i) the speaker did not subjectively hold the stated belief; (ii) the opinion contained embedded statements of fact and the embedded facts were untrue; or (iii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning" the opinion, and those facts "conflict with what a reasonable investor would take from the statement itself." 135 S.Ct. at 1326-27, 1329. According to Defendants, the Complaint does not allege that Defendants subjectively did not believe their statements about the loan loss provisions. (D.I. 64 at 13-14).

As an initial matter, Defendants assume that *Omnicare* applies to Plaintiffs' Exchange Act claims, but the Third Circuit has not reached that conclusion. *Jaroslawicz v. M&T Bank Corp.*,

---

[9]     Defendants argue that Remondi's statements reflect analysis that was not performed or known before Q2 2015, but that assertion is not clear from the citation Defendants provide. (D.I. 64 at 14 (citing D.I. 65, Ex. 4 at 6)). The earnings call transcript states that Navient learned of the red flags when the company "look[ed] a little bit deeper at these loans" but the transcript does not indicate when that deeper look occurred. (D.I. 65, Ex. 4 at 6).

912 F.3d 96 (3d Cir. 2018) ("We have yet to decide whether *Omnicare* applies to claims brought under the Exchange Act," and "[w]e decline to do so again today . . . ."); *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 132 n.12 (3d Cir. 2017) ("[W]e decline to decide whether *Omnicare* is applicable to § 10(b) claims . . . ."). Because the Third Circuit has twice declined to decide that *Omnicare* applies to Exchange Act claims, the Court is reluctant to decide that issue of first impression in connection with a motion to dismiss – particularly given that the parties did not address the issue in their briefs.

Defendants have also failed to show that the statements in this case regarding loan loss provisions are opinions, as opposed to facts. Defendants suggest that in *Shapiro v. UJB Financial Corp.*, the Third Circuit held that loan reserves are always statements of opinion. (D.I. 64 at 13 (citing *Shapiro*, 964 F.2d at 281). But that argument has been roundly rejected by other courts in this circuit. *See Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) (stating that "neither *Shapiro* nor any other case Defendants rely upon stands for the broad proposition that all statements pertaining to loan loss reserves are opinions."). If *Shapiro* were limited to the type of statements about loan loss provisions made in that case, then *Shapiro* is distinguishable. In *Shapiro*, the court held that "general labels" describing loan loss provisions as "adequate" or "solid" might be actionable material misstatements.[10] *Shapiro*, 964 F.2d at 282. Here, Plaintiffs' Complaint does not rest on statements about loan loss provisions using general labels. Rather, the Complaint alleges that the dollar amounts disclosed for the loan loss provisions were false or

---

[10]  The other cases cited by Defendants fit within the rubric of using general labels to describe the loan loss reserves. *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F.Supp.3d 473, 481 (S.D.N.Y. 2017) ("Ambac's management believes that the reserves for losses . . . are adequate . . . ."); *Orrstown*, 2015 WL 3833849, at *22 (stating that loan loss reserves are adequate).

misleading, because Defendants' systemic use of forbearance meant the loan loss provisions were "artificially understated." (D.I. 59 at ¶ 73).

For the foregoing reasons, Defendants have not shown that the Complaint fails to adequately plead the falsity of the statements regarding the loan loss provisions. Defendants' motion to dismiss the parts of the Securities Act claims based on statements about the loan loss provisions is denied. Unless Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on statements about the loan loss provisions.

### 4.    SOX Certifications

The Complaint alleges that the false and misleading statements regarding Navient's forbearance practices and "resulting manipulation of Navient's financial results" rendered the SOX certifications by Navient's CEO John F. Remondi and CFO Somsak Chivavibul in the Form 10-Qs and 10-K issued during the Class Period false and misleading when made. (D.I. 59 at ¶¶ 64-66). Those certifications stated, in relevant part, that "based on my knowledge, this report does not contain any untrue statement of material fact." (*Id*.).

The Court will not dismiss the portion of Plaintiffs' claims based on the SOX certifications, because Defendants' only arguments on this issue were buried in a couple of footnotes and further obscured by the high number of footnotes overall. Courts traditionally do not consider arguments presented entirely in the footnotes. *See Horatio Washington Depot Tech. LLC v. TOLMAR, Inc*., 2018 WL 5669168, at *13 (D. Del. Nov. 1, 2018) (declining to consider an argument raised entirely in a footnote); *UCB, Inc. v. Accord Healthcare, Inc*., 201 F. Supp. 3d 491, 542 n.33 (D. Del. 2016) ("Arguments that are presented in limited form in footnotes are entitled to little weight."); *Campbell v. Sussex Cty. Fed. Credit Union*, 2015 WL 3918946, at *1 (D. Del. June 22, 2015)

(stating that "[t]he Court will not address issues raised in footnotes"); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (stating that arguments raised only in footnotes are not preserved).

