**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al*., Individually and on Behalf of All Others Similarly Situated, <br><br>          *Plaintiffs*, <br><br>    v. <br><br> NAVIENT CORPORATION, *et al.*, <br>          *Defendants*. | C.A. No. 16-112-MN <br><br> Judge Maryellen Noreika <br><br> **ORAL ARGUMENT REQUESTED** <br><br> PUBLIC VERION <br> FILED ON: September 13, 2019 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Salvatore Graziano (*pro hac vice*)
Jeremy P. Robinson (*pro hac vice*)
Jesse Jensen (*pro hac vice*)
Ryan Dykhouse (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs, and
Lead Counsel for the Class*

**FRIEDLANDER & GORRIS, P.A.**

Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
Christopher P. Quinn (Bar No. 5823)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
Tel: (302) 573-3500
Fax: (302) 573-3501

*Liaison Counsel for Lead Plaintiffs, and
Liaison Counsel for the Class*

September 6, 2019

## TABLE OF CONTENTS

GLOSSARY ..................................................................................................................... v

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ..................................... 1

SUMMARY OF ARGUMENT ............................................................................................ 3

STATEMENT OF FACTS .................................................................................................. 4

     A.     Navient Spins-Off From Sallie Mae And Defendants Raise Billions While Misleading Investors About Key Aspects Of Navient's Business......................... 4

          1.     Material Misrepresentations Concerning Navient's Loans........................ 4

          2.     Misrepresentations Concerning Navient's Credit Facilities ...................... 6

     B.     The Proposed Class Representative ........................................................ 6

LEGAL ARGUMENT ....................................................................................................... 6

I.     THE PROPOSED CLASS SATISFIES FEDERAL RULE 23(a).......................................... 7

     A.     The Proposed Class Is So Numerous That Joinder Is Impracticable. .................... 7

     B.     Numerous Common Questions Of Law Or Fact Exist. ........................................ 8

     C.     The Lord Abbett Funds' Claims Are Typical. ....................................................... 8

     D.     The Lord Abbett Funds Will Adequately Protect the Proposed Class.................... 9

II.     THE PROPOSED CLASS SATISFIES RULE 23(b)(3) .................................................... 10

     A.     Common Questions Predominate ....................................................................... 10

          1.     Common questions predominate the Securities Act claims..................... 10

          2.     Common questions predominate the Exchange Act claims..................... 10

          3.     Individual damage calculations do not defeat predominance. ................. 19

     B.     Superiority Is Established Under Rule 23(b)(3) ................................................... 19

III.     BLB&G SHOULD BE APPOINTED CLASS COUNSEL ................................................ 20

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

CASES                                                                                          Page(s)

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005)..............................................................................13

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)..........................................................................................11, 18

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................10

*Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*,
    568 U.S. 455 (2013)............................................................................................7, 11

*Baby Neal ex rel. Kantor v. Casey*,
    43 F.3d 48 (3d Cir. 1994)........................................................................................8

*Bing Li v. Aeterna Zentaris, Inc.*,
    324 F.R.D. 331 (D.N.J. 2018)..................................................................................7

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................................*passim*

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009)..................................................................................10

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ............................................................................6, 8

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008)............................................................8, 13, 14, 17

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011).........................................................................*passim*

*In re Dynex Capital, Inc. Sec. Litig.*,
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) .......................................................15, 18

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985).....................................................................................6

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...........................................................11, 13, 14, 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)................................................................................................11

*Halliburton Co. v. Erica P. John Fund*,
  573 U.S. 258 (2014)................................................................................11, 16

*In re Heckmann Corp. Sec. Litig.*,
  2013 WL 2456104 (D. Del. June 6, 2013)................................................7, 11, 19

*Hurwitz v. LRR Energy L.P.*,
  2018 WL 6804481 (D. Del. Jan. 2, 2018)................................................................7

*Johnston v. HBO Film Mgmt.*,
  265 F.3d 178 (3d Cir. 2001)................................................................................18

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................15

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) ......................................................................13

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  2013 WL 396117 (D.N.J. Jan. 30, 2013) ..........................................................8, 11

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015)................................................................................19

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009)................................................................................8

*Skeway v. China Nat. Gas, Inc.*,
  304 F.R.D. 467 (D. Del. 2014) ......................................................................7, 19

*In re Tyson Foods, Inc.*,
  2003 WL 22316548 (D. Del. Oct. 6, 2003) ......................................................7, 9

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010)................................................................................16

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
  2019 WL 2305491 (3d Cir. May 30, 2019) ......................................................7, 11

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
  2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ....................................................12, 15

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)................................................................................12

*Willis v. Big Lots, Inc.*,
  242 F. Supp. 3d 634 (S.D. Ohio 2017) ..............................................................14

*In re Wilmington Trust Sec. Litig.*,
     310 F.R.D. 243 (D. Del. 2015) ..............................................................................................19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