Given the foregoing, Defendants have not shown that the Complaint fails to plead a Securities Act claim based on the SOX Certifications. Defendants' motion to dismiss the portion of the Securities Act claims based on the SOX Certifications is denied. Unless Defendants can show that the Complaint fails to plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the SOX Certifications.

### 5. Scienter

The Complaint collectively addresses the element of scienter as to the statements regarding Navient's loan quality, forbearance practices, loan loss provisions, and SOX Certifications (*i.e.*, the "loan statements"). (D.I. 59 at ¶¶ 67-83. The scienter allegations for the loan statements are comprised of: confidential witness allegations (*Id*. at ¶¶ 69, 76-78); allegations taken from government complaints (*Id*. at ¶ 70); Remondi's statements during Navient's Q2 2015 earnings call (*Id*. at ¶ 75); the centrality of certain operations to Navient (*Id*. at ¶¶ 72-73); company-wide incentive policies and scripts (*Id*. at ¶ 71); and motive and opportunity allegations (*Id.* at ¶¶ 74, 80-83, 124, 148).

In addressing the Complaint's purported failure to adequately plead scienter as to the loan statements, Defendants raise a variety of arguments, including arguments already made elsewhere. Specifically, Defendants argue that: (i) the centrality of forbearance and credit to Navient's operations are insufficient to plead scienter under the core operations doctrine; (ii) Remondi's statements in July 2015 do not suggest that he knew before July 2015 that the rate of default would be higher for the cohort exiting deferment in 2014; (iii) there is insufficient detail about the

confidential witnesses to credit their allegations; and (iv) the motive and opportunity allegations improperly rely on a "general corporate motive." (D.I. 64 at 18-22). As an initial matter, the Court will not again address Defendants' arguments about Remondi's statements or the reliability of the confidential witnesses, which were rejected for the reasons explained above. *See supra* III(E)(3) and III(E)(2)(a). The scienter allegations as to the loan statements does introduce a new confidential witness, CW4, but this confidential witness has the same characteristics as the other three confidential witnesses and, therefore, there is no reason to treat the credibility of his or her allegations differently.[11] (D.I. 59 at ¶¶ 76-78). That leaves Defendants' arguments based on the core operations doctrine and motive and opportunity allegations.

The Complaint relies on the core operations doctrine to allege scienter with respect to the loan statements, because delinquencies, defaults, and charge-offs were "key financial metric[s]" for Navient. (D.I. 59 at ¶ 73). As discussed previously, it is not enough under the core operations doctrine for a matter to be of central importance to company; a complaint must also allege that specific information related to the fraud was conveyed to management. *Rahman*, 736 F.3d at 237. Here, the Complaint's scienter allegations with respect to the credit facility statements failed for that reason. *See supra* III(D)(2). But the Complaint does not suffer the same infirmity with respect to the loan statements. It relies on allegations from confidential witnesses, which the Court has previously determined are credible, to allege that specific information regarding the fraud around forbearance, charge-offs, and delinquencies, was conveyed to the individual defendants Kane, Remondi, and Chivavibul. (D.I. 59 at ¶¶ 76-78).

---

[11] CW4 is Navient Collections Support Manager who worked in that position from the spring of 2010 until February 2015. (D.I. 59 at ¶ 76).

The Complaint alleges that Defendants were motivated to manipulate Navient's financial results to meet market expectations and prevent bad news from causing further drops in Navient's stock price. (*Id*. at ¶¶ 74, 80-82). Under the PSLRA, "[m]otive must be supported by facts stated 'with particularity,' and must give rise to a 'strong inference' of scienter." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quoting *In re Advanta*, 180 F.3d at 535). Therefore, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). A "desire to manage [a company's] earnings in order to meet analyst and market expectations . . . is a general corporate motive" that does not give rise to a strong inference of scienter. *In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig*., 103 F. App'x 465, 469 (3d Cir. 2004). Because the only motive the Complaint alleges as to the loan statements is a desire to meet market expectations, these scienter allegations based on motive and opportunity must be disregarded.

But, the scienter analysis is "case specific" and should "rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id*. at 267-68 (quoting *Tellabs*, 551 U.S. at 323). Even after setting aside the allegations based on motive and opportunity, the Court cannot conclude at this time that the remaining allegations in the Complaint, considered holistically, fail to support

a reasonable inference of scienter with respect to the loan statements. Defendants' motion to dismiss the Exchange Act claims based on the loan statements is denied.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (D.I. 63) is granted-in-part and denied-in-part. Defendants' motion is granted as to all claims based on the compliance statements and the Exchange Act claims based on the credit facility statements. Defendants' motion is denied in all other respects. The Securities Act and Exchange Act claims based on the compliance statements are dismissed with prejudice. The Exchange Act claims based on the credit facility statements are dismissed without prejudice. An appropriate Order will be entered.