**GLOSSARY**

| TERM | MEANING |
|---|---|
| **2014 Debt Offering** | Navient's registered offering on or about November 6, 2014 of $500 million in principal amount of 5.000% Senior Notes due 2020 (CUSIP 63938CAA6) and 5.875% Senior Notes due 2024 (CUSIP 63938CAB4) |
| **2015 Debt Offering** | Navient's registered offering on or about March 27, 2015 of $500 million in principal amount of 5.875% Senior Notes due 2021 (CUSIP 63938CAC2) |
| **BLB&G** | Lead Counsel Bernstein Litowitz Berger & Grossmann LLP |
| **CFPB** | Consumer Financial Protection Board |
| **Class** | All persons and entities who purchased or otherwise acquired Navient's publicly traded securities, or sold Navient put options, from April 17, 2014 through September 29, 2015, inclusive;[1] and/or all persons and entities who purchased or otherwise acquired Navient's 5.000% Senior Notes due 2020 (CUSIP 63938CAA6), 5.875% Senior Notes due 2024 (CUSIP 63938CAB4), and 5.875% Senior Notes due 2021 (CUSIP 63938CAC2) from November 3, 2014 through December 28, 2015, inclusive—and who were damaged thereby.<br><br>Excluded from the Class are Defendants, their officers and directors, all members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. |
| **Complaint** | The Second Amended Class Action Complaint (D.I. 59) filed on November 17, 2017 |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **Exchange Act Class Period** | April 17, 2014 through September 29, 2015 |
| **FHFA** | Federal Housing Finance Agency |
| **FHLB** | Federal Home Loan Bank |

---

[1] This includes the publicly traded securities consolidated by Navient pursuant to its April 30, 2014 separation from Sallie Mae.

| TERM | MEANING |
|---|---|
| **FHLB-DM** | Federal Home Loan Bank of Des Moines |
| **Friedlander** | Liaison Counsel Friedlander & Gorris P.A. |
| **Hartzmark Rpt.** | Expert Report of Michael L. Hartzmark, Ph.D, dated September 6, 2019, attached as Ex. I to the Robinson Decl. |
| **The Lord Abbett Funds** | Lead Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund |
| **MTD Order** | *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, (D. Del. 2019) |
| **Navient** | Defendant Navient Corporation |
| **Navient Defendants** | Defendants Navient, John F. ("Jack") Remondi, Somsak Chivavibul, John M. Kane, William M. Diefenderfer, III, Ann Torre Bates, Diane Suitt Gilleland, Linda Mills, Barry A. Munitz, Steven L. Shapiro, Jane J. Thompson, and Barry L. Williams |
| **Offerings** | The 2014 Debt Offering and the 2015 Debt Offering, collectively |
| **Offering Documents** | Documents issued in connection with the Offerings, including the Form S-3 Shelf Registration Statement and Prospectus filed on July 18, 2014; the Rule 424(b)(5) Preliminary Prospectus Supplements filed on November 3, 2014 and March 25, 2015; the Rule 433 Free Writing Prospectuses filed on November 4, 2014 and March 25, 2015; the Rule 424(b)(2) Prospectus Supplements filed on November 5, 2014 and March 26, 2015; and all documents incorporated by reference therein. |
| **PELs** | Navient's Private Education Loans segment |
| **Plaintiffs** or **Lead Plaintiffs** | The Lord Abbett Funds |
| **Registered Notes** | The Navient Senior Notes sold in the 2014 Debt Offering and the 2015 Debt Offering (CUSIPs 63938CAA6, 63938CAB4, and 63938CAC2), collectively |
| **Sallie Mae** | Sallie Mae Corporation |

| TERM | MEANING |
|---|---|
| **Scheduling Order** | The Court's March 4, 2019 Order (D.I. 81) |
| **Securities Act** | The Securities Act of 1933 |
| **Securities Act Class Period** | November 3, 2014 through December 28, 2015 |
| **Underwriter Defendants** or the **Underwriters** | Defendants Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Barclays Capital Inc., Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS Securities Inc., and Wells Fargo Securities, LLC |

.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure and the Scheduling Order, the Lord Abbett Funds[2] respectfully move this Court for entry of an Order: (1) certifying this Action as a class action under Federal Rule 23; (2) appointing Plaintiffs as Class Representatives; (3) appointing BLB&G as Class Counsel; and (4) appointing Friedlander as Liaison Class Counsel.

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

This federal securities action arises from Defendants' class-wide misrepresentations to investors concerning *inter alia* Navient's loans and credit facilities.  On January 29, 2019, the Court issued the MTD Order, which sustained Plaintiffs' claims under each of the Exchange Act and the Securities Act.  These securities claims are ideally-suited for class certification.

**The Exchange Act Claims.**  The Court sustained Plaintiffs' Exchange Act claims arising from Defendants' class-wide misrepresentations about Navient's loans, including its purportedly high-quality loan portfolio, forbearance practices, loan loss reserves and related SOX certifications.  Unbeknownst to investors, Defendants manipulated Navient's delinquency and default rates, misrepresented its risks, depressed loan loss reserves and artificially inflated earnings through various improper means, including by indiscriminately pushing Navient's most financially vulnerable student-borrowers into forbearance.  Investors learned the truth about Defendants' loan-related misconduct through a series of partial disclosures beginning in July 2015, and culminating on September 29, 2015, when a CFPB report exposed the reality that loan servicers like Navient systematically pushed student-borrowers into forbearance.  Indeed, Navient is now the target of numerous government actions, including by the CFPB as well as dozens of state Attorneys General.

---

[2] Unless otherwise noted, all capitalized terms are defined in the Complaint or the Glossary, emphasis is added, and internal citations and punctuation are omitted.  Citation to "¶" refers to the Complaint and "Robinson Decl." refers to the Declaration of Jeremy P. Robinson filed herewith.

**The Securities Act Claims.**   The Court also sustained Plaintiffs' claims under the Securities Act arising from Defendants' class-wide misstatements made in Offering Documents filed in connection with the 2014 Debt Offering and the 2015 Debt Offering.  Specifically, the Securities Act claims concern two categories of misrepresentations: (i) misstatements about Navient's loan portfolio (as summarized above); and (ii) misrepresentations concerning Navient's credit facilities.  On the latter issue, Defendants reported Navient's borrowing capacity under its credit facilities, but misleadingly failed to disclose the likelihood that its access to favorable credit terms would be terminated by an impending FHFA rule that blocked non-eligible entities from FHLB membership.  On December 28, 2015, after the rule was implemented, Navient disclosed that its credit facilities had been significantly reduced and were nearly fully drawn.

Discovery is underway.  In response to discovery requests served several months ago, Defendants recently began to produce meaningful volumes of documents.  The Lord Abbett Funds have responded to Defendants' discovery requests, producing documents as well as responses to several interrogatories.  The Lord Abbett Funds are also pursuing discovery from third parties.

Pursuant to the Court-ordered schedule, the Lord Abbett Funds now move for class certification.  Numerous courts—including the Supreme Court, the Third Circuit, and courts in this District—recognize that actions under the federal securities laws are ideally-suited for class treatment under Federal Rule 23.  This Action is no different.  Here, numerosity and commonality are satisfied because the proposed Class is comprised of thousands of investors whose claims involve multiple common questions capable of class-wide proof, including whether Defendants made class-wide misstatements and omissions.  Typicality and adequacy are met because the Lord Abbett Funds: (i) assert the same claims based on the same misconduct as other class members; (ii) are institutional investors—exactly the type that Congress intended to lead securities class

actions; (iii) have actively prosecuted this action; and (iv) have no conflicts with other class members.  Common issues will predominate over individual ones because the action concerns class-wide claims that are capable of class-wide proof and based on class-wide misconduct, and proceeding as a class action is the superior method of maintaining this litigation.  Finally, the class is ascertainable as membership is based on objective criteria, *i.e.*, the dates that investors acquired Navient's publicly-traded securities.  *See, e.g.*, ¶225.  Thus, the Lord Abbett Funds respectfully request that the Court certify a Class consisting of:

> All persons and entities who purchased or otherwise acquired Navient's publicly traded securities, or sold Navient put options, from April 17, 2014 through September 29, 2015, inclusive;[3] and/or all persons and entities who purchased or otherwise acquired Navient's 5.000% Senior Notes due 2020 (CUSIP 63938CAA6), 5.875% Senior Notes due 2024 (CUSIP 63938CAB4), and 5.875% Senior Notes due 2021 (CUSIP 63938CAC2) from November 3, 2014 through December 28, 2015, inclusive—and who were damaged thereby.[4]

## <u>SUMMARY OF ARGUMENT</u>

1.      This federal securities action is ideally suited for class treatment.  *See infra* at 6.

2.      The proposed Class satisfies Federal Rule 23(a) because (i) Class members are so numerous that joinder is impracticable; (ii) there are multiple common questions of law and fact; (iii) the Lord Abbett Funds' claims are typical of Class members' claims, and (iv) the Lord Abbett Funds will adequately protect the interests of the Class.  *See infra* at 7-9.

3.      The proposed Class also satisfies Federal Rule 23(b)(3) because (i) common issues predominate over individual ones; and (ii) a class action is the superior method of adjudicating this controversy.  *See infra* at 9-19.

---

[3] This includes the publicly traded securities consolidated by Navient pursuant to its April 30, 2014 separation from Sallie Mae.

[4] Excluded from the Class are Defendants, their officers and directors, all members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

4.      BLB&G should be appointed as Class Counsel and Friedlander appointed as Liaison Class Counsel because they are well qualified in this area of law and have been ably and vigorously prosecuting this action on behalf of the proposed Class.  *See infra* at 20.

## STATEMENT OF FACTS

### A.      Navient Spins-Off From Sallie Mae And Defendants Raise Billions While Misleading Investors About Key Aspects Of Navient's Business

In May 2013, Sallie Mae announced that it would spin-off its education loan management, servicing, and asset recovery business into a new company, Navient.  ¶29.  Nearly a year later, on April 17, 2014, Navient filed a Form 8-K attaching an investor "roadshow" presentation describing the new Company and the first quarter 2014 financial results of its predecessor Sallie Mae business. ¶50.  Shortly thereafter, Sallie Mae distributed all shares of Navient common stock.  ¶29.  In the following year, Navient raised $1.5 billion through the two public Offerings, which were underwritten by the Underwriter Defendants and conducted pursuant to various Offering Documents, including a Form S-3 Shelf Registration Statement.  ¶162-64; 169-190.  During this time, Defendants misrepresented the truth about Navient.

### 1.      Material Misrepresentations Concerning Navient's Loans

As the Court sustained in the MTD Order, Defendants made materially false and misleading statements concerning Navient's loans by: (i) misleadingly touting the purportedly "**high quality**" of Navient's loan portfolio, *see, e.g.*, Robinson Decl., Ex. D at 37; (ii) concealing the Company's deceptive forbearance practices through, for example, claims that Navient tailored granting forbearance to "a customer's **unique** situation," had purported "limits" on how forbearance was granted, and engaged in the "careful use of forbearance," *see, e.g.*, *id*., Ex. D at 80, Ex. E at 6; (iii) misstating Navient's reported provisions for loan losses, *see, e.g.*, *id*., Ex. F at 10-22; and (iv) falsely claiming that Navient's financial statements were in accordance with

4

accounting standards and that Navient maintained appropriate internal controls, *see, e.g.*, *id.*, Ex. D at Exhibit 31.1, 31.2, 32.1, 32.2.  *See also generally* ¶¶33-35, 50-51, 54, 65; MTD Order 490. Contrary to their public statements, Defendants indiscriminately pushed struggling borrowers into forbearance rather than recording them as delinquent or in default.  ¶¶36-49, 52-23.

Though still in its early stages, discovery has already begun to confirm the accuracy of Plaintiffs' allegations.  For example, far from the careful and tailored approach to forbearance that Defendants promised, a November 2014 email exchange shows that Defendants used mass-distributed, boilerplate emails encouraging delinquent borrowers to enter forbearance by "simply" pressing a button—and that student borrowers who tried to discuss other options were ignored.  *See* Robinson Decl., Ex. A.  Further, this email shows that all of this was expressly communicated to the Individual Defendants, including Defendants Remondi, Kane, and Chivavibul.  *Id.*  Likewise, another document shows that Navient's customer service representatives were instructed to "***us[e] … forbearance as leverage for payment***" while avoiding "***Q & A with the customer***," and instead "***pushing through the call***" and "***prevent[ing] [customers] from elaborating***."  *See* Robinson Decl., Ex. B at ~277, ~281, ~293, & ~294.  These sorts of practices have caused Navient to be the target of numerous government actions, including by the CFPB and more than thirty state Attorneys General—with more joining every day.  Indeed, just days before this filing, the Colorado Attorney General joined the large bipartisan coalition prosecuting Navient for inter alia "unfair, deceptive, and abusive" loan servicing practices.  Robinson Decl. Ex. M.

Starting in July 2015, Navient issued a series of partial disclosures gradually revealing the truth about its loan portfolio, starting with the unexpected increase of its PEL provisions by 31.7% and culminating in a CFPB Report that exposed the indiscriminate use of forbearance.  ¶¶9, 84-90. As a result, the price of Navient's securities fell dramatically.  ¶¶85-91.

### 2.      Misrepresentations Concerning Navient's Credit Facilities

At the same time, Defendants emphasized to investors the importance of Navient's credit facilities in financing Navient's operations.  In large part, Navient relied on a credit facility maintained through the FHLB-DM, which Navient accessed through a captive insurer originally formed by Sallie Mae.  ¶¶136-38.  In September 2014, the FHFA proposed a rule that would prohibit the use of captive insurers to gain membership with a FHLB (such as FHLB-DM).  ¶139. Defendants, however, did not reveal this risk to Navient's critical credit facility, violating their duty to disclose—including under Item 303's requirement to disclose "any known . . . events or uncertainties that . . . are reasonably likely to result in . . . liquidity increasing or decreasing in any material way."  ¶¶140-46; *see also* MTD Order 488-89.  Ultimately, on December 28, 2015, Defendants revealed that Navient would lose more than half of its ability to borrow under its FHLB-DM credit facility, a change the Company conceded was material because the low-cost credit was not available from other sources.  ¶¶149-50.  The news caused the price of Navient securities to decline, with the price of its common stock falling more than 9%.  ¶¶151.

### B.      The Proposed Class Representative

On June 30, 2016, the Court appointed the Lord Abbett Funds as Lead Plaintiff.  D.I. 29. The Lord Abbett Funds are institutional investors that collectively manage more than $20 billion in total assets.  D.I. 15.  The Lord Abbett Funds purchased and otherwise acquired publicly traded Navient securities at artificially inflated prices during the Exchange Act Class Period and purchased over $43 million in Navient notes issued pursuant and traceable to Defendants' misleading Offering Documents in the 2014 Debt Offering and the 2015 Debt Offering.

### LEGAL ARGUMENT

The Third Circuit has stated that class treatment of securities actions is "particularly appropriate and desirable."  *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985); *see also In*

*re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003) (class actions "are favored in securities fraud cases in this Circuit"); *In re Tyson Foods, Inc.*, 2003 WL 22316548, at *3 (D. Del. Oct. 6, 2003) ("securities fraud . . . is a prototypical class action claim.").  This Action is no different.  As set forth below, the Action readily satisfies the criteria set forth in Federal Rule 23. Nothing more is required for certification to be granted.  Indeed, the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries."  *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013).

## I.    THE PROPOSED CLASS SATISFIES FEDERAL RULE 23(a)

Federal Rule 23(a) states four prerequisites for certification:  numerosity, commonality, typicality and adequacy.  *Amgen*, 568 U.S. at 459.  The proposed Class readily satisfies each.

### A.    The Proposed Class Is So Numerous That Joinder Is Impracticable.

The Third Circuit held that Rule 23(a)(1)'s numerosity requirement is "generally . . . met" where "the potential number of plaintiffs exceeds [forty]."  *Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 473 (D. Del. 2014).  Here, this requirement is satisfied because Navient had over 364 million shares of common stock outstanding, held by hundreds of institutions and other investors. *See Hurwitz v. LRR Energy L.P.*, 2018 WL 6804481, at *1 (D. Del. Jan. 2, 2018) (numerosity met where 15.4 million units issued); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *10 (D. Del. June 6, 2013) (numerosity met where between 69 and 128 million shares were outstanding); *In re Tyson Foods, Inc.*, 2003 WL 22316548, at *3 (D. Del. Oct. 6, 2003) (numerosity met due to over 100 million shares of publicly traded stock).  Further, because several of Navient's securities traded on NASDAQ, the proposed Class qualifies for the "recognized . . . presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339-40 (D.N.J. 2018), *aff'd sub nom.*

*Vizirgianakis v. Aeterna Zentaris, Inc.*, No. 18-2474, 2019 WL 2305491 (3d Cir. May 30, 2019). Thus, the numerosity requirement is met here.

### B.  Numerous Common Questions Of Law Or Fact Exist.

The Third Circuit held that Rule 23(a)(2)'s commonality requirement requires "only one common issue." *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 201 (E.D. Pa. 2008).  Here, numerous common questions capable of class-wide proof exist, including: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants made misrepresentations or omissions in their class-wide statements to investors; (iii) whether those misstatements and omissions were material; and (iii) whether Defendants acted with scienter for the Exchange Act claims.  *See, e.g.*, ¶229. These "questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact." *DaimlerChrysler*, 216 F.R.D. at 296.  Other common questions capable of class-wide proof include: (iv) whether the price of Navient securities were artificially inflated; and (v) whether Defendants caused proposed Class members to suffer damages, as well as the proper measure of damages.  Commonality is satisfied here.

### C.  The Lord Abbett Funds' Claims Are Typical.

To meet the typicality requirement, a "proposed class representative must show his claims arise from the same event or practice or course of conduct that gives rise to the claims of the class members and are based on the same legal theory." *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2013 WL 396117, at *5 (D.N.J. Jan. 30, 2013) (citing *Baby Neal ex rel. Kantor v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) and *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)).  Here, typicality is satisfied because the same course of conduct, *i.e.*, Defendants' series of misstatements and omissions to investors, gives rise to the claims of the Lord Abbett Funds as well as those of other investors in Navient's publicly-traded securities who were damaged by Defendants' misstatements.  Likewise, the Lord Abbett Funds and members of the

proposed Class all share the same legal theory—namely, that Defendants' misstatements and omissions to investors violated the Exchange Act and/or the Securities Act.

### D.      The Lord Abbett Funds Will Adequately Protect the Proposed Class.

Rule 23(a)(4) requires that a Class Representative "fairly and adequately represent the interests of the class." The Lord Abbett Funds suffered significant losses on both their investments in Navient's common stock and its debt securities due to Defendants' misrepresentations (D.I. 15 at 1), which directly aligns their interests with those of the Class. There are no disabling conflicts of interest between the Lord Abbett Funds and the Class because, in proving their own claims, the Lord Abbett Funds will also prove the claims of the Class. Further, the Lord Abbett Funds—as institutional investors—are exactly the type of investor expressly "favor[ed]" by Congress to lead securities class actions like this one. *Tyson*, 2003 WL 22316548, at *6. Indeed, the Lord Abbett Funds have prior experience pursuing federal securities claims, and understand the fiduciary obligations it owes to the Class. *Id.*, Ex. J; *see also* D.I. 15 at 14. Indeed, to date, the Lord Abbett Funds have led this proposed Class Action through two rounds of vigorously contested motions to dismiss—and succeeded in getting the within claims sustained.

The Lord Abbett Funds' selection of Counsel further demonstrates adequacy. BLB&G, proposed Class Counsel, is among the most experienced securities class action law firms in the country – and has recovered tens of billions of dollars on behalf of investors. Robinson Decl., Ex. K. Friedlander, proposed Liaison Class Counsel, is also highly experienced in prosecuting complex civil actions. *Id.*, Ex. L. BLB&G and Friedlander, under the Lord Abbett Funds' supervision and direction, have thoroughly analyzed and investigated the securities law claims at issue; vigorously pursued discovery from Defendants and other third parties; assisted the Lord Abbett Funds in responding to Defendants' discovery requests, including by producing responsive

9

documents and answering interrogatories; retained a market efficiency expert; and regularly updated the Lord Abbett Funds on developments in this litigation.  Robinson Decl. ¶3.

## II.      THE PROPOSED CLASS SATISFIES RULE 23(b)(3)

The Action also satisfies Rule 23(b)(3), which requires that: (i) common questions predominate over individual questions; and (ii) the class action is superior to other available means of adjudication.  Fed. R. Civ. P. 23(b)(3).  Both factors are met here.

### A.      Common Questions Predominate

The Supreme Court has recognized that predominance is "readily met" in securities fraud suits like this one.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Here, common questions predominate for both the Securities Act and Exchange Act claims at issue.

#### 1.      Common questions predominate the Securities Act claims.

The Third Circuit has stated that predominance is readily met for Securities Act claims because "[t]he formulaic nature" of such claims do not require proof of reliance and fix damages to a statutory formula, "leav[ing] defendants with little room to maneuver."  *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783-86 (3d Cir. 2009).  That is the case here, where the Securities Act claims turn predominately (if not exclusively) on the common, class-wide question of whether Defendants made material misrepresentations or omissions in the Offering Documents.  *Constar*, 585 F.3d at 784-86 ("[B]ecause reliance is not an element under § 11, the conduct of the defendants, not the knowledge of the plaintiffs, is determinative[.]").

#### 2.      Common questions predominate the Exchange Act claims.

Common questions also predominate the Exchange Act claims, for which "Defendants' liability will depend on the same evidence relating to the existence and materiality of the misstatements and omissions at issue, as well as Defendants' state of mind in making such statements or failing to disclose certain information.  Further, loss causation is also a class-wide

issue that is "capable of proof through common evidence." *Merck*, 2013 WL 396117, at \*12. Thus, the question of "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). Here, reliance is established class-wide under both the fraud-on-the-market and the *Affiliated Ute* presumptions.

### a.  Reliance is presumed under fraud-on-the-market.

The fraud-on-the-market presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies"; therefore, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 2408 (2014) ("*Halliburton II*"). Thus, "a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458. *See also Vizirgianakis v. Aeterna Zentaris, Inc.*, 2019 WL 2305491, at \*1-2 (3d Cir. May 30, 2019) (affirming class certification based on "fraud-on-the-market theory of reliance"); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 631 (3d Cir. 2011) ("In order to facilitate securities class-actions, the Supreme Court established . . . the fraud on the market theory.").[5]

"To invoke the fraud-on-the-market presumption of reliance, plaintiffs must show they traded shares in an efficient market, and the misrepresentation at issue became public." *DVI*, 639 F.3d at 631-32.  Courts in this Circuit assess market efficiency by looking to the five factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See, e.g.*, *In re Heckmann Corp.*

---

[5] The Supreme Court has explained that the fraud-on-the-market presumption considers informational efficiency. *Halliburton II*, 573 U.S. at 271-73. Accordingly, "[d]ebates about the precise *degree* to which . . . prices accurately reflect public information are thus largely beside the point." *Id.* (emphasis in original); *see also In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 768 (S.D. Tex. 2006) ("[T]he issue is . . . whether the market for debt securities is adequately ***informationally efficient*** (whether the price reflect all publicly available information).").

*Sec. Litig.*, 2013 WL 2456104, at *7-9 (D. Del. June 6, 2013) ("This circuit commonly looks at the *Cammer* factors."). In addition to the five *Cammer* factors, some courts also consider three additional factors: (1) market capitalization; (2) bid-ask spread; and (3) float. *See, e.g.*, *DVI*, 639 F.3d at 634 n.16. It is important to note that the efficiency analysis is ultimately holistic, with no single factor determinative. *See W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016); *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018) (explaining that market efficiency is "a holistic analysis based on the totality of the evidence presented," without "distinct requirements," and emphasizing the importance of the first "four *Cammer* factors"—not only the fifth factor). Here, as discussed below, the report of the Lord Abbett Funds' market efficiency expert, Dr. Michael L. Hartzmark, Ph.D., establishes that the Navient securities at issue traded in an efficient market throughout the Exchange Act Class Period. *See* Hartzmark Rpt. ¶¶10, 108-09, 131-133, 233-241.

        (1)      *Cammer 1*: Navient securities had high trading volume.

Large weekly trading volume evidences market efficiency because it "implies significant investor interest in the company[,] . . . [which] in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. Therefore, under *Cammer*, weekly turnover equal to 2% or more of outstanding shares justifies a "strong presumption" of efficiency, and weekly turnover of 1% or more justifies a "substantial presumption." *Id.* at 1293.

Here, all Navient securities at issue had high trading volume. Navient common stock's average weekly volume during the Exchange Act Class Period was approximately 3.4% of its shares outstanding. *See* Hartzmark Rpt. ¶¶28-29. This is well above the 2% threshold described in *Cammer* as "justify[ing] a strong presumption that the market for the security is an efficient one," providing strong evidence of market efficiency. *Id.*; *see Cammer*, 711 F. Supp. at 1286.

This is equally true of options on Navient's common stock.  Indeed, because "the value of [the Navient stock options] depended upon the value of [the] common stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options," this evidence also supports the efficiency of the market for Navient stock options.  *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006).  Finally, Navient debt securities were also actively traded during the Exchange Act Class Period, justifying a "substantial presumption" of efficiency.  *See* Hartzmark Rpt. ¶¶165-69; *Cammer*, 711 F. Supp. at 1293; *see also, e.g.*, *DVI*, 249 F.R.D. at 215 (finding an efficient market for bonds with an average weekly turnover rate of 1.25% and trade frequency in the top 10% of corporate bonds); *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684-85 (N.D. Ala. 2005) (ruling that "[t]he market for these bonds was informationally efficient notwithstanding that on some days the trading volume was low and on others, there was no trading at all").

In addition, several of Navient's publicly traded securities were actively traded on exchanges.  Navient common stock and several of its debt securities were actively traded on the NASDAQ Exchange, which courts—including the Third Circuit—routinely rule **independently** suffices to establish efficiency.  Hartzmark Rpt. ¶¶42, 162.  *DVI*, 639 F.3d at 634 (crediting listing on exchange of common stock and notes in finding efficiency because "[s]ecurities markets like . . . the NASDAQ are open and developed, and are therefore well suited for application of the fraud on the market theory"); *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market . . .").  Likewise, Navient stock options were listed on numerous exchanges, with the primary exchange being the

Cboe Options Exchange.  *See* Hartzmark Rpt. ¶116.  *See Enron*, 529 F. Supp. 2d at 754 (S.D. Tex. 2006) (finding options market efficient where options traded on the Cboe).

(2)    *Cammer* 2: Navient had extensive analyst coverage.

Significant analyst coverage is "persuasive" evidence of market efficiency, as it demonstrates that the company in question is closely followed by investment professionals who make buy and sell recommendations to investors.  *Cammer*, 711 F. Supp. at 1286.  Here, more than 20 research analysts covered Navient during the Class Period, issuing over 280 analyst reports.  *See* Hartzmark Rpt. ¶¶30-34.  *See also DVI Inc.*, 249 F.R.D. at 209 (*Cammer 2* satisfied from as few as three analysts).  These analyst reports were important to holders of ***all*** Navient securities because they provided information on the overall financial health of the Company, including its ability to pay on the debt service for the notes.  Investors also received information about Navient from widespread media coverage and from SEC filings, which were made available without cost.  *See* Hartzmark Rpt. ¶¶34-35.  This widespread analyst and media coverage of Navient's business provides further evidence of market efficiency.  *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 758 (S.D. Tex. 2006) (ruling "reasonabl[e]" that "extensive information on [company's] financial condition from the multiple sources relating to the value of its common stock also was available to the . . . investors [in the company's other securities]").

(3)    *Cammer* 3: Navient had numerous market makers.

Market makers ensure efficient trading of shares, and thereby promote market efficiency. Use of a designated market maker ("DMM")—especially where supplemented by other market makers—satisfies *Cammer* 3.  *See, e.g.*, *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 654 (S.D. Ohio 2017).  Here, Navient common stock and certain notes were listed on NASDAQ, whose rules enable investors to trade efficiently on new information by through multiple market makers.  *See* Hartzmark Rpt. ¶¶37-48.  Likewise, the Cboe—the primary exchange on which Navient stock

14

options traded—required the use of a Designated Primary Market Maker, which performed a similar role as a DMM, while the members of the numerous other exchanges on which Navient stock options traded were also eligible market makers. *Id.* ¶¶116-18. Finally, other Navient notes were also traded through numerous market makers, which further bolsters a finding of market efficiency. *Id.* ¶¶184-86. *See In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *5 (S.D.N.Y. Mar. 7, 2011) (*Cammer* 3 satisfied even without "proper market makers").

> (4)      *Cammer* 4: Navient was eligible to use a Form S-3.

Companies meeting the SEC's filing criteria for raising capital via an abridged Form S-3 registration statement are "presumed to be actively traded and widely followed . . . point[ing] to market efficiency." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001). Here, Navient first filed a Form S-3 on April 28, 2014 (less than two weeks after the start of the Class Period), and it maintained eligibility throughout, using a Form S-3 in connection with the Offerings at issue in this case. *See* Hartzmark Rpt. ¶¶49-51, 115, 187. Thus, this factor also favors market efficiency for all securities. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006) (considering Form S-3 eligibility in efficiency for common stock, notes, and options).

> (5)      *Cammer* 5: the price of Navient securities reacted to company-specific news.

The fifth *Cammer* factor analyzes whether there is "a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. To assess this factor, Dr. Hartzmark conducted empirical analyses using a widely-accepted event study methodology to examine the price reaction of Navient's publicly traded securities to the disclosure of new information concerning Navient. *See* Hartzmark Rpt. ¶¶66-107, 211-232. An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *DFC Global*, 2016 WL 4138613, at *13

(quoting *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010)).  *See also DVI*, 639 F.3d at 635 (crediting event studies in finding efficiency for both stock and notes).   Here, Dr. Hartzmark's empirical analyses "show that the market price of the defendant's [securities] tends to respond to pertinent publicly reported events."  *Halliburton II*, 573 U.S. at 280.

Dr. Hartzmark conducted a statistical analysis of Navient common stock price movements on days when Navient made earnings announcements, excluding any dates on which Navient disclosed information allegedly misrepresented and omitted (*i.e.*, the "corrective disclosures"). Dr. Hartzmark's test found that the price reactions by Navient securities to the earnings disclosures were in-line with what would be expected in an efficient market.  *See* Hartzmark Rpt. ¶¶69-87.  As a cross-check, Dr. Hartzmark also analyzed whether there was a statistically significantly different relationship between the returns on Navient common stock on days with news when compared to those days with no news.   This analysis found a statistically significant cause-and-effect relationship between the release of new, Company-specific information and rapid movements in the price of Navient's stock, further reinforcing the conclusion that the prices of Navient securities reacted to new, Company-specific information, rather than to other economic influences or random events.  *See* Hartzmark Rpt. ¶¶94-100.  In addition, although not required, Dr. Hartzmark also analyzed the price reaction of Navient's stock following the disclosure of the information allegedly misrepresented and omitted (*i.e.*, the "corrective disclosures").  *See* Hartzmark Rpt. ¶¶105-107. While not necessary to demonstrate market efficiency, this analysis determined that the prices of Navient's securities had rapid reactions on all corrective disclosure dates, further confirming market efficiency.  *Id.*

Further, Dr. Hartzmark performed a separate analysis to confirm that the price of Navient securities promptly incorporated new, Company-specific information during the Exchange Act

Class Period (including on the corrective disclosure dates).   Utilizing a well-accepted "autocorrelation" analysis for Navient stock prices, Dr. Hartzmark tested whether the price movements could be predicted on a given day based on the price movements one day prior—*i.e.*, whether there were trends or correlations in daily stock price movements irrespective of new, Company-specific information.  *Id.* ¶¶101-104.  Dr. Hartzmark found no statistically significant autocorrelation during the Exchange Act Class Period, thereby confirming his conclusion that Navient stock prices quickly incorporated and reacted to new, Company-specific information, and thus traded in an efficient market.  *Id.*; *see also DVI*, 249 F.R.D at 213 (confirming autocorrelation analysis is an accepted test for determining efficiency).

Dr. Hartzmark also performed the same or similar analyses with respect to Navient's other publicly traded securities at issue.  *Id.* ¶¶120-130, 213-232.  In sum, Dr. Hartzmark's empirical cause-and-effect analyses readily establish that Navient's securities traded in an open, well-developed, and efficient market throughout the Exchange Act Class Period.

(6)     Other factors also support efficiency.

In addition to the *Cammer* factors, courts often consider a company's market capitalization, bid-ask spread, and float as supplemental factors to develop a holistic view of market efficiency. *See, e.g.*, *DVI*, 639 F.3d at 634 n.16.  Each of these additional factors further demonstrates that Navient's securities—stock, options, and debt—traded on efficient markets.  Navient's market capitalization peaked at $9.26 billion during the Exchange Act Class Period, and its market capitalization was greater than 86% of the common stocks on the NYSE and NASDAQ and 82% of the common stocks at the beginning and end of the Exchange Act Class Period, respectively. *See* Hartzmark Rpt. ¶¶53-56.  Navient's large public float of 99.7% of Navient's shares during that time allowed for unconstrained trading based on new information to the marketplace.  *See id.* ¶¶57-58.  Finally, Navient's bid-ask spread was much narrower than the average bid-ask to spread

among NASDAQ stocks, further demonstrating that Navient securities traded in an efficient market during the Exchange Act Class Period. *Id.* ¶¶59-63; *see also id.* ¶¶194-199.

### b.        Reliance is presumed under *Affiliated Ute*.

In addition to the fraud-on-the-market presumption, reliance can also separately be presumed here because the claims sustained by the Court also concern Defendants' omission of material information, and accordingly "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *see also Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 192 (3d Cir. 2001). *Dynex* is instructive. Like this case, *Dynex* was "about alleged 'statements regarding underwriting standards, market conditions, loss reserves, and delinquencies. However, it is also about omissions." *Dynex*, 2011 WL 781215, at *7. The *Dynex* court ruled that the *Affiliated Ute* presumption applied because "the allegedly actionable statements 'most central' to Plaintiff's fraud allegations are those that attribute losses to market conditions yet 'omit to state that the poor performance in fact derived from reckless underwriting and origination practices. . . . [T]he heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld[.]" *Id.* The same logic applies here. For example, the Court sustained claims that Defendants concealed Navient's "'systemic practice of indiscriminately placing borrowers into forbearance,' which allowed Navient to avoid recording those accounts as delinquent or in default." MTD Order 491 (quoting ¶36). The Court also sustained claims that Defendants omitted "information which should have caused an increase to the loan loss provisions at some point earlier" concerning "a cohort of borrowers exiting deferment in 2014 [that] exhibited characteristics long before 2014 that normally lead to a higher incidence of delinquencies and charge-offs." *Id.* at 495 & n.9.

### 3. Individual damage calculations do not defeat predominance.

The Third Circuit has made clear that predominance is not defeated by the need for individual damage calculations. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (denial of certification on that basis alone is "an abuse of discretion"). Dr. Hartzmark demonstrates that per-share damages can be determined using standard methodologies that apply class-wide for each of Plaintiffs' Exchange Act and Securities Act claims on the securities at issue. *See* Hartzmark Rpt. ¶¶10, 242-260. Nothing more is required. *In re Wilmington Trust Sec. Litig.*, 310 F.R.D. 243, 246 (D. Del. 2015) ("Consistent with the analysis by the Third Circuit, the court concludes that class certification is not defeated when there are individual issues with respect to the calculation of damages . . . . [P]laintiffs' theory that there is a common, class-wide methodology to calculate damages based on its expert's event study methodology is adequate to establish predominance.").

### B. Superiority Is Established Under Rule 23(b)(3)

The superiority requirement of Rule 23(b)(3) "is easily satisfied" in cases for violations of the federal securities laws, such as this, "where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant." *Heckmann*, 2013 WL 2456104, at *8. Superiority is further supported by consideration of each of the four factors provided by Rule 23(b)(3). The Lord Abbett Funds and Counsel are not aware of ***any*** individual actions that have been filed by other class members, indicating there is little—if any—"interests in individually controlling the prosecution . . . of separate actions." Fed. R. Civ. P. 23(b)(3)(A), (B). In any event, concentration of the litigation in this forum is desirable: Navient was headquartered in Wilmington, where litigation has been ongoing before this Court for nearly four years. Fed. R. Civ. P. 23(b)(3)(C). *See Skeway v. China Natural Gas, Inc.*, 304 F.R.D. 467, 476-77 (D. Del. 2014) (superiority where company's "shares were sold on a national stock exchange

and the Class is likely dispersed nation-wide" and "[t]his district is a logical choice as [the company] is a Delaware corporation").  Finally, there is no reason to expect any difficulties in the management of this action as a class action.  Fed. R. Civ. P. 23(b)(3)(D).

## III.   BLB&G SHOULD BE APPOINTED CLASS COUNSEL

The Lord Abbett Funds also request that the Court appoint BLB&G as Class Counsel and Friedlander as Liaison Counsel.  In appointing class counsel, the Court must take into account: (i) the work counsel has done; (ii) counsel's experience in handling *inter alia* class actions and the types of claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  These considerations weigh heavily in favor of appointing BLB&G as Class Counsel.  The firm is among the most experienced securities class action firms in the nation and has prosecuted numerous successful securities class actions.  Liaison counsel Friedlander is similarly experienced.  *See* Robinson Decl. Exs. K, L.  They have already undertaken a vigorous prosecution of this case, including developing a detailed plan for the prosecution of the case, commencing discovery, and pursuing class certification.  Robinson Decl. ¶3.  Finally, proposed Class Counsel will commit the necessary resources to achieve a successful recovery for investors.  Robinson Decl. ¶4.

CONCLUSION

For all the reasons set forth above, the Lord Abbett Funds respectfully request that the Motion be granted, the proposed Class certified, the Lord Abbett Funds appointed as Class Representatives, BLB&G appointed as Class Counsel, and Friedlander appointed as Liaison Counsel.

Dated: September 6, 2019

*/s/ Joel Friedlander*

Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
Christopher P. Quinn (Bar No. 5823)
**FRIEDLANDER & GORRIS, P.A.**
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
Tel: (302) 573-3500
Fax: (302) 573-3501
jfriedlander@friedlandergorris.com
cfoulds@friedlandergorris.com
cquinn@friedlandergorris.com

*Liaison Counsel for Lead Plaintiffs, and*
*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Salvatore Graziano
(Admitted *pro hac vice*)
Jeremy P. Robinson
(Admitted *pro hac vice*)
Jesse Jensen
(Admitted *pro hac vice*)
Ryan Dykhouse
(Admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
jesse.jensen@blbglaw.com
ryan.dykhouse@blbglaw.com

*Counsel for Lead Plaintiffs, and*
*Lead Counsel for the Class*