# EXHIBIT D

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the quarterly period ended March 31, 2014**

<div align="center">or</div>

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the transition period from      to**

                  **Commission File Number: 001-13251**

# Navient Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **52-2013874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **300 Continental Drive, Newark, Delaware** | **19713** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(302) 283-8000**

*(Registrant's telephone number, including area code)*

*(Former name, former address and former fiscal year, if changed since last report)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Outstanding at April 30, 2014 |
|---|---|
| Common Stock, par value $0.01 per share | 422,739,239 |

Table of Contents

# NAVIENT CORPORATION

### Table of Contents

**Part I. Financial Information**

| | | |
|---|---|---|
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 91 |
| Item 4. | Controls and Procedures | 95 |

**PART II. Other Information**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 96 |
| Item 1A. | Risk Factors | 98 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 98 |
| Item 3. | Defaults Upon Senior Securities | 98 |
| Item 4. | Mine Safety Disclosures | 98 |
| Item 5. | Other Information | 98 |
| Item 6. | Exhibits | 98 |

Table of Contents

PART I. FINANCIAL INFORMATION

Item 1.      Financial Statements

NAVIENT CORPORATION

CONSOLIDATED BALANCE SHEETS
(In millions, except share and per share amounts)
(Unaudited)

| | March 31, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| FFELP Loans (net of allowance for losses of $107 and $119, respectively) | $ 102,635 | $ 104,588 |
| Private Education Loans (net of allowance for losses of $2,059 and $2,097 respectively) | 38,157 | 37,512 |
| Investments | | |
| Available-for-sale | 135 | 109 |
| Other | 652 | 783 |
| Total investments | 787 | 892 |
| Cash and cash equivalents | 3,742 | 5,190 |
| Restricted cash and investments | 3,794 | 3,650 |
| Goodwill and acquired intangible assets, net | 421 | 424 |
| Other assets | 6,936 | 7,287 |
| Total assets | $ 156,472 | $ 159,543 |
| **Liabilities** | | |
| Short-term borrowings | $ 11,626 | $ 13,795 |
| Long-term borrowings | 136,177 | 136,648 |
| Other liabilities | 3,071 | 3,458 |
| Total liabilities | 150,874 | 153,901 |
| **Commitments and contingencies** | | |
| **Equity** | | |
| Preferred stock, par value $0.20 per share, 20 million shares authorized | | |
| Series A: 3.3 million and 3.3 million shares issued, respectively, at stated value of $50 per share | 165 | 165 |
| Series B: 4 million and 4 million shares issued, respectively, at stated value of $100 per share | 400 | 400 |
| Common stock, par value $0.20 per share, 1.125 billion shares authorized: 549 million and 545 million shares issued, respectively | 110 | 109 |
| Additional paid-in capital | 4,461 | 4,399 |
| Accumulated other comprehensive income (loss) (net of tax (expense) benefit of $(4) and $(7), respectively) | 7 | 13 |
| Retained earnings | 2,733 | 2,584 |
| Total Navient Corporation stockholders' equity before treasury stock | 7,876 | 7,670 |
| Less: Common stock held in treasury at cost: 127 million and 116 million shares, respectively | (2,283) | (2,033) |
| Total Navient Corporation stockholders' equity | 5,593 | 5,637 |
| Noncontrolling interest | 5 | 5 |
| Total equity | 5,598 | 5,642 |
| Total liabilities and equity | $ 156,472 | $ 159,543 |

**Supplemental information — assets and liabilities of consolidated variable interest entities:**

| | March 31, 2014 | December 31, 2013 |
|---|---|---|
| FFELP Loans | $ 97,380 | $ 99,254 |
| Private Education Loans | 25,139 | 25,530 |
| Restricted cash and investments | 3,618 | 3,395 |
| Other assets | 2,163 | 2,322 |
| Short-term borrowings | 1,694 | 3,655 |
| Long-term borrowings | 115,533 | 115,538 |
| Net assets of consolidated variable interest entities | $ 11,073 | $ 11,308 |

See accompanying notes to consolidated financial statements.

1

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF INCOME**
**(In millions, except per share amounts)**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| **Interest income:** | | |
| FFELP Loans | $ 646 | $ 735 |
| Private Education Loans | 644 | 623 |
| Other loans | 3 | 3 |
| Cash and investments | 3 | 5 |
| Total interest income | 1,296 | 1,366 |
| Total interest expense | 530 | 571 |
| Net interest income | 766 | 795 |
| Less: provisions for loan losses | 185 | 241 |
| Net interest income after provisions for loan losses | 581 | 554 |
| **Other income (loss):** | | |
| Gains on sales of loans and investments | — | 55 |
| Losses on derivative and hedging activities, net | (8) | (31) |
| Servicing revenue | 61 | 70 |
| Contingency revenue | 111 | 99 |
| Gains on debt repurchases | — | 23 |
| Other | 6 | 34 |
| Total other income (loss) | 170 | 250 |
| **Expenses:** | | |
| Salaries and benefits | 142 | 125 |
| Other operating expenses | 224 | 110 |
| Total operating expenses | 366 | 235 |
| Goodwill and acquired intangible asset impairment and amortization expense | 4 | 3 |
| Restructuring and other reorganization expenses | 26 | 10 |
| Total expenses | 396 | 248 |
| Income from continuing operations, before income tax expense | 355 | 556 |
| Income tax expense | 136 | 211 |
| Net income from continuing operations | 219 | 345 |
| Income from discontinued operations, net of tax expense | — | 1 |
| **Net income** | 219 | 346 |
| Less: net loss attributable to noncontrolling interest | — | — |
| Net income attributable to Navient Corporation | 219 | 346 |
| Preferred stock dividends | 5 | 5 |
| Net income attributable to Navient Corporation common stock | $ 214 | $ 341 |
| **Basic earnings per common share attributable to Navient Corporation:** | | |
| Continuing operations | $ .50 | $ .76 |
| Discontinued operations | — | — |
| Total | $ .50 | $ .76 |
| Average common shares outstanding | 427 | 451 |
| **Diluted earnings per common share attributable to Navient Corporation:** | | |
| Continuing operations | $ .49 | $ .74 |
| Discontinued operations | — | — |
| Total | $ .49 | $ .74 |
| Average common and common equivalent shares outstanding | 435 | 458 |
| Dividends per common share attributable to Navient Corporation | $ .15 | $ .15 |

See accompanying notes to consolidated financial statements.

2

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In millions)**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Net income | $ 219 | $ 346 |
| Other comprehensive income (loss): | | |
| Unrealized gains (losses) on derivatives: | | |
| Unrealized hedging gains (losses) on derivatives | (11) | 1 |
| Reclassification adjustments for derivative losses included in net income (interest expense) | 3 | 3 |
| Total unrealized gains (losses) on derivatives | (8) | 4 |
| Unrealized gains (losses) on investments | — | (1) |
| Income tax (expense) benefit | 2 | (1) |
| Other comprehensive income (loss), net of tax | (6) | 2 |
| Total comprehensive income | $ 213 | $ 348 |

See accompanying notes to consolidated financial statements.

3

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(Dollars in millions, except share and per share amounts)**
**(Unaudited)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2012** | 7,300,000 | 535,507,965 | (82,910,021) | 452,597,944 | $ 565 | $ 107 | $ 4,237 | $ (6) | $ 1,451 | $ (1,294) | $ 5,060 | $ 6 | $ 5,066 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 346 | — | 346 | — | 346 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | 2 | — | — | 2 | — | 2 |
| Total comprehensive income | | | | | | | | | | | 348 | — | 348 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.15 per share) | — | — | — | — | — | — | — | — | (68) | — | (68) | — | (68) |
| Preferred stock, series A ($.87 per share) | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Preferred stock, series B ($.49 per share) | — | — | — | — | — | — | — | — | (2) | — | (2) | — | (2) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Issuance of common shares | — | 4,157,795 | — | 4,157,795 | — | 1 | 33 | — | — | — | 34 | — | 34 |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | 2 | — | — | — | 2 | — | 2 |
| Stock-based compensation expense | — | — | — | — | — | — | 19 | — | — | — | 19 | — | 19 |
| Common stock repurchased | — | — | (10,220,804) | (10,220,804) | — | — | — | — | — | (199) | (199) | — | (199) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (2,324,575) | (2,324,575) | — | — | — | — | — | (42) | (42) | — | (42) |
| **Balance at March 31, 2013** | 7,300,000 | 539,665,760 | (95,455,400) | 444,210,360 | $ 565 | $ 108 | $ 4,291 | $ (4) | $ 1,723 | $ (1,535) | $ 5,148 | $ 6 | $ 5,154 |
| **Balance at December 31, 2013** | 7,300,000 | 545,210,941 | (116,262,066) | 428,948,875 | $ 565 | $ 109 | $ 4,399 | $ 13 | $ 2,584 | $ (2,033) | $ 5,637 | $ 5 | $ 5,642 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 219 | — | 219 | — | 219 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | (6) | — | — | (6) | — | (6) |
| Total comprehensive income | | | | | | | | | | | 213 | — | 213 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.15 per share) | — | — | — | — | — | — | — | — | (64) | — | (64) | — | (64) |
| Preferred stock, series A ($.87 per share) | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Preferred stock, series B ($.49 per share) | — | — | — | — | — | — | — | — | (2) | — | (2) | — | (2) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of common shares | — | 4,238,182 | — | 4,238,182 | — | 1 | 33 | — | — | — | 34 | — | 34 |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | 11 | — | — | — | 11 | — | 11 |
| Stock-based compensation expense | — | — | — | — | — | — | 18 | — | — | — | 18 | — | 18 |
| Common stock repurchased | — | — | (8,368,300) | (8,368,300) | — | — | — | — | — | (200) | (200) | — | (200) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (2,115,470) | (2,115,470) | — | — | — | — | — | (50) | (50) | — | (50) |
| **Balance at March 31, 2014** | 7,300,000 | 549,449,123 | (126,745,836) | 422,703,287 | $ 565 | $ 110 | $ 4,461 | $ 7 | $ 2,733 | $ (2,283) | $ 5,593 | $ 5 | $ 5,598 |

See accompanying notes to consolidated financial statements.

4

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

|  | Three Months Ended March 31, | |
|  | 2014 | 2013 |
|---|---|---|
| **Operating activities** | | |
| Net income | $ 219 | $ 346 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Income from discontinued operations, net of tax | — | (1) |
| Gains on loans and investments, net | — | (55) |
| Gains on debt repurchases | — | (23) |
| Goodwill and acquired intangible asset impairment and amortization expense | 4 | 3 |
| Stock-based compensation expense | 18 | 19 |
| Unrealized gains on derivative and hedging activities | (181) | (138) |
| Provisions for loan losses | 185 | 241 |
| Decrease (increase) in restricted cash — other | 5 | (15) |
| Decrease in accrued interest receivable | 109 | 19 |
| (Decrease) increase in accrued interest payable | (69) | 2 |
| Decrease in other assets | 257 | 291 |
| Increase (decrease) in other liabilities | 11 | (158) |
| Cash provided by operating activities — continuing operations | 558 | 531 |
| Cash (used in) operating activities — discontinued operations | — | (2) |
| Total net cash provided by operating activities | 558 | 529 |
| **Investing activities** | | |
| Student loans acquired and originated | (1,975) | (1,559) |
| Reduction of student loans: | | |
| Installment payments, claims and other | 3,090 | 3,349 |
| Proceeds from sales of student loans | — | 226 |
| Other investing activities, net | 119 | 65 |
| Purchases of available-for-sale securities | (25) | (14) |
| Proceeds from maturities of available-for-sale securities | 2 | 9 |
| Purchases of held-to-maturity and other securities | (65) | (93) |
| Proceeds from sales and maturities of held-to-maturity and other securities | 67 | 94 |
| (Increase) decrease in restricted cash — variable interest entities | (221) | 107 |
| Total net cash provided by investing activities | 992 | 2,184 |
| **Financing activities** | | |
| Borrowings collateralized by loans in trust — issued | 2,649 | 2,588 |
| Borrowings collateralized by loans in trust — repaid | (2,834) | (3,182) |
| Asset-backed commercial paper conduits, net | (1,918) | 427 |
| ED Conduit Program facility, net | — | (2,583) |
| Other long-term borrowings issued | 834 | 1,489 |
| Other long-term borrowings repaid | (1,535) | (1,433) |
| Other financing activities, net | (11) | (358) |
| Retail and other deposits, net | 86 | 396 |
| Common stock repurchased | (200) | (199) |
| Common stock dividends paid | (64) | (68) |
| Preferred stock dividends paid | (5) | (5) |
| Net cash used in financing activities | (2,998) | (2,928) |
| Net decrease in cash and cash equivalents | (1,448) | (215) |
| Cash and cash equivalents at beginning of period | 5,190 | 3,900 |
| **Cash and cash equivalents at end of period** | $ 3,742 | $ 3,685 |
| Cash disbursements made (refunds received) for: | | |
| Interest | $ 519 | $ 568 |
| Income taxes paid | $ 38 | $ 15 |
| Income taxes received | $ (1) | $ (1) |
| Noncash activity: | | |
| Investing activity — Student loans and other assets removed related to sale of Residual Interest in securitization | $ — | $ (3,665) |
| Financing activity — Borrowings removed related to sale of Residual Interest in securitization | $ — | $ (3,681) |

See accompanying notes to consolidated financial statements.

5

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information at March 31, 2014 and for the three months ended**
**March 31, 2014 and 2013 is unaudited)**

**1.  Organization and Business**

On May 29, 2013, SLM Corporation ("Existing SLM") first announced its intent to separate into two distinct publicly traded entities — a loan management, servicing and asset recovery business and a consumer banking business. The loan management, servicing and asset recovery business, Navient Corporation ("Navient"), would be comprised primarily of Existing SLM's portfolios of education loans not currently held in Sallie Mae Bank, as well as servicing and asset recovery activities on these loans and loans held by third parties. The consumer banking business would be comprised primarily of Sallie Mae Bank and its Private Education Loan origination business, the Private Education Loans it holds and a related servicing business, and would be a consumer banking franchise with expertise in helping families save, plan and pay for college.

On April 8, 2014, the board of directors of Existing SLM approved the distribution of all of the issued and outstanding shares of Navient common stock on the basis of one share of Navient common stock for each share of Existing SLM common stock issued and outstanding as of the close of business on April 22, 2014, the record date for the distribution. The distribution occurred on April 30, 2014. The distribution was preceded by an internal corporate reorganization of Existing SLM pursuant to which, on April 29, 2014, New BLC Corporation ("SLM BankCo") replaced Existing SLM as the parent holding company of Sallie Mae pursuant to a holding company merger (the "Merger"). In accordance with Section 251(g) of the Delaware General Corporation Law, by action of the Existing SLM board of directors and without a shareholder vote, Existing SLM was merged into Navient, LLC, a wholly-owned subsidiary of SLM BankCo, with Navient, LLC surviving ("Existing SLM SurvivorCo"). Immediately following the effective time of the Merger, SLM BankCo changed its name to "SLM Corporation." Following the Merger, the assets and liabilities associated with the education loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking business were transferred to Existing SLM. The internal corporate reorganization and the distribution of Navient common stock are sometimes collectively referred to herein as the "Spin-Off." The separation and distribution is intended to be tax-free to stockholders of Sallie Mae. For further information on the Spin-Off, please refer to Navient's Registration Statement on Form 10 (File No. 001-36228) filed with the Securities and Exchange Commission ("SEC") on April 10, 2014 and declared effective on April 14, 2014 (the "Form 10") and Existing SLM's Annual Report on Form 10-K for the year ended December 31, 2013 filed with the SEC on February 19, 2014 (the "2013 Form 10-K").

Due to the relative significance of Navient to Existing SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Existing SLM, notwithstanding the legal form of the Spin-Off. As a result, the historical financial statements of Existing SLM are the historical financial statements of Navient. For that reason, the historical financial information contained in this Quarterly Report on Form 10-Q is that of Existing SLM (which includes the consolidated results of both Navient and the consumer banking business). Navient will show the distribution of the approximate $1.7 billion of consumer banking business net assets as of the distribution date.

By virtue of Navient's Form 10 registration statement being declared effective by the SEC on April 14, 2014, Navient is required to file this Form 10-Q for the quarter ended March 31, 2014.

On May 6, 2014, SLM BankCo, as reconstituted after the Spin Off, issued audited consolidated financial statements on a stand-alone basis for SLM BankCo and its subsidiaries for each of the three years ended December 31, 2013. These carve-out financial statements were presented on a basis of accounting that reflects a change in reporting entity. They reflected the results of the consumer banking business and did not include Navient's results. As previously discussed, the historical financial statements of Existing SLM prior to the Spin-Off have become the historical financial statements of Navient.

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**1.   Organization and Business (Continued)**

For purposes of this Quarterly Report on Form 10-Q, any references to "we," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off means and refers to Existing SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off means and refers to Navient and its consolidated subsidiaries.

**2.   Significant Accounting Policies**

*Basis of Presentation*

The accompanying unaudited, consolidated financial statements of Navient Corporation have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements. The consolidated financial statements include the accounts of Navient Corporation and its majority-owned and controlled subsidiaries and those Variable Interest Entities ("VIEs") for which we are the primary beneficiary, after eliminating the effects of intercompany accounts and transactions. In the opinion of management, all adjustments considered necessary for a fair statement of the results for the interim periods have been included. The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates. Operating results for the three months ended March 31, 2014 are not necessarily indicative of the results for the year ending December 31, 2014 or for any other period. These unaudited financial statements should be read in conjunction with the audited financial statements and related notes included in the Form 10 and the 2013 Form 10-K. Definitions for certain capitalized terms used in this document can be found in the Form 10 and the 2013 Form 10-K.

*Consolidation*

In first-quarter 2013, we sold the Residual Interest in a FFELP Loan securitization trust to a third party. We will continue to service the student loans in the trust under existing agreements. Prior to the sale of the Residual Interest, we had consolidated the trust as a VIE because we had met the two criteria for consolidation. We had determined we were the primary beneficiary because (1) as servicer to the trust we had the power to direct the activities of the VIE that most significantly affected its economic performance and (2) as the residual holder of the trust we had an obligation to absorb losses or receive benefits of the trust that could potentially be significant. Upon the sale of the Residual Interest we are no longer the residual holder, thus we determined we no longer met criterion (2) above and deconsolidated the trust. As a result of this transaction we removed trust assets of $3.8 billion and the related liabilities of $3.7 billion from the balance sheet and recorded a $55 million gain as part of "gains on sales of loans and investments."

*Reclassifications*

Certain reclassifications have been made to the balances as of and for the three months ended March 31, 2013 to be consistent with classifications adopted for 2014, and had no effect on net income, total assets, or total liabilities.

**3.   Allowance for Loan Losses**

Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios. The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

susceptible to significant changes. We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios. We segregate our Private Education Loan portfolio into two classes of loans — traditional and non-traditional. Non-traditional loans are loans to (i) customers attending for-profit schools with an original Fair Isaac and Company ("FICO") score of less than 670 and (ii) customers attending not-for-profit schools with an original FICO score of less than 640. The FICO score used in determining whether a loan is non-traditional is the greater of the customer or cosigner FICO score at origination. Traditional loans are defined as all other Private Education Loans that are not classified as non-traditional.

*Allowance for Loan Losses Metrics*

| | Three Months Ended March 31, 2014 | | | |
|---|---|---|---|---|
| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $      119 | $      2,097 | $      28 | $   2,244 |
| Total provision | 10 | 175 | — | 185 |
| Charge-offs[1] | (22) | (218) | (1) | (241) |
| Reclassification of interest reserve[2] | — | 5 | — | 5 |
| Ending balance | $      107 | $      2,059 | $      27 | $   2,193 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $      — | $      1,081 | $      20 | $   1,101 |
| Ending balance: collectively evaluated for impairment | $      107 | $      978 | $      7 | $   1,092 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment | $      — | $      9,590 | $      44 | $   9,634 |
| Ending balance: collectively evaluated for impairment | $ 101,727 | $   31,307 | $      79 | $133,113 |
| Charge-offs as a percentage of average loans in repayment (annualized) | .12% | 2.82% | 3.62% | |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | .10% | 2.72% | 3.62% | |
| Allowance as a percentage of the ending total loan balance | .10% | 5.03% | 21.80% | |
| Allowance as a percentage of the ending loans in repayment | .15% | 6.58% | 21.80% | |
| Allowance coverage of charge-offs (annualized) | 1.2 | 2.3 | 5.9 | |
| Ending total loans[3] | $ 101,727 | $   40,897 | $ 123 | |
| Average loans in repayment | $   73,496 | $   31,416 | $ 126 | |
| Ending loans in repayment | $   73,061 | $   31,309 | $ 123 | |

[1]   Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]   Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]   Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

8

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

|  | | Three Months Ended March 31, 2013 | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | | FFELP Loans | Private Education Loans | Other Loans | Total |
| **Allowance for Loan Losses** | | | | | |
| Beginning balance | | $ 159 | $ 2,171 | $ 47 | $ 2,377 |
| Total provision | | 16 | 225 | — | 241 |
| Charge-offs[1] | | (22) | (232) | (5) | (259) |
| Student loan sales | | (6) | — | — | (6) |
| Reclassification of interest reserve[2] | | — | 6 | — | 6 |
| Ending balance | | $ 147 | $ 2,170 | $ 42 | $ 2,359 |
| *Allowance:* | | | | | |
| Ending balance: individually evaluated for impairment | | $ — | $ 1,157 | $ 31 | $ 1,188 |
| Ending balance: collectively evaluated for impairment | | $ 147 | $ 1,013 | $ 11 | $ 1,171 |
| *Loans:* | | | | | |
| Ending balance: individually evaluated for impairment | | $ — | $ 8,018 | $ 65 | $ 8,083 |
| Ending balance: collectively evaluated for impairment | | $ 118,058 | $ 32,389 | $ 106 | $150,553 |
| Charge-offs as a percentage of average loans in repayment (annualized) | | .10% | 2.97% | 10.95% | |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | | .09% | 2.87% | 10.95% | |
| Allowance as a percentage of the ending total loan balance | | .12% | 5.37% | 24.55% | |
| Allowance as a percentage of the ending loans in repayment | | .17% | 6.88% | 24.55% | |
| Allowance coverage of charge-offs (annualized) | | 1.6 | 2.3 | 2.1 | |
| Ending total loans[3] | | $ 118,058 | $ 40,407 | $ 171 | |
| Average loans in repayment | | $ 87,256 | $ 31,645 | $ 179 | |
| Ending loans in repayment | | $ 85,304 | $ 31,533 | $ 171 | |

[1]   Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]   Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]   Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

9

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

*Key Credit Quality Indicators*

FFELP Loans are substantially insured and guaranteed as to their principal and accrued interest in the event of default; therefore, the key credit quality indicator for this portfolio is loan status. The impact of changes in loan status is incorporated quarterly into the allowance for loan losses calculation.

For Private Education Loans, the key credit quality indicators are school type, FICO scores, the existence of a cosigner, the loan status and loan seasoning. The school type/FICO score are assessed at origination and maintained through the traditional/non-traditional loan designation. The other Private Education Loan key quality indicators can change and are incorporated quarterly into the allowance for loan losses calculation. The following table highlights the principal balance (excluding the receivable for partially charged-off loans) of our Private Education Loan portfolio stratified by the key credit quality indicators.

| | Private Education Loans Credit Quality Indicators | | | |
| | March 31, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance[3] | % of Balance | Balance[3] | % of Balance |
|---|---|---|---|---|
| **Credit Quality Indicators** | | | | |
| School Type/FICO Scores: | | | | |
| Traditional | $36,822 | 93% | $36,140 | 93% |
| Non-Traditional[1] | 2,778 | 7 | 2,860 | 7 |
| Total | $39,600 | 100% | $39,000 | 100% |
| Cosigners: | | | | |
| With cosigner | $27,084 | 68% | $26,321 | 67% |
| Without cosigner | 12,516 | 32 | 12,679 | 33 |
| Total | $39,600 | 100% | $39,000 | 100% |
| Seasoning[2]: | | | | |
| 1-12 payments | $ 5,305 | 13% | $ 5,171 | 14% |
| 13-24 payments | 5,282 | 13 | 5,511 | 14 |
| 25-36 payments | 5,186 | 13 | 5,506 | 14 |
| 37-48 payments | 5,038 | 13 | 5,103 | 13 |
| More than 48 payments | 11,714 | 30 | 11,181 | 29 |
| Not yet in repayment | 7,075 | 18 | 6,528 | 16 |
| Total | $39,600 | 100% | $39,000 | 100% |

[1] Defined as loans to customers attending for-profit schools (with a FICO score of less than 670 at origination) and customers attending not-for-profit schools (with a FICO score of less than 640 at origination).

[2] Number of months in active repayment for which a scheduled payment was due.

[3] Balance represents gross Private Education Loans.

10

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

The following tables provide information regarding the loan status and aging of past due loans.

| | FFELP Loan Delinquencies | | | |
| | March 31, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[1] | $ 13,016 | | $ 13,678 | |
| Loans in forbearance[2] | 15,650 | | 13,490 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 62,721 | 85.9% | 63,330 | 82.8% |
| Loans delinquent 31-60 days[3] | 3,059 | 4.2 | 3,746 | 4.9 |
| Loans delinquent 61-90 days[3] | 1,784 | 2.4 | 2,207 | 2.9 |
| Loans delinquent greater than 90 days[3] | 5,497 | 7.5 | 7,221 | 9.4 |
| Total FFELP Loans in repayment | 73,061 | 100% | 76,504 | 100% |
| Total FFELP Loans, gross | 101,727 | | 103,672 | |
| FFELP Loan unamortized premium | 1,015 | | 1,035 | |
| Total FFELP Loans | 102,742 | | 104,707 | |
| FFELP Loan allowance for losses | (107) | | (119) | |
| FFELP Loans, net | $102,635 | | $104,588 | |
| Percentage of FFELP Loans in repayment | | 71.8% | | 73.8% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 14.2% | | 17.2% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 17.6% | | 15.0% |

[1] Loans for customers who may still be attending school or engaging in other permitted educational activities and are not required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested and qualify for other permitted program deferments such as military, unemployment, or economic hardships.

[2] Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making full payments due to hardship or other factors.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

11

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

3.   **Allowance for Loan Losses (Continued)**

| (Dollars in millions) | March 31, 2014 Balance | % | December 31, 2013 Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[1] | $ 6,637 | | $ 6,088 | |
| Loans in forbearance[2] | 1,069 | | 969 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 27,364 | 94.0% | 26,977 | 92.8% |
| Loans delinquent 31-60 days[3] | 550 | 1.9 | 674 | 2.3 |
| Loans delinquent 61-90 days[3] | 353 | 1.2 | 420 | 1.4 |
| Loans delinquent greater than 90 days[3] | 849 | 2.9 | 1,012 | 3.5 |
| Total traditional loans in repayment | 29,116 | 100% | 29,083 | 100% |
| Total traditional loans, gross | 36,822 | | 36,140 | |
| Traditional loans unamortized discount | (609) | | (629) | |
| Total traditional loans | 36,213 | | 35,511 | |
| Traditional loans receivable for partially charged-off loans | 795 | | 799 | |
| Traditional loans allowance for losses | (1,583) | | (1,592) | |
| Traditional loans, net | $ 35,425 | | $ 34,718 | |
| Percentage of traditional loans in repayment | | 79.1% | | 80.5% |
| Delinquencies as a percentage of traditional loans in repayment | | 6.0% | | 7.2% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.5% | | 3.2% |

The header spans: Private Education Traditional Loan Delinquencies.

[1] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

12

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

| (Dollars in millions) | Private Education Non-Traditional Loan Delinquencies | | | | |
| | March 31, 2014 | | December 31, 2013 | |
| | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[1] | $     438 | | $     440 | |
| Loans in forbearance[2] | 147 | | 133 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 1,792 | 81.7% | 1,791 | 78.3% |
| Loans delinquent 31-60 days[3] | 105 | 4.8 | 128 | 5.6 |
| Loans delinquent 61-90 days[3] | 77 | 3.5 | 93 | 4.1 |
| Loans delinquent greater than 90 days[3] | 219 | 10.0 | 275 | 12.0 |
| Total non-traditional loans in repayment | 2,193 | 100% | 2,287 | 100% |
| Total non-traditional loans, gross | 2,778 | | 2,860 | |
| Non-traditional loans unamortized discount | (72) | | (75) | |
| Total non-traditional loans | 2,706 | | 2,785 | |
| Non-traditional loans receivable for partially charged-off loans | 502 | | 514 | |
| Non-traditional loans allowance for losses | (476) | | (505) | |
| Non-traditional loans, net | $  2,732 | | $  2,794 | |
| Percentage of non-traditional loans in repayment | | 79.0% | | 80.0% |
| Delinquencies as a percentage of non-traditional loans in repayment | | 18.3% | | 21.7% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 6.3% | | 5.5% |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

*Receivable for Partially Charged-Off Private Education Loans*

At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2008 and 2013 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so. There was $334 million and $209 million in the allowance for Private Education Loan losses at March 31, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans.

13

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.    Allowance for Loan Losses (Continued)**

The following table summarizes the activity in the receivable for partially charged-off Private Education Loans.

| | Three Months Ended March 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| Receivable at beginning of period | $ 1,313 | $ 1,347 |
| Expected future recoveries of current period defaults[1] | 71 | 78 |
| Recoveries[2] | (61) | (68) |
| Charge-offs[3] | (26) | (18) |
| Receivable at end of period | 1,297 | 1,339 |
| Allowance for estimated recovery shortfalls[4] | (334) | (209) |
| Net receivable at end of period | $  963 | $ 1,130 |

[1]    Represents the difference between the loan balance and our estimate of the amount to be collected in the future.

[2]    Current period cash recoveries.

[3]    Represents the current period recovery shortfall — the difference between what was expected to be collected and what was actually collected. These amounts are included in the Private Education Loan total charge-offs as reported in the "Allowance for Loan Losses Metrics" tables.

[4]    The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $2.1 billion and $2.2 billion overall allowance for Private Education Loan losses as of March 31, 2014 and 2013, respectively.

*Troubled Debt Restructurings ("TDRs")*

We modify the terms of loans for certain customers when we believe such modifications may increase the ability and willingness of a customer to make payments and thus increase the ultimate overall amount collected on a loan. These modifications generally take the form of a forbearance, a temporary interest rate reduction or an extended repayment plan. For customers experiencing financial difficulty, certain Private Education Loans for which we have granted either a forbearance of greater than three months, an interest rate reduction or an extended repayment plan are classified as TDRs. Approximately 46 percent and 45 percent of the loans granted forbearance have qualified as a TDR loan at March 31, 2014 and December 31, 2013, respectively. The unpaid principal balance of TDR loans that were in an interest rate reduction plan as of March 31, 2014 and December 31, 2013 was $1.7 billion and $1.5 billion, respectively.

14

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

At March 31, 2014 and December 31, 2013, all of our TDR loans had a related allowance recorded. The following table provides the recorded investment, unpaid principal balance and related allowance for our TDR loans.

| | TDR Loans | | |
|---|---|---|---|
| (Dollars in millions) | Recorded Investment[1] | Unpaid Principal Balance | Related Allowance |
| **March 31, 2014** | | | |
| Private Education Loans — Traditional | $    7,800 | $7,856 | $    852 |
| Private Education Loans — Non-Traditional | 1,441 | 1,439 | 229 |
| Total | $   9,241 | $9,295 | $ 1,081 |
| **December 31, 2013** | | | |
| Private Education Loans — Traditional | $    7,515 | $7,559 | $    812 |
| Private Education Loans — Non-Traditional | 1,434 | 1,427 | 236 |
| Total | $   8,949 | $8,986 | $ 1,048 |

[1]   The recorded investment is equal to the unpaid principal balance and accrued interest receivable net of unamortized deferred fees and costs.

The following table provides the average recorded investment and interest income recognized for our TDR loans.

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2014 | | 2013 | |
| (Dollars in millions) | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| Private Education Loans — Traditional | $   7,631 | $    118 | $   6,185 | $    96 |
| Private Education Loans — Non-Traditional | 1,434 | 29 | 1,315 | 27 |
| Total | $   9,065 | $    147 | $   7,500 | $    123 |

15

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

The following table provides information regarding the loan status and aging of TDR loans that are past due.

| | TDR Loan Delinquencies | | | |
| | March 31, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in deferment[1] | $ 997 | | $ 913 | |
| Loans in forbearance[2] | 786 | | 740 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 6,045 | 80.5% | 5,613 | 76.5% |
| Loans delinquent 31-60 days[3] | 413 | 5.5 | 469 | 6.4 |
| Loans delinquent 61-90 days[3] | 286 | 3.8 | 330 | 4.5 |
| Loans delinquent greater than 90 days[3] | 768 | 10.2 | 921 | 12.6 |
| Total TDR loans in repayment | 7,512 | 100% | 7,333 | 100% |
| Total TDR loans, gross | $9,295 | | $ 8,986 | |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on the loans, e.g. residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

The following table provides the amount of modified loans that resulted in a TDR in the periods presented. Additionally, the table summarizes charge-offs occurring in the TDR portfolio, as well as TDRs for which a payment default occurred in the current period within 12 months of the loan first being designated as a TDR. We define payment default as 60 days past due for this disclosure. The majority of our loans that are considered TDRs involve a temporary forbearance of payments and do not change the contractual interest rate of the loan.

| | Three Months Ended March 31, | | | | | |
| | 2014 | | | 2013 | | |
| (Dollars in millions) | Modified Loans[1] | Charge-Offs[2] | Payment Default | Modified Loans[1] | Charge-Offs[2] | Payment Default |
|---|---|---|---|---|---|---|
| Private Education Loans — Traditional | $ 466 | $ 100 | $ 119 | $ 545 | $ 97 | $ 216 |
| Private Education Loans — Non-Traditional | 57 | 34 | 29 | 90 | 34 | 57 |
| Total | $ 523 | $ 134 | $ 148 | $ 635 | $ 131 | $ 273 |

[1]   Represents period ending balance of loans that have been modified during the period and resulted in a TDR.

[2]   Represents loans that charged off that were classified as TDRs.

16

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

*Accrued Interest Receivable*

The following table provides information regarding accrued interest receivable on our Private Education Loans. The table also discloses the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest. The allowance for uncollectible interest exceeds the amount of accrued interest on our 90 days past due portfolio for all periods presented.

| | | Accrued Interest Receivable | |
| (Dollars in millions) | Total | Greater Than 90 Days Past Due | Allowance for Uncollectible Interest |
|---|---|---|---|
| **March 31, 2014** | | | |
| Private Education Loans — Traditional | $ 939 | $    29 | $    41 |
| Private Education Loans — Non-Traditional | 85 | 11 | 18 |
| Total | $1,024 | $    40 | $    59 |
| **December 31, 2013** | | | |
| Private Education Loans — Traditional | $ 926 | $    35 | $    46 |
| Private Education Loans — Non-Traditional | 97 | 13 | 20 |
| Total | $1,023 | $    48 | $    66 |

**4.   Borrowings**

The following table summarizes our borrowings.

| | March 31, 2014 | | | December 31, 2013 | | |
| (Dollars in millions) | Short Term | Long Term | Total | Short Term | Long Term | Total |
|---|---|---|---|---|---|---|
| *Unsecured borrowings:* | | | | | | |
| Senior unsecured debt | $ 1,046 | $ 16,836 | $ 17,882 | $ 2,213 | $ 16,056 | $ 18,269 |
| Bank deposits | 5,964 | 2,755 | 8,719 | 6,133 | 2,807 | 8,940 |
| Other[1] | 684 | — | 684 | 691 | — | 691 |
| Total unsecured borrowings | 7,694 | 19,591 | 27,285 | 9,037 | 18,863 | 27,900 |
| *Secured borrowings:* | | | | | | |
| FFELP Loan securitizations | — | 90,608 | 90,608 | — | 90,756 | 90,756 |
| Private Education Loan securitizations | — | 18,861 | 18,861 | — | 18,835 | 18,835 |
| FFELP Loans — other facilities | 3,919 | 4,400 | 8,319 | 4,715 | 5,311 | 10,026 |
| Private Education Loans — other facilities | — | 597 | 597 | — | 843 | 843 |
| Total secured borrowings | 3,919 | 114,466 | 118,385 | 4,715 | 115,745 | 120,460 |
| Total before hedge accounting adjustments | 11,613 | 134,057 | 145,670 | 13,752 | 134,608 | 148,360 |
| Hedge accounting adjustments | 13 | 2,120 | 2,133 | 43 | 2,040 | 2,083 |
| Total | $11,626 | $136,177 | $147,803 | $13,795 | $136,648 | $150,443 |

[1]   "Other" primarily consists of the obligation to return cash collateral held related to derivative exposures.

17

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Borrowings (Continued)**

*Variable Interest Entities*

We consolidate the following financing VIEs as of March 31, 2014 and December 31, 2013, as we are the primary beneficiary. As a result, these VIEs are accounted for as secured borrowings.

| | | | | March 31, 2014 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total | |
| **Secured Borrowings — VIEs:** | | | | | | | | |
| FFELP Loan securitizations | $  — | $ 90,608 | $ 90,608 | $ 91,299 | $3,055 | $    700 | $ 95,054 | |
| Private Education Loan securitizations | — | 18,861 | 18,861 | 23,880 | 390 | 428 | 24,698 | |
| FFELP Loans — other facilities | 1,694 | 4,137 | 5,831 | 6,081 | 157 | 73 | 6,311 | |
| Private Education Loans — other facilities | — | 597 | 597 | 1,259 | 16 | 24 | 1,299 | |
| Total before hedge accounting adjustments | 1,694 | 114,203 | 115,897 | 122,519 | 3,618 | 1,225 | 127,362 | |
| Hedge accounting adjustments | — | 1,330 | 1,330 | — | — | 938 | 938 | |
| Total | $1,694 | $115,533 | $117,227 | $122,519 | $3,618 | $  2,163 | $ 128,300 | |

| | | | | December 31, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total | |
| **Secured Borrowings — VIEs:** | | | | | | | | |
| FFELP Loan securitizations | $  — | $ 90,756 | $ 90,756 | $ 91,535 | $2,913 | $    683 | $ 95,131 | |
| Private Education Loan securitizations | — | 18,835 | 18,835 | 23,947 | 338 | 540 | 24,825 | |
| FFELP Loans — other facilities | 3,655 | 3,791 | 7,446 | 7,719 | 128 | 91 | 7,938 | |
| Private Education Loans — other facilities | — | 843 | 843 | 1,583 | 16 | 30 | 1,629 | |
| Total before hedge accounting adjustments | 3,655 | 114,225 | 117,880 | 124,784 | 3,395 | 1,344 | 129,523 | |
| Hedge accounting adjustments | — | 1,313 | 1,313 | — | — | 978 | 978 | |
| Total | $3,655 | $115,538 | $119,193 | $124,784 | $3,395 | $  2,322 | $ 130,501 | |

**5.   Derivative Financial Instruments**

Our risk management strategy and use of and accounting for derivatives have not materially changed from that discussed in the Form 10 and the 2013 Form 10-K. Please refer to "Note 7 — Derivative Financial Instruments" in the Form 10 and the 2013 Form 10-K for a full discussion.

18

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Derivative Financial Instruments (Continued)**

*Summary of Derivative Financial Statement Impact*

The following tables summarize the fair values and notional amounts of all derivative instruments at March 31, 2014 and December 31, 2013, and their impact on other comprehensive income and earnings for the three months ended March 31, 2014 and 2013.

*Impact of Derivatives on Consolidated Balance Sheet*

| (Dollars in millions) | Hedged Risk Exposure | Cash Flow Mar. 31, 2014 | Cash Flow Dec. 31, 2013 | Fair Value Mar. 31, 2014 | Fair Value Dec. 31, 2013 | Trading Mar. 31, 2014 | Trading Dec. 31, 2013 | Total Mar. 31, 2014 | Total Dec. 31, 2013 |
|---|---|---|---|---|---|---|---|---|---|
| **Fair Values**[1] | | | | | | | | | |
| *Derivative Assets:* | | | | | | | | | |
| Interest rate swaps | Interest rate | $ 16 | $ 24 | $ 753 | $ 738 | $ 47 | $ 61 | $ 816 | $ 823 |
| Cross-currency interest rate swaps | Foreign currency & interest rate | — | — | 1,118 | 1,185 | — | — | 1,118 | 1,185 |
| Other[2] | Interest rate | — | — | — | — | 1 | 2 | 1 | 2 |
| Total derivative assets[3] | | 16 | 24 | 1,871 | 1,923 | 48 | 63 | 1,935 | 2,010 |
| *Derivative Liabilities:* | | | | | | | | | |
| Interest rate swaps | Interest rate | — | — | (110) | (149) | (180) | (215) | (290) | (364) |
| Floor Income Contracts | Interest rate | — | — | — | — | (1,206) | (1,384) | (1,206) | (1,384) |
| Cross-currency interest rate swaps | Foreign currency & interest rate | — | — | (142) | (155) | (25) | (31) | (167) | (186) |
| Other[2] | Interest rate | — | — | — | — | (4) | (23) | (4) | (23) |
| Total derivative liabilities[3] | | — | — | (252) | (304) | (1,415) | (1,653) | (1,667) | (1,957) |
| Net total derivatives | | $ 16 | $ 24 | $1,619 | $1,619 | $(1,367) | $(1,590) | $ 268 | $ 53 |

[1] Fair values reported are exclusive of collateral held and pledged and accrued interest. Assets and liabilities are presented without consideration of master netting agreements. Derivatives are carried on the balance sheet based on net position by counterparty under master netting agreements, and classified in other assets or other liabilities depending on whether in a net positive or negative position.

[2] "Other" includes embedded derivatives bifurcated from securitization debt as well as derivatives related to our Total Return Swap Facility and back-to-back private credit floors.

[3] The following table reconciles gross positions without the impact of master netting agreements to the balance sheet classification:

| (Dollar in millions) | Other Assets March 31, 2014 | Other Assets December 31, 2013 | Other Liabilities March 31, 2014 | Other Liabilities December 31, 2013 |
|---|---|---|---|---|
| Gross position | $ 1,935 | $ 2,010 | $ (1,667) | $ (1,957) |
| Impact of master netting agreements | (342) | (386) | 342 | 386 |
| Derivative values with impact of master netting agreements (as carried on balance sheet) | 1,593 | 1,624 | (1,325) | (1,571) |
| Cash collateral (held) pledged | (683) | (687) | 645 | 777 |
| Net position | $ 910 | $ 937 | $ (680) | $ (794) |

The above fair values include adjustments for counterparty credit risk both for when we are exposed to the counterparty, net of collateral postings, and when the counterparty is exposed to us, net of collateral postings. The net adjustments decreased the overall net asset positions at March 31, 2014 and December 31, 2013 by $87 million and $91 million, respectively. In addition, the above fair values reflect adjustments for illiquid

19

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Derivative Financial Instruments (Continued)**

derivatives as indicated by a wide bid/ask spread in the interest rate indices to which the derivatives are indexed. These adjustments decreased the overall net asset positions at March 31, 2014 and December 31, 2013 by $82 million and $84 million, respectively.

| (Dollars in billions) | Cash Flow | | Fair Value | | Trading | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 |
| **Notional Values:** | | | | | | | | |
| Interest rate swaps | $ .7 | $ .7 | $ 17.2 | $ 16.0 | $ 46.3 | $ 46.3 | $ 64.2 | $ 63.0 |
| Floor Income Contracts | — | — | — | — | 27.2 | 31.8 | 27.2 | 31.8 |
| Cross-currency interest rate swaps | — | — | 10.7 | 11.1 | .4 | .3 | 11.1 | 11.4 |
| Other[1] | — | — | — | — | 3.8 | 3.9 | 3.8 | 3.9 |
| Total derivatives | $ .7 | $ .7 | $ 27.9 | $ 27.1 | $ 77.7 | $ 82.3 | $106.3 | $110.1 |

[1]   "Other" includes embedded derivatives bifurcated from securitization debt, as well as derivatives related to our Total Return Swap Facility and back to back private credit floors.

*Impact of Derivatives on Consolidated Statements of Income*

| (Dollars in millions) | Three Months Ended March 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Unrealized Gain (Loss) on Derivatives[1][2] | | Realized Gain (Loss) on Derivatives[3] | | Unrealized Gain (Loss) on Hedged Item[1] | | Total Gain (Loss) | |
| | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| **Fair Value Hedges:** | | | | | | | | |
| Interest rate swaps | $ 53 | $(172) | $ 100 | $ 109 | $(53) | $195 | $100 | $132 |
| Cross-currency interest rate swaps | (53) | (556) | 22 | 21 | 7 | 552 | (24) | 17 |
| Total fair value derivatives | — | (728) | 122 | 130 | (46) | 747 | 76 | 149 |
| **Cash Flow Hedges:** | | | | | | | | |
| Interest rate swaps | — | — | (3) | (3) | — | — | (3) | (3) |
| Total cash flow derivatives | — | — | (3) | (3) | — | — | (3) | (3) |
| **Trading:** | | | | | | | | |
| Interest rate swaps | 19 | (19) | 12 | 24 | — | — | 31 | 5 |
| Floor Income Contracts | 181 | 189 | (198) | (213) | — | — | (17) | (24) |
| Cross-currency interest rate swaps | 7 | (47) | (1) | 20 | — | — | 6 | (27) |
| Other | 19 | (4) | (1) | — | — | — | 18 | (4) |
| Total trading derivatives | 226 | (19) | (188) | (169) | — | — | 38 | (50) |
| Total | 226 | (609) | (69) | (42) | (46) | 747 | 111 | 96 |
| Less: realized gains (losses) recorded in interest expense | — | — | 119 | 127 | — | — | 119 | 127 |
| Gains (losses) on derivative and hedging activities, net | $226 | $(609) | $(188) | $(169) | $(46) | $747 | $ (8) | $ (31) |

[1]   Recorded in "Gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

[2]   Represents ineffectiveness related to cash flow hedges.

[3]   For fair value and cash flow hedges, recorded in interest expense. For trading derivatives, recorded in "Gains (losses) on derivative and hedging activities, net."

20

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Derivative Financial Instruments (Continued)**

*Collateral*

Collateral held and pledged related to derivative exposures between us and our derivative counterparties are detailed in the following table:

| (Dollars in millions) | March 31, 2014 | December 31, 2013 |
|---|---|---|
| **Collateral held:** | | |
| Cash (obligation to return cash collateral is recorded in short-term borrowings)[1] | $   683 | $   687 |
| Securities at fair value — on-balance sheet securitization derivatives (not recorded in financial statements)[2] | 633 | 629 |
| Total collateral held | $ 1,316 | $ 1,316 |
| Derivative asset at fair value including accrued interest | $ 1,824 | $ 1,878 |
| **Collateral pledged to others:** | | |
| Cash (right to receive return of cash collateral is recorded in investments) | $   645 | $   777 |
| Total collateral pledged | $   645 | $   777 |
| Derivative liability at fair value including accrued interest and premium receivable | $   769 | $   948 |

[1]   At March 31, 2014 and December 31, 2013, $0 and $0 million, respectively, were held in restricted cash accounts.

[2]   The trusts do not have the ability to sell or re-pledge securities they hold as collateral.

Our corporate derivatives contain credit contingent features. At our current unsecured credit rating, we have fully collateralized our corporate derivative liability position (including accrued interest and net of premiums receivable) of $581 million with our counterparties. Further downgrades would not result in any additional collateral requirements, except to increase the frequency of collateral calls. Two counterparties have the right to terminate the contracts based on our recent unsecured credit rating downgrades. We currently have a liability position with these derivative counterparties (including accrued interest and net of premiums receivable) of $133 million and have posted $118 million of collateral to these counterparties. If these two counterparties exercised their right to terminate, we would be required to deliver additional assets of $15 million to settle the contracts. Trust related derivatives do not contain credit contingent features related to our or the trusts' credit ratings.

**6.   Other Assets**

The following table provides the detail of our other assets.

| | March 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| (Dollars in millions) | Ending Balance | % of Balance | Ending Balance | % of Balance |
| Accrued interest receivable, net | $2,052 | 30% | $2,161 | 30% |
| Derivatives at fair value | 1,593 | 23 | 1,624 | 22 |
| Income tax asset, net current and deferred | 1,212 | 17 | 1,299 | 18 |
| Accounts receivable | 810 | 12 | 881 | 12 |
| Benefit and insurance-related investments | 480 | 7 | 477 | 7 |
| Fixed assets, net | 244 | 4 | 237 | 3 |
| Other loans, net | 96 | 1 | 101 | 1 |
| Other | 449 | 6 | 507 | 7 |
| Total | $6,936 | 100% | $7,287 | 100% |

21

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Stockholders' Equity**

The following table summarizes Existing SLM's common share repurchases and issuances.

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Common shares repurchased[1] | 8,368,300 | 10,220,804 |
| Average purchase price per share[2] | $ 23.89 | $ 19.49 |
| Shares repurchased related to employee stock-based compensation plans[3] | 2,115,470 | 2,324,575 |
| Average purchase price per share | $ 23.56 | $ 18.11 |
| Common shares issued[4] | 4,238,182 | 4,157,795 |

[1]   Common shares purchased under Existing SLM's share repurchase program, of which $0 million remained available as of March 31, 2014.

[2]   Average purchase price per share includes purchase commission costs.

[3]   Comprises shares withheld from stock option exercises and vesting of restricted stock for employees' tax withholding obligations and shares tendered by employees to satisfy option exercise costs.

[4]   Common shares issued under Existing SLM's various compensation and benefit plans.

The closing price of Existing SLM's common stock on March 31, 2014 was $24.48.

***Dividend and Share Repurchase Program***

In the first-quarter 2014, Existing SLM paid a common stock dividend of $0.15 per common share.

In the first-quarter 2014, Existing SLM repurchased 8 million shares of common stock for $200 million, fully utilizing Existing SLM's July 2013 share repurchase program authorization. In 2013, Existing SLM repurchased 27 million shares for an aggregate purchase price of $600 million.

22

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8.  Earnings per Common Share**

Basic earnings per common share ("EPS") are calculated using the weighted average number of shares of common stock outstanding during each period. A reconciliation of the numerators and denominators of the basic and diluted EPS calculations follows.

| (In millions, except per share data) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| **Numerator:** | | |
| Net income attributable to Navient Corporation | $  219 | $  346 |
| Preferred stock dividends | 5 | 5 |
| Net income attributable to Navient Corporation common stock | $  214 | $  341 |
| **Denominator:** | | |
| Weighted average shares used to compute basic EPS | 427 | 451 |
| Effect of dilutive securities: | | |
| Dilutive effect of stock options, non-vested restricted stock, restricted stock units and Employee Stock Purchase Plan ("ESPP")[1] | 8 | 7 |
| Dilutive potential common shares[2] | 8 | 7 |
| Weighted average shares used to compute diluted EPS | 435 | 458 |
| **Basic earnings (loss) per common share attributable to Navient Corporation:** | | |
| Continuing operations | $  .50 | $  .76 |
| Discontinued operations | — | — |
| Total | $  .50 | $  .76 |
| **Diluted earnings (loss) per common share attributable to Navient Corporation:** | | |
| Continuing operations | $  .49 | $  .74 |
| Discontinued operations | — | — |
| Total | $  .49 | $  .74 |

[1] Includes the potential dilutive effect of additional common shares that are issuable upon exercise of outstanding stock options, non-vested deferred compensation and restricted stock, restricted stock units, and the outstanding commitment to issue shares under the ESPP, determined by the treasury stock method.

[2] For the three months ended March 31, 2014 and 2013, securities covering approximately 3 million and 5 million shares, respectively, were outstanding but not included in the computation of diluted earnings per share because they were anti-dilutive.

**9.  Fair Value Measurements**

We use estimates of fair value in applying various accounting standards in our financial statements.

We categorize our fair value estimates based on a hierarchical framework associated with three levels of price transparency utilized in measuring financial instruments at fair value. Please refer to "Note 12 — Fair Value Measurements" in the Form 10 and the 2013 Form 10-K for a full discussion.

During the three months ended March 31, 2014, there were no significant transfers of financial instruments between levels, or changes in our methodology or assumptions used to value our financial instruments.

23

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.   Fair Value Measurements (Continued)**

The following table summarizes the valuation of our financial instruments that are marked-to-market on a recurring basis.

| | Fair Value Measurements on a Recurring Basis | | | | | | | |
| | March 31, 2014 | | | | December 31, 2013 | | | |
| (Dollars in millions) | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Available-for-sale investments: | | | | | | | | |
| Agency residential mortgage-backed securities | $  — | $  129 | $  — | $  129 | $  — | $  102 | $  — | $  102 |
| Guaranteed investment contracts | — | — | — | — | — | — | — | — |
| Other | — | 6 | — | 6 | — | 7 | — | 7 |
| Total available-for-sale investments | — | 135 | — | 135 | — | 109 | — | 109 |
| Derivative instruments:[1] | | | | | | | | |
| Interest rate swaps | — | 784 | 32 | 816 | — | 785 | 38 | 823 |
| Cross-currency interest rate swaps | — | 1 | 1,117 | 1,118 | — | 27 | 1,158 | 1,185 |
| Other | — | — | 1 | 1 | — | — | 2 | 2 |
| Total derivative assets[3] | — | 785 | 1,150 | 1,935 | — | 812 | 1,198 | 2,010 |
| **Total** | $  — | $  920 | $1,150 | $ 2,070 | $  — | $  921 | $1,198 | $ 2,119 |
| **Liabilities**[2] | | | | | | | | |
| Derivative instruments[1] | | | | | | | | |
| Interest rate swaps | $  — | $  (171) | $ (119) | $  (290) | $  — | $  (239) | $ (125) | $  (364) |
| Floor Income Contracts | — | (1,206) | — | (1,206) | — | (1,384) | — | (1,384) |
| Cross-currency interest rate swaps | — | (30) | (137) | (167) | — | (35) | (151) | (186) |
| Other | — | — | (4) | (4) | — | — | (23) | (23) |
| Total derivative liabilities[3] | — | (1,407) | (260) | (1,667) | — | (1,658) | (299) | (1,957) |
| **Total** | $  — | $(1,407) | $ (260) | $(1,667) | $  — | $(1,658) | $ (299) | $(1,957) |

[1] Fair value of derivative instruments excludes accrued interest and the value of collateral.

[2] Borrowings which are the hedged items in a fair value hedge relationship and which are adjusted for changes in value due to benchmark interest rates only are not carried at full fair value and are not reflected in this table.

[3] See "Note 5 — Derivative Financial Instruments" for a reconciliation of gross positions without the impact of master netting agreements to the balance sheet classification.

24

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.   Fair Value Measurements (Continued)**

The following tables summarize the change in balance sheet carrying value associated with level 3 financial instruments carried at fair value on a recurring basis.

| | Three Months Ended March 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2014** | | | | **2013** | | | |
| | **Derivative instruments** | | | | **Derivative instruments** | | | |
| (Dollars in millions) | **Interest Rate Swaps** | **Cross Currency Interest Rate Swaps** | **Other** | **Total Derivative Instruments** | **Interest Rate Swaps** | **Cross Currency Interest Rate Swaps** | **Other** | **Total Derivative Instruments** |
| **Balance, beginning of period** | $   (87) | $   1,007 | $(21) | $   899 | $   (73) | $   1,053 | $   4 | $   984 |
| Total gains/(losses) (realized and unrealized): | | | | | | | | |
| Included in earnings[1] | — | (10) | 17 | 7 | 5 | (546) | (5) | (546) |
| Included in other comprehensive income | — | — | — | — | — | — | — | — |
| Settlements | — | (17) | 1 | (16) | (8) | (37) | 1 | (44) |
| Transfers in and/or out of level 3 | — | — | — | — | — | — | — | — |
| **Balance, end of period** | $   (87) | $   980 | $   (3) | $   890 | $   (76) | $   470 | $   — | $   394 |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $   — | $   (28) | $ 19 | $   (9) | $   (3) | $   (514) | $   (5) | $   (522) |

(1)  "Included in earnings" is comprised of the following amounts recorded in the specified line item in the consolidated statements of income:

| | Three Months Ended March 31, | |
|---|---|---|
| (Dollars in millions) | **2014** | **2013** |
| Gains (losses) on derivative and hedging activities, net | $   (11) | $   (562) |
| Interest expense | 18 | 16 |
| Total | $   7 | $   (546) |

(2)  Recorded in "gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

25

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.   Fair Value Measurements (Continued)**

The following table presents the significant inputs that are unobservable or from inactive markets used in the recurring valuations of the level 3 financial instruments detailed above.

| (Dollars in millions) | Fair Value at March 31, 2014 | | Valuation Technique | Input | Range (Weighted Average) |
|---|---|---|---|---|---|
| **Derivatives** | | | | | |
| Consumer Price Index/ LIBOR basis swaps | $ | 29 | Discounted cash flow | Bid/ask adjustment to discount rate | 0.03% — 0.03% (0.03%) |
| Prime/LIBOR basis swaps | | (116) | Discounted cash flow | Constant prepayment rate | 4.2% |
| | | | | Bid/ask adjustment to discount rate | 0.08% — 0.08% (0.08%) |
| Cross-currency interest rate swaps | | 980 | Discounted cash flow | Constant prepayment rate | 2.6% |
| Other | | (3) | | | |
| Total | $ | 890 | | | |

The significant inputs that are unobservable or from inactive markets related to our level 3 derivatives detailed in the table above would be expected to have the following impacts to the valuations:

- Consumer Price Index/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation.

- Prime/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation. In addition, the unobservable inputs include Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap which will increase the value for swaps in a gain position and decrease the value for swaps in a loss position, everything else equal. The opposite is true for an increase in the input.

- Cross-currency interest rate swaps — The unobservable inputs used in these valuations are Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap. All else equal in a typical currency market, this will result in a decrease to the valuation due to the delay in the cash flows of the currency exchanges as well as diminished liquidity in the forward exchange markets as you increase the term. The opposite is true for an increase in the input.

26

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.   Fair Value Measurements (Continued)**

The following table summarizes the fair values of our financial assets and liabilities, including derivative financial instruments.

| (Dollars in millions) | March 31, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Fair Value | Carrying Value | Difference | Fair Value | Carrying Value | Difference |
| **Earning assets** | | | | | | |
| FFELP Loans | $103,058 | $102,635 | $   423 | $104,481 | $104,588 | $  (107) |
| Private Education Loans | 38,862 | 38,157 | 705 | 37,485 | 37,512 | (27) |
| Cash and investments[1] | 8,323 | 8,323 | — | 9,732 | 9,732 | — |
| Total earning assets | 150,243 | 149,115 | 1,128 | 151,698 | 151,832 | (134) |
| **Interest-bearing liabilities** | | | | | | |
| Short-term borrowings | 11,633 | 11,626 | (7) | 13,807 | 13,795 | (12) |
| Long-term borrowings | 134,190 | 136,177 | 1,987 | 133,578 | 136,648 | 3,070 |
| Total interest-bearing liabilities | 145,823 | 147,803 | 1,980 | 147,385 | 150,443 | 3,058 |
| **Derivative financial instruments** | | | | | | |
| Floor Income Contracts | (1,206) | (1,206) | — | (1,384) | (1,384) | — |
| Interest rate swaps | 526 | 526 | — | 459 | 459 | — |
| Cross-currency interest rate swaps | 951 | 951 | — | 999 | 999 | — |
| Other | (3) | (3) | — | (21) | (21) | — |
| **Excess of net asset fair value over carrying value** | | | $ 3,108 | | | $ 2,924 |

[1] "Cash and investments" includes available-for-sale investments that consist of investments that are primarily agency securities whose cost basis is $138 million and $113 million at March 31, 2014 and December 31, 2013, respectively, versus a fair value of $135 million and $109 million at March 31, 2014 and December 31, 2013, respectively.

**10.   Commitments and Contingencies**

As previously reported, Sallie Mae Bank remains subject to a cease and desist order originally issued in August 2008 by the Federal Deposit Insurance Corporation (the "FDIC") and the Utah Department of Financial Institutions. In July 2013, the FDIC first notified Sallie Mae Bank of plans to replace its order with a new formal enforcement action (the "Bank Order") that more specifically addresses certain cited violations of Section 5 of the Federal Trade Commission Act, including the customer billing disclosures and assessments of certain late fees, as well as alleged violations under the Servicemembers Civil Relief Act ("SCRA"). In November 2013, the FDIC indicated an additional enforcement action would be issued against Sallie Mae, Inc. ("SMI") in its capacity as a servicer of education loans for Sallie Mae Bank and other financial institutions. In connection with the recently completed spin-off of Navient Corporation ("Navient") from SLM Corporation, SMI became a wholly-owned subsidiary of Navient and changed its name to Navient Solutions, Inc. ("NSI").

Based on our discussions with the FDIC, we believe the FDIC intends to require certain late fee refunds to be made by NSI and Sallie Mae Bank with respect to loans owned or originated by Sallie Mae Bank from November 28, 2005 until the effective date of the agreement. To fulfill this requirement, NSI would fund a $30 million restitution reserve account.

In order to treat all customers in a similar manner, NSI expects to voluntarily make restitution of certain late fees to all other customers whose loans were neither owned nor originated by Sallie Mae Bank on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million.

27

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Commitments and Contingencies (Continued)**

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank remain engaged in discussions regarding a comprehensive settlement, remediation and civil settlement plan with the United States Department of Justice ("DOJ"), in its capacity as the agency having primary authority for enforcement of such matters. The DOJ inquiry covers all loans owned by either Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. Based on our settlement discussions with the DOJ, NSI would be required to fund a $60 million settlement fund, which would represent the total amount of compensation due to service members under the DOJ agreement.

Previous regulatory requirements and guidance from the Department of Education regarding compliance with the SCRA statute provide that customers must provide both a copy of the military orders calling a person to active duty and a written request to receive the 6 percent interest rate cap available for active duty service members. The terms of the potential settlement with the DOJ, which remain subject to approval by the Department of Education, would provide new guidance on what a service member must do to receive the SCRA benefit and would apply this new approach retroactively to November 2005. The proposed settlement would assess a penalty for past non-compliance with this new approach. This new approach would reduce the documentation required, thereby easing the burden on service members.

As of December 31, 2013, a reserve of $70 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In the first quarter of 2014, an additional reserve of $103 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators. The final cost of these proceedings remains uncertain until final execution of the agreements with the regulators.

We are cooperating fully and expect to resolve these matters very soon. We have already made enhancements to our billing statements and late fee practices. In addition, since 2009, we have made a number of enhancements to better serve military customers and their families. NSI created a specialized customer service team to serve military customers; launched a special, comprehensive website for service members; worked with the U.S. Department of Education and other federal loan servicers to publish resources to help service members learn more about their benefits under SCRA; and expedited processing to provide responsive service to members of the armed forces.

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees. Navient recently commenced discussions with the CFPB relating to the customer billing statement disclosures and assessment of late fees. Reserves have not been established for this matter as such estimate cannot be made at this time. Navient and its subsidiaries will remain subject to the CIDs. Sallie Mae Bank is not currently subject to CFPB jurisdiction on these matters but may be subject to inquiry as an affiliate.

Pursuant to the Separation and Distribution Agreement among SLM Corporation, New BLC Corporation and Navient, dated April 28, 2014 (the "Separation Agreement"), entered into in connection with the internal reorganization and Spin-Off, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom.

28

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Commitments and Contingencies (Continued)**

*Contingencies*

In the ordinary course of business, we and our subsidiaries are defendants in or parties to pending and threatened legal actions and proceedings including actions brought on behalf of various classes of claimants. These actions and proceedings may be based on alleged violations of consumer protection, securities, employment and other laws. In certain of these actions and proceedings, claims for substantial monetary damage are asserted against us and our subsidiaries.

In the ordinary course of business, we and our subsidiaries are subject to regulatory examinations, information gathering requests, inquiries and investigations. In connection with formal and informal inquiries in these cases, we and our subsidiaries receive numerous requests, subpoenas and orders for documents, testimony and information in connection with various aspects of our regulated activities.

In view of the inherent difficulty of predicting the outcome of such litigation and regulatory matters, we cannot predict what the eventual outcome of the pending matters will be, what the timing or the ultimate resolution of these matters will be, or what the eventual loss, fines or penalties related to each pending matter may be.

We are required to establish reserves for litigation and regulatory matters where those matters present loss contingencies that are both probable and estimable. When loss contingencies are not both probable and estimable, we do not establish reserves.

Based on current knowledge, reserves have been established for certain litigation or regulatory matters where the loss is both probable and estimable. Based on current knowledge, management does not believe that loss contingencies, if any, arising from pending investigations, litigation or regulatory matters will have a material adverse effect on our consolidated financial position, liquidity, results of operations or cash flows.

**11.  Segment Reporting**

*FFELP Loans Segment*

Our FFELP Loans segment consists of our FFELP Loan portfolio and underlying debt and capital funding these loans. Even though FFELP Loans are no longer originated we continue to seek to acquire FFELP Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. This segment is expected to generate significant amounts of cash as the FFELP Loan portfolio amortizes.

As of March 31, 2014, approximately $1.4 billion of FFELP Loans was held at Sallie Mae Bank, which remained with the consumer banking business following the separation and distribution. Navient will continue to service the FFELP Loans held by Sallie Mae Bank after the separation and distribution.

The following table includes asset information for our FFELP Loans segment.

| (Dollars in millions) | March 31, 2014 | December 31, 2013 |
|---|---|---|
| FFELP Loans, net | $      102,635 | $      104,588 |
| Cash and investments[1] | 3,836 | 4,473 |
| Other | 2,808 | 3,587 |
| Total assets | $      109,279 | $      112,648 |

[1]  Includes restricted cash and investments.

29

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Segment Reporting (Continued)**

*Private Education Loans Segment*

In this segment, we acquire, finance, service and historically originated Private Education Loans. The Private Education Loans we historically originated were primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or customers' resources. In this segment, we earn net interest income on the Private Education Loan portfolio (after provision for loan losses) as well as servicing fees, primarily late fees.

As of March 31, 2014, approximately $7.2 billion of our Private Education Loans was held at Sallie Mae Bank. In connection with the separation and distribution, Sallie Mae Bank, and its portfolio of Private Education Loans, will remain with the consumer banking business. Navient will provide servicing and asset recovery services for the consumer banking business's Private Education Loans during a transition period, with Private Education Loans whose individual borrowers also have an education loan owned by Navient continuing to be serviced by Navient after the transition period. Navient cannot originate Private Education loans until 2019, pursuant to the terms of the separation and distribution agreement.

The following table includes asset information for our Private Education Loans segment.

| (Dollars in millions) | March 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| Private Education Loans, net | $ | 38,157 | $ | 37,512 |
| Cash and investments[1] | | 1,724 | | 2,555 |
| Other | | 3,369 | | 2,934 |
| Total assets | $ | 43,250 | $ | 43,001 |

[1]  Includes restricted cash and investments.

*Business Services Segment*

Our Business Services segment generates the majority of its revenue from servicing our FFELP Loan portfolio. We also provide servicing, loan default aversion and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED. We also operate a consumer savings network that provides financial rewards on everyday purchases to help families save for college, Upromise.

After the separation and distribution, we will perform substantially all of the activities of the Business Services Segment, other than the activities of Upromise and the Insurance Business, which will be carried on by the consumer banking business.

At March 31, 2014 and December 31, 2013, the Business Services segment had total assets of $789 million and $892 million, respectively.

*Other Segment*

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

At March 31, 2014 and December 31, 2013, the Other segment had total assets of $3.2 billion and $3.0 billion, respectively.

30

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Segment Reporting (Continued)**

*Measure of Profitability*

The tables below include the condensed operating results for each of our reportable segments. Management, including the chief operating decision makers, evaluates the Company on certain performance measures that we refer to as "Core Earnings" performance measures for each operating segment. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for two items, discussed below, that create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information as we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. The two items adjusted for in our "Core Earnings" presentations are (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets. The tables presented below reflect "Core Earnings" operating measures reviewed and utilized by management to manage the business. Reconciliation of the "Core Earnings" segment totals to our consolidated operating results in accordance with GAAP is also included in the tables below.

Our "Core Earnings" performance measures are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Unlike financial accounting, there is no comprehensive, authoritative guidance for management reporting. The management reporting process measures the performance of the operating segments based on the management structure of the Company and is not necessarily comparable with similar information for any other financial institution. Our operating segments are defined by the products and services they offer or the types of customers they serve, and they reflect the manner in which financial information is currently evaluated by management. Intersegment revenues and expenses are netted within the appropriate financial statement line items consistent with the income statement presentation provided to management. Changes in management structure or allocation methodologies and procedures may result in changes in reported segment financial information.

31

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Segment Reporting (Continued)**

*Segment Results and Reconciliations to GAAP*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Three Months Ended March 31, 2014** | | | | |
| | | | | | | | | **Adjustments** | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
| Interest income: | | | | | | | | | | |
| Student loans | $ 523 | $ 644 | $ — | $ — | $ — | $ 1,167 | $ 198 | $ (75) | $ 123 | $1,290 |
| Other loans | — | — | — | 3 | — | 3 | — | — | — | 3 |
| Cash and investments | 1 | 1 | 1 | 1 | (1) | 3 | — | — | — | 3 |
| Total interest income | 524 | 645 | 1 | 4 | (1) | 1,173 | 198 | (75) | 123 | 1,296 |
| Total interest expense | 293 | 206 | — | 21 | (1) | 519 | 10 | 1(4) | 11 | 530 |
| Net interest income (loss) | 231 | 439 | 1 | (17) | — | 654 | 188 | (76) | 112 | 766 |
| Less: provisions for loan losses | 10 | 175 | — | — | — | 185 | — | — | — | 185 |
| Net interest income (loss) after provisions for loan losses | 221 | 264 | 1 | (17) | — | 469 | 188 | (76) | 112 | 581 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 11 | 1 | 167 | — | (118) | 61 | — | — | — | 61 |
| Contingency revenue | — | — | 111 | — | — | 111 | — | — | — | 111 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income (loss) | — | — | 8 | 3 | — | 11 | (188) | 175(5) | (13) | (2) |
| Total other income (loss) | 11 | 1 | 286 | 3 | (118) | 183 | (188) | 175 | (13) | 170 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 125 | 76 | 106 | 105 | (118) | 294 | — | — | — | 294 |
| Overhead expenses | — | — | — | 72 | — | 72 | — | — | — | 72 |
| Operating expenses | 125 | 76 | 106 | 177 | (118) | 366 | — | — | — | 366 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 4 | 4 | 4 |
| Restructuring and other reorganization expenses | — | — | — | 26 | — | 26 | — | — | — | 26 |
| Total expenses | 125 | 76 | 106 | 203 | (118) | 392 | — | 4 | 4 | 396 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 107 | 189 | 181 | (217) | — | 260 | — | 95 | 95 | 355 |
| Income tax expense (benefit)(3) | 41 | 71 | 68 | (83) | — | 97 | — | 39 | 39 | 136 |
| Net income (loss) from continuing operations | 66 | 118 | 113 | (134) | — | 163 | — | 56 | 56 | 219 |
| Income from discontinued operations, net of tax expense | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) | 66 | 118 | 113 | (134) | — | 163 | — | 56 | 56 | 219 |
| Less: net income attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 66 | $ 118 | $ 113 | $(134) | $ — | $ 163 | $ — | $ 56 | $ 56 | $ 219 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| | | | |
|---|---|---|---|
| | **Three Months Ended March 31, 2014** | | |
| (Dollars in millions) | Net Impact of Derivative Accounting | Net Impact of Goodwill and Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 112 | $ — | $ 112 |
| Total other loss | (13) | — | (13) |
| Goodwill and acquired intangible asset impairment and amortization | — | 4 | 4 |
| "Core Earnings" adjustments to GAAP | $ 99 | $ (4) | 95 |
| Income tax benefit | | | 39 |
| Net income | | | $ 56 |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

(4)  Represents a portion of the $6 million of "other derivative accounting adjustments."

(5)  Represents the $180 million of "unrealized gains on derivative and hedging activities, net" as well as the remaining portion of the $6 million of "other derivative accounting adjustments."

32

Table of Contents

NAVIENT CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**11.  Segment Reporting (Continued)**

| | | | | | | | | Adjustments | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Interest income: | | | | | | | | | | |
| Student loans | $ 599 | $ 623 | $ — | $ — | $ — | $ 1,222 | 212 | (76) | 136 | $1,358 |
| Other loans | — | — | — | 3 | — | 3 | — | — | — | 3 |
| Cash and investments | 2 | 1 | 1 | 2 | (1) | 5 | — | — | — | 5 |
| Total interest income | 601 | 624 | 1 | 5 | (1) | 1,230 | 212 | (76) | 136 | 1,366 |
| Total interest expense | 340 | 203 | — | 13 | (1) | 555 | 18 | (2)(4) | 16 | 571 |
| Net interest income (loss) | 261 | 421 | 1 | (8) | — | 675 | 194 | (74) | 120 | 795 |
| Less: provisions for loan losses | 16 | 225 | — | — | — | 241 | — | — | — | 241 |
| Net interest income (loss) after provisions for loan losses | 245 | 196 | 1 | (8) | — | 434 | 194 | (74) | 120 | 554 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | 55 | — | — | — | — | 55 | — | — | — | 55 |
| Servicing revenue | 23 | 10 | 186 | — | (149) | 70 | — | — | — | 70 |
| Contingency revenue | — | — | 99 | — | — | 99 | — | — | — | 99 |
| Gains on debt repurchases | — | — | — | 29 | — | 29 | (6) | — | (6) | 23 |
| Other income (loss) | — | — | 7 | — | — | 7 | (188) | 184(5) | (4) | 3 |
| Total other income (loss) | 78 | 10 | 292 | 29 | (149) | 260 | (194) | 184 | (10) | 250 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 157 | 67 | 95 | 3 | (149) | 173 | — | — | — | 173 |
| Overhead expenses | — | — | — | 62 | — | 62 | — | — | — | 62 |
| Operating expenses | 157 | 67 | 95 | 65 | (149) | 235 | — | — | — | 235 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 3 | 3 | 3 |
| Restructuring and other reorganization expenses | — | — | — | 10 | — | 10 | — | — | — | 10 |
| Total expenses | 157 | 67 | 95 | 75 | (149) | 245 | — | 3 | 3 | 248 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 166 | 139 | 198 | (54) | — | 449 | — | 107 | 107 | 556 |
| Income tax expense (benefit)(3) | 62 | 52 | 73 | (20) | — | 167 | — | 44 | 44 | 211 |
| Net income (loss) from continuing operations | 104 | 87 | 125 | (34) | — | 282 | — | 63 | 63 | 345 |
| Income from discontinued operations, net of tax expense | — | — | 1 | — | — | 1 | — | — | — | 1 |
| Net income (loss) | 104 | 87 | 126 | (34) | — | 283 | — | 63 | 63 | 346 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 104 | $ 87 | $ 126 | $ (34) | $ — | $ 283 | $ — | $ 63 | $ 63 | $ 346 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| | Three Months Ended March 31, 2013 | | |
| (Dollars in millions) | Net Impact of Derivative Accounting | Net Impact of Goodwill and Acquired Intangibles | Total |
|---|---|---|---|
| Net interest income after provisions for loan losses | $ 120 | $ — | $ 120 |
| Total other loss | (10) | — | (10) |
| Goodwill and acquired intangible asset impairment and amortization | — | 3 | 3 |
| "Core Earnings" adjustments to GAAP | $ 110 | $ (3) | 107 |
| Income tax benefit | | | 44 |
| Net loss | | | $ 63 |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

(4)  Represents a portion of the $29 million of "other derivative accounting adjustments."

(5)  Represents the $157 million of "unrealized gains (losses) on derivative and hedging activities, net" as well as the remaining portion of the $29 million of "other derivative accounting adjustments."

33

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Segment Reporting (Continued)**

*Summary of "Core Earnings" Adjustments to GAAP*

The two adjustments required to reconcile from our "Core Earnings" results to our GAAP results of operations relate to differing treatments for: (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets. The following table reflects aggregate adjustments associated with these areas.

| (Dollars in millions) | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2014 | 2013 |
| **"Core Earnings" adjustments to GAAP:** | | |
| Net impact of derivative accounting[1] | $    99 | $   110 |
| Net impact of goodwill and acquired intangibles assets[2] | (4) | (3) |
| Net tax effect[3] | (39) | (44) |
| Net effect from discontinued operations | — | — |
| Total "Core Earnings" adjustments to GAAP | $    56 | $    63 |

[1]   **Derivative accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These unrealized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

[2]   **Goodwill and acquired intangible assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and amortization of acquired intangible assets.

[3]   **Net tax effect:** Such tax effect is based upon our "Core Earnings" effective tax rate for the year.

34

Table of Contents

**Item 2.       Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q and the audited consolidated financial statements and related notes thereto and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Form 10 and included in the 2013 Form 10-K.

This report contains "forward-looking" statements and information based on management's current expectations as of the date of this document. Statements that are not historical facts, including statements about our beliefs, opinions, or expectations or statements that assume or are dependent upon future events, are forward-looking statements. Forward-looking statements are subject to risks, uncertainties, assumptions and other factors that may cause actual results to be materially different from those reflected in such forward-looking statements. These factors include, among others, the risks and uncertainties set forth in Item 1A "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q, the 2013 Form 10-K, the Form 10 and our subsequent filings with the SEC; increases in financing costs; limits on liquidity; increases in costs associated with compliance with laws and regulations; changes in accounting standards and the impact of related changes in significant accounting estimates; any adverse outcomes in any significant litigation to which we are a party; credit risk associated with our exposure to third parties, including counterparties to our derivative transactions; and changes in the terms of student loans and the educational credit marketplace (including changes resulting from new laws and the implementation of existing laws). We could also be affected by, among other things: changes in our funding costs and availability; reductions to our credit ratings or the credit ratings of the United States of America; failures of our operating systems or infrastructure, including those of third-party vendors; damage to our reputation; failures to successfully implement cost-cutting initiatives and adverse effects of such initiatives on our business; risks associated with restructuring initiatives, including the recently completed separation of Navient and SLM Corporation into two, distinct publicly traded companies; changes in the demand for educational financing or in financing preferences of lenders, educational institutions, students and their families; changes in law and regulations with respect to the student lending business and financial institutions generally; increased competition from banks and other consumer lenders; the creditworthiness of our customers; changes in the general interest rate environment, including the rate relationships among relevant money-market instruments and those of our earning assets versus our funding arrangements; changes in general economic conditions; our ability to successfully effectuate any acquisitions and other strategic initiatives; and changes in the demand for debt management services. The preparation of our consolidated financial statements also requires management to make certain estimates and assumptions including estimates and assumptions about future events. These estimates or assumptions may prove to be incorrect. All forward-looking statements contained in this report are qualified by these cautionary statements and are made only as of the date of this document. We do not undertake any obligation to update or revise these forward-looking statements to conform the statement to actual results or changes in our expectations.

Definitions for certain capitalized terms used in this document can be found in the Form 10 and in the 2013 Form 10-K.

Through this discussion and analysis, we intend to provide the reader with some narrative context for how our management views our consolidated financial statements, additional context within which to assess our operating results, and information on the quality and variability of our earnings, liquidity and cash flows.

**Presentation of Information**

Unless the context otherwise requires, references in this Management's Discussion and Analysis of Financial Condition and Results of Operations to:

- "We," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off means and refers to Existing SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off means and refers to Navient and its consolidated subsidiaries.

Table of Contents

- "Existing SLM" refers to SLM Corporation, as it existed prior to the separation and distribution of Navient that occurred on April 30, 2014, and its consolidated subsidiaries. As part of an internal corporate reorganization of Existing SLM, Existing SLM was merged into a limited liability company and become a subsidiary of Navient, changing its name to "Navient, LLC."

- Navient's historical business and operations refer to Existing SLM's portfolio of FFELP and private education student loans not held by Sallie Mae Bank, together with the servicing and asset recovery businesses that will be retained by or transferred to Navient in connection with the internal corporate reorganization.

- Navient historical information on a "pro forma basis" refers to Navient's businesses, net income, assets and liabilities, as adjusted to give effect to the separation and the distribution. See "Unaudited Pro Forma Condensed Consolidated Financial Statements."

- "SLM BankCo" refers to New BLC Corporation, which become the publicly traded successor to Existing SLM by virtue of a merger pursuant to Section 251(g) of the Delaware General Corporation Law ("DGCL"), and its consolidated subsidiaries. Following consummation of the merger, New BLC Corporation changed its name to SLM Corporation. After the separation and distribution, SLM BankCo's business consists primarily of Sallie Mae Bank and its portfolio of Private Education Loans, a new Private Education Loan servicing business and the Upromise Rewards business.

**Spin-Off of Navient**

On May 29, 2013, Existing SLM first announced its intent to separate into two distinct publicly traded entities — a loan management, servicing and asset recovery business and a consumer banking business. The loan management, servicing and asset recovery business, Navient, would be comprised primarily of Existing SLM's portfolios of education loans not currently held in Sallie Mae Bank, as well as servicing and asset recovery activities on these loans and loans held by third parties. The consumer banking business, SLM BankCo, would be comprised primarily of Sallie Mae Bank and its Private Education Loan origination business, the Private Education Loans it holds and a related servicing business, and would be a consumer banking franchise with expertise in helping families save, plan and pay for college.

On April 8, 2014, the board of directors of Existing SLM approved the distribution of all of the issued and outstanding shares of Navient common stock on the basis of one share of Navient common stock for each share of Existing SLM common stock issued and outstanding as of the close of business on April 22, 2014, the record date for the distribution. The distribution occurred on April 30, 2014. The distribution was preceded by an internal corporate reorganization of Existing SLM pursuant to which, on April 29, 2014, SLM BankCo replaced Existing SLM as the parent holding company of Sallie Mae pursuant the Merger. In accordance with Section 251(g) of the Delaware General Corporation Law, by action of the Existing SLM board of directors and without a shareholder vote, Existing SLM was merged into Navient, LLC, a wholly-owned subsidiary of SLM BankCo, with Navient, LLC surviving. Immediately following the effective time of the Merger, SLM BankCo changed its name to "SLM Corporation." Following the Merger, the assets and liabilities associated with the education loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking business were transferred to SLM BankCo. The separation and distribution is intended to be tax-free to stockholders of Sallie Mae. For further information on the Spin-Off, please refer to the Form 10 and the 2013 Form 10-K of Existing SLM.

Due to the relative significance of Navient to Existing SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Existing SLM, notwithstanding the legal form of the separation and distribution. As a result, the historical financial statements of Existing SLM are the historical financial statements of Navient. For that reason the historical financial information contained in this 10-Q is that of Existing SLM (which includes the consolidated results of both Navient and SLM BankCo). Navient will show the distribution of the approximate $1.7 billion of consumer banking business net assets on the distribution date.

By virtue of Navient's Form 10 registration statement being declared effective by the SEC on April 14, 2014, Navient is required to file this Form 10-Q for the quarter ended March 31, 2014.

36

Table of Contents

**Navient's Business**

Navient holds the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program (referred to as FFELP Loans), as well as the largest portfolio of private education loans (referred to as Private Education Loans). FFELP Loans are insured or guaranteed by state or not-for-profit agencies and are also protected by contractual rights to recovery from the United States pursuant to guaranty agreements among the U.S. Department of Education (referred to as ED) and these agencies. Private Education Loans are education loans to students or their families that are non-federal loans and not insured or guaranteed under FFELP. Private Education Loans bear the full credit risk of the customer and any cosigner and are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources. As of March 31, 2014 approximately 87 percent of the FFELP Loans and 60 percent of the Private Education Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts.

Navient services and collects on its own portfolio of education loans, as well as on those owned by numerous banks, credit unions and non-profit education lenders. It provides servicing support for guaranty agencies, which serve as intermediaries between the U.S. federal government and FFELP lenders and are responsible for paying claims on defaulted FFELP Loans. These services include account maintenance, default aversion, and asset recovery. Navient will also be one of four large servicers to ED under its Direct Student Loan Program, and will provide asset recovery services to ED. Navient will also generate revenue through asset recovery services (consisting of both education loans as well as other asset classes) on behalf of other clients on a contingent basis.

In 2010, Congress passed legislation ending the origination of education loans under the FFELP program. FFELP Loans that remain outstanding will amortize over approximately the next 20 years, and Navient's goal is to maximize the cash flow generated by its FFELP Loan portfolio, including by acquiring additional FFELP Loans from third parties and expanding its related servicing business. For a detailed description of FFELP, see "Appendix B — Description of Federal Family Education Loan Program" in the Form 10.

As of March 31, 2014, on a pro forma basis, Navient's principal assets consisted of:

- $101.2 billion in FFELP Loans, which yield an average of 2.03 percent annually on a "Core Earnings" basis and have a weighted average life of 7.6 years;

- $30.9 billion in Private Education Loans, which yield an average of 6.37 percent annually on a "Core Earnings" basis and have a weighted average life of 6.8 years;

- a leading student loan servicing platform that services loans for more than 12 million FFELP Loan, DSLP loan and Private Education Loan customers (including cosigners), including 5.8 million customer accounts serviced under Navient's contract with ED; and

- a leading student loan asset recovery platform with an outstanding inventory of contingent asset recovery receivables of approximately $15.9 billion, of which approximately $13.2 billion was student loans and the remainder was other debt.

*Navient's Strengths and Opportunities*

Navient possesses a number of competitive advantages that distinguishes it from its competitors, including:

***Large, high quality asset base with predictable cash flows.*** On a pro forma basis at March 31, 2014, Navient's $132 billion student loan portfolio is 80 percent funded to term and is expected to produce consistent and predictable cash flows over the remaining life of the portfolio. Navient's $101 billion portfolio of FFELP Loans bear a maximum three-percent loss exposure due to the federal guarantee. Navient also owns a $31 billion portfolio of Private Education Loans, which bear the full credit risk of the borrower and cosigner. Navient expects that cash flows from its FFELP Loan and Private Education Loan portfolios will significantly exceed future debt service obligations.

37

Table of Contents

*Efficient and large scale servicing platform.* Navient is the largest servicer of education loans, servicing 12 million customers with approximately $300 billion of loans. Navient has demonstrated scalable infrastructure with capacity to add volume at a low cost. Navient's premier market share and tested servicing and asset recovery infrastructure make it well-positioned to expand its servicing and asset recovery businesses to additional third-party FFELP, federal, Private Education and other loan portfolios.

*Superior operating performance.* Navient has demonstrated superior default prevention performance and industry leading asset recovery services. Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average. Navient prides itself in a robust compliance culture driven by a "customer first" approach.

*Strong capital return.* As a result of the significant cash flow and capital generation, Navient expects to return excess capital to stockholders through dividends and share repurchases.

*Meaningful growth opportunities.* Navient will pursue opportunistic acquisitions of FFELP and Private Education Loan portfolios as well as pursue additional ED and third-party servicing and asset recovery fee income opportunities. Navient will leverage its large-scale servicing platform, superior default prevention and asset recovery performance, operating efficiency and regulatory compliance and risk management infrastructure in pursuing these and other growth opportunities.

### *Navient's Approach to Assisting Students and Families in Repaying their Education Loans*

Navient has a leading student loan servicing platform that services loans for more than 12 million FFELP Loan, DSLP loan and Private Education Loan customers (including cosigners), including 5.8 million customer accounts serviced under Navient's contract with ED. Employee emphasis is placed on providing service with accuracy, courtesy, consistency and empathy. If we fall short, we make it a priority to correct our mistake, and we make it a priority to prevent it from happening again.

We understand managing repayment of education loans is critical for students to achieve their educational goals, recognize their full earning potential and develop a strong credit profile. A key indicator of future success in loan repayment is graduation. Navient encourages customers to plan for the full cost of their education to increase their likelihood of completing their course of study because we know that those who drop out or do not complete their course of study are more likely to default on their education loans.

When it comes to repaying education loans, customer success means making steady progress toward repayment, instead of falling behind on payments. Our experience has taught us that the transition from school to full repayment requires making and carrying out a financial plan. For many, this is their first borrowing experience. For new graduates, salaries grow over time, typically making payments easier to handle as their career progresses. It is also not uncommon for some to return to school, experience illness or encounter temporary interruptions in earnings.

To help customers manage these realities, Navient makes customer success and default prevention top priorities. Contact and counseling keep customers on track, and we believe we go beyond what is required in our efforts to assist customers with past-due student loan payments. That outreach pays off: approximately 90 percent of federal loan customers we reach successfully leverage the options available to them to resolve their delinquency. As a result of our outreach, the federal education loans Navient services default at rates 30 percent better than the national average.

### Unaudited Pro Forma Condensed Consolidated Financial Statements

The unaudited pro forma condensed consolidated financial statements of Navient presented below consist of unaudited pro forma consolidated statements of income for the quarter ended March 31, 2014 and the year ended

Table of Contents

December 31, 2013, and an unaudited pro forma consolidated balance sheet as of March 31, 2014. The unaudited pro forma condensed consolidated financial statements should be read in conjunction with the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the consolidated financial statements and notes thereto of Navient included elsewhere in this Quarterly Report on Form 10-Q and in the Form 10.

The unaudited pro forma condensed consolidated financial statements are not intended to be a complete presentation of Navient's financial position or results of operations had the separation and distribution and related agreements summarized under "Certain Relationships and Related Party Transactions" occurred as of and for the period indicated. In addition, they are provided for illustrative and informational purposes only and are not necessarily indicative of Navient's future results of operations or financial condition as an independent, publicly traded company. The pro forma adjustments are based upon available information and assumptions that management believes are reasonable, that reflect the expected impacts of events directly attributable to the separation and distribution and related agreements, and that are factually supportable and for the purposes of the statement of operations, are expected to have a continuing impact on Navient. However, such adjustments are subject to change based on the finalization of the separation and distribution agreement with SLM BankCo and related agreements.

The unaudited pro forma consolidated statements of operations for the quarter ended March 31, 2014 and the year ended December 31, 2013 reflect Navient's results as if the separation and distribution and related transactions described in the Form 10 and this Form 10-Q had occurred as of January 1, 2013. The unaudited pro forma consolidated balance sheet as of March 31, 2014 reflects Navient's results as if the separation and distribution and such related transactions had occurred as of such date.

As described in the Form 10 and this Form 10-Q, from a legal standpoint, SLM BankCo, the post-separation successor to Existing SLM, is distributing Navient. However, due to the relative significance of Navient to Existing SLM, among other factors, for financial reporting purposes Navient will be treated as the "accounting spinnor" and therefore will be the "accounting successor" to Existing SLM, notwithstanding the legal form of the separation and distribution described in the Form 10 and this Form 10-Q. As a result, the "Historical" financial statements for the periods presented herein are those of Existing SLM, which will be Navient's accounting predecessor.

The unaudited pro forma condensed consolidated financial statements have been adjusted to give effect to the distribution by means of a tax-free dividend, at a 1-to-1 ratio, for U.S. stockholders and other adjustments resulting from the distribution, the transfer of certain assets and liabilities historically operated by Navient that will be contributed to Existing SLM's post-separation successor SLM BankCo, Navient's anticipated post-separation capital structure and the impact of, and transactions contemplated by, the separation and distribution agreement, tax sharing agreement, employee matters agreement, a transition services agreement and other commercial agreements between Navient and SLM BankCo summarized under "Certain Relationships and Related Party Transactions" described in the Form 10.

Navient is currently in the process of implementing plans, which are subject to further refinement, to separate from Existing SLM certain of the internal functions that Navient needs to operate effectively and fulfill its responsibilities as a stand-alone public company. These plans reflect anticipated recurring activities that are different than our current activities, as well as certain nonrecurring activities that Navient expects will be required during our transition to a stand-alone public company.

The unaudited pro forma condensed consolidated financial statements do not give effect to future estimated annual operating expenses after separation, ranging from approximately $30 million to $45 million, attributed to various factors such as the following:

• Personnel required operating as a stand-alone public company;

• Possible changes in compensation with respect to new and existing positions;

39

Table of Contents

- The level of assistance required from professional service providers; and

- The amount of capital expenditures for information technology infrastructure investments associated with being a stand-alone public company.

We have estimated the costs of the nonrecurring activities and will continue to revise our estimates as we implement our plans. We currently estimate the nonrecurring costs that we will incur during our transition to being a stand-alone public company to be approximately $195 million. Of this amount, $30 million relates to expected severance, with the remainder related to other costs. We anticipate that substantially all of these costs will be incurred during the period from July 1, 2013 to a date approximately nine months after the distribution date. Our historical consolidated statements of income for the quarter ended March 31, 2014 and the year ended December 31, 2013 include approximately $26 million and $72 million, respectively, of such costs. These costs relate to the following:

- one-time legal, accounting, tax and consulting costs pertaining to structuring transactions and the separation and distribution and establishing Navient as a stand-alone public company;

- Costs to separate information systems;

- Office relocation costs;

- Recruiting and relocation costs associated with hiring key senior management personnel new to our company;

- Severance and related costs; and

- Other one-time costs.

We are continuing to refine our transition plan including specific arrangements for certain significant elements of our cost structure as a stand-alone public company. Although we believe our estimates of nonrecurring transition costs are reasonable based on the information we have to date, certain significant components of our estimates are preliminary and subject to change. A substantial portion of our estimated costs are thus not considered to be factually supportable.

Except for the pro forma adjustments described in footnote (d) to the tables below, we have not adjusted the unaudited pro forma consolidated statement of income presented below for nonrecurring transition costs as these costs are not expected to have an ongoing impact on our operating results.

The unaudited pro forma condensed consolidated financial statements of Navient presented herein constitute forward-looking information and are subject to uncertainties that could cause our actual results to differ materially from those inferred by such statements. Please see the forward-looking statements discussion at the beginning of Item 2. of this Form 10-Q.

40

Table of Contents

**Navient**

**Unaudited Pro Forma Consolidated Balance Sheet**
**As of March 31, 2014**
**($ in millions except per share amounts)**

| | "Existing SLM" (a) | Less: Stand-alone SLM BankCo (b) | Less: Historical I/C charges, receivables and payables that are 3rd party for stand-alone SLM BankCo (c) | Add: Separation adjustments | Navient Pro forma |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| FFELP loans (net of allowance for losses) | $102,635 | $ 1,395 | $ — | $ — | $101,240 |
| Private Education loans (net of allowance for losses) | 38,157 | 7,209 | — | — | 30,948 |
| Investments | | | | | |
| Available-for-sale | 135 | 127 | — | — | 8 |
| Other | 652 | 22 | — | — | 630 |
| Total investments | 787 | 149 | | | 638 |
| Cash and cash equivalents | 3,742 | 1,235 | — | (493) (h)2 | 2,014 |
| Restricted cash and investments | 3,794 | 4 | — | — | 3,790 |
| Goodwill and acquired intangible assets, net | 421 | 5 | — | — | 416 |
| Other assets | 6,936 | 503 | (79) (c)4 | (4) (g)1 | 6,508 |
| Total assets | $156,472 | $ 10,500 | $ (79) | $ (497) | $145,554 |
| **Liabilities** | | | | | |
| Short-term borrowings | $ 11,626 | $ 5,968 | $ — | — | $ 5,658 |
| Long-term borrowings | 136,177 | 2,748 | — | — | 133,429 |
| Other liabilities | 3,071 | 550 | (79) (c)4 | (22) (g)2 | 2,578 |
| Total liabilities | 150,874 | 9,266 | (79) | (22) | 141,665 |
| **Equity** | | | | | |
| Preferred stock, par value $.20 per share; 20 million shares authorized, 7.3 million shares issued and outstanding, actual, and none issued and outstanding, as adjusted | 565 | — | — | (565) (h)1 | — |
| Common stock, par value $.20 per share; 1.125 billion shares authorized and 549 million shares issued and outstanding, actual, and 549 million shares issued and outstanding, as adjusted | 110 | — | — | — | 110 |
| Additional paid in capital | 4,461 | 1,658 | — | 90 | 2,893 |
| Accumulated other comprehensive income | 7 | (2) | — | — | 9 |
| Retained earnings | 2,733 | (427) | — | — | 3,160 |
| Total stockholders' equity before treasury stock | 7,876 | 1,229 | — | (475) | 6,172 |
| Less: Common stock held in treasury at cost: 127 million shares, actual and 127 million shares, as adjusted | (2,283) | — | — | — | (2,283) |
| Total stockholders' equity | 5,593 | 1,229 | — | (475) | 3,889 |
| Noncontrolling interest | 5 | 5 | — | — | 5 |
| Total equity | 5,598 | 1,234 | — | (475) | 3,889 |
| Total liabilities and equity | $156,472 | $ 10,500 | $ (79) | $ (497) | $145,554 |

41

Table of Contents

**Navient**

**Unaudited Pro Forma Consolidated Statement of Income**
**Three Months Ended March 31, 2014**
**($ in millions except per share amounts)**

| | "Existing SLM" (a) | Less: Stand-alone SLM BankCo (b) | Less: Historical I/C charges, receivables and payables that are 3rd party for stand-alone SLM BankCo (c) | | Add: Separation adjustments | | Navient Pro forma |
|---|---|---|---|---|---|---|---|
| Total interest income | $ 1,296 | $ 162 | $ — | (c)3 | — | (h)2 | $1,134 |
| Total interest expense | 530 | 23 | — | | 1 | (h)3 | 508 |
| Net interest income | 766 | 139 | — | | (1) | | 626 |
| Less: provisions for loan losses | 185 | 39 | — | | — | | 146 |
| **Net interest income after provisions for loan losses** | 581 | 100 | — | | (1) | | 480 |
| Other income (loss): | | | | | | | |
| Gains on sales of loans and investments | — | 34 | (34) | (c)1 | — | | — |
| Losses on derivative and hedging activities, net | (8) | (1) | — | | — | | (7) |
| Servicing revenue | 61 | 1 | (1) | (c)2 | 1 | (e) | 62 |
| Contingency revenue | 111 | — | — | | — | | 111 |
| Gains on debt repurchases | — | — | — | | — | | — |
| Other | 6 | 7 | — | | 3 | (e) | 2 |
| Total other income (loss) | 170 | 41 | (35) | | 4 | | 168 |
| Expenses: | | | | | | | |
| Total operating expenses | 366 | 64 | (9) | (c)2 | (2) | | 309 |
| Goodwill and intangible expenses | 4 | 2 | — | | — | | 2 |
| Restructuring and other reorganization expenses | 26 | — | — | | (26) | (d) | — |
| Total expenses | 396 | 66 | (9) | | (28) | (e) | 311 |
| Income from continuing operations, before income tax expense | 355 | 75 | (26) | | 31 | | 337 |
| Income tax expense | 136 | 29 | (10) | (c)5 | 12 | (f) | 129 |
| **Net income from continuing operations** | $ 219 | $ 46 | $ (16) | | $ 19 | | $ 208 |
| **Earnings per common share calculation:** | | | | | | | |
| Net income from continuing operations | $ 219 | $ 46 | $ (16) | | $ 19 | | $ 208 |
| Less: net loss attributable to non-controlling interests | — | — | — | | — | | — |
| Less: Preferred stock dividends | 5 | — | — | | (5) | (h)1 | — |
| Net income from continuing operations attributable to common stock | $ 214 | $ 46 | $ (16) | | $ 24 | | $ 208 |
| **Basic earnings (loss) per common share:** | | | | | | | |
| Continuing operations | $ .50 | | | | | | $ .49(i) |
| Average common shares outstanding | 427 | | | | | | 427(i) |
| **Diluted earnings (loss) per common share:** | | | | | | | |
| Continued operations | $ .49 | | | | | | $ .48(i) |
| Average common and common equivalent shares outstanding | 435 | | | | | | 435(i) |

42

Table of Contents

**Navient**

**Unaudited Pro Forma Consolidated Statement of Income**
**Year Ended December 31, 2013**
**($ in millions except per share amounts)**

| | "Existing SLM" (a) | Less: Stand-alone SLM BankCo (b) | Less: Historical I/C charges, receivables and payables that are 3rd party for stand-alone SLM BankCo (c) | | Add: Separation adjustments | | Navient Pro forma |
|---|---|---|---|---|---|---|---|
| Total interest income | $ 5,377 | $ 551 | $ (18) | (c)3 | — | (h)2 | $4,844 |
| Total interest expense | 2,210 | 89 | (1) | | 19 | (h)3 | 2,141 |
| Net interest income | 3,167 | 462 | (17) | | (19) | | 2,703 |
| Less: provisions for loan losses | 839 | 69 | — | | — | | 770 |
| **Net interest income after provisions for loan losses** | 2,328 | 393 | (17) | | (19) | | 1,933 |
| Other income (loss): | | | | | | | |
| Gains on sales of loans and investments | 302 | 260 | (260) | (c)1 | — | | 302 |
| Losses on derivative and hedging activities, net | (268) | 1 | — | | — | | (269) |
| Servicing revenue | 290 | 5 | (3) | (c)2 | 4 | (e) | 292 |
| Contingency revenue | 420 | — | — | | — | | 420 |
| Gains on debt repurchases | 42 | — | — | | — | | 42 |
| Other | 100 | 32 | — | | 32 | (e) | 100 |
| Total other income (loss) | 886 | 298 | (263) | | 36 | | 887 |
| Expenses: | | | | | | | |
| Total operating expenses | 1,042 | 268 | (26) | (c)2 | 8 | | 808 |
| Goodwill and intangible expenses | 13 | 3 | — | | — | | 10 |
| Restructuring and other reorganization expenses | 72 | 2 | — | | (70) | (d) | — |
| Total expenses | 1,127 | 273 | (26) | | (62) | (e) | 818 |
| Income from continuing operations, before income tax expense | 2,087 | 418 | (254) | | 79 | | 2,002 |
| Income tax expense | 776 | 159 | (93) | (c)5 | 29 | (f) | 739 |
| **Net income from continuing operations** | $ 1,311 | $ 259 | $ (161) | | $ 50 | | $1,263 |
| **Earnings per common share calculation:** | | | | | | | |
| Net income from continuing operations | $ 1,311 | $ 259 | $ (161) | | $ 50 | | $1,263 |
| Less: net loss attributable to non-controlling interests | (1) | (1) | — | | — | | — |
| Less: Preferred stock dividends | 20 | — | — | | (20) | (h)1 | — |
| Net income from continuing operations attributable to common stock | $ 1,292 | $ 260 | $ (161) | | $ 70 | | $1,263 |
| **Basic earnings (loss) per common share:** | | | | | | | |
| Continuing operations | $ 2.94 | | | | | | $ 2.87(i) |
| Average common shares outstanding | 440 | | | | | | 440(i) |
| **Diluted earnings (loss) per common share:** | | | | | | | |
| Continued operations | $ 2.89 | | | | | | $ 2.82(i) |
| Average common and common equivalent shares outstanding | 449 | | | | | | 449(i) |

43

Table of Contents

Navient

**Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements**

(a)   Represents the historical financial statements of Existing SLM, the accounting predecessor of Navient.

(b)   Represents the operations, assets, liabilities and equity of SLM BankCo, which will be comprised of Sallie Mae Bank, Upromise Rewards, the Insurance Business, and the Private Education Loan origination functions. Included in these amounts are also certain general corporate overhead expenses related to SLM BankCo. General corporate overhead of $25 million and $77 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, consisted of costs primarily associated with accounting, finance, legal, human resources, certain information technology costs, stock compensation, and executive management and the board of directors. These costs were generally allocated to SLM BankCo based on the proportionate level of effort provided to SLM BankCo relative to Existing SLM using a relevant allocation driver (e.g., in proportion to the number of employees by function that were being transferred to BankCo as opposed to remaining at Navient).

(c)   Represents intercompany transactions between SLM BankCo and Navient that were eliminated in consolidation of the historical Existing SLM financial statements in accordance with GAAP, but not eliminated from the historical financial statements of SLM BankCo. Examples of historical intercompany revenues, expenses, receivables and payables that are third party for stand-alone SLM BankCo include, but are not limited to, the following:

1.   Gains on intercompany loan and investment sales of $34 million and $260 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, presented on SLM BankCo's historical statement of income. Existing SLM historically has used Sallie Mae Bank to initially fund originated private education loans through their bank deposits with the intent for Existing SLM to purchase and securitize such loans at a future date. Sallie Mae Bank sells Private Education Loans to Existing SLM on a regular basis in order for Existing SLM to securitize the loans along with other Private Education Loans Existing SLM owns. This purchase activity by Existing SLM of Sallie Mae Bank loans resulted in $34 million and $196 million of gains on intercompany loan sales for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively. The remaining $64 million of gains on intercompany loan and investment sales for the year ended December 31, 2013, relates to asset-backed security investments sold by SLM BankCo as further discussed in footnote (c)(3) below;

2.   FFELP and Private Education Loan servicing fees paid by SLM BankCo to Navient of $9 million and $26 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, that were presented on SLM BankCo's historical statement of income as operating expense. Sallie Mae Bank historically has not maintained servicing and asset recovery functions. As a result, Sallie Mae Bank remits to Existing SLM a market rate to service and collect on their student loan portfolios. Conversely, SLM BankCo recognized $1 million and $3 million of other revenue in connection with providing banking services to one of Existing SLM's business units for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively;

3.   During 2008, Existing SLM contributed $629 million (par value) of asset-backed securities to Sallie Mae Bank as additional capital. The asset-backed securities, which were issued by securitization trusts owned and consolidated by Existing SLM, were recorded at Sallie Mae Bank as available for sale investments until they were sold by Sallie Mae Bank to a third party during the fourth quarter of 2013. Sallie Mae Bank recorded $18 million of interest income and recognized a $64 million gain from the sale of the investments for the year ended December 31, 2013. For the purposes of the Existing SLM historical financial statements, the asset-backed securities held by Sallie Mae Bank, the associated debt at Existing SLM and related intercompany interest income/expense and gain on sale were eliminated in consolidation. Refer to footnote (h) for further discussion. Existing SLM contributed the $629 million (par value) of asset-backed securities as part of maintaining Sallie Mae Bank's required regulatory capital levels;

44

Table of Contents

4.   The other assets adjustment of $79 million consists of an intercompany receivable at Navient due from SLM BankCo. The $79 million other liabilities adjustment consists of the corresponding $79 million intercompany payable from BankCo to Navient;

5.   The income tax expense adjustment of $10 million and $93 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, reflects the income tax effect of the pro forma adjustments at the statutory rate in effect in the respective tax jurisdiction during the period presented. The statutory tax rate for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, was 36.8 percent and 36.6 percent.

(d)  Reflects the removal of separation costs directly related to the separation and distribution that were incurred during the historical period. These costs were primarily for third-party tax, accounting, legal and other consulting fees as well as severance costs.

(e)  Represents the anticipated impact of (i) a tax sharing agreement, (ii) an employee matters agreement, (iii) a transition services agreement and (iv) other commercial agreements which will be in place at the time of the distribution. Please see "Certain Relationships and Related Party Transactions" in the Form 10 for a general description of these agreements. The impacts of these agreements were determined based on the contractual provisions of the agreements in comparison with our historical operations on an as managed basis. Any difference between the as managed basis and the impacts of these agreements are presented as a separation adjustment. The individual effects of each agreement are detailed in the tables below:

| | Three Months Ended March 31, 2014 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Agreements | | | | | | | | |
| (Dollars in millions) | Tax Sharing Agreement | | Employee Matters Agreement | | Transition Services Agreement | | Other Commercial Agreements | Total | Other Separation Adjustments[1] | Total Separation Adjustments |
| **Earnings data:** | | | | | | | | | |
| Net interest income after provision for loan losses | $ — | $ — | | $ — | | $ — | $ — | $ (1) | $ (1) |
| Total other income | — | | — | | | 4 | 4 | — | 4 |
| Total expenses | — | | — | | | 2 | 2 | (30)[2] | (28) |
| Income tax expense | — | | — | | | 1 | 1 | 11 | 12 |
| Net income from continuing operations | $ — | $ — | | $ — | | $ 1 | $ 1 | $ 18 | $ 19 |

[1]   Other separation adjustments are comprised of the items in footnotes (d), (f), (g), and (h).

[2]   Amount is comprised of $26 million of separation costs discussed in footnote (d) above and $4 million of costs related to private loan servicing functions moving from Existing SLM to SLM BankCo.

45

Table of Contents

| (Dollars in millions) | Tax Sharing Agreement | Employee Matters Agreement | Transition Services Agreement | Other Commercial Agreements | Total | Other Separation Adjustments[1] | Total Separation Adjustments |
|---|---|---|---|---|---|---|---|
| **Earnings data:** | | | | | | | |
| Net interest income after provision for loan losses | $ — | $ — | $ — | $ — | $ — | $ (19) | $ (19) |
| Total other income | — | — | 18 | 18 | 36 | — | 36 |
| Total expenses | — | — | 18 | 10 | 28 | (90)[2] | (62) |
| Income tax expense | — | — | — | 3 | 3 | 26 | 29 |
| Net income from continuing operations | $ — | $ — | $ — | $ 5 | $ 5 | $ 45 | $ 50 |

Year Ended December 31, 2013 / Agreements

[1] Other separation adjustments are comprised of the items in footnotes (d), (f), (g), and (h).

[2] Amount is comprised of $70 million of separation costs discussed in footnote (d) above and $20 million of costs related to private loan servicing functions moving from Existing SLM to SLM BankCo.

(f) The income tax expense adjustment of $12 million and $29 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, reflects the income tax effects of the separation adjustments at the statutory rate in effect in the respective tax jurisdiction during the period presented. The statutory rate for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, was 36.8 percent and 36.6 percent.

(g) Reflects changes to deferred taxes as a result of the separation and distribution as follows:

   1. The other asset adjustment reflects a $4 million valuation allowance against deferred tax assets that will be required as a result of the separation.

   2. In connection with the separation and distribution, SLM BankCo will be the taxpayer legally responsible for $283 million of deferred taxes payable in connection with gains recognized by Existing SLM on debt repurchases in prior years. As part of the tax sharing agreement between SLM BankCo and Navient, Navient has agreed to indemnify SLM BankCo for these deferred taxes due. At the time of the separation, Navient will record a liability necessary to recognize the fair value of such indemnification. At this time we estimate the amount of the liability that will be recorded by Navient to be $261 million. The other liability adjustment on the balance sheet of $22 million reflects the transfer of the $283 million deferred tax liability on debt repurchases to BankCo, net of the related $261 million indemnification Navient will record.

(h) Reflects changes in the capital structure of Navient as a result of the separation and distribution. Changes in the capital structure are a result of the following:

   1. In connection with the separation and distribution, SLM BankCo will succeed Existing SLM, by means of a merger, as the issuer of the preferred stock. An adjustment has been made to the balance sheet to reflect the transfer of the $565 million of Existing SLM preferred stock to SLM BankCo for the periods presented. As a result Navient will not pay the dividends associated with this preferred stock. Preferred stock dividends were $5 million and $20 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively.

   2. In connection with the separation and distribution, it is anticipated that $493 million in cash will be contributed to SLM BankCo, which is primarily to support the $565 million of preferred stock discussed above. The amount of cash anticipated to be contributed could change between March 31, 2014 and the actual separation and distribution date to offset other changes to SLM BankCo's equity during that time period. An adjustment has been made to reflect the cash contribution at March 31, 2014. An adjustment to interest income of $0.1 million and $0.4 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, reflects the removal of interest

46

Table of Contents

income historically earned on the cash contributed. The adjustment to interest income reflects an interest rate of approximately 0.05 percent and 0.07 percent for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively, estimated using rates earned on comparable investments during the period.

3.   During 2008, Existing SLM contributed $629 million (par value) of asset-backed securities to Sallie Mae Bank as additional capital. For the purposes of the Existing SLM historical financial statements, the asset-backed securities held by Sallie Mae Bank, the associated debt at Existing SLM and related intercompany interest income/expense were eliminated in consolidation. See footnote (c)3 for further discussion of this intercompany transaction. As noted in (c)3, the asset-backed securities were sold by Sallie Mae Bank during the fourth quarter of 2013. However, as a result of the separation, these asset-backed securities are considered outstanding to a third party for the entire year ended December 31, 2013 as Navient consolidates the related securitization trust. Adjustments reflect the recognition by Navient of the related interest expense of $1 million and $19 million for the quarter ended March 31, 2014 and year ended December 31, 2013, respectively.

(i)   Common stock and pro forma weighted average basic and diluted shares outstanding reflect the issuance of Navient common stock as a result of the separation and distribution. Pro forma basic earnings per share and pro forma weighted-average basic shares outstanding are based on the number of shares of Existing SLM common stock outstanding during each period, adjusted for a 1-to-1 distribution ratio. Pro forma diluted earnings per share and pro forma weighted-average diluted shares outstanding reflect common shares from Navient equity plans in which employees participate based on the distribution ratio.

*Alternative performance measures — "Core Earnings" presentation*

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments.

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for two items, discussed below, that create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information as we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. The two items for which we adjust our "Core Earnings" presentations are (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets.

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, rating agencies, lenders and investors to assess performance.

47

Table of Contents

*Differences between "Core Earnings" and GAAP*

     The two adjustments required to reconcile from Navient's "Core Earnings" results to Navient's GAAP results of operations relate to differing treatments for: (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets. Substantially all of the Existing SLM GAAP to "Core Earnings" differences relate to Navient activities. Please see "Management's Discussion and Analysis — 'Core Earnings' — Definition and Limitations" and "— Differences between 'Core Earnings' and GAAP" for further discussion of the adjustments required to reconcile "Core Earnings" results to GAAP results. The following table reflects aggregate adjustments associated with these areas.

**Navient**

**Unaudited Pro Forma Consolidated Statement of Income — GAAP to "Core Earnings" Reconciliation**
**Three Months Ended March 31, 2014**
**($ in millions except per share amounts)**

| | GAAP Pro forma | Adjustments | "Core Earnings" Pro forma |
|---|---|---|---|
| Net interest income | 626 | (112) | 514 |
| Less: provisions for loan losses | 146 | — | 146 |
| Net interest income after provisions for loan losses | 480 | (112) | 368 |
| Other income (loss) | | | |
| Gains on sales of loans and investments | — | — | — |
| Losses on derivative and hedging activities, net | (7) | 7 | — |
| Servicing revenue | 62 | — | 62 |
| Contingency revenue | 111 | — | 111 |
| Gains on debt repurchases | — | — | — |
| Other | 2 | 6 | 8 |
| Total other income (loss) | 168 | 13 | 181 |
| Total expenses | 311 | (2) | 309 |
| Income from continuing operations, before income tax expense | 337 | (97) | 240 |
| Income tax expense | 129 | (40) | 89 |
| **Net income from continuing operations** | **$  208** | **$  (57)** | **$  151** |
| **Diluted earnings (loss) per common share attributable to Navient:** | | | |
| Continuing operations | $  0.48 | | $  0.35 |
| Average common and common equivalent shares outstanding | 435 | | 435 |

| | Three months ended March 31, 2014 |
|---|---|
| *"Core Earnings" adjustments to GAAP:* | |
| Pro forma Navient GAAP net income from continuing operations | $    208 |
| Net impact of derivative accounting | (99) |
| Net impact of goodwill and acquired intangible assets | 2 |
| Net income tax effect | 40 |
| Pro forma Navient "Core Earnings" net income adjustments | (57) |
| Pro forma "Core Earnings" net income from continuing operations | $    151 |

48

Table of Contents

**Navient**

**Unaudited Pro Forma Consolidated Statement of Income — GAAP to "Core Earnings" Reconciliation**
**Year Ended December 31, 2013**
**($ in millions except per share amounts)**

|  | GAAP Pro forma | Adjustments | "Core Earnings" Pro forma |
|---|---|---|---|
| Net interest income | $ 2,703 | (455) | $ 2,248 |
| Less: provisions for loan losses | 770 | — | 770 |
| Net interest income after provisions for loan losses | 1,933 | (455) | 1,478 |
| Other income (loss): |  |  |  |
| Gains on sales of loans and investments | 302 | — | 302 |
| Losses on derivative and hedging activities, net | (269) | 268 | (1) |
| Servicing revenue | 292 | — | 292 |
| Contingency revenue | 420 | — | 420 |
| Gains on debt repurchases | 42 | 6 | 48 |
| Other | 100 | (62) | 38 |
| Total other income (loss) | 887 | 212 | 1,099 |
| Total expenses | 818 | (10) | 808 |
| Income from continuing operations, before income tax expense | 2,002 | (233) | 1,769 |
| Income tax expense | 739 | (96) | 643 |
| **Net income from continuing operations** | $ 1,263 | $  (137) | $ 1,126 |
| **Diluted earnings (loss) per common share attributable to Navient:** |  |  |  |
| Continuing operations | $  2.82 |  | $  2.51 |
| Average common and common equivalent shares outstanding | 449 |  | 449 |

|  | Year ended December 31, 2013 |
|---|---|
| *"Core Earnings" adjustments to GAAP:* |  |
| Pro forma Navient GAAP net income from continuing operations | $   1,263 |
| Net impact of derivative accounting | (243) |
| Net impact of goodwill and acquired intangible assets | 10 |
| Net income tax effect | 96 |
| Pro forma Navient "Core Earnings" net income adjustments | (137) |
| Pro forma "Core Earnings" net income from continuing operations | $   1,126 |

49

Table of Contents

The following tables reconcile Pro forma Navient GAAP net income from continuing operations to Pro forma Navient GAAP net income and "Core Earnings" net income for the three months ended March 31, 2014 and the year ended December 31, 2014:

| | Three Months ended March 31, 2014 |
|---|---:|
| *"Core Earnings" adjustments to GAAP:* | |
| Pro forma Navient GAAP net income from continuing operations | $      208 |
| Pro forma Navient income from discontinued operations, net of tax | — |
| Pro forma Navient GAAP net income | 208 |
| Net impact of derivative accounting | (99) |
| Net impact of goodwill and acquired intangible assets | 2 |
| Net income tax effect | 40 |
| Net effect from discontinued operations | — |
| Pro forma Navient "Core Earnings" net income | $      151 |
| Pro forma Navient diluted "Core Earnings" EPS | $      0.35 |

| | Year ended December 31, 2013 |
|---|---:|
| *"Core Earnings" adjustments to GAAP:* | |
| Pro forma Navient GAAP net income from continuing operations | $      1,263 |
| Pro forma Navient income from discontinued operations, net of tax | 106 |
| Pro forma Navient GAAP net income | 1,369 |
| Net impact of derivative accounting | (243) |
| Net impact of goodwill and acquired intangible assets | 10 |
| Net income tax effect | 96 |
| Net effect from discontinued operations | 6 |
| Pro forma Navient "Core Earnings" net income | $      1,238 |
| Pro forma Navient diluted "Core Earnings" EPS | $      2.76 |

50

Table of Contents

**Pro forma Performance and Portfolio Metrics (Unaudited)**

*Pro Forma Selected Financial Information and Ratios*

| (In millions, except per share data) | Three Months Ended March 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|
| **Pro Forma GAAP Basis** | | | | |
| Net income attributable to Navient Corporation | $ | 208 | $ | 1,369 |
| Diluted earnings per common share attributable to Navient Corporation | $ | 0.48 | $ | 3.05 |
| Weighted average shares used to compute diluted earnings per share | | 435 | | 449 |
| Return on assets | | .60% | | .91% |
| **Pro Forma "Core Earnings" Basis**[1] | | | | |
| "Core Earnings" attributable to Navient Corporation | $ | 151 | $ | 1,238 |
| "Core Earnings" diluted earnings per common share attributable to Navient Corporation | $ | 0.35 | $ | 2.76 |
| Weighted average shares used to compute diluted earnings per share | | 435 | | 449 |
| "Core Earnings" return on assets | | .44% | | .82% |
| **Other Operating Statistics** | | | | |
| Ending FFELP Loans, net | $ | 101,240 | $ | 103,163 |
| Ending Private Education Loans, net | | 30,948 | | 31,006 |
| Ending total student loans, net | $ | 132,188 | $ | 134,169 |
| Average student loans | $ | 133,854 | $ | 143,304 |

[1] "Core Earnings" are non-GAAP financial measures and do not represent a comprehensive basis of accounting. For a greater explanation of "Core Earnings," see the section titled "'Core Earnings' — Definition and Limitations" and subsequent sections.

*Pro Forma FFELP Loan Performance Metrics*

| (In millions, except per share data) | Three Months Ended March 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|
| "Core Earnings" loan spread | | .94% | | .97% |
| "Core Earnings" net interest margin | | .86% | | .86% |
| Ending allowance for loan losses balance | $ | 101 | $ | 113 |
| Provision for loan losses | $ | 10 | $ | 48 |
| Charge-offs | $ | 22 | $ | 76 |
| Charge-off rate | | .12% | | .09% |
| Total delinquency rate | | 13.8% | | 17.0% |
| Greater than 90-day delinquency rate | | 7.3% | | 9.3% |
| Forbearance rate | | 17.6% | | 14.9% |

*Pro Forma Private Education Loan Performance Metrics*

| (In millions, except per share data) | Three Months Ended March 31, 2014 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|
| "Core Earnings" loan spread | | 4.01% | | 4.09% |
| "Core Earnings" net interest margin | | 3.91% | | 3.87% |
| Ending allowance for loan losses balance[1] | $ | 1,987 | $ | 2,035 |
| Provision for loan losses | $ | 136 | $ | 722 |
| Charge-offs | $ | 218 | $ | 878 |
| Charge-off rate | | 3.3% | | 3.1% |
| Total delinquency rate | | 7.8% | | 9.4% |
| Greater than 90-day delinquency rate | | 3.9% | | 4.7% |
| Forbearance rate | | 4.3% | | 3.8% |
| Cosigner rate | | 64% | | 63% |
| Average FICO | | 718 | | 717 |

[1] Prior to the Spin-Off, Sallie Mae Bank sold $666 million of loans to Existing SLM in the quarter ended March 31, 2014 for (1) securitization transactions at Existing SLM and (2) to enable Existing SLM to manage loans either granted forbearance or were 90 days or more past due. In the quarter ended March 31, 2014, $29 million of the allowance for loan loss balance was transferred from Sallie Mae Bank to Existing SLM. As a result, Existing SLM did not record any additional provision for loan losses for these loans in the quarter ended March 31, 2014 on a pro forma basis.

Table of Contents

Navient's portfolio of Private Education Loans is well seasoned. Loan seasoning affects credit risk because a loan with a history of making payments generally has a lower incidence of default than a loan with a history of making infrequent or no payments. Based on Navient's experience, the probability of default substantially diminishes as the number of payments and years of seasoning increases.

The tables below show the composition and status of Navient's pro forma Private Education Loan portfolio aged by number of months in active repayment status (months for which a scheduled monthly payment was due). As indicated in the tables, the percentage of loans that are delinquent greater than 90 days or that are in forbearance status decreases the longer the loans have been in active repayment status.

On a pro forma basis at March 31, 2014, loans in forbearance status as a percentage of loans in repayment and forbearance were 10.5 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.3 percent for loans that have been in active repayment status for more than 48 months. Approximately 63 percent of our Private Education Loans in forbearance status has been in active repayment status less than 25 months.

At March 31, 2014, loans in repayment that are delinquent greater than 90 days as a percentage of loans in repayment were 7.7 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.9 percent for loans that have been in active repayment status for more than 48 months. Approximately 46 percent of our Private Education Loans in repayment that are delinquent greater than 90 days status has been in active repayment status less than 25 months.

The following table illustrates Navient's loan seasoning, on a pro forma basis at March 31, 2014 and December 31, 2013:

| (Dollars in millions) March 31, 2014 | Monthly Scheduled Payments Due | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/ deferment | $    — | $    — | $    — | $    — | $    — | $  4,090 | $ 4,090 |
| Loans in forbearance | 551 | 206 | 176 | 120 | 152 | — | 1,205 |
| Loans in repayment — current | 1,958 | 3,563 | 4,096 | 4,246 | 11,049 | — | 24,912 |
| Loans in repayment — delinquent 31-60 days | 136 | 130 | 118 | 92 | 158 | — | 634 |
| Loans in repayment — delinquent 61-90 days | 89 | 92 | 77 | 60 | 98 | — | 416 |
| Loans in repayment — delinquent greater than 90 days | 230 | 266 | 198 | 151 | 223 | — | 1,068 |
| Total | $2,964 | $4,257 | $4,665 | $4,669 | $ 11,680 | $ 4,090 | $32,325 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 18.6% | 4.8% | 3.8% | 2.6% | 1.3% | —% | 4.3% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 9.5% | 6.6% | 4.4% | 3.3% | 1.9% | —% | 4.0% |

52

Table of Contents

| (Dollars in millions)<br>December 31, 2013 | Monthly Scheduled Payments Due | | | | | Not Yet in<br>Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in school/grace/ deferment | $ — | $ — | $ — | $ — | $ — | $ 3,954 | $ 3,954 |
| Loans in forbearance | 491 | 186 | 164 | 105 | 139 | — | 1,085 |
| Loans in repayment — current | 2,241 | 3,663 | 4,196 | 4,277 | 10,458 | — | 24,835 |
| Loans in repayment — delinquent 31-60 days | 155 | 160 | 145 | 117 | 196 | — | 773 |
| Loans in repayment — delinquent 61-90 days | 112 | 113 | 92 | 71 | 115 | — | 503 |
| Loans in repayment — delinquent greater than 90 days | 330 | 305 | 238 | 171 | 243 | — | 1,287 |
| Total | $3,329 | $4,427 | $4,835 | $4,741 | $ 11,151 | $ 3,954 | $32,437 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 14.8% | 4.2% | 3.4% | 2.2% | 1.2% | —% | 3.8% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 11.6% | 7.2% | 5.1% | 3.7% | 2.2% | —% | 4.7% |

## Selected Historical Financial Information and Ratios

Although SLM BankCo is the entity that distributed the shares of Navient common stock to SLM common stockholders, for financial reporting purposes Navient will be treated as the "accounting spinnor" and therefore it will be Navient, and not SLM BankCo, that will be the "accounting successor" to Existing SLM. Hence, the following discussion and analysis relates to the historical results of operations and financial condition of Existing SLM, which will be the accounting predecessor of Navient.

| (In millions, except per share data) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| **GAAP Basis** | | |
| Net income attributable to Navient Corporation | $ 219 | $ 346 |
| Diluted earnings per common share attributable to Navient Corporation | $ .49 | $ .74 |
| Weighted average shares used to compute diluted earnings per share | 435 | 458 |
| Return on assets | .59% | .82% |
| **"Core Earnings" Basis**[1] | | |
| "Core Earnings" attributable to Navient Corporation | $ 163 | $ 283 |
| "Core Earnings" diluted earnings per common share attributable to Navient Corporation | $ .36 | $ .61 |
| Weighted average shares used to compute diluted earnings per share | 435 | 458 |
| "Core Earnings" return on assets | .44% | .67% |
| **Other Operating Statistics** | | |
| Ending FFELP Loans, net | $102,635 | $119,195 |
| Ending Private Education Loans, net | 38,157 | 37,465 |
| Ending total student loans, net | $140,792 | $156,660 |
| Average student loans | $142,679 | $160,261 |

(1)   "Core Earnings" are non-GAAP financial measures and do not represent a comprehensive basis of accounting. For a greater explanation of "Core Earnings," see the section titled "'Core Earnings' — Definition and Limitations" and subsequent sections.

## Overview

Navient holds the largest portfolio of student loans issued under the FFELP. Navient is also the largest holder of Private Education Loans. Navient services and performs asset recovery services on these loans for its

53

Table of Contents

own account, as well as for loans owned by ED, numerous financial institutions, banks, credit unions and non-profit education lenders.

The following discussion and analysis presents a review of our business and operations as of and for the quarter ended March 31, 2014.

We monitor and assess our ongoing operations and results based on the following four reportable segments: (1) FFELP Loans (2) Private Education Loans, (3) Business Services and (4) Other.

### *FFELP Loans Segment*

Our FFELP Loans segment consists of our FFELP Loan portfolio and underlying debt and capital funding these loans. Even though FFELP Loans are no longer originated we continue to seek to acquire FFELP Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. This segment is expected to generate significant amounts of cash as the FFELP Loan portfolio amortizes.

As of March 31, 2014, approximately $1.4 billion of FFELP Loans was held at Sallie Mae Bank, which will remain with SLM BankCo following the separation and distribution. Navient will continue to service the FFELP Loans held by Sallie Mae Bank after the separation and distribution.

### *Private Education Loans Segment*

In this segment, we acquire, finance, service and historically originated Private Education Loans. The Private Education Loans we historically originated were primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or customers' resources. In this segment, we earn net interest income on the Private Education Loan portfolio (after provision for loan losses) as well as servicing fees, primarily late fees.

As of March 31, 2014, approximately $7.2 billion of Existing SLM's Private Education Loans was held at Sallie Mae Bank. In connection with the separation and distribution, Sallie Mae Bank, and its portfolio of Private Education Loans, remained with SLM BankCo. Navient will service and collect on SLM BankCo's Private Education Loans during a transition period, with Private Education Loans whose individual borrowers also have an education loan owned by Navient continuing to be serviced by Navient after the transition period. Navient cannot originate Private Education loans until 2019 pursuant to the terms of the separation and distribution agreement.

### *Business Services Segment*

Our Business Services segment generates the majority of its revenue from servicing our FFELP Loan portfolio. We also provide servicing, loan default aversion and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED. We also operate a consumer savings network that provides financial rewards on everyday purchases to help families save for college, Upromise.

After the separation and distribution, we will perform substantially all of the activities of the Business Services Segment, other than the activities of Upromise and the Insurance Business, which will be carried on by SLM BankCo.

### *Other*

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

### Key Financial Measures

Our operating results are primarily driven by net interest income from our student loan portfolios (which include financing costs), provision for loan losses, the revenues and expenses generated by our service

54

Table of Contents

businesses, and gains and losses on subsidiary sales, loan sales and debt repurchases. We manage and assess the performance of each business segment separately as each is focused on different customers and each derives its revenue from different activities and services. A brief summary of our key financial measures (net interest income; provisions for loan losses; charge-offs and delinquencies; servicing and contingency revenues; other income (loss); operating expenses; and "Core Earnings") can be found in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the 2013 Form 10-K.

**First-Quarter 2014 Summary of Results**

We report financial results on a GAAP basis and also present certain "Core Earnings" performance measures. Our management, equity investors, credit rating agencies and debt capital providers use these "Core Earnings" measures to monitor our business performance. See "'Core Earnings' — Definition and Limitations" for a further discussion and a complete reconciliation between GAAP net income and "Core Earnings."

First-quarter 2014 GAAP net income was $219 million ($.49 diluted earnings per share), versus net income of $346 million ($0.74 diluted earnings per share) in the first-quarter 2013. The changes in GAAP net income are driven by the same types of "Core Earnings" items discussed below as well as changes in "mark-to-market" unrealized gains and losses on derivative contracts and amortization and impairment of goodwill and intangible assets that are recognized in GAAP but not in "Core Earnings" results. First-quarter 2014 results included gains of $99 million from derivative accounting treatment that are excluded from "Core Earnings" results, compared with gains of $110 million in the year-ago period.

"Core Earnings" for the quarter were $163 million ($.36 diluted earnings per share), compared with $283 million ($0.61 diluted earnings per share) in the year-ago period. The primary driver of the decrease in net income was $103 million of additional reserve recorded for pending regulatory matters (see Part II. "Other Information," Item 1. "Legal Proceedings—Regulatory Matters"). In addition, last year we undertook a series of actions to improve shareholder value as the Company sold residual interests in FFELP securitization trusts and initiated the separation of the Company into two publicly traded companies. In the first quarter of 2013 the Company generated a $55 million gain on the sale of a residual interest in a FFELP securitization trust in addition to $29 million in gains from debt repurchases. There were no similar transactions in 2014. Compared to the year-ago quarter, we spent $16 million in additional reorganization expense tied to the separation of the Company and $28 million in additional operating expenses (excluding the $103 million of additional reserve discussed above), which increased third-party revenue in the business services segment and reduced loan losses in the Private Education Loans segment. Two other major contributors to the quarter's results — a $56 million reduction in provision and $21 million reduction in net interest income — are the result of an improving credit quality in the Private Education Loan business and the continued amortization of the FFELP portfolio, respectively.

During the first quarter of 2014, we:

- issued $2 billion of FFELP asset-backed securities ("ABS"), $676 million of Private Education Loan ABS and $850 million of unsecured bonds;

- closed on a new $8 billion asset-backed commercial paper ("ABCP") facility that matures in January 2016. This facility replaces an existing $5.5 million FFELP ABCP facility which was retired in January 2014; and

- repurchased 8 million common shares for $200 million on the open market.

**2014 Outlook and Management Objectives**

In May 2013, Existing SLM announced plans to separate its consumer banking and education loan management operations into two separate businesses and complete the Spin-Off in the first half of 2014. The primary objective for 2014 is successfully completing this transaction. Navient is expected to be spun off from Existing SLM on or about April 30, 2014. After the Spin-Off, Navient will put in place its own 2014 Management Objectives. We expect those objectives to be similar, as appropriate, to the 2013 Management Objectives that were previously established for Existing SLM.

Table of Contents

**Results of Operations**

We present the results of operations below first on a consolidated basis in accordance with GAAP. Following our discussion of consolidated earnings results on a GAAP basis, we present our results on a segment basis. We have four business segments: FFELP Loans, Private Education Loans, Business Services and Other. Since these segments operate in distinct business environments and we manage and evaluate the financial performance of these segments using non-GAAP financial measures, these segments are presented on a "Core Earnings" basis (see "'Core Earnings' — Definition and Limitations").

**GAAP Statements of Income (Unaudited)**

| (In millions, except per share data) | Three Months Ended March 31, 2014 | 2013 | Increase (Decrease) $ | % |
|---|---|---|---|---|
| Interest income: | | | | |
| FFELP Loans | $ 646 | $ 735 | $ (89) | (12)% |
| Private Education Loans | 644 | 623 | 21 | 3 |
| Other loans | 3 | 3 | — | — |
| Cash and investments | 3 | 5 | (2) | (40) |
| Total interest income | 1,296 | 1,366 | (70) | (5) |
| Total interest expense | 530 | 571 | (41) | (7) |
| Net interest income | 766 | 795 | (29) | (4) |
| Less: provisions for loan losses | 185 | 241 | (56) | (23) |
| Net interest income after provisions for loan losses | 581 | 554 | 27 | 5 |
| Other income (loss): | | | | |
| Gains on sales of loans and investments | — | 55 | (55) | (100) |
| Gains (losses) on derivative and hedging activities, net | (8) | (31) | 23 | (74) |
| Servicing revenue | 61 | 70 | (9) | (13) |
| Contingency revenue | 111 | 99 | 12 | 12 |
| Gains on debt repurchases | — | 23 | (23) | (100) |
| Other income (loss) | 6 | 34 | (28) | (82) |
| Total other income (loss) | 170 | 250 | (80) | (32) |
| Expenses: | | | | |
| Operating expenses | 366 | 235 | 131 | 56 |
| Goodwill and acquired intangible asset impairment and amortization expense | 4 | 3 | 1 | 33 |
| Restructuring and other reorganization expenses | 26 | 10 | 16 | 160 |
| Total expenses | 396 | 248 | 148 | 60 |
| Income from continuing operations, before income tax expense | 355 | 556 | (201) | (36) |
| Income tax expense | 136 | 211 | (75) | (36) |
| Net income from continuing operations | 219 | 345 | (126) | (37) |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | 1 | (1) | (100) |
| **Net income** | 219 | 346 | (127) | (37) |
| Less: net loss attributable to noncontrolling interest | — | — | — | — |
| Net income attributable to Navient Corporation | 219 | 346 | (127) | (37) |
| Preferred stock dividends | 5 | 5 | — | — |
| Net income attributable to Navient Corporation common stock | $ 214 | $ 341 | $(127) | (37)% |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .50 | $ .76 | $ (.26) | (34)% |
| Discontinued operations | — | — | — | — |
| Total | $ .50 | $ .76 | $ (.26) | (34)% |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .49 | $ .74 | $ (.25) | (34)% |
| Discontinued operations | — | — | — | — |
| Total | $ .49 | $ .74 | $ (.25) | (34)% |
| Dividends per common share attributable to Navient Corporation | $ .15 | $ .15 | $ — | —% |

56

**Table of Contents**

**Consolidated Earnings Summary — GAAP-basis**

**Three Months Ended March 31, 2014 Compared with Three Months Ended March 31, 2013**

For the three months ended March 31, 2014, net income was $219 million, or $0.49 diluted earnings per common share, compared with net income of $346 million, or $0.74 diluted earnings per common share, for the three months ended March 31, 2013. The primary driver of the decrease in net income was $103 million of additional reserve recorded for pending regulatory matters (see Part II. "Other Information," Item 1. "Legal Proceedings—Regulatory Matters"). The decrease in net income was also due to a $55 million gain on the sale of the Residual Interest in a FFELP Loan securitization that occurred in the year-ago quarter, a $29 million decline in net interest income, a $23 million decrease in debt repurchase gains, a $28 million decrease in other income, higher operating expenses of $28 million (excluding the $103 million of additional reserve discussed above) and higher restructuring and other reorganization costs of $16 million, which was partially offset by a $56 million decline in the provision for loan losses and a $23 million decrease in net losses on derivative and hedging activities.

The primary contributors to each of the identified drivers of changes in net income for the current quarter compared with the year-ago quarter are as follows:

- Net interest income decreased by $29 million primarily due to a reduction in FFELP net interest income resulting from an $18 billion decline in average FFELP Loans outstanding. This decline in FFELP loans was due, in part, to the sale of Residual Interests in FFELP Loan securitization trusts in the first half of 2013. There were approximately $12 billion of FFELP Loans in these trusts at the time of sale.

- Provisions for loan losses declined $56 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs.

- Gains on sales of loans and investments decreased by $55 million as the result of a $55 million gain on the sale of the Residual Interest in a FFELP Loan securitization trust in the year-ago quarter. There were no sales in the current quarter.

- Losses on derivative and hedging activities, net, decreased $23 million. The primary factors affecting the change were interest rate and foreign currency fluctuations, which primarily affected the valuations of our Floor Income Contracts, basis swaps and foreign currency hedges during each period. Valuations of derivative instruments vary based upon many factors including changes in interest rates, credit risk, foreign currency fluctuations and other market factors. As a result, net gains and losses on derivative and hedging activities may continue to vary significantly in future periods.

- Gains on debt repurchases decreased $23 million. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

- Other income decreased $28 million primarily due to a $32 million decrease in foreign currency translation gains. The foreign currency translation gains relate to a portion of our foreign currency denominated debt that does not receive hedge accounting treatment. These gains were partially offset by the "losses on derivative and hedging activities, net" line item on the income statement related to the derivatives used to economically hedge these debt instruments.

- Operating expenses increased $131 million primarily as a result of $103 million of additional reserve recorded for pending regulatory matters (see Part II. "Other Information," Item 1. "Legal Proceedings—Regulatory Matters"). Operating expenses also increased due to increases in our third-party servicing and asset recovery activities, as well as, increased account resolution activity on our Private Education Loan portfolio.

- Restructuring and other reorganization expenses increased $16 million to $26 million, which consisted of $25 million of expenses primarily related to third-party costs incurred in connection with the Company's previously announced plan to separate its existing organization into two, separate, publicly traded companies and $1 million related to severance costs.

Table of Contents

We repurchased 8 million shares and 10 million shares of our common stock during the three months ended March 31, 2014 and 2013, respectively, as part of our common share repurchase program. Primarily as a result of ongoing common share repurchases, our average outstanding diluted shares decreased by 23 million common shares from the year-ago quarter.

**"Core Earnings" — Definition and Limitations**

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments. For additional information, see "Note 11 — Segment Reporting."

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for two items, discussed below, that create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information as we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. The two items for which we adjust our "Core Earnings" presentations are (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets.

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, rating agencies, lenders and investors to assess performance.

Specific adjustments that management makes to GAAP results to derive our "Core Earnings" basis of presentation are described in detail in the section titled "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP" of this Item 2.

Table of Contents

The following tables show "Core Earnings" for each business segment and our business as a whole along with the adjustments made to the income/expense items to reconcile the amounts to our reported GAAP results as required by GAAP and reported in "Note 11 — Segment Reporting."

| | | | | | | | Three Months Ended March 31, 2014 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Adjustments | | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
| Interest income: | | | | | | | | | | |
| Student loans | $ 523 | $ 644 | $ — | $ — | $ — | $ 1,167 | $ 198 | $ (75) | $ 123 | $1,290 |
| Other loans | — | — | — | 3 | — | 3 | — | — | — | 3 |
| Cash and investments | 1 | 1 | 1 | 1 | (1) | 3 | — | — | — | 3 |
| Total interest income | 524 | 645 | 1 | 4 | (1) | 1,173 | 198 | (75) | 123 | 1,296 |
| Total interest expense | 293 | 206 | — | 21 | (1) | 519 | 10 | 1(4) | 11 | 530 |
| Net interest income (loss) | 231 | 439 | 1 | (17) | — | 654 | 188 | (76) | 112 | 766 |
| Less: provisions for loan losses | 10 | 175 | — | — | — | 185 | — | — | — | 185 |
| Net interest income (loss) after provisions for loan losses | 221 | 264 | 1 | (17) | — | 469 | 188 | (76) | 112 | 581 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 11 | 1 | 167 | — | (118) | 61 | — | — | — | 61 |
| Contingency revenue | — | — | 111 | — | — | 111 | — | — | — | 111 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income (loss) | — | — | 8 | 3 | — | 11 | (188) | 175(5) | (13) | (2) |
| Total other income (loss) | 11 | 1 | 286 | 3 | (118) | 183 | (188) | 175 | (13) | 170 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 125 | 76 | 106 | 105 | (118) | 294 | — | — | — | 294 |
| Overhead expenses | — | — | — | 72 | — | 72 | — | — | — | 72 |
| Operating expenses | 125 | 76 | 106 | 177 | (118) | 366 | — | — | — | 366 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 4 | 4 | 4 |
| Restructuring and other reorganization expenses | — | — | — | 26 | — | 26 | — | — | — | 26 |
| Total expenses | 125 | 76 | 106 | 203 | (118) | 392 | — | 4 | 4 | 396 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 107 | 189 | 181 | (217) | — | 260 | — | 95 | 95 | 355 |
| Income tax expense (benefit)(3) | 41 | 71 | 68 | (83) | — | 97 | — | 39 | 39 | 136 |
| Net income (loss) from continuing operations | 66 | 118 | 113 | (134) | — | 163 | — | 56 | 56 | 219 |
| Income from discontinued operations, net of tax expense | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) | 66 | 118 | 113 | (134) | — | 163 | — | 56 | 56 | 219 |
| Less: net income attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 66 | $ 118 | $ 113 | $(134) | $ — | $ 163 | $ — | $ 56 | $ 56 | $ 219 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| | | Three Months Ended March 31, 2014 | |
|---|---|---|---|
| (Dollars in millions) | Net Impact of Derivative Accounting | Net Impact of Goodwill and Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 112 | $ — | $ 112 |
| Total other loss | (13) | — | (13) |
| Goodwill and acquired intangible asset impairment and amortization | — | 4 | 4 |
| "Core Earnings" adjustments to GAAP | $ 99 | $ (4) | 95 |
| Income tax benefit | | | 39 |
| Net income | | | $ 56 |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

(4)  Represents a portion of the $6 million of "other derivative accounting adjustments."

(5)  Represents the $180 million of "unrealized gains on derivative and hedging activities, net" as well as the remaining portion of the $6 million of "other derivative accounting adjustments."

Table of Contents

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Adjustments | | | |
| Interest income: | | | | | | | | | | |
| Student loans | $ 599 | $ 623 | $ — | $ — | $ — | $ 1,222 | $ 212 | $ (76) | $ 136 | $1,358 |
| Other loans | — | — | — | 3 | — | 3 | — | — | — | 3 |
| Cash and investments | 2 | 1 | 1 | 2 | (1) | 5 | — | — | — | 5 |
| Total interest income | 601 | 624 | 1 | 5 | (1) | 1,230 | 212 | (76) | 136 | 1,366 |
| Total interest expense | 340 | 203 | — | 13 | (1) | 555 | 18 | (2)[4] | 16 | 571 |
| Net interest income (loss) | 261 | 421 | 1 | (8) | — | 675 | 194 | (74) | 120 | 795 |
| Less: provisions for loan losses | 16 | 225 | — | — | — | 241 | — | — | — | 241 |
| Net interest income (loss) after provisions for loan losses | 245 | 196 | 1 | (8) | — | 434 | 194 | (74) | 120 | 554 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | 55 | — | — | — | — | 55 | — | — | — | 55 |
| Servicing revenue | 23 | 10 | 186 | — | (149) | 70 | — | — | — | 70 |
| Contingency revenue | — | — | 99 | — | — | 99 | — | — | — | 99 |
| Gains on debt repurchases | — | — | — | 29 | — | 29 | (6) | — | (6) | 23 |
| Other income (loss) | — | — | 7 | — | — | 7 | (188) | 184[5] | (4) | 3 |
| Total other income (loss) | 78 | 10 | 292 | 29 | (149) | 260 | (194) | 184 | (10) | 250 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 157 | 67 | 95 | 3 | (149) | 173 | — | — | — | 173 |
| Overhead expenses | — | — | — | 62 | — | 62 | — | — | — | 62 |
| Operating expenses | 157 | 67 | 95 | 65 | (149) | 235 | | | | 235 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 3 | 3 | 3 |
| Restructuring and other reorganization expenses | — | — | — | 10 | — | 10 | — | — | — | 10 |
| Total expenses | 157 | 67 | 95 | 75 | (149) | 245 | — | 3 | 3 | 248 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 166 | 139 | 198 | (54) | — | 449 | — | 107 | 107 | 556 |
| Income tax expense (benefit)[3] | 62 | 52 | 73 | (20) | — | 167 | — | 44 | 44 | 211 |
| Net income (loss) from continuing operations | 104 | 87 | 125 | (34) | — | 282 | — | 63 | 63 | 345 |
| Income from discontinued operations, net of tax expense | — | — | 1 | — | — | 1 | — | — | — | 1 |
| Net income (loss) | 104 | 87 | 126 | (34) | — | 283 | — | 63 | 63 | 346 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 104 | $ 87 | $ 126 | $ (34) | $ — | $ 283 | $ — | $ 63 | $ 63 | $ 346 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of Derivative Accounting | Net Impact of Goodwill and Acquired Intangibles | Total |
|---|---|---|---|
| | Three Months Ended March 31, 2013 | | |
| Net interest income after provisions for loan losses | $ 120 | $ — | $ 120 |
| Total other income | (10) | — | (10) |
| Goodwill and acquired intangible asset impairment and amortization | — | 3 | 3 |
| Total "Core Earnings" adjustments to GAAP | $ 110 | $ (3) | 107 |
| Income tax expense | | | 44 |
| Net income | | | $ 63 |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

(4) Represents a portion of the $29 million of "other derivative accounting adjustments."

(5) Represents the $157 million of "unrealized gains on derivative and hedging activities, net" as well as the remaining portion of the $29 million of "other derivative accounting adjustments."

60

Table of Contents

*Differences between "Core Earnings" and GAAP*

The two adjustments required to reconcile from our "Core Earnings" results to our GAAP results of operations relate to differing treatments for: (1) our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness and (2) the accounting for goodwill and acquired intangible assets. The following table reflects aggregate adjustments associated with these areas.

| | Three Months Ended March 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| **"Core Earnings" adjustments to GAAP:** | | |
| Net impact of derivative accounting | $ 99 | $ 110 |
| Net impact of goodwill and acquired intangible assets | (4) | (3) |
| Net income tax effect | (39) | (44) |
| Net effect from discontinued operations | — | — |
| Total "Core Earnings" adjustments to GAAP | $ 56 | $ 63 |

1) **Derivative Accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP, as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These unrealized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts, where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

The accounting for derivatives requires that changes in the fair value of derivative instruments be recognized currently in earnings, with no fair value adjustment of the hedged item, unless specific hedge accounting criteria are met. We believe that our derivatives are effective economic hedges, and as such, are a critical element of our interest rate and foreign currency risk management strategy. However, some of our derivatives, primarily Floor Income Contracts and certain basis swaps, do not qualify for hedge accounting treatment and the stand-alone derivative must be marked-to-market in the income statement with no consideration for the corresponding change in fair value of the hedged item. These gains and losses recorded in "Gains (losses) on derivative and hedging activities, net" are primarily caused by interest rate and foreign currency exchange rate volatility and changing credit spreads during the period as well as the volume and term of derivatives not receiving hedge accounting treatment.

Our Floor Income Contracts are written options that must meet more stringent requirements than other hedging relationships to achieve hedge effectiveness. Specifically, our Floor Income Contracts do not qualify for hedge accounting treatment because the pay down of principal of the student loans underlying the Floor Income embedded in those student loans does not exactly match the change in the notional amount of our written Floor Income Contracts. Additionally, the term, the interest rate index, and the interest rate index reset frequency of the Floor Income Contract can be different than that of the student loans. Under derivative accounting treatment, the upfront payment is deemed a liability and changes in fair value are recorded through income throughout the life of the contract. The change in the value of Floor Income Contracts is primarily caused by changing interest rates that cause the amount of Floor Income earned on the underlying student loans and paid to the counterparties to vary. This is economically offset by the change in value of the student loan portfolio earning Floor Income but that offsetting change in value is not recognized. We believe the Floor Income Contracts are economic hedges because they effectively fix the amount of Floor Income earned over the contract period, thus eliminating the timing and uncertainty that changes in interest rates can have on Floor Income for that period. Therefore, for purposes of "Core Earnings," we have removed the unrealized gains and losses related to these contracts and

61

Table of Contents

added back the amortization of the net premiums received on the Floor Income Contracts. The amortization of the net premiums received on the Floor Income Contracts for "Core Earnings" is reflected in student loan interest income. Under GAAP accounting, the premiums received on the Floor Income Contracts are recorded as revenue in the "gains (losses) on derivative and hedging activities, net" line item by the end of the contracts' lives.

Basis swaps are used to convert floating rate debt from one floating interest rate index to another to better match the interest rate characteristics of the assets financed by that debt. We primarily use basis swaps to hedge our student loan assets that are primarily indexed to LIBOR or Prime. The accounting for derivatives requires that when using basis swaps, the change in the cash flows of the hedge effectively offset both the change in the cash flows of the asset and the change in the cash flows of the liability. Our basis swaps hedge variable interest rate risk; however, they generally do not meet this effectiveness test because the index of the swap does not exactly match the index of the hedged assets as required for hedge accounting treatment. Additionally, some of our FFELP Loans can earn at either a variable or a fixed interest rate depending on market interest rates and therefore swaps economically hedging these FFELP Loans do not meet the criteria for hedge accounting treatment. As a result, under GAAP, these swaps are recorded at fair value with changes in fair value reflected currently in the income statement.

The table below quantifies the adjustments for derivative accounting between GAAP and "Core Earnings" net income.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| **"Core Earnings" derivative adjustments:** | | |
| Gains (losses) on derivative and hedging activities, net, included in other income | $    (8) | $    (31) |
| Plus: Realized losses on derivative and hedging activities, net[1] | 188 | 188 |
| Unrealized gains on derivative and hedging activities, net[2] | 180 | 157 |
| Amortization of net premiums on Floor Income Contracts in net interest income for "Core Earnings" | (75) | (76) |
| Other derivative accounting adjustments[3] | (6) | 29 |
| Total net impact of derivative accounting[4] | $    99 | $    110 |

[1]   See "Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" below for a detailed breakdown of the components of realized losses on derivative and hedging activities.

[2]   "Unrealized gains on derivative and hedging activities, net" comprises the following unrealized mark-to-market gains (losses):

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Floor Income Contracts | $    181 | $    189 |
| Basis swaps | (1) | (4) |
| Foreign currency hedges | (39) | (32) |
| Other | 39 | 4 |
| Total unrealized gains on derivative and hedging activities, net | $    180 | $    157 |

[3]   Other derivative accounting adjustments consist of adjustments related to: (1) foreign currency denominated debt that is adjusted to spot foreign exchange rates for GAAP where such adjustment is reversed for "Core Earnings" and (2) certain terminated derivatives that did not receive hedge accounting treatment under GAAP but were economic hedges under "Core Earnings" and, as a result, such gains or losses amortized into "Core Earnings" over the life of the hedged item.

[4]   Negative amounts are subtracted from "Core Earnings" net income to arrive at GAAP net income and positive amounts are added to "Core Earnings" net income to arrive at GAAP net income.

Table of Contents

*Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities*

Derivative accounting requires net settlement income/expense on derivatives and realized gains/losses related to derivative dispositions (collectively referred to as "realized gains (losses) on derivative and hedging activities") that do not qualify as hedges to be recorded in a separate income statement line item below net interest income. Under our "Core Earnings" presentation, these gains and losses are reclassified to the income statement line item of the economically hedged item. For our "Core Earnings" net interest margin, this would primarily include: (a) reclassifying the net settlement amounts related to our Floor Income Contracts to student loan interest income and (b) reclassifying the net settlement amounts related to certain of our basis swaps to debt interest expense. The table below summarizes the realized losses on derivative and hedging activities and the associated reclassification on a "Core Earnings" basis.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| **Reclassification of realized gains (losses) on derivative and hedging activities:** | | |
| Net settlement expense on Floor Income Contracts reclassified to net interest income | $ (198) | $ (212) |
| Net settlement income on interest rate swaps reclassified to net interest income | 10 | 18 |
| Net realized gains on terminated derivative contracts reclassified to other income | — | 6 |
| Total reclassifications of realized losses on derivative and hedging activities | $ (188) | $ (188) |

*Cumulative Impact of Derivative Accounting under GAAP compared to "Core Earnings"*

As of March 31, 2014, derivative accounting has reduced GAAP equity by approximately $854 million as a result of cumulative net unrealized losses (after tax) recognized under GAAP, but not in "Core Earnings." The following table rolls forward the cumulative impact to GAAP equity due to these unrealized after tax net losses related to derivative accounting.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Beginning impact of derivative accounting on GAAP equity | $ (926) | $ (1,080) |
| Net impact of net unrealized gains (losses) under derivative accounting[1] | 72 | 53 |
| Ending impact of derivative accounting on GAAP equity | $ (854) | $ (1,027) |

[1]   Net impact of net unrealized gains (losses) under derivative accounting is composed of the following:

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Total pre-tax net impact of derivative accounting recognized in net income[a] | $ 99 | $ 110 |
| Tax impact of derivative accounting adjustments recognized in net income | (22) | (60) |
| Change in unrealized gain (losses) on derivatives, net of tax recognized in other comprehensive income | (5) | 3 |
| Net impact of net unrealized gains (losses) under derivative accounting | $ 72 | $ 53 |

[a]   See "'Core Earnings' derivative adjustments" table above.

63

Table of Contents

Net Floor premiums received on Floor Income Contracts that have not been amortized into "Core Earnings" as of the respective year-ends are presented in the table below. These net premiums will be recognized in "Core Earnings" in future periods. As of March 31, 2014, the remaining amortization term of the net floor premiums was approximately 2.25 years for existing contracts. Historically, we have sold Floor Income Contracts on a periodic basis and depending upon market conditions and pricing, we may enter into additional Floor Income Contracts in the future. The balance of unamortized Floor Income Contracts will increase as we sell new contracts and decline due to the amortization of existing contracts.

| (Dollars in millions) | March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Unamortized net Floor premiums (net of tax)[1] | $ (308) | $ (498) |

(1)   $(492) million and $(795) million on a pre-tax basis as of March 31, 2014 and 2013, respectively.

2) **Goodwill and Acquired Intangible Assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and the amortization of acquired intangible assets. The following table summarizes the goodwill and acquired intangible asset adjustments.

| (Dollars in millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| "Core Earnings" goodwill and acquired intangible asset adjustments[1] | $ (4) | $ (3) |

(1)   Negative amounts are subtracted from "Core Earnings" net income to arrive at GAAP net income.

**Business Segment Earnings Summary — "Core Earnings" Basis**

**FFELP Loans Segment**

The following table includes "Core Earnings" results for our FFELP Loans segment.

| (Dollars in millions) | Three Months Ended March 31, | | % Increase (Decrease) |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2013 vs. 2012 |
| "Core Earnings" interest income: | | | |
| FFELP Loans | $ 523 | $ 599 | (13)% |
| Cash and investments | 1 | 2 | (50) |
| Total "Core Earnings" interest income | 524 | 601 | (13) |
| Total "Core Earnings" interest expense | 293 | 340 | (14) |
| Net "Core Earnings" interest income | 231 | 261 | (11) |
| Less: provision for loan losses | 10 | 16 | (38) |
| Net "Core Earnings" interest income after provision for loan losses | 221 | 245 | (10) |
| Gains on sales of loans and investments | — | 55 | (100) |
| Servicing revenue | 11 | 23 | (52) |
| Total other income | 11 | 78 | (86) |
| Direct operating expenses | 125 | 157 | (20) |
| Restructuring and other reorganization expenses | — | — | — |
| Total expenses | 125 | 157 | (20) |
| Income from continuing operations, before income tax expense | 107 | 166 | (36) |
| Income tax expense | 41 | 62 | (34) |
| "Core Earnings" | $ 66 | $ 104 | (37)% |

64

Table of Contents

"Core Earnings" from the FFELP Loans segment were $66 million in the first quarter of 2014, compared with $104 million in the year-ago quarter. The decrease is primarily due to the $55 million gain from the sale of the Residual Interest in a FFELP Loan securitization trust in the year-ago quarter, as well as a reduction in net interest income due to the decrease in FFELP Loans outstanding. Key financial measures include:

- Net interest margin of .87 percent in the first quarter of 2014 compared with .83 percent in the year-ago quarter (see "FFELP Loan Net Interest Margin" for a further discussion of this increase).

- The provision for loan losses of $10 million in the first quarter of 2014 decreased from $16 million in the year-ago quarter.

### FFELP Loan Net Interest Margin

The following table includes the "Core Earnings" basis FFELP Loan net interest margin along with reconciliation to the GAAP-basis FFELP Loan net interest margin.

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2014 | 2013 |
| "Core Earnings" basis FFELP Loan yield | 2.56% | 2.61% |
| Hedged Floor Income | .29 | .25 |
| Unhedged Floor Income | .05 | .06 |
| Consolidation Loan Rebate Fees | (.65) | (.68) |
| Repayment Borrower Benefits | (.11) | (.11) |
| Premium amortization | (.10) | (.14) |
| "Core Earnings" basis FFELP Loan net yield | 2.04 | 1.99 |
| "Core Earnings" basis FFELP Loan cost of funds | (1.09) | (1.06) |
| "Core Earnings" basis FFELP Loan spread | .95 | .93 |
| "Core Earnings" basis other interest-earning asset spread impact | (.08) | (.10) |
| "Core Earnings" basis FFELP Loan net interest margin[1] | 0.87% | .83% |
|  |  |  |
| "Core Earnings" basis FFELP Loan net interest margin[1] | .87% | .83% |
| Adjustment for GAAP accounting treatment[2] | .44 | .40 |
| GAAP-basis FFELP Loan net interest margin[1] | 1.31% | 1.23% |

[1]   The average balances of our FFELP "Core Earnings" basis interest-earning assets for the respective periods are:

| | Three Months Ended March 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| FFELP Loans | $103,734 | $ 121,855 |
| Other interest-earning assets | 3,895 | 5,555 |
| Total FFELP "Core Earnings" basis interest-earning assets | $107,629 | $ 127,410 |

[2]   Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income, the reversal of the amortization of premiums received on Floor Income Contracts, and other derivative accounting adjustments. For further discussion of these adjustments, see section titled "'Core Earnings' — Definition and Limitations — Difference between 'Core Earnings' and GAAP" above.

As of March 31, 2014, our FFELP Loan portfolio totaled approximately $103 billion, comprised of $39 billion of FFELP Stafford loans and $64 billion of FFELP Consolidation Loans. The weighted-average life of these portfolios is 4.9 years and 9.2 years, respectively, assuming a Constant Prepayment Rate ("CPR") of 4 percent and 3 percent, respectively.

Table of Contents

### Floor Income

The following table analyzes the ability of the FFELP Loans in our portfolio to earn Floor Income after March 31, 2014 and 2013, based on interest rates as of those dates.

| (Dollars in billions) | March 31, 2014 | | | | March 31, 2013 | | |
|---|---|---|---|---|---|---|---|
| | Fixed Borrower Rate | Variable Borrower Rate | Total | | Fixed Borrower Rate | Variable Borrower Rate | Total |
| Student loans eligible to earn Floor Income | $ 88.4 | $ 12.9 | $101.3 | | $ 102.9 | $ 14.6 | $117.5 |
| Less: post-March 31, 2006 disbursed loans required to rebate Floor Income | (44.7) | (.9) | (45.6) | | (52.9) | (1.0) | (53.9) |
| Less: economically hedged Floor Income Contracts | (27.2) | — | (27.2) | | (31.7) | — | (31.7) |
| Student loans eligible to earn Floor Income | $ 16.5 | $ 12.0 | $ 28.5 | | $ 18.3 | $ 13.6 | $ 31.9 |
| Student loans earning Floor Income | $ 16.4 | $ 1.6 | $ 18.0 | | $ 18.3 | $ 1.9 | $ 20.2 |

We have sold Floor Income Contracts to hedge the potential Floor Income from specifically identified pools of FFELP Consolidation Loans that are eligible to earn Floor Income.

The following table presents a projection of the average balance of FFELP Consolidation Loans for which Fixed Rate Floor Income has been economically hedged through Floor Income Contracts for the period April 1, 2014 to June 30, 2016. The hedges related to these loans do not qualify as accounting hedges.

| (Dollars in billions) | April 1, 2014 to December 31, 2014 | 2015 | 2016 |
|---|---|---|---|
| Average balance of FFELP Consolidation Loans whose Floor Income is economically hedged[1] | $ 27.2 | $27.2 | $10.4 |

[1]    The remaining projected unamortized net Floor premium balance (pre-tax) related to Floor Income Contracts as of December 31, 2014, 2015 and 2016 is $314 million, $77 million, and $0 million, respectively.

### FFELP Loan Provision for Loan Losses and Charge-Offs

The following table summarizes the total FFELP Loan provision for loan losses and charge-offs for the three months March 31, 2014 and 2013.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| FFELP Loan provision for loan losses | $ 10 | $ 16 |
| FFELP Loan charge-offs | 22 | 22 |

### Gains on Sales of Loans and Investments

The decrease in gains on sales of loans and investments for the quarter ended March 31, 2014 from the year-ago period was the result of a $55 million gain from the sale of the Residual Interest in a FFELP Loan securitization trust in the first-quarter 2013. We will continue to service the student loans in the trusts that were sold under existing agreements. The first-quarter 2013 sale removed securitization trust assets of $3.8 billion and related liabilities of $3.7 billion from the balance sheet.

### Operating Expenses — FFELP Loans

Operating expenses for our FFELP Loans segment primarily include the contractual rates we pay to service loans in term asset-backed securitization trusts or a similar rate if a loan is not in a term financing facility (which is presented as an intercompany charge from the Business Services segment who services the loans), the fees we pay for third-party loan servicing and costs incurred to acquire loans. The intercompany revenue charged by the

Table of Contents

Business Services segment and included in those amounts was $118 million and $149 million for the quarters ended March 31, 2014 and 2013, respectively. These amounts exceed the actual cost of servicing the loans. Operating expenses were 49 basis points and 52 basis points of average FFELP Loans in the quarters ended March 31, 2014 and 2013, respectively. The decrease in operating expenses of $32 million in the quarter ended March 31, 2014 compared with the year-ago period was primarily the result of the reduction in the average outstanding balance of our FFELP Loan portfolio.

**Private Education Loans Segment**

The following table includes "Core Earnings" results for our Private Education Loans segment.

| (Dollars in millions) | Three Months Ended March 31, 2014 | Three Months Ended March 31, 2013 | % Increase (Decrease) 2014 vs. 2013 |
|---|---|---|---|
| "Core Earnings" interest income: | | | |
| Private Education Loans | $    644 | $    623 | 3% |
| Cash and investments | 1 | 1 | — |
| Total "Core Earnings" interest income | 645 | 624 | 3 |
| Total "Core Earnings" interest expense | 206 | 203 | 1 |
| Net "Core Earnings" interest income | 439 | 421 | 4 |
| Less: provision for loan losses | 175 | 225 | (22) |
| Net "Core Earnings" interest income after provision for loan losses | 264 | 196 | 35 |
| Servicing revenue | 1 | 10 | (90) |
| Direct operating expenses | 76 | 67 | 13 |
| Restructuring and other reorganization expenses | — | — | — |
| Total expenses | 76 | 67 | 13 |
| Income before income tax expense | 189 | 139 | 36 |
| Income tax expense | 71 | 52 | 37 |
| "Core Earnings" | $    118 | $    87 | 36% |

Quarterly core earnings were $118 million, compared with $87 million in the year-ago quarter. The increase is primarily the result of a $50 million decrease in the provision for Private Education Loan losses.

First-quarter 2014 Private Education Loan portfolio results vs. first-quarter 2013 included:

- Loan originations of $1.5 billion, up 8 percent.

- Delinquencies of 90 days or more of 3.4 percent of loans in repayment, down from 3.9 percent.

- Total delinquencies of 6.9 percent of loans in repayment, down from 7.8 percent.

- Loans in forbearance of 3.7 percent of loans in repayment and forbearance, up from 3.4 percent.

- Annualized charge-off rate of 2.8 percent of average loans in repayment, down from 3.0 percent.

- Provision for Private Education Loan losses of $175 million, down from $225 million.

- Core net interest margin, before loan loss provision, of 4.34 percent, up from 4.15 percent.

- The portfolio balance, net of loan loss allowance, totaled $38.2 billion, a $692 million increase over the year-ago quarter.

67

Table of Contents

### Private Education Loans Net Interest Margin

The following table shows the "Core Earnings" basis Private Education Loans net interest margin along with reconciliation to the GAAP-basis Private Education Loans net interest margin before provision for loan losses.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| "Core Earnings" basis Private Education Loan yield | 6.47% | 6.35% |
| Discount amortization | .23 | .23 |
| "Core Earnings" basis Private Education Loan net yield | 6.70 | 6.58 |
| "Core Earnings" basis Private Education Loan cost of funds | (2.08) | (2.02) |
| "Core Earnings" basis Private Education Loan spread | 4.62 | 4.56 |
| "Core Earnings" basis other interest-earning asset spread impact | (.28) | (.41) |
| "Core Earnings" basis Private Education Loans net interest margin[1] | 4.34% | 4.15% |
| | | |
| "Core Earnings" basis Private Education Loans net interest margin[1] | 4.34% | 4.15% |
| Adjustment for GAAP accounting treatment[2] | (.03) | (.03) |
| GAAP basis Private Education Loans net interest margin[1] | 4.31% | 4.12% |

[1]   The average balances of our Private Education Loans "Core Earnings" basis interest-earning assets for the respective periods are:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| (Dollars in millions) | 2014 | 2013 |
| Private Education Loans | $ 38,945 | $ 38,406 |
| Other interest-earning assets | 2,005 | 2,662 |
| Total Private Education Loans "Core Earnings" basis interest-earning assets | $ 40,950 | $ 41,068 |

[2]   Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income and other derivative accounting adjustments. For further discussion of these adjustments, see section titled "'Core Earnings' — Definition and Limitations — Difference between 'Core Earnings' and GAAP" above.

### Private Education Loan Provision for Loan Losses and Charge-Offs

The following table summarizes the total Private Education Loan provision for loan losses and charge-offs.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| (Dollars in millions) | 2014 | 2013 |
| Private Education Loan provision for loan losses | $ 175 | $ 225 |
| Private Education Loan charge-offs | 218 | 232 |

In establishing the allowance for Private Education Loan losses as of March 31, 2014, we considered several factors with respect to our Private Education Loan portfolio. In particular, we continue to see improvement in credit quality and continuing positive delinquency and charge-off trends in connection with this portfolio. Improving credit quality is seen in higher FICO scores and cosigner rates as well as a more seasoned portfolio. Total loans delinquent (as a percentage of loans in repayment) have decreased to 6.9 percent from 7.8 percent in the year-ago quarter. Loans greater than 90 days delinquent (as a percentage of loans in repayment) have decreased to 3.4 percent from 3.9 percent in the year-ago quarter. The charge-off rate decreased to 2.8 percent from 3.0 percent in the year-ago quarter. Loans in forbearance (as a percentage of loans in repayment and forbearance) increased to 3.7 percent from 3.4 percent in the year-ago quarter.

68

Table of Contents

Apart from the overall improvements discussed above that had the effect of reducing the provision for loan losses in the first-quarter 2014 compared to the year-ago quarter, Private Education Loans that have defaulted between 2008 and 2013 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue to not do so. Our allowance for loan losses takes into account these potential recovery uncertainties. See "Financial Condition — Private Education Loans Portfolio Performance — Receivable for Partially Charged-Off Private Education Loans" for further discussion.

The Private Education Loan provision for loan losses was $175 million in the first quarter of 2014, down $50 million from the first quarter of 2013. The decline was a result of the overall improvement in credit quality and performance trends discussed above, leading to decreases in expected future charge-offs.

For a more detailed discussion of our policy for determining the collectability of Private Education Loans and maintaining our allowance for Private Education Loan losses, see Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Policies and Estimates — Allowance for Loan Losses" in our Annual Report on Form 10-K for the year ended December 31, 2013.

### Operating Expenses — Private Education Loans Segment

Operating expenses for our Private Education Loans segment include costs incurred to originate Private Education Loans and to service and collect on our Private Education Loan portfolio. The increase in operating expenses of $9 million in the quarter ended March 31, 2014 compared with the year-ago quarter was primarily the result of increased account resolution activity on the portfolio which contributed to significant improvements in delinquency and charge-off rates. Direct operating expenses as a percentage of revenues (revenues calculated as net interest income after provision plus total other income) were 29 percent and 33 percent in the quarters ended March 31, 2014 and 2013, respectively.

## Business Services Segment

The following table includes "Core Earnings" results for our Business Services segment.

| (Dollars in millions) | Three Months Ended March 31, | | % Increase (Decrease) |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2014 vs. 2013 |
| Net interest income | $    1 | $    1 | —% |
| Servicing revenue: | | | |
| Intercompany loan servicing | 118 | 149 | (21) |
| Third-party loan servicing | 40 | 27 | 48 |
| Guarantor servicing | 9 | 10 | (10) |
| Total servicing revenue | 167 | 186 | (10) |
| Contingency revenue | 111 | 99 | 12 |
| Other Business Services revenue | 8 | 7 | 14 |
| Total other income | 286 | 292 | (2) |
| Direct operating expenses | 106 | 95 | 12 |
| Restructuring and other reorganization expenses | — | — | — |
| Total expenses | 106 | 95 | 12 |
| Income from continuing operations, before income tax expense | 181 | 198 | (9) |
| Income tax expense | 68 | 73 | (7) |
| Net income from continuing operations | 113 | 125 | (10) |
| Income from discontinued operations, net of tax expense | — | 1 | (100) |
| "Core Earnings" | $    113 | $    126 | (10)% |

69

Table of Contents

Business services "Core Earnings" were $113 million in first-quarter 2014, compared with $126 million in the year-ago quarter. The decrease is primarily due to the lower balance of FFELP Loans we serviced.

Our Business Services segment includes intercompany loan servicing fees from servicing the FFELP Loans in our FFELP Loans segment. The average balance of this portfolio was $103 billion and $121 billion for the quarters ended March 31, 2014 and 2013, respectively. The decline in average balance of FFELP loans outstanding along with the related intercompany loan servicing revenue from the year-ago period is primarily the result of normal amortization of the portfolio, as well as the sale of our Residual Interests in $12 billion of securitized FFELP loans in the first half of 2013.

Third-party loan servicing income for the current quarter compared with the prior-year period increased $13 million, primarily due to the increase in ED servicing revenue (discussed below) as well as a result of the sale of Residual Interests in FFELP Loan securitization trusts in 2013. (See "FFELP Loans Segment" for further discussion.) When we sold the Residual Interests, we retained the right to service the loans in the trusts. As such, servicing income that had previously been recorded as intercompany loan servicing is now recognized as third-party loan servicing income.

We are servicing approximately 5.8 million accounts under the ED Servicing Contract as of March 31, 2014, compared with 5.7 million and 4.8 million accounts serviced at December 31, 2013 and March 31, 2013, respectively. Third-party ED loan servicing fees in the quarters ended March 31, 2014 and 2013 included $31 million and $23 million, respectively, of servicing revenue related to the ED Servicing Contract.

Our contingency revenue consists of fees we receive for asset recovery on delinquent debt on behalf of third-party clients performed on a contingent basis. Contingency revenue increased $12 million in the current quarter compared with the year-ago quarter as a result of the higher asset recovery volume.

The following table presents the outstanding inventory of contingent asset recovery receivables that our Business Services segment will collect on behalf of others. We expect the inventory of FFELP contingent asset recovery receivables to decline over time as a result of the elimination of FFELP.

| (Dollars in millions) | March 31, 2014 | December 31, 2013 | March 31, 2013 |
|---|---|---|---|
| Contingent asset recovery receivables: | | | |
| Student loans | $13,168 | $ 13,481 | $13,549 |
| Other | 2,734 | 2,693 | 2,239 |
| Total | $15,902 | $ 16,174 | $15,788 |

In 2013, we sold our Campus Solutions and 529 college savings plan administration. The results related to these businesses for all periods presented have been reclassified as discontinued operations and are shown on an after-tax basis.

Revenues related to services performed on FFELP Loans accounted for 76 percent and 80 percent, respectively, of total segment revenues for the quarters ended March 31, 2014 and 2013.

### Operating Expenses — Business Services Segment

Operating expenses for our Business Services segment primarily include costs incurred to service our FFELP Loan portfolio, third-party servicing and asset recovery costs, and other operating costs. The increase in operating expenses of $11 million in the quarter ended March 31, 2014, respectively, compared with the year-ago period was primarily the result of an increase in our third-party servicing and asset recovery activities. This increase in activity resulted in a $26 million increase in related revenue over the same period.

70

Table of Contents

**Other Segment**

The following table includes "Core Earnings" results of our Other segment.

| (Dollars in millions) | Three Months Ended March 31, | | % Increase (Decrease) 2014 vs. 2013 |
|---|---|---|---|
| | 2014 | 2013 | |
| Net interest loss after provision for loan losses | $ (17) | $ (8) | 113% |
| Gains (losses) on sales of loans and investments | — | — | — |
| Gains on debt repurchases | — | 29 | (100) |
| Other | 3 | — | 100 |
| Total other income | 3 | 29 | (90) |
| Direct operating expenses | 105 | 3 | 3,400 |
| Overhead expenses: | | | |
| Corporate overhead | 40 | 35 | 14 |
| Unallocated information technology costs | 32 | 27 | 19 |
| Total overhead expenses | 72 | 62 | 16 |
| Total operating expenses | 177 | 65 | 172 |
| Restructuring and other reorganization expenses | 26 | 10 | 160 |
| Total expenses | 203 | 75 | 171 |
| Loss before income tax benefit | (217) | (54) | 302 |
| Income tax benefit | (83) | (20) | 315 |
| "Core Earnings" (loss) | $ (134) | $ (34) | 294% |

*Net Interest Loss after Provision for Loan Losses*

Net interest loss after provision for loan losses includes net interest income related to our corporate liquidity portfolio as well as net interest income and provision expense related to our mortgage and consumer loan portfolios.

*Gains on Debt Repurchases*

We repurchased $0 million and $927 million face amount of our debt for the quarters ended March 31, 2014 and 2013, respectively. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

*Direct Operating Expenses — Other Segment*

The primary driver of the increase in direct operating expenses was $103 million of additional reserve recorded in 2014 for pending regulatory matters (see Part II. "Other Information," Item 1. "Legal Proceedings—Regulatory Matters").

*Overhead — Other Segment*

Corporate overhead is comprised of costs related to executive management, the board of directors, accounting, finance, legal, human resources and stock-based compensation expense. Unallocated information technology costs are related to infrastructure and operations. The increase in overhead from fourth-quarter 2013 was primarily the result of $10 million of seasonal stock-based compensation expense.

71

Table of Contents

### Restructuring and Other Reorganization Expenses — Other Segment

Restructuring and other reorganization expenses for the quarter ended March 31, 2014 were $26 million compared with $10 million in the year-ago quarter. For the quarter ended March 31, 2014, these consisted of expenses primarily related to third-party costs incurred in connection with the Company's previously announced plan to separate its existing organization into two, distinct publicly traded companies.

### Financial Condition

This section provides additional information regarding the changes in our loan portfolio assets and related liabilities as well as credit quality and performance indicators related to our loan portfolio.

### Average Balance Sheets — GAAP

The following table reflects the rates earned on interest-earning assets and paid on interest-bearing liabilities and reflects our net interest margin on a consolidated basis.

| | Three Months Ended March 31, | | | |
| | 2014 | | 2013 | |
| (Dollars in millions) | Balance | Rate | Balance | Rate |
|---|---|---|---|---|
| **Average Assets** | | | | |
| FFELP Loans | $103,734 | 2.53% | $121,855 | 2.45% |
| Private Education Loans | 38,945 | 6.70 | 38,406 | 6.58 |
| Other loans | 98 | 9.69 | 133 | 9.36 |
| Cash and investments | 8,080 | .17 | 9,878 | .19 |
| Total interest-earning assets | 150,857 | 3.48% | 170,272 | 3.25% |
| Non-interest-earning assets | 4,124 | | 4,567 | |
| Total assets | $154,981 | | $174,839 | |
| **Average Liabilities and Equity** | | | | |
| Short-term borrowings | $ 13,258 | .82% | $ 19,070 | 1.03% |
| Long-term borrowings | 133,116 | 1.53 | 146,977 | 1.44 |
| Total interest-bearing liabilities | 146,374 | 1.47% | 166,047 | 1.39% |
| Non-interest-bearing liabilities | 2,982 | | 3,674 | |
| Equity | 5,625 | | 5,118 | |
| Total liabilities and equity | $154,981 | | $174,839 | |
| Net interest margin | | 2.06% | | 1.89% |

### Rate/Volume Analysis — GAAP

The following rate/volume analysis shows the relative contribution of changes in interest rates and asset volumes.

| | Increase | Change Due To[1] | |
| (Dollars in millions) | (Decrease) | Rate | Volume |
|---|---|---|---|
| **Three Months Ended March 31, 2014 vs. 2013** | | | |
| Interest income | $ (70) | $ 92 | $ (162) |
| Interest expense | (41) | 29 | (70) |
| Net interest income | $ (29) | $ 66 | $ (95) |

[1]  Changes in income and expense due to both rate and volume have been allocated in proportion to the relationship of the absolute dollar amounts of the change in each. The changes in income and expense are calculated independently for each line in the table. The totals for the rate and volume columns are not the sum of the individual lines.

72

Table of Contents

*Summary of our Student Loan Portfolio*

*Ending Student Loan Balances, net*

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| **March 31, 2014** | | | | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 682 | $ — | $ 682 | $ 3,001 | $ 3,683 |
| Grace, repayment and other[2] | 37,886 | 63,159 | 101,045 | 36,599 | 137,644 |
| Total, gross | 38,568 | 63,159 | 101,727 | 39,600 | 141,327 |
| Unamortized premium/(discount) | 589 | 426 | 1,015 | (681) | 334 |
| Receivable for partially charged-off loans | — | — | — | 1,297 | 1,297 |
| Allowance for loan losses | (69) | (38) | (107) | (2,059) | (2,166) |
| Total student loan portfolio | $ 39,088 | $ 63,547 | $102,635 | $38,157 | $140,792 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 45% | 73% | 27% | 100% |
| **December 31, 2013** | | | | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 742 | $ — | $ 742 | $ 2,629 | $ 3,371 |
| Grace, repayment and other[2] | 38,752 | 64,178 | 102,930 | 36,371 | 139,301 |
| Total, gross | 39,494 | 64,178 | 103,672 | 39,000 | 142,672 |
| Unamortized premium/(discount) | 602 | 433 | 1,035 | (704) | 331 |
| Receivable for partially charged-off loans | — | — | — | 1,313 | 1,313 |
| Allowance for loan losses | (75) | (44) | (119) | (2,097) | (2,216) |
| Total student loan portfolio | $ 40,021 | $ 64,567 | $104,588 | $37,512 | $142,100 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 46% | 74% | 26% | 100% |

[1] Loans for customers still attending school and are not yet required to make payments on the loan.

[2] Includes loans in deferment or forbearance.

*Average Student Loan Balances (net of unamortized premium/discount)*

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| **Three Months Ended March 31, 2014** | | | | | |
| Total | $ 39,682 | $ 64,052 | $103,734 | $38,945 | $142,679 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 45% | 73% | 27% | 100% |
| **Three Months Ended March 31, 2013** | | | | | |
| Total | $ 43,721 | $ 78,134 | $121,855 | $38,406 | $160,261 |
| % of FFELP | 36% | 64% | 100% | | |
| % of total | 27% | 49% | 76% | 24% | 100% |

73

Table of Contents

*Student Loan Activity*

| (Dollars in millions) | Three Months Ended March 31, 2014 | | | | |
| --- | --- | --- | --- | --- | --- |
| | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 40,021 | $ 64,567 | $104,588 | $ 37,512 | $142,100 |
| Acquisitions and originations | 278 | 175 | 453 | 1,522 | 1,975 |
| Capitalized interest and premium/discount amortization | 307 | 304 | 611 | 211 | 822 |
| Consolidations to third parties | (404) | (277) | (681) | (33) | (714) |
| Sales | — | — | — | — | — |
| Repayments and other | (1,114) | (1,222) | (2,336) | (1,055) | (3,391) |
| Ending balance | $ 39,088 | $ 63,547 | $102,635 | $ 38,157 | $140,792 |

| (Dollars in millions) | Three Months Ended March 31, 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 44,289 | $ 81,323 | $125,612 | $ 36,934 | $162,546 |
| Acquisitions and originations | 101 | 53 | 154 | 1,405 | 1,559 |
| Capitalized interest and premium/discount amortization | 295 | 313 | 608 | 200 | 808 |
| Consolidations to third parties | (445) | (275) | (720) | (24) | (744) |
| Sales[(1)] | (72) | (3,749) | (3,821) | — | (3,821) |
| Repayments and other | (1,163) | (1,475) | (2,638) | (1,050) | (3,688) |
| Ending balance | $ 43,005 | $ 76,190 | $119,195 | $ 37,465 | $156,660 |

[(1)] Includes $3.7 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

*Student Loan Allowance for Loan Losses Activity*

| (Dollars in millions) | Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | | | 2013 | | |
| | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 119 | $ 2,097 | $2,216 | $ 159 | $ 2,171 | $2,330 |
| Less: | | | | | | |
| Charge-offs[(1)] | (22) | (218) | (240) | (22) | (232) | (254) |
| Student loan sales | — | — | — | (6) | — | (6) |
| Plus: | | | | | | |
| Provision for loan losses | 10 | 175 | 185 | 16 | 225 | 241 |
| Reclassification of interest reserve[(2)] | — | 5 | 5 | — | 6 | 6 |
| Ending balance | $ 107 | $ 2,059 | $2,166 | $ 147 | $ 2,170 | $2,317 |
| Troubled debt restructuring[(3)] | $ — | $ 9,241 | $9,241 | $ — | $ 7,714 | $7,714 |

[(1)] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[(2)] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[(3)] Represents the recorded investment of loans classified as troubled debt restructuring.

74

Table of Contents

*Private Education Loan Originations*

The following table summarizes our Private Education Loan originations.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Smart Option — interest only[1] | $  372 | $  365 |
| Smart Option — fixed pay[1] | 483 | 439 |
| Smart Option — deferred[1] | 661 | 590 |
| Other | 14 | 17 |
| Total Private Education Loan originations | $1,530 | $ 1,411 |

[1]  Interest only, fixed pay and deferred describe the payment option while in school or in grace period. See "Consumer Loans Portfolio Performance — Private Education Loan Repayment Options" for further discussion.

**FFELP Loan Portfolio Performance**

*FFELP Loan Delinquencies and Forbearance*

The table below presents our FFELP Loan delinquency trends.

| (Dollars in millions) | FFELP Loan Delinquencies March 31, | | | |
|---|---|---|---|---|
| | 2014 | | 2013 | |
| | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 13,016 | | $ 17,324 | |
| Loans in forbearance[2] | 15,650 | | 15,430 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 62,721 | 85.9% | 71,792 | 84.2% |
| Loans delinquent 31-60 days[3] | 3,059 | 4.2 | 4,186 | 4.9 |
| Loans delinquent 61-90 days[3] | 1,784 | 2.4 | 2,441 | 2.9 |
| Loans delinquent greater than 90 days[3] | 5,497 | 7.5 | 6,885 | 8.0 |
| Total FFELP Loans in repayment | 73,061 | 100% | 85,304 | 100% |
| Total FFELP Loans, gross | 101,727 | | 118,058 | |
| FFELP Loan unamortized premium | 1,015 | | 1,284 | |
| Total FFELP Loans | 102,742 | | 119,342 | |
| FFELP Loan allowance for losses | (107) | | (147) | |
| FFELP Loans, net | $102,635 | | $119,195 | |
| Percentage of FFELP Loans in repayment | | 71.8% | | 72.3% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 14.2% | | 15.8% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 17.6% | | 15.3% |

[1]  Loans for customers who may still be attending school or engaging in other permitted educational activities and are not required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested extension of grace period during employment transition or who have temporarily ceased making payments due to hardship or other factors.

[2]  Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making payments due to hardship or other factors.

[3]  The period of delinquency is based on the number of days scheduled payments are contractually past due.

75

Table of Contents

*Allowance for FFELP Loan Losses*

The following table summarizes changes in the allowance for FFELP Loan losses.

| | Three Months Ended March 31, | |
|---|---|---|
| **(Dollars in millions)** | **2014** | **2013** |
| Allowance at beginning of period | 119 | 159 |
| Provision for FFELP Loan losses | 10 | 16 |
| Charge-offs | (22) | (22) |
| Student loan sales | — | (6) |
| Allowance at end of period | $ 107 | $ 147 |
| | | |
| Charge-offs as a percentage of average loans in repayment (annualized) | .12% | .10% |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | .10% | .09% |
| Allowance as a percentage of ending total loans, gross | .10% | .12% |
| Allowance as a percentage of ending loans in repayment | .15% | .17% |
| Allowance coverage of charge-offs (annualized) | 1.2 | 1.6 |
| Ending total loans, gross | $101,727 | $118,058 |
| Average loans in repayment | $ 73,496 | $ 87,256 |
| Ending loans in repayment | $ 73,061 | $ 85,304 |

76

Table of Contents

***Private Education Loans Portfolio Performance***

*Private Education Loan Delinquencies and Forbearance*

The table below presents our Private Education Loan delinquency trends.

| | Private Education Loan Delinquencies | | | |
| | March 31, | | | |
| | 2014 | | 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[(1)] | $ 7,075 | | $ 6,434 | |
| Loans in forbearance[(2)] | 1,216 | | 1,101 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 29,156 | 93.1% | 29,069 | 92.2% |
| Loans delinquent 31-60 days[(3)] | 655 | 2.1 | 731 | 2.3 |
| Loans delinquent 61-90 days[(3)] | 430 | 1.4 | 491 | 1.6 |
| Loans delinquent greater than 90 days[(3)] | 1,068 | 3.4 | 1,242 | 3.9 |
| Total Private Education Loans in repayment | 31,309 | 100% | 31,533 | 100% |
| Total Private Education Loans, gross | 39,600 | | 39,068 | |
| Private Education Loan unamortized discount | (681) | | (772) | |
| Total Private Education Loans | 38,919 | | 38,296 | |
| Private Education Loan receivable for partially charged-off loans | 1,297 | | 1,339 | |
| Private Education Loan allowance for losses | (2,059) | | (2,170) | |
| Private Education Loans, net | $38,157 | | $37,465 | |
| Percentage of Private Education Loans in repayment | | 79.1% | | 80.7% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 6.9% | | 7.8% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.7% | | 3.4% |
| Loans in repayment greater than 12 months as a percentage of loans in repayment[(4)] | | 84.8% | | 79.1% |

[(1)] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[(2)] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[(3)] The period of delinquency is based on the number of days scheduled payments are contractually past due.

[(4)] Based on number of months in an active repayment status for which a scheduled monthly payment was due.

77

Table of Contents

*Allowance for Private Education Loan Losses*

The following table summarizes changes in the allowance for Private Education Loan losses.

| | Three Months Ended March 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| Allowance at beginning of period | $ 2,097 | $ 2,171 |
| Provision for Private Education Loan losses | 175 | 225 |
| Charge-offs[1] | (218) | (232) |
| Reclassification of interest reserve[2] | 5 | 6 |
| Allowance at end of period | $ 2,059 | $ 2,170 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.8% | 3.0% |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | 2.7% | 2.9% |
| Allowance as a percentage of ending total loans | 5.0% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 6.6% | 6.9% |
| Average coverage of charge-offs (annualized) | 2.3 | 2.3 |
| Ending total loans[3] | $40,897 | $40,407 |
| Average loans in repayment | $31,416 | $31,645 |
| Ending loans in repayment | $31,309 | $31,533 |

[1] Charge-offs are reported net of expected recoveries. The expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Ending total loans represents gross Private Education Loans, plus the receivable for partially charged-off loans.

78

Table of Contents

The following table provides the detail for our traditional and non-traditional Private Education Loans for the quarters ended.

| (Dollars in millions)[1] | March 31, 2014 | | | March 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 37,617 | $ 3,280 | $40,897 | $ 36,746 | $ 3,661 | $40,407 |
| Ending loans in repayment | 29,116 | 2,193 | 31,309 | 29,022 | 2,511 | 31,533 |
| Private Education Loan allowance for losses | 1,583 | 476 | 2,059 | 1,643 | 527 | 2,170 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.3% | 9.5% | 2.8% | 2.5% | 8.7% | 3.0% |
| Allowance as a percentage of ending total loan balance | 4.2% | 14.5% | 5.0% | 4.5% | 14.4% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 5.4% | 21.7% | 6.6% | 5.7% | 21.0% | 6.9% |
| Average coverage of charge-offs (annualized) | 2.3 | 2.3 | 2.3 | 2.3 | 2.4 | 2.3 |
| Delinquencies as a percentage of Private Education Loans in repayment | 6.0% | 18.3% | 6.9% | 6.7% | 20.5% | 7.8% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 2.9% | 10.0% | 3.4% | 3.3% | 11.2% | 3.9% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 3.5% | 6.3% | 3.7% | 3.2% | 5.1% | 3.4% |
| Loans that entered repayment during the period[2] | $ 528 | $ 11 | $ 539 | $ 553 | $ 23 | $ 576 |
| Percentage of Private Education Loans with a cosigner | 71% | 31% | 68% | 69% | 30% | 66% |
| Average FICO at origination | 730 | 625 | 723 | 728 | 624 | 720 |

[1]  Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]  Includes loans that are required to make a payment for the first time.

As part of concluding on the adequacy of the allowance for loan losses, we review key allowance and loan metrics. The most significant of these metrics considered are the allowance coverage of charge-offs ratio; the allowance as a percentage of total loans and of loans in repayment; and delinquency and forbearance percentages.

*Receivable for Partially Charged-Off Private Education Loans*

At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2008 and 2013 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so. There was $334 million and $209 million in the allowance for Private Education Loan losses at March 31, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans (see "Private Education Loans Segment — Private Education Loan Provision for Loan Losses and Charge-Offs" for a further discussion).

79

Table of Contents

The following table summarizes the activity in the receivable for partially charged-off Private Education Loans.

| (Dollars in millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Receivable at beginning of period | $ 1,313 | $ 1,347 |
| Expected future recoveries of current period defaults[1] | 71 | 78 |
| Recoveries[2] | (61) | (68) |
| Charge-offs[3] | (26) | (18) |
| Receivable at end of period | 1,297 | 1,339 |
| Allowance for estimated recovery shortfalls[4] | (334) | (209) |
| Net receivable at end of period | $   963 | $ 1,130 |

[1] Represents the difference between the defaulted loan balance and our estimate of the amount to be collected in the future.

[2] Current period cash recoveries.

[3] Represents the current period recovery shortfall — the difference between what was expected to be collected and what was actually collected. These amounts are included in total charge-offs as reported in the "Allowance for Private Education Loan Losses" table.

[4] The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $2.1 billion and $2.2 billion overall allowance for Private Education Loan losses as of March 31, 2014 and 2013, respectively.

*Use of Forbearance as a Private Education Loan Recovery Tool*

Forbearance involves granting the customer a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time. Using forbearance extends the original term of the loan. Forbearance does not grant any reduction in the total repayment obligation (principal or interest). While in forbearance status, interest continues to accrue and is capitalized to principal when the loan re-enters repayment status. Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan. In some instances, we require good-faith payments before granting forbearance. Exceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of recovery of the loan. Forbearance as a recovery tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments. We leverage updated customer information and other decision support tools to best determine who will be granted forbearance based on our expectations as to a customer's ability and willingness to repay their obligation. This strategy is aimed at mitigating the overall risk of the portfolio as well as encouraging cash resolution of delinquent loans.

Forbearance may be granted to customers who are exiting their grace period to provide additional time to obtain employment and income to support their obligations, or to current customers who are faced with a hardship and request forbearance time to provide temporary payment relief. In these circumstances, a customer's loan is placed into a forbearance status in limited monthly increments and is reflected in the forbearance status at month-end during this time. At the end of their granted forbearance period, the customer will enter repayment status as current and is expected to begin making their scheduled monthly payments on a go-forward basis.

Forbearance may also be granted to customers who are delinquent in their payments. In these circumstances, the forbearance cures the delinquency and the customer is returned to a current repayment status. In more limited instances, delinquent customers will also be granted additional forbearance time.

The table below reflects the historical effectiveness of using forbearance. Our experience has shown that three years after being granted forbearance for the first time, 66 percent of the loans are current, paid in full, or receiving an in-school grace or deferment, and 20 percent have defaulted. The default experience associated with

80

Table of Contents

loans which utilize forbearance is considered in our allowance for loan losses. The number of loans in a forbearance status as a percentage of loans in repayment and forbearance increased to 3.7 percent in the first quarter of 2014 compared with 3.4 percent in the year-ago quarter. As of March 31, 2014, one percent of loans in current status were delinquent as of the end of the prior month, but were granted a forbearance that made them current as of March 31, 2014 (customers made payments on approximately 34 percent of these loans as a prerequisite to being granted forbearance).

**Tracking by First Time in Forbearance Compared to All Loans Entering Repayment —
Portfolio data through March 31, 2014**

|  | Status distribution 36 months after being granted forbearance for the first time | Status distribution 36 months after entering repayment (all loans) | Status distribution 36 months after entering repayment for loans never entering forbearance |
|---|---|---|---|
| In-school/grace/deferment | 9.8% | 9.1% | 5.5% |
| Current | 51.2 | 59.9 | 67.7 |
| Delinquent 31-60 days | 3.1 | 2.0 | .4 |
| Delinquent 61-90 days | 1.9 | 1.1 | .1 |
| Delinquent greater than 90 days | 4.7 | 2.7 | .3 |
| Forbearance | 3.8 | 3.0 | — |
| Defaulted | 20.2 | 11.4 | 7.6 |
| Paid | 5.3 | 10.8 | 18.4 |
| Total | 100% | 100% | 100% |

The tables below show the composition and status of the Private Education Loan portfolio aged by number of months in active repayment status (months for which a scheduled monthly payment was due). As indicated in the tables, the percentage of loans that are delinquent greater than 90 days or that are in forbearance status decreases the longer the loans have been in active repayment status.

At March 31, 2014, loans in forbearance status as a percentage of loans in repayment and forbearance were 7.2 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.3 percent for loans that have been in active repayment status for more than 48 months. Approximately 63 percent of our Private Education Loans in forbearance status has been in active repayment status less than 25 months.

At March 31, 2014, loans in repayment that are delinquent greater than 90 days as a percentage of loans in repayment were 5.0 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.9 percent for loans that have been in active repayment status for more than 48 months. Approximately 46 percent of our Private Education Loans in repayment that are delinquent greater than 90 days status has been in active repayment status less than 25 months.

81

Table of Contents

| (Dollars in millions) | Monthly Scheduled Payments Due | | | | | Not Yet in | |
|---|---|---|---|---|---|---|---|
| March 31, 2014 | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | Repayment | Total |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 7,075 | $ 7,075 |
| Loans in forbearance | 559 | 208 | 177 | 121 | 151 | — | 1,216 |
| Loans in repayment — current | 4,271 | 4,580 | 4,611 | 4,609 | 11,085 | — | 29,156 |
| Loans in repayment — delinquent 31-60 days | 147 | 134 | 121 | 95 | 158 | — | 655 |
| Loans in repayment — delinquent 61-90 days | 98 | 94 | 79 | 62 | 97 | — | 430 |
| Loans in repayment — delinquent greater than 90 days | 230 | 266 | 198 | 151 | 223 | — | 1,068 |
| Total | $5,305 | $ 5,282 | $ 5,186 | $ 5,038 | $ 11,714 | $ 7,075 | 39,600 |
| Unamortized discount | | | | | | | (681) |
| Receivable for partially charged-off loans | | | | | | | 1,297 |
| Allowance for loan losses | | | | | | | (2,059) |
| Total Private Education Loans, net | | | | | | | $38,157 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 10.5% | 3.9% | 3.4% | 2.4% | 1.3% | —% | 3.7% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 4.8% | 5.2% | 4.0% | 3.1% | 1.9% | —% | 3.4% |

| (Dollars in millions) | Monthly Scheduled Payments Due | | | | | Not Yet in | |
|---|---|---|---|---|---|---|---|
| March 31, 2013 | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | Repayment | Total |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 6,434 | $ 6,434 |
| Loans in forbearance | 587 | 184 | 145 | 79 | 106 | — | 1,101 |
| Loans in repayment — current | 5,645 | 5,156 | 5,345 | 4,505 | 8,418 | — | 29,069 |
| Loans in repayment — delinquent 31-60 days | 252 | 139 | 132 | 85 | 123 | — | 731 |
| Loans in repayment — delinquent 61-90 days | 189 | 95 | 82 | 54 | 71 | — | 491 |
| Loans in repayment — delinquent greater than 90 days | 513 | 260 | 204 | 115 | 150 | — | 1,242 |
| Total | $7,186 | $ 5,834 | $ 5,908 | $ 4,838 | $ 8,868 | $ 6,434 | 39,068 |
| Unamortized discount | | | | | | | (772) |
| Receivable for partially charged-off loans | | | | | | | 1,339 |
| Allowance for loan losses | | | | | | | (2,170) |
| Total Private Education Loans, net | | | | | | | $37,465 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 8.2% | 3.2% | 2.5% | 1.6% | 1.2% | —% | 3.4% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 7.8% | 4.6% | 3.5% | 2.4% | 1.7% | —% | 3.9% |

The table below stratifies the portfolio of Private Education Loans in forbearance by the cumulative number of months the customer has used forbearance as of the dates indicated.

| | March 31, 2014 | | March 31, 2013 | |
|---|---|---|---|---|
| (Dollars in millions) | Forbearance Balance | % of Total | Forbearance Balance | % of Total |
| **Cumulative number of months customer has used forbearance** | | | | |
| Up to 12 months | $ 913 | 75% | $ 867 | 79% |
| 13 to 24 months | 200 | 16 | 178 | 16 |
| More than 24 months | 103 | 9 | 56 | 5 |
| Total | $ 1,216 | 100% | $ 1,101 | 100% |

82

Table of Contents

*Private Education Loan Repayment Options*

Certain loan programs allow customers to select from a variety of repayment options depending on their loan type and their enrollment/loan status, which include the ability to extend their repayment term or change their monthly payment. The chart below provides the optional repayment offerings in addition to the standard level principal and interest payments as of March 31, 2014.

| | Loan Program | | | |
|---|---|---|---|---|
| (Dollars in millions) | Signature and Other | Smart Option | Career Training | Total |
| $ in repayment | $21,765 | $8,385 | $1,159 | $31,309 |
| $ in total | 26,660 | 11,735 | 1,205 | 39,600 |
| Payment method by enrollment status: | | | | |
| In-school/grace | Deferred[1] | Deferred[1], interest-only or fixed $25/month | Interest-only or fixed $25/month | |
| Repayment | Level principal and interest or graduated | Level principal and interest | Level principal and interest | |

[1] "Deferred" includes loans for which no payments are required and interest charges are capitalized into the loan balance.

The graduated repayment program that is part of Signature and Other Loans includes an interest-only payment feature that may be selected at the option of the customer. Customers elect to participate in this program at the time they enter repayment following their grace period. This program is available to customers in repayment, after their grace period, who would like a temporary lower payment from the required principal and interest payment amount. Customers participating in this program pay monthly interest with no amortization of their principal balance for up to 48 payments after entering repayment (dependent on the loan product type). The maturity date of the loan is not extended when a customer participates in this program. As of March 31, 2014 and 2013, customers in repayment owing approximately $4.2 billion (13 percent of loans in repayment) and $6.1 billion (19 percent of loans in repayment), respectively, were enrolled in the interest-only program. Of these amounts, 9 percent and 10 percent were non-traditional loans as of March 31, 2014 and 2013, respectively.

*Accrued Interest Receivable*

The following table provides information regarding accrued interest receivable on our Private Education Loans. The table also discloses the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest. The allowance for uncollectible interest exceeds the amount of accrued interest on our 90 days past due portfolio for all periods presented.

| | Accrued Interest Receivable | | |
|---|---|---|---|
| (Dollars in millions) | Total | Greater Than 90 Days Past Due | Allowance for Uncollectible Interest |
| March 31, 2014 | $1,024 | $ 40 | $ 59 |
| December 31, 2013 | $1,023 | $ 48 | $ 66 |
| March 31, 2013 | $ 918 | $ 48 | $ 68 |

83

Table of Contents

## Liquidity and Capital Resources

### Funding and Liquidity Risk Management

The following "Liquidity and Capital Resources" discussion concentrates on our FFELP Loans and Private Education Loans segments. Our Business Services and Other segments require minimal capital and funding. After the Spin-Off, Sallie Mae Bank became part of SLM BankCo, and Navient will neither originate Private Education Loans nor have bank deposits. As a result, Navient will not have liquidity risks associated with the origination of Private Education Loans and the maintenance of bank deposits.

We define liquidity risk as the potential inability to meet our obligations when they become due without incurring unacceptable losses, such as the ability to fund liability maturities or invest in future asset growth and business operations at reasonable market rates. Our two primary liquidity needs include our ongoing ability to meet our funding needs for our businesses throughout market cycles, including during periods of financial stress and servicing our indebtedness. To achieve these objectives we analyze and monitor our liquidity needs, maintain excess liquidity and access diverse funding sources including the issuance of unsecured debt and the issuance of secured debt primarily through asset-backed securitizations and/or other financing facilities.

We define liquidity as cash and high-quality liquid securities that we can use to meet our funding requirements. Our primary liquidity risk relates to our ability to raise replacement funding at a reasonable cost as our unsecured debt matures. In addition, we must continue to obtain funding at reasonable rates to meet our other business obligations and to continue to grow our business. Key risks associated with our liquidity relate to our ability to access the capital markets at reasonable rates. This ability may be affected by our credit ratings, as well as the overall availability of funding sources in the marketplace. In addition, credit ratings may be important to customers or counterparties when we compete in certain markets and when we seek to engage in certain transactions, including over-the-counter derivatives.

Credit ratings and outlooks are opinions subject to ongoing review by the ratings agencies and may change from time to time based on our financial performance, industry dynamics and other factors. Other factors that influence our credit ratings include the ratings agencies' assessment of the general operating environment, our relative positions in the markets in which we compete, reputation, liquidity position, the level and volatility of earnings, corporate governance and risk management policies, capital position and capital management practices. A negative change in our credit rating could have a negative effect on our liquidity because it would raise the cost and availability of funding and potentially require additional cash collateral or restrict cash currently held as collateral on existing borrowings or derivative collateral arrangements. It is our objective to improve our credit ratings so that we can continue to efficiently access the capital markets even in difficult economic and market conditions.

We have unsecured debt that totaled, as of March 31, 2014, approximately $17.9 billion. On April 30, 2014, three rating agencies took negative ratings actions with regard to our long-term unsecured debt ratings. Fitch lowered its rating one notch to BB and changed its rating outlook to stable. Moody's lowered its rating two notches to Ba3 and changed its rating outlook to stable. S&P lowered its rating two notches to BB and changed its rating outlook to stable. As a result of S&P's action, all three credit rating agencies now rate our long-term unsecured debt at below investment grade. This could result in higher cost of funds, and our senior unsecured debt to trade with greater volatility.

The negative actions taken by the credit rating agencies were based on concerns that the Spin-Off will have a negative impact on the holders of our senior unsecured debt. According to their ratings reports, these concerns primarily focus on Navient's loss of access to the earnings, cash flow, equity and potential market value of Sallie Mae Bank, the run-off of the FFELP Loan portfolio and the growth of other fee businesses to replace the earnings that are in run-off, refinancing risk, and the potential for new and more onerous rules and regulations.

Table of Contents

We expect to fund our ongoing liquidity needs, including the repayment of $1.0 billion of senior unsecured notes that mature in the next twelve months, primarily through our current cash and investment portfolio, the issuance of additional unsecured debt, the predictable operating cash flows provided by earnings, the repayment of principal on unencumbered student loan assets and the distributions from our securitization trusts (including servicing fees which are priority payments within the trusts). We may also draw down on our secured FFELP facilities; we may also issue term ABS.

Currently, new Private Education Loan originations of Existing SLM are initially funded through deposits and subsequently securitized to term. We have $1.4 billion of cash at Sallie Mae Bank as of March 31, 2014 available to fund future originations. We no longer originate FFELP Loans and therefore no longer have liquidity requirements for new FFELP Loan originations, but will continue to opportunistically purchase FFELP Loan portfolios from others.

### Sources of Liquidity and Available Capacity

*Ending Balances*

| (Dollars in millions) | March 31, 2014 | December 31, 2013 |
|---|---|---|
| **Sources of primary liquidity:** | | |
| Unrestricted cash and liquid investments: | | |
| Holding Company and other non-bank subsidiaries | $ 2,516 | $ 3,015 |
| Sallie Mae Bank[(1)] | 1,361 | 2,284 |
| Total unrestricted cash and liquid investments | $ 3,877 | $ 5,299 |
| Unencumbered FFELP Loans: | | |
| Holding Company and other non-bank subsidiaries | $ 1,441 | $ 1,259 |
| Sallie Mae Bank | 1,395 | 1,425 |
| Total unencumbered FFELP Loans | $ 2,836 | $ 2,684 |

85

Table of Contents

*Average Balances*

| (Dollars in millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| **Sources of primary liquidity:** | | |
| Unrestricted cash and liquid investments: | | |
| Holding Company and other non-bank subsidiaries | $2,180 | $ 2,820 |
| Sallie Mae Bank[1] | 1,505 | 1,229 |
| Total unrestricted cash and liquid investments | $3,685 | $ 4,049 |
| Unencumbered FFELP Loans: | | |
| Holding Company and other non-bank subsidiaries | $1,670 | $   655 |
| Sallie Mae Bank | 1,411 | 1,040 |
| Total unencumbered FFELP Loans | $3,081 | $ 1,695 |

[1]   This amount will be used primarily to originate or acquire student loans at Sallie Mae Bank. See discussion below on restrictions on Sallie Mae Bank to pay dividends.

Liquidity may also be available under secured credit facilities to the extent we have eligible collateral and capacity available. Maximum borrowing capacity under the FFELP Loan–other facilities will vary and be subject to each agreement's borrowing conditions, including, among others, facility size, current usage and availability of qualifying collateral from unencumbered FFELP Loans. As of March 31, 2014 and December 31, 2013, the maximum additional capacity under these facilities was $12.7 billion and $10.6 billion, respectively. For the three months ended March 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.3 billion and $10.8 billion, respectively.

We also hold a number of other unencumbered assets, consisting primarily of Private Education Loans and other assets. At March 31, 2014, total unencumbered student loans, net, comprised $16.0 billion of our unencumbered assets of which $13.2 billion and $2.8 billion related to Private Education Loans, net and FFELP Loans, net, respectively. At March 31, 2014, we had a total of $24.2 billion of unencumbered assets inclusive of those described above as sources of primary liquidity and exclusive of goodwill and acquired intangible assets.

86

Table of Contents

For further discussion of our various sources of liquidity, such as our continued access to the ABS market, our asset-backed financing facilities and our issuance of unsecured debt, see "Note 6 — Borrowings" in the 2013 Form 10-K.

The following table reconciles encumbered and unencumbered assets and their net impact on total tangible equity.

| (Dollars in billions) | March 31, 2014 | December 31, 2013 |
|---|---|---|
| Net assets of consolidated variable interest entities (encumbered assets) — FFELP Loans | $   4.6 | $   4.6 |
| Net assets of consolidated variable interest entities (encumbered assets) — Private Education Loans | 6.5 | 6.7 |
| Tangible unencumbered assets — Holding Company and other non-bank subsidiaries[1] | 13.6 | 13.1 |
| Tangible unencumbered assets — Sallie Mae Bank[1] | 10.6 | 10.7 |
| Unsecured debt | (27.3) | (27.9) |
| Mark-to-market on unsecured hedged debt[2] | (0.8) | (0.8) |
| Other liabilities, net | (2.0) | (1.2) |
| Total tangible equity | $   5.2 | $   5.2 |

[1]   Excludes goodwill and acquired intangible assets.

[2]   At March 31, 2014 and December 31, 2013, there were $640 million and $612 million, respectively, of net gains on derivatives hedging this debt in unencumbered assets, which partially offset these losses.

*First-Quarter 2014 Financing Transactions*

The following financing transactions have taken place in the first quarter of 2014:

Unsecured Financings:

- March 27, 2014 — issued $850 million senior unsecured bonds.

FFELP Loan Financings:

- January 28, 2014 — issued $994 million FFELP Loan ABS.

- March 27, 2014 — issued $992 million FFELP Loan ABS.

Private Education Loan Financings:

- March 6, 2014 — issued $676 million Private Education Loan ABS.

FFELP ABCP Facility

On January 10, 2014, we closed on a new $8 billion asset-backed commercial paper ("ABCP") facility that matures in January 2016. This facility replaces an existing $5.5 billion FFELP ABCP facility which was retired in January 2014. The additional $2.5 billion will be available for FFELP acquisition or refinancing. The maximum amount that can be financed steps down to $7 billion in March 2015. The new facility's maturity date is January 8, 2016.

*Shareholder distributions*

In the first-quarter 2014, Existing SLM paid a common stock dividend of $0.15 per share.

In the first-quarter 2014, Existing SLM repurchased 8 million shares of common stock for $200 million, fully utilizing Existing SLM's 2013 share repurchase program authorization.

Table of Contents

*Counterparty Exposure*

Counterparty exposure related to financial instruments arises from the risk that a lending, investment or derivative counterparty will not be able to meet its obligations to us. Risks associated with our lending portfolio are discussed in the section titled "Financial Condition — FFELP Loans Portfolio Performance" and "— Private Education Loans Portfolio Performance."

Our investment portfolio is composed of very short-term securities issued by a diversified group of highly rated issuers, limiting our counterparty exposure. Additionally, our investing activity is governed by Board of Director approved limits on the amount that is allowed to be invested with any one issuer based on the credit rating of the issuer, further minimizing our counterparty exposure. Counterparty credit risk is considered when valuing investments and considering impairment.

Related to derivative transactions, protection against counterparty risk is generally provided by International Swaps and Derivatives Association, Inc. ("ISDA") Credit Support Annexes ("CSAs"). CSAs require a counterparty to post collateral if a potential default would expose the other party to a loss. All derivative contracts entered into by us and Sallie Mae Bank are covered under such agreements and require collateral to be exchanged based on the net fair value of derivatives with each counterparty. Our securitization trusts require collateral in all cases if the counterparty's credit rating is withdrawn or downgraded below a certain level. Additionally, securitizations involving foreign currency notes issued after November 2005 also require the counterparty to post collateral to the trust based on the fair value of the derivative, regardless of credit rating. The trusts are not required to post collateral to the counterparties. In all cases, our exposure is limited to the value of the derivative contracts in a gain position net of any collateral we are holding. We consider counterparties' credit risk when determining the fair value of derivative positions on our exposure net of collateral.

We have liquidity exposure related to collateral movements between us and our derivative counterparties. Movements in the value of the derivatives, which are primarily affected by changes in interest rate and foreign exchange rates, may require us to return cash collateral held or may require us to access primary liquidity to post collateral to counterparties. If our credit ratings are downgraded from current levels, we may be required to segregate additional unrestricted cash collateral into restricted accounts.

The table below highlights exposure related to our derivative counterparties at March 31, 2014.

| (Dollars in millions) | Navient Corporation and Sallie Mae Bank Contracts | | Securitization Trust Contracts | |
|---|---|---|---|---|
| Exposure, net of collateral[1] | $ | 75 | $ | 947 |
| Percent of exposure to counterparties with credit ratings below S&P AA- or Moody's Aa3 | | 51% | | 30% |
| Percent of exposure to counterparties with credit ratings below S&P A- or Moody's A3 | | 44% | | 0% |

[1] Our securitization trusts had total net exposure of $770 million related to financial institutions located in France; of this amount, $577 million carries a guaranty from the French government. The total exposure relates to $5.1 billion notional amount of cross-currency interest rate swaps held in our securitization trusts, of which $3.3 billion notional amount carries a guaranty from the French government. Counterparties to the cross currency interest rate swaps are required to post collateral when their credit rating is withdrawn or downgraded below a certain level. As of March 31, 2014, no collateral was required to be posted and we are not holding any collateral related to these contracts. Adjustments are made to our derivative valuations for counterparty credit risk. The adjustments made at March 31, 2014 related to derivatives with French financial institutions (including those that carry a guaranty from the French government) decreased the derivative asset value by $57 million. Credit risks for all derivative counterparties are assessed internally on a continual basis.

*"Core Earnings" Basis Borrowings*

The following tables present the ending balances of our "Core Earnings" basis borrowings at March 31, 2014 and December 31, 2013, and average balances and average interest rates of our "Core Earnings" basis borrowings for the three months ended March 31, 2014 and 2013. The average interest rates include derivatives

Table of Contents

that are economically hedging the underlying debt but do not qualify for hedge accounting treatment. (See "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP — Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" of this Item 2).

*Ending Balances*

| (Dollars in millions) | March 31, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Short Term | Long Term | Total | Short Term | Long Term | Total |
| *Unsecured borrowings:* | | | | | | |
| Senior unsecured debt | $ 1,046 | $ 16,836 | $ 17,882 | $ 2,213 | $ 16,056 | $ 18,269 |
| Bank deposits | 5,964 | 2,755 | 8,719 | 6,133 | 2,807 | 8,940 |
| Other[1] | 684 | — | 684 | 691 | — | 691 |
| Total unsecured borrowings | 7,694 | 19,591 | 27,285 | 9,037 | 18,863 | 27,900 |
| *Secured borrowings:* | | | | | | |
| FFELP Loan securitizations | — | 90,608 | 90,608 | — | 90,756 | 90,756 |
| Private Education Loan securitizations | — | 18,861 | 18,861 | — | 18,835 | 18,835 |
| FFELP Loan — other facilities | 3,919 | 4,400 | 8,319 | 4,715 | 5,311 | 10,026 |
| Private Education Loan — other facilities | — | 597 | 597 | — | 843 | 843 |
| Total secured borrowings | 3,919 | 114,466 | 118,385 | 4,715 | 115,745 | 120,460 |
| Total before hedge accounting adjustments | 11,613 | 134,057 | 145,670 | 13,752 | 134,608 | 148,360 |
| Hedge accounting adjustments | 13 | 2,120 | 2,133 | 43 | 2,040 | 2,083 |
| Total | $11,626 | $136,177 | $147,803 | $13,795 | $136,648 | $150,443 |

[1] "Other" primarily consists of the obligation to return cash collateral held related to derivative exposures.

Secured borrowings comprised 81 percent and 81 percent of our "Core Earnings" basis debt outstanding at March 31, 2014 and December 31, 2013, respectively.

*Average Balances*

| (Dollars in millions) | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2014 | | 2013 | |
| | Average Balance | Average Rate | Average Balance | Average Rate |
| *Unsecured borrowings:* | | | | |
| Senior unsecured debt | $ 17,637 | 3.63% | $ 18,324 | 3.17% |
| Bank deposits | 8,921 | 1.03 | 7,552 | 1.22 |
| Other[1] | 729 | .12 | 1,396 | .22 |
| Total unsecured borrowings | 27,287 | 2.69 | 27,272 | 2.48 |
| *Secured borrowings:* | | | | |
| FFELP Loan securitizations | 90,391 | .99 | 102,532 | .97 |
| Private Education Loan securitizations | 18,664 | 2.02 | 19,712 | 2.06 |
| FFELP Loan — other facilities | 9,264 | .94 | 15,612 | 1.02 |
| Private Education Loan — other facilities | 768 | 1.30 | 919 | 1.74 |
| Total secured borrowings | 119,087 | 1.15 | 138,775 | 1.13 |
| Total | $146,374 | 1.44% | $166,047 | 1.35% |
| "Core Earnings" average balance and rate | $146,374 | 1.44% | $166,047 | 1.35% |
| Adjustment for GAAP accounting treatment | — | .03 | — | .04 |
| GAAP basis average balance and rate | $146,374 | 1.47% | $166,047 | 1.39% |

[1] "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

89

Table of Contents

**Critical Accounting Policies and Estimates**

Management's Discussion and Analysis of Financial Condition and Results of Operations addresses our consolidated financial statements, which have been prepared in accordance with GAAP. A discussion of our critical accounting policies, which include allowance for loan losses, premium and discount amortization related to our loan portfolio, fair value measurement, transfers of financial assets and the VIE consolidation model, derivative accounting and goodwill and intangible assets can be found in our 2013 Form 10-K. There were no significant changes to these critical accounting policies during the first three months of 2014.

90

Table of Contents

**Item 3.      Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Sensitivity Analysis**

Our interest rate risk management seeks to limit the impact of short-term movements in interest rates on our results of operations and financial position. The following tables summarize the potential effect on earnings over the next 12 months and the potential effect on fair values of balance sheet assets and liabilities at March 31, 2014 and December 31, 2013, based upon a sensitivity analysis performed by management assuming a hypothetical increase in market interest rates of 100 basis points and 300 basis points while funding spreads remain constant. Additionally, as it relates to the effect on earnings, a sensitivity analysis was performed assuming the funding index increases 25 basis points while holding the asset index constant, if the funding index is different than the asset index. The earnings sensitivity is applied only to financial assets and liabilities, including hedging instruments that existed at the balance sheet date and does not take into account new assets, liabilities or hedging instruments that may arise in 2014.

| (Dollars in millions, except per share amounts) | As of March 31, 2014 | | | | | | As of March 31, 2013 | | | | | |
| | Impact on Annual Earnings If: | | | | | | Impact on Annual Earnings If: | | | | | |
| | Interest Rates | | | | Funding Indices | | Interest Rates | | | | Funding Indices | |
| | Increase 100 Basis Points | | Increase 300 Basis Points | | Increase 25 Basis Points[1] | | Increase 100 Basis Points | | Increase 300 Basis Points | | Increase 25 Basis Points[1] | |
| **Effect on Earnings:** | | | | | | | | | | | | |
| Change in pre-tax net income before unrealized gains (losses) on derivative and hedging activities | $ | (11) | $ | 37 | $ | (225) | $ | (32) | $ | (17) | $ | (281) |
| Unrealized gains (losses) on derivative and hedging activities | | 214 | | 331 | | 1 | | 368 | | 593 | | (2) |
| Increase in net income before taxes | $ | 203 | $ | 368 | $ | (224) | $ | 336 | $ | 576 | $ | (283) |
| Increase in diluted earnings per common share | $ | .47 | $ | .85 | $ | (.51) | $ | .73 | $ | 1.26 | $ | (.62) |

[1]  If an asset is not funded with the same index/frequency reset of the asset then it is assumed the funding index increases 25 basis points while holding the asset index constant.

| (Dollars in millions) | | At March 31, 2014 | | | | |
| | | Interest Rates: | | | | |
| | | Change from Increase of 100 Basis Points | | Change from Increase of 300 Basis Points | | |
| | Fair Value | $ | % | $ | % | |
| **Effect on Fair Values:** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $103,058 | $ (565) | (1)% | $ (1,130) | (1)% | |
| Private Education Loans | 38,862 | — | — | — | — | |
| Other earning assets | 8,323 | — | — | (1) | — | |
| Other assets | 7,357 | (270) | (4) | (452) | (6)% | |
| Total assets gain/(loss) | $157,600 | $ (835) | (1)% | $ (1,583) | (1)% | |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $145,823 | $ (860) | (1)% | $ (2,411) | (2)% | |
| Other liabilities | 3,071 | 177 | 6 | 1,077 | 35 | |
| Total liabilities (gain)/loss | $148,894 | $ (683) | —% | $ (1,334) | (1)% | |

Table of Contents

| (Dollars in millions) | Fair Value | At December 31, 2013 | | | | |
|---|---|---|---|---|---|---|
| | | Interest Rates: | | | | |
| | | Change from Increase of 100 Basis Points | | | Change from Increase of 300 Basis Points | |
| | | $ | % | | $ | % |
| **Effect on Fair Values** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $104,481 | $ (566) | (1)% | | $ (1,126) | (1)% |
| Private Education Loans | 37,485 | — | — | | — | — |
| Other earning assets | 9,732 | — | — | | (1) | — |
| Other assets | 7,711 | (278) | (4) | | (435) | (6) |
| Total assets gain/(loss) | $159,409 | $ (844) | (1)% | | $ (1,562) | (1)% |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $147,385 | $ (859) | (1)% | | $ (2,393) | (2)% |
| Other liabilities | 3,458 | 58 | 2 | | 805 | 23 |
| Total liabilities (gain)/loss | $150,843 | $ (801) | (1)% | | $ (1,588) | (1)% |

A primary objective in our funding is to minimize our sensitivity to changing interest rates by generally funding our floating rate student loan portfolio with floating rate debt. However, due to the ability of some FFELP loans to earn Floor Income, we can have a fixed versus floating mismatch in funding if the student loan earns at the fixed borrower rate and the funding remains floating. In addition, we can have a mismatch in the index (including the frequency of reset) of floating rate debt versus floating rate assets.

During the three months ended March 31, 2014 and 2013, certain FFELP Loans were earning Floor Income and we locked in a portion of that Floor Income through the use of Floor Income Contracts. The result of these hedging transactions was to convert a portion of the fixed rate nature of student loans to variable rate, and to fix the relative spread between the student loan asset rate and the variable rate liability.

In the preceding tables, under the scenario where interest rates increase 100 and 300 basis points, the change in pre-tax net income before the unrealized gains (losses) on derivative and hedging activities is primarily due to the impact of (i) our unhedged loans being in a fixed-rate mode due to Floor Income, while being funded with variable debt in low interest rate environments; and (ii) a portion of our variable assets being funded with fixed rate liabilities and equity. Item (i) will generally cause income to decrease when interest rates increase from a low interest rate environment, whereas item (ii) will generally offset this decrease.

Under the scenario in the tables above labeled "Impact on Annual Earnings If: Funding Indices Increase 25 Basis Points," the main driver of the decrease in pre-tax income before unrealized gains (losses) on derivative and hedging activities in both the March 31, 2014 and March 31, 2014 analyses is primarily the result of one-month LIBOR-indexed FFELP Loans being funded with three-month LIBOR and other non-discrete indexed liabilities. See "Asset and Liability Funding Gap" of this Item 7A. for a further discussion. Increasing the spread between indices will also impact the unrealized gains (losses) on derivative and hedging activities as it relates to basis swaps that hedge the mismatch between the asset and funding indices.

In addition to interest rate risk addressed in the preceding tables, we are also exposed to risks related to foreign currency exchange rates. Foreign currency exchange risk is primarily the result of foreign currency denominated debt issued by us. When we issue foreign denominated corporate unsecured and securitization debt, our policy is to use cross currency interest rate swaps to swap all foreign currency denominated debt payments (fixed and floating) to U.S. dollar LIBOR using a fixed exchange rate. In the tables above, there would be an immaterial impact on earnings if exchange rates were to decrease or increase, due to the terms of the hedging

92

Table of Contents

instrument and hedged items matching. The balance sheet interest bearing liabilities would be affected by a change in exchange rates; however, the change would be materially offset by the cross currency interest rate swaps in other assets or other liabilities. In the current economic environment, volatility in the spread between spot and forward foreign exchange rates has resulted in material mark-to-market impacts to current-period earnings which have not been factored into the above analysis. The earnings impact is noncash, and at maturity of the instruments the cumulative mark-to-market impact will be zero.

**Asset and Liability Funding Gap**

The tables below present our assets and liabilities (funding) arranged by underlying indices as of March 31, 2014. In the following GAAP presentation, the funding gap only includes derivatives that qualify as effective hedges (those derivatives which are reflected in net interest margin, as opposed to those reflected in the "gains (losses) on derivatives and hedging activities, net" line on the consolidated statements of income). The difference between the asset and the funding is the funding gap for the specified index. This represents our exposure to interest rate risk in the form of basis risk and repricing risk, which is the risk that the different indices may reset at different frequencies or may not move in the same direction or at the same magnitude.

Management analyzes interest rate risk and in doing so includes all derivatives that are economically hedging our debt whether they qualify as effective hedges or not ("Core Earnings" basis). Accordingly, we are also presenting the asset and liability funding gap on a "Core Earnings" basis in the table that follows the GAAP presentation.

*GAAP-Basis*

| Index (Dollars in billions) | Frequency of Variable Resets | Assets[1] | Funding[2] | Funding Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $ 5.3 | $ — | $ 5.3 |
| Prime | annual | .6 | — | .6 |
| Prime | quarterly | 3.8 | — | 3.8 |
| Prime | monthly | 18.5 | — | 18.5 |
| Prime | daily | — | .1 | (.1) |
| PLUS Index | annual | .3 | — | .3 |
| 3-month LIBOR | daily | — | — | — |
| 3-month LIBOR | quarterly | — | 82.2 | (82.2) |
| 1-month LIBOR | monthly | 15.3 | 39.5 | (24.2) |
| 1-month LIBOR daily | daily | 96.4 | — | 96.4 |
| CMT/CPI Index | monthly/quarterly | — | 1.0 | (1.0) |
| Non-Discrete reset[3] | monthly | — | 10.8 | (10.8) |
| Non-Discrete reset[4] | daily/weekly | 8.3 | 5.2 | 3.1 |
| Fixed Rate[5] | | 8.0 | 17.7 | (9.7) |
| Total | | $156.5 | $ 156.5 | $ — |

[1]   FFELP Loans of $45.3 billion ($41.0 billion LIBOR index and $4.3 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2]   Funding (by index) includes all derivatives that qualify as hedges.

[3]   Funding consists of auction rate asset-backed securities and FFELP Loan-other facilities.

[4]   Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes retail and other deposits and the obligation to return cash collateral held related to derivatives exposures.

[5]   Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity (excluding series B Preferred Stock).

Table of Contents

The "Funding Gaps" in the above table are primarily interest rate mismatches in short-term indices between our assets and liabilities. We address this issue typically through the use of basis swaps that typically convert quarterly reset three-month LIBOR to other indices that are more correlated to our asset indices. These basis swaps do not qualify as effective hedges and as a result the effect on the funding index is not included in our interest margin and is therefore excluded from the GAAP presentation.

*"Core Earnings" Basis*

| Index (Dollars in billions) | Frequency of Variable Resets | Assets[1] | Funding[2] | Funding Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $ 5.3 | $ — | $ 5.3 |
| Prime | annual | .6 | — | .6 |
| Prime | quarterly | 3.8 | — | 3.8 |
| Prime | monthly | 18.5 | 1.5 | 17.0 |
| Prime | daily | — | .1 | (.1) |
| PLUS Index | annual | .3 | — | .3 |
| 3-month LIBOR | daily | — | — | — |
| 3-month LIBOR | quarterly | — | 66.9 | (66.9) |
| 1-month LIBOR | monthly | 15.3 | 51.8 | (36.5) |
| 1-month LIBOR | daily | 96.4 | 5.0 | 91.4 |
| Non-Discrete reset[3] | monthly | — | 10.8 | (10.8) |
| Non-Discrete reset[4] | daily/weekly | 8.3 | 5.2 | 3.1 |
| Fixed Rate[5] | | 5.8 | 13.0 | (7.2) |
| Total | | $154.3 | $ 154.3 | $ — |

[1]  FFELP Loans of $18.1 billion ($16.1 billion LIBOR index and $2.0 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2]  Funding (by index) includes all derivatives that management considers economic hedges of interest rate risk and reflects how we internally manage our interest rate exposure.

[3]  Funding consists of auction rate asset-backed securities and FFELP Loan-other facilities.

[4]  Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes retail and other deposits and the obligation to return cash collateral held related to derivatives exposures.

[5]  Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity (excluding series B Preferred Stock).

We use interest rate swaps and other derivatives to achieve our risk management objectives. Our asset liability management strategy is to match assets with debt (in combination with derivatives) that have the same underlying index and reset frequency or, when economical, have interest rate characteristics that we believe are highly correlated. The use of funding with index types and reset frequencies that are different from our assets exposes us to interest rate risk in the form of basis and repricing risk. This could result in our cost of funds not moving in the same direction or with the same magnitude as the yield on our assets. While we believe this risk is low, as all of these indices are short-term with rate movements that are highly correlated over a long period of time, market disruptions (which have occurred in recent years) can lead to a temporary divergence between indices resulting in a negative impact to our earnings.

94

Table of Contents

**Weighted Average Life**

The following table reflects the weighted average life of our earning assets and liabilities at March 31, 2014.

| (Averages in Years) | Weighted Average Life |
|---|---|
| **Earning assets** | |
| Student loans | 7.4 |
| Other loans | 7.4 |
| Cash and investments | .1 |
| Total earning assets | 7.0 |
| **Borrowings** | |
| Short-term borrowings | .2 |
| Long-term borrowings | 6.3 |
| Total borrowings | 5.8 |

**Item 4.       Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with the participation of our chief principal executive and principal financial officers, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of March 31, 2014. Based on this evaluation, our chief principal executive and principal financial officers concluded that, as of March 31, 2014, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) accumulated and communicated to our management, including our chief principal executive and principal financial officers as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the fiscal quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

# PART II. OTHER INFORMATION

**Item 1.      Legal Proceedings**

We and our subsidiaries and affiliates are subject to various claims, lawsuits and other actions that arise in the normal course of business. We believe that these claims, lawsuits and other actions will not, individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations. Most of these matters are claims against our servicing and asset recovery subsidiaries by borrowers and debtors alleging the violation of state or federal laws in connection with servicing or asset recovery activities on their student loans and other debts. In addition, our asset recovery subsidiaries are routinely named in individual plaintiff or class action lawsuits in which the plaintiffs allege that those subsidiaries have violated a federal or state law in the process of collecting their accounts.

For a description of these items and other litigation to which we are a party, please see the 2013 Form 10-K, and subsequent filings with the SEC. In addition, we are subject to the following pending litigation matter.

**Tina Ubaldi v. SLM Corporation**

On March 18, 2011, a student loan borrower filed a putative class action complaint against Existing SLM in the U.S. District Court for the Northern District of California. The complaint is captioned Tina M. Ubaldi v. SLM Corporation et. al., Case No. C-11-01320EDL. The plaintiff purports to bring the complaint on behalf of a class consisting of other similarly situated California borrowers. The complaint alleges, among other things, that Existing SLM's practice of charging late fees proportional to the amount of missed payments constitutes liquidated damages in violation of California law; and Existing SLM engages in unfair business practices by charging daily interest on private educational loans. Following motion practice and additional amendments to the complaint, which added usury claims under California state law, the operative complaint (Modified Third Amended Complaint) was filed on December 2, 2013. Plaintiffs filed their Motion for Class Certification on October 22, 2013. On March 24, 2014, the Court denied plaintiffs' Motion for Class Certification without prejudice, but granted plaintiffs leave to amend. Plaintiffs seek restitution of late charges and interest assessed against members of the class, injunctive relief, cancellation of all future interest payments, treble damages as permitted by law, as well as costs and attorneys' fees, among other relief. Prior to the formation of Sallie Mae Bank in 2005, Existing SLM followed prevalent capital market practices of acquiring and securitizing private education loans purchased in secondary transactions from banks who originated these loans. Plaintiffs allege that the services provided by Existing SLM and SMI to these the originating banks result in Existing SLM and SMI constituting lenders on these loans. Since 2006, Sallie Mae Bank has originated the vast majority of all private education loans acquired by Existing SLM. The claims at issue in this case expressly exclude loans originated by Sallie Mae Bank since its inception. As a subsidiary of Navient, Existing SLM will remain the named party to this lawsuit. Navient has agreed to indemnify SLM BankCo for any costs or expenses, including legal fees, arising out of any litigation such as this resulting from the operation of the business of Existing SLM and its subsidiaries prior to the distribution date. See "Certain Relationships and Related Party Transactions — The Separation and Distribution Agreement — Indemnification" in the Form 10. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith.

**Regulatory Matters**

As previously reported, Sallie Mae Bank remains subject to a cease and desist order originally issued in August 2008 by the Federal Deposit Insurance Corporation (the "FDIC") and the Utah Department of Financial Institutions. In July 2013, the FDIC first notified Sallie Mae Bank of plans to replace its order with a new formal enforcement action (the "Bank Order") that more specifically addresses certain cited violations of Section 5 of the Federal Trade Commission Act, including the customer billing disclosures and assessments of certain late fees, as well as alleged violations under the Servicemembers Civil Relief Act ("SCRA"). In November 2013, the FDIC indicated an additional enforcement action would be issued against Sallie Mae, Inc. ("SMI") in its capacity as a servicer of education loans for Sallie Mae Bank and other financial institutions. In connection with the

96

Table of Contents

recently completed spin-off of Navient Corporation ("Navient") from SLM Corporation, SMI became a wholly-owned subsidiary of Navient and changed its name to Navient Solutions, Inc. ("NSI").

Based on our discussions with the FDIC, we believe the FDIC intends to require certain late fee refunds to be made by NSI and Sallie Mae Bank with respect to loans owned or originated by Sallie Mae Bank from November 28, 2005 until the effective date of the agreement. To fulfill this requirement, NSI would fund a $30 million restitution reserve account.

In order to treat all customers in a similar manner, NSI expects to voluntarily make restitution of certain late fees to all other customers whose loans were neither owned nor originated by Sallie Mae Bank on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million.

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank remain engaged in discussions regarding a comprehensive settlement, remediation and civil settlement plan with the United States Department of Justice ("DOJ"), in its capacity as the agency having primary authority for enforcement of such matters. The DOJ inquiry covers all loans owned by either Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. Based on our settlement discussions with the DOJ, NSI would be required to fund a $60 million settlement fund, which would represent the total amount of compensation due to service members under the DOJ agreement.

Previous regulatory requirements and guidance from the Department of Education regarding compliance with the SCRA statute provide that customers must provide both a copy of the military orders calling a person to active duty and a written request to receive the 6 percent interest rate cap available for active duty service members. The terms of the potential settlement with the DOJ, which remain subject to approval by the Department of Education, would provide new guidance on what a service member must do to receive the SCRA benefit and would apply this new approach retroactively to November 2005. The proposed settlement would assess a penalty for past non-compliance with this new approach. This new approach would reduce the documentation required, thereby easing the burden on service members.

As of December 31, 2013, a reserve of $70 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In the first quarter of 2014, an additional reserve of $103 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators. The final cost of these proceedings remains uncertain until final execution of the agreements with the regulators.

We are cooperating fully and expect to resolve these matters very soon. We have already made enhancements to our billing statements and late fee practices. In addition, since 2009, we have made a number of enhancements to better serve military customers and their families. NSI created a specialized customer service team to serve military customers; launched a special, comprehensive website for service members; worked with the U.S. Department of Education and other federal loan servicers to publish resources to help service members learn more about their benefits under SCRA; and expedited processing to provide responsive service to members of the armed forces.

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees. Navient recently commenced discussions with the CFPB relating to the customer billing statement disclosures and assessment of late fees. Reserves have not been established for this matter as such estimate cannot be made at this time. Navient and its subsidiaries will remain subject to the CIDs. Sallie Mae Bank is not currently subject to CFPB jurisdiction on these matters but may be subject to inquiry as an affiliate.

97

Table of Contents

Pursuant to the Separation and Distribution Agreement among SLM Corporation, New BLC Corporation and Navient, dated April 28, 2014 (the "Separation Agreement"), entered into in connection with the internal reorganization and Spin-Off, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom.

**Item 1A.       Risk Factors**

There have been no material changes from the risk factors previously disclosed in the Form 10.

**Item 2.       Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3.       Defaults upon Senior Securities**

Nothing to report.

**Item 4.       Mine Safety Disclosures**

Nothing to report.

**Item 5.       Other Information**

Nothing to report.

**Item 6.       Exhibits**

The following exhibits are furnished or filed, as applicable:

| | |
|---|---|
| 12.1 | Computation of Ratio of Earnings to Fixed Charges and Preferred Stock Dividends. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

†   Management Contract or Compensatory Plan or Arrangement

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NAVIENT CORPORATION
(Registrant)

By:          /S/ SOMSAK CHIVAVIBUL
           Somsak Chivavibul
           Chief Financial Officer
           *(Principal Financial Officer)*

Date: May 9, 2014

99

Exhibit 12.1

**NAVIENT CORPORATION**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**
**(Dollars in millions)**

| | Years Ended | | | | | Three Months Ended Mar 31, | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2013 | 2014 |
| Income (loss) from continuing operations before income taxes | $ 789 | $1,229 | $ 925 | $1,437 | $2,087 | $ 556 | $ 355 |
| Add: Fixed charges | 3,038 | 2,279 | 2,404 | 2,565 | 2,213 | 572 | 530 |
| Total earnings | $3,827 | $3,508 | $3,329 | $4,002 | $4,300 | $ 1,128 | $ 885 |
| Interest expense | $3,036 | $2,275 | $2,401 | $2,561 | $2,210 | $ 571 | $ 530 |
| Rental expense, net of income | 2 | 4 | 3 | 4 | 3 | 1 | — |
| Total fixed charges | 3,038 | 2,279 | 2,404 | 2,565 | 2,213 | 572 | 530 |
| Preferred stock dividends | 171 | 121 | 28 | 31 | 31 | 8 | 8 |
| Total fixed charges and preferred stock dividends | $3,209 | $2,400 | $2,432 | $2,596 | $2,244 | $ 580 | $ 538 |
| **Ratio of earnings to fixed charges(1)** | **1.26** | **1.54** | **1.38** | **1.56** | **1.94** | **1.97** | **1.67** |
| **Ratio of earnings to fixed charges and preferred stock dividends(1)** | **1.19** | **1.46** | **1.37** | **1.54** | **1.92** | **1.95** | **1.65** |

(1)   For purposes of computing these ratios, earnings represent income (loss) from continuing operations before income tax expense plus fixed charges. Fixed charges represent interest expensed and capitalized plus one-third (the proportion deemed representative of the interest factor) of rents, net of income from subleases.

**Exhibit 31.1**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, John F. Remondi, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Navient Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
May 9, 2014

<div align="right">**Exhibit 31.2**</div>

<div align="center">**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**</div>

I, Somsak Chivavibul, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Navient Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

<div align="right">
/s/ SOMSAK CHIVAVIBUL<br>
Somsak Chivavibul<br>
Chief Financial Officer<br>
(Principal Financial Officer)<br>
May 9, 2014
</div>

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Navient Corporation (the "Company") on Form 10-Q for the quarter ended March 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John F. Remondi, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
May 9, 2014

<div align="right">**Exhibit 32.2**</div>

<div align="center">

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

In connection with the Quarterly Report of Navient Corporation (the "Company") on Form 10-Q for the quarter ended March 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Somsak Chivavibul, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
(Principal Financial Officer)
May 9, 2014

# EXHIBIT

# E

**Table of Contents**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the fiscal year ended December 31, 2014**

**or**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the transition period from     to**

               **Commission file numbers 001-36228**

# Navient Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **46-4054283** |
| *(State of Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **123 Justison Street, Wilmington, Delaware** | **19801** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**(302) 283-8000**
*(Registrant's Telephone Number, Including Area Code)*

**Securities registered pursuant to Section 12(b) of the Act**
**Common Stock, par value $.01 per share.**
**Name of Exchange on which Listed:**
**The NASDAQ Global Select Market**
**5% Senior Notes due October 26, 2020**
**5.875% Senior Notes due October 25, 2024**
**Name of Exchange on which Listed:**
**The NASDAQ Global Select Market**
**Securities registered pursuant to Section 12(g) of the Act:**
**None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2014 was $7.4 billion (based on closing sale price of $17.71 per share as reported for the NASDAQ Global Select Market).

As of January 31, 2015, there were 401,460,484 shares of common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the proxy statement relating to the Registrant's 2015 Annual Meeting of Stockholders, scheduled to be held on May 21, 2015, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

# NAVIENT CORPORATION

## TABLE OF CONTENTS

| | | Page Number |
|---|---|---|
| Forward-Looking and Cautionary Statements; Available Information | | 1 |
| PART I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 30 |
| Item 2. | Properties | 31 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Mine Safety Disclosures | 34 |
| PART II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| Item 6. | Selected Financial Data | 37 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 105 |
| Item 8. | Financial Statements and Supplementary Data | 109 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 109 |
| Item 9A. | Controls and Procedures | 109 |
| Item 9B. | Other Information | 109 |
| PART III | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 110 |
| Item 11. | Executive Compensation | 110 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 110 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 110 |
| Item 14. | Principal Accounting Fees and Services | 110 |
| PART IV | | |
| Item 15. | Exhibits, Financial Statement Schedules | 111 |
| Appendix A – Description of Federal Family Education Loan Program | | A-1 |
| Glossary | | G-1 |

Table of Contents

**FORWARD-LOOKING AND CAUTIONARY STATEMENTS**

This Annual Report on Form 10-K contains "forward-looking" statements and information based on management's current expectations as of the date of this document. Statements that are not historical facts, including statements about our beliefs, opinions, or expectations and statements that assume or are dependent upon future events, are forward-looking statements. Forward-looking statements are subject to risks, uncertainties, assumptions and other factors that may cause actual results to be materially different from those reflected in such forward-looking statements. These factors include, among others, the risks and uncertainties set forth in Item 1A "Risk Factors" and elsewhere in this Annual Report on Form 10-K and our subsequent filings with the Securities and Exchange Commission ("SEC"); increases in financing costs; limits on liquidity; increases in costs associated with compliance with laws and regulations; changes in accounting standards and the impact of related changes in significant accounting estimates; any adverse outcomes in any significant litigation to which we are a party; credit risk associated with our exposure to third parties, including counterparties to our derivative transactions; and changes in the terms of student loans and the educational credit marketplace (including changes resulting from new laws and the implementation of existing laws). We could also be affected by, among other things: changes in our funding costs and availability; reductions to our credit ratings or the credit ratings of the United States of America; failures of our operating systems or infrastructure, or those of third-party vendors; risks related to cybersecurity including the potential disruption of our systems or potential disclosure of confidential customer information; damage to our reputation; failures to successfully implement cost-cutting initiatives and adverse effects of such initiatives on our business; failures or delays in the planned conversion to our servicing platform of the recently acquired Wells Fargo portfolio of Federal Family Education Loan Program ("FFELP") loans or any other FFELP or Private Education Loan portfolio acquisitions; risks associated with restructuring initiatives, risks associated with the recently completed separation of Navient and SLM Corporation into two, distinct publicly traded companies, including failure to achieve the expected benefits of the separation; changes in the demand for educational financing or in financing preferences of lenders, educational institutions, students and their families; changes in law and regulations with respect to the student lending business and financial institutions generally; increased competition from banks and other consumer lenders; the creditworthiness of our customers; changes in the general interest rate environment, including the rate relationships among relevant money-market instruments and those of our earning assets versus our funding arrangements; changes in general economic conditions; our ability to successfully effectuate any acquisitions and other strategic initiatives; and changes in the demand for debt management services. The preparation of our consolidated financial statements also requires management to make certain estimates and assumptions including estimates and assumptions about future events. These estimates or assumptions may prove to be incorrect. All forward-looking statements contained in this report are qualified by these cautionary statements and are made only as of the date of this document. We do not undertake any obligation to update or revise these forward-looking statements to conform the statement to actual results or changes in our expectations.

Definitions for certain capitalized terms used but not otherwise defined in this Annual Report on Form 10-K can be found in the "Glossary" at the end of this report.

Through this discussion and analysis, we intend to provide the reader with some narrative context for how our management views our consolidated financial statements, additional context within which to assess our operating results, and information on the quality and variability of our earnings, liquidity and cash flows.

1

Table of Contents

**AVAILABLE INFORMATION**

Our website address is *www.navient.com.* Copies of our Registration Statement on Form 10, as amended (our "Form 10"), filed with the SEC on April 10, 2014, and declared effective on April 14, 2014, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as any amendments to those reports, are available free of charge through our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. In addition, copies of our Board Governance Guidelines, Code of Business Conduct (which includes the code of ethics applicable to our Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer) and the governing charters for each committee of our Board of Directors are available free of charge on our website, as well as in print to any stockholder upon request. We intend to disclose any amendments to or waivers from our Code of Business Conduct (to the extent applicable to our Principal Executive Officer or Principal Financial Officer) by posting such information on our website. Information contained or referenced on our website is not incorporated by reference into and does not form a part of this Annual Report on Form 10-K.

Table of Contents

PART I.

**Item 1.   Business**

**Overview**

Navient is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in student loans, Navient supports the educational and economic achievements of more than 12 million customers. A growing number of government and higher education clients rely on Navient for proven solutions to meet their financial goals. Navient began trading on Nasdaq as an independent company on May 1, 2014. Our website is navient.com. Information contained or referenced on our website is not incorporated by reference into and does not form a part of this Annual Report on Form 10-K.

Navient holds the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program ("FFELP"), as well as the largest portfolio of Private Education Loans. FFELP Loans are insured or guaranteed by state or not-for-profit agencies based on guaranty agreements among the United States Department of Education ("ED") and these agencies. Private Education Loans are education loans to students or their families that bear the full credit risk of the customer and any cosigner. Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources.

Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non-profit education lenders and ED. Navient is one of four large servicers to ED under its Direct Student Loan Program ("DSLP"). Navient also provides asset recovery services on its own portfolio (consisting of both education loans as well as other asset classes), guaranty agencies, higher education institutions, ED and other federal clients, as well as states, courts, and municipalities.

As of December 31, 2014, Navient's principal assets consisted of:

- $104.5 billion in FFELP Loans, with a student loan spread of 0.99 percent for the year ended December 31, 2014 on a "Core Earnings" basis and a weighted average life of 7.3 years;

- $29.8 billion in Private Education Loans, with a student loan spread of 4.04 percent for the year ended December 31, 2014 on a "Core Earnings" basis and a weighted average life of 7.0 years;

- a leading student loan servicing platform that services loans for more than 12 million DSLP Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts serviced under Navient's contract with ED; and

- a leading student loan asset recovery platform with an outstanding inventory of contingent asset recovery receivables of approximately $15.4 billion, of which approximately $12.5 billion was student loans and the remainder was other asset classes.

**Strengths and Opportunities**

Navient possesses a number of competitive advantages that distinguishes it from its competitors, including:

***Large, high quality asset base generating significant and predictable cash flows.*** At December 31, 2014, Navient's $134.3 billion student loan portfolio is 75 percent funded to term and is expected to produce consistent and predictable cash flows over the remaining life of the portfolio. Navient's $104.5 billion portfolio of FFELP Loans bears a maximum 3 percent loss exposure due to the federal guarantee. Navient's $29.8 billion portfolio of Private Education Loans bears the full credit risk of the borrower and cosigner. Navient expects that cash flows from its FFELP Loan and Private Education Loan portfolios will significantly exceed future debt service obligations.

***Efficient and large scale servicing platform.*** Navient is the largest servicer of education loans, servicing over $300 billion in student loans for more than 12 million customers. Navient has demonstrated scalable infrastructure with capacity to add volume at a low cost. Navient's premier market share and tested servicing and asset recovery infrastructure make it well-positioned to expand its servicing and asset recovery businesses to additional third-party FFELP, federal, private and other loan portfolios.

3

Table of Contents

*Superior operating performance.* Navient has demonstrated superior default prevention performance and industry leading asset recovery services. The combined portfolio of federal loans serviced by Navient experienced a Cohort Default Rate 40 percent lower than the national rate released by ED in September 2014. We are consistently a top performer in our asset recovery business as well.

*Commitment to compliance and customer centricity.* Navient fosters a robust compliance culture driven by a "customer first" approach. We invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service.

*Strong capital return.* As a result of its significant cash flow and capital generation, Navient expects to return excess capital to stockholders through dividends and share repurchases. For the year ended December 31, 2014, we paid $249 million in dividends on shares of our common stock and repurchased $600 million of our shares of common stock. In December 2014, Navient's board of directors authorized $1 billion to be utilized in a new common share repurchase program effective January 1, 2015. In addition, Navient increased its quarterly dividend amount from $0.15 per share to $0.16 per share effective for its first-quarter 2015 dividends.

*Meaningful growth opportunities.* Navient will pursue opportunistic acquisitions of FFELP and Private Education Loan portfolios. During the year, Navient acquired $12.9 billion of student loans. Navient will also pursue additional third-party servicing and asset recovery fee income opportunities. On February 25, 2015, Navient announced its acquisition of Gila LLC (commonly known as Municipal Services Bureau, or MSB), an asset recovery and business process outsourcing firm focused on the state and local government market. Navient will leverage its large-scale servicing platform, superior default prevention and asset recovery performance, operating efficiency and regulatory compliance and risk management infrastructure in pursuing these and other growth opportunities.

*Navient's Approach to Assisting Students and Families in Repaying their Education Loans*

Navient services loans for more than 12 million DSLP Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts serviced under Navient's contract with ED. In this work, we help our customers experience success through proactive outreach and emphasis on identifying the payment plan that best fits their budget and financial goals.

We understand managing repayment of education loans is critical for students to achieve their educational goals, recognize their full earning potential and develop a strong credit profile.

Customer success means making steady progress toward repayment, instead of falling behind on payments. Our experience has taught us that the transition from school to full repayment requires customer contact and counseling. For many customers, students loans are their first borrowing experience. For new graduates, salaries grow over time, typically making payments easier to handle as their career progresses. It is also not uncommon for some to return to school, experience illness or encounter temporary interruptions in earnings.

To help customers manage these realities, Navient makes customer success and default prevention top priorities. We customize our outreach using data-driven approaches that draw from our more than 40 years of experience in helping customers successfully manage their loans. As a result, in 2014, our customers experienced higher records of repayment success as evidenced by lower delinquencies and defaults.

We have been a partner in ED's campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice.

We also find that customers who have fallen behind benefit from outreach and assistance. In fact, nine times out of ten when we can reach federal loan customers who have missed payments, we can identify a solution to help them avoid default.

4

Table of Contents

We also offer free resources to help customers and the general public build knowledge on personal finance topics. In October 2014, we launched new online resources to encourage financial literacy and to help customers understand their repayment options and enroll in the plan that is best for them.

**Business Segments**

We have three primary operating business segments: FFELP Loans, Private Education Loans and Business Services. A fourth segment — Other — primarily consists of financial results of our holding company, including activities related to repurchases of debt, our corporate liquidity portfolio and all unallocated overhead.

*FFELP Loans Segment*

In the FFELP Loans segment, we acquire and finance FFELP Loans. Even though FFELP Loans are no longer originated due to changes in federal law that took effect in 2010, we continue to pursue acquisitions of FFELP Loan portfolios that leverage our servicing scale and generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the FFELP Loan portfolio. This segment is expected to generate significant amounts of earnings and cash flow as the portfolio amortizes.

We are currently the largest holder of FFELP Loans. Navient's portfolio of FFELP Loans as of December 31, 2014 was $104.5 billion. Navient's FFELP Loan portfolio will amortize over approximately 20 years. Navient's goal is to maximize the cash flow generated by its FFELP Loan portfolio. Navient also seeks to acquire other third-party FFELP Loan portfolios to add net interest income and servicing revenue. During the year, Navient acquired $11.3 billion of FFELP Loans. FFELP Loans are insured or guaranteed by state or not-for-profit agencies and are also protected by contractual rights to recovery from the United States pursuant to guaranty agreements among ED and these agencies. These guarantees generally cover at least 97 percent of a FFELP Loan's principal and accrued interest for loans disbursed.

As a result of the long-term funding used in the FFELP Loan portfolio and the insurance and guarantees provided on these loans, the net interest margin recorded in the FFELP Loans segment is relatively stable and the capital we choose to retain with respect to the segment is modest. As of December 31, 2014, approximately 80 percent of the FFELP Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts. For more discussion of the FFELP and related credit support mechanisms, see Appendix A "Description of Federal Family Education Loan Program."

For loans disbursed before April 1, 2006, FFELP Loans generally earn interest at the higher of either the borrower rate, which is fixed over a period of time, or a floating rate based on the Special Allowance Payment ("SAP") formula set by ED. Navient generally finances FFELP Loans with floating rate debt whose interest is matched closely to the floating nature of ED's applicable SAP formula. If a decline in interest rates causes the borrower rate to exceed the SAP formula rate, Navient will continue to earn interest on the loan at the fixed borrower rate while the floating rate interest on Navient debt will continue to decline. The additional spread earned between the fixed borrower rate and the SAP formula rate is referred to as Floor Income. Floor Income can be volatile as rates on the underlying debt move up and down. Navient may hedge this risk by using derivatives to lock in the value of the Floor Income over the term of the contract. As of December 31, 2014, approximately $27.2 billion (49 percent) of Navient's FFELP Loans eligible to earn Floor Income was economically hedged. This amount we hedge declines over time.

The Higher Education Act of 1965 ("HEA") continues to regulate every aspect of the FFELP, including ongoing communications with borrowers and default aversion requirements. Failure to service a FFELP Loan properly could jeopardize the insurance, guarantees and federal support on these loans. The insurance and guarantees on Navient's existing loans were not affected by the termination of the FFELP program.

5

Table of Contents

### Private Education Loans Segment

In this segment, we acquire, finance and service Private Education Loans. Even though we no longer originate Private Education Loans, we continue to pursue acquisitions of Private Education Loan portfolios that leverage our servicing scale and generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the Private Education Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of cash as the portfolio amortizes.

Unlike FFELP Loans, the holder of a Private Education Loan bears the full credit risk of the customer and any cosigner. Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources. Navient believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal servicing and risk mitigation practices, as well as our careful use of forbearance and our loan modification programs. Navient expects the combined existence of these elements and the use of these practices reduces the risk of payment interruptions and defaults on its Private Education Loan portfolio. On a "Core Earnings" basis, the 2014 charge-off rate for Private Education Loans as a percentage of loans in repayment was 2.6 percent.

Navient's portfolio of Private Education Loans totaled $29.8 billion at December 31, 2014. During the year, Navient acquired $1.6 billion of Private Education Loans. As of December 31, 2014, approximately 59 percent of the Private Education Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts.

### Business Services Segment

Our Business Services segment generates its revenue from servicing our FFELP Loan portfolio as well as providing servicing and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED, higher education institutions and other federal, state, court and municipal clients.

#### State, Local and Institutional Revenues

We provide asset recovery services for over 250 state and municipal clients, recovering on a broad spectrum of receivables including taxes, fines and court fees. Public agencies turn to qualified, responsible providers to supplement their own receivables management efforts to recover revenues to support public priorities. In addition, we provide recovery services for federal Perkins loan, tuition and other receivables for more than 1,000 colleges, universities and other institutional clients.

The acquisition of Municipal Services Bureau is the first step in executing Navient's growth strategy in the asset recovery business area. Navient intends to pursue additional acquisitions of both complementary and diversified asset recovery service and other outsourcing service businesses that can further expand demand for services in and beyond the education loan markets. Future acquisitions will continue to be analyzed in the context of their relative valuations and earnings contribution, and compared to other uses of Navient's capital resources including returning capital to stockholders.

#### FFELP-Related Revenues

Navient is currently the largest servicer and collector of loans made under the FFELP program, and the majority of our income has been derived, directly or indirectly, from our portfolio of FFELP Loans and servicing we have provided for FFELP Loans. In 2010, Congress passed legislation ending the origination of education loans under FFELP. The terms and conditions of existing FFELP Loans were not affected by this legislation. Our FFELP Loan portfolio will amortize over approximately 20 years. The fee income we have earned from

Table of Contents

providing servicing and asset recovery services on such loans will similarly decline over time. We also provide servicing and asset recovery services on behalf of Guarantors of FFELP Loans and other institutions.

- Servicing revenues from the FFELP Loans we own represent intercompany charges to the FFELP Loans segment at rates paid to us by the trusts which own the loans. These fees are legally the first payment priority of the trusts and exceed the actual cost of servicing the loans. Intercompany loan servicing revenues declined to $456 million in 2014 from $529 million in 2013. Intercompany loan servicing revenues will continue to decline as our FFELP Loan portfolio amortizes.

- In 2014, we earned account maintenance fees on FFELP Loans serviced for Guarantors of $34 million, down from $38 million in 2013. These fees will continue to decline as the underlying FFELP Loan portfolio serviced for Guarantors amortizes.

- We provide default aversion, post default collections and claims processing to 11 of the 29 Guarantor agencies that serve as an intermediary between the U.S. federal government and FFELP lenders and are responsible for paying the claims made on defaulted loans. As of December 31, 2014, Navient had an outstanding inventory of asset recovery receivables of approximately $15.4 billion, of which $12.5 billion was student loans ($10.0 billion FFELP Loans and $2.5 billion DSLP Loans) and the remainder was other asset classes. In 2014, asset recovery revenue from Guarantor clients totaled $275 million, compared to $303 million the prior year. As FFELP Loans are no longer originated, these revenues will decline over time unless we acquire additional portfolios from Guarantor clients. The rate at which these revenues will decrease has also been affected by the Bipartisan Budget Act (the "Budget Act") enacted on December 26, 2013 and effective on July 1, 2014, which reduced the amount to be paid to Guarantor agencies for assisting customers to rehabilitate their defaulted FFELP Loans under Section 428F of the HEA. The Budget Act reduced fee income by approximately $78 million in 2014.

In 2014, FFELP-related revenues accounted for 77 percent of total Business Services segment revenues compared with 80 percent and 85 percent, respectively, in 2013 and 2012. Total Business Services segment revenues were $1.06 billion for the year ended December 31, 2014, down from $1.13 billion for the year ended December 31, 2013. Over the next several years, Navient's objective is to grow or acquire additional sources of services revenue. The total amounts of these combined FFELP-related revenues and resulting earnings are significant to our business and Navient's ability to offset these FFELP-related revenue declines is uncertain.

Navient anticipates that with the end of new originations under the FFELP, owners of FFELP Loan portfolios, as well as Guarantors of those loans, will likely seek to reduce their FFELP servicing costs or sell those portfolios. Given the volume of FFELP Loans Navient services for its own portfolio and third parties, Navient is uniquely situated to adapt to the increasing levels of education loan-specific disclosure, compliance, servicing and collection standards which other financial institutions and servicers may not find economical to continue to support. Acquiring additional FFELP servicing volume as others sell FFELP Loan portfolios, exit existing FFELP servicing businesses or seek to find lower cost providers for those services is a key component of the current Business Services segment growth strategy, notwithstanding the discontinuation of the FFELP. As of the Federal Fiscal Year ended September 30, 2014, the estimated FFELP Loans outstanding that Navient does not own totals $157 billion.

*ED Asset Recovery and Servicing Revenues*

Since 1997, Navient has provided asset recovery services on defaulted student loans to ED. This contract expired by its terms on February 21, 2015 and our Pioneer Credit Recovery subsidiary received no new account placements under the contract. We are engaged with ED to learn more about their decision and address any questions or concerns they may have. In addition, we have submitted a response to ED's request for proposals (RFP) in relation to a new contract for similar services. There can be no assurances that Pioneer will be awarded an extension of the existing contract, a new contract under the RFP or what volume of accounts might be placed with Pioneer. In 2014, asset recovery revenue from ED totaled $65 million, compared to $62 million in the prior year and our 2015 earnings guidance includes approximately $48 million of revenue from this contract.

Table of Contents

Since the second quarter of 2009, we have been one of four large servicers awarded a servicing contract by ED to service federal loans owned by ED. We service approximately 6.2 million accounts under this servicing contract as of December 31, 2014. The servicing contract spans five years with the possibility of one five-year renewal at the option of ED. On August 27, 2014, ED extended its servicing contract with Navient to service federal loans for five more years. Under the terms of the contract extension, the allocation of ongoing volume will be determined twice each year based on the relative performance of the servicers of five metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more up to 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of ED personnel (5 percent). Quarterly scores in each metric will be averaged together twice each year to calculate the final result of each metric. Navient's allocation under the servicing contract increased to 24 percent for the period beginning August 15, 2014 from 18 percent for the prior period beginning August 15, 2013. Beginning on January 1, 2015, the aggregate allocation for not-for-profit servicers increased to 25 percent of all new DSLP borrowers. We earned $130 million of revenue under the contract for the year ended December 31, 2014.

The opportunity to expand the services we can provide under the DSLP has been an important component of the Business Services segment's growth strategy. In fiscal year 2015, ED is projected to originate approximately $104 billion in new federal education loans. To expand the services we provide under the DSLP, we continually strive to help our customers succeed and seek to improve on the performance metrics that determine the allocation of new accounts under the servicing contract with ED.

### *Other Segment*

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all unallocated overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

### Employees

At December 31, 2014, we had approximately 6,200 employees, none of whom are covered by collective bargaining agreements.

### Presentation of Information

Unless the context otherwise requires, references in this Form 10-K to:

- "We," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off (as defined below) means and refers to Old SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off means and refers to Navient and its consolidated subsidiaries.

- "Old SLM" refers to SLM Corporation, as it existed prior to the Spin-Off, and its consolidated subsidiaries. As part of an internal corporate reorganization of Old SLM, Old SLM was merged into a limited liability company and became a subsidiary of Navient, changing its name to "Navient, LLC." On October 16, 2014, Navient, LLC was merged with and into Navient, with Navient as the surviving corporation.

- Navient's historical business and operations refer to Old SLM's portfolio of FFELP and Private Education Loans not held by Sallie Mae Bank, together with the servicing and asset recovery businesses that were retained by or transferred to Navient in connection with the internal corporate reorganization.

- "SLM BankCo" refers to New BLC Corporation, which became the publicly traded successor to Old SLM on April 29, 2014 by virtue of a merger pursuant to Section 251(g) of the Delaware General Corporation Law ("DGCL"), and its consolidated subsidiaries. Following consummation of the merger, New BLC Corporation changed its name to SLM Corporation. After the Spin-Off, SLM BankCo's business consists primarily of the consumer banking business previously operated by Old SLM, which includes Sallie Mae Bank and its portfolio of Private Education Loans, a new Private Education Loan servicing business and the Upromise Rewards business.

Table of Contents

- "Spin-Off" collectively refers to the internal reorganization of Old SLM on April 29, 2014 and the distribution of all of the shares of common stock of Navient to the holders of shares of SLM BankCo on April 30, 2014.

**Spin-Off of Navient**

On April 30, 2014, the previously announced separation of Navient from SLM BankCo was completed. The separation was effected through the distribution by SLM BankCo, on a one-to-one basis, of all the shares of common stock of Navient to the holders of shares of SLM BankCo common stock, as of the close of business on April 22, 2014, the record date for the distribution. As a result of the distribution, Navient is an independent, publicly traded company that operates the loan management, servicing and asset recovery business previously operated by Old SLM. Navient is comprised primarily of Old SLM's portfolios of education loans that were not held in Sallie Mae Bank at the time of the separation, as well as servicing and asset recovery activities on those loans and loans held by third parties. In October 2014, Navient successfully completed the transition of the servicing operations and rolled out the Navient brand to its customers.

To implement the separation and distribution of Navient, an internal corporate reorganization of Old SLM was effected, pursuant to which, on April 29, 2014, SLM BankCo replaced Old SLM as the parent holding company pursuant to a holding company merger. In accordance with Section 251(g) of the DGCL, by action of the Old SLM board of directors and without a shareholder vote, Old SLM was merged into Navient, LLC, a wholly owned subsidiary of Old SLM, with Navient, LLC surviving. Immediately following the effective time of the merger, SLM BankCo changed its name to "SLM Corporation." As part of the internal corporate reorganization and pursuant to the merger, all of the outstanding shares of Old SLM Series A preferred stock and Series B preferred stock were converted, on a one-to-one basis, into substantially identical shares of SLM BankCo preferred stock. Following the merger, the assets and liabilities associated with the loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking were transferred to SLM BankCo. On July 9, 2014, Navient received a private letter ruling from the Internal Revenue Service confirming the intended tax-free status of the Spin-Off and the related internal reorganization transactions. For further information on the Spin-Off and all related matters, please refer to our Form 10.

Due to the relative significance of Navient to Old SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM, notwithstanding the legal form of the Spin-Off. As a result, the historical financial statements of Old SLM prior to the distribution on April 30, 2014 are the historical financial statements of Navient. For that reason, the historical GAAP financial information related to periods on or prior to April 30, 2014 contained in this Annual Report on Form 10-K is that of Old SLM, which includes the consolidated results of both the loan management, servicing and asset recovery business and the consumer banking business. Since Navient is the "accounting spinnor," the GAAP financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014, notwithstanding the legal form of the Spin-Off in which Navient common stock was distributed to the stockholders of SLM BankCo.

9

Table of Contents

The following table shows the condensed balance sheet of SLM BankCo that the financial statements of Navient reflect as a shareholder distribution on April 30, 2014:

| (Dollars in millions) | April 30, 2014 |
|---|---|
| **Assets** | |
| FFELP Loans, net | $ 1,380 |
| Private Education Loans, net | 7,204 |
| Investments | 139 |
| Cash and cash equivalents | 2,170 |
| Other assets | 883 |
| Total assets | $ 11,776 |
| **Liabilities** | |
| Short-term borrowings | $ 6,491 |
| Long-term borrowings | 2,750 |
| Other liabilities[1] | 825 |
| Total liabilities | 10,066 |
| **Equity** | |
| Preferred stock | |
| Series A | 165 |
| Series B | 400 |
| Common equity | 1,145 |
| Total equity[2] | 1,710 |
| Total liabilities and equity | $ 11,776 |

[1] "Other liabilities" include net income tax liabilities of $383 million, which were presented as net income tax assets within "Other assets" on the consolidated financial statements of Navient.

[2] In addition to the $1,710 million of consumer banking business net assets distributed, we also removed $41 million of goodwill from our balance sheet as required under ASC 350 in connection with the distribution. This goodwill was allocated to the consumer banking business based on relative fair value. This total of $1,751 million is the amount that appears on our consolidated statement of changes in stockholders' equity in connection with the deemed distribution of the consumer banking business.

**Supervision and Regulation**

*The Dodd-Frank Act*

The Dodd-Frank Act was adopted to reform and strengthen regulation and supervision of the U.S. financial services industry. The Dodd-Frank Act contains comprehensive provisions to govern the practices and oversight of financial institutions (including large non-bank financial institutions) and other participants in the financial markets. It imposes significant regulations, additional requirements and oversight on almost every aspect of the U.S. financial services industry, including increased capital and liquidity requirements, limits on leverage and enhanced supervisory authority. Some of these provisions apply to Navient and its various businesses. Most of the Dodd-Frank Act's provisions have become effective, but many remain subject to formal implementation by regulatory agencies through final rulemaking, leaving considerable uncertainty as to their ultimate scope and effect. Nonetheless, Navient's operational expenses may increase as it addresses new or additional compliance requirements arising from the implementation of various provisions of the Dodd-Frank Act.

The Consumer Financial Protection Act, a part of the Dodd-Frank Act, established the Consumer Financial Protection Bureau ("CFPB"), which has broad authority to write regulations under federal consumer financial protection laws and to directly or indirectly enforce those laws and examine financial institutions for compliance. The CFPB is authorized to impose fines and provide consumer restitution in the event of violations, engage in consumer financial education, track consumer complaints, request data and promote the availability of financial services to underserved consumers and communities. It has authority to prevent unfair, deceptive or abusive practices by issuing regulations that define the same or by using its enforcement authority without first issuing

10

Table of Contents

regulations. The CFPB has been active in its supervision, examination and enforcement of financial services companies, most notably bringing enforcement actions, imposing fines and mandating large refunds to customers of several large banking institutions for practices relating to the sale of additional products associated with the extension of consumer credit.

The Dodd-Frank Act also authorizes state officials to enforce regulations issued by the CFPB and to enforce the Dodd-Frank Act's general prohibition against unfair, deceptive and abusive practices.

### Regulatory Outlook

In general, the number and scope of regulatory and enforcement actions in 2014, as well as the amounts of fines and penalties levied against banking institutions, were significant. The types and numbers of class and stockholder derivative actions arising from allegations of violations of consumer protection and regulatory provisions also continued to increase. A number of prominent themes appear to be emerging from these actions:

- The number and configuration of regulators bringing actions often adds to the complexity, cost and unpredictability of timing for resolution of particular regulatory issues.

- The regulatory compliance and risk control structures of financial institutions subject to enforcement actions are frequently cited, regardless of whether past practices have been changed, and enforcement orders have often included detailed demands for increased compliance, audit and board supervision, as well as the use of third-party consultants to recommend further changes or monitor remediation efforts.

- Issues first identified with respect to one consumer product class or distribution channel are often applied to other product classes or channels.

Navient is experiencing heightened regulatory oversight of its compliance with applicable laws and regulations. We expect that the regulators overseeing our businesses will increase in number or change and that consumer protection regulations, standards, supervision, examination and enforcement practices will continue to evolve in both detail and scope. This evolution may significantly add to Navient's compliance, servicing and operating costs. We have invested in compliance through multiple steps including realignment of Navient's compliance management system to a servicing and collections business model rather than a loan originations business model; dedicated compliance resources for high-risk topics (SCRA, TCPA and third-party vendor management) to focus on regulator and consumer expectations; formation of business support operations to enhance risk, control and compliance functions in each business area; additional regulatory training for front-line employees to ensure obligations are understood and followed during interactions with customers; and expanded oversight and analysis of complaint trends to identify and remediate if necessary, areas of potential consumer harm.

While current operations and compliance processes may or may not satisfy heightened, evolving regulatory standards, they cannot provide assurance that past practices or products will not be the focus of examinations, inquiries or lawsuits.

As described in the section entitled "Management — Risk Management," Navient has implemented a coordinated, formal enterprise risk management system to reduce business and regulatory risks.

Listed below are some of the most significant recent and pending regulatory changes that have the potential to affect Navient in coming years.

*Consumer Financial Protection Bureau.* The CFPB has regulatory oversight of the private student loan industry as well as student loan servicers. Throughout 2013 and 2014, the CFPB continued to be active in the student loan industry and undertook a number of initiatives relative to the private student loan market and student loan servicing, including:

- In February 2013, the CFPB published a notice soliciting information on potential options to offer more affordable repayment options to borrowers having difficulty repaying their private student loans. Based

11

Table of Contents

on the more than 28,000 comments received, on May 8, 2013, the CFPB published a report highlighting the ways in which private student loan debt can be a roadblock to financial soundness for consumers. The report analyzes the impact of private student loan burdens on the broader economy, assesses recent actions of policymakers in the student loan market and discusses policy options put forth by the public regarding private student loans. Reports such as these may continue to influence regulatory developments in the student loan market. The report proposes a number of considerations for policymakers and market participants, such as refinancing relief and monthly payments more closely correlated with a borrower's debt-to-income ratio. Certain of these CFPB recommendations in the report could negatively affect our private education loan portfolio if implemented. For a discussion on Navient's approach to helping its customers, see "— Navient's Approach to Assisting Students and Families in Repaying their Education Loans" above.

- On December 3, 2013, the CFPB issued a final rule defining larger participants of the student loan servicing market. The rule, which became effective on March 1, 2014, allows the CFPB to federally supervise certain nonbank student loan servicers for the first time. Under the final rule, the CFPB will have supervisory authority over any nonbank student loan servicer that services more than one million borrower accounts, including accounts for both private and federal student loans. Our student loan servicing subsidiaries will be subject to this new oversight. The CFPB's supervision will include gathering reports, conducting examinations for compliance with federal consumer financial laws and taking enforcement actions as appropriate.

- On October 16, 2014, the Student Loan Ombudsman within the CFPB submitted his annual report based on private student loan inquiries and complaints received through the CFPB portal from October 1, 2013 through September 30, 2014. The CFPB does not seek to resolve or substantiate the inquiry or complaint but merely provides a gateway between the consumer and the lender or servicer to attempt to address consumer concerns. The Dodd-Frank Act created the Student Loan Ombudsman within the CFPB to receive and attempt to informally resolve inquiries about private student loans. The Student Loan Ombudsman reports to Congress annually on the trends and issues that he identifies through this process. The report offers analysis, commentary and recommendations to address issues reported by consumers. The report's key observations included: (1) approximately 41 percent of all private student loan inquiries and complaints received were related to consumers seeking a loan modification or other option to reduce their monthly payment; (2) 57 percent related to consumers having difficulties with dealing with their servicer or repaying their loan; and (3) many of the private student loan inquiries mirror the problems heard from consumers in the mortgage market and that recent changes to mortgage servicing and credit card servicing practices might be applicable to the private student loan market.

*Debt Collection Supervision.* Consistent with the authority granted to it under the Dodd-Frank Act, the CFPB also maintains supervisory authority over larger consumer debt collectors. On October 24, 2012, the CFPB issued its final debt collection larger participant rule and examination procedures that will allow the agency to federally supervise larger consumer debt collectors. The rule, which became effective January 2, 2013, defines larger participants as third-party debt collectors, debt buyers and collection attorneys with more than $10 million in annual receipts resulting from consumer debt collection. Under the rule, Navient's collection subsidiaries are considered larger participants and are subject to supervision. The issuance of the CFPB's rules does not preempt the various and varied levels of state consumer and collection regulations to which the activities of Navient's subsidiaries are currently subject. Navient also utilizes third-party debt collectors to collect defaulted and charged-off education loans and will continue to be responsible for oversight of their procedures and controls.

*Oversight of Derivatives.* The Dodd-Frank Act created a comprehensive new regulatory framework for derivatives transactions, to be implemented by the Commodity Futures Trading Commission ("CFTC") and the SEC. This new framework, among other things, subjects certain swap participants to new capital and margin requirements, recordkeeping and business conduct standards and imposes registration and regulation of swap dealers and major swap participants. The scope of potential exemptions remains to be further defined through agency rulemakings. Even if Navient qualifies for an exemption, many of its derivatives counterparties are likely to be subject to the new capital, margin and business conduct requirements.

Table of Contents

*Other Significant Sources of Regulation*

Many aspects of Navient's businesses are subject to federal and state regulation and administrative oversight. Some of the most significant of these are described below.

*Higher Education Act.* Navient is subject to the HEA and its student loan operations are periodically reviewed by ED and Guarantors. As a servicer of federal student loans, Navient is subject to ED regulations regarding financial responsibility and administrative capability that govern all third-party servicers of insured student loans. In connection with its servicing operations, Navient must comply with, on behalf of Guarantor clients, ED regulations that govern Guarantor activities as well as agreements for reimbursement between ED and our Guarantor clients.

*Federal Financial Institutions Examination Council.* As a third-party service provider to financial institutions, Navient is also subject to periodic examination by the Federal Financial Institutions Examination Council ("FFIEC"). FFIEC is a formal interagency body of the U.S. government empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Federal Reserve Banks (the "FRB"), the Federal Deposit Insurance Corporation (the "FDIC"), the National Credit Union Administration, the Office of the Comptroller of the Currency and the CFPB and to make recommendations to promote uniformity in the supervision of financial institutions.

*Consumer Protection and Privacy.* Navient's business servicing FFELP Loans, Private Education Loans and DSLP Loans is subject to federal and state consumer protection, privacy and related laws and regulations. Some of the more significant federal laws and regulations include:

• various laws governing unfair, deceptive or abusive acts or practices;

• the Truth-In-Lending Act and Regulation Z issued by the FRB, which governs disclosures of credit terms to consumer borrowers;

• the Fair Credit Reporting Act and Regulation V issued by the CFPB, which governs the use and provision of information to consumer reporting agencies;

• the Equal Credit Opportunity Act and Regulation B issued by the CFPB, which prohibits discrimination on the basis of race, creed or other prohibited factors in extending credit;

• the Servicemembers Civil Relief Act ("SCRA") which applies to all debts incurred prior to commencement of active military service (including education loans) and limits the amount of interest, including certain fees or charges that are related to the obligation or liability; and

• the Telephone Consumer Protection Act ("TCPA"), which governs communication methods that may be used to contact customers.

Navient's servicing and asset recovery businesses are subject to federal and state consumer protection, privacy and related laws and regulations, including supervision by the CFPB of larger consumer debt collectors as discussed above. Some of the more significant federal statutes are the Fair Debt Collection Practices Act and additional provisions of the acts listed above, as well as the HEA and the various laws and regulations that govern government contractors. These activities are also subject to state laws and regulations similar to the federal laws and regulations listed above.

13

Table of Contents

**Item 1A.       Risk Factors**

Our business activities involve a variety of risks. Below we describe the significant risk factors affecting our business. These risk factors should be considered in connection with evaluating the forward-looking statements contained in this Annual Report on Form 10-K because these factors could cause our actual results or financial condition to differ materially from our historic results as well as those projected in forward-looking statements.

**Risks Related to Navient's Business**

***Economic conditions and the creditworthiness of third parties could have a material adverse effect on Navient's business, results of operations, financial condition and stock price.***

Navient's earnings are dependent on the expected future creditworthiness of its student loan customers, especially with respect to its Private Education Loan portfolio. High unemployment rates and the failure of its in-school borrowers to graduate are two of the most significant macroeconomic factors that could increase loan delinquencies, defaults and forbearance or the use or performance of its payment modifications programs, or otherwise negatively affect performance of its FFELP Loan and Private Education Loan portfolios. Forbearance programs may have the effect of delaying default emergence as customers are granted a temporary waiver from having to make payments on their loans. Therefore, deterioration in the economy could adversely affect the credit quality of its borrowers. Higher credit-related losses and weaker credit quality could negatively affect Navient's business, financial condition and results of operations and limit funding options, including Navient's access to the capital markets, which could also adversely impact its liquidity position.

Navient is also subject to the creditworthiness of other third parties, including counterparties and clearinghouses to derivative transactions. If a counterparty or clearinghouse fails to perform its obligations, Navient could, depending on the type of arrangement, experience a loss of liquidity or an economic loss. In addition, Navient might not be able to cost effectively replace the derivative position depending on the type of derivative and the current economic environment, and thus could be exposed to a greater level of interest rate and/or foreign currency exchange rate risk which could lead to additional losses. If counterparties or clearinghouses are unable to perform their obligations, Navient's business, financial condition and results of operations could suffer.

***Legislation passed by Congress in 2010 ended new loan originations under the FFELP program, and, as a result, net income on its existing FFELP Loan portfolio will decline over time. Navient may not be able to develop revenue streams to replace the declining revenue from FFELP Loans.***

In 2010, Congress passed legislation ending the origination of student loans under the FFELP program. All federal student loans are now originated through the DSLP of the ED. The law did not alter or affect the terms and conditions of existing FFELP Loans. As a result of this legislation, net income on Navient's FFELP Loan portfolio will decline over time as existing FFELP Loans are paid down, refinanced or repaid after default by Guarantors. As of December 31, 2014, Navient's FFELP Loan portfolio totaled $104.5 billion, compared with $103.2 billion as of December 31, 2013, and Navient's intercompany FFELP Loan servicing revenue declined by $73 million, or 14 percent, compared to the prior year. If Navient does not acquire additional FFELP Loans or otherwise grow or develop new revenue streams to replace or supplement its existing, and declining, FFELP Loan net income, Navient's consolidated revenue and operating income will continue to decrease which could materially and adversely impact Navient's earnings.

***Navient is not presently originating Private Education Loans and, as a result, interest income on its existing Private Education Loan portfolio and fee-based revenue from servicing and asset recovery on Private Education Loans will decline over time. Navient may not be able to develop revenue streams to replace the declining revenue from Private Education Loans.***

Navient is not presently originating new Private Education Loans. As a result, interest income on Navient's Private Education Loan portfolio and fee-based revenue on that portfolio will decline over time as the loans are

14

Table of Contents

paid down, refinanced or charged off. As of December 31, 2014, Navient's Private Education Loan portfolio totaled $29.8 billion, compared with $31.0 billion as of December 31, 2013. Navient's loan servicing revenue on this portfolio declined by $7 million or 23 percent compared with the prior year. If Navient does not begin to originate Private Education Loans as permitted under its separation and distribution agreement, acquire additional Private Education Loans or otherwise grow or develop new revenue streams to replace or supplement its existing and declining Private Education Loan net interest and servicing revenue, Navient's consolidated revenue and operating income will continue to decrease which could materially and adversely impact Navient's earnings.

***Navient's business is affected by the cost and availability of funding in the capital markets.***

The capital markets have from time to time experienced periods of significant volatility. This volatility can dramatically and adversely affect financing costs when compared to historical norms. Additional factors that could make financing more expensive or unavailable to Navient include, but are not limited to, financial losses, events that have an adverse impact on Navient's reputation, changes in the activities of Navient's business partners, events that have an adverse impact on the financial services industry generally, counterparty availability, changes affecting Navient's assets, corporate and regulatory actions, absolute and comparative interest rate changes, ratings agencies' actions, general economic conditions and the legal, regulatory and tax environments governing funding transactions. If financing becomes more difficult, expensive or unavailable, Navient's business, financial condition and results of operations could be materially and adversely affected.

***Navient's credit ratings are important to its liquidity. A reduction in its credit ratings could adversely affect its liquidity, increase its borrowing costs or limit its access to the capital markets.***

As of December 31, 2014, all three credit rating agencies rate Navient's long term unsecured debt at below investment grade. This has resulted in a higher cost of funds for the Company, and has caused its senior unsecured debt to trade with greater volatility. In addition, the capital markets for below investment grade companies are not as liquid as those involving investment grade entities.

The negative actions taken by the credit rating agencies since Navient's separation transaction were based on concerns that the separation and distribution would reduce the sources of cash available to service its unsecured debt. According to their ratings reports, these concerns primarily focus on Navient's lack of future Private Education Loan originations and related servicing income, the loss of access to the earnings, cash flow, equity and potential market value of Sallie Mae Bank, the run-off of the FFELP Loan portfolio and strategic uncertainty as to the source of incremental earnings and cash flow to replace that run off, and an expected increase in the Company's cost of accessing the unsecured debt markets, including for refinancing purposes.

Navient's unsecured debt totaled $17.4 billion at December 31, 2014, and Navient utilizes the unsecured debt markets to help fund its business and refinance outstanding debt. The amount, type and cost of its funding directly affects the cost of operating its business and growing its assets and is dependent upon outside factors, including its credit rating from rating agencies. There can be no assurance that the Company's credit ratings will not be reduced further. A further reduction in the credit ratings of the Company's senior unsecured debt could adversely affect Navient's liquidity, increase its borrowing costs, limit its access to the capital markets and place incremental pressure on its net interest income.

***The interest rate characteristics of Navient's earning assets do not always match the interest rate characteristics of its funding arrangements, which may increase the price of, or decrease Navient's ability to obtain, necessary liquidity.***

Net interest income will be the primary source of cash flow generated by Navient's portfolios of FFELP Loans and Private Education Loans. Interest earned on FFELP Loans and Private Education Loans is primarily indexed to one-month LIBOR rates and either one-month LIBOR rates or the one-month Prime rate, respectively, but Navient's cost of funds will be primarily indexed to three-month LIBOR, creating the possibility of repricing risk related to these assets.

15

Table of Contents

The different interest rate characteristics of Navient's loan portfolios and liabilities funding these loan portfolios also result in basis risk and repricing risk. It is not possible to hedge all of Navient's exposure to such risks. While the asset and hedge indices are short-term with rate movements that are typically highly correlated, there can be no assurance that the historically high correlation will not be disrupted by capital market dislocations or other factors not within Navient's control. In these circumstances, Navient's earnings could be materially adversely affected.

***Higher than expected prepayments of loans could reduce servicing revenues or reduce or delay payments Navient receives as the holder of the Residual Interests of securitization trusts holding student loans.***

FFELP Loans and Private Education Loans may be voluntarily prepaid without penalty by the borrower or, in the case of FFELP Loans, consolidated with the borrower's other education loans through refinancing into the federal DSLP. FFELP Loans may also be repaid after default by the Guarantors of FFELP Loans. Prepayment rates and levels are subject to many factors beyond Navient's control, including repayment through loan consolidation programs. When education loans contained within a securitization trust are prepaid, the fees Navient earns as servicer decrease and the value of any Residual Interest Navient owns in the securitization trust may decline. While some fluctuation in prepayment levels is to be expected, extraordinary or extended increases in prepayment levels could materially adversely affect our liquidity, income and the value of those Residual Interests.

Future initiatives by ED or by Congress, such as its Special Direct Consolidation Loan ("SDCL") initiative launched in the fourth quarter of 2011 to encourage or force consolidation, or other factors affecting borrowers' repayment of their loans, could reduce Navient's cash flows from servicing and interest income as well as its net interest margin, which could materially adversely affect Navient's liquidity and income.

***Navient's use of derivatives to manage interest rate and foreign currency sensitivity exposes it to credit and market risk that could have a material adverse effect on its earnings and liquidity.***

Navient intends to maintain an overall strategy that uses derivatives to minimize the economic effect of interest rate and/or foreign currency changes. However, developing an effective strategy for dealing with these movements is complex, and no strategy can completely avoid the risks associated with these fluctuations. For example, Navient's student loan portfolio remains subject to prepayment risk that could result in its being under- or over-hedged, which could result in material losses. In addition, Navient's use of derivatives in its risk management activities could expose it to mark-to-market losses if interest rates or foreign currencies move in a materially different way than was expected when Navient entered into the related derivative contracts. As a result, there can be no assurance that hedging activities using derivatives will effectively manage Navient's interest rate or foreign currency sensitivity, have the desired beneficial impact on its results of operations or financial condition or not adversely impact its liquidity and earnings.

Navient's use of derivatives also exposes it to market risk and credit risk. Market risk is the chance of financial loss resulting from changes in interest rates, foreign exchange rates and market liquidity. Navient's Floor Income Contracts and some of the basis swaps it uses to manage earnings variability caused by different reset characteristics on interest-earning assets and interest-bearing liabilities do not qualify for hedge accounting treatment. Therefore, the change in fair value, called the "mark-to-market," of these derivative instruments is included in Navient's statement of income. A decline in the fair value of these derivatives could have a material adverse effect on Navient's reported earnings.

Credit risk is the risk that a counterparty will not perform its obligations under a contract. Credit risk is limited to the loss of the fair value gain in a derivative that the counterparty or clearinghouse owes Navient and therefore exists for derivatives with a positive fair value. At December 31, 2014, Navient had a net positive exposure (derivative gain positions less collateral posted by counterparties) related to derivatives of $96 million, excluding securitization trusts discussed below. If a counterparty or clearinghouse fails to perform its obligations, Navient could, depending on the type of counterparty arrangement, experience a loss of liquidity or an economic loss. In addition, Navient might not be able to cost effectively replace the derivative position depending on the type of derivative and the current economic environment.

16

Table of Contents

Navient's securitization trusts, which it is required to consolidate on its balance sheet, had $9.3 billion of Euro and British Pound Sterling denominated bonds outstanding as of December 31, 2014. To convert these non-U.S. dollar denominated bonds into U.S. dollar liabilities, the trusts have entered into foreign-currency swaps with highly rated counterparties. In addition, the trusts have entered into $12.5 billion of interest rate swaps which are primarily used to convert Prime rate payments received on securitized loans to LIBOR paid on the bonds. At December 31, 2014, the net positive exposure on swaps in securitization trusts was $129 million. A failure by a swap counterparty to perform its obligations could, if the swap has a positive fair value to Navient, materially and adversely affect Navient's earnings.

**High or increasing interest rate environments may cause Navient's Floor Income to decline, which may adversely affect its earnings.**

FFELP Loans disbursed before April 1, 2006, generally earn interest at the higher of either the borrower rate, which is fixed over a period of time, or a floating rate based on a SAP formula set by ED. Navient has generally financed its FFELP Loans with floating rate debt whose interest is matched closely to the floating nature of the applicable SAP formula. If a decline in interest rates causes the borrower rate to exceed the SAP formula rate, Navient will continue to earn interest on the loan at the fixed borrower rate while the floating rate interest on Navient debt will continue to decline. The additional spread earned between the fixed borrower rate and the SAP formula rate is referred to as "Floor Income."

Depending on the type of FFELP Loan and when it was originated, the borrower rate is either fixed to term or is reset to a market rate on July 1 of each year. For loans where the borrower rate is fixed to term, Navient may earn Floor Income for an extended period of time; for those loans where the borrower interest rate is reset annually on July 1, Navient may earn Floor Income to the next reset date. In accordance with legislation enacted in 2006, holders of FFELP Loans are required to rebate Floor Income to ED for all FFELP Loans disbursed on or after April 1, 2006. After accounting for these required rebates, as of December 31, 2014, approximately $55 billion of Navient's FFELP Loan portfolio was eligible to earn Floor Income.

Floor Income can be volatile as rates on the underlying student loans move up and down. Navient generally hedges this risk by using derivatives to lock in the value of the Floor Income over the term of the contract. As of December 31, 2014, approximately $27.2 billion (49 percent) of Navient's FFELP Loans eligible to earn Floor Income was economically hedged. This amount Navient hedges declines over time. A rise in interest rates will reduce the amount of Floor Income received on the approximately $27.8 billion of FFELP Loans not hedged with Floor Income Contracts, which will compress Navient's interest margins and depress its earnings.

**Failure to comply with applicable rules and regulations could result in the loss of insurance or guarantees on FFELP Loans and other penalties that could have a material, negative impact on its business, financial condition or results of operations.**

Loans serviced under the FFELP are subject to the HEA and related laws, rules, regulations and policies. Navient's servicing operations are designed and monitored to comply with the HEA, related regulations and program guidance; however, ED could determine that Navient is not in compliance for a variety of reasons, including that it misinterpreted ED guidance or incorrectly applied the HEA and its related laws, rules, regulations and policies. Failure to comply could result in fines, the loss of the insurance and related federal guarantees on affected FFELP Loans, expenses required to cure servicing deficiencies, suspension or termination of its right to participate as a FFELP servicer, negative publicity and potential legal claims. The imposition of significant fines, the loss of the insurance and related federal guarantees on a material number of FFELP Loans, the incurrence of additional expenses and/or the loss of its ability to participate as a FFELP servicer could individually or in the aggregate have a material, negative impact on its business, financial condition or results of operations.

**Defaults on student education loans held by Navient, particularly Private Education Loans, could adversely affect Navient's earnings.**

FFELP Loans are insured or guaranteed by state or not-for-profit agencies and are also protected by contractual rights to recovery from the United States pursuant to guaranty agreements among ED and these

17

Table of Contents

agencies. These guarantees generally cover at least 97 percent of a FFELP Loan's principal and accrued interest and, in limited circumstances, 100 percent of the loan's principal and accrued interest. Nevertheless, Navient is exposed to credit risk on the non-guaranteed portion of the FFELP Loans in its portfolio and to the possible loss of the insurance or guarantee due to a failure by Navient to comply with HEA and related regulations.

Navient bears the full credit exposure on Private Education Loans. For the year ended December 31, 2014, on a "Core Earnings" basis, the annualized charge-off rate for Navient's Private Education Loans (as a percentage of loans in repayment) was 2.6 percent. Delinquencies are an important indicator of the potential future credit performance for Private Education Loans. Navient's delinquencies as a percentage of Private Education Loans in repayment were 8.1 percent at December 31, 2014.

The evaluation of Navient's allowance for loan losses is inherently subjective, as it requires estimates that may be subject to significant changes. As of December 31, 2014, Navient's allowance for FFELP Loan and Private Education Loan losses was approximately $93 million and $1.9 billion, respectively. During the year ended December 31, 2014, Navient recognized provisions for FFELP Loan and Private Education Loan losses, on a "Core Earnings" basis, of $40 million and $539 million, respectively. The provision for loan losses reflects the activity for the applicable period and provides an allowance at a level that management believes is appropriate to cover probable losses inherent in the loan portfolio. However, future defaults can be higher than anticipated due to a variety of factors outside of Navient's control, such as downturns in the economy, regulatory or operational changes and other unforeseen future trends. Losses on Private Education Loans are also determined by risk characteristics such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months in which a payment has been made), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. General economic and employment conditions, including employment rates for recent college graduates, during the recent recession led to higher rates of student loan defaults. Although default rates have decreased recently as economic conditions have improved, they remain higher than pre-recession levels. If actual loan performance is worse than currently estimated, it could materially affect Navient's estimate of the allowance for loan losses and the related provision for loan losses in Navient's statements of income and as a result adversely affect Navient's results of operations.

***Adverse market conditions or an inability to effectively manage its liquidity risk could negatively impact Navient's ability to meet its liquidity and funding needs, which could materially and adversely impact its business operations and overall financial condition.***

Navient must effectively manage the liquidity risk to which it is exposed. Navient requires liquidity to meet cash requirements such as day-to-day operating expenses, required payments of principal and interest on borrowings, and distributions to stockholders. Navient's primary sources of liquidity are its current cash and investment portfolio, operating cash flows provided by operating activities, repayment of principal on unencumbered student loan assets, distributions from its securitization trusts (including servicing fees which are priority payments within the trusts) and issuance of additional unsecured debt. Navient may also draw down on its secured FFELP and Private Education Loan facilities or issue term asset-backed securities ("ABS"). Navient may maintain too much liquidity, which can be costly, or may be too illiquid, which could result in financial distress during times of financial stress or capital market disruptions.

***A failure of the operating systems or infrastructure of Navient could disrupt its business, cause significant losses, result in regulatory action or damage its reputation.***

A failure of Navient's operating systems or infrastructure could disrupt its business. Navient's business is dependent on its ability to process and monitor large numbers of daily transactions in compliance with legal and regulatory standards and its own product specifications, both currently and in the future. As Navient's processing demands and loan portfolios change, both in volume and in terms and conditions, Navient's ability to develop and maintain its operating systems and infrastructure will become increasingly challenging. There is no assurance that Navient has adequately or efficiently developed, maintained or acquired such systems and infrastructure or will do so in the future.

18

Table of Contents

The servicing, financial, accounting, data processing and other operating systems and facilities that support Navient's business may fail to operate properly or become disabled as a result of events that are beyond Navient's control, adversely affecting its ability to timely process transactions. Any such failure could adversely affect Navient's ability to service its clients, result in financial loss or liability to its clients, disrupt its business, and result in regulatory action or cause reputational damage.

Despite the plans and facilities Navient has in place, its ability to conduct business may be adversely affected by a disruption in the infrastructure that supports its business. This may include a disruption involving electrical, communications, Internet, transportation or other services used by Navient or third parties with which it conducts business. Notwithstanding efforts to maintain business continuity, a disruptive event impacting Navient's processing locations could adversely affect its business, financial condition and results of operations.

***Navient depends on secure information technology, and a breach of its information technology systems could result in significant losses, disclosure of confidential customer information and reputational damage, which would adversely affect Navient's business.***

Navient's operations rely on the secure processing, storage and transmission of personal, confidential and other information in its computer systems and networks. Although Navient takes protective measures it deems reasonable and appropriate, its computer systems, software and networks may be vulnerable to unauthorized access, computer viruses, malicious attacks and other events that could have a security impact beyond Navient's control. These technologies, systems and networks, and those of third parties, may become the target of cyber-attacks or information security breaches that could result in the unauthorized release, gathering, monitoring, misuse, loss or destruction of Navient's or its customers' confidential, proprietary and other information, or otherwise disrupt Navient's business operations or those of its customers or other third parties. Information security risks for institutions that handle large numbers of financial transactions on a daily basis such as Navient have generally increased in recent years, in part because of the proliferation of new technologies, the use of the Internet and telecommunications technologies to conduct financial transactions, and the increased sophistication and activities of organized crime, hackers, terrorists, activists and other external parties.

If one or more of such events occur, personal, confidential and other information processed and stored in, and transmitted through, Navient's computer systems and networks could be jeopardized or could cause interruptions or malfunctions in Navient's operations that could result in significant losses or reputational damage. Navient routinely transmits and receives personal, confidential and proprietary information, some of it through third parties. Navient put in place secure transmission capability and works to ensure that third parties follow similar procedures. Nevertheless, an interception, misuse or mishandling of personal, confidential or proprietary information being sent to or received from a customer or third party could result in legal liability, regulatory action and reputational harm. In the event personal, confidential or other information is jeopardized, intercepted, misused or mishandled, Navient may need to expend significant additional resources to modify its protective measures or to investigate and remediate vulnerabilities or other exposures, and it may be subject to fines, penalties, litigation and settlement costs and financial losses that may either not be insured against or not be fully covered through insurance. If one or more of such events occur, Navient's business, financial condition or results of operations could be significantly and adversely affected.

***Navient depends on third parties for a wide array of services, systems and information technology applications, and a breach or violation of law by one of these third parties could disrupt Navient's business or provide its competitors with an opportunity to enhance their position at Navient's expense.***

Navient depends on third parties for a wide array of services, systems and information technology applications. Third-party vendors are significantly involved in aspects of Navient's software and systems development, the timely transmission of information across its data communication network, and for other telecommunications, processing, remittance and technology-related services in connection with Navient's payment services businesses. Navient also utilizes third-party debt collectors in the collection of defaulted Private Education Loans. If a service provider fails to provide the services required or expected, or fails to meet

19

Table of Contents

applicable contractual or regulatory requirements such as service levels or compliance with applicable laws, the failure could negatively impact Navient's business by adversely affecting its ability to process customers' transactions in a timely and accurate manner, otherwise hampering Navient's ability to serve its customers, or subjecting Navient to litigation and regulatory risk for matters as diverse as poor vendor oversight or improper release or protection of personal information. Such a failure could also adversely affect the perception of the reliability of Navient's networks and services and the quality of its brands, which could materially adversely affect Navient's business and results of operations.

***Federal funding constraints and spending policy changes triggered by associated federal spending deadlines and ongoing lawmaker and regulatory efforts to change the student lending sector may result in disruption of federal payments for services Navient provides to the government, which could materially and adversely affect Navient's business strategy or future business prospects.***

Navient receives payments from the federal government on its FFELP Loan portfolio and for other services it provides, including servicing loans under the DSLP and providing default aversion and contingency collections to ED. Payments for these services may be affected by various factors, including the following:

- The Budget Act enacted on December 26, 2013, includes several provisions that will have or could have an effect on Navient's business. First, the Budget Act reduced the amount paid to guaranty agencies for defaulted FFELP Loans rehabilitated under Section 428F of the HEA, beginning on July 1, 2014. In addition, the Budget Act eliminated funding for the Direct Loan servicing performed by not-for-profit servicers. The Budget Act requires that all servicing funding be provided through the annual appropriations process which is subject to certain limitations. Although the payments for Navient's DSLP servicing contract is already funded from annual appropriations, the requirement to fund all servicing from the limited appropriated funding could have an effect on its future business in ways the Company cannot predict at this time.

- Other Higher Education Legislation: As Congress considers the reauthorization of the Higher Education Act, it may consider legislation that would reduce the payments to Guarantors or change the consolidation program to incentivize student loan borrowers to refinance their existing student loans, both private and federal. Such reforms could reduce Navient's cash flows from servicing and interest income as well as its net interest margin.

It is possible that the Administration and Congress in the future could engage in a prolonged debate linking the federal deficit, debt ceiling and other budget issues. If U.S. lawmakers in the future fail to reach agreement on these issues, the federal government could stop or delay payment on its obligations, including those on services Navient provides. Navient cannot predict how or what programs will be impacted by any actions that the Administration, Congress or the federal government may take. Further, legislation to address the federal deficit and spending could include proposals that would adversely affect FFELP and DSLP-related servicing businesses. A protracted reduction, suspension or cancellation of the demand for the services Navient provides, or proposed changes to the terms or pricing of services provided under existing contracts with the federal government, including its contract with ED, could have a material adverse effect on Navient's revenues, cash flows, profitability and business outlook, and, as a result, could materially adversely affect its business, financial condition and results of operations.

***If Navient does not effectively align its cost structure with its business operations, its results of operations and financial condition could be materially adversely affected.***

Navient will need to align its cost structure with its business operations to remain profitable. Navient intends to make opportunistic acquisitions of additional FFELP Loans, both to increase cash flow from its loan portfolio and to expand its FFELP Loan servicing business. It will need to undertake other initiatives to grow its business. Navient's ability to properly size its cost structure will be dependent upon a number of variables, including its ability to successfully execute on its business plan and future legislative changes that may increase its compliance costs or otherwise impact its business. If Navient undertakes cost reductions based on its business

20

Table of Contents

plan, those reductions could be too dramatic and could cause disruptions in its business, reductions in the quality of the services it provides or cause it to fail to comply with applicable regulatory standards. Alternatively, Navient may fail to implement, or be unable to achieve, necessary cost savings commensurate with its business and prospects. In either case, Navient's business, results of operations and financial condition could be adversely affected.

***Incorrect estimates and assumptions by management in connection with the preparation of Navient's consolidated financial statements could adversely affect Navient's reported assets, liabilities, income, revenue or expenses.***

The preparation of Navient's consolidated financial statements requires management to make critical accounting estimates and assumptions that affect the reported amounts of assets, liabilities, income, revenue or expenses during the reporting periods. Incorrect estimates and assumptions by management could adversely affect Navient's reported amounts of assets, liabilities, income, revenue and expenses during the reporting periods. If Navient makes incorrect assumptions or estimates, it may under- or overstate reported financial results, which could materially and adversely affect its business, financial condition and results of operations.

***Acquisitions or strategic investments that Navient pursues may not be successful and could disrupt its business, harm its financial condition or reduce its earnings.***

Navient's strategy includes making opportunistic acquisitions of, or material investments in, complementary businesses, products and portfolios of loans. Navient may not be able to identify suitable opportunities and, if not, this strategy could fail. Navient may not be able to obtain financing necessary to allow Navient to make such acquisitions or investments on satisfactory terms or at all or obtain necessary regulatory approvals, or be able to complete the transactions on satisfactory terms. If the purchase price of any acquisition or investment is paid in cash, it may have an adverse effect on Navient's financial condition; if the purchase price is paid with Navient stock, it could be dilutive to stockholders. Navient may assume liabilities, including unrecorded liabilities that are not discovered at the time of the transaction, and the repayment of those liabilities may have an adverse effect on Navient's financial condition.

Navient may not be able to successfully integrate personnel, operations, businesses, products, or technologies of an acquisition. There may be additional risks if Navient enters into a line of business in which it has limited experience or the business operates in a legal, regulatory or competitive environment with which it is not familiar. Navient may not have or be able to maintain the expertise needed to manage the new business. The expected benefits of acquisitions and investments also may not be realized for various reasons, including the loss of key personnel, customers or vendors. If Navient fails to integrate or realize the expected benefits of its acquisitions or investments, it may lose the return on these acquisitions or investments or incur additional transaction costs, and its business and financial condition may be harmed as a result.

***If Navient is unable to attract and retain professionals with strong leadership skills, its business, results of operations and financial condition may be materially adversely affected.***

Navient's success is dependent, in large part, on its ability to attract and retain personnel with the knowledge and skills to lead its business. Experienced personnel in its industry are in high demand, and competition for talent is very high. Navient must hire, retain and motivate appropriate numbers of talented people with diverse skills in order to serve its clients, respond quickly to rapid and ongoing technology, industry and macroeconomic developments, and grow and manage its business. As Navient expands its services and solutions, it must also hire and retain an increasing number of professionals with different skills and professional expectations than those of the professionals it has historically hired and retained. If Navient is unable to successfully integrate, motivate and retain these professionals, its ability to continue to secure work in those industries and for its services and solutions may suffer.

<div align="center">21</div>

Table of Contents

***Navient's servicing and asset recovery businesses operate in competitive environments and could lose market share and revenues if competitors compete more aggressively or effectively.***

Navient competes in the servicing and asset recovery businesses with for-profit and non-profit servicing institutions, many with strong records of performance. Navient competes based on capability and customer service metrics. To the extent its competitors compete aggressively or more effectively than Navient, Navient could lose market share to them or Navient's service offerings may not prove to be profitable.

Since the second quarter of 2009, Navient has been one of four large servicers awarded a servicing contract by ED to service federal loans owned by ED. Navient services approximately 6.2 million accounts under this servicing contract as of December 31, 2014. The servicing contract spans five years with the possibility of one five-year renewal at the option of ED. On August 27, 2014, ED extended its servicing contract with Navient to service federal loans for five more years. Under the terms of the contract extension, the allocation of ongoing volume will be determined twice each year based on the relative performance of the servicers of five metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more up to 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of ED personnel (5 percent). Quarterly scores in each metric will be averaged together twice each year to calculate the final result of each metric. Navient's allocation under the servicing contract increased to 24 percent for the period beginning August 15, 2014 from 18 percent for the prior period beginning August 15, 2013. Beginning on January 1, 2015, the aggregate allocation for not-for-profit servicers increased to 25 percent of all new DSLP borrowers. Navient earned $130 million of revenue under the contract for the year ended December 31, 2014.

If Navient is unable to improve on these and increase its relative standing compared to the three other servicing companies it competes with for account allocations under the servicing contract, its ability to increase its servicing business with ED may be materially adversely affected.

***Changes in law, regulation or regulatory policy involving student loans could have a material impact on Navient's profitability, results of operations, financial condition, cash flows or future business prospects.***

Navient's businesses are subject to numerous state and federal laws and regulations and changes to such laws and regulations or changes in existing regulatory guidance or their interpretation could adversely impact Navient's business and results of operations if it is not able to adequately mitigate the impact of such changes.

The Company's FFELP Loan business has been affected extensively by changes in law, most notably by the legislation Congress passed in 2010 to eliminate new FFELP Loans.

The Company's Private Education Loan business may also be impacted by changes in law, regulations or regulatory policy. For example, the CFPB's 2014 Report recommended that Congress consider: (i) making changes to the U.S. Bankruptcy Code's treatment of private education loans in order to motivate lenders to more constructively work with borrowers struggling to make payments, (ii) making reforms to the disclosures and guidelines that apply to borrower repayment options and loan modification programs and (iii) assessing the impact of tax treatment of principal forgiveness on loan modification activity. In the future, Congress or the Administration may act on these recommendations or choose to take actions beyond or unrelated to the CFPB's recommendations to further regulate the private student loan market or dictate the terms and conditions applicable to private student loans. Additionally, even in the absence of Congress or the Administration pursing the CFPB's recommendations, the CFPB may use its regulatory authority and enforcement actions to make substantial changes on its own to the private student loan or loan servicing markets and we believe that the CFPB has shown through its actions that it is willing to do so. The taking of any such actions may adversely impact the profitability and growth of Navient's business and/or significantly alter the costs and manner in which Navient conducts this business.

In addition, the Dodd-Frank Act contains comprehensive provisions that govern the practices and oversight of financial institutions (including large non-bank financial institutions) and other participants in the financial markets. It imposed significant regulations on almost every aspect of the U.S. financial services industry, including enhanced supervisory authority over Navient's business. Many of the Dodd-Frank Act's provisions have become effective but remain subject to interpretation and formal implementation by regulatory authorities through final rulemaking. As a result of the Dodd-Frank Act, the CFPB and other financial regulators have

22

Table of Contents

introduced and continue to introduce new regulations and guidance, even as they impose enforcement actions against financial institutions and financial service providers which often contain additional cautions and guidance which must be taken into consideration. Due to the uncertainty engendered by these new regulations, guidance and actions, coupled with the likelihood of additional changes or additions to the statutes, regulations and practices applicable to its business, Navient is not able to estimate the ultimate impact of changes in law on its financial results, business operations or strategies. Navient believes that the cost of responding to and complying with these evolving laws and regulations, as well as any guidance from enforcement actions, will continue to increase, as will the risk of penalties and fines from any enforcement actions that may be imposed on its businesses. Navient's profitability, results of operations, financial condition, cash flows or future business prospects could be materially and adversely affected as a result.

The Dodd-Frank Act authorizes state officials to enforce regulations issued by the CFPB and to enforce the Dodd-Frank Act's general prohibition against unfair, deceptive or abusive practices. Most states also have statutes that prohibit unfair and deceptive practices. To the extent states enact requirements that differ from federal standards or state officials and courts adopt interpretations of federal consumer laws that differ from those adopted by the CFPB under the Dodd-Frank Act, or states increase their examination, supervision and enforcement activities, Navient's compliance costs could increase and reduce its ability to offer the same products and services to consumers nationwide and it may be subject to a higher risk of state enforcement actions.

***Navient's business may be adversely impacted by increased expenditures due to changes in law or agency interpretations, increased regulatory oversight or supervision and possible remediation efforts and penalties.***

The CFPB has broad authority with respect to Navient's loan servicing business. It has authority to write regulations under federal consumer financial protection laws and to directly or indirectly enforce those laws and examine Navient for compliance. The CFPB also has examination and enforcement authority with respect to various federal consumer financial laws for some providers of consumer financial products and services, including Navient. In December 2013, the CFPB issued a final rule, effective March 14, 2014, defining "larger participants" in the student loan servicing market that will be subject to supervision and examination by the CFPB, a category that will include Navient's student loan servicing subsidiaries.

The CFPB is authorized to collect fines and provide consumer restitution in the event of violations, engage in consumer financial education, track consumer complaints, request data and promote the availability of financial services to underserved consumers and communities. The CFPB has authority to prevent unfair, deceptive or abusive acts or practices and to ensure that all consumers have access to fair, transparent and competitive markets for consumer financial products and services. The review of products and practices to prevent unfair, deceptive or abusive conduct will be a continuing focus of the CFPB. The ultimate impact of this heightened scrutiny is uncertain, but it has resulted in, and could continue to result in, changes to pricing, practices, products and procedures. It could also result in increased costs related to regulatory oversight, supervision and examination, additional remediation efforts and possible penalties.

In furtherance of its regulatory and supervisory powers, the CFPB has the authority to impose monetary penalties for violations of applicable federal consumer financial laws, require remediation of practices and pursue administrative proceedings or litigation for violations of applicable federal consumer financial laws (including the CFPB's own rules). The CFPB has the authority to issue cease and desist orders (which can include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief) and monetary penalties ranging from $5,000 per day for ordinary violations of federal consumer financial laws to $25,000 per day for reckless violations and $1 million per day for knowing violations. Also, where a company has violated Title X of the Dodd-Frank Act or CFPB regulations implemented under Title X of the Dodd-Frank Act, the Dodd-Frank Act empowers state attorneys general and state regulators to bring civil actions to remedy violations of state law. If the CFPB or one or more state attorneys general or state regulators believe that Navient has violated any of the applicable laws or regulations, they could exercise their enforcement powers in ways that could have a material adverse effect on Navient or its business.

23

Table of Contents

Loans serviced under the FFELP are subject to the HEA and related regulations. Navient's servicing operations are designed and monitored to comply with the HEA, related regulations and program guidance; however, ED could determine that Navient is not in compliance for a variety of reasons, including that Navient misinterpreted ED guidance or incorrectly applied the HEA and its related regulations or policies. Failure to comply could result in fines, the loss of the insurance and related federal guarantees on affected FFELP Loans, expenses required to cure servicing deficiencies, suspension or termination of Navient's right to participate as a FFELP servicer, negative publicity and potential legal claims. The imposition of significant fines, the loss of the insurance and related federal guarantees on a material number of FFELP Loans, the incurrence of additional expenses and/or the loss of Navient's ability to participate as a FFELP servicer could individually or in the aggregate have a material, negative impact on Navient's business, financial condition or results of operations.

***Expanded regulatory and governmental oversight of Navient's businesses will increase its costs and risks.***

Navient's businesses and operations are increasingly subject to heightened governmental and regulatory oversight and scrutiny. In recent years, Navient has entered into several Consent Orders with the FDIC, the United States Department of Justice ("DOJ") and other banking regulators and settlements of enforcement actions with various governmental agencies. Navient has paid significant fines and penalties or provided monetary and other relief in connection with many of these actions and settlements.

In addition, Navient is devoting substantial resources to satisfying the requirements of these Consent Orders and settlements, enhancing its procedures and controls, expanding the risk and control functions within each line of business, investing in technology and hiring additional risk, control and compliance personnel, all of which has increased its operational and compliance costs.

If Navient fails to successfully address the requirements of the Consent Orders or the regulatory settlements of enforcement actions it is currently subject, or more generally to effectively enhance its risk and control procedures and processes to meet the heightened expectations of its regulators and other government agencies, it could be required to enter into further orders and settlements, pay additional fines, penalties or judgments, or accept material regulatory restrictions on its businesses, which could adversely affect its operations and, in turn, its financial results.

Navient expects heightened regulatory scrutiny and governmental investigations and enforcement actions to continue for it and the for the financial services industry as a whole. Navient anticipates that regulators will continue to take formal enforcement action, rather than taking informal supervisory actions, more frequently than they have done historically. Such actions can have significant consequences for a financial institution such as Navient, including loss of customers and business and the inability to operate certain businesses.

***Navient's asset recovery business is subject to significant regulation and oversight by state and federal agencies, and a failure to comply with applicable laws and regulations may result in significant costs, sanctions and litigation.***

Navient's asset recovery business is subject to regulation and oversight by various state and federal agencies, particularly in the area of consumer protection, and is subject to numerous state and federal laws and regulations. Failure to comply with these laws and regulations may result in significant costs, including litigation costs, and/or business sanctions including but not limited to termination or non-renewal of contracts. In addition, changes to such laws and regulations could adversely impact Navient's business and results of operations if it is not able to adequately mitigate the impact of such changes. Navient is now and may be subject in the future, to inquiries and audits from state and federal regulators as well as litigation from private plaintiffs.

24

Table of Contents

***Navient's work with government clients exposes it to additional risks inherent in the government contracting environment.***

Navient's clients include federal, state and local governmental entities. This work carries various risks inherent in the government contracting process. These risks include, but are not limited to, the following:

- Government entities in the United States often reserve the right to audit contract costs and conduct inquiries and investigations of business practices. These entities also conduct reviews and investigations and make inquiries regarding systems, including systems of third parties, used in connection with the performance of the contracts. Negative findings from audits, investigations or inquiries could affect the contractor's future revenues and profitability by preventing them, by operation of law or in practice, from receiving new government contracts for some period of time or prevent them from being paid at the rate they believe is warranted.

- If improper or illegal activities are found in the course of government audits or investigations, the contractor may become subject to various civil and criminal penalties, including those under the civil U.S. False Claims Act, and administrative sanctions, which may include termination or non-renewal of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with other agencies of that government. Due to the inherent limitations of internal controls, all improper or illegal activities may not be prevented or detected.

The occurrences or conditions described above could affect not only Navient's business with the particular government entities involved, but also its business or potential future business with other entities of the same or other governmental bodies or with commercial clients, and could have a material adverse effect on its business or its results of operations.

***Navient's framework for managing risks may not be effective in mitigating the risk of loss.***

Navient's risk management framework seeks to mitigate risk and appropriately balance risk and returns. Navient has established processes and procedures intended to identify, measure, monitor, control and report the types of risk to which it is subject. Navient seeks to monitor and control risk exposure through a framework of policies, procedures, limits and reporting requirements. Management of risks in some cases depends upon the use of analytical and forecasting models. If the models that Navient uses to mitigate these risks are inadequate, it may incur increased losses. In addition, there may be risks that exist, or that develop in the future, that Navient has not appropriately anticipated, identified or mitigated. If Navient's risk management framework does not effectively identify or mitigate risks, Navient could suffer unexpected losses, and its financial condition and results of operations could be materially adversely affected.

***Navient is subject to evolving and complex tax laws, which may result in additional liabilities that may affect its results of operations.***

Navient is subject to evolving and complex federal and state tax laws. Significant judgment is required for determining Navient's tax liabilities, and Existing SLM's tax returns have been, and Navient's tax returns will continue to be, periodically examined by various tax authorities. Navient will have, among other tax liabilities, risks for future tax contingencies arising from operations post-separation. Due to the complexity of tax contingencies, the ultimate resolution of any tax matters related to operations post-separation may result in payments greater or less than amounts accrued.

In addition, Navient may be impacted by changes in tax laws, including tax rate changes, changes to the laws related to the treatment and remittance of foreign earnings, new tax laws and subsequent interpretations of tax laws by federal and state tax authorities.

25

Table of Contents

**Risks Related to the Separation**

*Navient's historical and pro forma financial information is not necessarily representative of the results that it would have achieved as a separate, publicly traded company and may not be a reliable indicator of its future results.*

Due to the relative significance of Navient to Existing SLM, among other factors, Navient is treated as the "accounting successor" to Existing SLM for financial reporting purposes, notwithstanding the legal form of the separation described in this Form 10-K. Hence, Navient's historical consolidated financial statements included in this Form 10-K are the consolidated financial statements of Existing SLM. Accordingly, the historical financial information for Navient included in this Form 10-K does not necessarily reflect the financial condition, results of operations or cash flows that Navient would have achieved as a separate, publicly traded company during the periods presented or those that Navient will achieve in the future primarily as a result of the factors described below:

- Prior to the separation, Navient's business had been operated by Existing SLM as part of its broader corporate organization in combination with those businesses that are held by SLM BankCo after the separation and distribution. Some of the SLM BankCo businesses performed services for or engaged in intercompany transactions with the businesses that are held by Navient after the separation and distribution. Navient's pro forma financial results included in its Form 10 reflect allocations of corporate expenses from Existing SLM for such functions and are likely to be less than the expenses Navient will incur operating as a separate company from Existing SLM. After the separation and distribution, Navient may not be able to operate its business efficiently or at comparable costs, and its profitability may decline.

- Prior to the separation, Navient's historical financial statements include the assets, liabilities, results of operations and cash flows attributable to Existing SLM's consumer banking business, including Sallie Mae Bank, which are held by SLM BankCo after the separation and distribution.

Other significant changes will occur in Navient's cost structure, management, financing and business operations as the Company continues to operate as a company separate from the combined businesses of Existing SLM.

*The migration of systems from Navient's information technology platform to support SLM BankCo may be disruptive to Navient's business and Navient's ability to service its customers.*

Navient Solutions, Inc. ("NSI"), a wholly owned subsidiary of the Company, currently services substantially all of the education loans held by the Company, as well as a portfolio of education loans held by Sallie Mae Bank. During a transition period after the separation and distribution which may last until 2016, NSI will continue to host and provide Private ServiceCo, a subsidiary of SLM BankCo, with access to Navient's information technology systems and services to enable Private ServiceCo to service the Private Education Loans held at and serviced by Sallie Mae Bank. During this transition period, SLM BankCo will work to create its own, or engage third parties to provide, the information systems and services to replace those provided by Navient. Disruptions to Navient's information technology systems during this period, including the inability of customers with more than one type of student loan to speak to a single customer service representative, could occur. Any perceived disruption of Navient's or SLM BankCo's ability to service their customers may damage Navient's reputation and have a material adverse impact on its business, financial condition or results of operations. Further, although the transition period is expected to be less than 24 months, unforeseen circumstances or significant third-party delays could significantly extend this period. Any extension of the transition period may increase the costs incurred by Navient to provide transition assistance to SLM BankCo and may increase the chance of a disruption to Navient's information technology systems and its businesses.

26

Table of Contents

***Navient will owe obligations, including service and indemnification obligations, to SLM BankCo under various transaction agreements that have been executed as part of the separation. These obligations could be materially disruptive to Navient's business or subject it to substantial liabilities, including contingent liabilities and liabilities that are presently unknown.***

In connection with the separation and distribution, Navient, Existing SLM and SLM BankCo entered into various agreements, including, among others, a transition services agreement, a tax sharing agreement, an employee matters agreement, a loan servicing and administration agreement, a joint marketing agreement, a key systems agreement, a data sharing agreement and a sublease agreement. Under the transition services agreement, a subsidiary of Navient hosts and provides SLM BankCo with access to Navient's information technology systems and services, and Navient assists SLM BankCo migrating its customer data and service functions to a separate environment. The performance by Navient of its obligations to SLM BankCo under these agreements may require the diversion of a significant amount of Navient management's time from Navient's operations and could be disruptive to its business operations.

The separation and distribution agreement between Navient, Existing SLM and SLM BankCo provides for, among other things, indemnification obligations designed to make Navient financially responsible for substantially all liabilities that may exist whether incurred prior to or after the separation, relating to the business activities, of Existing SLM prior to the separation and distribution, other than those arising out of the consumer banking business and expressly assumed by SLM BankCo pursuant to the separation and distribution agreement. This includes Navient being financially responsible for all servicing and collections activities that it performed or directed on behalf of Sallie Mae Bank. If Navient is required to indemnify SLM BankCo under the circumstances set forth in the separation and distribution agreement, Navient may be subject to substantial liabilities including liabilities that are accrued, contingent or otherwise and regardless of whether the liabilities were known or unknown at the time of the separation and distribution. SLM BankCo is party to various claims, litigation and legal, regulatory and other proceedings resulting from ordinary business activities relating to its current and former operations. Previous business activities of SLM BankCo, including originations and acquisitions of various classes of consumer loans outside of Sallie Mae Bank, may also result in liability due to future laws, rules, interpretations or court decisions which purport to have retroactive effect, and such liability could be significant. SLM BankCo may also be subject to liabilities related to past activities of acquired businesses. It is inherently difficult, and in some cases impossible, to estimate the probable losses associated with contingent and unknown liabilities of this nature, but future losses may be substantial and will be borne by Navient in accordance with the terms of the separation and distribution agreement.

***There could be significant liability to Navient if the distribution is determined to be a taxable transaction.***

The separation and distribution of Navient from SLM BankCo was intended to qualify as a reorganization under various provisions of the Internal Revenue Code of 1986, as amended (the "Code") and as such to not be a taxable transaction. The separation and distribution was therefore conditioned on the receipt by Existing SLM of a private letter ruling from the IRS to the effect that, among other things, (i) the SLM Merger (together with the conversion of the shares of Existing SLM common and preferred stock into shares of SLM BankCo common and preferred stock pursuant to the SLM Merger) will qualify as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code and will not be integrated with the rest of the separation and distribution, and (ii) the separation and distribution will qualify as a "reorganization" for U.S. federal income tax purposes under Sections 355 and 368(a)(1)(D) of the Code. In addition, the distribution was conditioned on SLM BankCo's receipt of an opinion from outside tax counsel to the effect that, with respect to certain requirements for tax-free treatment under Section 355 of the Code on which the IRS will not rule, such requirements will be satisfied. Both of these conditions were satisfied or waived prior to the distribution. Navient received the private letter ruling from the IRS after the distribution.

The ruling and the opinion rely on facts, assumptions, representations and undertakings from Existing SLM, SLM BankCo and Navient regarding the past and future conduct of the companies' respective businesses and other matters. If any of these facts, assumptions, representations or undertakings is incorrect, SLM BankCo and its stockholders may not be able to rely on the ruling or the opinion of tax counsel and could be subject to significant

Table of Contents

tax liabilities. In addition, notwithstanding receipt of the private letter ruling from the IRS and opinion of tax counsel, the IRS could determine on audit that the SLM Merger and/or separation and distribution was taxable if it determines that any of these facts, assumptions, representations or undertakings were not correct or have been violated or if it disagrees with the conclusions in the opinion that are not covered by the private letter ruling, or for other reasons, including as a result of significant changes in the share ownership of SLM BankCo or Navient after the separation. If the SLM Merger and/or separation and distribution is determined to be taxable for U.S. federal income tax purposes, SLM BankCo and its stockholders that are subject to U.S. federal income tax could incur significant U.S. federal income tax liabilities and Navient could incur significant liabilities related thereto.

***Navient's ability to engage in stockholder distributions and other strategic corporate transactions in the near term could be limited.***

To preserve the tax-free treatment to SLM BankCo of the separation and the distribution, Navient and SLM BankCo entered into a tax sharing agreement that restricts Navient from engaging in certain transactions. These restrictions are intended to prevent the distribution and related transactions from becoming taxable to SLM BankCo and its stockholders for U.S. federal income tax purposes. Under the tax sharing agreement, for up to a two-year period following the distribution (the "Restricted Period"), Navient is prohibited from, among other things:

- issuing shares of Navient stock equal to or exceeding 25 percent of the shares of Navient stock issued and outstanding immediately following the distribution date, including to raise capital or as acquisition currency in furtherance of strategic transactions, such as for the purchase of additional portfolios of student loans;

- selling 50 percent or more of the assets of the loan management, servicing and asset recovery business or engaging in mergers or other strategic transactions that may result in a change of control of Navient (as determined under U.S. federal income tax law);

- repurchasing outstanding shares of its common stock, other than in open market repurchases constituting less than 20 percent of such stock outstanding immediately following the distribution date; and

- ceasing to actively conduct its business or liquidating.

The foregoing prohibitions are in some cases more restrictive than those required under the Code due to the potential significant liability to SLM BankCo and its stockholders were the separation and the distribution determined to be a taxable transaction. Under the tax sharing agreement, Navient has the ability to engage in certain otherwise prohibited transactions, such as additional stock issuances or stock repurchases during the Restricted Period, provided it first delivers to SLM BankCo a tax opinion reasonably satisfactory to SLM BankCo or an IRS ruling that doing so will not adversely affect the tax-free treatment of the separation and the distribution.

The foregoing prohibitions could limit Navient's ability to pursue strategic transactions or other transactions during the Restricted Period that it may believe to be in the best interests of its stockholders or that might increase the value of its business. In addition, under the tax sharing agreement, Navient is required to indemnify SLM BankCo against any tax liabilities incurred as a result of the violation of any of the foregoing restrictions, as well as any transaction (or series of transactions) that results in the distribution being considered part of a plan by Navient that includes a later change in control of Navient during the Restricted Period (as determined under U.S. federal income tax law).

***Navient may not achieve some or all of the expected benefits of the separation, and the separation may adversely affect its business.***

Navient may not be able to achieve the full strategic and financial benefits expected to result from the separation, or such benefits may be delayed or not occur at all. We believe that the separation and distribution provided the following benefits, among others: (i) a distinct investment identity allowing investors to evaluate the merits, performance, and future prospects of Navient separately from SLM BankCo; (ii) cash flows significantly

28

Table of Contents

in excess of debt service obligations; (iii) more efficient allocation of capital for both Navient and SLM BankCo; (iv) a reduced likelihood that Navient is designated a systemically important financial institution; and (v) a separate equity structure that allows direct access by Navient to the capital markets and the use of Navient equity for acquisitions and equity compensation.

Navient may not achieve other anticipated benefits for a variety of reasons, including, among others: (a) the separation will require significant amounts of management's time and effort, which may divert management's attention from operating Navient's business; (b) Navient may be more susceptible to market fluctuations and other adverse events than if it were still a part of Sallie Mae; (c) Navient's business is less diversified than Existing SLM's business prior to the separation; (d) absent the acquisition of new loan portfolios or new sources of fee income, Navient's revenue and operating margin will decline as its FFELP Loan portfolio amortizes over the next 20 years; and (e) remaining actions related to separating SLM BankCo's and Navient's respective businesses could disrupt Navient's operations. If Navient fails to achieve some or all of the benefits expected to result from the separation, or if such benefits are delayed, the business, financial condition and results of operations of Navient could be adversely affected and the value of its stock could be impacted.

***Shareholders' percentage ownership in Navient may be diluted in the future.***

In the future, shareholders' percentage ownership in Navient may be diluted because of equity issuances for acquisitions, capital market transactions or otherwise, including equity awards that Navient may grant to Navient's directors, officers and employees. Navient's and SLM BankCo's employees will continue to have options to purchase shares of Navient common stock after the distribution as a result of conversion of a portion of their Existing SLM stock options to Navient stock options. From time to time, Navient will issue additional stock options or other equity-based awards to its employees under Navient's employee benefits plans. Such awards will have a dilutive effect on Navient's earnings per share, which could adversely affect the market price of shares of Navient common stock.

In addition, Navient's amended and restated certificate of incorporation authorizes Navient to issue, without the approval of Navient's stockholders, one or more series of preferred stock having such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over Navient's common stock with respect to dividends and distributions, as Navient's board of directors generally may determine. If Navient's board were to approve the issuance of preferred stock in the future, the terms of one or more series of such preferred stock could dilute the voting power or reduce the value of Navient's common stock. For example, Navient could grant the holders of preferred stock the right to elect some number of Navient's directors in all events or on the happening of specified events or the right to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences Navient could assign to holders of preferred stock could affect the residual value of the common stock.

***Certain provisions of Delaware law and Navient's amended and restated certificate of incorporation and amended and restated by-laws prevent or delay an acquisition of Navient, which could decrease the trading price of Navient's common stock.***

Certain provisions of Delaware law and of Navient's amended and restated certificate of incorporation and amended and restated by-laws are intended to deter coercive takeover practices and inadequate takeover bids by, among other things, making such practices or bids encouraging prospective acquirors to negotiate with Navient's board of directors rather than to attempt a hostile takeover. These provisions include, among others:

- limitations on the ability of Navient's stockholders to call a special meeting such that stockholder-requested special meetings will only be called upon the request of the holders of at least one-third of Navient's capital stock issued and outstanding and entitled to vote at an election of directors;

- rules regarding how stockholders may present proposals or nominate directors for election at stockholder meetings;

29

Table of Contents

- the right of Navient's board of directors to issue one or more series of preferred stock without stockholder approval;

- the inability of Navient's stockholders to fill vacancies on Navient's board of directors;

- the requirement that the affirmative vote of the holders of at least 75 percent in voting power of Navient's stock entitled to vote thereon is required for stockholders to amend Navient's amended and restated by-laws; and

- the inability of Navient stockholders to cumulate their votes in the election of directors.

In addition, because Navient has not chosen to be exempt from Section 203 of the DGCL, this provision could also delay or prevent a change of control that shareholders may favor. Section 203 generally provides that, subject to limited exceptions, persons that acquire, or are affiliated with a person that acquires, 15 percent or more of the outstanding voting stock of a Delaware corporation shall not engage in any business combination with that corporation, including by merger, consolidation or acquisitions of additional shares, for a three-year period following the time at which that person or its affiliates becomes the holder of 15 percent of more of the corporation's outstanding voting stock.

Navient believes these provisions protect its stockholders from coercive or otherwise unfair takeover tactics by requiring potential acquirors to negotiate with Navient's board of directors and by providing Navient's board of directors with more time to assess any acquisition proposal. These provisions are not intended to make the Company immune from takeovers. However, these provisions will apply even if the offer may be considered beneficial by some stockholders and could delay or prevent an acquisition that Navient's board of directors determines is not in the best interests of Navient and Navient's stockholders.

**Item 1B.**       **Unresolved Staff Comments**

None.

30

Table of Contents

**Item 2.     Properties**

The following table lists the principal facilities owned by us as of December 31, 2014:

| Location | Function | Business Segment(s) | Approximate Square Feet |
|---|---|---|---|
| Fishers, IN | Loan Servicing and Data Center | FFELP Loans; Business Services | 450,000 |
| Wilkes-Barre, PA | Loan Servicing Center | FFELP Loans; Business Services | 133,000 |
| Big Flats, NY | GRC and Pioneer Credit Recovery — Collections Center | Business Services | 60,000 |
| Indianapolis, IN | Loan Servicing Center | Business Services | 50,000 |
| Arcade, NY | Pioneer Credit Recovery — Collections Center | Business Services | 46,000 |
| Perry, NY | Pioneer Credit Recovery — Collections Center | Business Services | 45,000 |

The following table lists the principal facilities leased by us as of December 31, 2014:

| Location | Function | Business Segment(s) | Approximate Square Feet |
|---|---|---|---|
| Newark, DE | Operations Center and Administrative Offices | FFELP Loans; Private Education Loans; Business Services; Other | 106,000 |
| Reston, VA[1] | Administrative Offices | FFELP Loans; Private Education Loans; Business Services; Other | 90,000 |
| Muncie, IN | Collections Center | Private Education Loans; Business Services | 75,400 |
| Mason, OH | GRC Headquarters and Collections Center | Business Services | 54,000 |
| Wilmington, DE | Headquarters | FFELP Loans; Private Education Loans; Business Services; Other | 46,000 |
| Moorestown, NJ | Pioneer Credit Recovery — Collections Center | Business Services; Other | 30,000 |

[1]   Includes 18,000 square feet sublet to SLM Corporation.

None of the facilities that we own is encumbered by a mortgage. We believe that our headquarters, loan servicing centers, data center, back-up facility and data management and collections centers are generally adequate to meet our long-term customer needs and business goals. Our headquarters are currently in leased space at 123 Justison Street, Wilmington, Delaware, 19801.

**Item 3.     Legal Proceedings**

We and our subsidiaries and affiliates are subject to various claims, lawsuits and other actions that arise in the normal course of business. We believe that these claims, lawsuits and other actions will not, individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations. Most of these matters are claims against our servicing and collection subsidiaries by borrowers and debtors alleging the violation of state or federal laws in connection with servicing or collection activities on their student loans and other debts. In addition, our collection subsidiaries are routinely named in individual plaintiff or class action lawsuits in which the plaintiffs allege that those subsidiaries have violated a federal or state law in the process of collecting their accounts.

In the ordinary course of our business, it is common for the Company, our subsidiaries and affiliates to receive information and document requests and investigative demands from state attorneys general, legislative committees and administrative agencies. These requests may be informational or regulatory in nature and may relate to our business practices, the industries in which we operate, or other companies with whom we conduct business. Our practice has been and continues to be to cooperate with these bodies and to be responsive to any such requests.

We are continuing to experience significant year-over-year increases in not only the numbers of requests and investigative demands from various regulators, states attorney generals and administrative agencies, but also in the depth and breadth of information being requested. The main drivers of the increase in regulatory inquiries in 2014 are CFPB and various state investigative demands related to our business and those of others with whom

31

Table of Contents

we conduct business. These increases in the number of inquiries and the volume of related information demands are increasing the costs and resources we must dedicate to timely respond to these requests and may, depending on their outcome, result in payments of additional amounts of restitution, fines and penalties in addition to those described below.

On March 18, 2011, a student loan borrower filed a putative class action complaint against Old SLM in the U.S. District Court for the Northern District of California. The complaint was captioned Tina M. Ubaldi v. SLM Corporation et. al., Case No. C-11-01320EDL. The plaintiff brought the complaint on behalf of a class consisting of other similarly situated California borrowers. The complaint alleged, among other things, that Old SLM's practice of charging late fees proportional to the amount of missed payments constituted liquidated damages in violation of California law; and Old SLM engaged in unfair business practices by charging daily interest on private educational loans. Following motion practice and additional amendments to the complaint, which added usury claims under California state law and two additional defendants (Sallie Mae, Inc., now known as Navient Solutions, Inc. ("NSI"), and SLM PC Student Loan Trust 2004-A), a Modified Third Amended Complaint was filed on December 2, 2013. Plaintiffs sought restitution of late charges and interest paid by members of the class, injunctive relief, cancellation of all future interest payments, treble damages as permitted by law, as well as costs and attorneys' fees, among other relief. Prior to the formation of Sallie Mae Bank in 2005, Old SLM followed prevalent capital market practices of acquiring and securitizing private education loans purchased in secondary transactions from banks who originated these loans. Plaintiffs alleged that the services provided by Old SLM and Sallie Mae, Inc. to the originating banks resulted in Old SLM and Sallie Mae, Inc. constituting lenders on these loans. Since 2006, Sallie Mae Bank originated the vast majority of all private education loans acquired by Old SLM. The claims at issue in this case expressly exclude loans originated by Sallie Mae Bank since its inception. Named defendants are subsidiaries of Navient and as such the Ubaldi litigation will remain the sole responsibility of Navient Corporation. Plaintiffs filed their Motion for Class Certification on October 22, 2013. On March 24, 2014, the Court denied plaintiffs' Motion for Class Certification without prejudice, but granted plaintiffs leave to file an amended Motion for Class Certification. On June 20, 2014, a Complaint in Intervention was filed on behalf of two additional customers representing a proposed usury sub-class. On June 23, 2014, Plaintiffs filed a Renewed Motion for Class Certification. A hearing on the Renewed Motion for Class Certification was held on October 14, 2014. On December 19, 2014, the court granted plaintiffs' Renewed Motion for Class Certification regarding the claims concerning late fees, but denied the motion as to the usury claims. On January 30, 2015, Plaintiff-Intervenors filed a Motion for Leave to File a First Amended Complaint in Intervention. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith.

On November 26, 2014, Marlene Blyden filed a putative class action suit in the U.S. District Court for the Central District of California against Navient Corporation, Navient, LLC, Navient Solutions, Inc., Navient Credit Finance Corporation, Navient Investment Corporation, SLM Corporation, Bank of New York, and the Bank of New York Mellon Trust Company, N.A. The complaint was captioned Marlene Blyden v. Navient Corporation et. al., Case No. 5:14-CV-2456. On December 2, 2014, plaintiff filed a First Amended Complaint. The plaintiff purports to bring the First Amended Complaint on behalf of a class consisting of other similarly situated California borrowers. The First Amended Complaint alleged that plaintiff and members of the asserted class were charged and/or paid interest at a rate above that permitted under California law. On January 21, 2015, the parties filed a Joint Stipulation to File Second Amended Complaint; the Joint Stipulation was approved by Court Order on January 23, 2015. On February 4, 2015, Plaintiff filed her Second Amended Complaint, which drops SLM Corporation as a defendant, adds various trusts as defendants, and adds claims for conversion and for money had and received. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith.

### Regulatory Matters

On May 2, 2014, Navient Solutions, Inc. ("NSI"), a wholly-owned subsidiary of Navient, and Sallie Mae Bank entered into consent orders with the FDIC (respectively, the "NSI Order" and the "Bank Order"; collectively, "the FDIC Orders") to resolve matters related to certain cited violations of Section 5 of the Federal

32

Table of Contents

Trade Commission Act, including the disclosures and assessments of certain late fees, as well as alleged violations under the SCRA. The FDIC Orders, which became effective upon the signing of the consent order with the DOJ by Navient and SLM BankCo on May 13, 2014, required NSI to pay $3.3 million in civil monetary penalties. NSI has paid its civil monetary penalties. In addition, the FDIC Orders required the establishment of a restitution reserve account totaling $30 million to provide restitution with respect to loans owned or originated by Sallie Mae Bank, from November 28, 2005 until the effective date of the FDIC Orders. Pursuant to the Separation and Distribution Agreement among SLM Corporation, SLM BankCo and Navient dated as of April 28, 2014 (the "Separation Agreement"), Navient was responsible for funding the restitution reserve account. We funded the account in May 2014.

The NSI Order requires NSI to ensure proper servicing for service members and proper application of SCRA benefits under a revised and broader definition of eligibility than previously required by the statute and regulatory guidance and to make changes to billing statements and late fee practices. These changes to billing statements have already been implemented. In order to treat all customers in a similar manner, NSI decided to voluntarily make payments to all other customers whose loans were neither owned nor originated by Sallie Mae Bank. These payments will refund certain late fees incurred by the customer and were calculated on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million and the refund process is on-going.

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank entered into a consent order with the DOJ, in its capacity as the agency having primary authority for enforcement of such matters. The DOJ consent order ("DOJ Order") covers all loans either owned by Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. The DOJ Order required NSI to fund a $60 million settlement fund, which represents the total amount of compensation due to service members under the DOJ agreement, and to pay $55,000 in civil money penalties. The DOJ Order was approved by the United States District Court in Delaware on September 29, 2014, and as a result, Navient funded the settlement fund and paid the civil money penalties in October 2014.

In 2013, a reserve of $65 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In 2014, an additional reserve of $112 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators. As a result, the total reserve established by the Company to cover these costs was $177 million, and as of December 31, 2014, $78 million of those reserves remained. The final cost of these proceedings will remain uncertain until all of the work under the various consent orders has been completed.

As previously disclosed in April 2014, NSI received a Civil Investigative Demand ("CID") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

In November 2014, NSI's subsidiary, Pioneer Credit Recovery, Inc. ("Pioneer"), received a CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to rehabilitation loans and collection of defaulted student debt. Navient has been in discussions with the CFPB relating to this matter, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

In December 2014, NSI received a subpoena from the New York Department of Financial Services (the "NY DFS") as part of the NY DFS's inquiry with regard to whether persons or entities have engaged in fraud or misconduct with respect to a financial product or service under New York Financial Services Law or other laws. Navient has been in discussions with the NY DFS relating to this matter, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

Table of Contents

Navient has also received CIDs issued by the State of Illinois Office of Attorney General and the State of Washington Office of the Attorney General and continues to cooperate with multiple state Attorneys General in connection with these investigations. According to the CIDs, the investigations were initiated to ascertain whether any practices declared to be unlawful under the Consumer Fraud and Deceptive Business Practices Act have occurred or are about to occur. Navient is cooperating with these investigations and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

Pursuant to the separation and distribution agreement entered into in connection with the Spin-Off, Navient has agreed to be responsible and indemnify SLM BankCo for all claims, actions, damages, losses or expenses that may arise from the conduct of all activities of pre-Spin-Off SLM BankCo occurring prior to the Spin-Off other than those specifically excluded in the Separation and Distribution Agreement. As a result, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom. There are no additional reserves Navient has related to other indemnification matters with SLM BankCo as of December 31, 2014.

### OIG Audit

The Office of the Inspector General (the "OIG") of ED commenced an audit regarding Special Allowance Payments ("SAP") on September 10, 2007. On September 25, 2013, we received the final audit determination of Federal Student Aid (the "Final Audit Determination") on the final audit report issued by the OIG on August 3, 2009 related to our billing practices for SAP. The Final Audit Determination concurred with the final audit report issued by the OIG and instructed us to make adjustment to our government billing to reflect the policy determination. Navient remains in active discussions with ED on this matter and we also have the right to appeal the Final Audit Determination to the Administrative Actions and Appeals Service Group of ED. The appeal must be filed no later than March 31, 2015. We continue to believe that our SAP billing practices were proper, considering then-existing ED guidance and lack of applicable regulations. The Company established a reserve for this matter in 2014.

**Item 4.      Mine Safety Disclosures**

N/A

34

Table of Contents

## PART II.

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is listed and traded on the NASDAQ under the symbol NAVI. As of January 31, 2015, there were 401,460,484 shares of our common stock outstanding and 397 holders of record.

The following table presents the high and low sales prices for Navient's common stock for each quarter following the Spin-Off on April 30, 2014.

| | Sales Price | |
| | High | Low |
|---|---|---|
| **2014** | | |
| 2nd Quarter (May 1 — Jun 30, 2014) | $17.98 | $15.50 |
| 3rd Quarter (Jul 1 — Sep 30, 2014) | 18.28 | 16.76 |
| 4th Quarter (Oct 1 — Dec 31, 2014) | 22.71 | 16.98 |

We paid quarterly cash dividends on our common stock of $0.15 per share for each quarter of 2014. On January 26, 2015, our board of directors approved an increase in our first-quarter 2015 dividend to $0.16 per share.

**Issuer Purchases of Equity Securities**

The following table provides information relating to our purchase of shares of our common stock in the three months ended December 31, 2014.

| (In millions, except per share data) | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[2] | Approximate Dollar Value of Shares that May Yet Be Purchased Under Publicly Announced Plans or Programs[2] |
|---|---|---|---|---|
| **Period:** | | | | |
| Oct 1 – Oct 31, 2014 | 4.7 | $  18.28 | 4.6 | $  84 |
| Nov 1 – Nov 30, 2014 | 4.3 | 20.43 | 4.1 | — |
| Dec 1 – Dec 31, 2014 | .1 | 24.66 | — | — |
| Total fourth quarter | 9.1 | $  19.34 | 8.7 | |

[1]    The total number of shares purchased includes: (i) shares purchased under the stock repurchase program discussed below and (ii) shares of our common stock tendered to us to satisfy the exercise price in connection with cashless exercise of stock options, and tax withholding obligations in connection with exercise of stock options and vesting of restricted stock and restricted stock units.

[2]    In May 2014, our board of directors authorized us to purchase up to $400 million of shares of our common stock, which was fully utilized. In December 2014, our board of directors authorized $1 billion to be utilized in a new common share repurchase program that is effective January 1, 2015 and does not have an expiration date.

Table of Contents

**Stock Performance**

The following performance graph compares the monthly dollar change in our cumulative total shareholder return on our common stock to that of the S&P 500 Financials Index and the S&P 500 following the Spin-Off on April 30, 2014. The graph assumes a base investment of $100 at May 1, 2014 and reinvestment of dividends through December 31, 2014.



Cumulative Total Stockholder Return since Spin-Off

| Company/Index | 5/01/14 | 6/30/14 | 9/30/14 | 12/31/14 |
|---|---|---|---|---|
| Navient Corporation | $100.0 | $105.2 | $106.1 | $130.4 |
| S&P 500 Financials Index | 100.0 | 103.8 | 106.3 | 113.9 |
| S&P 500 | 100.0 | 104.5 | 105.7 | 110.9 |

Source: Bloomberg Total Return Analysis

36

Table of Contents

Item 6.      Selected Financial Data.

**Selected Financial Data 2010-2014**
**(Dollars in millions, except per share amounts)**

The following table sets forth our selected financial and other operating information prepared in accordance with GAAP. The selected financial data in the table is derived from our consolidated financial statements. The data should be read in conjunction with the consolidated financial statements, related notes, and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|
| **Operating Data:** | | | | | |
| Net interest income | $ 2,667 | $ 3,167 | $ 3,208 | $ 3,529 | $ 3,479 |
| Net income (loss) attributable to Navient Corporation: | | | | | |
| Continuing operations, net of tax | $ 1,149 | $ 1,312 | $ 941 | $ 598 | $ 729 |
| Discontinued operations, net of tax | — | 106 | (2) | 35 | (199) |
| Net income (loss) attributable to Navient Corporation | $ 1,149 | $ 1,418 | $ 939 | $ 633 | $ 530 |
| Basic earnings (loss) per common share attributable to Navient Corporation: | | | | | |
| Continuing operations | $ 2.74 | $ 2.94 | $ 1.93 | $ 1.12 | $ 1.35 |
| Discontinued operations | — | .24 | — | .07 | (.41) |
| Total | $ 2.74 | $ 3.18 | $ 1.93 | $ 1.19 | $ .94 |
| Diluted earnings (loss) per common share attributable to Navient Corporation: | | | | | |
| Continuing operations | $ 2.69 | $ 2.89 | $ 1.90 | $ 1.11 | $ 1.35 |
| Discontinued operations | — | .23 | — | .07 | (.41) |
| Total | $ 2.69 | $ 3.12 | $ 1.90 | $ 1.18 | $ .94 |
| Dividends per common share attributable to Navient Corporation common shareholders | $ .60 | $ .60 | $ .50 | $ .30 | $ — |
| Return on common stockholders' equity | 26% | 29% | 21% | 14% | 13% |
| Net interest margin | 1.89 | 1.98 | 1.78 | 1.85 | 1.82 |
| Return on assets | 0.81 | .89 | .52 | .33 | .28 |
| Dividend payout ratio | 22 | 19 | 26 | 25 | — |
| Average equity/average assets | 3.15 | 3.28 | 2.69 | 2.54 | 2.47 |
| **Balance Sheet Data:** | | | | | |
| Student loans, net | $134,317 | $142,100 | $162,546 | $174,420 | $184,305 |
| Total assets | 146,352 | 159,543 | 181,260 | 193,345 | 205,307 |
| Total borrowings | 139,529 | 150,443 | 172,257 | 183,966 | 197,159 |
| Total Navient Corporation stockholders' equity | 4,198 | 5,637 | 5,060 | 5,243 | 5,012 |
| Book value per common share | 10.45 | 11.82 | 9.92 | 9.20 | 8.44 |

37

Table of Contents

**Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. This discussion and analysis also contains forward-looking statements and should also be read in conjunction with the disclosures and information contained in "Forward-Looking and Cautionary Statements" and Item 1A. "Risk Factors" in this Annual Report on Form 10-K.*

*Through this discussion and analysis, we intend to provide the reader with some narrative context for how our management views our consolidated financial statements, additional context within which to assess our operating results, and information on the quality and variability of our earnings, liquidity and cash flows.*

**Selected Historical Financial Information and Ratios**

Although SLM BankCo is the entity that distributed the shares of Navient common stock to SLM BankCo common stockholders, for financial reporting purposes, Navient is treated as the "accounting spinnor" and therefore Navient, and not SLM BankCo, is the "accounting successor" to Old SLM. Hence, the following GAAP financial information to the extent related to periods on or prior to April 30, 2014 reflects the historical results of operations and financial condition of Old SLM, which is the accounting predecessor of Navient. For a discussion of how "Core Earnings" results are different than GAAP results, see "'Core Earnings' — Definition and Limitations" and "Differences between 'Core Earnings' and GAAP."

| | Years Ended December 31, | | |
|---|---|---|---|
| (In millions, except per share data) | **2014** | **2013** | **2012** |
| **GAAP Basis** | | | |
| Net income attributable to Navient Corporation | $    1,149 | $    1,418 | $    939 |
| Diluted earnings per common share attributable to Navient Corporation | $    2.69 | $    3.12 | $    1.90 |
| Weighted average shares used to compute diluted earnings per share | 425 | 449 | 483 |
| Net interest margin, FFELP Loans | 1.30% | 1.29% | 1.15% |
| Net interest margin, Private Education Loans | 4.06% | 4.13% | 4.03% |
| Return on assets | .81% | .89% | .52% |
| Ending FFELP Loans, net | $104,521 | $104,588 | $125,612 |
| Ending Private Education Loans, net | 29,796 | 37,512 | 36,934 |
| Ending total student loans, net | $134,317 | $142,100 | $162,546 |
| Average FFELP Loans | $100,662 | $112,152 | $132,124 |
| Average Private Education Loans | 33,672 | 38,292 | 37,691 |
| Average total student loans | $134,334 | $150,444 | $169,815 |
| **"Core Earnings" Basis**[(1)] | | | |
| Net income attributable to Navient Corporation | $    818 | $    1,242 | $    1,003 |
| Diluted earnings per common share attributable to Navient Corporation | $    1.93 | $    2.77 | $    2.08 |
| Weighted average shares used to compute diluted earnings per share | 425 | 449 | 483 |
| Net interest margin, FFELP Loans | .90% | .88% | .83% |
| Net interest margin, Private Education Loans | 3.94% | 3.87% | 3.83% |
| Return on assets | .59% | .82% | .58% |
| Ending FFELP Loans, net | $104,521 | $103,163 | $124,572 |
| Ending Private Education Loans, net | 29,796 | 31,006 | 31,486 |
| Ending total student loans, net | $134,317 | $134,169 | $156,058 |
| Average FFELP Loans | $100,202 | $111,008 | $131,597 |
| Average Private Education Loans | 31,243 | 32,296 | 32,352 |
| Average total student loans | $131,445 | $143,304 | $163,949 |

[(1)] "Core Earnings" are non-GAAP financial measures and do not represent a comprehensive basis of accounting. For a greater explanation of "Core Earnings," see the section titled "'Core Earnings' — Definition and Limitations" and subsequent sections.

Table of Contents

**Overview**

The following discussion and analysis presents a review of our business and operations as of and for the year ended December 31, 2014.

We monitor and assess our ongoing operations and results based on the following four reportable segments: (1) FFELP Loans (2) Private Education Loans, (3) Business Services and (4) Other. Our segment presentation excludes the results of the consumer banking business distributed on April 30, 2014. See "'Core Earnings' — Definition and Limitations" for further discussion.

*FFELP Loans Segment*

In the FFELP Loans segment, we acquire and finance FFELP Loans. Even though FFELP Loans are no longer originated due to changes in federal law that took effect in 2010, we continue to pursue acquisitions of FFELP Loan portfolios that leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the FFELP Loan portfolio. This segment is expected to generate significant amounts of earnings and cash flow as the portfolio amortizes.

*Private Education Loans Segment*

In this segment, we acquire, finance and service Private Education Loans. Even though we no longer originate Private Education Loans, we continue to pursue acquisitions of Private Education Loan portfolios that leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the Private Education Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of cash as the portfolio amortizes.

*Business Services Segment*

Our Business Services segment generates its revenue from servicing our FFELP Loan portfolio as well as providing servicing and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED, higher education institutions and other federal, state, court and municipal clients.

*Other*

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all unallocated overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

**Key Financial Measures**

Our operating results are primarily driven by net interest income from our student loan portfolios (which include financing costs), provision for loan losses, the revenues and expenses generated by our servicing and asset recovery businesses, and gains and losses on subsidiary sales, loan sales and debt repurchases. We manage and assess the performance of each business segment separately as each is focused on different customers and each derives its revenue from different activities and services. A brief summary of our key financial measures are listed below.

*Net Interest Income*

The most significant portion of our earnings is generated by the spread earned between the interest income we receive on assets in our student loan portfolios and the interest expense on debt funding these loans. We report these earnings as net interest income. Net interest income in our FFELP Loans and Private Education Loans segments are driven by significantly different factors.

39

Table of Contents

*FFELP Loans Segment*

Net interest income will be the primary source of cash flow generated by this segment over the next approximately 20 years as this portfolio amortizes. Interest earned on our FFELP Loans is indexed to one-month LIBOR rates and our cost of funds is primarily indexed to three-month LIBOR, creating the possibility of basis and repricing risk related to these assets. As of December 31, 2014, we had $104.5 billion of FFELP Loans outstanding, compared with $103.2 billion outstanding at December 31, 2013 on a "Core Earnings" basis. The FFELP Loans segment's "Core Earnings" net interest margin was 0.90 percent in 2014 compared with 0.88 percent in 2013.

The major source of variability in net interest income is expected to be Floor Income we earn on certain FFELP Loans. Pursuant to the terms of the FFELP, certain FFELP Loans can earn interest at the stated fixed rate of interest as underlying debt costs decrease during low interest rate environments. We refer to this additional spread income as "Floor Income." Floor Income can be volatile. We frequently hedge this volatility with derivatives which lock in the value of the Floor Income over the term of the contract.

At December 31, 2014, 80 percent of our FFELP Loan portfolio was funded to term with non-recourse, long-term securitization debt.

*Private Education Loans Segment*

Net interest income will be the primary source of cash flow generated by this segment over the next approximately 14 years as this portfolio amortizes. The majority of our Private Education Loans earn variable rate interest and are funded primarily with variable rate liabilities. The Private Education Loans segment's "Core Earnings" net interest margin was 3.94 percent in 2014 compared with 3.87 percent in 2013. Our cost of funds can be influenced by a number of factors, including the quality of the loans in our portfolio, our corporate credit rating, general economic conditions, investor demand for Private Education Loan ABS and corporate unsecured debt. At December 31, 2014, 59 percent of our Private Education Loan portfolio was funded to term with non-recourse, long-term securitization debt. As of December 31, 2014, we had $29.8 billion of Private Education Loans outstanding, compared with $31.0 billion outstanding at December 31, 2013 on a "Core Earnings" basis.

### Provisions for Loan Losses

Management estimates and maintains an allowance for loan losses at a level sufficient to cover charge-offs expected over the next two years, plus an additional allowance to cover life-of-loan expected losses for loans classified as a troubled debt restructuring ("TDR"). The provision for loan losses increases the related allowance for loan losses. Generally, the allowance for loan losses rises when future charge-offs are expected to increase and falls when future charge-offs are expected to decline. Our loss exposure and resulting provision for loan losses is small for FFELP Loans because we generally bear a maximum of 3 percent loss exposure on them. We bear the full credit exposure on our Private Education Loans. Our "Core Earnings" provision for loan losses in our FFELP Loans segment was $40 million in 2014 compared with $48 million in 2013. Losses in our Private Education Loans segment are determined by risk characteristics, such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months a payment has been made by a customer), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. Our "Core Earnings" provision for loan losses in our Private Education Loans segment was $539 million in 2014 compared with $722 million in 2013.

### Charge-Offs and Delinquencies

When we conclude a loan is uncollectible, the unrecoverable portion of the loan is charged against the allowance for loan losses in the applicable segment. Charge-off data provides relevant information with respect to the performance of our loan portfolios. Management focuses on delinquencies as well as the progression of loans from early to late stage delinquency. The Private Education Loans segment's "Core Earnings" charge-off

40

Table of Contents

rate was 2.6 percent of loans in repayment in 2014 compared with 3.1 percent of loans in repayment in 2013. Delinquencies are a very important indicator of the potential future credit performance. Private Education Loan delinquencies as a percentage of Private Education Loans in repayment decreased from 9.3 percent at December 31, 2013 to 8.1 percent at December 31, 2014 on a "Core Earnings" basis. The FFELP Loans segment's "Core Earnings" charge-off rate was 0.08 percent of loans in repayment in 2014 compared with 0.09 percent in 2013.

### Servicing and Asset Recovery Revenues

We earn servicing revenues from servicing student loans. We earn asset recovery revenue related to default aversion and post-default collection work we perform primarily on federal loans. The fees we recognize are primarily driven by our success in collecting or rehabilitating defaulted loans, the number of transactions processed and the underlying volume of loans we are servicing on behalf of others.

### Other Income / (Loss)

In managing our loan portfolios and funding sources, we periodically engage in sales of loans and the repurchase of our outstanding debt. In each case, depending on market conditions, we may incur gains or losses from these transactions that affect our results from operations.

We also sold our Campus Solutions business and our 529 college-savings plan administration business in 2013 in connection with better aligning our core business. The results of both of these businesses are reported in discontinued operations for all periods presented.

### Operating Expenses

The operating expenses reported for our Private Education Loans and Business Services segments are those that are directly attributable to the generation of revenues by those segments. The operating expenses for the FFELP Loans segment primarily represent an intercompany servicing charge from the Business Services segment and do not reflect our actual underlying costs incurred to service the loans. We have included unallocated corporate overhead expenses and certain information technology costs (together referred to as "Overhead") in our Other segment rather than allocate those expenses by segment. Overhead expenses include executive management, the board of directors, accounting, finance, legal, human resources, stock-based compensation expense and certain information technology and infrastructure costs.

### "Core Earnings"

We report financial results on a GAAP basis and also present certain "Core Earnings" performance measures. Our management, equity investors, credit rating agencies and debt capital providers use these "Core Earnings" measures to monitor our business performance. "Core Earnings" is the basis in which we prepare our segment disclosures as required by GAAP under ASC 280 "Segment Reporting" (see "Note 15 — Segment Reporting"). For a full explanation of the contents and limitations of "Core Earnings," see the section titled "'Core Earnings' — Definition and Limitations" of this Item 7.

## 2014 Summary of Results

2014 GAAP net income was $1.1 billion ($2.69 diluted earnings per share), versus net income of $1.4 billion ($3.12 diluted earnings per share) in the prior year. The changes in GAAP net income are impacted by the same "Core Earnings" items discussed below, as well as changes in net income attributable to (1) the financial results attributable to the operations of the consumer banking business prior to the Spin-Off on April 30, 2014 and related restructuring and reorganization expense incurred in connection with the Spin-Off, (2) unrealized, mark-to-market gains/losses on derivatives and (3) goodwill and acquired intangible asset amortization and impairment. These items are recognized in GAAP but have not been included in "Core

Table of Contents

Earnings" results. In 2014, GAAP results included gains of $573 million from derivative accounting treatment that are excluded from "Core Earnings" results, compared with gains of $243 million in the prior year. See "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP" for a complete reconciliation between GAAP net income and "Core Earnings."

"Core Earnings" for 2014 were $818 million ($1.93 diluted earnings per share), compared with $1.2 billion ($2.77 diluted earnings per share) in 2013. Excluding expenses associated with regulatory matters ($120 million in 2014 and $54 million in 2013), 2014 and 2013 diluted "Core Earnings" per share were $2.10 and $2.85, respectively. The results for 2013 include $312 million of pre-tax gains from the sale of Residual Interests in FFELP securitization trusts, $109 million of after-tax gains from the divestiture of two subsidiaries and $48 million of pre-tax gains from debt repurchases. In 2013, these transactions increased "Core Earnings" by $0.75 per diluted share; 2014 did not include these types of transactions. Excluding these transactions and the expenses associated with regulatory matters, 2014 diluted "Core Earnings" per share was $2.10 compared with $2.10 for 2013.

In addition, during 2014 we:

- acquired $12.9 billion of student loans ($11.3 billion of FFELP Loans and $1.6 billion of Private Education Loans);

- issued $5.0 billion of FFELP ABS, $1.8 billion of Private Education Loan ABS and $1.9 billion of unsecured debt;

- closed on a $1.0 billion Private Education Loan asset-backed commercial paper ("ABCP") facility that matures in June 2015, an $8.0 billion FFELP Loan ABCP facility that matures in January 2016, and a $10.0 billion FFELP Loan ABCP facility that matures in November 2017;

- repurchased 30.4 million common shares for $600 million on the open market (8.3 million common shares for $200 million pre-Spin-Off, and 22.1 million common shares for $400 million post-Spin-Off);

- paid $249 million in common dividends; and

- authorized $1.0 billion in December 2014 to be utilized in a new share repurchase program that is effective January 1, 2015.

## Results of Operations

We present the results of operations below first on a consolidated basis in accordance with GAAP. Following our discussion of consolidated earnings results on a GAAP basis, we present our results on a segment basis. We have four business segments: FFELP Loans, Private Education Loans, Business Services and Other. Since these segments operate in distinct business environments and we manage and evaluate the financial performance of these segments using non-GAAP financial measures, these segments are presented on a "Core Earnings" basis (see "'Core Earnings' — Definition and Limitations").

Table of Contents

**GAAP Consolidated Statements of Income**

| (Dollars in millions, except per share amounts) | Years Ended December 31, 2014 | 2013 | 2012 | Increase (Decrease) 2014 vs. 2013 $ | % | 2013 vs. 2012 $ | % |
|---|---|---|---|---|---|---|---|
| Interest income | | | | | | | |
| FFELP Loans | $2,556 | $2,822 | $3,251 | $(266) | (9)% | $(429) | (13)% |
| Private Education Loans | 2,156 | 2,527 | 2,481 | (371) | (15) | 46 | 2 |
| Other loans | 9 | 11 | 16 | (2) | (18) | (5) | (31) |
| Cash and investments | 9 | 17 | 21 | (8) | (47) | (4) | (19) |
| Total interest income | 4,730 | 5,377 | 5,769 | (647) | (12) | (392) | (7) |
| Total interest expense | 2,063 | 2,210 | 2,561 | (147) | (7) | (351) | (14) |
| Net interest income | 2,667 | 3,167 | 3,208 | (500) | (16) | (41) | (1) |
| Less: provisions for loan losses | 628 | 839 | 1,080 | (211) | (25) | (241) | (22) |
| Net interest income after provisions for loan losses | 2,039 | 2,328 | 2,128 | (289) | (12) | 200 | 9 |
| Other income (loss): | | | | | | | |
| Gains on sales of loans and investments | — | 302 | — | (302) | (100) | 302 | 100 |
| Gains (losses) on derivative and hedging activities, net | 139 | (268) | (628) | 407 | 152 | 360 | (57) |
| Servicing revenue | 298 | 290 | 279 | 8 | 3 | 11 | 4 |
| Asset recovery revenue | 388 | 420 | 356 | (32) | (8) | 64 | 18 |
| Gains on debt repurchases | — | 42 | 145 | (42) | (100) | (103) | (71) |
| Other income | 82 | 100 | 92 | (18) | (18) | 8 | 9 |
| Total other income | 907 | 886 | 244 | 21 | 2 | 642 | 263 |
| Expenses: | | | | | | | |
| Operating expenses | 987 | 1,042 | 897 | (55) | (5) | 145 | 16 |
| Goodwill and acquired intangible assets impairment and amortization expense | 9 | 13 | 27 | (4) | (31) | (14) | (52) |
| Restructuring and other reorganization expenses | 113 | 72 | 11 | 41 | 57 | 61 | 555 |
| Total expenses | 1,109 | 1,127 | 935 | (18) | (2) | 192 | 21 |
| Income from continuing operations, before income tax expense | 1,837 | 2,087 | 1,437 | (250) | (12) | 650 | 45 |
| Income tax expense | 688 | 776 | 498 | (88) | (11) | 278 | 56 |
| Net income from continuing operations | 1,149 | 1,311 | 939 | (162) | (12) | 372 | 40 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | 106 | (2) | (106) | (100) | 108 | 5,400 |
| Net income | 1,149 | 1,417 | 937 | (268) | (19) | 480 | 51 |
| Less: net loss attributable to noncontrolling interest | — | (1) | (2) | 1 | (100) | 1 | (50) |
| Net income attributable to Navient Corporation | 1,149 | 1,418 | 939 | (269) | (19) | 479 | 51 |
| Preferred stock dividends | 6 | 20 | 20 | (14) | (70) | — | — |
| Net income attributable to Navient Corporation common stock | $1,143 | $1,398 | $ 919 | $(255) | (18)% | $ 479 | 52% |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | | | | |
| Continuing operations | $ 2.74 | $ 2.94 | $ 1.93 | $ (.20) | (7)% | $1.01 | 52% |
| Discontinued operations | — | .24 | — | (.24) | (100) | .24 | 100 |
| Total | $ 2.74 | $ 3.18 | $ 1.93 | $ (.44) | (14)% | $1.25 | 65% |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | | | | |
| Continuing operations | $ 2.69 | $ 2.89 | $ 1.90 | $ (.20) | (7)% | $ .99 | 52% |
| Discontinued operations | — | .23 | — | (.23) | (100) | .23 | 100 |
| Total | $ 2.69 | $ 3.12 | $ 1.90 | $ (.43) | (14)% | $1.22 | 64% |
| Dividends per common share | $ .60 | $ .60 | $ .50 | $ — | —% | $ .10 | 20% |

43

Table of Contents

**Consolidated Earnings Summary — GAAP-basis**

**Year Ended December 31, 2014 Compared with Year Ended December 31, 2013**

For the year ended December 31, 2014, net income was $1.1 billion, or $2.69 diluted earnings per common share, compared with net income of $1.4 billion, or $3.12 diluted earnings per common share, for the year ended December 31, 2013. The decrease in net income was primarily due to a $500 million decline in net interest income, a $302 million decrease in gains on sales of loans and investments, a $106 million after-tax decrease in income from discontinued operations, a $42 million decrease in debt repurchase gains, and higher restructuring and other reorganization costs of $41 million. This was partially offset by a $211 million decline in the provisions for loan losses, a $407 million increase in net gains on derivative and hedging activities and a $55 million decrease in operating expenses.

The primary contributors to each of the identified drivers of changes in net income for the current year-end period compared with the year-ago period are as follows:

- Net interest income decreased by $500 million, of which $259 million related to the deemed distribution of SLM BankCo on April 30, 2014. Also contributing to the decrease was a reduction in FFELP net interest income resulting from an $11 billion decline in average FFELP Loans outstanding. This decline in FFELP Loans was due, in part, to the sale of Residual Interests in FFELP Loan securitization trusts in the first half of 2013. There were approximately $12 billion of FFELP Loans in these trusts at the time of sale.

- Provisions for loan losses declined $211 million, of which $20 million related to the deemed distribution of SLM BankCo on April 30, 2014. The remaining $191 million decrease was primarily the result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs.

- Gains on sales of loans and investments decreased by $302 million primarily as the result of $312 million in gains on the sales of the Residual Interests in FFELP Loan securitization trusts in the first-half of 2013. There were no sales in the current year-end period.

- Gains (losses) on derivative and hedging activities, net, increased $407 million. The primary factors affecting the change were interest rate and foreign currency fluctuations, which primarily affected the valuations of our Floor Income Contracts, basis swaps and foreign currency hedges during each period. Valuations of derivative instruments vary based upon many factors including changes in interest rates, credit risk, foreign currency fluctuations and other market factors. As a result, net gains and losses on derivative and hedging activities may continue to vary significantly in future periods.

- Gains on debt repurchases decreased $42 million. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

- In 2014 and 2013, we recognized $112 million and $65 million of expense, respectively, related to the settlement of regulatory matters (for additional information, see Item 3. "Legal Proceedings — Regulatory Matters"). Excluding these expenses, operating expenses decreased $102 million. This decrease was primarily due to $171 million related to the deemed distribution of SLM BankCo on April 30, 2014, partially offset by incremental costs post-Spin-Off resulting from operating as a new separate company, increased third-party servicing and asset recovery activities, increased account resolution efforts on our education loan portfolios, as well as additional external servicing costs related to loan acquisitions during the year.

- Restructuring and other reorganization expenses increased $41 million to $113 million. These expenses were primarily related to costs incurred in connection with the Spin-Off. We expect the costs associated with the Spin-Off to be minimal after December 31, 2014.

- Income from discontinued operations decreased by $106 million primarily as a result of the sale of our Campus Solutions business in the second quarter of 2013 and our 529 college savings plan administration business in the fourth quarter of 2013, which resulted in after-tax gains of $38 million and $65 million, respectively.

44

Table of Contents

We repurchased 30.4 million shares and 27.0 million shares of our common stock during the years ended December 31, 2014 and 2013, respectively, as part of our common share repurchase program. Primarily as a result of ongoing common share repurchases, our average outstanding diluted shares decreased by 24 million common shares from the year-ago period.

**Year Ended December 31, 2013 Compared with Year Ended December 31, 2012**

For the years ended December 31, 2013 and 2012, net income was $1.4 billion, or $3.12 diluted earnings per common share, and $939 million, or $1.90 diluted earnings per common share, respectively. The increase in net income was primarily due to a $360 million decrease in net losses on derivative and hedging activities, a $302 million increase in gains on sales of loans and investments, a $241 million decrease in provisions for loan losses, and a $108 million after-tax increase in income from discontinued operations, which were partially offset by $103 million of lower gains on debt repurchases, higher operating expenses of $145 million and higher restructuring and other reorganization expenses of $61 million.

The primary contributors to each of the identified drivers of changes in net income for 2013 compared with 2012 are as follows:

- Net interest income decreased by $41 million in the current year compared with the prior year primarily due to a reduction in FFELP net interest income from a $20 billion decline in average FFELP Loans outstanding in part due to the sale of Residual Interests in FFELP Loan securitization trusts in the first half of 2013. There were approximately $12 billion of FFELP Loans in these trusts.

- Provisions for loan losses decreased by $241 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs.

- Gains on sales of loans and investments increased by $302 million as a result of $312 million in gains on the sales of the Residual Interests in FFELP Loan securitization trusts in 2013. See the section titled "Business Segment Earnings Summary — 'Core Earnings' Basis — FFELP Loans Segment" for further discussion.

- Losses on derivative and hedging activities, net, resulted in a net loss of $268 million in 2013 compared with a net loss of $628 million in 2012. The primary factors affecting the change were interest rate and foreign currency fluctuations, which primarily affected the valuations of our Floor Income Contracts, basis swaps and foreign currency hedges during each period. Valuations of derivative instruments vary based upon many factors including changes in interest rates, credit risk, foreign currency fluctuations and other market factors. As a result, net gains and losses on derivative and hedging activities may continue to vary significantly in future periods.

- Servicing and contingency revenue increased $75 million from the prior year primarily from an increase in the number of accounts serviced and in asset recovery volumes in 2013.

- Gains on debt repurchases decreased $103 million. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

- In 2013, we recognized $65 million of expense related to the settlement of regulatory matters. Excluding this expense, operating expenses increased by $80 million. This increase was primarily the result of increases in our third-party servicing and collection activities, increased Private Education Loan marketing activities, continued investments in technology and an increase in compliance remediation expense.

- Restructuring and other reorganization expenses were $72 million compared with $11 million in the prior year. For 2013, these consisted of $43 million primarily related to the Spin-Off and $29 million related to severance costs. The $11 million of expenses in 2012 related to restructuring expenses.

- The effective tax rates for 2013 and 2012 were 37 percent and 35 percent, respectively. The movement in the effective tax rate was primarily driven by the impact of state law changes recorded in the year-ago period.

- Income from discontinued operations increased $108 million primarily as a result of the sale of our Campus Solutions business in the second quarter of 2013 and our 529 college-savings plan administration business in the fourth quarter of 2013, which resulted in after-tax gains of $38 million and $65 million, respectively.

45

Table of Contents

We repurchased 27 million shares and 58 million shares of our common stock during 2013 and 2012, respectively, as part of our common share repurchase program. Primarily as a result of these repurchases, our average outstanding diluted shares decreased by 34 million common shares in 2013.

**"Core Earnings" — Definition and Limitations**

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments.

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for three items, discussed below, that are either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information because we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. When compared to GAAP results, the three items we remove to result in our "Core Earnings" presentations are:

1.   The financial results attributable to the operations of the consumer banking business (SLM BankCo) prior to the Spin-Off and related restructuring and reorganization expense incurred in connection with the Spin-Off. For GAAP purposes, Navient reflected the deemed distribution of SLM BankCo on April 30, 2014. For "Core Earnings," we exclude the consumer banking business as if it had never been a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014;

2.   Unrealized mark-to-market gains/losses resulting from our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness; and

3.   The accounting for goodwill and acquired intangible assets.

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, credit rating agencies, lenders and investors to assess performance.

Old SLM's definition of "Core Earnings" did not exclude the financial results attributable to the operations of the consumer banking business and related restructuring and reorganization expense incurred in connection with the Spin-Off. In the second quarter of 2014, in connection with the Spin-Off, Navient included this additional adjustment as a part of "Core Earnings" to allow better comparability of Navient's results to pre-Spin-Off historical periods. All prior periods in this Annual Report on Form 10-K have been restated to conform to Navient's revised definition of "Core Earnings."

46

Table of Contents

The following tables show "Core Earnings" for each business segment and our business as a whole along with the adjustments made to the income/expense items to reconcile the amounts to our reported GAAP results as required by GAAP and reported in "Note 15 — Segment Reporting."

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Adjustments Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 2,097 | $ 1,958 | $ — | $ — | $ — | $ 4,055 | $ 699 | $ (42) | $ 657 | $4,712 |
| Other loans | — | — | — | 9 | — | 9 | — | — | — | 9 |
| Cash and investments | 4 | — | — | 4 | — | 8 | — | 1 | 1 | 9 |
| Total interest income | 2,101 | 1,958 | — | 13 | — | 4,072 | 699 | (41) | 658 | 4,730 |
| Total interest expense | 1,168 | 708 | — | 114 | — | 1,990 | 42 | 31 | 73 | 2,063 |
| Net interest income (loss) | 933 | 1,250 | — | (101) | — | 2,082 | 657 | (72) | 585 | 2,667 |
| Less: provisions for loan losses | 40 | 539 | — | — | — | 579 | — | 49 | 49 | 628 |
| Net interest income (loss) after provisions for loan losses | 893 | 711 | — | (101) | — | 1,503 | 657 | (121) | 536 | 2,039 |
| **Other income (loss):** | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 62 | 25 | 668 | — | (456) | 299 | — | (1) | (1) | 298 |
| Asset recovery revenue | — | — | 388 | — | — | 388 | — | — | — | 388 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income (loss) | — | — | 6 | 26 | — | 32 | (657) | 846 | 189 | 221 |
| Total other income (loss) | 62 | 25 | 1,062 | 26 | (456) | 719 | (657) | 845 | 188 | 907 |
| **Expenses:** | | | | | | | | | | |
| Direct operating expenses | 483 | 181 | 384 | 132 | (456) | 724 | — | 36 | 36 | 760 |
| Overhead expenses | — | — | — | 200 | — | 200 | — | 27 | 27 | 227 |
| Operating expenses | 483 | 181 | 384 | 332 | (456) | 924 | — | 63 | 63 | 987 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 9 | 9 | 9 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 113 | 113 | 113 |
| Total expenses | 483 | 181 | 384 | 332 | (456) | 924 | — | 185 | 185 | 1,109 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 472 | 555 | 678 | (407) | — | 1,298 | — | 539 | 539 | 1,837 |
| Income tax expense (benefit)(3) | 176 | 204 | 250 | (150) | — | 480 | — | 208 | 208 | 688 |
| Net income from continuing operations | $ 296 | $ 351 | $ 428 | $(257) | $ — | $ 818 | $ — | $ 331 | $ 331 | $1,149 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | | | | | | | | | | |
| Net income (loss) | $ 296 | $ 351 | $ 428 | $(257) | $ — | $ 818 | $ — | $ 331 | $ 331 | $1,149 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact from Spin-Off of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| Net interest income after provisions for loan losses | $ 136 | $ 400 | $ — | $ 536 |
| Total other income | 15 | 173 | — | 188 |
| Operating expenses | 63 | — | — | 63 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 9 | 9 |
| Restructuring and other reorganization expenses | 113 | — | — | 113 |
| Total "Core Earnings" adjustments to GAAP | $ (25) | $ 573 | $ (9) | 539 |
| Income tax expense | | | | 208 |
| Net income | | | | $ 331 |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

47

Table of Contents

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Adjustments | | |
| Interest income: | | | | | | | | | | |
| Student loans | $ 2,274 | $ 2,037 | $ — | $ — | $ — | $ 4,311 | $ 816 | $ 222 | $ 1,038 | $5,349 |
| Other loans | — | — | — | 11 | — | 11 | — | — | — | 11 |
| Cash and investments | 5 | 2 | — | 5 | — | 12 | — | 5 | 5 | 17 |
| Total interest income | 2,279 | 2,039 | — | 16 | — | 4,334 | 816 | 227 | 1,043 | 5,377 |
| Total interest expense | 1,260 | 748 | — | 59 | — | 2,067 | 55 | 88 | 143 | 2,210 |
| Net interest income (loss) | 1,019 | 1,291 | — | (43) | — | 2,267 | 761 | 139 | 900 | 3,167 |
| Less: provisions for loan losses | 48 | 722 | — | — | — | 770 | — | 69 | 69 | 839 |
| Net interest income (loss) after provisions for loan losses | 971 | 569 | — | (43) | — | 1,497 | 761 | 70 | 831 | 2,328 |
| Other income (loss): | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | 312 | — | — | (10) | — | 302 | — | — | — | 302 |
| Servicing revenue | 76 | 33 | 705 | (1) | (529) | 284 | — | 6 | 6 | 290 |
| Asset recovery revenue | — | — | 420 | — | — | 420 | — | — | — | 420 |
| Gains on debt repurchases | — | — | — | 48 | — | 48 | (6) | — | (6) | 42 |
| Other income (loss) | — | — | 5 | 5 | — | 10 | (755) | 577 | (178) | (168) |
| Total other income (loss) | 388 | 33 | 1,130 | 42 | (529) | 1,064 | (761) | 583 | (178) | 886 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 555 | 179 | 348 | 68 | (529) | 621 | — | 185 | 185 | 806 |
| Overhead expenses | — | — | — | 167 | — | 167 | — | 69 | 69 | 236 |
| Operating expenses | 555 | 179 | 348 | 235 | (529) | 788 | — | 254 | 254 | 1,042 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 13 | 13 | 13 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 72 | 72 | 72 |
| Total expenses | 555 | 179 | 348 | 235 | (529) | 788 | — | 339 | 339 | 1,127 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 804 | 423 | 782 | (236) | — | 1,773 | — | 314 | 314 | 2,087 |
| Income tax expense (benefit)(3) | 291 | 154 | 284 | (86) | — | 643 | — | 133 | 133 | 776 |
| Net income (loss) from continuing operations | 513 | 269 | 498 | (150) | — | 1,130 | — | 181 | 181 | 1,311 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 111 | 1 | — | 112 | — | (6) | (6) | 106 |
| Net income (loss) | 513 | 269 | 609 | (149) | — | 1,242 | — | 175 | 175 | 1,417 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 513 | $ 269 | $ 609 | $(149) | $ — | $ 1,242 | $ — | $ 176 | $ 176 | $1,418 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact from Spin-Off of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| | | Year Ended December 31, 2013 | | |
| Net interest income after provisions for loan losses | $ 376 | $ 455 | $ — | $ 831 |
| Total other income | 34 | (212) | — | (178) |
| Operating expenses | 254 | — | — | 254 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 13 | 13 |
| Restructuring and other reorganization expenses | 72 | — | — | 72 |
| Total "Core Earnings" adjustments to GAAP | $ 84 | $ 243 | $ (13) | 314 |
| Income tax expense | | | | 133 |
| Loss from discontinued operations, net of tax benefit | | | | (6) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 176 |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

48

Table of Contents

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Adjustments Additions/(Subtractions) | Total Adjustments[2] | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year Ended December 31, 2012 | | | | | |
| Interest income: | | | | | | | | | | |
| Student loans | $ 2,729 | $ 2,036 | $ — | $ — | $ — | $ 4,765 | $ 858 | $ 109 | $ 967 | $5,732 |
| Other loans | — | — | — | 16 | — | 16 | — | — | — | 16 |
| Cash and investments | 11 | 3 | (3) | 2 | 4 | 17 | — | 4 | 4 | 21 |
| Total interest income | 2,740 | 2,039 | (3) | 18 | 4 | 4,798 | 858 | 113 | 971 | 5,769 |
| Total interest expense | 1,589 | 733 | — | 38 | 4 | 2,364 | 115 | 82 | 197 | 2,561 |
| Net interest income (loss) | 1,151 | 1,306 | (3) | (20) | — | 2,434 | 743 | 31 | 774 | 3,208 |
| Less: provisions for loan losses | 68 | 946 | — | — | — | 1,014 | — | 66 | 66 | 1,080 |
| Net interest income (loss) after provisions for loan losses | 1,083 | 360 | (3) | (20) | — | 1,420 | 743 | (35) | 708 | 2,128 |
| Other income (loss): | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | | | | | | | | | | |
| Servicing revenue | 90 | 45 | 812 | — | (669) | 278 | — | 1 | 1 | 279 |
| Asset recovery revenue | — | — | 356 | — | — | 356 | — | — | — | 356 |
| Gains on debt repurchases | — | — | — | 145 | — | 145 | — | — | — | 145 |
| Other income (loss) | — | — | (2) | 15 | — | 13 | (743) | 194 | (549) | (536) |
| Total other income (loss) | 90 | 45 | 1,166 | 160 | (669) | 792 | (743) | 195 | (548) | 244 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 699 | 150 | 312 | 13 | (669) | 505 | — | 168 | 168 | 673 |
| Overhead expenses | — | — | — | 143 | — | 143 | — | 81 | 81 | 224 |
| Operating expenses | 699 | 150 | 312 | 156 | (669) | 648 | — | 249 | 249 | 897 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 27 | 27 | 27 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 11 | 11 | 11 |
| Total expenses | 699 | 150 | 312 | 156 | (669) | 648 | — | 287 | 287 | 935 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 474 | 255 | 851 | (16) | — | 1,564 | — | (127) | (127) | 1,437 |
| Income tax expense (benefit)[3] | 171 | 87 | 305 | (3) | — | 560 | — | (62) | (62) | 498 |
| Net income (loss) from continuing operations | 303 | 168 | 546 | (13) | — | 1,004 | — | (65) | (65) | 939 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | (2) | — | 1 | — | (1) | — | (1) | (1) | (2) |
| Net income (loss) | 303 | 166 | 546 | (12) | — | 1,003 | — | (66) | (66) | 937 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (2) | (2) | (2) |
| Net income (loss) attributable to Navient Corporation | $ 303 | $ 166 | $ 546 | $ (12) | $ — | $ 1,003 | $ — | $ (64) | $ (64) | $ 939 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| | Year Ended December 31, 2012 | | | |
| Net interest income after provisions for loan losses | $ 318 | $ 390 | $ — | $ 708 |
| Total other income (loss) | 36 | (584) | — | (548) |
| Operating expenses | 249 | — | — | 249 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 27 | 27 |
| Restructuring and other reorganization expenses | 11 | — | — | 11 |
| Total "Core Earnings" adjustments to GAAP | $ 94 | $ (194) | $ (27) | (127) |
| Income tax benefit | | | | (62) |
| Loss from discontinued operations, net of tax benefit | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (2) |
| Net loss | | | | $ (64) |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

49

Table of Contents

*Differences between "Core Earnings" and GAAP*

The following discussion summarizes the differences between "Core Earnings" and GAAP net income and details each specific adjustment required to reconcile our "Core Earnings" segment presentation to our GAAP earnings.

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| **"Core Earnings" net income attributable to Navient Corporation** | $ 818 | $1,242 | $1,003 |
| "Core Earnings" adjustments to GAAP: | | | |
| Net impact of the removal of SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off | (25) | 84 | 94 |
| Net impact of derivative accounting | 573 | 243 | (194) |
| Net impact of goodwill and acquired intangible assets | (9) | (13) | (27) |
| Net income tax effect | (208) | (133) | 62 |
| Net impact of discontinued operations and noncontrolling interest | — | (5) | 1 |
| Total "Core Earnings" adjustments to GAAP | 331 | 176 | (64) |
| **GAAP net income attributable to Navient Corporation** | $1,149 | $1,418 | $ 939 |

1) **SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off:** On April 30, 2014, the Spin-Off of Navient from Old SLM was completed and Navient is now an independent, publicly-traded company. Due to the relative significance of Navient to Old SLM prior to the Spin-Off, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM as constituted prior to the Spin-Off, notwithstanding the legal form of the Spin-Off. Since Navient is treated for accounting purposes as the "accounting spinnor," the GAAP financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014.

For "Core Earnings," we have assumed the consumer banking business (SLM BankCo) was never a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014 and we have removed the restructuring and reorganization expense incurred in connection with the Spin-Off. Excluding these items provides management with a useful basis from which to better evaluate results from ongoing operations against results from prior periods. The adjustment relates to the exclusion of the consumer banking business and represents the operations, assets, liabilities and equity of SLM BankCo, which is comprised of Sallie Mae Bank, Upromise Rewards, the Insurance Business, and the Private Education Loan origination functions. Included in these amounts are also certain general corporate overhead expenses related to the consumer banking business. General corporate overhead consists of costs primarily associated with accounting, finance, legal, human resources, certain information technology costs, stock compensation, and executive management and the board of directors. These costs were generally allocated to the consumer banking business based on the proportionate level of effort provided to the consumer banking business relative to Old SLM using a relevant allocation driver (e.g., in proportion to the number of employees by function that were being transferred to SLM BankCo as opposed to remaining at Navient). All intercompany transactions between SLM BankCo and Navient have been eliminated. In addition, all prior preferred stock dividends have been removed as SLM BankCo succeeded Old SLM as the issuer of the preferred stock in connection with the Spin-Off.

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| SLM BankCo net income, before income tax expense | $ 88 | $ 156 | $ 105 |
| Restructuring and reorganization expense in connection with the Spin-Off | (113) | (72) | (11) |
| Total net impact of SLM BankCo, before income tax expense | $ (25) | $ 84 | $ 94 |

50

Table of Contents

2) **Derivative Accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP, as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These unrealized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts, where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

The accounting for derivatives requires that changes in the fair value of derivative instruments be recognized currently in earnings, with no fair value adjustment of the hedged item, unless specific hedge accounting criteria are met. We believe that our derivatives are effective economic hedges, and as such, are a critical element of our interest rate and foreign currency risk management strategy. However, some of our derivatives, primarily Floor Income Contracts and certain basis swaps, do not qualify for hedge accounting treatment and the stand-alone derivative must be marked-to-market in the income statement with no consideration for the corresponding change in fair value of the hedged item. These gains and losses recorded in "Gains (losses) on derivative and hedging activities, net" are primarily caused by interest rate and foreign currency exchange rate volatility and changing credit spreads during the period as well as the volume and term of derivatives not receiving hedge accounting treatment.

Our Floor Income Contracts are written options that must meet more stringent requirements than other hedging relationships to achieve hedge effectiveness. Specifically, our Floor Income Contracts do not qualify for hedge accounting treatment because the pay down of principal of the student loans underlying the Floor Income embedded in those student loans does not exactly match the change in the notional amount of our written Floor Income Contracts. Additionally, the term, the interest rate index, and the interest rate index reset frequency of the Floor Income Contract can be different than that of the student loans. Under derivative accounting treatment, the upfront contractual payment is deemed a liability and changes in fair value are recorded through income throughout the life of the contract. The change in the value of Floor Income Contracts is primarily caused by changing interest rates that cause the amount of Floor Income earned on the underlying student loans and paid to the counterparties to vary. This is economically offset by the change in value of the student loan portfolio earning Floor Income but that offsetting change in value is not recognized. We believe the Floor Income Contracts are economic hedges because they effectively fix the amount of Floor Income earned over the contract period, thus eliminating the timing and uncertainty that changes in interest rates can have on Floor Income for that period. Therefore, for purposes of "Core Earnings," we have removed the unrealized gains and losses related to these contracts and added back the amortization of the net contractual premiums received on the Floor Income Contracts. The amortization of the net contractual premiums received on the Floor Income Contracts for "Core Earnings" is reflected in student loan interest income. Under GAAP accounting, the premiums received on the Floor Income Contracts are recorded as revenue in the "gains (losses) on derivative and hedging activities, net" line item by the end of the contracts' lives.

Basis swaps are used to convert floating rate debt from one floating interest rate index to another to better match the interest rate characteristics of the assets financed by that debt. We primarily use basis swaps to hedge our student loan assets that are primarily indexed to LIBOR or Prime. The accounting for derivatives requires that when using basis swaps, the change in the cash flows of the hedge effectively offset both the change in the cash flows of the asset and the change in the cash flows of the liability. Our basis swaps hedge variable interest rate risk; however, they generally do not meet this effectiveness test because the index of the swap does not exactly match the index of the hedged assets as required for hedge accounting treatment. Additionally, some of our FFELP Loans can earn at either a variable or a fixed interest rate depending on market interest rates and therefore swaps economically hedging these FFELP Loans do not meet the criteria for hedge accounting treatment. As a result, under GAAP, these swaps are recorded at fair value with changes in fair value reflected currently in the income statement.

51

Table of Contents

The table below quantifies the adjustments for derivative accounting between GAAP and "Core Earnings" net income.

| (Dollars in millions) | 2014 | 2013 | 2012 |
|---|---|---|---|
| **"Core Earnings" derivative adjustments:** | | | |
| Gains (losses) on derivative and hedging activities, net, included in other income[1] | $ 139 | $(268) | $(628) |
| Plus: Realized losses on derivative and hedging activities, net[1] | 657 | 755 | 743 |
| Unrealized gains (losses) on derivative and hedging activities, net[2] | 796 | 487 | 115 |
| Amortization of net premiums on Floor Income Contracts in net interest income for "Core Earnings" | (255) | (307) | (351) |
| Other derivative accounting adjustments[3] | 32 | 63 | 42 |
| Total net impact derivative accounting[4] | $ 573 | $ 243 | $(194) |

Header spanning: **Years Ended December 31,**

[1]  See the section titled "Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" below for a detailed breakdown of the components of realized losses on derivative and hedging activities.

[2]  "Unrealized gains (losses) on derivative and hedging activities, net" comprises the following unrealized mark-to-market gains (losses):

| (Dollars in millions) | 2014 | 2013 | 2012 |
|---|---|---|---|
| Floor Income Contracts | $633 | $ 785 | $ 412 |
| Basis swaps | (5) | (14) | (66) |
| Foreign currency hedges | 72 | (248) | (199) |
| Other | 96 | (36) | (32) |
| Total unrealized gains (losses) on derivative and hedging activities, net | $796 | $ 487 | $ 115 |

Header spanning: **Years Ended December 31,**

[3]  Other derivative accounting adjustments consist of adjustments related to: (1) foreign currency denominated debt that is adjusted to spot foreign exchange rates for GAAP where such adjustment was reversed for "Core Earnings"; and (2) certain terminated derivatives that did not receive hedge accounting treatment under GAAP but were economic hedges under "Core Earnings" and, as a result, such gains or losses amortized into "Core Earnings" over the life of the hedged item.

[4]  Negative amounts are subtracted from "Core Earnings" net income to arrive at GAAP net income and positive amounts are added to "Core Earnings" to arrive at GAAP net income.

Table of Contents

*Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities*

Derivative accounting requires net settlement income/expense on derivatives and realized gains/losses related to derivative dispositions (collectively referred to as "realized gains (losses) on derivative and hedging activities") that do not qualify as hedges to be recorded in a separate income statement line item below net interest income. Under our "Core Earnings" presentation, these gains and losses are reclassified to the income statement line item of the economically hedged item. For our "Core Earnings" net interest margin, this would primarily include: (a) reclassifying the net settlement amounts related to our Floor Income Contracts to student loan interest income and (b) reclassifying the net settlement amounts related to certain of our basis swaps to debt interest expense. The table below summarizes the realized losses on derivative and hedging activities and the associated reclassification on a "Core Earnings" basis.

| (Dollars in millions) | Years Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Reclassification of realized gains (losses) on derivative and hedging activities:** | | | |
| Net settlement expense on Floor Income Contracts reclassified to net interest income | $(699) | $(816) | $(858) |
| Net settlement income on interest rate swaps reclassified to net interest income | 42 | 55 | 115 |
| Net realized gains (losses) on terminated derivative contracts reclassified to other income | — | 6 | — |
| Total reclassifications of realized losses on derivative and hedging activities | $(657) | $(755) | $(743) |

*Cumulative Impact of Derivative Accounting under GAAP compared to "Core Earnings"*

As of December 31, 2014, derivative accounting has reduced GAAP equity by approximately $553 million as a result of cumulative net unrealized losses (after tax) recognized under GAAP, but not in "Core Earnings." The following table rolls forward the cumulative impact to GAAP equity due to these unrealized after tax net losses related to derivative accounting.

| (Dollars in millions) | Years Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Beginning impact of derivative accounting on GAAP equity | $(926) | $(1,080) | $  (977) |
| Net impact of net unrealized gains/(losses) under derivative accounting[1] | 373 | 154 | (103) |
| Ending impact of derivative accounting on GAAP equity | $(553) | $  (926) | $(1,080) |

[1]    Net impact of net unrealized gains (losses) under derivative accounting is composed of the following:

| (Dollars in millions) | Years Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Total pre-tax net impact of derivative accounting recognized in net income[a] | $ 573 | $ 243 | $(194) |
| Tax impact of derivative accounting adjustment recognized in net income | (195) | (111) | 82 |
| Change in unrealized gains on derivatives, net of tax recognized in Other Comprehensive Income | (5) | 22 | 9 |
| Net impact of net unrealized gains (losses) under derivative accounting | $ 373 | $ 154 | $(103) |

[a]    See "'Core Earnings' derivative adjustments" table above.

53

Table of Contents

*Hedging Embedded Floor Income*

Net Floor premiums received on Floor Income Contracts that have not been amortized into "Core Earnings" as of the respective year-ends are presented in the table below. These net premiums will be recognized in "Core Earnings" in future periods. As of December 31, 2014, the remaining amortization term of the net floor premiums was approximately 5 years for existing contracts. Historically, we have sold Floor Income Contracts on a periodic basis and depending upon market conditions and pricing, we may enter into additional Floor Income Contracts in the future. The balance of unamortized Floor Income Contracts will increase as we sell new contracts and decline due to the amortization of existing contracts.

| | December 31, | | |
|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2012 |
| Unamortized net Floor premiums (net of tax)[1] | $(295) | $(354) | $(551) |

   [1]   $(466) million, $(567) million and $(871) million on a pre-tax basis as of December 31, 2014, 2013 and 2012, respectively

In addition to using Floor Income Contracts, we also use pay fixed interest rate swaps to hedge the embedded Floor Income within FFELP Loans. These interest rate swaps qualify as GAAP hedges and are accounted for as cash flow hedges of variable rate debt. Gains and losses on the effective portion of these hedges are recorded in accumulated other comprehensive income and ineffectiveness is recorded immediately to earnings. Hedged Floor Income from these cash flow hedges that has not been recognized into "Core Earnings" and GAAP as of the respective period-ends is presented in the table below. This hedged Floor Income will be recognized in "Core Earnings" and GAAP in future periods and is presented net of tax. As of December 31, 2014, the hedged period is from April 2016 through December 2019. Historically, we have used pay fixed interest rate swaps on a periodic basis to hedge embedded Floor Income and depending upon market conditions and pricing, we may enter into swaps in the future. The balance of unrecognized hedged Floor Income will increase as we enter into new swaps and decline as revenue is recognized.

| | December 31, | | |
|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2012 |
| Unrecognized hedged Floor Income (net of tax)[1] | $(320) | $— | $— |

   [1]   $(508) million on a pre-tax basis as of December 31, 2014

**3) Goodwill and Acquired Intangible Assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and the amortization of acquired intangible assets. The following table summarizes the goodwill and acquired intangible asset adjustments.

| | Years Ended December 31, | | |
|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2012 |
| **"Core Earnings" goodwill and acquired intangible asset adjustments[1]:** | | | |
| Goodwill and intangible impairment of acquired intangible assets | $ — | $ — | $ (9) |
| Amortization of acquired intangible assets | (9) | (13) | (18) |
| Total "Core Earnings" goodwill and acquired intangible asset adjustments[1] | $ (9) | $ (13) | $ (27) |

  [1]   Negative amounts are subtracted from "Core Earnings" to arrive at GAAP net income and positive amounts are added to "Core Earnings" to arrive at GAAP net income.

54

Table of Contents

**Business Segment Earnings Summary — "Core Earnings" Basis**

**FFELP Loans Segment**

The following table includes "Core Earnings" results for our FFELP Loans segment.

| (Dollars in millions) | Years Ended December 31, | | | % Increase (Decrease) | |
|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2014 vs. 2013 | 2013 vs. 2012 |
| "Core Earnings" interest income: | | | | | |
| FFELP Loans | $2,097 | $2,274 | $2,729 | (8)% | (17)% |
| Cash and investments | 4 | 5 | 11 | (20) | (55) |
| Total "Core Earnings" interest income | 2,101 | 2,279 | 2,740 | (8) | (17) |
| Total "Core Earnings" interest expense | 1,168 | 1,260 | 1,589 | (7) | (21) |
| Net "Core Earnings" interest income | 933 | 1,019 | 1,151 | (8) | (11) |
| Less: provision for loan losses | 40 | 48 | 68 | (17) | (29) |
| Net "Core Earnings" interest income after provision for loan losses | 893 | 971 | 1,083 | (8) | (10) |
| Gains on sales of loans and investments | — | 312 | — | 100 | (100) |
| Servicing revenue | 62 | 76 | 90 | (18) | (16) |
| Total other income | 62 | 388 | 90 | (84) | 331 |
| Direct operating expenses | 483 | 555 | 699 | (13) | (21) |
| Income before income tax expense | 472 | 804 | 474 | (41) | 70 |
| Income tax expense | 176 | 291 | 171 | (40) | 70 |
| "Core Earnings" | $ 296 | $ 513 | $ 303 | (42)% | 69% |

"Core Earnings" from the FFELP Loans segment were $296 million in 2014, compared with $513 million and $303 million in 2013 and 2012, respectively. The decrease in 2014 compared with 2013, and the increase in 2013 compared with 2012, was primarily due to $312 million of gains from the sale of Residual Interests in FFELP Loan securitization trusts in 2013. "Core Earnings" key performance metrics are as follows:

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| FFELP Loan spread | .99% | .98% | .94% |
| Net interest margin | .90% | .88% | .83% |
| Provision for loan losses | $ 40 | $ 48 | $ 68 |
| Charge-offs | $ 60 | $ 76 | $ 92 |
| Charge-off rate | .08% | .09% | .10% |
| Total delinquency rate | 16.6% | 17.0% | 16.6% |
| Greater than 90-day delinquency rate | 8.5% | 9.3% | 8.4% |
| Forbearance rate | 15.5% | 14.9% | 14.9% |

Table of Contents

### FFELP Loan Net Interest Margin

The following table includes the "Core Earnings" basis FFELP Loan net interest margin along with reconciliation to the GAAP-basis FFELP Loan net interest margin.

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2014** | **2013** | **2012** |
| "Core Earnings" basis FFELP Loan yield | 2.56% | 2.60% | 2.64% |
| Hedged Floor Income | .25 | .27 | .27 |
| Unhedged Floor Income | .15 | .07 | .10 |
| Consolidation Loan Rebate Fees | (.65) | (.65) | (.66) |
| Repayment Borrower Benefits | (.11) | (.11) | (.13) |
| Premium amortization | (.11) | (.13) | (.15) |
| "Core Earnings" basis FFELP Loan net yield | 2.09 | 2.05 | 2.07 |
| "Core Earnings" basis FFELP Loan cost of funds | (1.10) | (1.07) | (1.13) |
| "Core Earnings" basis FFELP Loan spread | .99 | .98 | .94 |
| "Core Earnings" basis other interest-earning asset spread impact | (.09) | (.10) | (.11) |
| "Core Earnings" basis FFELP Loan net interest margin[1] | .90% | .88% | .83% |
| | | | |
| "Core Earnings" basis FFELP Loan net interest margin[1] | .90% | .88% | .83% |
| Adjustment for GAAP accounting treatment[2] | .40 | .41 | .32 |
| GAAP-basis FFELP Loan net interest margin | 1.30% | 1.29% | 1.15% |

[1]    The average balances of our FFELP Loan "Core Earnings" basis interest-earning assets for the respective periods are:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| (Dollars in millions) | **2014** | **2013** | **2012** |
| FFELP Loans | $ 100,202 | $ 111,008 | $ 131,597 |
| Other interest-earning assets | 3,890 | 5,014 | 6,619 |
| Total FFELP "Core Earnings" basis interest-earning assets | $ 104,092 | $ 116,022 | $ 138,216 |

[2]    Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income and other derivative accounting adjustments. For further discussion of these adjustments, see section titled "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP" above.

As of December 31, 2014, our FFELP Loan portfolio totaled $104.5 billion, comprised of $41.1 billion of FFELP Stafford and $63.4 billion of FFELP Consolidation Loans. The weighted-average life of these portfolios as of December 31, 2014 was 4.8 years and 9.0 years, respectively, assuming a Constant Prepayment Rate ("CPR") of 4 percent and 3 percent, respectively.

Table of Contents

### Floor Income

The following table analyzes on a "Core Earnings" basis the ability of the FFELP Loans in our portfolio to earn Floor Income after December 31, 2014 and 2013, based on interest rates as of those dates.

| | December 31, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in billions) | Fixed Borrower Rate | Variable Borrower Rate | Total | Fixed Borrower Rate | Variable Borrower Rate | Total |
| Student loans eligible to earn Floor Income | $ 89.9 | $ 13.1 | $103.0 | $ 88.8 | $ 13.0 | $101.8 |
| Less: post-March 31, 2006 disbursed loans required to rebate Floor Income | (47.0) | (1.0) | (48.0) | (44.9) | (.9) | (45.8) |
| Less: economically hedged Floor Income | (27.2) | — | (27.2) | (31.7) | — | (31.7) |
| Student loans eligible to earn Floor Income | $ 15.7 | $ 12.1 | $ 27.8 | $ 12.2 | $ 12.1 | $ 24.3 |
| Student loans earning Floor Income | $ 15.7 | $ 1.5 | $ 17.2 | $ 12.2 | $ .6 | $ 12.8 |

The following table presents a projection of the average balance of FFELP Consolidation Loans for which Fixed Rate Floor Income has been economically hedged with derivatives for the period January 1, 2015 to December 31, 2019.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| (Dollars in billions) | 2015 | 2016 | 2017 | 2018 | 2019 |
| Average balance of FFELP Consolidation Loans whose Floor Income is economically hedged | $27.2 | $19.0 | $14.0 | $13.2 | $5.5 |

### Gains on Sales of Loans and Investments

The decrease in gains on sales of loans and investments from 2013 to 2014, and the increase in gains on sales of loans and investments from 2012 to 2013, was the result of $312 million in gains from the sale of Residual Interests in FFELP Loan securitization trusts in 2013. There were no similar transactions in 2012 or 2014.

We continue to service the student loans in the trusts that were sold under existing agreements. The sales removed securitization trust assets of $12.5 billion and related liabilities of $12.1 billion from the balance sheet during year ended December 31, 2013.

### Operating Expenses — FFELP Loans Segment

Operating expenses for our FFELP Loans segment primarily include the contractual rates we pay to service loans in term asset-backed securitization trusts or a similar rate if a loan is not in a term financing facility (which is presented as an intercompany charge from the Business Services segment who services the loans), the fees we pay for third-party loan servicing and costs incurred to acquire loans. The intercompany revenue charged from the Business Services segment and included in those amounts was $456 million, $529 million and $669 million for the years ended December 31, 2014, 2013 and 2012, respectively. These amounts exceed the actual cost of servicing the loans. Operating expenses were 48 basis points, 50 basis points and 53 basis points of average FFELP Loans in the years ended December 31, 2014, 2013 and 2012, respectively. The decrease in operating expenses from the prior periods was primarily the result of the reduction in the average outstanding balance of our FFELP Loan portfolio.

57

Table of Contents

**Private Education Loans Segment**

The following table includes "Core Earnings" results for our Private Education Loans segment.

| (Dollars in millions) | Years Ended December 31, | | | % Increase (Decrease) | |
|---|---|---|---|---|---|
| | **2014** | **2013** | **2012** | **2014 vs. 2013** | **2013 vs. 2012** |
| "Core Earnings" interest income: | | | | | |
| Private Education Loans | $1,958 | $2,037 | $2,036 | (4)% | —% |
| Cash and investments | — | 2 | 3 | (100) | (33) |
| Total "Core Earnings" interest income | 1,958 | 2,039 | 2,039 | (4) | — |
| Total "Core Earnings" interest expense | 708 | 748 | 733 | (5) | 2 |
| Net "Core Earnings" interest income | 1,250 | 1,291 | 1,306 | (3) | (1) |
| Less: provision for loan losses | 539 | 722 | 946 | (25) | (24) |
| Net "Core Earnings" interest income after provision for loan losses | 711 | 569 | 360 | 25 | 58 |
| Servicing revenue | 25 | 33 | 45 | (24) | (27) |
| Direct operating expenses | 181 | 179 | 150 | 1 | 19 |
| Income before income tax expense | 555 | 423 | 255 | 31 | 66 |
| Income tax expense | 204 | 154 | 87 | 32 | 77 |
| Net income from continuing operations | 351 | 269 | 168 | 30 | 60 |
| Loss from discontinued operations, net of tax benefit | — | — | (2) | — | (100) |
| "Core Earnings" | $ 351 | $ 269 | $ 166 | 30% | 62% |

"Core Earnings" were $351 million in 2014, compared with $269 million in 2013 and $166 million in 2012. This increase across all years was primarily the result of lower provision for loan losses. "Core Earnings" key performance metrics are as follows:

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Private Education Loan spread | 4.04% | 4.09% | 4.12% |
| Net interest margin | 3.94% | 3.87% | 3.83% |
| Provision for loan losses | $ 539[1] | $ 722 | $ 946 |
| Charge-offs | $ 717 | $ 878 | $1,037 |
| Charge-off rate | 2.6% | 3.1% | 3.9% |
| Total delinquency rate | 8.1% | 9.3% | 10.4% |
| Greater than 90-day delinquency rate | 3.8% | 4.7% | 5.2% |
| Forbearance rate | 3.8% | 3.8% | 3.9% |
| Loans in repayment with more than 12 payments made | 92% | 89% | 81% |
| Cosigner rate | 64% | 63% | 60% |
| Average FICO | 719 | 717 | 715 |

[1] Prior to the Spin-Off, Sallie Mae Bank sold $666 million of loans to Old SLM in the quarter ended March 31, 2014 for (1) securitization transactions at Old SLM and (2) to enable Old SLM to manage loans either granted forbearance or were 90 days or more past due. In the quarter ended March 31, 2014, $29 million of the allowance for loan loss balance was transferred from Sallie Mae Bank to Old SLM. As a result, Old SLM did not need to provide additional provision for loan losses for these loans in the quarter ended March 31, 2014. Had the allowance not transferred from Sallie Mae Bank to Old SLM, the provision would have been $568 million for the year ended December 31, 2014.

Table of Contents

### Private Education Loan Net Interest Margin

The following table shows the "Core Earnings" basis Private Education Loan net interest margin along with reconciliation to the GAAP-basis Private Education Loan net interest margin before provision for loan losses.

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| "Core Earnings" basis Private Education Loan yield | 6.27% | 6.31% | 6.29% |
| "Core Earnings" basis Private Education Loan cost of funds | (2.23) | (2.22) | (2.17) |
| "Core Earnings" basis Private Education Loan spread | 4.04 | 4.09 | 4.12 |
| "Core Earnings" basis other interest-earning asset spread impact | (.10) | (.22) | (.29) |
| "Core Earnings" basis Private Education Loan net interest margin[1] | 3.94% | 3.87% | 3.83% |
| | | | |
| "Core Earnings" basis Private Education Loan net interest margin[1] | 3.94% | 3.87% | 3.83% |
| Adjustment for GAAP accounting treatment[2] | .12 | .26 | .20 |
| GAAP-basis Private Education Loan net interest margin[1] | 4.06% | 4.13% | 4.03% |

[1]  The average balances of our Private Education Loan "Core Earnings" basis interest-earning assets for the respective periods are:

| | Years Ended December 31, | | |
|---|---|---|---|
| (Dollars in millions) | **2014** | **2013** | **2012** |
| Private Education Loans | $31,243 | $32,296 | $32,352 |
| Other interest-earning assets | 494 | 1,144 | 1,601 |
| Total Private Education Loan "Core Earnings" basis interest-earning assets | $31,737 | $33,440 | $33,953 |

[2]  Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income and other derivative accounting adjustments. For further discussion of these adjustments, see the section titled "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP."

As of December 31, 2014, our Private Education Loan portfolio totaled $29.8 billion. The weighted-average life of this portfolio as of December 31, 2014 was 7.0 years, assuming a Constant Prepayment Rate ("CPR") of 5 percent.

### Private Education Loan Provision for Loan Losses

In establishing the allowance for Private Education Loan losses as of December 31, 2014, we considered several factors with respect to our Private Education Loan portfolio. In particular, we continue to see improvement in credit quality and continuing positive delinquency and charge-off trends in connection with this portfolio. On a "Core Earnings" basis, total loans delinquent (as a percentage of loans in repayment) have decreased to 8.1 percent from 9.3 percent in the prior year. Loans greater than 90 days delinquent (as a percentage of loans in repayment) have decreased to 3.8 percent from 4.7 percent in the prior year. The "Core Earnings" charge-off rate decreased to 2.6 percent from 3.1 percent in the prior year. Loans in forbearance (as a percentage of loans in repayment and forbearance) remained unchanged at 3.8 percent compared with the prior year.

Apart from the overall improvements discussed above that had the effect of reducing the provision for loan losses in 2014 compared to 2013, Private Education Loans that have defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue to not do so. Our allowance for loan losses takes into account these potential recovery uncertainties. In second-quarter 2014, we increased our allowance related to these potential recovery shortfalls by approximately $68 million.

Table of Contents

The Private Education Loan provision for loan losses on a "Core Earnings" basis was $539 million for 2014, down $183 million from the year-ago period and down $407 million from two years ago. This decline over the prior two years was a result of the overall improvement in credit quality and performance trends discussed above, leading to decreases in expected future charge-offs.

For a more detailed discussion of our policy for determining the collectability of Private Education Loans and maintaining our allowance for Private Education Loan losses, see the section titled "Critical Accounting Policies and Estimates — Allowance for Loan Losses."

### Operating Expenses — Private Education Loans Segment

Operating expenses for our Private Education Loans segment include costs incurred to service and collect on our Private Education Loan portfolio. Direct operating expenses as a percentage of revenues (revenues calculated as net interest income after provision plus total other income) were 25 percent, 30 percent and 37 percent in the years ended December 31, 2014, 2013 and 2012, respectively.

### Business Services Segment

The following tables include "Core Earnings" results for our Business Services segment.

| (Dollars in millions) | Years Ended December 31, | | | % Increase (Decrease) | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2012 | 2014 vs. 2013 | 2013 vs. 2012 |
| Net interest income (loss) after provision | $  — | $  — | $  (3) | —% | 100% |
| Servicing revenue: | | | | | |
| Intercompany loan servicing | 456 | 529 | 670 | (14) | (21) |
| Third-party loan servicing | 176 | 138 | 97 | 28 | 42 |
| Guarantor servicing | 36 | 39 | 44 | (8) | (11) |
| Other servicing | — | (1) | 1 | 100 | (200) |
| Total servicing revenue | 668 | 705 | 812 | (5) | (13) |
| Asset recovery revenue | 388 | 420 | 356 | (8) | 18 |
| Other Business Services revenue | 6 | 5 | (2) | 20 | 350 |
| Total other income | 1,062 | 1,130 | 1,166 | (6) | (3) |
| Direct operating expenses | 384 | 348 | 312 | 10 | 12 |
| Income from continuing operations, before income tax expense | 678 | 782 | 851 | (13) | (8) |
| Income tax expense | 250 | 284 | 305 | (12) | (7) |
| Net income from continuing operations | 428 | 498 | 546 | (14) | (9) |
| Income from discontinued operations, net of tax expense | — | 111 | — | (100) | 100 |
| Net income | 428 | 609 | 546 | (30) | 12 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — |
| "Core Earnings" attributable to Navient Corporation | $  428 | $  609 | $  546 | (30)% | 12% |

60

Table of Contents

"Core Earnings" were $428 million for 2014, compared with $609 million and $546 million in 2013 and 2012, respectively. The decrease in 2014 from 2013 was primarily the result of $109 million of after-tax gains from the sale of two subsidiaries in 2013, lower asset recovery revenue and a lower balance of intercompany FFELP Loans serviced. The increase in 2013 compared to 2012 was primarily the result of $109 million of after-tax gains from the sale of two subsidiaries in 2013 and an increase in asset recovery revenue which was partially offset by a decline in intercompany loan servicing fees due to a lower balance of FFELP Loans serviced. Key segment metrics are:

| (Dollars in billions) | As of December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Asset recovery receivables | $15.4 | $16.2 | $15.3 |
| Number of accounts serviced for ED (in millions) | 6.2 | 5.7 | 4.3 |
| Total federal loans serviced | $ 276 | $ 265 | $ 214 |

Our Business Services segment includes intercompany loan servicing fees from servicing the FFELP Loans in our FFELP Loans segment. The average balance of this portfolio was $99 billion, $112 billion and $134 billion for the years ended December 31, 2014, 2013 and 2012, respectively. The decline in the average balance of FFELP Loans outstanding along with the related intercompany loan servicing revenue from the year-ago periods is primarily the result of normal amortization of the portfolio, as well as the sale of our Residual Interests in $12 billion of securitized FFELP Loans in 2013.

Third-party loan servicing income increased $38 million in 2014 compared with 2013 and increased $41 million in 2013 compared with 2012, primarily due to the increase in ED servicing revenue (discussed below) as well as a result of the sale of Residual Interests in FFELP Loan securitization trusts in 2013. (See "FFELP Loans Segment" for further discussion.) When we sold the Residual Interests, we retained the right to service the trusts. As such, servicing income that had previously been recorded as intercompany loan servicing income is now recognized as third-party loan servicing income.

The Company services student loans for more than 12 million DSLP Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts under the ED Servicing Contract as of December 31, 2014, compared with 5.7 million and 4.3 million customer accounts serviced at December 31, 2013 and 2012, respectively. Third-party loan servicing fees in the years ended December 31, 2014, 2013 and 2012 included $130 million, $109 million and $84 million, respectively, of servicing revenue related to the ED Servicing Contract. On June 13, 2014, ED extended its servicing contract with us to service Direct Student Loan Program federal loans for five more years.

Our asset recovery revenue consists of fees we receive for asset recovery of delinquent and defaulted debt on behalf of third-party clients performed on a contingent basis. The majority of this fee revenue is generated through collecting or rehabilitating defaulted federal loans. Asset recovery revenue decreased $32 million in 2014 compared with 2013 primarily as a result of the Bipartisan Budget Act (the "Budget Act") enacted on December 26, 2013 and effective on July 1, 2014, which reduced the amount paid to Guarantor agencies for defaulted FFELP Loans that are rehabilitated. This legislative reduction in fees earned represents $78 million of the $32 million decrease in asset recovery revenue. This decrease from the legislative reduction in fees was partially offset with a higher volume of asset recoveries. Asset recovery revenue increased $64 million in 2013 compared with 2012 as a result of higher volume of asset recoveries.

In 2013, we sold our Campus Solutions business and recorded an after-tax gain of $38 million. In 2013, we sold our 529 college-savings plan administration business and recorded an after-tax gain of $71 million. The results related to these two businesses for all periods presented have been reclassified as discontinued operations and are shown on an after-tax basis.

Revenues related to services performed on FFELP Loans accounted for 77 percent, 80 percent and 85 percent of total segment revenues for the years ended December 31, 2014, 2013 and 2012, respectively.

Table of Contents

### Operating Expenses — Business Services Segment

Operating expenses for our Business Services segment primarily include costs incurred to service our FFELP Loan portfolio, third-party servicing and asset recovery costs, and other operating costs. The $36 million increase in operating expenses in 2014 compared with 2013 was primarily the result of incremental costs post-Spin-Off resulting from operating as a new separate company and an increase in our third-party servicing and asset recovery activities. The $36 million increase in operating expenses in 2013 compared with 2012 was primarily the result of an increase in our third-party servicing and asset recovery activities as well as continued investments in technology.

## Other Segment

The following table includes "Core Earnings" results for our Other segment.

| | Years Ended December 31, | | | % Increase (Decrease) | |
|---|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2012 | 2014 vs. 2013 | 2013 vs. 2012 |
| Net interest loss after provision for loan losses | $(101) | $ (43) | $ (20) | 135% | 115% |
| Losses on sales of loans and investments | — | (10) | — | (100) | 100 |
| Gains on debt repurchases | — | 48 | 145 | (100) | (67) |
| Other income | 26 | 4 | 15 | 550 | (73) |
| Total other income | 26 | 42 | 160 | (38) | (73) |
| Direct operating expenses | 132 | 68 | 13 | 94 | 423 |
| Overhead expenses: | | | | | |
| Unallocated corporate overhead | 97 | 73 | 62 | 33 | 18 |
| Unallocated information technology costs | 103 | 94 | 81 | 10 | 16 |
| Total overhead expenses | 200 | 167 | 143 | 20 | 17 |
| Total operating expenses | 332 | 235 | 156 | 41 | 51 |
| Loss from continuing operations, before income tax benefit | (407) | (236) | (16) | 72 | 1,375 |
| Income tax benefit | (150) | (86) | (3) | 74 | 2,767 |
| Net loss from continuing operations | (257) | (150) | (13) | 71 | 1,054 |
| Income from discontinued operations, net of tax expense | — | 1 | 1 | (100) | — |
| "Core Earnings" net loss | $(257) | $(149) | $ (12) | 72% | 1,142% |

### Net Interest Loss after Provision for Loan Losses

Net interest loss after provision for loan losses includes net interest loss related to our corporate liquidity portfolio, partially offset by net interest income related to our mortgage and consumer loan portfolios.

### Gains on Debt Repurchases

We repurchased $548 million, $1.3 billion and $711 million face amount of our debt in 2014, 2013 and 2012, respectively. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

### Other Income — Other Segment

The increase in other income in 2014 compared with 2013 is primarily due to income earned in 2014 for services provided to SLM BankCo under various transition services agreements entered into in connection with the Spin-Off.

Table of Contents

### Direct Operating Expenses — Other Segment

In 2014 and 2013, we recognized $120 million and $54 million of expense, respectively, related to the settlement of regulatory matters (for additional information, see Item 3. "Legal Proceedings – Regulatory Matters"). This regulatory expense was the primary driver of the respective increases in operating expenses from 2013 to 2014 and from 2012 to 2013.

### Overhead — Other Segment

Unallocated corporate overhead is comprised of costs related to executive management, the board of directors, accounting, finance, legal, human resources and stock-based compensation expense. Unallocated information technology costs are related to infrastructure and operations. The increase in overhead expenses in 2014 compared with 2013 is primarily due to incremental costs post-Spin-Off resulting from operating as a new separate company, as well as costs incurred to provide related support to SLM BankCo under various transition services agreements entered into in connection with the Spin-Off and stock-based compensation expense in connection with the Spin-Off.

## Financial Condition

This section provides additional information regarding the changes related to our loan portfolio assets and related liabilities as well as credit performance indicators related to our loan portfolio.

### Average Balance Sheets — GAAP

The following table reflects the rates earned on interest-earning assets and paid on interest-bearing liabilities and reflects our net interest margin on a consolidated basis.

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | Rate | Balance | Rate | Balance | Rate |
| **Average Assets** | | | | | | |
| FFELP Loans | $100,662 | 2.54% | $112,152 | 2.52% | $132,124 | 2.46% |
| Private Education Loans | 33,672 | 6.40 | 38,292 | 6.60 | 37,691 | 6.58 |
| Other loans | 92 | 9.36 | 118 | 9.75 | 172 | 9.41 |
| Cash and investments | 6,971 | .13 | 9,305 | .19 | 10,331 | .20 |
| Total interest-earning assets | 141,397 | 3.34% | 159,867 | 3.36% | 180,318 | 3.20% |
| Non-interest-earning assets | 3,537 | | 4,316 | | 4,732 | |
| Total assets | $144,934 | | $164,183 | | $185,050 | |
| **Average Liabilities and Equity** | | | | | | |
| Short-term borrowings | $ 7,541 | .77% | $ 16,730 | .99% | $ 24,831 | .88% |
| Long-term borrowings | 130,250 | 1.54 | 138,682 | 1.47 | 151,397 | 1.55 |
| Total interest-bearing liabilities | 137,791 | 1.50% | 155,412 | 1.42% | 176,228 | 1.45% |
| Non-interest-bearing liabilities | 2,575 | | 3,385 | | 3,837 | |
| Equity | 4,568 | | 5,386 | | 4,985 | |
| Total liabilities and equity | $144,934 | | $164,183 | | $185,050 | |
| Net interest margin | | 1.89% | | 1.98% | | 1.78% |

63

Table of Contents

*Rate/Volume Analysis — GAAP*

The following rate/volume analysis shows the relative contribution of changes in interest rates and asset volumes.

| (Dollars in millions) | Increase (Decrease) | Change Due To[1] | |
|---|---|---|---|
| | | Rate | Volume |
| **2014 vs. 2013** | | | |
| Interest income | $  (647) | $  (30) | $(617) |
| Interest expense | (147) | 112 | (259) |
| Net interest income | $  (500) | $(146) | $(354) |
| **2013 vs. 2012** | | | |
| Interest income | $  (392) | $ 286 | $(678) |
| Interest expense | (351) | (54) | (297) |
| Net interest income | $   (41) | $ 344 | $(385) |

(1)   Changes in income and expense due to both rate and volume have been allocated in proportion to the relationship of the absolute dollar amounts of the change in each. The changes in income and expense are calculated independently for each line in the table. The totals for the rate and volume columns are not the sum of the individual lines.

64

Table of Contents

### Summary of our Student Loan Portfolio

*Ending Student Loan Balances, net — GAAP Basis*

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| | | | December 31, 2014 | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 488 | $ — | $ 488 | $ 436 | $ 924 |
| Grace, repayment and other[2] | 39,958 | 62,992 | 102,950 | 30,625 | 133,575 |
| Total, gross | 40,446 | 62,992 | 103,438 | 31,061 | 134,499 |
| Unamortized premium/(discount) | 677 | 499 | 1,176 | (594) | 582 |
| Receivable for partially charged-off loans | — | — | — | 1,245 | 1,245 |
| Allowance for loan losses | (58) | (35) | (93) | (1,916) | (2,009) |
| Total student loan portfolio | $ 41,065 | $ 63,456 | $104,521 | $29,796 | $134,317 |
| % of total FFELP | 39% | 61% | 100% | | |
| % of total | 31% | 47% | 78% | 22% | 100% |

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| | | | December 31, 2013 | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 742 | $ — | $ 742 | $ 2,629 | $ 3,371 |
| Grace, repayment and other[2] | 38,752 | 64,178 | 102,930 | 36,371 | 139,301 |
| Total, gross | 39,494 | 64,178 | 103,672 | 39,000 | 142,672 |
| Unamortized premium/(discount) | 602 | 433 | 1,035 | (704) | 331 |
| Receivable for partially charged-off loans | — | — | — | 1,313 | 1,313 |
| Allowance for loan losses | (75) | (44) | (119) | (2,097) | (2,216) |
| Total student loan portfolio | $ 40,021 | $ 64,567 | $104,588 | $37,512 | $142,100 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 46% | 74% | 26% | 100% |

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| | | | December 31, 2012 | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 1,506 | $ — | $ 1,506 | $ 2,194 | $ 3,700 |
| Grace, repayment and other[2] | 42,189 | 80,640 | 122,829 | 36,360 | 159,189 |
| Total, gross | 43,695 | 80,640 | 124,335 | 38,554 | 162,889 |
| Unamortized premium/(discount) | 691 | 745 | 1,436 | (796) | 640 |
| Receivable for partially charged-off loans | — | — | — | 1,347 | 1,347 |
| Allowance for loan losses | (97) | (62) | (159) | (2,171) | (2,330) |
| Total student loan portfolio | $ 44,289 | $ 81,323 | $125,612 | $36,934 | $162,546 |
| % of total FFELP | 35% | 65% | 100% | | |
| % of total | 27% | 50% | 77% | 23% | 100% |

[1] Loans for customers still attending school and are not yet required to make payments on the loan.

[2] Includes loans in deferment or forbearance.

65

**Table of Contents**

| | December 31, 2011 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio | $ 50,440 | $ 87,690 | $138,130 | $36,290 | $174,420 |

| | December 31, 2010 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio | $ 56,252 | $ 92,397 | $148,649 | $35,656 | $184,305 |

66

Table of Contents

*Ending Student Loan Balances, net — "Core Earnings" Basis*

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| **December 31, 2014** | | | | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 488 | $ — | $ 488 | $ 436 | $ 924 |
| Grace, repayment and other[2] | 39,958 | 62,992 | 102,950 | 30,625 | 133,575 |
| Total, gross | 40,446 | 62,992 | 103,438 | 31,061 | 134,499 |
| Unamortized premium/(discount) | 677 | 499 | 1,176 | (594) | 582 |
| Receivable for partially charged-off loans | | | | 1,245 | 1,245 |
| Allowance for loan losses | (58) | (35) | (93) | (1,916) | (2,009) |
| Total student loan portfolio | $ 41,065 | $ 63,456 | $104,521 | $29,796 | $134,317 |
| % of total FFELP | 39% | 61% | 100% | | |
| % of total | 31% | 47% | 78% | 22% | 100% |

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| **December 31, 2013** | | | | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 739 | $ — | $ 739 | $ 438 | $ 1,177 |
| Grace, repayment and other[2] | 38,232 | 63,274 | 101,506 | 31,999 | 133,505 |
| Total, gross | 38,971 | 63,274 | 102,245 | 32,437 | 134,682 |
| Unamortized premium/(discount) | 601 | 430 | 1,031 | (709) | 322 |
| Receivable for partially charged-off loans | — | — | — | 1,313 | 1,313 |
| Allowance for loan losses | (73) | (40) | (113) | (2,035) | (2,148) |
| Total student loan portfolio | $ 39,499 | $ 63,664 | $103,163 | $31,006 | $134,169 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 30% | 47% | 77% | 23% | 100% |

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| **December 31, 2012** | | | | | |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 1,501 | $ — | $ 1,501 | $ 674 | $ 2,175 |
| Grace, repayment and other[2] | 41,836 | 79,955 | 121,791 | 32,372 | 154,163 |
| Total, gross | 43,337 | 79,955 | 123,292 | 33,046 | 156,338 |
| Unamortized premium/(discount) | 690 | 745 | 1,435 | (801) | 634 |
| Receivable for partially charged-off loans | — | — | — | 1,347 | 1,347 |
| Allowance for loan losses | (95) | (60) | (155) | (2,106) | (2,261) |
| Total student loan portfolio | $ 43,932 | $ 80,640 | $124,572 | $31,486 | $156,058 |
| % of total FFELP | 35% | 65% | 100% | | |
| % of total | 28% | 52% | 80% | 20% | 100% |

[1] Loans for customers still attending school and are not yet required to make payments on the loan.

[2] Includes loans in deferment or forbearance.

67

**Table of Contents**

|  | December 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio | $ 50,423 | $ 87,468 | $137,891 | $31,227 | $169,118 |

|  | December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio | $ 56,252 | $ 92,194 | $148,446 | $31,199 | $179,645 |

68

Table of Contents

*Average Student Loan Balances (net of unamortized premium/discount) — GAAP Basis*

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 38,335 | $ 62,327 | $100,662 | $33,672 | $134,334 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 46% | 75% | 25% | 100% |

| | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 42,039 | $ 70,113 | $112,152 | $38,292 | $150,444 |
| % of FFELP | 37% | 63% | 100% | | |
| % of total | 28% | 47% | 75% | 25% | 100% |

| | Year Ended December 31, 2012 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 47,629 | $ 84,495 | $132,124 | $37,691 | $169,815 |
| % of FFELP | 36% | 64% | 100% | | |
| % of total | 28% | 50% | 78% | 22% | 100% |

*Average Student Loan Balances (net of unamortized premium/discount) — "Core Earnings" Basis*

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 38,168 | $ 62,034 | $100,202 | $31,243 | $131,445 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 47% | 76% | 24% | 100% |

| | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 41,648 | $ 69,360 | $111,008 | $32,296 | $143,304 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 48% | 77% | 23% | 100% |

| | Year Ended December 31, 2012 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 47,502 | $ 84,095 | $131,597 | $32,352 | $163,949 |
| % of FFELP | 36% | 64% | 100% | | |
| % of total | 29% | 51% | 80% | 20% | 100% |

69

Table of Contents

*Student Loan Activity — GAAP Basis*

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 40,021 | $ 64,567 | $104,588 | $37,512 | $142,100 |
| Acquisitions and originations | 6,566 | 4,733 | 11,299 | 2,504 | 13,803 |
| Capitalized interest and premium/discount amortization | 1,165 | 1,110 | 2,275 | 693 | 2,968 |
| Consolidations to third parties | (2,081) | (1,610) | (3,691) | (111) | (3,802) |
| Distribution of SLM BankCo | (495) | (885) | (1,380) | (7,204) | (8,584) |
| Repayments and other | (4,111) | (4,459) | (8,570) | (3,598) | (12,168) |
| Ending balance | $ 41,065 | $ 63,456 | $104,521 | $29,796 | $134,317 |

| | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 44,289 | $ 81,323 | $125,612 | $36,934 | $162,546 |
| Acquisitions and originations | 413 | 323 | 736 | 3,819 | 4,555 |
| Capitalized interest and premium/discount amortization | 1,203 | 1,120 | 2,323 | 756 | 3,079 |
| Consolidations to third parties | (1,525) | (1,001) | (2,526) | (94) | (2,620) |
| Sales[1] | (102) | (12,147) | (12,249) | (61) | (12,310) |
| Repayments and other | (4,257) | (5,051) | (9,308) | (3,842) | (13,150) |
| Ending balance | $ 40,021 | $ 64,567 | $104,588 | $37,512 | $142,100 |

| | Year Ended December 31, 2012 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 50,440 | $ 87,690 | $138,130 | $36,290 | $174,420 |
| Acquisitions and originations | 2,764 | 903 | 3,667 | 3,386 | 7,053 |
| Capitalized interest and premium/discount amortization | 1,373 | 1,443 | 2,816 | 1,029 | 3,845 |
| Consolidations to third parties | (5,049) | (2,803) | (7,852) | (73) | (7,925) |
| Sales | (530) | — | (530) | — | (530) |
| Repayments and other | (4,709) | (5,910) | (10,619) | (3,698) | (14,317) |
| Ending balance | $ 44,289 | $ 81,323 | $125,612 | $36,934 | $162,546 |

[1]  Includes $12.0 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

70

Table of Contents

*Student Loan Activity — "Core Earnings" Basis*

| (Dollars in millions) | Year Ended December 31, 2014 | | | | |
| --- | --- | --- | --- | --- | --- |
| | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 39,499 | $ 63,664 | $103,163 | $31,006 | $134,169 |
| Acquisitions and originations | 6,567 | 4,732 | 11,299 | 1,624 | 12,923 |
| Capitalized interest and premium/discount amortization | 1,158 | 1,099 | 2,257 | 661 | 2,918 |
| Consolidations to third parties | (2,074) | (1,605) | (3,679) | (103) | (3,782) |
| Repayments and other | (4,085) | (4,434) | (8,519) | (3,392) | (11,911) |
| Ending balance | $ 41,065 | $ 63,456 | $104,521 | $29,796 | $134,317 |

| (Dollars in millions) | Year Ended December 31, 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 43,932 | $ 80,640 | $124,572 | $31,486 | $156,058 |
| Acquisitions and originations | 192 | 64 | 256 | 2,432 | 2,688 |
| Capitalized interest and premium/discount amortization | 1,186 | 1,089 | 2,275 | 644 | 2,919 |
| Consolidations to third parties | (1,511) | (986) | (2,497) | (79) | (2,576) |
| Sales[1] | (102) | (12,147) | (12,249) | (61) | (12,310) |
| Repayments and other | (4,198) | (4,996) | (9,194) | (3,416) | (12,610) |
| Ending balance | $ 39,499 | $ 63,664 | $103,163 | $31,006 | $134,169 |

| (Dollars in millions) | Year Ended December 31, 2012 | | | | |
| --- | --- | --- | --- | --- | --- |
| | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 50,423 | $ 87,468 | $137,891 | $31,227 | $169,118 |
| Acquisitions and originations | 2,419 | 429 | 2,848 | 2,641 | 5,489 |
| Capitalized interest and premium/discount amortization | 1,368 | 1,424 | 2,792 | 952 | 3,744 |
| Consolidations to third parties | (5,045) | (2,789) | (7,834) | (58) | (7,892) |
| Sales | (531) | — | (531) | — | (531) |
| Repayments and other | (4,702) | (5,892) | (10,594) | (3,276) | (13,870) |
| Ending balance | $ 43,932 | $ 80,640 | $124,572 | $31,486 | $156,058 |

[1]  Includes $12.0 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

71

Table of Contents

*Student Loan Allowance for Loan Losses Activity — GAAP Basis*

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 119 | $ 2,097 | $ 2,216 | $ 159 | $ 2,171 | $2,330 | $ 187 | $ 2,171 | $ 2,358 |
| Less: | | | | | | | | | |
| Charge-offs[1] | (60) | (717) | (777) | (78) | (878) | (956) | (92) | (1,037) | (1,129) |
| Student loan sales | — | — | — | (14) | — | (14) | (8) | — | (8) |
| Distribution of SLM BankCo | (6) | (69) | (75) | — | — | — | — | — | — |
| Plus: | | | | | | | | | |
| Provision for loan losses | 40 | 588 | 628 | 52 | 787 | 839 | 72 | 1,008 | 1,080 |
| Reclassification of interest reserve[2] | — | 17 | 17 | — | 17 | 17 | — | 29 | 29 |
| Ending balance | $ 93 | $ 1,916 | $ 2,009 | $ 119 | $ 2,097 | $2,216 | $ 159 | $ 2,171 | $ 2,330 |
| Percent of total | 5% | 95% | 100% | 5% | 95% | 100% | 7% | 93% | 100% |
| Troubled debt restructuring[3] | — | 10,205 | 10,205 | — | 8,949 | 8,949 | — | 7,294 | 7,294 |

| (Dollars in millions) | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
| Balance at beginning of period | $ 189 | $ 2,022 | $ 2,211 | $ 186 | $ 1,967 | $ 2,153 |
| Less: | | | | | | |
| Charge-offs[1] | (78) | (1,072) | (1,150) | (87) | (1,291) | (1,378) |
| Student loan sales | (10) | — | (10) | (8) | — | (8) |
| Plus: | | | | | | |
| Provision for loan losses | 86 | 1,179 | 1,265 | 98 | 1,298 | 1,396 |
| Reclassification of interest reserve[2] | — | 42 | 42 | — | 48 | 48 |
| Ending balance | $ 187 | $ 2,171 | $ 2,358 | $ 189 | $ 2,022 | $ 2,211 |
| Percent of total | 8% | 92% | 100% | 9% | 91% | 100% |
| Troubled debt restructuring[3] | — | 5,249 | 5,249 | $ — | $ 439 | $ 439 |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See the section titled "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Represents the recorded investment of loans identified as troubled debt restructuring.

72

Table of Contents

*Student Loan Allowance for Loan Losses Activity — "Core Earnings" Basis*

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
| Beginning balance | $ 113 | $ 2,035 | $ 2,148 | $ 155 | $ 2,106 | $2,261 | $ 187 | $ 2,102 | $ 2,289 |
| Less: | | | | | | | | | |
| Charge-offs[1] | (60) | (717) | (777) | (76) | (878) | (954) | (92) | (1,037) | (1,129) |
| Student loan sales | — | — | — | (14) | — | (14) | (8) | — | (8) |
| Plus: | | | | | | | | | |
| Provision for loan losses | 40 | 539 | 579 | 48 | 722 | 770 | 68 | 946 | 1,014 |
| Reclassification of interest reserve[2] | — | 17 | 17 | — | 17 | 17 | — | 29 | 29 |
| Other transactions | — | 42 | 42 | — | 68 | 68 | — | 66 | 66 |
| Ending balance | $ 93 | $ 1,916 | $ 2,009 | $ 113 | $ 2,035 | $2,148 | $ 155 | $ 2,106 | $ 2,261 |
| Percent of total | 5% | 95% | 100% | 5% | 95% | 100% | 7% | 93% | 100% |
| Troubled debt restructuring[3] | — | 10,205 | 10,205 | — | 8,949 | 8,949 | — | 7,294 | 7,294 |

| (Dollars in millions) | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
| Balance at beginning of period | $ 189 | $ 1,972 | $ 2,161 | $ 161 | $ 1,928 | $ 2,089 |
| Less: | | | | | | |
| Charge-offs[1] | (78) | (1,072) | (1,150) | (88) | (1,291) | (1,379) |
| Student loan sales | (10) | — | (10) | | | |
| Plus: | | | | | | |
| Provision for loan losses | 86 | 1,094 | 1,180 | 99 | 1,240 | 1,339 |
| Reclassification of interest reserve[2] | — | 42 | 42 | — | 46 | 46 |
| Other transactions | — | 66 | 66 | 17 | 49 | 66 |
| Ending balance | $ 187 | $ 2,102 | $ 2,289 | $ 189 | $ 1,972 | $ 2,161 |
| Percent of total | 8% | 92% | 100% | 9% | 91% | 100% |
| Troubled debt restructuring[3] | — | 5,249 | 5,249 | $ — | $ 439 | $ 439 |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See the section titled "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Represents the recorded investment of loans identified as troubled debt restructuring.

73

Table of Contents

*FFELP Loan Portfolio Performance*

*FFELP Loan Delinquencies and Forbearance — GAAP Basis*

| | FFELP Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | **2014** | | **2013** | | **2012** | |
| **(Dollars in millions)** | **Balance** | **%** | **Balance** | **%** | **Balance** | **%** |
| Loans in-school/grace/deferment[1] | $ 10,861 | | $ 13,678 | | $ 17,702 | |
| Loans in forbearance[2] | 14,366 | | 13,490 | | 15,902 | |
| Loans in repayment and percentage of each status: | | | | | | |
|     Loans current | 65,221 | 83.4% | 63,330 | 82.8% | 75,499 | 83.2% |
|     Loans delinquent 31-60 days[3] | 3,942 | 5.0 | 3,746 | 4.9 | 4,710 | 5.2 |
|     Loans delinquent 61-90 days[3] | 2,451 | 3.1 | 2,207 | 2.9 | 2,788 | 3.1 |
|     Loans delinquent greater than 90 days[3] | 6,597 | 8.5 | 7,221 | 9.4 | 7,734 | 8.5 |
|     Total FFELP Loans in repayment | 78,211 | 100% | 76,504 | 100% | 90,731 | 100% |
| Total FFELP Loans, gross | 103,438 | | 103,672 | | 124,335 | |
| FFELP Loan unamortized premium | 1,176 | | 1,035 | | 1,436 | |
| Total FFELP Loans | 104,614 | | 104,707 | | 125,771 | |
| FFELP Loan allowance for losses | (93) | | (119) | | (159) | |
| FFELP Loans, net | $104,521 | | $104,588 | | $125,612 | |
| Percentage of FFELP Loans in repayment | | 75.6% | | 73.8% | | 73.0% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 16.6% | | 17.2% | | 16.8% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 15.5% | | 15.0% | | 14.9% |

[1]  Loans for customers who may still be attending school or engaging in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested and qualify for other permitted program deferments such as military, unemployment, or economic hardship.

[2]  Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making full payments due to hardship or other factors.

[3]  The period of delinquency is based on the number of days scheduled payments are contractually past due.

Table of Contents

*FFELP Loan Delinquencies and Forbearance — "Core Earnings" Basis*

| | FFELP Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | **2014** | | **2013** | | **2012** | |
| **(Dollars in millions)** | **Balance** | **%** | **Balance** | **%** | **Balance** | **%** |
| Loans in-school/grace/deferment[1] | $ 10,861 | | $ 13,546 | | $ 17,594 | |
| Loans in forbearance[2] | 14,366 | | 13,219 | | 15,737 | |
| Loans in repayment and percentage of each status: | | | | | | |
|   Loans current | 65,221 | 83.4% | 62,663 | 83.0% | 74,997 | 83.4% |
|   Loans delinquent 31-60 days[3] | 3,942 | 5.0 | 3,665 | 4.9 | 4,634 | 5.2 |
|   Loans delinquent 61-90 days[3] | 2,451 | 3.1 | 2,152 | 2.8 | 2,740 | 3.0 |
|   Loans delinquent greater than 90 days[3] | 6,597 | 8.5 | 7,000 | 9.3 | 7,590 | 8.4 |
|   Total FFELP Loans in repayment | 78,211 | 100% | 75,480 | 100% | 89,961 | 100% |
| Total FFELP Loans, gross | 103,438 | | 102,245 | | 123,292 | |
| FFELP Loan unamortized premium | 1,176 | | 1,031 | | 1,435 | |
| Total FFELP Loans | 104,614 | | 103,276 | | 124,727 | |
| FFELP Loan allowance for losses | (93) | | (113) | | (155) | |
| FFELP Loans, net | $104,521 | | $103,163 | | $124,572 | |
| Percentage of FFELP Loans in repayment | | 75.6% | | 73.8% | | 73.0% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 16.6% | | 17.0% | | 16.6% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 15.5% | | 14.9% | | 14.9% |

[1] Loans for customers who may still be attending school or engaging in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested and qualify for other permitted program deferments such as military, unemployment, or economic hardship.

[2] Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making full payments due to hardship or other factors.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

Table of Contents

*Allowance for FFELP Loan Losses — GAAP Basis*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Allowance at beginning of period | $    119 | $    159 | $    187 |
| Provision for FFELP Loan losses | 40 | 52 | 72 |
| Charge-offs | (60) | (78) | (92) |
| Student loan sales | — | (14) | (8) |
| Distribution of SLM BankCo | (6) | — | — |
| Allowance at end of period | $    93 | $    119 | $    159 |
| Charge-offs as a percentage of average loans in repayment | .08% | .10% | .10% |
| Allowance as a percentage of the ending total loans, gross | .09% | .12% | .13% |
| Allowance as a percentage of ending loans in repayment | .12% | .16% | .18% |
| Allowance coverage of charge-offs | 1.5 | 1.5 | 1.7 |
| Ending total loans, gross | $103,438 | $103,672 | $124,335 |
| Average loans in repayment | $ 72,829 | $ 80,822 | $ 91,653 |
| Ending loans in repayment | $ 78,211 | $ 76,504 | $ 90,731 |

*Allowance for FFELP Loan Losses — "Core Earnings" Basis*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Allowance at beginning of period | $    113 | $    155 | $    187 |
| Provision for FFELP Loan losses | 40 | 48 | 68 |
| Charge-offs | (60) | (76) | (92) |
| Student loan sales | — | (14) | (8) |
| Allowance at end of period | $    93 | $    113 | $    155 |
| Charge-offs as a percentage of average loans in repayment | .08% | .09% | .10% |
| Allowance as a percentage of the ending total loans, gross | .09% | .11% | .13% |
| Allowance as a percentage of ending loans in repayment | .12% | .15% | .17% |
| Allowance coverage of charge-offs | 1.6 | 1.5 | 1.7 |
| Ending total loans, gross | $103,438 | $102,245 | $123,292 |
| Average loans in repayment | $ 72,499 | $ 79,977 | $ 91,258 |
| Ending loans in repayment | $ 78,211 | $ 75,480 | $ 89,961 |

76

Table of Contents

***Private Education Loan Portfolio Performance***

*Private Education Loan Delinquencies and Forbearance — GAAP Basis*

| | Private Education Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 3,053 | | $ 6,528 | | $ 5,904 | |
| Loans in forbearance[2] | 1,059 | | 1,102 | | 1,136 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 24,761 | 91.9% | 28,768 | 91.7% | 28,575 | 90.7% |
| Loans delinquent 31-60 days[3] | 734 | 2.7 | 802 | 2.6 | 1,012 | 3.2 |
| Loans delinquent 61-90 days[3] | 436 | 1.6 | 513 | 1.6 | 481 | 1.5 |
| Loans delinquent greater than 90 days[3] | 1,018 | 3.8 | 1,287 | 4.1 | 1,446 | 4.6 |
| Total Private Education Loans in repayment | 26,949 | 100% | 31,370 | 100% | 31,514 | 100% |
| Total Private Education Loans, gross | 31,061 | | 39,000 | | 38,554 | |
| Private Education Loan unamortized discount | (594) | | (704) | | (796) | |
| Total Private Education Loans | 30,467 | | 38,296 | | 37,758 | |
| Private Education Loan receivable for partially charged-off loans | 1,245 | | 1,313 | | 1,347 | |
| Private Education Loan allowance for losses | (1,916) | | (2,097) | | (2,171) | |
| Private Education Loans, net | $29,796 | | $37,512 | | $36,934 | |
| Percentage of Private Education Loans in repayment | | 86.8% | | 80.4% | | 81.7% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 8.1% | | 8.3% | | 9.3% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.8% | | 3.4% | | 3.5% |
| Loans in repayment with more than 12 payments made | | 91.5% | | 84.3% | | 77.9% |
| Percentage of Private Education Loans with a cosigner | | 64% | | 67% | | 65% |
| Average FICO at origination | | 719 | | 722 | | 720 |

[1] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

Table of Contents

*Private Education Loan Delinquencies and Forbearance — "Core Earnings" Basis*

| | Private Education Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 3,053 | | $ 3,954 | | $ 4,155 | |
| Loans in forbearance[2] | 1,059 | | 1,085 | | 1,127 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 24,761 | 91.9% | 24,835 | 90.7% | 24,869 | 89.6% |
| Loans delinquent 31-60 days[3] | 734 | 2.7 | 773 | 2.8 | 978 | 3.5 |
| Loans delinquent 61-90 days[3] | 436 | 1.6 | 503 | 1.8 | 471 | 1.7 |
| Loans delinquent greater than 90 days[3] | 1,018 | 3.8 | 1,287 | 4.7 | 1,446 | 5.2 |
| Total Private Education Loans in repayment | 26,949 | 100% | 27,398 | 100% | 27,764 | 100% |
| Total Private Education Loans, gross | 31,061 | | 32,437 | | 33,046 | |
| Private Education Loan unamortized discount | (594) | | (709) | | (801) | |
| Total Private Education Loans | 30,467 | | 31,728 | | 32,245 | |
| Private Education Loan receivable for partially charged-off loans | 1,245 | | 1,313 | | 1,347 | |
| Private Education Loan allowance for losses | (1,916) | | (2,035) | | (2,106) | |
| Private Education Loans, net | $29,796 | | $31,006 | | $31,486 | |
| Percentage of Private Education Loans in repayment | | 86.8% | | 84.5% | | 84.0% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 8.1% | | 9.3% | | 10.4% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 3.8% | | 3.8% | | 3.9% |
| Loans in repayment with more than 12 payments made | | 91.5% | | 88.7% | | 80.8% |
| Percentage of Private Education Loans with a cosigner | | 64% | | 63% | | 60% |
| Average FICO at origination | | 719 | | 717 | | 715 |

[1]  Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]  Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]  The period of delinquency is based on the number of days scheduled payments are contractually past due.

Table of Contents

*Allowance for Private Education Loan Losses — GAAP Basis*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Allowance at beginning of period | $ 2,097 | $ 2,171 | $ 2,171 |
| Provision for Private Education Loan losses | 588 | 787 | 1,008 |
| Charge-offs[1] | (717) | (878) | (1,037) |
| Reclassification of interest reserve[2] | 17 | 17 | 29 |
| Distribution of SLM BankCo | (69) | — | — |
| Allowance at end of period | $ 1,916 | $ 2,097 | $ 2,171 |
| Charge-offs as a percentage of average loans in repayment | 2.5% | 2.8% | 3.4% |
| Allowance as a percentage of the ending total loans | 5.9% | 5.2% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 7.1% | 6.7% | 6.9% |
| Average coverage of charge-offs | 2.7 | 2.4 | 2.1 |
| Ending total loans[3] | $32,306 | $40,313 | $39,901 |
| Average loans in repayment | $28,577 | $31,556 | $30,750 |
| Ending loans in repayment | $26,949 | $31,370 | $31,514 |

*Allowance for Private Education Loan Losses — "Core Earnings" Basis*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Allowance at beginning of period | $ 2,035 | $ 2,106 | $ 2,102 |
| Provision for Private Education Loan losses | 539 | 722 | 946 |
| Charge-offs[1] | (717) | (878) | (1,037) |
| Reclassification of interest reserve[2] | 17 | 17 | 29 |
| Other transactions | 42 | 68 | 66 |
| Allowance at end of period | $ 1,916 | $ 2,035 | $ 2,106 |
| Charge-offs as a percentage of average loans in repayment | 2.6% | 3.1% | 3.9% |
| Allowance as a percentage of the ending total loans | 5.9% | 6.0% | 6.1% |
| Allowance as a percentage of ending loans in repayment | 7.1% | 7.4% | 7.6% |
| Average coverage of charge-offs | 2.7 | 2.3 | 2.0 |
| Ending total loans[3] | $32,306 | $33,750 | $34,393 |
| Average loans in repayment | $27,145 | $27,966 | $26,831 |
| Ending loans in repayment | $26,949 | $27,398 | $27,764 |

[1] Charge-offs are reported net of expected recoveries. The expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See the section titled "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Ending total loans represents gross Private Education Loans, plus the receivable for partially charged-off loans.

Table of Contents

The following tables provide the detail for our traditional and non-traditional Private Education Loans for the respective years ended.

*GAAP Basis:*

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 29,302 | $ 3,004 | $32,306 | $ 36,940 | $ 3,373 | $40,313 | $ 36,144 | $ 3,757 | $39,901 |
| Ending loans in repayment | 24,815 | 2,134 | 26,949 | 29,083 | 2,287 | 31,370 | 28,930 | 2,584 | 31,514 |
| Private Education Loan allowance for loan losses | 1,515 | 401 | 1,916 | 1,592 | 505 | 2,097 | 1,637 | 534 | 2,171 |
| Charge-offs as a percentage of average loans in repayment | 2.1% | 7.7% | 2.5% | 2.3% | 9.1% | 2.8% | 2.7% | 10.9% | 3.4% |
| Allowance as a percentage of ending total loans | 5.2% | 13.3% | 5.9% | 4.3% | 15.0% | 5.2% | 4.5% | 14.2% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 6.1% | 18.8% | 7.1% | 5.5% | 22.1% | 6.7% | 5.7% | 20.7% | 6.9% |
| Average coverage of charge-offs | 2.8 | 2.4 | 2.7 | 2.4 | 2.3 | 2.4 | 2.2 | 1.9 | 2.1 |
| Delinquencies as a percentage of Private Education Loans in repayment | 7.3% | 18.1% | 8.1% | 7.2% | 21.7% | 8.3% | 8.1% | 23.4% | 9.3% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 3.3% | 9.5% | 3.8% | 3.5% | 12.0% | 4.1% | 3.9% | 12.6% | 4.6% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 3.6% | 5.5% | 3.8% | 3.2% | 5.5% | 3.4% | 3.3% | 5.1% | 3.5% |
| Loans that entered repayment during the period[2] | $ 959 | $ 30 | $ 989 | $ 2,906 | $ 81 | $ 2,987 | $ 3,336 | $ 194 | $ 3,530 |
| Percentage of Private Education Loans with a cosigner | 67% | 32% | 64% | 70% | 31% | 67% | 68% | 30% | 65% |
| Average FICO at origination | 727 | 626 | 719 | 729 | 625 | 722 | 728 | 624 | 720 |

[1]   Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]   Includes loans that are required to make a payment for the first time.

Table of Contents

| (Dollars in millions) | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 35,233 | $ 4,101 | $39,334 | $ 34,177 | $ 4,395 | $38,572 |
| Ending loans in repayment | 27,467 | 2,718 | 30,185 | 25,043 | 2,809 | 27,852 |
| Private Education Loan allowance for loan losses | 1,542 | 629 | 2,171 | 1,231 | 791 | 2,022 |
| Charge-offs as a percentage of average loans in repayment | 2.8% | 12.3% | 3.7% | 3.6% | 16.8% | 5.0% |
| Allowance as a percentage of ending total loans | 4.4% | 15.3% | 5.5% | 3.6% | 18.0% | 5.2% |
| Allowance as a percentage of ending loans in repayment | 5.6% | 23.1% | 7.2% | 4.9% | 28.2% | 7.3% |
| Allowance coverage of charge-offs | 2.1 | 1.9 | 2.0 | 1.5 | 1.7 | 1.6 |
| Delinquencies as a percentage of Private Education Loans in repayment | 8.6% | 26.0% | 10.1% | 8.8% | 27.4% | 10.6% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 4.0% | 13.6% | 4.9% | 4.2% | 15.0% | 5.3% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 4.2% | 6.6% | 4.4% | 4.4% | 6.1% | 4.6% |
| Loans that entered repayment during the period[2] | $ 4,886 | $ 345 | $ 5,231 | $ 6,451 | $ 553 | $ 7,004 |
| Percentage of Private Education Loans with a cosigner | 65% | 29% | 62% | 63% | 28% | 59% |
| Average FICO at origination | 726 | 624 | 717 | 725 | 623 | 715 |

[1]  Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]  Includes loans that are required to make a payment for the first time.

81

Table of Contents

*"Core Earnings" Basis:*

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 29,302 | $ 3,004 | $32,306 | $ 30,430 | $ 3,320 | $33,750 | $ 30,711 | $ 3,682 | $34,393 |
| Ending loans in repayment | 24,815 | 2,134 | 26,949 | 25,144 | 2,254 | 27,398 | 25,224 | 2,540 | 27,764 |
| Private Education Loan allowance for loan losses | 1,515 | 401 | 1,916 | 1,537 | 498 | 2,035 | 1,579 | 527 | 2,106 |
| Charge-offs as a percentage of average loans in repayment | 2.2% | 7.7% | 2.6% | 2.6% | 9.2% | 3.1% | 3.1% | 11.1% | 3.9% |
| Allowance as a percentage of ending total loans | 5.2% | 13.3% | 5.9% | 5.0% | 15.0% | 6.0% | 5.1% | 14.3% | 6.1% |
| Allowance as a percentage of ending loans in repayment | 6.1% | 18.8% | 7.1% | 6.1% | 22.1% | 7.4% | 6.3% | 20.7% | 7.6% |
| Average coverage of charge-offs | 2.8 | 2.4 | 2.7 | 2.3 | 2.2 | 2.3 | 2.1 | 1.8 | 2.0 |
| Delinquencies as a percentage of Private Education Loans in repayment | 7.3% | 18.1% | 8.1% | 8.2% | 21.9% | 9.3% | 9.0% | 23.7% | 10.4% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 3.3% | 9.5% | 3.8% | 4.0% | 12.2% | 4.7% | 4.4% | 12.8% | 5.2% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 3.6% | 5.5% | 3.8% | 3.7% | 5.6% | 3.8% | 3.8% | 5.2% | 3.9% |
| Loans that entered repayment during the period[2] | $ 561 | $ 27 | $ 588 | $ 896 | $ 61 | $ 957 | $ 1,817 | $ 155 | $ 1,972 |
| Percentage of Private Education Loans with a cosigner | 67% | 32% | 64% | 66% | 31% | 63% | 64% | 30% | 60% |
| Average FICO at origination | 727 | 626 | 719 | 726 | 626 | 717 | 724 | 625 | 715 |

[1] Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2] Includes loans that are required to make a payment for the first time.

82

Table of Contents

| (Dollars in millions)[1] | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 30,176 | $ 3,985 | $34,161 | $ 29,774 | $ 4,243 | $34,017 |
| Ending loans in repayment | 23,273 | 2,662 | 25,935 | 21,914 | 2,758 | 24,672 |
| Private Education Loan allowance for loan losses | 1,486 | 616 | 2,102 | 1,192 | 780 | 1,972 |
| Charge-offs as a percentage of average loans in repayment | 3.3% | 12.5% | 4.3% | 4.0% | 16.9% | 5.5% |
| Allowance as a percentage of ending total loans | 4.9% | 15.5% | 6.2% | 4.0% | 18.4% | 5.8% |
| Allowance as a percentage of ending loans in repayment | 6.4% | 23.2% | 8.1% | 5.4% | 28.3% | 8.0% |
| Allowance coverage of charge-offs | 2.0 | 1.8 | 2.0 | 1.4 | 1.7 | 1.5 |
| Delinquencies as a percentage of Private Education Loans in repayment | 9.8% | 26.4% | 11.5% | 9.8% | 27.8% | 11.8% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 4.7% | 13.9% | 5.6% | 4.8% | 15.3% | 6.0% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 4.9% | 6.7% | 5.1% | 5.0% | 6.2% | 5.1% |
| Loans that entered repayment during the period[2] | $ 2,762 | $ 285 | $ 3,047 | $ 3,886 | $ 481 | $ 4,367 |
| Percentage of Private Education Loans with a cosigner | 61% | 29% | 57% | 60% | 29% | 56% |
| Average FICO at origination | 723 | 624 | 713 | 722 | 624 | 712 |

[1]  Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]  Includes loans that are required to make a payment for the first time.

As part of determining the adequacy of the allowance for loan losses, we review key allowance and loan metrics. The most significant of these metrics considered are the allowance coverage of charge-offs ratio; the allowance as a percentage of total loans and of loans in repayment; and delinquency and forbearance percentages.

83

Table of Contents

*Receivable for Partially Charged-Off Private Education Loans*

At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so. There was $385 million and $336 million in the allowance for Private Education Loan losses at December 31, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans (see "Private Education Loans Segment — Private Education Loan Provision for Loan Losses" for a further discussion).

The following table summarizes the activity in the receivable for partially charged-off Private Education Loans (GAAP-basis and "Core Earnings"-basis are the same).

| (Dollars in millions) | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2014 | 2013 | 2012 |
| Receivable at beginning of period | $1,313 | $1,347 | $1,241 |
| Expected future recoveries of current period defaults[1] | 233 | 290 | 351 |
| Recoveries[2] | (215) | (230) | (189) |
| Charge-offs[3] | (86) | (94) | (56) |
| Receivable at end of period | 1,245 | 1,313 | 1,347 |
| Allowance for estimated recovery shortfalls[4] | (385) | (336) | (198) |
| Net receivable at end of period | $ 860 | $ 977 | $1,149 |

[1] Represents the difference between the defaulted loan balance and our estimate of the amount to be collected in the future.

[2] Current period cash collections.

[3] Represents the current period recovery shortfall — the difference between what was expected to be collected and what was actually collected. These amounts are included in total charge-offs as reported in the "Allowance for Private Education Loan Losses" table.

[4] The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $1.9 billion, $2.1 billion and $2.2 billion overall allowance for Private Education Loan losses as of December 31, 2014, 2013 and 2012, respectively.

84

Table of Contents

*Use of Forbearance as a Private Education Loan Collection Tool*

Forbearance involves granting the customer a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time. Using forbearance extends the original term of the loan. Forbearance does not grant any reduction in the total repayment obligation (principal or interest). While in forbearance status, interest continues to accrue and is capitalized to principal when the loan re-enters repayment status. Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan. In some instances, we require good-faith payments before granting forbearance. Exceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of recovery of the loan. Forbearance as a recovery tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments. We leverage updated customer information and other decision support tools to best determine who will be granted forbearance based on our expectations as to a customer's ability and willingness to repay their obligation. This strategy is aimed at mitigating the overall risk of the portfolio as well as encouraging cash resolution of delinquent loans.

Forbearance may be granted to customers who are exiting their grace period to provide additional time to obtain employment and income to support their obligations, or to current customers who are faced with a hardship and request forbearance time to provide temporary payment relief. In these circumstances, a customer's loan is placed into a forbearance status in limited monthly increments and is reflected in the forbearance status at month-end during this time. At the end of their granted forbearance period, the customer will enter repayment status as current and is expected to begin making their scheduled monthly payments on a go-forward basis.

Forbearance may also be granted to customers who are delinquent in their payments. In these circumstances, the forbearance cures the delinquency and the customer is returned to a current repayment status. In more limited instances, delinquent customers will also be granted additional forbearance time.

The tables below show the composition and status of the Private Education Loan portfolio aged by number of months in active repayment status (months for which a scheduled monthly payment was received). As indicated in the tables, the percentage of loans that are delinquent greater than 90 days or that are in forbearance status decreases the longer the loans have been in active repayment status.

At December 31, 2014, loans in forbearance status as a percentage of loans in repayment and forbearance were 10.3 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.4 percent for loans that have been in active repayment status for more than 48 months. Approximately 57 percent of our Private Education Loans in forbearance status have been in active repayment status less than 25 months.

At December 31, 2014, loans in repayment that are delinquent greater than 90 days as a percentage of loans in repayment were 9.5 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.6 percent for loans that have been in active repayment status for more than 48 months. Approximately 49 percent of our Private Education Loans in repayment that are delinquent greater than 90 days status have been in active repayment status less than 25 months.

85

Table of Contents

*GAAP Basis:*

| (Dollars in millions) December 31, 2014 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 3,053 | $ 3,053 |
| Loans in forbearance | 438 | 168 | 148 | 121 | 184 | — | 1,059 |
| Loans in repayment — current | 1,732 | 2,586 | 3,734 | 3,982 | 12,727 | — | 24,761 |
| Loans in repayment — delinquent 31-60 days | 163 | 122 | 124 | 107 | 218 | — | 734 |
| Loans in repayment — delinquent 61-90 days | 102 | 81 | 78 | 62 | 113 | — | 436 |
| Loans in repayment — delinquent greater than 90 days | 299 | 204 | 175 | 132 | 208 | — | 1,018 |
| Total | $2,734 | $ 3,161 | $ 4,259 | $ 4,404 | $ 13,450 | $ 3,053 | 31,061 |
| Unamortized discount | | | | | | | (594) |
| Receivable for partially charged-off loans | | | | | | | 1,245 |
| Allowance for loan losses | | | | | | | (1,916) |
| Total Private Education Loans, net | | | | | | | $29,796 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 16.0% | 5.3% | 3.5% | 2.7% | 1.4% | —% | 3.8% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 13.0% | 6.8% | 4.3% | 3.1% | 1.6% | —% | 3.8% |
| Charge-offs as a percentage of loans in repayment | 8.8% | 3.3% | 2.2% | 1.5% | .9% | —% | 2.5% |

| (Dollars in millions) December 31, 2013 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 6,528 | $ 6,528 |
| Loans in forbearance | 504 | 188 | 165 | 106 | 139 | — | 1,102 |
| Loans in repayment — current | 4,093 | 4,743 | 4,858 | 4,621 | 10,453 | — | 28,768 |
| Loans in repayment — delinquent 31-60 days | 196 | 165 | 149 | 113 | 179 | — | 802 |
| Loans in repayment — delinquent 61-90 days | 149 | 106 | 94 | 65 | 99 | — | 513 |
| Loans in repayment — delinquent greater than 90 days | 482 | 264 | 216 | 135 | 190 | — | 1,287 |
| Total | $5,424 | $ 5,466 | $ 5,482 | $ 5,040 | $ 11,060 | $ 6,528 | 39,000 |
| Unamortized discount | | | | | | | (704) |
| Receivable for partially charged-off loans | | | | | | | 1,313 |
| Allowance for loan losses | | | | | | | (2,097) |
| Total Private Education Loans, net | | | | | | | $37,512 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 9.3% | 3.4% | 3.0% | 2.1% | 1.3% | —% | 3.4% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 9.8% | 5.0% | 4.1% | 2.7% | 1.7% | —% | 4.1% |
| Charge-offs as a percentage of loans in repayment | 8.7% | 2.4% | 1.7% | 1.1% | .8% | —% | 2.8% |

| (Dollars in millions) December 31, 2012 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 5,904 | $ 5,904 |
| Loans in forbearance | 602 | 195 | 149 | 83 | 107 | — | 1,136 |
| Loans in repayment — current | 5,587 | 5,316 | 5,325 | 4,398 | 7,949 | — | 28,575 |
| Loans in repayment — delinquent 31-60 days | 387 | 193 | 164 | 107 | 161 | — | 1,012 |
| Loans in repayment — delinquent 61-90 days | 213 | 92 | 73 | 41 | 62 | — | 481 |
| Loans in repayment — delinquent greater than 90 days | 781 | 261 | 183 | 96 | 125 | — | 1,446 |
| Total | $7,570 | $ 6,057 | $ 5,894 | $ 4,725 | $ 8,404 | $ 5,904 | 38,554 |
| Unamortized discount | | | | | | | (796) |
| Receivable for partially charged-off loans | | | | | | | 1,347 |
| Allowance for loan losses | | | | | | | (2,171) |
| Total Private Education Loans, net | | | | | | | $36,934 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 8.0% | 3.2% | 2.5% | 1.8% | 1.3% | —% | 3.5% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 11.2% | 4.4% | 3.2% | 2.1% | 1.5% | —% | 4.6% |
| Charge-offs as a percentage of loans in repayment | 9.5% | 2.2% | 1.4% | 1.0% | .8% | —% | 3.4% |

86

Table of Contents

*"Core Earnings" Basis:*

| (Dollars in millions) December 31, 2014 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| | $ — | $ — | $ — | $ — | $ — | $ 3,053 | $ 3,053 |
| Loans in-school/grace/deferment | | | | | | | |
| Loans in forbearance | 438 | 168 | 148 | 121 | 184 | — | 1,059 |
| Loans in repayment — current | 1,732 | 2,586 | 3,734 | 3,982 | 12,727 | — | 24,761 |
| Loans in repayment — delinquent 31-60 days | 163 | 122 | 124 | 107 | 218 | — | 734 |
| Loans in repayment — delinquent 61-90 days | 102 | 81 | 78 | 62 | 113 | — | 436 |
| Loans in repayment — delinquent greater than 90 days | 299 | 204 | 175 | 132 | 208 | — | 1,018 |
| Total | $2,734 | $ 3,161 | $ 4,259 | $ 4,404 | $ 13,450 | $ 3,053 | 31,061 |
| Unamortized discount | | | | | | | (594) |
| Receivable for partially charged-off loans | | | | | | | 1,245 |
| Allowance for loan losses | | | | | | | (1,916) |
| Total Private Education Loans, net | | | | | | | $29,796 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 16.0% | 5.3% | 3.5% | 2.7% | 1.4% | —% | 3.8% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 13.0% | 6.8% | 4.3% | 3.1% | 1.6% | —% | 3.8% |
| Charge-offs as a percentage of loans in repayment | 11.2% | 3.8% | 2.3% | 1.5% | .9% | —% | 2.6% |

| (Dollars in millions) December 31, 2013 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| | $ — | $ — | $ — | $ — | $ — | $ 3,954 | $ 3,954 |
| Loans in-school/grace/deferment | | | | | | | |
| Loans in forbearance | 493 | 186 | 163 | 105 | 138 | — | 1,085 |
| Loans in repayment — current | 2,274 | 3,673 | 4,197 | 4,268 | 10,423 | — | 24,835 |
| Loans in repayment — delinquent 31-60 days | 183 | 159 | 142 | 111 | 178 | — | 773 |
| Loans in repayment — delinquent 61-90 days | 144 | 104 | 92 | 64 | 99 | — | 503 |
| Loans in repayment — delinquent greater than 90 days | 482 | 263 | 216 | 135 | 191 | — | 1,287 |
| Total | $3,576 | $ 4,385 | $ 4,810 | $ 4,683 | $ 11,029 | $ 3,954 | 32,437 |
| Unamortized discount | | | | | | | (709) |
| Receivable for partially charged-off loans | | | | | | | 1,313 |
| Allowance for loan losses | | | | | | | (2,035) |
| Total Private Education Loans, net | | | | | | | $31,006 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 13.8% | 4.2% | 3.4% | 2.2% | 1.2% | —% | 3.8% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 15.6% | 6.3% | 4.6% | 3.0% | 1.8% | —% | 4.7% |
| Charge-offs as a percentage of loans in repayment | 12.0% | 3.1% | 1.9% | 1.2% | .8% | —% | 3.1% |

| (Dollars in millions) December 31, 2012 | Monthly Scheduled Payments Received | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| | $ — | $ — | $ — | $ — | $ — | $ 4,155 | $ 4,155 |
| Loans in-school/grace/deferment | | | | | | | |
| Loans in forbearance | 597 | 192 | 148 | 83 | 107 | — | 1,127 |
| Loans in repayment — current | 3,959 | 3,819 | 4,803 | 4,355 | 7,933 | — | 24,869 |
| Loans in repayment — delinquent 31-60 days | 372 | 181 | 158 | 106 | 161 | — | 978 |
| Loans in repayment — delinquent 61-90 days | 208 | 88 | 72 | 41 | 62 | — | 471 |
| Loans in repayment — delinquent greater than 90 days | 781 | 260 | 183 | 96 | 126 | — | 1,446 |
| Total | $5,917 | $ 4,540 | $ 5,364 | $ 4,681 | $ 8,389 | $ 4,155 | 33,046 |
| Unamortized discount | | | | | | | (801) |
| Receivable for partially charged-off loans | | | | | | | 1,347 |
| Allowance for loan losses | | | | | | | (2,106) |
| Total Private Education Loans, net | | | | | | | $31,486 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 10.1% | 4.2% | 2.8% | 1.8% | 1.3% | —% | 3.9% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 14.7% | 6.0% | 3.5% | 2.1% | 1.5% | —% | 5.2% |
| Charge-offs as a percentage of loans in repayment | 11.9% | 2.9% | 1.6% | 1.0% | .8% | —% | 3.9% |

Table of Contents

*Private Education Loan Repayment Options*

Certain loan programs allow customers to select from a variety of repayment options depending on their loan type and their enrollment/loan status, which include the ability to extend their repayment term or change their monthly payment. The chart below provides the optional repayment offerings in addition to the standard level principal and interest payments as of December 31, 2014.

| (Dollars in millions) | Loan Program | | | |
| | Signature and Other | Smart Option | Career Training | Total |
|---|---|---|---|---|
| $ in repayment | $21,361 | $4,614 | $ 974 | $26,949 |
| $ in total | $24,837 | $5,211 | $1,013 | $31,061 |
| Payment method by enrollment status: | | | | |
| In-school/grace | Deferred[1] | Deferred[1], interest-only or fixed $25/month | Interest-only or fixed $25/month | |
| Repayment | Level principal and interest or graduated | Level principal and interest | Level principal and interest | |

[1] "Deferred" includes loans for which no payments are required and interest charges are capitalized into the loan balance.

The graduated repayment program that is part of Signature and Other Loans includes an interest-only payment feature that may be selected at the option of the customer. Customers elect to participate in this program at the time they enter repayment following their grace period. This program is available to customers in repayment, after their grace period, who would like a temporary lower payment from the required principal and interest payment amount. Customers participating in this program pay monthly interest with no amortization of their principal balance for up to 48 payments after entering repayment (dependent on the loan product type). The maturity date of the loan is not extended when a customer participates in this program. On a "Core Earnings" basis, as of December 31, 2014 and 2013, customers in repayment owing approximately $3.2 billion (12 percent of loans in repayment) and $4.5 billion (16 percent of loans in repayment), respectively, were enrolled in the interest-only program. Of these amounts, 8 percent and 9 percent were non-traditional loans as of December 31, 2014 and 2013, respectively.

88

Table of Contents

*Accrued Interest Receivable*

The following tables provide information regarding accrued interest receivable on our Private Education Loans. The tables also disclose the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest. The allowance for uncollectible interest exceeds the amount of accrued interest on our 90 days past due portfolio for all periods presented.

*GAAP Basis:*

| | Accrued Interest Receivable As of December 31, | | |
|---|---|---|---|
| (Dollars in millions) | Total | Greater than 90 days Past Due | Allowance for Uncollectible Interest |
| 2014 | $   612 | $        41 | $         40 |
| 2013 | $1,023 | $        48 | $         66 |
| 2012 | $   904 | $        55 | $         67 |
| 2011 | $1,018 | $        54 | $         72 |
| 2010 | $1,271 | $        55 | $         94 |

*"Core Earnings" Basis:*

| | Accrued Interest Receivable As of December 31, | | |
|---|---|---|---|
| (Dollars in millions) | Total | Greater than 90 days Past Due | Allowance for Uncollectible Interest |
| 2014 | $   612 | $        41 | $         40 |
| 2013 | $   689 | $        48 | $         62 |
| 2012 | $   688 | $        55 | $         63 |
| 2011 | $   860 | $        54 | $         68 |
| 2010 | $1,080 | $        56 | $         91 |

## Liquidity and Capital Resources

### Funding and Liquidity Risk Management

The following "Liquidity and Capital Resources" discussion concentrates on our FFELP Loans and Private Education Loans segments. Our Business Services and Other segments require minimal capital and funding. As part of the Spin-Off, Navient neither originates Private Education Loans nor maintains bank deposits and as a result, no longer has liquidity risks associated with the origination of Private Education Loans and the maintenance of bank deposits.

We define liquidity risk as the potential inability to meet our obligations when they become due without incurring unacceptable losses or invest in future asset growth and business operations at reasonable market rates. Our two primary liquidity needs are: (1) servicing our debt and (2) our ongoing ability to meet our cash needs for running the operations of our businesses (including derivative collateral requirements) throughout market cycles, including during periods of financial stress. Secondary liquidity needs, which can be adjusted as needed, include acquisitions of Private Education Loan and FFELP Loan portfolios, acquisitions of companies, the payment of common stock dividends and the repurchase of common stock under common share repurchase programs. To achieve these objectives, we analyze and monitor our liquidity needs, maintain excess liquidity and access diverse funding sources including the issuance of unsecured debt and the issuance of secured debt primarily through asset-backed securitizations and/or other financing facilities.

We define liquidity as cash and high-quality liquid assets that we can use to meet our cash requirements. Our primary liquidity risk relates to our ability to raise replacement debt at a reasonable cost as our unsecured

89

Table of Contents

debt matures. In addition, we must continue to obtain funding at reasonable rates to meet our other business obligations and to continue to grow our business. This ability to access the capital markets may be affected by our credit ratings, as well as the overall availability of funding sources in the marketplace. In addition, credit ratings may be important to customers or counterparties when we compete in certain markets and when we seek to engage in certain transactions, including over-the-counter derivatives.

Credit ratings and outlooks are opinions subject to ongoing review by the ratings agencies and may change, from time to time, based on our financial performance, industry dynamics and other factors. Other factors that influence our credit ratings include the ratings agencies' assessment of the general operating environment, our relative positions in the markets in which we compete, reputation, liquidity position, the level and volatility of earnings, corporate governance and risk management policies, capital position and capital management practices. A negative change in our credit rating could have a negative effect on our liquidity because it might raise the cost and availability of funding and potentially require additional cash collateral or restrict cash currently held as collateral on existing borrowings or derivative collateral arrangements. It is our objective to improve our credit ratings so that we can continue to efficiently access the capital markets even in difficult economic and market conditions.

We have unsecured debt that totaled, as of December 31, 2014, approximately $17.4 billion. On April 30, 2014, three rating agencies took negative ratings actions with regard to our long-term unsecured debt ratings. The negative actions taken by the credit rating agencies were based on concerns that the Spin-Off will have a negative impact on the holders of our senior unsecured debt. According to their ratings reports, these concerns primarily focus on Navient's loss of access to the earnings, cash flow, equity and potential market value of Sallie Mae Bank, the run-off of the FFELP Loan portfolio and the growth of other fee businesses to replace the earnings that are in run-off, refinancing risk, and the potential for new and more onerous rules and regulations. All three credit rating agencies now rate our long-term unsecured debt at below investment grade. These ratings could result in higher cost of funds, and our senior unsecured debt to trade with greater volatility. From May 1, 2014 to December 31, 2014, we issued $1.0 billion of unsecured debt at an average all-in cost of one-month LIBOR plus 3.54 percent.

We expect to fund our ongoing liquidity needs, including the repayment of $1.1 billion of senior unsecured notes that mature in the next twelve months, primarily through our current cash and investment portfolio, the predictable operating cash flows provided by operating activities ($1.7 billion in 2014), the repayment of principal on unencumbered student loan assets, the distributions from our securitization trusts (including servicing fees which are priority payments within the trusts) and the issuance of additional unsecured debt. We may also draw down on our secured FFELP and Private Education facilities or issue term ABS.

### *Sources of Liquidity and Available Capacity*

*Ending Balances*

| (Dollars in millions) | December 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| **Sources of primary liquidity:** | | | | |
| Total unrestricted cash and liquid investments | $ | 1,449 | $ | 3,015 |
| Unencumbered FFELP Loans | | 1,909 | | 1,259 |
| Total "Core Earnings" basis | | 3,358 | | 4,274 |
| SLM BankCo[(1)] | | — | | 3,709 |
| Total GAAP basis | $ | 3,358 | $ | 7,983 |

(1)   As of December 31, 2013, includes $2.3 billion of cash and $1.4 billion of FFELP Loans.

90

Table of Contents

*Average Balances*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| **Sources of primary liquidity:** | | | |
| Total unrestricted cash and liquid investments | $2,066 | $2,475 | $2,386 |
| Unencumbered FFELP Loans | 1,810 | 835 | 691 |
| Total "Core Earnings" basis | 3,876 | 3,310 | 3,077 |
| SLM BankCo[1] | 976 | 2,725 | 1,440 |
| Total GAAP basis | $4,852 | $6,035 | $4,517 |

[1]   For the years ended December 31, 2014, 2013 and 2012, includes $515 million, $1.6 billion and $913 million of cash, respectively, and $461 million, $1.1 billion and $527 million of FFELP Loans, respectively.

Liquidity may also be available under secured credit facilities to the extent we have eligible collateral and capacity available. Maximum borrowing capacity under the FFELP Loan — other facilities will vary and be subject to each agreement's borrowing conditions, including, among others, facility size, current usage and availability of qualifying collateral from unencumbered FFELP Loans. As of December 31, 2014 and 2013, the maximum additional capacity under these facilities was $13.2 billion and $10.6 billion, respectively. For the years ended December 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.2 billion and $11.1 billion, respectively.

In addition to the FFELP Loan — other facilities, liquidity may also be available from our Private Education Loan ABCP facility. This facility provides liquidity for Private Education Loan acquisitions and for the refinancing of loans presently on our balance sheet or in other short–term facilities. The maximum capacity under this facility is $1 billion and it matures in June 2015. At December 31, 2014, the available capacity under this facility was $652 million.

We also hold a number of other unencumbered assets, consisting primarily of Private Education Loans and other assets. Total unencumbered student loans comprised $7.3 billion of our unencumbered assets of which $5.4 billion and $1.9 billion related to Private Education Loans and FFELP Loans, respectively. At December 31, 2014, we had a total of $12.4 billion of unencumbered assets inclusive of those described above as sources of primary liquidity and exclusive of goodwill and acquired intangible assets.

For further discussion of our various sources of liquidity, our continued access to the ABS market, our asset-backed financing facilities, and our issuance of unsecured debt, see "Note 6 — Borrowings."

Table of Contents

The following table reconciles encumbered and unencumbered assets and their net impact on total tangible equity.

| (Dollars in billions) | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Net assets of consolidated variable interest entities (encumbered assets) — FFELP Loans | $ 4.9 | $ 4.6 |
| Net assets of consolidated variable interest entities (encumbered assets) — Private Education Loans | 6.5 | 6.7 |
| Tangible unencumbered assets[1] | 12.4 | 23.8 |
| Senior unsecured debt | (17.4) | (18.3) |
| Bank deposits | — | (8.9) |
| Mark-to-market on unsecured hedged debt[2] | (.9) | (.8) |
| Other liabilities, net | (1.7) | (1.9) |
| Total tangible equity — GAAP Basis | $ 3.8 | $ 5.2 |

[1] Excludes goodwill and acquired intangible assets.

[2] At December 31, 2014 and 2013, there were $794 million and $612 million, respectively, of net gains on derivatives hedging this debt in unencumbered assets, which partially offset these losses.

The $1.4 billion decrease in total tangible equity from December 31, 2013 to December 31, 2014 is primarily the result of the deemed distribution of the $1.7 billion of consumer banking business net assets on April 30, 2014.

*2014 Financing Transactions*

During 2014, we issued $5.0 billion in FFELP ABS, $1.8 billion in Private Education Loan ABS and $1.9 billion in unsecured debt.

On January 10, 2014, we closed on a new $8.0 billion FFELP ABCP facility that matures in January 2016. This facility replaced a $5.5 billion FFELP ABCP facility which was retired in January 2014. The additional $2.5 billion will be available for FFELP acquisition or refinancing. The maximum amount that can be financed steps down to $7 billion in March 2015.

In June 2014, we closed on a new $1.0 billion Private Education Loan ABCP facility. This facility, which matures in June 2015, will be available for Private Education Loan refinancing and acquisitions.

In November 2014, we closed on a new $10.0 billion FFELP Loan ABCP facility. The facility, which matures in November 2017, will finance the acquisition of FFELP Loans, as well as provide additional liquidity to the Company.

*Shareholder Distributions*

We paid a $0.15 quarterly common stock dividend on March 21, 2014, June 20, 2014, September 26, 2014 and December 26, 2014. In May 2014, we authorized $400 million to be utilized in a new common share repurchase program, which was fully utilized as of December 31, 2014. During 2014, we repurchased 30.4 million shares of common stock for an aggregate purchase price of $600 million (8.3 million common shares for $200 million pre-Spin-Off, and 22.1 million common shares for $400 million post-Spin-Off). In December 2014, the Company authorized $1.0 billion to be utilized in a new common share repurchase program that is effective January 1, 2015 and does not have an expiration date.

Table of Contents

### Counterparty Exposure

Counterparty exposure related to financial instruments arises from the risk that a lending, investment or derivative counterparty will not be able to meet its obligations to us. Risks associated with our lending portfolio are discussed in the section titled "Financial Condition — FFELP Loans Portfolio Performance" and "— Private Education Loans Portfolio Performance."

Our investment portfolio is composed of very short-term securities issued by a diversified group of highly rated issuers, limiting our counterparty exposure. Additionally, our investing activity is governed by Board of Director approved limits on the amount that is allowed to be invested with any one issuer based on the credit rating of the issuer, further minimizing our counterparty exposure. Counterparty credit risk is considered when valuing investments and considering impairment.

Related to derivative transactions, protection against counterparty risk is generally provided by International Swaps and Derivatives Association, Inc. ("ISDA") Credit Support Annexes ("CSAs"). CSAs require a counterparty to post collateral if a potential default would expose the other party to a loss. All corporate derivative contracts entered into by Navient are covered under such agreements and require collateral to be exchanged based on the net fair value of derivatives with each counterparty. Our securitization trusts require collateral in all cases if the counterparty's credit rating is withdrawn or downgraded below a certain level. Additionally, securitizations involving foreign currency notes issued after November 2005 also require the counterparty to post collateral to the trust based on the fair value of the derivative, regardless of credit rating. The trusts are not required to post collateral to the counterparties. In all cases, our exposure is limited to the value of the derivative contracts in a gain position net of any collateral we are holding. We consider counterparties' credit risk when determining the fair value of derivative positions on our exposure net of collateral.

We have liquidity exposure related to collateral movements between us and our derivative counterparties. Movements in the value of the derivatives, which are primarily affected by changes in interest rate and foreign exchange rates, may require us to return cash collateral held or may require us to access primary liquidity to post collateral to counterparties. See "Note 7 — Derivative Financial Instruments" for more information on the amount of cash that has been received and delivered to derivative counterparties.

The table below highlights exposure related to our derivative counterparties at December 31, 2014.

| (Dollars in millions) | Corporate Contracts | Securitization Trust Contracts |
|---|---|---|
| Exposure, net of collateral | $    96 | $    129 |
| Percent of exposure to counterparties with credit ratings below S&P AA- or Moody's Aa3 | 65% | 2% |
| Percent of exposure to counterparties with credit ratings below S&P A- or Moody's A3 | 35% | 0% |

### "Core Earnings" Basis Borrowings

The following tables present the ending balances of our "Core Earnings" basis borrowings at December 31, 2014, 2013 and 2012, and average balances and average interest rates of our "Core Earnings" basis borrowings for 2014, 2013 and 2012. The average interest rates include derivatives that are economically hedging the underlying debt but do not qualify for hedge accounting treatment. (See "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP — Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" of this Item 7).

93

Table of Contents

*Ending Balances*

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Short Term | Long Term | Total | Short Term | Long Term | Total | Short Term | Long Term | Total |
| ***Unsecured borrowings:*** | | | | | | | | | |
| Senior unsecured debt | $ 1,066 | $ 16,311 | $ 17,377 | $ 2,213 | $ 16,056 | $ 18,269 | $ 2,319 | $ 15,446 | $ 17,765 |
| Total unsecured borrowings | 1,066 | 16,311 | 17,377 | 2,213 | 16,056 | 18,269 | 2,319 | 15,446 | 17,765 |
| ***Secured borrowings:*** | | | | | | | | | |
| FFELP Loan securitizations | — | 86,241 | 86,241 | — | 90,756 | 90,756 | — | 105,525 | 105,525 |
| Private Education Loan securitizations | — | 17,997 | 17,997 | — | 18,835 | 18,835 | — | 19,656 | 19,656 |
| FFELP Loan — other facilities | — | 15,358 | 15,358 | 4,715 | 5,311 | 10,026 | 11,651 | 4,827 | 16,478 |
| Private Education Loan — other facilities | 653 | — | 653 | — | 843 | 843 | — | 1,070 | 1,070 |
| Other[(1)] | 937 | — | 937 | 686 | — | 686 | 1,578 | — | 1,578 |
| Total secured borrowings | 1,590 | 119,596 | 121,186 | 5,401 | 115,745 | 121,146 | 13,229 | 131,078 | 144,307 |
| Total "Core Earnings" basis | 2,656 | 135,907 | 138,563 | 7,614 | 131,801 | 139,415 | 15,548 | 146,524 | 162,072 |
| Adjustment for GAAP accounting treatment | 7 | 959 | 966 | 6,181 | 4,847 | 11,028 | 4,308 | 5,877 | 10,185 |
| GAAP balances | $ 2,663 | $ 136,866 | $ 139,529 | $ 13,795 | $ 136,648 | $ 150,443 | $ 19,856 | $ 152,401 | $ 172,257 |

(1)  "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

Secured borrowings comprised 87 percent of our "Core Earnings" basis debt outstanding at both December 31, 2014 and 2013.

*Average Balances*

| (Dollars in millions) | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | |
| | Average Balance | Average Rate | Average Balance | Average Rate | Average Balance | Average Rate |
| ***Unsecured borrowings:*** | | | | | | |
| Senior unsecured debt | $ 17,533 | 3.73% | $ 17,893 | 3.27% | $ 18,183 | 2.98% |
| Total unsecured borrowings | 17,533 | 3.73 | 17,893 | 3.27 | 18,183 | 2.98 |
| ***Secured borrowings:*** | | | | | | |
| FFELP Loan securitizations | 88,729 | .99 | 95,486 | .99 | 106,493 | 1.08 |
| Private Education Loan securitizations | 18,347 | 2.00 | 19,770 | 2.03 | 19,322 | 2.10 |
| FFELP Loan — other facilities | 8,618 | .81 | 12,890 | .98 | 23,123 | .97 |
| Private Education Loan — other facilities | 780 | 1.54 | 627 | 1.50 | 1,880 | 1.77 |
| Other[(1)] | 832 | .45 | 1,020 | .15 | 1,431 | .22 |
| Total secured borrowings | 117,306 | 1.14 | 129,793 | 1.14 | 152,249 | 1.20 |
| Total | $ 134,839 | 1.47% | $ 147,686 | 1.40% | $ 170,432 | 1.39% |
| "Core Earnings" average balance and rate | $ 134,839 | 1.47% | $ 147,686 | 1.40% | $ 170,432 | 1.39% |
| Adjustment for GAAP accounting treatment | 2,952 | 2.50 | 7,726 | 1.84 | 5,796 | 3.45 |
| GAAP-basis average balance and rate | $ 137,791 | 1.50% | $ 155,412 | 1.42% | $ 176,228 | 1.45% |

(1)  "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

94

Table of Contents

**Contractual Cash Obligations**

The following table provides a summary of our contractual principal obligations associated with long-term notes at December 31, 2014. For further discussion of these obligations, see "Note 6 — Borrowings."

| (Dollars in millions) | 1 Year or Less | 1 to 3 Years | 3 to 5 Years | Over 5 Years | Total |
|---|---|---|---|---|---|
| Long-term notes: | | | | | |
| Senior unsecured debt | $    — | $  4,058 | $  5,240 | $  7,013 | $ 16,311 |
| Secured borrowings[1] | 16,786 | 25,358 | 19,369 | 58,083 | 119,596 |
| Total contractual cash obligations[2] | $16,786 | $29,416 | $24,609 | $65,096 | $135,907 |

[1]  Includes long-term beneficial interests of $104.2 billion of notes issued by consolidated VIEs in conjunction with our securitization transactions and included in long-term notes in the consolidated balance sheet. Timing of obligations is estimated based on our current projection of prepayment speeds of the securitized assets.

[2]  The aggregate principal amount of debt that matures in each period is $16.9 billion, $29.5 billion, $24.7 billion and $65.6 billion, respectively. Specifically excludes derivative market value adjustments of $1.0 billion for long-term notes. Interest obligations on notes are predominantly variable in nature, resetting monthly and quarterly based on LIBOR.

Unrecognized tax benefits were $59 million and $62 million for 2014 and 2013, respectively. For additional information, see "Note 14 — Income Taxes."

**Critical Accounting Policies and Estimates**

Management's Discussion and Analysis of Financial Condition and Results of Operations addresses our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP"). "Note 2 — Significant Accounting Policies" includes a summary of the significant accounting policies and methods used in the preparation of our consolidated financial statements. The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of income and expenses during the reporting periods. Actual results may differ from these estimates under varying assumptions or conditions. On a quarterly basis, management evaluates its estimates, particularly those that include the most difficult, subjective or complex judgments and are often about matters that are inherently uncertain. The most significant judgments, estimates and assumptions relate to the following critical accounting policies that are discussed in more detail below.

*Allowance for Loan Losses*

Our Private Education Loan portfolio contains TDR and non-TDR loans. For customers experiencing financial difficulty, certain Private Education Loans for which we have granted either a forbearance of greater than three months, an interest rate reduction or an extended repayment plan are classified as TDRs. The allowance requirements are different based on these designations. In determining the allowance for loan losses on our non-TDR portfolio, we estimate the principal amount of loans that will default over the next two years (two years being the expected period between a loss event and default) and how much we expect to recover over time related to the defaulted amount. Expected defaults less our expected recoveries equal the allowance related to this portfolio. Our historical experience indicates that, on average, the time between the date that a customer experiences a default causing event (i.e., the loss trigger event) and the date that we charge off the unrecoverable portion of that loan is two years. Separately, for our TDR portfolio, we estimate an allowance amount sufficient to cover life-of-loan expected losses through an impairment calculation based on the difference between the loan's basis and the present value of expected future cash flows (which would include life-of-loan default and recovery assumptions) discounted at the loan's original effective interest rate. See "Allowance for Private Education Loan Losses" in "Note 2 — Significant Accounting Policies." Our TDR portfolio is comprised mostly of loans with interest rate reductions and forbearance usage greater than three months. The separate allowance estimates for our TDR and non-TDR portfolios are combined into our total allowance for Private Education Loan losses.

95

Table of Contents

In estimating both the non-TDR and TDR allowance amounts, we start with historical experience of customer default behavior. We make judgments about which historical period to start with and then make further judgments about whether that historical experience is representative of future expectations and whether additional adjustments may be needed to those historical default rates. We also take the economic environment into consideration when calculating the allowance for loan losses. We analyze key economic statistics and the effect we expect them to have on future defaults. Key economic statistics analyzed as part of the allowance for loan losses are unemployment rates and other asset type delinquency rates. Our allowance for loan losses is estimated using an analysis of delinquent and current accounts. Our model is used to estimate the likelihood that a loan receivable may progress through the various delinquency stages and ultimately charge off. The evaluation of the allowance for loan losses is inherently subjective, as it requires material estimates that may be susceptible to significant changes. The estimate for the allowance for loan losses is subject to a number of assumptions. If actual future performance in delinquency, charge-offs and recoveries are significantly different than estimated, this could materially affect our estimate of the allowance for loan losses and the related provision for loan losses on our income statement.

We determine the collectability of our Private Education Loan portfolio by evaluating certain risk characteristics. We consider school type, credit score (FICO), existence of a cosigner, loan status and loan seasoning as the key credit quality indicators because they have the most significant effect on our determination of the adequacy of our allowance for loan losses. The type of school customers attend can have an impact on their job prospects after graduation and therefore affects their ability to make payments. Credit scores are an indicator of the credit worthiness of a customer and the higher the credit score the more likely it is the customer will be able to make all of their contractual payments. Loan status affects the credit risk because a past due loan is more likely to result in a credit loss than an up-to-date loan. Additionally, loans in a deferred payment status have different credit risk profiles compared with those in current pay status. Loan seasoning affects credit risk because a loan with a history of making payments generally has a lower incidence of default than a loan with a history of making infrequent or no payments. The existence of a cosigner lowers the likelihood of default. We monitor and update these credit quality indicators in the analysis of the adequacy of our allowance for loan losses on a quarterly basis.

To estimate the probable credit losses incurred in the loan portfolio at the reporting date, we use historical experience of customer payment behavior in connection with the key credit quality indicators and incorporate management expectations regarding macroeconomic and collection procedure factors. Our model is based upon the most recent twelve months of actual collection experience as the starting point and applies expected macroeconomic changes and collection procedure changes to estimate expected losses caused by loss events incurred as of the balance sheet date. Our model places a greater emphasis on the more recent default experience rather than the default experience for older historical periods, as we believe the recent default experience is more indicative of the probable losses incurred in the loan portfolio today. Similar to estimating defaults, we use historical customer payment behavior to estimate the timing and amount of future recoveries on charged-off loans. We use judgment in determining whether historical performance is representative of what we expect to collect in the future. We then apply the default and collection rate projections to each category of loans. Once the quantitative calculation is performed, we review the adequacy of the allowance for loan losses and determine if qualitative adjustments need to be considered. Additionally, we consider changes in laws and regulations that could potentially impact the allowance for loan losses. More judgment has been required over the last several years, compared with years prior, in light of the U.S. economy and its effect on our customers' ability to pay their obligations. We believe that our model reflects recent customer behavior, loan performance, and collection performance, as well as expectations about economic factors.

Our collection policies allow for periods of nonpayment for customers requesting additional payment grace periods upon leaving school or experiencing temporary difficulty meeting payment obligations. This is referred to as forbearance status and is considered in our allowance for loan losses. The loss confirmation period is in alignment with our typical collection cycle and takes into account these periods of nonpayment.

Our allowance for Private Education Loan losses also provides for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans. At the end of each month, for loans

96

Table of Contents

that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so.

FFELP Loans are insured as to their principal and accrued interest in the event of default subject to a Risk Sharing level based on the date of loan disbursement. These insurance obligations are supported by contractual rights against the United States. For loans disbursed after October 1, 1993, and before July 1, 2006, we receive 98 percent reimbursement on all qualifying default claims. For loans disbursed on or after July 1, 2006, we receive 97 percent reimbursement. For loans disbursed prior to October 1, 1993, we receive 100 percent reimbursement.

The allowance for FFELP Loan losses uses historical experience of customer default behavior and a two year loss confirmation period to estimate the credit losses incurred in the loan portfolio at the reporting date. We apply the default rate projections, net of applicable Risk Sharing, to each category for the current period to perform our quantitative calculation. Once the quantitative calculation is performed, we review the adequacy of the allowance for loan losses and determine if qualitative adjustments need to be considered.

*Premium and Discount Amortization*

The most judgmental estimate for premium and discount amortization on student loans is the Constant Prepayment Rate ("CPR"), which measures the rate at which loans in the portfolio pay down principal compared to their stated terms. Loan consolidation, default, term extension (through deferment, forbearance or other payment modification programs) and other prepayment factors affecting our CPR estimates are affected by changes in our business strategy, changes in our competitor's business strategies, legislative changes, interest rates and changes to the current economic and credit environment. When we determine the CPR we begin with historical prepayment rates due to consolidation activity, defaults, payoffs and term extensions. We make judgments about which historical period to start with and then make further judgments about whether that historical experience is representative of future expectations and whether additional adjustment may be needed to those historical prepayment rates.

In the past (prior to 2008), the consolidation of FFELP Loans and Private Education Loans significantly affected our CPRs and updating those assumptions often resulted in material adjustments to our amortization expense. As a result of the passage of HCERA in 2010, there is no longer the ability to consolidate loans under the FFELP. As a result, we do not expect to actively consolidate FFELP Loans in the future and do not currently expect others to actively consolidate our FFELP Loans. As a result, we expect CPRs related to our FFELP Loans to remain relatively stable over time, unless there is a legislative change. Some student loan companies offer private education loans which can consolidate both FFELP and Private Education Loans and we anticipate more entrants to offer similar products. We expect that in the future we may begin to consolidate FFELP and Private Education Loans as well. These products and expectations are built into the CPR assumption we use for FFELP and Private Education Loans. However, it is difficult to accurately project the timing and level at which this consolidation activity will begin and our assumption may need to be updated by a material amount in the future based on changes in the economy and marketplace. The level of defaults is a significant component of our FFELP Loan and Private Education Loan CPR. This component of the FFELP Loan and Private Education Loan CPR is estimated in the same manner as discussed in "Critical Accounting Policies and Estimates — Allowance for Loan Losses." Recently, there has been an increase in the use of income based repayment plans with FFELP

97

Table of Contents

Loans and interest rate modifications/extensions with Private Education Loans. These programs have the effect of slowing down the pay down of the loan portfolios. This continued usage of these programs is built into our CPR assumptions.

*Fair Value Measurement*

The most significant assumptions used in fair value measurements, including those related to credit and liquidity risk, are as follows:

1.  **Derivatives** — When determining the fair value of derivatives, we take into account counterparty credit risk for positions where we are exposed to the counterparty on a net basis by assessing exposure net of collateral held. The net exposure for each counterparty is adjusted based on market information available for that specific counterparty, including spreads from credit default swaps. Additionally, when the counterparty has exposure to us related to our derivatives, we fully collateralize the exposure, minimizing the adjustment necessary to the derivative valuations for our own credit risk. Trusts that contain derivatives are not required to post collateral to counterparties as the credit quality and securitized nature of the trusts minimizes any adjustments for the counterparty's exposure to the trusts. Adjustments related to credit risk reduced the overall value of our derivatives by $18 million as of December 31, 2014. We also take into account changes in liquidity when determining the fair value of derivative positions. We adjusted the fair value of certain less liquid positions downward by approximately $73 million, to take into account a significant reduction in liquidity as of December 31, 2014, related primarily to basis swaps indexed to interest rate indices with inactive markets. A major indicator of market inactivity is the widening of the bid/ask spread in these markets. In general, the widening of counterparty credit spreads and reduced liquidity for derivative instruments as indicated by wider bid/ask spreads will reduce the fair value of derivatives. In addition, certain cross-currency interest rate swaps hedging foreign currency denominated reset rate and amortizing notes in our trusts contain extension features that coincide with the remarketing dates of the notes. The valuation of the extension feature requires significant judgment based on internally developed inputs.

2.  **Student Loans** — Our FFELP Loans and Private Education Loans are accounted for at cost or at the lower of cost or fair value if the loan is held-for-sale. The fair values of our student loans are disclosed in "Note 12 — Fair Value Measurements." For both FFELP Loans and Private Education Loans accounted for at cost, fair value is determined by modeling loan level cash flows using stated terms of the assets and internally-developed assumptions to determine aggregate portfolio yield, net present value and average life. The significant assumptions used to project cash flows are prepayment speeds, default rates, cost of funds, the amount funded by debt versus equity, and required return on equity. In addition, the Floor Income component of our FFELP Loan portfolio is valued through discounted cash flow and option models using both observable market inputs and internally developed inputs. Significant inputs into the models are not generally market observable. They are either derived internally through a combination of historical experience and management's qualitative expectation of future performance (in the case of prepayment speeds, default rates, and capital assumptions) or are obtained through external broker quotes (as in the case of cost of funds). When possible, market transactions are used to validate the model. In most cases, these are either infrequent or not observable.

For further information regarding the effect of our use of fair values on our results of operations, see "Note 12 — Fair Value Measurements."

*Transfers of Financial Assets and the Variable Interest Entity ("VIE") Consolidation Model*

If we have a variable interest in a Variable Interest Entity ("VIE") and we have determined that we are the primary beneficiary of the VIE then we will consolidate the VIE. We are considered the primary beneficiary if we have both: (1) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and (2) the obligation to absorb losses or receive benefits of the entity that could potentially be significant to the VIE. There can be considerable judgment that has to be used as it relates to determining the

98

Table of Contents

primary beneficiary of the VIEs with which we are associated. There are no "bright line" tests. Rather, the assessment of who has the power to direct the activities of the VIE that most significantly affect the VIE's economic performance and who has the obligation to absorb losses or receive benefits of the entity that could potentially be significant to the VIE can be very qualitative and judgmental in nature. However, based on our current relationship with our securitization trusts and other financing vehicles which are considered VIEs, we believe the assessment is more straightforward. As it relates to our securitized assets, we are the servicer of those securitized assets (which means we "have the power" to direct the activities of the trust) and we own the Residual Interest (which means we "have the loss and gain obligation that could potentially be significant to the VIE") of the securitization trusts. As a result, we are the primary beneficiary of our securitization trusts and other financing vehicles. See "Note 2 — Significant Accounting Policies" for further details.

In 2013, we sold Residual Interests in FFELP Loan securitization trusts to third parties. We will continue to service the student loans in the trusts under existing agreements. Prior to the sale of the Residual Interests, we had consolidated the trusts as VIEs because we had met the two criteria for consolidation. We had determined we were the primary beneficiary because (1) as servicer to the trust we had the power to direct the activities of the VIE that most significantly affected its economic performance and (2) as the residual holder of the trust, we had an obligation to absorb losses or receive benefits of the trust that could potentially be significant. Upon the sale of the Residual Interests we were no longer the residual holder, thus we determined we no longer met criterion (2) above and deconsolidated the trusts.

### Derivative Accounting

The most significant judgments related to derivative accounting are: (1) concluding the derivative is an effective hedge and qualifies for hedge accounting; and (2) determining the fair value of certain derivatives and hedged items. To qualify for hedge accounting a derivative must be concluded to be a highly effective hedge upon designation and on an ongoing basis. There are no "bright line" tests on what is considered a highly effective hedge. We use a historical regression analysis to prove ongoing and prospective hedge effectiveness. Although some of our valuations are more judgmental than others, we compare the fair values of our derivatives that we calculate to those provided by our counterparties on a monthly basis. We view this as a critical control which helps validate these judgments. Any significant differences with our counterparties are identified and resolved appropriately.

## Risk Management

### Our Approach

The loan servicing and collection services Navient provides, as well as the financial markets in which Navient operates, continue to undergo dramatic competitive, technological and regulatory changes. Identifying, understanding, and effectively managing the risks inherent in our business are critical to our continued success. Navient has risk oversight, management and assessment responsibilities assigned and documented at various levels within our organization and coordinated across our organization. We maintain comprehensive risk management practices to identify, measure, monitor, evaluate, control, and report on our significant risks.

### Risk Management Philosophy

Navient's risk management philosophy is to ensure all significant risk inherent in our business is identified, measured, monitored, evaluated, controlled and reported. In furtherance of these goals, Navient: (i) maintains a comprehensive and uniform risk management framework; (ii) follows a "three lines of defense" structure based upon: (1) accountability and ownership at the business area level for risks inherent in their activities (first line of defense); (2) supporting areas, such as Human Resources, Legal, Compliance, Finance and Accounting, Information-Technology and Information Security, monitor, guide and advise the business areas in their respective areas of expertise (second line of defense); and (3) Internal Audit reviews both business and support areas to ensure compliance with applicable laws, regulations and internal policies and procedures (third line of defense);

99

Table of Contents

(iii) provides appropriate reporting tools to management and our board of directors and their respective committees; and (iv) trains our employees on our risk management processes and philosophy.

*Risk Oversight, Roles and Responsibilities*

The Navient board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements. We escalate to our board of directors any significant departures from established tolerances and parameters and review new and emerging risks with them.

Responsibility for risk management is assigned at several different levels of our organization, including our board of directors and its committees. Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in collaboration with our executive management team and internal risk management partners. Our Human Resources, Legal, Compliance, Finance and Accounting, Information-Technology and Information Security support areas are responsible for providing our business areas with the training, systems and specialized expertise necessary to properly perform their risk management responsibilities.

*Board of Directors.* Our board of directors, directly and through its standing committees, is responsible for overseeing our strategic direction and risk management approach. It approves our annual business plan, periodically reviews our strategic approach and priorities and spends significant time considering our capital requirements and our dividend and share repurchase levels and activities. Standing committees of our board of directors include Executive, Audit, Compensation and Personnel, Nominations and Governance and Finance and Operations. Charters for each committee providing their specific responsibilities and areas of risk oversight are published on our website together with the names of the directors serving on these committees.

*Chief Executive Officer.* Our Chief Executive Officer is responsible for establishing our risk management culture and ensuring business areas operate within risk parameters and in accordance with our annual business plan.

*Chief Risk and Compliance Officer.* Our Chief Risk and Compliance Officer is responsible for ensuring proper oversight, management and reporting to our board of directors and management regarding our risk management practices, the timely escalation and complete resolution of any significant risk issues and for instilling our risk management culture in our people and our practices, ensuring business areas operate within risk parameters and in accordance with our annual business plan.

*Enterprise Risk Committee.* Our Enterprise Risk Committee is an executive management-level committee chaired by our Chief Risk and Compliance Officer where senior management reviews our significant risks, receives periodic reports on adherence to agreed risk parameters, prioritizes and provides direction on mitigation of our risks and closure of issues and supervises the continued evolution of our enterprise risk management program. This committee also oversees our Internal Controls Excellence ("ICE") initiative and Sarbanes-Oxley compliance and ensures any control deficiencies are identified, understood by all relevant affected parties, and have established resolution plans supported by adequate resources. Lastly, this committee evaluates risks associated with new or modified business and make recommendations regarding proposed business initiatives based on their inherent risks and controls. In addition to the Chair, committee membership includes our Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Information Officer, Chief Business Development Officer and Chief Audit Officer (in a non-voting capacity). The committee meets six times per year in advance of each regularly scheduled board of directors meeting and more frequently if needed to address particular issues.

*Credit and Loan Loss Committee.* Our Credit and Loan Loss Committee is an executive management-level committee chaired by our Chief Risk and Compliance Officer to oversee our credit and portfolio management

100

Table of Contents

monitoring and strategies, the sufficiency of our loan loss reserves and current or emerging issues affecting delinquency and default trends which may result in adjustments in our allowances for loan losses.

*Compliance Committee*. Our Compliance Committee is an executive management-level committee chaired by our Chief Risk and Compliance Officer to oversee regulatory compliance risk management activities including compliance regulatory training, compliance regulatory change management, compliance and operational risk assessment, transactional testing and monitoring, policies and procedures, our privacy and information sharing practices and our Code of Business Conduct.

*Disclosure Committee*. Our Disclosure Committee reviews our periodic SEC reporting documents, earnings releases and related disclosure policies and procedures.

*Critical Accounting Assumptions Committee*. Our Critical Accounting Assumptions Committee oversees critical accounting assumptions, as well as key judgments and estimates involved in preparing our financial statements. These include assumptions about matters such as default, recovery and prepayment rates.

*Asset and Liability Committee*. Our Asset and Liability Committee oversees our investment portfolio and strategy and our compliance with our investment policy.

*Operations and Information-Technology Committee*. Our Operations and Information-Technology Committee oversees our business area operations and the activities of out Information-Technology support area, including Information Security.

### Internal Audit Risk Assessment

Navient Internal Audit monitors our various risk management and compliance efforts, identifies areas that may require increased focus and resources, and reports significant control issues and recommendations to executive management and the Audit Committee of our board of directors. Internal Audit performs an annual risk assessment evaluating the risk of all significant components of our company and uses the results to develop an annual internal audit plan. The risk assessment process includes detailed measures of risk and formalized identification of auditable components of our company to ensure Internal Audit's efforts are both properly focused and comprehensive.

### Risk Appetite Framework

Navient's Risk Appetite Framework establishes the level of risk we are willing to accept within each risk category in pursuit of our business strategy. Our Audit Committee of the board of directors reviews our Risk Appetite Framework annually, helping to ensure consistency in our business decisions, monitoring and reporting. Our management-level Enterprise Risk Committee monitors approved risk limits and thresholds to ensure our businesses are operating within approved risk limits. Through ongoing monitoring of risk exposures, management identifies potential risks and develops appropriate responses and mitigation strategies.

### Risk Categories

Our Risk Appetite Framework segments Navient's risks across nine domains: (1) credit; (2) market; (3) funding and liquidity; (4) compliance; (5) legal; (6) operational; (7) reputational/political; (8) governance; and (9) strategy.

*Credit Risk*. Credit risk is the risk to earnings or capital resulting from an obligor's failure to meet the terms of any contract with us or otherwise fail to perform as agreed. Credit risk is found in all activities where success depends on counterparty, issuer or borrower performance.

Navient has credit or counterparty risk exposure with borrowers and cosigners of our Private Education Loans, the various counterparties with whom we have entered into derivative contracts and the various issuers

101

Table of Contents

with whom we make investments. Credit and counterparty risks are overseen by our Chief Risk and Compliance Officer, our Loss Forecasting staff and the management-level Credit and Loan Loss Committee. Our Chief Risk and Compliance Officer reports regularly to our board of directors and both the Finance and Operations and Audit Committees of the board.

The credit risk related to our Private Education Loans is managed within a credit risk infrastructure which includes: (i) a well-defined asset quality and collection policy framework; (ii) an ongoing monitoring and review process of portfolio concentration and trends; (iii) assignment and management of credit and loss forecasting authorities and responsibilities; and (iv) establishment of an allowance for loan losses that covers estimated losses based upon portfolio and economic analysis.

Credit risk related to derivative contracts is managed by reviewing counterparties for credit strength on an ongoing basis and through our credit policies, which place limits on our exposure with any single counterparty and, in most cases, require collateral to secure the position. Credit and counterparty risk associated with derivatives is measured based on the replacement cost if counterparties in a gain position fail to perform under the terms of the contract.

*Market Risk.* Market risk is the risk to earnings or capital resulting from changes in market conditions, such as interest rates, credit spreads, commodity prices or volatilities. Navient is exposed to various types of market risk, in particular the risk of loss resulting in a mismatch between the maturity/duration of assets and liabilities, interest rate risk and other risks that arise through the management of our investment, debt and student loan portfolios. Market risk exposure is managed primarily through our management-level Asset and Liability Committee, which is responsible for all risks associated with managing our assets and liabilities and recommending limits to be included in our risk appetite and investment structure. These activities are closely tied to those related to the management of our funding and liquidity risks. The Finance and Operations Committee of our board of directors periodically reviews and approves the investment, asset and liability management policies and contingency funding plans developed and administered by our Asset and Liability Committee. The Finance and Operations Committee and our Chief Financial Officer report to the full board of directors on matters of market risk management.

*Funding & Liquidity Risk.* Funding and liquidity risk is the risk to earnings, capital or the conduct of our business arising from the inability to meet our obligations when they become due without incurring unacceptable losses, such as the ability to fund liability maturities or invest in future asset growth and business operations at reasonable market rates. Our primary liquidity risks are any mismatch between the maturity of our assets and liabilities and the servicing of our indebtedness.

Navient's Finance department oversees our funding and liquidity management activities and is responsible for planning and executing our funding activities and strategies, analyzing and monitoring our liquidity risk, maintaining excess liquidity and accessing diverse funding sources depending on current market conditions. Funding and liquidity risks are overseen and recommendations approved primarily through our management-level Asset and Liability Committee. The Finance and Operations Committee of our board of directors periodically reviews and approves our funding and liquidity positions and the contingency funding plan developed and administered by our Asset and Liability Committee. The Finance and Operations Committee also receives regular reports on our performance against funding and liquidity plans at each of its meetings.

*Operational Risk.* Operational risk is the risk to earnings resulting from inadequate or failed internal processes, people or systems or from external events. Operational risk is pervasive, existing in all business areas, functional units, legal entities and geographic locations, and it includes information technology risk, cybersecurity risk, physical security risk on tangible assets, legal/compliance risk and reputational risk.

The Finance and Operations Committee of our board of directors receives operations reports (including operating metrics and performance against annual plan) from our Chief Operating Officer at each regularly scheduled meeting. The Finance & Operations Committee also receives business development updates regarding

102

Table of Contents

our various business initiatives providing information and metrics about each key component of our business operations. The Audit Committee of our board of directors receives periodic information security updates and reviews operational and systems-related matters to insure their implementation produces no significant internal control issues.

Operational risk exposures are managed through a combination of business area management (first line of defense), support area oversight and expertise (second line of defense) and enterprise wide oversight. Our Chief Operating Officer is responsible for all of our business operations (servicing and collections). Management-level committees, comprised of senior managers and subject matter experts, including our Enterprise Risk Committee, Compliance Committee, Credit and Loan Loss Committee, Operations and Information-Technology Committee and Human Resources Committee, focus on particular aspects of operational risk.

*Compliance, Legal and Governance Risk*. Compliance risk is the risk to earnings or capital arising from violations of, or non-conformance with, laws, rules, regulations, prescribed practices, internal policies and procedures, or ethical standards. Legal risk is the risk to earnings, capital or reputation manifested by claims made through the legal system and may arise from a product or service, a transaction, a business relationship, property (real, personal or intellectual), conduct of an employee or change in law or regulation. Governance risk is the risk of not establishing and maintaining a control environment that aligns with stakeholder and regulatory expectations, including tone at the top and board performance. These risks are inherent in all of our businesses. Compliance, legal and governance risk are sub-sets of operational risk but are recognized as a separate and complementary risk category given their importance in our business. We can be exposed to these risks in key areas such as our collections or loan servicing businesses if compliance with legal and regulatory requirements is not properly implemented, documented or tested, or when an oversight program does not include appropriate audit and control features.

*Reputational/Political Risk*. Reputational risk is the risk to earnings or capital arising from damage to our reputation in the view of, or loss of the trust of, customers and the general public. Political risk is the closely related risk to earnings or capital arising from damage to our relationships with governmental entities, regulators and political leaders and candidates. These risks can arise due to both our own acts and omissions, and the acts and omissions of other industry participants or other third parties, and they are inherent in all of our businesses. Reputational risk and political risk are managed through a combination of business area management (first line of defense), support area oversight and expertise (second line of defense) and enterprise-wide oversight.

*Strategy Risk*. Strategy risk is the risk to earnings or capital arising from our potential inability to carry out successfully our strategy. This risk can arise due to both our own acts and omissions, and the acts and omissions of other industry participants or other third parties, and it is inherent in all of our businesses. Strategy risk is managed through a combination of business area management (first line of defense), support area oversight and expertise (second line of defense) and enterprise-wide oversight.

The Audit Committee of our board of directors oversees our monitoring and control of legal and compliance risks and the qualifications of employees overseeing these risk management functions. The Audit Committee annually reviews our Compliance Plan, significant breaches of our Code of Business Conduct and receives regular reports from executive management responsible for the regulatory and compliance risk management functions.

Table of Contents

**Common Stock**

The following table summarizes our common share repurchases and issuances.

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Common stock repurchased[1] | 30,432,689 | 26,987,043 | 58,038,239 |
| Average purchase price per share[2] | $ 19.72 | $ 22.26 | $ 15.52 |
| Shares repurchased related to employee stock-based compensation plans[3] | 4,171,342 | 6,365,002 | 4,547,785 |
| Average purchase price per share | $ 20.91 | $ 21.76 | $ 15.86 |
| Common shares issued[4] | 7,389,962 | 9,702,976 | 6,432,643 |

(1)   Common shares purchased under our share repurchase programs.

(2)   Average purchase price per share includes purchase commission costs.

(3)   Comprises shares withheld from stock option exercises and vesting of restricted stock for employees' tax withholding obligations and shares tendered by employees to satisfy option exercise costs.

(4)   Common shares issued under our various compensation and benefit plans.

Our shareholders have authorized the issuance of 1.125 billion shares of common stock (par value of $0.01). At December 31, 2014, 402 million shares were issued and outstanding and 33 million shares were unissued but encumbered for outstanding stock options, restricted stock units and dividend equivalent units for employee compensation and remaining authority for stock-based compensation plans. The stock-based compensation plans are described in "Note 11 — Stock-Based Compensation Plans and Arrangements."

In April 2014, in connection with the Spin-Off, Old SLM retired 127 million shares of common stock held in treasury. This retirement decreased the balance in treasury stock by $2.3 billion, with corresponding decreases of $25 million in common stock and $2.3 billion in additional paid-in capital. There was no impact to total equity from this retirement.

The closing price of our common stock on December 31, 2014 was $21.61.

*Dividend and Share Repurchase Program*

In 2014, we paid quarterly common stock dividends of $0.15 per share, resulting in a full-year common stock dividend of $0.60 per share.

In 2012, Old SLM authorized the repurchase of up to $900 million of outstanding common stock in open market transactions and repurchased 58.0 million shares for an aggregate purchase price of $900 million. In 2013, Old SLM authorized the repurchase of up to $800 million of outstanding common stock in open market transactions and repurchased 27.0 million shares for an aggregate purchase price of $600 million.

In May 2014, Navient authorized $400 million to be utilized in a new common share repurchase program. We repurchased 30.4 million shares of common stock for $600 million in 2014 (8.3 million shares for $200 million pre-Spin-Off, and 22.1 million shares for $400 million post-Spin-Off), fully utilizing the 2013 and 2014 share repurchase programs. In December 2014, our board of directors authorized $1.0 billion to be utilized in a new common share repurchase program that is effective January 1, 2015 and does not have an expiration date.

104

Table of Contents

**Item 7A.      Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Sensitivity Analysis**

Our interest rate risk management seeks to limit the impact of short-term movements in interest rates on our results of operations and financial position. The following tables summarize the potential effect on earnings over the next 12 months and the potential effect on fair values of balance sheet assets and liabilities at December 31, 2014 and 2013, based upon a sensitivity analysis performed by management assuming a hypothetical increase in market interest rates of 100 basis points and 300 basis points while funding spreads remain constant. Additionally, as it relates to the effect on earnings, a sensitivity analysis was performed assuming the funding index increases 25 basis points while holding the asset index constant, if the funding index and repricing frequency are different than the asset index. The earnings sensitivity is applied only to financial assets and liabilities, including hedging instruments that existed at the balance sheet date and does not take into account new assets, liabilities or hedging instruments that may arise over the next 12 months.

| | As of December 31, 2014 Impact on Annual Earnings If: | | | As of December 31, 2013 Impact on Annual Earnings If: | | |
|---|---|---|---|---|---|---|
| | Interest Rates: | | Funding Indices | Interest Rates: | | Funding Indices |
| (Dollars in millions, except per share amounts) | Increase 100 Basis Points | Increase 300 Basis Points | Increase 25 Basis Points[1] | Increase 100 Basis Points | Increase 300 Basis Points | Increase 25 Basis Points[1] |
| **Effect on Earnings:** | | | | | | |
| Change in pre-tax net income before unrealized gains (losses) on derivative and hedging activities | $   (28) | $   (28) | $ (319) | $    9 | $   93 | $ (326) |
| Unrealized gains (losses) on derivative and hedging activities | 143 | 154 | 3 | 256 | 427 | 1 |
| Increase in net income before taxes | $  115 | $  126 | $ (317) | $  265 | $  520 | $ (325) |
| Increase in diluted earnings per common share[2] | $   .28 | $   .31 | $  (.77) | $   .59 | $ 1.16 | $  (.72) |

[1]  If an asset is not funded with the same index/frequency reset of the asset then it is assumed the funding index increases 25 basis points while holding the asset index constant.

[2]  Calculated based on "increase in net income before taxes."

| | | At December 31, 2014 | | | | |
|---|---|---|---|---|---|---|
| | | Interest Rates: | | | | |
| | | Change from Increase of 100 Basis Points | | Change from Increase of 300 Basis Points | | |
| (Dollars in millions) | Fair Value | $ | % | $ | % | |
| **Effect on Fair Values** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $104,419 | $   (486) | —% | $   (977) | (1)% | |
| Private Education Loans | 29,433 | — | — | — | — | |
| Other earning assets | 6,002 | — | — | — | — | |
| Other assets | 6,033 | (236) | (4) | (317) | (5) | |
| Total assets gain/(loss) | $145,887 | $   (722) | —% | $ (1,294) | (1)% | |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $136,862 | $   (781) | (1)% | $ (2,164) | (2)% | |
| Other liabilities | 2,625 | 85 | 3 | 822 | 31 | |
| Total liabilities (gain)/loss | $139,487 | $   (696) | —% | $ (1,342) | (1)% | |

Table of Contents

| | | At December 31, 2013 | | | | |
| | | | Interest Rates: | | | |
| | | Change from Increase of 100 Basis Points | | Change from Increase of 300 Basis Points | | |
| (Dollars in millions) | Fair Value | $ | % | $ | % | |
| **Effect on Fair Values** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $104,481 | $ (566) | (1)% | $ (1,126) | (1)% | |
| Private Education Loans | 37,485 | — | — | — | — | |
| Other earning assets | 9,732 | — | — | (1) | — | |
| Other assets | 7,711 | (278) | (4) | (435) | (6) | |
| Total assets gain/(loss) | $159,409 | $ (844) | (1)% | $ (1,562) | (1)% | |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $147,385 | $ (859) | (1)% | $ (2,393) | (2)% | |
| Other liabilities | 3,458 | 58 | 2 | 805 | 23 | |
| Total liabilities (gain)/loss | $150,843 | $ (801) | (1)% | $ (1,588) | (1)% | |

A primary objective in our funding is to minimize our sensitivity to changing interest rates by generally funding our floating rate student loan portfolio with floating rate debt. However, due to the ability of some FFELP loans to earn Floor Income, we can have a fixed versus floating mismatch in funding if the student loan earns at the fixed borrower rate and the funding remains floating. In addition, we can have a mismatch in the index (including the frequency of reset) of floating rate debt versus floating rate assets.

During the years ended December 31, 2014 and 2013, certain FFELP Loans were earning Floor Income and we locked in a portion of that Floor Income through the use of Floor Income Contracts. The result of these hedging transactions was to convert a portion of the fixed rate nature of student loans to variable rate, and to fix the relative spread between the student loan asset rate and the variable rate liability.

In the preceding tables, under the scenario where interest rates increase 100 and 300 basis points, the change in pre-tax net income before the unrealized gains (losses) on derivative and hedging activities is primarily due to the impact of (i) our unhedged loans being in a fixed-rate mode due to Floor Income, while being funded with variable debt in low interest rate environments; and (ii) a portion of our variable assets being funded with fixed rate liabilities and equity. Item (i) will generally cause income to decrease when interest rates increase from a low interest rate environment, whereas item (ii) will generally offset this decrease.

Under the scenario in the tables above labeled "Impact on Annual Earnings If: Funding Indices Increase 25 Basis Points," the main driver of the decrease in pre-tax income before unrealized gains (losses) on derivative and hedging activities in both the December 31, 2014 and 2013 analyses is primarily the result of one-month LIBOR-indexed FFELP Loans being funded with three-month LIBOR and other non-discrete indexed liabilities. See "Asset and Liability Funding Gap" of this Item 7A. for a further discussion. Increasing the spread between indices will also impact the unrealized gains (losses) on derivative and hedging activities as it relates to basis swaps that hedge the mismatch between the asset and funding indices.

In addition to interest rate risk addressed in the preceding tables, we are also exposed to risks related to foreign currency exchange rates. Foreign currency exchange risk is primarily the result of foreign currency denominated debt issued by us. When we issue foreign denominated corporate unsecured and securitization debt, our policy is to use cross currency interest rate swaps to swap all foreign currency denominated debt payments (fixed and floating) to U.S. dollar LIBOR using a fixed exchange rate. In the tables above, there would be an immaterial impact on earnings if exchange rates were to decrease or increase, due to the terms of the hedging instrument and hedged items matching. The balance sheet interest bearing liabilities would be affected by a change in exchange rates; however, the change would be materially offset by the cross currency interest rate

106

Table of Contents

swaps in other assets or other liabilities. In the current economic environment, volatility in the spread between spot and forward foreign exchange rates has resulted in material mark-to-market impacts to current-period earnings which have not been factored into the above analysis. The earnings impact is noncash, and at maturity of the instruments the cumulative mark-to-market impact will be zero.

**Asset and Liability Funding Gap**

The tables below present our assets and liabilities (funding) arranged by underlying indices as of December 31, 2014. In the following GAAP presentation, the funding gap only includes derivatives that qualify as effective hedges (those derivatives which are reflected in net interest margin, as opposed to those reflected in the "gains (losses) on derivatives and hedging activities, net" line on the consolidated statements of income). The difference between the asset and the funding is the funding gap for the specified index. This represents our exposure to interest rate risk in the form of basis risk and repricing risk, which is the risk that the different indices may reset at different frequencies or may not move in the same direction or at the same magnitude.

Management analyzes interest rate risk and in doing so includes all derivatives that are economically hedging our debt whether they qualify as effective hedges or not ("Core Earnings" basis). Accordingly, we are also presenting the asset and liability funding gap on a "Core Earnings" basis in the table that follows the GAAP presentation.

*GAAP-Basis*

| Index (Dollars in billions) | Frequency of Variable Resets | Assets[1] | Funding[2] | Funding Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $ 5.1 | $ — | $ 5.1 |
| Prime | annual | .5 | — | .5 |
| Prime | quarterly | 3.5 | — | 3.5 |
| Prime | monthly | 17.4 | — | 17.4 |
| Prime | daily | — | .1 | (.1) |
| PLUS Index | annual | .3 | — | .3 |
| 3-month LIBOR | quarterly | — | 75.1 | (75.1) |
| 1-month LIBOR | monthly | 9.2 | 38.5 | (29.3) |
| 1-month LIBOR daily | daily | 98.3 | — | 98.3 |
| CMT/CPI Index | monthly/quarterly | — | .6 | (.6) |
| Non-Discrete reset[3] | monthly | — | 18.0 | (18.0) |
| Non-Discrete reset[4] | daily/weekly | 6.0 | .9 | 5.1 |
| Fixed Rate[5] | | 6.1 | 13.2 | (7.1) |
| Total | | $146.4 | $ 146.4 | $ — |

[1] FFELP Loans of $44.4 billion ($40.3 billion LIBOR index and $4.1 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2] Funding (by index) includes all derivatives that qualify as hedges.

[3] Funding consists of auction rate ABS and FFELP and Private Education Loan-other facilities.

[4] Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes the obligation to return cash collateral held related to derivatives exposures.

[5] Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity.

The "Funding Gaps" in the above table are primarily interest rate mismatches in short-term indices between our assets and liabilities. We address this issue typically through the use of basis swaps that typically convert quarterly reset three-month LIBOR to other indices that are more correlated to our asset indices. These basis swaps do not qualify as effective hedges and as a result the effect on the funding index is not included in our interest margin and is therefore excluded from the GAAP presentation.

107

Table of Contents

*"Core Earnings" Basis*

| Index (Dollars in billions) | Frequency of Variable Resets | Assets[1] | Funding[2] | Funding Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $ 5.1 | $ — | $ 5.1 |
| Prime | annual | .5 | — | .5 |
| Prime | quarterly | 3.5 | — | 3.5 |
| Prime | monthly | 17.4 | 1.5 | 15.9 |
| Prime | daily | — | .1 | (.1) |
| PLUS Index | annual | .3 | — | .3 |
| 3-month LIBOR | quarterly | — | 74.9 | (74.9) |
| 1-month LIBOR | monthly | 9.2 | 39.9 | (30.7) |
| 1-month LIBOR | daily | 98.3 | — | 98.3 |
| Non-Discrete reset[3] | monthly | — | 18.0 | (18.0) |
| Non-Discrete reset[4] | daily/weekly | 6.0 | .9 | 5.1 |
| Fixed Rate[5] | | 4.9 | 9.9 | (5.0) |
| Total | | $145.2 | $ 145.2 | $ — |

[1]  FFELP Loans of $17.2 billion ($15.4 billion LIBOR index and $1.8 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2]  Funding (by index) includes all derivatives that management considers economic hedges of interest rate risk and reflects how we internally manage our interest rate exposure.

[3]  Funding consists of auction rate ABS and FFELP and Private Education Loan-other facilities.

[4]  Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes the obligation to return cash collateral held related to derivatives exposures.

[5]  Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity.

    We use interest rate swaps and other derivatives to achieve our risk management objectives. Our asset liability management strategy is to match assets with debt (in combination with derivatives) that have the same underlying index and reset frequency or, when economical, have interest rate characteristics that we believe are highly correlated. The use of funding with index types and reset frequencies that are different from our assets exposes us to interest rate risk in the form of basis and repricing risk. This could result in our cost of funds not moving in the same direction or with the same magnitude as the yield on our assets. While we believe this risk is low, as all of these indices are short-term with rate movements that are highly correlated over a long period of time, market disruptions (which have occurred in recent years) can lead to a temporary divergence between indices resulting in a negative impact to our earnings.

**Weighted Average Life**

    The following table reflects the weighted average life for our earning assets and liabilities at December 31, 2014.

| (Averages in Years) | Weighted Average Life |
|---|---|
| **Earning assets** | |
| Student loans | 7.2 |
| Other loans | 7.7 |
| Cash and investments | .1 |
| Total earning assets | 6.9 |
| **Borrowings** | |
| Short-term borrowings | .4 |
| Long-term borrowings | 6.0 |
| Total borrowings | 5.9 |

Table of Contents

**Item 8.       Financial Statements and Supplementary Data**

Reference is made to the financial statements listed under the heading "(a) 1.A. Financial Statements" of Item 15 hereof, which financial statements are incorporated by reference in response to this Item 8.

**Item 9.       Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Nothing to report.

**Item 9A.      Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with the participation of our principal executive and principal financial officers, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2014. Based on this evaluation, our chief principal executive and principal financial officers concluded that, as of December 31, 2014, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) accumulated and communicated to our management, including our chief principal executive and principal financial officers as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Under the supervision and with the participation of our management, including our Principal Executive Officer and Principal Financial Officer, we assessed the effectiveness of our internal control over financial reporting as of December 31, 2014. In making this assessment, our management used the criteria established in *Internal Control — Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on our assessment and those criteria, management concluded that, as of December 31, 2014, our internal control over financial reporting is effective.

KPMG LLP, an independent registered public accounting firm, audited the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, as stated in their report which appears below.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the fiscal quarter ended December 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.      Other Information**

Nothing to report.

Table of Contents

**PART III.**

**Item 10.        Directors, Executive Officers and Corporate Governance**

The information contained in the 2015 Proxy Statement, including information appearing in the sections titled "Proposal 1 — Election of Directors," "Executive Officers," "Other Matters — Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Governance" in the 2015 Proxy Statement, is incorporated herein by reference.

**Item 11.        Executive Compensation**

The information contained in the 2015 Proxy Statement, including information appearing in the sections titled "Executive Compensation" and "Director Compensation" in the 2015 Proxy Statement, is incorporated herein by reference.

**Item 12.        Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information contained in the 2015 Proxy Statement, including information appearing in the sections titled "Equity Compensation Plan Information," "Ownership of Common Stock" and "Ownership of Common Stock by Directors and Executive Officers" in the 2015 Proxy Statement, is incorporated herein by reference.

**Item 13.        Certain Relationships and Related Transactions, and Director Independence**

The information contained in the 2015 Proxy Statement, including information appearing under "Other Matters — Certain Relationships and Transactions" and "Corporate Governance" in the 2015 Proxy Statement, is incorporated herein by reference.

**Item 14.        Principal Accounting Fees and Services**

The information contained in the 2015 Proxy Statement, including information appearing under "Independent Registered Public Accounting Firm" in the 2015 Proxy Statement, is incorporated herein by reference.

Table of Contents

## PART IV.

**Item 15.        Exhibits, Financial Statement Schedules**

**(a)  1.  Financial Statements**

A. The following consolidated financial statements of Navient Corporation and the Report of the Independent Registered Public Accounting Firm thereon are included in Item 8 above:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheets as of December 31, 2014 and 2013 | F-4 |
| Consolidated Statements of Income for the years ended December 31, 2014, 2013 and 2012 | F-5 |
| Consolidated Statements of Comprehensive Income for the years ended December 31, 2014, 2013 and 2012 | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2012, 2013 and 2014 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2014, 2013 and 2012 | F-10 |
| Notes to Consolidated Financial Statements | F-11 |

**2. Financial Statement Schedules**

All schedules are omitted because they are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

**3. Exhibits**

The exhibits listed in the accompanying index to exhibits are filed or incorporated by reference as part of this Annual Report on Form 10-K.

We will furnish at cost a copy of any exhibit filed with or incorporated by reference into this Annual Report on Form 10-K. Oral or written requests for copies of any exhibits should be directed to the Secretary.

111

Table of Contents

### 4. Appendices

Appendix A — Federal Family Education Loan Program

**(b) Exhibits**

| | |
|---|---|
| 2.1 | The Agreement and Plan of Merger, dated as of October 16, 2014, between Navient Corporation and Navient, LLC (incorporated by reference to Exhibit 2.1 to Navient Corporation's Current Report on Form 8-K filed on October 17, 2014). |
| 3.1 | Amended and Restated Certificate of Incorporation of Navient Corporation (incorporated by reference to Exhibit 3.1 of Amendment No. 3 to Navient Corporation's Registration Statement on Form 10 (File No. 001-36228) filed on March 27, 2014). |
| 3.2 | Amended and Restated By-Laws of Navient Corporation (incorporated by reference to Exhibit 3.2 of Amendment No. 3 to Navient Corporation's Registration Statement on Form 10 (File No. 001-36228) filed on March 27, 2014). |
| 4.1 | The Second Supplemental Indenture, dated as of October 16, 2014, between Navient Corporation and Deutsche Trust Company Limited, as trustee (incorporated by reference to Exhibit 4.1 to Navient Corporation's Current Report on Form 8-K filed on October 17, 2014). |
| 4.2 | The Eighth Supplemental Indenture, dated as of October 16, 2014, between Navient Corporation and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to Navient Corporation's Current Report on Form 8-K filed on October 17, 2014). |
| 10.1 † | Navient Corporation Executive Severance Plan of Senior Officers (incorporated by reference to Exhibit 10.1 to Navient Corporation's Current Report on Form 8-K filed on August 19, 2014). |
| 10.2† | Navient Corporation Change in Control Severance Plan of Senior Officers (incorporated by reference to Exhibit 10.2 to Navient Corporation's Current Report on Form 8-K filed on August 19, 2014). |
| 10.3† | Navient Deferred Compensation Plan, as amended and restated effective January 1, 2015 (incorporated by reference to Exhibit 10.1 to Navient Corporation's Current Report on Form 8-K filed on December 23, 2014). |
| 10.4† | Navient Supplemental 401(k) Savings Plan (incorporated by reference to Exhibit 4.3 of the Company's Registration Statement on Form S-8 (File No. 333-195536) filed on April 28, 2014). |
| 10.5† | Navient Deferred Compensation Plan for Key Employees (incorporated by reference to Exhibit 4.3 of the Company's Registration Statement on Form S-8 (File No. 333-195539) filed on April 28, 2014). |
| 10.6†* | Navient Deferred Compensation Plan for Directors, as amended and restated effective November 1, 2014. |
| 10.7† | Navient Deferred Compensation Plan for Directors (incorporated by reference to Exhibit 4.3 of the Company's Registration Statement on Form S-8 (File No. 333-195538) filed on April 28, 2014). |
| 10.8† | Navient Corporation 2014 Omnibus Incentive Plan (incorporated by reference to Exhibit 4.3 of the Company's Registration Statement on Form S-8 (File No. 333-195529) filed on April 28, 2014). |
| 10.9† | Navient Employee Stock Purchase Plan (incorporated by reference to Exhibit 4.3 of the Company's Registration Statement on Form S-8 (File No. 333-195533) filed on April 28, 2014). |
| 10.10† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2012 PSU Conversion (incorporated by reference to Exhibit 10.9 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.11† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2013 PSU Conversion (incorporated by reference to Exhibit 10.10 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |

Table of Contents

10.12†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2014 (incorporated by reference to Exhibit 10.11 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.13†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Two-Year Restriction) — 2014 (incorporated by reference to Exhibit 10.12 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.14†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Three-Year Restriction) — 2014 (incorporated by reference to Exhibit 10.13 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.15†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options—2014 (incorporated by reference to Exhibit 10.14 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.16†     Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet for John F. Remondi — 2013 (incorporated by reference to Exhibit 10.15 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.17†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2013 (incorporated by reference to Exhibit 10.16 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.18†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2013 (incorporated by reference to Exhibit 10.17 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.19†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2012 (incorporated by reference to Exhibit 10.18 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.20†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Two-Year Restriction) — 2012 (incorporated by reference to Exhibit 10.19 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.21†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Three-Year Restriction) — 2012 (incorporated by reference to Exhibit 10.20 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.22†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2012 (incorporated by reference to Exhibit 10.21 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.23†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2011 (incorporated by reference to Exhibit 10.22 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.24†     Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2010 (incorporated by reference to Exhibit 10.23 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.25†     Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement for John M. Kane — 2008 (incorporated by reference to Exhibit 10.24 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

10.26†     Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement for Timothy J. Hynes — 2008 (incorporated by reference to Exhibit 10.25 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014).

113

Table of Contents

| 10.27† | Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Notice for John F. Remondi — 2008 (incorporated by reference to Exhibit 10.26 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.28† | Navient Corporation 2014 Omnibus Incentive Plan, Additional Stock Option Notice for John F. Remondi — 2008 (incorporated by reference to Exhibit 10.27 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.29† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Award Agreement — 2014 (incorporated by reference to Exhibit 10.28 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.30† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2013 (incorporated by reference to Exhibit 10.29 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.31† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2012 (incorporated by reference to Exhibit 10.30 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.32† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2011 (incorporated by reference to Exhibit 10.31 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.33† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2010 (incorporated by reference to Exhibit 10.32 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.34† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2009 (incorporated by reference to Exhibit 10.33 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.35† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2008 (incorporated by reference to Exhibit 10.34 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.36† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2007 (incorporated by reference to Exhibit 10.35 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.37† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2006 (incorporated by reference to Exhibit 10.36 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 10.38† | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2005 (incorporated by reference to Exhibit 10.37 of the Company's Quarterly Report on Form 10-Q filed on August 1, 2014). |
| 12.1* | Computation of Ratio of Earnings to Fixed Charges and Preferred Stock Dividends. |
| 21.1* | List of Subsidiaries. |
| 23.1* | Consent of KPMG LLP |
| 31.1* | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2003. |
| 31.2* | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2003. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2003. |
| 32.2* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2003. |

Table of Contents

| | |
|---|---|
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

†   Management Contract or Compensatory Plan or Arrangement

*   Filed herewith

Table of Contents

<div align="center">

**SIGNATURES**

</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: February 27, 2015

<div align="center">

NAVIENT CORPORATION

</div>

By: _____/S/ JOHN F. REMONDI_____
         John F. Remondi
         *President and Chief Executive Officer*

Pursuant to the requirement of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/ JOHN F. REMONDI<br>John F. Remondi | President, Chief Executive Officer and Director (Principal Executive Officer) | February 27, 2015 |
| /S/ SOMSAK CHIVAVIBUL<br>Somsak Chivavibul | Chief Financial Officer (Principal Financial and Accounting Officer) | February 27, 2015 |
| /S/ WILLIAM M. DIEFENDERFER, III<br>William M. Diefenderfer, III | Chairman of the Board of Directors | February 27, 2015 |
| /S/ JOHN K. ADAMS, JR.<br>John K. Adams, Jr. | Director | February 27, 2015 |
| /S/ ANN TORRE BATES<br>Ann Torre Bates | Director | February 27, 2015 |
| /S/ ANNA ESCOBEDO CABRAL<br>Anna Escobedo Cabral | Director | February 27, 2015 |
| /S/ DIANE SUITT GILLELAND<br>Diane Suitt Gilleland | Director | February 27, 2015 |
| /S/ KATHERINE A. LEHMAN<br>Katherine A. Lehman | Director | February 27, 2015 |
| /S/ LINDA A. MILLS<br>Linda A. Mills | Director | February 27, 2015 |
| /S/ BARRY A. MUNITZ<br>Barry A. Munitz | Director | February 27, 2015 |
| /S/ STEVEN L. SHAPIRO<br>Steven L. Shapiro | Director | February 27, 2015 |
| /S/ JANE J. THOMPSON<br>Jane J. Thompson | Director | February 27, 2015 |
| /S/ LAURA S. UNGER<br>Laura S. Unger | Director | February 27, 2015 |
| /S/ BARRY L. WILLIAMS<br>Barry L. Williams | Director | February 27, 2015 |

<div align="center">

116

</div>

Table of Contents

### CONSOLIDATED FINANCIAL STATEMENTS

### INDEX

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Income | F-5 |
| Consolidated Statements of Comprehensive Income | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity | F-7 |
| Consolidated Statements of Cash Flows | F-10 |
| Notes to Consolidated Financial Statements | F-11 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Navient Corporation:

We have audited Navient Corporation and subsidiaries' (the Company) internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control – Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control – Integrated Framework (1992)* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of the Company as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, change in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2014, and our report dated February 27, 2015 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

McLean, Virginia
February 27, 2015

F-2

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Navient Corporation:

We have audited the accompanying consolidated balance sheets of Navient Corporation and subsidiaries (the Company) as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2014 and 2013, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2014, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control – Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2015 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

McLean, Virginia
February 27, 2015

F-3

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED BALANCE SHEETS**
**(In millions, except per share amounts)**

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| FFELP Loans (net of allowance for losses of $93 and $119, respectively) | $ 104,521 | $ 104,588 |
| Private Education Loans (net of allowance for losses of $1,916 and $2,097, respectively) | 29,796 | 37,512 |
| Investments | | |
|    Available-for-sale | 6 | 109 |
|    Other | 627 | 783 |
| Total investments | 633 | 892 |
| Cash and cash equivalents | 1,443 | 5,190 |
| Restricted cash and investments | 3,926 | 3,650 |
| Goodwill and acquired intangible assets, net | 369 | 424 |
| Other assets | 5,664 | 7,287 |
| Total assets | $ 146,352 | $ 159,543 |
| **Liabilities** | | |
| Short-term borrowings | $ 2,663 | $ 13,795 |
| Long-term borrowings | 136,866 | 136,648 |
| Other liabilities | 2,625 | 3,458 |
| Total liabilities | 142,154 | 153,901 |
| **Commitments and contingencies** | | |
| **Equity** | | |
| Preferred stock, par value $.20 per share, 20 million shares authorized | | |
|    Series A: 0 million and 3.3 million shares issued, respectively, at stated value of $50 per share | — | 165 |
|    Series B: 0 million and 4 million shares issued, respectively, at stated value of $100 per share | — | 400 |
| Common stock, par value $0.01 and $.20 per share, respectively; 1.125 billion shares authorized; 426 million and 545 million shares issued, respectively | 4 | 109 |
| Additional paid-in capital | 2,893 | 4,399 |
| Accumulated other comprehensive income (net of tax expense of $5 and $7, respectively) | 9 | 13 |
| Retained earnings | 1,724 | 2,584 |
| Total Navient Corporation stockholders' equity before treasury stock | 4,630 | 7,670 |
| Less: Common stock held in treasury at cost: 24 million and 116 million shares, respectively | (432) | (2,033) |
| Total Navient Corporation stockholders' equity | 4,198 | 5,637 |
| Noncontrolling interest | — | 5 |
| Total equity | 4,198 | 5,642 |
| Total liabilities and equity | $ 146,352 | $ 159,543 |

**Supplemental information — assets and liabilities of consolidated variable interest entities:**

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| FFELP Loans | $ 100,367 | $ 99,254 |
| Private Education Loans | 24,418 | 25,530 |
| Restricted cash and investments | 3,733 | 3,395 |
| Other assets | 1,230 | 2,322 |
| Short-term borrowings | 653 | 3,655 |
| Long-term borrowings | 117,678 | 115,538 |
| Net assets of consolidated variable interest entities | $ 11,417 | $ 11,308 |

See accompanying notes to consolidated financial statements.

F-4

**Table of Contents**

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF INCOME**
**(In millions, except per share amounts)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2014** | **2013** | **2012** |
| **Interest income:** | | | |
| FFELP Loans | $ 2,556 | $ 2,822 | $ 3,251 |
| Private Education Loans | 2,156 | 2,527 | 2,481 |
| Other loans | 9 | 11 | 16 |
| Cash and investments | 9 | 17 | 21 |
| Total interest income | 4,730 | 5,377 | 5,769 |
| Total interest expense | 2,063 | 2,210 | 2,561 |
| Net interest income | 2,667 | 3,167 | 3,208 |
| Less: provisions for loan losses | 628 | 839 | 1,080 |
| Net interest income after provisions for loan losses | 2,039 | 2,328 | 2,128 |
| **Other income (loss):** | | | |
| Gains on sales of loans and investments | — | 302 | — |
| Gains (losses) on derivative and hedging activities, net | 139 | (268) | (628) |
| Servicing revenue | 298 | 290 | 279 |
| Asset recovery revenue | 388 | 420 | 356 |
| Gains on debt repurchases | — | 42 | 145 |
| Other | 82 | 100 | 92 |
| Total other income | 907 | 886 | 244 |
| **Expenses:** | | | |
| Salaries and benefits | 458 | 504 | 457 |
| Other operating expenses | 529 | 538 | 440 |
| Total operating expenses | 987 | 1,042 | 897 |
| Goodwill and acquired intangible asset impairment and amortization expense | 9 | 13 | 27 |
| Restructuring and other reorganization expenses | 113 | 72 | 11 |
| Total expenses | 1,109 | 1,127 | 935 |
| Income from continuing operations, before income tax expense | 1,837 | 2,087 | 1,437 |
| Income tax expense | 688 | 776 | 498 |
| Net income from continuing operations | 1,149 | 1,311 | 939 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | 106 | (2) |
| **Net income** | 1,149 | 1,417 | 937 |
| Less: net loss attributable to noncontrolling interest | — | (1) | (2) |
| Net income attributable to Navient Corporation | 1,149 | 1,418 | 939 |
| Preferred stock dividends | 6 | 20 | 20 |
| Net income attributable to Navient Corporation common stock | $ 1,143 | $ 1,398 | $ 919 |
| **Basic earnings per common share attributable to Navient Corporation:** | | | |
| Continuing operations | $ 2.74 | $ 2.94 | $ 1.93 |
| Discontinued operations | — | .24 | — |
| Total | $ 2.74 | $ 3.18 | $ 1.93 |
| Average common shares outstanding | 417 | 440 | 476 |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | |
| Continuing operations | $ 2.69 | $ 2.89 | $ 1.90 |
| Discontinued operations | — | .23 | — |
| Total | $ 2.69 | $ 3.12 | $ 1.90 |
| Average common and common equivalent shares outstanding | 425 | 449 | 483 |
| Dividends per common share attributable to Navient Corporation | $ .60 | $ .60 | $ .50 |

See accompanying notes to consolidated financial statements.

F-5

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In millions)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Net income | $1,149 | $1,417 | $937 |
| Other comprehensive income (loss): | | | |
| Unrealized gains (losses) on derivatives: | | | |
| Unrealized hedging gains (losses) on derivatives | (11) | 27 | (11) |
| Reclassification adjustments for derivative losses included in net income (interest expense) | 3 | 9 | 25 |
| Total unrealized gains (losses) on derivatives | (8) | 36 | 14 |
| Unrealized gains (losses) on investments | 2 | (6) | (1) |
| Income tax (expense) benefit | 2 | (11) | (5) |
| Other comprehensive income (loss), net of tax | (4) | 19 | 8 |
| Comprehensive income | 1,145 | 1,436 | 945 |
| Less: comprehensive loss attributable to noncontrolling interest | — | (1) | (2) |
| Total comprehensive income attributable to Navient Corporation | $1,145 | $1,437 | $947 |

See accompanying notes to consolidated financial statements.

F-6

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(In millions, except share and per share amounts)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2011** | 7,300,000 | 529,075,322 | (20,323,997) | 508,751,325 | $ 565 | $ 106 | $ 4,136 | $ (14) | $ 770 | $ (320) | $ 5,243 | $ 8 | $ 5,251 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | — | 939 | — | 939 | (2) | 937 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | 8 | — | — | 8 | — | 8 |
| Total comprehensive income | — | — | — | — | — | — | — | — | — | — | 947 | (2) | 945 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.50 per share) | — | — | — | — | — | — | — | — | (237) | — | (237) | — | (237) |
| Preferred stock, series A ($3.49 per share) | — | — | — | — | — | — | — | — | (11) | — | (11) | — | (11) |
| Preferred stock, series B ($2.22 per share) | — | — | — | — | — | — | — | — | (9) | — | (9) | — | (9) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Issuance of common shares | — | 6,432,643 | — | 6,432,643 | — | 1 | 60 | — | — | — | 61 | — | 61 |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | (6) | — | — | — | (6) | — | (6) |
| Stock-based compensation expense | — | — | — | — | — | — | 47 | — | — | — | 47 | — | 47 |
| Common stock repurchased | — | — | (58,038,239) | (58,038,239) | — | — | — | — | — | (900) | (900) | — | (900) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (4,547,785) | (4,547,785) | — | — | — | — | — | (74) | (74) | — | (74) |
| **Balance at December 31, 2012** | 7,300,000 | 535,507,965 | (82,910,021) | 452,597,944 | $ 565 | $ 107 | $ 4,237 | $ (6) | $ 1,451 | $ (1,294) | $ 5,060 | $ 6 | $ 5,066 |

See accompanying notes to consolidated financial statements.

F-7

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(In millions, except share and per share amounts)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2012** | 7,300,000 | 535,507,965 | (82,910,021) | 452,597,944 | $ 565 | $ 107 | $ 4,237 | $ (6) | $ 1,451 | $ (1,294) | $ 5,060 | $ 6 | $ 5,066 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | — | 1,418 | — | 1,418 | (1) | 1,417 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | 19 | — | — | 19 | — | 19 |
| Total comprehensive income | — | — | — | — | — | — | — | — | — | — | 1,437 | (1) | 1,436 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.60 per share) | — | — | — | — | — | — | — | — | (264) | — | (264) | — | (264) |
| Preferred stock, series A ($3.49 per share) | | | | | | | | | (12) | | (12) | | (12) |
| Preferred stock, series B ($2.00 per share) | | | | | | | | — | (8) | | (8) | | (8) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Issuance of common shares | — | 9,702,976 | — | 9,702,976 | — | 2 | 105 | — | — | — | 107 | — | 107 |
| Tax benefit related to employee stock-based compensation plans | | | | | | | 10 | | | | 10 | | 10 |
| Stock-based compensation expense | — | — | — | — | — | — | 47 | — | — | — | 47 | — | 47 |
| Common stock repurchased | — | — | (26,987,043) | (26,987,043) | — | — | — | — | — | (600) | (600) | — | (600) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (6,365,002) | (6,365,002) | — | — | — | — | — | (139) | (139) | — | (139) |
| **Balance at December 31, 2013** | 7,300,000 | 545,210,941 | (116,262,066) | 428,948,875 | $ 565 | $ 109 | $ 4,399 | $ 13 | $ 2,584 | $ (2,033) | $ 5,637 | $ 5 | $ 5,642 |

See accompanying notes to consolidated financial statements.

F-8

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(In millions, except share and per share amounts)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2013** | 7,300,000 | 545,210,941 | (116,262,066) | 428,948,875 | $565 | $109 | $4,399 | $13 | $2,584 | $(2,033) | $5,637 | $5 | $5,642 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | — | 1,149 | — | 1,149 | — | 1,149 |
| Other comprehensive loss, net of tax | — | — | — | — | — | — | — | (4) | — | — | (4) | — | (4) |
| Total comprehensive income | — | — | — | — | — | — | — | — | — | — | 1,145 | — | 1,145 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.60 per share) | — | — | — | — | — | — | — | — | (249) | — | (249) | — | (249) |
| Preferred stock, series A ($1.74 per share) | — | — | — | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Preferred stock, series B ($.98 per share) | — | — | — | — | — | — | — | — | (2) | — | (2) | — | (2) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Issuance of common shares | — | 7,389,962 | — | 7,389,962 | — | (80) | 138 | — | — | — | 58 | — | 58 |
| Retirement of common stock in treasury | — | (126,963,268) | 126,963,268 | — | — | (25) | (2,263) | — | — | 2,288 | — | — | — |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | 15 | — | — | — | 15 | — | 15 |
| Stock-based compensation expense | — | — | — | — | — | — | 39 | — | — | — | 39 | — | 39 |
| Common stock repurchased | — | — | (30,432,689) | (30,432,689) | — | — | — | — | — | (600) | (600) | — | (600) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (4,171,342) | (4,171,342) | — | — | — | — | — | (87) | (87) | — | (87) |
| Deconsolidation of subsidiary | — | — | — | — | — | — | — | — | — | — | — | (5) | (5) |
| Distribution of consumer banking business | (7,300,000) | — | — | — | (565) | — | 565 | — | (1,751) | — | (1,751) | — | (1,751) |
| **Balance at December 31, 2014** | — | 425,637,635 | (23,902,829) | 401,734,806 | $— | $4 | $2,893 | $9 | $1,724 | $(432) | $4,198 | $— | $4,198 |

See accompanying notes to consolidated financial statements.

F-9

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| **Operating activities** | | | |
| Net income | $ 1,149 | $ 1,417 | $ 937 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| (Income) loss from discontinued operations, net of tax | — | (106) | 2 |
| Gains on loans and investments, net | — | (302) | — |
| Gains on debt repurchases, net | — | (42) | (145) |
| Goodwill and acquired intangible assets impairment and amortization expense | 9 | 13 | 27 |
| Stock-based compensation expense | 39 | 47 | 47 |
| Unrealized gains on derivative and hedging activities | (797) | (444) | (117) |
| Provisions for loan losses | 628 | 839 | 1,080 |
| (Increase) decrease in restricted cash — other | (64) | (11) | 10 |
| (Increase) decrease in accrued interest receivable | (75) | (68) | 361 |
| Decrease in accrued interest payable | (27) | (23) | (41) |
| Decrease in other assets | 853 | 625 | 437 |
| (Decrease) increase in other liabilities | (51) | (87) | 38 |
| Cash provided by operating activities — continuing operations | 1,664 | 1,858 | 2,636 |
| Cash provided by operating activities — discontinued operations | — | 142 | — |
| Total net cash provided by operating activities | 1,664 | 2,000 | 2,636 |
| **Investing activities** | | | |
| Student loans acquired and originated | (13,803) | (4,555) | (6,663) |
| Reduction of student loans: | | | |
| Installment payments, claims and other | 12,321 | 11,763 | 17,198 |
| Proceeds from sales of student loans | — | 768 | 531 |
| Other investing activities, net | 123 | 144 | 41 |
| Purchases of available-for-sale securities | (28) | (73) | (63) |
| Proceeds from maturities of available-for-sale securities | 4 | 38 | 71 |
| Purchases of other securities | (785) | (375) | (245) |
| Proceeds from sales and maturities of other securities | 800 | 381 | 206 |
| (Increase) decrease in restricted cash — variable interest entities | (285) | 1,119 | 769 |
| Total net cash (used in) provided by investing activities | (1,653) | 9,210 | 11,845 |
| **Financing activities** | | | |
| Distribution of consumer banking business | (2,217) | — | — |
| Borrowings collateralized by loans in trust — issued | 6,776 | 9,534 | 13,727 |
| Borrowings collateralized by loans in trust — repaid | (12,534) | (13,468) | (15,953) |
| Asset-backed commercial paper conduits, net | 5,440 | 3,242 | (323) |
| ED Conduit Program Facility, net | — | (9,551) | (12,187) |
| Other short-term borrowings issued | — | — | 23 |
| Other short-term borrowings repaid | — | — | (307) |
| Other long-term borrowings issued | 1,817 | 5,154 | 4,713 |
| Other long-term borrowings repaid | (3,162) | (4,201) | (3,307) |
| Other financing activities, net | 251 | (895) | 272 |
| Retail and other deposits, net | 726 | 1,149 | 1,124 |
| Common stock repurchased | (600) | (600) | (900) |
| Common stock dividends paid | (249) | (264) | (237) |
| Preferred stock dividends paid | (6) | (20) | (20) |
| Net cash used in financing activities | (3,758) | (9,920) | (13,375) |
| Net (decrease) increase in cash and cash equivalents | (3,747) | 1,290 | 1,106 |
| Cash and cash equivalents at beginning of year | 5,190 | 3,900 | 2,794 |
| Cash and cash equivalents at end of year | $ 1,443 | $ 5,190 | $ 3,900 |
| Cash disbursements made (refunds received) for: | | | |
| Interest | $ 1,983 | $ 2,163 | $ 2,527 |
| Income taxes paid | $ 484 | $ 636 | $ 569 |
| Income taxes received | $ (108) | $ (20) | $ (12) |
| Noncash activity: | | | |
| Investing activity — Student loans and other assets acquired | $ — | $ — | $ 402 |
| Student loans and other assets removed related to sale of Residual Interest in securitization | $ — | $(11,802) | $ — |
| Financing activity — Borrowings assumed in acquisition of student loans and other assets | $ — | $ — | $ 425 |
| Borrowings removed related to sale of Residual Interest in securitization | $ — | $(12,084) | $ — |

See accompanying notes to consolidated financial statements.

F-10

Table of Contents

NAVIENT CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.   Organization and Business**

*Navient's Business*

Navient is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in student loans, the Company supports the educational and economic achievements of more than 12 million customers. A growing number of government and higher education clients rely on Navient for proven solutions to meet their financial goals. Navient began trading on Nasdaq as an independent company on May 1, 2014. Our website is navient.com.

Navient holds the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program ("FFELP"), as well as the largest portfolio of Private Education Loans. FFELP Loans are insured or guaranteed by state or not-for-profit agencies based on guaranty agreements among the U.S. Department of Education ("ED") and these agencies. Private Education Loans are education loans to students or their families that are non-federal loans and not insured or guaranteed under FFELP. Private Education Loans bear the full credit risk of the customer and any cosigner and are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources.

Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non-profit education lenders and ED. Navient is one of four large servicers to ED under its Direct Student Loan Program ("DSLP"). Navient also provides asset recovery services on its own portfolio (consisting of both education loans as well as other asset classes), guaranty agencies, higher education institutions, ED and other federal clients, as well as states, courts, and municipalities.

*Presentation of Information*

Unless the context otherwise requires, references in this Annual Report on Form 10-K to:

• "We," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off refers to Old SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off refers to Navient and its consolidated subsidiaries.

• "Old SLM" refers to SLM Corporation, as it existed prior to the Spin-Off, and its consolidated subsidiaries. As part of an internal corporate reorganization of Old SLM, Old SLM was merged into a limited liability company and became a subsidiary of Navient, changing its name to "Navient, LLC." On October 16, 2014, Navient, LLC was merged with and into Navient, with Navient as the surviving corporation.

• Navient's historical business and operations refer to Old SLM's portfolio of FFELP and Private Education Loans not held by Sallie Mae Bank, together with the servicing and asset recovery businesses that were retained by or transferred to Navient in connection with the internal corporate reorganization.

• "SLM BankCo" refers to New BLC Corporation, which became the publicly traded successor to Old SLM on April 29, 2014 by virtue of a merger pursuant to Section 251(g) of the Delaware General Corporation Law ("DGCL"), and its consolidated subsidiaries. Following consummation of the merger, New BLC Corporation changed its name to SLM Corporation. After the Spin-Off, SLM BankCo's business consists primarily of the consumer banking business previously operated by Old SLM, which includes Sallie Mae Bank and its portfolio of Private Education Loans, a new Private Education Loan servicing business and the Upromise Rewards business.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**1.    Organization and Business (Continued)**

- "Spin-Off" collectively refers to the internal reorganization of Old SLM on April 29, 2014 and the distribution on April 30, 2014 of all of the shares of common stock of Navient to the holders of shares of SLM BankCo.

### *Spin-Off of Navient*

On April 30, 2014, the previously announced separation of Navient from SLM BankCo was completed. The separation was effected through the distribution by SLM BankCo of all the shares of common stock of Navient, on a one-to-one basis, to the holders of shares of SLM BankCo common stock as of the close of business on April 22, 2014, the record date for the distribution. As a result of the distribution, Navient is an independent, publicly traded company that operates the loan management, servicing and asset recovery business previously operated by Old SLM. Navient is comprised primarily of Old SLM's portfolios of education loans that were not held in Sallie Mae Bank at the time of the separation, as well as servicing and asset recovery activities on those loans and loans held by third parties. In October 2014, Navient successfully completed the transition of the servicing operations and rolled out the Navient brand to its customers.

To implement the separation and distribution of Navient, an internal corporate reorganization of Old SLM was effected, pursuant to which, on April 29, 2014, SLM BankCo replaced Old SLM as the parent holding company pursuant to a holding company merger. In accordance with Section 251(g) of the DGCL, by action of the Old SLM board of directors and without a shareholder vote, Old SLM was merged into Navient, LLC, a wholly owned subsidiary of Old SLM, with Navient, LLC surviving. Immediately following the effective time of the merger, SLM BankCo changed its name to "SLM Corporation." As part of the internal corporate reorganization and pursuant to the merger, all of the outstanding shares of Old SLM Series A preferred stock and Series B preferred stock were converted, on a one-to-one basis, into substantially identical shares of SLM BankCo preferred stock. Following the merger, the assets and liabilities associated with the loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking were transferred to SLM BankCo. On July 9, 2014, Navient received a private letter ruling from the Internal Revenue Service confirming the intended tax-free status of the Spin-Off and the related internal reorganization transactions. For further information on the Spin-Off and all related matters, please refer to our Registration Statement on Form 10, as amended (our "Form 10"), filed with the Securities and Exchange Commission (the "SEC") on April 10, 2014, and declared effective on April 14, 2014.

Due to the relative significance of Navient to Old SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM, notwithstanding the legal form of the Spin-Off. As a result, the historical financial statements of Old SLM prior to the distribution on April 30, 2014 are the historical financial statements of Navient. For that reason the historical financial information related to periods on or prior to April 30, 2014 contained in this Annual Report on Form 10-K is that of Old SLM, which includes the consolidated results of both the loan management, servicing and asset recovery business (Navient) and the consumer banking business (SLM BankCo).

Since Navient is the "accounting spinnor," the financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014, notwithstanding the legal form of the Spin-Off in which Navient common stock was distributed to the stockholders of SLM BankCo.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## 1.   Organization and Business (Continued)

The following table shows the condensed balance sheet of SLM BankCo that the financial statements of Navient reflect as a shareholder distribution on April 30, 2014:

| (Dollars in millions) | | April 30, 2014 |
|---|---|---|
| **Assets** | | |
| FFELP Loans, net | $ | 1,380 |
| Private Education Loans, net | | 7,204 |
| Investments | | 139 |
| Cash and cash equivalents | | 2,170 |
| Other assets | | 883 |
| Total assets | $ | 11,776 |
| **Liabilities** | | |
| Short-term borrowings | $ | 6,491 |
| Long-term borrowings | | 2,750 |
| Other liabilities[1] | | 825 |
| Total liabilities | | 10,066 |
| **Equity** | | |
| Preferred stock | | |
| Series A | | 165 |
| Series B | | 400 |
| Common equity | | 1,145 |
| Total equity[2] | | 1,710 |
| Total liabilities and equity | $ | 11,776 |

[1]  "Other liabilities" include net income tax liabilities of $383 million, which were presented as net income tax assets within "Other assets" on the consolidated financial statements of Navient.

[2]  In addition to the $1,710 million of consumer banking business net assets distributed, we also removed $41 million of goodwill from our balance sheet as required under Accounting Standards Codification ("ASC") 350, "Intangibles — Goodwill and Other," in connection with the distribution. This goodwill was allocated to the consumer banking business based on relative fair value. This total of $1,751 million is the amount that appears on our consolidated statement of changes in stockholders' equity in connection with the deemed distribution of the consumer banking business.

## 2.   Significant Accounting Policies

### Use of Estimates

Our financial reporting and accounting policies conform to generally accepted accounting principles in the United States of America ("GAAP"). The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Current market conditions increase the risk and complexity of the judgments in these estimates and actual results could differ from estimates. Key accounting policies that include the most significant judgments, estimates and assumptions include the allowance for loan losses, the effective interest rate method (amortization of student loan and debt premiums and discounts), fair value measurement, the consolidation of variable interest entities, and derivative accounting.

F-13

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

*Consolidation*

The consolidated financial statements include the accounts of Navient Corporation and its majority-owned and controlled subsidiaries and those Variable Interest Entities ("VIEs") for which we are the primary beneficiary, after eliminating the effects of intercompany accounts and transactions.

We consolidate any VIEs where we have determined we are the primary beneficiary. The primary beneficiary is the entity which has both: (1) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and (2) the obligation to absorb losses or receive benefits of the entity that could potentially be significant to the VIE. As it relates to our securitized assets as of December 31, 2014, we are the servicer of the securitized assets and own the Residual Interest of the securitization trusts. As a result, we are the primary beneficiary of our securitization trusts and consolidate those trusts.

In 2013, we sold Residual Interests in FFELP Loan securitization trusts to third parties. We continue to service the student loans in the trusts under existing agreements. Prior to the sale of the Residual Interests, we had consolidated the trusts as VIEs because we had met the two criteria for consolidation. We had determined we were the primary beneficiary because (1) as servicer to the trust we had the power to direct the activities of the VIE that most significantly affected its economic performance and (2) as the residual holder of the trust, we had an obligation to absorb losses or receive benefits of the trust that could potentially be significant. Upon the sale of the Residual Interests we were no longer the residual holder, thus we determined we no longer met criterion (2) above and deconsolidated the trusts. As a result of these transactions, we removed securitization trust assets of $12.5 billion and the related liabilities of $12.1 billion from the balance sheet and recorded a $312 million gain as part of "gains on sales of loans and investments" in 2013.

*Fair Value Measurement*

We use estimates of fair value in applying various accounting standards for our financial statements. Fair value measurements are used in one of four ways:

- In the consolidated balance sheet with changes in fair value recorded in the consolidated statement of income;

- In the consolidated balance sheet with changes in fair value recorded in the accumulated other comprehensive income section of the consolidated statement of changes in stockholders' equity;

- In the consolidated balance sheet for instruments carried at lower of cost or fair value with impairment charges recorded in the consolidated statement of income; and

- In the notes to the financial statements.

Fair value is defined as the price to sell an asset or transfer a liability in an orderly transaction between willing and able market participants. In general, our policy in estimating fair value is to first look at observable market prices for identical assets and liabilities in active markets, where available. When these are not available, other inputs are used to model fair value such as prices of similar instruments, yield curves, volatilities, prepayment speeds, default rates and credit spreads (including for our liabilities), relying first on observable data from active markets. Depending on current market conditions, additional adjustments to fair value may be based on factors such as liquidity, credit, and bid/offer spreads. Transaction costs are not included in the determination of fair value. When possible, we seek to validate the model's output to market transactions. Depending on the availability of observable inputs and prices, different valuation models could produce materially different fair value estimates. The values presented may not represent future fair values and may not be realizable.

F-14

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

We categorize our fair value estimates based on a hierarchical framework associated with three levels of price transparency utilized in measuring financial instruments at fair value. Classification is based on the lowest level of input that is significant to the fair value of the instrument. The three levels are as follows:

- Level 1 — Quoted prices (unadjusted) in active markets for identical assets or liabilities that we have the ability to access at the measurement date. The types of financial instruments included in level 1 are highly liquid instruments with quoted prices.

- Level 2 — Inputs from active markets, other than quoted prices for identical instruments, are used to determine fair value. Significant inputs are directly observable from active markets for substantially the full term of the asset or liability being valued.

- Level 3 — Pricing inputs significant to the valuation are unobservable. Inputs are developed based on the best information available. However, significant judgment is required by us in developing the inputs.

*Loans*

Loans, consisting primarily of federally insured student loans and Private Education Loans, that we have the ability and intent to hold for the foreseeable future are classified as held-for-investment and are carried at amortized cost. Amortized cost includes the unamortized premiums, discounts, and capitalized origination costs and fees, all of which are amortized to interest income as further discussed below. Loans which are held-for-investment also have an allowance for loan loss as needed. Any loans we have not classified as held-for-investment are classified as held-for-sale, and carried at the lower of cost or fair value. Loans are classified as held-for-sale when we have the intent and ability to sell such loans. Loans which are held-for-sale do not have the associated premium, discount, and capitalized origination costs and fees amortized into interest income. In addition, once a loan is classified as held-for-sale, there is no further adjustment to the loan's allowance for loan losses that existed immediately prior to the reclassification to held-for-sale.

*Allowance for Loan Losses*

We consider a loan to be impaired when, based on current information, a loss has been incurred and it is probable that we will not receive all contractual amounts due. When making our assessment as to whether a loan is impaired, we also take into account more than insignificant delays in payment. We generally evaluate impaired loans on an aggregate basis by grouping similar loans. Impaired loans also include those loans which are individually assessed and measured for impairment at a loan level, such as in a troubled debt restructuring ("TDR"). We maintain an allowance for loan losses at an amount sufficient to absorb losses incurred in our portfolios at the reporting date based on a projection of estimated probable credit losses incurred in the portfolio.

Our Private Education Loan portfolio contains TDR and non-TDR loans. For customers experiencing financial difficulty, certain Private Education Loans for which we have granted either a forbearance of greater than three months, an interest rate reduction or an extended repayment plan are classified as TDRs. The allowance requirements are different based on these designations. In determining the allowance for loan losses on our non-TDR portfolio, we estimate the principal amount of loans that will default over the next two years (two years being the expected period between a loss event and default) and how much we expect to recover over time related to the defaulted amount. Expected defaults less our expected recoveries equal the allowance related to this portfolio. Our historical experience indicates that, on average, the time between the date that a customer experiences a default causing event (i.e., the loss trigger event) and the date that we charge off the unrecoverable portion of that loan is two years. Separately, for our TDR portfolio, we estimate an allowance amount sufficient

F-15

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.    Significant Accounting Policies (Continued)**

to cover life-of-loan expected losses through an impairment calculation based on the difference between the loan's basis and the present value of expected future cash flows (which would include life-of-loan default and recovery assumptions) discounted at the loan's original effective interest rate. The separate allowance estimates for our TDR and non-TDR portfolios, are combined into our total Allowance for Private Education Loan losses.

In estimating both the non-TDR and TDR allowance amounts, we start with historical experience of customer default behavior. We make judgments about which historical period to start with and then make further judgments about whether that historical experience is representative of future expectations and whether additional adjustments may be needed to those historical default rates. We also take the economic environment into consideration when calculating the allowance for loan losses. We analyze key economic statistics and the effect we expect it to have on future defaults. Key economic statistics analyzed as part of the allowance for loan losses are unemployment rates and other asset type delinquency rates. Our allowance for loan losses is estimated using an analysis of delinquent and current accounts. Our model is used to estimate the likelihood that a loan receivable may progress through the various delinquency stages and ultimately charge off. The evaluation of the allowance for loan losses is inherently subjective, as it requires material estimates that may be susceptible to significant changes. The estimate for the allowance for loan losses is subject to a number of assumptions. If actual future performance in delinquency, charge-offs and recoveries are significantly different than estimated, this could materially affect our estimate of the allowance for loan losses and the related provision for loan losses on our income statement.

Below we describe in further detail our policies and procedures for the allowance for loan losses as they relate to our Private Education Loan and FFELP Loan portfolios.

*Allowance for Private Education Loan Losses*

We determine the collectability of our Private Education Loan portfolio by evaluating certain risk characteristics. We consider school type, credit score (FICO), existence of a cosigner, loan status and loan seasoning as the key credit quality indicators because they have the most significant effect on our determination of the adequacy of our allowance for loan losses. The type of school customers attend can have an impact on their job prospects after graduation and therefore affects their ability to make payments. Credit scores are an indicator of the creditworthiness of a customer and generally the higher the credit score the more likely it is the customer will be able to make all of their contractual payments. Loan status affects the credit risk because generally a past due loan is more likely to result in a credit loss than an up-to-date loan. Additionally, loans in a deferred payment status have different credit risk profiles compared with those in current pay status. Loan seasoning affects credit risk because a loan with a history of making payments generally has a lower incidence of default than a loan with a history of making infrequent or no payments. The existence of a cosigner lowers the likelihood of default. We monitor and update these credit quality indicators in the analysis of the adequacy of our allowance for loan losses on a quarterly basis.

To estimate the probable credit losses incurred in the loan portfolio at the reporting date, we use historical experience of customer payment behavior in connection with the key credit quality indicators and incorporate management expectation regarding macroeconomic and collection procedure factors. Our model is based upon the most recent 12 months of actual collection experience as the starting point and applies expected macroeconomic changes and collection procedure changes to estimate expected losses caused by loss events incurred as of the balance sheet date. Our model places a greater emphasis on the more recent default experience rather than the default experience for older historical periods, as we believe the recent default experience is more indicative of the probable losses incurred in the loan portfolio today. Similar to estimating defaults, we use

F-16

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

historical customer payment behavior to estimate the timing and amount of future recoveries on charged-off loans. We use judgment in determining whether historical performance is representative of what we expect to collect in the future. We then apply the default and collection rate projections to each category of loans. Once the quantitative calculation is performed, we review the adequacy of the allowance for loan losses and determine if qualitative adjustments need to be considered. Additionally, we consider changes in laws and regulations that could potentially impact the allowance for loan losses. More judgment has been required over the last several years, compared with years prior, in light of the U.S. economy and its effect on our customer's ability to pay their obligations. We believe that our model reflects recent customer behavior, loan performance, and collection performance, as well as expectations about economic factors.

Our collection policies allow for periods of nonpayment for customers requesting additional payment grace periods upon leaving school or experiencing temporary difficulty meeting payment obligations. This is referred to as forbearance status and is considered in our allowance for loan losses. The loss confirmation period is in alignment with our typical collection cycle and takes into account these periods of nonpayment.

As part of concluding on the adequacy of the allowance for loan losses, we review key allowance and loan metrics. The most relevant of these metrics considered are the allowance coverage of charge-offs ratio; the allowance as a percentage of total loans and of loans in repayment; and delinquency and forbearance percentages.

Certain Private Education Loans do not require customers to begin repayment until six months after they have graduated or otherwise left school. Consequently, our loss estimates for these programs are generally low while the customer is in school. At December 31, 2014, 10 percent of the principal balance in the higher education Private Education Loan portfolio was related to customers who are in an in-school/grace/deferment status and not required to make payments. As this population of customers leaves school, they will be required to begin payments on their loans, and the allowance for loan losses may change accordingly.

We consider a loan to be delinquent 31 days after the last payment was contractually due. We use a model to estimate the amount of uncollectible accrued interest on Private Education Loans and reserve for that amount against current period interest income.

In general, Private Education Loan principal is charged off against the allowance when at the end of the month the loan exceeds 212 days past due. The charged-off amount equals the estimated loss of the defaulted loan balance. Actual recoveries, as they are received, are applied against the remaining loan balance that was not charged off. If periodic recoveries are less than originally expected, the difference results in immediate additional provision expense and charge-off of such amount.

Our allowance for Private Education Loan losses also provides for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans. At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According

F-17

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so.

*Allowance for FFELP Loan Losses*

FFELP Loans are insured as to their principal and accrued interest in the event of default subject to a Risk Sharing level based on the date of loan disbursement. These insurance obligations are supported by contractual rights against the United States. For loans disbursed after October 1, 1993, and before July 1, 2006, we receive 98 percent reimbursement on all qualifying default claims. For loans disbursed on or after July 1, 2006, we receive 97 percent reimbursement. For loans disbursed prior to October 1, 1993, we receive 100 percent reimbursement.

Similar to the allowance for Private Education Loan losses, the allowance for FFELP Loan losses uses historical experience of customer default behavior and a two-year loss confirmation period to estimate the credit losses incurred in the loan portfolio at the reporting date. We apply the default rate projections, net of applicable Risk Sharing, to each category for the current period to perform our quantitative calculation. Once the quantitative calculation is performed, we review the adequacy of the allowance for loan losses and determine if qualitative adjustments need to be considered.

*Investments*

Our available-for-sale investment portfolio consists of investments that are carried at fair value, with the temporary changes in fair value carried as a separate component of stockholders' equity, net of taxes. The amortized cost of debt securities in this category is adjusted for amortization of premiums and accretion of discounts, which are amortized using the effective interest rate method. Other-than-temporary impairment is evaluated by considering several factors, including the length of time and extent to which the fair value has been less than the amortized cost basis, the financial condition and near-term prospects of the security (considering factors such as adverse conditions specific to the security and ratings agency actions), and the intent and ability to retain the investment to allow for an anticipated recovery in fair value. The entire fair value loss on a security that is other-than-temporary impairment is recorded in earnings if we intend to sell the security or if it is more likely than not that we will be required to sell the security before the expected recovery of the loss. However, if the impairment is other-than-temporary, and those two conditions do not exist, the portion of the impairment related to credit losses is recorded in earnings and the impairment related to other factors is recorded in other comprehensive income. Securities classified as trading are accounted for at fair value with unrealized gains and losses included in investment income. Securities that we have the intent and ability to hold to maturity are classified as held-to-maturity and are accounted for at amortized cost unless the security is determined to have an other-than-temporary impairment. In this case it is accounted for in the same manner described above.

We also have other investments, including a receivable for cash collateral posted to derivative counterparties. These investments are accounted for at amortized cost in other investments.

*Cash and Cash Equivalents*

Cash and cash equivalents can include term federal funds, Eurodollar deposits, commercial paper, asset-backed commercial paper, treasuries and money market funds with original terms to maturity of less than three months.

F-18

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

2.   **Significant Accounting Policies (Continued)**

*Restricted Cash and Investments*

Restricted cash primarily includes amounts held in student loan securitization trusts and other secured borrowings. This cash must be used to make payments related to trust obligations. Amounts on deposit in these accounts are primarily the result of timing differences between when principal and interest is collected on the trust assets and when principal and interest is paid on trust liabilities. As such, changes in this balance are reflected in investing activities in the statement of cash flows.

Securities pledged as collateral related to our derivative portfolio, where the counterparty has rights to replace the securities, are classified as restricted. When the counterparty does not have these rights, the security is recorded in investments and disclosed as pledged collateral in the notes. Additionally, certain counterparties require cash collateral pledged to us to be segregated and held in restricted cash accounts.

*Goodwill and Acquired Intangible Assets*

We account for goodwill and acquired intangible assets in accordance with the applicable accounting guidance. Under this guidance goodwill is not amortized but is tested periodically for impairment. We test goodwill for impairment annually as of October 1 at the reporting unit level, which is the same as or one level below a business segment. Goodwill is also tested at interim periods if an event occurs or circumstances change that would indicate the carrying amount may be impaired.

We assess qualitative factors to determine whether it is "more-likely-than-not" that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the two-step goodwill impairment test. The "more-likely-than-not" threshold is defined as having a likelihood of more than 50 percent. If, after assessing relevant qualitative factors, we conclude that it is "more-likely-than-not" that the fair value of a reporting unit as of October 1 is less than its carrying amount, we will complete Step 1 of the goodwill impairment analysis. Step 1 consists of a comparison of the fair value of the reporting unit to the reporting unit's carrying value, including goodwill. If the carrying value of the reporting unit exceeds the fair value, Step 2 in the goodwill impairment analysis is performed to measure the amount of impairment loss, if any. Step 2 of the goodwill impairment analysis compares the implied fair value of the reporting unit's goodwill to the carrying value of the reporting unit's goodwill. The implied fair value of goodwill is determined in a manner consistent with determining goodwill in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in an amount equal to that excess.

Other acquired intangible assets include, but are not limited to, trade names, customer and other relationships, and non-compete agreements. Acquired intangible assets with finite lives are amortized over their estimated useful lives in proportion to their estimated economic benefit. Finite-lived acquired intangible assets are reviewed for impairment using an undiscounted cash flow analysis when an event occurs or circumstances change indicating the carrying amount of a finite-lived asset or asset group may not be recoverable. If the carrying amount of the asset or asset groups exceeds the undiscounted cash flows, the fair value of the asset or asset group is determined using an acceptable valuation technique. An impairment loss would be recognized if the carrying amount of the asset (or asset group) exceeds the fair value of the asset or asset group. The impairment loss recognized would be the difference between the carrying amount and fair value. Indefinite-life acquired intangible assets are not amortized. We test these indefinite life acquired intangible assets for impairment annually as of October 1 or at interim periods if an event occurs or circumstances change that would indicate the carrying value of these assets may be impaired. The annual or interim impairment test of indefinite-lived acquired intangible assets is based primarily on a discounted cash flow analysis.

F-19

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

*Transfer of Financial Assets and Extinguishments of Liabilities*

We account for loan sales and debt repurchases in accordance with the applicable accounting guidance. Our securitizations and other asset-backed secured financings are accounted for as on-balance sheet secured borrowings. See "Securitization Accounting" of this Note 2 for further discussion on the criteria assessed to determine whether a transfer of financial assets is a sale or a secured borrowing. If a transfer of loans qualifies as a sale we derecognize the loan and recognize a gain or loss as the difference between the carrying basis of the loan sold and liabilities retained and the compensation received.

We periodically repurchase our outstanding debt in the open market or through public tender offers. We record a gain or loss on the early extinguishment of debt based upon the difference between the carrying cost of the debt and the amount paid to the third party and is net of hedging gains and losses when the debt is in a qualifying hedge relationship.

We recognize the results of a transfer of loans and the extinguishment of debt based upon the settlement date of the transaction.

*Securitization Accounting*

Our securitizations use a two-step structure with a special purpose entity that legally isolates the transferred assets from us, even in the event of bankruptcy. Transactions receiving sale treatment are also structured to ensure that the holders of the beneficial interests issued are not constrained from pledging or exchanging their interests, and that we do not maintain effective control over the transferred assets. If these criteria are not met, then the transaction is accounted for as an on-balance sheet secured borrowing. In all cases, irrespective of whether they qualify as accounting sales our securitizations are legally structured to be sales of assets that isolate the transferred assets from us. If a securitization qualifies as a sale, we then assess whether we are the primary beneficiary of the securitization trust and are required to consolidate such trust. If we are the primary beneficiary then no gain or loss is recognized. See "Consolidation" of this Note 2 for additional information regarding the accounting rules for consolidation when we are the primary beneficiary of these trusts.

Irrespective of whether a securitization receives sale or on-balance sheet treatment, our continuing involvement with our securitization trusts is generally limited to:

• Owning the equity certificates of certain trusts.

• The servicing of the student loan assets within the securitization trusts, on both a pre- and post-default basis.

• Our acting as administrator for the securitization transactions we sponsored, which includes remarketing certain bonds at future dates.

• Our responsibilities relative to representation and warranty violations.

• Temporarily advancing to the trust certain borrower benefits afforded the borrowers of student loans that have been securitized. These advances subsequently are returned to us in the next quarter.

• Certain back-to-back derivatives entered into by us contemporaneously with the execution of derivatives by certain Private Education Loan securitization trusts.

• The option held by us to buy certain delinquent loans from certain Private Education Loan securitization trusts.

F-20

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. Significant Accounting Policies (Continued)**

- The option to exercise the clean-up call and purchase the student loans from the trust when the asset balance is 10 percent or less of the original loan balance.

- The option (in certain trusts) to call rate reset notes in instances where the remarketing process has failed.

The investors of the securitization trusts have no recourse to our other assets should there be a failure of the trusts to pay when due. Generally, the only arrangements under which we have to provide financial support to the trusts are representation and warranty violations requiring the buyback of loans.

Under the terms of the transaction documents of certain trusts, we have, from time to time, exercised our options to purchase delinquent loans from Private Education Loan trusts, to purchase the remaining loans from trusts once the loan balance falls below 10 percent of the original amount, or to call rate reset notes. Certain trusts maintain financial arrangements with third parties also typical of securitization transactions, such as derivative contracts (swaps) and bond insurance policies that, in the case of a counterparty failure, could adversely impact the value of any Residual Interest.

We do not record servicing assets or servicing liabilities when our securitization trusts are accounted for as on-balance sheet secured financings. As of December 31, 2014 and 2013, all of our securitization trusts are on-balance sheet, except as discussed in the next paragraph, and as a result we do not have servicing assets or liabilities recorded on the consolidated balance sheet related to these securitization trusts.

As of December 31, 2014, we have $32 million of servicing assets on our balance sheet related to Residual Interests in FFELP Loan securitization trusts we sold in 2013. See "Note 3 — Student Loans" for further details.

*Student Loan Interest Income*

For loans classified as held-for-investment, we recognize student loan interest income as earned, adjusted for the amortization of premiums and capitalized direct origination costs, accretion of discounts, and Repayment Borrower Benefits. These adjustments result in income being recognized based upon the expected yield of the loan over its life after giving effect to prepayments and extensions, and to estimates related to Repayment Borrower Benefits. The estimate of the prepayment speed includes the effect of consolidations, voluntary prepayments and student loan defaults, all of which shorten the life-of-loan. Prepayment speed estimates also consider the utilization of deferment, forbearance and extended repayment plans which lengthen the life-of-loan. For Repayment Borrower Benefits, the estimates of their effect on student loan yield are based on analyses of historical payment behavior of customers who are eligible for the incentives and its effect on the ultimate qualification rate for these incentives. We regularly evaluate the assumptions used to estimate the prepayment speeds and the qualification rates used for Repayment Borrower Benefits. In instances where there are changes to the assumptions, amortization is adjusted on a cumulative basis to reflect the change since the acquisition of the loan. We also pay an annual 105 basis point Consolidation Loan Rebate Fee on FFELP Consolidation Loans which is netted against student loan interest income. Additionally, interest earned on student loans reflects potential non-payment adjustments in accordance with our uncollectible interest recognition policy as discussed further in "Allowance for Loan Losses" of this Note 2. We do not amortize any premiums, discounts or other adjustments to the basis of student loans when they are classified as held-for-sale.

*Interest Expense*

Interest expense is based upon contractual interest rates adjusted for the amortization of debt issuance costs and premiums and the accretion of discounts. Our interest expense may also be adjusted for net payments/

F-21

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

receipts related to interest rate and foreign currency swap agreements that qualify and are designated as hedges. Interest expense also includes the amortization of deferred gains and losses on closed hedge transactions that qualified as hedges. Amortization of debt issuance costs, premiums, discounts and terminated hedge-basis adjustments are recognized using the effective interest rate method.

*Derivative Accounting*

The accounting guidance for our derivative instruments, which primarily includes interest rate swaps, cross-currency interest rate swaps and Floor Income Contracts, requires that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded at fair value on the balance sheet as either an asset or liability. Derivative positions are recorded as net positions by counterparty based on master netting arrangements (see "Note 7 — Derivative Financial Instruments — Risk Management Strategy") exclusive of accrued interest and cash collateral held or pledged.

Many of our derivatives, mainly fixed to variable or variable to fixed interest rate swaps and cross-currency interest rate swaps, qualify as effective hedges. For these derivatives, the relationship between the hedging instrument and the hedged items (including the hedged risk and method for assessing effectiveness), as well as the risk management objective and strategy for undertaking various hedge transactions at the inception of the hedging relationship, is documented. Each derivative is designated to either a specific (or pool of) asset(s) or liability(ies) on the balance sheet or expected future cash flows, and designated as either a "fair value" or a "cash flow" hedge. Fair value hedges are designed to hedge our exposure to changes in fair value of a fixed rate or foreign denominated asset or liability, while cash flow hedges are designed to hedge our exposure to variability of either a floating rate asset's or liability's cash flows or an expected fixed rate debt issuance. For effective fair value hedges, both the derivative and the hedged item (for the risk being hedged) are marked-to-market with any difference reflecting ineffectiveness and recorded immediately in the statement of income. For effective cash flow hedges, the change in the fair value of the derivative is recorded in other comprehensive income, net of tax, and recognized in earnings in the same period as the earnings effects of the hedged item. The ineffective portion of a cash flow hedge is recorded immediately through earnings. The assessment of the hedge's effectiveness is performed at inception and on an ongoing basis, generally using regression testing. For hedges of a pool of assets or liabilities, tests are performed to demonstrate the similarity of individual instruments of the pool. When it is determined that a derivative is not currently an effective hedge, ineffectiveness is recognized for the full change in value of the derivative with no offsetting mark-to-market of the hedged item for the current period. If it is also determined the hedge will not be effective in the future, we discontinue the hedge accounting prospectively, cease recording changes in the fair value of the hedged item, and begin amortization of any basis adjustments that exist related to the hedged item.

We also have derivatives, primarily Floor Income Contracts and certain basis swaps, that we believe are effective economic hedges but do not qualify for hedge accounting treatment. These derivatives are classified as "trading" and as a result they are marked-to-market through earnings with no consideration for the fair value fluctuation of the economically hedged item.

The "gains (losses) on derivative and hedging activities, net" line item in the consolidated statements of income includes the unrealized changes in the fair value of our derivatives (except effective cash flow hedges which are recorded in other comprehensive income), the unrealized changes in fair value of hedged items in qualifying fair value hedges, as well as the realized changes in fair value related to derivative net settlements and dispositions that do not qualify for hedge accounting. Net settlement income/expense on derivatives that qualify as hedges are included with the income or expense of the hedged item (mainly interest expense).

F-22

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

2.   **Significant Accounting Policies (Continued)**

*Servicing Revenue*

We perform loan servicing functions for third-parties in return for a servicing fee. Our compensation is typically based on a per-unit fee arrangement or a percentage of the loans outstanding. We recognize servicing revenues associated with these activities based upon the contractual arrangements as the services are rendered. We recognize late fees on third-party serviced loans as well as on loans in our portfolio according to the contractual provisions of the promissory notes, as well as our expectation of collectability.

*Asset Recovery Revenue*

We receive fees for collections or rehabilitation of delinquent or defaulted debt on behalf of clients performed on a contingency basis. Revenue is earned and recognized upon the completion of rehabilitation activities or upon receipt of the delinquent customer funds.

We also receive fees from Guarantor agencies for performing default aversion services on delinquent loans prior to default. The fee is received when the loan is initially placed with us and we are obligated to provide such services for the remaining life of the loan for no additional fee. In the event that the loan defaults, we are obligated to rebate a portion of the fee to the Guarantor agency in proportion to the principal and interest outstanding when the loan defaults. We recognize fees received, net of an estimate of future rebates owed due to subsequent defaults, over the service period which is estimated to be the life of the loan.

*Accounting for Stock-Based Compensation*

We recognize stock-based compensation cost in our consolidated statements of income using the fair value based method. Under this method we determine the fair value of the stock-based compensation at the time of the grant and recognize the resulting compensation expense over the vesting period of the stock-based grant.

*Restructuring and Other Reorganization Expenses*

From time to time we implement plans to restructure our business. In conjunction with these restructuring plans, involuntary benefit arrangements, disposal costs (including contract termination costs and other exit costs), as well as certain other costs that are incremental and incurred as a direct result of our restructuring plans, are classified as restructuring expenses in the accompanying consolidated statements of income.

We sponsor the Navient Corporation Employee Severance Plan (the "Severance Plan") which provides severance benefits in the event of termination of our full-time employees (with the exception of certain specified levels of management) and part-time employees who work at least 24 hours per week. The Severance Plan establishes specified benefits based on base salary, job level immediately preceding termination and years of service upon termination of employment due to Involuntary Termination or a Job Abolishment, as defined in the Severance Plan. The benefits payable under the Severance Plan relate to past service and they accumulate and vest. Accordingly, we recognize severance costs to be paid pursuant to the Severance Plan when payment of such benefits is probable and reasonably estimable. Such benefits, including severance pay calculated based on the Severance Plan, medical and dental benefits, outplacement services and continuation pay, have been incurred during 2014, 2013 and 2012, as a direct result of our restructuring initiatives. Accordingly, such costs are classified as restructuring expenses in the accompanying consolidated statements of income.

Contract termination costs are expensed at the earlier of (1) the contract termination date or (2) the cease use date under the contract. Other exit costs are expensed as incurred and classified as restructuring expenses if (1) the cost is incremental to and incurred as a direct result of planned restructuring activities and (2) the cost is not associated with or incurred to generate revenues subsequent to our consummation of the related restructuring activities.

F-23

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

Other reorganization expenses include internal costs, third-party costs and severance incurred in connection with our April 30, 2014 Spin transaction.

*Income Taxes*

We account for income taxes under the asset and liability approach which requires the recognition of deferred tax liabilities and assets for the expected future tax consequences of temporary differences between the carrying amounts and tax basis of our assets and liabilities. To the extent tax laws change, deferred tax assets and liabilities are adjusted in the period that the tax change is enacted.

"Income tax expense/(benefit)" includes (i) deferred tax expense/(benefit), which represents the net change in the deferred tax asset or liability balance during the year plus any change in a valuation allowance, and (ii) current tax expense/(benefit), which represents the amount of tax currently payable to or receivable from a tax authority plus amounts accrued for unrecognized tax benefits. Income tax expense/(benefit) excludes the tax effects related to adjustments recorded in equity.

If we have an uncertain tax position, then that tax position is recognized only if it is more likely than not to be sustained upon examination based on the technical merits of the position. The amount of tax benefit recognized in the financial statements is the largest amount of benefit that is more than 50 percent likely of being sustained upon ultimate settlement of the uncertain tax position. We recognize interest related to unrecognized tax benefits in income tax expense/(benefit), and penalties, if any, in operating expenses.

*Discontinued Operations*

A "Component" of a business comprises operations and cash flows that can be clearly distinguished operationally and for financial reporting purposes from the rest of the Company. When we determine that a Component of our business has been disposed of or has met the criteria to be classified as held-for-sale such Component is presented separately as discontinued operations if the operations of the Component have been or will be eliminated from our ongoing operations and we will have no continuing involvement with the Component after the disposal transaction is complete. If a Component is classified as held-for-sale, then it is carried at the lower of its cost basis or fair value. Included within discontinued operations are the accounting results related to our Campus Solutions and 529 college-savings plan administration business, which were sold during 2013. See "Note 16 — Discontinued Operations" for further discussion.

*Earnings (Loss) per Common Share*

We compute earnings (loss) per common share ("EPS") by dividing net income allocated to common shareholders by the weighted average common shares outstanding. Net income allocated to common shareholders represents net income applicable to common shareholders (net income adjusted for preferred stock dividends). Diluted earnings per common share is computed by dividing income allocated to common shareholders by the weighted average common shares outstanding plus amounts representing the dilutive effect of stock options outstanding, restricted stock, restricted stock units, and the outstanding commitment to issue shares under the Employee Stock Purchase Plan. See "Note 10 — Earnings (Loss) per Common Share" for further discussion.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

2.   **Significant Accounting Policies (Continued)**

*Reclassifications*

Certain reclassifications have been made to the balances as of and for the years ended December 31, 2013 and 2012, to be consistent with classifications adopted for 2014, which had no effect on net income, total assets or total liabilities.

*Recently Issued Accounting Pronouncements*

*Discontinued Operations*

On April 10, 2014, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update ("ASU") No. 2014-08, "Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity," which changes the definition of a discontinued operation and the requirements for reporting discontinued operations to include disposals of a component or a group of components of a business which result in a strategic shift that has or will have a major impact on the company's operations and financial results. Accordingly, this guidance, which is effective at the beginning of 2015, may result in a decrease in the number of disposals that qualify for discontinued operations presentation and preclude the Company from classifying future disposals, if any, as discontinued operations.

*Revenue Recognition*

On May 28, 2014, the FASB issued Accounting Standards Update ("ASU") No. 2014-09, "Revenue from Contracts with Customers," which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The ASU will replace most existing revenue recognition guidance in GAAP when it becomes effective. The new standard is effective for the Company on January 1, 2017. Early application is not permitted. The standard permits the use of either the retrospective or cumulative effect transition method. We are evaluating the effect that ASU 2014-09 will have on our consolidated financial statements and related disclosures. We have not yet determined the effect of the standard on our ongoing financial reporting but do not expect it to be material.

3.   **Student Loans**

Student loans consist of FFELP and Private Education Loans.

There are three principal categories of FFELP Loans: Stafford, PLUS, and FFELP Consolidation Loans. Generally, Stafford and PLUS Loans have repayment periods of between five and ten years. FFELP Consolidation Loans have repayment periods of twelve to thirty years. FFELP Loans do not require repayment, or have modified repayment plans, while the customer is in-school and during the grace period immediately upon leaving school. The customer may also be granted a deferment or forbearance for a period of time based on need, during which time the customer is not considered to be in repayment. Interest continues to accrue on loans in the in-school, deferment and forbearance period. FFELP Loans obligate the customer to pay interest at a stated fixed rate or a variable rate reset annually (subject to a cap) on July 1 of each year depending on when the loan was originated and the loan type. FFELP Loans disbursed before April 1, 2006 earn interest at the greater of the borrower's rate or a floating rate based on the Special Allowance Payment ("SAP") formula, with the interest earned on the floating rate that exceeds the interest earned from the customer being paid directly by ED. In low

F-25

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Student Loans (Continued)**

or certain declining interest rate environments when student loans are earning at the fixed borrower rate, and the interest on the funding for the loans is variable and declining, we can earn additional spread income that we refer to as Floor Income. For loans disbursed after April 1, 2006, FFELP Loans effectively only earn at the SAP rate, as the excess interest earned when the borrower rate exceeds the SAP rate (Floor Income) is required to be rebated to ED.

FFELP Loans are insured as to their principal and accrued interest in the event of default subject to a Risk Sharing level based on the date of loan disbursement. These insurance obligations are supported by contractual rights against the United States. For loans disbursed after October 1, 1993 and before July 1, 2006, we receive 98 percent reimbursement on all qualifying default claims. For loans disbursed on or after July 1, 2006, we receive 97 percent reimbursement.

Our Private Education Loans largely bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or customers' resources. Private Education Loans bear the full credit risk of the customer. Private Education Loans generally carry a variable rate indexed to LIBOR or Prime indices. We encourage customers to include a cosigner on the loan, and the majority of loans in our portfolio are cosigned. We also encourage customers to make payments while in school. Similar to FFELP loans, Private Education Loans are generally non-dischargeable in bankruptcy. Most loans have repayment terms of 15 years or more, and for loans made prior to 2009, payments are typically deferred until after graduation. However, since 2009 we began to encourage interest-only or fixed payment options while the customer is enrolled in school and today, the majority of our customers with loans originated since 2009 make payments while in school.

The estimated weighted average life of student loans in our portfolio was approximately 7.2 years and 7.5 years at December 31, 2014 and 2013, respectively. The following table reflects the distribution of our student loan portfolio by program.

| (Dollars in millions) | December 31, 2014 | | Year Ended December 31, 2014 | |
|---|---|---|---|---|
| | Ending Balance | % of Balance | Average Balance | Average Effective Interest Rate |
| FFELP Stafford and Other Student Loans, net[1] | $ 41,065 | 31% | $ 38,335 | 2.05% |
| FFELP Consolidation Loans, net | 63,456 | 47 | 62,327 | 2.84 |
| Private Education Loans, net | 29,796 | 22 | 33,672 | 6.40 |
| Total student loans, net | $134,317 | 100% | $134,334 | 3.51% |

| (Dollars in millions) | December 31, 2013 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|
| | Ending Balance | % of Balance | Average Balance | Average Effective Interest Rate |
| FFELP Stafford and Other Student Loans, net[1] | $ 40,021 | 28% | $ 42,039 | 2.01% |
| FFELP Consolidation Loans, net | 64,567 | 46 | 70,113 | 2.82 |
| Private Education Loans, net | 37,512 | 26 | 38,292 | 6.60 |
| Total student loans, net | $142,100 | 100% | $150,444 | 3.56% |

[1]  The FFELP category is primarily Stafford Loans, but also includes federally guaranteed PLUS and HEAL Loans.

F-26

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.    Student Loans (Continued)**

As of December 31, 2014 and 2013, 78 percent and 76 percent, respectively, of our student loan portfolio was in repayment.

*Loan Sales*

In 2013, we sold Residual Interests in FFELP Loan securitization trusts to third parties. We continue to service the student loans in the trusts under existing agreements. As a result of these transactions, we removed securitization trust assets of $12.5 billion and the related liabilities of $12.1 billion from the balance sheet and recorded a $312 million gain as part of "gains on sales of loans and investments" in 2013.

*Certain Collection Tools — Private Education Loans*

Forbearance involves granting the customer a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time. Using forbearance extends the original term of the loan. Forbearance does not grant any reduction in the total repayment obligation (principal or interest). While in forbearance status, interest continues to accrue and is capitalized to principal when the loan re-enters repayment status. Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan. In some instances, we require good-faith payments before granting forbearance. Exceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of collection of the loan. Forbearance as a collection tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments. We leverage updated customer information and other decision support tools to best determine who will be granted forbearance based on our expectations as to a customer's ability and willingness to repay their obligation. This strategy is aimed at mitigating the overall risk of the portfolio as well as encouraging cash resolution of delinquent loans.

Forbearance may be granted to customers who are exiting their grace period to provide additional time to obtain employment and income to support their obligations, or to current customers who are faced with a hardship and request forbearance time to provide temporary payment relief. In these circumstances, a customer's loan is placed into a forbearance status in limited monthly increments and is reflected in the forbearance status at month-end during this time. At the end of the granted forbearance period, the customer will enter repayment status as current and is expected to begin making scheduled monthly payments on a go-forward basis.

Forbearance may also be granted to customers who are delinquent in their payments. In these circumstances, the forbearance cures the delinquency and the customer is returned to a current repayment status. In more limited instances, delinquent customers will also be granted additional forbearance time.

During 2009, we instituted an interest rate reduction program to assist customers in repaying their Private Education Loans through reduced payments, while continuing to reduce their outstanding principal balance. This program is offered in situations where the potential for principal recovery, through a modification of the monthly payment amount, is better than other alternatives currently available. Along with demonstrating the ability and willingness to pay, the customer must make three consecutive monthly payments at the reduced rate to qualify for the program. Once the customer has made the initial three payments, the loan's status is returned to current and the interest rate is reduced for the successive twelve month period.

**4.    Allowance for Loan Losses**

Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios. The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be

F-27

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.  Allowance for Loan Losses (Continued)**

susceptible to significant changes. We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios. We segregate our Private Education Loan portfolio into two classes of loans — traditional and non-traditional. Non-traditional loans are loans to (i) customers attending for-profit schools with an original Fair Isaac and Company ("FICO") score of less than 670 and (ii) customers attending not-for-profit schools with an original FICO score of less than 640. The FICO score used in determining whether a loan is non-traditional is the greater of the customer or cosigner FICO score at origination. Traditional loans are defined as all other Private Education Loans that are not classified as non-traditional.

*Allowance for Loan Losses Metrics*

| | Allowance for Loan Losses | | | |
| | Year Ended December 31, 2014 | | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
|---|---|---|---|---|
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $  119 | $  2,097 | $  28 | $  2,244 |
| Total provision | 40 | 588 | — | 628 |
| Charge-offs[1] | (60) | (717) | (4) | (781) |
| Reclassification of interest reserve[2] | — | 17 | — | 17 |
| Distribution of SLM BankCo | (6) | (69) | — | (75) |
| Ending balance | $  93 | $  1,916 | $  24 | $  2,033 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $  — | $  1,132 | $  19 | $  1,151 |
| Ending balance: collectively evaluated for impairment | $  93 | $  784 | $  5 | $  882 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment | $  — | $  10,609 | $  45 | $  10,654 |
| Ending balance: collectively evaluated for impairment | $  103,438 | $  21,697 | $  62 | $125,196 |
| Charge-offs as a percentage of average loans in repayment | .08% | 2.51% | 3.31% | |
| Allowance as a percentage of the ending total loan balance | .09% | 5.93% | 22.23% | |
| Allowance as a percentage of the ending loans in repayment | .12% | 7.11% | 22.23% | |
| Allowance coverage of charge-offs | 1.5 | 2.7 | 6.1 | |
| Ending total loans[3] | $  103,438 | $  32,306 | $  107 | |
| Average loans in repayment | $  72,829 | $  28,577 | $  117 | |
| Ending loans in repayment | $  78,211 | $  26,949 | $  107 | |

[1]  Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]  Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]  Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

F-28

Table of Contents

**NAVIENT CORPORATION**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

4.  **Allowance for Loan Losses (Continued)**

| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
|---|---|---|---|---|
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $ 159 | $ 2,171 | $ 47 | $ 2,377 |
| Total provision | 52 | 787 | — | 839 |
| Charge-offs[1] | (78) | (878) | (19) | (975) |
| Student loan sales | (14) | — | — | (14) |
| Reclassification of interest reserve[2] | — | 17 | — | 17 |
| Ending balance | $ 119 | $ 2,097 | $ 28 | $ 2,244 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $ — | $ 1,048 | $ 20 | $ 1,068 |
| Ending balance: collectively evaluated for impairment | $ 119 | $ 1,049 | $ 8 | $ 1,176 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment | $ — | $ 9,262 | $ 45 | $ 9,307 |
| Ending balance: collectively evaluated for impairment | $ 103,672 | $ 31,051 | $ 85 | $134,808 |
| Charge-offs as a percentage of average loans in repayment | .10% | 2.78% | 12.28% | |
| Allowance as a percentage of the ending total loan balance | .12% | 5.20% | 21.42% | |
| Allowance as a percentage of the ending loans in repayment | .16% | 6.68% | 21.42% | |
| Allowance coverage of charge-offs | 1.5 | 2.4 | 1.5 | |
| Ending total loans[3] | $ 103,672 | $ 40,313 | $ 130 | |
| Average loans in repayment | $ 80,822 | $ 31,556 | $ 156 | |
| Ending loans in repayment | $ 76,504 | $ 31,370 | $ 130 | |

[1]  Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]  Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]  Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

F-29

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.    Allowance for Loan Losses (Continued)**

| | Allowance for Loan Losses | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2012 | | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $      187 | $      2,171 | $      69 | $      2,427 |
| Total provision | 72 | 1,008 | — | 1,080 |
| Charge-offs[1] | (92) | (1,037) | (22) | (1,151) |
| Student loan sales | (8) | — | — | (8) |
| Reclassification of interest reserve[2] | — | 29 | — | 29 |
| Ending balance | $      159 | $      2,171 | $      47 | $      2,377 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $      — | $      1,126 | $      35 | $      1,161 |
| Ending balance: collectively evaluated for impairment | $      159 | $      1,045 | $      12 | $      1,216 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment | $      — | $      7,560 | $      69 | $      7,629 |
| Ending balance: collectively evaluated for impairment | $  124,335 | $      32,341 | $    116 | $156,792 |
| Charge-offs as a percentage of average loans in repayment | .10% | 3.37% | 9.51% | |
| Allowance as a percentage of the ending total loan balance | .13% | 5.44% | 25.39% | |
| Allowance as a percentage of the ending loans in repayment | .18% | 6.89% | 25.39% | |
| Allowance coverage of charge-offs | 1.7 | 2.1 | 2.1 | |
| Ending total loans[3] | $  124,335 | $      39,901 | $    185 | |
| Average loans in repayment | $    91,653 | $      30,750 | $    231 | |
| Ending loans in repayment | $    90,731 | $      31,514 | $    185 | |

[1]    Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]    Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]    Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

F-30

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

*Key Credit Quality Indicators*

FFELP Loans are substantially insured and guaranteed as to their principal and accrued interest in the event of default; therefore, the key credit quality indicator for this portfolio is loan status. The impact of changes in loan status is incorporated quarterly into the allowance for loan losses calculation.

For Private Education Loans, the key credit quality indicators are school type, FICO scores, the existence of a cosigner, the loan status and loan seasoning. The school type/FICO score are assessed at origination and maintained through the traditional/non-traditional loan designation. The other Private Education Loan key quality indicators can change and are incorporated quarterly into the allowance for loan losses calculation. The following table highlights the principal balance (excluding the receivable for partially charged-off loans) of our Private Education Loan portfolio stratified by the key credit quality indicators.

| | Private Education Loans Credit Quality Indicators | | | |
| | December 31, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance[3] | % of Balance | Balance[3] | % of Balance |
|---|---|---|---|---|
| **Credit Quality Indicators** | | | | |
| School Type/FICO Scores: | | | | |
|    Traditional | $28,527 | 92% | $36,140 | 93% |
|    Non-Traditional[1] | 2,534 | 8 | 2,860 | 7 |
| Total | $31,061 | 100% | $39,000 | 100% |
| Cosigners: | | | | |
|    With cosigner | $20,001 | 64% | $26,321 | 67% |
|    Without cosigner | 11,060 | 36 | 12,679 | 33 |
| Total | $31,061 | 100% | $39,000 | 100% |
| Seasoning[2]: | | | | |
|    1-12 payments | $ 2,734 | 9% | $ 5,424 | 14% |
|    13-24 payments | 3,161 | 10 | 5,466 | 14 |
|    25-36 payments | 4,259 | 14 | 5,482 | 14 |
|    37-48 payments | 4,404 | 14 | 5,040 | 13 |
|    More than 48 payments | 13,450 | 43 | 11,060 | 28 |
|    Not yet in repayment | 3,053 | 10 | 6,528 | 17 |
| Total | $31,061 | 100% | $39,000 | 100% |

[1]   Defined as loans to customers attending for-profit schools (with a FICO score of less than 670 at origination) and customers attending not-for-profit schools (with a FICO score of less than 640 at origination).

[2]   Number of months in active repayment for which a scheduled payment was received.

[3]   Balance represents gross Private Education Loans.

F-31

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.  Allowance for Loan Losses (Continued)**

The following tables provide information regarding the loan status and aging of past due loans.

| | FFELP Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 10,861 | | $ 13,678 | | $ 17,702 | |
| Loans in forbearance[2] | 14,366 | | 13,490 | | 15,902 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 65,221 | 83.4% | 63,330 | 82.8% | 75,499 | 83.2% |
| Loans delinquent 31-60 days[3] | 3,942 | 5.0 | 3,746 | 4.9 | 4,710 | 5.2 |
| Loans delinquent 61-90 days[3] | 2,451 | 3.1 | 2,207 | 2.9 | 2,788 | 3.1 |
| Loans delinquent greater than 90 days[3] | 6,597 | 8.5 | 7,221 | 9.4 | 7,734 | 8.5 |
| Total FFELP Loans in repayment | 78,211 | 100% | 76,504 | 100% | 90,731 | 100% |
| Total FFELP Loans, gross | 103,438 | | 103,672 | | 124,335 | |
| FFELP Loan unamortized premium | 1,176 | | 1,035 | | 1,436 | |
| Total FFELP Loans | 104,614 | | 104,707 | | 125,771 | |
| FFELP Loan allowance for losses | (93) | | (119) | | (159) | |
| FFELP Loans, net | $104,521 | | $104,588 | | $125,612 | |
| Percentage of FFELP Loans in repayment | | 75.6% | | 73.8% | | 73.0% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 16.6% | | 17.2% | | 16.8% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 15.5% | | 15.0% | | 14.9% |

[1] Loans for customers who may still be attending school or engaging in other permitted educational activities and are not required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested and qualify for other permitted program deferments such as military, unemployment, or economic hardships.

[2] Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making full payments due to hardship or other factors.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

F-32

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

| | Private Education Traditional Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 2,777 | | $ 6,088 | | $ 5,421 | |
| Loans in forbearance[2] | 935 | | 969 | | 996 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 23,012 | 92.7% | 26,977 | 92.8% | 26,597 | 91.9% |
| Loans delinquent 31-60 days[3] | 624 | 2.5 | 674 | 2.3 | 837 | 2.9 |
| Loans delinquent 61-90 days[3] | 363 | 1.5 | 420 | 1.4 | 375 | 1.3 |
| Loans delinquent greater than 90 days[3] | 816 | 3.3 | 1,012 | 3.5 | 1,121 | 3.9 |
| Total traditional loans in repayment | 24,815 | 100% | 29,083 | 100% | 28,930 | 100% |
| Total traditional loans, gross | 28,527 | | 36,140 | | 35,347 | |
| Traditional loans unamortized discount | (526) | | (629) | | (713) | |
| Total traditional loans | 28,001 | | 35,511 | | 34,634 | |
| Traditional loans receivable for partially charged-off loans | 775 | | 799 | | 797 | |
| Traditional loans allowance for losses | (1,515) | | (1,592) | | (1,637) | |
| Traditional loans, net | $27,261 | | $34,718 | | $33,794 | |
| Percentage of traditional loans in repayment | | 87.0% | | 80.5% | | 81.9% |
| Delinquencies as a percentage of traditional loans in repayment | | 7.3% | | 7.2% | | 8.1% |
| Loans in forbearance as a percentage of traditional loans in repayment and forbearance | | 3.6% | | 3.2% | | 3.3% |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

F-33

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

| | Private Education Non-Traditional Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | **2014** | | **2013** | | **2012** | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 276 | | $ 440 | | $ 483 | |
| Loans in forbearance[2] | 124 | | 133 | | 140 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 1,749 | 81.9% | 1,791 | 78.3% | 1,978 | 76.5% |
| Loans delinquent 31-60 days[3] | 110 | 5.2 | 128 | 5.6 | 175 | 6.8 |
| Loans delinquent 61-90 days[3] | 73 | 3.4 | 93 | 4.1 | 106 | 4.1 |
| Loans delinquent greater than 90 days[3] | 202 | 9.5 | 275 | 12.0 | 325 | 12.6 |
| Total non-traditional loans in repayment | 2,134 | 100% | 2,287 | 100% | 2,584 | 100% |
| Total non-traditional loans, gross | 2,534 | | 2,860 | | 3,207 | |
| Non-traditional loans unamortized discount | (68) | | (75) | | (83) | |
| Total non-traditional loans | 2,466 | | 2,785 | | 3,124 | |
| Non-traditional loans receivable for partially charged-off loans | 470 | | 514 | | 550 | |
| Non-traditional loans allowance for losses | (401) | | (505) | | (534) | |
| Non-traditional loans, net | $2,535 | | $2,794 | | $3,140 | |
| Percentage of non-traditional loans in repayment | | 84.2% | | 80.0% | | 80.6% |
| Delinquencies as a percentage of non-traditional loans in repayment | | 18.1% | | 21.7% | | 23.4% |
| Loans in forbearance as a percentage of non-traditional loans in repayment and forbearance | | 5.5% | | 5.5% | | 5.1% |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

*Receivable for Partially Charged-Off Private Education Loans*

At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for

F-34

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

partially charged-off Private Education Loans and we will continue to do so. There was $385 million and $336 million in the allowance for Private Education Loan losses at December 31, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans.

The following table summarizes the activity in the receivable for partially charged-off loans.

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Receivable at beginning of period | $1,313 | $1,347 | $1,241 |
| Expected future recoveries of current period defaults[1] | 233 | 290 | 351 |
| Recoveries[2] | (215) | (230) | (189) |
| Charge-offs[3] | (86) | (94) | (56) |
| Receivable at end of period | 1,245 | 1,313 | 1,347 |
| Allowance for estimated recovery shortfalls[4] | (385) | (336) | (198) |
| Net receivable at end of period | $   860 | $   977 | $1,149 |

[1]   Represents the difference between the loan balance and our estimate of the amount to be collected in the future.

[2]   Current period cash collections.

[3]   Represents the current period recovery shortfall – the difference between what was expected to be collected and what was actually collected. These amounts are included in the Private Education Loan total charge-offs as reported in the "Allowance for Loan Losses Metrics" tables.

[4]   The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $1.9 billion, $2.1 billion and $2.2 billion overall allowance for Private Education Loan losses as of December 31, 2014, 2013 and 2012, respectively.

*Troubled Debt Restructurings ("TDRs")*

We modify the terms of loans for certain customers when we believe such modifications may increase the ability and willingness of a customer to make payments and thus increase the ultimate overall amount collected on a loan. These modifications generally take the form of a forbearance, a temporary interest rate reduction or an extended repayment plan. For customers experiencing financial difficulty, certain Private Education Loans for which we have granted either a forbearance of greater than three months, an interest rate reduction or an extended repayment plan are classified as TDRs. Approximately 51 percent and 45 percent of the loans granted forbearance have qualified as a TDR loan at December 31, 2014, and 2013, respectively. The unpaid principal balance of TDR loans that were in an interest rate reduction plan as of December 31, 2014 and 2013 was $2.2 billion and $1.5 billion, respectively.

F-35

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

At December 31, 2014 and 2013, all of our TDR loans had a related allowance recorded. The following table provides the recorded investment, unpaid principal balance and related allowance for our TDR loans.

| | TDR Loans | | |
| (Dollars in millions) | Recorded Investment[1] | Unpaid Principal Balance | Related Allowance |
|---|---|---|---|
| **December 31, 2014** | | | |
| Private Education Loans — Traditional | $   8,728 | $  8,790 | $    917 |
| Private Education Loans — Non-Traditional | 1,477 | 1,476 | 215 |
| Total | $   10,205 | $10,266 | $  1,132 |
| **December 31, 2013** | | | |
| Private Education Loans — Traditional | $   7,515 | $  7,559 | $    812 |
| Private Education Loans — Non-Traditional | 1,434 | 1,427 | 236 |
| Total | $   8,949 | $  8,986 | $  1,048 |

[1]   The recorded investment is equal to the unpaid principal balance and accrued interest receivable net of unamortized deferred fees and costs.

The following table provides the average recorded investment and interest income recognized for our TDR loans.

| | Years Ended December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
|---|---|---|---|---|---|---|
| Private Education Loans — Traditional | $  8,139 | $    497 | $  6,805 | $    418 | $  5,181 | $    333 |
| Private Education Loans — Non-Traditional | 1,456 | 116 | 1,376 | 112 | 1,205 | 106 |
| Total | $  9,595 | $    613 | $  8,181 | $    530 | $  6,386 | $    439 |

F-36

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.   Allowance for Loan Losses (Continued)**

The following tables provide information regarding the loan status and aging of TDR loans that are past due.

| | TDR Loan Delinquencies | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2014 | | 2013 | | 2012 | |
| (Dollars in millions) | Balance | % | Balance | % | Balance | % |
| Loans in deferment[1] | $   825 | | $   913 | | $   574 | |
| Loans in forbearance[2] | 745 | | 740 | | 544 | |
| Loans in repayment and percentage of each status: | | | | | | |
| Loans current | 7,186 | 82.7% | 5,613 | 76.5% | 4,619 | 73.8% |
| Loans delinquent 31-60 days[3] | 464 | 5.3 | 469 | 6.4 | 478 | 7.6 |
| Loans delinquent 61-90 days[3] | 299 | 3.4 | 330 | 4.5 | 254 | 4.1 |
| Loans delinquent greater than 90 days[3] | 747 | 8.6 | 921 | 12.6 | 908 | 14.5 |
| Total TDR loans in repayment | 8,696 | 100% | 7,333 | 100% | 6,259 | 100% |
| Total TDR loans, gross | $10,266 | | $8,986 | | $7,377 | |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

The following table provides the amount of modified loans that resulted in a TDR in the periods presented. Additionally, the table summarizes charge-offs occurring in the TDR portfolio, as well as TDRs for which a payment default occurred in the current period within 12 months of the loan first being designated as a TDR. We define payment default as 60 days past due for this disclosure. The majority of our loans that are considered TDRs involve a temporary forbearance of payments and do not change the contractual interest rate of the loan.

| | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | | | 2013 | | | 2012 | | |
| (Dollars in millions) | Modified Loans[1] | Charge-Offs[2] | Payment-Default | Modified Loans[1] | Charge-Offs[2] | Payment-Default | Modified Loans[1] | Charge-Offs[2] | Payment-Default |
| Private Education Loans — Traditional | $1,858 | $ 332 | $   449 | $2,114 | $ 372 | $   680 | $2,375 | $ 389 | $1,351 |
| Private Education Loans — Non-Traditional | 206 | 107 | 100 | 314 | 132 | 184 | 443 | 152 | 420 |
| Total | $2,064 | $ 439 | $   549 | $2,428 | $ 504 | $   864 | $2,818 | $ 541 | $1,771 |

[1]   Represents period ending balance of loans that have been modified during the period and resulted in a TDR.

[2]   Represents loans that charged off that were classified as TDRs.

F-37

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

4.   **Allowance for Loan Losses (Continued)**

*Accrued Interest Receivable*

The following table provides information regarding accrued interest receivable on our Private Education Loans. The table also discloses the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest.

| (Dollars in millions) | Total | Accrued Interest Receivable As of December 31, | | Allowance for Uncollectible Interest |
|---|---|---|---|---|
| | | Greater Than 90 Days Past Due | | |
| **2014** | | | | |
| Private Education Loans — Traditional | $ 542 | $ 31 | | $ 29 |
| Private Education Loans — Non-Traditional | 70 | 10 | | 11 |
| Total | $ 612 | $ 41 | | $ 40 |
| **2013** | | | | |
| Private Education Loans — Traditional | $ 926 | $ 35 | | $ 46 |
| Private Education Loans — Non-Traditional | 97 | 13 | | 20 |
| Total | $1,023 | $ 48 | | $ 66 |
| **2012** | | | | |
| Private Education Loans — Traditional | $ 798 | $ 39 | | $ 45 |
| Private Education Loans — Non-Traditional | 106 | 16 | | 22 |
| Total | $ 904 | $ 55 | | $ 67 |

F-38

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Goodwill and Acquired Intangible Assets**

*Goodwill*

All acquisitions must be assigned to a reporting unit or units. A reporting unit is the same as, or one level below, an operating segment. We have four reportable segments: FFELP Loans, Private Education Loans, Business Services and Other. The following table summarizes our goodwill, accumulated impairments and net goodwill for our reporting units and reportable segments.

| | As of December 31, 2014 | | | As of December 31, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Gross | Accumulated Impairments and Other Adjustments[1] | Net | Gross | Accumulated Impairments | Net |
| Total FFELP Loans reportable segment | $194 | $        (4) | $190 | $194 | $        (4) | $190 |
| Total Private Education Loans reportable segment[1] | 147 | (41) | 106 | 147 | — | 147 |
| Business Services reportable segment: | | | | | | |
| Servicing | 50 | — | 50 | 50 | — | 50 |
| Asset Recovery | 136 | (129) | 7 | 136 | (129) | 7 |
| Total Business Services reportable segment | 186 | (129) | 57 | 186 | (129) | 57 |
| Total | $527 | $     (174) | $353 | $527 | $     (133) | $394 |

[1]   In conjunction with our Separation from SLM BankCo, we removed $41 million of goodwill from our balance sheet as required under ASC 350, "Intangibles — Goodwill and Other." This goodwill was allocated to the consumer banking business retained by SLM BankCo based on relative fair value. The former Consumer Lending reportable segment became the Private Education Loans reportable segment.

*Interim Goodwill Impairment Testing — June 30, 2014*

We performed interim goodwill impairment testing during the second quarter of 2014 as the separation from SLM BankCo was deemed a triggering event warranting an impairment assessment. We assessed relevant qualitative factors consistent with the qualitative factors we considered in conjunction with our October 1, 2014 annual impairment assessment discussed below. We determined that it was more-likely-than-not that the fair values of these reporting units exceeded their carrying amounts as of June 30, 2014.

*Annual Goodwill Impairment Testing — October 1, 2014*

In performing our annual goodwill impairment analysis as of October 1, 2014, we assessed relevant qualitative factors to determine whether it is "more-likely-than-not" that the fair value of an individual reporting unit is less than its carrying value. As part of our qualitative assessment, we considered the amount of excess fair values over the carrying values of the FFELP Loans, Private Education Loans, Servicing and Asset Recovery reporting units as of October 1, 2013 when we performed a step 1 goodwill impairment test and engaged an appraisal firm to estimate the fair values of these reporting units. The fair value of each reporting unit at October 1, 2013 was substantially in excess of its carrying amount.

We also considered the current legislative environment, the increase in our 2014 stock price from fourth-quarter 2013 and subsequent to the April 30, 2014 separation from SLM BankCo, analyst expectations, EPS results and market capitalization, which was approximately $8.7 billion, up from approximately $7.0 billion on April 30, 2014. We believe the other qualitative factors we considered would indicate favorable changes to reporting unit fair values since appraised values were determined as of October 1, 2013. After assessing these relevant qualitative factors, we determined that it is more-likely-than-not that the fair values of the FFELP Loans,

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Goodwill and Acquired Intangible Assets (Continued)**

Private Education Loans, Servicing and Asset Recovery reporting units exceed their carrying amounts. Accordingly, we did not perform the Step 1 impairment analysis as of October 1, 2014 for these reporting units.

*Acquired Intangible Assets*

Acquired intangible assets include the following:

| (Dollars in millions) | As of December 31, 2014 | | | As of December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Cost Basis[1] | Accumulated Impairment and Amortization[1] | Net | Cost Basis[1] | Accumulated Impairment and Amortization[1] | Net |
| Intangible assets subject to amortization: | | | | | | |
| Customer, services and lending relationships | $ 199 | $ (192) | $ 7 | $ 278 | $ (261) | $17 |
| Software and technology | 78 | (78) | — | 79 | (79) | — |
| Trade names and trademarks | 14 | (5) | 9 | 34 | (21) | 13 |
| Total acquired intangible assets | $ 291 | $ (275) | $16 | $ 391 | $ (361) | $30 |

[1] Accumulated impairment and amortization includes impairment amounts only if the acquired intangible asset has been deemed partially impaired. When an acquired intangible asset is considered fully impaired and no longer in use, the cost basis and any accumulated amortization related to the asset is written off. In conjunction with our separation from SLM BankCo, we removed aggregate cost basis and accumulated impairment and amortization of $100 million and $94 million, respectively, related to Upromise and the Insurance Services reporting units, which were retained by SLM BankCo in their entirety.

Intangible assets not subject to amortization include trade names and trademarks totaling $6 million and $6 million, net of accumulated impairment, as of December 31, 2014 and 2013, respectively.

We recorded amortization of acquired intangible assets from continuing operations totaling $8 million, $13 million and $18 million in 2014, 2013 and 2012, respectively. We will continue to amortize our intangible assets with definite useful lives over their remaining estimated useful lives. We estimate amortization expense associated with these intangible assets will be $5 million, $3 million, $1 million, $1 million and $0 million in 2015, 2016, 2017, 2018 and 2019, respectively.

**6.   Borrowings**

Borrowings consist of secured borrowings issued through our securitization program, borrowings through secured facilities, unsecured notes issued by us, and other interest-bearing liabilities related primarily to obligations to return cash collateral held. To match the interest rate and currency characteristics of our borrowings with the interest rate and currency characteristics of our assets, we enter into interest rate and foreign currency swaps with independent parties. Under these agreements, we make periodic payments, generally indexed to the related asset rates or rates which are highly correlated to the asset rates, in exchange for periodic payments which generally match our interest obligations on fixed or variable rate notes (see "Note 7 —Derivative Financial Instruments"). Payments and receipts on our interest rate and currency swaps are not reflected in the following tables.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.    Borrowings (Continued)**

The following table summarizes our borrowings.

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Short Term | Long Term | Total | Short Term | Long Term | Total |
| *Unsecured borrowings:* | | | | | | |
| Senior unsecured debt | $1,066 | $ 16,311 | $ 17,377 | $ 2,213 | $ 16,056 | $ 18,269 |
| Bank deposits | — | — | — | 6,133 | 2,807 | 8,940 |
| Total unsecured borrowings | 1,066 | 16,311 | 17,377 | 8,346 | 18,863 | 27,209 |
| *Secured borrowings:* | | | | | | |
| FFELP Loan securitizations | — | 86,241 | 86,241 | — | 90,756 | 90,756 |
| Private Education Loan securitizations | — | 17,997 | 17,997 | — | 18,835 | 18,835 |
| FFELP Loan — other facilities | — | 15,358 | 15,358 | 4,715 | 5,311 | 10,026 |
| Private Education Loan — other facilities | 653 | — | 653 | — | 843 | 843 |
| Other[1] | 937 | — | 937 | 691 | — | 691 |
| Total secured borrowings | 1,590 | 119,596 | 121,186 | 5,406 | 115,745 | 121,151 |
| Total before hedge accounting adjustments | 2,656 | 135,907 | 138,563 | 13,752 | 134,608 | 148,360 |
| Hedge accounting adjustments | 7 | 959 | 966 | 43 | 2,040 | 2,083 |
| Total | $2,663 | $136,866 | $139,529 | $13,795 | $136,648 | $150,443 |

(1)    "Other" primarily consists of the obligation to return cash collateral held related to derivative exposures.

*Short-term Borrowings*

Short-term borrowings have a remaining term to maturity of one year or less. The following tables summarize outstanding short-term borrowings (secured and unsecured), the weighted average interest rates at the end of each period, and the related average balances and weighted average interest rates during the periods. Rates reflect stated interest of borrowings and related discounts and premiums.

| (Dollars in millions) | December 31, 2014 | | Year Ended December 31, 2014 | |
|---|---|---|---|---|
| | Ending Balance | Weighted Average Interest Rate | Average Balance | Weighted Average Interest Rate |
| Bank deposits | $      — | —% | $   2,032 | 1.14% |
| FFELP Loan — other facilities | — | — | 2,893 | .37 |
| Private Education Loan — other facilities | 653 | 1.06 | 397 | 1.85 |
| Senior unsecured debt | 1,073 | 4.40 | 1,385 | 4.36 |
| Other interest-bearing liabilities | 937 | .06 | 834 | .09 |
| Total short-term borrowings | $   2,663 | 2.06% | $   7,541 | 1.36% |
| Maximum outstanding at any month end | $    13,142 | | | |

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.   Borrowings (Continued)**

| (Dollars in millions) | December 31, 2013 | | Year Ended December 31, 2013 | |
|---|---|---|---|---|
| | Ending Balance | Weighted Average Interest Rate | Average Balance | Weighted Average Interest Rate |
| Bank deposits | $    6,133 | 1.14% | $    5,221 | 1.44% |
| FFELP Loan — other facilities | 4,715 | .21 | 7,386 | .84 |
| Private Education Loan — other facilities | — | — | 272 | 1.86 |
| Senior unsecured debt | 2,256 | 3.09 | 2,814 | 3.59 |
| Other interest-bearing liabilities | 691 | .07 | 1,037 | .14 |
| Total short-term borrowings | $    13,795 | 1.09% | $    16,730 | 1.46% |
| Maximum outstanding at any month end | $    20,038 | | | |

**Long-term Borrowings**

The following tables summarize outstanding long-term borrowings (secured and unsecured), the weighted average interest rates at the end of the periods, and the related average balances during the periods. Rates reflect stated interest rate of borrowings and related discounts and premiums.

| (Dollars in millions) | December 31, 2014 | | Year Ended December 31, 2014 |
|---|---|---|---|
| | Ending Balance[1] | Weighted Average Interest Rate[2] | Average Balance |
| Floating rate notes: | | | |
| U.S. dollar-denominated: | | | |
| Interest bearing, due 2016-2054 | $107,621 | .95% | $ 100,966 |
| Non-U.S. dollar-denominated: | | | |
| Interest bearing, due 2021-2041 | 8,516 | .47 | 8,842 |
| Total floating rate notes | 116,137 | .95 | 109,808 |
| Fixed rate notes: | | | |
| U.S. dollar-denominated: | | | |
| Interest bearing, due 2016-2047 | 19,495 | 5.61 | 18,108 |
| Non-U.S.-dollar denominated: | | | |
| Interest bearing, due 2016-2039 | 1,234 | 4.57 | 1,416 |
| Total fixed rate notes | 20,729 | 5.55 | 19,524 |
| Brokered deposits — U.S. dollar-denominated | — | — | 918 |
| Total long-term borrowings | $136,866 | 1.62% | $ 130,250 |

F-42

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.   Borrowings (Continued)**

| (Dollars in millions) | December 31, 2013 | | Year Ended December 31, 2013 |
| | Ending Balance[1] | Weighted Average Interest Rate[2] | Average Balance |
|---|---|---|---|
| Floating rate notes: | | | |
| U.S. dollar-denominated: | | | |
| Interest bearing, due 2015-2048 | $102,878 | .98% | $ 108,100 |
| Non-U.S. dollar-denominated: | | | |
| Interest bearing, due 2021-2041 | 9,249 | .62 | 9,525 |
| Total floating rate notes | 112,127 | .95 | 117,625 |
| Fixed rate notes: | | | |
| U.S. dollar-denominated: | | | |
| Interest bearing, due 2015-2047 | 18,510 | 5.61 | 16,149 |
| Non-U.S.-dollar denominated: | | | |
| Interest bearing, due 2015-2039 | 3,204 | 2.72 | 2,420 |
| Total fixed rate notes | 21,714 | 5.18 | 18,569 |
| Brokered deposits — U.S. dollar-denominated, due 2015-2018 | 2,807 | 1.32 | 2,488 |
| Total long-term borrowings | $136,648 | 1.63% | $ 138,682 |

[1]   Ending balance is expressed in U.S. dollars using the spot currency exchange rate. Includes fair value adjustments under hedge accounting for notes designated as the hedged item in a fair value hedge.

[2]   Weighted average interest rate is stated rate relative to currency denomination of debt.

At December 31, 2014, we had outstanding long-term borrowings with call features totaling $1.7 billion. In addition, we have $15.4 billion of pre-payable debt related to our secured facilities. Generally, these instruments are callable at the par amount. As of December 31, 2014, the stated maturities and maturities if accelerated to the call dates are shown in the following table.

| (Dollars in millions) | Stated Maturity | | | Maturity to Call Date | | |
| | Senior Unsecured Debt | Secured Borrowings[1] | Total[2] | Senior Unsecured Debt | Secured Borrowings[1] | Total |
|---|---|---|---|---|---|---|
| Year of Maturity | | | | | | |
| 2015 | $ — | $ 16,786 | $ 16,786 | $ 1,699 | $ 16,786 | $ 18,485 |
| 2016 | 2,224 | 12,526 | 14,750 | 2,223 | 12,526 | 14,749 |
| 2017 | 1,834 | 12,832 | 14,666 | 1,812 | 12,832 | 14,644 |
| 2018 | 2,802 | 9,036 | 11,838 | 2,553 | 9,036 | 11,589 |
| 2019 | 2,438 | 10,333 | 12,771 | 2,257 | 10,333 | 12,590 |
| 2020-2054 | 7,013 | 58,083 | 65,096 | 5,767 | 58,083 | 63,850 |
| | 16,311 | 119,596 | 135,907 | 16,311 | 119,596 | 135,907 |
| Hedge accounting adjustments | 877 | 82 | 959 | 877 | 82 | 959 |
| Total | $17,188 | $ 119,678 | $ 136,866 | $ 17,188 | $ 119,678 | $ 136,866 |

[1]   We view our securitization trust debt as long-term based on the contractual maturity dates and have projected the expected principal paydowns based on our current estimates regarding loan prepayment speeds. The projected principal paydowns in year 2015 include $16.8 billion related to the securitization trust debt.

[2]   The aggregate principal amount of debt that matures in each period is $16.9 billion in 2015, $14.8 billion in 2016, $14.7 billion in 2017, $11.9 billion in 2018, $12.8 billion in 2019, and $65.6 billion in 2020-2054.

F-43

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.   Borrowings (Continued)**

*Variable Interest Entities*

We consolidate the following financing VIEs as of December 31, 2014 and 2013, as we are the primary beneficiary. As a result, these VIEs are accounted for as secured borrowings.

| | December 31, 2014 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total |
| **Secured Borrowings — VIEs:** | | | | | | | |
| FFELP Loan securitizations | $   — | $ 86,241 | $ 86,241 | $ 86,715 | $3,069 | $   722 | $ 90,506 |
| Private Education Loan securitizations | — | 17,997 | 17,997 | 23,184 | 378 | 389 | 23,951 |
| FFELP Loan — other facilities | — | 13,358 | 13,358 | 13,653 | 269 | 260 | 14,182 |
| Private Education Loan — other facilities | 653 | — | 653 | 1,233 | 17 | 36 | 1,286 |
| Total before hedge accounting adjustments | 653 | 117,596 | 118,249 | 124,785 | 3,733 | 1,407 | 129,925 |
| Hedge accounting adjustments | — | 82 | 82 | — | — | (177) | (177) |
| Total | $   653 | $117,678 | $118,331 | $124,785 | $3,733 | $   1,230 | $129,748 |

| | December 31, 2013 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total |
| **Secured Borrowings — VIEs:** | | | | | | | |
| FFELP Loan securitizations | $   — | $ 90,756 | $ 90,756 | $ 91,535 | $2,913 | $   683 | $ 95,131 |
| Private Education Loan securitizations | — | 18,835 | 18,835 | 23,947 | 338 | 540 | 24,825 |
| FFELP Loan — other facilities | 3,655 | 3,791 | 7,446 | 7,719 | 128 | 91 | 7,938 |
| Private Education Loan — other facilities | — | 843 | 843 | 1,583 | 16 | 30 | 1,629 |
| Total before hedge accounting adjustments | 3,655 | 114,225 | 117,880 | 124,784 | 3,395 | 1,344 | 129,523 |
| Hedge accounting adjustments | — | 1,313 | 1,313 | — | — | 978 | 978 |
| Total | $3,655 | $115,538 | $119,193 | $124,784 | $3,395 | $   2,322 | $130,501 |

*Securitizations*

*2013 Sales of FFELP Securitization Trust Residual Interests*

In 2013, we sold Residual Interests in FFELP Loan securitization trusts to third parties. We continue to service the student loans in the trusts under existing agreements. As a result of these transactions, we removed securitization trust assets of $12.5 billion and the related liabilities of $12.1 billion from the balance sheet and recorded a $312 million gain as part of "gains on sales of loans and investments" in 2013.

F-44

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.   Borrowings (Continued)**

*FFELP Loans — Other Secured Borrowing Facilities*

We have various secured borrowing facilities that we use to finance our FFELP Loans. Liquidity is available under these secured credit facilities to the extent we have eligible collateral and available capacity. The maximum borrowing capacity under these facilities will vary and is subject to each agreement's borrowing conditions. These include but are not limited to the facility's size, current usage and the availability and fair value of qualifying unencumbered FFELP Loan collateral. Our borrowings under these facilities are non-recourse. The maturity dates on these facilities range from January 2016 to February 2019. The interest rate on certain facilities can increase under certain circumstances. The facilities are subject to termination under certain circumstances. As of December 31, 2014, there was approximately $15.4 billion outstanding under these facilities, with approximately $16.5 billion of assets securing these facilities. As of December 31, 2014, the maximum unused capacity under these facilities was $13.2 billion. As of December 31, 2014, we had $1.9 billion of unencumbered FFELP Loans.

*Private Education Loans — Other Secured Borrowing Facilities*

In June 2014, Navient closed on a new $1.0 billion Private Education Loan asset-backed commercial paper ("ABCP") facility. This facility, which matures in June 2015, provides liquidity for Private Education Loan acquisitions and for the refinancing of loans presently on our balance sheet or in other short-term facilities. As of December 31, 2014, there was $348 million outstanding under the facility. The book basis of the assets securing the facility as of December 31, 2014 was $440 million.

We also have a facility that was used to fund the call and redemption of our SLM 2009-D Private Education Loan trust asset-backed securities ("ABS"), which occurred on August 15, 2013. The maturity date of this facility is August 15, 2015. Our borrowings under this facility are non-recourse. The interest rate can increase under certain circumstances. The facility is subject to termination under certain circumstances. As of December 31, 2014, there was $305 million outstanding under the facility. The book basis of the assets securing the facility as of December 31, 2014 was $847 million. Additional borrowings are not available under this facility.

*Other Funding Sources*

*Senior Unsecured Debt*

We issued $1.9 billion, $3.8 billion and $2.7 billion of unsecured debt in 2014, 2013 and 2012, respectively.

*Debt Repurchases*

The following table summarizes activity related to our senior unsecured debt and ABS repurchases. "Gains on debt repurchases" is shown net of hedging-related gains and losses.

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Debt principal repurchased | $548 | $1,279 | $711 |
| Gains on debt repurchases | — | 42 | 145 |

F-45

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments**

*Risk Management Strategy*

We maintain an overall interest rate risk management strategy that incorporates the use of derivative instruments to minimize the economic effect of interest rate changes. Our goal is to manage interest rate sensitivity by modifying the repricing frequency and underlying index characteristics of certain balance sheet assets and liabilities so the net interest margin is not, on a material basis, adversely affected by movements in interest rates. We do not use derivative instruments to hedge credit risk associated with debt we issued. As a result of interest rate fluctuations, hedged assets and liabilities will appreciate or depreciate in market value. Income or loss on the derivative instruments that are linked to the hedged assets and liabilities will generally offset the effect of this unrealized appreciation or depreciation for the period the item is being hedged. We view this strategy as a prudent management of interest rate sensitivity. In addition, we utilize derivative contracts to minimize the economic impact of changes in foreign currency exchange rates on certain debt obligations that are denominated in foreign currencies. As foreign currency exchange rates fluctuate, these liabilities will appreciate and depreciate in value. These fluctuations, to the extent the hedge relationship is effective, are offset by changes in the value of the cross-currency interest rate swaps executed to hedge these instruments. Management believes certain derivative transactions entered into as hedges, primarily Floor Income Contracts and basis swaps, are economically effective; however, those transactions generally do not qualify for hedge accounting under GAAP (as discussed below) and thus may adversely impact earnings.

Although we use derivatives to offset (or minimize) the risk of interest rate and foreign currency changes, the use of derivatives does expose us to both market and credit risk. Market risk is the chance of financial loss resulting from changes in interest rates, foreign exchange rates and market liquidity. Credit risk is the risk that a counterparty will not perform its obligations under a contract and it is limited to the loss of the fair value gain in a derivative that the counterparty owes us. When the fair value of a derivative contract is negative, we owe the counterparty and, therefore, have no credit risk exposure to the counterparty; however, the counterparty has exposure to us. We minimize the credit risk in derivative instruments by entering into transactions with highly rated counterparties that are reviewed regularly by our Credit Department. We also maintain a policy of requiring that all derivative contracts be governed by an International Swaps and Derivative Association Master Agreement. Depending on the nature of the derivative transaction, bilateral collateral arrangements related to Navient Corporation contracts generally are required as well. When we have more than one outstanding derivative transaction with the counterparty, and there exists legally enforceable netting provisions with the counterparty (i.e., a legal right to offset receivable and payable derivative contracts), the "net" mark-to-market exposure, less collateral the counterparty has posted to us, represents exposure with the counterparty. When there is a net negative exposure, we consider our exposure to the counterparty to be zero. At December 31, 2014 and 2013, we had a net positive exposure (derivative gain positions to us less collateral which has been posted by counterparties to us) related to Navient Corporation derivatives of $96 million and $83 million, respectively.

Our on-balance sheet securitization trusts have $9.3 billion of Euro and British Pound Sterling denominated bonds outstanding as of December 31, 2014. To convert these non-U.S. dollar denominated bonds into U.S. dollar liabilities, the trusts have entered into foreign-currency swaps with highly–rated counterparties. In addition, the trusts have entered into $12.5 billion of interest rates swaps which are primarily used to convert Prime received on securitized student loans to LIBOR paid on the bonds. Our securitization trusts require collateral in all cases if the counterparty's credit rating is withdrawn or downgraded below a certain level. Additionally, securitizations involving foreign currency notes issued after November 2005 also require the counterparty to post collateral to the trust based on the fair value of the derivative, regardless of credit rating. The trusts are not required to post collateral to the counterparties. At December 31, 2014, the net positive exposure on swaps in securitization trusts is $129 million.

*Accounting for Derivative Instruments*

Derivative instruments that are used as part of our interest rate and foreign currency risk management strategy include interest rate swaps, basis swaps, cross-currency interest rate swaps, and interest rate floor contracts with indices that relate to the pricing of specific balance sheet assets and liabilities. The accounting for

F-46

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments (Continued)**

derivative instruments requires that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded on the balance sheet as either an asset or liability measured at its fair value. As more fully described below, if certain criteria are met, derivative instruments are classified and accounted for by us as either fair value or cash flow hedges. If these criteria are not met, the derivative financial instruments are accounted for as trading.

*Fair Value Hedges*

Fair value hedges are generally used by us to hedge the exposure to changes in fair value of a recognized fixed rate asset or liability. We enter into interest rate swaps to economically convert fixed rate assets into variable rate assets and fixed rate debt into variable rate debt. We also enter into cross-currency interest rate swaps to economically convert foreign currency denominated fixed and floating debt to U.S. dollar denominated variable debt. For fair value hedges, we generally consider all components of the derivative's gain and/or loss when assessing hedge effectiveness and generally hedge changes in fair values due to interest rates or interest rates and foreign currency exchange rates.

*Cash Flow Hedges*

We use cash flow hedges to hedge the exposure to variability in cash flows for a forecasted debt issuance and for exposure to variability in cash flows of floating rate debt. This strategy is used primarily to minimize the exposure to volatility from future changes in interest rates. Gains and losses on the effective portion of a qualifying hedge are recorded in accumulated other comprehensive income and ineffectiveness is recorded immediately to earnings. In the case of a forecasted debt issuance, gains and losses are reclassified to earnings over the period which the stated hedged transaction affects earnings. If we determine it is not probable that the anticipated transaction will occur, gains and losses are reclassified immediately to earnings. In assessing hedge effectiveness, generally all components of each derivative's gains or losses are included in the assessment. We generally hedge exposure to changes in cash flows due to changes in interest rates or total changes in cash flow.

*Trading Activities*

When derivative instruments do not qualify as hedges, they are accounted for as trading instruments where all changes in fair value are recorded through earnings. We sell interest rate floors (Floor Income Contracts) to hedge the embedded Floor Income options in student loan assets. The Floor Income Contracts are written options which have a more stringent hedge effectiveness hurdle to meet. Specifically, our Floor Income Contracts do not qualify for hedge accounting treatment because the pay down of principal of the student loans underlying the Floor Income embedded in those student loans does not exactly match the change in the notional amount of our written Floor Income Contracts. Additionally, the term, the interest rate index and the interest rate index reset frequency of the Floor Income Contracts can be different from that of the student loans. Therefore, Floor Income Contracts do not qualify for hedge accounting treatment, and are recorded as trading instruments. Regardless of the accounting treatment, we consider these contracts to be economic hedges for risk management purposes. We use this strategy to minimize our exposure to changes in interest rates.

We use basis swaps to minimize earnings variability caused by having different reset characteristics on our interest-earning assets and interest-bearing liabilities. The specific terms and notional amounts of the swaps are determined based on a review of our asset/liability structure, our assessment of future interest rate relationships, and on other factors such as short-term strategic initiatives. Hedge accounting requires that when using basis swaps, the change in the cash flows of the hedge effectively offset both the change in the cash flows of the asset and the change in the cash flows of the liability. Our basis swaps hedge variable interest rate risk; however, they

F-47

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments (Continued)**

generally do not meet this effectiveness criterion because the index of the swap does not exactly match the index of the hedged assets. Additionally, some of our FFELP Loans can earn at either a variable or a fixed interest rate depending on market interest rates and, therefore, swaps economically hedging these FFELP Loans do not meet the criteria for hedge accounting treatment. As a result, these swaps are recorded at fair value with changes in fair value reflected currently in the statement of income.

*Summary of Derivative Financial Statement Impact*

The following tables summarize the fair values and notional amounts or number of contracts of all derivative instruments at December 31, 2014 and 2013, and their impact on other comprehensive income and earnings for 2014, 2013 and 2012.

*Impact of Derivatives on Consolidated Balance Sheet*

| (Dollars in millions) | Hedged Risk Exposure | Cash Flow | | Fair Value | | Trading | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Fair Values**(1) | | | | | | | | | |
| *Derivative Assets:* | | | | | | | | | |
| Interest rate swaps | Interest rate | $ 6 | $ 24 | $ 828 | $ 738 | $ 23 | $ 61 | $ 857 | $ 823 |
| Cross-currency interest rate swaps | Foreign currency and interest rate | — | — | 164 | 1,185 | — | — | 164 | 1,185 |
| Other(2) | Interest rate | — | — | — | — | 1 | 2 | 1 | 2 |
| Total derivative assets(3) | | 6 | 24 | 992 | 1,923 | 24 | 63 | 1,022 | 2,010 |
| *Derivative Liabilities:* | | | | | | | | | |
| Interest rate swaps | Interest rate | (3) | — | (22) | (149) | (120) | (215) | (145) | (364) |
| Floor Income Contracts | Interest rate | — | — | — | — | (915) | (1,384) | (915) | (1,384) |
| Cross-currency interest rate swaps | Foreign currency and interest rate | — | — | (293) | (155) | (65) | (31) | (358) | (186) |
| Other(2) | Interest rate | — | — | — | — | (12) | (23) | (12) | (23) |
| Total derivative liabilities(3) | | (3) | — | (315) | (304) | (1,112) | (1,653) | (1,430) | (1,957) |
| Net total derivatives | | $ 3 | $ 24 | $ 677 | $1,619 | $(1,088) | $(1,590) | $ (408) | $ 53 |

(1) Fair values reported are exclusive of collateral held and pledged and accrued interest. Assets and liabilities are presented without consideration of master netting agreements. Derivatives are carried on the balance sheet based on net position by counterparty under master netting agreements, and classified in other assets or other liabilities depending on whether in a net positive or negative position.

(2) "Other" includes embedded derivatives bifurcated from securitization debt as well as derivatives related to our Total Return Swap Facility.

(3) The following table reconciles gross positions with the impact of master netting agreements to the balance sheet classification:

| | Other Assets | | Other Liabilities | |
|---|---|---|---|---|
| (Dollar in millions) | December 31, 2014 | December 31, 2013 | December 31, 2014 | December 31, 2013 |
| Gross position | $ 1,022 | $ 2,010 | $ (1,430) | $ (1,957) |
| Impact of master netting agreements | (241) | (386) | 241 | 386 |
| Derivative values with impact of master netting agreements (as carried on balance sheet) | 781 | 1,624 | (1,189) | (1,571) |
| Cash collateral (held) pledged | (935) | (687) | 624 | 777 |
| Net position | $ (154) | $ 937 | $ (565) | $ (794) |

F-48

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments (Continued)**

The above fair values include adjustments for counterparty credit risk for both when we are exposed to the counterparty, net of collateral postings, and when the counterparty is exposed to us, net of collateral postings. The net adjustments decreased the overall net asset positions at December 31, 2014 and 2013 by $18 million and $91 million, respectively. In addition, the above fair values reflect adjustments for illiquid derivatives as indicated by a wide bid/ask spread in the interest rate indices to which the derivatives are indexed. These adjustments decreased the overall net asset positions at December 31, 2014 and 2013 by $73 million and $84 million, respectively.

| (Dollars in billions) | Cash Flow | | Fair Value | | Trading | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Notional Values:** | | | | | | | | |
| Interest rate swaps | $ 6.0 | $ .7 | $ 14.3 | $ 16.0 | $ 28.7 | $ 46.3 | $ 49.0 | $ 63.0 |
| Floor Income Contracts | — | — | — | — | 35.2 | 31.8 | 35.2 | 31.8 |
| Cross-currency interest rate swaps | — | — | 9.4 | 11.1 | .4 | .3 | 9.8 | 11.4 |
| Other[1] | — | — | — | — | 3.6 | 3.9 | 3.6 | 3.9 |
| Total derivatives | $ 6.0 | $ .7 | $ 23.7 | $ 27.1 | $ 67.9 | $ 82.3 | $ 97.6 | $110.1 |

[1]  "Other" includes embedded derivatives bifurcated from securitization debt, as well as derivatives related to our Total Return Swap Facility.

F-49

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments (Continued)**

*Impact of Derivatives on Consolidated Statements of Income*

| | Years Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Unrealized Gain (Loss) on Derivatives[1][2] | | | Realized Gain (Loss) on Derivatives[3] | | | Unrealized Gain (Loss) on Hedged Item[1] | | | Total Gain (Loss) | | |
| (Dollars in millions) | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| **Fair Value Hedges:** | | | | | | | | | | | | |
| Interest rate swaps | $ 213 | $(806) | $ (75) | $ 389 | $ 414 | $ 449 | $ (185) | $ 873 | $ 41 | $417 | $ 481 | $ 415 |
| Cross-currency interest rate swaps | (1,159) | 1 | 42 | 52 | 98 | 167 | 1,264 | (183) | (182) | 157 | (84) | 27 |
| Total fair value derivatives | (946) | (805) | (33) | 441 | 512 | 616 | 1,079 | 690 | (141) | 574 | 397 | 442 |
| **Cash Flow Hedges:** | | | | | | | | | | | | |
| Interest rate swaps | — | — | (1) | (3) | (9) | (26) | — | — | — | (3) | (9) | (27) |
| Total cash flow derivatives | — | — | (1) | (3) | (9) | (26) | — | — | — | (3) | (9) | (27) |
| **Trading:** | | | | | | | | | | | | |
| Interest rate swaps | 54 | (107) | (66) | 46 | 71 | 108 | — | — | — | 100 | (36) | 42 |
| Floor Income Contracts | 633 | 785 | 412 | (699) | (815) | (859) | — | — | — | (66) | (30) | (447) |
| Cross-currency interest rate swaps | (33) | (101) | (59) | (2) | 35 | 7 | — | — | — | (35) | (66) | (52) |
| Other | 9 | (19) | 5 | (2) | (2) | (1) | — | — | — | 7 | (21) | 4 |
| Total trading derivatives | 663 | 558 | 292 | (657) | (711) | (745) | — | — | — | 6 | (153) | (453) |
| Total | (283) | (247) | 258 | (219) | (208) | (155) | 1,079 | 690 | (141) | 577 | 235 | (38) |
| Less: realized gains (losses) recorded in interest expense | — | — | — | 438 | 503 | 590 | — | — | — | 438 | 503 | 590 |
| Gains (losses) on derivative and hedging activities, net | $ (283) | $(247) | $258 | $(657) | $(711) | $(745) | $1,079 | $ 690 | $(141) | $139 | $(268) | $(628) |

[1]   Recorded in "Gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

[2]   Represents ineffectiveness related to cash flow hedges.

[3]   For fair value and cash flow hedges, recorded in interest expense. For trading derivatives, recorded in "Gains (losses) on derivative and hedging activities, net."

F-50

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Derivative Financial Instruments (Continued)**

*Impact of Derivatives on Consolidated Statements of Changes in Stockholders' Equity (net of tax)*

| (Dollars in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Total gains (losses) on cash flow hedges | $ (7) | $16 | $ (7) |
| Realized losses recognized in interest expense[1][2][3] | 2 | 6 | 16 |
| Total change in stockholders' equity for unrealized gains on derivatives | $ (5) | $22 | $ 9 |

[1]   Amounts included in "Realized gain (loss) on derivatives" in the "Impact of Derivatives on Consolidated Statements of Income" table above.

[2]   Includes net settlement income/expense.

[3]   We expect to reclassify $1 million of after-tax net losses from accumulated other comprehensive income to earnings during the next 12 months related to net settlement accruals on interest rate swaps.

*Collateral*

The following table details collateral held and pledged related to derivative exposure between us and our derivative counterparties.

| (Dollars in millions) | December 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| **Collateral held:** | | | | |
| Cash (obligation to return cash collateral is recorded in short-term borrowings) | $ | 935 | $ | 687 |
| Securities at fair value — on-balance sheet securitization derivatives (not recorded in financial statements)[1] | | 344 | | 629 |
| Total collateral held | $ | 1,279 | $ | 1,316 |
| Derivative asset at fair value including accrued interest | $ | 1,091 | $ | 1,878 |
| **Collateral pledged to others:** | | | | |
| Cash (right to receive return of cash collateral is recorded in investments) | $ | 624 | $ | 777 |
| Total collateral pledged | $ | 624 | $ | 777 |
| Derivative liability at fair value including accrued interest and premium receivable | $ | 926 | $ | 948 |

[1]   The trusts do not have the ability to sell or re-pledge securities they hold as collateral.

Our corporate derivatives contain credit contingent features. At our current unsecured credit rating, we have fully collateralized our corporate derivative liability position (including accrued interest and net of premiums receivable) of $615 million with our counterparties. Downgrades in our unsecured credit rating would not result in any additional collateral requirements, except to increase the frequency of collateral calls. Two counterparties have the right to terminate the contracts based on our current unsecured credit rating. We currently have a liability position with these derivative counterparties (including accrued interest and net of premiums receivable) of $80 million and have posted $79 million of collateral to these counterparties. If these two counterparties exercised their right to terminate, we would be required to deliver additional assets of $1 million to settle the contracts. Trust related derivatives do not contain credit contingent features related to our or the trusts' credit ratings.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8.   Other Assets**

The following table provides the detail of our other assets.

| (Dollars in millions) | December 31, 2014 Ending Balance | % of Balance | December 31, 2013 Ending Balance | % of Balance |
|---|---|---|---|---|
| Accrued interest receivable, net | $1,821 | 32% | $2,161 | 30% |
| Derivatives at fair value | 781 | 14 | 1,624 | 22 |
| Income tax asset, net current and deferred | 1,389 | 25 | 1,299 | 18 |
| Accounts receivable | 558 | 10 | 881 | 12 |
| Benefit and insurance-related investments | 485 | 9 | 477 | 7 |
| Fixed assets, net | 152 | 3 | 237 | 3 |
| Other loans, net | 83 | 1 | 101 | 1 |
| Other | 395 | 6 | 507 | 7 |
| Total | $5,664 | 100% | $7,287 | 100% |

**9.   Stockholders' Equity**

*Preferred Stock*

At December 31, 2013, Old SLM had outstanding 3.3 million shares of 6.97 percent Cumulative Redeemable Preferred Stock, Series A (the "Series A Preferred Stock") and 4.0 million shares of Floating-Rate Non-Cumulative Preferred Stock, Series B (the "Series B Preferred Stock"). As part of the internal corporate reorganization and pursuant to the merger, all of the outstanding shares of Old SLM Series A Preferred Stock and Series B Preferred Stock were converted, on a one-to-one basis, into substantially identical shares of SLM BankCo preferred stock. Following the merger, SLM BankCo is the issuer of the Series A and Series B Preferred Stock.

*Common Stock*

Our shareholders have authorized the issuance of 1.125 billion shares of common stock. The par value of Navient common stock is $0.01 per share, while the par value of the common stock of Old SLM, our accounting predecessor, was $0.20 per share. At December 31, 2014, 402 million shares were issued and outstanding and 33 million shares were unissued but encumbered for outstanding stock options, restricted stock units and dividend equivalent units for employee compensation and remaining authority for stock-based compensation plans. The stock-based compensation plans are described in "Note 11 — Stock-Based Compensation Plans and Arrangements."

In April 2014, in connection with the Spin-Off, Old SLM retired 127 million shares of common stock held in treasury. This retirement decreased the balance in treasury stock by $2.3 billion, with corresponding decreases of $25 million in common stock and $2.3 billion in additional paid-in capital. There was no impact to total equity from this retirement.

*Dividend and Share Repurchase Program*

In 2014, we paid quarterly common stock dividends of $0.15 per share, resulting in a full-year common stock dividend of $0.60 per share.

In 2012, Old SLM authorized the repurchase of up to $900 million of outstanding common stock in open market transactions and repurchased 58.0 million shares for an aggregate purchase price of $900 million. In 2013, Old SLM authorized the repurchase of up to $800 million of outstanding common stock in open market transactions and repurchased 27.0 million shares for an aggregate purchase price of $600 million.

F-52

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.    Stockholders' Equity (Continued)**

In May 2014, Navient authorized $400 million to be utilized in a new common share repurchase program. We repurchased 30.4 million shares of common stock for $600 million in 2014 (8.3 million shares for $200 million pre-Spin-Off, and 22.1 million shares for $400 million post-Spin-Off), fully utilizing the 2013 and 2014 share repurchase programs. In December 2014, our board of directors authorized $1.0 billion to be utilized in a new common share repurchase program that is effective January 1, 2015 and does not have an expiration date.

The following table summarizes our common share repurchases and issuances.

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Common stock repurchased[1] | 30,432,689 | 26,987,043 | 58,038,239 |
| Average purchase price per share | $       19.72 | $       22.26 | $       15.52 |
| Shares repurchased related to employee stock-based compensation plans[2] | 4,171,342 | 6,365,002 | 4,547,785 |
| Average purchase price per share | $       20.91 | $       21.76 | $       15.86 |
| Common shares issued[3] | 7,389,962 | 9,702,976 | 6,432,643 |

[1]   Common shares purchased under our share repurchase programs.

[2]   Comprises shares withheld from stock option exercises and vesting of restricted stock for employees' tax withholding obligations and shares tendered by employees to satisfy option exercise costs.

[3]   Common shares issued under our various compensation and benefit plans.

The closing price of our common stock on December 31, 2014 was $21.61.

F-53

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Earnings (Loss) per Common Share**

Basic earnings (loss) per common share ("EPS") are calculated using the weighted average number of shares of common stock outstanding during each period. A reconciliation of the numerators and denominators of the basic and diluted EPS calculations follows.

| (In millions, except per share data) | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| **Numerator:** | | | |
| Net income attributable to Navient Corporation | $1,149 | $1,418 | $ 939 |
| Preferred stock dividends | 6 | 20 | 20 |
| Net income attributable to Navient Corporation common stock | $1,143 | $1,398 | $ 919 |
| **Denominator:** | | | |
| Weighted average shares used to compute basic EPS | 417 | 440 | 476 |
| Effect of dilutive securities: | | | |
| Dilutive effect of stock options, restricted stock, restricted stock units and Employee Stock Purchase Plan ("ESPP")[1] | 8 | 9 | 7 |
| Dilutive potential common shares[2] | 8 | 9 | 7 |
| Weighted average shares used to compute diluted EPS | 425 | 449 | 483 |
| **Basic earnings (loss) per common share attributable to Navient Corporation:** | | | |
| Continuing operations | $ 2.74 | $ 2.94 | $1.93 |
| Discontinued operations | — | .24 | — |
| Total | $ 2.74 | $ 3.18 | $1.93 |
| **Diluted earnings (loss) per common share attributable to Navient Corporation:** | | | |
| Continuing operations | $ 2.69 | $ 2.89 | $1.90 |
| Discontinued operations | — | .23 | — |
| Total | $ 2.69 | $ 3.12 | $1.90 |

[1] Includes the potential dilutive effect of additional common shares that are issuable upon exercise of outstanding stock options, restricted stock, restricted stock units, and the outstanding commitment to issue shares under the ESPP, determined by the treasury stock method.

[2] For the years ended December 31, 2014, 2013 and 2012, stock options covering approximately 3 million, 3 million and 12 million shares, respectively, were outstanding but not included in the computation of diluted earnings per share because they were anti-dilutive.

**11.  Stock-Based Compensation Plans and Arrangements**

In connection with the Spin-Off, SLM BankCo assumed the equity incentive plans of Old SLM and outstanding awards granted thereunder, as well as the ESPP of Old SLM. Following the Spin-Off, Navient established a new equity incentive plan and a new ESPP with respect to its common stock. In order to maintain the intrinsic value of outstanding equity awards prior to the distribution, certain adjustments to the exercise price and number of awards were made. In general, holders of awards granted prior to 2014 received both adjusted SLM BankCo and new Navient equity awards, and holders of awards granted in 2014 received solely equity awards of their post-distribution employer. Outstanding stock options, restricted stock, restricted stock units and dividend equivalent units were adjusted into equity in the new companies by a specific conversion ratio per company, which was based upon the volume weighted average prices for each company leading up to the time of the separation, to keep the intrinsic value of the equity awards constant. These adjustments were accounted for as modifications to the original awards. In general, the SLM BankCo and Navient awards are subject to substantially the same terms and conditions as the original Old SLM awards. A comparison of the fair value of the modified awards with the fair value of the original awards immediately before the modification resulted in an immaterial amount of incremental compensation expense which was recorded immediately.

F-54

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Stock-Based Compensation Plans and Arrangements (Continued)**

As of December 31, 2014, we have one active stock-based incentive plan that provides for grants of equity awards to our employees and non-employee directors. We also maintain an ESPP. Shares issued under these stock-based compensation plans may be either shares reacquired by us or shares that are authorized but unissued.

Our Navient Corporation 2014 Omnibus Incentive Plan was effective on April 7, 2014. At December 31, 2014, 45 million shares were authorized to be issued from this plan.

Our Navient Corporation ESPP was effective on May 1, 2014. At December 31, 2014, 1 million shares were authorized to be issued from this plan.

The total stock-based compensation cost recognized in the consolidated statements of income for 2014, 2013 and 2012 was $39 million, $47 million and $47 million, respectively. As of December 31, 2014, there was $14 million of total unrecognized compensation expense related to unvested stock awards, which is expected to be recognized over a weighted average period of 1.7 years. We amortize compensation expense on a straight-line basis over the related vesting periods of each tranche of each award.

***Stock Options***

Stock options originally granted prior to 2012 expire 10 years after the grant date, and those granted since 2012 expire in 5 years. The exercise price must be equal to or greater than the market price of our common stock on the grant date. We have granted time-vested, price-vested and performance-vested options to our employees and non-employee directors. Time-vested options granted to management and non-management employees generally vest over three years. Price-vested options granted to management employees vest upon our common stock reaching a targeted closing price for a set number of days. Performance-vested options granted to management employees vest one-third per year for three years based on corporate earnings-related performance targets. Options granted to non-employee directors vest upon the director's election to the board.

The fair values of the options granted in the years ended December 31, 2014, 2013 and 2012 were estimated as of the grant date using a Black-Scholes option pricing model with the following weighted average assumptions (information for the 2014 period prior to the Spin-Off is based on stock option awards for Old SLM common stock):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2014 Post-Spin-Off | 2014 Pre-Spin-Off | 2013 | 2012 |
| Expected life of the option | 2.9 years | 2.9 years | 2.8 years | 2.8 years |
| Expected volatility | 27% | 26% | 31% | 44% |
| Risk-free interest rate | .81% | .76% | .65% | .60% |
| Expected dividend rate | 3.53% | 2.48% | 3.35% | 3.13% |
| Weighted average fair value of options granted | $    2.29 | $    3.48 | $    3.11 | $    4.12 |

The expected life of the options for all periods presented is based on observed historical exercise patterns of Old SLM's employees. Groups of employees (and non-employee directors) that have received similar option grant terms are considered separately for valuation purposes. The expected volatility for all pre-Spin-Off periods presented is based on implied volatility from publicly-traded options on Old SLM's stock at the grant date and historical volatility of Old SLM's stock consistent with the expected life of the option. The 2014 post-Spin-Off expected volatility is based on implied and historical volatility of Navient's peer group as of May 1, 2014. The risk-free interest rate is based on the U.S. Treasury spot rate at the grant date consistent with the expected life of the option. The dividend yield is based on the projected annual dividend payment per share based on the dividend amount at the grant date, divided by the stock price at the grant date.

F-55

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Stock-Based Compensation Plans and Arrangements (Continued)**

The following table summarizes stock option activity in 2014 for Old SLM (pre-Spin-Off) and Navient (post-Spin-Off) common stock.

| | Number of Options | Weighted Average Exercise Price per Share | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[1] |
|---|---|---|---|---|
| Outstanding at December 31, 2013 | 20,272,760 | $ 20.55 | | |
| Granted | 16,132 | 24.24 | | |
| Exercised[2][3] | (1,990,681) | 12.71 | | |
| Canceled | (206,046) | 38.04 | | |
| Outstanding at April 30, 2014 | 18,092,165 | 21.21 | | |
| Outstanding at May 1, 2014 | — | — | | |
| Replacement awards granted upon distribution of SLM BankCo[4] | 18,092,165 | 13.61 | | |
| Granted | 1,988,228 | 17.00 | | |
| Exercised[2][3] | (2,669,174) | 8.84 | | |
| Canceled | (89,660) | 22.95 | | |
| Outstanding at December 31, 2014[5] | 17,321,559 | $ 14.68 | 3.1 yrs | $  155 |
| Exercisable at December 31, 2014 | 12,390,540 | $ 15.14 | 3.0 yrs | $  116 |

[1] The aggregate intrinsic value represents the total intrinsic value (the aggregate difference between our closing stock price on December 31, 2014 and the exercise price of in-the-money options) that would have been received by the option holders if all in-the-money options had been exercised on December 31, 2014.

[2] The total intrinsic value of Old SLM stock options exercised during periods prior to the Spin-Off was $23 million, $73 million and $27 million for 2014, 2013 and 2012, respectively. The total intrinsic value of Navient stock options exercised during 2014 subsequent to the Spin-Off was $23 million.

[3] There was no cash received from option exercises in 2014. The actual tax benefit realized for the tax deductions from option exercises totaled $15 million for 2014.

[4] In connection with the Spin-Off, holders of Old SLM stock options granted prior to the Spin-Off received the same number of Navient stock options with adjusted strike prices.

[5] As of December 31, 2014, there was $2 million of unrecognized compensation cost related to stock options, which is expected to be recognized over a weighted average period of 1.8 years.

*Restricted Stock*

Restricted stock awards are generally granted to non-employee directors and can be vested upon appointment to the board, upon the director's election to the board, or in some cases after one year with continued board service. Outstanding restricted stock is entitled to dividend equivalent units that vest subject to the same vesting requirements or lapse of transfer restrictions, as applicable, as the underlying restricted stock award. The fair value of restricted stock awards is based on our stock price at the grant date.

F-56

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Stock-Based Compensation Plans and Arrangements (Continued)**

The following table summarizes restricted stock activity in 2014 for Old SLM (pre-Spin-Off) and Navient (post-Spin-Off) common stock.

|  | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non-vested at December 31, 2013 | 39,355 | $  14.29 |
| Granted | 4,333 | 21.91 |
| Vested[1] | (38,355) | 13.48 |
| Canceled | (1,000) | 45.41 |
| Non-vested at April 30, 2014 | 4,333 | 21.91 |
| Non-vested at May 1, 2014 | — | — |
| Replacement awards granted upon distribution of SLM BankCo[2] | — | — |
| Granted | 62,811 | 16.68 |
| Vested[1] | (62,811) | 16.68 |
| Canceled | — | — |
| Non-vested at December 31, 2014[3] | — | $  — |

[1]  The total fair value of Old SLM shares that vested during periods prior to the Spin-Off was $1 million, $2 million and $4 million for 2014, 2013 and 2012, respectively. The total fair value of Navient shares that vested during 2014 subsequent to the Spin-Off was $1 million.

[2]  In connection with the Spin-Off, all holders of Old SLM restricted stock were associated with SLM BankCo and received solely restricted stock awards in SLM BankCo.

[3]  As of December 31, 2014, there was no unrecognized compensation cost related to restricted stock.

*Restricted Stock Units and Performance Stock Units*

Restricted stock units ("RSUs") and performance stock units ("PSUs") are equity awards granted to employees that entitle the holder to shares of our common stock when the award vests. RSUs may be time-vested over three years or vested at grant but subject to transfer restrictions, while PSUs vest based on corporate earnings-related performance targets over a three-year period. Outstanding RSUs and PSUs are entitled to dividend equivalent units that vest subject to the same vesting requirements or lapse of transfer restrictions, as applicable, as the underlying award. The fair value of RSUs and PSUs is based on our stock price at the grant date.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Stock-Based Compensation Plans and Arrangements (Continued)**

The following table summarizes RSU and PSU activity in 2014 for Old SLM (pre-Spin-Off) and Navient (post-Spin-Off) common stock.

| | Number of RSUs/ PSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2013 | 5,126,887 | $    16.72 |
| Granted | 3,286,586 | 20.89 |
| Vested and converted to common stock[1] | (2,151,196) | 16.17 |
| Canceled | (951,281) | 17.02 |
| Outstanding at April 30, 2014 | 5,310,996 | 19.47 |
| Outstanding at May 1, 2014 | — | — |
| Replacement awards granted upon distribution of SLM BankCo[2] | 4,980,459 | 12.23 |
| Granted | 62,920 | 16.95 |
| Vested and converted to common stock[1] | (125,430) | 10.37 |
| Canceled | (48,728) | 12.38 |
| Outstanding at December 31, 2014[3] | 4,869,221 | $    12.34 |

[1] The total fair value of Old SLM RSUs and PSUs that vested and converted to common stock during periods prior to the Spin-Off was $35 million, $27 million and $13 million for 2014, 2013 and 2012, respectively. The total fair value of Navient RSUs and PSUs that vested and converted to common stock during 2014 subsequent to the Spin-Off was $1 million.

[2] In connection with the Spin-Off, holders of Old SLM RSUs granted prior to 2014 received the same number of Navient RSUs, and holders of Old SLM RSUs granted during 2014 received solely RSUs of their post-separation employer. This conversion resulted in 1 million less RSUs held by SLM BankCo employees and 0.7 million additional Navient RSUs for a net change to outstanding of 0.3 million RSUs.

[3] As of December 31, 2014, there was $11 million of unrecognized compensation cost related to RSUs and PSUs, which is expected to be recognized over a weighted average period of 1.8 years.

***Employee Stock Purchase Plan***

Under the ESPP, employees can purchase shares of our common stock at the end of a 12-month offering period at a price equal to the share price at the beginning of the 12-month period, less 15 percent, up to a maximum purchase price of $7,500 plus accrued interest. The purchase price for each offering is determined at the beginning of the offering period.

The fair values of the stock purchase rights of the ESPP offerings were calculated using a Black-Scholes option pricing model with the following weighted average assumptions.

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2014 Post-Spin-Off | 2013 | 2012 |
| Expected life of the option | 1 year | 1 year | 1 year |
| Expected volatility | 24% | 29% | 29% |
| Risk-free interest rate | .13% | .15% | .13% |
| Expected dividend rate | 3.46% | 3.51% | 3.27% |
| Weighted average fair value of stock purchase rights | $    2.74 | $  2.95 | $  3.01 |

The expected volatility for all pre-Spin-Off periods presented is based on implied volatility from publicly-traded options on Old SLM's stock at the grant date and historical volatility of Old SLM's stock consistent with

F-58

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Stock-Based Compensation Plans and Arrangements (Continued)**

the expected life. The 2014 post-Spin-Off expected volatility is based on implied and historical volatility of Navient's peer group as of May 1, 2014. The risk-free interest rate is based on the U.S. Treasury spot rate at the grant date consistent with the expected life. The dividend yield is based on the projected annual dividend payment per share based on the current dividend amount at the grant date divided by the stock price at the grant date.

The fair values were amortized to compensation cost on a straight-line basis over a one-year vesting period. As of December 31, 2014, there was $0.4 million of unrecognized compensation cost related to the ESPP, which is expected to be recognized over a weighted average period of 0.6 years.

During 2014, 2013 and 2012, plan participants purchased 228,053 shares, 218,389 shares and 192,755 shares, respectively, of common stock, net of shares withheld for taxes.

**12.  Fair Value Measurements**

We use estimates of fair value in applying various accounting standards for our financial statements. We categorize our fair value estimates based on a hierarchical framework associated with three levels of price transparency utilized in measuring financial instruments at fair value.

*Student Loans*

Our FFELP Loans and Private Education Loans are accounted for at cost or at the lower of cost or market if the loan is held-for-sale. Fair values were determined by modeling loan cash flows using stated terms of the assets and internally-developed assumptions to determine aggregate portfolio yield, net present value and average life.

*FFELP Loans*

The significant assumptions used to determine fair value of our FFELP Loans are prepayment speeds, default rates, cost of funds, capital levels, and expected Repayment Borrower Benefits to be earned. In addition, the Floor Income component of our FFELP Loan portfolio is valued with option models using both observable market inputs and internally developed inputs. A number of significant inputs into the models are internally derived and not observable to market participants. As such, these are level 3 valuations.

*Private Education Loans*

The significant assumptions used to determine fair value of our Private Education Loans are prepayment speeds, default rates, recovery rates, cost of funds and capital levels. A number of significant inputs into the models are internally derived and not observable to market participants nor can the resulting fair values be validated against market transactions. While the resulting fair value can be validated against market transactions where we are a participant, these markets are not considered active. As such, these are level 3 valuations.

F-59

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

*Cash and Investments (Including "Restricted Cash and Investments")*

Cash and cash equivalents are carried at cost. Carrying value approximates fair value. Investments classified as trading or available-for-sale are carried at fair value in the financial statements. Investments in mortgage-backed securities are valued using observable market prices. These securities are primarily collateralized by real estate properties and are guaranteed by either a government sponsored enterprise or the U.S. government. Other investments (primarily municipal bonds) for which observable prices from active markets are not available were valued through standard bond pricing models using observable market yield curves adjusted for credit and liquidity spreads. These valuations are immaterial to the overall investment portfolio. The fair value of investments in commercial paper, asset-backed commercial paper, or demand deposits that have a remaining term of less than 90 days when purchased are estimated to equal their cost and, when needed, adjustments for liquidity and credit spreads are made depending on market conditions and counterparty credit risks. No additional adjustments were deemed necessary. These are level 2 valuations.

*Borrowings*

Borrowings are accounted for at cost in the financial statements except when denominated in a foreign currency or when designated as the hedged item in a fair value hedge relationship. When the hedged risk is the benchmark interest rate (which for us is LIBOR) and not full fair value, the cost basis is adjusted for changes in value due to benchmark interest rates only. Foreign currency-denominated borrowings are re-measured at current spot rates in the financial statements. The full fair value of all borrowings is disclosed. Fair value was determined through standard bond pricing models and option models (when applicable) using the stated terms of the borrowings, observable yield curves, foreign currency exchange rates, volatilities from active markets or from quotes from broker-dealers. Fair value adjustments for unsecured corporate debt are made based on indicative quotes from observable trades and spreads on credit default swaps specific to the Company. Fair value adjustments for secured borrowings are based on indicative quotes from broker-dealers. These adjustments for both secured and unsecured borrowings are material to the overall valuation of these items and, currently, are based on inputs from inactive markets. As such, these are level 3 valuations.

*Derivative Financial Instruments*

All derivatives are accounted for at fair value in the financial statements. The fair value of a majority of derivative financial instruments was determined by standard derivative pricing and option models using the stated terms of the contracts and observable market inputs. In some cases, we utilized internally developed inputs that are not observable in the market, and as such, classified these instruments as level 3 fair values. Complex structured derivatives or derivatives that trade in less liquid markets require significant estimates and judgment in determining fair value that cannot be corroborated with market transactions. It is our policy to compare our derivative fair values to those received by our counterparties in order to validate the model's outputs. Any significant differences are identified and resolved appropriately.

When determining the fair value of derivatives, we take into account counterparty credit risk for positions where there is exposure to the counterparty on a net basis by assessing exposure net of collateral held. The net exposures for each counterparty are adjusted based on market information available for the specific counterparty, including spreads from credit default swaps. When the counterparty has exposure to us under derivatives with us, we fully collateralize the exposure, minimizing the adjustment necessary to the derivative valuations for our credit risk. While trusts that contain derivatives are not required to post collateral, when the counterparty is exposed to the trust the credit quality and securitized nature of the trusts minimizes any adjustments for the counterparty's exposure to the trusts. The net credit risk adjustment (adjustments for our exposure to counterparties net of adjustments for the counterparties' exposure to us) decreased the valuations by $18 million at December 31, 2014.

F-60

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

Inputs specific to each class of derivatives disclosed in the table below are as follows:

- Interest rate swaps — Derivatives are valued using standard derivative cash flow models. Derivatives that swap fixed interest payments for LIBOR interest payments (or vice versa) and derivatives swapping quarterly reset LIBOR for daily reset LIBOR or one-month LIBOR were valued using the LIBOR swap yield curve which is an observable input from an active market. These derivatives are level 2 fair value estimates in the hierarchy. Other derivatives swapping LIBOR interest payments for another variable interest payment (primarily T-Bill or Prime) or swapping interest payments based on the Consumer Price Index for LIBOR interest payments are valued using the LIBOR swap yield curve and observable market spreads for the specified index. The markets for these swaps are generally illiquid as indicated by a wide bid/ask spread. The adjustment made for liquidity decreased the valuations by $73 million at December 31, 2014. These derivatives are level 3 fair value estimates.

- Cross-currency interest rate swaps — Derivatives are valued using standard derivative cash flow models. Derivatives hedging foreign-denominated bonds are valued using the LIBOR swap yield curve (for both USD and the foreign-denominated currency), cross-currency basis spreads, and forward foreign currency exchange rates. The derivatives are primarily British Pound Sterling and Euro denominated. These inputs are observable inputs from active markets. Therefore, the resulting valuation is a level 2 fair value estimate. Amortizing notional derivatives (derivatives whose notional amounts change based on changes in the balance of, or pool of, assets or debt) hedging trust debt use internally derived assumptions for the trust assets' prepayment speeds and default rates to model the notional amortization. Management makes assumptions concerning the extension features of derivatives hedging rate-reset notes denominated in a foreign currency. These inputs are not market observable; therefore, these derivatives are level 3 fair value estimates.

- Floor Income Contracts — Derivatives are valued using an option pricing model. Inputs to the model include the LIBOR swap yield curve and LIBOR interest rate volatilities. The inputs are observable inputs in active markets and these derivatives are level 2 fair value estimates.

The carrying value of borrowings designated as the hedged item in a fair value hedge is adjusted for changes in fair value due to benchmark interest rates and foreign-currency exchange rates. These valuations are determined through standard bond pricing models and option models (when applicable) using the stated terms of the borrowings, and observable yield curves, foreign currency exchange rates, and volatilities.

F-61

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

The following table summarizes the valuation of our financial instruments that are marked-to-market on a recurring basis. During 2014 and 2013, there were no significant transfers of financial instruments between levels.

| | Fair Value Measurements on a Recurring Basis | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2014 | | | | December 31, 2013 | | | |
| (Dollars in millions) | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | | | | |
| Available-for-sale investments: | | | | | | | | |
| Agency residential mortgage-backed securities | $  — | $    1 | $  — | $    1 | $  — | $  102 | $  — | $  102 |
| Other | — | 5 | — | 5 | — | 7 | — | 7 |
| Total available-for-sale investments | — | 6 | — | 6 | — | 109 | — | 109 |
| Derivative instruments:[1] | | | | | | | | |
| Interest rate swaps | — | 841 | 16 | 857 | — | 785 | 38 | 823 |
| Cross-currency interest rate swaps | — | — | 164 | 164 | — | 27 | 1,158 | 1,185 |
| Other | — | — | 1 | 1 | — | — | 2 | 2 |
| Total derivative assets[3] | — | 841 | 181 | 1,022 | — | 812 | 1,198 | 2,010 |
| **Total** | $  — | $  847 | $ 181 | $ 1,028 | $  — | $  921 | $1,198 | $ 2,119 |
| | | | | | | | | |
| **Liabilities**[2] | | | | | | | | |
| Derivative instruments:[1] | | | | | | | | |
| Interest rate swaps | $  — | $   (41) | $(104) | $  (145) | $  — | $  (239) | $ (125) | $  (364) |
| Floor Income Contracts | — | (915) | — | (915) | — | (1,384) | — | (1,384) |
| Cross-currency interest rate swaps | — | (77) | (281) | (358) | — | (35) | (151) | (186) |
| Other | — | — | (12) | (12) | — | — | (23) | (23) |
| Total derivative liabilities[3] | — | (1,033) | (397) | (1,430) | — | (1,658) | (299) | (1,957) |
| **Total** | $  — | $(1,033) | $(397) | $(1,430) | $  — | $(1,658) | $ (299) | $(1,957) |

[1]  Fair value of derivative instruments excludes accrued interest and the value of collateral.

[2]  Borrowings which are the hedged items in a fair value hedge relationship and which are adjusted for changes in value due to benchmark interest rates only are not carried at full fair value and are not reflected in this table.

[3]  See "Note 7 — Derivative Financial Instruments" for a reconciliation of gross positions without the impact of master netting agreements to the balance sheet classification.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

The following tables summarize the change in balance sheet carrying value associated with level 3 financial instruments carried at fair value on a recurring basis.

|  | Year Ended December 31, 2014 | | | |
| | Derivative Instruments | | | |
| (Dollars in millions) | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments |
|---|---|---|---|---|
| **Balance, beginning of period** | $     (87) | $   1,007 | $(21) | $     899 |
| Total gains/(losses) (realized and unrealized): | | | | |
| Included in earnings[1] | 1 | (1,081) | 8 | (1,072) |
| Included in other comprehensive income | — | — | — | — |
| Settlements | (2) | (43) | 2 | (43) |
| Transfers in and/or out of level 3 | — | — | — | — |
| **Balance, end of period** | $     (88) | $   (117) | $(11) | $   (216) |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $        — | $ (1,225) | $ 10 | $ (1,215) |

|  | Year Ended December 31, 2013 | | | |
| | Derivative Instruments | | | |
| (Dollars in millions) | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments |
|---|---|---|---|---|
| **Balance, beginning of period** | $     (73) | $   1,053 | $  4 | $     984 |
| Total gains/(losses) (realized and unrealized): | | | | |
| Included in earnings[1] | 9 | 63 | (22) | 50 |
| Included in other comprehensive income | — | — | — | — |
| Settlements | (23) | (109) | (3) | (135) |
| Transfers in and/or out of level 3 | — | — | — | — |
| **Balance, end of period** | $     (87) | $   1,007 | $(21) | $     899 |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $      (2) | $     116 | $(19) | $      95 |

F-63

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

| | Year Ended December 31, 2012 | | | |
| | Derivative Instruments | | | |
| (Dollars in millions) | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments |
|---|---|---|---|---|
| **Balance, beginning of period** | $(40) | $1,021 | $  1 | $    982 |
| Total gains/(losses) (realized and unrealized): | | | | |
| Included in earnings[1] | (5) | 159 | 3 | 157 |
| Included in other comprehensive income | — | — | — | — |
| Settlements | (28) | (127) | — | (155) |
| Transfers in and/or out of level 3 | — | — | — | — |
| **Balance, end of period** | $    (73) | $  1,053 | $  4 | $    984 |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $    (31) | $    55 | $  4 | $    28 |

[1]  "Included in earnings" is comprised of the following amounts recorded in the specified line item in the consolidated statements of income:

| | Years Ended December 31, | | |
| (Dollars in millions) | 2014 | 2013 | 2012 |
|---|---|---|---|
| Gains (losses) on derivative and hedging activities, net | $(1,116) | $  (27) | $    37 |
| Interest expense | 44 | 77 | 120 |
| Total | $(1,072) | $    50 | $  157 |

[2]  Recorded in "gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

The following table presents the significant inputs that are unobservable or from inactive markets used in the recurring valuations of the level 3 financial instruments detailed above.

| (Dollars in millions) | Fair Value at December 31, 2014 | Valuation Technique | Input | Range (Weighted Average) |
|---|---|---|---|---|
| **Derivatives** | | | | |
| Consumer Price Index/LIBOR basis swaps | $      13 | Discounted cash flow | Bid/ask adjustment to discount rate | .02% — .05% (.05%) |
| Prime/LIBOR basis swaps | (101) | Discounted cash flow | Constant Prepayment Rate | 4.6% |
| | | | Bid/ask adjustment to discount rate | .08% — .08% (.08%) |
| Cross-currency interest rate swaps | (117) | Discounted cash flow | Constant Prepayment Rate | 2.7% |
| Other | (11) | | | |
| Total | $    (216) | | | |

The significant inputs that are unobservable or from inactive markets related to our level 3 derivatives detailed in the table above would be expected to have the following impacts to the valuations:

- Consumer Price Index/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation.

F-64

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Fair Value Measurements (Continued)**

- Prime/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation. In addition, the unobservable inputs include Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap which will increase the value for swaps in a gain position and decrease the value for swaps in a loss position, everything else equal. The opposite is true for an increase in the input.

- Cross-currency interest rate swaps — The unobservable inputs used in these valuations are Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap. All else equal in a typical currency market, this will result in a decrease to the valuation due to the delay in the cash flows of the currency exchanges as well as diminished liquidity in the forward exchange markets as you increase the term. The opposite is true for an increase in the input.

The following table summarizes the fair values of our financial assets and liabilities, including derivative financial instruments.

| (Dollars in millions) | December 31, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Fair Value | Carrying Value | Difference | Fair Value | Carrying Value | Difference |
| **Earning assets** | | | | | | |
| FFELP Loans | $ 104,419 | $ 104,521 | $    (102) | $ 104,481 | $ 104,588 | $    (107) |
| Private Education Loans | 29,433 | 29,796 | (363) | 37,485 | 37,512 | (27) |
| Cash and investments[1] | 6,002 | 6,002 | — | 9,732 | 9,732 | — |
| Total earning assets | 139,854 | 140,319 | (465) | 151,698 | 151,832 | (134) |
| **Interest-bearing liabilities** | | | | | | |
| Short-term borrowings | 2,661 | 2,663 | 2 | 13,807 | 13,795 | (12) |
| Long-term borrowings | 134,201 | 136,866 | 2,665 | 133,578 | 136,648 | 3,070 |
| Total interest-bearing liabilities | 136,862 | 139,529 | 2,667 | 147,385 | 150,443 | 3,058 |
| **Derivative financial instruments** | | | | | | |
| Floor Income Contracts | (915) | (915) | — | (1,384) | (1,384) | — |
| Interest rate swaps | 712 | 712 | — | 459 | 459 | — |
| Cross-currency interest rate swaps | (194) | (194) | — | 999 | 999 | — |
| Other | (11) | (11) | — | (21) | (21) | — |
| **Excess of net asset fair value over carrying value** | | | $  2,202 | | | $  2,924 |

[1]  "Cash and investments" includes available-for-sale investments that consist of investments that are primarily agency securities whose cost basis is $5 million and $113 million at December 31, 2014 and 2013, respectively, versus a fair value of $6 million and $109 million at December 31, 2014 and 2013, respectively.

**13.  Commitments, Contingencies and Guarantees**

*Regulatory Matters*

On May 2, 2014, Navient Solutions, Inc. ("NSI"), a wholly-owned subsidiary of Navient, and Sallie Mae Bank entered into consent orders with the Federal Deposit Insurance Corporation (the "FDIC") (respectively, the "NSI Order" and the "Bank Order"; collectively, "the FDIC Orders") to resolve matters related to certain cited violations of Section 5 of the Federal Trade Commission Act, including the disclosures and assessments of certain late fees, as well as alleged violations under the Servicemembers Civil Relief Act ("SCRA"). The FDIC

F-65

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**13.  Commitments, Contingencies and Guarantees (Continued)**

Orders, which became effective upon the signing of the consent order with the United States Department of Justice ("DOJ") by Navient and SLM BankCo on May 13, 2014, required NSI to pay $3.3 million in civil monetary penalties. NSI has paid its civil monetary penalties. In addition, the FDIC Orders required the establishment of a restitution reserve account totaling $30 million to provide restitution with respect to loans owned or originated by Sallie Mae Bank, from November 28, 2005 until the effective date of the FDIC Orders. Pursuant to the Separation and Distribution Agreement among SLM Corporation, SLM BankCo and Navient dated as of April 28, 2014 (the "Separation Agreement"), Navient was responsible for funding the restitution reserve account. We funded the account in May 2014.

The NSI Order requires NSI to ensure proper servicing for service members and proper application of SCRA benefits under a revised and broader definition of eligibility than previously required by the statute and regulatory guidance and to make changes to billing statements and late fee practices. These changes to billing statements have already been implemented. In order to treat all customers in a similar manner, NSI decided to voluntarily make restitution of certain late fees to all other customers whose loans were neither owned nor originated by Sallie Mae Bank. These payments will refund certain late fees incurred by the customer and were calculated on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million and the refund process is on-going.

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank entered into a consent order with the DOJ, in its capacity as the agency having primary authority for enforcement of such matters. The DOJ consent order ("DOJ Order") covers all loans either owned by Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. The DOJ Order required NSI to fund a $60 million settlement fund, which represents the total amount of compensation due to service members under the DOJ agreement, and to pay $55,000 in civil money penalties. The DOJ Order was approved by the United States District Court in Delaware on September 29, 2014, and as a result, Navient funded the settlement fund and paid the civil money penalties in October 2014.

In 2013, a reserve of $65 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In 2014, an additional reserve of $112 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators. As a result, the total reserve established by the Company to cover these costs was $177 million, and as of December 31, 2014, $78 million of those reserves remained. The final cost of these proceedings will remain uncertain until all of the work under the various consent orders has been completed.

As previously disclosed in April 2014, NSI received a Civil Investigative Demand ("CID") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters and is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

In November 2014, NSI's subsidiary, Pioneer Credit Recovery, Inc. ("Pioneer"), received a CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to rehabilitation loans and collection of defaulted student debt. Navient has been in discussions with the CFPB relating to this matter, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

F-66

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**13.  Commitments, Contingencies and Guarantees (Continued)**

In December 2014, NSI received a subpoena from the New York Department of Financial Services (the "NY DFS") as part of the NY DFS's inquiry with regard to whether persons or entities have engaged in fraud or misconduct with respect to a financial product or service under New York Financial Services Law or other laws. Navient has been in discussions with the NY DFS relating to this matter, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

Navient has also received CIDs issued by the State of Illinois Office of Attorney General and the State of Washington Office of the Attorney General and continues to cooperate with multiple state Attorneys General in connection with these investigations. According to the CIDs, the investigations were initiated to ascertain whether any practices declared to be unlawful under the Consumer Fraud and Deceptive Business Practices Act have occurred or are about to occur. Navient is cooperating with these investigations and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

Pursuant to the separation and distribution agreement entered into in connection with the Spin-Off, Navient has agreed to be responsible and indemnify SLM BankCo for all claims, actions, damages, losses or expenses that may arise from the conduct of all activities of pre-Spin-Off SLM BankCo occurring prior to the Spin-Off other than those specifically excluded in the Separation and Distribution Agreement. As a result, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom. There are no additional reserves Navient has related to other indemnification matters with SLM BankCo as of December 31, 2014.

*OIG Audit*

The Office of the Inspector General (the "OIG") of ED commenced an audit regarding Special Allowance Payments ("SAP") on September 10, 2007. On September 25, 2013, we received the final audit determination of Federal Student Aid (the "Final Audit Determination") on the final audit report issued by the OIG on August 3, 2009 related to our billing practices for SAP. The Final Audit Determination concurred with the final audit report issued by the OIG and instructed us to make adjustment to our government billing to reflect the policy determination. Navient remains in active discussions with ED on this matter and we also have the right to appeal the Final Audit Determination to the Administrative Actions and Appeals Service Group of ED. The appeal must be filed no later than March 31, 2015. We continue to believe that our SAP billing practices were proper, considering then-existing ED guidance and lack of applicable regulations. The Company established a reserve for this matter in 2014.

*Contingencies*

In the ordinary course of business, we and our subsidiaries are defendants in or parties to pending and threatened legal actions and proceedings including actions brought on behalf of various classes of claimants. These actions and proceedings may be based on alleged violations of consumer protection, securities, employment and other laws. In certain of these actions and proceedings, claims for substantial monetary damage are asserted against us and our subsidiaries.

In the ordinary course of business, we and our subsidiaries are subject to regulatory examinations, information gathering requests, inquiries and investigations. In connection with formal and informal inquiries in

F-67

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**13.  Commitments, Contingencies and Guarantees (Continued)**

these cases, we and our subsidiaries receive numerous requests, subpoenas and orders for documents, testimony and information in connection with various aspects of our regulated activities.

In view of the inherent difficulty of predicting the outcome of such litigation and regulatory matters, we cannot predict what the eventual outcome of the pending matters will be, what the timing or the ultimate resolution of these matters will be, or what the eventual loss, fines or penalties related to each pending matter may be.

We are required to establish reserves for litigation and regulatory matters where those matters present loss contingencies that are both probable and estimable. When loss contingencies are not both probable and estimable, we do not establish reserves.

Based on current knowledge, reserves have been established for certain litigation or regulatory matters where the loss is both probable and estimable. Based on current knowledge, management does not believe that loss contingencies, if any, arising from pending investigations, litigation or regulatory matters will have a material adverse effect on our consolidated financial position, liquidity, results of operations or cash flows.

**14.  Income Taxes**

Reconciliations of the statutory U.S. federal income tax rates to our effective tax rate for continuing operations follow:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2014 | 2013 | 2012 |
| Statutory rate | 35.0% | 35.0% | 35.0% |
| State tax, net of federal benefit | 2.0 | 2.0 | .1 |
| Other, net | .5 | .1 | (.5) |
| Effective tax rate | 37.5% | 37.1% | 34.6% |

F-68

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**14.  Income Taxes (Continued)**

The effective tax rates for discontinued operations for the years ended December 31, 2014, 2013 and 2012 are 37.0 percent, 16.2 percent, and 40.7 percent, respectively. The effective tax rate varies from the statutory U.S. federal rate of 35 percent primarily due to the impact of state taxes, net of federal benefit, for the years ended December 31, 2014, 2013 and 2012 and the release of valuation allowances against capital loss carryforwards for the year ended December 31, 2013.

Income tax expense consists of:

| | | December 31, | |
|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2012 |
| Continuing operations current provision/(benefit): | | | |
|   Federal | $443 | $567 | $474 |
|   State | 42 | 47 | 27 |
| Total continuing operations current provision/(benefit) | 485 | 614 | 501 |
| Continuing operations deferred provision/(benefit): | | | |
|   Federal | 189 | 142 | 23 |
|   State | 14 | 20 | (26) |
| Total continuing operations deferred provision/(benefit) | 203 | 162 | (3) |
| Continuing operations provision for income tax expense/(benefit) | 688 | 776 | 498 |
| Discontinued operations current provision/(benefit): | | | |
|   Federal | $ (4) | $ 32 | $  1 |
|   State | — | 1 | — |
| Total discontinued operations current provision/(benefit) | (4) | 33 | 1 |
| Discontinued operations deferred provision/(benefit): | | | |
|   Federal | 4 | (12) | (2) |
|   State | — | (1) | — |
| Total discontinued operations deferred provision/(benefit) | 4 | (13) | (2) |
| Discontinued operations provision for income tax expense/(benefit) | — | 20 | (1) |
| Provision for income tax expense/(benefit) | $688 | $796 | $497 |

F-69

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**14.  Income Taxes (Continued)**

The tax effect of temporary differences that give rise to deferred tax assets and liabilities include the following:

| | December 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| **Deferred tax assets:** | | |
| Loan reserves | $  795 | $  893 |
| Market value adjustments on student loans, investments and derivatives | 352 | 572 |
| Student loan premiums and discounts, net | 114 | 25 |
| Stock-based compensation plans | 50 | 66 |
| Deferred revenue | 49 | 57 |
| Accrued expenses not currently deductible | 27 | 61 |
| Other | 25 | 30 |
| Total deferred tax assets | 1,412 | 1,704 |
| **Deferred tax liabilities:** | | |
| Gains/(losses) on repurchased debt | — | 304 |
| Other | 64 | 81 |
| Total deferred tax liabilities | 64 | 385 |
| Net deferred tax assets | $1,348 | $1,319 |

Included in other deferred tax assets is a valuation allowance of $8 million and $19 million as of December 31, 2014 and 2013, respectively, against a portion of the Company's federal, state and international deferred tax assets. The valuation allowance is primarily attributable to deferred tax assets for state capital loss carryforwards and state and international net operating loss carryforwards that management believes it is more likely than not will expire prior to being realized. The ultimate realization of the deferred tax assets is dependent upon the generation of future taxable income of the appropriate character (i.e., capital or ordinary) during the period in which the temporary differences become deductible. Management considers, among other things, the economic slowdown, the scheduled reversals of deferred tax liabilities, and the history of positive taxable income available for net operating loss carrybacks in evaluating the realizability of the deferred tax assets.

As of December 31, 2014, we have apportioned state net operating loss carryforwards of $245 million which begin to expire in 2024, state capital loss carryforwards of $2 million which begin to expire in 2017 and international net operating loss carryforwards of $0.3 million which begin to expire in 2032.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**14.  Income Taxes (Continued)**

*Accounting for Uncertainty in Income Taxes*

The following table summarizes changes in unrecognized tax benefits:

| (Dollars in millions) | December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Unrecognized tax benefits at beginning of year** | $ 56.0 | $41.2 | $ 45.9 |
| Increases resulting from tax positions taken during a prior period | 1.0 | 5.8 | 20.0 |
| Decreases resulting from tax positions taken during a prior period | (12.4) | (7.7) | (18.0) |
| Increases resulting from tax positions taken during the current period | 8.4 | 28.1 | 11.3 |
| Decreases related to settlements with taxing authorities | (.6) | (7.7) | (14.7) |
| Increases related to settlements with taxing authorities | — | — | — |
| Reductions related to the lapse of statute of limitations | (.5) | (3.7) | (3.3) |
| **Unrecognized tax benefits at end of year** | $ 51.9 | $56.0 | $ 41.2 |

As of December 31, 2014, the gross unrecognized tax benefits are $51.9 million. Included in the $51.9 million are $28.3 million of unrecognized tax benefits that, if recognized, would favorably impact the effective tax rate.

The Company or one of its subsidiaries files income tax returns at the U.S. federal level, in most U.S. states and various foreign jurisdictions. U.S. federal income tax returns filed for years 2011 and prior have either been audited or surveyed and are now resolved. Various combinations of subsidiaries, tax years and jurisdictions remain open for review, subject to statute of limitations periods (typically 3 to 4 prior years). We do not expect the resolution of open audits to have a material impact on our unrecognized tax benefits.

**15.  Segment Reporting**

We monitor and assess our ongoing operations and results by three primary operating segments — the FFELP Loans operating segment, the Private Education Loans operating segment and the Business Services operating segment. These three operating segments meet the quantitative thresholds for reportable segments. Accordingly, the results of operations of our FFELP Loans, Private Education Loans and Business Services segments are presented separately. We have smaller operating segments that consist of business operations that have either been discontinued or are winding down. These operating segments do not meet the quantitative thresholds to be considered reportable segments. As a result, the results of operations for these operating segments (Purchased Paper business and mortgage and other loan business) are combined with gains/losses from the repurchase of debt, the financial results of our corporate liquidity portfolio and all unallocated overhead within the Other reportable segment. The management reporting process measures the performance of our operating segments based on our management structure, as well as the methodology we used to evaluate performance and allocate resources. Management, including our chief operating decision makers, evaluates the performance of our operating segments based on their profitability. As discussed further below, we measure the profitability of our operating segments based on "Core Earnings." Accordingly, information regarding our reportable segments is provided based on a "Core Earnings" basis.

*FFELP Loans Segment*

In the FFELP Loans segment, we acquire and finance FFELP Loans. Even though FFELP Loans are no longer originated due to changes in federal law that took effect in 2010, we continue to pursue acquisitions of FFELP Loan portfolios that leverage our servicing scale and generate incremental earnings and cash flow. In this

F-71

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

segment, we primarily earn net interest income on the FFELP Loan portfolio. This segment is expected to generate significant amounts of earnings and cash flow as the portfolio amortizes.

We are currently the largest holder of FFELP Loans. Navient's portfolio of FFELP Loans as of December 31, 2014 was $104.5 billion. Navient's FFELP Loan portfolio will amortize over approximately 20 years. Navient's goal is to maximize the cash flow generated by its FFELP Loan portfolio. Navient also seeks to acquire other third-party FFELP Loan portfolios to add net interest income and servicing revenue. During the year, Navient acquired $11.3 billion of FFELP Loans. FFELP Loans are insured or guaranteed by state or not-for-profit agencies and are also protected by contractual rights to recovery from the United States pursuant to guaranty agreements among ED and these agencies. These guarantees generally cover at least 97 percent of a FFELP Loan's principal and accrued interest for loans disbursed.

As a result of the long-term funding used in the FFELP Loan portfolio and the insurance and guarantees provided on these loans, the net interest margin recorded in the FFELP Loans segment is relatively stable and the capital we choose to retain with respect to the segment is modest. As of December 31, 2014, approximately 80 percent of the FFELP Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts. For more discussion of the FFELP and related credit support mechanisms, see Appendix A "Description of Federal Family Education Loan Program."

For loans disbursed before April 1, 2006, FFELP Loans generally earn interest at the higher of either the borrower rate, which is fixed over a period of time, or a floating rate based on the SAP formula set by ED. Navient generally finances FFELP Loans with floating rate debt whose interest is matched closely to the floating nature of the applicable SAP formula. If a decline in interest rates causes the borrower rate to exceed the SAP formula rate, Navient will continue to earn interest on the loan at the fixed borrower rate while the floating rate interest on Navient debt will continue to decline. The additional spread earned between the fixed borrower rate and the SAP formula rate is referred to as Floor Income. Floor Income can be volatile as rates on the underlying debt move up and down. Navient may hedge this risk by using derivatives to lock in the value of the Floor Income over the term of the contract. As of December 31, 2014, approximately $27.2 billion (49 percent) of Navient's FFELP Loans eligible to earn Floor Income was economically hedged. This amount we hedge declines over time.

The Higher Education Act of 1965 ("HEA") continues to regulate every aspect of the FFELP, including ongoing communications with borrowers and default aversion requirements. Failure to service a FFELP Loan properly could jeopardize the insurance, guarantees and federal support on these loans. The insurance and guarantees on Navient's existing loans were not affected by the termination of the FFELP program.

The following table includes asset information for our FFELP Loans segment.

| | December 31, | |
|---|---|---|
| (Dollars in millions) | 2014 | 2013 |
| FFELP Loans, net | $104,521 | $104,588 |
| Cash and investments[1] | 4,050 | 4,473 |
| Other | 2,566 | 3,587 |
| Total assets | $111,137 | $112,648 |

[1]  Includes restricted cash and investments.

F-72

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

*Private Education Loans Segment*

In this segment, we acquire, finance and service Private Education Loans. Even though we no longer originate Private Education Loans, we continue to pursue acquisitions of Private Education Loan portfolios that leverage our servicing scale and generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the Private Education Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of cash as the portfolio amortizes.

Unlike FFELP Loans, the holder of a Private Education Loan bears the full credit risk of the customer and any cosigner. Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources. Navient believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal servicing and risk mitigation practices, as well as our careful use of forbearance and our loan modification programs. Navient expects the combined existence of these elements and the use of these practices reduces the risk of payment interruptions and defaults on its Private Education Loan portfolio. On a "Core Earnings" basis, the 2014 charge-off rate for Private Education Loans as a percentage of loans in repayment was 2.6 percent.

Navient's portfolio of Private Education Loans totaled $29.8 billion at December 31, 2014. During the year, Navient acquired $1.6 billion of Private Education Loans. As of December 31, 2014, approximately 59 percent of the Private Education Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts.

The following table includes asset information for our Private Education Loans segment.

|  | December 31, | |
| --- | --- | --- |
| (Dollars in millions) | 2014 | 2013 |
| Private Education Loans, net | $29,796 | $37,512 |
| Cash and investments[1] | 402 | 2,555 |
| Other | 2,453 | 2,934 |
| Total assets | $32,651 | $43,001 |

[1]  Includes restricted cash and investments.

*Business Services Segment*

Our Business Services segment generates its revenue from servicing our FFELP Loan portfolio as well as providing servicing and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED, higher education institutions and other federal, state, court and municipal clients.

*State, Local and Institutional Revenues*

We provide asset recovery services for over 250 state and municipal clients, recovering on a broad spectrum of receivables including taxes, fines and court fees. Public agencies turn to qualified, responsible providers to supplement their own receivables management efforts to recover revenues to support public priorities. In addition, we provide recovery services for federal Perkins loan, tuition and other receivables for more than 1,000 colleges, universities and other institutional clients.

Table of Contents

**NAVIENT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

*FFELP-Related Revenues*

Navient is currently the largest servicer and collector of loans made under the FFELP program, and the majority of our income has been derived, directly or indirectly, from our portfolio of FFELP Loans and servicing we have provided for FFELP Loans. In 2010, Congress passed legislation ending the origination of education loans under FFELP. The terms and conditions of existing FFELP Loans were not affected by this legislation. Our FFELP Loan portfolio will amortize over approximately 20 years. The fee income we have earned from providing servicing and asset recovery services on such loans will similarly decline over time. We also provide servicing and asset recovery services on behalf of Guarantors of FFELP Loans and other institutions.

- Servicing revenues from the FFELP Loans we own represent intercompany charges to the FFELP Loans segment at rates paid to us by the trusts which own the loans. These fees are legally the first payment priority of the trusts and exceed the actual cost of servicing the loans. Intercompany loan servicing revenues declined to $456 million in 2014 from $529 million in 2013. Intercompany loan servicing revenues will continue to decline as our FFELP Loan portfolio amortizes.

- In 2014, we earned account maintenance fees on FFELP Loans serviced for Guarantors of $34 million, down from $38 million in 2013. These fees will continue to decline as the underlying FFELP Loan portfolio serviced for Guarantors amortizes.

- We provide default aversion, post default collections and claims processing to 11 of the 29 Guarantor agencies that serve as an intermediary between the U.S. federal government and FFELP lenders and are responsible for paying the claims made on defaulted loans. As of December 31, 2014, Navient had an outstanding inventory of asset recovery receivables of approximately $15.4 billion, of which $12.5 billion was student loans ($10.0 billion FFELP Loans and $2.5 billion DSLP Loans) and the remainder was other asset classes. In 2014, asset recovery revenue from Guarantor clients totaled $275 million, compared to $303 million the prior year. As FFELP Loans are no longer originated, these revenues will decline over time unless we acquire additional portfolios from Guarantor clients. The rate at which these revenues will decrease has also been affected by the Bipartisan Budget Act (the "Budget Act") enacted on December 26, 2013 and effective on July 1, 2014, which reduced the amount to be paid to Guarantor agencies for assisting customers to rehabilitate their defaulted FFELP Loans under Section 428F of the HEA. The Budget Act reduced fee income by approximately $78 million in 2014.

In 2014, FFELP-related revenues accounted for 77 percent of total Business Services segment revenues compared with 80 percent and 85 percent, respectively, in 2013 and 2012. Total Business Services segment revenues were $1.06 billion for the year ended December 31, 2014, down from $1.13 billion for the year ended December 31, 2013.

*ED Asset Recovery and Servicing Revenues*

Since 1997, Navient has provided asset recovery services on defaulted student loans to ED. This contract expired by its terms on February 21, 2015 and our Pioneer Credit Recovery subsidiary received no new account placements under the contract. We are engaged with ED to learn more about their decision and address any questions or concerns they may have. In addition, we have submitted a response to ED's request for proposals (RFP) in relation to a new contract for similar services. There can be no assurances that Pioneer will be awarded an extension of the existing contract, a new contract under the RFP or what volume of accounts might be placed with Pioneer. In 2014, asset recovery revenue from ED totaled $65 million, compared to $62 million in the prior year.

Since the second quarter of 2009, we have been one of four large servicers awarded a servicing contract by ED to service federal loans owned by ED. We service approximately 6.2 million accounts under this servicing

F-74

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

contract as of December 31, 2014. The servicing contract spans five years with the possibility of one five-year renewal at the option of ED. On August 27, 2014, ED extended its servicing contract with Navient to service federal loans for five more years. Under the terms of the contract extension, the allocation of ongoing volume will be determined twice each year based on the relative performance of the servicers of five metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more up to 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of ED personnel (5 percent). Quarterly scores in each metric will be averaged together twice each year to calculate the final result of each metric. Our allocation under the servicing contract increased to 24 percent for the period beginning August 15, 2014 from 18 percent for the prior period beginning August 15, 2013. Beginning on January 1, 2015, the aggregate allocation for not-for-profit servicers increased to 25 percent of all new DSLP borrowers. We earned $130 million of revenue under the contract for the year ended December 31, 2014.

At December 31, 2014 and 2013, the Business Services segment had total assets of $416 million and $892 million, respectively.

*Other Segment*

The Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all unallocated overhead. We also include results from certain smaller wind-down and discontinued operations within this segment. Overhead expenses include costs related to executive management, the board of directors, accounting, finance, legal, human resources, stock-based compensation expense and certain information technology costs related to infrastructure and operations.

At December 31, 2014 and 2013, the Other segment had total assets of $2.1 billion and $3.0 billion, respectively.

*Measure of Profitability*

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments.

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for three items, discussed below, that are either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information because we believe it provides

F-75

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

investors with additional information regarding the operational and performance indicators that are most closely assessed by management. When compared to GAAP results, the three items we remove to result in our "Core Earnings" presentations are:

1.  The financial results attributable to the operations of the consumer banking business (SLM BankCo) prior to the Spin-Off and related restructuring and reorganization expense incurred in connection with the Spin-Off. For GAAP purposes, Navient reflected the deemed distribution of SLM BankCo on April 30, 2014. For "Core Earnings," we exclude the consumer banking business as if it had never been a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014;

2.  Our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness resulting in unrealized, mark-to-market gains/losses; and

3.  The accounting for goodwill and acquired intangible assets.

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, rating agencies, lenders and investors to assess performance.

Old SLM's definition of "Core Earnings" did not exclude the financial results attributable to the operations of the consumer banking business and related restructuring and reorganization expense incurred in connection with the Spin-Off. In the second quarter of 2014, in connection with the Spin-Off, Navient included this additional adjustment as a part of "Core Earnings" to allow better comparability of Navient's results to pre-Spin-Off historical periods. All "Core Earnings" financial results for prior periods in this Annual Report on Form 10-K have been restated to conform to Navient's revised definition of "Core Earnings."

F-76

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15. Segment Reporting (Continued)**

*Segment Results and Reconciliations to GAAP*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Year Ended December 31, 2014** | | | | | |
| | | | | | | | **Adjustments** | | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
| Interest income: | | | | | | | | | | |
| Student loans | $ 2,097 | $ 1,958 | $ — | $ — | $ — | $ 4,055 | $ 699 | $ (42) | $ 657 | $4,712 |
| Other loans | — | — | — | 9 | — | 9 | — | — | — | 9 |
| Cash and investments | 4 | — | — | 4 | — | 8 | — | 1 | 1 | 9 |
| Total interest income | 2,101 | 1,958 | — | 13 | — | 4,072 | 699 | (41) | 658 | 4,730 |
| Total interest expense | 1,168 | 708 | — | 114 | — | 1,990 | 42 | 31 | 73 | 2,063 |
| Net interest income (loss) | 933 | 1,250 | — | (101) | — | 2,082 | 657 | (72) | 585 | 2,667 |
| Less: provisions for loan losses | 40 | 539 | — | — | — | 579 | — | 49 | 49 | 628 |
| Net interest income (loss) after provisions for loan losses | 893 | 711 | — | (101) | — | 1,503 | 657 | (121) | 536 | 2,039 |
| Other income (loss): | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 62 | 25 | 668 | — | (456) | 299 | — | (1) | (1) | 298 |
| Asset recovery revenue | — | — | 388 | — | — | 388 | — | — | — | 388 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income (loss) | — | — | 6 | 26 | — | 32 | (657) | 846 | 189 | 221 |
| Total other income (loss) | 62 | 25 | 1,062 | 26 | (456) | 719 | (657) | 845 | 188 | 907 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 483 | 181 | 384 | 132 | (456) | 724 | — | 36 | 36 | 760 |
| Overhead expenses | — | — | — | 200 | — | 200 | — | 27 | 27 | 227 |
| Operating expenses | 483 | 181 | 384 | 332 | (456) | 924 | — | 63 | 63 | 987 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 9 | 9 | 9 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 113 | 113 | 113 |
| Total expenses | 483 | 181 | 384 | 332 | (456) | 924 | — | 185 | 185 | 1,109 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 472 | 555 | 678 | (407) | — | 1,298 | — | 539 | 539 | 1,837 |
| Income tax expense (benefit)(3) | 176 | 204 | 250 | (150) | — | 480 | — | 208 | 208 | 688 |
| Net income (loss) from continuing operations | $ 296 | $ 351 | $ 428 | $ (257) | $ — | $ 818 | $ — | $ 331 | $ 331 | $1,149 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | | | | | | | | | | |
| Net income (loss) | $ 296 | $ 351 | $ 428 | $ (257) | $ — | $ 818 | $ — | $ 331 | $ 331 | $1,149 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| | | | | |
|---|---|---|---|---|
| | **Year Ended December 31, 2014** | | | |
| (Dollars in millions) | Net Impact from Spin-Off of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 136 | $ 400 | $ — | $ 536 |
| Total other income | 15 | 173 | — | 188 |
| Operating expenses | 63 | — | — | 63 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 9 | 9 |
| Restructuring and other reorganization expenses | 113 | — | — | 113 |
| Total "Core Earnings" adjustments to GAAP | $ (25) | $ 573 | $ (9) | 539 |
| Income tax expense | | | | 208 |
| Net income | | | | $ 331 |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## 15.  Segment Reporting (Continued)

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Elimina-tions[1] | Total "Core Earnings" | Reclassi-fications | Adjustments Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Interest income: | | | | | | | | | | |
| Student loans | $ 2,274 | $ 2,037 | $ — | $ — | $ — | $ 4,311 | $ 816 | $ 222 | $ 1,038 | $5,349 |
| Other loans | — | — | — | 11 | — | 11 | — | — | — | 11 |
| Cash and investments | 5 | 2 | — | 5 | — | 12 | — | 5 | 5 | 17 |
| Total interest income | 2,279 | 2,039 | — | 16 | — | 4,334 | 816 | 227 | 1,043 | 5,377 |
| Total interest expense | 1,260 | 748 | — | 59 | — | 2,067 | 55 | 88 | 143 | 2,210 |
| Net interest income (loss) | 1,019 | 1,291 | — | (43) | — | 2,267 | 761 | 139 | 900 | 3,167 |
| Less: provisions for loan losses | 48 | 722 | — | — | — | 770 | — | 69 | 69 | 839 |
| Net interest income (loss) after provisions for loan losses | 971 | 569 | — | (43) | — | 1,497 | 761 | 70 | 831 | 2,328 |
| Other income (loss): | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | 312 | — | — | (10) | — | 302 | — | — | — | 302 |
| Servicing revenue | 76 | 33 | 705 | (1) | (529) | 284 | — | 6 | 6 | 290 |
| Asset recovery revenue | — | — | 420 | — | — | 420 | — | — | — | 420 |
| Gains on debt repurchases | — | — | — | 48 | — | 48 | (6) | — | (6) | 42 |
| Other income (loss) | — | — | 5 | 5 | — | 10 | (755) | 577 | (178) | (168) |
| Total other income (loss) | 388 | 33 | 1,130 | 42 | (529) | 1,064 | (761) | 583 | (178) | 886 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 555 | 179 | 348 | 68 | (529) | 621 | — | 185 | 185 | 806 |
| Overhead expenses | — | — | — | 167 | — | 167 | — | 69 | 69 | 236 |
| Operating expenses | 555 | 179 | 348 | 235 | (529) | 788 | — | 254 | 254 | 1,042 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 13 | 13 | 13 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 72 | 72 | 72 |
| Total expenses | 555 | 179 | 348 | 235 | (529) | 788 | — | 339 | 339 | 1,127 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 804 | 423 | 782 | (236) | — | 1,773 | — | 314 | 314 | 2,087 |
| Income tax expense (benefit)[3] | 291 | 154 | 284 | (86) | — | 643 | — | 133 | 133 | 776 |
| Net income (loss) from continuing operations | 513 | 269 | 498 | (150) | — | 1,130 | — | 181 | 181 | 1,311 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 111 | 1 | — | 112 | — | (6) | (6) | 106 |
| Net income (loss) | 513 | 269 | 609 | (149) | — | 1,242 | — | 175 | 175 | 1,417 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 513 | $ 269 | $ 609 | $(149) | $ — | $ 1,242 | $ — | $ — | $ 176 | 1,418 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Year Ended December 31, 2013 | | | |
|---|---|---|---|---|
| | Net Impact from Spin-Off of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 376 | $ 455 | $ — | $ 831 |
| Total other income (loss) | 34 | (212) | — | (178) |
| Operating expenses | 254 | — | — | 254 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 13 | 13 |
| Restructuring and other reorganization expenses | 72 | — | — | 72 |
| Total "Core Earnings" adjustments to GAAP | $ 84 | $ 243 | $ (13) | 314 |
| Income tax expense | | | | 133 |
| Loss from discontinued operations, net of tax benefit | | | | (6) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 176 |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

F-78

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Elimina-tions(1) | Total "Core Earnings" | Reclassi-fications | Additions/(Subtractions) | Total Adjustments(2) | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Adjustments | | |
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 2,729 | $ 2,036 | $ — | $ — | $ — | $ 4,765 | $ 858 | $ 109 | $ 967 | $5,732 |
| Other loans | — | — | — | 16 | — | 16 | — | — | — | 16 |
| Cash and investments | 11 | 3 | (3) | 2 | 4 | 17 | — | 4 | 4 | 21 |
| Total interest income | 2,740 | 2,039 | (3) | 18 | 4 | 4,798 | 858 | 113 | 971 | 5,769 |
| Total interest expense | 1,589 | 733 | — | 38 | 4 | 2,364 | 115 | 82 | 197 | 2,561 |
| Net interest income (loss) | 1,151 | 1,306 | (3) | (20) | — | 2,434 | 743 | 31 | 774 | 3,208 |
| Less: provisions for loan losses | 68 | 946 | — | — | — | 1,014 | — | 66 | 66 | 1,080 |
| Net interest income (loss) after provisions for loan losses | 1,083 | 360 | (3) | (20) | — | 1,420 | 743 | (35) | 708 | 2,128 |
| **Other income (loss):** | | | | | | | | | | |
| Gains (losses) on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 90 | 45 | 812 | — | (669) | 278 | — | 1 | 1 | 279 |
| Asset recovery revenue | — | — | 356 | — | — | 356 | — | — | — | 356 |
| Gains on debt repurchases | — | — | — | 145 | — | 145 | — | — | — | 145 |
| Other income (loss) | — | — | (2) | 15 | — | 13 | (743) | 194 | (549) | (536) |
| Total other income (loss) | 90 | 45 | 1,166 | 160 | (669) | 792 | (743) | 195 | (548) | 244 |
| **Expenses:** | | | | | | | | | | |
| Direct operating expenses | 699 | 150 | 312 | 13 | (669) | 505 | — | 168 | 168 | 673 |
| Overhead expenses | — | — | — | 143 | — | 143 | — | 81 | 81 | 224 |
| Operating expenses | 699 | 150 | 312 | 156 | (669) | 648 | — | 249 | 249 | 897 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 27 | 27 | 27 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 11 | 11 | 11 |
| Total expenses | 699 | 150 | 312 | 156 | (669) | 648 | — | 287 | 287 | 935 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 474 | 255 | 851 | (16) | — | 1,564 | — | (127) | (127) | 1,437 |
| Income tax expense (benefit)(3) | 171 | 87 | 305 | (3) | — | 560 | — | (62) | (62) | 498 |
| Net income (loss) from continuing operations | 303 | 168 | 546 | (13) | — | 1,004 | — | (65) | (65) | 939 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | (2) | — | 1 | — | (1) | — | (1) | (1) | (2) |
| Net income (loss) | 303 | 166 | 546 | (12) | — | 1,003 | — | (66) | (66) | 937 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (2) | (2) | (2) |
| Net income (loss) attributable to Navient Corporation | $ 303 | $ 166 | $ 546 | $ (12) | $ — | $ 1,003 | $ — | | $ (64) | $ 939 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| | Year Ended December 31, 2012 | | | |
| Net interest income after provisions for loan losses | $ 318 | $ 390 | $ — | $ 708 |
| Total other income (loss) | 36 | (584) | — | (548) |
| Operating expenses | 249 | — | — | 249 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 27 | 27 |
| Restructuring and other reorganization expenses | 11 | — | — | 11 |
| Total "Core Earnings" adjustments to GAAP | $ 94 | $ (194) | $ (27) | (127) |
| Income tax benefit | | | | (62) |
| Loss from discontinued operations, net of tax benefit | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (2) |
| Net loss | | | | $ (64) |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.  Segment Reporting (Continued)**

*Summary of "Core Earnings" Adjustments to GAAP*

| (Dollars in millions) | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| **"Core Earnings" adjustments to GAAP:** | | | |
| Net impact of the removal of SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off[1] | $    (25) | $    84 | $    94 |
| Net impact of derivative accounting[2] | 573 | 243 | (194) |
| Net impact of goodwill and acquired intangible assets[3] | (9) | (13) | (27) |
| Net tax effect[4] | (208) | (133) | 62 |
| Net impact of discontinued operations and noncontrolling interest | — | (5) | 1 |
| Total "Core Earnings" adjustments to GAAP | $    331 | $    176 | $    (64) |

[1]  **SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off:** For "Core Earnings," we have assumed the consumer banking business (SLM BankCo) was never a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014 and we have removed the restructuring and reorganization expense incurred in connection with the Spin-Off. Excluding these items provides management with a useful basis from which to better evaluate results from ongoing operations against results from prior periods. The adjustment relates to the exclusion of the consumer banking business and represents the operations, assets, liabilities and equity of SLM BankCo, which is comprised of Sallie Mae Bank, Upromise Rewards, the Insurance Business, and the Private Education Loan origination functions. Included in these amounts are also certain general corporate overhead expenses related to the consumer banking business. General corporate overhead consists of costs primarily associated with accounting, finance, legal, human resources, certain information technology costs, stock compensation, and executive management and the board of directors. These costs were generally allocated to the consumer banking business based on the proportionate level of effort provided to the consumer banking business relative to Old SLM using a relevant allocation driver (e.g., in proportion to the number of employees by function that were being transferred to SLM BankCo as opposed to remaining at Navient). All intercompany transactions between SLM BankCo and Navient have been eliminated. In addition, all preferred stock dividends have been removed as SLM BankCo succeeded Old SLM as the issuer of the preferred stock in connection with the Spin-Off.

[2]  **Derivative accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These unrealized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

[3]  **Goodwill and acquired intangible assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and amortization of acquired intangible assets.

[4]  **Net Tax Effect:** Such tax effect is based upon our "Core Earnings" effective tax rate for the year.

F-80

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**16.  Discontinued Operations**

In 2013, we sold our Campus Solutions business and our 529 college-savings plan administration business and recorded an after-tax gain of $38 million and $65 million, respectively. These businesses comprise operations and cash flows that can be clearly distinguished operationally and for financial reporting purposes from the rest of the Company and we will have no continuing involvement. As a result, these businesses are presented in discontinued operations of our Business Services segment for the periods presented.

At December 31, 2013, assets of our discontinued operations of $103 million, including primarily other assets of $98 million and the offsetting liability of $94 million included within other liabilities, consisted primarily of funds held in accordance with contractual requirements on behalf of the acquirer of our Campus Solutions business pending remittance to their school clients and transition of administration of remaining bank accounts, which transition was substantially complete at December 31, 2014.

The following table summarizes our discontinued operations.

| (Dollars in millions) | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Operations:** | | | |
| Income (loss) from discontinued operations before income tax expense (benefit) | $ — | $ 126 | $ (3) |
| Income tax expense (benefit) | — | 20 | (1) |
| Income (loss) from discontinued operations, net of tax expense (benefit) | $ — | $ 106 | $ (2) |

F-81

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**17.  Quarterly Financial Information (unaudited)**

| (Dollars in millions, except per share data) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Net interest income | $ 766 | $ 662 | $ 624 | $ 614 |
| Less: provisions for loan losses | 185 | 165 | 140 | 138 |
| Net interest income after provisions for loan losses | 581 | 497 | 484 | 476 |
| Gains (losses) on derivative and hedging activities, net | (8) | 61 | 108 | (22) |
| Other income | 178 | 214 | 180 | 194 |
| Operating expenses | 366 | 211 | 195 | 215 |
| Goodwill and acquired intangible asset impairment and amortization expense | 4 | 2 | 2 | 2 |
| Restructuring and other reorganization expenses | 26 | 61 | 14 | 10 |
| Income tax expense | 136 | 191 | 200 | 159 |
| Net income from continuing operations | 219 | 307 | 361 | 262 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | (2) | 1 |
| **Net income** | 219 | 307 | 359 | 263 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — |
| Net income attributable to Navient Corporation | 219 | 307 | 359 | 263 |
| Preferred stock dividends | 5 | 2 | — | — |
| Net income attributable to Navient Corporation common stock | $ 214 | $ 305 | $ 359 | $ 263 |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .50 | $ .72 | $ .87 | $ .65 |
| Discontinued operations | — | — | — | — |
| Total | $ .50 | $ .72 | $ .87 | $ .65 |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .49 | $ .71 | $ .85 | $ .64 |
| Discontinued operations | — | — | — | — |
| Total | $ .49 | $ .71 | $ .85 | $ .64 |

F-82

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**17.  Quarterly Financial Information (unaudited) (Continued)**

| | 2013 | | | |
|---|---|---|---|---|
| (Dollars in millions, except per share data) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net interest income | $ 795 | $ 784 | $ 799 | $ 789 |
| Less: provisions for loan losses | 241 | 201 | 207 | 190 |
| Net interest income after provisions for loan losses | 554 | 583 | 592 | 599 |
| Gains (losses) on derivative and hedging activities, net | (31) | 18 | (127) | (128) |
| Other income | 281 | 472 | 196 | 203 |
| Operating expenses | 235 | 244 | 257 | 305 |
| Goodwill and acquired intangible asset impairment and amortization expense | 3 | 3 | 4 | 3 |
| Restructuring and other reorganization expenses | 10 | 23 | 12 | 26 |
| Income tax expense | 211 | 299 | 136 | 129 |
| Net income from continuing operations | 345 | 504 | 252 | 211 |
| Income from discontinued operations, net of tax expense | 1 | 38 | 8 | 59 |
| **Net income** | 346 | 542 | 260 | 270 |
| Less: net loss attributable to noncontrolling interest | — | (1) | — | — |
| Net income attributable to Navient Corporation | 346 | 543 | 260 | 270 |
| Preferred stock dividends | 5 | 5 | 5 | 5 |
| Net income attributable to Navient Corporation common stock | $ 341 | $ 538 | $ 255 | $ 265 |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $  .76 | $ 1.14 | $  .56 | $  .47 |
| Discontinued operations | — | .08 | .02 | .14 |
| Total | $  .76 | $ 1.22 | $  .58 | $  .61 |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $  .74 | $ 1.12 | $  .55 | $  .47 |
| Discontinued operations | — | .08 | .02 | .13 |
| Total | $  .74 | $ 1.20 | $  .57 | $  .60 |

Table of Contents

APPENDIX A

DESCRIPTION OF FEDERAL FAMILY EDUCATION LOAN PROGRAM

**Note:** On March 30, 2010, the President signed into law the Health Care and Education Reconciliation Act of 2010 ("HCERA") which terminated the FFELP as of July 1, 2010. This appendix presents an abbreviated summary of the program prior to the termination date. The new law does not alter or affect the terms and conditions of existing FFELP Loans made before July 1, 2010 or the credit support related thereto.

This appendix describes or summarizes the material provisions of Title IV of the Higher Education Act ("HEA"), the FFELP and related statutes and regulations. It, however, is not complete and is qualified in its entirety by reference to each actual statute and regulation. Both the HEA and the related regulations has been the subject of extensive amendments over the years. We cannot predict whether future amendments or modifications might materially change any of the programs described in this appendix or the statutes and regulations that implement them.

**General**

The FFELP, under Title IV of HEA, provided for loans to students who were enrolled in eligible institutions, or to parents of dependent students who were enrolled in eligible institutions, to finance their educational costs. Payment of principal and interest on the student loans to the holders of the loans is insured by a state or not-for-profit guaranty agency against:

- default of the borrower;

- the death, bankruptcy or permanent, total disability of the borrower;

- closing of the student's school prior to the end of the academic period;

- false certification of the borrower's eligibility for the loan by the school; and

- an unpaid school refund.

Claims are paid from federal assets, known as "federal student loan reserve funds," which are maintained and administered by state and not-for-profit guaranty agencies. In addition the holders of student loans are entitled to receive interest subsidy payments and Special Allowance Payments from ED on eligible student loans. Special Allowance Payments raise the yield to student loan lenders when the statutory borrower interest rate is below an indexed market value.

Four types of FFELP Loans were authorized under the HEA:

- Subsidized Federal Stafford Loans to students who demonstrated requisite financial need;

- Unsubsidized Federal Stafford Loans to students who either did not demonstrate financial need or require additional loans to supplement their Subsidized Stafford Loans;

- Federal PLUS Loans to graduate or professional students (effective July 1, 2006) or parents of dependent students whose estimated costs of attending school exceed other available financial aid; and

- FFELP Consolidation Loans, which consolidate into a single loan a borrower's obligations under various federally authorized student loan programs.

**Legislative Matters**

The federal student loan programs are subject to frequent statutory and regulatory changes. The most significant change to the FFELP was with the enactment of the HCERA, which terminated the FFELP as of July 1, 2010.

On December 23, 2011, the President signed the Consolidated Appropriations Act of 2012 into law. This law includes changes that permit FFELP lenders or beneficial holders to change the index on which the Special

A-1

Table of Contents

Allowance Payments are calculated for FFELP Loans first disbursed on or after January 1, 2000. The law allows holders to elect to move the index from the Commercial Paper ("CP") Rate to the one-month London Interbank Offered Rate ("LIBOR"). Such elections have been made by April 1, 2012.

**Eligible Lenders, Students and Educational Institutions**

Lenders who were eligible to make loans under the FFELP generally included banks, savings and loan associations, credit unions, pension funds and, under some conditions, schools and guaranty agencies. FFELP Loans were made to, or on behalf of, a "qualified student." A "qualified student" is an individual who

- is a United States citizen, national or permanent resident;

- has been accepted for enrollment or is enrolled and maintaining satisfactory academic progress at a participating educational institution; and

- is carrying at least one-half of the normal full-time academic workload for the course of study the student is pursuing.

A student qualified for a subsidized Stafford Loan if his family met the financial need requirements for the particular loan program. Only PLUS Loan borrowers have to meet credit standards.

Eligible schools included institutions of higher education, including proprietary institutions, meeting the standards provided in the HEA. For a school to participate in the program, the U.S. Department of Education ("ED") had to approve its eligibility under standards established by regulation.

**Financial Need Analysis**

Subject to program limits and conditions, student loans generally were made in amounts sufficient to cover the student's estimated costs of attending school, including tuition and fees, books, supplies, room and board, transportation and miscellaneous personal expenses as determined by the institution. Generally, each loan applicant (and parents in the case of a dependent child) underwent a financial need analysis.

**Special Allowance Payments ("SAP")**

The HEA provides for quarterly Special Allowance Payments to be made by ED to holders of student loans to the extent necessary to ensure that they receive at least specified market interest rates of return. The rates for Special Allowance Payments depend on formulas that vary according to the type of loan, the date the loan was made and the type of funds, tax-exempt or taxable, used to finance the loan. ED makes a Special Allowance Payment for each calendar quarter.

The Special Allowance Payment equals the average unpaid principal balance, including interest which has been capitalized, of all eligible loans held by a holder during the quarterly period multiplied by the special allowance percentage.

**Fees**

*Loan Rebate Fee.* A loan rebate fee of 1.05 percent is paid annually on the unpaid principal and interest of each Consolidation Loan disbursed on or after October 1, 1993. This fee was reduced to 0.62 percent for loans made from October 1, 1998 to January 31, 1999.

**Stafford Loan Program**

For Stafford Loans, the HEA provided for:

- federal reimbursement of Stafford Loans made by eligible lenders to qualified students;

- federal interest subsidy payments on Subsidized Stafford Loans paid by ED to holders of the loans in lieu of the borrowers' making interest payments during in-school, grace and deferment periods; and

A-2

Table of Contents

• Special Allowance Payments representing an additional subsidy paid by ED to the holders of eligible Stafford Loans.

We refer to all three types of assistance as "federal assistance."

The HEA also permits, and in some cases requires, "forbearance" periods from loan collection in some circumstances. Interest that accrues during forbearance is never subsidized. Interest that accrues during deferment periods may be subsidized.

**PLUS and Supplemental Loans to Students ("SLS") Loan Programs**

The HEA authorizes PLUS Loans to be made to graduate or professional students (effective July 1, 2006) and parents of eligible dependent students and previously authorized SLS Loans to be made to the categories of students subsequently served by the Unsubsidized Stafford Loan program. Borrowers who have no adverse credit history or who are able to secure an endorser without an adverse credit history are eligible for PLUS Loans, as well as some borrowers with extenuating circumstances. The federal assistance applicable to PLUS and SLS Loans are similar to those of Stafford Loans. However, interest subsidy payments are not available under the PLUS and SLS programs and, in some instances, Special Allowance Payments are more restricted.

The annual and aggregate amounts of PLUS Loans were limited only to the difference between the cost of the student's education and other financial aid received, including scholarship, grants and other student loans.

**Consolidation Loan Program**

The enactment of HCERA ended new originations under the FFELP consolidation program, effective July 1, 2010. Previously, the HEA authorized a program under which borrowers may consolidate one or more of their student loans into a single FFELP Consolidation Loan that is insured and reinsured on a basis similar to Stafford and PLUS Loans. FFELP Consolidation Loans were made in an amount sufficient to pay outstanding principal, unpaid interest, late charges and collection costs on all federally reinsured student loans incurred under the FFELP that the borrower selects for consolidation, as well as loans made under various other federal student loan programs and loans made by different lenders. In general, a borrower's eligibility to consolidate their federal student loans ends upon receipt of a Consolidation Loan. With the end of new FFELP originations, borrowers with multiple loans, including FFELP loans, may only consolidate their loans in the DSLP.

**Guaranty Agencies under the FFELP**

Under the FFELP, guaranty agencies insured FFELP loans made by eligible lending institutions, paying claims from "federal student loan reserve funds." These loans are insured as to 100 percent of principal and accrued interest against death or discharge. FFELP loans are also insured against default, with the percent insured dependent on the date of the loans disbursement. For loans that were made before October 1, 1993, lenders are insured for 100 percent of the principal and unpaid accrued interest. From October 1, 1993 to June 30, 2006, lenders are insured for 98 percent of principal and all unpaid accrued interest. Insurance for loans made on or after July 1, 2006 was reduced from 98 percent to 97 percent.

ED guarantees to the guaranty agencies reimbursement of amounts paid to lenders on FFELP Loans. Under the HEA, the guaranty agencies by way of guaranty agreements entered into with ED are, subject to conditions, deemed to have a contractual right against the United States during the life of the loan to receive reimbursement for these amounts.

After ED reimburses a guaranty agency for a default claim, the guaranty agency attempts to collect the loan from the borrower. However, ED requires that the defaulted loans be assigned to it when the guaranty agency is not successful. A guaranty agency also refers defaulted loans to ED to "offset" any federal income tax refunds or other federal reimbursement which may be due the borrowers. Some states have similar offset programs.

A-3

Table of Contents

To be eligible, FFELP loans must meet the requirements of the HEA and regulations issued under the HEA. Generally, these regulations require that lenders determine whether the applicant is an eligible borrower attending an eligible institution, explain to borrowers their responsibilities under the loan, ensure that the promissory notes evidencing the loan are executed by the borrower; and disburse the loan proceeds as required. After the loan is made, the lender must establish repayment terms with the borrower, properly administer deferrals and forbearances, credit the borrower for payments made, and report the loan's status to credit reporting agencies. If a borrower becomes delinquent in repaying a loan, a lender must perform collection procedures that vary depending upon the length of time a loan is delinquent. The collection procedures consist of telephone calls, demand letters, skiptracing procedures and requesting assistance from the guaranty agency.

A lender may submit a default claim to the guaranty agency after a student loan has been delinquent for at least 270 days. The guaranty agency must review and pay the claim within 90 days after the lender filed it. The guaranty agency will pay the lender interest accrued on the loan for up to 450 days after delinquency. The guaranty agency must file a reimbursement claim with ED within 45 days (reduced to 30 days July 1, 2006) after the guaranty agency paid the lender for the default claim. Following payment of claims, the guaranty agency endeavors to collect the loan. Guaranty agencies also must meet statutory and regulatory requirements for collecting loans.

If ED determines that a guaranty agency is unable to meet its insurance obligations, the holders of loans insured by that guaranty agency may submit claims directly to ED and ED is required to pay the full reimbursements amounts due, in accordance with claim processing standards no more stringent than those applied by the affected guaranty agency. However, ED's obligation to pay reimbursement amounts directly in this fashion is contingent upon ED determining a guaranty agency is unable to meet its obligations. While there have been situations where ED has made such determinations regarding affected guaranty agencies, there can be no assurances as to whether ED must make such determinations in the future or whether payments of reimbursement amounts would be made in a timely manner.

**Student Loan Discharges**

FFELP Loans are not generally dischargeable in bankruptcy. Under the United States Bankruptcy Code, before a student loan may be discharged, the borrower must demonstrate that repaying it would cause the borrower or his family undue hardship. When a FFELP borrower files for bankruptcy, collection of the loan is suspended during the time of the proceeding. If the borrower files under the "wage earner" provisions of the Bankruptcy Code or files a petition for discharge on the ground of undue hardship, then the lender transfers the loan to the guaranty agency which then participates in the bankruptcy proceeding. When the proceeding is complete, unless there was a finding of undue hardship, the loan is transferred back to the lender and collection resumes.

Student loans are discharged if the borrower died or becomes totally and permanently disabled. A physician must certify eligibility for a total and permanent disability discharge. Effective January 29, 2007, discharge eligibility was extended to survivors of eligible public servants and certain other eligible victims of the terrorist attacks on the United States on September 11, 2001.

If a school closes while a student is enrolled, or within 120 days after the student withdrew, loans made for that enrollment period are discharged. If a school falsely certifies that a borrower is eligible for the loan, the loan may be discharged. And if a school fails to make a refund to which a student is entitled, the loan is discharged to the extent of the unpaid refund.

**Rehabilitation of Defaulted Loans**

ED is authorized to enter into agreements with the guaranty agency under which the guaranty agency may sell defaulted loans that are eligible for rehabilitation to an eligible lender. For a loan to be eligible for rehabilitation the guaranty agency must have received reasonable and affordable payments for 12 months (reduced to 9 payments in 10 months effective July 1, 2006), then the loans will be submitted to a lender, and only after the

A-4

Table of Contents

sale to an eligible lender is the loan considered rehabilitated. Upon rehabilitation, a borrower is again eligible for all the benefits under the HEA. No student loan rehabilitated on or after August 14, 2008, is eligible to be rehabilitated more than once.

The July 1, 2009 technical corrections made to the HEA under H.R. 1777, Public Law 111-39, provide authority between July 1, 2009 through September 30, 2011, for a guaranty agency to assign a defaulted loan to ED depending on market conditions.

The Bipartisan Budget Act of 2013 reduced the charge that a Guarantor may assess to a borrower to defray the collection cost for assisting a borrower with the rehabilitation of a defaulted FFELP loan. The change was effective for loans sold by a Guarantor to an eligible lender on and after July 1, 2014.

A-5

Table of Contents

## GLOSSARY

Listed below are definitions of key terms that are used throughout this document. See also Appendix A "Description of Federal Family Education Loan Program" for a further discussion of the FFELP.

**Consolidation Loan Rebate Fee** — All holders of FFELP Consolidation Loans are required to pay to the U.S. Department of Education an annual 1.05 percent Consolidation Loan Rebate Fee on all outstanding principal and accrued interest balances of FFELP Consolidation Loans purchased or originated after October 1, 1993, except for loans for which consolidation applications were received between October 1, 1998 and January 31, 1999, where the Consolidation Loan Rebate Fee is 62 basis points.

**Constant Prepayment Rate ("CPR")** — A variable in life-of-loan estimates that measures the rate at which loans in the portfolio prepay before their stated maturity. The CPR is directly correlated to the average life of the portfolio. CPR equals the percentage of loans that prepay annually as a percentage of the beginning of period balance.

**"Core Earnings"** — We prepare financial statements in accordance with generally accepted accounting principles in the United States of America ("GAAP"). In addition to evaluating our GAAP-based financial information, management evaluates the business segments on a basis that, as allowed under the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 280, "Segment Reporting," differs from GAAP. We refer to management's basis of evaluating its segment results as "Core Earnings" presentations for each business segment and refer to these performance measures in its presentations with credit rating agencies and lenders. While "Core Earnings" results are not a substitute for reported results under GAAP, we rely on "Core Earnings" performance measures in operating each business segment because we believes these measures provide additional information regarding the operational and performance indicators that are most closely assessed by management.

"Core Earnings" performance measures are the primary financial performance measures used by management to evaluate performance and to allocate resources. Accordingly, financial information is reported to management on a "Core Earnings" basis by reportable segment, as these are the measures used regularly by our chief operating decision makers. "Core Earnings" performance measures are used in developing our financial plans, tracking results, and establishing corporate performance targets and incentive compensation. Management believes this information provides additional insight into the financial performance of our core business activities. "Core Earnings" performance measures are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Our "Core Earnings" presentation does not represent another comprehensive basis of accounting.

See "Note 15 — Segment Reporting" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations — 'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP" for further discussion of the differences between "Core Earnings" and GAAP, as well as reconciliations between "Core Earnings" and GAAP.

**Direct Loans** — Educational loans provided by the DSLP (see definition below) to students and parent borrowers directly through ED (see definition below) rather than through a bank or other lender.

**DSLP** — The William D. Ford Federal Direct Loan Program.

**ED** — The U.S. Department of Education.

**FFELP** — The Federal Family Education Loan Program, formerly the Guaranteed Student Loan Program, a program that was discontinued in 2010.

**FFELP Consolidation Loans** — Under the FFELP, borrowers with multiple eligible student loans may have consolidated them into a single student loan with one lender at a fixed rate for the life of the loan. The new

G-1

Table of Contents

loan is considered a FFELP Consolidation Loan. The borrower rate on a FFELP Consolidation Loan is fixed for the term of the loan and was set by the weighted average interest rate of the loans being consolidated, rounded up to the nearest 1/8th of a percent, not to exceed 8.25 percent. Holders of FFELP Consolidation Loans are eligible to earn interest under the Special Allowance Payment ("SAP") formula. In April 2008, we suspended originating new FFELP Consolidation Loans.

**FFELP Stafford and Other Student Loans** — Education loans to students or parents of students that are guaranteed or reinsured under the FFELP. The loans are primarily Stafford loans but also include PLUS and HEAL loans. The FFELP was discontinued in 2010.

**Fixed Rate Floor Income** — Fixed Rate Floor Income is Floor Income associated with student loans with borrower rates that are fixed to term (primarily FFELP Consolidation Loans and Stafford Loans originated on or after July 1, 2006).

**Floor Income** — For loans disbursed before April 1, 2006, FFELP Loans generally earn interest at the higher of either the borrower rate, which is fixed over a period of time, or a floating rate based on the SAP formula. We generally finance our student loan portfolio with floating rate debt whose interest is matched closely to the floating nature of the applicable SAP formula. If interest rates decline to a level at which the borrower rate exceeds the SAP formula rate, we continue to earn interest on the loan at the fixed borrower rate while the floating rate interest on our debt continues to decline. In these interest rate environments, we refer to the additional spread it earns between the fixed borrower rate and the SAP formula rate as Floor Income. Depending on the type of student loan and when it was originated, the borrower rate is either fixed to term or is reset to a market rate each July 1. As a result, for loans where the borrower rate is fixed to term, we may earn Floor Income for an extended period of time, and for those loans where the borrower interest rate is reset annually on July 1, we may earn Floor Income to the next reset date. In accordance with legislation enacted in 2006, lenders are required to rebate Floor Income to ED for all FFELP Loans disbursed on or after April 1, 2006.

The following example shows the mechanics of Floor Income for a typical fixed rate FFELP Consolidation Loan (with a LIBOR-based SAP spread of 2.64 percent):

| | |
|---|---|
| Fixed Borrower Rate | 4.25% |
| SAP Spread over LIBOR | (2.64) |
| Floor Strike Rate[1] | 1.61% |

[1]   The interest rate at which the underlying index (LIBOR, Treasury bill or commercial paper) plus the fixed SAP spread equals the fixed borrower rate. Floor Income is earned anytime the interest rate of the underlying index declines below this rate.

Based on this example, if the quarterly average LIBOR rate is over 1.61 percent, the holder of the student loan will earn at a floating rate based on the SAP formula, which in this example is a fixed spread to LIBOR of 2.64 percent. On the other hand, if the quarterly average LIBOR rate is below 1.61 percent, the SAP formula will produce a rate below the fixed borrower rate of 4.25 percent and the loan holder earns at the borrower rate of 4.25 percent.

G-2

Table of Contents

*Graphic Depiction of Floor Income:*



**Floor Income Contracts** — We enter into contracts with counterparties under which, in exchange for an upfront contractual payment representing the present value of the Floor Income that we expect to earn on a notional amount of underlying student loans being economically hedged, we will pay the counterparties the Floor Income earned on that notional amount over the life of the Floor Income Contract. Specifically, we agree to pay the counterparty the difference, if positive, between the fixed borrower rate less the SAP (see definition below) spread and the average of the applicable interest rate index on that notional amount, regardless of the actual balance of underlying student loans, over the life of the contract. The contracts generally do not extend over the life of the underlying student loans. This contract effectively locks in the amount of Floor Income we will earn over the period of the contract. Floor Income Contracts are not considered effective hedges under ASC 815, "Derivatives and Hedging," and each quarter we must record the change in fair value of these contracts through income.

**GAAP** — Generally accepted accounting principles in the United States of America.

**Guarantor(s)** — State agencies or non-profit companies that guarantee (or insure) FFELP Loans made by eligible lenders under The Higher Education Act of 1965 ("HEA"), as amended.

**HCERA** — The Health Care and Education Reconciliation Act of 2010.

**Private Education Loans** — Education loans to students or their families that bear the full credit risk of the customer and any cosigner. Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources. Private Education Loans include loans for higher education (undergraduate and graduate degrees) and for alternative education, such as career training, private kindergarten through secondary education schools and tutorial schools. Certain higher education loans have repayment terms similar to FFELP Loans, whereby repayments begin after the borrower leaves school while others require repayment of interest or a fixed pay amount while the borrower is still in school. Our higher education Private Education Loans are not dischargeable in bankruptcy, except in certain limited circumstances.

G-3

Table of Contents

In the context of our Private Education Loan business, we use the term "non-traditional loans" to describe education loans made to certain customers that have or are expected to have a high default rate as a result of a number of factors, including having a lower tier credit rating, low program completion and graduation rates or, where the customer is expected to graduate, a low expected income relative to the customer's cost of attendance. Non-traditional loans are loans to customers attending for-profit schools with an original FICO score of less than 670 and customers attending not-for-profit schools with an original FICO score of less than 640. The FICO score used in determining whether a loan is non-traditional is the greater of the customer or cosigner FICO score at origination.

**Repayment Borrower Benefits** — Financial incentives offered to borrowers based on pre-determined qualifying factors, which are generally tied directly to making on-time monthly payments. The impact of Repayment Borrower Benefits is dependent on the estimate of the number of borrowers who will eventually qualify for these benefits and the amount of the financial benefit offered to the borrower.

**Residual Interest** — When we securitize student loans, we retain the right to receive cash flows from the student loans sold to trusts that we sponsor in excess of amounts needed to pay derivative costs (if any), other fees, and the principal and interest on the bonds backed by the student loans.

**Risk Sharing** — When a FFELP Loan first disbursed on and after July 1, 2006 defaults, the federal government guarantees 97 percent of the principal balance plus accrued interest (98 percent on loans disbursed before July 1, 2006) and the holder of the loan is at risk for the remaining amount not guaranteed as a Risk Sharing loss on the loan. FFELP Loans originated after October 1, 1993 are subject to Risk Sharing on loan default claim payments unless the default results from the borrower's death, disability or bankruptcy.

**SDCL** — Special Direct Consolidation Loan initiative. The initiative provided an incentive to borrowers who have at least one student loan owned by ED and at least one held by a FFELP lender to consolidate the FFELP lender's loans into the Direct Loan Program by providing a 0.25 percentage point interest rate reduction on the FFELP Loans eligible for consolidation. The program was available from January 17, 2012 through June 30, 2012.

**Special Allowance Payment ("SAP")** — FFELP Loans disbursed prior to April 1, 2006 (with the exception of certain PLUS and Supplemental Loans to Students ("SLS") loans discussed below) generally earn interest at the greater of the borrower rate or a floating rate determined by reference to the average of the applicable floating rates (LIBOR, 91-day Treasury bill rate or commercial paper) in a calendar quarter, plus a fixed spread that is dependent upon when the loan was originated and the loan's repayment status. If the resulting floating rate exceeds the borrower rate, ED pays the difference directly to us. This payment is referred to as the Special Allowance Payment or SAP and the formula used to determine the floating rate is the SAP formula. We refer to the fixed spread to the underlying index as the SAP spread. For loans disbursed after April 1, 2006, FFELP Loans effectively only earn at the SAP rate, as the excess interest earned when the borrower rate exceeds the SAP rate (Floor Income) must be refunded to ED.

Variable rate PLUS Loans and SLS Loans earn SAP only if the variable rate, which is reset annually, exceeds the applicable maximum borrower rate. For PLUS Loans disbursed on or after January 1, 2000, this limitation on SAP was repealed effective April 1, 2006.

**TDR** — Troubled Debt Restructuring. The accounting and reporting standards for loan modifications and TDR's are primarily found in FASB's ASC 310-40, "Troubled Debt Restructurings by Creditors."

**Variable Rate Floor Income** — Variable Rate Floor Income is Floor Income that is earned only through the next date at which the borrower interest rate is reset to a market rate. For FFELP Stafford Loans whose borrower interest rate resets annually on July 1, we may earn Floor Income based on a calculation of the difference between the borrower rate and the then current interest rate.

G-4

Exhibit 10.6

**NAVIENT CORPORATION**
**DEFERRED COMPENSATION PLAN FOR DIRECTORS**
**(As Amended and Restated Effective November 1, 2014)**

**INTRODUCTION**

The Navient Corporation Deferred Compensation Plan for Directors (the "Plan") is hereby amended and restated by Navient Corporation (the "Corporation") effective as of November 1, 2014 (the "Effective Date").

The Plan, originally named the Student Loan Marketing Association Deferred Compensation Plan for Directors, was adopted on February 21, 1995, for the benefit of directors of the Student Loan Marketing Association, the predecessor of SLM Corporation. The Plan was later renamed the SLM Corporation Deferred Compensation Plan for Directors, as amended and restated effective October 1, 2010. The Plan was amended and restated, effective as of May 1, 2014, to reflect an assumption and continuation of the SLM Corporation Deferred Compensation Plan for Directors, a portion of which was spun-off to be maintained by New BLC Corporation (later renamed SLM Corporation) or an affiliate thereof. Effective May 1, 2014, the Plan was renamed the Navient Corporation Deferred Compensation Plan for Directors.

This Plan includes certain Grandfathered Accounts (defined below), which shall continue to be subject to, and governed by, the terms of the Plan as in effect on December 31, 2004. "Grandfathered Account" means the separate memorandum account maintained by the Corporation for a Plan participant to which amounts that were deferred and vested prior to January 1, 2005, and any earnings attributable thereto, are credited.

With respect to deferrals after December 31, 2004, the Plan is to be interpreted as necessary to comply with section 409A of the Internal Revenue Code of 1986 and Treasury Regulations section 1.409A-1 et seq., as they both may be amended from time to time, and other guidance issued by the U.S. Department of Treasury and U.S. Internal Revenue Service thereunder ("Section 409A"). If an amount credited to a Grandfathered Account becomes subject to Section 409A, such amount shall be deemed governed by the Plan, as amended and restated herein, and shall be paid in accordance with Section 3(E).

**1.   DEFERRAL OPPORTUNITY**

Each year during the annual enrollment period determined by the Corporation ("Annual Enrollment Period") any non-employee director ("Director") of the Corporation may, in accordance with rules, procedures and forms specified from time to time by the Corporation, elect to defer receipt of either all or a specified part of the Director's retainer or fees (as set forth in Section 3(A) below) for the following calendar year (the "Deferral Election"). Any amount so deferred (the "Deferred Amount"), shall be credited to a memorandum account maintained by the Corporation on behalf of the Director (the "Deferred Account") and paid out as hereinafter provided. In addition, an individual may make an election prior to commencing his or her initial term as a member of the Board and such election shall be effective as of the date the Director commences such term or, if permitted by the Corporation in its sole discretion, such later time as permitted by Section 409A.

Exhibit 10.6

A Director who does not file a Deferral Election before the last day of the calendar year (or any earlier date required by the Corporation) to defer earnings for the following calendar year will be treated as having elected not to defer any amounts for the following calendar year. A Director who does not file a Deferral Election with respect to a calendar year may file a Deferral Election for a subsequent calendar year in accordance with this Section.

## 2.   PARTICIPATION

To participate in this Plan, a Director shall submit to the Corporation a Deferral Election form relating to all or part of the retainer or fees he or she is entitled to receive as a Director.

## 3.   DEFERRAL ELECTION

Upon filing a Deferral Election, a Director shall designate the amount to be deferred; elect the deferral period; elect to have such deferred amounts invested in cash, in shares of the Corporation's common stock or a successor class of stock ("Common Stock"), or some combination of both; elect the time and form of payment; and designate a beneficiary.

Deferral Elections are effective on a calendar year basis and become irrevocable no later than the December 31 before the beginning of the calendar year to which the elections relate.

### A.   Amount to be Deferred

A Director may elect to defer all or a portion of his or her annual retainer, meeting fees, or per diem payments, whether such amounts otherwise would be payable in the form of cash or equity.

Any Deferred Amount shall be credited to the Director's Deferred Account and paid out as hereinafter provided.

### B.   Deferral Period

At the election of the Director, the payment of the Deferred Account shall commence as soon as administratively possible (but no later than 90 days) after:

(i)      the first day of the tenth month after the Director ceases to be a Director of the Corporation for any reason;

(ii)     the first day of the tenth month after the Director ceases to be a Director and attains an age specified by the Director at the time of the Deferral Election; or

(iii)    the expiration of a period of years not shorter than three years. For the avoidance of doubt, payment shall commence on the first day of the calendar year elected by the Director; provided, however, that the Director may not elect a calendar year that is earlier than the third calendar year following the date of the Deferral Election.

2

Exhibit 10.6

For purposes of the Plan, a Director shall not be considered to cease to be a Director unless the cessation of the Director's service as a Director constitutes a separation from service within the meaning of Section 409A.

A Director may not designate the taxable year of distribution except to the extent permitted in Section 3(B)(iii).

A Director shall not be allowed to receive the Deferred Account before the expiration of the Deferral Period, unless the Director meets the requirements of a hardship as provided in Section 5, nor shall a Director be allowed to defer his or her Deferred Account beyond the Deferral Period.

C.    <u>Investment Election</u>

Any portion of a Director's Deferred Account representing a deferral of compensation that otherwise would have been payable in the form of equity shall be automatically invested in the Stock Account described below. With respect to any other portion of a Director's Deferred Account:

(i)    **Cash Account**. If the Director elects to have all or a portion of his or her Deferred Account invested in cash:

The Corporation shall maintain a separate memorandum account (the "Cash Account"), reflecting the Corporation's liability to the Director for that portion of the deferred earnings invested in cash. All deferred earnings that are invested in cash shall be credited to the Cash Account at the time such earnings would have been paid but for the Deferral Election. Amounts credited to the Cash Account shall earn interest, compounded quarterly, on March 31st, June 30th, September 30th, and December 31st, at an effective rate equal to the quarterly average of the monthly five-year average Treasury Constant Maturity Rate listed on the Federal Reserve Statistical Release H.15 for each month during such quarter.

(ii)   **Stock Account**. If the Director elects to have all or a portion of his or her Deferred Account invested in Common Stock:

The Corporation shall maintain a separate memorandum account (the "Stock Account"), reflecting the Corporation's liability to the Director for the Deferred Account invested in Common Stock, measured in accordance with the value of Common Stock. All deferred earnings that are invested in Common Stock shall be converted into a number of shares (or fraction thereof) of Common Stock and such number of shares shall be credited to the Stock Account at the time such earnings would have been paid but for the Deferral Election. The Stock Account will be credited with additional shares determined by reference to any dividends paid on or adjustments to

3

Exhibit 10.6

Common Stock through the date of distribution. The conversion of deferred earnings, dividends, or other cash payments into a number of shares of Common Stock shall be based on the fair market value of a share of Common Stock at the close of business on the business day immediately preceding the date on which a Director receives a credit to his or her Stock Account under this Plan, which shall be the last sale price on the NASDAQ Stock Exchange on such business day, or, if there shall have been no such sale so reported on that business day, on the last preceding business day on which such a sale was so reported.

Directors shall receive quarterly statements reflecting their Deferred Account balances.

D.    Vesting of Deferred Account

A Director's Deferred Account shall be 100% vested and non-forfeitable at all times, with the exception of any portion of the Deferred Account representing a deferral of compensation that otherwise would have been payable in the form of equity, which shall be subject to the vesting conditions (if any) otherwise applicable to such equity-based compensation.

E.    Form of Payment

A Director may elect to receive his or her Deferred Account in a lump sum or annual installments, not exceeding 15 installments. Deferred Accounts shall be distributed in the form that reflects the investment of the Deferred Account at the end of the Deferral Period; the Cash Account shall be paid in cash and the Stock Account shall be paid in Common Stock.

If a Director elects to receive his or her Deferred Account in annual installments, such installments shall equal:

(i)      the value of the Deferred Account on the date that payments begin divided by the number of installments elected by the Director, plus

(ii)     interest credited to the Cash Account or dividends credited to the Stock Account since the payment of the previous installment; and each annual installment will be paid during the year in which it is due.

F.    Default Time and Form of Payment

If a Director fails timely to elect a time and form of distribution, the Director's Deferred Account will be distributed in the form of a single lump sum payment as soon as administratively possible (but no later than 90 days) after the first day of the tenth month after the Director ceases to be a Director of the Corporation for any reason.

4

Exhibit 10.6

G.   <u>Death Benefit and Beneficiary Designation</u>

In the event of a Director's death, the entire balance in the Director's Deferred Account shall be paid to his or her beneficiary as soon as administratively possible after his or her death but in no event later than the end of the year in which the Director's death occurred or, if later, the 15th day of the third calendar month following the Director's death.

A Director may designate a beneficiary or beneficiaries to receive the balance of his or her Deferred Account upon his or her death. Any death benefit with respect to a Director who did not designate a beneficiary or who is not survived by a beneficiary shall be paid to the personal representative of the Director.

**4.   TERMINATION/AMENDMENT OF ELECTION**

Once a Deferral Election becomes irrevocable for a calendar year, a Director may not terminate the deferral of his or her earnings during that calendar year.

A Director may not modify his or her current or prior year Deferral Elections; however:

A.   **Increase or decrease the amount of fees that are deferred**. A Director may increase or decrease the amount of retainer or fees that are deferred in a future calendar year by filing a new Deferral Election during the relevant Annual Enrollment Period. Any such election shall be effective only for the calendar year following the year in which the Corporation receives the new Deferral Election.

B.   **Change the Investment Election**. A Director may change his or her investment election with respect to any portion of his or her Deferred Account that is invested in cash but a Director may not change his or her investment election with respect to any portion of his or her Deferred Account that is invested in Common Stock. Any change shall be subject to the Corporation's open trading-window policy governing the purchase and sale of its Common Stock (except for when the Director has ceased to be a Director) and shall be effective on the later of the date that it is received by the Corporation or the date elected by the Director. At the Director's election, the change in investment election may apply to amounts previously deferred and/or amounts to be deferred after the effective date of the modification. An investment election may not be changed after the expiration of the Deferral Period.

C.   **Change the Deferral Period**. A Director may change the Deferral Period with respect to deferrals in a future calendar year by filing a new Deferral Election during the relevant Annual Enrollment Period. This change shall be effective only for amounts earned in the calendar year following the calendar year in which the Corporation receives the new Deferral Election.

5

Exhibit 10.6

    D.    **Change the Form of Payment**. A Director may change the form of payment with respect to deferrals in a future calendar year by filing a new Deferral Election during the relevant Annual Enrollment Period. This change shall be effective only for amounts earned in the calendar year following the calendar year in which the Corporation receives the new Deferral Election.

    E.    **Change in Beneficiaries**. A Director may change beneficiaries by filing a written change of beneficiary designation form with the Corporation and such new beneficiary designation shall be effective upon receipt by the Corporation.

Upon cessation of service as a Director, the terms of this Plan shall continue to govern a Director's Deferred Account until the Deferred Account is paid in full. Accordingly, a Director's Deferred Account shall continue to be credited with investment earnings, as provided by Section 3.C, and the Deferral Period shall continue in effect.

**5.    HARDSHIP DISTRIBUTION**

In the event of a substantial, unforeseen hardship, a Director may file a notice with the Chairman of the Nominations and Governance Committee of the Board of Directors (the "Committee"), advising the Committee of the circumstances of the hardship, and requesting a hardship distribution. Upon approval by the Committee of a Director's request, the Director's Deferred Account, or that portion of a Director's Deferred Account deemed necessary by the Committee to satisfy the hardship (determined in a manner consistent with Section 409A) plus amounts necessary to pay taxes reasonably anticipated because of the distribution, will be distributed in a single lump sum as soon as administratively possible (but no later than 90 days) following the date of approval. The Committee, in its sole discretion, shall determine how a Director's Cash and Common Stock accounts shall be debited for the distribution. No member of the Committee may vote on, or otherwise influence a decision of the Committee concerning his or her request for a hardship distribution. If the Committee approves a Director's hardship distribution request, then effective as of the date the request is approved, the Committee shall cancel the Director's Deferral Election, if any, for the remainder of the calendar year. A Director whose Deferral Election is cancelled in accordance with this Section may file a new Deferral Election for the following calendar year in accordance with Section 1. A hardship distribution by a Director shall have no effect on any amounts remaining in the Plan following the hardship distribution.

For purposes of this paragraph, a substantial, unforeseen hardship is a severe financial hardship resulting from extraordinary and unforeseeable circumstances arising as a result of events beyond the Director's control, such as (i) an illness or accident of the Director or the Director's spouse, the Director's beneficiary, or the Director's dependent (as defined in Internal Revenue Code section 152, without regard to Code sections 152(b)(l), (b)(2), and (d)(1)(B)), (ii) a loss of the Director's property due to casualty, or (iii) other similar extraordinary and unforeseeable circumstances, all as determined in the sole discretion of the Committee. A hardship distribution shall not be made to the extent such hardship is or may be relieved (i) through reimbursement or compensation by insurance or otherwise, (ii) by liquidation of the

6

Exhibit 10.6

Director's assets, to the extent the liquidation of such assets would not itself cause a severe financial hardship, or (iii) by cessation of deferrals under the Plan. Examples of what are not considered to be unforeseeable hardships include the need to send a Director's dependent or child to college, or the desire to purchase a home.

### 6.   ACCELERATION OF PAYMENT

The Plan shall not permit the acceleration of the time or schedule of any payment, except as set forth herein or as otherwise permitted by Section 409A. The Committee may, in a manner that results in Section 409A compliance, determine to accelerate the time of a Director's payment if at any time the Plan, as applicable to such Director, fails to meet the requirements of Section 409A. Such amount may not exceed the amount required to be included in income as a result of the failure to comply with Section 409A. Any such tax liability distribution shall be paid between the date of the Committee's determination and the end of the calendar year during which the determination occurred, or if later, the 15th day of the third calendar month following the date of the Committee's determination.

### 7.   SECTION 409A

The Plan is intended to comply with Section 409A, and shall be construed and administered accordingly to the extent Section 409A applies to the Plan. To the extent that a provision of the Plan would cause a conflict with the requirements of Section 409A, or would cause the administration of the Plan to fail to satisfy Section 409A, such provision shall be deemed null and void to the extent permitted by applicable law. Nothing herein shall be construed as a guarantee of any particular tax treatment to a Director.

### 8.   CREDITOR STATUS

The rights of a Director in his or her Deferred Account shall be only as a general, unsecured creditor of the Corporation. Any amount of cash or number of shares of Common Stock payable under this Plan shall be paid solely from the general assets or authorized Common Stock of the Corporation and a Director shall have no rights, claim, interest or lien in any property which the Corporation may have, acquire, or otherwise identify to assist the Corporation in fulfilling its obligation to any and all Directors under the Plan.

### 9.   ADMINISTRATION AND TERMINATION

The Secretary of the Corporation shall provide a copy of this Plan to each Director.

The Board may, at any time and in its sole discretion, terminate or amend the Plan in accordance with Section 409A; provided, however, that no such termination or amendment shall reduce or in any manner adversely affect the rights of any Director with respect to benefits that are payable or become payable under the Plan as of the effective date of such amendment or termination. In the event of termination, existing Deferred Accounts shall be paid in accordance with the terms of the Plan except to the extent the Plan is terminated in accordance with the requirements of Section 409A, in which event the existing Deferred Accounts shall be paid in accordance with Section 409A.

7

Exhibit 10.6

**IN WITNESS WHEREOF**, Navient Corporation has caused this amended and restated Plan to be duly executed in its name and on its behalf.

Navient Corporation

By:   /s/ MARK L. HELEEN

Name:  Mark L. Heleen

Title:  Secretary

8

**Exhibit 12.1**

**NAVIENT**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**
**(Dollars in millions)**

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2010** | **2011** | **2012** | **2013** | **2014** |
| Income (loss) from continuing operations before income taxes | $1,229 | $ 925 | $1,437 | $2,087 | $1,837 |
| Add: Fixed charges | 2,279 | 2,404 | 2,565 | 2,213 | 2,066 |
| Total earnings | $3,508 | $3,329 | $4,002 | $4,300 | $3,903 |
| Interest expense | $2,275 | $2,401 | $2,561 | $2,210 | $2,063 |
| Rental expense, net of income | 4 | 3 | 4 | 3 | 3 |
| Total fixed charges | 2,279 | 2,404 | 2,565 | 2,213 | 2,066 |
| Preferred stock dividends | 121 | 28 | 31 | 31 | 10 |
| Total fixed charges and preferred stock dividends | $2,400 | $2,432 | $2,596 | $2,244 | $2,076 |
| **Ratio of earnings to fixed charges**[1] | **1.54** | **1.38** | **1.56** | **1.94** | **1.89** |
| **Ratio of earnings to fixed charges and preferred stock dividends**[1] | **1.46** | **1.37** | **1.54** | **1.92** | **1.88** |

(1)  For purposes of computing these ratios, earnings represent income (loss) from continuing operations before income tax expense plus fixed charges.
Fixed charges represent interest expensed and capitalized plus one-third (the proportion deemed representative of the interest factor) of rents, net of income from subleases.

**Exhibit 21.1**

SUBSIDIARIES OF
NAVIENT CORPORATION

| Name | Jurisdiction of Incorporation |
|---|---|
| HICA Holding, Inc. | South Dakota |
| Navient Solutions, Inc. | Delaware |
| Navient Credit Finance Corporation | Delaware |
|     Navient Credit Funding, LLC | Delaware |
|     Blue Ridge Funding, LLC | Delaware |
| Navient Investment Corporation | Delaware |
| Southwest Student Services Corporation | Delaware |

---

\* Pursuant to Item 601(b)(21)(ii) of Regulation S-K, the names of other subsidiaries of Navient Corporation are omitted because, considered in the aggregate, they would not constitute a significant subsidiary as of the end of the year covered by this report.

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Navient Corporation:

We consent to the incorporation by reference in the following registration statements of Navient Corporation and subsidiaries (the Company):

| Form | Registration Number |
|------|---------------------|
| S-3  | 333-195540          |
| S-3  | 333-197516          |
| S-8  | 333-195539          |
| S-8  | 333-195538          |
| S-8  | 333-195536          |
| S-8  | 333-195535          |
| S-8  | 333-195533          |
| S-8  | 333-195529          |

of our reports dated February 27, 2015, with respect to the consolidated balance sheets of the Company as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2014, and the effectiveness of internal control over financial reporting as of December 31, 2014, which reports appear in the December 31, 2014 annual report on Form 10-K of the Company.

/s/ KPMG LLP

McLean, Virginia
February 27, 2015

Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, John F. Remondi, certify that:

1. I have reviewed this annual report on Form 10-K of Navient Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
February 27, 2015

Exhibit 31.2

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Somsak Chivavibul, certify that:

1.  I have reviewed this annual report on Form 10-K of Navient Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
(Principal Financial and Accounting Officer)
February 27, 2015

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Navient Corporation (the "Company") on Form 10-K for the year ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John F. Remondi, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
February 27, 2015

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Navient Corporation (the "Company") on Form 10-K for the year ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Somsak Chivavibul, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
(Principal Financial and Accounting Officer)
February 27, 2015

# EXHIBIT

# F

**Table of Contents**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the quarterly period ended June 30, 2014**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the transition period from          to**

   **Commission File Number: 001-36228**

# Navient Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **46-4054283** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **300 Continental Drive, Newark, Delaware** | **19713** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(302) 283-8000**

*(Registrant's telephone number, including area code)*

*(Former name, former address and former fiscal year, if changed since last report)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☑    No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Outstanding at June 30, 2014 |
|---|---|
| Common Stock, $0.01 par value | 419,438,459 shares |

Table of Contents

# NAVIENT CORPORATION

## Table of Contents

**Part I. Financial Information**

| | | |
|---|---|---|
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 101 |
| Item 4. | Controls and Procedures | 105 |

**PART II. Other Information**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 106 |
| Item 1A. | Risk Factors | 107 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 108 |
| Item 3. | Defaults Upon Senior Securities | 108 |
| Item 4. | Mine Safety Disclosures | 108 |
| Item 5. | Other Information | 108 |
| Item 6. | Exhibits | 109 |

Table of Contents

PART I. FINANCIAL INFORMATION

Item 1.      Financial Statements

NAVIENT CORPORATION

CONSOLIDATED BALANCE SHEETS
(In millions, except share and per share amounts)
(Unaudited)

| | June 30, 2014 | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| FFELP Loans (net of allowance for losses of $96 and $119, respectively) | $ 99,730 | $   104,588 |
| Private Education Loans (net of allowance for losses of $1,983 and $2,097 respectively) | 30,324 | 37,512 |
| Investments | | |
| Available-for-sale | 7 | 109 |
| Other | 651 | 783 |
| Total investments | 658 | 892 |
| Cash and cash equivalents | 1,636 | 5,190 |
| Restricted cash and investments | 3,613 | 3,650 |
| Goodwill and acquired intangible assets, net | 373 | 424 |
| Other assets | 6,642 | 7,287 |
| Total assets | $142,976 | $   159,543 |
| **Liabilities** | | |
| Short-term borrowings | $   4,316 | $   13,795 |
| Long-term borrowings | 131,919 | 136,648 |
| Other liabilities | 2,720 | 3,458 |
| Total liabilities | 138,955 | 153,901 |
| **Commitments and contingencies** | | |
| **Equity** | | |
| Preferred stock, par value $0.20 per share, 20 million shares authorized | | |
| Series A: 0 million and 3.3 million shares issued, respectively, at stated value of $50 per share | — | 165 |
| Series B: 0 million and 4 million shares issued, respectively, at stated value of $100 per share | — | 400 |
| Common stock, par value $0.01 and $0.20 per share, respectively, 1.125 billion shares authorized: 424 million and 545 million shares issued, respectively | 4 | 109 |
| Additional paid-in capital | 2,868 | 4,399 |
| Accumulated other comprehensive income (net of tax expense of $4 and $7, respectively) | 7 | 13 |
| Retained earnings | 1,224 | 2,584 |
| Total Navient Corporation stockholders' equity before treasury stock | 4,103 | 7,670 |
| Less: Common stock held in treasury at cost: 5 million and 116 million shares, respectively | (82) | (2,033) |
| Total Navient Corporation stockholders' equity | 4,021 | 5,637 |
| Noncontrolling interest | — | 5 |
| Total equity | 4,021 | 5,642 |
| Total liabilities and equity | $142,976 | $   159,543 |

**Supplemental information — assets and liabilities of consolidated variable interest entities:**

| | June 30, 2014 | December 31, 2013 |
|---|---|---|
| FFELP Loans | $ 95,604 | $   99,254 |
| Private Education Loans | 24,198 | 25,530 |
| Restricted cash and investments | 3,394 | 3,395 |
| Other assets | 2,184 | 2,322 |
| Short-term borrowings | — | 3,655 |
| Long-term borrowings | 114,711 | 115,538 |
| Net assets of consolidated variable interest entities | $ 10,669 | $   11,308 |

See accompanying notes to consolidated financial statements.

1

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF INCOME**
**(In millions, except per share amounts)**
**(Unaudited)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2014** | **2013** | **2014** | **2013** |
| **Interest income:** | | | | |
| FFELP Loans | $ 631 | $ 703 | $ 1,278 | $ 1,439 |
| Private Education Loans | 539 | 627 | 1,183 | 1,249 |
| Other loans | 2 | 3 | 4 | 6 |
| Cash and investments | 3 | 4 | 6 | 8 |
| Total interest income | 1,175 | 1,337 | 2,471 | 2,702 |
| Total interest expense | 513 | 553 | 1,042 | 1,123 |
| Net interest income | 662 | 784 | 1,429 | 1,579 |
| Less: provisions for loan losses | 165 | 201 | 350 | 442 |
| Net interest income after provisions for loan losses | 497 | 583 | 1,079 | 1,137 |
| **Other income (loss):** | | | | |
| Gains on sales of loans and investments | — | 251 | — | 307 |
| Gains (losses) on derivative and hedging activities, net | 61 | 18 | 53 | (13) |
| Servicing revenue | 73 | 69 | 136 | 139 |
| Asset recovery revenue | 132 | 109 | 243 | 208 |
| Gains on debt repurchases | — | 19 | — | 42 |
| Other | 9 | 24 | 13 | 59 |
| Total other income | 275 | 490 | 445 | 742 |
| **Expenses:** | | | | |
| Salaries and benefits | 116 | 128 | 257 | 253 |
| Other operating expenses | 95 | 116 | 321 | 228 |
| Total operating expenses | 211 | 244 | 578 | 481 |
| Goodwill and acquired intangible asset impairment and amortization expense | 2 | 3 | 6 | 6 |
| Restructuring and other reorganization expenses | 61 | 23 | 87 | 34 |
| Total expenses | 274 | 270 | 671 | 521 |
| Income from continuing operations, before income tax expense | 498 | 803 | 853 | 1,358 |
| Income tax expense | 191 | 299 | 328 | 509 |
| Net income from continuing operations | 307 | 504 | 525 | 849 |
| Income from discontinued operations, net of tax expense | — | 38 | 1 | 39 |
| **Net income** | 307 | 542 | 526 | 888 |
| Less: net loss attributable to noncontrolling interest | — | (1) | — | (1) |
| Net income attributable to Navient Corporation | 307 | 543 | 526 | 889 |
| Preferred stock dividends | 2 | 5 | 6 | 10 |
| Net income attributable to Navient Corporation common stock | $ 305 | $ 538 | $ 520 | $ 879 |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .72 | $ 1.14 | $ 1.22 | $ 1.88 |
| Discontinued operations | — | .08 | — | .09 |
| Total | $ .72 | $ 1.22 | $ 1.22 | $ 1.97 |
| Average common shares outstanding | 422 | 440 | 424 | 445 |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .71 | $ 1.12 | $ 1.20 | $ 1.85 |
| Discontinued operations | — | .08 | — | .09 |
| Total | $ .71 | $ 1.20 | $ 1.20 | $ 1.94 |
| Average common and common equivalent shares outstanding | 430 | 448 | 432 | 453 |
| Dividends per common share attributable to Navient Corporation | $ .15 | $ .15 | $ .30 | $ .30 |

See accompanying notes to consolidated financial statements.

2

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In millions)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Net income | $    307 | $    542 | $    526 | $    888 |
| Other comprehensive income (loss): | | | | |
| Unrealized gains (losses) on derivatives: | | | | |
| Unrealized hedging gains (losses) on derivatives | (4) | 22 | (15) | 23 |
| Reclassification adjustments for derivative losses included in net income (interest expense) | 1 | 2 | 4 | 5 |
| Total unrealized gains (losses) on derivatives | (3) | 24 | (11) | 28 |
| Unrealized gain (losses) on investments | 3 | (3) | 3 | (4) |
| Income tax (expense) benefit | — | (8) | 2 | (9) |
| Other comprehensive income (loss), net of tax | — | 13 | (6) | 15 |
| Comprehensive income | 307 | 555 | 520 | 903 |
| Less: comprehensive loss attributable to noncontrolling interest | — | (1) | — | (1) |
| Total comprehensive income attributable to Navient Corporation | $    307 | $    556 | $    520 | $    904 |

See accompanying notes to consolidated financial statements.

3

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(Dollars in millions, except share and per share amounts)**
**(Unaudited)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at March 31, 2013** | 7,300,000 | 539,665,760 | (95,455,400) | 444,210,360 | $ 565 | $ 108 | $ 4,291 | $ (4) | $ 1,723 | $ (1,535) | $ 5,148 | $ 6 | $ 5,154 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 543 | — | 543 | (1) | 542 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | 13 | — | — | 13 | — | 13 |
| Total comprehensive income | — | — | — | — | — | — | — | — | — | — | 556 | (1) | 555 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.15 per share) | — | — | — | — | — | — | — | — | (66) | — | (66) | — | (66) |
| Preferred stock, series A ($.87 per share) | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Preferred stock, series B ($.52 per share) | — | — | — | — | — | — | — | — | (2) | — | (2) | — | (2) |
| Issuance of common shares | — | 4,115,424 | — | 4,115,424 | — | 1 | 50 | — | — | — | 51 | — | 51 |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | 4 | — | — | — | 4 | — | 4 |
| Stock-based compensation expense | — | — | — | — | — | — | 10 | — | — | — | 10 | — | 10 |
| Common stock repurchased | — | — | (9,096,144) | (9,096,144) | — | — | — | — | — | (201) | (201) | — | (201) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (3,040,788) | (3,040,788) | — | — | — | — | — | (68) | (68) | — | (68) |
| **Balance at June 30, 2013** | 7,300,000 | 543,781,184 | (107,592,332) | 436,188,852 | $ 565 | $ 109 | $ 4,355 | $ 9 | $ 2,195 | $ (1,804) | $ 5,429 | $ 5 | $ 5,434 |
| **Balance at March 31, 2014** | 7,300,000 | 549,449,123 | (126,745,836) | 422,703,287 | $ 565 | $ 110 | $ 4,461 | $ 7 | $ 2,733 | $ (2,283) | $ 5,593 | $ 5 | $ 5,598 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 307 | — | 307 | — | 307 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total comprehensive income | — | — | — | — | — | — | — | — | — | — | 307 | — | 307 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.15 per share) | — | — | — | — | — | — | — | — | (63) | — | (63) | — | (63) |
| Preferred stock, series A ($.87 per share) | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Preferred stock, series B ($.49 per share) | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Issuance of common shares | — | 1,867,844 | — | 1,867,844 | — | — | (81) | 94 | — | — | 13 | — | 13 |
| Retirement of common stock in treasury | — | (126,963,268) | 126,963,268 | — | — | (25) | (2,263) | — | — | 2,288 | — | — | — |
| Tax benefit related to employee stock-based compensation plans | — | — | — | — | — | — | 1 | — | — | — | 1 | — | 1 |
| Stock-based compensation expense | — | — | — | — | — | — | 10 | — | — | — | 10 | — | 10 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Common stock repurchased | — | — | (3,862,214) | (3,862,214) | — | — | — | — | — | (65) | (65) | — | (65) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (1,270,458) | (1,270,458) | — | — | — | — | — | (22) | (22) | — | (22) |
| Deconsolidation of subsidiary | | | | | | | | | | | | (5) | (5) |
| Distribution of consumer banking business | (7,300,000) | — | — | — | (565) | — | 565 | — | (1,751) | — | (1,751) | — | (1,751) |
| **Balance at June 30, 2014** | — | 424,353,699 | (4,915,240) | 419,438,459 | $ — | $ 4 | $ 2,868 | $ 7 | $ 1,224 | $ (82) | $ 4,021 | $ — | $ 4,021 |

See accompanying notes to consolidated financial statements.

4

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(Dollars in millions, except share and per share amounts)**
**(Unaudited)**

| | Preferred Stock Shares | Common Stock Shares | | | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity | Noncontrolling Interest | Total Equity |
| | | Issued | Treasury | Outstanding | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2012 | 7,300,000 | 535,507,965 | (82,910,021) | 452,597,944 | $ 565 | $ 107 | $ 4,237 | $ (6) | $ 1,451 | $ (1,294) | $ 5,060 | $ 6 | $ 5,066 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 889 | — | 889 | (1) | 888 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | 15 | — | — | 15 | — | 15 |
| Total comprehensive income | | | | | | | | | | | 904 | (1) | 903 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.30 per share) | — | — | — | — | — | — | — | — | (134) | — | (134) | — | (134) |
| Preferred stock, series A ($1.74 per share) | — | — | — | — | — | — | — | — | (6) | — | (6) | — | (6) |
| Preferred stock, series B ($1.01 per share) | — | — | — | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Dividend equivalent units related to employee stock-based compensation plans | — | — | — | — | — | — | — | — | (1) | — | (1) | — | (1) |
| Issuance of common shares | — | 8,273,219 | — | 8,273,219 | — | 2 | 84 | — | — | — | 86 | — | 86 |
| Tax benefit related to employee stock-based compensation plans | | | | | | | 5 | | | | 5 | | 5 |
| Stock-based compensation expense | | | | | | | 29 | | | | 29 | | 29 |
| Common stock repurchased | — | — | (19,316,948) | (19,316,948) | — | — | — | — | — | (400) | (400) | — | (400) |
| Shares repurchased related to employee stock-based compensation plans | — | — | (5,365,363) | (5,365,363) | — | — | — | — | — | (110) | (110) | — | (110) |
| Balance at June 30, 2013 | 7,300,000 | 543,781,184 | (107,592,332) | 436,188,852 | $ 565 | $ 109 | $ 4,355 | $ 9 | $ 2,195 | $ (1,804) | $ 5,429 | $ 5 | $ 5,434 |
| Balance at December 31, 2013 | 7,300,000 | 545,210,941 | (116,262,066) | 428,948,875 | $ 565 | $ 109 | $ 4,399 | $ 13 | $ 2,584 | $ (2,033) | $ 5,637 | $ 5 | $ 5,642 |
| Comprehensive income: | | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | — | 526 | — | 526 | — | 526 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | (6) | — | — | (6) | — | (6) |
| Total comprehensive income | | | | | | | | | | | 520 | | 520 |
| Cash dividends: | | | | | | | | | | | | | |
| Common stock ($.30 per share) | — | — | — | — | — | — | — | — | (127) | — | (127) | — | (127) |
| Preferred stock, series A ($1.74 per share) | — | — | — | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Preferred stock, series B ($.98 per share) | — | — | — | — | — | — | — | — | (2) | — | (2) | — | (2) |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dividend equivalent units related to employee stock-based compensation plans | | | | | | | | — | (2) | — | (2) | — | (2) |
| Issuance of common shares | — | 6,106,026 | — | 6,106,026 | — | (80) | 127 | | | | 47 | — | 47 |
| Retirement of common stock in treasury | — | (126,963,268) | 126,963,268 | — | | (25) | (2,263) | | | 2,288 | — | | — |
| Tax benefit related to employee stock-based compensation plans | | | | | | | 12 | | | | 12 | | 12 |
| Stock-based compensation expense | | | | | | | 28 | | | | 28 | | 28 |
| Common stock repurchased | — | — | (12,230,514) | (12,230,514) | — | — | — | | | (265) | (265) | | (265) |
| Shares repurchased related to employee stock-based compensation plans | | | (3,385,928) | (3,385,928) | | | | | | (72) | (72) | | (72) |
| Deconsolidation of subsidiary | | | | | | | | | | | | (5) | (5) |
| Distribution of consumer banking business | (7,300,000) | — | — | — | (565) | — | 565 | — | (1,751) | — | (1,751) | | (1,751) |
| **Balance at June 30, 2014** | — | 424,353,699 | (4,915,240) | 419,438,459 | $ — | $ 4 | 2,868 | 7 | $ 1,224 | $ (82) | $ 4,021 | $ — | $ 4,021 |

See accompanying notes to consolidated financial statements.

5

Table of Contents

**NAVIENT CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | | Six Months Ended June 30, | | |
|---|---|---:|---|---:|
| | | **2014** | | **2013** |
| **Operating activities** | | | | |
| Net income | $ | 526 | $ | 888 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Income from discontinued operations, net of tax | | (1) | | (39) |
| Gains on loans and investments, net | | — | | (307) |
| Gains on debt repurchases | | — | | (42) |
| Goodwill and acquired intangible asset impairment and amortization expense | | 6 | | 6 |
| Stock-based compensation expense | | 28 | | 29 |
| Unrealized (gains) losses on derivative and hedging activities | | (397) | | (330) |
| Provisions for loan losses | | 350 | | 442 |
| Increase in restricted cash — other | | (45) | | (3) |
| Decrease (increase) in accrued interest receivable | | 63 | | (42) |
| (Decrease) increase in accrued interest payable | | (32) | | 6 |
| Decrease in other assets | | 177 | | 504 |
| Increase (decrease) in other liabilities | | 437 | | (198) |
| Cash provided by operating activities — continuing operations | | 1,112 | | 914 |
| Cash provided by operating activities — discontinued operations | | 1 | | 40 |
| Total net cash provided by operating activities | | 1,113 | | 954 |
| **Investing activities** | | | | |
| Student loans acquired and originated | | (2,917) | | (2,078) |
| Reduction of student loans: | | | | |
| Installment payments, claims and other | | 6,005 | | 6,265 |
| Proceeds from sales of student loans | | — | | 707 |
| Other investing activities, net | | 108 | | 115 |
| Purchases of available-for-sale securities | | (28) | | (24) |
| Proceeds from maturities of available-for-sale securities | | 3 | | 20 |
| Purchases of other securities | | (104) | | (144) |
| Proceeds from maturities of other securities | | 107 | | 133 |
| Decrease in restricted cash — variable interest entities | | 54 | | 611 |
| Total net cash provided by investing activities | | 3,228 | | 5,605 |
| **Financing activities** | | | | |
| Distribution of consumer banking business | | (2,217) | | — |
| Borrowings collateralized by loans in trust — issued | | 3,393 | | 6,187 |
| Borrowings collateralized by loans in trust — repaid | | (6,108) | | (6,439) |
| Asset-backed commercial paper conduits, net | | (2,243) | | 4,349 |
| ED Conduit Program facility, net | | — | | (9,551) |
| Other long-term borrowings issued | | 834 | | 1,489 |
| Other long-term borrowings repaid | | (2,040) | | (2,296) |
| Other financing activities, net | | 158 | | (766) |
| Retail and other deposits, net | | 726 | | 439 |
| Common stock repurchased | | (265) | | (400) |
| Common stock dividends paid | | (127) | | (134) |
| Preferred stock dividends paid | | (6) | | (10) |
| Net cash used in financing activities | | (7,895) | | (7,132) |
| Net decrease in cash and cash equivalents | | (3,554) | | (573) |
| Cash and cash equivalents at beginning of period | | 5,190 | | 3,900 |
| **Cash and cash equivalents at end of period** | $ | 1,636 | $ | 3,327 |
| Cash disbursements made (refunds received) for: | | | | |
| Interest | $ | 1,005 | $ | 1,121 |
| Income taxes paid | $ | 192 | $ | 282 |
| Income taxes received | $ | (70) | $ | (18) |
| Noncash activity: | | | | |
| Investing activity — Student loans and other assets removed related to sale of Residual Interest in securitization | $ | — | $ | (11,802) |
| Financing activity — Borrowings removed related to sale of Residual Interest in securitization | $ | — | $ | (12,084) |

See accompanying notes to consolidated financial statements.

6

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(Information at June 30, 2014 and for the three and six months ended
June 30, 2014 and 2013 is unaudited)**

1. **The Separation**

   *Presentation of Information*

   Unless the context otherwise requires, references in this Quarterly Report on Form 10-Q to:

   - "We," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off refers to Old SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off refers to Navient and its consolidated subsidiaries.

   - "Old SLM" refers to SLM Corporation, as it existed prior to the Spin-Off, and its consolidated subsidiaries. As part of an internal corporate reorganization of Old SLM, Old SLM was merged into a limited liability company and became a subsidiary of Navient, changing its name to "Navient, LLC."

   - Navient's historical business and operations refer to Old SLM's portfolio of FFELP and Private Education Loans not held by Sallie Mae Bank, together with the servicing and asset recovery businesses that were retained by or transferred to Navient in connection with the internal corporate reorganization.

   - "SLM BankCo" refers to New BLC Corporation, which became the publicly traded successor to Old SLM on April 29, 2014 by virtue of a merger pursuant to Section 251(g) of the Delaware General Corporation Law ("DGCL"), and its consolidated subsidiaries. Following consummation of the merger, New BLC Corporation changed its name to SLM Corporation. After the Spin-Off, SLM BankCo's business consists primarily of the consumer banking business previously operated by Old SLM, which includes Sallie Mae Bank and its portfolio of Private Education Loans, a new Private Education Loan servicing business and the Upromise Rewards business.

   - "Spin-Off" collectively refers to the internal reorganization of Old SLM on April 29, 2014 and the distribution on April 30, 2014 of all of the shares of common stock of Navient to the holders of shares of SLM BankCo.

   *Spin-Off of Navient*

   On April 30, 2014, the previously announced separation of Navient from SLM BankCo was completed. The separation was effected through the distribution by SLM BankCo of all the shares of common stock of Navient, on a one-to-one basis, to the holders of shares of SLM BankCo common stock as of the close of business on April 22, 2014, the record date for the distribution. As a result of the distribution, Navient is an independent, publicly traded company that operates the education loan management, servicing and asset recovery business previously operated by Old SLM. Navient is comprised primarily of Old SLM's portfolios of education loans that were not held in Sallie Mae Bank at the time of the separation, as well as servicing and asset recovery activities on those loans and loans held by third parties. The consumer banking business, SLM BankCo, is comprised primarily of Sallie Mae Bank and its Private Education Loan origination business, the Private Education Loans it holds and a related servicing business.

   To implement the separation and distribution of Navient, an internal corporate reorganization of Old SLM was effected, pursuant to which, on April 29, 2014, SLM BankCo replaced Old SLM as the parent holding company pursuant to a holding company merger. In accordance with Section 251(g) of the DGCL, by action of the Old SLM board of directors and without a shareholder vote, Old SLM was merged into Navient, LLC, a wholly owned subsidiary of Old SLM, with Navient, LLC surviving. Immediately following the effective time of the merger, SLM BankCo changed its name to "SLM Corporation." As part of the internal corporate reorganization and pursuant to the merger, all of the outstanding shares of Old SLM Series A preferred stock and

7

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**1.   The Separation (Continued)**

Series B preferred stock were converted, on a one-to-one basis, into substantially identical shares of SLM BankCo preferred stock. Following the merger, the assets and liabilities associated with the education loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking were transferred to SLM BankCo. The Spin-Off is intended to be tax-free and on July 9, 2014, Navient received a private letter ruling from the Internal Revenue Service confirming the tax-free status of the Spin-Off and the related internal reorganization transactions. For further information on the Spin-Off and all related matters, please refer to our Registration Statement on Form 10, as amended (our "Form 10"), filed with the Securities and Exchange Commission (the "SEC") on April 10, 2014, and declared effective on April 14, 2014.

Due to the relative significance of Navient to Old SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM, notwithstanding the legal form of the Spin-Off. As a result, the historical financial statements of Old SLM prior to the distribution on April 30, 2014 are the historical financial statements of Navient. For that reason the historical financial information related to periods on or prior to April 30, 2014 contained in this Quarterly Report on Form 10-Q is that of Old SLM, which includes the consolidated results of both the loan management, servicing and asset recovery business (Navient) and the consumer banking business (SLM BankCo).

Since Navient is the "accounting spinnor," the financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014, notwithstanding the legal form of the Spin-Off in which Navient common stock was distributed to the stockholders of SLM BankCo.

The following table shows the condensed balance sheet of SLM BankCo that the financial statements of Navient reflect as a shareholder distribution on April 30, 2014:

| (Dollars in millions) | | April 30, 2014 |
|---|---|---|
| **Assets** | | |
| FFELP Loans, net | $ | 1,380 |
| Private Education Loans, net | | 7,204 |
| Investments | | 139 |
| Cash and cash equivalents | | 2,170 |
| Other assets | | 883 |
| Total assets | $ | 11,776 |
| **Liabilities** | | |
| Short-term borrowings | $ | 6,491 |
| Long-term borrowings | | 2,750 |
| Other liabilities | | 825 |
| Total liabilities | | 10,066 |
| **Equity** | | |
| Preferred stock | | |
| Series A | | 165 |
| Series B | | 400 |
| Common equity | | 1,145 |
| Total equity(1) | | 1,710 |
| Total liabilities and equity | $ | 11,776 |

(1)   In addition to the $1,710 million of consumer banking business net assets distributed, we also removed $41 million of goodwill from our balance sheet as required under Accounting Standards Codification ("ASC") 350, "Intangibles—Goodwill and Other," in connection with the distribution. This goodwill was allocated to the consumer banking business based on relative fair value. This total of $1,751 million is the amount that appears on our consolidated statement of changes in stockholders' equity in connection with the deemed distribution of the consumer banking business.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.  Significant Accounting Policies**

*Basis of Presentation*

The accompanying unaudited, consolidated financial statements of Navient have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements. The consolidated financial statements include the accounts of Navient and its majority-owned and controlled subsidiaries and those Variable Interest Entities ("VIEs") for which we are the primary beneficiary, after eliminating the effects of intercompany accounts and transactions. In the opinion of management, all adjustments considered necessary for a fair statement of the results for the interim periods have been included. The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates. Operating results for the three and six month periods ended June 30, 2014 are not necessarily indicative of the results for the year ending December 31, 2014 or for any other period. These unaudited financial statements should be read in conjunction with the audited financial statements and related notes included in our Form 10. Definitions for certain capitalized terms used but not otherwise defined in this Quarterly Report on Form 10-Q can be found in our Form 10.

*Consolidation*

In the first six months of 2013, we sold Residual Interests in FFELP Loan securitization trusts to third parties. We continue to service the student loans in the trust under existing agreements. Prior to the sale of the Residual Interests, we had consolidated the trusts as VIEs because we had met the two criteria for consolidation. We had determined we were the primary beneficiary because (1) as servicer to the trust we had the power to direct the activities of the VIE that most significantly affected its economic performance and (2) as the residual holder of the trust, we had an obligation to absorb losses or receive benefits of the trust that could potentially be significant. Upon the sale of the Residual Interests, we are no longer the residual holder, thus we determined we no longer met criterion (2) above and deconsolidated the trusts. As a result of these transactions, we removed securitization trust assets of $12.5 billion and the related liabilities of $12.1 billion from the balance sheet and recorded a $312 million gain as part of "gains on sales of loans and investments" for the six months ended June 30, 2013.

*Goodwill*

We account for goodwill in accordance with the applicable accounting guidance. Under this guidance, goodwill is not amortized but is tested periodically for impairment. We test goodwill for impairment annually as of October 1 at the reporting unit level, which is the same as or one level below a business segment. Goodwill is also tested at interim periods if an event occurs or circumstances change that would indicate the carrying amount may be impaired.

As a result of the separation of Navient from SLM BankCo, we assessed relevant qualitative factors impacting the reporting units that have goodwill, including the FFELP Loans, Private Education Loans, Servicing and Asset Recovery reporting units, to determine whether it is "more-likely-than-not" that the fair values of the individual reporting units, after taking into account the distribution of the consumer banking business, are less than their individual carrying values. The "more-likely-than-not" threshold is defined in the guidance as having a likelihood of more than 50 percent. Based on this qualitative assessment, we determined that it is "more-likely-than-not" that the fair values of the FFELP Loans, Private Education Loans, Servicing and Asset Recovery reporting units exceed their carrying values. Accordingly, no further impairment assessment is warranted in accordance with the applicable guidance.

9

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2.   Significant Accounting Policies (Continued)**

*Reclassifications*

Certain reclassifications have been made to the balances as of and for the three and six months ended June 30, 2013 to be consistent with classifications adopted for 2014, and had no effect on net income, total assets, or total liabilities.

*Recently Issued Accounting Pronouncements*

*Revenue Recognition*

On May 28, 2014, the Financial Accounting Standards Board issued Accounting Standards Update ("ASU") No. 2014-09, "Revenue from Contracts with Customers," which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The ASU will replace most existing revenue recognition guidance in GAAP when it becomes effective. The new standard is effective for the Company on January 1, 2017. Early application is not permitted. The standard permits the use of either the retrospective or cumulative effect transition method. We are evaluating the effect that ASU 2014-09 will have on our consolidated financial statements and related disclosures. We have not yet determined the effect of the standard on our ongoing financial reporting but do not expect it to be material.

**3.   Allowance for Loan Losses**

The financial statements of Navient reflect the deemed distribution of SLM BankCo on April 30, 2014. See the table in "Note 1 — The Separation" which shows the related asset and liabilities that were deemed to be distributed. As a result of the deemed distribution, all disclosures in this footnote as of a date prior to April 30, 2014 include SLM BankCo's FFELP and Private Education Loans, whereas the disclosures as of June 30, 2014 do not contain SLM BankCo's FFELP and Private Education Loans.

Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios. The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be susceptible to significant changes. We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios. We segregate our Private Education Loan portfolio into two classes of loans — traditional and non-traditional. Non-traditional loans are loans to (i) customers attending for-profit schools with an original Fair Isaac and Company ("FICO") score of less than 670 and (ii) customers attending not-for-profit schools with an original FICO score of less than 640. The FICO score used in determining whether a loan is non-traditional is the greater of the customer or cosigner FICO score at origination. Traditional loans are defined as all other Private Education Loans that are not classified as non-traditional.

10

Table of Contents

**NAVIENT CORPORATION**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**3.    Allowance for Loan Losses (Continued)**

*Allowance for Loan Losses Metrics*

| (Dollars in millions) | | Three Months Ended June 30, 2014 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | FFELP Loans | | Private Education Loans | | Other Loans | | Total | |
| **Allowance for Loan Losses** | | | | | | | | |
| Beginning balance | $ | 107 | $ | 2,059 | $ | 27 | $ | 2,193 |
| Total provision | | 10 | | 155 | | — | | 165 |
| Charge-offs[1] | | (15) | | (166) | | (1) | | (182) |
| Reclassification of interest reserve[2] | | — | | 4 | | — | | 4 |
| Distribution of SLM BankCo | | (6) | | (69) | | — | | (75) |
| Ending balance | $ | 96 | $ | 1,983 | $ | 26 | $ | 2,105 |
| *Allowance:* | | | | | | | | |
| Ending balance: individually evaluated for impairment | $ | — | $ | 1,063 | $ | 20 | $ | 1,083 |
| Ending balance: collectively evaluated for impairment | $ | 96 | $ | 920 | $ | 6 | $ | 1,022 |
| *Loans:* | | | | | | | | |
| Ending balance: individually evaluated for impairment[3] | $ | — | $ | 10,015 | $ | 43 | $ | 10,058 |
| Ending balance: collectively evaluated for impairment[3] | $ | 98,837 | $ | 22,966 | $ | 74 | $ | 121,877 |
| Charge-offs as a percentage of average loans in repayment (annualized) | | .08% | | 2.33% | | 3.73% | | |
| Allowance as a percentage of the ending total loan balance | | .10% | | 6.01% | | 21.91% | | |
| Allowance as a percentage of the ending loans in repayment | | .13% | | 7.31% | | 21.91% | | |
| Allowance coverage of charge-offs (annualized) | | 1.6 | | 3.0 | | 5.7 | | |
| Ending total loans[3] | $ | 98,837 | $ | 32,981 | $ | 117 | | |
| Average loans in repayment | $ | 72,621 | $ | 28,599 | $ | 119 | | |
| Ending loans in repayment | $ | 72,114 | $ | 27,136 | $ | 117 | | |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be recovered and any shortfalls in what was actually recovered in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

11

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

| | | Three Months Ended June 30, 2013 | | |
|---|---|---|---|---|
| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $     147 | $     2,170 | $     42 | $     2,359 |
| Total provision | 14 | 187 | — | 201 |
| Charge-offs[1] | (20) | (212) | (7) | (239) |
| Student loan sales | (8) | — | — | (8) |
| Reclassification of interest reserve[2] | — | 4 | — | 4 |
| Ending balance | $     133 | $     2,149 | $     35 | $     2,317 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $     — | $     1,181 | $     26 | $     1,207 |
| Ending balance: collectively evaluated for impairment | $     133 | $     968 | $     9 | $     1,110 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment[3] | $     — | $     8,416 | $     57 | $     8,473 |
| Ending balance: collectively evaluated for impairment[3] | $     107,538 | $     31,601 | $     96 | $139,235 |
| Charge-offs as a percentage of average loans in repayment (annualized) | .10% | 2.69% | 17.57% | |
| Allowance as a percentage of the ending total loan balance | .12% | 5.37% | 22.93% | |
| Allowance as a percentage of the ending loans in repayment | .17% | 6.80% | 22.93% | |
| Allowance coverage of charge-offs (annualized) | 1.7 | 2.5 | 1.2 | |
| Ending total loans[3] | $     107,538 | $     40,017 | $     153 | |
| Average loans in repayment | $     81,423 | $     31,618 | $     161 | |
| Ending loans in repayment | $     77,063 | $     31,627 | $     153 | |

[1]   Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be recovered and any shortfalls in what was actually recovered in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]   Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]   Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

3.  **Allowance for Loan Losses (Continued)**

| (Dollars in millions) | FFELP Loans | Private Education Loans | Other Loans | Total |
|---|---|---|---|---|
| | | Six Months Ended June 30, 2014 | | |
| **Allowance for Loan Losses** | | | | |
| Beginning balance | $ 119 | $ 2,097 | $ 28 | $ 2,244 |
| Total provision | 20 | 330 | — | 350 |
| Charge-offs[1] | (37) | (385) | (2) | (424) |
| Reclassification of interest reserve[2] | — | 10 | — | 10 |
| Distribution of SLM BankCo | (6) | (69) | — | (75) |
| Ending balance | $ 96 | $ 1,983 | $ 26 | $ 2,105 |
| *Allowance:* | | | | |
| Ending balance: individually evaluated for impairment | $ — | $ 1,063 | $ 20 | $ 1,083 |
| Ending balance: collectively evaluated for impairment | $ 96 | $ 920 | $ 6 | $ 1,022 |
| *Loans:* | | | | |
| Ending balance: individually evaluated for impairment[3] | $ — | $ 10,015 | $ 43 | $ 10,058 |
| Ending balance: collectively evaluated for impairment[3] | $ 98,837 | $ 22,966 | $ 74 | $121,877 |
| Charge-offs as a percentage of average loans in repayment (annualized) | .10% | 2.59% | 3.67% | |
| Allowance as a percentage of the ending total loan balance | .10% | 6.01% | 21.91% | |
| Allowance as a percentage of the ending loans in repayment | .13% | 7.31% | 21.91% | |
| Allowance coverage of charge-offs (annualized) | 1.3 | 2.6 | 5.7 | |
| Ending total loans[3] | $ 98,837 | $ 32,981 | $ 117 | |
| Average loans in repayment | $ 73,056 | $ 29,999 | $ 123 | |
| Ending loans in repayment | $ 72,114 | $ 27,136 | $ 117 | |

[1]   Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be recovered and any shortfalls in what was actually recovered in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2]   Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3]   Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

13

Table of Contents

**NAVIENT CORPORATION**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

3.   **Allowance for Loan Losses (Continued)**

| (Dollars in millions) | | FFELP Loans | | Private Education Loans | | Other Loans | | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | **Six Months Ended June 30, 2013** | | | | |
| **Allowance for Loan Losses** | | | | | | | | |
| Beginning balance | $ | 159 | $ | 2,171 | $ | 47 | $ | 2,377 |
|    Total provision | | 30 | | 412 | | — | | 442 |
|    Charge-offs[1] | | (42) | | (444) | | (12) | | (498) |
|    Student loan sales | | (14) | | — | | — | | (14) |
|    Reclassification of interest reserve[2] | | — | | 10 | | — | | 10 |
| Ending balance | $ | 133 | $ | 2,149 | $ | 35 | $ | 2,317 |
| *Allowance:* | | | | | | | | |
| Ending balance: individually evaluated for impairment | $ | — | $ | 1,181 | $ | 26 | $ | 1,207 |
| Ending balance: collectively evaluated for impairment | $ | 133 | $ | 968 | $ | 9 | $ | 1,110 |
| *Loans:* | | | | | | | | |
| Ending balance: individually evaluated for impairment[3] | $ | — | $ | 8,416 | $ | 57 | $ | 8,473 |
| Ending balance: collectively evaluated for impairment[3] | $ | 107,538 | $ | 31,601 | $ | 96 | | $139,235 |
| Charge-offs as a percentage of average loans in repayment (annualized) | | .10% | | 2.83% | | 14.11% | | |
| Allowance as a percentage of the ending total loan balance | | .12% | | 5.37% | | 22.93% | | |
| Allowance as a percentage of the ending loans in repayment | | .17% | | 6.80% | | 22.93% | | |
| Allowance coverage of charge-offs (annualized) | | 1.6 | | 2.4 | | 1.5 | | |
| Ending total loans[3] | $ | 107,538 | $ | 40,017 | $ | 153 | | |
| Average loans in repayment | $ | 84,323 | $ | 31,631 | $ | 170 | | |
| Ending loans in repayment | $ | 77,063 | $ | 31,627 | $ | 153 | | |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be recovered and any shortfalls in what was actually recovered in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Ending total loans for Private Education Loans includes the receivable for partially charged-off loans.

14

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

*Key Credit Quality Indicators*

FFELP Loans are substantially insured and guaranteed as to their principal and accrued interest in the event of default; therefore, the key credit quality indicator for this portfolio is loan status. The impact of changes in loan status is incorporated quarterly into the allowance for loan losses calculation.

For Private Education Loans, the key credit quality indicators are school type, FICO scores, the existence of a cosigner, the loan status and loan seasoning. The school type/FICO score are assessed at origination and maintained through the traditional/non-traditional loan designation. The other Private Education Loan key quality indicators can change and are incorporated quarterly into the allowance for loan losses calculation. The following table highlights the principal balance (excluding the receivable for partially charged-off loans) of our Private Education Loan portfolio stratified by the key credit quality indicators.

| | Private Education Loans Credit Quality Indicators | | | |
| | June 30, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance[3] | % of Balance | Balance[3] | % of Balance |
|---|---|---|---|---|
| **Credit Quality Indicators** | | | | |
| School Type/FICO Scores: | | | | |
| Traditional | $29,042 | 92% | $36,140 | 93% |
| Non-Traditional[1] | 2,670 | 8 | 2,860 | 7 |
| Total | $31,712 | 100% | $39,000 | 100% |
| Cosigners: | | | | |
| With cosigner | $20,133 | 64% | $26,321 | 67% |
| Without cosigner | 11,579 | 36 | 12,679 | 33 |
| Total | $31,712 | 100% | $39,000 | 100% |
| Seasoning[2]: | | | | |
| 1-12 payments | $ 3,012 | 9% | $ 5,171 | 14% |
| 13-24 payments | 4,082 | 13 | 5,511 | 14 |
| 25-36 payments | 4,576 | 14 | 5,506 | 14 |
| 37-48 payments | 4,640 | 15 | 5,103 | 13 |
| More than 48 payments | 12,027 | 38 | 11,181 | 29 |
| Not yet in repayment | 3,375 | 11 | 6,528 | 16 |
| Total | $31,712 | 100% | $39,000 | 100% |

[1]   Defined as loans to customers attending for-profit schools (with a FICO score of less than 670 at origination) and customers attending not-for-profit schools (with a FICO score of less than 640 at origination).

[2]   Number of months in active repayment for which a scheduled payment was due.

[3]   Balance represents gross Private Education Loans.

15

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

The following tables provide information regarding the loan status and aging of past due loans.

| | FFELP Loan Delinquencies | | | | |
|---|---|---|---|---|---|
| | June 30, 2014 | | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | | Balance | % |
| Loans in-school/grace/deferment[1] | $ 11,794 | | | $ 13,678 | |
| Loans in forbearance[2] | 14,929 | | | 13,490 | |
| Loans in repayment and percentage of each status: | | | | | |
| Loans current | 61,438 | 85.2% | | 63,330 | 82.8% |
| Loans delinquent 31-60 days[3] | 3,531 | 4.9 | | 3,746 | 4.9 |
| Loans delinquent 61-90 days[3] | 2,112 | 2.9 | | 2,207 | 2.9 |
| Loans delinquent greater than 90 days[3] | 5,033 | 7.0 | | 7,221 | 9.4 |
| Total FFELP Loans in repayment | 72,114 | 100% | | 76,504 | 100% |
| Total FFELP Loans, gross | 98,837 | | | 103,672 | |
| FFELP Loan unamortized premium | 989 | | | 1,035 | |
| Total FFELP Loans | 99,826 | | | 104,707 | |
| FFELP Loan allowance for losses | (96) | | | (119) | |
| FFELP Loans, net | $ 99,730 | | | $ 104,588 | |
| Percentage of FFELP Loans in repayment | | 73.0% | | | 73.8% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 14.8% | | | 17.2% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 17.2% | | | 15.0% |

[1]   Loans for customers who may still be attending school or engaging in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested and qualify for other permitted program deferments such as military, unemployment, or economic hardships.

[2]   Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making full payments due to hardship or other factors.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

16

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.    Allowance for Loan Losses (Continued)**

| | Private Education Traditional Loan Delinquencies | | | |
|---|---|---|---|---|
| | June 30, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $    3,036 | | $    6,088 | |
| Loans in forbearance[2] | 1,059 | | 969 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 23,367 | 93.7% | 26,977 | 92.8% |
| Loans delinquent 31-60 days[3] | 561 | 2.2 | 674 | 2.3 |
| Loans delinquent 61-90 days[3] | 322 | 1.3 | 420 | 1.4 |
| Loans delinquent greater than 90 days[3] | 697 | 2.8 | 1,012 | 3.5 |
| Total traditional loans in repayment | 24,947 | 100% | 29,083 | 100% |
| Total traditional loans, gross | 29,042 | | 36,140 | |
| Traditional loans unamortized discount | (605) | | (629) | |
| Total traditional loans | 28,437 | | 35,511 | |
| Traditional loans receivable for partially charged-off loans | 782 | | 799 | |
| Traditional loans allowance for losses | (1,546) | | (1,592) | |
| Traditional loans, net | $    27,673 | | $    34,718 | |
| Percentage of traditional loans in repayment | | 85.9% | | 80.5% |
| Delinquencies as a percentage of traditional loans in repayment | | 6.3% | | 7.2% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 4.1% | | 3.2% |

[1] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

17

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

| | Private Education Non-Traditional Loan Delinquencies | | | |
|---|---|---|---|---|
| | June 30, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $    339 | | $    440 | |
| Loans in forbearance[2] | 142 | | 133 | |
| Loans in repayment and percentage of each status: | | | | |
|    Loans current | 1,835 | 83.8% | 1,791 | 78.3% |
|    Loans delinquent 31-60 days[3] | 109 | 5.0 | 128 | 5.6 |
|    Loans delinquent 61-90 days[3] | 69 | 3.2 | 93 | 4.1 |
|    Loans delinquent greater than 90 days[3] | 176 | 8.0 | 275 | 12.0 |
|    Total non-traditional loans in repayment | 2,189 | 100% | 2,287 | 100% |
| Total non-traditional loans, gross | 2,670 | | 2,860 | |
| Non-traditional loans unamortized discount | (69) | | (75) | |
| Total non-traditional loans | 2,601 | | 2,785 | |
| Non-traditional loans receivable for partially charged-off loans | 487 | | 514 | |
| Non-traditional loans allowance for losses | (437) | | (505) | |
| Non-traditional loans, net | $  2,651 | | $  2,794 | |
| Percentage of non-traditional loans in repayment | | 82.0% | | 80.0% |
| Delinquencies as a percentage of non-traditional loans in repayment | | 16.2% | | 21.7% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 6.1% | | 5.5% |

[1]   Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]   Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]   The period of delinquency is based on the number of days scheduled payments are contractually past due.

*Receivable for Partially Charged-Off Private Education Loans*

At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so. There was $402 million and

18

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

$217 million in the allowance for Private Education Loan losses at June 30, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans (see "Private Education Loans Segment — Private Education Loan Provision for Loan Losses" for a further discussion).

The following table summarizes the activity in the receivable for partially charged-off Private Education Loans.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Receivable at beginning of period | $1,297 | $1,339 | $1,313 | $1,347 |
| Expected future recoveries of current period defaults[1] | 53 | 70 | 124 | 148 |
| Recoveries[2] | (58) | (54) | (119) | (122) |
| Charge-offs[3] | (23) | (21) | (49) | (39) |
| Receivable at end of period | 1,269 | 1,334 | 1,269 | 1,334 |
| Allowance for estimated recovery shortfalls[4] | (402) | (217) | (402) | (217) |
| Net receivable at end of period | $   867 | $ 1,117 | $   867 | $1,117 |

[1]   Represents the difference between the loan balance and our estimate of the amount to be collected in the future.

[2]   Current period cash collections.

[3]   Represents the current period recovery shortfall — the difference between what was expected to be collected and what was actually collected. These amounts are included in the Private Education Loan total charge-offs as reported in the "Allowance for Loan Losses Metrics" tables.

[4]   The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $2.0 billion and $2.1 billion overall allowance for Private Education Loan losses as of June 30, 2014 and 2013, respectively.

*Troubled Debt Restructurings ("TDRs")*

We modify the terms of loans for certain customers when we believe such modifications may increase the ability and willingness of a customer to make payments and thus increase the ultimate overall amount collected on a loan. These modifications generally take the form of a forbearance, a temporary interest rate reduction or an extended repayment plan. For customers experiencing financial difficulty, certain Private Education Loans for which we have granted either a forbearance of greater than three months, an interest rate reduction or an extended repayment plan are classified as TDRs. Approximately 48 percent and 45 percent of the loans granted forbearance have qualified as a TDR loan at June 30, 2014 and December 31, 2013, respectively. The unpaid principal balance of TDR loans that were in an interest rate reduction plan as of June 30, 2014 and December 31, 2013 was $2.0 billion and $1.5 billion, respectively.

19

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

At June 30, 2014 and December 31, 2013, all of our TDR loans had a related allowance recorded. The following table provides the recorded investment, unpaid principal balance and related allowance for our TDR loans.

| (Dollars in millions) | TDR Loans | | |
| --- | --- | --- | --- |
| | Recorded Investment[1] | Unpaid Principal Balance | Related Allowance |
| **June 30, 2014** | | | |
| Private Education Loans — Traditional | $  8,187 | $ 8,249 | $   841 |
| Private Education Loans — Non-Traditional | 1,463 | 1,463 | 222 |
| Total | $  9,650 | $ 9,712 | $ 1,063 |
| **December 31, 2013** | | | |
| Private Education Loans — Traditional | $  7,515 | $ 7,559 | $   812 |
| Private Education Loans — Non-Traditional | 1,434 | 1,427 | 236 |
| Total | $  8,949 | $ 8,986 | $ 1,048 |

[1]   The recorded investment is equal to the unpaid principal balance and accrued interest receivable net of unamortized deferred fees and costs.

The following table provides the average recorded investment and interest income recognized for our TDR loans.

| (Dollars in millions) | Three Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| Private Education Loans — Traditional | $ 8,002 | $    122 | $ 6,556 | $    100 |
| Private Education Loans — Non-Traditional | 1,451 | 29 | 1,351 | 27 |
| Total | $ 9,453 | $    151 | $ 7,907 | $    127 |

| (Dollars in millions) | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| Private Education Loans — Traditional | $ 7,818 | $    240 | $ 6,371 | $    196 |
| Private Education Loans — Non-Traditional | 1,442 | 58 | 1,333 | 54 |
| Total | $ 9,260 | $    298 | $ 7,704 | $    250 |

20

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

The following table provides information regarding the loan status and aging of TDR loans that are past due.

|  | TDR Loan Delinquencies | | | |
|  | June 30, 2014 | | December 31, 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in deferment[1] | $ 851 | | $ 913 | |
| Loans in forbearance[2] | 846 | | 740 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 6,682 | 83.3% | 5,613 | 76.5% |
| Loans delinquent 31-60 days[3] | 432 | 5.4 | 469 | 6.4 |
| Loans delinquent 61-90 days[3] | 270 | 3.4 | 330 | 4.5 |
| Loans delinquent greater than 90 days[3] | 631 | 7.9 | 921 | 12.6 |
| Total TDR loans in repayment | 8,015 | 100% | 7,333 | 100% |
| Total TDR loans, gross | $9,712 | | $ 8,986 | |

[1]  Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2]  Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3]  The period of delinquency is based on the number of days scheduled payments are contractually past due.

The following table provides the amount of modified loans that resulted in a TDR in the periods presented. Additionally, the table summarizes charge-offs occurring in the TDR portfolio, as well as TDRs for which a payment default occurred in the current period within 12 months of the loan first being designated as a TDR. We define payment default as 60 days past due for this disclosure. The majority of our loans that are considered TDRs involve a temporary forbearance of payments and do not change the contractual interest rate of the loan.

|  | Three Months Ended June 30, | | | | | |
|  | 2014 | | | 2013 | | |
| (Dollars in millions) | Modified Loans[1] | Charge-Offs[2] | Payment Default | Modified Loans[1] | Charge-Offs[2] | Payment Default |
|---|---|---|---|---|---|---|
| Private Education Loans — Traditional | $ 533 | $ 74 | $ 102 | $ 491 | $ 84 | $ 159 |
| Private Education Loans — Non-Traditional | 59 | 23 | 23 | 75 | 31 | 45 |
| Total | $ 592 | $ 97 | $ 125 | $ 566 | $ 115 | $ 204 |

|  | Six Months Ended June 30, | | | | | |
|  | 2014 | | | 2013 | | |
| (Dollars in millions) | Modified Loans[1] | Charge-Offs[2] | Payment Default | Modified Loans[1] | Charge-Offs[2] | Payment Default |
|---|---|---|---|---|---|---|
| Private Education Loans — Traditional | $ 999 | $ 174 | $ 221 | $1,036 | $ 181 | $ 375 |
| Private Education Loans — Non-Traditional | 116 | 57 | 52 | 165 | 65 | 101 |
| Total | $1,115 | $ 231 | $ 273 | $1,201 | $ 246 | $ 476 |

[1]  Represents period ending balance of loans that have been modified during the period and resulted in a TDR.

[2]  Represents loans that charged off that were classified as TDRs.

21

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**3.   Allowance for Loan Losses (Continued)**

*Accrued Interest Receivable*

The following table provides information regarding accrued interest receivable on our Private Education Loans. The table also discloses the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest. The allowance for uncollectible interest exceeds the amount of accrued interest on our 90 days past due portfolio for all periods presented.

| | | Accrued Interest Receivable | |
| (Dollars in millions) | Total | Greater Than 90 Days Past Due | Allowance for Uncollectible Interest |
|---|---|---|---|
| **June 30, 2014** | | | |
| Private Education Loans — Traditional | $ 558 | $ 25 | $ 36 |
| Private Education Loans — Non-Traditional | 75 | 9 | 13 |
| Total | $ 633 | $ 34 | $ 49 |
| **December 31, 2013** | | | |
| Private Education Loans — Traditional | $ 926 | $ 35 | $ 46 |
| Private Education Loans — Non-Traditional | 97 | 13 | 20 |
| Total | $1,023 | $ 48 | $ 66 |

**4.   Borrowings**

The following table summarizes our borrowings.

| | June 30, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Short Term | Long Term | Total | Short Term | Long Term | Total |
| *Unsecured borrowings:* | | | | | | |
| Senior unsecured debt | $1,189 | $ 16,311 | $ 17,500 | $ 2,213 | $ 16,056 | $ 18,269 |
| Bank deposits | — | — | — | 6,133 | 2,807 | 8,940 |
| Other[1] | 912 | — | 912 | 691 | — | 691 |
| Total unsecured borrowings | 2,101 | 16,311 | 18,412 | 9,037 | 18,863 | 27,900 |
| *Secured borrowings:* | | | | | | |
| FFELP Loan securitizations | — | 89,036 | 89,036 | — | 90,756 | 90,756 |
| Private Education Loan securitizations | — | 18,190 | 18,190 | — | 18,835 | 18,835 |
| FFELP Loan — other facilities | 2,190 | 5,573 | 7,763 | 4,715 | 5,311 | 10,026 |
| Private Education Loan — other facilities | — | 565 | 565 | — | 843 | 843 |
| Total secured borrowings | 2,190 | 113,364 | 115,554 | 4,715 | 115,745 | 120,460 |
| Total before hedge accounting adjustments | 4,291 | 129,675 | 133,966 | 13,752 | 134,608 | 148,360 |
| Hedge accounting adjustments | 25 | 2,244 | 2,269 | 43 | 2,040 | 2,083 |
| Total | $4,316 | $131,919 | $136,235 | $13,795 | $136,648 | $150,443 |

[1]   "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

22

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4.  Borrowings (Continued)**

*Variable Interest Entities*

We consolidated the following financing VIEs as of June 30, 2014 and December 31, 2013, as we are the primary beneficiary. As a result, these VIEs are accounted for as secured borrowings.

| | | | | June 30, 2014 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total | |
| **Secured Borrowings — VIEs:** | | | | | | | | |
| FFELP Loan securitizations | $  — | $  89,036 | $  89,036 | $  89,746 | $2,959 | $   711 | $  93,416 | |
| Private Education Loan securitizations | — | 18,190 | 18,190 | 22,955 | 329 | 409 | 23,693 | |
| FFELP Loans — other facilities | — | 5,573 | 5,573 | 5,858 | 92 | 75 | 6,025 | |
| Private Education Loans — other facilities | — | 565 | 565 | 1,243 | 14 | 23 | 1,280 | |
| Total before hedge accounting adjustments | — | 113,364 | 113,364 | 119,802 | 3,394 | 1,218 | 124,414 | |
| Hedge accounting adjustments | — | 1,347 | 1,347 | — | — | 966 | 966 | |
| Total | $  — | $114,711 | $114,711 | $119,802 | $3,394 | $  2,184 | $ 125,380 | |

| | | | | December 31, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Debt Outstanding | | | Carrying Amount of Assets Securing Debt Outstanding | | | |
| (Dollars in millions) | Short Term | Long Term | Total | Loans | Cash | Other Assets | Total | |
| **Secured Borrowings — VIEs:** | | | | | | | | |
| FFELP Loan securitizations | $  — | $  90,756 | $  90,756 | $  91,535 | $2,913 | $   683 | $  95,131 | |
| Private Education Loan securitizations | — | 18,835 | 18,835 | 23,947 | 338 | 540 | 24,825 | |
| FFELP Loans — other facilities | 3,655 | 3,791 | 7,446 | 7,719 | 128 | 91 | 7,938 | |
| Private Education Loans — other facilities | — | 843 | 843 | 1,583 | 16 | 30 | 1,629 | |
| Total before hedge accounting adjustments | 3,655 | 114,225 | 117,880 | 124,784 | 3,395 | 1,344 | 129,523 | |
| Hedge accounting adjustments | — | 1,313 | 1,313 | — | — | 978 | 978 | |
| Total | $3,655 | $115,538 | $119,193 | $124,784 | $3,395 | $  2,322 | $ 130,501 | |

**5.  Derivative Financial Instruments**

Our risk management strategy and use of and accounting for derivatives have not materially changed from that discussed in our Form 10. Please refer to "Note 7 — Derivative Financial Instruments" in our Form 10 for a full discussion.

23

**Table of Contents**

**NAVIENT CORPORATION**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**5.  Derivative Financial Instruments (Continued)**

*Summary of Derivative Financial Statement Impact*

The following tables summarize the fair values and notional amounts of all derivative instruments at June 30, 2014 and December 31, 2013, and their impact on other comprehensive income and earnings for the three and six months ended June 30, 2014 and 2013.

*Impact of Derivatives on Consolidated Balance Sheet*

| (Dollars in millions) | Hedged Risk Exposure | Cash Flow | | Fair Value | | Trading | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 |
| **Fair Values**[1] | | | | | | | | | |
| *Derivative Assets:* | | | | | | | | | |
| Interest rate swaps | Interest rate | $  — | $  24 | $  813 | $  738 | $  50 | $  61 | $  863 | $  823 |
| Cross-currency interest rate swaps | Foreign currency & interest rate | — | — | 1,072 | 1,185 | — | — | 1,072 | 1,185 |
| Other[2] | Interest rate | — | — | — | — | 1 | 2 | 1 | 2 |
| Total derivative assets[3] | | — | 24 | 1,885 | 1,923 | 51 | 63 | 1,936 | 2,010 |
| *Derivative Liabilities:* | | | | | | | | | |
| Interest rate swaps | Interest rate | — | — | (53) | (149) | (149) | (215) | (202) | (364) |
| Floor Income Contracts | Interest rate | — | — | — | — | (1,077) | (1,384) | (1,077) | (1,384) |
| Cross-currency interest rate swaps | Foreign currency & interest rate | — | — | (33) | (155) | (17) | (31) | (50) | (186) |
| Other[2] | Interest rate | — | — | — | — | (7) | (23) | (7) | (23) |
| Total derivative liabilities[3] | | — | — | (86) | (304) | (1,250) | (1,653) | (1,336) | (1,957) |
| Net total derivatives | | $  — | $  24 | $1,799 | $1,619 | $(1,199) | $(1,590) | $  600 | $  53 |

[1] Fair values reported are exclusive of collateral held and pledged and accrued interest. Assets and liabilities are presented without consideration of master netting agreements. Derivatives are carried on the balance sheet based on net position by counterparty under master netting agreements, and classified in other assets or other liabilities depending on whether in a net positive or negative position.

[2] "Other" includes embedded derivatives bifurcated from securitization debt as well as derivatives related to our Total Return Swap Facility and back-to-back private credit floors.

[3] The following table reconciles gross positions without the impact of master netting agreements to the balance sheet classification:

| (Dollar in millions) | Other Assets | | Other Liabilities | |
|---|---|---|---|---|
| | June 30, 2014 | December 31, 2013 | June 30, 2014 | December 31, 2013 |
| Gross position | $  1,936 | $  2,010 | $ (1,336) | $  (1,957) |
| Impact of master netting agreements | (284) | (386) | 284 | 386 |
| Derivative values with impact of master netting agreements (as carried on balance sheet) | 1,652 | 1,624 | (1,052) | (1,571) |
| Cash collateral (held) pledged | (912) | (687) | 646 | 777 |
| Net position | $  740 | $  937 | $  (406) | $  (794) |

The above fair values include adjustments for counterparty credit risk both for when we are exposed to the counterparty, net of collateral postings, and when the counterparty is exposed to us, net of collateral postings.

24

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Derivative Financial Instruments (Continued)**

The net adjustments decreased the overall net asset positions at June 30, 2014 and December 31, 2013 by $75 million and $91 million, respectively. In addition, the above fair values reflect adjustments for illiquid derivatives as indicated by a wide bid/ask spread in the interest rate indices to which the derivatives are indexed. These adjustments decreased the overall net asset positions at June 30, 2014 and December 31, 2013 by $77 million and $84 million, respectively.

| (Dollars in billions) | Cash Flow | | Fair Value | | Trading | | Total | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 | June 30, 2014 | Dec. 31, 2013 |
| **Notional Values:** | | | | | | | | |
| Interest rate swaps | $  — | $  0.7 | $ 14.6 | $ 16.0 | $ 44.1 | $ 46.3 | $ 58.7 | $ 63.0 |
| Floor Income Contracts | — | — | — | — | 27.2 | 31.8 | 27.2 | 31.8 |
| Cross-currency interest rate swaps | — | — | 9.6 | 11.1 | 0.4 | 0.3 | 10.0 | 11.4 |
| Other[1] | — | — | — | — | 4.0 | 3.9 | 4.0 | 3.9 |
| Total derivatives | $  — | $  0.7 | $ 24.2 | $ 27.1 | $ 75.7 | $ 82.3 | $ 99.9 | $110.1 |

[1]   "Other" includes embedded derivatives bifurcated from securitization debt, as well as derivatives related to our Total Return Swap Facility and back-to-back private credit floors.

*Impact of Derivatives on Consolidated Statements of Income*

| (Dollars in millions) | Three Months Ended June 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Unrealized Gain (Loss) on Derivatives[1][2] | | Realized Gain (Loss) on Derivatives[3] | | Unrealized Gain (Loss) on Hedged Item[1] | | Total Gain (Loss) | |
| | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| **Fair Value Hedges:** | | | | | | | | |
| Interest rate swaps | $112 | $(404) | $  99 | $ 104 | $(112) | $443 | $  99 | $143 |
| Cross-currency interest rate swaps | 63 | 34 | 16 | 26 | (17) | (80) | 62 | (20) |
| Total fair value derivatives | 175 | (370) | 115 | 130 | (129) | 363 | 161 | 123 |
| **Cash Flow Hedges:** | | | | | | | | |
| Interest rate swaps | — | — | (1) | (2) | — | — | (1) | (2) |
| Total cash flow derivatives | — | — | (1) | (2) | — | — | (1) | (2) |
| **Trading:** | | | | | | | | |
| Interest rate swaps | 34 | (58) | 12 | 14 | — | — | 46 | (44) |
| Floor Income Contracts | 132 | 297 | (166) | (198) | — | — | (34) | 99 |
| Cross-currency interest rate swaps | 7 | (32) | (1) | 10 | — | — | 6 | (22) |
| Other | (3) | (8) | — | — | — | — | (3) | (8) |
| Total trading derivatives | 170 | 199 | (155) | (174) | — | — | 15 | 25 |
| Total | 345 | (171) | (41) | (46) | (129) | 363 | 175 | 146 |
| Less: realized gains (losses) recorded in interest expense | — | — | 114 | 128 | — | — | 114 | 128 |
| Gains (losses) on derivative and hedging activities, net | $345 | $(171) | $(155) | $(174) | $(129) | $363 | $  61 | $  18 |

[1]   Recorded in "Gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

[2]   Represents ineffectiveness related to cash flow hedges.

[3]   For fair value and cash flow hedges, recorded in interest expense. For trading derivatives, recorded in "Gains (losses) on derivative and hedging activities, net."

25

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.  Derivative Financial Instruments (Continued)**

| | Six Months Ended June 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Unrealized Gain (Loss) on Derivatives[1][2] | | Realized Gain (Loss) on Derivatives[3] | | Unrealized Gain (Loss) on Hedged Item[1] | | Total Gain (Loss) | |
| (Dollars in millions) | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| **Fair Value Hedges:** | | | | | | | | |
| Interest rate swaps | $166 | $ (576) | $ 199 | $ 214 | $(165) | $ 638 | $200 | $276 |
| Cross-currency interest rate swaps | 9 | (522) | 38 | 46 | (9) | 473 | 38 | (3) |
| Total fair value derivatives | 175 | (1,098) | 237 | 260 | (174) | 1,111 | 238 | 273 |
| **Cash Flow Hedges:** | | | | | | | | |
| Interest rate swaps | — | — | (3) | (5) | — | — | (3) | (5) |
| Total cash flow derivatives | — | — | (3) | (5) | — | — | (3) | (5) |
| **Trading:** | | | | | | | | |
| Interest rate swaps | 53 | (77) | 23 | 37 | — | — | 76 | (40) |
| Floor Income Contracts | 313 | 486 | (365) | (411) | — | — | (52) | 75 |
| Cross-currency interest rate swaps | 14 | (79) | (1) | 31 | — | — | 13 | (48) |
| Other | 16 | (13) | (1) | — | — | — | 15 | (13) |
| Total trading derivatives | 396 | 317 | (344) | (343) | — | — | 52 | (26) |
| Total | 571 | (781) | (110) | (88) | (174) | 1,111 | 287 | 242 |
| Less: realized gains (losses) recorded in interest expense | — | — | 234 | 255 | — | — | 234 | 255 |
| Gains (losses) on derivative and hedging activities, net | $571 | $ (781) | $(344) | $(343) | $(174) | $1,111 | $ 53 | $(13) |

[1]  Recorded in "Gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

[2]  Represents ineffectiveness related to cash flow hedges.

[3]  For fair value and cash flow hedges, recorded in interest expense. For trading derivatives, recorded in "Gains (losses) on derivative and hedging activities, net."

26

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5.   Derivative Financial Instruments (Continued)**

*Collateral*

Collateral held and pledged related to derivative exposures between us and our derivative counterparties are detailed in the following table:

| (Dollars in millions) | June 30, 2014 | December 31, 2013 |
|---|---|---|
| **Collateral held:** | | |
| Cash (obligation to return cash collateral is recorded in short-term borrowings)[1] | $  912 | $  687 |
| Securities at fair value — on-balance sheet securitization derivatives (not recorded in financial statements)[2] | 502 | 629 |
| Total collateral held | $1,414 | $  1,316 |
| Derivative asset at fair value including accrued interest | $1,951 | $  1,878 |
| **Collateral pledged to others:** | | |
| Cash (right to receive return of cash collateral is recorded in investments) | $  646 | $  777 |
| Total collateral pledged | $  646 | $  777 |
| Derivative liability at fair value including accrued interest and premium receivable | $  670 | $  948 |

[1]  At June 30, 2014 and December 31, 2013, $62 million and $0 million, respectively, were held in restricted cash accounts.

[2]  The trusts do not have the ability to sell or re-pledge securities they hold as collateral.

Our corporate derivatives contain credit contingent features. At our current unsecured credit rating, we have fully collateralized our corporate derivative liability position (including accrued interest and net of premiums receivable) of $563 million with our counterparties. Further downgrades would not result in any additional collateral requirements, except to increase the frequency of collateral calls. Two counterparties have the right to terminate the contracts based on our current unsecured credit rating. We currently have a liability position with these derivative counterparties (including accrued interest and net of premiums receivable) of $120 million and have posted $118 million of collateral to these counterparties. If these two counterparties exercised their right to terminate, we would be required to deliver additional assets of $2 million to settle the contracts. Trust related derivatives do not contain credit contingent features related to our or the trusts' credit ratings.

**6.   Other Assets**

The following table provides the detail of our other assets.

| | June 30, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| (Dollars in millions) | Ending Balance | % of Balance | Ending Balance | % of Balance |
| Accrued interest receivable, net | $1,683 | 25% | $2,161 | 30% |
| Derivatives at fair value | 1,652 | 25 | 1,624 | 22 |
| Income tax asset, net current and deferred | 1,493 | 23 | 1,299 | 18 |
| Accounts receivable | 654 | 10 | 881 | 12 |
| Benefit and insurance-related investments | 483 | 7 | 477 | 7 |
| Fixed assets, net | 159 | 2 | 237 | 3 |
| Other loans, net | 91 | 1 | 101 | 1 |
| Other | 427 | 7 | 507 | 7 |
| Total | $6,642 | 100% | $7,287 | 100% |

27

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7.   Stockholders' Equity**

The following table summarizes common share repurchases and issuances by Navient and Old SLM.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Common shares repurchased[(1)] | 3,862,214 | 9,096,144 | 12,230,514 | 19,316,948 |
| Average purchase price per share[(2)] | $ 16.81 | $ 22.12 | $ 21.65 | $ 20.72 |
| Shares repurchased related to employee stock-based compensation plans[(3)] | 1,270,458 | 3,040,788 | 3,385,928 | 5,365,363 |
| Average purchase price per share | $ 17.75 | $ 22.35 | $ 21.38 | $ 20.51 |
| Common shares issued[(4)] | 1,867,844 | 4,115,424 | 6,106,026 | 8,273,219 |

[(1)]   Common shares purchased under board approved share repurchase programs. In May 2014, Navient authorized $400 million to be utilized in a new common share repurchase program, of which $335 million remained available as of June 30, 2014.

[(2)]   Average purchase price per share includes purchase commission costs.

[(3)]   Comprises shares withheld from stock option exercises and vesting of restricted stock for employees' tax withholding obligations and shares tendered by employees to satisfy option exercise costs.

[(4)]   Common shares issued under our various compensation and benefit plans.

The closing price of our common stock on June 30, 2014 was $17.71.

In April 2014, in connection with the Spin-Off, Old SLM retired 127 million shares of common stock held in treasury. This retirement decreased the balance in treasury stock by $2.3 billion, with corresponding decreases of $25 million in common stock and $2.3 billion in additional paid-in capital. There was no impact to total equity from this retirement.

The par value of Navient common stock is $0.01 per share, while the par value of the common stock of Old SLM, our accounting predecessor, was $0.20 per share.

***Dividend and Share Repurchase Program***

In June 2014, we paid a common stock dividend of $0.15 per share.

In May 2014, we authorized $400 million to be utilized in a new common share repurchase program that does not have an expiration date. We repurchased 3.9 million shares of common stock for $65 million in the second quarter of 2014.

28

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8.   Earnings per Common Share**

Basic earnings per common share ("EPS") are calculated using the weighted average number of shares of common stock outstanding during each period. A reconciliation of the numerators and denominators of the basic and diluted EPS calculations follows.

| (In millions, except per share data) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **Numerator:** | | | | |
| Net income attributable to Navient Corporation | $ 307 | $ 543 | $ 526 | $ 889 |
| Preferred stock dividends | 2 | 5 | 6 | 10 |
| Net income attributable to Navient Corporation common stock | $ 305 | $ 538 | $ 520 | $ 879 |
| **Denominator:** | | | | |
| Weighted average shares used to compute basic EPS | 422 | 440 | 424 | 445 |
| Effect of dilutive securities: | | | | |
| Dilutive effect of stock options, non-vested restricted stock, restricted stock units and Employee Stock Purchase Plans ("ESPPs")[1] | 8 | 8 | 8 | 8 |
| Dilutive potential common shares[2] | 8 | 8 | 8 | 8 |
| Weighted average shares used to compute diluted EPS | 430 | 448 | 432 | 453 |
| **Basic earnings (loss) per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .72 | $ 1.14 | $ 1.22 | $ 1.88 |
| Discontinued operations | — | .08 | — | .09 |
| Total | $ .72 | $ 1.22 | $ 1.22 | $ 1.97 |
| **Diluted earnings (loss) per common share attributable to Navient Corporation:** | | | | |
| Continuing operations | $ .71 | $ 1.12 | $ 1.20 | $ 1.85 |
| Discontinued operations | — | .08 | — | .09 |
| Total | $ .71 | $ 1.20 | $ 1.20 | $ 1.94 |

[1]   Includes the potential dilutive effect of additional common shares that are issuable upon exercise of outstanding stock options, non-vested restricted stock, restricted stock units, and the outstanding commitment to issue shares under applicable ESPPs, determined by the treasury stock method.

[2]   For the three months ended June 30, 2014 and 2013, securities covering approximately 3 million and 4 million shares, respectively, were outstanding but not included in the computation of diluted earnings per share because they were anti-dilutive. For the six months ended June 30, 2014 and 2013, securities covering approximately 3 million and 5 million shares, respectively, were outstanding but not included in the computation of diluted earnings per share because they were anti-dilutive.

**9.   Stock-Based Compensation Plans and Arrangements**

In connection with the Spin-Off, SLM BankCo assumed the equity incentive plans of Old SLM and outstanding awards granted thereunder. Following the Spin-Off, Navient established a new equity incentive plan with respect to its common stock. In order to maintain the intrinsic value of outstanding equity awards prior to the distribution, certain adjustments to the exercise price and number of awards were made. In general, holders of awards granted prior to 2014 received both adjusted SLM BankCo and new Navient equity awards, and holders of awards granted in 2014 received solely equity awards of their post-distribution employer. Outstanding stock options, restricted stock, restricted stock units and dividend equivalent units were adjusted into equity in the new companies by a specific conversion ratio per company, which was based upon the volume weighted average prices for each company leading up to the time of the separation, to keep the intrinsic value of the equity awards

29

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9.   Stock-Based Compensation Plans and Arrangements (Continued)**

constant. These adjustments were accounted for as modifications to the original awards. In general, the SLM BankCo and Navient awards are subject to substantially the same terms and conditions as the original Old SLM awards. A comparison of the fair value of the modified awards with the fair value of the original awards immediately before the modification resulted in an immaterial amount of incremental compensation expense which was recorded immediately.

**10.   Fair Value Measurements**

We use estimates of fair value in applying various accounting standards in our financial statements.

We categorize our fair value estimates based on a hierarchical framework associated with three levels of price transparency utilized in measuring financial instruments at fair value. Please refer to "Note 12 — Fair Value Measurements" in our Form 10 for a full discussion.

During the three and six months ended June 30, 2014, there were no significant transfers of financial instruments between levels, or changes in our methodology or assumptions used to value our financial instruments.

The following table summarizes the valuation of our financial instruments that are marked-to-market on a recurring basis.

| | Fair Value Measurements on a Recurring Basis | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2014 | | | | December 31, 2013 | | | |
| (Dollars in millions) | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | | | | |
| Available-for-sale investments: | | | | | | | | |
| Agency residential mortgage-backed securities | $  — | $  1 | $  — | $  1 | $  — | $  102 | $  — | $  102 |
| Guaranteed investment contracts | — | — | — | — | — | — | — | — |
| Other | — | 6 | — | 6 | — | 7 | — | 7 |
| Total available-for-sale investments | — | 7 | — | 7 | — | 109 | — | 109 |
| Derivative instruments:[1] | | | | | | | | |
| Interest rate swaps | — | 824 | 39 | 863 | — | 785 | 38 | 823 |
| Cross-currency interest rate swaps | — | 1 | 1,071 | 1,072 | — | 27 | 1,158 | 1,185 |
| Other | — | — | 1 | 1 | — | — | 2 | 2 |
| Total derivative assets[3] | — | 825 | 1,111 | 1,936 | — | 812 | 1,198 | 2,010 |
| **Total** | $  — | $  832 | $1,111 | $ 1,943 | $  — | $  921 | $1,198 | $ 2,119 |
| **Liabilities[2]** | | | | | | | | |
| Derivative instruments:[1] | | | | | | | | |
| Interest rate swaps | $  — | $  (89) | $ (113) | $ (202) | $  — | $  (239) | $ (125) | $  (364) |
| Floor Income Contracts | — | (1,077) | — | (1,077) | — | (1,384) | — | (1,384) |
| Cross-currency interest rate swaps | — | (21) | (29) | (50) | — | (35) | (151) | (186) |
| Other | — | — | (7) | (7) | — | — | (23) | (23) |
| Total derivative liabilities[3] | — | (1,187) | (149) | (1,336) | — | (1,658) | (299) | (1,957) |
| **Total** | $  — | $(1,187) | $ (149) | $(1,336) | $  — | $(1,658) | $ (299) | $(1,957) |

[1] Fair value of derivative instruments excludes accrued interest and the value of collateral.

[2] Borrowings which are the hedged items in a fair value hedge relationship and which are adjusted for changes in value due to benchmark interest rates only are not carried at full fair value and are not reflected in this table.

[3] See "Note 5 — Derivative Financial Instruments" for a reconciliation of gross positions without the impact of master netting agreements to the balance sheet classification.

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Fair Value Measurements (Continued)**

The following tables summarize the change in balance sheet carrying value associated with level 3 financial instruments carried at fair value on a recurring basis.

| | Three Months Ended June 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | | | | 2013 | | | |
| | Derivative instruments | | | | Derivative instruments | | | |
| (Dollars in millions) | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments |
| **Balance, beginning of period** | $  (87) | $  980 | $  (3) | $  890 | $  (76) | $  470 | $  — | $  394 |
| Total gains/(losses) (realized and unrealized): | | | | | | | | |
| Included in earnings[1] | 13 | 77 | (3) | 87 | (10) | 48 | (8) | 30 |
| Included in other comprehensive income | — | — | — | — | — | — | — | — |
| Settlements | — | (15) | — | (15) | (2) | (32) | (7) | (41) |
| Transfers in and/or out of level 3 | — | — | — | — | — | — | — | — |
| **Balance, end of period** | $  (74) | $  1,042 | $  (6) | $  962 | $  (88) | $  486 | $(15) | $  383 |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $  13 | $  (30) | $  (3) | $  (20) | $  (12) | $  61 | $(10) | $  39 |

| | Six Months Ended June 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | | | | 2013 | | | |
| | Derivative instruments | | | | Derivative instruments | | | |
| (Dollars in millions) | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments | Interest Rate Swaps | Cross Currency Interest Rate Swaps | Other | Total Derivative Instruments |
| **Balance, beginning of period** | $  (87) | $  1,007 | $(21) | $  899 | $  (73) | $  1,053 | $  4 | $  984 |
| Total gains/(losses) (realized and unrealized): | | | | | | | | |
| Included in earnings[1] | 13 | 67 | 14 | 94 | (4) | (499) | (13) | (516) |
| Included in other comprehensive income | — | — | — | — | — | — | — | — |
| Settlements | — | (32) | 1 | (31) | (11) | (68) | (6) | (85) |
| Transfers in and/or out of level 3 | — | — | — | — | — | — | — | — |
| **Balance, end of period** | $  (74) | $  1,042 | $  (6) | $  962 | $  (88) | $  486 | $(15) | $  383 |
| Change in unrealized gains/(losses) relating to instruments still held at the reporting date[2] | $  13 | $  (65) | $  15 | $  (37) | $  (15) | $  (430) | $(12) | $  (457) |

[1]  "Included in earnings" is comprised of the following amounts recorded in the specified line item in the consolidated statements of income:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2014 | 2013 |
| Gains (losses) on derivative and hedging activities, net | $  73 | $  9 | $  62 | $  (553) |
| Interest expense | 14 | 21 | 32 | 37 |
| Total | $  87 | $  30 | $  94 | $  (516) |

[2]  Recorded in "gains (losses) on derivative and hedging activities, net" in the consolidated statements of income.

31

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Fair Value Measurements (Continued)**

The following table presents the significant inputs that are unobservable or from inactive markets used in the recurring valuations of the level 3 financial instruments detailed above.

| (Dollars in millions) | Fair Value at June 30, 2014 | | Valuation Technique | Input | Range (Weighted Average) |
|---|---|---|---|---|---|
| **Derivatives** | | | | | |
| Consumer Price Index/ LIBOR basis swaps | $ | 35 | Discounted cash flow | Bid/ask adjustment to discount rate | 0.08% — 0.02% (0.04%) |
| Prime/LIBOR basis swaps | | (109) | Discounted cash flow | Constant prepayment rate | 4.5% |
| | | | | Bid/ask adjustment to discount rate | 0.08% — 0.08% (0.08%) |
| Cross-currency interest rate swaps | | 1,042 | Discounted cash flow | Constant prepayment rate | 2.6% |
| Other | | (6) | | | |
| Total | $ | 962 | | | |

The significant inputs that are unobservable or from inactive markets related to our level 3 derivatives detailed in the table above would be expected to have the following impacts to the valuations:

- Consumer Price Index/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation.

- Prime/LIBOR basis swaps — These swaps do not actively trade in the markets as indicated by a wide bid/ask spread. A wider bid/ask spread will result in a decrease in the overall valuation. In addition, the unobservable inputs include Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap which will increase the value for swaps in a gain position and decrease the value for swaps in a loss position, everything else equal. The opposite is true for an increase in the input.

- Cross-currency interest rate swaps — The unobservable inputs used in these valuations are Constant Prepayment Rates of the underlying securitization trust the swap references. A decrease in this input will result in a longer weighted average life of the swap. All else equal in a typical currency market, this will result in a decrease to the valuation due to the delay in the cash flows of the currency exchanges as well as diminished liquidity in the forward exchange markets as you increase the term. The opposite is true for an increase in the input.

32

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.  Fair Value Measurements (Continued)**

The following table summarizes the fair values of our financial assets and liabilities, including derivative financial instruments.

| | June 30, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Fair Value | Carrying Value | Difference | Fair Value | Carrying Value | Difference |
| **Earning assets** | | | | | | |
| FFELP Loans | $100,517 | $ 99,730 | $ 787 | $104,481 | $104,588 | $ (107) |
| Private Education Loans | 30,941 | 30,324 | 617 | 37,485 | 37,512 | (27) |
| Cash and investments[1] | 5,907 | 5,907 | — | 9,732 | 9,732 | — |
| Total earning assets | 137,365 | 135,961 | 1,404 | 151,698 | 151,832 | (134) |
| **Interest-bearing liabilities** | | | | | | |
| Short-term borrowings | 4,312 | 4,316 | 4 | 13,807 | 13,795 | (12) |
| Long-term borrowings | 130,909 | 131,919 | 1,010 | 133,578 | 136,648 | 3,070 |
| Total interest-bearing liabilities | 135,221 | 136,235 | 1,014 | 147,385 | 150,443 | 3,058 |
| **Derivative financial instruments** | | | | | | |
| Floor Income Contracts | (1,077) | (1,077) | — | (1,384) | (1,384) | — |
| Interest rate swaps | 661 | 661 | — | 459 | 459 | — |
| Cross-currency interest rate swaps | 1,022 | 1,022 | — | 999 | 999 | — |
| Other | (6) | (6) | — | (21) | (21) | — |
| **Excess of net asset fair value over carrying value** | | | $ 2,418 | | | $ 2,924 |

[1] "Cash and investments" includes available-for-sale investments that consist of investments that are primarily agency securities whose cost basis is $6 million and $113 million at June 30, 2014 and December 31, 2013, respectively, versus a fair value of $7 million and $109 million at June 30, 2014 and December 31, 2013, respectively.

**11.  Commitments and Contingencies**

On May 2, 2014, Navient Solutions, Inc. ("NSI") (formerly Sallie Mae, Inc.), a wholly-owned subsidiary of Navient, and Sallie Mae Bank entered into consent orders with the Federal Deposit Insurance Corporation (the "FDIC") (respectively, the "NSI Order" and the "Bank Order"; collectively, "the FDIC Orders") to resolve previously disclosed matters related to certain cited violations of Section 5 of the Federal Trade Commission Act, including the disclosures and assessments of certain late fees, as well as alleged violations under the Servicemembers Civil Relief Act ("SCRA"). The FDIC Orders, which became effective upon the signing of the consent order with the United States Department of Justice ("DOJ") by Navient and SLM BankCo on May 13, 2014, required each of Sallie Mae Bank and NSI to pay $3.3 million in civil monetary penalties. NSI has paid its civil monetary penalties. In addition, the FDIC Orders required the establishment of a restitution reserve account totaling $30 million to provide restitution with respect to loans owned or originated by Sallie Mae Bank, from November 28, 2005 until the effective date of the FDIC Orders. Pursuant to the Separation and Distribution Agreement among SLM Corporation, SLM BankCo and Navient dated as of April 28, 2014 (the "Separation Agreement"), Navient is responsible for funding the restitution reserve account. We funded the account in May 2014.

The NSI Order requires NSI to ensure proper servicing for service members and proper application of SCRA benefits under a revised and broader definition of eligibility than previously required by the statute and regulatory guidance and to make changes to billing statements and late fee practices. These changes to billing statements have already been implemented. In order to treat all customers in a similar manner, NSI will voluntarily make restitution of certain late fees to all other customers whose loans were neither owned nor originated by Sallie Mae Bank on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million.

33

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11. Commitments and Contingencies (Continued)**

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank have entered into a consent order with the DOJ, in its capacity as the agency having primary authority for enforcement of such matters. The DOJ consent order ("DOJ Order") covers all loans either owned by Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. The DOJ Order requires NSI to fund a $60 million settlement fund, which would represent the total amount of compensation due to service members under the DOJ agreement and pay $55,000 in civil money penalties. The DOJ Order is currently on the docket of the United States District Court in Delaware awaiting Court approval.

As of December 31, 2013, a reserve of $65 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In the first quarter of 2014, an additional reserve of $103 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators and as a result, as of March 31, 2014, the related regulatory reserve was $168 million. The final cost of these proceedings remains uncertain until the DOJ Order is approved by the Court and all of the work under the various consent orders has been completed.

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters and is cooperating with the investigation. We are not in a position at this time to predict the duration or outcome of this investigation and reserves have not been established for this matter.

Navient has received CIDs issued by the State of Illinois Office of Attorney General and the State of Washington Office of Attorney General and continues to cooperate with multiple state Attorneys General in connection with these investigations. According to the CIDs, the investigation was initiated to ascertain whether any practices declared to be unlawful under the Consumer Fraud and Deceptive Business Practices Act have occurred or are about to occur. Navient is cooperating with this investigation. We are not in a position at this time to predict the duration or the outcome of this investigation and reserves have not been established for this matter.

Pursuant to the Separation Agreement entered into in connection with the Spin-Off, Navient has agreed to be responsible and indemnify SLM BankCo for all claims, actions, damages, losses or expenses that may arise from the conduct of all activities of pre-Spin-Off SLM BankCo occurring prior to the Spin-Off other than those specifically excluded in the Separation and Distribution Agreement. Please see our Form 10 for a discussion of these indemnifications. As a result, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom. Navient retained $165 million of the $168 million total regulatory reserve in connection with the Spin-Off. There are no additional reserves Navient has related to other indemnification matters with SLM BankCo as of June 30, 2014.

*Contingencies*

In the ordinary course of business, we and our subsidiaries are defendants in or parties to pending and threatened legal actions and proceedings including actions brought on behalf of various classes of claimants. These actions and proceedings may be based on alleged violations of consumer protection, securities, employment and other laws. In certain of these actions and proceedings, claims for substantial monetary damage are asserted against us and our subsidiaries.

In the ordinary course of business, we and our subsidiaries are subject to regulatory examinations, information gathering requests, inquiries and investigations. In connection with formal and informal inquiries in these cases, we and our subsidiaries receive numerous requests, subpoenas and orders for documents, testimony and information in connection with various aspects of our regulated activities.

34

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11.  Commitments and Contingencies (Continued)**

In view of the inherent difficulty of predicting the outcome of such litigation and regulatory matters, we cannot predict what the eventual outcome of the pending matters will be, what the timing or the ultimate resolution of these matters will be, or what the eventual loss, fines or penalties related to each pending matter may be.

We are required to establish reserves for litigation and regulatory matters where those matters present loss contingencies that are both probable and estimable. When loss contingencies are not both probable and estimable, we do not establish reserves.

Based on current knowledge, reserves have been established for certain litigation or regulatory matters where the loss is both probable and estimable. Based on current knowledge, management does not believe that loss contingencies, if any, arising from pending investigations, litigation or regulatory matters will have a material adverse effect on our consolidated financial position, liquidity, results of operations or cash flows.

**12.  Segment Reporting**

*FFELP Loans Segment*

In the FFELP Loans segment, Navient acquires and finances FFELP Loans. Even though FFELP Loans are no longer originated, we continue to seek to acquire FFELP Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the FFELP Loan portfolio. This segment is expected to generate significant amounts of cash as the portfolio amortizes.

The following table includes GAAP-basis asset information for our FFELP Loans segment.

| (Dollars in millions) | June 30, 2014 | December 31, 2013 |
|---|---|---|
| FFELP Loans, net | $   99,730 | $   104,588 |
| Cash and investments[1] | 3,793 | 4,473 |
| Other | 2,855 | 3,587 |
| Total assets | $   106,378 | $   112,648 |

[1]   Includes restricted cash and investments.

*Private Education Loans Segment*

In this segment, we acquire, finance and service Private Education Loans. Even though we no longer originate Private Education Loans, we continue to seek to acquire Private Education Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the Private Education Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of cash as the portfolio amortizes.

The following table includes GAAP-basis asset information for our Private Education Loans segment.

| (Dollars in millions) | June 30, 2014 | December 31, 2013 |
|---|---|---|
| Private Education Loans, net | $   30,324 | $   37,512 |
| Cash and investments[1] | 105 | 2,555 |
| Other | 2,901 | 2,934 |
| Total assets | $   33,330 | $   43,001 |

[1]   Includes restricted cash and investments.

35

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12. Segment Reporting (Continued)**

*Business Services Segment*

Our Business Services segment generates the majority of its revenue from servicing our FFELP Loan portfolio. We also provide servicing and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED.

At June 30, 2014 and December 31, 2013, the Business Services segment had total assets of $503 million and $892 million, respectively, on a GAAP basis.

*Other Segment*

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

At June 30, 2014 and December 31, 2013, the Other segment had total assets of $2.8 billion and $3.0 billion, respectively, on a GAAP basis.

*Measure of Profitability*

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments.

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for three items, discussed below, that are either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information because we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. When compared to GAAP results, the three items we remove to result in our "Core Earnings" presentations are:

1.  The financial results attributable to the operations of the consumer banking business (SLM BankCo) prior to the Spin-Off and related restructuring and reorganization expense incurred in connection with the Spin-Off. For GAAP purposes, Navient reflected the deemed distribution of SLM BankCo on April 30, 2014. For "Core Earnings," we exclude the consumer banking business as if it had never been a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014;

2.  Our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness resulting in unrealized, mark-to-market gains/losses; and

3.  The accounting for goodwill and acquired intangible assets.

36

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Segment Reporting (Continued)**

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, rating agencies, lenders and investors to assess performance.

Old SLM's definition of "Core Earnings" did not exclude the financial results attributable to the operations of the consumer banking business and related restructuring and reorganization expense incurred in connection with the Spin-Off. In the second quarter of 2014, in connection with the Spin-Off, Navient included this additional adjustment as a part of "Core Earnings" to allow better comparability of Navient's results to pre-Spin-Off historical periods. All "Core Earnings" financial results for prior periods in this Quarterly Report on Form 10-Q have been restated to conform to Navient's revised definition of "Core Earnings."

37

Table of Contents

NAVIENT CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**12. Segment Reporting (Continued)**

*Segment Results and Reconciliations to GAAP*

| | | | | | | | Quarter Ended June 30, 2014 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Adjustments | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
| Interest income: | | | | | | | | | | |
| Student loans | $ 522 | $ 490 | $ — | $ — | $ — | $ 1,012 | $ 166 | $ (8) | $ 158 | $1,170 |
| Other loans | — | — | — | 2 | — | 2 | — | — | — | 2 |
| Cash and investments | 1 | — | — | 1 | — | 2 | — | 1 | 1 | 3 |
| Total interest income | 523 | 490 | — | 3 | — | 1,016 | 166 | (7) | 159 | 1,175 |
| Total interest expense | 291 | 173 | — | 30 | — | 494 | 12 | 7 | 19 | 513 |
| Net interest income (loss) | 232 | 317 | — | (27) | — | 522 | 154 | (14) | 140 | 662 |
| Less: provisions for loan losses | 10 | 145 | — | — | — | 155 | — | 10 | 10 | 165 |
| Net interest income (loss) after provisions for loan losses | 222 | 172 | — | (27) | — | 367 | 154 | (24) | 130 | 497 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | — | | | | | — | | | — | — |
| Servicing revenue | 15 | 7 | 166 | — | (115) | 73 | — | | — | 73 |
| Asset recovery revenue | — | — | 132 | — | | 132 | — | | — | 132 |
| Gains on debt repurchases | | | | | | | | | — | — |
| Other income | — | — | 1 | 8 | — | 9 | (154) | 215 | 61 | 70 |
| Total other income (loss) | 15 | 7 | 299 | 8 | (115) | 214 | (154) | 215 | 61 | 275 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 121 | 42 | 93 | 2 | (115) | 143 | — | 11 | 11 | 154 |
| Overhead expenses | — | — | — | 52 | — | 52 | — | 5 | 5 | 57 |
| Operating expenses | 121 | 42 | 93 | 54 | (115) | 195 | — | 16 | 16 | 211 |
| Goodwill and acquired intangible asset impairment and amortization | — | | | | | | | 2 | 2 | 2 |
| Restructuring and other reorganization expenses | — | | | | | | | 61 | 61 | 61 |
| Total expenses | 121 | 42 | 93 | 54 | (115) | 195 | — | 79 | 79 | 274 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 116 | 137 | 206 | (73) | — | 386 | — | 112 | 112 | 498 |
| Income tax expense (benefit)[3] | 44 | 51 | 76 | (26) | — | 145 | — | 46 | 46 | 191 |
| Net income (loss) from continuing operations | 72 | 86 | 130 | (47) | $ — | 241 | — | 66 | 66 | 307 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | | | | | — | | | — | — |
| Net income (loss) | 72 | 86 | 130 | (47) | $ — | 241 | — | 66 | 66 | 307 |
| Less: net loss attributable to noncontrolling interest | — | | | | | — | | | — | — |
| Net income (loss) attributable to Navient Corporation | $ 72 | $ 86 | $ 130 | $ (47) | $ — | $ 241 | — | $ 66 | $ 66 | $ 307 |

[1] The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

[2] "Core Earnings" adjustments to GAAP:

| | Quarter Ended June 30, 2014 | | | |
|---|---|---|---|---|
| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 35 | $ 95 | $ — | $ 130 |
| Total other income | 6 | 55 | — | 61 |
| Operating expenses | 16 | — | — | 16 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 2 | 2 |
| Restructuring and other reorganization expenses | 61 | — | — | 61 |
| Total "Core Earnings" adjustments to GAAP | $ (36) | $ 150 | $ (2) | 112 |
| Income tax expense | | | | 46 |
| Net income | | | | $ 66 |

[3] Income taxes are based on a percentage of net income before tax for the individual reportable segment.

38

**Table of Contents**

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12.  Segment Reporting (Continued)**

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Adjustments | | | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Reclassifications | Additions/(Subtractions) | Total Adjustments[2] | |
| Interest income: | | | | | | | | | | |
| Student loans | $ 573 | $ 513 | $ — | $ — | $ — | $ 1,086 | $ 198 | $ 46 | $ 244 | $1,330 |
| Other loans | — | — | 3 | — | — | 3 | — | — | — | 3 |
| Cash and investments | 2 | — | — | 1 | — | 3 | — | 1 | 1 | 4 |
| Total interest income | 575 | 513 | — | 4 | — | 1,092 | 198 | 47 | 245 | 1,337 |
| Total interest expense | 319 | 187 | — | 10 | — | 516 | 13 | 24 | 37 | 553 |
| Net interest income (loss) | 256 | 326 | — | (6) | — | 576 | 185 | 23 | 208 | 784 |
| Less: provisions for loan losses | 13 | 189 | — | — | — | 202 | — | (1) | (1) | 201 |
| Net interest income (loss) after provisions for loan losses | 243 | 137 | — | (6) | — | 374 | 185 | 24 | 209 | 583 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | 257 | — | — | (6) | — | 251 | — | — | — | 251 |
| Servicing revenue | 16 | 10 | 180 | — | (137) | 69 | — | — | — | 69 |
| Asset recovery revenue | — | — | 109 | — | — | 109 | — | — | — | 109 |
| Gains on debt repurchases | — | — | — | 19 | — | 19 | — | — | — | 19 |
| Other income | — | — | — | — | — | — | (185) | 227 | 42 | 42 |
| Total other income (loss) | 273 | 10 | 289 | 13 | (137) | 448 | (185) | 227 | 42 | 490 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 143 | 51 | 88 | 3 | (137) | 148 | — | 38 | 38 | 186 |
| Overhead expenses | — | — | — | 37 | — | 37 | — | 21 | 21 | 58 |
| Operating expenses | 143 | 51 | 88 | 40 | (137) | 185 | — | 59 | 59 | 244 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 3 | 3 | 3 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 23 | 23 | 23 |
| Total expenses | 143 | 51 | 88 | 40 | (137) | 185 | — | 85 | 85 | 270 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 373 | 96 | 201 | (33) | — | 637 | — | 166 | 166 | 803 |
| Income tax expense (benefit)[3] | 135 | 35 | 72 | (13) | — | 229 | — | 70 | 70 | 299 |
| Net income (loss) from continuing operations | 238 | 61 | 129 | (20) | $ — | 408 | — | 96 | 96 | 504 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 39 | — | — | 39 | — | (1) | (1) | 38 |
| Net income (loss) | 238 | 61 | 168 | (20) | $ — | 447 | — | 95 | 95 | 542 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 238 | $ 61 | $ 168 | $ (20) | $ — | $ 447 | $ — | $ 96 | $ 96 | $ 543 |

The table header for the above: **Quarter Ended June 30, 2013**

[1]  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

[2]  "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| Net interest income after provisions for loan losses | $ 100 | $ 109 | $ — | $ 209 |
| Total other income | 8 | 34 | — | 42 |
| Operating expenses | 59 | — | — | 59 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 3 | 3 |
| Restructuring and other reorganization expenses | 23 | — | — | 23 |
| Total "Core Earnings" adjustments to GAAP | $ 26 | $ 143 | $ (3) | 166 |
| Income tax expense | | | | 70 |
| Income from discontinued operations | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 96 |

The table header for the above: **Quarter Ended June 30, 2013**

[3]  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

Table of Contents

## NAVIENT CORPORATION
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**12. Segment Reporting (Continued)**

| | | | | | | | | Adjustments | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
| Interest income: | | | | | | | | | | | |
| Student loans | $1,033 | $985 | $ — | $ — | $ — | $2,018 | $365 | $78 | $443 | $2,461 |
| Other loans | — | — | — | 5 | — | 5 | — | (1) | (1) | 4 |
| Cash and investments | 2 | — | — | 2 | — | 4 | — | 2 | 2 | 6 |
| Total interest income | 1,035 | 985 | — | 7 | — | 2,027 | 365 | 79 | 444 | 2,471 |
| Total interest expense | 578 | 358 | — | 55 | — | 991 | 22 | 29 | 51 | 1,042 |
| Net interest income (loss) | 457 | 627 | — | (48) | — | 1,036 | 343 | 50 | 393 | 1,429 |
| Less: provisions for loan losses | 20 | 281 | — | — | — | 301 | — | 49 | 49 | 350 |
| Net interest income (loss) after provisions for loan losses | 437 | 346 | — | (48) | — | 735 | 343 | 1 | 344 | 1,079 |
| Other income (loss): | | | | | | | | | | | |
| Gains on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 26 | 8 | 335 | — | (233) | 136 | — | — | — | 136 |
| Asset recovery revenue | — | — | 243 | — | — | 243 | — | — | — | 243 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income | — | — | — | 11 | — | 11 | (343) | 398 | 55 | 66 |
| Total other income (loss) | 26 | 8 | 578 | 11 | (233) | 390 | (343) | 398 | 55 | 445 |
| Expenses: | | | | | | | | | | | |
| Direct operating expenses | 245 | 98 | 188 | 115 | (233) | 413 | — | 36 | 36 | 449 |
| Overhead expenses | — | — | — | 101 | — | 101 | — | 28 | 28 | 129 |
| Operating expenses | 245 | 98 | 188 | 216 | (233) | 514 | — | 64 | 64 | 578 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 6 | 6 | 6 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 87 | 87 | 87 |
| Total expenses | 245 | 98 | 188 | 216 | (233) | 514 | — | 157 | 157 | 671 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 218 | 256 | 390 | (253) | — | 611 | — | 242 | 242 | 853 |
| Income tax expense (benefit)[3] | 83 | 95 | 146 | (95) | — | 229 | — | 99 | 99 | 328 |
| Net income (loss) from continuing operations | 135 | 161 | 244 | (158) | $ — | 382 | — | 143 | 143 | 525 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 1 | — | — | 1 | — | — | — | 1 |
| Net income (loss) | 135 | 161 | 245 | (158) | $ — | 383 | — | 143 | 143 | 526 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $135 | $161 | $245 | $(158) | $ — | $383 | $ — | $143 | $143 | $526 |

[1] The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

[2] "Core Earnings" adjustments to GAAP:

| | Six Months Ended June 30, 2014 | | | |
|---|---|---|---|---|
| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $136 | $208 | $ — | $344 |
| Total other income | 14 | 41 | — | 55 |
| Operating expenses | 64 | — | — | 64 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 6 | 6 |
| Restructuring and other reorganization expenses | 87 | — | — | 87 |
| Total "Core Earnings" adjustments to GAAP | $(1) | $249 | $(6) | 242 |
| Income tax expense | | | | 99 |
| Net income | | | | $143 |

[3] Income taxes are based on a percentage of net income before tax for the individual reportable segment.

40

Table of Contents

## NAVIENT CORPORATION
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**12. Segment Reporting (Continued)**

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 1,163 | $ 1,013 | $ — | $ — | $ — | $ 2,176 | $ 410 | $ 102 | $ 512 | $2,688 |
| Other loans | — | — | — | 6 | — | 6 | — | — | — | 6 |
| Cash and investments | 4 | — | — | 2 | — | 6 | — | 2 | 2 | 8 |
| Total interest income | 1,167 | 1,013 | — | 8 | — | 2,188 | 410 | 104 | 514 | 2,702 |
| Total interest expense | 654 | 371 | — | 25 | — | 1,050 | 31 | 42 | 73 | 1,123 |
| Net interest income (loss) | 513 | 642 | — | (17) | — | 1,138 | 379 | 62 | 441 | 1,579 |
| Less: provisions for loan losses | 29 | 394 | — | — | — | 423 | — | 19 | 19 | 442 |
| Net interest income (loss) after provisions for loan losses | 484 | 248 | — | (17) | — | 715 | 379 | 43 | 422 | 1,137 |
| **Other income (loss):** | | | | | | | | | | |
| Gains on sales of loans and investments | 312 | — | — | (5) | — | 307 | — | — | — | 307 |
| Servicing revenue | 39 | 19 | 366 | 1 | (286) | 139 | — | — | — | 139 |
| Asset recovery revenue | — | — | 208 | — | — | 208 | — | — | — | 208 |
| Gains on debt repurchases | — | — | — | 48 | — | 48 | (6) | — | (6) | 42 |
| Other income | — | — | — | — | — | — | (373) | 419 | 46 | 46 |
| Total other income (loss) | 351 | 19 | 574 | 44 | (286) | 702 | (379) | 419 | 40 | 742 |
| **Expenses:** | | | | | | | | | | |
| Direct operating expenses | 300 | 97 | 173 | 5 | (286) | 289 | — | 70 | 70 | 359 |
| Overhead expenses | — | — | — | 78 | — | 78 | — | 44 | 44 | 122 |
| Operating expenses | 300 | 97 | 173 | 83 | (286) | 367 | — | 114 | 114 | 481 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 6 | 6 | 6 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 34 | 34 | 34 |
| Total expenses | 300 | 97 | 173 | 83 | (286) | 367 | — | 154 | 154 | 521 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 535 | 170 | 401 | (56) | — | 1,050 | — | 308 | 308 | 1,358 |
| Income tax expense (benefit)[3] | 194 | 62 | 146 | (21) | — | 381 | — | 128 | 128 | 509 |
| Net income (loss) from continuing operations | 341 | 108 | 255 | (35) | $ — | 669 | — | 180 | 180 | 849 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 40 | — | — | 40 | — | (1) | (1) | 39 |
| Net income (loss) | 341 | 108 | 295 | (35) | $ — | 709 | — | 179 | 179 | 888 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 341 | $ 108 | $ 295 | $ (35) | $ — | $ 709 | $ — | $ 180 | $ 180 | $ 889 |

*Table header spanning note: "Six Months Ended June 30, 2013"; "Adjustments" spans Reclassifications, Additions/(Subtractions), Total Adjustments[2]*

[1] The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

[2] "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| Net interest income after provisions for loan losses | $ 194 | $ 228 | $ — | $ 422 |
| Total other income | 16 | 24 | — | 40 |
| Operating expenses | 114 | — | — | 114 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 6 | 6 |
| Restructuring and other reorganization expenses | 34 | — | — | 34 |
| Total "Core Earnings" adjustments to GAAP | $ 62 | $ 252 | $ (6) | 308 |
| Income tax expense | | | | 128 |
| Income (loss) from discontinued operations | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 180 |

*Table header spanning note: "Six Months Ended June 30, 2013"*

[3] Income taxes are based on a percentage of net income before tax for the individual reportable segment.

Table of Contents

**NAVIENT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12. Segment Reporting (Continued)**

*Summary of "Core Earnings" Adjustments to GAAP*

| (Dollars in millions) | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2014 | | 2013 | |
| **"Core Earnings" adjustments to GAAP:** | | | | | | | | |
| Net impact of the removal of SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off[1] | $ | (36) | $ | 26 | $ | (1) | $ | 62 |
| Net impact of derivative accounting[2] | | 150 | | 143 | | 249 | | 252 |
| Net impact of goodwill and acquired intangibles assets[3] | | (2) | | (3) | | (6) | | (6) |
| Net tax effect[4] | | (46) | | (70) | | (99) | | (128) |
| Total "Core Earnings" adjustments to GAAP | $ | 66 | $ | 96 | $ | 143 | $ | 180 |

[1] **SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off:** For "Core Earnings," we assume the consumer banking business (SLM BankCo) was never a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014 and we have removed the restructuring and reorganization expense incurred in connection with the Spin-Off. Excluding these items provides management with a useful basis from which to better evaluate results from ongoing operations against results from prior periods. The adjustment relates to the exclusion of the consumer banking business and represents the operations, assets, liabilities and equity of SLM BankCo, which is comprised of Sallie Mae Bank, Upromise Rewards, the Insurance Business, and the Private Education Loan origination functions. Included in these amounts are also certain general corporate overhead expenses related to the consumer banking business. General corporate overhead consists of costs primarily associated with accounting, finance, legal, human resources, certain information technology costs, stock compensation, and executive management and the board of directors. These costs were generally allocated to the consumer banking business based on the proportionate level of effort provided to the consumer banking business relative to Old SLM using a relevant allocation driver (e.g., in proportion to the number of employees by function that were being transferred to SLM BankCo as opposed to remaining at Navient). All intercompany transactions between SLM BankCo and Navient have been eliminated. In addition, all preferred stock dividends are removed as SLM BankCo succeeded Old SLM as the issuer of the preferred stock in connection with the Spin-Off.

[2] **Derivative accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These unrealized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

[3] **Goodwill and acquired intangible assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and amortization of acquired intangible assets.

[4] **Net tax effect:** Such tax effect is based upon our "Core Earnings" effective tax rate for the year.

42

Table of Contents

**Item 2.**     **Management's Discussion and Analysis of Financial Condition and Results of Operations**

   The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q and the audited consolidated financial statements and related notes thereto and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our Registration Statement on Form 10, as amended (our "Form 10"), filed with the Securities and Exchange Commission (the "SEC") on April 10, 2014, and declared effective on April 14, 2014.

   This Quarterly Report on Form 10-Q contains "forward-looking" statements and information based on management's current expectations as of the date of this document. Statements that are not historical facts, including statements about our beliefs, opinions, or expectations and statements that assume or are dependent upon future events, are forward-looking statements. Forward-looking statements are subject to risks, uncertainties, assumptions and other factors that may cause actual results to be materially different from those reflected in such forward-looking statements. These factors include, among others, the risks and uncertainties set forth in Item 1A "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q, our Form 10 and our subsequent filings with the SEC; increases in financing costs; limits on liquidity; increases in costs associated with compliance with laws and regulations; changes in accounting standards and the impact of related changes in significant accounting estimates; any adverse outcomes in any significant litigation to which we are a party; credit risk associated with our exposure to third parties, including counterparties to our derivative transactions; and changes in the terms of student loans and the educational credit marketplace (including changes resulting from new laws and the implementation of existing laws). We could also be affected by, among other things: changes in our funding costs and availability; reductions to our credit ratings or the credit ratings of the United States of America; failures of our operating systems or infrastructure, including those of third-party vendors; damage to our reputation; failures to successfully implement cost-cutting initiatives and adverse effects of such initiatives on our business; risks associated with the recently completed separation of Navient and SLM Corporation into two, distinct publicly traded companies, including failure to achieve the expected benefits of the separation; changes in the demand for educational financing or in financing preferences of lenders, educational institutions, students and their families; changes in law and regulations with respect to the student lending business and financial institutions generally; increased competition from banks and other consumer lenders; the creditworthiness of our customers; changes in the general interest rate environment, including the rate relationships among relevant money-market instruments and those of our earning assets versus our funding arrangements; changes in general economic conditions; our ability to successfully effectuate any acquisitions and other strategic initiatives; and changes in the demand for debt management services. The preparation of our consolidated financial statements also requires management to make certain estimates and assumptions including estimates and assumptions about future events. These estimates or assumptions may prove to be incorrect. All forward-looking statements contained in this report are qualified by these cautionary statements and are made only as of the date of this document. We do not undertake any obligation to update or revise these forward-looking statements to conform the statement to actual results or changes in our expectations.

   Definitions for certain capitalized terms used but not otherwise defined in this Quarterly Report on Form 10-Q can be found in our Form 10.

   Through this discussion and analysis, we intend to provide the reader with some narrative context for how our management views our consolidated financial statements, additional context within which to assess our operating results, and information on the quality and variability of our earnings, liquidity and cash flows.

**Presentation of Information**

   Unless the context otherwise requires, references in this Management's Discussion and Analysis of Financial Condition and Results of Operations to:

- "We," "our," "us," or the "Company" with respect to any period on or prior to the date of the Spin-Off means and refers to Old SLM and its consolidated subsidiaries as constituted prior to the Spin-Off, and any references to "Navient," "we," "our," "us," or the "Company" with respect to any period after the date of the Spin-Off means and refers to Navient and its consolidated subsidiaries.

Table of Contents

- "Old SLM" refers to SLM Corporation, as it existed prior to the Spin-Off, and its consolidated subsidiaries. As part of an internal corporate reorganization of Old SLM, Old SLM was merged into a limited liability company and became a subsidiary of Navient, changing its name to "Navient, LLC."

- Navient's historical business and operations refer to Old SLM's portfolio of FFELP and Private Education Loans not held by Sallie Mae Bank, together with the servicing and asset recovery businesses that were retained by or transferred to Navient in connection with the internal corporate reorganization.

- "SLM BankCo" refers to New BLC Corporation, which became the publicly traded successor to Old SLM on April 29, 2014 by virtue of a merger pursuant to Section 251(g) of the Delaware General Corporation Law ("DGCL"), and its consolidated subsidiaries. Following consummation of the merger, New BLC Corporation changed its name to SLM Corporation. After the Spin-Off, SLM BankCo's business consists primarily of the consumer banking business previously operated by Old SLM, which includes Sallie Mae Bank and its portfolio of Private Education Loans, a new Private Education Loan servicing business and the Upromise Rewards business.

- "Spin-Off" collectively refers to the internal reorganization of Old SLM on April 29, 2014 and the distribution of all of the shares of common stock of Navient to the holders of shares of SLM BankCo on April 30, 2014.

## Spin-Off of Navient

On April 30, 2014, the previously announced separation of Navient from SLM BankCo was completed. The separation was effected through the distribution by SLM BankCo, on a one-to-one basis, of all the shares of common stock of Navient to the holders of shares of SLM Bank Co common stock, as of the close of business on April 22, 2014, the record date for the distribution. As a result of the distribution, Navient is an independent, publicly traded company that operates the education loan management, servicing and asset recovery business previously operated by Old SLM. Navient is comprised primarily of Old SLM's portfolios of education loans that were not held in Sallie Mae Bank at the time of the separation, as well as servicing and asset recovery activities on those loans and loans held by third parties. The consumer banking business, SLM BankCo, is comprised primarily of Sallie Mae Bank and its Private Education Loan origination business, the Private Education Loans it holds and a related servicing business.

To implement the separation and distribution of Navient, an internal corporate reorganization of Old SLM was effected, pursuant to which, on April 29, 2014, SLM BankCo replaced Old SLM as the parent holding company pursuant to a holding company merger. In accordance with Section 251(g) of the DGCL, by action of the Old SLM board of directors and without a shareholder vote, Old SLM was merged into Navient, LLC, a wholly owned subsidiary of Old SLM, with Navient, LLC surviving. Immediately following the effective time of the merger, SLM BankCo changed its name to "SLM Corporation." As part of the internal corporate reorganization and pursuant to the merger, all of the outstanding shares of Old SLM Series A preferred stock and Series B preferred stock were converted, on a one-to-one basis, into substantially identical shares of SLM BankCo preferred stock. Following the merger, the assets and liabilities associated with the education loan management, servicing and asset recovery business were transferred to Navient, and those assets and liabilities associated with the consumer banking were transferred to SLM BankCo. The Spin-Off is intended to be tax-free and on July 9, 2014, Navient received a private letter ruling from the Internal Revenue Service confirming the tax-free status of the Spin-Off and the related internal reorganization transactions. For further information on the Spin-Off and all related matters, please refer to our Form 10.

Due to the relative significance of Navient to Old SLM, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM, notwithstanding the legal form of the Spin-Off. As a result, the historical financial statements of Old SLM prior to the distribution on April 30, 2014 are the historical financial statements of Navient. For that reason the historical financial information related to periods on or prior to April 30, 2014 contained in this Quarterly Report on Form 10-Q is that of Old SLM, which includes the consolidated results of both the loan management, servicing and asset recovery business (Navient) and the consumer banking business (SLM BankCo). Since

44

Table of Contents

Navient is the "accounting spinnor," the GAAP financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014, notwithstanding the legal form of the Spin-Off in which Navient common stock was distributed to the stockholders of SLM BankCo.

The following table shows the condensed balance sheet of SLM BankCo that the financial statements of Navient reflect as a shareholder distribution on April 30, 2014:

| (Dollars in millions) | April 30, 2014 |
|---|---|
| **Assets** | |
| FFELP Loans, net | $ 1,380 |
| Private Education Loans, net | 7,204 |
| Investments | 139 |
| Cash and cash equivalents | 2,170 |
| Other assets | 883 |
| Total assets | $ 11,776 |
| **Liabilities** | |
| Short-term borrowings | $ 6,491 |
| Long-term borrowings | 2,750 |
| Other liabilities | 825 |
| Total liabilities | 10,066 |
| **Equity** | |
| Preferred stock | |
| Series A | 165 |
| Series B | 400 |
| Common equity | 1,145 |
| Total equity(1) | 1,710 |
| Total liabilities and equity | $ 11,776 |

(1)    In addition to the $1,710 million of consumer banking business net assets distributed, we also removed $41 million of goodwill from our balance sheet as required under ASC 350 in connection with the distribution. This goodwill was allocated to the consumer banking business based on relative fair value. This total of $1,751 million is the amount that appears on our consolidated statement of changes in stockholders' equity in connection with the deemed distribution of the consumer banking business.

**Navient's Business**

Navient is a loan management, servicing and asset recovery company.

Navient holds the largest portfolio of education loans insured or guaranteed under the FFELP, as well as the largest portfolio of Private Education Loans. FFELP Loans are insured or guaranteed by state or not-for-profit agencies and are also protected by contractual rights to recovery from the United States pursuant to guaranty agreements among ED and these agencies. Private Education Loans are education loans to students or their families that are non-federal loans and not insured or guaranteed under FFELP. Private Education Loans bear the full credit risk of the customer and any cosigner and are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources. As of June 30, 2014 approximately 86 percent of the FFELP Loans and 59 percent of the Private Education Loans held by Navient were funded to term with non-recourse, long-term securitization debt through the use of securitization trusts.

Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non-profit education lenders and ED. Navient is one of four large servicers to ED under its Direct Student Loan Program ("DSLP"). It provides asset recovery services on its own portfolio (consisting of both education loans as well as other asset classes), and for guaranty agencies (which serve as intermediaries between the U.S. federal

45

Table of Contents

government and FFELP lenders and are responsible for paying claims on defaulted FFELP Loans), ED and other clients.

As of June 30, 2014, Navient's principal assets consisted of:

- $99.7 billion in FFELP Loans, with a student loan spread of 0.98 percent for the quarter ended June 30, 2014 on a "Core Earnings" basis and a weighted average life of 7.6 years;

- $30.3 billion in Private Education Loans, with a student loan spread of 4.10 percent for the quarter ended June 30, 2014 on a "Core Earnings" basis and a weighted average life of 7.0 years;

- a leading student loan servicing platform that services loans for more than 12 million FFELP Loan, DSLP loan and Private Education Loan customers (including cosigners), including 5.8 million customer accounts serviced under Navient's contract with ED; and

- a leading student loan asset recovery platform with an outstanding inventory of contingent asset recovery receivables of approximately $16.3 billion, of which approximately $13.5 billion was student loans and the remainder was other debt.

### Navient's Strengths and Opportunities

Navient possesses a number of competitive advantages that distinguishes it from its competitors, including:

*Large, high quality asset base with predictable cash flows.* At June 30, 2014, Navient's $130 billion student loan portfolio is 80 percent funded to term and is expected to produce consistent and predictable cash flows over the remaining life of the portfolio. Navient's $100 billion portfolio of FFELP Loans bears a maximum three-percent loss exposure due to the federal guarantee. Navient's $30 billion portfolio of Private Education Loans bears the full credit risk of the borrower and cosigner. Navient expects that cash flows from its FFELP Loan and Private Education Loan portfolios will significantly exceed future debt service obligations.

*Efficient and large scale servicing platform.* Navient is the largest servicer of education loans, servicing more than 12 million customers with over $300 billion of loans. Navient has demonstrated scalable infrastructure with capacity to add volume at a low cost. Navient's premier market share and tested servicing and asset recovery infrastructure make it well-positioned to expand its servicing and asset recovery businesses to additional third-party FFELP, federal, Private Education and other loan portfolios.

*Superior operating performance.* Navient has demonstrated superior default prevention performance and industry leading asset recovery services. Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average. Navient prides itself on a robust compliance culture driven by a "customer first" approach.

*Strong capital return.* As a result of the significant cash flow and capital generation, Navient expects to return excess capital to stockholders through dividends and share repurchases.

*Meaningful growth opportunities.* Navient will pursue opportunistic acquisitions of FFELP and Private Education Loan portfolios as well as additional ED and third-party servicing and asset recovery fee income opportunities. Navient will leverage its large-scale servicing platform, superior default prevention and asset recovery performance, operating efficiency and regulatory compliance and risk management infrastructure in pursuing these and other growth opportunities.

### Navient's Approach to Assisting Students and Families in Repaying their Education Loans

Navient has a leading student loan servicing platform that services loans for more than 12 million FFELP Loan, DSLP loan and Private Education Loan customers (including cosigners), including 5.8 million customer accounts serviced under Navient's contract with ED. Employee emphasis is placed on providing service with

46

Table of Contents

accuracy, courtesy, consistency and empathy. If we fall short, we make it a priority to correct our mistake, and we make it a priority to prevent it from happening again.

We understand managing repayment of education loans is critical for students to achieve their educational goals, recognize their full earning potential and develop a strong credit profile. A key indicator of future success in loan repayment is graduation. Navient encourages customers to plan for the full cost of their education to increase their likelihood of completing their course of study because we know that those who drop out or do not complete their course of study are more likely to default on their education loans.

When it comes to repaying education loans, customer success means making steady progress toward repayment, instead of falling behind on payments. Our experience has taught us that the transition from school to full repayment requires making and carrying out a financial plan. For many, this is their first borrowing experience. For new graduates, salaries grow over time, typically making payments easier to handle as their career progresses. It is also not uncommon for some to return to school, experience illness or encounter temporary interruptions in earnings.

To help customers manage these realities, Navient makes customer success and default prevention top priorities. Contact and counseling keep customers on track, and we believe we go beyond what is required in our efforts to assist customers with past-due student loan payments. That outreach pays off: approximately 90 percent of federal loan customers we reach successfully utilize the options available to them to resolve their delinquency. As a result of our outreach, the federal education loans Navient services default at rates 30 percent better than the national average.

**Selected Historical Financial Information and Ratios**

Although SLM BankCo is the entity that distributed the shares of Navient common stock to SLM BankCo common stockholders, for financial reporting purposes, Navient is treated as the "accounting spinnor" and therefore Navient, and not SLM BankCo, is the "accounting successor" to Old SLM. Hence, the following GAAP financial information to the extent related to periods on or prior to April 30, 2014 reflects the historical results of operations and financial condition of Old SLM, which is the accounting predecessor of Navient. For a discussion of how "Core Earnings" results are different than GAAP results, see "'Core Earnings' — Definitions and Limitations" and "Differences between 'Core Earnings' and GAAP."

47

Table of Contents

| (In millions, except per share data) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **GAAP Basis** | | | | |
| Net income attributable to Navient Corporation | $ 307 | $ 543 | $ 526 | $ 889 |
| Diluted earnings per common share attributable to Navient Corporation | $ .71 | $ 1.20 | $ 1.20 | $ 1.94 |
| Weighted average shares used to compute diluted earnings per common share | 430 | 448 | 432 | 453 |
| Return on assets | .87% | 1.35% | .72% | 1.08% |
| Ending FFELP Loans, net | $ 99,730 | $108,491 | $ 99,730 | $108,491 |
| Ending Private Education Loans, net | 30,324 | 37,116 | 30,324 | 37,116 |
| Ending total student loans, net | $130,054 | $145,607 | $130,054 | $145,607 |
| Average FFELP Loans | $100,926 | $113,981 | $102,322 | $117,896 |
| Average Private Education Loans | 33,811 | 38,154 | 36,364 | 38,279 |
| Average total student loans | $134,737 | $152,135 | $138,686 | $156,175 |
| **"Core Earnings" Basis**[1] | | | | |
| Net income attributable to Navient Corporation | $ 241 | $ 447 | $ 383 | $ 709 |
| Diluted earnings per common share attributable to Navient Corporation | $ .56 | $ 1.00 | $ .89 | $ 1.56 |
| Weighted average shares used to compute diluted earnings per common share | 430 | 448 | 432 | 453 |
| Return on assets | .70% | 1.17% | .56% | .91% |
| Ending FFELP Loans, net | $ 99,730 | $107,331 | $ 99,730 | $107,331 |
| Ending Private Education Loans, net | 30,324 | 31,781 | 30,324 | 31,781 |
| Ending total student loans, net | $130,054 | $139,112 | $130,054 | $139,112 |
| Average FFELP Loans | $100,467 | $112,891 | $101,393 | $116,831 |
| Average Private Education Loans | 31,408 | 32,619 | 31,467 | 32,411 |
| Average total student loans | $131,875 | $145,510 | $132,860 | $149,242 |

(1) "Core Earnings" are non-GAAP financial measures and do not represent a comprehensive basis of accounting. For a greater explanation of "Core Earnings," see the section titled "'Core Earnings' — Definition and Limitations" and subsequent sections.

**Overview**

Navient is a loan management, servicing and asset recovery company. Navient holds the largest portfolio of student loans issued or guaranteed under the FFELP. Navient is also the largest holder of Private Education Loans. Navient services and performs asset recovery services on these loans for its own accounts, for guaranty agencies, and for loans owned by ED, financial institutions, banks, credit unions and non-profit education lenders.

The following discussion and analysis presents a review of our business and operations as of and for the quarter and six months ended June 30, 2014.

We monitor and assess our ongoing operations and results based on the following four reportable segments: (1) FFELP Loans (2) Private Education Loans, (3) Business Services and (4) Other. Our segment presentation excludes the results of the consumer banking business distributed on April 30, 2014. See "'Core Earnings' — Definition and Limitations" for further discussion.

48

Table of Contents

### FFELP Loans Segment

In the FFELP Loans segment, we acquire and finance FFELP Loans. Even though FFELP Loans are no longer originated, we continue to seek to acquire FFELP Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the FFELP Loan portfolio. This segment is expected to generate significant amounts of cash as the portfolio amortizes.

### Private Education Loans Segment

In this segment, we acquire, finance and service Private Education Loans. Even though we no longer originate Private Education Loans, we continue to seek to acquire Private Education Loan portfolios to leverage our servicing scale to generate incremental earnings and cash flow. In this segment, we primarily earn net interest income on the Private Education Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of cash as the portfolio amortizes.

### Business Services Segment

Our Business Services segment generates its revenue from servicing our FFELP Loan portfolio as well as providing servicing and asset recovery services for loans on behalf of Guarantors of FFELP Loans and other institutions, including ED.

### Other

Our Other segment primarily consists of activities of our holding company, including the repurchase of debt, the corporate liquidity portfolio and all overhead. We also include results from certain smaller wind-down and discontinued operations within this segment.

## Key Financial Measures

Our operating results are primarily driven by net interest income from our student loan portfolios (which include financing costs), provision for loan losses, the revenues and expenses generated by our service businesses, and gains and losses on subsidiary sales, loan sales and debt repurchases. We manage and assess the performance of each business segment separately as each is focused on different customers and each derives its revenue from different activities and services. A brief summary of our key financial measures (net interest income; provisions for loan losses; charge-offs and delinquencies; servicing and asset recovery revenues; other income (loss); and operating expenses) can be found in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Form 10.

## Second-Quarter 2014 Summary of Results

We report financial results on a GAAP basis and also present certain "Core Earnings" performance measures. Our management, board of directors, credit rating agencies, lenders and investors use these "Core Earnings" measures to monitor our business performance. See "'Core Earnings' — Definition and Limitations" for a further discussion and a complete reconciliation between GAAP net income and "Core Earnings."

Second-quarter 2014 GAAP net income was $307 million ($0.71 diluted earnings per share), versus net income of $543 million ($1.20 diluted earnings per share) in the second-quarter 2013. The changes in GAAP net income are impacted by the same "Core Earnings" items discussed below, as well as changes in net income attributable to (1) the financial results attributable to the operations of the consumer banking business prior to the Spin-Off on April 30, 2014 and related restructuring and reorganization expense incurred in connection with the Spin-Off, (2) unrealized, mark-to-market gains/losses on derivatives and (3) goodwill and acquired intangible asset amortization and impairment. These items are recognized in GAAP but have not been included in "Core Earnings" results. Second-quarter 2014 GAAP results included gains of $150 million from derivative accounting treatment that are excluded from "Core Earnings" results, compared with gains of $143 million in the year-ago

49

Table of Contents

period. See "Differences between 'Core Earnings' and GAAP" for a complete reconciliation between GAAP net income and "Core Earnings."

"Core Earnings" for the second-quarter 2014 were $241 million ($0.56 diluted earnings per share), compared with $447 million ($1.00 diluted earnings per share) for the year-ago quarter.

Last year, management undertook a series of actions to improve shareholder value, including the sale of residual interests in several FFELP securitization trusts, the divestiture of two subsidiaries, debt repurchases, and the strategic separation of Navient from Old SLM, which was completed on April 30, 2014. Adjusting for these transactions, second quarter 2014 "Core Earnings" increased $0.04 per share compared to the year-ago quarter, primarily due to increased servicing and asset recovery revenue and lower provisions for loan losses. The table below summarizes the impact of these items on "Core Earnings":

*Impact of items related to improving shareholder value*

| (Dollars in millions) | Three Months Ended June 30, 2014 | | Three Months Ended June 30, 2013 | | Increase (Decrease) in "Core Earnings" | |
|---|---|---|---|---|---|---|
| Gains from sales of residual interests in FFELP securitization trusts | $ | — | $ | 257 | $ | (257) |
| Gains from sales of subsidiaries, net of tax | | — | | 38 | | (38) |
| Debt repurchase gains | | — | | 19 | | (19) |

*Other items*

| (Dollars in millions) | Three Months Ended June 30, 2014 | | Three Months Ended June 30, 2013 | | Increase (Decrease) in "Core Earnings" | |
|---|---|---|---|---|---|---|
| Servicing, asset recovery and other revenue | $ | 214 | $ | 178 | $ | 36 |
| Provisions for loan losses | | 155 | | 202 | | 47 |
| Operating expenses | | 195 | | 185 | | (10) |
| Net interest income before provisions for loan losses | | 522 | | 576 | | (54) |

In addition, during the first six months of 2014, we:

• issued $2.7 billion of FFELP asset-backed securities ("ABS"), $676 million of Private Education Loan ABS and $850 million of unsecured bonds;

• closed on a new $8 billion FFELP Loan asset-backed commercial paper ("ABCP") facility that matures in January 2016. This facility replaced an existing $5.5 million FFELP ABCP facility which was retired in January 2014;

• closed a $1.0 billion Private Education Loan ABS commercial paper facility. The facility, which matures in June 2015, will be available for Private Education Loan refinancing and acquisitions;

• repurchased 12.2 million common shares for $265 million on the open market (8.3 million common shares for $200 million pre-Spin-Off, and 3.9 million common shares for $65 million post-Spin-Off); and

• authorized $400 million in May 2014 to be utilized in a new common share repurchase program.

**Results of Operations**

We present the results of operations below first on a consolidated basis in accordance with GAAP. Following our discussion of consolidated earnings results on a GAAP basis, we present our results on a segment basis. We have four business segments: FFELP Loans, Private Education Loans, Business Services and Other. Since these segments operate in distinct business environments and we manage and evaluate the financial performance of these segments using non-GAAP financial measures, these segments are presented on a "Core Earnings" basis (see "'Core Earnings' — Definition and Limitations").

Table of Contents

**GAAP Statements of Income (Unaudited)**

| (In millions, except per share data) | Three Months Ended June 30, 2014 | 2013 | Increase (Decrease) $ | % | Six Months Ended June 30, 2014 | 2013 | Increase (Decrease) $ | % |
|---|---|---|---|---|---|---|---|---|
| Interest income: | | | | | | | | |
| FFELP Loans | $ 631 | $ 703 | $ (72) | (10)% | $1,278 | $1,439 | $(161) | (11)% |
| Private Education Loans | 539 | 627 | (88) | (14) | 1,183 | 1,249 | (66) | (5) |
| Other loans | 2 | 3 | (1) | (33) | 4 | 6 | (2) | (33) |
| Cash and investments | 3 | 4 | (1) | (25) | 6 | 8 | (2) | (25) |
| Total interest income | 1,175 | 1,337 | (162) | (12) | 2,471 | 2,702 | (231) | (9) |
| Total interest expense | 513 | 553 | (40) | (7) | 1,042 | 1,123 | (81) | (7) |
| Net interest income | 662 | 784 | (122) | (16) | 1,429 | 1,579 | (150) | (9) |
| Less: provisions for loan losses | 165 | 201 | (36) | (18) | 350 | 442 | (92) | (21) |
| Net interest income after provisions for loan losses | 497 | 583 | (86) | (15) | 1,079 | 1,137 | (58) | (5) |
| Other income (loss): | | | | | | | | |
| Gains on sales of loans and investments | — | 251 | (251) | (100) | — | 307 | (307) | (100) |
| Gains (losses) on derivative and hedging activities, net | 61 | 18 | 43 | 239 | 53 | (13) | 66 | 508 |
| Servicing revenue | 73 | 69 | 4 | 6 | 136 | 139 | (3) | (2) |
| Asset recovery revenue | 132 | 109 | 23 | 21 | 243 | 208 | 35 | 17 |
| Gains on debt repurchases | — | 19 | (19) | (100) | — | 42 | (42) | (100) |
| Other income | 9 | 24 | (15) | (63) | 13 | 59 | (46) | (78) |
| Total other income | 275 | 490 | (215) | (44) | 445 | 742 | (297) | (40) |
| Expenses: | | | | | | | | |
| Operating expenses | 211 | 244 | (33) | (14) | 578 | 481 | 97 | 20 |
| Goodwill and acquired intangible asset impairment and amortization expense | 2 | 3 | (1) | (33) | 6 | 6 | — | — |
| Restructuring and other reorganization expenses | 61 | 23 | 38 | 165 | 87 | 34 | 53 | 156 |
| Total expenses | 274 | 270 | 4 | 1 | 671 | 521 | 150 | 29 |
| Income from continuing operations, before income tax expense | 498 | 803 | (305) | (38) | 853 | 1,358 | (505) | (37) |
| Income tax expense | 191 | 299 | (108) | (36) | 328 | 509 | (181) | (36) |
| Net income from continuing operations | 307 | 504 | (197) | (39) | 525 | 849 | (324) | (38) |
| Income from discontinued operations, net of tax expense | — | 38 | (38) | (100) | 1 | 39 | (38) | (97) |
| **Net income** | 307 | 542 | (235) | (43) | 526 | 888 | (362) | (41) |
| Less: net loss attributable to noncontrolling interest | — | (1) | 1 | (100) | — | (1) | 1 | (100) |
| **Net income attributable to Navient Corporation** | 307 | 543 | (236) | (43) | 526 | 889 | (363) | (41) |
| Preferred stock dividends | 2 | 5 | (3) | (60) | 6 | 10 | (4) | (40) |
| Net income attributable to Navient Corporation common stock | $ 305 | $ 538 | $(233) | (43)% | $ 520 | $ 879 | $(359) | (41)% |
| **Basic earnings per common share attributable to Navient Corporation:** | | | | | | | | |
| Continuing operations | $ .72 | $ 1.14 | $ (.42) | (37)% | $ 1.22 | $ 1.88 | $ (.66) | (35)% |
| Discontinued operations | — | .08 | (.08) | (100) | — | .09 | (.09) | (100) |
| Total | $ .72 | $ 1.22 | $ (.50) | (41)% | $ 1.22 | $ 1.97 | $ (.75) | (38)% |
| **Diluted earnings per common share attributable to Navient Corporation:** | | | | | | | | |
| Continuing operations | $ .71 | $ 1.12 | $ (.41) | (37)% | $ 1.20 | $ 1.85 | $ (.65) | (35)% |
| Discontinued operations | — | .08 | (.08) | (100) | — | .09 | (.09) | (100) |
| Total | $ .71 | $ 1.20 | $ (.49) | (41)% | $ 1.20 | $ 1.94 | $ (.74) | (38)% |
| Dividends per common share attributable to Navient Corporation | $ .15 | $ .15 | $ — | —% | $ .30 | $ .30 | $ — | —% |

51

Table of Contents

**Consolidated Earnings Summary — GAAP-basis**

**Three Months Ended June 30, 2014 Compared with Three Months Ended June 30, 2013**

   For the three months ended June 30, 2014, net income was $307 million, or $0.71 diluted earnings per common share, compared with net income of $543 million, or $1.20 diluted earnings per common share, for the three months ended June 30, 2013. The decrease in net income was primarily due to $257 million in gains from the sale of Residual Interests in FFELP Loan securitization trusts that occurred in the year-ago quarter, a $38 million after-tax gain from the sale of the Campus Solutions business in the year-ago quarter, a $122 million decline in net interest income, a $19 million decrease in debt repurchase gains, a $15 million decrease in other income, and higher restructuring and other reorganization costs of $38 million, which was partially offset by a $36 million decline in the provision for loan losses, lower operating expenses of $33 million, a $43 million increase in net gains on derivative and hedging activities and a $27 million increase in servicing and asset recovery revenue.

   The primary contributors to each of the identified drivers of changes in net income for the current quarter compared with the year-ago quarter are as follows:

- Net interest income decreased by $122 million due to a reduction in FFELP net interest income resulting from a $13 billion decline in average FFELP Loans outstanding. This decline in FFELP Loans was due, in part, to the sale of Residual Interests in FFELP Loan securitization trusts in the first half of 2013. There were approximately $12 billion of FFELP Loans in these trusts at the time of sale. Also contributing to the decrease was SLM BankCo's net interest income attributable to the Company declining $54 million between the periods primarily as a result of the deemed distribution on April 30, 2014.

- Provisions for loan losses declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs.

- Gains on sales of loans and investments decreased by $251 million as the result of a $257 million gain on the sale of the Residual Interests in FFELP Loan securitization trusts in the year-ago quarter. There were no sales in the current quarter.

- Gains (losses) on derivative and hedging activities, net, increased $43 million. The primary factors affecting the change were interest rate and foreign currency fluctuations, which primarily affected the valuations of our Floor Income Contracts, basis swaps and foreign currency hedges during each period. Valuations of derivative instruments vary based upon many factors including changes in interest rates, credit risk, foreign currency fluctuations and other market factors. As a result, net gains and losses on derivative and hedging activities may continue to vary significantly in future periods.

- Servicing and asset recovery revenue increased $27 million primarily as a result of an increase in the number of accounts serviced and an increase in asset recovery volumes.

- Gains on debt repurchases decreased $19 million. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

- Other income decreased $15 million primarily due to a $21 million decrease in foreign currency translation gains. The foreign currency translation gains relate to a portion of our foreign currency denominated debt that does not receive hedge accounting treatment. These gains were partially offset by the "gains (losses) on derivative and hedging activities, net" line item on the income statement related to the derivatives used to economically hedge these debt instruments.

- Operating expenses decreased $33 million primarily as a result of SLM BankCo's operating expenses attributable to the Company declining $44 million between the periods primarily as a result of the deemed distribution on April 30, 2014. This was partially offset primarily by increases in our third-party servicing and asset recovery activities.

- Restructuring and other reorganization expenses increased $38 million to $61 million. These expenses were primarily related to third-party costs incurred in connection with the Spin-Off.

52

Table of Contents

We repurchased 3.9 million shares and 9.1 million shares of our common stock during the three months ended June 30, 2014 and 2013, respectively, as part of our common share repurchase programs. Primarily as a result of ongoing common share repurchases, our average outstanding diluted shares decreased by 18 million common shares from the year-ago quarter.

**Six Months Ended June 30, 2014 Compared with Six Months Ended June 30, 2013**

For the six months ended June 30, 2014, net income was $526 million, or $1.20 diluted earnings per common share, compared with net income of $889 million, or $1.94 diluted earnings per common share, for the six months ended June 30, 2013. The decrease in net income was primarily due to $312 million in gains from the sale of Residual Interests in FFELP Loan securitization trusts that occurred in the first half of 2013, a $38 million after-tax gain from the sale of the Campus Solutions business in the year-ago period, a $150 million decline in net interest income, a $42 million decrease in debt repurchase gains, a $46 million decrease in other income, higher operating expenses of $97 million and higher restructuring and other reorganization costs of $53 million, which was partially offset by a $92 million decline in the provision for loan losses, a $66 million increase in net gains on derivative and hedging activities and a $32 million increase in servicing and asset recovery revenue.

The primary contributors to each of the identified drivers of changes in net income for the current six-month period compared with the year-ago six-month period are as follows:

- Net interest income decreased by $150 million due to a reduction in FFELP net interest income resulting from a $16 billion decline in average FFELP Loans outstanding. This decline in FFELP Loans was due, in part, to the sale of Residual Interests in FFELP Loan securitization trusts in the first half of 2013. There were approximately $12 billion of FFELP Loans in these trusts at the time of sale. Also contributing to the decrease was SLM BankCo's net interest income attributable to the Company declining $27 million between the periods primarily as a result of the deemed distribution on April 30, 2014.

- Provisions for loan losses declined $92 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs.

- Gains on sales of loans and investments decreased by $307 million as the result of $312 million in gains on the sales of the Residual Interests in FFELP Loan securitization trusts in the first-half of 2013. There were no sales in the current six-month period.

- Gains (losses) on derivative and hedging activities, net, increased $66 million. The primary factors affecting the change were interest rate and foreign currency fluctuations, which primarily affected the valuations of our Floor Income Contracts, basis swaps and foreign currency hedges during each period. Valuations of derivative instruments vary based upon many factors including changes in interest rates, credit risk, foreign currency fluctuations and other market factors. As a result, net gains and losses on derivative and hedging activities may continue to vary significantly in future periods.

- Servicing and asset recovery revenue increased $32 million primarily as a result of an increase in the number of accounts serviced and an increase in asset recovery volumes.

- Gains on debt repurchases decreased $42 million. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

- Other income decreased $46 million primarily due to a $55 million decrease in foreign currency translation gains. The foreign currency translation gains relate to a portion of our foreign currency denominated debt that does not receive hedge accounting treatment. These gains were partially offset by the "gains (losses) on derivative and hedging activities, net" line item on the income statement related to the derivatives used to economically hedge these debt instruments.

- The primary driver of the increase in direct operating expenses for the six months ended June 30, 2014 compared with the prior-year period was $103 million of additional reserve recorded in first-quarter 2014 for pending regulatory matters. During the second quarter, Navient entered into agreements with the

53

Table of Contents

United States Department of Justice ("DOJ") and Federal Deposit Insurance Corporation (the "FDIC") to resolve these previously reported regulatory matters.

Operating expenses excluding the regulatory reserve discussed above decreased $6 million, primarily due to SLM BankCo's operating expenses attributable to the Company declining $50 million between the periods primarily as a result of the deemed distribution on April 30, 2014. This was partially offset primarily by increases in our third-party servicing and asset recovery activities.

• Restructuring and other reorganization expenses increased $53 million to $87 million. These expenses were primarily related to third-party costs incurred in connection with the Spin-Off.

We repurchased 12.2 million shares and 19.3 million shares of our common stock during the six months ended June 30, 2014 and 2013, respectively, as part of our common share repurchase programs. Primarily as a result of ongoing common share repurchases, our average outstanding diluted shares decreased by 21 million common shares from the year-ago period.

**"Core Earnings" — Definition and Limitations**

We prepare financial statements in accordance with GAAP. However, we also evaluate our business segments on a basis that differs from GAAP. We refer to this different basis of presentation as "Core Earnings." We provide this "Core Earnings" basis of presentation on a consolidated basis for each business segment because this is what we review internally when making management decisions regarding our performance and how we allocate resources. We also refer to this information in our presentations with credit rating agencies, lenders and investors. Because our "Core Earnings" basis of presentation corresponds to our segment financial presentations, we are required by GAAP to provide "Core Earnings" disclosure in the notes to our consolidated financial statements for our business segments.

"Core Earnings" are not a substitute for reported results under GAAP. We use "Core Earnings" to manage each business segment because "Core Earnings" reflect adjustments to GAAP financial results for three items, discussed below, that are either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management. Accordingly, we believe that "Core Earnings" provide management with a useful basis from which to better evaluate results from ongoing operations against the business plan or against results from prior periods. Consequently, we disclose this information because we believe it provides investors with additional information regarding the operational and performance indicators that are most closely assessed by management. When compared to GAAP results, the three items we remove to result in our "Core Earnings" presentations are:

1. The financial results attributable to the operations of the consumer banking business (SLM BankCo) prior to the Spin-Off and related restructuring and reorganization expense incurred in connection with the Spin-Off. For GAAP purposes, Navient reflected the deemed distribution of SLM BankCo on April 30, 2014. For "Core Earnings," we exclude the consumer banking business as if it had never been a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014;

2. Our use of derivative instruments to hedge our economic risks that do not qualify for hedge accounting treatment or do qualify for hedge accounting treatment but result in ineffectiveness resulting in unrealized, mark-to-market gains/losses; and

3. The accounting for goodwill and acquired intangible assets.

While GAAP provides a uniform, comprehensive basis of accounting, for the reasons described above, our "Core Earnings" basis of presentation does not. "Core Earnings" are subject to certain general and specific limitations that investors should carefully consider. For example, there is no comprehensive, authoritative guidance for management reporting. Our "Core Earnings" are not defined terms within GAAP and may not be comparable to similarly titled measures reported by other companies. Accordingly, our "Core Earnings" presentation does not represent a comprehensive basis of accounting. Investors, therefore, may not be able to compare our performance with that of other financial services companies based upon "Core Earnings." "Core

54

Table of Contents

Earnings" results are only meant to supplement GAAP results by providing additional information regarding the operational and performance indicators that are most closely used by management, our board of directors, credit rating agencies, lenders and investors to assess performance.

Old SLM's definition of "Core Earnings" did not exclude the financial results attributable to the operations of the consumer banking business and related restructuring and reorganization expense incurred in connection with the Spin-Off. In the second quarter of 2014, in connection with the Spin-Off, Navient included this additional adjustment as a part of "Core Earnings" to allow better comparability of Navient's results to pre-Spin-Off historical periods. All prior periods in this Quarterly Report on Form 10-Q have been restated to conform to Navient's revised definition of "Core Earnings."

55

Table of Contents

The following tables show "Core Earnings" for each business segment and our business as a whole along with the adjustments made to the income/expense items to reconcile the amounts to our reported GAAP results as required by GAAP and reported in "Note 12 — Segment Reporting."

| | | | | | | | | Adjustments | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 522 | $ 490 | $ — | $ — | $ — | $ 1,012 | $ 166 | $ (8) | $ 158 | $1,170 |
| Other loans | — | — | 2 | — | — | 2 | — | — | — | 2 |
| Cash and investments | 1 | — | 1 | — | — | 2 | — | 1 | 1 | 3 |
| Total interest income | 523 | 490 | — | 3 | — | 1,016 | 166 | (7) | 159 | 1,175 |
| Total interest expense | 291 | 173 | — | 30 | — | 494 | 12 | 7 | 19 | 513 |
| Net interest income (loss) | 232 | 317 | — | (27) | — | 522 | 154 | (14) | 140 | 662 |
| Less: provisions for loan losses | 10 | 145 | — | — | — | 155 | — | 10 | 10 | 165 |
| Net interest income (loss) after provisions for loan losses | 222 | 172 | — | (27) | — | 367 | 154 | (24) | 130 | 497 |
| **Other income (loss):** | | | | | | | | | | |
| Gains on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 15 | 7 | 166 | — | (115) | 73 | — | — | — | 73 |
| Asset recovery revenue | — | — | 132 | — | — | 132 | — | — | — | 132 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income | — | — | 1 | 8 | — | 9 | (154) | 215 | 61 | 70 |
| Total other income (loss) | 15 | 7 | 299 | 8 | (115) | 214 | (154) | 215 | 61 | 275 |
| **Expenses:** | | | | | | | | | | |
| Direct operating expenses | 121 | 42 | 93 | 2 | (115) | 143 | — | 11 | 11 | 154 |
| Overhead expenses | — | — | — | 52 | — | 52 | — | 5 | 5 | 57 |
| Operating expenses | 121 | 42 | 93 | 54 | (115) | 195 | — | 16 | 16 | 211 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 2 | 2 | 2 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 61 | 61 | 61 |
| Total expenses | 121 | 42 | 93 | 54 | (115) | 195 | — | 79 | 79 | 274 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 116 | 137 | 206 | (73) | — | 386 | — | 112 | 112 | 498 |
| Income tax expense (benefit)[3] | 44 | 51 | 76 | (26) | — | 145 | — | 46 | 46 | 191 |
| Net income (loss) from continuing operations | 72 | 86 | 130 | (47) | $ — | 241 | — | 66 | 66 | 307 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | — | — | | — | — | — | — | — |
| Net income (loss) | 72 | 86 | 130 | (47) | — | 241 | — | 66 | 66 | 307 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 72 | $ 86 | $ 130 | $ (47) | $ — | $ 241 | $ — | $ 66 | $ 66 | $ 307 |

[1] The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

[2] "Core Earnings" adjustments to GAAP:

| | Quarter Ended June 30, 2014 | | | |
|---|---|---|---|---|
| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 35 | $ 95 | $ — | $ 130 |
| Total other income | 6 | 55 | — | 61 |
| Operating expenses | 16 | — | — | 16 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 2 | 2 |
| Restructuring and other reorganization expenses | 61 | — | — | 61 |
| Total "Core Earnings" adjustments to GAAP | $ (36) | $ 150 | $ (2) | 112 |
| Income tax expense | | | | 46 |
| Net income | | | | $ 66 |

[3] Income taxes are based on a percentage of net income before tax for the individual reportable segment.

56

Table of Contents

| | | | | | | | Adjustments | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Quarter Ended June 30, 2013 | | | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
| Interest income: | | | | | | | | | | |
| Student loans | $ 573 | $ 513 | $ — | $ — | $ — | $ 1,086 | $ 198 | $ 46 | $ 244 | $1,330 |
| Other loans | — | — | — | 3 | — | 3 | — | — | — | 3 |
| Cash and investments | 2 | — | — | 1 | — | 3 | — | 1 | 1 | 4 |
| Total interest income | 575 | 513 | — | 4 | — | 1,092 | 198 | 47 | 245 | 1,337 |
| Total interest expense | 319 | 187 | — | 10 | — | 516 | 13 | 24 | 37 | 553 |
| Net interest income (loss) | 256 | 326 | — | (6) | — | 576 | 185 | 23 | 208 | 784 |
| Less: provisions for loan losses | 13 | 189 | — | — | — | 202 | — | (1) | (1) | 201 |
| Net interest income (loss) after provisions for loan losses | 243 | 137 | — | (6) | — | 374 | 185 | 24 | 209 | 583 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | 257 | — | — | (6) | — | 251 | — | — | — | 251 |
| Servicing revenue | 16 | 10 | 180 | — | (137) | 69 | — | — | — | 69 |
| Asset recovery revenue | — | — | 109 | — | — | 109 | — | — | — | 109 |
| Gains on debt repurchases | — | — | — | 19 | — | 19 | — | — | — | 19 |
| Other income | — | — | — | — | — | — | (185) | 227 | 42 | 42 |
| Total other income (loss) | 273 | 10 | 289 | 13 | (137) | 448 | (185) | 227 | 42 | 490 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 143 | 51 | 88 | 3 | (137) | 148 | — | 38 | 38 | 186 |
| Overhead expenses | — | — | — | 37 | — | 37 | — | 21 | 21 | 58 |
| Operating expenses | 143 | 51 | 88 | 40 | (137) | 185 | — | 59 | 59 | 244 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 3 | 3 | 3 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 23 | 23 | 23 |
| Total expenses | 143 | 51 | 88 | 40 | (137) | 185 | — | 85 | 85 | 270 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 373 | 96 | 201 | (33) | — | 637 | — | 166 | 166 | 803 |
| Income tax expense (benefit)(3) | 135 | 35 | 72 | (13) | — | 229 | — | 70 | 70 | 299 |
| Net income (loss) from continuing operations | 238 | 61 | 129 | (20) | $ — | 408 | — | 96 | 96 | 504 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 39 | — | — | 39 | — | (1) | (1) | 38 |
| Net income (loss) | 238 | 61 | 168 | (20) | — | 447 | — | 95 | 95 | 542 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 238 | $ 61 | $ 168 | $ (20) | $ — | $ 447 | $ — | $ 96 | $ 96 | $ 543 |

(1)  The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2)  "Core Earnings" adjustments to GAAP:

| | Quarter Ended June 30, 2013 | | | |
|---|---|---|---|---|
| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
| Net interest income after provisions for loan losses | $ 100 | $ 109 | $ — | $ 209 |
| Total other income | 8 | 34 | — | 42 |
| Operating expenses | 59 | — | — | 59 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 3 | 3 |
| Restructuring and other reorganization expenses | 23 | — | — | 23 |
| Total "Core Earnings" adjustments to GAAP | $ 26 | $ 143 | $ (3) | 166 |
| Income tax expense | | | | 70 |
| Income (loss) from discontinued operations | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 96 |

(3)  Income taxes are based on a percentage of net income before tax for the individual reportable segment.

57

Table of Contents

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations(1) | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments(2) | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Adjustments | | | |
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 1,033 | $ 985 | $ — | $ — | $ — | $ 2,018 | $ 365 | $ 78 | $ 443 | $2,461 |
| Other loans | — | — | 5 | — | — | 5 | — | (1) | (1) | 4 |
| Cash and investments | 2 | — | — | 2 | — | 4 | — | 2 | 2 | 6 |
| Total interest income | 1,035 | 985 | — | 7 | — | 2,027 | 365 | 79 | 444 | 2,471 |
| Total interest expense | 578 | 358 | — | 55 | — | 991 | 22 | 29 | 51 | 1,042 |
| Net interest income (loss) | 457 | 627 | — | (48) | — | 1,036 | 343 | 50 | 393 | 1,429 |
| Less: provisions for loan losses | 20 | 281 | — | — | — | 301 | — | 49 | 49 | 350 |
| Net interest income (loss) after provisions for loan losses | 437 | 346 | — | (48) | — | 735 | 343 | 1 | 344 | 1,079 |
| **Other income (loss):** | | | | | | | | | | |
| Gains on sales of loans and investments | — | — | — | — | — | — | — | — | — | — |
| Servicing revenue | 26 | 8 | 335 | — | (233) | 136 | — | — | — | 136 |
| Asset recovery revenue | — | — | 243 | — | — | 243 | — | — | — | 243 |
| Gains on debt repurchases | — | — | — | — | — | — | — | — | — | — |
| Other income | — | — | — | 11 | — | 11 | (343) | 398 | 55 | 66 |
| Total other income (loss) | 26 | 8 | 578 | 11 | (233) | 390 | (343) | 398 | 55 | 445 |
| **Expenses:** | | | | | | | | | | |
| Direct operating expenses | 245 | 98 | 188 | 115 | (233) | 413 | — | 36 | 36 | 449 |
| Overhead expenses | — | — | — | 101 | — | 101 | — | 28 | 28 | 129 |
| Operating expenses | 245 | 98 | 188 | 216 | (233) | 514 | — | 64 | 64 | 578 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 6 | 6 | 6 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 87 | 87 | 87 |
| Total expenses | 245 | 98 | 188 | 216 | (233) | 514 | — | 157 | 157 | 671 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 218 | 256 | 390 | (253) | — | 611 | — | 242 | 242 | 853 |
| Income tax expense (benefit)(3) | 83 | 95 | 146 | (95) | — | 229 | — | 99 | 99 | 328 |
| Net income (loss) from continuing operations | 135 | 161 | 244 | (158) | $ — | 382 | — | 143 | 143 | 525 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 1 | — | — | 1 | — | — | — | 1 |
| Net income (loss) | 135 | 161 | 245 | (158) | — | 383 | — | 143 | 143 | 526 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Navient Corporation | $ 135 | $ 161 | $ 245 | $(158) | $ — | $ 383 | $ — | $ 143 | 143 | $ 526 |

*Six Months Ended June 30, 2014*

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| Net interest income after provisions for loan losses | $ 136 | $ 208 | $ — | $ 344 |
| Total other income | 14 | 41 | — | 55 |
| Operating expenses | 64 | — | — | 64 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 6 | 6 |
| Restructuring and other reorganization expenses | 87 | — | — | 87 |
| Total "Core Earnings" adjustments to GAAP | $ (1) | $ 249 | $ (6) | 242 |
| Income tax expense | | | | 99 |
| Net income | | | | $ 143 |

*Six Months Ended June 30, 2014*

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

58

Table of Contents

| (Dollars in millions) | FFELP Loans | Private Education Loans | Business Services | Other | Eliminations[1] | Total "Core Earnings" | Reclassifications | Additions/ (Subtractions) | Total Adjustments[2] | Total GAAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Six Months Ended June 30, 2013 — Adjustments | | |
| **Interest income:** | | | | | | | | | | |
| Student loans | $ 1,163 | $ 1,013 | $ — | $ — | $ — | $ 2,176 | $ 410 | $ 102 | $ 512 | $2,688 |
| Other loans | — | — | — | 6 | — | 6 | — | — | — | 6 |
| Cash and investments | 4 | — | — | 2 | — | 6 | — | 2 | 2 | 8 |
| Total interest income | 1,167 | 1,013 | — | 8 | — | 2,188 | 410 | 104 | 514 | 2,702 |
| Total interest expense | 654 | 371 | — | 25 | — | 1,050 | 31 | 42 | 73 | 1,123 |
| Net interest income (loss) | 513 | 642 | — | (17) | — | 1,138 | 379 | 62 | 441 | 1,579 |
| Less: provisions for loan losses | 29 | 394 | — | — | — | 423 | — | 19 | 19 | 442 |
| Net interest income (loss) after provisions for loan losses | 484 | 248 | — | (17) | — | 715 | 379 | 43 | 422 | 1,137 |
| Other income (loss): | | | | | | | | | | |
| Gains on sales of loans and investments | 312 | — | — | (5) | — | 307 | — | — | — | 307 |
| Servicing revenue | 39 | 19 | 366 | 1 | (286) | 139 | — | — | — | 139 |
| Asset recovery revenue | — | — | 208 | — | — | 208 | — | — | — | 208 |
| Gains on debt repurchases | — | — | — | 48 | — | 48 | (6) | — | (6) | 42 |
| Other income | — | — | — | — | — | — | (373) | 419 | 46 | 46 |
| Total other income (loss) | 351 | 19 | 574 | 44 | (286) | 702 | (379) | 419 | 40 | 742 |
| Expenses: | | | | | | | | | | |
| Direct operating expenses | 300 | 97 | 173 | 5 | (286) | 289 | — | 70 | 70 | 359 |
| Overhead expenses | — | — | — | 78 | — | 78 | — | 44 | 44 | 122 |
| Operating expenses | 300 | 97 | 173 | 83 | (286) | 367 | — | 114 | 114 | 481 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | — | — | — | — | — | 6 | 6 | 6 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — | — | 34 | 34 | 34 |
| Total expenses | 300 | 97 | 173 | 83 | (286) | 367 | — | 154 | 154 | 521 |
| Income (loss) from continuing operations, before income tax expense (benefit) | 535 | 170 | 401 | (56) | — | 1,050 | — | 308 | 308 | 1,358 |
| Income tax expense (benefit)[3] | 194 | 62 | 146 | (21) | — | 381 | — | 128 | 128 | 509 |
| Net income (loss) from continuing operations | 341 | 108 | 255 | (35) $ | — | 669 | — | 180 | 180 | 849 |
| Income (loss) from discontinued operations, net of tax expense (benefit) | — | — | 40 | — | — | 40 | — | (1) | (1) | 39 |
| Net income (loss) | 341 | 108 | 295 | (35) $ | — | 709 | — | 179 | 179 | 888 |
| Less: net loss attributable to noncontrolling interest | — | — | — | — | — | — | — | (1) | (1) | (1) |
| Net income (loss) attributable to Navient Corporation | $ 341 | $ 108 | $ 295 | $ (35) | $ — | $ 709 | $ — | 180 | 180 | $ 889 |

(1) The eliminations in servicing revenue and direct operating expense represent the elimination of intercompany servicing revenue where the Business Services segment performs the loan servicing function for the FFELP Loans segment.

(2) "Core Earnings" adjustments to GAAP:

| (Dollars in millions) | Net Impact of SLM BankCo | Net Impact of Derivative Accounting | Net Impact of Acquired Intangibles | Total |
|---|---|---|---|---|
| | | Six Months Ended June 30, 2013 | | |
| Net interest income after provisions for loan losses | $ 194 | $ 228 | $ — | $ 422 |
| Total other income | 16 | 24 | — | 40 |
| Operating expenses | 114 | — | — | 114 |
| Goodwill and acquired intangible asset impairment and amortization | — | — | 6 | 6 |
| Restructuring and other reorganization expenses | 34 | — | — | 34 |
| Total "Core Earnings" adjustments to GAAP | $ 62 | $ 252 | $ (6) | 308 |
| Income tax expense | | | | 128 |
| Income (loss) from discontinued operations | | | | (1) |
| Net loss attributable to noncontrolling interest | | | | (1) |
| Net income | | | | $ 180 |

(3) Income taxes are based on a percentage of net income before tax for the individual reportable segment.

59

Table of Contents

*Differences between "Core Earnings" and GAAP*

The following discussion summarizes the differences between "Core Earnings" and GAAP net income and details each specific adjustment required to reconcile our "Core Earnings" segment presentation to our GAAP earnings.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **"Core Earnings" net income attributable to Navient Corporation** | $   241 | $   447 | $   383 | $   709 |
| "Core Earnings" adjustments to GAAP: | | | | |
| Net impact of the removal of SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off | (36) | 26 | (1) | 62 |
| Net impact of derivative accounting | 150 | $   143 | $   249 | $   252 |
| Net impact of goodwill and acquired intangible assets | (2) | (3) | (6) | (6) |
| Net tax effect | (46) | (70) | (99) | (128) |
| Total "Core Earnings" adjustments to GAAP | 66 | 96 | 143 | 180 |
| **GAAP net income attributable to Navient Corporation** | $   307 | $   543 | $   526 | $   889 |

1) **SLM BankCo's operations and restructuring and reorganization expense in connection with the Spin-Off:** On April 30, 2014, the Spin-Off of Navient from Old SLM was completed and Navient is now an independent, publicly-traded company. Due to the relative significance of Navient to Old SLM prior to the Spin-Off, among other factors, for financial reporting purposes Navient is treated as the "accounting spinnor" and therefore is the "accounting successor" to Old SLM as constituted prior to the Spin-Off, notwithstanding the legal form of the Spin-Off. Since Navient is treated for accounting purposes as the "accounting spinnor," the GAAP financial statements of Navient reflect the deemed distribution of SLM BankCo to SLM BankCo's stockholders on April 30, 2014.

For "Core Earnings," we assume the consumer banking business (SLM BankCo) was never a part of Navient's historical results prior to the deemed distribution of SLM BankCo on April 30, 2014 and we have removed the restructuring and reorganization expense incurred in connection with the Spin-Off. Excluding these items provides management with a useful basis from which to better evaluate results from ongoing operations against results from prior periods. The adjustment relates to the exclusion of the consumer banking business and represents the operations, assets, liabilities and equity of SLM BankCo, which is comprised of Sallie Mae Bank, Upromise Rewards, the Insurance Business, and the Private Education Loan origination functions. Included in these amounts are also certain general corporate overhead expenses related to the consumer banking business. General corporate overhead consists of costs primarily associated with accounting, finance, legal, human resources, certain information technology costs, stock compensation, and executive management and the board of directors. These costs were generally allocated to the consumer banking business based on the proportionate level of effort provided to the consumer banking business relative to Old SLM using a relevant allocation driver (e.g., in proportion to the number of employees by function that were being transferred to SLM BankCo as opposed to remaining at Navient). All intercompany transactions between SLM BankCo and Navient have been eliminated. In addition, all preferred stock dividends are removed as SLM BankCo succeeded Old SLM as the issuer of the preferred stock in connection with the Spin-Off.

Table of Contents

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2014 | 2013 |
| SLM BankCo net income, before income tax expense | $    25 | $    49 | $    86 | $    96 |
| Restructuring and reorganization expense in connection with the Spin-Off | (61) | (23) | (87) | (34) |
| Total net impact of SLM BankCo | $    (36) | $    26 | $    (1) | $    62 |

2) **Derivative Accounting:** "Core Earnings" exclude periodic unrealized gains and losses that are caused by the mark-to-market valuations on derivatives that do not qualify for hedge accounting treatment under GAAP, as well as the periodic unrealized gains and losses that are a result of ineffectiveness recognized related to effective hedges under GAAP. These realized gains and losses occur in our FFELP Loans, Private Education Loans and Other business segments. Under GAAP, for our derivatives that are held to maturity, the cumulative net unrealized gain or loss over the life of the contract will equal $0 except for Floor Income Contracts, where the cumulative unrealized gain will equal the amount for which we sold the contract. In our "Core Earnings" presentation, we recognize the economic effect of these hedges, which generally results in any net settlement cash paid or received being recognized ratably as an interest expense or revenue over the hedged item's life.

The accounting for derivatives requires that changes in the fair value of derivative instruments be recognized currently in earnings, with no fair value adjustment of the hedged item, unless specific hedge accounting criteria are met. We believe that our derivatives are effective economic hedges, and as such, are a critical element of our interest rate and foreign currency risk management strategy. However, some of our derivatives, primarily Floor Income Contracts and certain basis swaps, do not qualify for hedge accounting treatment and the stand-alone derivative must be marked-to-market in the income statement with no consideration for the corresponding change in fair value of the hedged item. These gains and losses recorded in "Gains (losses) on derivative and hedging activities, net" are primarily caused by interest rate and foreign currency exchange rate volatility and changing credit spreads during the period as well as the volume and term of derivatives not receiving hedge accounting treatment.

Our Floor Income Contracts are written options that must meet more stringent requirements than other hedging relationships to achieve hedge effectiveness. Specifically, our Floor Income Contracts do not qualify for hedge accounting treatment because the pay down of principal of the student loans underlying the Floor Income embedded in those student loans does not exactly match the change in the notional amount of our written Floor Income Contracts. Additionally, the term, the interest rate index, and the interest rate index reset frequency of the Floor Income Contract can be different than that of the student loans. Under derivative accounting treatment, the upfront payment is deemed a liability and changes in fair value are recorded through income throughout the life of the contract. The change in the value of Floor Income Contracts is primarily caused by changing interest rates that cause the amount of Floor Income earned on the underlying student loans and paid to the counterparties to vary. This is economically offset by the change in value of the student loan portfolio earning Floor Income but that offsetting change in value is not recognized. We believe the Floor Income Contracts are economic hedges because they effectively fix the amount of Floor Income earned over the contract period, thus eliminating the timing and uncertainty that changes in interest rates can have on Floor Income for that period. Therefore, for purposes of "Core Earnings," we have removed the unrealized gains and losses related to these contracts and added back the amortization of the net premiums received on the Floor Income Contracts. The amortization of the net premiums received on the Floor Income Contracts for "Core Earnings" is reflected in student loan interest income. Under GAAP accounting, the premiums received on the Floor Income Contracts are recorded as revenue in the "gains (losses) on derivative and hedging activities, net" line item by the end of the contracts' lives.

Basis swaps are used to convert floating rate debt from one floating interest rate index to another to better match the interest rate characteristics of the assets financed by that debt. We primarily use basis swaps to hedge our student loan assets that are primarily indexed to LIBOR or Prime. The accounting for derivatives requires

61

Table of Contents

that when using basis swaps, the change in the cash flows of the hedge effectively offset both the change in the cash flows of the asset and the change in the cash flows of the liability. Our basis swaps hedge variable interest rate risk; however, they generally do not meet this effectiveness test because the index of the swap does not exactly match the index of the hedged assets as required for hedge accounting treatment. Additionally, some of our FFELP Loans can earn at either a variable or a fixed interest rate depending on market interest rates and therefore swaps economically hedging these FFELP Loans do not meet the criteria for hedge accounting treatment. As a result, under GAAP, these swaps are recorded at fair value with changes in fair value reflected currently in the income statement.

The table below quantifies the adjustments for derivative accounting between GAAP and "Core Earnings" net income.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **"Core Earnings" derivative adjustments:** | | | | |
| Gains (losses) on derivative and hedging activities, net, included in other income | $ 61 | $ 18 | $ 53 | $ (13) |
| Plus: Realized losses on derivative and hedging activities, net[1] | 154 | 185 | 343 | 373 |
| Unrealized gains on derivative and hedging activities, net[2] | 215 | 203 | 396 | 360 |
| Amortization of net premiums on Floor Income Contracts in net interest income for "Core Earnings" | (59) | (76) | (135) | (152) |
| Other derivative accounting adjustments[3] | (6) | 16 | (12) | 44 |
| Total net impact of derivative accounting[4] | $ 150 | $ 143 | $ 249 | $ 252 |

[1] See "Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" below for a detailed breakdown of the components of realized losses on derivative and hedging activities.

[2] "Unrealized gains on derivative and hedging activities, net" comprises the following unrealized mark-to-market gains (losses):

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Floor Income Contracts | $ 132 | $ 297 | $ 313 | $ 486 |
| Basis swaps | 12 | (15) | 11 | (19) |
| Foreign currency hedges | 54 | (67) | 15 | (99) |
| Other | 17 | (12) | 57 | (8) |
| Total unrealized gains on derivative and hedging activities, net | $ 215 | $ 203 | $ 396 | $ 360 |

[3] Other derivative accounting adjustments consist of adjustments related to: (1) foreign currency denominated debt that is adjusted to spot foreign exchange rates for GAAP where such adjustment is reversed for "Core Earnings" and (2) certain terminated derivatives that did not receive hedge accounting treatment under GAAP but were economic hedges under "Core Earnings" and, as a result, such gains or losses amortized into "Core Earnings" over the life of the hedged item.

[4] Negative amounts are subtracted from "Core Earnings" net income to arrive at GAAP net income and positive amounts are added to "Core Earnings" net income to arrive at GAAP net income.

*Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities*

Derivative accounting requires net settlement income/expense on derivatives and realized gains/losses related to derivative dispositions (collectively referred to as "realized gains (losses) on derivative and hedging activities") that do not qualify as hedges to be recorded in a separate income statement line item below net interest income. Under our "Core Earnings" presentation, these gains and losses are reclassified to the income statement line item of the economically hedged item. For our "Core Earnings" net interest margin, this would primarily include: (a) reclassifying the net settlement amounts related to our Floor Income Contracts to student loan interest income and (b) reclassifying the net settlement amounts related to certain of our basis swaps to debt

62

Table of Contents

interest expense. The table below summarizes the realized losses on derivative and hedging activities and the associated reclassification on a "Core Earnings" basis.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **Reclassification of realized gains (losses) on derivative and hedging activities:** | | | | |
| Net settlement expense on Floor Income Contracts reclassified to net interest income | $ (166) | $ (198) | $ (365) | $ (410) |
| Net settlement income on interest rate swaps reclassified to net interest income | 12 | 13 | 22 | 31 |
| Foreign exchange derivatives gains reclassified to other income | — | — | — | — |
| Net realized gains on terminated derivative contracts reclassified to other income | — | — | — | 6 |
| Total reclassifications of realized losses on derivative and hedging activities | $ (154) | $ (185) | $ (343) | $ (373) |

*Cumulative Impact of Derivative Accounting under GAAP compared to "Core Earnings"*

As of June 30, 2014, derivative accounting has reduced GAAP equity by approximately $760 million as a result of cumulative net unrealized losses (after tax) recognized under GAAP, but not in "Core Earnings." The following table rolls forward the cumulative impact to GAAP equity due to these unrealized after tax net losses related to derivative accounting.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Beginning impact of derivative accounting on GAAP equity | $ (854) | $ (1,027) | $ (926) | $ (1,080) |
| Net impact of net unrealized gains (losses) under derivative accounting[1] | 94 | 104 | 166 | 157 |
| Ending impact of derivative accounting on GAAP equity | $ (760) | $ (923) | $ (760) | $ (923) |

[1]  Net impact of net unrealized gains (losses) under derivative accounting is composed of the following:

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Total pre-tax net impact of derivative accounting recognized in net income[a] | $ 150 | $ 143 | $ 249 | $ 252 |
| Tax impact of derivative accounting adjustments recognized in net income | (54) | (54) | (76) | (113) |
| Change in unrealized gain (losses) on derivatives, net of tax recognized in other comprehensive income | (2) | 15 | (7) | 18 |
| Net impact of net unrealized gains (losses) under derivative accounting | $ 94 | $ 104 | $ 166 | $ 157 |

[a]  See "'Core Earnings' derivative adjustments" table above.

Net Floor premiums received on Floor Income Contracts that have not been amortized into "Core Earnings" as of the respective year-ends are presented in the table below. These net premiums will be recognized in "Core

63

Table of Contents

Earnings" in future periods. As of June 30, 2014, the remaining amortization term of the net floor premiums was approximately 2.00 years for existing contracts. Historically, we have sold Floor Income Contracts on a periodic basis and depending upon market conditions and pricing, we may enter into additional Floor Income Contracts in the future. The balance of unamortized Floor Income Contracts will increase as we sell new contracts and decline due to the amortization of existing contracts.

| (Dollars in millions) | June 30, 2014 | June 30, 2013 |
|---|---|---|
| Unamortized net Floor premiums (net of tax)[1] | $ (274) | $ (452) |

(1)    $(433) million and $(720) million on a pre-tax basis as of June 30, 2014 and 2013, respectively.

3) **Goodwill and Acquired Intangible Assets:** Our "Core Earnings" exclude goodwill and intangible asset impairment and the amortization of acquired intangible assets. The following table summarizes the goodwill and acquired intangible asset adjustments.

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| "Core Earnings" goodwill and acquired intangible asset adjustments[1] | $ (3) | $ (3) | $ (6) | $ (6) |

(1)    Negative amounts are subtracted from "Core Earnings" net income to arrive at GAAP net income.

**Business Segment Earnings Summary — "Core Earnings" Basis**

**FFELP Loans Segment**

The following table includes "Core Earnings" results for our FFELP Loans segment.

| (Dollars in millions) | Three Months Ended June 30, | | % Increase (Decrease) | Six Months Ended June 30, | | % Increase (Decrease) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2014 vs. 2013 | 2014 | 2013 | 2014 vs. 2013 |
| "Core Earnings" interest income: | | | | | | |
| FFELP Loans | $ 522 | $ 573 | (9)% | $ 1,033 | $ 1,163 | (11)% |
| Cash and investments | 1 | 2 | (50) | 2 | 4 | (50) |
| Total "Core Earnings" interest income | 523 | 575 | (9) | 1,035 | 1,167 | (11) |
| Total "Core Earnings" interest expense | 291 | 319 | (9) | 578 | 654 | (12) |
| Net "Core Earnings" interest income | 232 | 256 | (9) | 457 | 513 | (11) |
| Less: provision for loan losses | 10 | 13 | (23) | 20 | 29 | (31) |
| Net "Core Earnings" interest income after provision for loan losses | 222 | 243 | (9) | 437 | 484 | (10) |
| Gains on sales of loans and investments | — | 257 | (100) | — | 312 | (100) |
| Servicing revenue | 15 | 16 | (6) | 26 | 39 | (33) |
| Total other income | 15 | 273 | (95) | 26 | 351 | (93) |
| Direct operating expenses | 121 | 143 | (15) | 245 | 300 | (18) |
| Restructuring and other reorganization expenses | — | — | — | — | — | — |
| Total expenses | 121 | 143 | (15) | 245 | 300 | (18) |
| Income before income tax expense | 116 | 373 | (69) | 218 | 535 | (59) |
| Income tax expense | 44 | 135 | (67) | 83 | 194 | (57) |
| "Core Earnings" | $ 72 | $ 238 | (70)% | $ 135 | $ 341 | (60)% |

Table of Contents

"Core Earnings" from the FFELP Loans segment were $72 million in the second quarter of 2014, compared with $238 million in the year-ago quarter. The decrease is primarily due to the $257 million gain from the sale of Residual Interests in FFELP Loan securitization trusts in the year-ago quarter, as well as a reduction in net interest income due to the decrease in FFELP Loans outstanding. "Core Earnings" key performance metrics are as follows:

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| FFELP Loan spread | .98% | .97% | .96% | .95% |
| Net interest margin | .89% | .87% | .88% | .85% |
| Provision for loan losses | $ 10 | $ 13 | $ 20 | $ 29 |
| Charge-offs | $ 15 | $ 20 | $ 37 | $ 42 |
| Charge-off rate | .08% | .10% | .10% | .10% |
| Total delinquency rate | 14.8% | 15.7% | 14.8% | 15.7% |
| Greater than 90-day delinquency rate | 7.0% | 8.1% | 7.0% | 8.1% |
| Forbearance rate | 17.2% | 16.5% | 17.2% | 16.5% |

*FFELP Loan Net Interest Margin*

The following table includes the "Core Earnings" basis FFELP Loan net interest margin along with reconciliation to the GAAP-basis FFELP Loan net interest margin.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| "Core Earnings" basis FFELP Loan yield | 2.49% | 2.59% | 2.53% | 2.61% |
| Hedged Floor Income | .24 | .27 | .27 | .26 |
| Unhedged Floor Income | .24 | .09 | .14 | .07 |
| Consolidation Loan Rebate Fees | (.65) | (.65) | (.65) | (.67) |
| Repayment Borrower Benefits | (.11) | (.11) | (.11) | (.11) |
| Premium amortization | (.13) | (.16) | (.12) | (.15) |
| "Core Earnings" basis FFELP Loan net yield | 2.08 | 2.03 | 2.06 | 2.01 |
| "Core Earnings" basis FFELP Loan cost of funds | (1.10) | (1.06) | (1.10) | (1.06) |
| "Core Earnings" basis FFELP Loan spread | .98 | .97 | .96 | .95 |
| "Core Earnings" basis other interest-earning asset spread impact | (.09) | (.10) | (.08) | (.10) |
| "Core Earnings" basis FFELP Loan net interest margin[1] | .89% | .87% | .88% | .85% |
| | | | | |
| "Core Earnings" basis FFELP Loan net interest margin[1] | .89% | .87% | .88% | .85% |
| Adjustment for GAAP accounting treatment[2] | .38 | .38 | .41 | .39 |
| GAAP-basis FFELP Loan net interest margin[1] | 1.27% | 1.25% | 1.29% | 1.24% |

[1]   The average balances of our FFELP Loan "Core Earnings" basis interest-earning assets for the respective periods are:

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| FFELP Loans | $ 100,467 | $ 112,891 | $ 101,393 | $ 116,831 |
| Other interest-earning assets | 3,949 | 5,264 | 3,922 | 5,409 |
| Total FFELP Loan "Core Earnings" basis interest-earning assets | $ 104,416 | $ 118,155 | $ 105,315 | $ 122,240 |

[2]   Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income, the reversal of the amortization of premiums received on Floor Income Contracts, and other derivative accounting adjustments. For further discussion of these adjustments, see section titled "'Core Earnings' — Definition and Limitations — Difference between 'Core Earnings' and GAAP" above.

65

Table of Contents

As of June 30, 2014, our FFELP Loan portfolio totaled approximately $100 billion, comprised of $38 billion of FFELP Stafford loans and $62 billion of FFELP Consolidation Loans. The weighted-average life of these portfolios is 5 years and 9 years, respectively, assuming a Constant Prepayment Rate ("CPR") of 4 percent and 3 percent, respectively.

### Floor Income

The following table analyzes on a "Core Earnings" basis the ability of the FFELP Loans in our portfolio to earn Floor Income after June 30, 2014 and 2013, based on interest rates as of those dates.

| | June 30, 2014 | | | June 30, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in billions) | Fixed Borrower Rate | Variable Borrower Rate | Total | Fixed Borrower Rate | Variable Borrower Rate | Total |
| Student loans eligible to earn Floor Income | $ 86.0 | $ 12.4 | $ 98.4 | $ 92.0 | $ 13.9 | $105.9 |
| Less: post-March 31, 2006 disbursed loans required to rebate Floor Income | (43.4) | (0.9) | (44.3) | (46.5) | (1.0) | (47.5) |
| Less: economically hedged Floor Income Contracts | (27.2) | — | (27.2) | (31.7) | — | (31.7) |
| Student loans eligible to earn Floor Income | $ 15.4 | $ 11.5 | $ 26.9 | $ 13.8 | $ 12.9 | $ 26.7 |
| Student loans earning Floor Income | $ 15.3 | $ 0.6 | $ 15.9 | $ 13.8 | $ 0.7 | $ 14.5 |

We have sold Floor Income Contracts to hedge the potential Floor Income from specifically identified pools of FFELP Consolidation Loans that are eligible to earn Floor Income.

The following table presents a projection of the average balance of FFELP Consolidation Loans for which Fixed Rate Floor Income has been economically hedged through Floor Income Contracts for the period July 1, 2014 to June 30, 2016. The hedges related to these loans do not qualify as accounting hedges.

| (Dollars in billions) | July 1, 2014 to December 31, 2014 | 2015 | 2016 |
|---|---|---|---|
| Average balance of FFELP Consolidation Loans whose Floor Income is economically hedged[1] | $ 27.2 | $27.2 | $10.4 |

[1] The remaining projected unamortized net Floor premium balance (pre-tax) related to Floor Income Contracts as of December 31, 2014, 2015 and 2016 is $314 million, $77 million, and $0 million, respectively.

### Gains on Sales of Loans and Investments

The decrease in gains on sales of loans and investments from the year-ago quarter and the first six months of 2013 was the result of $257 million and $312 million, respectively, in gains from the sale of Residual Interests in FFELP Loan securitization trusts in the year-ago periods. There were no similar transactions in the current periods.

We will continue to service the student loans in the trusts that were sold under existing agreements. The sales removed securitization trust assets of $12.5 billion and related liabilities of $12.1 billion from the balance sheet during the six months ended June 30, 2013.

### Operating Expenses — FFELP Loans

Operating expenses for our FFELP Loans segment primarily include the contractual rates we pay to service loans in term asset-backed securitization trusts or a similar rate if a loan is not in a term financing facility (which is presented as an intercompany charge from the Business Services segment who services the loans), the fees we pay for third-party loan servicing and costs incurred to acquire loans. The intercompany revenue charged by the

66

Table of Contents

Business Services segment and included in those amounts was $115 million and $137 million for the quarters ended June 30, 2014 and 2013, respectively, and $233 million and $286 million for the six months ended June 30, 2014 and 2013, respectively. These amounts exceed the actual cost of servicing the loans. Operating expenses were 48 basis points and 51 basis points of average FFELP Loans in the quarters ended June 30, 2014 and 2013, respectively, and 49 basis points and 52 basis points of average FFELP Loans in the six months ended June 30, 2014 and 2013, respectively. The decrease in operating expenses from the prior-year quarter was primarily the result of the reduction in the average outstanding balance of our FFELP Loan portfolio.

**Private Education Loans Segment**

The following table includes "Core Earnings" results for our Private Education Loans segment.

| (Dollars in millions) | Three Months Ended June 30, | | % Increase (Decrease) | Six Months Ended June 30, | | % Increase (Decrease) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2014 vs. 2013 | 2014 | 2013 | 2014 vs. 2013 |
| "Core Earnings" interest income: | | | | | | |
| Private Education Loans | $ 490 | $ 513 | (4)% | $ 985 | $ 1,013 | (3)% |
| Cash and investments | — | — | — | — | — | — |
| Total "Core Earnings" interest income | 490 | 513 | (4) | 985 | 1,013 | (3) |
| Total "Core Earnings" interest expense | 173 | 187 | (7) | 358 | 371 | (4) |
| Net "Core Earnings" interest income | 317 | 326 | (3) | 627 | 642 | (2) |
| Less: provision for loan losses | 145 | 189 | (23) | 281 | 394 | (29) |
| Net "Core Earnings" interest income after provision for loan losses | 172 | 137 | 26 | 346 | 248 | 40 |
| Servicing revenue | 7 | 10 | (30) | 8 | 19 | (58) |
| Direct operating expenses | 42 | 51 | (18) | 98 | 97 | 1 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — |
| Total expenses | 42 | 51 | (18) | 98 | 97 | 1 |
| Income before income tax expense | 137 | 96 | 43 | 256 | 170 | 51 |
| Income tax expense | 51 | 35 | 46 | 95 | 62 | 53 |
| "Core Earnings" | $ 86 | $ 61 | 41% | $ 161 | $ 108 | 49% |

Quarterly "Core Earnings" were $86 million compared with $61 million in the year-ago quarter. The increase is primarily the result of a $44 million decrease in the provision for Private Education Loan losses. "Core Earnings" key performance metrics are as follows:

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Private Education Loan spread | 4.10% | 4.10% | 4.05% | 4.09% |
| Net interest margin | 4.00% | 3.86% | 3.96% | 3.84% |
| Provision for loan losses | $ 145 | $ 189 | $ 281[1] | $ 394 |
| Charge-offs | $ 166 | $ 212 | $ 385 | $ 444 |
| Charge-off rate | 2.5% | 3.0% | 2.9% | 3.2% |
| Total delinquency rate | 7.1% | 8.4% | 7.1% | 8.4% |
| Greater than 90-day delinquency rate | 3.2% | 4.0% | 3.2% | 4.0% |
| Forbearance rate | 4.2% | 3.9% | 4.2% | 3.9% |
| Loans in repayment greater than 12 months | 90.9% | 82.6% | 90.9% | 82.6% |
| Cosigner rate | 64% | 62% | 64% | 62% |
| Average FICO | 718 | 717 | 718 | 717 |

[1]  Prior to the Spin-Off, Sallie Mae Bank sold $666 million of loans to Old SLM in the quarter ended March 31, 2014 for (1) securitization transactions at Old SLM and (2) to enable Old SLM to manage loans either granted forbearance or were 90 days or more past due. In the quarter ended March 31, 2014, $29 million of the allowance for loan loss balance was transferred from Sallie Mae Bank to Old SLM. As a result, Old SLM did not need to provide additional provision for loan losses for these loans in the quarter ended March 31, 2014. Had the allowance not transferred from Sallie Mae Bank to Old SLM, the provision would have been $310 million for the six months ended June 30, 2014.

67

Table of Contents

*Private Education Loan Net Interest Margin*

The following table shows the "Core Earnings" basis Private Education Loan net interest margin along with reconciliation to the GAAP-basis Private Education Loan net interest margin before provision for loan losses.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| "Core Earnings" basis Private Education Loan yield | 6.27% | 6.31% | 6.31% | 6.30% |
| "Core Earnings" basis Private Education Loan cost of funds | (2.17) | (2.21) | (2.26) | (2.21) |
| "Core Earnings" basis Private Education Loan spread | 4.10 | 4.10 | 4.05 | 4.09 |
| "Core Earnings" basis other interest-earning asset spread impact | (.10) | (.24) | (.09) | (.25) |
| "Core Earnings" basis Private Education Loan net interest margin[1] | 4.00% | 3.86% | 3.96% | 3.84% |
| | | | | |
| "Core Earnings" basis Private Education Loan net interest margin[1] | 4.00% | 3.86% | 3.96% | 3.84% |
| Adjustment for GAAP accounting treatment[2] | .11 | .22 | .26 | .26 |
| GAAP basis Private Education Loan net interest margin[1] | 4.11% | 4.08% | 4.22% | 4.10% |

[1]   The average balances of our Private Education Loan "Core Earnings" basis interest-earning assets for the respective periods are:

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Private Education Loans | $ 31,408 | $ 32,619 | $31,467 | $ 32,411 |
| Other interest-earning assets | 491 | 1,245 | 492 | 1,339 |
| Total Private Education Loan "Core Earnings" basis interest-earning assets | $ 31,899 | $ 33,864 | $31,959 | $ 33,750 |

[2]   Represents the reclassification of periodic interest accruals on derivative contracts from net interest income to other income and other derivative accounting adjustments. For further discussion of these adjustments, see section titled "'Core Earnings' — Definition and Limitations — Difference between 'Core Earnings' and GAAP" above.

*Private Education Loan Provision for Loan Losses*

In establishing the allowance for Private Education Loan losses as of June 30, 2014, we considered several factors with respect to our Private Education Loan portfolio. In particular, we continue to see improvement in credit quality and continuing positive delinquency and charge-off trends in connection with this portfolio. On a "Core Earnings" basis, total loans delinquent (as a percentage of loans in repayment) have decreased to 7.1 percent from 8.4 percent in the year-ago quarter. Loans greater than 90 days delinquent (as a percentage of loans in repayment) have decreased to 3.2 percent from 4.0 percent in the year-ago quarter. The charge-off rate decreased to 2.5 percent from 3.0 percent in the year-ago quarter. Loans in forbearance (as a percentage of loans in repayment and forbearance) increased to 4.2 percent from 3.9 percent in the year-ago quarter.

Apart from the overall improvements discussed above that had the effect of reducing the provision for loan losses in the second-quarter 2014 compared to the year-ago quarter, Private Education Loans that have defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue to not do so. Our allowance for loan losses takes into account these potential recovery uncertainties. In the second-quarter 2014, we increased our allowance related to these potential recovery shortfalls by approximately $68 million.

The Private Education Loan provision for loan losses on a "Core Earnings" basis was $145 million in the second quarter of 2014, down $44 million from the second quarter of 2013, and $281 million for the first six months of 2014, down $113 million from the year-ago period. The decline in both periods was primarily a result

68

Table of Contents

of the overall improvement in credit quality and performance trends discussed above, leading to decreases in expected future charge-offs.

### *Operating Expenses — Private Education Loans Segment*

Operating expenses for our Private Education Loans segment include costs incurred to service and collect on our Private Education Loan portfolio. Direct operating expenses as a percentage of revenues (revenues calculated as net interest income after provision plus total other income) were 23 percent and 35 percent in the quarters ended June 30, 2014 and 2013, respectively, and 28 percent and 36 percent in the six months ended June 30, 2014 and 2013, respectively.

## Business Services Segment

The following table includes "Core Earnings" results for our Business Services segment.

| | Three Months Ended June 30, | | % Increase (Decrease) | Six Months Ended June 30, | | % Increase (Decrease) |
|---|---|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2014 vs. 2013 | 2014 | 2013 | 2014 vs. 2013 |
| Net interest income | $ — | $ — | —% | $ — | $ — | —% |
| Servicing revenue: | | | | | | |
|    Intercompany loan servicing | 115 | 137 | (16) | 234 | 286 | (18) |
|    Third-party loan servicing | 42 | 33 | 27 | 83 | 60 | 38 |
|    Guarantor servicing | 9 | 10 | (10) | 18 | 20 | (10) |
| Total servicing revenue | 166 | 180 | (8) | 335 | 366 | (8) |
| Asset recovery revenue | 132 | 109 | 21 | 243 | 208 | 17 |
| Other Business Services revenue | 1 | — | 100 | — | — | — |
| Total other income | 299 | 289 | 3 | 578 | 574 | 1 |
| Direct operating expenses | 93 | 88 | 6 | 188 | 173 | 9 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — |
| Total expenses | 93 | 88 | 6 | 188 | 173 | 9 |
| Income from continuing operations, before income tax expense | 206 | 201 | 2 | 390 | 401 | (3) |
| Income tax expense | 76 | 72 | 6 | 146 | 146 | — |
| Net income from continuing operations | 130 | 129 | 1 | 244 | 255 | (4) |
| Income from discontinued operations, net of tax expense | — | 39 | (100) | 1 | 40 | (98) |
| "Core Earnings" | $ 130 | $ 168 | (23)% | $ 245 | $ 295 | (17)% |

"Core Earnings" were $130 million in the second quarter of 2014, compared with $168 million in the year-ago quarter. The decrease is primarily due to the $38 million after-tax gain recognized on the Campus Solutions sale in the year-ago quarter. Key segment metrics are:

| | As of June 30, | |
|---|---|---|
| (Dollars in billions) | 2014 | 2013 |
| Asset recovery receivables | $16.3 | $14.6 |
| Number of accounts serviced for ED (in millions) | 5.8 | 5.2 |
| Total federal loans serviced | $ 272 | $ 245 |

69

Table of Contents

Our Business Services segment includes intercompany loan servicing fees from servicing the FFELP Loans in our FFELP Loans segment. The average balance of this portfolio was $100 billion and $116 billion for the quarters ended June 30, 2014 and 2013, respectively, and $102 billion and $119 billion for the six months ended June 30, 2014 and 2013, respectively. The decline in the average balance of FFELP Loans outstanding along with the related intercompany loan servicing revenue from the year-ago period is primarily the result of normal amortization of the portfolio, as well as the sale of our Residual Interests in $12 billion of securitized FFELP Loans in the first half of 2013.

Third-party loan servicing income increased $9 million from the year-ago quarter and $23 million for the first six months compared with the prior-year period primarily due to the increase in ED servicing revenue (discussed below) as well as a result of the sale of Residual Interests in FFELP Loan securitization trusts in 2013. (See "FFELP Loans Segment" for further discussion.) When we sold the Residual Interests, we retained the right to service the trusts. As such, servicing income that had previously been recorded as intercompany loan servicing income is now recognized as third-party loan servicing income.

We are servicing approximately 5.8 million accounts under the ED Servicing Contract as of June 30, 2014, compared with 5.2 million accounts serviced at June 30, 2013. Third-party loan servicing fees in the quarters ended June 30, 2014 and 2013 included $31 million and $26 million, respectively, of servicing revenue related to the ED Servicing Contract.

Our asset recovery revenue consists of fees we receive for asset recovery of delinquent debt on behalf of third-party clients performed on a contingent basis. Asset recovery revenue increased $23 million in the current quarter compared with the year-ago quarter and $35 million for the first six months of 2014 compared with the prior-year period as a result of the higher asset recovery volume.

In second-quarter 2013, we sold our Campus Solutions and 529 college savings plan administration businesses, which resulted in a $38 million after-tax gain. The results related to these businesses for all periods presented have been reclassified as discontinued operations and are shown on an after-tax basis.

Revenues related to services performed on FFELP Loans accounted for 78 percent and 80 percent, respectively, of total segment revenues for the quarters ended June 30, 2014 and 2013, and 78 percent and 81 percent, respectively, of total segment revenues for the six months ended June 30, 2014 and 2013.

### Operating Expenses — Business Services Segment

Operating expenses for our Business Services segment primarily include costs incurred to service our FFELP Loan portfolio, third-party servicing and asset recovery costs, and other operating costs. The increase in operating expenses in the quarter ended June 30, 2014 compared with the year-ago quarter was primarily the result of an increase in our third-party servicing and asset recovery activities. This increase in activity resulted in a $32 million increase in related revenue from second-quarter 2013 to second-quarter 2014.

Table of Contents

**Other Segment**

The following table includes "Core Earnings" results of our Other segment.

| (Dollars in millions) | Three Months Ended June 30, | | % Increase (Decrease) | Six Months Ended June 30, | | % Increase (Decrease) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2014 vs. 2013 | 2014 | 2013 | 2014 vs. 2013 |
| Net interest loss after provision for loan losses | $ (27) | $ (6) | 350% | $ (48) | $ (17) | 182% |
| Losses on sales of loans and investments | — | (6) | (100) | — | (5) | (100) |
| Gains on debt repurchases | — | 19 | (100) | — | 48 | (100) |
| Other | 8 | — | 100 | 11 | 1 | 1,000 |
| Total other income | 8 | 13 | (38) | 11 | 44 | (75) |
| Direct operating expenses | 2 | 3 | (33) | 115 | 5 | 2,200 |
| Overhead expenses: | | | | | | |
| Corporate overhead | 27 | 18 | 50 | 53 | 39 | 36 |
| Unallocated information technology costs | 25 | 19 | 32 | 48 | 39 | 23 |
| Total overhead expenses | 52 | 37 | 41 | 101 | 78 | 29 |
| Total operating expenses | 54 | 40 | 35 | 216 | 83 | 160 |
| Restructuring and other reorganization expenses | — | — | — | — | — | — |
| Total expenses | 54 | 40 | 35 | 216 | 83 | 160 |
| Loss before income tax benefit | (73) | (33) | 121 | (253) | (56) | 352 |
| Income tax benefit | (26) | (13) | 100 | (95) | (21) | 352 |
| "Core Earnings" (loss) | $ (47) | $ (20) | 135% | $(158) | $ (35) | 351% |

*Net Interest Loss after Provision for Loan Losses*

Net interest loss after provision for loan losses includes net interest loss related to our corporate liquidity portfolio, partially offset by net interest income related to our mortgage and consumer loan portfolios.

*Gains on Debt Repurchases*

We repurchased $5 million and $70 million face amount of our debt for the quarters ended June 30, 2014 and 2013, respectively, and $5 million and $997 million face amount of our debt for the six months ended June 30, 2014 and 2013, respectively. Debt repurchase activity will fluctuate based on market fundamentals and our liability management strategy.

*Direct Operating Expenses — Other Segment*

The primary driver of the increase in direct operating expenses for the six months ended June 30, 2014 compared with the prior-year period was $111 million of additional reserve recorded in first-quarter 2014 for regulatory matters. During the second quarter of 2014, Navient entered into agreements with the DOJ and FDIC to resolve previously reported regulatory matters.

*Overhead — Other Segment*

Corporate overhead is comprised of costs related to executive management, the board of directors, accounting, finance, legal, human resources and stock-based compensation expense. Unallocated information technology costs are related to infrastructure and operations. The increase in overhead expenses in the three and six months ended June 30, 2014 compared with the year-ago periods is primarily due to temporary information technology costs incurred to provide related support to SLM BankCo under various transition services

**Table of Contents**

agreements entered into in connection with the Spin-Off as well as stock-based compensation expense in connection with the Spin-Off.

**Financial Condition**

This section provides additional information regarding the changes in our loan portfolio assets and related liabilities as well as credit quality and performance indicators related to our loan portfolio.

*Average Balance Sheets — GAAP*

The following table reflects the rates earned on interest-earning assets and paid on interest-bearing liabilities and reflects our net interest margin on a consolidated basis.

| (Dollars in millions) | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2014 | | 2013 | | 2014 | | 2013 | |
| | Balance | Rate | Balance | Rate | Balance | Rate | Balance | Rate |
|---|---|---|---|---|---|---|---|---|
| **Average Assets** | | | | | | | | |
| FFELP Loans | $100,926 | 2.51% | $113,981 | 2.48% | $102,322 | 2.52% | $117,896 | 2.46% |
| Private Education Loans | 33,811 | 6.40 | 38,154 | 6.59 | 36,364 | 6.56 | 38,279 | 6.58 |
| Other loans | 93 | 9.36 | 123 | 9.64 | 96 | 9.52 | 128 | 9.50 |
| Cash and investments | 7,014 | .13 | 9,395 | .17 | 7,543 | .15 | 9,636 | .17 |
| Total interest-earning assets | 141,844 | 3.32% | 161,653 | 3.32% | 146,325 | 3.41% | 165,939 | 3.28% |
| Non-interest-earning assets | 3,411 | | 4,287 | | 3,766 | | 4,426 | |
| Total assets | $145,255 | | $165,940 | | $150,091 | | $170,365 | |
| **Average Liabilities and Equity** | | | | | | | | |
| Short-term borrowings | $ 7,678 | .67% | $ 17,122 | .98% | $ 10,452 | .76% | $ 18,091 | 1.00% |
| Long-term borrowings | 130,534 | 1.54 | 140,170 | 1.46 | 131,819 | 1.53 | 143,554 | 1.45 |
| Total interest-bearing liabilities | 138,212 | 1.49% | 157,292 | 1.41% | 142,271 | 1.48% | 161,645 | 1.40% |
| Non-interest-bearing liabilities | 2,537 | | 3,390 | | 2,758 | | 3,531 | |
| Equity | 4,506 | | 5,258 | | 5,062 | | 5,189 | |
| Total liabilities and equity | $145,255 | | $165,940 | | $150,091 | | $170,365 | |
| Net interest margin | | 1.87% | | 1.94% | | 1.97% | | 1.92% |

*Rate/Volume Analysis — GAAP*

The following rate/volume analysis shows the relative contribution of changes in interest rates and asset volumes.

| (Dollars in millions) | Increase (Decrease) | Change Due To[1] | |
| | | Rate | Volume |
|---|---|---|---|
| **Three Months Ended June 30, 2014 vs. 2013** | | | |
| Interest income | $ (162) | $ 2 | $(164) |
| Interest expense | (40) | 29 | (69) |
| Net interest income | $ (122) | $(28) | $ (94) |
| **Six Months Ended June 30, 2014 vs. 2013** | | | |
| Interest income | $ (231) | $ 97 | $(328) |
| Interest expense | (81) | 58 | (139) |
| Net interest income | $ (150) | $ 40 | $(190) |

(1) Changes in income and expense due to both rate and volume have been allocated in proportion to the relationship of the absolute dollar amounts of the change in each. The changes in income and expense are calculated independently for each line in the table. The totals for the rate and volume columns are not the sum of the individual lines.

72

Table of Contents

*Summary of our Student Loan Portfolio*

*Ending Student Loan Balances, net — GAAP Basis*

| | June 30, 2014 | | | | |
| --- | --- | --- | --- | --- | --- |
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 536 | $ — | $ 536 | $ 344 | $ 880 |
| Grace, repayment and other[2] | 36,761 | 61,540 | 98,301 | 31,368 | 129,669 |
| Total, gross | 37,297 | 61,540 | 98,837 | 31,712 | 130,549 |
| Unamortized premium/(discount) | 571 | 418 | 989 | (674) | 315 |
| Receivable for partially charged-off loans | — | — | — | 1,269 | 1,269 |
| Allowance for loan losses | (62) | (34) | (96) | (1,983) | (2,079) |
| Total student loan portfolio | $ 37,806 | $ 61,924 | $99,730 | $30,324 | $130,054 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 48% | 77% | 23% | 100% |

| | December 31, 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 742 | $ — | $ 742 | $ 2,629 | $ 3,371 |
| Grace, repayment and other[2] | 38,752 | 64,178 | 102,930 | 36,371 | 139,301 |
| Total, gross | 39,494 | 64,178 | 103,672 | 39,000 | 142,672 |
| Unamortized premium/(discount) | 602 | 433 | 1,035 | (704) | 331 |
| Receivable for partially charged-off loans | — | — | — | 1,313 | 1,313 |
| Allowance for loan losses | (75) | (44) | (119) | (2,097) | (2,216) |
| Total student loan portfolio | $ 40,021 | $ 64,567 | $104,588 | $37,512 | $142,100 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 46% | 74% | 26% | 100% |

[1]   Loans for customers still attending school and are not yet required to make payments on the loan.

[2]   Includes loans in deferment or forbearance.

73

Table of Contents

*Ending Student Loan Balances, net — "Core Earnings" Basis*

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | June 30, 2014 Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 536 | $ — | $ 536 | $ 344 | $ 880 |
| Grace, repayment and other[2] | 36,761 | 61,540 | 98,301 | 31,368 | 129,669 |
| Total, gross | 37,297 | 61,540 | 98,837 | 31,712 | 130,549 |
| Unamortized premium/(discount) | 571 | 418 | 989 | (674) | 315 |
| Receivable for partially charged-off loans | — | — | — | 1,269 | 1,269 |
| Allowance for loan losses | (62) | (34) | (96) | (1,983) | (2,079) |
| Total student loan portfolio | $ 37,806 | $ 61,924 | $99,730 | $30,324 | $130,054 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 48% | 77% | 23% | 100% |

| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | December 31, 2013 Total FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|
| Total student loan portfolio: | | | | | |
| In-school[1] | $ 739 | $ — | $ 739 | $ 438 | $ 1,177 |
| Grace, repayment and other[2] | 38,232 | 63,274 | 101,506 | 31,999 | 133,505 |
| Total, gross | 38,971 | 63,274 | 102,245 | 32,437 | 134,682 |
| Unamortized premium/(discount) | 601 | 430 | 1,031 | (709) | 322 |
| Receivable for partially charged-off loans | — | — | — | 1,313 | 1,313 |
| Allowance for loan losses | (73) | (40) | (113) | (2,035) | (2,148) |
| Total student loan portfolio | $ 39,499 | $ 63,664 | $103,163 | $31,006 | $134,169 |
| % of total FFELP | 38% | 62% | 100% | | |
| % of total | 30% | 47% | 77% | 23% | 100% |

[1]   Loans for customers still attending school and are not yet required to make payments on the loan.

[2]   Includes loans in deferment or forbearance.

74

Table of Contents

*Average Student Loan Balances (net of unamortized premium/discount) — GAAP Basis*

|  | Three Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 38,408 | $ 62,518 | $100,926 | $33,811 | $134,737 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 46% | 75% | 25% | 100% |

|  | Three Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 42,516 | $ 71,465 | $113,981 | $38,154 | $152,135 |
| % of FFELP | 37% | 63% | 100% | | |
| % of total | 28% | 47% | 75% | 25% | 100% |

|  | Six Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 39,041 | $ 63,281 | $102,322 | $36,364 | $138,686 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 28% | 46% | 74% | 26% | 100% |

|  | Six Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 43,115 | $ 74,781 | $117,896 | $38,279 | $156,175 |
| % of FFELP | 37% | 63% | 100% | | |
| % of total | 27% | 48% | 75% | 25% | 100% |

75

Table of Contents

*Average Student Loan Balances (net of unamortized premium/discount) — "Core Earnings" Basis*

| | Three Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 38,408 | $ 62,059 | $100,467 | $31,408 | $131,875 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 47% | 76% | 24% | 100% |

| | Three Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 42,516 | $ 70,375 | $112,891 | $32,619 | $145,510 |
| % of FFELP | 38% | 62% | 100% | | |
| % of total | 29% | 49% | 78% | 22% | 100% |

| | Six Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 39,041 | $ 62,352 | $101,393 | $31,467 | $132,860 |
| % of FFELP | 39% | 61% | 100% | | |
| % of total | 29% | 47% | 76% | 24% | 100% |

| | Six Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Private Education Loans | Total Portfolio |
| Total | $ 43,115 | $ 73,716 | $116,831 | $32,411 | $149,242 |
| % of FFELP | 37% | 63% | 100% | | |
| % of total | 29% | 49% | 78% | 22% | 100% |

Table of Contents

*Student Loan Activity — GAAP Basis*

| | Three Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 39,088 | $ 63,547 | $102,635 | $ 38,157 | $140,792 |
| Acquisitions and originations | 344 | 474 | 818 | 123 | 941 |
| Capitalized interest and premium/discount amortization | 281 | 271 | 552 | 157 | 709 |
| Consolidations to third parties | (418) | (349) | (767) | (26) | (793) |
| Sales | — | — | — | — | — |
| Distribution of SLM BankCo | (495) | (885) | (1,380) | (7,204) | (8,584) |
| Repayments and other | (994) | (1,134) | (2,128) | (883) | (3,011) |
| Ending balance | $ 37,806 | $ 61,924 | $ 99,730 | $ 30,324 | $130,054 |

| | Three Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 43,005 | $ 76,190 | $119,195 | $ 37,465 | $156,660 |
| Acquisitions and originations | 57 | 74 | 131 | 390 | 521 |
| Capitalized interest and premium/discount amortization | 285 | 272 | 557 | 210 | 767 |
| Consolidations to third parties | (378) | (235) | (613) | (25) | (638) |
| Sales[1] | (30) | (8,398) | (8,428) | — | (8,428) |
| Repayments and other | (1,065) | (1,286) | (2,351) | (924) | (3,275) |
| Ending balance | $ 41,874 | $ 66,617 | $108,491 | $ 37,116 | $145,607 |

| | Six Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 40,021 | $ 64,567 | $104,588 | $ 37,512 | $142,100 |
| Acquisitions and originations | 622 | 650 | 1,272 | 1,645 | 2,917 |
| Capitalized interest and premium/discount amortization | 588 | 575 | 1,163 | 368 | 1,531 |
| Consolidations to third parties | (822) | (626) | (1,448) | (59) | (1,507) |
| Sales | — | — | — | — | — |
| Distribution of SLM BankCo | (495) | (885) | (1,380) | (7,204) | (8,584) |
| Repayments and other | (2,108) | (2,357) | (4,465) | (1,938) | (6,403) |
| Ending balance | $ 37,806 | $ 61,924 | $ 99,730 | $ 30,324 | $130,054 |

| | Six Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 44,289 | $ 81,323 | $125,612 | $ 36,934 | $162,546 |
| Acquisitions and originations | 158 | 127 | 285 | 1,795 | 2,080 |
| Capitalized interest and premium/discount amortization | 580 | 585 | 1,165 | 410 | 1,575 |
| Consolidations to third parties | (823) | (510) | (1,333) | (49) | (1,382) |
| Sales[2] | (102) | (12,147) | (12,249) | — | (12,249) |
| Repayments and other | (2,228) | (2,761) | (4,989) | (1,974) | (6,963) |
| Ending balance | $ 41,874 | $ 66,617 | $108,491 | $ 37,116 | $145,607 |

[1] Includes $8.3 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

[2] Includes $12.0 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

Table of Contents

*Student Loan Activity — "Core Earnings" Basis*

| | Three Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 38,585 | $ 62,655 | $101,240 | $ 30,949 | $132,189 |
| Acquisitions | 344 | 474 | 818 | 93 | 911 |
| Capitalized interest and premium/discount amortization | 280 | 269 | 549 | 153 | 702 |
| Consolidations to third parties | (416) | (347) | (763) | (25) | (788) |
| Sales | — | — | — | — | — |
| Repayments and other | (987) | (1,127) | (2,114) | (846) | (2,960) |
| Ending balance | $ 37,806 | $ 61,924 | $ 99,730 | $ 30,324 | $130,054 |

| | Three Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 42,634 | $ 75,483 | $118,117 | $ 31,633 | $149,750 |
| Acquisitions | 20 | 3 | 23 | 828 | 851 |
| Capitalized interest and premium/discount amortization | 282 | 265 | 547 | 192 | 739 |
| Consolidations to third parties | (373) | (229) | (602) | (21) | (623) |
| Sales[1] | (30) | (8,398) | (8,428) | — | (8,428) |
| Repayments and other | (1,051) | (1,275) | (2,326) | (851) | (3,177) |
| Ending balance | $ 41,482 | $ 65,849 | $107,331 | $ 31,781 | $139,112 |

| | Six Months Ended June 30, 2014 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 39,499 | $ 63,664 | $103,163 | $ 31,006 | $134,169 |
| Acquisitions | 623 | 649 | 1,272 | 765 | 2,037 |
| Capitalized interest and premium/discount amortization | 581 | 564 | 1,145 | 336 | 1,481 |
| Consolidations to third parties | (815) | (621) | (1,436) | (51) | (1,487) |
| Sales | — | — | — | — | — |
| Repayments and other | (2,082) | (2,332) | (4,414) | (1,732) | (6,146) |
| Ending balance | $ 37,806 | $ 61,924 | $ 99,730 | $ 30,324 | $130,054 |

| | Six Months Ended June 30, 2013 | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | FFELP Stafford and Other | FFELP Consolidation Loans | Total FFELP Loans | Total Private Education Loans | Total Portfolio |
| Beginning balance | $ 43,932 | $ 80,640 | $124,572 | $ 31,486 | $156,058 |
| Acquisitions | 98 | 26 | 124 | 1,714 | 1,838 |
| Capitalized interest and premium/discount amortization | 574 | 573 | 1,147 | 374 | 1,521 |
| Consolidations to third parties | (815) | (501) | (1,316) | (42) | (1,358) |
| Sales[2] | (102) | (12,147) | (12,249) | — | (12,249) |
| Repayments and other | (2,205) | (2,742) | (4,947) | (1,751) | (6,698) |
| Ending balance | $ 41,482 | $ 65,849 | $107,331 | $ 31,781 | $139,112 |

[1] Includes $8.3 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

[2] Includes $12.0 billion of student loans in connection with the sale of Residual Interests in FFELP Loan securitization trusts.

Table of Contents

*Student Loan Allowance for Loan Losses Activity — GAAP Basis*

| | Three Months Ended June 30, | | | | | |
| | 2014 | | | 2013 | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|---|
| Beginning balance | $ 107 | $ 2,059 | $2,166 | $ 147 | $ 2,170 | $2,317 |
| Less: | | | | | | |
| Charge-offs[1] | (15) | (166) | (181) | (20) | (212) | (232) |
| Student loan sales | — | — | — | (8) | — | (8) |
| Distribution of SLM BankCo | (6) | (69) | (75) | — | — | — |
| Plus: | | | | | | |
| Provision for loan losses | 10 | 155 | 165 | 14 | 187 | 201 |
| Reclassification of interest reserve[2] | — | 4 | 4 | — | 4 | 4 |
| Ending balance | $ 96 | $ 1,983 | $2,079 | $ 133 | $ 2,149 | $2,282 |
| Troubled debt restructuring[3] | $ — | $ 9,650 | $9,650 | $ — | $ 8,094 | $8,094 |

| | Six Months Ended June 30, | | | | | |
| | 2014 | | | 2013 | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|---|
| Beginning balance | $ 119 | $ 2,097 | $2,216 | $ 159 | $ 2,171 | $2,330 |
| Less: | | | | | | |
| Charge-offs[1] | (37) | (385) | (422) | (42) | (444) | (486) |
| Student loan sales | — | — | — | (14) | — | (14) |
| Distribution of SLM BankCo | (6) | (69) | (75) | — | — | — |
| Plus: | | | | | | |
| Provision for loan losses | 20 | 330 | 350 | 30 | 412 | 442 |
| Reclassification of interest reserve[2] | — | 10 | 10 | — | 10 | 10 |
| Ending balance | $ 96 | $ 1,983 | $2,079 | $ 133 | $ 2,149 | $2,282 |
| Troubled debt restructuring[3] | $ — | $ 9,650 | $9,650 | $ — | $ 8,094 | $8,094 |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Represents the recorded investment of loans classified as troubled debt restructuring.

Table of Contents

*Student Loan Allowance for Loan Losses Activity — "Core Earnings" Basis*

|  | Three Months Ended June 30, | | | | | |
|  | 2014 | | | 2013 | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|---|
| Beginning balance | $ 101 | $ 1,987 | $2,088 | $ 143 | $ 2,105 | $2,248 |
| Less: | | | | | | |
| Charge-offs[1] | (15) | (166) | (181) | (20) | (212) | (232) |
| Student loan sales | — | — | — | (8) | — | (8) |
| Plus: | | | | | | |
| Provision for loan losses | 10 | 145 | 155 | 13 | 189 | 202 |
| Reclassification of interest reserve[2] | — | 4 | 4 | — | 4 | 4 |
| Other transactions | — | 13 | 13 | — | 12 | 12 |
| Ending balance | $ 96 | $ 1,983 | $2,079 | $ 128 | $ 2,098 | $2,226 |
| Troubled debt restructuring[3] | $ — | $ 9,650 | $9,650 | $ — | $ 8,094 | $8,094 |

|  | Six Months Ended June 30, | | | | | |
|  | 2014 | | | 2013 | | |
| (Dollars in millions) | FFELP Loans | Private Education Loans | Total Portfolio | FFELP Loans | Private Education Loans | Total Portfolio |
|---|---|---|---|---|---|---|
| Beginning balance | $ 113 | $ 2,035 | $2,148 | $ 155 | $ 2,106 | $2,261 |
| Less: | | | | | | |
| Charge-offs[1] | (37) | (385) | (422) | (42) | (444) | (486) |
| Student loan sales | — | — | — | (14) | — | (14) |
| Plus: | | | | | | |
| Provision for loan losses | 20 | 281 | 301 | 29 | 394 | 423 |
| Reclassification of interest reserve[2] | — | 10 | 10 | — | 10 | 10 |
| Other transactions | — | 42 | 42 | — | 32 | 32 |
| Ending balance | $ 96 | $ 1,983 | $2,079 | $ 128 | $ 2,098 | $2,226 |
| Troubled debt restructuring[3] | $ — | $ 9,650 | $9,650 | $ — | $ 8,094 | $8,094 |

[1] Charge-offs are reported net of expected recoveries. For Private Education Loans, the expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Represents the recorded investment of loans classified as troubled debt restructuring.

Table of Contents

***FFELP Loan Portfolio Performance***

*FFELP Loan Delinquencies and Forbearance – GAAP Basis*

| (Dollars in millions) | FFELP Loan Delinquencies June 30, 2014 Balance | 2014 % | 2013 Balance | 2013 % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[1] | $11,794 | | $ 15,239 | |
| Loans in forbearance[2] | 14,929 | | 15,236 | |
| Loans in repayment and percentage of each status: | | | | |
|    Loans current | 61,438 | 85.2% | 64,801 | 84.1% |
|    Loans delinquent 31-60 days[3] | 3,531 | 4.9 | 3,750 | 4.9 |
|    Loans delinquent 61-90 days[3] | 2,112 | 2.9 | 2,156 | 2.8 |
|    Loans delinquent greater than 90 days[3] | 5,033 | 7.0 | 6,356 | 8.2 |
| Total FFELP Loans in repayment | 72,114 | 100% | 77,063 | 100% |
| Total FFELP Loans, gross | 98,837 | | 107,538 | |
| FFELP Loan unamortized premium | 989 | | 1,086 | |
| Total FFELP Loans | 99,826 | | 108,624 | |
| FFELP Loan allowance for losses | (96) | | (133) | |
| FFELP Loans, net | $99,730 | | $108,491 | |
| Percentage of FFELP Loans in repayment | | 73.0% | | 71.7% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 14.8% | | 15.9% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 17.2% | | 16.5% |

[1] Loans for customers who may still be attending school or engaging in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested extension of grace period during employment transition or who have temporarily ceased making payments due to hardship or other factors.

[2] Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making payments due to hardship or other factors.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

81

Table of Contents

*FFELP Loan Delinquencies and Forbearance — "Core Earnings" Basis*

| | FFELP Loan Delinquencies | | | |
|---|---|---|---|---|
| | June 30, | | | |
| | 2014 | | 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $11,794 | | $ 15,120 | |
| Loans in forbearance[2] | 14,929 | | 15,018 | |
| Loans in repayment and percentage of each status: | | | | |
|   Loans current | 61,438 | 85.2% | 64,261 | 84.3% |
|   Loans delinquent 31-60 days[3] | 3,531 | 4.9 | 3,682 | 4.8 |
|   Loans delinquent 61-90 days[3] | 2,112 | 2.9 | 2,109 | 2.8 |
|   Loans delinquent greater than 90 days[3] | 5,033 | 7.0 | 6,186 | 8.1 |
| Total FFELP Loans in repayment | 72,114 | 100% | 76,238 | 100% |
| Total FFELP Loans, gross | 98,837 | | 106,376 | |
| FFELP Loan unamortized premium | 989 | | 1,084 | |
| Total FFELP Loans | 99,826 | | 107,460 | |
| FFELP Loan allowance for losses | (96) | | (128) | |
| FFELP Loans, net | $99,730 | | $107,332 | |
| Percentage of FFELP Loans in repayment | | 73.0% | | 71.7% |
| Delinquencies as a percentage of FFELP Loans in repayment | | 14.8% | | 15.7% |
| FFELP Loans in forbearance as a percentage of loans in repayment and forbearance | | 17.2% | | 16.5% |

[1] Loans for customers who may still be attending school or engaging in other permitted educational activities and are not yet required to make payments on the loans, e.g., residency periods for medical students or a grace period for bar exam preparation, as well as loans for customers who have requested extension of grace period during employment transition or who have temporarily ceased making payments due to hardship or other factors.

[2] Loans for customers who have used their allowable deferment time or do not qualify for deferment, that need additional time to obtain employment or who have temporarily ceased making payments due to hardship or other factors.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

82

Table of Contents

*Allowance for FFELP Loan Losses — GAAP Basis*

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Allowance at beginning of period | $ 107 | $ 147 | $ 119 | $ 159 |
| Provision for FFELP Loan losses | 10 | 14 | 20 | 30 |
| Charge-offs | (15) | (20) | (37) | (42) |
| Student loan sales | — | (8) | — | (14) |
| Distribution of SLM BankCo | (6) | — | (6) | — |
| Allowance at end of period | $ 96 | $ 133 | $ 96 | $ 133 |
| Charge-offs as a percentage of average loans in repayment (annualized) | .08% | .10% | .10% | .10% |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | .07% | .08% | .09% | .09% |
| Allowance as a percentage of ending total loans, gross | .10% | .12% | .10% | .12% |
| Allowance as a percentage of ending loans in repayment | .13% | .17% | .13% | .17% |
| Allowance coverage of charge-offs (annualized) | 1.6 | 1.7 | 1.3 | 1.6 |
| Ending total loans, gross | $98,837 | $107,538 | $98,837 | $107,538 |
| Average loans in repayment | $72,621 | $ 81,423 | $73,056 | $ 84,323 |
| Ending loans in repayment | $72,114 | $ 77,063 | $72,114 | $ 77,063 |

*Allowance for FFELP Loan Losses — "Core Earnings" Basis*

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Allowance at beginning of period | $ 101 | $ 143 | $ 113 | $ 155 |
| Provision for FFELP Loan losses | 10 | 13 | 20 | 29 |
| Charge-offs | (15) | (20) | (37) | (42) |
| Student loan sales | — | (8) | — | (14) |
| Allowance at end of period | $ 96 | $ 128 | $ 96 | $ 128 |
| Charge-offs as a percentage of average loans in repayment (annualized) | .08% | .10% | .10% | .10% |
| Charge-offs as a percentage of average loans in repayment and forbearance (annualized) | .07% | .08% | .08% | .08% |
| Allowance as a percentage of ending total loans, gross | .10% | .12% | .10% | .12% |
| Allowance as a percentage of ending loans in repayment | .13% | .17% | .13% | .17% |
| Allowance coverage of charge-offs (annualized) | 1.6 | 1.6 | 1.3 | 1.5 |
| Ending total loans, gross | $98,837 | $106,376 | $98,837 | $106,376 |
| Average loans in repayment | $72,297 | $ 80,621 | $72,391 | $ 85,530 |
| Ending loans in repayment | $72,114 | $ 76,238 | $72,114 | $ 76,238 |

83

Table of Contents

*Private Education Loans Portfolio Performance*

*Private Education Loan Delinquencies and Forbearance — GAAP Basis*

| (Dollars in millions) | Private Education Loan Delinquencies | | | |
| | June 30, | | | |
| | 2014 | | 2013 | |
| | Balance | % | Balance | % |
|---|---|---|---|---|
| Loans in-school/grace/deferment[1] | $ 3,375 | | $ 5,896 | |
| Loans in forbearance[2] | 1,201 | | 1,160 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 25,202 | 92.9% | 29,196 | 92.3% |
| Loans delinquent 31-60 days[3] | 670 | 2.5 | 792 | 2.5 |
| Loans delinquent 61-90 days[3] | 391 | 1.4 | 495 | 1.6 |
| Loans delinquent greater than 90 days[3] | 873 | 3.2 | 1,144 | 3.6 |
| Total Private Education Loans in repayment | 27,136 | 100% | 31,627 | 100% |
| Total Private Education Loans, gross | 31,712 | | 38,683 | |
| Private Education Loan unamortized discount | (674) | | (752) | |
| Total Private Education Loans | 31,038 | | 37,931 | |
| Private Education Loan receivable for partially charged-off loans | 1,269 | | 1,334 | |
| Private Education Loan allowance for losses | (1,983) | | (2,149) | |
| Private Education Loans, net | $30,324 | | $37,116 | |
| Percentage of Private Education Loans in repayment | | 85.6% | | 81.8% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 7.1% | | 7.7% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 4.2% | | 3.5% |
| Loans in repayment greater than 12 months as a percentage of loans in repayment[4] | | 90.9% | | 79.3% |
| Percentage of Private Education Loans with a cosigner | | 64% | | 66% |
| Average FICO at origination | | 718 | | 721 |

[1] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

[4] Based on number of months in an active repayment status for which a scheduled monthly payment was due.

84

Table of Contents

*Private Education Loan Delinquencies and Forbearance — "Core Earnings" Basis*

| | Private Education Loan Delinquencies | | | |
|---|---|---|---|---|
| | June 30, | | | |
| | 2014 | | 2013 | |
| (Dollars in millions) | Balance | % | Balance | % |
| Loans in-school/grace/deferment[1] | $ 3,375 | | $ 3,599 | |
| Loans in forbearance[2] | 1,201 | | 1,156 | |
| Loans in repayment and percentage of each status: | | | | |
| Loans current | 25,202 | 92.9% | 26,141 | 91.6% |
| Loans delinquent 31-60 days[3] | 670 | 2.5 | 774 | 2.7 |
| Loans delinquent 61-90 days[3] | 391 | 1.4 | 486 | 1.7 |
| Loans delinquent greater than 90 days[3] | 873 | 3.2 | 1,144 | 4.0 |
| Total Private Education Loans in repayment | 27,136 | 100% | 28,545 | 100% |
| Total Private Education Loans, gross | 31,712 | | 33,300 | |
| Private Education Loan unamortized discount | (674) | | (755) | |
| Total Private Education Loans | 31,038 | | 32,545 | |
| Private Education Loan receivable for partially charged-off loans | 1,269 | | 1,334 | |
| Private Education Loan allowance for losses | (1,983) | | (2,098) | |
| Private Education Loans, net | $30,324 | | $31,781 | |
| Percentage of Private Education Loans in repayment | | 85.6% | | 85.7% |
| Delinquencies as a percentage of Private Education Loans in repayment | | 7.1% | | 8.4% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | | 4.2% | | 3.9% |
| Loans in repayment greater than 12 months as a percentage of loans in repayment[4] | | 90.9% | | 82.6% |
| Percentage of Private Education Loans with a cosigner | | 64% | | 62% |
| Average FICO at origination | | 718 | | 717 |

[1] Deferment includes customers who have returned to school or are engaged in other permitted educational activities and are not yet required to make payments on their loans, e.g., residency periods for medical students or a grace period for bar exam preparation.

[2] Loans for customers who have requested extension of grace period generally during employment transition or who have temporarily ceased making full payments due to hardship or other factors, consistent with established loan program servicing policies and procedures.

[3] The period of delinquency is based on the number of days scheduled payments are contractually past due.

[4] Based on number of months in an active repayment status for which a scheduled monthly payment was due.

85

Table of Contents

*Allowance for Private Education Loan Losses — GAAP Basis*

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Allowance at beginning of period | $ 2,059 | $ 2,170 | $ 2,097 | $ 2,171 |
| Provision for Private Education Loan losses | 155 | 187 | 330 | 412 |
| Charge-offs[1] | (166) | (212) | (385) | (444) |
| Reclassification of interest reserve[2] | 4 | 4 | 10 | 10 |
| Distribution of SLM BankCo | (69) | — | (69) | — |
| Allowance at end of period | $ 1,983 | $ 2,149 | $ 1,983 | $ 2,149 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.3% | 2.7% | 2.6% | 2.8% |
| Allowance as a percentage of ending total loans | 6.0% | 5.4% | 6.0% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 7.3% | 6.8% | 7.3% | 6.8% |
| Average coverage of charge-offs (annualized) | 3.0 | 2.5 | 2.6 | 2.4 |
| Ending total loans[3] | $32,981 | $40,017 | $32,981 | $40,017 |
| Average loans in repayment | $28,599 | $31,618 | $29,999 | $31,631 |
| Ending loans in repayment | $27,136 | $31,627 | $27,136 | $31,627 |

*Allowance for Private Education Loan Losses — "Core Earnings" Basis*

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Allowance at beginning of period | $ 1,987 | $ 2,105 | $ 2,035 | $ 2,106 |
| Provision for Private Education Loan losses | 145 | 189 | 281 | 394 |
| Charge-offs[1] | (166) | (212) | (385) | (444) |
| Reclassification of interest reserve[2] | 4 | 4 | 10 | 10 |
| Other transactions | 13 | 12 | 42 | 32 |
| Allowance at end of period | $ 1,983 | $ 2,098 | $ 1,983 | $ 2,098 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.5% | 3.0% | 2.9% | 3.2% |
| Allowance as a percentage of ending total loans | 6.0% | 6.1% | 6.0% | 6.1% |
| Allowance as a percentage of ending loans in repayment | 7.3% | 7.4% | 7.3% | 7.4% |
| Average coverage of charge-offs (annualized) | 3.0 | 2.5 | 2.6 | 2.3 |
| Ending total loans[3] | $32,981 | $34,634 | $32,981 | $34,634 |
| Average loans in repayment | $27,181 | $28,382 | $27,105 | $28,004 |
| Ending loans in repayment | $27,136 | $28,545 | $27,136 | $28,545 |

[1] Charge-offs are reported net of expected recoveries. The expected recovery amount is transferred to the receivable for partially charged-off loan balance. Charge-offs include charge-offs against the receivable for partially charged-off loans which represents the difference between what was expected to be collected and any shortfalls in what was actually collected in the period. See "Receivable for Partially Charged-Off Private Education Loans" for further discussion.

[2] Represents the additional allowance related to the amount of uncollectible interest reserved within interest income that is transferred in the period to the allowance for loan losses when interest is capitalized to a loan's principal balance.

[3] Ending total loans represents gross Private Education Loans, plus the receivable for partially charged-off loans.

Table of Contents

The following table provides the detail for our traditional and non-traditional Private Education Loans for the quarters ended.

*GAAP Basis:*

| | June 30, 2014 | | | June 30, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 29,824 | $  3,157 | $32,981 | $ 36,445 | $  3,572 | $40,017 |
| Ending loans in repayment | 24,947 | 2,189 | 27,136 | 29,155 | 2,472 | 31,627 |
| Private Education Loan allowance for losses | 1,546 | 437 | 1,983 | 1,629 | 520 | 2,149 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.0% | 6.8% | 2.3% | 2.1% | 9.1% | 2.7% |
| Allowance as a percentage of ending total loan balance | 5.2% | 13.8% | 6.0% | 4.5% | 14.6% | 5.4% |
| Allowance as a percentage of ending loans in repayment | 6.2% | 19.9% | 7.3% | 5.6% | 21.0% | 6.8% |
| Average coverage of charge-offs (annualized) | 3.0 | 2.9 | 3.0 | 2.6 | 2.3 | 2.5 |
| Delinquencies as a percentage of Private Education Loans in repayment | 6.3% | 16.2% | 7.1% | 6.6% | 20.0% | 7.7% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 2.8% | 8.0% | 3.2% | 3.1% | 10.2% | 3.6% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 4.1% | 6.1% | 4.2% | 3.4% | 5.5% | 3.5% |
| Loans that entered repayment during the period[2] | $   85 | $   5 | $   90 | $   481 | $   24 | $   505 |
| Percentage of Private Education Loans with a cosigner | 67% | 31% | 64% | 69% | 30% | 66% |
| Average FICO at origination | 726 | 626 | 718 | 728 | 624 | 721 |

[1]  Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]  Includes loans that are required to make a payment for the first time.

87

Table of Contents

*"Core Earnings" Basis:*

| (Dollars in millions)[1] | June 30, 2014 | | | June 30, 2013 | | |
|---|---|---|---|---|---|---|
| | Traditional | Non-Traditional | Total | Traditional | Non-Traditional | Total |
| Ending total loans[1] | $ 29,824 | $ 3,157 | $32,981 | $ 31,125 | $ 3,509 | $34,634 |
| Ending loans in repayment | 24,947 | 2,189 | 27,136 | 26,110 | 2,435 | 28,545 |
| Private Education Loan allowance for losses | 1,546 | 437 | 1,983 | 1,584 | 514 | 2,098 |
| Charge-offs as a percentage of average loans in repayment (annualized) | 2.1% | 6.8% | 2.5% | 2.4% | 9.2% | 3.0% |
| Allowance as a percentage of ending total loan balance | 5.2% | 13.8% | 6.0% | 5.1% | 14.6% | 6.1% |
| Allowance as a percentage of ending loans in repayment | 6.2% | 19.9% | 7.3% | 6.1% | 21.1% | 7.4% |
| Average coverage of charge-offs (annualized) | 3.0 | 2.9 | 3.0 | 2.5 | 2.3 | 2.5 |
| Delinquencies as a percentage of Private Education Loans in repayment | 6.3% | 16.2% | 7.1% | 7.3% | 20.2% | 8.4% |
| Delinquencies greater than 90 days as a percentage of Private Education Loans in repayment | 2.8% | 8.0% | 3.2% | 3.4% | 10.4% | 4.0% |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 4.1% | 6.1% | 4.2% | 3.7% | 5.6% | 3.9% |
| Loans that entered repayment during the period[2] | $    85 | $    5 | $    90 | $  219 | $   17 | $  236 |
| Percentage of Private Education Loans with a cosigner | 67% | 31% | 64% | 65% | 31% | 62% |
| Average FICO at origination | 726 | 626 | 718 | 725 | 625 | 717 |

[1]   Ending total loans represent gross Private Education Loans, plus the receivable for partially charged-off loans.

[2]   Includes loans that are required to make a payment for the first time.

    As part of concluding on the adequacy of the allowance for loan losses, we review key allowance and loan metrics. The most significant of these metrics considered are the allowance coverage of charge-offs ratio; the allowance as a percentage of total loans and of loans in repayment; and delinquency and forbearance percentages.

*Receivable for Partially Charged-Off Private Education Loans*

    At the end of each month, for loans that are 212 days past due, we charge off the estimated loss of a defaulted loan balance. Actual recoveries are applied against the remaining loan balance that was not charged off. We refer to this remaining loan balance as the "receivable for partially charged-off loans." If actual periodic recoveries are less than expected, the difference is immediately charged off through the allowance for loan losses with an offsetting reduction in the receivable for partially charged-off Private Education Loans. If actual periodic recoveries are greater than expected, they will be reflected as a recovery through the allowance for Private Education Loan losses once the cumulative recovery amount exceeds the cumulative amount originally expected to be recovered. Private Education Loans which defaulted between 2007 and 2014 for which we have previously charged off estimated losses have, to varying degrees, not met our post-default recovery expectations to date and may continue not to do so. According to our policy, we have been charging off these periodic shortfalls in expected recoveries against our allowance for Private Education Loan losses and the related receivable for partially charged-off Private Education Loans and we will continue to do so. There was $402 million and $217 million in the allowance for Private Education Loan losses at June 30, 2014 and 2013, respectively, providing for possible additional future charge-offs related to the receivable for partially charged-off Private Education Loans (see "Private Education Loans Segment — Private Education Loan Provision for Loan Losses" for a further discussion).

Table of Contents

The following table summarizes the activity in the receivable for partially charged-off Private Education Loans (GAAP-basis and "Core Earnings"-basis are the same).

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Receivable at beginning of period | $ 1,297 | $ 1,339 | $1,313 | $1,347 |
| Expected future recoveries of current period defaults[1] | 53 | 70 | 124 | 148 |
| Recoveries[2] | (58) | (54) | (119) | (122) |
| Charge-offs[3] | (23) | (21) | (49) | (39) |
| Receivable at end of period | 1,269 | 1,334 | 1,269 | 1,334 |
| Allowance for estimated recovery shortfalls[4] | (402) | (217) | (402) | (217) |
| Net receivable at end of period | $ 867 | $ 1,117 | $ 867 | $1,117 |

[1] Represents the difference between the defaulted loan balance and our estimate of the amount to be collected in the future.

[2] Current period cash collections.

[3] Represents the current period recovery shortfall — the difference between what was expected to be collected and what was actually collected. These amounts are included in total charge-offs as reported in the "Allowance for Private Education Loan Losses" table.

[4] The allowance for estimated recovery shortfalls of the receivable for partially charged-off Private Education Loans is a component of the $2.0 billion and $2.1 billion overall allowance for Private Education Loan losses as of June 30, 2014 and 2013, respectively.

*Use of Forbearance as a Private Education Loan Collection Tool*

Forbearance involves granting the customer a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time. Using forbearance extends the original term of the loan. Forbearance does not grant any reduction in the total repayment obligation (principal or interest). While in forbearance status, interest continues to accrue and is capitalized to principal when the loan re-enters repayment status. Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan. In some instances, we require good-faith payments before granting forbearance. Exceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of recovery of the loan. Forbearance as a recovery tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments. We leverage updated customer information and other decision support tools to best determine who will be granted forbearance based on our expectations as to a customer's ability and willingness to repay their obligation. This strategy is aimed at mitigating the overall risk of the portfolio as well as encouraging cash resolution of delinquent loans.

Forbearance may be granted to customers who are exiting their grace period to provide additional time to obtain employment and income to support their obligations, or to current customers who are faced with a hardship and request forbearance time to provide temporary payment relief. In these circumstances, a customer's loan is placed into a forbearance status in limited monthly increments and is reflected in the forbearance status at month-end during this time. At the end of their granted forbearance period, the customer will enter repayment status as current and is expected to begin making their scheduled monthly payments on a go-forward basis.

Forbearance may also be granted to customers who are delinquent in their payments. In these circumstances, the forbearance cures the delinquency and the customer is returned to a current repayment status. In more limited instances, delinquent customers will also be granted additional forbearance time.

The table below reflects on a "Core Earnings" basis the historical effectiveness of using forbearance. Our experience has shown that three years after being granted forbearance for the first time, 66 percent of the loans are current, paid in full, or receiving an in-school grace or deferment, and 20 percent have defaulted. The default experience associated with loans which utilize forbearance is considered in our allowance for loan losses. On a "Core Earnings" basis, the number of loans in a forbearance status as a percentage of loans in repayment and forbearance increased to 4.2 percent in the second quarter of 2014 compared with 3.9 percent in the year-ago

89

Table of Contents

quarter. As of June 30, 2014, 1 percent of loans in current status were delinquent as of the end of the prior month, but were granted a forbearance that made them current as of June 30, 2014 (customers made payments on approximately 30 percent of these loans as a prerequisite to being granted forbearance).

**Tracking by First Time in Forbearance Compared to All Loans Entering Repayment —**
**Portfolio data through June 30, 2013**

|  | Status distribution 36 months after being granted forbearance for the first time | Status distribution 36 months after entering repayment (all loans) | Status distribution 36 months after entering repayment for loans never entering forbearance |
|---|---|---|---|
| In-school/grace/deferment | 9.8% | 10.1% | 6.2% |
| Current | 51.2 | 57.7 | 65.7 |
| Delinquent 31-60 days | 3.1 | 2.0 | 0.3 |
| Delinquent 61-90 days | 1.9 | 1.2 | 0.1 |
| Delinquent greater than 90 days | 4.7 | 2.9 | 0.2 |
| Forbearance | 3.8 | 3.2 | — |
| Defaulted | 20.3 | 12.6 | 8.6 |
| Paid | 5.2 | 10.3 | 18.9 |
| Total | 100% | 100% | 100% |

The tables below show the composition and status of the Private Education Loan portfolio aged by number of months in active repayment status (months for which a scheduled monthly payment was due). As indicated in the tables, the percentage of loans that are delinquent greater than 90 days or that are in forbearance status decreases the longer the loans have been in active repayment status.

At June 30, 2014, loans in forbearance status as a percentage of loans in repayment and forbearance were 10.4 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.4 percent for loans that have been in active repayment status for more than 48 months. Approximately 61 percent of our Private Education Loans in forbearance status has been in active repayment status less than 25 months.

At June 30, 2014, loans in repayment that are delinquent greater than 90 days as a percentage of loans in repayment were 6.2 percent for loans that have been in active repayment status for less than 25 months. The percentage drops to 1.6 percent for loans that have been in active repayment status for more than 48 months. Approximately 45 percent of our Private Education Loans in repayment that are delinquent greater than 90 days status has been in active repayment status less than 25 months.

90

Table of Contents

*GAAP Basis:*

| (Dollars in millions) June 30, 2014 | Monthly Scheduled Payments Due | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 3,375 | $ 3,375 |
| Loans in forbearance | 537 | 200 | 169 | 125 | 170 | — | 1,201 |
| Loans in repayment — current | 2,069 | 3,463 | 4,048 | 4,233 | 11,389 | — | 25,202 |
| Loans in repayment — delinquent 31-60 days | 141 | 131 | 122 | 100 | 176 | — | 670 |
| Loans in repayment — delinquent 61-90 days | 80 | 81 | 75 | 56 | 99 | — | 391 |
| Loans in repayment — delinquent greater than 90 days | 185 | 207 | 162 | 126 | 193 | — | 873 |
| Total | $3,012 | $ 4,082 | $ 4,576 | $ 4,640 | $ 12,027 | $ 3,375 | 31,712 |
| Unamortized discount | | | | | | | (674) |
| Receivable for partially charged-off loans | | | | | | | 1,269 |
| Allowance for loan losses | | | | | | | (1,983) |
| Total Private Education Loans, net | | | | | | | $30,324 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 17.8% | 4.9% | 3.7% | 2.7% | 1.4% | —% | 4.2% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 7.5% | 5.3% | 3.7% | 2.8% | 1.6% | —% | 3.2% |

| (Dollars in millions) June 30, 2013 | Monthly Scheduled Payments Due | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 5,896 | $ 5,896 |
| Loans in forbearance | 584 | 192 | 162 | 96 | 126 | — | 1,160 |
| Loans in repayment — current | 5,671 | 4,996 | 5,303 | 4,455 | 8,771 | — | 29,196 |
| Loans in repayment — delinquent 31-60 days | 254 | 152 | 137 | 99 | 150 | — | 792 |
| Loans in repayment — delinquent 61-90 days | 181 | 95 | 86 | 54 | 79 | — | 495 |
| Loans in repayment — delinquent greater than 90 days | 442 | 246 | 190 | 118 | 148 | — | 1,144 |
| Total | $7,132 | $ 5,681 | $ 5,878 | $ 4,822 | $ 9,274 | $ 5,896 | 38,683 |
| Unamortized discount | | | | | | | (752) |
| Receivable for partially charged-off loans | | | | | | | 1,334 |
| Allowance for loan losses | | | | | | | (2,149) |
| Total Private Education Loans, net | | | | | | | $37,116 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 8.2% | 3.4% | 2.8% | 2.0% | 1.4% | —% | 3.5% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 6.8% | 4.5% | 3.3% | 2.5% | 1.6% | —% | 3.6% |

91

Table of Contents

*"Core Earnings" Basis:*

| (Dollars in millions)<br>June 30, 2014 | Monthly Scheduled Payments Due | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 3,375 | $ 3,375 |
| Loans in forbearance | 537 | 200 | 169 | 125 | 170 | — | 1,201 |
| Loans in repayment — current | 2,069 | 3,463 | 4,048 | 4,233 | 11,389 | — | 25,202 |
| Loans in repayment — delinquent 31-60 days | 141 | 131 | 122 | 100 | 176 | — | 670 |
| Loans in repayment — delinquent 61-90 days | 80 | 81 | 75 | 56 | 99 | — | 391 |
| Loans in repayment — delinquent greater than 90 days | 185 | 207 | 162 | 126 | 193 | — | 873 |
| Total | $3,012 | $ 4,082 | $ 4,576 | $ 4,640 | $ 12,027 | $ 3,375 | 31,712 |
| Unamortized discount | | | | | | | (674) |
| Receivable for partially charged-off loans | | | | | | | 1,269 |
| Allowance for loan losses | | | | | | | (1,983) |
| Total Private Education Loans, net | | | | | | | $30,324 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 17.8% | 4.9% | 3.7% | 2.7% | 1.4% | —% | 4.2% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 7.5% | 5.3% | 3.7% | 2.8% | 1.6% | —% | 3.2% |

| (Dollars in millions)<br>June 30, 2013 | Monthly Scheduled Payments Due | | | | | Not Yet in Repayment | Total |
|---|---|---|---|---|---|---|---|
| | 0 to 12 | 13 to 24 | 25 to 36 | 37 to 48 | More than 48 | | |
| Loans in-school/grace/deferment | $ — | $ — | $ — | $ — | $ — | $ 3,599 | $ 3,599 |
| Loans in forbearance | 582 | 191 | 161 | 96 | 126 | — | 1,156 |
| Loans in repayment — current | 4,092 | 4,165 | 4,708 | 4,416 | 8,760 | — | 26,141 |
| Loans in repayment — delinquent 31-60 days | 245 | 148 | 133 | 99 | 149 | — | 774 |
| Loans in repayment — delinquent 61-90 days | 176 | 93 | 84 | 54 | 79 | — | 486 |
| Loans in repayment — delinquent greater than 90 days | 442 | 246 | 190 | 118 | 148 | — | 1,144 |
| Total | $5,537 | $ 4,843 | $ 5,276 | $ 4,783 | $ 9,262 | $ 3,599 | 33,300 |
| Unamortized discount | | | | | | | (755) |
| Receivable for partially charged-off loans | | | | | | | 1,334 |
| Allowance for loan losses | | | | | | | (2,098) |
| Total Private Education Loans, net | | | | | | | $31,781 |
| Loans in forbearance as a percentage of loans in repayment and forbearance | 10.5% | 3.9% | 3.1% | 2.0% | 1.4% | —% | 3.9% |
| Loans in repayment — delinquent greater than 90 days as a percentage of loans in repayment | 8.9% | 5.3% | 3.7% | 2.5% | 1.6% | —% | 4.0% |

92

Table of Contents

The table below stratifies the portfolio of Private Education Loans in forbearance by the cumulative number of months the customer has used forbearance as of the dates indicated.

| (Dollars in millions) | June 30, 2014 | | June 30, 2013 | |
| | Forbearance Balance | % of Total | Forbearance Balance | % of Total |
|---|---|---|---|---|
| **Cumulative number of months customer has used forbearance** | | | | |
| Up to 12 months | $ 916 | 76% | $ 883 | 76% |
| 13 to 24 months | 188 | 16 | 197 | 17 |
| More than 24 months | 97 | 8 | 80 | 7 |
| Total | $ 1,201 | 100% | $ 1,160 | 100% |

*Private Education Loan Repayment Options*

Certain loan programs allow customers to select from a variety of repayment options depending on their loan type and their enrollment/loan status, which include the ability to extend their repayment term or change their monthly payment. The chart below provides the optional repayment offerings in addition to the standard level principal and interest payments as of June 30, 2014.

| | Loan Program | | | |
| (Dollars in millions) | Signature and Other | Smart Option | Career Training | Total |
|---|---|---|---|---|
| $ in repayment | $21,806 | $4,250 | $1,080 | $27,136 |
| $ in total | $25,895 | $4,690 | $1,127 | $31,712 |
| Payment method by enrollment status: | Deferred[1] | | | |
| In-school/grace | | Deferred[1], interest-only or fixed $25/month | Interest-only or fixed $25/month | |
| Repayment | Level principal and interest or graduated | Level principal and interest | Level principal and interest | |

[1] "Deferred" includes loans for which no payments are required and interest charges are capitalized into the loan balance.

93

Table of Contents

The graduated repayment program that is part of Signature and Other Loans includes an interest-only payment feature that may be selected at the option of the customer. Customers elect to participate in this program at the time they enter repayment following their grace period. This program is available to customers in repayment, after their grace period, who would like a temporary lower payment from the required principal and interest payment amount. Customers participating in this program pay monthly interest with no amortization of their principal balance for up to 48 payments after entering repayment (dependent on the loan product type). The maturity date of the loan is not extended when a customer participates in this program. On a "Core Earnings" basis, as of June 30, 2014 and 2013, customers in repayment owing approximately $3.9 billion (14 percent of loans in repayment) and $5.8 billion (20 percent of loans in repayment), respectively, were enrolled in the interest-only program. Of these amounts, 8 percent and 10 percent were non-traditional loans as of June 30, 2014 and 2013, respectively.

*Accrued Interest Receivable*

The following tables provide information regarding accrued interest receivable on our Private Education Loans. The tables also disclose the amount of accrued interest on loans greater than 90 days past due as compared to our allowance for uncollectible interest. The allowance for uncollectible interest exceeds the amount of accrued interest on our 90 days past due portfolio for all periods presented.

*GAAP Basis:*

| | | Accrued Interest Receivable | | |
| | | Greater Than 90 Days Past Due | Allowance for Uncollectible Interest |
|---|---|---|---|
| (Dollars in millions) | Total | | |
| June 30, 2014 | $ 633 | $ 34 | $ 49 |
| December 31, 2013 | $1,023 | $ 48 | $ 66 |
| June 30, 2013 | $ 928 | $ 44 | $ 69 |

*"Core Earnings" Basis:*

| | | Accrued Interest Receivable | | |
| | | Greater Than 90 Days Past Due | Allowance for Uncollectible Interest |
|---|---|---|---|
| (Dollars in millions) | Total | | |
| June 30, 2014 | $633 | $ 34 | $ 49 |
| December 31, 2013 | $689 | $ 48 | $ 62 |
| June 30, 2013 | $648 | $ 44 | $ 65 |

## Liquidity and Capital Resources

### *Funding and Liquidity Risk Management*

The following "Liquidity and Capital Resources" discussion concentrates on our FFELP Loans and Private Education Loans segments. Our Business Services and Other segments require minimal capital and funding. As part of the Spin-Off, Navient neither originates Private Education Loans nor maintains bank deposits. As a result, Navient no longer has liquidity risks associated with the origination of Private Education Loans and the maintenance of bank deposits.

We define liquidity risk as the potential inability to meet our obligations when they become due without incurring unacceptable losses, such as the ability to fund liability maturities or invest in future asset growth and business operations at reasonable market rates. Our two primary liquidity needs include our ongoing ability to meet our funding needs for our businesses throughout market cycles, including during periods of financial stress, and servicing our indebtedness. To achieve these objectives, we analyze and monitor our liquidity needs, maintain excess liquidity and access diverse funding sources including the issuance of unsecured debt and the issuance of secured debt primarily through asset-backed securitizations and/or other financing facilities.

94

Table of Contents

We define liquidity as cash and high-quality liquid securities that we can use to meet our funding requirements. Our primary liquidity risk relates to our ability to raise replacement funding at a reasonable cost as our unsecured debt matures. In addition, we must continue to obtain funding at reasonable rates to meet our other business obligations and to continue to grow our business. This ability to access the capital markets may be affected by our credit ratings, as well as the overall availability of funding sources in the marketplace. In addition, credit ratings may be important to customers or counterparties when we compete in certain markets and when we seek to engage in certain transactions, including over-the-counter derivatives.

Credit ratings and outlooks are opinions subject to ongoing review by the ratings agencies and may change, from time to time, based on our financial performance, industry dynamics and other factors. Other factors that influence our credit ratings include the ratings agencies' assessment of the general operating environment, our relative positions in the markets in which we compete, reputation, liquidity position, the level and volatility of earnings, corporate governance and risk management policies, capital position and capital management practices. A negative change in our credit rating could have a negative effect on our liquidity because it might raise the cost and availability of funding and potentially require additional cash collateral or restrict cash currently held as collateral on existing borrowings or derivative collateral arrangements. It is our objective to improve our credit ratings so that we can continue to efficiently access the capital markets even in difficult economic and market conditions.

We have unsecured debt that totaled, as of June 30, 2014, approximately $17.5 billion. On April 30, 2014, three rating agencies took negative ratings actions with regard to our long-term unsecured debt ratings. Fitch lowered its rating one notch to BB and changed its rating outlook to stable. Moody's lowered its rating two notches to Ba3 and changed its rating outlook to stable. S&P lowered its rating two notches to BB and changed its rating outlook to stable. As a result of S&P's action, all three credit rating agencies now rate our long-term unsecured debt at below investment grade. These ratings could result in higher cost of funds, and our senior unsecured debt to trade with greater volatility.

The negative actions taken by the credit rating agencies were based on concerns that the Spin-Off will have a negative impact on the holders of our senior unsecured debt. According to their ratings reports, these concerns primarily focus on Navient's loss of access to the earnings, cash flow, equity and potential market value of Sallie Mae Bank, the run-off of the FFELP Loan portfolio and the growth of other fee businesses to replace the earnings that are in run-off, refinancing risk, and the potential for new and more onerous rules and regulations.

We expect to fund our ongoing liquidity needs, including the repayment of $1.2 billion of senior unsecured notes that mature in the next twelve months, primarily through our current cash and investment portfolio, the predictable operating cash flows provided by earnings, the repayment of principal on unencumbered student loan assets, the distributions from our securitization trusts (including servicing fees which are priority payments within the trusts) and the issuance of additional unsecured debt. We may also draw down on our secured FFELP and Private Education facilities or issue term asset-backed securities ("ABS").

While we no longer originate Private Education Loans or FFELP Loans and therefore no longer have liquidity requirements for new originations, we will continue to opportunistically purchase Private Education Loan and FFELP Loan portfolios from others.

95

Table of Contents

### Sources of Liquidity and Available Capacity

*Ending Balances*

| (Dollars in millions) | June 30, 2014 | December 31, 2013 |
|---|---|---|
| **Sources of primary liquidity:** | | |
| Total unrestricted cash and liquid investments | $1,643 | $ 3,015 |
| Unencumbered FFELP Loans | 1,766 | 1,259 |
| Total "Core Earnings" basis | 3,409 | 4,274 |
| SLM BankCo[1] | — | 3,709 |
| Total GAAP basis | $3,409 | $ 7,983 |

(1)   As of December 31, 2013, includes $2.3 billion of cash and $1.4 billion of FFELP Loans which were transferred to or retained by SLM BankCo following the Spin-Off.

*Average Balances*

| (Dollars in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| **Sources of primary liquidity:** | | | | |
| Total unrestricted cash and liquid investments | $1,988 | $ 2,250 | $2,083 | $2,534 |
| Unencumbered FFELP Loans | 1,854 | 801 | 1,763 | 728 |
| Total "Core Earnings" basis | 3,842 | 3,051 | 3,846 | 3,262 |
| SLM BankCo | 1,039 | 2,780 | 1,969 | 2,525 |
| Total GAAP basis | $4,881 | $ 5,831 | $5,815 | $5,787 |

(1)   For the three months ended June 30, 2014 and 2013, includes $580 million and $1.7 billion of cash, respectively, and $459 million and $1.1 billion of FFELP Loans, respectively. For the six months ended June 30, 2014 and 2013, includes $1.0 billion and $1.5 billion of cash, respectively, and $929 million and $1.1 billion of FFELP Loans, respectively.

Liquidity may also be available under secured credit facilities to the extent we have eligible collateral and capacity available. Maximum borrowing capacity under the FFELP Loan – other facilities will vary and be subject to each agreement's borrowing conditions, including, among others, facility size, current usage and availability of qualifying collateral from unencumbered FFELP Loans. As of June 30, 2014 and 2013, the maximum additional capacity under these facilities was $10.7 billion and $11.9 billion, respectively. For the three months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $11.8 billion and $11.1 billion, respectively. For the six months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $12.0 billion and $10.9 billion, respectively.

In addition to the FFELP Loan – other facilities, funding may also be available from our Private Education Loan asset-backed commercial paper facility which we closed in June 2014. The new facility will provide liquidity for Private Education Loan acquisitions and for the refinancing of loans presently on our balance sheet or in other short–term facilities. The maximum capacity under this facility is $1 billion. It matures in June 2015.

We also hold a number of other unencumbered assets, consisting primarily of Private Education Loans and other assets. Total unencumbered student loans comprised $7.9 billion of our unencumbered assets of which $6.1 billion and $1.8 billion related to Private Education Loans and FFELP Loans, respectively. At June 30, 2014, we had a total of $13.5 billion of unencumbered assets inclusive of those described above as sources of primary liquidity and exclusive of goodwill and acquired intangible assets.

For further discussion of our various sources of liquidity, our continued access to the ABS market, our asset-backed financing facilities, and our issuance of unsecured debt, see "Note 6 — Borrowings" in our Form 10.

96

Table of Contents

The following table reconciles encumbered and unencumbered assets and their net impact on GAAP total tangible equity.

| (Dollars in billions) | June 30, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| Net assets of consolidated variable interest entities (encumbered assets) — FFELP Loans | $ | 4.5 | $ | 4.6 |
| Net assets of consolidated variable interest entities (encumbered assets) — Private Education Loans | | 6.1 | | 6.7 |
| Tangible unencumbered assets[1] | | 13.4 | | 23.8 |
| Unsecured debt | | (18.4) | | (27.9) |
| Mark-to-market on unsecured hedged debt[2] | | (0.9) | | (0.8) |
| Other liabilities, net | | (1.1) | | (1.2) |
| Total tangible equity – GAAP Basis | $ | 3.6 | $ | 5.2 |

[1] Excludes goodwill and acquired intangible assets.

[2] At June 30, 2014 and December 31, 2013, there were $756 million billion and $612 million, respectively, of net gains on derivatives hedging this debt in unencumbered assets, which partially offset these losses.

The $1.6 billion decrease in total tangible equity from December 31, 2013 to June 30, 2014 is primarily the result of the deemed distribution of the $1.7 billion of consumer banking business net assets on April 30, 2014.

*Financing Transactions during the Six Months Ended June 30, 2014*

The following financing transactions have taken place in the first six months of 2014:

Unsecured Financings:

• March 27, 2014 — issued $850 million senior unsecured bonds.

FFELP Loan Financings:

• January 28, 2014 — issued $994 million FFELP Loan ABS.

• March 27, 2014 — issued $992 million FFELP Loan ABS.

• May 29, 2014 — issued $747 million FFELP Loan ABS.

Private Education Loan Financings:

• March 6, 2014 — issued $676 million Private Education Loan ABS.

FFELP ABCP Facility:

On January 10, 2014, we closed on a new $8 billion asset-backed commercial paper ("ABCP") facility that matures in January 2016. This facility replaces an existing $5.5 billion FFELP ABCP facility which was retired in January 2014. The additional $2.5 billion will be available for FFELP acquisition or refinancing. The maximum amount that can be financed steps down to $7 billion in March 2015. The new facility's maturity date is January 8, 2016.

Private Education Loan Facility:

On June 25, 2014, Navient closed a $1.0 billion Private Education Loan ABCP facility that is supported by four banks. The facility, which matures on June 24, 2015, will be available for Private Education Loan refinancing and acquisitions.

Table of Contents

*Shareholder Distributions*

In June 2014, we paid a common stock dividend of $0.15 per share.

In May 2014, we authorized $400 million to be utilized in a new common share repurchase program that does not have an expiration date. We repurchased 3.9 million shares of common stock for $65 million in the second quarter of 2014.

*Recent Third-Quarter 2014 Transactions*

Private Education Loan Financings:

• July 24, 2014 – issued $463 million Private Education Loan ABS.

**Counterparty Exposure**

Counterparty exposure related to financial instruments arises from the risk that a lending, investment or derivative counterparty will not be able to meet its obligations to us. Risks associated with our lending portfolio are discussed in the section titled "Financial Condition — FFELP Loans Portfolio Performance" and "— Private Education Loans Portfolio Performance."

Our investment portfolio is composed of very short-term securities issued by a diversified group of highly rated issuers, limiting our counterparty exposure. Additionally, our investing activity is governed by Board of Director approved limits on the amount that is allowed to be invested with any one issuer based on the credit rating of the issuer, further minimizing our counterparty exposure. Counterparty credit risk is considered when valuing investments and considering impairment.

Related to derivative transactions, protection against counterparty risk is generally provided by International Swaps and Derivatives Association, Inc. ("ISDA") Credit Support Annexes ("CSAs"). CSAs require a counterparty to post collateral if a potential default would expose the other party to a loss. All derivative contracts entered into by us are covered under such agreements and require collateral to be exchanged based on the net fair value of derivatives with each counterparty. Our securitization trusts require collateral in all cases if the counterparty's credit rating is withdrawn or downgraded below a certain level. Additionally, securitizations involving foreign currency notes issued after November 2005 also require the counterparty to post collateral to the trust based on the fair value of the derivative, regardless of credit rating. The trusts are not required to post collateral to the counterparties. In all cases, our exposure is limited to the value of the derivative contracts in a gain position net of any collateral we are holding. We consider counterparties' credit risk when determining the fair value of derivative positions on our exposure net of collateral.

We have liquidity exposure related to collateral movements between us and our derivative counterparties. Movements in the value of the derivatives, which are primarily affected by changes in interest rate and foreign exchange rates, may require us to return cash collateral held or may require us to access primary liquidity to post collateral to counterparties. If our credit ratings are downgraded from current levels, we may be required to segregate additional unrestricted cash collateral into restricted accounts.

Table of Contents

The table below highlights exposure related to our derivative counterparties at June 30, 2014.

| (Dollars in millions) | Corporate Contracts | Securitization Trust Contracts |
|---|---|---|
| Exposure, net of collateral[1] | $    98 | $    897 |
| Percent of exposure to counterparties with credit ratings below S&P AA- or Moody's Aa3 | 64% | 27% |
| Percent of exposure to counterparties with credit ratings below S&P A- or Moody's A3 | 34% | 0% |

[1]   Our securitization trusts had total net exposure of $733 million related to financial institutions located in France; of this amount, $578 million carries a guaranty from the French government. The total exposure relates to $5.0 billion notional amount of cross-currency interest rate swaps held in our securitization trusts, of which $3.2 billion notional amount carries a guaranty from the French government. Counterparties to the cross currency interest rate swaps are required to post collateral when their credit rating is withdrawn or downgraded below a certain level. As of June 30, 2014, no collateral was required to be posted and we are not holding any collateral related to these contracts. Adjustments are made to our derivative valuations for counterparty credit risk. The adjustments made at June 30, 2014 related to derivatives with French financial institutions (including those that carry a guaranty from the French government) decreased the derivative asset value by $49 million. Credit risks for all derivative counterparties are assessed internally on a continual basis.

### "Core Earnings" Basis Borrowings

The following tables present the ending balances of our "Core Earnings" basis borrowings at June 30, 2014 and December 31, 2013, and average balances and average interest rates of our "Core Earnings" basis borrowings for the three and six months ended June 30, 2014 and 2013. The average interest rates include derivatives that are economically hedging the underlying debt but do not qualify for hedge accounting treatment. (See "'Core Earnings' — Definition and Limitations — Differences between 'Core Earnings' and GAAP — Reclassification of Realized Gains (Losses) on Derivative and Hedging Activities" of this Item 2).

*Ending Balances*

| | June 30, 2014 | | | December 31, 2013 | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Short Term | Long Term | Total | Short Term | Long Term | Total |
| *Unsecured borrowings:* | | | | | | |
| Senior unsecured debt | $1,189 | $ 16,311 | $ 17,500 | $ 2,213 | $ 16,056 | $ 18,269 |
| Other[1] | 912 | — | 912 | 686 | — | 686 |
| Total unsecured borrowings | 2,101 | 16,311 | 18,412 | 2,899 | 16,056 | 18,955 |
| *Secured borrowings:* | | | | | | |
| FFELP Loan securitizations | — | 89,036 | 89,036 | — | 90,756 | 90,756 |
| Private Education Loan securitizations | — | 18,190 | 18,190 | — | 18,835 | 18,835 |
| FFELP Loan – other facilities | 2,190 | 5,573 | 7,763 | 4,715 | 5,311 | 10,026 |
| Private Education Loan — other facilities | — | 565 | 565 | — | 843 | 843 |
| Total secured borrowings | 2,190 | 113,364 | 115,554 | 4,715 | 115,745 | 120,460 |
| "Core Earnings" balances | 4,291 | 129,675 | 133,966 | 7,614 | 131,801 | 139,415 |
| Adjustment for GAAP accounting treatment | 25 | 2,244 | 2,269 | 6,181 | 4,847 | 11,028 |
| GAAP balances | $4,316 | $131,919 | $136,235 | $13,795 | $136,648 | $150,443 |

[1]   "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

Secured borrowings comprised 86 percent and 86 percent of our "Core Earnings" basis debt outstanding at June 30, 2014 and December 31, 2013, respectively.

99

Table of Contents

*Average Balances*

| (Dollars in millions) | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2014 | | 2013 | |
| | Average Balance | Average Rate | Average Balance | Average Rate | Average Balance | Average Rate | Average Balance | Average Rate |
| *Unsecured borrowings:* | | | | | | | | |
| Senior unsecured debt | $ 17,662 | 3.72% | $ 17,848 | 3.22% | $ 17,649 | 3.68% | $ 18,085 | 3.19% |
| Other[1] | 845 | .44 | 1,157 | .13 | 785 | .29 | 1,261 | .18 |
| Total unsecured borrowings | 18,507 | 3.57 | 19,005 | 3.03 | 18,434 | 3.53 | 19,346 | 2.99 |
| *Secured borrowings:* | | | | | | | | |
| FFELP Loan securitizations | 89,594 | .98 | 96,656 | .98 | 89,990 | .99 | 99,578 | .97 |
| Private Education Loan securitizations | 18,455 | 1.99 | 20,600 | 2.05 | 18,559 | 2.01 | 20,159 | 2.06 |
| FFELP Loan — other facilities | 8,061 | .81 | 13,383 | .99 | 8,659 | .88 | 14,491 | 1.01 |
| Private Education Loan — other facilities | 584 | 1.13 | 183 | 2.48 | 676 | 1.23 | 549 | 1.86 |
| Total secured borrowings | 116,694 | 1.13 | 130,822 | 1.15 | 117,884 | 1.14 | 134,777 | 1.14 |
| Total | $135,201 | 1.47% | $149,827 | 1.39% | $136,318 | 1.46% | $154,123 | 1.37% |
| "Core Earnings" average balance and rate | $135,201 | 1.47% | $149,827 | 1.39% | $136,318 | 1.46% | $154,123 | 1.37% |
| Adjustment for GAAP accounting treatment | 3,011 | 2.53 | 7,465 | 1.90 | 5,953 | 1.78 | 7,522 | 2.00 |
| GAAP basis average balance and rate | $138,212 | 1.49% | $157,292 | 1.41% | $142,271 | 1.48% | $161,645 | 1.40% |

[1] "Other" primarily consists of the obligation to return cash collateral held related to derivative exposure.

## Critical Accounting Policies and Estimates

Management's Discussion and Analysis of Financial Condition and Results of Operations addresses our consolidated financial statements, which have been prepared in accordance with GAAP. A discussion of our critical accounting policies, which include allowance for loan losses, premium and discount amortization related to our loan portfolio, fair value measurement, transfers of financial assets and the VIE consolidation model, derivative accounting and goodwill and intangible assets can be found in our Form 10. There were no significant changes to these critical accounting policies during the first half of 2014.

100

Table of Contents

**Item 3.     Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Sensitivity Analysis**

Our interest rate risk management seeks to limit the impact of short-term movements in interest rates on our results of operations and financial position. The following tables summarize the potential effect on earnings over the next 12 months and the potential effect on fair values of balance sheet assets and liabilities at June 30, 2014 and December 31, 2013, based upon a sensitivity analysis performed by management assuming a hypothetical increase in market interest rates of 100 basis points and 300 basis points while funding spreads remain constant. Additionally, as it relates to the effect on earnings, a sensitivity analysis was performed assuming the funding index increases 25 basis points while holding the asset index constant, if the funding index is different than the asset index. The earnings sensitivity is applied only to financial assets and liabilities, including hedging instruments that existed at the balance sheet date and does not take into account new assets, liabilities or hedging instruments that may arise in 2014.

| | As of June 30, 2014 | | | | | | As of June 30, 2013 | | | | | |
| | Impact on Annual Earnings If: | | | | | | Impact on Annual Earnings If: | | | | | |
| | Interest Rates | | | | Funding Indices | | Interest Rates | | | | Funding Indices | |
| (Dollars in millions, except per share amounts) | Increase 100 Basis Points | | Increase 300 Basis Points | | Increase 25 Basis Points[1] | | Increase 100 Basis Points | | Increase 300 Basis Points | | Increase 25 Basis Points[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Effect on Earnings:** | | | | | | | | | | | | |
| Change on pre-tax net income before unrealized gains (losses) on derivative and hedging activities | $ | (23) | $ | (6) | $ | (202) | $ | (15) | $ | 16 | $ | (246) |
| Unrealized gains (losses) on derivative and hedging activities | | 189 | | 273 | | 2 | | 293 | | 476 | | (1) |
| Increase in net income before taxes | $ | 166 | $ | 267 | $ | (200) | $ | 278 | $ | 492 | $ | (247) |
| Increase in diluted earnings per common share | $ | .38 | $ | .62 | $ | (.46) | $ | .61 | $ | 1.09 | $ | (.54) |

[1]   If an asset is not funded with the same index/frequency reset of the asset then it is assumed the funding index increases 25 basis points while holding the asset index constant.

| | | At June 30, 2014 | | | | |
| | | Interest Rates: | | | | |
| | | Change from Increase of 100 Basis Points | | | Change from Increase of 300 Basis Points | |
| (Dollars in millions) | Fair Value | $ | % | | $ | % |
|---|---|---|---|---|---|---|
| **Effect on Fair Values:** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $100,517 | $ (565) | (1)% | | $ (1,133) | (1)% |
| Private Education Loans | 30,941 | — | — | | — | — |
| Other earning assets | 5,907 | — | — | | — | — |
| Other assets | 7,015 | (362) | (5) | | (685) | (10)% |
| Total assets gain/(loss) | $144,380 | $ (927) | (1)% | | $ (1,818) | (1)% |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $135,221 | $ (795) | (1)% | | $ (2,206) | (2)% |
| Other liabilities | 2,720 | 83 | 3 | | 821 | 30 |
| Total liabilities (gain)/loss | $137,941 | $ (712) | (1)% | | $ (1,385) | (1)% |

101

Table of Contents

| (Dollars in millions) | Fair Value | At December 31, 2013 | | | | |
|---|---|---|---|---|---|---|
| | | Interest Rates: | | | | |
| | | Change from Increase of 100 Basis Points | | Change from Increase of 300 Basis Points | | |
| | | $ | % | $ | % | |
| **Effect on Fair Values:** | | | | | | |
| Assets | | | | | | |
| FFELP Loans | $104,481 | $ (566) | (1)% | $ (1,126) | (1)% | |
| Private Education Loans | 37,485 | — | — | — | — | |
| Other earning assets | 9,732 | — | — | (1) | — | |
| Other assets | 7,711 | (278) | (4) | (435) | (6)% | |
| Total assets gain/(loss) | $159,409 | $ (844) | (1)% | $ (1,562) | (1)% | |
| Liabilities | | | | | | |
| Interest-bearing liabilities | $147,385 | $ (859) | (1)% | $ (2,393) | (2)% | |
| Other liabilities | 3,458 | 58 | 2 | 805 | 23 | |
| Total liabilities (gain)/loss | $150,843 | $ (801) | (1)% | $ (1,588) | (1)% | |

A primary objective in our funding is to minimize our sensitivity to changing interest rates by generally funding our floating rate student loan portfolio with floating rate debt. However, due to the ability of some FFELP loans to earn Floor Income, we can have a fixed versus floating mismatch in funding if the student loan earns at the fixed borrower rate and the funding remains floating. In addition, we can have a mismatch in the index (including the frequency of reset) of floating rate debt versus floating rate assets.

During the three months ended June 30, 2014 and 2013, certain FFELP Loans were earning Floor Income and we locked in a portion of that Floor Income through the use of Floor Income Contracts. The result of these hedging transactions was to convert a portion of the fixed rate nature of student loans to variable rate, and to fix the relative spread between the student loan asset rate and the variable rate liability.

In the preceding tables, under the scenario where interest rates increase 100 and 300 basis points, the change in pre-tax net income before the unrealized gains (losses) on derivative and hedging activities is primarily due to the impact of (i) our unhedged loans being in a fixed-rate mode due to Floor Income, while being funded with variable debt in low interest rate environments; and (ii) a portion of our variable assets being funded with fixed rate liabilities and equity. Item (i) will generally cause income to decrease when interest rates increase from a low interest rate environment, whereas item (ii) will generally offset this decrease.

Under the scenario in the tables above labeled "Impact on Annual Earnings If: Funding Indices Increase 25 Basis Points," the main driver of the decrease in pre-tax income before unrealized gains (losses) on derivative and hedging activities in both the June 30, 2014 and June 30, 2013 analyses is primarily the result of one-month LIBOR-indexed FFELP Loans being funded with three-month LIBOR and other non-discrete indexed liabilities. See "Asset and Liability Funding Gap" of this Item 7A. for a further discussion. Increasing the spread between indices will also impact the unrealized gains (losses) on derivative and hedging activities as it relates to basis swaps that hedge the mismatch between the asset and funding indices.

In addition to interest rate risk addressed in the preceding tables, we are also exposed to risks related to foreign currency exchange rates. Foreign currency exchange risk is primarily the result of foreign currency denominated debt issued by us. When we issue foreign denominated corporate unsecured and securitization debt, our policy is to use cross currency interest rate swaps to swap all foreign currency denominated debt payments (fixed and floating) to U.S. dollar LIBOR using a fixed exchange rate. In the tables above, there would be an immaterial impact on earnings if exchange rates were to decrease or increase, due to the terms of the hedging instrument and hedged items matching. The balance sheet interest bearing liabilities would be affected by a

102

Table of Contents

change in exchange rates; however, the change would be materially offset by the cross currency interest rate swaps in other assets or other liabilities. In the current economic environment, volatility in the spread between spot and forward foreign exchange rates has resulted in material mark-to-market impacts to current-period earnings which have not been factored into the above analysis. The earnings impact is noncash, and at maturity of the instruments the cumulative mark-to-market impact will be zero.

**Asset and Liability Funding Gap**

The tables below present our assets and liabilities (funding) arranged by underlying indices as of June 30, 2014. In the following GAAP presentation, the funding gap only includes derivatives that qualify as effective hedges (those derivatives which are reflected in net interest margin, as opposed to those reflected in the "gains (losses) on derivatives and hedging activities, net" line on the consolidated statements of income). The difference between the asset and the funding is the funding gap for the specified index. This represents our exposure to interest rate risk in the form of basis risk and repricing risk, which is the risk that the different indices may reset at different frequencies or may not move in the same direction or at the same magnitude.

Management analyzes interest rate risk and in doing so includes all derivatives that are economically hedging our debt whether they qualify as effective hedges or not ("Core Earnings" basis). Accordingly, we are also presenting the asset and liability funding gap on a "Core Earnings" basis in the table that follows the GAAP presentation.

*GAAP Basis:*

| Index (Dollars in billions) | Frequency of Variable Resets | Assets[1] | Funding [2] | Funding Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $   5.1 | $     — | $   5.1 |
| Prime | annual | 0.6 | — | 0.6 |
| Prime | quarterly | 3.7 | — | 3.7 |
| Prime | monthly | 18.1 | — | 18.1 |
| Prime | daily | — | 0.1 | (0.1) |
| PLUS Index | annual | 0.3 | — | 0.3 |
| 3-month LIBOR | daily | — | — | — |
| 3-month LIBOR | quarterly | — | 79.7 | (79.7) |
| 1-month LIBOR | monthly | 8.9 | 37.3 | (28.4) |
| 1-month LIBOR daily | daily | 93.7 | — | 93.7 |
| CMT/CPI Index | monthly/quarterly | — | 0.8 | (0.8) |
| Non-Discrete reset[3] | monthly | — | 10.4 | (10.4) |
| Non-Discrete reset[4] | daily/weekly | 5.9 | 0.9 | 5.0 |
| Fixed Rate[5] | | 6.7 | 13.8 | (7.1) |
| Total | | $143.0 | $  143.0 | $     — |

[1]   FFELP Loans of $43.1 billion ($40.0 billion LIBOR index and $3.1 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2]   Funding (by index) includes all derivatives that qualify as hedges.

[3]   Funding consists of auction rate asset-backed securities and FFELP Loan – other facilities.

[4]   Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes the obligation to return cash collateral held related to derivatives exposures.

[5]   Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity.

Table of Contents

The "Funding Gaps" in the above table are primarily interest rate mismatches in short-term indices between our assets and liabilities. We address this issue typically through the use of basis swaps that typically convert quarterly reset three-month LIBOR to other indices that are more correlated to our asset indices. These basis swaps do not qualify as effective hedges and as a result the effect on the funding index is not included in our interest margin and is therefore excluded from the GAAP presentation.

*"Core Earnings" Basis:*

| Index<br>(Dollars in billions) | Frequency of<br>Variable<br>Resets | Assets[1] | Funding[2] | Funding<br>Gap |
|---|---|---|---|---|
| 3-month Treasury bill | weekly | $    5.1 | $      — | $    5.1 |
| Prime | annual | 0.6 | — | 0.6 |
| Prime | quarterly | 3.7 | — | 3.7 |
| Prime | monthly | 18.1 | 1.5 | 16.6 |
| Prime | daily | — | 0.1 | (0.1) |
| PLUS Index | annual | 0.3 | — | 0.3 |
| 3-month LIBOR | daily | — | — | — |
| 3-month LIBOR | quarterly | — | 64.2 | (64.2) |
| 1-month LIBOR | monthly | 8.9 | 48.9 | (40.0) |
| 1-month LIBOR | daily | 93.7 | 5.0 | 88.7 |
| Non-Discrete reset[3] | monthly | — | 10.4 | (10.4) |
| Non-Discrete reset[4] | daily/<br>weekly | 5.9 | 0.9 | 5.0 |
| Fixed Rate[5] | | 4.5 | 9.8 | (5.3) |
| Total | | $140.8 | $   140.8 | $      — |

[1]  FFELP Loans of 15.9 billion ($15.1 billion LIBOR index and $0.8 billion Treasury bill index) are currently earning a fixed rate of interest as a result of the low interest rate environment.

[2]  Funding (by index) includes all derivatives that management considers economic hedges of interest rate risk and reflects how we internally manage our interest rate exposure.

[3]  Funding consists of auction rate asset-backed securities and FFELP Loan – other facilities.

[4]  Assets include restricted and unrestricted cash equivalents and other overnight type instruments. Funding includes the obligation to return cash collateral held related to derivatives exposures.

[5]  Assets include receivables and other assets (including goodwill and acquired intangibles). Funding includes other liabilities and stockholders' equity.

We use interest rate swaps and other derivatives to achieve our risk management objectives. Our asset liability management strategy is to match assets with debt (in combination with derivatives) that have the same underlying index and reset frequency or, when economical, have interest rate characteristics that we believe are highly correlated. The use of funding with index types and reset frequencies that are different from our assets exposes us to interest rate risk in the form of basis and repricing risk. This could result in our cost of funds not moving in the same direction or with the same magnitude as the yield on our assets. While we believe this risk is low, as all of these indices are short-term with rate movements that are highly correlated over a long period of time, market disruptions (which have occurred in recent years) can lead to a temporary divergence between indices resulting in a negative impact to our earnings.

Table of Contents

**Weighted Average Life**

The following table reflects the weighted average life of our GAAP and "Core Earning" assets and liabilities at June 30, 2014.

| (Averages in Years) | Weighted Average Life |
|---|---|
| **Earning assets** | |
| Student loans | 7.4 |
| Other loans | 7.5 |
| Cash and investments | — |
| Total earning assets | 7.1 |
| **Borrowings** | |
| Short-term borrowings | 0.3 |
| Long-term borrowings | 6.3 |
| Total borrowings | 6.1 |

**Item 4.    Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with the participation of our principal executive and principal financial officers, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of June 30, 2014. Based on this evaluation, our chief principal executive and principal financial officers concluded that, as of June 30, 2014, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) accumulated and communicated to our management, including our chief principal executive and principal financial officers as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the fiscal quarter ended June 30, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

## PART II. OTHER INFORMATION

**Item 1.       Legal Proceedings**

We and our subsidiaries and affiliates are subject to various claims, lawsuits and other actions that arise in the normal course of business. We believe that these claims, lawsuits and other actions will not, individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations. Most of these matters are claims against our servicing and asset recovery subsidiaries by borrowers and debtors alleging the violation of state or federal laws in connection with servicing or asset recovery activities on their student loans and other debts. In addition, our asset recovery subsidiaries are routinely named in individual plaintiff or class action lawsuits in which the plaintiffs allege that those subsidiaries have violated a federal or state law in the process of collecting their accounts.

For a description of these items and other litigation to which we are a party, please see our Form 10.

**Tina Ubaldi v. SLM Corporation**

On March 18, 2011, a student loan borrower filed a putative class action complaint against Old SLM (now known as Navient, LLC) in the U.S. District Court for the Northern District of California. The complaint is captioned Tina M. Ubaldi v. SLM Corporation et. al., Case No. C-11-01320EDL. The plaintiff purports to bring the complaint on behalf of a class consisting of other similarly situated California borrowers. The complaint alleges, among other things, that Old SLM's practice of charging late fees proportional to the amount of missed payments constituted liquidated damages in violation of California law; and Old SLM engaged in unfair business practices by charging daily interest on private educational loans. Following motion practice and additional amendments to the complaint, which added usury claims under California state law and two additional defendants (Sallie Mae, Inc., now known as Navient Solutions, Inc. ("NSI"), and SLM PC Student Loan Trust 2004-A), the operative complaint (Modified Third Amended Complaint) was filed on December 2, 2013. Plaintiffs filed their Motion for Class Certification on October 22, 2013. On March 24, 2014, the Court denied plaintiffs' Motion for Class Certification without prejudice, but granted plaintiffs leave to file an amended Motion for Class Certification. On June 20, 2014, a Complaint in Intervention was filed on behalf of two additional customers representing a proposed usury sub-class. On June 23, 2014, Plaintiffs filed a Renewed Motion for Class Certification, which is scheduled for hearing on October 14, 2014. Plaintiffs seek restitution of late charges and interest paid by members of the class, injunctive relief, cancellation of all future interest payments, treble damages as permitted by law, as well as costs and attorneys' fees, among other relief. Prior to the formation of Sallie Mae Bank in 2005, Old SLM followed prevalent capital market practices of acquiring and securitizing private education loans purchased in secondary transactions from banks who originated these loans. Plaintiffs allege that the services provided by Old SLM and Sallie Mae, Inc. to the originating banks resulted in Old SLM and Sallie Mae, Inc. constituting lenders on these loans. Since 2006, Sallie Mae Bank originated the vast majority of all private education loans acquired by Old SLM. The claims at issue in this case expressly exclude loans originated by Sallie Mae Bank since its inception. Named defendants are subsidiaries of Navient and as such the Ubaldi litigation will remain the sole responsibility of Navient Corporation. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith.

**Regulatory Matters**

On May 2, 2014, NSI, a wholly-owned subsidiary of Navient, and Sallie Mae Bank entered into consent orders with the FDIC (respectively, the "NSI Order" and the "Bank Order"; collectively, "the FDIC Orders") to resolve previously disclosed matters related to certain cited violations of Section 5 of the Federal Trade Commission Act, including the disclosures and assessments of certain late fees, as well as alleged violations under the Servicemembers Civil Relief Act ("SCRA"). The FDIC Orders, which became effective upon the signing of the consent order with the DOJ by Navient and SLM BankCo on May 13, 2014, required each of Sallie Mae Bank and NSI to pay $3.3 million in civil monetary penalties. NSI has paid its civil monetary penalties. In addition, the FDIC Orders required the establishment of a restitution reserve account totaling $30 million to

106

Table of Contents

provide restitution with respect to loans owned or originated by Sallie Mae Bank, from November 28, 2005 until the effective date of the FDIC Orders. Pursuant to the Separation Agreement, Navient is responsible for funding the restitution reserve account. We funded the account in May 2014.

The NSI Order requires NSI to ensure proper servicing for service members and proper application of SCRA benefits under a revised and broader definition of eligibility than previously required by the statute and regulatory guidance and to make changes to billing statements and late fee practices. These changes to billing statements have already been implemented. In order to treat all customers in a similar manner, NSI expects to voluntarily make restitution of certain late fees to all other customers whose loans were neither owned nor originated by Sallie Mae Bank on the same basis and in the same manner as that which would be required by the FDIC. These refunds are estimated at $42 million.

With respect to alleged civil violations of the SCRA, NSI and Sallie Mae Bank have entered into a consent order with the DOJ, in its capacity as the agency having primary authority for enforcement of such matters. The DOJ consent order ("DOJ Order") covers all loans either owned by Sallie Mae Bank or serviced by NSI from November 28, 2005 until the effective date of the settlement. The DOJ Order requires NSI to fund a $60 million settlement fund, which would represent the total amount of compensation due to service members under the DOJ agreement and pay $55,000 in civil money penalties. The DOJ Order is currently on the docket of the United States District Court in Delaware awaiting Court approval.

As of December 31, 2013, a reserve of $65 million was established for estimated amounts and costs that were probable of being incurred for the FDIC and DOJ matters discussed above. In the first quarter of 2014, an additional reserve of $103 million was recorded for pending regulatory matters based on the progression of settlement discussions with the regulators and as a result, as of March 31, 2014, the related regulatory reserve was $168 million. The final cost of these proceedings remains uncertain until the DOJ Order is approved by the Court and all of the work under the various consent orders has been completed.

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters and is cooperating with the investigation. We are not in a position at this time to predict the duration or the outcome of this investigation and reserves have not been established for this matter.

Navient has received CIDs issued by the State of Illinois Office of Attorney General and the State of Washington Office of Attorney General and continues to cooperate with multiple state Attorneys General in connection with these investigations. According to the CIDs, the investigation was initiated to ascertain whether any practices declared to be unlawful under the Consumer Fraud and Deceptive Business Practices Act have occurred or are about to occur. Navient is cooperating with this investigation. We are not in a position at this time to predict the duration or the outcome of this investigation and reserves have not been established for this matter.

Pursuant to the Separation Agreement entered into in connection with the Spin-Off, Navient has agreed to be responsible and indemnify SLM BankCo for all claims, actions, damages, losses or expenses that may arise from the conduct of all activities of pre-Spin-Off SLM BankCo occurring prior to the Spin-Off other than those specifically excluded in the Separation and Distribution Agreement. Please see our Form 10 for a discussion of these indemnifications. As a result, all liabilities arising out of the aforementioned regulatory matters, other than fines or penalties directly levied against Sallie Mae Bank, are the responsibility of, or assumed by, Navient or one of its subsidiaries, and Navient has agreed to indemnify and hold harmless Sallie Mae and its subsidiaries, including Sallie Mae Bank, therefrom. Navient retained $165 million of the $168 million total regulatory reserve in connection with the Spin-Off. There are no additional reserves Navient has related to other indemnification matters with SLM BankCo as of June 30, 2014.

**Item 1A.        Risk Factors**

There have been no material changes from the risk factors previously disclosed in our Form 10.

107

Table of Contents

**Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds**

*Share Repurchases*

The following table provides information relating to our purchase of shares of our common stock in the three months ended June 30, 2014.

| (In millions, except per share data) | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[2] | Approximate Dollar Value of Shares That May Yet Be Purchased Under Publicly Announced Plans or Programs[2] |
|---|---|---|---|---|
| Period: | | | | |
| April 1 — April 30, 2014 | .2 | $   25.58 | — | $    — |
| May 1 — May 31, 2014 | 1.3 | 16.01 | .4 | $    394 |
| June 1 — June 30, 2014 | 3.6 | 16.90 | 3.5 | $    335 |
| Total second-quarter 2014 | 5.1 | $   17.04 | 3.9 | |

[1]  The total number of shares purchased includes: (i) shares purchased under the stock repurchase program discussed below, and (ii) shares of our common stock tendered to us to satisfy the exercise price in connection with cashless exercise of stock options, and tax withholding obligations in connection with exercise of stock options and vesting of restricted stock and restricted stock units.

[2]  In May 2014, our board of directors authorized us to purchase up to $400 million of shares of our common stock.

The closing price of our common stock on the NASDAQ Global Select Market on June 30, 2014 was $17.71.

**Item 3.    Defaults upon Senior Securities**

Nothing to report.

**Item 4.    Mine Safety Disclosures**

Nothing to report.

**Item 5.    Other Information**

Nothing to report.

108

Table of Contents

**Item 6.     Exhibits**

The following exhibits are furnished or filed, as applicable:

| | |
|---|---|
| 2.1 | Separation and Distribution Agreement, by and among, SLM Corporation, SLM BankCo and Navient Corporation, dated as of April 28, 2014 (incorporated by reference to Exhibit 2.1 to Navient Corporation's Current Report on Form 8-K filed on May 2, 2014). |
| 3.1 | Amended and Restated Certificate of Incorporation of Navient Corporation (incorporated by reference to Exhibit 3.1 of Amendment No. 3 to Navient Corporation's Registration Statement on Form 10 (File No. 001-36228) filed on March 27, 2014). |
| 3.2 | Amended and Restated By-Laws of Navient Corporation (incorporated by reference to Exhibit 3.2 of Amendment No. 3 to Navient Corporation's Registration Statement on Form 10 (File No. 001-36228) filed on March 27, 2014). |
| 10.1 | Transition Services Agreement by and between Navient Corporation and SLM Corporation, dated as of April 29, 2014 (incorporated by reference to Exhibit 10.1 to Navient Corporation's Current Report on Form 8-K filed on May 2, 2014). |
| 10.2 | Employee Matters Agreement, by and among SLM Corporation, New BLC Corporation and Navient Corporation, dated as of April 28, 2014 (incorporated by reference to Exhibit 10.2 to Navient Corporation's Current Report on Form 8-K filed on May 2, 2014). |
| 10.3 | Tax Sharing Agreement, by and between Navient Corporation and New BLC Corporation, dated as of April 28, 2014 (incorporated by reference to Exhibit 10.2 to Navient Corporation's Current Report on Form 8-K filed on May 2, 2014). |
| 10.4† | Navient Deferred Compensation Plan for Key Employees (incorporated by reference to Exhibit 4.3 to Navient Corporation's Registration Statement on Form S-8 (File No. 333-195539) filed on April 28, 2014). |
| 10.5† | Navient Deferred Compensation Plan for Directors (incorporated by reference to Exhibit 4.3 to Navient Corporation's Registration Statement on Form S-8 (File No. 333-195538) filed on April 28, 2014). |
| 10.6† | Navient Corporation 2014 Omnibus Incentive Plan (incorporated by reference to Exhibit 4.3 to Navient Corporation's Registration Statement on Form S-8 (File No. 333-195529) filed on April 28, 2014). |
| 10.7† | Navient Corporation Employee Stock Purchase Plan (incorporated by reference to Exhibit 4.3 to Navient Corporation's Registration Statement on Form S-8 (File No. 333-195533) filed on April 28, 2014). |
| 10.8† | Navient Supplemental 401(k) Savings Plan (incorporated by reference to Exhibit 4.3 to Navient Corporation's Registration Statement on Form S-8 (File No. 333-195535) filed on April 28, 2014). |
| 10.9†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2012 PSU Conversion. |
| 10.10†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2013 PSU Conversion. |
| 10.11†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2014. |
| 10.12†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Two-Year Restriction) — 2014. |
| 10.13†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Three-Year Restriction) — 2014. |

Table of Contents

| 10.14†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2014. |
| 10.15†* | Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet for John F. Remondi — 2013. |
| 10.16†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2013. |
| 10.17†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2013. |
| 10.18†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Restricted Stock Unit Term Sheet — 2012. |
| 10.19†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Two-Year Restriction) — 2012. |
| 10.20†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Bonus Restricted Stock Unit Term Sheet (Three-Year Restriction) — 2012. |
| 10.21†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2012. |
| 10.22†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2011. |
| 10.23†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement, Net Settled Options — 2010. |
| 10.24†* | Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement for John M. Kane — 2008. |
| 10.25†* | Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Agreement for Timothy J. Hynes — 2008. |
| 10.26†* | Navient Corporation 2014 Omnibus Incentive Plan, Stock Option Notice for John F. Remondi — 2008. |
| 10.27†* | Navient Corporation 2014 Omnibus Incentive Plan, Additional Stock Option Notice for John F. Remondi — 2008. |
| 10.28†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Award Agreement — 2014. |
| 10.29†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2013. |
| 10.30†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2012. |
| 10.31†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2011. |
| 10.32†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2010. |
| 10.33†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2009. |
| 10.34†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2008. |

Table of Contents

| | |
|---|---|
| 10.35†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2007. |
| 10.36†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2006. |
| 10.37†* | Form of Navient Corporation 2014 Omnibus Incentive Plan, Independent Director Stock Option Agreement — 2005. |
| 12.1* | Computation of Ratio of Earnings to Fixed Charges and Preferred Stock Dividends. |
| 31.1* | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document. |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document. |

\*   Filed herewith.

†   Management Contract or Compensatory Plan or Arrangement

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NAVIENT CORPORATION
(Registrant)

By:  /s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
*(Principal Financial Officer)*

Date: August 1, 2014

112

Exhibit 10.9

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Grantee") was granted on April 21, 2014 (the "Original Grant Date") Restricted Stock Units under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of _____ Restricted Stock Units ("RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1. <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award shall vest on the second business day after the Corporation's annual report on Form 10-K for the fiscal year 2014 is filed, and in no event later than March 15, 2015.

2. <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct (as defined below), he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate

Page 1 of 6

**Exhibit 10.9**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement:

    (a)  In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of the Award that is not vested shall become 100 percent vested; provided, however, the conversion of the accelerated portion of the RSUs into shares of common stock (i.e., the settlement of the Award) will

Page 2 of 6

Exhibit 10.9

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

(b)     If Grantee's employment shall terminate within twenty-four months following a Change in Control for any reason other than (i) by the Corporation for Misconduct, as determined by the Corporation in its sole discretion or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4.     Taxes; Dividends. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5.     Section 409A. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with ore be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole

Page 3 of 6

Exhibit 10.9

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6.  <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

7.  <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

8.  <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security

**Exhibit 10.9**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

9.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

10. <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

11. <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

12. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

13. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

Exhibit 10.9

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2012 PSU Conversion)

14. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

> If to the Corporation to:

> Navient Corporation
> Human Resources Department, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

> If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

15. <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

16. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

**Exhibit 10.10**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Grantee") was granted on April 21, 2014 (the "Original Grant Date") Restricted Stock Units under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of _____ Restricted Stock Units ("RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1. <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award shall vest on the second business day after the Corporation's annual report on Form 10-K for the fiscal year 2015 is filed, and in no event later than March 15, 2016.

2. <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct (as defined below), he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate

Page 1 of 6

**Exhibit 10.10**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement:

    (a)  In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of the Award that is not vested shall become 100 percent vested; provided, however, the conversion of the accelerated portion of the RSUs into shares of common stock (i.e., the settlement of the Award) will

**Exhibit 10.10**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

(b)   If Grantee's employment shall terminate within twenty-four months following a Change in Control for any reason other than (i) by the Corporation for Misconduct, as determined by the Corporation in its sole discretion or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4.   <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5.   <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with ore be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole

Exhibit 10.10

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6.  <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

7.  <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

8.  <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security

Exhibit 10.10

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

9.   Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

10.  Board Interpretation. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

11.  No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

12.  Amendments for Accounting Charges. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

13.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

Exhibit 10.10

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet
(2013 PSU Conversion)

14.  <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

> If to the Corporation to:
>
> Navient Corporation
> Human Resources Department, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713
>
> If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

15.  <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

16.  <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 6 of 6

**Exhibit 10.11**

Navient Corporation 2014 Omnibus Incentive Plan
Restricted Stock Unit Term Sheet

Pursuant to the terms and conditions of the Navient Corporation 2014 Omnibus Incentive Plan (the "Plan"), the Compensation and Personnel Committee of the Navient Corporation Board of Directors (the "Committee") hereby grants to          (the "Grantee") on May 1, 2014 (the "Grant Date") an award (the "Award") of          shares of Restricted Stock Units ("RSUs"), which represent the right to acquire shares of common stock of Navient Corporation (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.  <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award will vest, and will be converted into shares of common stock, in one-third increments on May 1, 2015, May 1, 2016 and May 1, 2017.

2.  <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct (as defined below), he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation, breach of fiduciary duty or deliberate disregard of Corporation rules; an unauthorized disclosure of any Corporation trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation to breach a contract with the Corporation or any principal for whom the Corporation acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the Corporation's retirement eligibility requirements under the Corporation's retirement eligibility policy in effect as of the Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)).

The Award shall be forfeited upon termination of employment due to Misconduct.

Notwithstanding anything stated herein, the Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

1

Exhibit 10.11

3. <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement:

    (a)    In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of the Award that is not vested shall become 100 percent vested; provided, however, the conversion of the accelerated portion of the RSUs into shares of common stock (i.e., the settlement of the Award) will nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

    (b)    If Grantee's employment shall terminate within twenty-four months following a Change in Control for any reason other than (i) by the Corporation for Misconduct or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4. <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5. <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with or be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and unless the

2

Exhibit 10.11

Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6.  Clawback Provision. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy or has committed fraud or Misconduct, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three- year period following the date the Board first learns of the violation, fraud or Misconduct.

7.  Securities Law Compliance. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

8.  Data Privacy. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the Plan ("Data"). Grantee acknowledges

3

Exhibit 10.11

that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the Plan.

9.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the Plan by electronic means or to request Grantee's consent to participate in the Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

10. <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the Plan.

11. <u>No Right to Continued Employment</u>. Nothing in the Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

12. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

13. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

14. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

4

<div align="right">**Exhibit 10.11**</div>

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

15. <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the terms of the Plan control, except as expressly stated otherwise herein. This Agreement and the Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the Plan.

16. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Accepted by:**

_____

_____
Date

**NAVIENT CORPORATION**

BY:    Jack Remondi
        President and Chief Executive Officer

<div align="center">5</div>

Exhibit 10.12

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
Management Incentive Plan Award

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan").

                (the "Grantee") was granted on February 4, 2014 (the "Original Grant Date") Bonus Restricted Stock Units ("Bonus RSUs") under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Bonus RSUs (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of          Bonus RSUs, which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.  Restrictions on Transfer. The Award is fully vested at grant, but subject to transfer restrictions ("Transfer Restrictions"), with such restrictions to lapse ratably over two years in one-half increments on February 4th in each of 2015 and 2016 and upon such lapsing the subject portion of the Award shall be settled in shares of the Corporation's common stock.

2.  Employment Termination; Death; Disability. If not previously lapsed, the Transfer Restrictions will remain, and the Award will be converted into shares of common stock on the original terms and dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation or Predecessor SLM (or its subsidiaries) for any reason other than for Misconduct (as defined below) or (ii) the Grantee voluntarily ceases to be an employee of the Corporation or Predecessor SLM (or its subsidiaries) for any reason. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor

1

Exhibit 10.12

SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer as Misconduct.

If not previously lapsed, the Transfer Restrictions will lapse and the Award will be settled in shares of the Corporation's common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of the Corporation from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

3.   <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on vested Awards subject to transfer restrictions will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same schedule regarding the lapsing of transfer restrictions to which the Award is subject. Upon such lapsing of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any Dividend Equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

Exhibit 10.12

4.  <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all Bonus RSUs provided under this Agreement and shares issuable hereunder comply with the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Bonus RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated Bonus RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1.409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the Bonus RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such Bonus RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such Bonus RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such Bonus RSUs will be settled.

5.  <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of the Corporation or Predecessor SLM has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of the Corporation or Predecessor SLM or has committed fraud or Misconduct with respect to the Corporation or Predecessor SLM, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs/Bonus RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs/Bonus RSUs from the Grantee (whether or not such individual is currently employed by the Corporation (or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

Exhibit 10.12

6.   <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of Common Stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

7.   <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

8.   <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

Exhibit 10.12

9.    Board Interpretation. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

10.    No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

11.    Amendments for Accounting Charges. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

12.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

13.    Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

14.    Plan Controls; Entire Agreement; Capitalized Terms. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

15.    Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete

Exhibit 10.12

such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of Bonus RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of Bonus RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

6

**Exhibit 10.13**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
Management Incentive Plan Award

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan").

                        (the "Grantee") was granted on February 4, 2014 (the "Original Grant Date") Bonus Restricted Stock Units ("Bonus RSUs") under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Bonus RSUs (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of         Bonus RSUs, which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.   Restrictions on Transfer. The Award is fully vested at grant, but subject to transfer restrictions ("Transfer Restrictions"), with such restrictions to lapse ratably over three years in one-third increments on February 4th in each of 2015, 2016 and 2017 and upon such lapsing the subject portion of the Award shall be settled in shares of the Corporation's common stock.

2.   Employment Termination; Death; Disability. If not previously lapsed, the Transfer Restrictions will remain, and the Award will be converted into shares of common stock on the original terms and dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation or Predecessor SLM (or its subsidiaries) for any reason other than for Misconduct (as defined below) or (ii) the Grantee voluntarily ceases to be an employee of the Corporation or Predecessor SLM (or its subsidiaries) for any reason. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor

1

Exhibit 10.13

SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer as Misconduct.

If not previously lapsed, the Transfer Restrictions will lapse and the Award will be settled in shares of the Corporation's common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of the Corporation from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

3.  Taxes; Dividends. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on vested Awards subject to transfer restrictions will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same schedule regarding the lapsing of transfer restrictions to which the Award is subject. Upon such lapsing of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any Dividend Equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

2

Exhibit 10.13

4.  <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all Bonus RSUs provided under this Agreement and shares issuable hereunder comply with the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Bonus RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated Bonus RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1.409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the Bonus RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such Bonus RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such Bonus RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such Bonus RSUs will be settled.

5.  <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of the Corporation or Predecessor SLM has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of the Corporation or Predecessor SLM or has committed fraud or Misconduct with respect to the Corporation or Predecessor SLM, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs/Bonus RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs/Bonus RSUs from the Grantee (whether or not such individual is currently employed by the Corporation (or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

3

Exhibit 10.13

6.   <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of Common Stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

7.   <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

8.   <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

<div align="center">4</div>

Exhibit 10.13

9. <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

10. <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

11. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

12. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

13. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

14. <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

15. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete

Exhibit 10.13

such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of Bonus RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of Bonus RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

**Exhibit 10.14**

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
Long-Term Incentive Award

A.    <u>Option Grant</u>. Net-Settled Stock Options (the "Options") to purchase a total of        shares of Common Stock, par value $.01 per share, of Navient Corporation (the "Corporation") are hereby granted to (the "Grantee") subject in all respects to the terms and provisions of the Navient Corporation 2014 Omnibus Incentive Plan (the "Plan"), which is incorporated herein by reference, and this Stock Option Agreement (this "Agreement"). The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.    <u>Option Price</u>. The purchase price per share is $      (the "Option Price"), which is the fair market value per share of Common Stock on the Grant Date.

C.    <u>Grant Date</u>. The date of grant of these Options is May 1, 2014 (the "Grant Date").

D.    <u>Vesting; Exercisability</u>. The Options are not vested as of the Grant Date. Unless vested earlier as set forth below, the Options will vest as follows: one-third of the Options shall vest on each of the first, second, and third anniversary of the Grant Date.

- Except as set forth below, if the Grantee ceases to be an employee of the Corporation (or its subsidiaries) for any reason, he/she will forfeit any unvested Options as of the date of such termination of employment.

- Except as otherwise set forth herein, including Section H, if the Grantee's employment with the Corporation (or its subsidiaries) is terminated by the Corporation for any reason other than for Misconduct (as defined below), or if the Grantee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) and meets the Corporation's retirement eligibility requirements under the Corporation's retirement eligibility policy in effect as of the Grant Date, which shall be determined by the Corporation in its sole discretion, all unvested Options will continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year from the date such portion vests, but in no event later than the Expiration Date (as defined below). For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation, breach of fiduciary duty or deliberate disregard of Corporation rules; an unauthorized disclosure of any Corporation trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation to breach a contract with the Corporation or any principal for whom the Corporation acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer as Misconduct.

1

Exhibit 10.14

- Upon termination of employment for death, Disability or as provided for under the Navient Corporation Change in Control Severance Plan for Senior Officers, all unvested Options will vest and will be exercisable for one year from the date of such vesting.

- Except as otherwise set forth herein and except as otherwise provided in the Navient Corporation Change in Control Severance Plan, vested Options (taking into account any vesting acceleration, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

- Upon termination of employment for Misconduct or for cause, as determined by the Corporation in its sole discretion, all Options, vested or unvested, are forfeited.

E.  <u>Expiration</u>. These Options expire five years from the Grant Date (the "Expiration Date"), subject to the provisions of the Plan and this Agreement, which may provide for earlier expiration in certain instances, including Grantee's termination of employment.

F.  <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by the Grantee by will or by the laws of descent and distribution. In addition, Grantee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Grantee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Grantee. Any Options that are transferred are further conditioned on the Grantee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Grantee.

G.  <u>Net-Settlement upon Option Exercise; Taxes</u>. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Grantee shall receive from the Corporation the number of shares of Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes", rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of Corporation's common stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding minimum) divided by the fair market value of the Corporation's common stock at the time of exercise. Grantee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of Common Stock of the Corporation pursuant to these Options, the Grantee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

Exhibit 10.14

H.   <u>Vesting Upon Change In Control</u>. Notwithstanding anything to the contrary in this Agreement, including Section (D):

    (I)   In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of these Options that were not vested shall become 100 percent vested and exercisable effective immediately prior to the consummation of such Change in Control; and

    (II)   If Grantee's employment shall terminate within twenty-four months following a Change in Control other than for (i) Misconduct or for cause, as determined by the Corporation in its sole discretion, or (ii) voluntary termination, any Options not previously vested shall immediately become vested and exercisable upon such employment termination and such Options shall be exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

I.   <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors (the "Board") of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy or has committed fraud or Misconduct, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting and exercise of Options and the cancellation of any outstanding Options from the Grantee (whether or not such individual is currently employed by the Corporation (or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

J.   <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Compensation and Personnel Committee of the Board (the "Committee") concerning any questions arising under this Agreement or the Plan.

K.   <u>Stockholder Rights</u>. The Grantee shall not be deemed a stockholder of the Corporation with respect to any of the shares of Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Grantee. The Corporation shall not be required to issue or transfer any shares of Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the Common Stock may then be listed.

L.   <u>No Right to Continued Employment</u>. Nothing in the Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

<div align="center">3</div>

Exhibit 10.14

M.   <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.   <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Grantee or other subsequent transfers by the Grantee of any shares of Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares of Common Stock underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.   <u>Data Privacy</u>. As an essential term of this Option, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Grantee's participation in the Plan. By entering into this Agreement and accepting the Option, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the Plan.

P.   <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the Plan by electronic means or to request Grantee's consent to participate in the Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation and thereafter until withdrawn in writing by Grantee.

4

Exhibit 10.14

Q.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

R.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

   Navient Corporation
   Attn: Human Resources, Equity Plan Administration
   300 Continental Drive
   Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

S.   <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the terms of the Plan control, except as expressly stated otherwise herein. This Agreement and the Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the Plan.

T.   <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

5

**Exhibit 10.14**

The Grantee must contact Merrill Lynch to accept the terms of this grant. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Grantee fails to accept the terms of this grant, the Options may not be exercised.

**NAVIENT CORPORATION**

BY: _____

      Jack Remondi
      President and Chief Executive Officer

**Accepted by:**

_____

_____
Date

6

**Exhibit 10.15**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

John F. Remondi (the "Grantee") was granted on August 8, 2013 (the "Original Grant Date") Restricted Stock Units under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of 20,128 Restricted Stock Units ("RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.   <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award will vest, and will be converted into shares of common stock, in one-third increments on August 8, 2014, August 8, 2015 and August 8, 2016.

2.   <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct, as determined by the Corporation in its sole discretion, he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules;

Page 1 of 6

**Exhibit 10.15**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.   <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement:

   (a)   In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of the Award that is not vested shall become 100 percent vested; provided, however, the conversion of the accelerated portion of the RSUs into shares of common stock (i.e., the settlement of the Award) will nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

Page 2 of 6

Exhibit 10.15

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

(b)   If Grantee's employment shall terminate within twenty-four months following a Change in Control for any reason other than (i) by the Corporation for Misconduct, as determined by the Corporation in its sole discretion or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4.   <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5.   <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with or be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's

**Exhibit 10.15**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be made until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6.   Clawback Provision. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

7.   Securities Law Compliance. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

8.   Data Privacy. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or

Exhibit 10.15

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

9.   Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

10.  Board Interpretation. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

11.  No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

12.  Amendments for Accounting Charges. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

13.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

14.  Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered,

Page 5 of 6

**Exhibit 10.15**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Human Resources Department, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

15. Plan Controls; Entire Agreement; Capitalized Terms. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

16. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 6 of 6

**Exhibit 10.16**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new grants granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

(the "Grantee") was granted on February 7, 2013 (the "Original Grant Date") Restricted Stock Units under the SLM Plan (the "Original Grant").

A portion of the Restricted Stock Units issued under the Original Grant have vested by reason of the terms and conditions of the Original Grant. Any unvested Restricted Stock Units remaining under the Original Grant are hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of           Restricted Stock Units ("RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.   <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award will vest, and will be converted into shares of common stock, in one-half increments on February 7, 2015 and February 7, 2016.

2.   <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct, as determined by the Corporation in its sole discretion, he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud,

Exhibit 10.16

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

---

dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement:

    (a)   In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of the Award that is not vested shall become 100 percent vested; provided, however, the conversion of the accelerated portion

Page 2 of 6

Exhibit 10.16

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

of the RSUs into shares of common stock (i.e., the settlement of the Award) will nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

(b) If Grantee's employment shall terminate within twenty-four months following a Change in Control for any reason other than (i) by the Corporation for Misconduct, as determined by the Corporation in its sole discretion or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4. <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5. <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with or be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole

Page 3 of 6

**Exhibit 10.16**

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be made until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6. <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

7. <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

8. <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job

Page 4 of 6

Exhibit 10.16

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

10. Board Interpretation. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

11. No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

12. Amendments for Accounting Charges. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

13. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

Page 5 of 6

Exhibit 10.16

Navient Corporation 2014 Omnibus Incentive Plan
2013 Restricted Stock Unit Term Sheet

14.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Human Resources Department, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

15.   <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

16.   <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 6 of 6

**Exhibit 10.17**

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

(the "Grantee") was granted on February 7, 2013 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A. **Option Grant**. Net-Settled Stock Options (the "Options") to purchase a total of _____ shares of Common Stock, par value $.01 per share, ("NewCo Common Stock"), of Navient Corporation (the "Corporation") are hereby granted to Grantee subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (this "Agreement"). The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B. **Option Price**. The purchase price per share is $11.4873 (the "Option Price").

C. **Grant Date**. The date of grant of these Options is April 30, 2014 (the "Grant Date").

D. **Vesting; Exercisability**. Unless vested earlier by reason of the terms and conditions of the Original Grant or as set forth below, the Options are vested and/or will vest as

Page 1 of 7

Exhibit 10.17

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

follows: one-third of the Options shall vest on each of the first, second, and third anniversary of the Original Grant Date.

- Except as set forth below, if the Grantee ceases to be an employee of the Corporation (or its subsidiaries) for any reason, he/she will forfeit any unvested Options as of the date of such termination of employment.

- Except as otherwise set forth herein, including Section H, if the Grantee's employment with the Corporation (or its subsidiaries) is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or if the Grantee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date ("Retirement Eligible"), which shall be determined by the Corporation in its sole discretion, all unvested Options will continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year from the date such portion vests, but in no event later than the Expiration Date (as defined below). If Grantee voluntarily terminates employment while Retirement Eligible, then any Options that are vested as of the date of Grantee's termination of employment will remain exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

- Upon termination of employment for death, Disability or as provided for under the Navient Corporation Change in Control Severance Plan for Senior Officers as it exists on the Grant Date, all unvested Options will vest and will be exercisable for one year from the date of such vesting. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

- Except as otherwise set forth herein and except as otherwise provided in the Navient Corporation Change in Control Severance Plan as it exists on the Grant Date, vested Options (taking into account any vesting acceleration, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

**Exhibit 10.17**

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

---

- Upon termination of employment for Misconduct or for cause, as determined by the Corporation in its sole discretion, any/all Options, vested or unvested, are forfeited.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

E.    <u>Expiration</u>. These Options expire five years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Grantee's termination of employment.

F.    <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by the Grantee by will or by the laws of descent and distribution. In addition, Grantee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Grantee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Grantee. Any Options that are transferred are further conditioned on the Grantee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Grantee.

G.    <u>Net-Settlement upon Option Exercise; Taxes</u>. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Grantee shall receive from the Corporation the number of shares of Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes", rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding minimum) divided by the fair market value of the NewCo Common Stock at the time of exercise. Grantee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of NewCo Common Stock pursuant to these Options, the Grantee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

Page 3 of 7

Exhibit 10.17

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

H.   <u>Vesting Upon Change in Control</u>. Notwithstanding anything to the contrary in this Agreement, including Section (D):

  (I)   In the event of a Change in Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change in Control, then any portion of these Options that were not vested shall become 100 percent vested and exercisable effective immediately prior to the consummation of such Change in Control; and

  (II)   If Grantee's employment with the Corporation shall terminate within twenty-four months following a Change in Control other than for (i) Misconduct or for cause, as determined by the Corporation in its sole discretion, or (ii) voluntary termination, any Options not previously vested shall immediately become vested and exercisable upon such employment termination and such Options shall be exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

I.   <u>Clawback Provisions</u>. Notwithstanding anything to the contrary herein, if the Board of Directors (the "Board") of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy or has committed fraud or Misconduct, and the Grantee at the time of such violation, fraud or Misconduct (or at any time thereafter) was an officer of Predecessor SLM or the Corporation (or its subsidiaries) at the Senior Vice President level or above, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting and exercise of Options and the cancellation of any outstanding Options from the Grantee (whether or not such individual is currently employed by the Corporation (or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

J.   <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Compensation and Personnel Committee of the Board (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

K.   <u>Stockholder Rights</u>. The Grantee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Grantee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

Exhibit 10.17

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

---

L.  <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

M.  <u>Amendments for Accounting Charges.</u> The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.  <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Grantee or other subsequent transfers by the Grantee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares of NewCo Common Stock underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.  <u>Data Privacy</u>. As an essential term of this Option, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Grantee acknowledges that Data may be held to implement, administer and manage the

Page 5 of 7

Exhibit 10.17

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

P.   Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation and thereafter until withdrawn in writing by Grantee.

Q.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

R.   Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

S.   Plan Controls; Entire Agreement; Capitalized Terms. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

T.   Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision

Page 6 of 7

Exhibit 10.17

Navient Corporation 2014 Omnibus Incentive Plan
Net-Settled Options—Stock Option Agreement
2013 Long-Term Incentive Award

shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

The Grantee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Grantee fails to accept the terms of this grant, the Options may not be exercised.

**Exhibit 10.18**

Navient Corporation 2014 Omnibus Incentive Plan
Restricted Stock Unit Term Sheet
2012

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2009-2012 Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Grantee") was granted on February 3, 2012 (the "Original Grant Date") Restricted Stock Units under the SLM Plan (the "Original Grant").

A portion of the Restricted Stock Units issued under the Original Grant have vested by reason of the terms and conditions of the Original Grant. Any unvested Restricted Stock Units remaining under the Original Grant are hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of _____ Restricted Stock Units as applicable ("RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (the "Agreement"):

1. <u>Vesting Schedule</u>. Unless vested earlier as set forth below, the Award will vest, and will be converted into shares of common stock on February 3, 2015.

2. <u>Employment Termination; Death; Disability</u>. Except as provided below, if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or his or her employment is terminated by the Corporation for Misconduct, as determined by the Corporation in its sole discretion, he/she shall forfeit any portion of the Award that has not vested as of the date of such termination of employment. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud,

Page 1 of 4

**Exhibit 10.18**

Navient Corporation 2014 Omnibus Incentive Plan
Restricted Stock Unit Term Sheet
2012

dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously vested, the Award will continue to vest, and will be converted into shares of common stock, on the original vesting terms and vesting dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

If not previously vested, the Award will vest, and will be converted into shares of common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  Change of Control. Notwithstanding anything to the contrary in this Agreement:

    (a)  In the event of a Change of Control Transaction or a Change of Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change of Control or Change of Control Transaction, then any portion of the Award that is not vested shall become 100

Page 2 of 4

**Exhibit 10.18**

Navient Corporation 2014 Omnibus Incentive Plan
Restricted Stock Unit Term Sheet
2012

percent vested; provided, however, the conversion of the accelerated portion of the RSUs into shares of common stock (i.e., the settlement of the Award) will nevertheless be made at the same time or times as if such RSUs had vested in accordance with the vesting schedule set forth in Section 1 or, if earlier, upon the termination of Grantee's employment for reasons other than Misconduct.

(b)     If Grantee's employment shall terminate within twenty-four months following a Change of Control or a Change of Control Transaction for any reason other than (i) by the Corporation for Misconduct, as determined by the Corporation in its sole discretion or (ii) by Grantee's voluntary termination of employment that is not a Termination of Employment for Good Reason, as defined in the Change in Control Severance Plan for Senior Officers (if applicable to the Grantee), any portion of the Award not previously vested shall immediately become vested, and shall be converted into shares of common stock, upon such employment termination.

4.     <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on an unvested Award will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same vesting schedule to which the Award is subject. Upon vesting of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also vest and will be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

5.     <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all RSUs provided under this Agreement and shares issuable hereunder comply with or be exempt from the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated RSUs will not be settled by virtue of such acceleration until and

Page 3 of 4

Exhibit 10.18

Navient Corporation 2014 Omnibus Incentive Plan
Restricted Stock Unit Term Sheet
2012

unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such RSUs during such six (6) month period will accrue and will not be made until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such RSUs will be settled.

6.  Clawback Provision. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, and the Grantee at the time of such violation, fraud or Misconduct (or at any time thereafter) was an officer of the Corporation or Predecessor SLM at the Senior Vice President level or above, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs from the Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

7.  Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

**Grantee is deemed to accept this Award of RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 4 of 4

**Exhibit 10.19**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

                (the "Grantee") was granted on February 7, 2013 (the "Original Grant Date") Bonus Restricted Stock Units under the SLM Plan (the "Original Grant").

The Transfer Restrictions on a portion of the Bonus Restricted Stock Units issued under the Original Grant have lapsed by reason of the terms and conditions of the Original Grant. Any Bonus Restricted Stock Units remaining under the Original Grant are hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Bonus Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of           Bonus Restricted Stock Units ("Bonus RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.  <u>Restrictions on Transfer</u>. The Award is fully vested at grant, but subject to transfer restrictions ("Transfer Restrictions"), with such restrictions to lapse on February 7, 2015 and upon such lapsing the subject portion of the Award shall be settled in shares of the Corporation's common stock.

2.  <u>Employment Termination; Death; Disability</u>. If not previously lapsed, the Transfer Restrictions will remain, and the Award will be converted into shares of common stock on the original terms and dates set forth above in the event that (i) the Grantee's employment is terminated by the Corporation (or its subsidiaries) for any reason other

**Exhibit 10.19**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) for any reason. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously lapsed, the Transfer Restrictions will lapse and the Award will be settled in shares of the Corporation's common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on vested Awards subject to Transfer Restrictions will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same schedule regarding the lapsing of Transfer Restrictions to which the Award is subject. Upon such lapsing of any portion of

Page 2 of 6

Exhibit 10.19

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

4.    Section 409A. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all Bonus RSUs provided under this Agreement and shares issuable hereunder comply with the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Bonus RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated Bonus RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the Bonus RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such Bonus RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such Bonus RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such Bonus RSUs will be settled.

5.    Clawback Provision. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, and the Grantee at the time of such violation, fraud or Misconduct (or at any time thereafter) was an officer of Predecessor SLM or the Corporation (or its subsidiaries) at the Senior Vice President level or above, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting, exercise or settlement of Options and/or Restricted Stock/RSUs/Bonus RSUs and the

Page 3 of 6

**Exhibit 10.19**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

cancellation of any outstanding Options and/or Restricted Stock/RSUs/Bonus RSUs from the Grantee (whether or not such individual is currently employed by the Corporation(or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

6.   <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

7.   <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

8.   <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic

Page 4 of 6

**Exhibit 10.19**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

9.  <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

10. <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

11. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

12. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

13. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

> If to the Corporation to:

> Navient Corporation
> Human Resources Department, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

> If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

14. <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

Page 5 of 6

**Exhibit 10.19**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

15.  <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of Bonus RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of Bonus RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 6 of 6

**Exhibit 10.20**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

            (the "Grantee") was granted on February 7, 2013 (the "Original Grant Date") Bonus Restricted Stock Units under the SLM Plan (the "Original Grant").

The Transfer Restrictions on a portion of the Bonus Restricted Stock Units issued under the Original Grant have lapsed by reason of the terms and conditions of the Original Grant. Any Bonus Restricted Stock Units remaining under the Original Grant are hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Bonus Restricted Stock Units (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of shares of restricted stock units under the SLM Plan.

Pursuant to the terms and conditions of the NewCo Plan, the Committee hereby grants to the Grantee on April 30, 2014 (the "Grant Date") an award (the "Award") of          Bonus Restricted Stock Units ("Bonus RSUs"), which represent the right to acquire shares of common stock of NewCo (the "Corporation") subject to the following terms and conditions (this "Agreement"):

1.  <u>Restrictions on Transfer</u>. The Award is fully vested at grant, but subject to transfer restrictions ("Transfer Restrictions"), with such restrictions to lapse ratably over two years in one-half increments on February 7 in each of 2015 and 2016 and upon such lapsing the subject portion of the Award shall be settled in shares of the Corporation's common stock.

2.  <u>Employment Termination; Death; Disability</u>. If not previously lapsed, the Transfer Restrictions will remain, and the Award will be converted into shares of common stock on the original terms and dates set forth above in the event that (i) the Grantee's

Exhibit 10.20

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

---

employment is terminated by the Corporation (or its subsidiaries) for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or (ii) the Grantee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) for any reason. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

If not previously lapsed, the Transfer Restrictions will lapse and the Award will be settled in shares of the Corporation's common stock, upon death or Disability (provided that such Disability qualifies as a "disability" within the meaning of Treasury Regulation Section 1.409A-3(i)(4)). For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

The Award shall be forfeited upon termination of employment due to Misconduct, as determined by the Corporation in its sole discretion.

Notwithstanding anything stated herein, the NewCo Plan or in the Navient Corporation Change in Control Severance Plan for Senior Officers, this Award shall not be subject to the terms set forth in the Navient Corporation Change in Control Severance Plan for Senior Officers.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the NewCo Plan or the SLM Plan.

3.  <u>Taxes; Dividends</u>. The Grantee of the Award shall make such arrangements as may reasonably be required by the Corporation, including transferring a sufficient number of shares of the Corporation's stock, to satisfy the income and employment tax withholding requirements that accrue upon the Award becoming vested or, if applicable, settled in shares of the Corporation's common stock (by approving this Agreement, the Committee hereby approves the transfer of such shares to the Corporation for purposes of SEC Rule 16b-3). Dividends declared on vested Awards subject to Transfer Restrictions will not be paid currently. Instead, amounts equal to such dividends will be credited to an account established on behalf of the Grantee and such amounts will be deemed to be invested in additional shares of the Corporation's common stock ("Dividend Equivalents"). Such Dividend Equivalents will be subject to the same schedule regarding the lapsing of

Page 2 of 6

Exhibit 10.20

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

Transfer Restrictions to which the Award is subject. Upon such lapsing of any portion of the Award, the amount of Dividend Equivalents allocable to such Award and any dividend equivalents earned under the Original Grant allocable to this Award (and any fractional share amount) will also be converted into shares of the Corporation's common stock (provided that any fractional share amount shall be paid in cash).

4.  <u>Section 409A</u>. For purposes of section 409A of the Internal Revenue Code, the regulations and other guidance thereunder and any state law of similar effect (collectively "Section 409A"), each payment and benefit payable under this Agreement is hereby designated as a separate payment. The parties intend that all Bonus RSUs provided under this Agreement and shares issuable hereunder comply with the requirements of Section 409A so that none of the payments or benefits will be subject to the adverse tax penalties imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Bonus RSUs is to be accelerated in connection with the Grantee's termination of service, such accelerated Bonus RSUs will not be settled by virtue of such acceleration until and unless the Grantee has a "separation from service" within the meaning of Section Treasury Regulation 1-409A-1(h), as determined by the Corporation, in its sole discretion. Further, and notwithstanding anything in the NewCo Plan or this Agreement to the contrary, if (x) any of the Bonus RSUs to be provided in connection with the Grantee's separation from service do not qualify for any reason to be exempt from Section 409A, (y) the Grantee is, at the time of such separation from service, a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) and (z) the settlement of such Bonus RSUs would result in the imposition of additional tax under Section 409A if such settlement occurs on or within the six (6) month period following the Grantee's separation from service, then, to the extent necessary to avoid the imposition of such additional taxation, the settlement of any such Bonus RSUs during such six (6) month period will accrue and will not be settled until the date six (6) months and one (1) day following the date of the Grantee's separation from service and on such date (or, if earlier, the date of the Grantee's death), such Bonus RSUs will be settled.

5.  <u>Clawback Provision</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation (the "Board"), or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or Misconduct with respect to Predecessor SLM or the Corporation, and the Grantee at the time of such violation, fraud or Misconduct (or at any time thereafter) was an officer of Predecessor SLM or the Corporation (or its subsidiaries) at the Senior Vice President level or above, then the Board or committee shall consider all factors, with particular scrutiny when one of the top 20 members of management are involved, and the Board or such committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting,

Page 3 of 6

**Exhibit 10.20**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

exercise or settlement of Options and/or Restricted Stock/RSUs/Bonus RSUs and the cancellation of any outstanding Options and/or Restricted Stock/RSUs/Bonus RSUs from the Grantee (whether or not such individual is currently employed by the Corporation(or its subsidiaries)) during the three-year period following the date the Board first learns of the violation, fraud or Misconduct.

6.  <u>Securities Law Compliance</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of the Corporation's common stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

7.  <u>Data Privacy</u>. As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

8.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if

Page 4 of 6

**Exhibit 10.20**

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation (or its subsidiaries) and thereafter until withdrawn in writing by Grantee.

9.  <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the NewCo Plan.

10. <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

11. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

12. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

13. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

> If to the Corporation to:
>
> Navient Corporation
> Human Resources Department, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713
>
> If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation (or its subsidiaries).

14. <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the NewCo Plan.

Page 5 of 6

Exhibit 10.20

Navient Corporation 2014 Omnibus Incentive Plan
Bonus Restricted Stock Unit Term Sheet
2012 Management Incentive Plan Award

15. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Grantee is deemed to accept this Award of Bonus RSUs under this Agreement and to agree that such Award is subject to the terms and conditions set forth in this Agreement and the NewCo Plan unless Grantee provides the Corporation written notification of Grantee's rejection of this Award of Bonus RSUs not later than 30 days after Grantee's receipt of notice of the posting of this Agreement on-line or through electronic means (in which case such Award will be forfeited and Grantee shall have no further right or interest therein as of such date).**

Page 6 of 6

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2009-2012 Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

(the "Grantee") was granted on February 3, 2012 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A. <u>Option Grant</u>. Net-Settled Stock Options (the "Options") to purchase a total of      shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Grantee subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (the "Agreement"). The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B. <u>Option Price</u>. The purchase price per share is $10.2558 (the "Option Price").

C. <u>Grant Date</u>. The date of grant of these Options is April 30, 2014 (the "Grant Date").

D. <u>Vesting; Exercisability</u>. Unless vested earlier by reason of the terms and conditions of the Original Grant or as set forth below, the Options are vested and/or will vest as

Page 1 of 7

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

follows: one-third of the options shall vest on each of the first, second and third anniversary of the Original Grant Date.

- Except as set forth below, if the Grantee ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason, he/she shall forfeit any unvested Options as of the date of such termination of employment.

- Except as otherwise set forth herein, including Section H, if the Grantee's employment with the Corporation (or one of its subsidiaries) is terminated by the Corporation for any reason other than for Misconduct, as determined by the Corporation in its sole discretion, or if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under SLM's retirement eligibility policy in effect as of the Original Grant Date ("Retirement Eligible"), which shall be determined by the Corporation in its sole discretion, all unvested Options shall continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year after such portion vests, but in no event later than the Expiration Date (as defined below). If Grantee voluntarily terminates employment while Retirement Eligible, then any Options that are vested as of the date of Grantee's termination of employment will remain exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

- Upon termination of employment for death, Disability or as provided for under the Navient Corporation Change in Control Severance Plan for Senior Officers as it exists on the Grant Date, all unvested Options will vest and will be exercisable for one year from the date of such vesting. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

- Except as otherwise set forth herein and except as otherwise provided in the Navient Corporation Change in Control Severance Plan as it exists on the Grant Date, vested Options (taking into account any vesting acceleration, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

- Upon termination of employment for Misconduct or for cause, as determined by the Corporation in its sole discretion, any/all Options, vested or unvested, are forfeited.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

E.   Expiration. These Options expire five years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Grantee's termination of employment.

F.   Non-Transferable; Binding Effect. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by the Grantee by will or by the laws of descent and distribution. In addition, Grantee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Grantee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Grantee. Any Options that are transferred are further conditioned on the Grantee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Grantee.

G.   Net-Settlement upon Option Exercise; Taxes. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Grantee shall receive from the Corporation the number of shares of Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes", rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding minimum) divided by the fair market value of NewCo Common Stock at the time of exercise. Grantee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of NewCo Common Stock pursuant to these Options, the Grantee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

Page 3 of 7

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

H.  <u>Vesting Upon Change in Control</u>. Notwithstanding anything to the contrary in this Agreement, including Section (D):

(I)  In the event of a Change of Control Transaction or a Change of Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change of Control or Change of Control Transaction, then any portion of these Options that were not vested shall become 100 percent vested and exercisable effective immediately prior to the consummation of such Change of Control or Change of Control Transaction; and

(II)  If Grantee's employment with the Corporation shall terminate within twenty-four months following a Change of Control or a Change of Control Transaction other than for (i) Misconduct or for cause, as determined by the Corporation in its sole discretion, or (ii) voluntary termination, any Options not previously vested shall immediately become vested and exercisable upon such employment termination and such Options shall be exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

I.  <u>Clawback Provisions</u>. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the Grantee's conduct or the Grantee has committed a material violation of corporate policy or has committed fraud or misconduct, and the Grantee at the time of such violation, fraud or misconduct (or at any time thereafter) was an officer of Predecessor SLM or the Corporation at the Senior Vice President level or above, then the Board or committee shall consider all factors, with particular scrutiny when one the top 20 members of management are involved, and the Board or such Committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting and exercise of Options and the cancellation of any outstanding Options from such Grantee (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or misconduct.

J.  <u>Board Interpretation</u>. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors of the Corporation and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

K.  <u>Stockholder Rights</u>. The Grantee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Grantee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

L.    <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

M.    <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.    <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Grantee or other subsequent transfers by the Grantee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.    <u>Data Privacy</u>. As an essential term of this Option, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Grantee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw

Page 5 of 7

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

P.      <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation and thereafter until withdrawn in writing by Grantee.

Q.      <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

R.      <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

      Navient Corporation
      Attn: Human Resources, Equity Plan Administration
      300 Continental Drive
      Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation.

S.      <u>Plan Controls; Entire Agreement; Capitalized Terms</u>. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

T.      <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and

Page 6 of 7

Exhibit 10.21

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled Options—2012**

enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

The Grantee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Grantee fails to accept the terms of this grant, the Options may not be exercised.

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2009-2012 Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

(the "Grantee") was granted on January 27, 2011 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Grantee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Grantee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.  Option Grant. Net-Settled Stock Options (the "Options") to purchase a total of          shares of Common Stock, par value $.01, ("NewCo Common Stock"), of Navient Corporation (the "Corporation") are hereby granted the Grantee subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (the "Agreement"). The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.  Option Price. The purchase price per share is $9.3771 dollars (the "Option Price").

C.  Grant Date. The date of grant of these Options is April 30, 2014 (the "Grant Date").

D.  Vesting; Exercisability. Unless vested earlier by reason of the terms and conditions of the Original Grant or as set forth below, the Options are vested and/or will vest in three installments, on the first, second and third anniversaries of the Original Grant Date.

Page 1 of 7

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

- If the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) for any reason or is involuntarily terminated for cause, as determined by the Corporation in its sole discretion, he/she shall forfeit any unvested Options as of the date of such termination of employment.

- If the Grantee's employment with the Corporation (or one of its subsidiaries) is terminated by the Corporation for any reason other than Misconduct or for cause, as determined by the Corporation in its sole discretion, or if the Grantee voluntarily ceases to be an employee of the Corporation (or one of its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion, all unvested Options shall continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year after such portion vests. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

- Upon termination of employment for death or Disability or as provided for under the Navient Corporation Change in Control Severance Plan for Senior Officers, all unvested Options will vest and vested Options (taking into account any vesting acceleration provided for, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

- Upon termination of employment for all reasons except Misconduct and except as otherwise provided in the Navient Corporation Change in Control Severance Plan, vested Options (taking into account any vesting acceleration, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

- Upon termination of employment for Misconduct, any Options, vested or unvested, are forfeited.

Grantee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

Page 2 of 7

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

E.   Expiration. These Options expire ten years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Grantee's termination of employment.

F.   Non-Transferable; Binding Effect. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by the Grantee by will or by the laws of descent and distribution. In addition, Grantee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Grantee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Grantee. Any Options that are transferred are further conditioned on the Grantee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Grantee.

G.   Net-Settlement upon Option Exercise; Taxes. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Grantee shall receive from the Corporation the number of shares of Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes", rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding maximum) divided by the fair market value of NewCo Common Stock at the time of exercise. Grantee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of Common Stock of the Corporation pursuant to these Options, the Grantee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

H.   Vesting Upon Change In Control. Notwithstanding anything to the contrary in this Agreement, including Section (D):

   (I)   In the event of a Change of Control Transaction or a Change of Control in which the acquiring or surviving company in the transaction does not assume or continue outstanding Awards upon the Change of Control or Change of Control Transaction, immediately prior to such transactions, then if these Options are not assumed or continued as described above, then any portion of these Options that were not vested shall become 100 percent vested and exercisable effective immediately prior to the consummation of such Change of Control or Change of Control Transaction; and

Page 3 of 7

Exhibit 10.22

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2011

---

(II)     If Grantee's employment with the Corporation shall terminate within twenty-four months of a Change of Control or a Change of Control Transaction other than for Misconduct, any Options not previously vested shall immediately become vested and exercisable upon such employment termination and such Options shall be exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

I.     Clawback Provisions. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the conduct of any officer of Predecessor SLM or the Corporation at the Senior Vice President level or above ("Senior Officer"), or such Senior Officer has committed a material violation of corporate policy Predecessor SLM or the Corporation or has committed fraud or misconduct with respect to Predecessor SLM or the Corporation, with particular scrutiny when one the top 20 members of management are involved, and the Board or such Committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting and exercise of Options and the cancellation of any outstanding Options from such Senior Officer (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or misconduct.

J.     Board Interpretation. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors of the Corporation and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

K.     Stockholder Rights. The Grantee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Grantee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

L.     No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

Page 4 of 7

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

M.    <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.    <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Grantee or other subsequent transfers by the Grantee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.    <u>Data Privacy</u>. As an essential term of this Option, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Grantee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Grantee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Grantee's participation in the NewCo Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the NewCo Plan.

P.    <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

to request Grantee's consent to participate in the NewCo Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation and thereafter until withdrawn in writing by Grantee.

Q.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

R.   Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to (i) the last address maintained in the Corporation's Human Resources files for the Grantee or (ii) the Grantee's mail delivery code or place of work at the Corporation.

S.   Plan Controls; Entire Agreement; Capitalized Terms. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

T.   Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

Page 6 of 7

Exhibit 10.22

**Navient Corporation 2014 Omnibus Incentive Plan**
**Stock Option Agreement**
**Net-Settled, Time Vested Options—2011**

The Grantee must contact Merrill Lynch to accept this grant and agree to the terms and condition in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Grantee fails to accept the terms of this grant, the Options may not be exercised.

Page 7 of 7

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

---

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2009-2012 Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

(the "Optionee") was granted on January 28, 2010 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.  Option Grant. Net-Settled Stock Options (the "Options") to purchase a total of          shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Optionee subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (the "Agreement"). Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.  Option Price. The purchase price per share is $6.6127 dollars (the "Option Price").

C.  Grant Date. The date of grant of these Options is April 30, 2014 (the "Grant Date").

Page 1 of 6

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

D.   <u>Vesting; Exercisability</u>. The Options are vested by reason of the terms and conditions of the Original Grant.

- Upon termination of employment for death or Disability, by Optionee while Retirement Eligible or as provided for under the Navient Corporation Change in Control Severance Plan for Senior Officers, all unvested Options will vest and vested Options (taking into account any vesting acceleration provided for, if any) are exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). For purposes of this Agreement, "Retirement Eligible" means Optionee meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date, which shall be determined by the Corporation in its sole discretion.

- Except as otherwise provided herein, vested Options are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

- Upon termination of employment for Misconduct, any Options, vested or unvested, are forfeited. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

Optionee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

E.   <u>Expiration</u>. These Options expire ten years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Optionee's termination of employment.

F.   <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by the Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family

Page 2 of 6

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Optionee.

G.   Net-Settlement upon Option Exercise; Taxes. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Optionee shall receive from the Corporation the number of shares of Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes", rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding maximum) divided by the fair market value of NewCo Common Stock at the time of exercise. Optionee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of Common Stock of the Corporation pursuant to these Options, the Optionee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

H.   Clawback Provisions. Notwithstanding anything to the contrary herein, if the Board of Directors of the Corporation, or an appropriate committee thereof, determines that, any material misstatement of financial results or a performance metric criteria of Predecessor SLM or the Corporation has occurred as a result of the conduct of any officer of Predecessor SLM or the Corporation at the Senior Vice President level or above ("Senior Officer"), or such Senior Officer has committed a material violation of corporate policy of Predecessor SLM or the Corporation or has committed fraud or misconduct with respect to Predecessor SLM or the Corporation, then the Board or committee shall consider all factors, with particular scrutiny when one the top 20 members of management are involved, and the Board or such Committee, may in its sole discretion require reimbursement of any compensation resulting from the vesting and exercise of Options and the cancellation of any outstanding Options from such Senior Officer (whether or not such individual is currently employed by the Corporation) during the three-year period following the date the Board first learns of the violation, fraud or misconduct.

I.   Board Interpretation. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors of the Corporation and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

Page 3 of 6

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

J.     <u>Stockholder Rights</u>. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

K.     <u>No Right to Continued Employment</u>. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Optionee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

L.     <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

M.     <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

N.     <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients

Page 4 of 6

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

O.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

P.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

Q.  Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Optionee, to (i) the last address maintained in the Corporation's Human Resources files for the Optionee or (ii) the Optionee's mail delivery code or place of work at the Corporation.

R.  Plan Controls; Entire Agreement; Capitalized Terms. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. This

Page 5 of 6

**Exhibit 10.23**

Navient Corporation 2014 Omnibus Incentive Plan
Stock Option Agreement
Net-Settled, Time Vested Options—2010

Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

S.  <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Optionee fails to accept the terms of this grant, the Options may not be exercised.

Page 6 of 6

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

John M. Kane (the "Optionee") was granted on May 12, 2008 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.  Option Grant. Stock Options (the "Options") to purchase a total of 100,000 shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Optionee, subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (the "Agreement"). Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.  Option Price. The purchase price per share is $14.0336 dollars (the "Option Price").

C.  Grant Date. The date of grant of these Options is April 30, 2014 (the "Grant Date").

Page 1 of 7

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

D.   <u>Vesting; Exercisability</u>. Fifty (50) percent of the Options are vested by reason of the terms and conditions of the Original Grant. Fifty (50) percent of the Options vest upon the earlier of (i) the Predecessor SLM common stock par value of $.20 ("SLM Common Stock") per share price reaching a closing price equal to or greater than $30.63 per share for five days at any time after the Original Grant Date and before the Grant Date, but no sooner than two years from the Original Grant Date, (ii) NewCo Common Stock reaching a closing price equal to or greater than $19.6470 per share for five days at any time on or after the Grant Date, or (iii) in combination the per share price of SLM Common Stock and/or NewCo Common Stock reaches a closing price equal to or greater than $30.63 per share in the case of SLM Common Stock and $19.6470 per share in the case of NewCo Common Stock for five days after the Original Grant Date. In any event, all the Options vest eight years from the Original Grant Date or upon the Optionee's death, Disability or Involuntary Termination, unless the Options are terminated earlier in accordance with the provisions of the NewCo Plan or this Agreement. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

- Upon termination of employment for any reason, other than death, Disability or Involuntary Termination, any unvested Options will not vest and will be canceled. If the Optionee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date ("Retirement Eligible"), which shall be determined by the Corporation in its sole discretion, all unvested Options will continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year from the date such portion vests, but in no event later than the Expiration Date (as defined below). If Optionee voluntarily terminates employment while Retirement Eligible, then any Options that are vested as of the date of Optionee's termination of employment will remain exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

- Upon termination of employment for Misconduct, any Options, vested or unvested, are forfeited. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

Page 2 of 7

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

- Upon termination for death or Disability, vested Options (taking into account any vesting acceleration set forth above) are exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

- Except as otherwise provided herein, vested Options are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

Optionee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

E.  <u>Expiration</u>. These Options expire ten years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Optionee's termination of employment.

F.  <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for in the NewCo Plan, and may be exercised during the lifetime of the Optionee only by him or her. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Optionee.

G.  <u>Net-Settlement upon Option Exercise; Taxes</u>. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Optionee shall receive from the Corporation the number of shares of NewCo Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes," rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding maximum) divided by the fair market value of NewCo Common Stock at the time of exercise. Optionee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of NewCo Common Stock pursuant to these Options, the Optionee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

H.  <u>Vesting Upon Change in Control</u>. Notwithstanding anything to the contrary in this Agreement, any of the Options which have not otherwise become exercisable shall become immediately exercisable upon a Change in Control of the Corporation.

In the event that, as a result of the Options becoming exercisable in connection with a Change in Control, any state, local or federal taxing authority imposes any taxes on the Optionee that would not be imposed but for the occurrence of a Change in Control,

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

including any excise tax under Section 4999 of the Internal Revenue Code and any successor or comparable provision, then the Corporation (including any successor to the Corporation) shall pay to the Optionee at the time any such tax becomes payable an amount equal to the amount of any such tax imposed on the Optionee (the amount of any such payment, the "Parachute Tax Reimbursement"). In addition, the Corporation (including any successor to the Corporation) shall "gross up" such Parachute Tax Reimbursement by paying to the Optionee at the time any such tax becomes payable an additional amount equal to the aggregate amount of any additional taxes (whether income taxes, excise taxes, special taxes, employment taxes or otherwise) that are payable by the Optionee as a result of the Parachute Tax Reimbursement being payable to the Optionee and/or as a result of the additional amounts payable to the Optionee pursuant to this sentence, such that after payment of such additional taxes the Optionee shall have been paid on an after-tax basis an amount equal to the Parachute Tax Reimbursement.

I.    Clawback Provision. If the Board of Directors of the Corporation, or an appropriate committee thereof, determines that any fraud or intentional misconduct by an officer of Predecessor SLM or the Corporation at the level of Senior Vice President or above (the "Officer") was a significant contributing factor to Predecessor SLM or the Corporation having to restate all or a portion of its financial statement(s), the Board or committee shall, to the extent permitted by governing law, require reimbursement of any compensation ("spread") resulting from the exercise of the Options by the Officer: 1) if such exercise occurred during the 12-month period following the first public disclosure of the incorrect financial statement; and 2) in the Board or committee's judgment, to the extent that the filing of the false financial statement negatively impacted Predecessor SLM or the Corporation's share price.

J.    Board Interpretation. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors of the Corporation and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

K.    Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

L.    No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Optionee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

M.    <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.    <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.    <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

Exhibit 10.24

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

P.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

Q.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of Delaware, without giving effect to principles of conflicts of law.

R.  <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Navient Corporation
Attn: Human Resources, Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Optionee, to (i) the last address maintained in the Corporation's Human Resources files for the Optionee or (ii) the Optionee's mail delivery code or place of work at the Corporation.

S.  <u>Entire Agreement</u>. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature.

T.  <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

**Exhibit 10.24**

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options—2008**

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Optionee fails to accept the terms of this grant, the Options may not be exercised.

NAVIENT CORPORATION

By: _____
    Chief Executive Officer

*Copies of the Plan Document and Prospectus are available on the Company's Intranet site and the Merrill Lynch BenefitsOnline website at www.Benefits.ML.com. Paper copies or fax request of these documents can also be obtained by contacting Equity Plan Administration by sending an email to Equity.Plans@Navient.com.*

Page 7 of 7

**Exhibit 10.25**

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

Timothy J. Hynes (the "Optionee") was granted on May 13, 2008 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.  Option Grant. Stock Options (the "Options") to purchase a total of 100,000 shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Optionee, subject in all respects to the terms and provisions of the NewCo Plan, which is incorporated herein by reference, and this Stock Option Agreement (the "Agreement"). Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.  Option Price. The purchase price per share is $13.9310 dollars (the "Option Price").

C.  Grant Date. The date of grant of these Options is April 30, 2014 (the "Grant Date").

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

D.  <u>Vesting; Exercisability</u>. Fifty (50) percent of the Options are vested by reason of the terms and conditions of the Original Grant. Fifty (50) percent of the Options vest upon the earlier of (i) the Predecessor SLM common stock par value of $.20 ("SLM Common Stock") per share price reaching a closing price equal to or greater than $30.63 per share for five days at any time after the Original Grant Date and before the Grant Date, but no sooner than two years from the Original Grant Date, (ii) NewCo Common Stock reaching a closing price equal to or greater than $19.5034 per share for five days at any time on or after the Grant Date, or (iii) in combination the per share price of SLM Common Stock and/or NewCo Common Stock reaches a closing price equal to or greater than $30.63 per share in the case of SLM Common Stock and $19.5034 per share in the case of NewCo Common Stock for five days after the Original Grant Date. In any event, all the Options vest eight years from the Original Grant Date or upon the Optionee's death, Disability or Involuntary Termination, unless the Options are terminated earlier in accordance with the provisions of the NewCo Plan or this Agreement. For purposes of this Agreement, "Disability" has the meaning set forth in the SLM Long Term Disability Plan in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

- Upon termination of employment for any reason, other than death, Disability or Involuntary Termination, any unvested Options will not vest and will be canceled. If the Optionee voluntarily ceases to be an employee of the Corporation (or its subsidiaries) and meets the retirement eligibility requirements under Predecessor SLM's retirement eligibility policy in effect as of the Original Grant Date ("Retirement Eligible"), which shall be determined by the Corporation in its sole discretion, all unvested Options will continue to vest based on their original vesting terms and each vested portion of the Options will be exercisable for one year from the date such portion vests, but in no event later than the Expiration Date (as defined below). If Optionee voluntarily terminates employment while Retirement Eligible, then any Options that are vested as of the date of Optionee's termination of employment will remain exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

- Upon termination of employment for Misconduct, any Options, vested or unvested, are forfeited. For purposes of this Agreement, "Misconduct" is defined as an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Corporation or Predecessor SLM, breach of fiduciary duty or deliberate disregard of Corporation or Predecessor SLM rules; an unauthorized disclosure of any Corporation or Predecessor SLM trade secret or confidential information; any conduct constituting unfair competition; inducing any customer of the Corporation or Predecessor SLM to breach a contract with the Corporation or Predecessor SLM or any principal for whom the Corporation or Predecessor SLM acts as agent to terminate such agency relationship; or engaging in any other act or conduct proscribed by the senior human resources officer of the Corporation or Predecessor SLM as Misconduct.

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

- Upon termination for death or Disability, vested Options (taking into account any vesting acceleration set forth above) are exercisable until the earlier of: (1) the Expiration Date; or (2) one year from the date of termination.

- Except as otherwise provided herein, vested Options are exercisable until the earlier of: (1) the Expiration Date; or (2) three months from the date of termination.

Optionee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

E.  <u>Expiration</u>. These Options expire ten years from the Original Grant Date (the "Expiration Date"), subject to the provisions of the NewCo Plan and this Agreement, which may provide for earlier expiration in certain instances, including Optionee's termination of employment.

F.  <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for in the NewCo Plan, and may be exercised during the lifetime of the Optionee only by him or her. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Optionee.

G.  <u>Net-Settlement upon Option Exercise; Taxes</u>. These Options shall be exercised only in accordance with the terms of this Agreement. Each exercise must be for no fewer than fifty (50) Options, other than an exercise for all remaining Options. Upon exercise of all or part of the Options, the Optionee shall receive from the Corporation the number of shares of NewCo Common Stock resulting from the following formula: the total number of Options exercised less the sum of "Shares for the Option Cost" and "Shares for Taxes," rounded up to the nearest whole share. "Shares for the Option Cost" equals the Option Price multiplied by the number of Options exercised divided by the fair market value of NewCo Common Stock at the time of exercise. "Shares for Taxes" equals the tax liability (the statutory withholding maximum) divided by the fair market value of NewCo Common Stock at the time of exercise. Optionee shall receive cash for any resulting fractional share amount. As a condition to the issuance of shares of NewCo Common Stock pursuant to these Options, the Optionee agrees to remit to the Corporation (through the procedure described in this paragraph) at the time of any exercise of these Options any taxes required to be withheld by the Corporation under federal, state, or local law as a result of the exercise of these Options.

H.  <u>Vesting Upon Change in Control</u>. Notwithstanding anything to the contrary in this Agreement, any of the Options which have not otherwise become exercisable shall become immediately exercisable upon a Change in Control of the Corporation.

In the event that, as a result of the Options becoming exercisable in connection with a Change in Control, any state, local or federal taxing authority imposes any taxes on the Optionee that would not be imposed but for the occurrence of a Change in Control,

Page 3 of 7

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

including any excise tax under Section 4999 of the Internal Revenue Code and any successor or comparable provision, then the Corporation (including any successor to the Corporation) shall pay to the Optionee at the time any such tax becomes payable an amount equal to the amount of any such tax imposed on the Optionee (the amount of any such payment, the "Parachute Tax Reimbursement"). In addition, the Corporation (including any successor to the Corporation) shall "gross up" such Parachute Tax Reimbursement by paying to the Optionee at the time any such tax becomes payable an additional amount equal to the aggregate amount of any additional taxes (whether income taxes, excise taxes, special taxes, employment taxes or otherwise) that are payable by the Optionee as a result of the Parachute Tax Reimbursement being payable to the Optionee and/or as a result of the additional amounts payable to the Optionee pursuant to this sentence, such that after payment of such additional taxes the Optionee shall have been paid on an after-tax basis an amount equal to the Parachute Tax Reimbursement.

I.   Clawback Provision. If the Board of Directors of the Corporation, or an appropriate committee thereof, determines that any fraud or intentional misconduct by an officer of Predecessor SLM or the Corporation at the level of Senior Vice President or above (the "Officer") was a significant contributing factor to Predecessor SLM or the Corporation having to restate all or a portion of its financial statement(s), the Board or committee shall, to the extent permitted by governing law, require reimbursement of any compensation ("spread") resulting from the exercise of the Options by the Officer: 1) if such exercise occurred during the 12-month period following the first public disclosure of the incorrect financial statement; and 2) in the Board or committee's judgment, to the extent that the filing of the false financial statement negatively impacted Predecessor SLM or the Corporation's share price.

J.   Board Interpretation. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors of the Corporation and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

K.   Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

L.   No Right to Continued Employment. Nothing in the NewCo Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Optionee any right to continued employment with the Corporation or any of its subsidiaries or affiliates.

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

M.    <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

N.    <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

O.    <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

Page 5 of 7

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

P.   <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

Q.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of Delaware, without giving effect to principles of conflicts of law.

R.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to (i) the last address maintained in the Corporation's Human Resources files for the Optionee or (ii) the Optionee's mail delivery code or place of work at the Corporation.

S.   <u>Entire Agreement</u>. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature.

T.   <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

Exhibit 10.25

**Stock Option Agreement**
**Navient Corporation 2014 Omnibus Incentive Plan**
**Net-Settled, Price-Vested Options – 2008**

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Optionee fails to accept the terms of this grant, the Options may not be exercised.

> *Copies of the Plan Document and Prospectus are available on the Company's Intranet site and the Merrill Lynch BenefitsOnline website at www.Benefits.ML.com. Paper copies or fax request of these documents can also be obtained by contacting Equity Plan Administration by sending an email to Equity.Plans@Navient.com.*

Exhibit 10.26

**Stock Option Notice**
**Navient Corporation 2014 Omnibus Incentive Plan**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

In conjunction with the Employment Agreement between John F. Remondi (the "Optionee") and Predecessor SLM commencing on January 8, 2008 (the "Employment Agreement"), the Optionee was granted on January 8, 2008 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan covering 2,000,000 shares (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.  <u>Option Grant</u>. Stock Options (the "Options") to purchase a total of 2,000,000 shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Optionee, subject in all respects to the terms and provisions of the NewCo Plan and the Employment Agreement, both of which are incorporated herein by reference, and this Stock Option Notice (the "Notice"). Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.  <u>Option Price</u>. The purchase price per share is $11.0960 dollars (the "Option Price").

Exhibit 10.26

**Stock Option Notice**
**Navient Corporation 2014 Omnibus Incentive Plan**

C.    <u>Grant Date</u>. The date of grant of these Options is April 30, 2014 (the "Grant Date").

D.    <u>Vesting; Exercisability</u>. The Options are vested by reason of the terms and conditions of the Original Grant.

Optionee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Notice, the Employment Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Optionee fails to accept the terms of this grant, the Options may not be exercised.

---

*Copies of the Plan Document and Prospectus are available on the Company's Intranet site and the Merrill Lynch BenefitsOnline website at www.Benefits.ML.com. Paper copies or fax request of these documents can also be obtained by contacting Equity Plan Administration by sending an email to Equity.Plans@Navient.com.*

Page 2 of 2

Exhibit 10.27

**Stock Option Notice**
**Navient Corporation 2014 Omnibus Incentive Plan**

---

SLM Corporation ("Predecessor SLM") established the SLM Corporation Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

In conjunction with the Employment Agreement between John F. Remondi (the "Optionee") and Predecessor SLM commencing on January 8, 2008 (the "Employment Agreement"), the Optionee was granted on January 8, 2009 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan covering 1,000,000 shares (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

A.   <u>Option Grant</u>. Stock Options (the "Options") to purchase a total of 1,000,000 shares of Common Stock, par value $.01, ("NewCo Common Stock"), of NewCo (the "Corporation") are hereby granted the Optionee, subject in all respects to the terms and provisions of the NewCo Plan and the Employment Agreement, both of which are incorporated herein by reference, and this Stock Option Notice (the "Notice"). Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement). In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan control, except as expressly stated otherwise herein. The Options are non-qualified stock options and are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended, and will be interpreted accordingly.

B.   <u>Option Price</u>. The purchase price per share is $6.5230 dollars (the "Option Price").

**Exhibit 10.27**

**Stock Option Notice**
**Navient Corporation 2014 Omnibus Incentive Plan**

C.   Grant Date. The date of grant of these Options is April 30, 2014 (the "Grant Date").

D.   Vesting; Exercisability. The Options are vested by reason of the terms and conditions of the Original Grant.

Optionee's being an employee of NewCo from and after the Grant Date shall not be treated as a termination of employment upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Notice, the Employment Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. Merrill Lynch can be contacted at www.benefits.ml.com or by phone at 1-877-756-ESOP. If Optionee fails to accept the terms of this grant, the Options may not be exercised.

> *Copies of the Plan Document and Prospectus are available on the Company's Intranet site and the Merrill Lynch BenefitsOnline website at www.Benefits.ML.com. Paper copies or fax request of these documents can also be obtained by contacting Equity Plan Administration by sending an email to Equity.Plans@Navient.com.*

Exhibit 10.28

**Navient Corporation 2014 Omnibus Incentive Plan**
**Independent Director Stock Award Agreement 2014**

Pursuant to the terms and conditions of the Navient Corporation 2014 Omnibus Incentive Plan (the "Plan"), Navient Corporation (the "Corporation") hereby grants to       (the "Grantee")      shares of common stock of the Corporation, par value $0.01, on May 22, 2014 (the "Grant Date"), subject to the terms and conditions below. All capitalized terms used herein that are not defined shall have the meanings as set forth in the Plan.

- The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any transfer or sale by the Grantee of any shares of Common Stock, including without limitation (a) restrictions under an insider trading policy and (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the shares of the Corporation's common stock. The sale of the shares must also comply with other applicable laws and regulations governing the sale of such shares.

- As an essential term of this award, the Grantee consents to the collection, use and transfer, in electronic or other form, of personal data as described herein for the exclusive purpose of implementing, administering and managing Grantee's participation in the Plan. By accepting this award, the Grantee acknowledges that the Corporation holds certain personal information about the Grantee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the Plan ("Data"). Grantee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Grantee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Grantee or the Corporation may elect to deposit any shares of the Corporation's common stock. Grantee acknowledges that Data may be held to implement, administer and manage the Grantee's participation in the Plan as determined by the Corporation, and that Grantee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Grantee's consent may adversely affect Grantee's ability to participate in the Plan.

- The Corporation may, in its sole discretion, decide to deliver any documents related to any awards granted under the Plan by electronic means or to request Grantee's

1

Exhibit 10.28

consent to participate in the Plan by electronic means. Grantee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Grantee's term of service with the Corporation and thereafter until withdrawn in writing by Grantee.

• The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Board and, where applicable, the Committee concerning any questions arising under this Agreement or the Plan.

• Nothing in the Plan, in this Agreement or any other instrument executed pursuant thereto or hereto shall confer upon the Grantee any right to continued service on the Board.

• The Board and/or the Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

• This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

Human Resources Department
ATTN: Equity Plan Administration
300 Continental Drive
Newark, DE 19713

If to the Grantee, to the last address maintained in the Corporation's files for the Grantee.

• In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the terms of the Plan control, except as expressly stated otherwise herein. This Agreement and the Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Capitalized terms not defined herein shall have the meanings as described in the Plan.

• In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable,

2

Exhibit 10.28

or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Grantee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Grantee is responsible for complying with all laws applicable to Grantee, including federal and state securities reporting laws.

**Accepted by:**

_____
Signature

_____
Date

**NAVIENT CORPORATION**

BY:     John F. Remondi
        Chief Executive Officer

3

**Exhibit 10.29**

Navient Corporation 2014 Omnibus Incentive Plan
Independent Director Stock Option Agreement 2013

---

SLM Corporation ("Predecessor SLM") established the SLM Corporation 2012 Omnibus Incentive Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on February 7, 2013 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee non-qualified stock options (the "Options") to purchase any part or all of the number of shares of the Corporation's common stock, par value $0.01 per share (the "NewCo Common Stock") specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this agreement ("Agreement") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein.

Name of Optionee:                                    _____

Grant Date:                                         April 30, 2014

Number of Shares covered by Option:                 _____

Page 1 of 5

**Exhibit 10.29**

| | |
|---|---|
| Exercise Price Per Share: | $11.4873 |
| Expiration Date: | February 7, 2018 |
| Vesting: | The Options are vested and exercisable by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within three years after the date Optionee ceases to be a member of the Board of Directors of NewCo (the "NewCo Board") or the Expiration Date, whichever occurs first. |

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

1. <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

2. <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members" pursuant to a gift (a transfer that is not for value) or a domestic relations order, as defined in the General Instructions to Form S-8 under the Securities Act of 1933. "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee and the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Optionee.

3. <u>Net-Settlement upon Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall receive from the Corporation the number of shares of NewCo Common Stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the Exercise Price multiplied by the number of Options exercised divided by the Fair Market Value of NewCo Common Stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the Optionee in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the Exercise Price multiplied by the number of Options exercised.

<div align="center">Page 2 of 5</div>

Exhibit 10.29

4.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to the last address maintained in the Corporation's Human Resources files for the Optionee.

5.   <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Committee, concerning any questions arising under this Agreement or the NewCo Plan.

6.   <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.   <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of these Options and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Options, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Options and/or the NewCo Common Stock underlying the Options and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Options and/or for such resales or other transfers. The sale of the shares underlying the Options must also comply with other applicable laws and regulations governing the sale of such shares.

8.   <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee

Page 3 of 5

Exhibit 10.29

acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9. <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. <u>Stockholder Rights</u>. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

12. <u>Entire Agreement; Capitalized Terms</u>. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

13. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and

Exhibit 10.29

enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

       The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting this Agreement, Optionee acknowledges that he or she has received and read, and agrees that these Options shall be subject to this Agreement and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Exhibit 10.30

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2012**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Equity Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on February 3, 2012 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee non-qualified stock options (the "Options") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this agreement ("Agreement") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein.

Name of Optionee: _____

Grant Date: April 30, 2014

Number of Shares covered by Option: _____

Exercise Price Per Share: $10.2558

Expiration Date: February 3, 2017

Page 1 of 5

Exhibit 10.30

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2012**

| | |
|---|---|
| Vesting: | The Options are vested and exercisable by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within three years after the date Optionee ceases to be a member of the Board of Directors of NewCo (the "NewCo Board") or the Expiration Date, whichever occurs first. |

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

1.  <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

2.  <u>Non-Transferable; Binding Effect</u>. These Options may not be transferred except as provided for herein. All or any part of these Options may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members" pursuant to a gift (a transfer that is not for value) or a domestic relations order, as defined in the General Instructions to Form S-8 under the Securities Act of 1933. "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee and the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines. The terms of these Options shall be binding upon the executors, administrators, heirs, and successors of the Optionee.

3.  <u>Net-Settlement upon Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall receive from the Corporation the number of shares of NewCo Common Stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the Exercise Price multiplied by the number of Options exercised divided by the Fair Market Value of NewCo Common Stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the Optionee in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the Exercise Price multiplied by the number of Options exercised.

Page 2 of 5

Exhibit 10.30

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2012**

4.    <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to the last address maintained in the Corporation's Human Resources files for the Optionee.

5.    <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Committee, concerning any questions arising under this Agreement or the NewCo Plan.

6.    <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.    <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of these Options and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Options, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Options and/or the NewCo Common Stock underlying the Options and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Options and/or for such resales or other transfers. The sale of the shares underlying the Options must also comply with other applicable laws and regulations governing the sale of such shares.

8.    <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the

Page 3 of 5

Exhibit 10.30

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2012**

implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data shall be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9. <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. <u>Stockholder Rights</u>. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

12. <u>Entire Agreement; Capitalized Terms</u>. This Agreement and the NewCo Plan together set forth the entire agreement and understanding between the parties as to the subject matter hereof and supersede all prior oral and written and all contemporaneous or subsequent oral discussions, agreements and understandings of any kind or nature. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

13. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and

Page 4 of 5

**Exhibit 10.30**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2012**

enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting this Agreement, Optionee acknowledges that he or she has received and read, and agrees that these Options shall be subject to this Agreement and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

Exhibit 10.31

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2011**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Equity Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on January 27, 2011 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee non-qualified stock options (the "Options") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this agreement ("Agreement") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein.

Name of Optionee:                                    _____

Grant Date:                                               April 30, 2014

Number of Shares covered by Option:         _____

Exercise Price Per Share:                            $9.3771

Expiration Date:                                          January 27, 2021

Page 1 of 5

Exhibit 10.31

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2011**

| | |
|---|---|
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within three years after the date Optionee ceases to be a member of the Board of Directors of NewCo (the "NewCo Board") or the Expiration Date, whichever occurs first. |

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

1. Definitions. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

2. Transferability. These Options may not be transferred except as provided herein. All or any part of these Options may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members" pursuant to a gift (a transfer that is not for value) or a domestic relations order, as defined in the General Instructions to Form S-8 under the Securities Act of 1933. "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee and the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3. Net-Settlement upon Exercise of the Option. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall receive from the Corporation as a result of any Option exercise the number of shares of common stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the option exercise price multiplied by the number of options exercised divided by the Fair Market Value of common stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the option holder in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the option exercise price multiplied by the number of options exercised.

Page 2 of 5

Exhibit 10.31

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2011**

4.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to the address listed on record.

5.   <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Committee, concerning any questions arising under this Agreement or the NewCo Plan.

6.   <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.   <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of these Options and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Options, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Options and/or the NewCo Common Stock underlying the Options and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Options and/or for such resales or other transfers. The sale of the shares underlying the Options must also comply with other applicable laws and regulations governing the sale of such shares.

8.   <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients

Page 3 of 5

Exhibit 10.31

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2011**

may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting this Agreement, Optionee

Page 4 of 5

Exhibit 10.31

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2011**

acknowledges that he or she has received and read, and agrees that these Options shall be subject to this Agreement and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

**Exhibit 10.32**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2010**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Equity Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on January 28, 2010 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee non-qualified stock options (the "Options") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this agreement ("Agreement") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein.

Name of Optionee:                                        _____

Grant Date:                                                   April 30, 2014

Number of Shares covered by Option:              _____

Exercise Price Per Share:                                $6.6127

Expiration Date:                                             January 28, 2020

Page 1 of 5

Exhibit 10.32

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2010**

| | |
|---|---|
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within three years after the date Optionee ceases to be a member of the Board of Directors of NewCo (the "NewCo Board") or the Expiration Date, whichever occurs first. |

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

1. <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

2. <u>Transferability</u>. These Options may not be transferred except as provided herein. All or any part of these Options may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members" pursuant to a gift (a transfer that is not for value) or a domestic relations order, as defined in the General Instructions to Form S-8 under the Securities Act of 1933. "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee and the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3. <u>Net-Settlement upon Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall receive from the Corporation as a result of any Option exercise the number of shares of common stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the option exercise price multiplied by the number of options exercised divided by the Fair Market Value of common stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the option holder in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the option exercise price multiplied by the number of options exercised.

Page 2 of 5

Exhibit 10.32

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2010**

4.   <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

    Navient Corporation
    Attn: Human Resources, Equity Plan Administration
    300 Continental Drive
    Newark, DE 19713

If to the Optionee, to the address listed on record.

5.   <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Committee, concerning any questions arising under this Agreement or the NewCo Plan.

6.   <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.   <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of these Options and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Options, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Options and/or the NewCo Common Stock underlying the Options and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Options and/or for such resales or other transfers. The sale of the shares underlying the Options must also comply with other applicable laws and regulations governing the sale of such shares.

8.   <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients

Page 3 of 5

Exhibit 10.32

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2010**

may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred by the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting this Agreement, Optionee

Page 4 of 5

**Exhibit 10.32**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2010**

acknowledges that he or she has received and read, and agrees that these Options shall be subject to this Agreement and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

**Exhibit 10.33**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2009**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Equity Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on May 22, 2009 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee non-qualified stock options (the "Options") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this agreement ("Agreement") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein.

Name of Optionee: _____

Grant Date: April 30, 2014

Number of Shares covered by Option: _____

Exercise Price Per Share: $3.7009

Expiration Date: May 8, 2018

Page 1 of 5

**Exhibit 10.33**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2009**

| | |
|---|---|
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within three years after the date Optionee ceases to be a member of the Board of Directors of NewCo (the "NewCo Board") or the Expiration Date, whichever occurs first. |

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan or the NewCo Plan.

1.  Definitions. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

2.  Transferability. These Options may not be transferred except as provided herein. All or any part of these Options may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members" pursuant to a gift (a transfer that is not for value) or a domestic relations order, as defined in the General Instructions to Form S-8 under the Securities Act of 1933. "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee and the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3.  Exercise of the Option. These Options shall be exercised only in accordance with the terms of the Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall pay the Option Price to the Corporation only in the following manner: either (i) by cash or certified or cashier's check, (ii) by arrangement with a broker where payment is made pursuant to an irrevocable direction to the broker to sell sufficient Option shares and pay the entire Option Price to the Corporation in cash, or (iii) by delivery of shares of NewCo Common. The value of any such shares delivered as payment of the Option Price shall be such shares' fair market value as indicated by the price per share of the Corporation's common stock at the time of exercise. In addition to the exercise methods specified above, the Optionee may exercise Options using a net-settled method under which the Optionee shall receive from the Corporation as a result of any Option exercise the number of shares of common stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the option exercise price multiplied by the number of options exercised divided by the Fair Market Value of

Exhibit 10.33

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2009**

common stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the option holder in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the option exercise price multiplied by the number of options exercised.

4.  <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

    If to the Corporation to:

    > Navient Corporation
    > Attn: Human Resources, Equity Plan Administration
    > 300 Continental Drive
    > Newark, DE 19713

    If to the Optionee, to the address listed on record.

5.  <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Committee, concerning any questions arising under this Agreement or the NewCo Plan.

6.  <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.  <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of these Options and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Options, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Options and/or the NewCo Common Stock underlying the Options and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Options and/or for such resales or other transfers. The sale of the shares underlying the Options must also comply with other applicable laws and regulations governing the sale of such shares.

8.  <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other

Exhibit 10.33

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2009**

identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

Page 4 of 5

**Exhibit 10.33**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**INDEPENDENT DIRECTOR STOCK OPTION AGREEMENT – 2009**

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting this Agreement, Optionee acknowledges that he or she has received and read, and agrees that these Options shall be subject to this Agreement and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

Exhibit 10.34

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2008**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Stock Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on May 8, 2008 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee named below a non-qualified stock option (the "Option") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") that are covered by this Option, as specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this term sheet ("Term Sheet") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein. The terms of this Term Sheet and the NewCo Plan together constitute the "Option Agreement".

Name of Optionee: _____

Grant Date: April 30, 2014

Number of Shares covered by Option: _____

Exercise Price Per Share: $14.2901

Page 1 of 5

<div align="right">**Exhibit 10.34**</div>

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2008**

| | |
|---|---|
| Expiration Date: | May 8, 2018 |
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within five years after the date Optionee ceases to be a member of the Board of Directors of the NewCo (the "NewCo Board") or a subsidiary or the Expiration Date, whichever occurs first. |

The following terms and conditions apply to the Option.

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan and the NewCo Plan.

1. <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

   "Subsidiary" means any joint venture, corporation, partnership or other entity as to which the Corporation, whether directly or indirectly, has more than 50% of the (i) voting rights or (ii) rights to capital or profits.

2. <u>Transferability</u>. Pursuant to the November 20, 1997 resolution of the Corporation's Board of Directors, all or any part of an Option may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3. <u>Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall pay the Option Price to the Corporation only in the following manner: either (i) by cash or certified or cashier's check, (ii) by arrangement with a broker where payment is made pursuant to an irrevocable direction to the broker to sell sufficient Option shares and pay the entire Option Price to the Corporation in cash, or (iii) by delivery of shares of NewCo Common Stock that have been owned by Optionee for at least six months. The value of any such shares delivered as payment of the Option Price shall be such shares' fair market value as indicated by the price per share of the Corporation's common stock at the time of exercise. In addition to

<div align="center">Page 2 of 5</div>

**Exhibit 10.34**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2008**

the exercise methods specified above, the Optionee may exercise Options using a net-settled method under which the Optionee shall receive from the Corporation the number of shares of common stock resulting from the following formula: the total number of Options exercised less "shares for the option cost". "Shares for the option cost" equals the Option exercise price multiplied by the number of Options exercised divided by the Fair Market Value of common stock at the time of exercise, rounded up to the nearest whole share. The Corporation shall pay the option holder in cash the amount, if any, by which the Fair Market Value of the "shares for the option cost" exceeds the Option exercise price multiplied by the number of options exercised.

4.  Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or teleopied to, or, if mailed, when received by, the other party at the following addresses:

    If to the Corporation to:

        Navient Corporation
        Attn: Human Resources, Equity Plan Administration
        300 Continental Drive
        Newark, DE 19713

    If to the Optionee, to the address listed on record.

5.  Board Interpretation. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

6.  Amendments for Accounting Charges. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.  Securities Law Compliance; Restrictions on Resales of Option Shares. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

Page 3 of 5

Exhibit 10.34

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2008**

8.  <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. <u>Stockholder Rights</u>. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision

Page 4 of 5

Exhibit 10.34

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2008**

shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting the Option Agreement, Optionee acknowledges that he or she has received and read, and agrees that this Option shall be subject to this Term Sheet and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

Exhibit 10.35

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2007**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Stock Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on January 25, 2007 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee named below a non-qualified stock option (the "Option") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") that are covered by this Option, as specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this term sheet ("Term Sheet") and the NewCo Plan, each as may be amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the NewCo Plan, the terms of the NewCo Plan shall control, except as expressly stated otherwise herein. The terms of this Term Sheet and the NewCo Plan together constitute the "Option Agreement".

Name of Optionee: _____

Grant Date:                                                         April 30, 2014

Number of Shares covered by Option:                     _____

Exercise Price Per Share:                                       $29.1254

Exhibit 10.35

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2007**

| | |
|---|---|
| Expiration Date: | January 25, 2017 |
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within five years after the date Optionee ceases to be a member of the Board of Directors of the NewCo (the "NewCo Board") or a subsidiary or the Expiration Date, whichever occurs first. |

The following terms and conditions apply to the Option.

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan and the NewCo Plan.

1.  <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

    "Subsidiary" means any joint venture, corporation, partnership or other entity as to which the Corporation, whether directly or indirectly, has more than 50% of the (i) voting rights or (ii) rights to capital or profits.

2.  <u>Transferability</u>. Pursuant to the November 20, 1997 resolution of the Corporation's Board of Directors, all or any part of an Option may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3.  <u>Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall pay the Option Price to the Corporation only in the following manner: either (i) by cash or certified or cashier's check, (ii) by arrangement with a broker where payment is made pursuant to an irrevocable direction to the broker to sell sufficient Option shares and pay the entire Option Price to the Corporation in cash, or (iii) by delivery of shares of NewCo Common Stock that have been owned by Optionee for at least six months. The value of any such shares delivered as payment of the Option Price shall be such shares' fair market value as indicated by the price per share of the Corporation's common stock at the time of exercise.

Page 2 of 5

Exhibit 10.35

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2007**

4.  <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

    If to the Corporation to:

    > Navient Corporation
    > Attn: Human Resources, Equity Plan Administration
    > 300 Continental Drive
    > Newark, DE 19713

    If to the Optionee, to the address listed on record.

5.  <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

6.  <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.  <u>Securities Law Compliance; Restrictions on Resales of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resales by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resales or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

8.  <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of

Page 3 of 5

Exhibit 10.35

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2007**

implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. Stockholder Rights. The Optionee shall not be deemed a stockholder of the Corporation with respect to any of the shares of NewCo Common Stock subject to the Options, except to the extent that such shares shall have been purchased and transferred to the Optionee. The Corporation shall not be required to issue or transfer any shares of NewCo Common Stock purchased upon exercise of the Options until all applicable requirements of law have been complied with and such shares shall have been duly listed on any securities exchange on which the NewCo Common Stock may then be listed.

11. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

Page 4 of 5

**Exhibit 10.35**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2007**

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting the Option Agreement, Optionee acknowledges that he or she has received and read, and agrees that this Option shall be subject to this Term Sheet and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 5 of 5

Exhibit 10.36

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2006**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Stock Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on **January 26, 2006** (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee named below a non-qualified stock option (the "Option") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") that are covered by this Option, as specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this term sheet ("Term Sheet") and the NewCo Plan, each as may be amended from time to time. The terms of this Term Sheet and the NewCo Plan together constitute the "Option Agreement".

Name of Optionee:                                  _____

Grant Date:                                              April 30, 2014

Number of Shares covered by Option:          _____

Exercise Price Per Share:                           $35.8023

Expiration Date:                                         January 26, 2016

Page 1 of 4

Exhibit 10.36

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2006**

| | |
|---|---|
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within five years after the date Optionee ceases to be a member of the Board of Directors of the NewCo (the "NewCo Board") or a subsidiary or the Expiration Date, whichever occurs first. |

The following terms and conditions apply to the Option.

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan and the NewCo Plan.

1.  <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

    "Subsidiary" means any joint venture, corporation, partnership or other entity as to which the Corporation, whether directly or indirectly, has more than 50% of the (i) voting rights or (ii) rights to capital or profits.

2.  <u>Transferability</u>. Pursuant to the November 20, 1997 resolution of the Corporation's Board of Directors, all or any part of an Option may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3.  <u>Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall pay the Option Price to the Corporation only in the following manner: either (i) by cash or certified or cashier's check, (ii) by arrangement with a broker where payment is made pursuant to an irrevocable direction to the broker to sell sufficient Option shares and pay the entire Option Price to the Corporation in cash, or (iii) by delivery of shares of NewCo Common Stock that have been owned by Optionee for at least six months. The value of any such shares delivered as payment of the Option Price shall be such shares' fair market value as indicated by the price per share of the Corporation's common stock at the time of exercise.

Page 2 of 4

Exhibit 10.36

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2006**

4. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to the address listed on record.

5. <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

6. <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7. <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resale's by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resale's or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

8. <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of

Exhibit 10.36

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2006**

implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  <u>Electronic Delivery</u>. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. <u>Miscellaneous</u>. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting the Option Agreement, Optionee acknowledges that he or she has received and read, and agrees that this Option shall be subject to this Term Sheet and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Page 4 of 4

Exhibit 10.37

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2005**

SLM Corporation ("Predecessor SLM") established the SLM Corporation Directors Stock Plan (the "SLM Plan").

In connection with the separation (the "Separation") of the publicly-traded bank holding company pursuant to that certain Separation and Distribution Agreement (the "Separation Agreement") by and among Predecessor SLM, New BLC Corporation, which entity was renamed as of April 29, 2014 as SLM Corporation ("SLM BankCo"), and Navient Corporation ("NewCo"), SLM BankCo has assumed the SLM Plan.

In connection with the Separation, then outstanding grants under the SLM Plan are required by the terms of the Separation Agreement to be modified and/or canceled and modified and/or new awards granted in respect of the outstanding awards, such grants to be under either or both of the SLM Plan or the Navient Corporation 2014 Omnibus Incentive Plan (the "NewCo Plan"). New grants under the SLM Plan required by the Separation Agreement are being made by the Compensation and Personnel Committee of the Board of Directors of SLM BankCo.

_____ (the "Optionee") was granted on January 27, 2005 (the "Original Grant Date") Net-Settled Stock Options under the SLM Plan (the "Original Grant").

The Original Grant is hereby canceled.

The Compensation and Personnel Committee of the Board of Directors of NewCo (the "Committee") hereby grants to Optionee Net-Settled Options (the "Substitute Grant") under the NewCo Plan with terms and conditions set out below. By agreement of even date herewith Optionee is also receiving in respect of the Original Grant a grant of net-settled options under the SLM Plan.

FOR GOOD AND VALUABLE CONSIDERATION, NewCo, (the "Corporation") hereby grants to Optionee named below a non-qualified stock option (the "Option") to purchase any part or all of the number of shares of the Corporation's $0.01 par value common stock (the "NewCo Common Stock") that are covered by this Option, as specified below, at the Exercise Price per share specified below and upon the terms and conditions set forth in this term sheet ("Term Sheet") and the NewCo Plan, each as may be amended from time to time. The terms of this Term Sheet and the NewCo Plan together constitute the "Option Agreement".

Name of Optionee:                                          _____

Grant Date:                                               April 30, 2014

Number of Shares covered by Option:                       _____

Exercise Price Per Share:                                 $32.5504

Expiration Date:                                          January 27, 2015

Page 1 of 4

Exhibit 10.37

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2005**

| | |
|---|---|
| Vesting Schedule: | The Options are vested by reason of the terms and conditions of the Original Grant. |
| Exercise Right Upon Termination: | Vested Options must be exercised within five years after the date Optionee ceases to be a member of the Board of Directors of the NewCo (the "NewCo Board") or a subsidiary or the Expiration Date, whichever occurs first. |

The following terms and conditions apply to the Option.

Optionee's being a member of the NewCo Board from and after the Grant Date shall not be treated as a termination upon the Separation under the Original Grant and the Separation shall not be treated as a Change in Control under the SLM Plan and the NewCo Plan.

1. <u>Definitions</u>. Unless otherwise stated, any capitalized terms not defined herein shall have the meanings as described in the SLM Plan as in effect immediately prior to the Distribution Date (as defined in the Separation Agreement).

   "Subsidiary" means any joint venture, corporation, partnership or other entity as to which the Corporation, whether directly or indirectly, has more than 50% of the (i) voting rights or (ii) rights to capital or profits.

2. <u>Transferability</u>. Pursuant to the November 20, 1997 resolution of the Corporation's Board of Directors, all or any part of an Option may be transferred by Optionee by will or by the laws of descent and distribution. In addition, Optionee may transfer all or any part of any Option to "Immediate Family Members." "Immediate Family Members" means children, grandchildren, spouse or common law spouse, siblings or parents of the Optionee or bona fide trusts, partnerships or other entities controlled by and of which all beneficiaries are Immediate Family Members of the Optionee. Any Options that are transferred are further conditioned on the Optionee's transferees and Immediate Family Members agreeing to abide by the Corporation's then current stock option transfer guidelines.

3. <u>Exercise of the Option</u>. These Options shall be exercised only in accordance with the terms of the NewCo Plan and this Agreement. Each exercise shall be for no fewer than fifty (50) shares, other than an exercise for all remaining Option shares. Upon exercise of all or part of these Options, the Optionee shall pay the Option Price to the Corporation only in the following manner: either (i) by cash or certified or cashier's check, (ii) by arrangement with a broker where payment is made pursuant to an irrevocable direction to the broker to sell sufficient Option shares and pay the entire Option Price to the Corporation in cash, or (iii) by delivery of shares of NewCo Common Stock that have been owned by Optionee for at least six months. The value of any such shares delivered as payment of the Option Price shall be such shares' fair market value as indicated by the price per share of the Corporation's common stock at the time of exercise.

Page 2 of 4

**Exhibit 10.37**

**NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN**
**STOCK OPTION TERM SHEET – 2005**

4.  <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telefaxed or telecopied to, or, if mailed, when received by, the other party at the following addresses:

If to the Corporation to:

> Navient Corporation
> Attn: Human Resources, Equity Plan Administration
> 300 Continental Drive
> Newark, DE 19713

If to the Optionee, to the address listed on record.

5.  <u>Board Interpretation</u>. The Optionee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the NewCo Board and, where applicable, the Compensation and Personnel Committee of the Board of Directors (the "Committee") concerning any questions arising under this Agreement or the NewCo Plan.

6.  <u>Amendments for Accounting Charges</u>. The Committee reserves the right to unilaterally amend this Agreement to reflect any changes in applicable law or financial accounting standards.

7.  <u>Securities Law Compliance; Restrictions on Resale's of Option Shares</u>. The Corporation may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any exercise of the Option and/or any resale's by the Optionee or other subsequent transfers by the Optionee of any shares of NewCo Common Stock issued as a result of the exercise of the Option, including without limitation (a) restrictions under an insider trading policy, (b) restrictions that may be necessary in the absence of an effective registration statement under the Securities Act of 1933, as amended, covering the Option and/or the NewCo Common Stock underlying the Option and (c) restrictions as to the use of a specified brokerage firm or other agent for exercising the Option and/or for such resale's or other transfers. The sale of the shares underlying the Option must also comply with other applicable laws and regulations governing the sale of such shares.

8.  <u>Data Privacy</u>. As an essential term of this Option, the Optionee consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Option Agreement for the exclusive purpose of implementing, administering and managing Optionee's participation in the NewCo Plan. By entering into this Agreement and accepting the Option, the Optionee acknowledges that the Corporation holds certain personal information about the Optionee, including, but not limited to, name, home address and telephone number, date of birth, social security number or other identification number, salary, tax rates and amounts, nationality, job title, any shares of stock held in the Corporation, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding, for the purpose of

Page 3 of 4

Exhibit 10.37

## NAVIENT CORPORATION 2014 OMNIBUS INCENTIVE PLAN
## STOCK OPTION TERM SHEET – 2005

implementing, administering and managing the NewCo Plan ("Data"). Optionee acknowledges that Data may be transferred to any third parties assisting in the implementation, administration and management of the NewCo Plan, that these recipients may be located in jurisdictions that may have different data privacy laws and protections, and Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the NewCo Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee or the Corporation may elect to deposit any shares of NewCo Common Stock acquired upon exercise of the Option. Optionee acknowledges that Data may be held only as long as is necessary to implement, administer and manage the Optionee's participation in the NewCo Plan as determined by the Corporation, and that Optionee may request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, provided however, that refusing or withdrawing Optionee's consent may adversely affect Optionee's ability to participate in the NewCo Plan.

9.  Electronic Delivery. The Corporation may, in its sole discretion, decide to deliver any documents related to any options granted under the NewCo Plan by electronic means or to request Optionee's consent to participate in the NewCo Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the NewCo Plan through an on-line or electronic system established and maintained by the Corporation or another third party designated by the Corporation, and such consent shall remain in effect throughout Optionee's term of service with the Corporation and thereafter until withdrawn in writing by Optionee.

10. Miscellaneous. In the event that any provision of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, such provision shall be reformed, if possible, to the extent necessary to render it legal, valid and enforceable, or otherwise deleted, and the remainder of this Agreement shall not be affected except to the extent necessary to reform or delete such illegal, invalid or unenforceable provision. The headings in this Agreement are solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. The Optionee shall cooperate and take such actions as may be reasonably requested by the Corporation in order to carry out the provisions and purposes of the Agreement. The Optionee is responsible for complying with all laws applicable to Optionee, including federal and state securities reporting laws.

The Optionee must contact Merrill Lynch to accept this grant and agree to the terms and conditions in this Agreement, the applicable plan document, any terms and conditions documents and all other applicable documents. By accepting the Option Agreement, Optionee acknowledges that he or she has received and read, and agrees that this Option shall be subject to this Term Sheet and the NewCo Plan. At any time, copies of the NewCo Plan may be obtained by contacting Eric Watson at (703) 984-6756.

Exhibit 12.1

**NAVIENT CORPORATION**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**
**(Dollars in millions)**

| | Years Ended December 31, | | | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** | **2013** | **2014** |
| Income (loss) from continuing operations before income taxes | $ 789 | $1,229 | $ 925 | $1,437 | $2,087 | $1,358 | $ 853 |
| Add: Fixed charges | 3,038 | 2,279 | 2,404 | 2,565 | 2,213 | 1,125 | 1,043 |
| Total earnings | $3,827 | $3,508 | $3,329 | $4,002 | $4,300 | $2,483 | $1,896 |
| Interest expense | $3,036 | $2,275 | $2,401 | $2,561 | $2,210 | $1,123 | $1,042 |
| Rental expense, net of income | 2 | 4 | 3 | 4 | 3 | 2 | 1 |
| Total fixed charges | 3,038 | 2,279 | 2,404 | 2,565 | 2,213 | 1,125 | 1,043 |
| Preferred stock dividends | 171 | 121 | 28 | 31 | 31 | 16 | 10 |
| Total fixed charges and preferred stock dividends | $3,209 | $2,400 | $2,432 | $2,596 | $2,244 | $1,141 | $1,053 |
| **Ratio of earnings to fixed charges**[1] | **1.26** | **1.54** | **1.38** | **1.56** | **1.94** | **2.21** | **1.82** |
| **Ratio of earnings to fixed charges and preferred stock dividends**[1] | **1.19** | **1.46** | **1.37** | **1.54** | **1.92** | **2.18** | **1.80** |

[1]   For purposes of computing these ratios, earnings represent income (loss) from continuing operations before income tax expense plus fixed charges. Fixed charges represent interest expensed and capitalized plus one-third (the proportion deemed representative of the interest factor) of rents, net of income from subleases.

Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, John F. Remondi, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Navient Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
August 1, 2014

<div align="right"><strong>Exhibit 31.2</strong></div>

<div align="center"><strong>Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002</strong></div>

I, Somsak Chivavibul, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Navient Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
(Principal Financial Officer)
August 1, 2014

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Navient Corporation (the "Company") on Form 10-Q for the quarter ended June 30, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John F. Remondi, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ JOHN F. REMONDI
John F. Remondi
Chief Executive Officer
(Principal Executive Officer)
August 1, 2014

<div align="right">**Exhibit 32.2**</div>

<div align="center">

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

In connection with the Quarterly Report of Navient Corporation (the "Company") on Form 10-Q for the quarter ended June 30, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Somsak Chivavibul, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ SOMSAK CHIVAVIBUL
Somsak Chivavibul
Chief Financial Officer
(Principal Financial Officer)
August 1, 2014

# EXHIBIT G

Case 1:16-cv-00112-MN Document 59 Filed 09/13/19 Page 615 of 1145 PageID #: 5401

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al*., Individually and On Behalf of All Others Similarly Situated, | Case No. 1:16-cv-112-GMS <br><br> <u>CLASS ACTION</u> |
| Plaintiffs, | |
| v. | |
| NAVIENT CORPORATION, *et al*., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ................................................................................ 2

    A.   Claims Under the Securities Exchange Act of 1934 ................................. 2

    B.   Claims Under the Securities Act of 1933 .................................................. 9

II.  JURISDICTION AND VENUE ....................................................................... 10

III. EXCHANGE ACT PARTIES ......................................................................... 10

    A.   Plaintiffs .................................................................................................. 10

    B.   Exchange Act Defendants ....................................................................... 11

        1.   Navient .......................................................................................... 11

        2.   Officer Defendants ........................................................................ 12

IV.  DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING
    NAVIENT'S FORBEARANCE PRACTICES, THE CREDIT QUALITY
    OF ITS LOAN PORTFOLIOS, AND ITS FINANCIAL RESULTS .................. 13

    A.   Defendants Made False or Misleading Statements to Investors
        Regarding Forbearances, Loan Credit Quality, and Related
        Financial Results. ................................................................................... 13

        1.   False or Misleading Statements Regarding Forbearance ............. 13

        2.   False or Misleading Statements Concerning the "High
            Quality" of Navient's Loan Portfolio and, Relatedly, the
            Low Level of Delinquencies and Charge-Offs ........................... 20

        3.   False or Misleading Statements Regarding Navient's Loan
            Loss Provisions and Financial Results ........................................ 22

        4.   False or Misleading SOX Certifications by Remondi and
            Chivavibul .................................................................................... 26

    B.   Defendants Made the False or Misleading Statements Regarding
        Forbearances, Loan Credit Quality, and Navient's Financial
        Results with Scienter ............................................................................... 27

        1.   The available facts demonstrate Defendants' conscious
            misbehavior or recklessness ........................................................ 28

        2.   Defendants also had the motive and opportunity to conceal
            the significant risk of default posed by the cohort of
            borrowers exiting deferment in 2014, as well as Navient's
            pervasive and systemic practice of placing borrowers into
            forbearance ................................................................................... 31

i

# TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|

C. Defendants' Misrepresentations Regarding Forbearances, Loan Credit Quality, and Navient's Related Financial Results Caused Losses to Investors. ... 32

V. DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S COMPLIANCE WITH LEGAL AND REGULATORY REQUIREMENTS ... 36

A. Defendants Made False or Misleading Statements Regarding Compliance to Investors. ... 36

1. Navient provided inadequate notice to borrowers regarding annual recertifications for IDR plans. ... 37

2. Navient misadvised borrowers regarding the prerequisites to allowing them to release their cosigners from responsibility for the loan payments. ... 38

3. Navient misrepresented the amounts delinquent borrowers needed to pay to become current on their loans. ... 39

4. Navient repeatedly made payment processing errors and lacked adequate systems to address and prevent their recurrence. ... 40

5. Navient mishandled the accounts of military borrowers, even after the Company paid $60 million to the DOJ for that very misconduct. ... 41

6. Pioneer and GRC deceived borrowers regarding the federal loan rehabilitation program. ... 43

B. Defendants Made the False or Misleading Statements Regarding Compliance with Scienter. ... 45

C. Defendants' Misrepresentations Regarding Legal Compliance Caused Investors Losses. ... 47

VI. DEFENDANTS DEFRAUDED INVESTORS BY CONCEALING VITAL FACTS REGARDING NAVIENT'S ABILITY TO FUND ITS OPERATIONS ... 51

A. Defendants Made False or Misleading Statements to Investors Regarding Navient's Liquidity and Financing Arrangements. ... 51

B. Defendants Made the Misrepresentations Regarding Navient's Credit Facilities with Scienter. ... 55

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| | C. Defendants' Misrepresentations Regarding Navient's Credit Facilities Caused Investors Losses | 55 |
| VII. | PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE | 56 |
| VIII. | CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT | 58 |
| IX. | PLAINTIFFS' SECURITIES ACT CLAIMS | 59 |
| | A. Summary of the Claims | 59 |
| | B. Securities Act Parties | 60 |
| | 1. Plaintiffs | 60 |
| | 2. Securities Act Defendants | 61 |
| | C. The Offering Documents Contained Untrue Statements of Material Fact or Omitted Material Facts Necessary to Make Those Statements Not Misleading. | 63 |
| | 1. The 2014 Offering Materials contained untrue or misleading statements of material fact. | 63 |
| | 2. The 2015 Offering Documents contained untrue or misleading statements of material fact. | 65 |
| X. | CLAIMS FOR RELIEF UNDER THE SECURITIES ACT | 67 |
| XI. | CLASS ACTION ALLEGATIONS | 72 |
| XII. | PRAYER FOR RELIEF | 73 |
| JURY TRIAL DEMANDED | | 74 |

Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund ("Plaintiffs" or the "Lord Abbett Funds") bring this class action on behalf of themselves and all other similarly situated investors against Navient Corporation ("Navient" or the "Company"), one of the country's largest servicers of student loans, as well as its President and Chief Executive Officer John F. ("Jack") Remondi, Chief Financial Officer Somsak Chivavibul, Chief Operating Officer John M. Kane, and others for violations of the federal securities laws. As detailed below, Defendants made numerous false or misleading statements of material fact between April 17, 2014 and December 28, 2015, inclusive ("Class Period"), with respect to Navient's business operations and financial results. Defendants' statements or omissions caused the price of Navient securities to be artificially inflated, and caused significant damages to purchasers of Navient stock and notes when they ultimately learned facts revealing that Defendants' prior representations were false or misleading when made. The Lord Abbett Funds, who suffered more than $13 million in damages due to Defendants' misconduct, seek a recovery through this action on behalf of themselves and other injured investors.

The allegations in this Complaint derive from Plaintiffs' investigation (through their counsel) of (1) filings with the U.S. Securities and Exchange Commission ("SEC") regarding Navient and related entities; (2) government reports, news articles, securities analysts' reports, wire and press releases, transcripts of public conference calls regarding Navient, and other readily obtainable information; (3) information provided to Plaintiffs by former Navient employees, each of whom worked at the Company for part or all of the Class Period and interacted directly with borrowers as well as Navient management; and (4) facts set forth in

1

actions brought by the U.S. Consumer Financial Protection Bureau ("CFPB") and the attorneys

general of Washington, Illinois, and Pennsylvania against Navient, which are the product of

extensive investigations by those entities and cite to, among other things, internal Navient

documents.[1]

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all entities and individuals

who (1) purchased Navient's publicly traded securities during the Class Period; (2) purchased

notes in or traceable to the Company's public offering conducted on or about November 6, 2014

(the "2014 Debt Offering"); or (3) purchased notes in or traceable to the Company's public

offering conducted on or about March 27, 2015 (the "2015 Debt Offering").

2.      Defendants' misconduct gives rise to two sets of claims, as summarized

immediately below.

### A.    Claims Under the Securities Exchange Act of 1934

3.      Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), as well as SEC Rule 10b-5 (17

C.F.R. § 240.10b-5), against Navient, CEO Jack Remondi, CFO Somsak Chivavibul, and COO

John Kane (collectively, the "Exchange Act Defendants") for knowingly or recklessly making

false or misleading statements in connection with investors' purchase or sale of Navient stock

and notes.[2] Defendants' misrepresentations related to (1) Navient's practices regarding

---

[1] Those cases are, respectively, (i) *Consumer Financial Protection Bureau v. Navient Corp., et al.*, No. 3:17-cv-00101-RDM (M.D. Pa. filed Jan. 18, 2017); (ii) *State of Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (King Cnty. Super. Ct. filed Jan. 18, 2017); (iii) *People of the State of Illinois v. Navient Corp., et al.*, No. 2017 CH 00761 (Cir. Ct. Cook Cnty. Ch. Div. filed Jan. 18, 2017); and (iv) *Commonwealth of Pennsylvania v. Navient Corp., et al.*, No. 3:17-cv-01814-RDM (M.D. Pa. filed Oct. 5, 2017).

[2] Unless otherwise indicated, "Defendants" refers to the Exchange Act Defendants.

forbearances (which were supposed to be temporary reprieves of borrowers' payment obligations) and more broadly the credit quality of the Company's loan portfolios, as well as the Company's related determinations of "provisions for loan losses," reserves maintained to address potential "charge-offs" the Company is forced to take when it deems loans uncollectible; (2) Navient's compliance with governing laws and regulations; and (3) Navient's ability to borrow funds through credit facilities that were critical to its ability to purchase Federal Family Education Loan Program ("FFELP") loans.

### Forbearance practices, loan credit quality, and loan loss provisions

4.     Defendants repeatedly assured investors during the Class Period that forbearances were meant to afford temporary (not long-term) relief to borrowers, and that Navient engaged in a careful, borrower-specific evaluation of whether to grant forbearances.  *See* ¶¶ 33-49; App'x at Section I.  But in fact there was a pervasive and systemic practice at Navient, directed by senior management, of *regularly and indiscriminately* granting forbearances to struggling borrowers. Those undisclosed forbearance practices had three objectives.

5.     *First*, Defendants aimed to avoid having to classify those borrowers as delinquent or in default, which would raise a red flag to analysts and investors that Navient's loan portfolios were exposed to higher levels of risk than Defendants disclosed, and that the Company was in turn a riskier investment than Defendants portrayed to the market.

6.     *Second*, misusing forbearances also allowed Defendants to manipulate Navient's financial results.  *See* ¶¶ 50-63.  In particular, Defendants misrepresented Navient's provisions for loan losses, an indicator of the level of risk to which the Company's loan portfolios were exposed.

7.      Increases in delinquencies, defaults, and charge-offs cause the Company to increase its loan loss provisions, whereas favorable delinquency and default trends correspond with lower provisions.  The provision for loan losses "increases the related allowance for loan losses," i.e., the total reserve set aside to address charge-offs.[3]  Navient records those provisions as an expense on its income statement, so lower provisions allow the Company to report higher income, resulting in higher earnings per share ("EPS").  By overusing forbearances, Navient artificially kept delinquencies, defaults, and charge-offs lower than they should have been, which in turn allowed the Company to report artificially low loan loss provisions as well as correspondingly high net income and EPS.

8.      *Third*, Navient placed borrowers into forbearance in lieu of counseling and enrolling them in alternative repayment programs, including income-driven repayment ("IDR") plans.[4]  In doing so, Navient avoided (at borrowers' expense) the higher operational costs associated with properly counseling and enrolling borrowers in such plans.  That is, it would take significantly more time, and thus employee resources, to shepherd a borrower through the process of getting into an alternative repayment plan than simply to place her into forbearance. That, in turn, would necessitate hiring more personnel to meet the needs of Navient's customer base.  *See* ¶¶ 43-44.  By eschewing its stated commitment to promote borrowers' best interests, Navient artificially kept its operational costs lower than they should have been.

9.      Defendants' misrepresentations caused investors to value the Company higher than they otherwise would have, in turn causing the price of Navient securities to be artificially

---

[3] Form 10 Registration Statement (Apr. 10, 2014) ("April 2014 Information Statement") at 64.

[4] An IDR plan sets the borrower's monthly student loan payment at an amount intended to be affordable based on the borrower's monthly income and family size.  *See, e.g.*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.  The U.S. Department of Education ("DOE"), for example, offers several types of IDR plans, including the "Pay As You Earn," or "PAYE," plan, and the Income-Based Repayment, or "IBR," plan.  *See id.*

inflated during the Class Period. But the fraud was ultimately revealed through several disclosures of information contradicting Defendants' prior statements. Among other things, on July 13, 2015, Navient—after having reported decreases in loan loss provisions for every prior quarter of the Class Period—suddenly announced it would need to increase its provision for loans in the "Private Education Loans" (or "PEL") segment (i.e., loans originated from private sources rather than the government) by $46 million, or *31.7%*. Defendants revealed that a group of borrowers (i.e., "cohort") who had returned to school during the "Great Recession" of 2007-2008, and who represented *$2.5 billion* in loans, had demonstrated difficulty repaying their loans. That disclosure was followed by Remondi's revelation during a July 22, 2015 earnings call that those borrowers "were struggling to begin with," i.e., even before they went back to school. And on September 29, 2015, the CFPB issued a report (the "CFPB Report") detailing, among other widespread problems in the loan-servicing industry, that loan servicers were placing borrowers into forbearance in lieu of alternative repayment plans. Those disclosures caused significant drops in the prices of Navient securities, damaging investors. *See* ¶¶ 84-91.

### *Legal and regulatory compliance*

10.     Defendants also repeatedly assured investors that Navient was diligent in complying with applicable laws and regulations. *See* ¶¶ 92-94. While compliance would naturally be of great concern to investors in a loan-servicer, it was even more important to Navient investors in light of the scrutiny the Company faced from the CFPB and other agencies relating to the loan-servicing and collection practices of Navient's wholly-owned subsidiaries Navient Solutions, LLC (f/k/a Navient Solutions, Inc.) ("Navient Solutions"), Pioneer Credit Recovery, Inc. ("Pioneer"), and General Revenue Corporation ("GRC"). In April 2014, Navient Solutions received a Civil Investigative Demand ("CID") from the CFPB relating to allegations

that Navient was processing monthly student loan payments in a manner designed to maximize late fees and had provided inadequate disclosures regarding the assessment of late fees. And on May 13, 2014, Navient announced it had entered into an agreement with the U.S. Department of Justice ("DOJ") and the Federal Deposit Insurance Corporation ("FDIC") to settle allegations that Navient Solutions violated the Servicemembers Civil Relief Act ("SCRA") by charging borrowers who served in the military more than the legally mandated 6% cap applicable to those borrowers, and failed to sufficiently inform borrowers about late fees incurred on loans owned or originated by Sallie Mae Bank between 2005 and 2014. In light of regulators' enhanced scrutiny of Navient, Defendants' continued assurances during the Class Period about the Company's compliance with governing laws and regulations were all the more important to investors.

11.     But while Defendants represented to investors that Navient maintained a "robust compliance culture driven by a 'customer-first' approach,"[5] the Company and its subsidiaries were actually engaged in a series of unfair and deceptive practices, including (1) misleading borrowers about the availability of IDR plans; (2) misadvising borrowers about the availability of releases of cosigners of borrowers' loans; (3) misleading delinquent borrowers regarding the amounts they needed to pay to become current on their loans; (4) failing to disclose or properly address systemic processing errors and the inadequate systems in place to deal with those errors; (5) charging borrowers who had served in the military high interest rates on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between Navient Solutions and the DOJ for that very practice; and (6) deceiving borrowers regarding attributes of the federal loan rehabilitation program, which affords borrowers in default the opportunity to "rehabilitate" their loans and remove them from default status. *See* ¶¶ 96-119. Those unfair and

---

[5] *E.g.*, 2014 Form 10-K at 4.

deceptive practices are the subject of actions filed by the CFPB and state attorneys general (*see supra* at 2 n.1) asserting claims under the Consumer Financial Protection Act ("CFPA"), the Fair Debt Collection Practices Act ("FDCPA"), and state consumer protection laws. The Government Complaints assert, based in part on internal Navient documents, that the Company engaged in those practices systemically and repeatedly for years, including during much of the Class Period in this case.

12. Investors ultimately learned the truth about Navient's pervasive failures to comply with governing legal and regulatory requirements through a series of disclosures beginning on February 27, 2015 and ending on October 14, 2015, which revealed the existence of rampant misconduct in the loan-servicing industry, and at Navient in particular. *See* ¶¶ 125-35. Each of those disclosures was met with surprise by the market, and each was followed by a material drop in the prices of Navient securities. *See* ¶¶ 127, 129, 131-32, 135.

### *Navient's borrowing capacity*

13. Defendants emphasized to investors that Navient's ability to fund its operations depended in part on the Company's ability to access funds through credit facilities, including those maintained with the Federal Home Loan Bank of Des Moines ("FHLB-DM"). But Defendants' representations regarding Navient's credit facilities failed to apprise investors of the true likelihood that FHLB-DM would terminate its facilities in light of a rule proposed by the Federal Housing Finance Agency ("FHFA") in *September 2014* (which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities from gaining membership with a Federal Home Loan Bank ("FHLB")—and thus access credit on extraordinarily favorable

terms—through the use of a "captive insurer."  *See* ¶¶ 136-39.[6]  Sallie Mae formed a captive

insurer, HICA Education Loan Corporation ("HICA"), to become a "member" of FHLB-DM,

effectively exploiting a loophole that would be closed by the proposed rule.  The proposed rule

thus threatened Navient's ability to obtain low-cost credit to fund its operations.  And

Defendants, unlike investors, plainly were aware of the proposed rule and the impact its adoption

could have on Navient.

14.     The truth regarding the credit facilities was revealed to investors on December 28,

2015, when Navient disclosed that FHLB-DM would reduce—by more than 50%—the

Company's ability to borrow under the credit facilities maintained with FHLB-DM.  That news

drove the price of Navient stock down more than 9%.

### *Collective impact of Defendants' fraud on investors*

15.     In all, including the substantial effect of declines attributable to corrective

disclosures, Navient stock went down more than 46.4%, from $21.40 per share on February 27,

2015 to $11.46 per share on December 28, 2015, the last day of the Class Period.

16.     The following chart demonstrates the significant negative impact on the price of

Navient shares upon the disclosure of Defendants' misconduct:

---

[6] A captive insurer is an insurance company formed to allow the organizing company to insure
itself against risks that are too expensive to insure on the regular insurance market.



**B.    Claims Under the Securities Act of 1933**

17.    Plaintiffs also assert non-fraud claims under Sections 11, 12(a)(2), and 15 of the

Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77l, and 77o) against Navient,

Remondi, Chivavibul, and Navient's directors, as well as the underwriters of the 2014 and 2015

Debt Offerings (collectively, the "Securities Act Defendants," as further identified in ¶¶ 169-90).

18.    Those claims arise from untrue statements of material fact in, or omissions of

material fact from, the Shelf Registration Statement, prospectuses, and prospectus supplements

issued in connection with the Debt Offerings, which incorporated by reference many of the

misrepresentations summarized above and detailed in ¶¶ 33-35, 50-51, 54-56, 65, 93-94, 136-38

9

below regarding Navient's forbearance practices, loan credit quality, and related financial results; legal and regulatory compliance; and credit facilities.[7]

## II.   JURISDICTION AND VENUE

19.   This Court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

20.   Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act and Section 22 of the Securities Act, as well as the Fifth Amendment of the United States Constitution.

21.   Venue is proper in this District in accordance with Section 27 of the Exchange Act, Section 22(a) of the Securities Act, and 28 U.S.C. § 1391(b).  Navient is headquartered in this District and many of the acts and practices alleged in this Complaint occurred in substantial part in this District.

22.   In connection with the misconduct alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   EXCHANGE ACT PARTIES

### A.   Plaintiffs

23.   Plaintiff Lord Abbett Affiliated Fund, Inc. is a diversified, open-end management-investment company registered under the Investment Company Act of 1940, as amended.

---

[7] Sections IV-VI, and IX.C.  below detail the false or misleading statements giving rise to Plaintiffs' Exchange Act and Securities Act claims, categorized by subject matter.  Plaintiffs also attach to this Complaint an Appendix that (i) identifies each statement, (ii) summarizes why it was false or misleading when made, and (iii) identifies the subsequent disclosure associated with it.

24.     Plaintiff Lord Abbett Bond-Debenture Fund, Inc. is an open-end management-investment company registered under the Investment Company Act.

25.     Plaintiff Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund is diversified, open-end management-investment company registered under the Investment Company Act.  The Fund is a series of Lord Abbett Equity Trust, a Delaware statutory trust.

26.     Plaintiff Lord Abbett Investment Trust – Lord Abbett High Yield Fund is a diversified investment company registered under the Investment Company Act.  The Fund is a series of the Lord Abbett Investment Trust, a Delaware statutory trust.

27.     The Lord Abbett Funds' investments are managed by Lord, Abbett & Co. LLC ("Lord, Abbett & Co."), located at 90 Hudson Street, Jersey City, NJ 07302.  Lord, Abbett & Co. caused each of the Lord Abbett Funds to transact in Navient securities during the Class Period, and each of the Funds owned the securities it acquired, respectively, through those transactions.

28.     By order of June 30, 2016 (Dkt. 32), this Court appointed the Lord Abbett Funds as Lead Plaintiff in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA").  As set forth in the Funds' certification filed in connection with their motion for appointment as Lead Plaintiff (Dkt. 14 (Ex. 1)), Plaintiffs purchased Navient stock and notes during the Class Period and suffered losses in connection with those purchases.

**B.     Exchange Act Defendants**

**1.     Navient**

29.     On May 29, 2013, Sallie Mae announced it would separate into two distinct publicly-traded entities—an education loan management business named "Navient" and a consumer banking business named "SLM BankCo."  Navient's separation from Sallie Mae was effected through the distribution of Navient common stock (the "Spin-Off").  On April 30, 2014, the Spin-Off was completed via a distribution by Sallie Mae of all the shares of common stock of

Navient to the shareholders of Sallie Mae common stock.  Navient stock trades on the NASDAQ under the symbol "NAVI."

### 2.  Officer Defendants

30.    Defendant John F. (Jack) Remondi served at all times relevant to this Complaint as Navient's President and CEO, as well as a director and a member of the Navient board's Executive Committee.  Remondi served as Sallie Mae's President and CEO from May 2013 to April 2014, President and COO from January 2011 to May 2013, and Vice Chairman and CFO from January 2008 to January 2011.  Remondi signed numerous Navient SEC filings and made other statements on the Company's behalf during the Class Period.  *See generally* App'x.

31.    Defendant Somsak Chivavibul served at all times relevant to this Complaint as Navient's Executive Vice President and CFO.  Chivavibul joined Sallie Mae in 1992 and worked in various positions at the company.  He previously worked at Ernst & Young and is an accountant.  Chivavibul signed numerous Navient SEC filings during the Class Period.  *See generally* App'x.

32.    Defendant John Kane served at all times relevant to this Complaint as Navient's COO and Group President, Asset Recovery and Business Services.  Kane made statements on Navient's behalf at least during the Credit Suisse Group Financial Services Forum on February 11, 2015 ("Credit Suisse Forum").  *See* ¶ 93; App'x at Section II.

## IV.   DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S FORBEARANCE PRACTICES, THE CREDIT QUALITY OF ITS LOAN PORTFOLIOS, AND ITS FINANCIAL RESULTS

### A.   Defendants Made False or Misleading Statements to Investors Regarding Forbearances, Loan Credit Quality, and Related Financial Results.

#### 1.   False or Misleading Statements Regarding Forbearance

33.   Defendants made numerous representations to investors throughout the Class Period regarding Navient's forbearance "philosophy" and practices.  In the April 2014 "Information Statement" issued in connection with the Spin-Off, Navient stated (1) "[f]orbearance as a collection tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments"; (2) "[o]ur forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan"; and (3) "[w]e continue to see improvement in credit quality and continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio."

34.   Substantially similar representations appear in Navient's Form 10-Qs for Q1 2014 (issued on May 9, 2014); Q2 2014 (issued on August 1, 2014); Q3 2014 (issued on October 30, 2014); and Q1 2015 (issued on April 30, 2015).  *See* App'x at Section I.1.[8]

35.   Navient's forbearance practices were addressed in detail in its 2014 Form 10-K filed on February 27, 2015:

> Navient believes the credit risk of the Private Education Loans it owns is *well managed* through the *rigorous underwriting practices* and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal

---

[8] For the Court's convenience, Plaintiffs often do not list each substantially similar representation in this Complaint, but rather address them in the Appendix.

servicing and risk mitigation practices, as well as *our careful use of forbearance* and our loan modification programs.[9]

36.     The statements recounted in ¶¶ 33-35 above were false or misleading when made, because Navient engaged in a systemic practice of indiscriminately placing borrowers into forbearance—sometimes multiple, consecutive forbearances—regardless of the impact it would have on those customers and without regard to borrowers' particular circumstances.  By doing so, Navient avoided having to record those accounts, particularly for PEL borrowers, as delinquent or in default, which would have signaled to investors that the Company was exposed to greater risk in its loan portfolios than it was reporting.  Further, as detailed in ¶¶ 43-44 below, by placing FFELP borrowers into forbearance rather than enroll them in appropriate IDR plans, Navient avoided the increased costs that the latter entailed, in particular because it took substantially more time and paperwork for employees to counsel borrowers about, and enroll them in, IDR plans than to simply stick them into forbearance.

37.     Former Navient employees with direct knowledge of Navient's undisclosed forbearance practices have recounted them in detail.  A former Navient employee who worked as a Collections Supervisor from early 2014 until April 2015 ("CW 1"), for example, explained that the Collections Department's "objective all of the time was to keep an account current" through using forbearances or other means of postponing payments borrowers were unable to make.  Accordingly, CW 1 said, "[y]ou would never see us have a goal where it was 'Let's see how much money we can collect this month.'  It was how much can we postpone?  How many forbearances can we slap on [an] account."  CW 1 stated this management directive was conveyed by CW 1's supervisor but came from Navient District Manager/Senior Vice President

---

[9] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations and quotation marks have been omitted.

of Default Prevention Troy Standish, who reported to Defendant John Kane. As a result of those practices, CW 1 explained, borrowers were misled and their accounts "were just growing and growing and growing."

38.     CW 1's account is corroborated by a former Navient Collections Department Supervisor who worked at the Company from mid-2010 until October 2014 and supervised 25 Collections Agents ("CW 2"). CW 2 recounted that Navient Director of Operations Christi Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as "current" on Navient's books, "even though putting [borrowers] into our forbearance for 12 months drastically capitalizes a lot more interest and increases their loan substantially."

39.     CW 2 explained, moreover, that while CW 2 was at Navient, collections agents were incentivized by management, in order to be counted "number one by the number of loans [they] had," to "put … [customers] in something that makes them look like they're up to date for a longer period of time, even though by doing that every month the company is making like millions of dollars simply by the interest rate capitalizing," and "if an agent [had] 50 accounts, that [was] the mindset for those 50 accounts." CW 2 related that it "was negative for the customer. If the customer call[ed] in requesting the good thing"—i.e., a relatively short forbearance—"we were coached [by management] to coach our agents to do the bad thing" and convince the customer to obtain a longer one.

40.     CW 1 recounted that to achieve a good performance rating, agents had just five and a half minutes per phone call with borrowers, during which agents ran down a list of questions concerning family size, whether the borrower worked part or full time, and whether the borrower received assistance, before sending off paperwork to qualify for a deferral due to

15

unemployment; if there were no questions, the agent ended the call at that point. Further, CW 1 explained, while the paperwork was in process the loan was put into forbearance. According to CW 1, "[i]t's not like [the borrower] was getting any information" during those calls about the impact on their balances.

41. A former Navient Department of Education Specialist II who worked at Navient's Delaware headquarters from June 2014 until after the Class Period ("CW 3") similarly recounted that Navient provided incentives to personnel for getting customers off the phone in the fastest amount of time. CW 3 indicated that CW 3 was pushed to work as fast as CW 3 could. CW 3 stated, "It was preached there to get someone off the phone as soon as possible." CW 3 recalled that if CW 3 failed to get someone off the phone quickly, it was looked down upon by Navient management. CW 3 further noted there was a lot of miscommunication toward the borrowers about forbearance; CW 3 indicated that a lot of borrowers did not know what they were entitled to, and that Navient customer service representatives were responsible for the miscommunications.

42. The CFPB and state attorneys general likewise report that Navient's compensation policies incentivized its employees to place federal-loan borrowers into forbearance without adequately exploring IDR plans with those borrowers and, in some cases, without even mentioning such plans.

43. Because Navient compensated its customer service representatives based in part on average call time, employees were dissuaded from engaging in longer, time-consuming conversations with borrowers to determine the most-appropriate alternative payment plan for each borrower, or assist them in completing the required enrollment application or annual recertification forms. By contrast, it typically took only a few minutes over the phone, without

16

any paperwork, for a Navient representative to enroll a borrower in forbearance. Navient thus pressured its employees to churn out forbearances rather than take more time to determine what options would work best in light of borrowers' specific circumstances.

44. Additionally, because a borrower seeking to enroll in an IDR plan must submit a paper or online application and include certain income tax documentation with it, the enrollment process sometimes requires multiple, lengthy conversations with the borrower. In its complaint the CFPB reports "[t]his is especially true considering that more than half of Navient borrowers who enroll in [IDR] plans for the first time report that they could not navigate the application process on their own."[10] Enrollment in forbearance, by contrast, can often be completed over the phone within minutes, and generally without submitting any paperwork. Further, a borrower enrolled in an IDR plan must also complete an annual recertification form to document her current income and family size, which is then used to adjust her payment amount. Processing that renewal paperwork further increases the time Navient employees must devote to borrowers who enroll in IDR plans. As the CFPB explains, "[a]s the volume of [IDR] plan applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs."[11] Navient thus avoided those necessary operating costs by improperly placing borrowers into forbearance.

45. The Illinois AG reports in its complaint that a review of 200 sample calls answered by Navient representatives "revealed that despite Navient's assurances to borrowers that it would offer assistance regarding repayment options, when on the phone with borrowers it

---

[10] CFPB Compl. ¶ 44.

[11] *Id.* ¶ 46.

offered deferments or forbearances without mentioning any other options over 50% of the time."[12]

46.     The CFPB reports in its complaint that as a result of Navient's undisclosed forbearance practices, between January 2010 and March 2015 the number of federal-loan borrowers the Company enrolled in forbearance far exceeded the number of borrowers enrolled in IDR repayment plans.[13]  The CFPB further states that Navient's customer service representatives regularly responded to federal-loan borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available IDR plans, notwithstanding that more than 50% of Navient's borrowers who needed relief and were eligible for IDR plans actually qualified for a $0 monthly payment and thus did not need to enroll in forbearance.[14]  Indeed, the CFPB reports that between January 1, 2010 and March 31, 2015, (1) nearly 25% of borrowers who ultimately enrolled in IBR (as noted earlier, a type of IDR plan) with a $0 payment were enrolled in voluntary forbearance within the 12-month period before they enrolled in IBR; and (2) nearly 16% of borrowers who ultimately enrolled in PAYE (another IDR plan) with a $0 payment were enrolled in voluntary forbearance within the 12-month period before they enrolled in PAYE.[15]

47.     Making things worse, Navient enrolled many borrowers in multiple, consecutive forbearances, even though the borrowers had clearly demonstrated a long-term inability to repay their loans.  The Pennsylvania AG reports in its complaint that between January 1, 2010 and March 31, 2015 Navient enrolled over *1.5 million federal-loan borrowers* in two or more consecutive forbearances totaling at least 12 months; approximately one million of those

---

[12] Ill. Compl. ¶ 279.
[13] CFPB Compl. ¶ 50.
[14] *Id.* ¶ 51.
[15] *Id.* ¶ 52.

borrowers were enrolled in three or more consecutive forbearances, where each forbearance period lasted an average of six months, and more than 520,000 of the borrowers were enrolled in four or more consecutive forbearances.[16]

48.     Additionally, the September 2015 CFPB Report confirms that the improper use of forbearances was prevalent with respect to *both* private and federal loans.  The Report resulted from a public inquiry by the CFPB, DOE, and U.S. Treasury Department commenced in May 2015, which drew "more than 30,000 comments describing specific student loan servicing practices that may be contributing to student debt stress, and offering specific recommendations for ways to improve student loan servicing, encourage borrower success, and mitigate defaults."[17]  The CFPB recounted that comments from individual borrowers and organizations representing public service workers "note that servicers of both private and federal student loans may not inform borrowers experiencing financial hardship about available alternative repayment plans," and instead "may advise borrowers *to postpone payments through forbearance* or deferment or instruct borrowers that the only available option is to pay the full amount due."

49.     The pervasive and systemic use of forbearances at Navient, which Defendants did not publicly disclose, belied their representations to investors (as recounted in ¶¶ 33-35 above) that (1) Navient engaged in a "careful use of forbearance," (2) Navient applied forbearances "based on a customer's unique situation," (3) the Company's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan," and (4) Navient "continue[d] to see . . . continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio."  Those statements accordingly were false or misleading when made.

---

[16] Pa. Compl. ¶¶ 122-23.

[17] *See* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

### 2. False or Misleading Statements Concerning the "High Quality" of Navient's Loan Portfolio and, Relatedly, the Low Level of Delinquencies and Charge-Offs

50.     Defendants made numerous statements throughout the Class Period touting the purportedly high quality of Navient's loan portfolio and, relatedly, the low level of delinquencies by borrowers and charge-offs by Navient.  In an April 16, 2014 press release announcing Q1 2014 financial results for Sallie Mae (of which Navient remained a part until the Spin-Off was completed on April 30, 2014), Remondi stated, "We're . . . pleased that this quarter set a six-year-record low in delinquencies, reflecting our strong underwriting and customer support." Navient reiterated those sentiments in a "Roadshow" presentation attached to a Form 8-K filed the next day (April 17, 2014), which (1) emphasized Navient's "[l]arge, high quality asset base," including its "[s]easoned portfolio" of Private Education Loans"; and (2) highlighted, in a section titled "Leveraging Core Strengths to Drive Growth," "Default Prevention and Asset Recovery," specifying "[d]elinquency and charge-offs significantly below national average" and "[i]ndustry leading asset recovery and private credit loss mitigation capabilities."

51.     Defendants made substantially similar statements regarding loan-credit quality for the remainder of the Class Period.  *See, e.g.*, (1) Q2 2014 earnings press release (July 16, 2014) (reporting "continued improvement in student loan portfolio credit quality with 90-plus day delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008"); (2) Q2 2014 Form 10-Q (filed on Aug. 1, 2014) (noting provisions for PEL losses "declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs"); (3) 3Q 2014 earnings press release (Oct. 15, 2014) (stating financial results "show[ed] continued improvements in delinquencies and defaults since a year ago" and improved performance of Navient's Private Education Loan portfolio, claiming that "Charge-Off Rates on Private

Education Loan Portfolio Improve[d] to Lowest Levels Since 2008"); (4) Q4 & FY 2014 press release (Jan. 21, 2015) (stating "2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008").[18]

52.     The statements recounted in ¶¶ 50-51 were false or misleading when made because Defendants failed to disclose that Navient was regularly and indiscriminately placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolios and artificially depressing the number of delinquencies, defaults, and charge-offs. *See* ¶¶ 36-49, 55-56. The quality of Navient's loan portfolios was therefore not as Defendants described it to investors.

53.     Indeed, even regardless of Navient's forbearance practices, the statements made from January 21, 2015—when Defendants began reporting Navient's financial results for Q4 2014 and full-year 2014—onward were false or misleading when made because by then (at the latest) Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default. Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into in-school deferment). Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers. Yet Defendants inexplicably waited until July 2015 to disclose that issue to investors and increase the Company's provision—in the meantime

---

[18] *See also* App'x at Section I.2 (including (i) Q1 2014 Form 10-Q (filed on May 9, 2014); (ii) Q2 2014 earnings call (July 17, 2014); (iii) Remondi presentation at Barclays Global Financial Services Conference (Sept. 8, 2014); (iv) Remondi presentation at Bank of America-Merrill Lynch Conference (Nov. 12, 2014); (v) Q4 & FY 2014 earnings call (Jan. 22, 2015); (vi) 2014 Form 10-K (Feb. 27, 2015); (vii) Q1 2015 earnings press release (Apr. 21, 2015); (viii) Q1 2015 earnings call (Apr. 22, 2015); and (ix) Q1 2015 Form 10-Q (Apr. 30, 2015).

repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.

### 3. False or Misleading Statements Regarding Navient's Loan Loss Provisions and Financial Results

54. During the Class Period, Defendants also touted Navient's relatively low loan loss provisions for PELs, which decreased each quarter (and for the full year) as compared with the corresponding prior year quarter (and full year). The table below tracks the loss provision for PELs, net income on a GAAP (Generally Accepted Accounting Principles) and "Core Earnings" basis, and diluted EPS on a GAAP and Core Earnings basis, as reported by Defendants each quarter of the Class Period before Q2 2015 (when Defendants announced an increase in the PEL loss provision):[19]

| Reporting Period | Loss Provision for PELs | Net Income (GAAP Basis / Core Earnings Basis) | Diluted EPS (GAAP Basis / Core Earnings Basis) |
|---|---|---|---|
| **Q1 2014** (period ending Mar. 31, 2014) | $136M, down from Q1 2013 | $284M / $227M | $0.64 / $0.51 |
| **Q2 2014** (period ending June 30, 2014) | $145M, down from Q2 2013 | $307M / $241M | $0.71 / $0.56 |
| **Q3 2014** (period ending Sept. 30, 2014) | $130M, down from Q3 2013 | $359M / $218M | $0.85 / $0.52 |

[19] Navient defines "Core Earnings" as a non-GAAP figure reflecting adjustments to GAAP financial results for certain items Navient characterizes as "either related to the Spin-Off or create significant volatility mostly due to timing factors generally beyond the control of management." *See, e.g.*, 2014 Form 10-K at 46.

22

| Reporting Period | Loss Provision for PELs | Net Income (GAAP Basis / Core Earnings Basis) | Diluted EPS (GAAP Basis / Core Earnings Basis) |
|---|---|---|---|
| **Q4 2014/FY 2014** (period ending Dec. 31, 2014) | <u>Q4</u>: $128M, down from Q4 2013<br><br><u>FY</u>: $539M, down from $722M for FY 2013 | <u>Q4</u>: $263M / $217M<br><br><u>FY</u>: $1.1B / $818M | <u>Q4</u>: $0.64 / $0.53<br><br><u>FY</u>: $2.69 / $1.93 |
| **Q1 2015** (period ending Mar. 31, 2015) | $120M, down from Q1 2014 | $292M / $194M | $0.72 / $0.48 |

55. Those figures were materially misstated. Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan loss provisions. Those artificially low provisions, in turn, caused Core Earnings for the PEL segment and net income—both of which depended to a material degree on the level of loan loss provisions—to be artificially inflated, resulting in artificially inflated EPS.

56. Navient's PEL loss provision, net income, and diluted EPS for Q4 2014 were misstated for the additional and independent reason that by then (at the latest) Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default. Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers. *See* ¶¶ 53, 61-63. Expert consulting analysis obtained by Plaintiffs already demonstrates that had the additional loan loss provisions Navient recorded in Q2 2015 been recognized in Q4 2014, the Company's reported net income attributable to Navient Corporation would have fallen 14%—from $217 million to approximately $187 million—on a Core Earnings basis, and 11%—from $263 million to approximately $233

23

million—on a GAAP basis. Further, GAAP-reported diluted earnings per common share attributable to Navient Corporation would have been reduced by $0.08 per share for Q4 2014, resulting in diluted earnings per common share of $0.56 for the quarter. On a Core Earnings basis, Navient's reported diluted earnings per common share attributable to Navient Corporation would have been reduced by $0.08 per share (from $0.53 per share), resulting in diluted earnings per common share of $0.45 for Q4 2014, significantly below analysts' consensus forecast for that quarter. The amount by which Navient's Q4 2014 financial results were overstated thus was quantitatively material.

57.     Defendants' failure to timely adjust Navient's loan loss provision to account for that significant group of struggling borrowers also violated GAAP, which required that the Company account for incurred and inherent credit losses in its allowance for loan losses and related loan loss provisions at the end of each quarter.

58.     The Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 450 concerning "Contingencies," together with ASC 310 concerning "Receivables," set forth the primary accounting guidance with respect to the recognition of allowances for loan losses that are both probable and estimable.[20]  Specifically, ASC 450 defines a "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[21]  When a loss contingency exists, the likelihood that a future event or events will occur or fail to occur, and thereby confirm the loss or impairment of

---

[20] These accounting standards were principally developed from the FASB's pre-codification accounting principles established under Statements of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS No. 5"), and SFAS No. 114, *Accounting by Creditors for Impairment of a Loan*.
[21] FASB ASC Master Glossary.

an asset or the incurrence of a liability, ranges from "probable" to "reasonably possible" to "remote." Under GAAP, (1) "probable" means the future event or events "are likely to occur"; (2) "reasonably possible" means the chance of the future event or events occurring "is more than remote but less than likely"; and (3) "remote" means the chance of the future event or events occurring "is slight."[22]

59. GAAP required that Navient account for loan losses inherent in its loan portfolio by recording a provision (a current-period expense) and corresponding allowance for loan loss if (1) information available prior to the issuance of Navient's financial statements indicated it was "probable" that the Company's loans had been impaired based on past events and conditions existing at the date of the financial statements; and (2) the amount of probable loss could be reasonably estimated.[23]

60. Even if particular uncollectible loans may not be identifiable,[24] GAAP requires that Navient account for them.[25] SEC guidance affirms this GAAP requirement.[26]

61. The risk that Navient would not collect contractual principal and interest due from its PEL borrowers involved uncertainty as to possible losses, for which the Company was required to account.

---

[22] *Id.*

[23] *See* ASC 450-20-05-03; ASC 310-10-35-8; ASC 310-10-35-18.

[24] *See* ASC 310-10-35-9.

[25] ASC 310-10-35-22 (the conditions were not intended to be so rigid that they required virtual certainty before a loss was to be accrued). GAAP further establishes accounting requirements for individual loans evaluated for impairment (as opposed to large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment). *See* ASC 310.

[26] *See* ASC 310-10-S99-4 ("An estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued when, based on information available prior to the issuance of the financial statements, it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated[.]")

62. Contrary to those principles, Navient failed to properly account for losses on more than $2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014 (*see* ¶¶ 53, 55-56). As Remondi revealed during Navient's Q2 2015 earnings call on July 22, 2015, that cohort of borrowers presented unique characteristics in that they returned to school years earlier, during the "Great Recession" (in or around *2008*), "moved in and out of school multiple times" (some without earning a degree) and exited deferment status in 2014. Remondi also disclosed that historically, those borrowers were "struggling to begin with" in making their loan payments. Further, Remondi recognized that typically, "[t]he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher" and acknowledged the subject cohort of higher-risk PEL borrowers indeed reflected that trend. *See* ¶ 87.

63. Accordingly, by no later than Q4 2014, by which time the $2.5 billion in delinquent and defaulted PELs had exited deferment, Navient should have increased its provision for PEL losses to account for the higher likelihood that those struggling borrowers would default. Navient's failure to do so constituted a violation of GAAP. The loan loss provisions Navient reported at least for Q4 2014, full-year 2014, and Q1 2015 were therefore misstated, which in turn caused the Company's net income and EPS for those periods to be misstated.

### 4.    False or Misleading SOX Certifications by Remondi and Chivavibul

64. Navient's series of undisclosed and improper practices also rendered Remondi's and Chivavibul's SOX certifications false or misleading when made.

65. In those certifications under Sections 302 and 906 of SOX, which appeared in Navient's Form 10-Qs and 10-K during the Class Period (*see* App'x at Section I.4), Remondi and Chivavibul represented that, among other things:

1)  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report";

2)  "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Navient] as of, and for, the periods presented in this report";

3)  "[Navient]'s other certifying officer [i.e., Remondi or Chivavibul] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to [Navient]'s auditors and the audit committee of [Navient]'s board of directors (or persons performing equivalent functions) . . . "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Navient]'s internal control over financial reporting"; and

4)  "The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

66.     Those certifications were false or misleading when made, in light of Navient's undisclosed forbearance practices and the resulting manipulation of Navient's financial results. *See* ¶¶ 33-63.  Further, the certifications included in Navient's 2014 Form 10-K and Q1 2015 Form 10-Q were false or misleading even regardless of those forbearance practices, as by that time it was clear to Defendants that they should increase the provision for PEL loans to reflect the demonstrably high risk of default posed by the cohort of borrowers who exited deferment in 2014 and had been, as Remondi admitted in July 2015, struggling even before they entered deferment around 2008.

**B.      Defendants Made the False or Misleading Statements Regarding Forbearances, Loan Credit Quality, and Navient's Financial Results with Scienter.**

67.     Defendants made the numerous statements recounted above knowing, or at least recklessly disregarding, that they were false or misleading when made.  The allegations set forth in ¶¶ 68-83 demonstrate Defendants' scienter, for several reasons.

### 1. The available facts demonstrate Defendants' conscious misbehavior or recklessness.

68.     *First*, the egregiousness, pervasiveness, and duration of Navient's undisclosed forbearance practices strongly indicate senior management knew of and approved those practices or could only have disregarded them by consciously turning a blind eye to them.

69.     Indeed, CW 1 and CW 2 recount a policy *directed by senior executives* that applied *throughout Navient's Collections Department*.  *See* ¶¶ 37-40.  CW 2 specified that Navient Director of Operations Christi Hewes instructed CW 2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as "current" on Navient's books.  And CW 1 recounted that the management directive to prioritize forbearances was conveyed by CW 1's supervisor and came from Navient District Manager/Senior Vice President of Default Prevention Troy Standish, who reported to Defendant John Kane.  At minimum, the actions of Hewes and Standish alone, which can be imputed to Navient, establish the Company's scienter.

70.     The Government Complaints similarly describe the pervasiveness and systematic nature of Navient's forbearance practices.  *See* ¶¶ 42-48.  That Navient put 1.5 million federal-loan borrowers into multiple forbearances is not a fact senior management could ignore.

71.     *Second*, Navient maintained incentive policies that encouraged the improper forbearance practices.  *See* ¶¶ 39, 41-44.  Senior executives clearly would have known about such widespread practices spawned by Company policies that were implemented by management.

72.     *Third*, there was nothing more critical to Navient's financial results and prospects than the prudent management of student loans.  Navient's pervasive practice of placing

borrowers into forbearance materially impacted the Company's financial results and thus went to the Company's core operations.

73.    *Fourth*, as noted above (*see* ¶¶ 52, 55) and further detailed below, misusing forbearances allowed Navient to artificially understate the levels of delinquencies, defaults, and charge-offs in its loan portfolios, as borrowers in forbearance were still considered "current" on their accounts.  Understating delinquencies, defaults, and charge-offs allowed Navient in turn to artificially understate its provisions for loan losses (particularly for PELs)—a key financial metric for the Company.  And because loan loss provisions were recorded as an expense on Navient's income statement, artificially depressing them allowed Navient to report artificially inflated net income and EPS.  That manipulation of core financial information would have required the knowledge (or reckless disregard) of Navient's senior executives.

74.    Further, Defendants' manipulation of Navient's financial results allowed the Company to meet (or come very close to) analysts' EPS estimates during the Class Period.  As the following chart—which incorporates expert consulting analysis obtained by Plaintiffs— demonstrates, had Navient not recorded decreases in its loan loss provisions for Q2 2014 and Q3 2014, it would not have met analysts' consensus estimates for EPS, or in the case of Q4 2014 and Q1 2015, would have missed them by significantly more than it did.  The strong connection between Navient's loan loss provisions and its ability to meet market expectations indicates Defendants' manipulation of loan loss provisions and related financial results was purposeful.

| Reporting Period | Analyst Consensus EPS Estimate | Reported Diluted EPS | Diluted EPS without Quarterly Decrease in Loan Loss Provisions |
|:---:|:---:|:---:|:---:|
| **Q2 2014** | $0.54 | $0.56 | $0.49 |

| | | | |
|---|---|---|---|
| **Q3 2014** | $0.51 | $0.52 | $0.44 |
| **Q4 2014** | $0.54 | $0.53 | $0.46 |
| **Q1 2015** | $0.50 | $0.48 | $0.41 |

75.     *Fifth*, as noted above, Remondi admitted during Navient's July 22, 2015 earnings call that the cohort of borrowers whose difficulties in repaying their loans caused Navient to increase its loan loss provision by 31.7% had previously "demonstrated difficulty in making payments," indicating "they were struggling to begin with."  *See* ¶ 87.  Remondi thus confirmed that Navient was aware long before Q2 2015 that those borrowers, who represented $2.5 billion in loans, were experiencing repeated difficulties paying back their loans.  Yet Defendants failed to timely apprise investors of that serious situation, instead continuing to report—and vociferously tout—low loan loss provisions.

76.     Remondi's acknowledgment is consistent with information provided by a former Navient Collections Support Manager who worked in that position from spring 2010 until February 2015 ("CW 4").  CW 4 recounted that Navient Collections Department directors, including collection directors of Navient subsidiaries Pioneer and GRC, participated in weekly, monthly, and quarterly telephonic status meetings with upper management, including Remondi and Chivavibul.  CW 4 stated John Kane also attended those meetings, which were led by Jeff Mersmann.

77.     CW 4 explained that before each meeting, CW 4 e-mailed "very in-depth" reports to Mersmann showing (1) delinquency rates, (2) revenue, (3) borrowers participating in a loan-rehabilitation program, (4) any borrowers who fell out of compliance with rehabilitation requirements due to missing a loan payment, (5) the number of borrowers who had consolidated

loans, and (6) the number of borrowers who attempted to consolidate their loans but were unable to do so. CW 4 further recounted that the numbers in the quarterly reports were compared with the numbers for the same quarter of the previous year, and that the reports collectively provided Company-wide information.[27] CW 4 stated that after the reports were provided to Mersmann, Mersmann presented the numbers to Kane.

78. CW 4's account is also consistent with Navient's statement to investors that management "focuse[d] on delinquencies as well as the progression of loans from early to late stage delinquency."[28]

79. The above facts afford a strong inference that Remondi and Chivavibul knew of or recklessly disregarded the serious issues plaguing the large cohort of borrowers (representing $2.5 billion in loans) about which Defendants did not inform investors until July 2015.

**2. Defendants also had the motive and opportunity to conceal the significant risk of default posed by the cohort of borrowers exiting deferment in 2014, as well as Navient's pervasive and systemic practice of placing borrowers into forbearance.**

80. Defendants also had significant motivations for concealing the significant problems plaguing the cohort of borrowers who exited deferment in 2014, as well as the rampant and indiscriminate use of forbearances at the Company.

81. Given the uncertainties that Navient would achieve success as a standalone entity no longer under the Salle Mae umbrella as of April 2014, Defendants had a motive to conceal the improper forbearance practices, as well as the ongoing impact of those practices on Navient's financial results.

---

[27] CW 4 explained that the reports were generated through several programs or systems: (i) Excel, both automatically and through employee input; (ii) Clearview (personalized reports); and (iii) Sharepoint.

[28] April 2014 Information Statement at 64.

82.     Defendants were particularly motivated to conceal the negative trends in the cohort of borrowers ultimately addressed in Navient's July 2015 disclosures—i.e., those Remondi acknowledged on July 22, 2015 "had been struggling to begin with"—rather than account for those trends in determining the Company's Q4 2014 financial results (at the latest). The same day Navient filed its 2014 Form 10-K, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program.  Further, before the market opened on the next trading day, March 2, 2015, *Inside Higher Ed* reported that the DOE's action was part of a "crackdown" on Navient.  *See* ¶ 126.[29]  Defendants accordingly had a strong motive not to disclose the striking information regarding the $2.5 billion worth of loans that they knew were experiencing major difficulties, so as not to compound the impact on the Company of the negative news regarding Pioneer (which itself caused the prices of Navient securities to drop).

83.     As senior executives of Navient, Remondi and Chivavibul plainly had the opportunity to defraud investors.

**C.     Defendants' Misrepresentations Regarding Forbearances, Loan Credit Quality, and Navient's Related Financial Results Caused Losses to Investors.**

84.     Defendants' July 2015 disclosures regarding the increase in the provision for loan losses for Q2 2015, as well as the CFPB Report published on September 29, 2015, revealed, at least in part, the reality Defendants had been concealing from investors.

---

[29] *See* Michael Stratford, *Feds Fire 5 Debt Collectors*, Inside Higher Ed. (Mar. 2, 2015) https://www.insidehighered.com/news/2015/03/02/us-ends-contract-5-debt-collectors-citing-misrepresentations-borrowers.

85.     As discussed above, the price of Navient shares dropped significantly following

the Company's disclosure on July 13, 2015 that it was increasing the provision for PEL losses by

31.7%, or $46 million, due to repayment issues among a cohort of borrowers who had exited in-

school deferment in 2014.  *See* ¶ 9.  Specifically, the price of Navient common stock fell $1.94

per share, or 10.6%, from its closing price of $18.36 on July 13, 2015 to close at $16.42 on July

14, 2015, on extraordinary trading volume of more than 8.5 million shares.  During the same

period, Navient 5.875% Senior Notes due 2021 declined 1.75%, Navient 5.875% Senior Notes

due 2024 declined 2.41%, and Navient 5% Senior Notes declined 2.33%.

86.     After the market closed on July 21, 2015, Navient issued a press release

announcing its financial results for Q2 2015, in line with its earlier guidance.  Navient reported

GAAP net income of $182 million ($0.47 diluted earnings per share) in Q2 2015, compared with

$307 million ($0.71 diluted earnings per share) for the same quarter the previous year, as well as

Core Earnings for the quarter of $154 million ($0.40 diluted earnings per share), compared with

$241 million ($0.56 diluted earnings per share) for the same quarter the previous year.  Navient

also reported disappointing performance of its PEL portfolio, noting Core Earnings were $22

million for the quarter, compared with $86 million in the same quarter the previous year.

Navient attributed the disappointing earnings in significant part to the 31.7% increase in its

provision for PEL losses in Q2 2015.

87.     As noted earlier, during a related earnings call the next day (July 22, 2015),

Defendants revealed additional, highly significant information regarding the increase in

Navient's increased loan loss provision.  Remondi first quantified the total amount of troubled

loans that exited deferment since 2014, leading to the increased provision:  "It's the $2.5 billion

that exited in 2014, $1.7 billion that will exit in 2015, and we expect that number . . . for 2016

exits to be under $1 billion."  Further, in responding to an analyst's question as to what made the cohort that exited deferment in 2014 "different from 2012 and 2013," Remondi revealed that Navient "had a higher percentage of these borrowers who had demonstrated difficulty in making payments when they were in repayment prior to returning to school than in prior cohorts," adding, "[s]o that gives you an example of an indication that they were struggling to begin with." Remondi further disclosed that a portion of borrowers in that cohort had entered and exited deferment multiple times and did not complete their degrees, which he acknowledged generally results in a higher incidence of delinquency and default.  Following that news, the price of Navient common stock fell 2.2% from its closing price of $16.60 on July 21, 2015 to close at $16.23 on July 23, 2015.  During the same period, Navient 5.875% Senior Notes due 2024 declined 3.51% and Navient 5% Senior Notes declined 1.64%.

88.     Navient's July 2015 disclosures that a cohort of borrowers representing $2.5 billion in loans had been struggling so mightily, and for an extended period of time, revealed to the market that Defendants' prior representations regarding the credit quality of loans in Navient's PEL portfolio was far weaker than Defendants had represented to investors. Accordingly, as discussed in ¶¶ 53, 56, 63 above, Navient should have increased its loan loss reserves no later than Q4 2014 to account for the significantly heightened risk of loss those borrowers entailed.

89.     Further, while the July 2015 disclosures did not explicitly mention forbearances, on information and belief—given the information provided by the CFPB, the attorneys general of three states, and former Navient employees—Navient placed a substantial number of those borrowers into forbearance after they exited deferment in 2014.  Indeed, placing those borrowers into forbearance helped allow Navient to conceal from investors the heightened risk of default

posed by those borrowers, as by doing so the Company avoided classifying them as delinquent or in default. Accordingly, the July 2015 disclosures revealed information about Navient's undisclosed forbearance practices, and the true level of risk to which the Company's loan portfolio was exposed, that the market did not previously know.

90.     Additional information regarding Navient's forbearance practices was revealed through the CFPB Report issued on September 29, 2015. The Report referenced comments from individual student loan borrowers and organizations representing public service workers indicating that servicers of both private and federal student loans did not inform borrowers experiencing financial hardship about available alternative repayment plans, but instead *advised borrowers to postpone payments through forbearance* or deferment or instruct borrowers that the only available option was to pay the full amount due. The facts detailed in the CFPB Report plainly applied to (among others) Navient, one of the country's largest loan servicers.

91.     Following the CFPB Report's release, the price of Navient's common stock fell 4.4% from its closing price of $12.16 on September 28, 2015 to close at $11.63 on September 29, 2015, on extraordinary trading volume of more than 8.5 million shares. Navient's stock price continued to fall over the next two trading days, on unusually heavy trading volume, closing at $10.96 per share on October 1, 2015. Around the same period, Navient's 5% Senior Notes declined 6.35%, from its close of 90.50 on September 28, 2015 to close at 84.75 on September 29, 2015. The 5% Senior Notes continued to decline over the next trading sessions for a total decline of 11.6%, from its close of 90.50 on September 28, 2015 to close at 80.00 on October 2, 2015. And Navient's 5.875% Senior Notes due 2021 fell 2.75% from their close of 86.25 on September 29, 2015 to close at 83.875 on September 30, 2015. Navient's 5.875% Senior Notes

due 2021 continued to fall over the next trading days for a total decline of 11.9% from their close

of 86.25 on September 29, 2015 to close at 75.958 on October 2, 2015.

## V. DEFENDANTS DEFRAUDED INVESTORS BY MISREPRESENTING NAVIENT'S COMPLIANCE WITH LEGAL AND REGULATORY REQUIREMENTS

### A. Defendants Made False or Misleading Statements Regarding Compliance to Investors.

92.     Navient operates in a heavily regulated industry, rendering compliance with

applicable laws and regulations critical to the Company's business.  Navient was subject to, *inter*

*alia*, the SCRA, CFPA, FDCRA, and other federal and state consumer protection and privacy

laws.

93.     In public statements to investors, Defendants emphasized Navient's "robust

compliance driven culture driven by a 'customer first' approach," its "demonstrated compliance

infrastructure," and "operational and technical expertise and capacity to adapt to [a] new

regulatory environment," and represented that the Company "demonstrated FFELP compliance

and preserved federal loan guarantee."  *E.g.*, Apr. 17, 2014 Form 8-K.  Defendants reiterated

those sentiments repeatedly throughout the Class Period, including emphasizing (in the 2014

Form 10-K) Navient's "rigorous training programs, internal and external auditing, escalated

service tracking and analysis, and customer research to enhance [its] compliance and customer

service."[30]  Defendants' representations included John Kane's statements on Navient's behalf at

the Credit Suisse Forum on February 11, 2015, emphasizing the "very, very strong compliance

culture at Navient across the entire Company, across all levels of management," and adding: "So

we take that very seriously.  We keep our thumb obviously on the changing compliance

---

[30] *See also* App'x at Section II (including (i) Remondi presentation at November 2014 BofA-Merrill Lynch Conference); (ii) Q1 2015 Form 10-Q (Apr. 30, 2015)).

landscape and we look to make updates to our processes, procedures and work activities to comply."

94. Defendants also specifically addressed Navient's purported efforts to inform borrowers about IDR plans: "We have been a partner in [the DOE]'s campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice."[31]

95. The statements referenced in ¶¶ 93-94 were false or misleading when made, in light of the rampant unfair and deceptive practices at Navient detailed below.

### 1. Navient provided inadequate notice to borrowers regarding annual recertifications for IDR plans.

96. Navient engaged in a pervasive practice of providing inadequate notice to borrowers regarding annual recertifications of their IDR plans, in violation of federal and state law.

97. A federal student loan borrower enrolled in an IDR plan is required to recertify his income and family size each year to qualify for an affordable payment and remain on the plan. The CFPB reports in its complaint that between mid-2010 and at least March 2015, Navient provided inadequate notice to federal student loan borrowers who consented to receive electronic communications of an electronic renewal notice (more than 75% consented).[32] During that period, Navient merely sent those borrowers an email with a hyperlink to the Company's website, which required borrowers to log in with their user ID and password to view the renewal notice.[33] Navient's email, however, did not indicate in its subject line or in its contents the

---

[31] 2014 Form 10-K at 4.
[32] CFPB Compl. ¶¶ 66-67.
[33] *Id.* ¶ 68.

purpose of the notice, and therefore many borrowers disregarded or did not view the email.[34]  As

a result, between July 2011 and at least March 2015, more than 60% of borrowers did not timely

renew enrollment in their IDR plan; Defendants were aware of that fact, because Navient tracked

the number of borrowers who click on the hyperlink in the emails.[35]

98.      Failing to complete the IDR plan recertification process had financially dire

consequences for a borrower, including an increase in payment amount and the addition of any

accrued, unpaid interest to the principal balance of the loan.

99.      The CFPB and State AGs assert that as a result of those practices, Navient

violated the CFPA and state consumer protection laws.  The rampant misconduct at Navient

contradicted Defendants' statements to investors about the Company's diligence in complying

with governing laws and regulations—including that Navient had a "robust compliance driven

culture driven by a 'customer first' approach," a "demonstrated compliance infrastructure," and

"operational and technical expertise and capacity to adapt to [a] new regulatory environment,"

and that it "demonstrated FFELP compliance and preserved federal loan guarantee."  Those

statements accordingly were false or misleading when made.

> **2.  Navient misadvised borrowers regarding the prerequisites to allowing them to release their cosigners from responsibility for the loan payments.**

100.      Throughout the Class Period, Navient encouraged borrowers to enlist persons to

cosign their loans in order to qualify for Navient's private loans and to receive lower interest

rates.  Navient also touted the availability of a so-called "cosigner release," which enticed

parents, grandparents, friends, and other persons to become cosigners, with the understanding

that they could be released from their obligation if certain prerequisites were satisfied.  But

---

[34] *Id.* ¶¶ 68-71.

[35] *Id.* ¶¶ 72-74.

Navient set up undisclosed hurdles that made obtaining a cosigner release very difficult, in violation of federal and state law.

101. The CFPB reports in its complaint that until at least mid-2015 Navient treated the lack of payment by a borrower in response to a $0 bill as a result of a previous month's overpayment as a failure to make a "consecutive, on-time principal and interest payment" that month, which Navient required for the borrower to be eligible to apply to release her cosigner from liability on the loan.[36] Navient then reset the borrower's progress toward the "consecutive, on-time principal and interest payments" requirement to zero months.[37] By doing so, Navient unfairly delayed cosigner release for borrowers who had already made progress towards satisfying Navient's published eligibility requirements. As the Illinois AG summarizes those practices in its complaint, "Navient uses deceptive and misleading information about what borrowers must do to obtain cosigner release," thereby "leaving borrowers in the dark" on how to get such relief for persons who were enticed by Navient to cosign loans.[38]

102. The CFPB and State AGs assert that as a result of those practices, Navient violated the CFPA and state consumer protection laws. Those improper practices rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

### 3. Navient misrepresented the amounts delinquent borrowers needed to pay to become current on their loans.

103. Throughout the Class Period, Navient employees regularly represented during collection calls to delinquent borrowers and cosigners that to bring their accounts current they

---

[36] CFPB Compl. ¶ 90. Since January 21, 2014, Navient has required that the borrower make 12 consecutive payments; the Company previously required borrowers to make between 12 and 48 consecutive payments. *Id.* ¶ 86.

[37] *Id.* ¶ 90.

[38] Ill. Compl. ¶ 404.

would need to pay the "present amount due," i.e., the past-due amount plus the current amount due. Navient thus improperly and misleadingly sought to collect from borrowers a higher amount than necessary to bring the borrower's account current, in violation at least of state law.

104. The Washington AG reports in its complaint, based on "recorded phone calls between Defendants [i.e., Navient, Navient Solutions, Pioneer, and GRC] and borrowers," that "Defendants follow the training manuals and request the Present Amount Due from past due borrowers instead of asking for the amount that would bring them current."[39] Further, "[u]ntil borrowers catch on to the fact that the amount Defendants are seeking is more than the amount they are delinquent, Defendants do not attempt to explain that the Present Amount Due captures the next month's payment and may not be due immediately on the day of the call."[40] The Washington AG further states that borrowers who paid the "Present Amount Due" were not aware it was possible to pay a lesser amount to become current on their account.[41]

105. The State AGs assert that as a result of those practices, Navient violated state consumer protection laws. Those improper practices rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

### 4. Navient repeatedly made payment processing errors and lacked adequate systems to address and prevent their recurrence.

106. Throughout the Class Period, Navient repeatedly misallocated or misapplied loan payments primarily made by borrowers and cosigners who paid by mailing a check or through an external bill payment system, in violation of federal and state law.

---

[39] Wash. Compl. ¶ 5.191.

[40] *Id.*

[41] *Id.* ¶ 5.193.

107. The CFPB reports in its complaint that those processing errors included misallocating payments intended or designated for a specific loan(s) among some or all of a borrower's other loans, misallocating lump-sum payments to all loans in a borrower's account instead of a specific loan as intended to pay it off, disregarding borrower or cosigner instructions on how to divide payments among loans, or incorrectly allocating payments made by cosigners to loans they did not cosign.[42]

108. The CFPB further reports that those errors resulted in part from Navient's failure to implement adequate processes and procedures to sufficiently address a wide range of payment processing errors and to prevent them from recurring.[43]  Navient's errors in processing payments received from borrowers and cosigners, the CFPB observes, "have resulted in borrowers and cosigners incurring improper late fees, increased interest charges, the furnishing of inaccurate negative information to consumer reporting agencies, and the loss of certain benefits."[44]

109. The CFPB and State AGs assert that as a result of those practices, Navient violated the CFPA and state consumer protection laws.  Those improper practices rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

> **5.** **Navient mishandled the accounts of military borrowers, even after the Company paid $60 million to the DOJ for that very misconduct.**

110. Navient also charged unlawfully high interest rates to student borrowers who had served in the military, even after reaching a settlement to resolve allegations by the DOJ regarding that practice.

---

[42] CFPB Compl. ¶ 101.

[43] *Id.* ¶¶ 98, 103-12.

[44] *Id.* ¶ 108.

111.     Specifically, on May 13, 2014, the DOJ announced a $60 million settlement—the result of a joint effort with the FDIC, DOE, and CFPB—of allegations that Navient Solutions, SLM DE Corporation (n/k/a Navient DE Corporation), and Sallie Mae Bank charged military servicemembers excessive rates on student loans, in violation of the SCRA.  The government's complaint asserted that defendants "engaged in a nationwide pattern or practice, dating as far back as 2005, of violating the SCRA by failing to provide members of the military the six percent interest rate cap to which they were entitled."[45]  The complaint further asserted that Sallie Mae Inc. and SLM DE Corporation "also violated the SCRA by improperly obtaining default judgments against servicemembers."[46]  The DOJ estimated about 60,000 servicemembers would receive compensation under the settlement.

112.     CW 4 recounted, however, that Navient's systemic mishandling of loans of active servicemembers continued *well after* the DOJ settlement.  According to CW 4, "[t]here were no processes in place to properly handle the military borrower accounts."  CW 4 noted that "when you were told that a borrower is in the active military, they are deployed or something like that, at that point the borrower should be noted" but that "there was nothing in the system to follow such protocol."  Rather, CW 4 explained, "all of the collectors were directed to try to get authorization to speak to somebody else to collect on the debt still as regular," such as having a spouse make payments, instead of actually handling the account in accordance with regulations.

113.     CW 4 recalled that Navient's mishandling of military borrowers' loans came to a head years later, *in or around September 2014*, because Navient had received complaints about its servicing of such accounts.  CW 4's boss at the time, a Senior Collections Support Manager

---

[45] *See* https://www.justice.gov/opa/pr/justice-department-reaches-60-million-settlement-sallie-mae-resolve-allegations-charging.
[46] *Id.*

for GRC and Pioneer, met with CW 4 and the Collections Support Manager for Pioneer and in September 2014 they worked on a "back office project setting up a process where Navient borrowers were actually scanned to see if they were active military." CW 4 indicated that a third party agency was hired to assist in setting up the process and that Navient paid for and checked a certain website for active military members. According to CW 4, "the practice was just getting started." CW 4 recalled one account with Texas Guaranty involving an active military borrower who had a "cease and desist for collection," yet, "every single month, I would redeem the account again and the interest rate would be right back up to I believe it was 12.5 percent. . . The system just wasn't set to deal with it, so every month I was fighting with our IT department on this borrower[.]" CW 4 indicated that Navient had not completely resolved the problems in managing active military accounts by the time CW 4 departed Navient *in February 2015*, long after the Company had settled with the DOJ.

114.    CW 1 also recounted that Navient did not apply deferments and forbearances to the accounts of military borrowers on time.

115.    Accordingly, Navient *continued to violate the SCRA* well after its settlement with the DOJ in or around May 2014 for that very misconduct. Those legal violations rendered Defendants' statements to investors about the Company's diligence in complying with governing laws and regulations false or misleading when made.

### 6.    Pioneer and GRC deceived borrowers regarding the federal loan rehabilitation program.

116.    From 2009 until 2014, Navient's wholly owned subsidiaries Pioneer and GRC made material misrepresentations to borrowers about the federal loan rehabilitation program, in violation of federal and state law. Specifically, they disregarded instructions issued by the DOE mandating that debt collectors such as Pioneer must not state or imply to borrowers who

complete rehabilitation (after having defaulted on their loans) that default information reported

by the original lender will be removed from the borrower's credit report after rehabilitation.

117.    The DOE instructs that adverse information reported by the original lender will

not be expunged or excluded from credit reports before the seven-year period that runs from the

lender's report of that default, even if the loan is rehabilitated.  The CFPB reports that

nonetheless, in calls with borrowers from at least January 2012 through December 2014, Pioneer

collectors systematically stated or implied to borrowers that *all* negative information—including

pre-default delinquencies—would be removed from the borrowers' credit reports after

rehabilitation.[47]  As the Washington AG reports in its complaint, those deceptive representations

were reflected in scripts that Pioneer representatives used between at least 2012 and 2014.[48]  The

CFPB also reports that customer service representatives' statements to borrowers regarding the

removal of information from their credit reports were consistent with Pioneer's training guides,

which included the following talking points:

> You have qualified for a rehabilitation program.  What you will
> need to do is make a minimum of 9 qualifying monthly payments.
> After all payments are made, a new lender will pay off the
> Department of Education for you.  You will then in turn owe the
> new lender, which means you will no longer be in Federal Default.
> All of the collection fees will be removed at the time of the sale.
> Also it will be completely deleted from your credit report as
> though it never happened."[49]

118.    Pioneer collectors also routinely misrepresented in calls with borrowers that all

collection fees assessed by the DOE on defaulted loans (approximately 25% of principal amount

due) would be forgiven, when in fact *20% of each rehabilitation payment made by a borrower*

*goes towards satisfying collection fees*.  Specifically, after a borrower makes her ninth

---

[47] CFPB Compl. ¶¶ 126-33.
[48] Wash. Compl. ¶ 5.207.
[49] CFPB Compl. ¶ 124.

rehabilitation payment, collection fees assessed to her account are waived by the DOE.
Accordingly, by the time borrowers complete the rehabilitation program, they have paid down a
significant portion of their collection fees, and the amount of fees to be forgiven is significantly
less than Pioneer initially misrepresented would be forgiven.

119.     The CFPB and State AGs assert that as a result of those practices, Navient
violated the FDCPA and state consumer protection laws.  Those legal violations rendered
Defendants' statements to investors about the Company's diligence in complying with governing
laws and regulations false or misleading when made.

**B.     Defendants Made the False or Misleading Statements Regarding Compliance with Scienter.**

120.     Defendants knew or recklessly disregarded that their representations concerning
Navient's legal compliance were false or misleading when made.  Given the pervasiveness of
improper loan-servicing activities at Navient, it is inconceivable that the Company's senior
executives, including Remondi, Chivavibul, and Kane, were unaware of them.  Particularly so
given that, as with forbearances and related issues, legal compliance was at the core of Navient's
operations.  Indeed, it was necessary to the Company's very survival, given the particular
significance of legal compliance to a heavily regulated entity like Navient.

121.     Additionally, as detailed in the Government Complaints, these improper loan-
servicing practices were not the sporadic actions of rogue employees, but rather highly
systematized, including through the use of scripts.  *See* ¶¶ 42-47, 97, 101, 104, 117-18.  Such a
streamlined process for dealing with borrowers could not have been implemented without the
knowledge and approval of senior management.

122.     Further, there was significant overlap among executives at Navient, Navient
Solutions, Pioneer, and GRC.  Since 2014, (1) Remondi, Chivavibul, and Kane have served,

respectively, as CEO, CFO, and COO of both Navient and Navient Solutions; (2) Timothy

Hynes has served as Chief Risk Officer of both entities; and (3) Stephen O'Connell has served as

Senior Vice President and Treasurer of both entities.  Additionally, Jack Frazier, the current

Director and former President of Pioneer, also serves as Senior Vice President of Navient; and

Jeff Mersmann, the current President of Pioneer, also serves as Navient's Vice President of

Operations.  It is therefore apparent that Remondi, Chivavibul, and Kane knew about the

misconduct occurring at Navient Solutions, Pioneer, and GRC, or that they were reckless in

disregarding it.

123.     That is particularly true in light of CW 4's statement that Navient Collections

Department directors, including collection directors of Navient subsidiaries Pioneer and GRC,

participated in regular telephonic status meetings with upper management, including Remondi,

Chivavibul, and Kane, which were led by Jeff Mersmann.  *See* ¶¶ 76-77.  Accordingly, if

widespread misconduct was occurring at Navient—and it was—Navient's senior executives

knew about it.

124.     Further, the same motivations that compelled Defendants to misrepresent the

credit quality of Navient's loans, as well as its forbearance practices, loan loss provisions, and

related financial results, drove them to conceal Navient's improper loan-servicing and debt-

collection practices.  *See* ¶¶ 80-82.  Defendants, in short, were under significant pressure to

establish Navient as a sustainable entity independent of Sallie Mae, which motivated them to

conceal from investors the truth about the misconduct pervading the Company.  Defendants'

motivation was particularly acute given that they were forced to disclose in May 2014—just as

Navient had become an independent entity—the DOJ settlement regarding SCRA violations;

Defendants did not want to allow more negative attention on the Company.

## C.    Defendants' Misrepresentations Regarding Legal Compliance Caused Investors Losses.

125.    Navient's rampant misconduct in servicing student loans ultimately was revealed to the market through a series of partial disclosures beginning in February 2015. Defendants nonetheless continued to misstate or omit material facts, causing the price of Navient securities to be artificially inflated for the remainder of the Class Period.

126.    On February 27, 2015, the same day Navient filed its 2014 Form 10-K, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program,[50] i.e., the very misconduct detailed in ¶¶ 82, 117-18 above. This disclosure was followed the next day by revelations regarding the financial impact the DOE's action would have on Navient. *Inside Higher Ed*'s March 2, 2015 article, which referred to a "crackdown" on Navient, noted the Company "said that it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013"—i.e., approximately $127 million for just two years—and that Representative Chris Collins, who represents the upstate New York district where Pioneer operates, "told The Buffalo News that the decision to end the contract would lead to the loss of about 400 jobs at the company."[51]

127.    The disclosures on February 27 and March 2, 2015 revealed to investors that Defendants' prior representations concerning Navient's legal compliance were a far cry from the reality at the Company. Accordingly, following those disclosures, the price of Navient securities fell sharply. The price of Navient stock declined 8.8% from its close of $21.40 on February 27,

---

[50] *See* https://www.ed.gov/news/press-releases/us-department-education-end-contracts-several-private-collection-agencies.

[51] Stratford, *supra*.

2015 to close at $19.51 on March 2, 2015 (the next trading day), on unusually heavy trading volume of more than 10 million shares. During the same period, Navient 5.875% Senior Notes due 2024 declined 2%, and Navient 5% Senior Notes declined 2%.

128. Despite those partial disclosures, Defendants denied any wrongdoing and continued to mislead the market regarding Navient's purported compliance with applicable laws. During Navient's Q1 2015 earnings call on April 22, 2015, for example, Remondi at least misleadingly stated the DOE "simply decided not to extend [Pioneer's] contract" and did not "terminate" it, adding, "[w]e know that when we look at our own work here and when we look at the reviews that the Department of Ed conducted over the past year and a half, we don't see similar kinds of issues or findings."

129. On April 24, 2015, *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by authorities in Massachusetts "over allegations the company mistreated distressed borrowers."[52] On that news, the price of Navient stock fell 2.1% from its close of $20.28 on April 24 to close at $19.85 on the next trading day, April 27, 2015.

130. On July 7, 2015, the CFPB published a report on its website titled "Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform."[53] The CFPB disclosed that it had continued to receive complaints about student loan servicing from servicemembers after the 2014 settlement between federal regulators and Navient and Sallie

---

[52] *See* Shahien Nasiripour, Student Loan Giant Navient Bemoans Cost Of Mounting Government Probes, *The Huffington Post* (April 24, 2015), https://www.huffingtonpost.com/2015/04/24/navient-government-investigations_n_7131914.html.

[53] Hollister Petraeus and Seth Frotman, *Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform*, CFPB website, July 2015, *available at* http://files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

Mae.  Specifically, the CFPB indicated that since it published a report in October 2012 on complaints it had received from military borrowers about student loan servicers and shared those complaints with the DOJ and other federal regulators (which subsequently resulted in the $60 million settlement with Navient and Sallie Mae), "the Bureau has received more than 1,300 complaints from military borrowers related to the servicing or collection of student loans."

131.  The CFPB's report is consistent with CW 4's account that Navient's improper handling of servicemembers' accounts continued well after the May 2014 DOJ settlement.  *See* ¶¶ 112-15.  The report further revealed to investors that Navient's representations regarding legal compliance were false or misleading when made.  Following the announcement of the report, the price of Navient stock fell 2.1%, from $18.97 to $18.57 per share.

132.  After the market closed on August 24, 2015, Navient disclosed in an SEC Form 8-K that on August 19, 2015 Navient Solutions received a letter from the CFPB stating the Bureau's Office of Enforcement was considering taking legal action against Navient Solutions regarding its disclosures and assessment of late fees.  Navient nonetheless represented that Navient Solutions "continues to believe that its acts and practices relating to student loans are lawful and meet industry standards and, where applicable, the statutory or contractual requirements of [Navient Solutions]'s other regulators."  Navient's partial (though still misleadingly incomplete) disclosure of potential regulatory action regarding some of the very practices detailed in this Complaint (*see* ¶¶ 10-12, 93, 117-18, 125-28) further alerted investors to the truth regarding the raft of improper loan-servicing practices at the Company, in stark contrast to Defendants' representations regarding legal compliance.  Accordingly, the price of Navient common stock fell 7.8%, from its closing price of $13.06 on August 24, 2015 to close at

$12.04 per share on August 25, 2015, on unusually heavy trading volume of more than nine million shares.

133.    The truth regarding Navient's legal compliance was further revealed through the CFPB Report issued on September 29, 2015. In addition to shedding light on Navient's widespread use of forbearances (*see* ¶¶ 36-49), the Report recounted:

    1)    Comments from individual student loan borrowers described how they encountered servicing problems or practices that discouraged utilization of alternative repayment plans, including income-driven repayment plans. A number of comments described how some borrowers may end up in default when they are unable to obtain an alternative repayment plan. Comments also described how some servicing practices subsequently can result in payment shock, lost benefits, and increased interest charges for borrowers enrolled in these plans.

    2)    Commenters detailed problems related to customer service, including issues for borrowers seeking to resolve servicing errors. Commenters described how those problems create barriers for borrowers experiencing financial hardship who are seeking to avoid default, and may cause significant credit reporting harm.

    3)    Commenters described how payment processing and servicing-transfer practices create problems for borrowers trying to repay student debt. Public comments from individual borrowers described how those practices cause payment processing problems, increase interest charges and late fees, prolong repayment, and create confusion for student loan borrowers.[54]

134.    The CFPB Report further disclosed that "[s]ervicemembers consistently report difficulties obtaining the SCRA interest rate cap of six percent," specifically, "that servicers continue to improperly process these requests and do not clearly convey information about the application process and other requirements." The CFPB also reported "[s]ervicemembers state that they were guided into military deferments or forbearance and were not told that their total

---

[54] *See* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

loan debt would balloon at the end of their military service due to accrued interest." Indeed, the CFPB recounted, "[s]ervicemembers also note that the servicers guide them into forbearance or deferment, *even when the borrower is actively seeking information and assistance concerning other forms of repayment*."

135. The very practices reported by the CFPB are discussed in ¶¶ 36-49, 96-118 above, and Defendants previously failed to disclose them to investors. The prices of Navient stock and notes declined significantly in response to the information revealed through the CFPB Report. *See* ¶¶ 90-91.[55]

## VI. DEFENDANTS DEFRAUDED INVESTORS BY CONCEALING VITAL FACTS REGARDING NAVIENT'S ABILITY TO FUND ITS OPERATIONS

### A. Defendants Made False or Misleading Statements to Investors Regarding Navient's Liquidity and Financing Arrangements.

136. Navient needed ready access to liquidity to fund its operations, including its purchases of student loans. More specifically, as stated in Navient's 2014 Form 10-K, it "requires liquidity to meet cash requirements such as day-to-day operating expenses, required payments of principal and interest on borrowings, and distributions to stockholders." The Company relied in material part on credit facilities, including those maintained with FHLB-DM, which provided billions of dollars in borrowing capability. The FHLB-DM credit facilities were highly important to Navient, as those facilities—which were meant to afford "members" of FHLBs access to low-cost credit—offered terms far more favorable than the Company got from

---

[55] The CFPB Report's findings were further bolstered by the Annual Report of the CFPB Student Loan Ombudsman for 2015, released on October 14, 2015. The report analyzed approximately 6,400 private student loan complaints submitted to the CFPB between October 1, 2014 and September 30, 2015, an increase of 23% compared to 2014. Complaints concerning Navient accounted for 1,724, or approximately 26%, of the total complaints submitted. According to the report, private student loan borrowers complained of servicing problems, "including lack of access to timely and accurate information on availability or eligibility criteria to enroll in alternative repayment programs."

other sources.  *See* ¶¶ 13, 137.  In the first six months of 2013, for example, Sallie Mae enjoyed a 0.28% interest rate when borrowing from FHLB-DM, making it the company's lowest-cost source of funds outside of debt tied to derivatives, and from 2010 to 2012 FHLB-DM lent Sallie Mae money at rates that on average were at most 0.35%.[56]  Sallie Mae and Navient thus were able to borrow billions of dollars at extremely low rates from FHLB-DM.

137.    The FHLB-DM credit facilities were particularly important to Navient given that Navient's cost of borrowing, which reflected the financial markets' confidence in the Company's ability to pay its bills, for short periods of time had more than tripled since 2014.[57]

138.    Navient's SEC filings consistently discussed the amounts of capacity available under its credit facilities.  *E.g.*, Q1 2014 Form 10-Q (May 9, 2014) ("As of March 31, 2014 and December 31, 2013, the maximum additional capacity under these facilities was $12.7 billion and $10.6 billion, respectively.  For the three months ended March 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.3 billion and $10.8 billion, respectively.").[58]  Additionally, Navient stated in its 2014 Form 10-K:

> We have various secured borrowing facilities that we use to finance our FFELP Loans.  Liquidity is available under these secured credit facilities to the extent we have eligible collateral and available capacity.  The maximum borrowing capacity under these facilities will vary and is subject to each agreement's borrowing conditions.  These include but are not limited to the facility's size, current usage and the availability and fair value of qualifying unencumbered FFELP Loan collateral. . . . The facilities are subject to termination under certain circumstances.

---

[56] *See* Shahien Nasiripour, *How Elizabeth Warren Beat a Student Loan Giant*, The Huffington Post, Dec. 31, 2015, *available at* http://www.huffingtonpost.com/entry/elizabeth-warren-student-loan-giant_us_568412fbe4b06fa68881b03f.

[57] *See id.*

[58] *See also* App'x at Section III.

139.    Those statements were false or misleading when made because, despite reporting the available capacity on the facilities and acknowledging they were "subject to termination under certain circumstances," Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate the facilities in light of a rule proposed by the FHFA in September 2014 (which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities from gaining membership with a FHLB—and thus access credit on extraordinarily favorable terms—through the use of a captive insurer.  Defendants accordingly misled investors regarding the risk that Navient's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance.

140.    Further, Defendants' failure to apprise investors of that serious risk to the Company's business violated SEC rules mandating such disclosure.

141.    SEC Regulation S-X, Rule 5-02-22, concerning "Bonds, Mortgages, and Other Long Term Debt, Including Capitalized Leases," required that Navient disclose certain information regarding its long-term debt, including "[t]he amount and terms (including commitment fees and *the conditions under which commitments may be withdrawn*) of unused commitments for long-term financing arrangements that would be disclosed under this rule if used shall be disclosed in the notes to the financial statements if significant."

142.    Additionally, SEC Regulation S-K, Rule 303, pertaining to "Management's Discussion and Analysis of Financial Condition and Results of Operations," required that Navient (1) "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the [Company]'s liquidity increasing or decreasing in any material way"; and (2) "[i]f a material deficiency is identified, indicate the course of action that the [Company] has taken or proposes to take to remedy the

deficiency"; and (3) "[d]escribe any known material trends, favorable or unfavorable, in the [Company]'s capital resources," including "[i]ndicat[ing] any expected material changes in the mix and relative cost of such resources."

143.    The SEC also provides the following interpretive guidance on the liquidity and capital resource disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations":

> [I]f the registrant's financial statements do not adequately convey the registrant's financing arrangements during the period, or the impact of those arrangements on liquidity, because of a known trend, demand, commitment, event or uncertainty, additional narrative disclosure should be considered and may be required to enable an understanding of the amounts depicted in the financial statements.[59]

144.    By failing to inform investors of the serious risk to Navient posed by the FHFA's proposed rule to amend FHLB membership eligibility requirements, Defendants violated SEC Regulation S-K, because the proposed rule presented a material trend or risk that could result in the reduction in the FHLB-DM credit facilities and thus seriously impair Navient's liquidity. Defendants also violated SEC Regulation S-X, Rule 5-02-22, as the FHFA's proposed rule bore on "the conditions under which" the FHLB-DM credit facilities "may be withdrawn."

145.    Defendants were aware of the FHFA's proposed rule to amend FHLB membership requirements and knew that the new rule, or a substantially similar version of it, could lead to a significant reduction in the FHLB-DM credit facilities and increase Navient's borrowing costs. The rule was proposed in September 2014, and Navient should have disclosed the risks it entailed well before December 2015.

---

[59] SEC Release No. 33-9144: *Commission Guidance on Presentation of Liquidity and Capital Resource Disclosures in Management's Discussion and Analysis*, Sept. 17, 2010, *available at* https://www.sec.gov/rules/interp/2010/33-9144.pdf.

146. Further, as senior Navient executives with intimate knowledge of the Company's financing arrangements and the potential impact of material changes in those financing arrangements on the Company's ability to fund its operations, Defendants had far more knowledge of the potential impact of the FHFA's proposed rule than investors did.

**B. Defendants Made the Misrepresentations Regarding Navient's Credit Facilities with Scienter.**

147. Navient's senior executives clearly would have been aware of the potential impact of the FHFA's proposed rule, given its centrality to the FHLB-DM credit facilities to Navient's ability to fund its operations. At the very least, Defendants were reckless in disregarding the potential impact the proposed rule could have on the Company.

148. Further, as with Defendants' knowledge of issues relating to the cohort of borrowers who had exited deferment in 2014, as well as Navient's pervasive and systematic forbearance practices and its rampant violations of federal and state law, Defendants were highly motivated to conceal negative information threatening the Company's liquidity. *See* ¶¶ 80-82, 124.

**C. Defendants' Misrepresentations Regarding Navient's Credit Facilities Caused Investors Losses.**

149. The true level of risk to which Navient's credit facilities with FHLB-DM were exposed was revealed to the market on December 28, 2015, when the Company announced in a Form 8-K that on December 22, 2015 its wholly owned subsidiary HICA received a notice from FHLB-DM stating "availability under the FHLB-DM Credit Facilities would be reduced from approximately $10.7 billion to approximately $5.0 billion for the period from December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for advances maturing after October 31, 2016."

150. Navient explained that FHLB-DM's action would "result in a reduction of aggregate borrowing availability under the FHLB-DM Credit Facilities and the other credit facilities available to the Company and its subsidiaries as of the date of this [Form 8-K] from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof." In other words, as a result of the significant reduction of the FHLB-DM credit facilities, Navient would be able to borrow only an additional $2.5 billion under existing credit lines of which the Company already had drawn down 87%, likely resulting in an adverse impact on the Company's liquidity and borrowing costs. In its 2015 Form 10-K filed on February 25, 2016, Navient confirmed what the market already understood, i.e., that FHLB-DM's action related to the FHFA's rule (which became final in January 2016 but was initially proposed and published in the Federal Register in *September 2014*) preventing non-eligible entities (now defined to include Navient) from gaining membership with a FHLB through the use of a captive insurer.

151. In response to the news disclosed on December 28, 2015, Navient's stock price fell 9.1% from its closing price of $12.61 on the previous trading day, December 24, 2015, to close at $11.46 per share on December 28, 2015, on unusually high trading volume of more than 9.3 million shares. Investors accordingly suffered significant losses as a result of Navient's failure to inform them of the truth regarding the likelihood that the Company's borrowing capacity under the FHLB-DM's credit facilities would be drastically reduced.

## VII.  PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

152. At all relevant times, the markets for Navient publicly-traded securities were efficient markets for the following reasons, among others:

(a)     Navient publicly-traded securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      as a regulated issuer, Navient filed periodic public reports with the SEC and the NASDAQ;

(c)      Navient regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)      Navient claimed to be a well-capitalized and seasoned issuer able to utilize the more truncated Shelf Registration Statement for its Class Period debt offerings; and

(e)      Navient was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

153.     As a result of the foregoing, the market for Navient publicly-traded securities promptly digested current information regarding Navient from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Navient publicly traded securities during the Class Period suffered similar injury through their purchase of Navient publicly-traded securities at artificially inflated prices and a presumption of reliance applies.

154.     Additionally, throughout the Class Period, Plaintiffs and other Class members justifiably expected Defendants to disclose material information regarding Navient as required by law and SEC regulations.  Plaintiffs and other Class members would not have purchased Navient securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Reliance by Plaintiffs and other Class

members should therefore be presumed with respect to Defendants' omissions of material information, as established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## VIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Exchange Act Defendants**

155.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth in this paragraph.

156.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified in ¶¶ 33-35, 50-51, 54, 56, 64-66 above, which they knew or recklessly disregarded were false or misleading in that they contained misstatements of material fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    The Exchange Act Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Navient's publicly traded securities during the Class Period.

158.    Plaintiffs and other Class members suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navient publicly traded securities. Plaintiffs and other Class members would not have purchased Navient publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Exchange Act Defendants' false or misleading statements.

159.     As a direct and proximate result of the Exchange Act Defendants' wrongful

conduct, Plaintiffs and other Class members suffered damages in connection with their purchases

of Navient publicly traded securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Officer Defendants

160.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth

in this paragraph.

161.     Defendants Remondi, Chivavibul, and Kane (collectively, the "Officer

Defendants") acted as controlling persons of Navient within the meaning of Section 20(a) of the

Exchange Act, as alleged in this Complaint.  By reason of their positions as officers of Navient

and their ownership of Navient stock, the Officer Defendants had the power and authority to

cause Navient to engage in the wrongful conduct detailed in this Complaint.  Further, as detailed

in this Complaint, the Officer Defendants were culpable participants in the misconduct.  The

Officer Defendants are accordingly liable under Section 20(a) of the Exchange Act.

## IX.     PLAINTIFFS' SECURITIES ACT CLAIMS

### A.     Summary of the Claims

162.     During the Class Period, Navient conducted (1) an offering on or around

November 6, 2014, consisting of $500 million in principal amount of 5.000% Senior Notes due

2020 and $500 million in principal amount of 5.875% Senior Notes due 2024 (as defined above,

the 2014 Debt Offering); and (2) an offering on or around March 27, 2015, consisting of $500

million in principal amount of 5.875% Senior Notes due 2021 (as defined above, the 2015 Debt

Offering).

163.     The offering materials in connection with the 2014 Debt Offering ("2014 Offering Materials") included (1) the Form S-3 Shelf Registration Statement and Prospectus filed on July 18, 2014 ("July 2014 Registration Statement"); (2) the Rule 424(b)(5) Preliminary Prospectus Supplement filed on November 3, 2014; (3) the Rule 433 Free Writing Prospectus filed on November 4, 2014; and (4) the Rule 424(b)(2) Prospectus Supplement filed on November 5, 2014.

164.     The offering materials in connection with the 2015 Debt Offering ("2015 Offering Materials") included (1) the July 2014 Registration Statement; (2) the Rule 424(b)(5) Preliminary Prospectus Supplement filed on March 25, 2015; (3) the Rule 433 Free Writing Prospectus filed on March 25, 2015; and (4) the Rule 424(b)(2) Prospectus Supplement filed on March 26, 2015.

165.     Each of the Securities Act Defendants (identified below) is statutorily liable under Section 11 of the Securities Act for untrue or misleading statements of material fact contained in the 2014 Offering Materials and the 2015 Offering Materials.  Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants (identified below), which were "sellers" of the notes issued in connection with the 2014 and 2015 Debt Offerings (as contemplated by Section 12(a)(2)), as well as control person liability claims under Section 15 of the Securities Act against the Individual Securities Act Defendants.

166.     Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

**B.     Securities Act Parties**

**1.     Plaintiffs**

167.     Plaintiff Lord Abbett Bond-Debenture Fund, Inc. purchased notes in or traceable to Navient's 2014 Debt Offering.

168.     Plaintiff Lord Abbett Investment Trust – Lord Abbett High Yield Fund purchased notes in or traceable to Navient's 2015 Debt Offering.

### 2.     Securities Act Defendants

#### Navient

169.     Defendant Navient issued each of the securities sold in the Offerings.

#### Remondi and Chivavibul

170.     Defendant Remondi signed the Shelf Registration Statement for the Offerings.

171.     Defendant Chivavibul signed the Shelf Registration Statement for the Offerings.

#### Director Defendants

172.     Defendant William M. Diefenderfer, III served at all relevant times as Chairman of the Board of Directors of Navient.

173.     Defendant Ann Torre Bates served at all relevant times as a Director of Navient.

174.     Defendant Diane Suitt Gilleland served at all relevant times as a Director of Navient.

175.     Defendant Linda Mills served at all relevant times as a Director of Navient.

176.     Defendant Barry A. Munitz served at all relevant times as a Director of Navient.

177.     Defendant Steven L. Shapiro served at all relevant times as a Director of Navient.

178.     Defendant Jane J. Thompson served at all relevant times as a Director of Navient.

179.     Defendant Barry L. Williams served at all relevant times as a Director of Navient.

180.     Defendants Diefenderfer, Bates, Gilleland, Mills, Munitz, Shapiro, Thompson, and Williams (collectively, the "Director Defendants") signed the 2014 Registration Statement. The Director Defendants, together with Remondi and Chivavibul, are referenced collectively as the "Individual Securities Act Defendants."

#### Underwriter Defendants

181.     Credit Suisse Securities (USA) LLC, headquartered at 11 Madison Avenue, New York, NY 10010, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

182.     Deutsche Bank Securities Inc., headquartered at 60 Wall Street, New York, NY 10005, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

183.     J.P. Morgan Securities LLC, headquartered at 383 Madison Avenue, New York, NY 10179, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

184.     RBC Capital Markets, LLC, headquartered at 60 South 6th Street, Minneapolis, Minnesota 55402, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

185.     Barclays Capital Inc., headquartered at 745 Seventh Avenue, New York, NY 10020, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

186.     Goldman, Sachs & Co., headquartered at 200 West Street, New York, NY 10282, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

187.     Merrill Lynch, Pierce, Fenner & Smith Incorporated, headquartered at One Bryant Park, New York, NY 10036, served as an underwriter for the 2014 Debt Offering and the 2015 Debt Offering.

188.     Defendant RBS Securities Inc. ("RBS"), headquartered at 600 Washington Boulevard, Stamford, CT 06901, served as an underwriter for the 2014 Debt Offering.

189.     Defendant Wells Fargo Securities, LLC ("Wells Fargo"), headquartered at 550 South Tryon Street, Charlotte, NC 28202, served as an underwriter for the 2015 Debt Offering.

190.    The entities identified in ¶¶ 181-89 above are referenced collectively as the "Underwriter Defendants."  The Underwriter Defendants, Director Defendants, Remondi, Chivavibul, and Navient are referenced collectively as the "Securities Act Defendants."

**C.    The Offering Documents Contained Untrue Statements of Material Fact or Omitted Material Facts Necessary to Make Those Statements Not Misleading.**

191.    As set forth below, the Securities Act Defendants are subject to liability for a series of untrue statements or omissions of material fact in the Offering Materials issues in connection with the Offerings.

**1.    The 2014 Offering Materials contained untrue or misleading statements of material fact.**

192.    The 2014 Debt Offering Prospectus and Prospectus Supplements (each of which formed a part of the 2014 Registration Statement) incorporated by reference, among other things, (1) Navient's April 2014 Information Statement filed in connection with the Spin-Off; (2) Navient's Q1 2014, Q2 2014, and Q3 2014 Form 10-Qs; and (3) Navient's Form 8-Ks filed on April 17, 2014, May 2, 2014, May 9, 2014, May 14, 2014, May 16, 2014, August 19, 2014, and October 17, 2014.

193.    As detailed in Sections IV.A., V.A., and VI.A. above, each of those documents contained false or misleading statements of material fact, as supported by the since-revealed facts concerning Navient's improper practices.  The statements recounted above from those documents—which were incorporated by reference into the 2014 Offering Documents—were false or misleading when made, for at least three reasons.

194.    *First*, the 2014 Offering Materials (including documents they incorporated) failed to disclose that Navient was pervasively and systemically placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolios and artificially

depressing the number of delinquencies, defaults, and charge-offs. *See* ¶¶ 33-53. The quality of Navient's loan portfolios was therefore not as the Company described it to investors, and Navient's statements regarding its forbearance practices were likewise false or misleading when made. *See* ¶¶ 50-53. Further, Navient's undisclosed forbearance practices caused its loan loss provisions to be artificially understated, which in turn resulted in artificially inflated net interest and EPS for the reporting periods preceding the 2014 Debt Offering, i.e., Q1 2014, Q2 2014, and Q3 2014. *See* ¶¶ 54-63.

195. *Second*, the 2014 Offering Materials failed to disclose the rampant violations of federal and state law by Navient and its subsidiaries during the Class Period. As detailed above, Navient (1) misled borrowers about the availability of IDR plans; (2) misadvised borrowers about the availability of releases of cosigners of borrowers' loans; (3) misled delinquent borrowers regarding the amounts they needed to pay to become current on their loans; (4) failed to disclose or properly address systemic processing errors and the inadequate systems in place to deal with those errors; (5) charged borrowers who had served in the military high interest rates on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between Navient Solutions and the DOJ for that very practice; and (6) deceived borrowers regarding attributes of the federal loan rehabilitation program. *See* ¶¶ 96-118. Those unfair and deceptive practices rendered Defendants' repeated representations to investors regarding Navient's compliance with governing laws and regulations false or misleading when made. *See* ¶¶ 92-95.

196. *Third*, despite reporting the available capacity on its credit facilities and acknowledging they were "subject to termination under certain circumstances," Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate its facilities with Navient in light of the rule proposed by the FHFA in September 2014 (which was ultimately adopted as a

final rule in January 2016) preventing non-eligible entities from gaining membership with a FHLB—and thus access credit on extraordinarily favorable terms—through the use of a captive insurer. *See* ¶¶ 13, 136-39, 144-45. Navient accordingly misled investors regarding the risk that the Company's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance. *See* ¶¶ 139, 144-45, 150. Further, Navient's failure to apprise investors of that serious risk to its business violated SEC rules mandating such disclosure. *See* ¶¶ 140-44. Navient's Class Period statements regarding its credit facilities accordingly were false or misleading when made. *See* ¶¶ 138-39.

### 2. The 2015 Offering Documents contained untrue or misleading statements of material fact.

197. The 2015 Debt Offering Prospectus and Prospectus Supplements (each of which formed a part of Shelf Registration Statement) incorporated by reference, among other things, (1) the April 2014 Information Statement; (2) Navient's Q1 2014, Q2 2014, and Q3 2014 Form 10-Qs; (3) Navient's Form 8-K filed on January 26, 2015; and (4) Navient's 2014 Form 10-K filed on February 27, 2015.

198. As detailed in Section Sections IV.A., V.A., and VI.A. above, each of those documents contained false or misleading statements of material fact, as supported by the since-revealed facts concerning Navient's improper practices. The statements recounted above from those documents—which were incorporated by reference into the 2015 Offering Documents—were false or misleading when made, for at least four reasons.

199. *First*, the 2015 Offering Materials (including documents they incorporated) failed to disclose that Navient was pervasively and systemically placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolios and artificially depressing the number of delinquencies, defaults, and charge-offs. *See* ¶¶ 33-53. The quality of

Navient's loan portfolios was therefore not as the Company described it to investors, and Navient's statements regarding its forbearance practices were likewise false or misleading when made.  *See* ¶¶ 50-53.  Further, Navient's undisclosed forbearance practices caused its loan loss provisions to be artificially understated, which in turn resulted in artificially inflated net interest and EPS for the reporting periods preceding the 2014 Debt Offering, i.e., Q1 2014, Q2 2014, Q3 2014, and Q4 & FY 2014.  *See* ¶¶ 54-63.

200.    *Second*, even regardless of Navient's forbearance practices, the statements made from January 21, 2015—when Defendants began reporting Navient's financial results for Q4 2014 and full-year 2014—onward were false or misleading when made because by then (at the latest) Navient should have known that the cohort of borrowers representing $2.5 billion in PELs posed a high risk of default.  Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into in-school deferment).  Accordingly, when those borrowers exited deferment in 2014, Navient should have increased its provision for PEL loans to account for the risk of default posed by those borrowers.  Yet Defendants failed to disclose that issue to investors and increase the Company's provision until July 2015—in the meantime repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.  Those representations accordingly were false or misleading when made.  *See* ¶¶ 53, 62-63.

201.    *Third*, the 2015 Offering Materials failed to disclose the rampant violations of federal and state law by Navient and its subsidiaries during the Class Period.  *See* ¶¶ 96-118.  Those unfair and deceptive practices rendered Defendants' repeated representations to investors

regarding Navient's compliance with governing laws and regulations false or misleading when made.  *See* ¶¶ 92-95.

202.    *Fourth*, Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate its facilities with Navient in light of the FHFA's proposed rule discussed above. *See* ¶¶ 13, 136-39, 144-45.  Navient accordingly misled investors regarding the risk that the Company's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance.  *See* ¶¶ 139, 144-45, 150.  Navient's failure to apprise investors of that serious risk to its business also violated SEC rules.  *See* ¶¶ 140-44. Navient's Class Period statements regarding its credit facilities accordingly were false or misleading when made.  *See* ¶¶ 138-39.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

### Violations of Section 11 of
### the Securities Act Against All Securities Act Defendants

203.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

204.    This cause of action is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants, and is predicated on the Securities Act Defendants' strict liability for making false and misleading statements in the 2014 Offering Materials and/or the 2015 Offering Materials.  Liability under this Count is predicated on Remondi's, Chivavibul's, and the Director Defendants' signing of the 2014 Registration Statement, all of the Securities Act Defendants' (except Wells Fargo) respective participation in the 2014 Debt Offering, which were conducted pursuant to the 2014 Offering Materials, and all of the Securities Act Defendants'

(except RBS) respective participation in the 2015 Debt Offering, which was conducted pursuant to the 2015 Offering Materials.

205. The 2014 Offering Materials and the 2015 Offering Materials were materially inaccurate or misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, or omitted to state material facts required to be stated in those documents.

206. Remondi, Chivavibul, and the Director Defendants served as officers and/or directors of Navient at times relevant to this claim, and/or signed the 2014 Registration Statement.

207. Navient caused the 2014 Offering Materials and the 2015 Offering Materials to be issued to investors in connection with the offering and sale of the notes associated with the 2014 Debt Offering and the 2015 Debt Offering, respectively.

208. The Securities Act Defendants owed to Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the 2014 Offering Materials and the 2015 Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in those documents not misleading. The Securities Act Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the 2014 Offering Materials and the 2015 Offering Materials, and did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements in those

documents not misleading. The Securities Act Defendants accordingly are liable under Section 11.

209. Plaintiffs and other Class members acquired notes pursuant to the false or misleading 2014 Registration Statement in connection with the 2014 Offering and the 2015 Offering.

210. At the time they acquired those notes, Plaintiffs and other Class members did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact in, or omissions of material fact from, the 2014 Offering Materials or the 2015 Offering Materials.

211. Plaintiffs and other Class members suffered damages. The value of the notes has declined substantially, following and because of the Securities Act Defendants' violations.

212. By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Securities Act Defendants.

## COUNT IV

### Violations of Section 12(a)(2) of
### the Securities Act Against the Underwriter Defendants

213. Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

214. This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of Plaintiffs and all other members of the Class who purchased Navient securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering and who were damaged thereby.

215.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

216.     The Underwriter Defendants were statutory sellers of Navient securities that were registered in the Offerings pursuant to the 2014 Registration Statement and sold by means of the Offering Materials.  By means of the 2014 Offering Materials, the Underwriter Defendants (except for Wells Fargo) sold $1 billion in principal amount of notes through the 2014 Debt Offering to members of the Class.  By means of the 2015 Offering Materials, the Underwriter Defendants (except for RBS) sold $500 million in principal amount of notes through the 2015 Debt Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Debt Offerings by means of the materially false or misleading Offering Materials.

217.     The Offering Materials contained untrue statements of material fact or omitted facts necessary to make the statements not misleading, as set forth in this Complaint.

218.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased securities in or traceable to the 2014 Debt Offering and/or the 2015 Debt Offering, and who were damaged thereby pursuant to Section 12(a)(2).

## COUNT V

### For Violation of Section 15 of the Securities Act
### (Against Navient and the Individual Securities Act Defendants)

219.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully in this paragraph, only to the extent such allegations do not allege fraud, scienter, or the intent to defraud Plaintiffs and other Class members.

220.     This count is asserted under Section 15 of the Securities Act against Navient and the Individual Securities Act Defendants.

221.     Navient and each of the Individual Securities Act Defendants was, by virtue of its, his, or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Navient and each of the Individual Securities Act Defendants had the power and influence to cause Navient to engage in the acts described in this Complaint, and exercised that power and influence.

222.     Additionally, each of the Individual Securities Act Defendants was, by virtue of his or her control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a controlling person of Navient within the meaning of Section 15 of the Securities Act.  Each of the Individual Securities Act Defendants had the power and influence to cause Navient to engage in the acts described in this Complaint, and exercised that power and influence.

223.     Navient and the Individual Securities Act Defendants' control, ownership, and position made them privy to, and provided them with knowledge of, the material facts concealed from Plaintiffs and other Class members.

224. By virtue of the non-fraudulent conduct alleged in this Complaint, Navient and the Individual Securities Act Defendants are liable to Plaintiffs and other Class members for damages suffered as a result of that conduct.

## XI. CLASS ACTION ALLEGATIONS

225. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased (1) the publicly traded securities of Navient during the Class Period; (2) securities in or traceable to the Company's 2014 Debt Offering; and/or (3) securities in or traceable to the Company's 2015 Debt Offering (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Navient publicly traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of in this Complaint.

228.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

229.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Navient;

(c)     whether the price of Navient publicly traded securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages, as well as the proper measure of damages.

230.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     Determining this action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as the Class representatives;

73

B.    Requiring Defendants to pay damages sustained by Plaintiffs and other Class members by reason of the acts and transactions alleged in this Complaint;

C.    Awarding Plaintiffs and other Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

November 17, 2017

**MORRIS AND MORRIS LLC**
**COUNSELORS AT LAW**

By: */s/ Patrick F. Morris*

Karen L. Morris (Del. Bar No. 2899)
Patrick F. Morris (Del. Bar No. 3015)
R. Michael Lindsey (Del. Bar No. 2711)
4023 Kennett Pike, #254
Wilmington, DE 19807
Telephone: (302) 426-0400
kmorris@morrisandmorrislaw.com
pmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

*Liaison Counsel for Lead Plaintiff the Lord Abbett Funds and the Proposed Class*

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

Steven E. Fineman (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Michael J. Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
Richard M. Heimann (admitted *pro hac vice*)
Bruce W. Leppla (admitted *pro hac vice*)
Sharon M. Lee (*pro hac vice* application
forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com
slee@lchb.com

*Counsel for Lead Plaintiff the Lord Abbett Funds
and Lead Counsel for the Proposed Class*

# APPENDIX

## TO SECOND AMENDED CLASS ACTION COMPLAINT[1]

I. **STATEMENTS REGARDING FORBEARANCES; LOAN CREDIT QUALITY, DELINQUENCIES AND CHARGE-OFFS; LOAN LOSS PROVISION AND FINANCIAL RESULTS; SOX CERTIFICATIONS[2]**

1. **Statements Regarding Forbearance**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Forbearances | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **April 10, 2014 Amended Registration Statement ("April 2014 Information Statement")**<br><br>Maker(s) of Statements:  Navient; Remondi (signed) | (1) "Forbearance as a collection tool is used most effectively when applied based on a customer's unique situation, including historical information and judgments."<br><br>(2) "Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan."<br><br>(3) "[W]e continue to see improvement in credit quality and continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL]" | Statements (1) – (4) were false or misleading when made because Navient engaged in a systemic and pervasive practice of placing borrowers into forbearance—sometimes multiple, consecutive forbearances—regardless of the impact it would have on those customers and without accounting for borrowers' particular circumstances.  By doing so, Navient avoided having to record those accounts, particularly for PEL borrowers, as delinquent or in default, which would have signaled to investors that the Company was exposed to greater risk in its loan portfolios than it was reporting.  As a result of Navient's undisclosed forbearance practices, Navient's | These statements correspond with three disclosures:<br><br>*First*, on July 13, 2015, Navient announced it would need to increase its provision for its PEL loans segment by $46 million, or 31.7%, and that a cohort of borrowers who had returned to school during the "Great Recession" of 2007-2008, and who represented $2.5 billion in loans, had demonstrated difficulty repaying their loans.  Following that news (the "July 13, 2015 Disclosure"), the price of Navient common stock fell $1.94 per share, or 10.6%, from its closing price of $18.36 on July 13, 2015 to close at |

---

[1] All references in this Appendix to "¶ __" are to paragraphs of the Complaint.

[2] This Appendix does not reference the 2014 Offering Materials issued in connection with the 2014 Debt Offering or the 2015 Offering Materials in connection with the 2015 Debt Offerings.  As stated in the Complaint, the Offering Materials incorporate many of the false or misleading statements listed in this Appendix, thereby rendering the Offering Materials false or misleading as well.  *See* ¶¶ 192-202.

| Q1 2014 Form 10-Q issued on May 9, 2014<br><br><u>Maker(s) of Statements</u>:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | loan loss provisions and related financial results were materially misstated.<br><br>Statements (4) – (6) are false or misleading for the additional and | $16.42 on July 14, 2015, on extraordinary trading volume of more than 8.5 million shares. During the same period, Navient 5.875% Senior Notes due 2021 declined 1.75%, Navient 5.875% |
| Q2 2014 Form 10-Q issued on August 1, 2014<br><br><u>Maker(s) of Statements</u>:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | independent reason that by the time Navient reported its Q4 2014 financial results (at the latest), Defendants knew or recklessly disregarded that the cohort of borrowers representing $2.5 billion | Senior Notes due 2024 declined 2.41%, and Navient 5% Senior Notes declined 2.33%.  *See* ¶¶ 9, 85. |

| Q3 2014 Form 10-Q issued on October 30, 2014<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements to (1), (2), and (3) above) | in PELs that exited deferment in 2014 posed a high risk of default. Remondi admitted during Navient's July 22, 2015 earnings call that those borrowers demonstrated they "were struggling to begin with," i.e., even before reentering school around 2008 (when they were then placed into deferment).  Accordingly, when those borrowers exited deferment in 2014, Defendants knew or recklessly disregarded that Navient needed to increase its provision for PEL loans to account for the risk of default posed by those borrowers.  Yet Defendants inexplicably waited until July 2015 to disclose that issue to investors and increase the Company's provision—in the meantime repeatedly assuring investors of the quality of the PEL portfolio and touting low delinquency, default, and charge-off rates.  *See* ¶¶ 9, 53, 56, 63, 75, 87. | *Second*, on July 22, 2015, during a Navient earnings call, Remondi revealed that the subject borrowers "were struggling to begin with." Remondi further disclosed that a portion of borrowers in that cohort had entered and exited deferment multiple times and did not complete their degrees, which he acknowledged generally results in a higher incidence of delinquency and default.  Following that news (the "July 22, 2015 Disclosure"), the price of Navient common stock fell 2.2% from its closing price of $16.60 on July 21, 2015 to close at $16.23 on July 23, 2015.  During the same period, Navient 5.875% Senior Notes due 2024 declined 3.51% and Navient 5% Senior Notes declined 1.64%.  *See* ¶ 87.<br><br>*Third*, on September 29, 2015, the CFPB issued a report detailing widespread problems in the loan-servicing industry, including that loan servicers of both private and federal student loans may not inform borrowers experiencing financial hardship about available alternative repayment plans, but |

3

| | | | |
|---|---|---|---|
| 2014 Form 10-K issued on February 27, 2015<br><br><u>Maker(s) of Statements</u>:  Navient; Remondi (signed); Chivavibul (signed) | (4) "Navient believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing utilized when the loans were originated, the continued high levels of qualified cosigners and our internal servicing and risk mitigation practices, as | | instead may advise borrowers to postpone payments through forbearance or deferment or instruct borrowers that the only available option is to pay the full amount due.  Following the CFPB Report's release (the "September 29, 2015 Disclosure"), the price of Navient's common stock fell 4.4% from its closing price of $12.16 on September 28, 2015 to close at $11.63 on September 29, 2015, on extraordinary trading volume of more than 8.5 million shares.  *See* ¶¶ 90-91. |

| | well as our careful use of forbearance and our loan modification programs.<br><br>(5) Navient's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan"<br><br>(6) "[e]xceptions to forbearance policies are permitted when such exceptions are judged to increase the likelihood of collection of the loan."the likelihood of collection of the loan." | | |
|---|---|---|---|
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements as (1), (2), and (3) above) | | |

2. **Statements Regarding Loan Credit Quality, Delinquencies, and Charge-Offs**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Loan Credit Quality, Delinquencies, and Charge-Offs | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 earnings press release issued on April 16, 2014**<br><br>Maker(s) of Statement:  Navient; Remondi | (7) We're . . . pleased that this quarter set a six-year-record low in delinquencies, reflecting our strong underwriting and customer support." | Statements (7) – (24) were false or misleading when made because Defendants failed to disclose that Navient was pervasively and systemically placing borrowers into forbearance, thereby masking the true level of risk in the Company's loan portfolio and artificially depressing the number of delinquencies, defaults, and charge-offs.  The quality of Navient's loan portfolios was therefore not as Defendants described it to investors. | • July 13, 2015 Disclosure;<br><br>• July 22, 2015 Disclosure; and<br><br>• September 29, 2015 Disclosure |
| **Navient Investor Road show presentation , attached as exhibit to Form 8-K issued on April 17, 2014**<br><br>Maker(s) of Statements:  Navient | (8) Referred to Navient's "[l]arge, high quality asset base," including its "[s]easoned portfolio" of Private Education Loans"<br><br>(9) Highlighted "[d]elinquency and charge-offs significantly below national average"<br><br>(10) Highlighted "[i]ndustry leading asset recovery and private credit loss mitigation capabilities" | | |
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (Substantially similar statements to (7), (8), (9), and (10) above) | | |
| **Q2 2014 earnings press release issued on July 16, 2014**<br><br>Maker(s) of Statement:  Navient | (11) "continued improvement in student loan portfolio credit quality with 90-plus day delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008" | | |

| | | | |
|---|---|---|---|
| **Q2 2014 earnings call on July 17, 2014**<br><br>Maker(s) of Statement:  Navient; Remondi | (12) "Our private loan segment continues to benefit from improving credit metrics, delinquencies and defaults continue to fall hitting six year lows, and driving down credit costs." | | |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (13) "[provisions for PEL losses] declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs" | | |
| **Q3 2014 earnings press release issued on October 15, 2014**<br><br>Maker(s) of Statements:  Navient | (14) "[financial results] show[ed] continued improvements in delinquencies and defaults since a year ago"<br><br>(15) "Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008" | | |
| **Remondi presentation at Barclays Global Financial Services Conference on September 8, 2014**<br><br>Maker(s) of Statement:  Navient; Remondi | (16) Describing Navient's $30 billion private education loan portfolio as "well-seasoned" and possessing "very strong credit metrics" | | |

| | | | |
|---|---|---|---|
| **Remondi presentation at Bank of America-Merrill Lynch Conference on November 12, 2014**<br><br>Maker(s) of Statements:  Navient; Remondi | (17) "On the private education side of the equation, we own a portfolio of $30 billion of student loans. These loans have very strong credit metrics.  There is a high-quality improving performance in these metrics, particularly as the economy is improving." | | |
| **Q4 and FY 2014 earnings press release issued on January 21, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (18) "2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008"<br><br>(19) Remondi stated that in 2014 Navient "realized year-over-year improvements in credit quality." | | |
| **Q4 and FY 2014 earnings call on January 22, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi | (20) Remondi emphasized that Navient "[saw] continued opportunities to increase the expected cash flows from [its] federal and private loan portfolios as credit continue[d] to improve and [Navient] benefit[ed] from lower financing costs and low interest rates." | | |
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed), Chivavibul (signed) | (21) Highlighted, among Navient's "Strengths and Opportunities," a "[l]arge, high quality asset base generating significant and predictable cash flows" | | |

| | | | |
|---|---|---|---|
| **Q1 2015 earnings press release issued on April 21, 2015**<br><br><u>Maker(s) of Statements</u>:  Navient; Remondi | (22) Remondi stated "[p]rivate credit quality . . . continued to improve, leading to a lower loan loss provision." | | |
| **Q1 2015 earnings call on April 22, 2015**<br><br><u>Maker(s) of Statements</u>:  Navient; Remondi | (23) Remondi stated that "[o]n the credit front, [Navient] continue[d] to see delinquency rates and [its] outlook for future expected charge-offs on [its] private portfolio improve." | | |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br><u>Maker(s) of Statements</u>:  Navient; Chivavibul (signed) | (24) Navient represented that its provisions for loan losses declined $60 million and that "contributing to the decrease was the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends leading to decreases in expected future charge-offs." | | |

3.    **Statements Regarding Loan Loss Provisions and Financial Results**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Loan Loss Provisions and Financial Results | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (25) Loss Provision for PELs: $136 M, down from Q1 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $219M / $163M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.64 / $0.51 | Statements (25) – (29) were false or misleading when made because Defendants failed to disclose Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan loss provisions.  Navient failed to account for losses on more than $2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014.  Navient's reported allowance for loan losses and related provisions accordingly were understated, in violation of GAAP.  Navient's artificially low provisions, in turn, caused Core Earnings for the PEL segment and net income—both of which depended to a material degree on the level of loan loss provisions—to be artificially inflated, resulting in inflated EPS. | • July 13, 2015 Disclosure;<br><br>• July 22, 2015 Disclosure; and<br><br>• September 29, 2015 Disclosure |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (26) Loss Provision for PELs: $145 M, down from Q2 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $307M / $241M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.71 / $0.56 | | |
| **Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (27) Loss Provision for PELs: $130 M, down from Q3 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $359M / $218M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.85 / $0.52 | | |

| | | | |
|---|---|---|---|
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed); Chivavibul (signed) | (28) Loss Provision for PELs:<br><br>*Q4 2014*:  $128M, down from Q4 2013<br>*FY 2014*:  $539M, down from $722M for FY 2013<br><br>Net Income (GAAP Basis / Core Earnings Basis):<br><br>*Q4 2014*:  $263M / $217M<br>*FY 2014*:  $1.1B / $818M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):<br><br>*Q4 2014*:  $0.64 / $0.53<br>*FY 2014*:  $2.69 / $1.93 | | |
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (29) Loss Provision for PELs: $120 M, down from Q1 2014<br><br>Net Income (GAAP Basis / Core Earnings Basis):  $182M / $154M<br><br>Diluted EPS (GAAP Basis / Core Earnings Basis):  $0.47 / $0.48 | | |

4.      **Statements in SOX Certifications**

| Document/"Maker(s)" of the Statement(s) | Statements in SOX Certifications | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Certifications Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), attached to Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (30) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"<br><br>(31) "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Navient] as of, and for, the periods presented in this report"<br><br>(32) "[Navient]'s other certifying officer [i.e., Remondi or Chivavibul] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to [Navient]'s auditors and the audit committee of [Navient]'s board of directors (or persons performing equivalent functions) . . . "[a]ny fraud, whether or not material, that involves management or other employees who have a significant | Statements (30) – (33) were false or misleading when made, in light of Navient's undisclosed forbearance practices and the resulting manipulation of Navient's financial results. *See* ¶¶ 33-63. Further, the certifications included in Navient's 2014 Form 10-K and Q1 2015 Form 10-Q were false or misleading for the additional and independent reason that by that time it was clear to Defendants that they should increase the provision for PEL loans to reflect the demonstrably high risk of default posed by the cohort of borrowers who exited deferment in 2014 and had been, as Remondi admitted in July 2015, struggling even before they entered deferment around 2008. | • July 13, 2015 Disclosure;<br><br>• July 22, 2015 Disclosure; and<br><br>• September 29, 2015 Disclosure |

| | | | |
|---|---|---|---|
| | role in [Navient]'s internal control over financial reporting"<br><br>(33) "The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company." | | |
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |

| | | | |
|---|---|---|---|
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |
| **Certification Pursuant to Sections 302 and 906 of SOX, attached to 2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |
| **Certifications Pursuant to Sections 302 and 906 of SOX, attached to Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:<br>Navient; Remondi; Chivavibul | (Substantially similar to statements (30) – (33) above) | | |

## II.    STATEMENTS REGARDING LEGAL COMPLIANCE

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Legal Compliance | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Navient Investor Roadshow presentation, attached as exhibit to Form 8-K issued on April 17, 2014**<br><br>Maker(s) of Statements:  Navient | (34) Highlighting "[Navient's] robust compliance driven culture driven by a 'customer first' approach,"<br><br>(35) Referring to "[Navient's]operational and technical expertise and capacity to adapt to [a] new regulatory environment,"<br><br>(36) Citing "[Navient's] demonstrated FFELP compliance and preserved federal loan guarantee." | Statements (34) – (43) were false or misleading when made, because Navient and its subsidiaries were actually engaged in a series of unfair and deceptive practices, including (1) misleading borrowers about the availability of IDR plans; (2) misadvising borrowers about the availability of releases of cosigners of borrowers' loans; (3) misleading delinquent borrowers regarding the amounts they needed to pay to become current on their loans; (4) failing to disclose or properly address systemic processing errors and the inadequate systems in place to deal with those errors; (5) charging borrowers who had served in the military high interest rates on their loans, in violation of the SCRA, notwithstanding the February 2015 settlement between Navient Solutions and the DOJ for that very practice; and (6) deceiving borrowers regarding attributes of the federal loan rehabilitation program, which affords borrowers in default the opportunity to "rehabilitate" their loans and remove them from default status. *See* ¶¶ 96-118.  Those unfair and deceptive practices are the subject | These statements correspond with six disclosures:<br><br>*First*, on February 27, 2015, the DOE announced it would terminate its contract with Pioneer and four other private collection agencies for "g[iving] borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees" in connection with the federal loan rehabilitation program, i.e., the very misconduct detailed in ¶¶ 82, 117-18.<br><br>*Second*, on March 2, 2015, *Inside Higher Ed* referred to the loss of the Pioneer contract as part of a "crackdown" on Navient, noted the Company "said that it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013"—i.e., approximately $127 million for just two years—reported that Representative Chris Collins, who represents the upstate New York district where Pioneer operates, "told The Buffalo News that the decision to end the contract would lead to the loss of about 400 jobs at the company." |
| **2014 Form 10-K issued on February 27, 2015**<br><br>Maker(s) of Statements:  Navient; Remondi (signed); Chivavibul (signed) | (37) "[Navient's] rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance [its] compliance and customer service."<br><br>(38) "We have been a partner in [the DOE]'s campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice." | | |
| **Remondi presentation at Bank of** | (39) "We're also doing it by | | |

| | | | |
|---|---|---|---|
| **America-Merrill Lynch Conference on November 12, 2014**<br><br>Maker(s) of Statements: Navient; Remondi | helping customers enroll in payment programs rather than simply deferring any payments at all. So we have a higher percentage of our customers enrolled in income-driven repayment programs authorized under the federal programs than do others and, consequently, a lower percentage of customers using deferral products, like forbearance as an example."<br><br>(40) "In private credit, we bring that same kind of approach. Our approach here is a little bit different in that we're not running against a design program of the federal programs; we have created our own solutions for customers."<br><br>(41) "One of the things that we have been very, very successful at is helping borrowers who are struggling find a solution that not only keeps them out of default but helps them successfully reduce their debt balance. Actively we will work with customers, and that includes modifying their loan terms to help them be successful." | of actions filed by the CFPB and state attorneys general (*see* Compl. at 2 n.1) asserting claims under the Consumer Financial Protection Act ("CFPA"), the Fair Debt Collection Practices Act ("FDCPA"), and state consumer protection laws. The Government Complaints assert, based in part on internal Navient documents, that the Company engaged in those practices systemically and repeatedly for years, including during much of the Class Period in this case. | The price of Navient stock declined 8.8% from its close of $21.40 on February 27, 2015 to close at $19.51 on March 2, 2015 (the next trading day), on unusually heavy trading volume of more than 10 million shares. During the same period, Navient 5.875% Senior Notes due 2024 declined 2%, and Navient 5% Senior Notes declined 2%.<br><br>*Third*, on April 24, 2015, *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by authorities in Massachusetts "over allegations the company mistreated distressed borrowers." On that news, the price of Navient stock fell 2.1% from its close of $20.28 on April 24 to close at $19.85 on the next trading day, April 27, 2015.<br><br>*Fourth*, on July 7, 2015, the CFPB published a report on its website titled "Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform." The CFPB disclosed that it had continued to receive complaints about student loan servicing from servicemembers after the 2014 settlement between federal regulators and Navient and |
| **Q1 2015 Form 10-Q issued on Apr. 30, 2015**<br><br>Maker(s) of Statements: Navient; Chivavibul (signed) | (42) Navient again stated it "fosters a robust compliance culture driven by a 'customer first' approach," adding, "[w]e invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer | | |

| | | | research to enhance our compliance and customer service." | | Sallie Mae. Specifically, the CFPB indicated that since it published a report in October 2012 on complaints it had received from military borrowers about student loan servicers and shared those complaints with the DOJ and other federal regulators (which subsequently resulted in the $60 million settlement with Navient and Sallie Mae), "the Bureau has received more than 1,300 complaints from military borrowers related to the servicing or collection of student loans." Following the announcement of the report, the price of Navient stock fell 2.1%, from $18.97 to $18.57 per share. |
| **Q2 2015 Form 10-Q issued on Aug. 3, 2015** <br><br> Maker(s) of Statements: Navient; Chivavibul (signed) | Substantially similar to (42) above | | | | |
| **Kane presentation at Credit Suisse Group Financial Services Forum on February 11, 2015** <br><br> Maker(s) of Statements: Navient; Kane | (43) "very, very strong compliance culture at Navient across the entire Company, across all levels of management," adding, "[s]o we take that very seriously. We keep our thumb obviously on the changing compliance landscape and we look to make updates to our processes, procedures and work activities to comply." | | | | *Fifth*, after the market closed on August 24, 2015, Navient disclosed in an SEC Form 8-K that on August 19, 2015 Navient Solutions received a letter from the CFPB stating the Bureau's Office of Enforcement was considering taking legal action against Navient Solutions regarding its disclosures and assessment of late fees. Following that news, the price of Navient common stock fell 7.8%, from its closing price of $13.06 on August 24, 2015 to close at $12.04 per share on August 25, 2015, on unusually heavy trading volume of more than nine million shares. <br><br> *Sixth*, the CFPB Report issued on |

17

| | | | September 29, 2015 referred to (in addition to the forbearance issue referenced above), (i) comments from individual student loan borrowers described how they encountered servicing problems or practices that discouraged utilization of alternative repayment plans, including income-driven repayment plans; (ii) comments detailing problems related to customer service, including issues for borrowers seeking to resolve servicing errors; (iii) Comments describing how payment processing and servicing-transfer practices create problems for borrowers trying to repay student debt; and (iv) "[s]ervicemembers consistently report difficulties obtaining the SCRA interest rate cap of six percent," i.e., "that servicers continue to improperly process these requests and do not clearly convey information about the application process and other requirements." The CFPB further recounted, "Servicemembers also note that the servicers guide them into forbearance or deferment, even when the borrower is actively seeking information and assistance concerning other forms of repayment." |
| --- | --- | --- | --- |

## III.    STATEMENTS REGARDING LIQUIDITY AND FINANCING ARRANGEMENTS

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Liquidity and Financing Arrangements | Why Statements Were False or Misleading When Made | Corresponding Corrective Disclosure(s) |
|---|---|---|---|
| **Q1 2014 Form 10-Q issued on May 9, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (44)  "As of March 31, 2014 and December 31, 2013, the maximum additional capacity under these facilities was $12.7 billion and $10.6 billion, respectively.  For the three months ended March 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.3 billion and $10.8 billion, respectively." | Statements (44) – (51) were false and misleading when made because Navient failed to disclose the true likelihood that FHLB-DM would in fact terminate the facilities in light of a rule proposed by the FHFA in September 2014 (which was ultimately adopted as a final rule in January 2016) preventing non-eligible entities from gaining membership with a FHLB—and thus access credit on extraordinarily favorable terms—through the use of a captive insurer.  Defendants accordingly misled investors regarding the risk that Navient's borrowing costs would rise suddenly and dramatically and thereby affect the Company's liquidity and financial performance.  Further, Defendants' failure to apprise investors of that serious risk to the Company's business violated SEC rules mandating such disclosure. | On December 28, 2015, the true level of risk to which Navient's credit facilities with FHLB-DM were exposed was revealed to the market when the Company announced in a Form 8-K that on December 22, 2015 its wholly owned subsidiary HICA received a notice from FHLB-DM stating "availability under the FHLB-DM Credit Facilities would be reduced from approximately $10.7 billion to approximately $5.0 billion for the period from December 22, 2015 to October 31, 2016, and to approximately $3.9 billion, effective for advances maturing after October 31, 2016."<br><br>Navient explained that FHLB-DM's action would "result in a reduction of aggregate borrowing availability under the FHLB-DM Credit Facilities and the other credit facilities available to the Company and its subsidiaries as of the date of this [Form 8-K] from approximately $25.6 billion to approximately $18.8 billion, of which approximately $16.3 billion is drawn as of the date hereof."  In other words, as a result of the significant reduction of the FHLB- |
| **Q2 2014 Form 10-Q issued on August 1, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (45)  "As of June 30, 2014 and 2013, the maximum additional capacity under these facilities was $10.7 billion and $11.9 billion, respectively.  For the three months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $11.8 billion and $11.1 billion, respectively." | | |
| **Q3 2014 Form 10-Q issued on October 30, 2014**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (46)  "As of September 30, 2014 and 2013, the maximum additional capacity under these facilities was $11.0 billion and $11.2 billion, respectively.  For the three months ended September 30, 2014 and 2013, the average maximum additional capacity under these facilities was $10.8 billion and $11.4 billion, respectively." | | |

| 2014 Form 10-K issued on February 27, 2015<br><br>Maker(s) of Statements: Navient; Remondi (signed); Chivavibul (signed) | (47) "[Navient] requires liquidity to meet cash requirements such as day-to-day operating expenses, required payments of principal and interest on borrowings, and distributions to stockholders."<br><br>(48) We have various secured borrowing facilities that we use to finance our FFELP Loans. Liquidity is available under these secured credit facilities to the extent we have eligible collateral and available capacity. The maximum borrowing capacity under these facilities will vary and is subject to each agreement's borrowing conditions. These include but are not limited to the facility's size, current usage and the availability and fair value of qualifying unencumbered FFELP Loan collateral. . . . The facilities are subject to termination under certain circumstances | | DM credit facilities, Navient would be able to borrow only an additional $2.5 billion under existing credit lines of which the Company already had drawn down 87%, likely resulting in an adverse impact on the Company's liquidity and borrowing costs.<br><br>In response to the news disclosed on December 28, 2015, Navient's stock price fell 9.1% from its closing price of $12.61 on the previous trading day, December 24, 2015, to close at $11.46 per share on December 28, 2015, on unusually high trading volume of more than 9.3 million shares. Investors accordingly suffered significant losses as a result of Navient's failure to inform them of the truth regarding the likelihood that the Company's borrowing capacity under the FHLB-DM's credit facilities would be drastically reduced.<br><br>Further, in its 2015 Form 10-K filed on February 25, 2016, Navient confirmed what the market already understood, i.e., that FHLB-DM's action related to the FHFA's rule (which became final in January 2016 but was initially proposed and published in the Federal Register in *September 2014*) preventing non-eligible entities (now defined to include Navient) from gaining membership |

| | | | with a FHLB through the use of a captive insurer. |
|---|---|---|---|
| **Q1 2015 Form 10-Q issued on April 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (49) "As of March 31, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $12.5 billion and $13.2 billion, respectively.  For the three months ended March 31, 2015 and 2014, the average maximum additional capacity under these facilities was $12.9 billion and $12.3 billion, respectively." | | |
| **Q2 2015 Form 10-Q issued on August 3, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (50) "As of June 30, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $11.5 billion and $13.2 billion, respectively.  For the three months ended June 30, 2015 and 2014, the average maximum additional capacity under these facilities was $12.2 billion and $11.8 billion, respectively." | | |
| **Q3 2015 Form 10-Q issued on October 30, 2015**<br><br>Maker(s) of Statements:  Navient; Chivavibul (signed) | (51) "As of September 30, 2015 and December 31, 2014, the maximum additional capacity under these facilities was $10.1 billion and $13.2 billion, respectively.  For the three months ended September 30, 2015 and 2014, the average maximum additional capacity under these facilities was $11.0 billion and $10.8 billion, respectively." | | |

# EXHIBIT H

on the record evidence, the ALJ properly weighed the opinions of Distefano's treating physicians, according several of the opinions little or very little weight. The ALJ properly accounted for Distefano's limitations concerning social interactions, limiting him to "occasionally interact with supervisors, coworkers and the general public." R. 29, 40. This assessment is consistent with Distefano's ability to engage in daily activities, including working on a part-time basis. The ALJ's hypothetical to the Vocational Expert also properly limited Distefano from "working at unprotected heights or climbing ladders/ropes/scaffolds," and required that he would "avoid concentrated exposure to dust, fumes and noxious gases" due to "obesity, possible distractibility, mental health symptoms, plantar fasciitis, hypertension, atrial fibrillation and sleep apnea." R. 29, 40. The hypothetical posed to the VE matched the limitations found and thus were proper.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 28) is granted and Distefano's motion for judgment on the pleadings (Docket # 15) is denied. The Clerk is requested to enter judgment and to close this case.

SO ORDERED.



**LORD ABBETT AFFILIATED FUND, INC., et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**NAVIENT CORPORATION, et al., Defendants.**

**C.A. No. 16-112-MN Consolidated**

United States District Court, D. Delaware.

Signed 01/29/2019

**Background:** Investors brought putative class action against student loan servicer, individual officers and directors, and underwriters alleging that defendants made false and misleading disclosures in connection with two debt offerings, in violation of Securities Exchange Act (SEA) and Securities Act. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Noreika, J., held that:

(1) investors failed to state securities fraud or Securities Act claims based on servicer's compliance statements;

(2) investors stated Securities Act claims based on servicer's omissions concerning impact of Federal Housing Finance Agency (FHFA) rule;

(3) investors failed to state securities fraud claim based on servicer's omissions concerning impact of FHFA rule;

(4) investors stated Securities Act claims based on servicer's statements concerning its loan portfolio quality;

(5) investors stated Securities Act claims based on servicer's statements regarding its forbearance practices;

(6) investors stated Securities Act claims based on servicer's statements regarding its loan loss provisions; and

(7) investors stated securities fraud claim based on servicer's statements regarding its loans.

Motion granted in part and denied in part.

**1. Federal Civil Procedure ☞636**

   **Securities Regulation ☞60.51(1)**

   Securities fraud claims are subject to the heightened pleading requirements for claims of fraud or mistake and the Private Securities Litigation Reform Act (PSLRA).   Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. §§ 78u-4(b)(1), 78u-4(b)(2); Fed. R. Civ. P. 9(b).

**2. Federal Civil Procedure ☞636**

   The fraud and mistake pleading rule requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.   Fed. R. Civ. P. 9(b).

**3. Federal Civil Procedure ☞636**

   When Securities Act claims are grounded in fraud rather than negligence, the heightened pleading standard for claims of fraud or mistake applies.   Securities Act of 1933, § 1 et seq., 15 U.S.C.A. § 77a et seq.

**4. Securities Regulation ☞60.18**

   To state a claim for violation of § 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.   Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**5. Securities Regulation ☞25.21(3), 25.62(4)**

   Under both of the Securities Act sections imposing strict liability in connection with registration statements, prospectuses, or oral communications, a plaintiff must show a material misstatement or omission, but one section focuses on registration statements and the other section focuses on prospectuses and oral communications.   Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2).

**6. Securities Regulation ☞25.18, 25.56**

   Fraud is not a necessary element to establish a prima facie claim under the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications unless the claims are grounded in fraud.   Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2).

**7. Securities Regulation ☞25.21(3), 25.62(4), 60.46**

   A statement or omission is "material," as an element of a claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications, if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.   Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

      See publication Words and Phrases for other judicial constructions and definitions.

**8. Securities Regulation ☞25.21(3), 25.62(4), 60.46**

   A statement or omission must have significantly altered the total mix of information made available to an investor for it to be "material," as an element of a claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications.   Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a),

77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

> See publication Words and Phrases for other judicial constructions and definitions.

**9. Securities Regulation ⟐25.21(3), 25.62(4), 60.46**

A statement is not "material," and, thus, cannot support a claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications, if it involves subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism; such statements constitute no more than puffery and are understood by reasonable investors as such. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

> See publication Words and Phrases for other judicial constructions and definitions.

**10. Securities Regulation ⟐25.18, 25.56, 60.27(1), 60.46**

Materiality and falsity are separate elements of a claim under § 10(b), Rule 10b-5, or the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications, with distinct requirements. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**11. Securities Regulation ⟐25.25, 25.65, 60.53**

To establish falsity, as an element of a securities fraud claim or Securities Act claim, the Private Securities Litigation Reform Act (PSLRA) requires a complaint to plead with particularity the reasons why the statements were false or misleading when made. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**12. Securities Regulation ⟐25.18, 25.56, 60.27(1), 60.46**

As elements of a claim under § 10(b), Rule 10b-5, or the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications, materiality goes to why a statement is important, and falsity goes to why a statement is untrue or misleading. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**13. Securities Regulation ⟐60.45(1)**

"Scienter," within the meaning of the Private Securities Litigation Reform Act (PSLRA), is defined as a knowing or reckless mental state embracing intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

> See publication Words and Phrases for other judicial constructions and definitions.

**14. Securities Regulation ⟐60.45(1)**

"Recklessness," as a basis for establishing scienter within the meaning of the Private Securities Litigation Reform Act (PSLRA), is not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

> See publication Words and Phrases for other judicial constructions and definitions.

**15. Securities Regulation ⊝60.51(2)**

Under the Private Securities Litigation Reform Act (PSLRA), a "strong inference" of scienter is one that is cogent and at least as compelling as any opposing inference of nonfraudulent intent. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

> See publication Words and Phrases for other judicial constructions and definitions.

**16. Securities Regulation ⊝60.51(2)**

Under the Private Securities Litigation Reform Act (PSLRA), the pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

**17. Securities Regulation ⊝60.51(2)**

The inference of scienter within the meaning of the Private Securities Litigation Reform Act (PSLRA) must be more than merely reasonable or permissible but need not be irrefutable. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

**18. Securities Regulation ⊝25.18, 25.57, 60.27(4)**

Legal compliance statements and regulatory compliance statements by student loan servicer in connection with two debt offerings were not material, rather they constituted inactionable puffery, and, thus, could not support investors' claims under § 10(b), Rule 10b-5, or the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications; servicer's use of words such

as "robust," "strong," and "rigorous" to describe its compliance did not infer any quantifiable amount of compliance. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**19. Securities Regulation ⊝25.25, 25.65, 60.54**

Investors sufficiently alleged materiality of omissions by student loan servicer concerning impact of proposed Federal Housing Finance Agency (FHFA) rule that would limit its access to credit facilities to obtain low-cost credit to fund its operations, as required to state claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications in connection with two debt offerings by servicer; investors alleged that servicer had duty under Securities and Exchange Commission (SEC) regulations and rules to disclose "serious risk" that its ability to access credit facilities would change if proposed rule were adopted. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**20. Securities Regulation ⊝60.45(1)**

Under the core operations doctrine, when the alleged misrepresentations and omissions involve core matters of central importance to the company and its principle executives, an inference of scienter may arise, as an element of a securities fraud claim. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**21. Securities Regulation ⊝60.51(2)**

Under the core operations doctrine, it is not enough to allege that the misrepresentations and omissions involve core mat-

ters, because corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter, as an element of a securities fraud claim; there must also be some additional allegations of specific information conveyed to management and related to fraud. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**22. Securities Regulation ⟐60.51(2)**

To show motive and opportunity, as a basis for establishing the scienter element of a securities fraud claim, catch-all allegations that the defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**23. Securities Regulation ⟐60.45(1)**

Motives that are generally possessed by most corporate directors and officers do not suffice to establish the scienter element of a securities fraud claim; instead, a plaintiff must assert a concrete and personal benefit to the individual defendants resulting from the fraud. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**24. Securities Regulation ⟐60.51(2)**

Investors did not sufficiently allege inference of scienter under core operations doctrine with respect to omissions by student loan servicer concerning impact of proposed Federal Housing Finance Agency (FHFA) rule that would limit its access to credit facilities to obtain low-cost credit to fund its operations, and, thus, failed to state claim under § 10(b) and Rule 10b-5 in connection with two debt offerings by servicer on such basis, where investors alleged that access to credit facility was central to servicer's ability to fund its op-

erations, but did not allege any specific information regarding impact of proposed rule conveyed to management. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**25. Securities Regulation ⟐60.51(2)**

Investors did not sufficiently allege inference of scienter based on motive and opportunity with respect to omissions by student loan servicer concerning impact of proposed Federal Housing Finance Agency (FHFA) rule that would limit its access to credit facilities to obtain low-cost credit to fund its operations, and, thus, failed to state claim under § 10(b) and Rule 10b-5 in connection with two debt offerings by servicer on such basis, where investors alleged that servicer was highly motivated to conceal negative information threatening its liquidity, but did not allege any concrete and personal benefit to individual officers or directors resulting from alleged fraud. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**26. Securities Regulation ⟐25.21(3), 25.62(4), 60.46**

Investors sufficiently alleged materiality of statements by student loan servicer concerning its loan portfolio quality, as required to state claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications in connection with two debt offerings by servicer, where investors alleged that servicer made statements that it had "strong underwriting and customer support," "large, high quality asset base," and "seasoned portfolio," that it set six-year record low in delinquencies and showed continued improvements in delinquencies and defaults, and that such statements were misrepresentations. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A.

§§ 77k(a), 77l(a)(2);  Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**27. Securities Regulation ⚖60.51(1)**

If a securities fraud complaint relies on allegations from confidential witnesses, then the complaint must describe the confidential witness with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

**28. Securities Regulation ⚖60.51(1)**

To assess the probability that confidential witnesses have personal knowledge, as required when a securities fraud complaint relies on allegations from confidential witnesses, a court should consider: (i) the positions formerly held by each confidential witness; (ii) the duration of each confidential witnesses' employment; (iii) the time period during which the confidential witnesses acquired the relevant information; and (iv) how each confidential witness had access to such information; where these facts are found wanting, then the court must steeply discount the confidential witnesses' allegations.

**29. Securities Regulation ⚖60.51(2), 60.53**

Even if the confidential witness allegations in a securities fraud complaint are not discounted for lack of personal knowledge, those allegations may still fail either to establish the falsity of a statement, or to give rise to a strong inference of scienter.

**30. Securities Regulation ⚖60.51(1)**

Investors sufficiently alleged that their confidential witnesses had personal knowledge with respect to alleged falsity of student loan servicer's statements regarding its forbearance practices, as required for investors to rely on confidential witnesses' allegations to state securities fraud claim against servicer, where investors alleged that two of three confidential witnesses worked at servicer as collections supervisors during portion of class period, that third confidential witness worked at servicer's headquarters as specialist during portion of class period, and that all three witnesses alleged that there were employee incentives to put borrowers in forbearance, thereby allowing such accounts to show up as current in servicer's books.  Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**31. Securities Regulation ⚖60.53**

District Court would consider allegations from government complaints filed in separate actions, that were incorporated into investors' securities fraud complaint against student loan servicer, when considering servicer's motion to dismiss for failure to state a claim, since investors were not categorically barred from relying on such allegations to adequately plead falsity of servicer's statements regarding its forbearance practices.  Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**32. Securities Regulation ⚖25.18, 25.57, 60.27(1)**

Investors sufficiently alleged falsity of student loan servicer's statements regarding its forbearance practices, as required to state claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications in connection with two debt offerings by servicer, where investors alleged that employee incentive programs, employee rating programs, scripts, and guidance from supervisors encouraged collections agents to place borrowers into forbearance indiscriminately and for longest possible periods of time, rather than to be careful about use of forbearance and to apply forbearance based on a customer's unique situation.  Securities Act of 1933 §§ 11, 12, 15

U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**33. Securities Regulation ⟺25.18, 25.57, 60.27(1)**

Investors sufficiently alleged falsity of student loan servicer's statements regarding its loan loss provisions, as required to state claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications in connection with two debt offerings by servicer; investors alleged that servicer's systemic use of forbearances artificially depressed its loan loss provisions and that servicer failed to properly account for losses in delinquent and defaulted loans of higher risk borrowers who exited deferment, and such allegations did not rely on hindsight, rather they asserted that servicer ignored certain red flags. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**34. Securities Regulation ⟺25.18, 25.56, 60.27(5)**

A complaint may not rely on hindsight to show falsity, as an element of a claim under § 10(b), Rule 10b-5, and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**35. Securities Regulation ⟺25.18, 25.57, 60.27(1)**

Investors sufficiently alleged falsity of student loan servicer's Sarbanes-Oxley Act (SOX) certifications, as required to state claim under § 10(b), Rule 10b-5,

and the Securities Act sections imposing strict liability for material misstatements or omissions in registration statements, prospectuses, or oral communications in connection with two debt offerings by servicer, where investors alleged that servicer's misleading statements regarding its forbearance practices and resulting manipulation of its financial results rendered certifications false and misleading. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**36. Securities Regulation ⟺60.45(1)**

Investors sufficiently alleged inference of scienter under core operations doctrine with respect to student loan servicer's statements regarding its loans, and, thus, stated claim under § 10(b) and Rule 10b-5 in connection with two debt offerings by servicer on such basis, where investors alleged that specific information concerning fraud around forbearance, charge-offs, and delinquencies were conveyed to individual officers and directors of servicer. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**37. Securities Regulation ⟺60.45(1)**

Investors did not sufficiently allege inference of scienter based on motive and opportunity with respect to student loan servicer's statements regarding its loans, and, thus, failed to state claim under § 10(b) and Rule 10b-5 in connection with two debt offerings by servicer on such basis; investors alleged that servicer was motivated to manipulate its financial results to meet market expectations and to prevent bad news from causing further drops in its stock price, but a desire to manage a company's earnings in order to meet analyst and market expectations was general corporate motive. Securities Ex-

change Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**38. Securities Regulation ⟨⟩60.45(1)**

A desire to manage a company's earnings in order to meet analyst and market expectations is a general corporate motive that does not give rise to a strong inference of scienter, as an element of a securities fraud claim. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

————

Patrick F. Morris, Karen L. Morris, and R. Michael Lindsey, Morris and Morris LLC, Wilmington, DE; Steven E. Fineman, Daniel P. Chiplock, and Michael J. Miarmi, Liefe Cabraser Heimann & Bernstein, LLP, New York, NY; Richard M. Heimann, Bruce W. Leppla, Liefe Cabraser Heimann & Bernstein, San Francisco, CA; Sharon M. Lee, Liefe Cabraser Heimann & Bernstein, Seattle, WA – Attorneys for Plaintiffs.

Kelly E. Farnan, Richards Layton & Finger, P.A., Wilmington, DE; Peter A. Wald, Latham & Watkins LLP, San Francisco, CA; Abid R. Qureshi, Christopher S. Turner, Latham & Watkins LLP, Washington, D.C.; Christopher R. Harris, Latham & Watkins LLP, New York, NY – Attorneys for Navient Corporation and the Individual Defendants.

Kevin G. Abrams, John M. Seaman, Abrams & Bayliss LLP, Wilmington, DE;

Adam S. Hakki, Daniel C. Lewis, and Anthony D. Marinello, Shearman & Sterling LLP – Attorneys for Defendants Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Barclays Capital Inc., Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS Securities Inc., and Wells Fargo Securities, LLC.

## MEMORANDUM OPINION

NOREIKA, U.S. DISTRICT JUDGE:

Defendant Navient Corporation ("Navient") is one of the country's largest servicers of student loans. (D.I. 59 at ¶ 90). The Individual Defendants are officers and/or directors of Navient.[1] (*Id.* at ¶¶ 30-32, 172-80). The Underwriter Defendants served as underwriters on two debt offerings made by Navient between April 17, 2014 and December 28, 2015 ("the Class Period").[2] (*Id.* at ¶¶ 181-90). (Navient, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants.") Lead plaintiffs, referred to collectively as the Lord Abbett Funds, allege that Defendants made false and misleading disclosures during the Class Period.[3] Specifically, the Second Amended Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and Sections 11, 12(a)(2), and 15 of the Securities

---

1. The Individual Defendants are John F. Remondi, Somsak Chivavibul, John Kane, William M. Diefenderfer, III, Ann Torre Bates, Diane Suitt Gilleland, Linda Mills, Barry A. Munitz, Steven L. Shapiro, Jane J. Thompson, and Barry L. Williams.

2. The Underwriter Defendants are Barclays Capital Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., J.P. Morgan Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith

Incorporated, RBC Capital Markets LLC, RBS Securities Inc., and Wells Fargo Securities LLC.

3. The Lord Abbett Funds are comprised of the Lord Abbett Affiliated Fund, Inc., the Lord Abbett Equity Trust-Lord Abbett Calibrated Mid Cap Value Fund, the Lord Abbett Bond-Debenture Fund, Inc., and the Lord Abbett Investment Trust-Lord Abbett High Yield Fund.

Act of 1933 ("the Securities Act"). (*Id.* at ¶¶ 155-61, 203-24).

Pending before the Court is Defendants' motion to dismiss the Second Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and pursuant to the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). (D.I. 63). The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 15 U.S.C. § 78aa (jurisdiction for violations of the Exchange Act), and 15 U.S.C. § 77v (jurisdiction for violations of the Securities Act). For the following reasons, the motion to dismiss is granted-in-part and denied-in-part.

## I.  BACKGROUND

Navient is a loan management, servicing, and asset recovery business. (D.I. 65-1, Ex. 1 at 6). Navient's stock price went from a high of $ 21.40 on February 27, 2015 to a low of $ 11.46 on December 28, 2015, the last day of the Class Period. (D.I. 59 at ¶¶ 15-16). Several plaintiffs sued alleging that the loss in stock price can be attributed to false and misleading disclosures made by Defendants during the Class Period. On July 1, 2016, those actions were consolidated, and, on September 28, 2016, Plaintiffs filed an Amended Complaint in the consolidated class action. (D.I. 36). Defendants moved to dismiss the Amended Complaint for failure to state a claim (D.I. 38), and the Court granted the motion to dismiss because the Amended Complaint improperly relied on puzzle pleading that failed to set forth a "short and plain" statement of their claims. (D.I. 55 at 6-7; D.I. 56). On November 17, 2017, Plaintiffs filed the Second Amended Complaint (D.I. 59) (referred to hereinafter as "the Complaint"), which is the subject to the current motion to dismiss. (D.I. 63). To minimize repetition, the Court will discuss relevant background facts with each group of statements at issue in Defendants' mo-

tion when it discusses whether the Complaint states a claim with respect to each group of statements.

## II.  STANDARD OF REVIEW

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Courts must accept all well-pleaded factual allegations in a complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The Court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, and items subject to judicial notice. *Siwulec v. J.M. Adjustment Serv., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012).

### B.  Rule 9(b) & the PSLRA

[1, 2]  Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Put another way, Rule 9(b) requires that a plaintiff set forth "the who, what, when, where and how" of the alleged fraud. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999). Under the PSLRA, plaintiffs must: (1) "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tel-*

*labs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal citations and punctuation omitted) (quoting 15 U.S.C. § 78u–4(b)(1) and 15 U.S.C. § 78u–4(b)(2) ).

### C. Claims that Sound in Fraud

[3] When Securities Act claims "are grounded in fraud rather than negligence," the heightened pleading standard of Rule 9(b) applies. *Cal. Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161 (3d Cir. 2004). It does not, however, appear that the Securities Act claims of the Complaint are grounded in a theory of fraud. In addressing Plaintiffs' First Amended Complaint, which was dismissed, the Court applied a heightened pleading standard to Plaintiffs' Securities Act claims, because the Securities Act claims incorporated allegations from the Exchange Act claims that Defendants "knew or recklessly disregarded" Navient's "improper practices." (*See* D.I. 55 at 6 (citing D.I. 36 at ¶ 24) ). The Complaint does not repeat this problem. Finally, even if Rule 9(b) did apply, Defendants have done no more than make a one-sentence conclusory argument that the Securities Act claims are not pleaded with particularity. (D.I. 64 at 24). This is not enough for the Court to reach the same conclusion it did previously. Thus, the Court's decision not to apply Rule 9(b) to the Securities Act claims does not affect the outcome of this motion.

### III. DISCUSSION

Counts 1 and 2 of the Complaint assert claims under Sections 10(b) and 20(a) of the Exchange Act, respectively. (D.I. 59 at

¶¶ 155-61). Counts 3, 4, and 5 assert violations of Sections 11, 12(a)(2), and 15 of the Securities Act, respectively. (*Id.* at ¶¶ 213-24). Liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act is predicated on first finding liability under Section 10(b) of the Exchange Act and Sections 11 or 12 of the Securities Act.[4] Consistent with that framework, Defendants have confined their arguments on the motion to dismiss to whether the Complaint pleads a claim under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act.

The Court will first set out of the elements of a claim under the relevant statutory sections. It will then elaborate on the standards for pleading the elements on which Defendants have focused their motion, to wit, materiality, falsity, and scienter. Finally, the Court will address whether the Complaint meets those standards. The Complaint has arranged the purportedly false and misleading statements into three groups: compliance, credit facilities, and loans. The "loan" topic is further divided into four subgroups: the quality of the loan portfolio, forbearance practices, loan loss provisions, and SOX certifications. Defendants have set forth several arguments as to why allegations regarding each group and subgroup of statements fails to adequately plead materiality, falsity, and/or scienter.

### A. The Relevant Statutory Sections
### 1. Exchange Act Claims: § 10(b) and Rule 10b-5

[4] Section 10(b) of the Exchange Act makes it unlawful for any person to "use

---

**4.** Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a person, including a corporation, who has committed a Section 10(b) violation. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) (citation omitted); 15 U.S.C. § 78t(a).

Section 15 of the Securities Act provides for joint and several liability on any individual who controls a violator of Sections 11 or 12. 15 U.S.C. § 77o; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006).

or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b). Thus, to state a claim for violation of Section 10(b) and Rule 10b-5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630–31 (3d Cir. 2011). Defendants' motion to dismiss focuses on the elements of materiality and scienter.

## 2. Securities Act Claim: Sections 11 and 12(a)(2)

**[5, 6]**   Section 11 of the Securities Act imposes liability where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability where a prospectus or oral communication "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under

which they were made, not misleading." *Id.* at § 77l(a)(2). Thus, under both Section 11 and Section 12(a)(2), a plaintiff must show a material misstatement or omission, but Section 11 focuses on registration statements and Section 12(a)(2) focuses on prospectuses and oral communications. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004). "Fraud … is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)" unless the Securities Act claims are grounded in fraud. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006). As the Court has already determined, for the reasons explained above, that Plaintiffs' Securities Act claims are not grounded in fraud, the only element at issue for these claims is materiality.

## B. Standards for Pleading Materiality, Falsity, and Scienter

### 1. Materiality

**[7–9]**   A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (alteration in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ). The statement or omission must have "significantly altered the total mix of information made available.'" *Aetna*, 617 F.3d at 283 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ). A statement is not material if it involves "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism." *Aetna*, 617 F.3d at 283 (quoting *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) ). "Such statements 'constitute no more than puffery and are understood by reasonable investors as such.'" *Aetna*,

617 F.3d at 283 (quoting *In re Advanta*, 180 F.3d at 538).

## 2. Falsity

**[10–12]** Materiality and falsity are separate elements with distinct requirements. *See, e.g., Emps. Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1168 (10th Cir. 2018) (explaining that "materiality is an element of the claim in addition to falsity"). To establish falsity, the PSLRA requires a complaint to plead with particularity the "the reasons why" the statements were false or misleading when made. *Avaya*, 564 F.3d at 252; *Chubb*, 394 F.3d at 142 (explaining that falsity requires a complaint to plead "the 'true facts' purporting to show *how* or *why* those statements are false" (emphasis in original) ). Thus, materiality goes to why a statement is important, and falsity goes to why a statement is untrue or misleading.

## 3. Scienter

**[13, 14]** Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," *i.e.*, that defendants acted with "scienter." 15 U.S.C. § 78u–4(b)(2)(A); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013). Scienter is defined as a " 'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.' " *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (quoting *Avaya*, 564 F.3d at 252). Recklessness is "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (quoting *In re Advanta*, 180 F.3d at 535).

**[15–17]** "A 'strong inference' of scienter is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Avaya*, 564 F.3d at 267 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504-05, 168 L.Ed.2d 179 (2007). "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.' " *Avaya*, 564 F.3d at 267 (emphasis in original) (quoting *Tellabs*, 127 S.Ct. at 2509). Finally, the inference of scienter "must be more than merely reasonable or permissible but need not be irrefutable." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011) (internal punctuation and citation omitted).

## C. Compliance

**[18]** The Complaint alleges that Defendants made materially false or misleading statements regarding Navient's compliance with legal and regulatory requirements. (D.I. 59 at ¶ 93). Specifically, it alleges that in public statements to investors, Navient purported to have a "robust compliance driven culture," a "very, very strong compliance culture," "demonstrated compliance infrastructure," and "rigorous training programs." (*Id.*). Consistent with cases addressing similar statements, the Court finds that the compliance statements on which Plaintiffs' Complaint rest are not material, but instead constitute inactionable puffery. *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014) (statements about "rigorous" processes and "effective" training were not material because those terms "do not assert specific [and] verifiable facts" on which reasonable investors would rely); *In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 401 (S.D.N.Y. 2016) (state-

ment that company "maintain[s] an effective compliance organization" is corporate puffery); *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *7 (S.D. Fla. Sept. 4, 2015) (statement that company had " 'robust' compliance controls" is puffery); *In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352, 370 (E.D.N.Y. 2013) (description of compliance program as "robust" or "best-of-class" is puffery); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *24 (S.D.N.Y. Sept. 28, 2010) (statement that company is "maintaining a very strong internal control environment" is inactionable puffery).

The Court is not persuaded by the cases Plaintiffs cited to show that the compliance statements are material, because the financial statements evaluated in those cases are not sufficiently analogous to the legal compliance statements Plaintiffs allege here. *See* D.I. 67 at 14-16 (citing *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (statement that the company's loan loss reserves are "adequate") and *In re Wilmington Trust Sec. Litig.*, 29 F.Supp.3d 432, 447 (D. Del. 2014) (statement that the company " 'consistently' applied 'rigorous loan underwriting standards' "). It could be argued that "adequate" and "rigorous," in a financial context, imply a quantifiable amount of money, whereas the same words in a compliance context do not infer a quantifiable amount of compliance. Accordingly, Plaintiffs' cases are not illuminating on the issue of whether Defendants' compliance statements are material. Defendants' motion to dismiss the portion of Plaintiffs' claims based on the compliance statements is granted. The portion of Plaintiffs' Securities Act claims, and Exchange Act claims based on compliance statements is dismissed with prejudice.

**D. Credit Facilities**

The Complaint alleges that Navient made false or misleading statements when it reported the borrowing capacity under its credit facilities, because Navient failed to disclose the likelihood that the Federal Home Loan Bank of Des Moines ("FHLB-DM") would terminate Navient's access to those credit facilities in light of a proposed rule by the Federal Housing Finance Agency ("the FHFA"). (D.I. 59 at ¶¶ 138-39). In September 2014, the FHFA proposed a rule that would prevent entities from using a "captive insurer" to gain membership to a Federal Home Loan Bank like FHLB-DM. (*Id.* at ¶ 13). Navient's predecessor Sallie Mae formed a captive insurer which Navient then used to access the FHLB-DM's credit facility. (*Id.*). Thus, the proposed rule, which was adopted as a final rule in January 2016, impacted Navient's ability to obtain low-cost credit to fund its operations. (*Id.*). On December 28, 2015, Navient disclosed that the FHLB-DM would reduce the company's ability to borrow under its credit facility by more than 50%, a change the Complaint alleges is material because the low-cost credit available under the FHLB-DM was not available from other sources. (*Id.* at ¶ 13). Defendants argue that the Complaint fails to adequately plead materiality and scienter with respect to the credit facility statements. (D.I. 64 at 16-17; D.I. 69 at 15). Each element is addressed in turn below.

**1. Materiality**

**[19]** The Complaint alleges that, under SEC Regulations, Navient had a duty to disclose the "serious risk" that the FHLB-DM would terminate Navient's access to the credit facility due to the FHFA's proposed rule. (D.I. 59 at ¶ 139-142). Specifically, it alleges that Navient violated its duty under SEC Regulation S-X, Rule 05-02-22, to disclose the "conditions under which commitments may be withdrawn." (*Id.* at ¶ 141). It also alleges that Navient violated its duty under SEC Regulation S-

K, Rule 303, to "[i]dentify <mark>any known</mark> trends or any known demands, commitments, <mark>events or uncertainties that</mark> will result in or that <mark>are reasonably likely to result</mark> in the [company]'s <mark>liquidity increasing or decreasing in any material way."</mark> (*Id.* at ¶ 142).

Defendants' motion to dismiss does not discuss Rule 05-02-22 or Rule 303 or whether these rules do in fact impose a duty to disclose the FHFA's proposed rule regarding captive insurers. While Defendants mentioned that the proposed rule was public information, they do not explain the significance of that fact or provide citations to case law showing that it is proper grounds for dismissal. (*See* D.I. 69 at 9). Defendants also suggest that the risk was in fact disclosed when the 2014 Form 10-K stated that "regulatory actions" are one of many "factors that could make financing more expensive or unavailable to Navient." (*See* D.I. 64 at 17). But Defendants did not explain, with citation to case law, how this statement was more than mere boilerplate and provided adequate warning with respect to the proposed FHFA rule. Finally, Defendants rely on *Gaer v. Education Management Corp.* to suggest that, as a matter of law, a company is "not obligated to predict months in advance about the final regulations that eventually issued." *See* D.I. 64 at 17 (citing *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447, at *2 (W.D. Pa. Aug. 30, 2011) ). But this reliance is misplaced, because the quote is taken out of context.

The court in *Gaer* essentially held that a company did not have to predict, at the time of its initial public offering ("IPO"), that the Department of Education would adopt a final rule over a year later, when the only activity before the IPO was an announcement that the Department of Education planned to form a negotiated rule-making committee, that committee eventually failed to produce any rules, and the rules finally adopted came about after a stop and start process. *Gaer*, 2011 WL 7277447, at *2-*5, *23. Defendants have not shown that a similar start and stop process hindered its ability to disclose any risk from the FHFA's proposed rule. More importantly, the court in *Gaer* ultimately rejected the plaintiff's argument because the company "did warn investors about the potential impact that the rulemaking might have."[5] *Id.* at *23. Therefore, Defendants have failed to show that the credit facility statements are not material. Defendants' motion to dismiss the portion of the Securities Act claims based on the credit facility statements is denied. Dismissal of the Exchange Act claims based on the credit facility statements will depend on whether Defendants have shown that the Complaint fails to adequately plead scienter.

### 2. Scienter

**[20, 21]** To plead scienter with respect to the credit facility statements, the Complaint relies on: (i) the "core operations doctrine" and (ii) motive and opportunity. (D.I. 59 at ¶¶ 147-148). Under the core operations doctrine, when the misrepresentations and omissions involve " 'core matters' of central importance" to the company and its principle executives, an inference of scienter may arise. *Avaya*, 564 F.3d at 268. It is not enough, however, to allege that the misrepresentations and omissions involve core matters, because

---

**5.** The other cases cited by Defendants are equally unhelpful. In *Matrixx Initiatives, Inc. v. Siracusano,* the U.S. Supreme Court held that plaintiffs stated a claim for relief based on a pharmaceutical company's failure to disclose reports of adverse medical events. 563 U.S. 27, 30, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). In *In re Morgan Stanley Info. Fund Sec. Litig.,* the court addressed whether the defendants had an affirmative obligation in registration statements and prospectuses filed on Form N-1A to disclose conflicts of interests. 592 F.3d 347, 351 (2d Cir. 2010).

"corporate management's general aware-
ness of the day-to-day workings of the
company's business does not establish
scienter." *Rahman*, 736 F.3d at 246-47
(quoting *Metzler Inv. GMBH v. Corinthi-
an Coll., Inc.*, 540 F.3d 1049, 1068 (9th Cir.
2008) ). There must also be "some addition-
al allegations of specific information con-
veyed to management and related to
fraud." *Rahman*, 736 F.3d at 237 (quoting
*Metzler*, 540 F.3d at 1068).

[22, 23]   To show motive and opportuni-
ty, "catch-all allegations that defendants
stood to benefit from wrongdoing and had
the opportunity to implement a fraudulent
scheme are [not] sufficient, because they
do not state facts with particularity or give
rise to a strong inference of scienter." *GSC
Partners*, 368 F.3d at 237 (quoting *In re
Advanta*, 180 F.3d at 535). In addition,
"[m]otives that are generally possessed by
most corporate directors and officers do
not suffice; instead, plaintiffs must assert a
concrete and personal benefit to the indi-
vidual defendants resulting from this
fraud." *GSC Partners*, 368 F.3d at 237
(quoting *Kalnit v. Eichler*, 264 F.3d 131,
139 (2d Cir. 2001) ).

[24, 25]   Here, Plaintiffs' allegations re-
lated to the FHFA's proposed rule are
insufficient to give rise to a strong infer-
ence of scienter. The Complaint does no
more than make the conclusory allegation
that the FHLB-DM credit facility was
"central[ ]" to Navient's ability to fund its
operations. (D.I. 59 at ¶ 147). The Com-
plaint does not allege, as required, that
specific information regarding the impact
of the proposed FHA rule was conveyed to
management. Thus, there is no inference
of scienter as to the credit facility state-
ments based on the core operations doc-
trine. Similarly, the Complaint makes a
single conclusory allegation that "Defen-
dants were highly motivated to conceal
negative information threatening the Com-
pany's liquidity." (*Id.* at ¶ 148). It does not,

however, allege, as required, any "concrete
and personal benefit to the individual de-
fendants resulting from this fraud." *See
GSC Partners*, 368 F.3d at 237. Thus, the
Complaint does not give rise to any infer-
ence of scienter, let alone a strong one,
based on motive and opportunity. Given
the foregoing, the Court grants Defen-
dants' motion to dismiss the portion of the
Exchange Act claims based on the credit
facility statements for failure to adequately
plead the element of scienter. Those claims
are dismissed without prejudice.

**E.   Loans**

The Complaint alleges that Defendants
made material statements regarding Na-
vient's loans that were false and mislead-
ing. It divides the allegations regarding
the materiality of Navient's loans into four
subsections. The first section addresses
the "high quality" of Navient's loan portfo-
lio, including the "low level" of delinquen-
cies and charge-offs. (D.I. 59 at ¶¶ 50-53).
The second section addresses statements
regarding Navient's forbearance practices.
(*Id.* at ¶¶ 33-49). The third section address-
es Navient's loan loss provisions. (*Id.* at
¶¶ 54-63). The last section addresses SOX
certifications signed by Navient's chief ex-
ecutive officer ("CEO") and chief financial
officer ("CFO"). (*Id.* at ¶¶ 64-66). Finally,
the Complaint sets forth the scienter alle-
gations as to the loan statements collec-
tively in a separate section. (*Id.* at ¶¶ 67-
93). The Court will discuss the materiality
and/or falsity of each group of loan state-
ments separately before addressing the
scienter allegations collectively.

**1.   Loan Portfolio Quality: Charge-
Offs and Delinquencies**

[26]   Plaintiffs allege that Defendants
made misrepresentations regarding the
"quality" of Navient's loan portfolio, in-
cluding the number of delinquencies and

charge-offs.[6] (D.I. 59 at ¶¶ 50-51). This subsection of the Complaint attacks two types of statements: statements characterizing Navient's loan portfolio and statements reporting on the portfolio's performance. The first type includes statements that the company has "strong underwriting and customer support," a "[l]arge, high quality asset base," and a "[s]easoned portfolio." (*Id.*). The second type includes statements that the company "set a six year-record low in delinquencies" and "show[ed] continued improvements in delinquencies and defaults since a year ago." (*Id.*).

For reasons not clear to the Court, Defendants does not address the materiality (or falsity) of the loan quality statements. Defendants' opening brief combined the arguments on materiality of the loan quality statements and loan loss provisions under the broader heading of "financial results," but ultimately the arguments and cases cited focused on loan loss provisions. (D.I. 64 at 7, 10-14). As a result, there is no argument, with citations to supporting case law, addressing the materiality of Navient's loan quality statements. Because materiality is the only element at issue with respect to the Securities Act claims, Defendants have not shown that the Complaint fails to plead a Securities Act claim based on the loan quality statements. Defendants' motion to dismiss the portion of the Securities Act claims based on the loan quality statements is denied. Unless Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the loan quality statements.

### 2. Forbearance Practices

Defendants argue that the Complaint fails to adequately plead the falsity of Defendants' forbearance statements.[7] (D.I. 64 at 7-10). The Complaint alleges that the following forbearance statements were false or misleading when made: (1) Navient engaged in a "careful use of forbearance," (2) Navient applied forbearances "based on a customer's unique situation," (3) the company's forbearance policies "include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan," and (4) Navient "continue[d] to see . . . continuing positive delinquency, forbearance and charge-off trends in connection with th[e] [PEL] portfolio." (D.I. 59 at ¶ 49). The Complaint alleges that those forbearance statements were false or misleading when made, because "Navient engaged in a systemic practice of indiscriminately placing borrowers into forbearance," which allowed Navient to avoid recording those accounts as delinquent or in default. (*Id.* at ¶ 36).

To show how or why those forbearance statements were false, the Complaint relies on: (i) statements from three confidential witnesses; (ii) the allegations in complaints filed against Navient by the Consumer Financial Protection Bureau ("CFPB"), the Attorney General of Illinois, and the Attorney General of Pennsylvania; and (iii) a September 2015 report by the CFPB resulting from a public inquiry by the CFPB, Department of Education, and the U.S. Treasury Department. (D.I. 59 at ¶¶ 37-48). Defendants attack the Complaint's reliance on confi-

---

**6.** A loan is delinquent when a scheduled payment is past due. (D.I. 65-1, Ex. 1 at 11). A "charge-off" occurs when a loan is considered uncollectible. (D.I. 65-1, Ex. 2 at 40).

**7.** Forbearance means the borrower is granted a period of time where no payments have to be made or the company accepts a smaller than scheduled payment. (D.I. 65-1, Ex. 2 at 85). Forbearance does not grant any reduction in the total repayment obligation. (*Id.*). While in forbearance, interest continues to accrue. (*Id.*).

dential witnesses and government complaints as sources to show the alleged falsity of the forbearance statements. (D.I. 64 at 8-10). Defendants further argue that even if the Complaint may appropriately rely on these types of sources, the allegations from those sources are insufficient to show falsity. (*Id.*). Accordingly, the Court will first address the appropriateness of relying on confidential witness and government complaints, and then address whether those allegations do in fact adequately plead falsity.

### a. Confidential Witnesses

[27–29]   If a complaint relies on allegations from confidential witnesses, then the complaint must describe the confidential witness with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Rahman*, 736 F.3d at 244 (quoting *Chubb*, 394 F.3d at 146). To assess the probability that confidential witnesses have personal knowledge, the Court should consider: (i) "the positions formerly held by each [confidential witness]," (ii) "the duration of each [confidential witnesses'] employment," (iii) "the time period during which the [confidential witnesses] acquired the relevant information," (iv) and "how each confidential witness had access to such information." *Avaya*, 564 F.3d at 263. Where these facts are "found wanting," then the Court must "steeply" discount the confidential witnesses' allegations. *Id.* at 263. Finally, even if the confidential-witness allegations are not discounted, those allegations may still "fail either to establish the falsity of a statement, or to give rise to a strong inference of scienter." *Id.* at 263 n.33 (citing *Metzler*, 540 F.3d at 1069 n.13).

[30]   Here, the Complaint relies on allegations from three confidential witnesses to plead the falsity of Navient's statements regarding its forbearance practices. (D.I. 59 at ¶¶ 37-41). CW1 worked at Navient as

a collections supervisor from early 2014 until April 2015. (*Id.* at ¶ 37). CW1 alleged, among other things, that "the Collections Department's 'objective all of the time was to keep an account current' through using forbearances." (*Id.*). According to the Complaint, this policy directive was conveyed to CW1 by her supervisor but came from Navient District Manager/Senior Vice President of Default Prevention Troy Standish, who reported to defendant John Kane, the Chief Operating Officer of Navient. (*Id.* at ¶¶ 32, 37). CW1 further explained that Navient encouraged employees to place borrowers into forbearance, which took less time than other options, by giving agents who wanted "to achieve a good performance rating, just five and a half minutes per phone call with borrowers." (*Id.* at ¶ 40).

CW2 is a former Navient collections department supervisor who worked at the company from mid-2010 until October 2014 and supervised 25 collections agents. (*Id.* at ¶ 38). According to CW2, "Navient Director of Operations Christi Hewes instructed CW2 and others to encourage customers to obtain longer forbearances than they initially requested, as that would result in a longer period during which the account would show up as 'current' on Navient's books." (*Id.* at ¶ 38). CW2 also corroborated CW1's allegations regarding employee incentives to put borrowers into forbearance by stating that in order to be rated "number one," agents had to put borrowers "in something that makes them look like they're up to date for a longer period of time." (*Id.* at ¶ 39). So even if a borrower requested a short forbearance, the supervisors were coached by management to coach the agents to convince the borrower to obtain a longer forbearance. (*Id.*).

Finally, CW3 is a former Navient Department of Education Specialist II who

worked at Navient's Delaware headquarters from June 2014 until after the Class Period. (*Id.* at ¶ 41). CW3 further corroborated allegations that "Navient provided incentives to personnel for getting customers off the phone in the fastest amount of time" and that borrowers relied on Navient customer service representatives to understand their options with respect to forbearance. (*Id.*).

The Court finds that the Complaint describes each CW with sufficient particularity to support the probability that the CW has personal knowledge of Navient's forbearance practices. Defendants assert that the CWs' allegations should be steeply discounted, because they are "all low-level former employees" and "were not employed for the full class period." (D.I. 64 at 8). But other courts have not discounted a CW's allegations just because those characteristics were present. *See Avaya*, 564 F.3d at 265-66 (concluding that allegations from CWs who were "relatively low level former employees" showed that certain forecast-related statements were false); *In re SLM Corp. Sec. Litig.*, 740 F.Supp.2d 542, 555 n.5 (S.D.N.Y. 2010) (concluding that the "CWs were positioned, albeit at low levels, to have knowledge of how Sallie Mae implemented its forbearance policy."); *Id.* at 245 n.1, 260, 266 (relying on allegations based on CWs who worked at the company until March and November 2004, even though the class period was October 2004 to April 2005).

In addition, the Complaint does not rest solely on allegations from purportedly "low-level" employees who worked at Navient for less than the full class period. It alleges the direct involvement of the CWs supervisors, alleges that at least one of the CWs is only a few levels removed from one of the individual defendants in this case, and alleges that the actions taken by the CWs were guided by incentive programs, employee rating programs, and scripts.

(D.I. 59 at ¶¶ 37-41). It is reasonable to infer that those programs and scripts would have been prepared and approved by employees who are not low-level. Finally, at least one CW was employed at any point during the Class Period. For the foregoing reasons, the Court does not agree with Defendants that the allegations of the CWs should be discounted.

### b. Government Complaints

**[31]** To corroborate the confidential witness statements, the Complaint incorporates allegations from government complaints filed in other cases. Defendants assert that this is not permitted. Specifically, Defendants contend that "courts deeply discount, or decline to consider altogether, untested allegations imported from third-party complaints." (D.I. 64 at 9). The Court cannot determine whether this is correct, because the few cases Defendants cite do not appear relevant to the issue before the Court. (*Id.* at 9-10).

First, Defendants rely on the court's statement in *Gaer*, "the fact that the government may join in a *qui tam* suit does not demonstrate that the suit has merit." (*Id.* at 9 n.9 (quoting *Gaer*, 2011 WL 7277447, at *10) ). This, however, is not *a qui tam* action, the government complaints incorporated into Plaintiffs' Complaint are not *qui tam* actions, and Plaintiffs are not relying on the fact that the government has brought an action to bolster the merits of their own suit. Instead, Plaintiffs rely on specific factual allegations in the government complaint, which must under Fed. R. Civ. P. 11 be based on a reasonable inquiry, to corroborate similar factual allegations in its own complaint.

Second, Defendants rely on *RSM Productions* where a district court in the Second Circuit granted a motion to strike, because "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed,

settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009). As an initial matter, Second Circuit case law is not binding on this Court. In addition, Defendants are not asking the Court to strike the government allegations incorporated into the Complaint. Finally, there is some doubt that *RSM Production* correctly summarizes Second Circuit case law. *See, e.g.*, *Sec. & Exchange Comm'n. v. Lee*, 720 F.Supp.2d 305, 340 (S.D.N.Y. 2010) (a later case from the same circuit denying a defendant's motion to strike because "[t]here is no absolute rule barring a private plaintiff from relying on government pleadings . . . to meet the Rule 9(b) and PSLRA thresholds"). Given the foregoing, Defendants have not presented any binding or persuasive authority on the issue of whether Plaintiffs may rely on allegations in government complaints to adequately plead falsity. Therefore, the Court will not at this time "deeply discount or decline to consider altogether" those allegations.

### c.   Sufficiency of the Falsity Allegations

[32]   Defendants argue that the Complaint fails to adequately plead the falsity of the forbearance statements. (*Id.* at 9). The Court, however, is not convinced. The CWs' allegations, taken as true and read in the light most favorable to plaintiff, contribute to an overall picture that the forbearance statements were false when made. The CWs allege that – per the incentive programs, employee rating programs, scripts, and guidance from supervisors – the CWs and other collections agents in similar positions were not "care-

ful" about the use of forbearance, did not apply forbearance "based on a customer's unique situation," and did not limit either the number of forbearance months granted consecutively or the total number of forbearance months granted over the life of the loan," but instead placed borrowers into forbearance indiscriminately and for the longest possible periods of time. In addition, Defendants addressed the sufficiency of the falsity allegations taken from the government complaints in a single unhelpful sentence. (*See* D.I. 64 at 9 (stating that "[t]hese mundane allegations neither support the bombastic conclusions with which Plaintiffs pair them, nor show any systemic policy of forbearance misuse") ). Accordingly, Defendants have not shown that the Complaint fails to adequately plead the falsity of the forbearance statements. For these reasons, Defendants motion to dismiss the parts of the Securities Act claims based on the forbearance statements is denied. Unless Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the forbearance statements.

### 3.   Loan Loss Provisions

[33]   For each quarter from Q1 2014 to Q1 2015, Navient reported the amount of its loan loss provisions for its Private Education Loans ("PELs").[8] (D.I. 59 at ¶ 54). Navient also reported an amount for the full year of 2014. (*Id.*). The Complaint alleges that the loan loss provisions were materially misstated, because "Navient's systemic use of forbearances to hide what otherwise would have added to the Company's reported delinquencies, defaults, and charge-offs artificially depressed its loan

---

**8.**  A "loan loss allowance" is the amount of money that Navient has set aside to cover the total amount of charge-offs expected over the next two years. (D.I. 65-1, Ex. 2 at 40). The provision for loan losses increases the related

allowance for loan losses. (*Id.*). Generally, the allowance for loan losses rises when future charge-offs are expected to increase and falls when future charge-offs are expected to decline. (*Id.*).

loss provisions." (*Id.* at ¶ 55). The Complaint also alleges that Navient "failed to properly account for losses on more than $ 2.5 billion in delinquent and defaulted PELs of higher risk borrowers who exited deferment in 2014." (*Id.* at ¶ 62). According to Defendants, the Complaint fails to adequately plead the falsity of the loan loss provisions for three reasons: (i) the lack of allegations that the loan loss model was manipulated; (ii) the improper reliance on hindsight; and (iii) the failure to meet the pleading requirements for statements of opinion. (D.I. 64 at 10-14). Each argument is addressed in turn.

First, Defendants assert that successful challenges to loan loss provisions require a plaintiff to allege "facts showing that the defendant misapplied or manipulated its [loan loss] model" to achieve a particular accounting outcome. (D.I. 64 at 12 (citing *Southeastern Pennsylvania Transp. Authority v. Orrstown Fin. Serv., Inc.*, 2015 WL 3833849, at *23-24, *27 (M.D. Pa. June 22, 2015); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ). Assuming Defendants are correct as to the law, and the Court cannot be certain of that because the cases Defendants cite do not say that manipulation is a requirement, the Complaint alleges that Navient's systemic use of forbearance artificially depressed Navient's loan loss provisions. (D.I. 59 at ¶ 55). Read in the light most favorable to Plaintiffs, that appears to be an allegation of manipulation. Defendants do not explain why this allegation of manipulation is insufficient without getting into an evidentiary challenge that is improper on a motion to dismiss. Specifically, Defendants argue that systemic use of forbearance cannot be a form of manipulation, because Navient's loan loss model "is designed to prevent precisely [that] kind of manipulation." (D.I. 64 at 12). Because this issue cannot be resolved on a motion to

dismiss, the Court is not convinced that the Complaint fails to adequately plead falsity based on the manipulation of the loan loss model.

[34] Second, Defendants assert that the Complaint improperly relies on hindsight to show the falsity of the loan loss provisions. (D.I. 64 at 10-11). Specifically, the increase to the loan loss provision in July 2015 does not show that the earlier loan loss provisions were false or misleading. (*Id.*). Defendants are correct that a complaint may not rely on hindsight to show falsity. *See, e.g.*, *Orrstown*, 2015 WL 3833849, at *23 ("[T]he fact that a company's loan loss reserves are subsequently increased does not mean that the reserves were knowingly understated at some earlier time."). But it does not appear that the Complaint here is relying on the increase in July 2015 to show that the earlier amounts were false or misleading.

Instead, the Complaint alleges that Defendants knew or recklessly disregarded information which should have caused an increase to the loan loss provisions at some point earlier than July 2015. Specifically, the Complaint alleges that Remondi, the CEO of Navient, indicated during Navient's Q2 2015 earnings call that a cohort of borrowers exiting deferment in 2014 exhibited characteristics long before 2014 that normally lead to a higher incidence of delinquencies and charge-offs. (D.I. 59 at ¶ 62). Remondi stated that "[t]he incidence of delinquency and default on borrowers who take more time to get an undergraduate degree is certainly higher," and this cohort had reflected that trend when they " 'moved in and out of school multiple times' (some without earning a degree)," and historically had been "struggling to begin with." (*Id.* (quoting D.I. 65-1, Ex. 4 at 11-12) ). The Complaint suggests that the Defendants ignored those red flags.[9]

---

**9.** Defendants argue that Remondi's statements reflect analysis that was not performed

Thus, Defendants have not shown that the Complaint improperly relies on hindsight.

Finally, Defendants argue that loan losses provisions are statements of opinion and, therefore, the claims based on the loan losses provisions should be dismissed for failing to comply with the pleading requirements of *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, —— U.S. ——, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015) ("*Omnicare*"). (D.I. 64 at 13). In *Omnicare*, the Supreme Court held that under § 11 of the Securities Act, a defendant may be liable for a false statement of opinion if: (i) the speaker did not subjectively hold the stated belief; (ii) the opinion contained embedded statements of fact and the embedded facts were untrue; or (iii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning" the opinion, and those facts "conflict with what a reasonable investor would take from the statement itself." 135 S.Ct. at 1326-27, 1329. According to Defendants, the Complaint does not allege that Navient subjectively did not believe their statements about the loan loss provisions. (D.I. 64 at 13-14).

As an initial matter, Defendants assume that *Omnicare* applies to Plaintiffs' Exchange Act claims, but the Third Circuit has not reached that conclusion. *Jaroslawicz v. M & T Bank Corp.*, 912 F.3d 96 (3d Cir. 2018) ("We have yet to decide whether *Omnicare* applies to claims brought under the Exchange Act," and "[w]e decline to do so again today . . . ."); *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 132 n.12

(3d Cir. 2017) ("[W]e decline to decide whether *Omnicare* is applicable to § 10(b) claims . . . ."). Because the Third Circuit has twice declined to decide that *Omnicare* applies to Exchange Act claims, the Court is reluctant to decide that issue of first impression in connection with a motion to dismiss – particularly given that the parties did not address the issue in their briefs.

Defendants have also failed to show that the statements in this case regarding loan loss provisions are opinions, as opposed to facts. Defendants suggest that in *Shapiro v. UJB Financial Corp.*, the Third Circuit held that loan reserves are always statements of opinion. (D.I. 64 at 13 (citing *Shapiro*, 964 F.2d at 281). But that argument has been roundly rejected by other courts in this circuit. *See Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) (stating that "neither *Shapiro* nor any other case Defendants rely upon stands for the broad proposition that all statements pertaining to loan loss reserves are opinions."). If *Shapiro* were limited to the type of statements about loan loss provisions made in that case, then *Shapiro* is distinguishable. In *Shapiro*, the court held that "general labels" describing loan loss provisions as "adequate" or "solid" might be actionable material misstatements.[10] *Shapiro*, 964 F.2d at 282. Here, Plaintiffs' Complaint does not rest on statements about loan loss provisions using general labels. Rather, the Complaint alleges that the dollar amounts disclosed for the loan loss provisions were false or mis-

or known before Q2 2015, but that assertion is not clear from the citation Defendants provide. (D.I. 64 at 14 (citing D.I. 65, Ex. 4 at 6) ). The earnings call transcript states that Navient learned of the red flags when the company "look[ed] a little bit deeper at these loans" but the transcript does not indicate when that deeper look occurred. (D.I. 65, Ex. 4 at 6).

**10.** The other cases cited by Defendants fit within the rubric of using general labels to describe the loan loss reserves. *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F.Supp.3d 473, 481 (S.D.N.Y. 2017) ("Ambac's management believes that the reserves for losses . . . are adequate . . . ."); *Orrstown*, 2015 WL 3833849, at *22 (stating that loan loss reserves are adequate).

leading, because Defendants' systemic use of forbearance meant the loan loss provisions were "artificially understated." (D.I. 59 at ¶ 73).

For the foregoing reasons, Defendants have not shown that the Complaint fails to adequately plead the falsity of the statements regarding the loan loss provisions. Defendants' motion to dismiss the parts of the Securities Act claims based on statements about the loan loss provisions is denied. Unless Defendants can show that the Complaint fails to adequately plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on statements about the loan loss provisions.

**4.  SOX Certifications**

[35]  The Complaint alleges that the false and misleading statements regarding Navient's forbearance practices and "resulting manipulation of Navient's financial results" rendered the SOX certifications by Navient's CEO John F. Remondi and CFO Somsak Chivavibul in the Form 10-Qs and 10-K issued during the Class Period false and misleading when made. (D.I. 59 at ¶¶ 64-66). Those certifications stated, in relevant part, that "based on my knowledge, this report does not contain any untrue statement of material fact." (*Id.*).

The Court will not dismiss the portion of Plaintiffs' claims based on the SOX certifications, because Defendants' only arguments on this issue were buried in a couple of footnotes and further obscured by the high number of footnotes overall. Courts traditionally do not consider arguments presented entirely in the footnotes. *See Horatio Washington Depot Tech. LLC v. TOLMAR, Inc.*, 2018 WL 5669168, at *13 (D. Del. Nov. 1, 2018) (declining to consider an argument raised entirely in a footnote); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F.Supp.3d 491, 542 n.33 (D. Del. 2016) ("Arguments that are presented in limited form in footnotes are entitled to

little weight."); *Campbell v. Sussex Cty. Fed. Credit Union*, 2015 WL 3918946, at *1 (D. Del. June 22, 2015) (stating that "[t]he Court will not address issues raised in footnotes"); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (stating that arguments raised only in footnotes are not preserved).

Given the foregoing, Defendants have not shown that the Complaint fails to plead a Securities Act claim based on the SOX Certifications. Defendants' motion to dismiss the portion of the Securities Act claims based on the SOX Certifications is denied. Unless Defendants can show that the Complaint fails to plead scienter, the Court will also deny Defendants' motion to dismiss the portion of the Exchange Act claims based on the SOX Certifications.

**5.  Scienter**

The Complaint collectively addresses the element of scienter as to the statements regarding Navient's loan quality, forbearance practices, loan loss provisions, and SOX Certifications (*i.e.*, the "loan statements"). (D.I. 59 at ¶¶ 67-83). The scienter allegations for the loan statements are comprised of: confidential witness allegations (*Id.* at ¶¶ 69, 76-78); allegations taken from government complaints (*Id.* at ¶ 70); Remondi's statements during Navient's Q2 2015 earnings call (*Id.* at ¶ 75); the centrality of certain operations to Navient (*Id.* at ¶¶ 72-73); company-wide incentive policies and scripts (*Id.* at ¶ 71); and motive and opportunity allegations (*Id.* at ¶¶ 74, 80-83, 124, 148).

In addressing the Complaint's purported failure to adequately plead scienter as to the loan statements, Defendants raise a variety of arguments, including arguments already made elsewhere. Specifically, Defendants argue that: (i) the centrality of forbearance and credit to Navient's operations are insufficient to plead scienter un-

der the core operations doctrine; (ii) Remondi's statements in July 2015 do not suggest that he knew before July 2015 that the rate of default would be higher for the cohort exiting deferment in 2014; (iii) there is insufficient detail about the confidential witnesses to credit their allegations; and (iv) the motive and opportunity allegations improperly rely on a "general corporate motive." (D.I. 64 at 18-22). As an initial matter, the Court will not again address Defendants' arguments about Remondi's statements or the reliability of the confidential witnesses, which were rejected for the reasons explained above. *See supra* III(E)(3) and III(E)(2)(a). The scienter allegations as to the loan statements does introduce a new confidential witness, CW4, but this confidential witness has the same characteristics as the other three confidential witnesses and, therefore, there is no reason to treat the credibility of his or her allegations differently.[11] (D.I. 59 at ¶¶ 76-78). That leaves Defendants' arguments based on the core operations doctrine and motive and opportunity allegations.

[36]  The Complaint relies on the core operations doctrine to allege scienter with respect to the loan statements, because delinquencies, defaults, and charge-offs were "key financial metric[s]" for Navient. (D.I. 59 at ¶ 73). As discussed previously, it is not enough under the core operations doctrine for a matter to be of central importance to company; a complaint must also allege that specific information related to the fraud was conveyed to management. *Rahman*, 736 F.3d at 237. Here, the Complaint's scienter allegations with respect to the credit facility statements failed for that reason. *See supra* III(D)(2). But the Complaint does not suffer the same infirmity with respect to the loan statements. It relies on allegations from confidential witnesses, which the Court has previously

determined are credible, to allege that specific information regarding the fraud around forbearance, charge-offs, and delinquencies, was conveyed to the individual defendants Kane, Remondi, and Chivavibul. (D.I. 59 at ¶¶ 76-78).

[37, 38]  The Complaint alleges that Defendants were motivated to manipulate Navient's financial results to meet market expectations and prevent bad news from causing further drops in Navient's stock price. (*Id.* at ¶¶ 74, 80-82). Under the PSLRA, "[m]otive must be supported by facts stated 'with particularity,' and must give rise to a 'strong inference' of scienter." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quoting *In re Advanta*, 180 F.3d at 535). Therefore, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ). A "desire to manage [a company's] earnings in order to meet analyst and market expectations . . . is a general corporate motive" that does not give rise to a strong inference of scienter. *In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004). Because the only motive the Complaint alleges as to the loan statements is a desire to meet market expectations, these scienter allegations based on motive and opportunity must be disregarded.

But, the scienter analysis is "case specific" and should "rest not on the presence or absence of certain types of allegations but on a practical judgment about whether,

---

11.  CW4 is Navient Collections Support Manager who worked in that position from the

spring of 2010 until February 2015. (D.I. 59 at ¶ 76).

E. HEDINGER AG v. BRAINWAVE SCIENCE, LLC            **499**
Cite as 363 F.Supp.3d 499 (D.Del. 2019)

accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 267-68 (quoting *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499). Even after setting aside the allegations based on motive and opportunity, the Court cannot conclude at this time that the remaining allegations in the Complaint, considered holistically, fail to support a reasonable inference of scienter with respect to the loan statements. Defendants' motion to dismiss the Exchange Act claims based on the loan statements is denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (D.I. 63) is granted-in-part and denied-in-part. Defendants' motion is granted as to all claims based on the compliance statements and the Exchange Act claims based on the credit facility statements. Defendants' motion is denied in all other respects. The Securities Act and Exchange Act claims based on the compliance statements are dismissed with prejudice. The Exchange Act claims based on the credit facility statements are dismissed without prejudice. An appropriate Order will be entered.

## ORDER

Consistent with the Memorandum Opinion issued this same date, IT IS HEREBY ORDERED this 29th day of January 2019 that:

1.  Defendants' motion to dismiss (D.I. 63) is GRANTED-IN-PART and DENIED-IN-PART; Defendants' motion is GRANTED as to all claims based on the compliance statements and the Exchange

Act claims based on the credit facility statements; Defendants' motion is DENIED in all other respects;

2.  The Securities Act and Exchange Act claims based on the compliance statements are dismissed WITH PREJUDICE; and

3.  The Exchange Act claims based on the credit facility statements are dismissed WITHOUT PREJUDICE.



**E. HEDINGER AG and Hedinger Middle East DWC LLC, Plaintiffs,**

**v.**

**BRAINWAVE SCIENCE, LLC, Brainwave Science Inc., and Krishna Ika, Defendants.**

**C.A. No. 18-538 (MN)**

United States District Court, D. Delaware.

Signed 02/13/2019

**Background:**  Exclusive dealer of brain fingerprinting technology brought action against owner of technology, alleging fraudulent inducement, false advertising, breach of contract, breach of implied covenant of good faith and fair dealing, and related claims. Owner moved to dismiss.

**Holdings:**  The District Court, Maryellen Noreika, J., held that:

(1)  owner did not waive its right to arbitrate;

(2)  arbitration clause was not void for referencing non-existent tribunal;

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al.*, Individually and on Behalf of All Others Similarly Situated, | C.A. No. 16-cv-112-MN |
| Plaintiffs, | Judge Maryellen Noreika |
| vs. | |
| NAVIENT CORPORATION, *et al.*, | |
| Defendants. | |

**Expert Report of Michael L. Hartzmark, Ph.D.**

**September 6, 2019**

# Table of Contents

I.      Scope of Engagement ..................................................................................1

II.     Qualifications ............................................................................................3

III.    Summary of Opinions ..............................................................................6

IV.     Basis for Opinions on Efficiency of the Market for the Navient Common
        Stock .......................................................................................................8

        A.      Efficient Market Defined .......................................................................8

                1.      Operational Factors Employed to Evaluate Whether a Security
                        Trades in an Efficient Market .................................................10

                2.      Price-Related Factors Employed to Evaluate Whether a Security
                        Trades in an Efficient Market .................................................12

                3.      Evaluating Operational and Price-Related Factors ................13

V.      Analysis of Operational Factors of Navient Common Stock ...................14

        A.      Background ..........................................................................................14

        B.      Analysis of the Operational Factors .....................................................15

                1.      Cammer Factor I – Average Weekly Trading Volume ........................15

                2.      Cammer Factor II – Analyst Coverage ...............................17

                3.      Cammer Factor III – Market Makers and Arbitrageurs ......................20

                4.      Cammer Factor IV – SEC Form S-3 Eligibility ....................................25

        C.      Other Operational Factors to Weigh When Examining Market
                Efficiency ............................................................................................26

                1.      Krogman Factor – Market Capitalization ...............................26

                2.      Krogman Factor – The Size of the Float of Navient Common
                        Stock .................................................................................28

                3.      Krogman Factor – Bid-Ask Spread .....................................28

VI.     The Price-Related Factors Describing Market Efficiency of Navient
        Common Stock .........................................................................................30

        A.      Background ..........................................................................................30

        B.      Price Reaction to Unexpected New Information ..............................31

                1.      Event Study Methodology Used to Test for Cause and Effect ............31

                2.      Cause and Effect Analysis Examining Days with Earnings
                        News – Background ...............................................................32

                3.      Cause and Effect Analysis Examining Earnings Days That Are
                        Not Corrective Disclosure Dates ...........................................35

| | 4. | Cause and Effect Analysis Examining the Relationship Between Abnormal Returns and Volume ............................................................39 |
|---|---|---|
| | 5. | Cause and Effect Analysis Examining Days with News versus Days with No News .....................................................................41 |
| | 6. | Cause and Effect Analysis Examining Autocorrelation.......................44 |
| | 7. | Cause and Effect Analysis Examining Corrective Disclosure Dates......................................................................................45 |
| C. | | Conclusion Based on the Basket of Factors the Courts Evaluate ..................46 |
| VII. | | The Basket of Relevant Factors Used to Evaluate The Market Efficiency of Navient Common Stock Applies To The Examination Of Whether Options on Navient Common Stock Traded In An Efficient Market .....................................47 |
| A. | | Overview of Options..................................................................47 |
| B. | | Efficiency of the Market for Options on Navient Common Stock ................50 |
| | 1. | Operational Factors and Options...............................................50 |
| | 2. | Cause and Effect Analysis for Navient Stock Options ........................53 |
| C. | | Conclusion Based on the Basket of Factors the Courts Evaluate ..................57 |
| VIII. | | Introduction to Corporate Bonds and Bond Pricing Theory .........................57 |
| A. | | Background Information on Corporate Bonds .......................................57 |
| B. | | Bond and Stock Prices Often Move in Different Directions in an Efficient Market........................................................................62 |
| C. | | Differences in Price Movements between Notes with Different Coupons and Maturities.................................................................64 |
| D. | | Description of the Navient Debt Securities .........................................65 |
| | 1. | 2020B Note, 2021 Note and 2024B Note ......................................65 |
| | 2. | Other Navient Debt Securities .................................................66 |
| E. | | The Navient Debt Securities Were Comparable or Homogenous Corporate Bond Issues..............................................................66 |
| F. | | Analysis of the Exemplar Notes ....................................................67 |
| IX. | | Analysis of Operational Factors for the Exemplar Notes .............................70 |
| A. | | The Operational Factors Describing Market Efficiency.............................70 |
| | 1. | Cammer Factor I – Average Weekly Trading Volume........................70 |
| | 2. | Cammer Factor II – Analyst Coverage ........................................77 |
| | 3. | Cammer Factor III – Market Makers ..........................................78 |
| | 4. | Cammer Factor IV – SEC Form S-3 Eligibility................................79 |

B.   Other Operational Factors to Weigh When Examining Market Efficiency................................................................................79

    1.   Krogman Factor – Market Value ..................................................79

    2.   Krogman Factor – The Size of the Float........................................81

    3.   Krogman Factor – Bid-Ask Spread...............................................82

    4.   Other Operational Factors – Institutional Holdings.......................83

X.   The Price-Related Factors Describing Market Efficiency for the Exemplar Notes.................................................................................................84

  A.   Event Study for the Exemplar Notes .............................................84

  B.   Cammer Factor V – Price Reaction to Unexpected New Information ..........89

    1.   Cause and Effect Analysis Examining the Relationship Between Abnormal Returns and Volume ...........................................89

    2.   Cause and Effect Analysis Examining Earnings Days That Are Not Corrective Disclosure Dates........................................90

    3.   Cause and Effect Analysis Examining Days with News versus Days with No News ...............................................90

    4.   Cause and Effect Analysis Examining Autocorrelation.......................92

    5.   Analysis Examining Corrective Disclosure Dates ..........................96

  C.   Conclusion Based on the Basket of Factors the Courts Evaluate.................97

  D.   Navient Debt Securities Traded in an Efficient Market ................................98

XI.   Ability to Calculate Damages on a Class-Wide Basis ...........................................101

  A.   Calculating Damages for Violation of § 10(b) of the Exchange Act For Both Common Stock and Navient Debt Securities................................101

    1.   Summary ...................................................................101

    2.   Description of the OOP Method ......................................102

    3.   Damages Methodology for Options on Navient Common Stock .......104

  B.   Calculating Damages for Violations of § 11 and § 12(a)(2) of the Securities Act...................................................................105

    1.   Section 11........................................................................105

    2.   Section 12........................................................................106

XII.   Conclusions .....................................................................................107

## I.   SCOPE OF ENGAGEMENT

1.    I have been retained by Court-appointed Lead Counsel ("Counsel")[1] for the putative Class (the "Class")[2] in the matter of *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.* to determine whether the publicly traded securities of Navient Corp. ("Navient" or the "Company")—including common stock, related put and call options that traded in reference to the common stock, and certain debt securities—traded in efficient markets[3] from April 17, 2014 through September 29, 2015, inclusive (the "Exchange Act Class Period").[4]   I have also been asked by Counsel to opine on whether the calculation of

---

[1]    Bernstein Litowitz Berger & Grossmann LLP.

[2]    I understand from Lead Counsel that the proposed Class definition is:  "All persons and entities who purchased or otherwise acquired Navient's publicly traded securities, or sold Navient put options, from April 17, 2014 through September 29, 2015, inclusive; and/or all persons and entities who purchased or otherwise acquired Navient's 5.000% Senior Notes due 2020 (CUSIP 63938CAA6), 5.875% Senior Notes due 2024 (CUSIP 63938CAB4), and 5.875% Senior Notes due 2021 (CUSIP 63938CAC2) from November 3, 2014 through December 28, 2015, inclusive—and who were damaged thereby." This includes the publicly traded securities consolidated by Navient pursuant to its April 30, 2014 separation from Sallie Mae.  Excluded from the Class are Defendants, their officers and directors, all members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

[3]    "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-242 (1988).

The premise of the fraud-on-the-market presumption is that "'the price of a security traded in an efficient market will reflect all publicly available information about a company,' so that 'a buyer of the security may be presumed to have relied on that information in purchasing the security.'"  *In re Bridgepoint Educ. Inc. Sec. Litig.*, 2015 WL 224631, at *6 (S.D. Cal. Jan. 15, 2015) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1190 (2013)).

[4]    I understand that Defendants moved to dismiss the Second Amended Consolidated Class Action Complaint dated November 17, 2017 (the "Complaint") and the Court denied that motion in part in its opinion dated January 29, 2019 (the "MTD Order").  I further understand that, following the MTD Order, Plaintiffs' Exchange Act (defined below) claims cover a period from April 17, 2014 through September 29, 2015, inclusive (the "Exchange Act Class Period").  For the September 29, 2015 corrective disclosure, the Complaint alleges Navient's common stock price declined that day and through September 30 and October 1, 2015 (Complaint, ¶¶90-91 and Appendix to the Complaint, pp. 1-5).  I refer to the "Exchange Act Class Period+" as the Exchange Act Class Period plus September 30 and October 1, 2015.

damages on a class-wide basis is subject to a common methodology for all Class members in connection with their claims under: (i) Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)"); and (ii) Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act").[5]

2.    I have reviewed the Complaint and assume the allegations are true for purposes of this report.[6]  I have made no investigation of the issues of liability and loss causation in this case, and nor have I been asked to calculate damages.  My report applies widely-accepted economic, financial and statistical analyses to determine whether the securities discussed herein traded in an efficient market.

3.    My report is organized as follows:  In Section II, I present my qualifications as an expert.  In Section III, I summarize each of my opinions.  In Section IV, I describe the concept of market efficiency.  In Section V, I offer empirical support for the conclusion that Navient common stock traded in an efficient market during the Exchange Act Class Period by examining the "operational" factors for demonstrating market efficiency set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*") and *Krogman v. Sterritt*, 202 F.R.D. 467, 474-78 (N.D. Tex. 2001) ("*Krogman*").  In Section VI, I review the results of statistical tests examining the behavior of Navient stock price on earnings announcement and other dates collectively over the Exchange Act Class Period.  These empirical analyses demonstrate that Navient common stock responded to new, Company-

---

[5]    In the MTD Order, the Court sustained Plaintiffs' Securities Act claims arising from two registered offerings of Navient notes: (1) an offering on or around November 3, 2014, consisting of $500 million in principal amount of 5.000% Senior Notes due 2020 and $500 million in principal amount of 5.875% Senior Notes due 2024 (as defined above, the 2014 Debt Offering); and (2) an offering on or around March 27, 2015, consisting of $500 million in principal amount of 5.875% Senior Notes due 2021 (as defined above, the 2015 Debt Offering)."  *See, e.g.,* Complaint at ¶1.  Therefore, Plaintiffs' Securities Act claims apply to three debt securities: 5.000% Senior Notes due 2020 ("2020B Note"); 5.875% Senior Notes due 2024 ("2024B Note"); and 5.875% Senior Notes due 2021 ("2021 Note").  Plaintiffs' Exchange Act claims also apply to the three Notes as well as the other Navient securities discussed herein, which all are a part of the 210 Notes that make up all of Navient's senior unsecured debt (the "Navient Debt Securities").

[6]    I have also reviewed and relied upon the Court's MTD Order.

specific information, which also supports the conclusion that Navient stock traded in an efficient market.  In Section VII, I examine how the basket of factors related to Navient's stock price applies to options on Navient common stock, as well as the relationship between the prices of Navient common stock and its options, to demonstrate that the options on Navient common stock traded in an efficient market.  In Sections VIII, IX and X, I analyze whether the Navient Debt Securities traded in an efficient market, based on my analysis of the *Cammer* and *Krogman* factors with respect to the market for Navient Debt Securities, including analysis of "Exemplar Notes" representing a supra-majority face value subset of Navient's publicly-traded unsecured senior debt securities, it is my opinion that the market for Navient Debt Securities was efficient.   In Section XI, I show that the calculation of damages in this case can be done on a class-wide basis subject to a common methodology for Plaintiffs' claims under each of the Securities Act and the Exchange Act.

## II.   QUALIFICATIONS

4.     I am President of Hartzmark Economics Litigation Practice, LLC and prior to this I was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.).  Both firms specialize in the application of economics and finance to legal, commercial and regulatory issues, including issues such as those addressed in this report.  I also am currently engaged as an independent contractor the Office of the Attorney General of the State of New Jersey and was previously engaged by the Office of the Attorney General of the State of New York, to assist in investigations of the mortgage-backed securities market.[7]

5.     I have served as a testifying and consulting expert in numerous securities class actions.  In addition, I have published scholarly articles on a multitude of issues in financial economics including those associated with securities class actions, including the topic of market efficiency.  I have spent much of my time as an economic consultant evaluating

---

[7]   "A residential *mortgage-backed security* (MBS) is an instrument whose cash flow depends on the cash flows of an underlying pool of mortgages." Frank J. Fabozzi and Steven V. Mann, The Handbook of Fixed Income Securities, Seventh Edition, McGraw-Hill Education (2005), p. 16 ("Handbook").

issues related to market efficiency, including its relation to the certification of securities class actions.  My primary focus has been on securities such as common stock, corporate bonds, Treasury and energy futures, swaps, swaptions and options, and asset-backed securities.  Recently my expert report which included the topic of market efficiency in *In re Signet Jewelers Limited Securities Litigation* was cited with approval by the United States District Court for the Southern District of New York[8] and my expert report, which included the topic of market efficiency in *In re Cobalt International Energy, Inc. Securities Litigation* was cited with approval by the United States District Court for the Southern District of Texas.  In each of those cases, the district court cited my expert reports in their orders certifying the class of holders of both common stock and, in the case of *Cobalt*, corporate bonds.[9]  I also wrote a series of reports cited in the district court's opinion granting class certification of DVI common stock and corporate bonds in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), which was affirmed by the Third Circuit.  *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011).  My expert report in *West Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.* was cited with approval and as support in the *DFC* court's order certifying the class.[10]  I have

---

[8]  *In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.NY. July 10, 2019) at *20 (finding that "Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.  It has done so here.  Dr. Hartzmark's purports to 'us[e] the results of an event study along with the disclosures of firm-specific information' to measure 'the level of artificial inflation in the prices of the Signet common stock' based upon 'price reactions to disclosures revealing [Defendants'] alleged misstatements and omissions. . . . From this, daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout the Class Period.' This methodology, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the Class members.").

[9]  *In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017) at *5 (finding that "Plaintiffs have provided expert testimony demonstrating, at this class certification stage, that the market for Cobalt Notes was adequately efficient to allow them to rely on the fraud-on-the market presumption of reliance.").

[10]  *W. Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et. al.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016) (finding that "Dr. Hartzmark has data underlying his conclusions and [the defendants' expert] just has noise").

also co-authored three law review publications discussing the commonly used empirical tests applicable to securities class actions.[11]

6.     I earned my B.A. in economics from The University of Michigan and my M.A. and Ph.D. in economics from The University of Chicago.  I have taught economics and financial economics in the Department of Economics at The University of Chicago and jointly in the Michigan Business School (now the Ross School of Business) and the Department of Economics at the University of Michigan.

7.     At the University of Michigan, I created and taught courses on financial and commodity futures markets.  While an Assistant Professor at the University of Michigan, I received a research grant from the University of Chicago Center for the Study of Futures Prices, as well as the John M. Olin Faculty Fellowship to further my research in financial markets.  In addition, I published articles in peer-reviewed journals related to financial markets.  Prior to my tenure track appointment at the University of Michigan, I was employed as a Financial Economist at the Commodity Futures Trading Commission, Division of Economics and Education.

8.     I have been a holder of the Series 7 and 63 registered representative licenses and have served as a Financial Advisor at Fahnestock & Co., Inc. (now Oppenheimer & Co., Inc.).  I was also founder and President of DARMA, LLC, a wealth and asset advisory company affiliated with Oppenheimer & Co., Inc.

9.     My qualifications, publications, and expert engagements are summarized in detail in my *curriculum vitae*, which is attached to this report as **Appendix A**.  Hartzmark Economics Litigation Practice, LLC is being compensated at a rate of $640 per hour for my work in this matter.  My compensation is not dependent on my opinions expressed in this report or the outcome of this matter.

---

[11]   Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev., 654-716 (2011); Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012); Michael L. Hartzmark, H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev., 149-230 (Spring 2014).

### III.   SUMMARY OF OPINIONS

10.   Based on my analysis to date, I have formed the following opinions:

**OPINION 1:** Throughout the Exchange Act Class Period, Navient common stock traded in an efficient market.  This opinion is based on an analysis of a basket of factors, including those set forth in *Cammer* and *Krogman*, which, consistent with the fundamental principles of economics and finance and academic research, indicate market efficiency for Navient common stock.  Commonly-utilized and generally-accepted statistical tests examining the behavior of Navient common stock price movements on news dates collectively over the Exchange Act Class Period, as well as other empirical analyses of price movements, demonstrate that Navient common stock rapidly responded to unanticipated and material Company-specific information.  Analysis of the other factors set forth in *Cammer* and *Krogman* also demonstrate that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

**OPINION 2:** Throughout the Exchange Act Class Period, options on Navient common stock traded in an efficient market.  This opinion is based on an analysis of a basket of factors, including those set forth in *Cammer* and *Krogman*, which, consistent with the fundamental principles of economics and finance and academic research, indicate market efficiency for options on Navient common stock.  A commonly-utilized and generally-accepted statistical tests examining the relationship between the price behavior of options on Navient common stock and the price movements of Navient common stock collectively over the Exchange Act Class Period, demonstrate that options on Navient common stock rapidly responded to unanticipated and material Company-specific information.

**OPINION 3:** Throughout the Exchange Act Class Period, the Exemplar Notes — that made up more than 76% of the face value of the Navient Debt Securities— traded in an efficient market.  This opinion is based on an analysis of a basket of factors, including those set forth in *Cammer* and *Krogman*, which, consistent with the fundamental principles of economics and finance and academic research, indicate market efficiency for the Exemplar Notes.  Commonly-utilized and

generally-accepted statistical tests examining the behavior of the Exemplar Notes price movements on news dates collectively over the Exchange Act Class Period, as well as other empirical analyses of price movements, demonstrate that the Exemplar Notes rapidly responded to unanticipated and material Company-specific information.  Analysis of the other factors set forth in *Cammer* and *Krogman* also demonstrate that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.

**OPINION 4**: Throughout the Exchange Act Class Period, the entire series of Navigant Debt Securities traded in an efficient market.  Support for this conclusion comes from a multitude of sources.  First, several of the *Cammer* and *Krogman* factors that support efficiency for the Exemplar Notes apply similarly across all Navient Debt Securities (e.g., *Cammer* 2-Analyst Coverage; *Cammer*-4 SEC Form S-3 Eligibility; *Krogman* 1- Market Capitalization; *Krogman* 2-The Size of the Float).  Second, fundamental principles of economics and finance, and specifically corporate bond pricing theory, suggest that the observing cause and effect (*Cammer* 5) for certain debt instruments of a specific company will extend to other related debt of the same company, especially for debt of the same rank.  Third, academic research, as well as arbitrage and bond trading activities would also suggest that observing cause and effect (*Cammer* 5) for certain debt instruments of a specific company will extend to other related debt of the same company.  Fourth, the credit rating agencies evaluated the Navigant Debt Securities as a single homogenous, fungible pool.  Fifth, Navient in its financial statements reported and described the Navient Debt Securities as a single, homogenous pool. Finally, as it relates to certain securities, such as options and preferred stocks, courts have generally considered these to be similar enough — because they represent claims on the same company's cash flow, and thus have the same basic source of risk — to be included in a single pool or a collective for the purpose of determining whether they trade in an efficient market.

**OPINION 5:** While I have not been requested to quantify damages, the calculations of damages for violations of Section 10(b) of the Exchange Act (and SEC Rule 10b-

5) are subject to a common methodology and may be computed on a class-wide basis.

**OPINION 6:** While I have not been requested to quantify damages, the calculations of damages for violations of Section 11 of the Securities Act are subject to a common methodology and may be computed on a class-wide basis.

**OPINION 7:** While I have not been requested to quantify damages, the calculations of damages for violations of Section 12(a)(2) of the Securities Act are subject to a common methodology and may be computed on a class-wide basis.

11.   In reaching these opinions, I have relied upon various materials, which are listed in **Appendix B** and/or are otherwise cited in this report.  The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision.  My conclusions are based on information available to me as of the date of this report.  I understand that discovery is ongoing, and I may review, evaluate, and analyze relevant material that becomes available to me in the future.  I reserve the right to modify my conclusions based on additional information.

## IV.   BASIS FOR OPINIONS ON EFFICIENCY OF THE MARKET FOR THE NAVIENT COMMON STOCK

### A.  Efficient Market Defined

12.   A market is defined as being informationally efficient if prices of securities trading in that market reflect all material, publicly available information.[12]  Further, informational efficiency means that prices of securities rapidly change to reflect new, unanticipated, material, public information.  The notion behind efficient markets is that the

---

[12]   *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin., 383 (1970) ("A market in which prices always 'fully reflect' available information is called 'efficient'"); Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Fin., 1575 (1991) ("I take the market efficiency hypothesis to be the simple statement that security prices fully reflect all available information.").

competition among investors to discover new profit opportunities pushes security prices to reflect all material, publicly available information.

13.    The finance literature supports the concept of market efficiency.  The father of modern finance and Nobel Prize winner, Eugene Fama, wrote, "We shall conclude that, with but a few exceptions, the efficient markets model stands up well,"[13] and "[i]n short, the evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[14]   In 1991, Professor Fama updated his analysis and wrote, "The empirical literature on efficiency and asset-pricing models passes the acid test of scientific usefulness."[15]   Professor Fama also wrote that "precise inferences about the degree of market efficiency are likely to remain impossible. Nevertheless, judged on how it has improved our understanding of the behavior of security returns, the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[16]

14.    The opinion in *Cammer* articulated five factors used by courts to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988). The fundamental principles of economics and finance that underlie a large body of academic research published over the past forty years support each factor as an indicator of market efficiency. As explained below, it is important to understand that assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.   For ease of comprehension, the factors can be separated into two general categories: "operational factors" and "price-related factors."

---

[13]   Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. at 383.

[14]   *Id*. at 416.

[15]   Fama, *Efficient Capital Markets: II*, 46 J. Fin. at 1576.

[16]   *Id.* at 1576.  *See also* Eugene F. Fama, *Market efficiency, long-term returns, and behavioral finance*, 49 J. Fin. Econ. 283 (1998); G. William Schwert, *Anomalies and Market Efficiency*, in Handbook of the Economics of Finance (G. Constantinides et al., eds., 2003); and Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives 59 (2003).

### 1.    *Operational Factors Employed to Evaluate Whether a Security Trades in an Efficient Market*

15.    The operational factors examine the trading and arbitrage activity in the market, with the clear understanding that (a) an efficient market is one in which anyone can buy and sell securities; (b) an efficient market is one that has a high level of trading activity, and for which trading information is readily available; and (c) an efficient market can be characterized as a liquid market that can absorb a reasonable amount of trading volume at relatively low trading costs.[17]   As a result, the operational factors are used to examine whether there is sufficient liquidity, trading and arbitrage activity, along with widespread information dissemination, such that it can reasonably be expected that the market price for the security is efficient in that it rapidly reflects new information.[18]

16.    The operational factors set forth in *Cammer* are:

(1)    average weekly turnover;[19]

(2)    analyst coverage;[20]

---

[17]   Economists often suggest that, "The common metrics of liquidity are turnover, bid-ask spread, and transactional size."   This is also consistent with the operational *Cammer* factors.  Handbook, p. 363.

[18]   "In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value."  *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986).

"Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed."  *Basic*, 485 U.S. at 247.

[19]   "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  *Cammer*, 711 F. Supp. at 1286.

[20]   "…[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."  *Id.  See also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 205 (2d Cir. 2008) ("[T]he greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors.") (quoting *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005)).

(3)     number of market makers or dealers of the common stock, along with arbitrageurs;[21] and

(4)     the issuer's eligibility to file SEC Form S-3 and to incorporate by reference other SEC Forms.[22]

17.     The court in *Krogman* suggested three additional operational factors:

(1)     the market capitalization of the security;[23]

---

[21]   "[I]t could be alleged the stock had numerous market makers.  The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  *Cammer*, 711 F. Supp. at 1286-87.

Related to arbitrage activity, some courts have also suggested that other factors may be relevant to determining whether a market is efficient for class-certification purposes, including the activity and number of institutional investors.  For example, in *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006), the court decided that the Enron bonds traded in efficient markets partially based on "data on institutional holdings . . . [that] there was active trading . . . during the Class Period, [and] there were a substantial number of institutional investors."

"Consistent with the efficiency indicators used recently by the courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and **lower institutional ownership (number and percentage)** than efficient firms."  Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L., 285-312, 302 (Winter 1994) (footnote omitted and emphasis added).

[22]   "… [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."  *Cammer*, 711 F. Supp. at 1287.  *See also id.* at 1271 n.5 ("Generally speaking, it is the largest and most well-known companies which register equity securities on Form S-3"); *id.* at 1284 (quoting SEC Securities Act Release No. 6235, 45 FR 63,693 (1980)) ("This form [S-3] is predicated on the Commission's belief that the market operates efficiently for these companies, *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.") (Emphasis omitted).

[23]   In *Krogman*, the court suggested that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  202 F.R.D. at 478.

(2)    the bid-ask price spread;[24] and

(3)    the float of the security (*i.e.*, the amount of outstanding security not held by insiders of the corporation).[25]

## 2.    *Price-Related Factors Employed to Evaluate Whether a Security Trades in an Efficient Market*

18.    The price-related factors are used to examine whether the market price for the security rapidly reflects unanticipated information about future Company cash flows as would be expected in an efficient market.

19.    To examine the market efficiency of Navient's securities, I test whether:

(1)    there is a rapid price reaction to new information relevant to the valuation of the securities;[26] and

(2)    there are certain statistical properties associated with security price movements, such as the lack of autocorrelation.[27]

---

[24]    *See Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

[25]    Insiders cannot freely trade in the stock of their firm based on their privileged, nonpublic information.  They are subject to both trading restrictions (blackout periods, and restrictions of Rule 10b-5 and Exchange Act Sections 16(b) and 16(c)) and the reporting requirements of Section 16(a).  *See* 17 C.F.R. § 240.10b-5 (2011); 15 U.S.C. §§ 78p(b), 78p(c), 78p(a) (2011).  "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

[26]    "[I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287.

[27]    "Autocorrelation is usually found in time-series data.  Economic time series often display a 'memory' in that variation is not independent from one period to the next." William H. Greene, Econometric Analysis 358 (2d ed. 1993).  In other words, autocorrelation is the measurement of the relationship between the security return at time *t* and the return of the same security at some fixed time in the past.  First-order autocorrelation would be found when there is a statistically significant relationship between the common stock return today and the common stock return yesterday.  Another way of looking at this concept is that if an observer can use the return from yesterday to predict with some level of certainty the return today, there exists autocorrelation. The absence of autocorrelation is an indicator of market efficiency. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-507 n.20 (S.D. Tex. 2004) (noting that both parties' experts agreed on the helpfulness of an autocorrelation analysis).

### 3.      Evaluating Operational and Price-Related Factors

20.    Professor Fama's conclusion that "precise inferences about the degree of market efficiency are likely to remain impossible," as well as other academic research in economics and finance, support an approach whereby the above factors should be used as a basket of indicators of the efficiency of the security, but as previously noted by no means is it necessary that each factor in that basket specifically offer support.  Judicial analysis of market efficiency reflects this recognition.  For instance, the Second Circuit recently held that market efficiency may be demonstrated where the operational factors support that conclusion, even if the price-related factor does not.[28]  In so holding, the Second Circuit noted, "The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision–making. But they are no more than tools in arriving at that conclusion, and certain factors will be more helpful than others in assessing particular securities and particular markets for efficiency."[29]

21.    In forming my opinion that Navient's securities traded in efficient markets throughout the Exchange Act Class Period, I have considered each of these operational and price-related factors.  Moreover, even though the *Cammer/Krogman* factors were initially developed to evaluate the market for common stock, academics and courts have utilized

---

[28]  *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018).

[29]  *Id*.  *See also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2015 U.S. Dist. LEXIS 110382, at *33 (S.D.N.Y. Aug. 20, 2015) ("The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'  Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that 'it *would be helpful* to a plaintiff seeking to allege an efficient market.'") (footnotes omitted).

"Different contexts require courts to place greater importance on some factors than on others. No other court has adopted a per se rule that any one factor is dispositive.  At the same time, courts have found market efficiency in the absence of an event study or where the event study was not definitive."  *Id.* at *34 (footnote omitted).

"It is widely accepted that analysis of the *Cammer* and *Krogman* factors is a reliable and accepted methodology for establishing market efficiency."  *Id.* at *49 (footnote omitted).

them to evaluate all types of financial instruments, including stock options and corporate bonds.[30]

## V.   ANALYSIS OF OPERATIONAL FACTORS OF NAVIENT COMMON STOCK

### A.  Background

22.   In its Form 10-K filed for the fiscal year 2014, Navient described itself as follows:

> Navient is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success.  Servicing more than $300 billion in student loans, Navient supports the educational and economic achievements of more than 12 million customers. … Navient holds the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program ("FFELP"), as well as the largest portfolio of Private Education Loans.  FFELP Loans are insured or guaranteed by state or not- for- profit agencies based on guaranty agreements among the United States Department of Education ("ED") and these agencies. Private Education Loans are education loans to students or their families that bear the full credit risk of the customer and any cosigner.  Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources.  Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non- profit education lenders and ED.  Navient is one of four large servicers to ED under its Direct Student Loan Program ("DSLP").   Navient also provides asset recovery services on its own portfolio (consisting of both education loans as well as other asset classes), guaranty agencies, higher education institutions, ED and other federal clients, as well as states, courts, and municipalities.[31]

---

[30]   For example, for academic and court cites, see: Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev., 654-716 (2011); Michael L. Hartzmark, H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev., 149-230 (Spring 2014).

[31]   Navient SEC Form 10-K filed February 27, 2015, p. 3.

23.  Navient was formed through a spin-off from Sallie Mae Corporation ("SLM Corporation") in April 2014.[32]  Throughout the Exchange Act Class Period, Navient common stock was listed on the NASDAQ Global Select Market under the "NAVI" trading symbol, beginning with "when issued" trading on April 17, 2014 (under the ticker "NAVIV").[33]  Navient was incorporated in Delaware, with headquarters in Wilmington, Delaware.[34]

24.  On March 31, 2014, SLM Corporation had 442.7 million shares outstanding.[35] As of April 30, 2014, two weeks after the start of the Exchange Act Class Period, Navient had 442.7 million shares outstanding.[36]

25.  Throughout the Exchange Act Class Period, Navient engaged in repurchases of its common stock, repurchasing 22.5 million shares from April-December 2014 and 41.9 million shares from January-September 2015.[37]

26.  As of September 30, 2015, shortly after the end of the Exchange Act Class Period, Navient had 362.3 million shares of common stock outstanding.[38]

B.  Analysis of the Operational Factors

1.  *Cammer Factor I – Average Weekly Trading Volume*

27.  The first operational factor is the average weekly turnover of a security.  As discussed in the *Cammer* opinion: "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the

---

[32]  Navient SEC Form 10-K filed February 27, 2015, p. 9.

[33]  Navient SEC Form S-1 filed April 22, 2014, p. 12; Navient SEC Form 10-K filed February 27, 2015, p. 35; Navient SEC Form 10-K filed February 25, 2016, p. 36.

[34]  Navient SEC Form 10-K filed February 27, 2015, cover and p. 31.

[35]  Navient SEC Form 10-Q filed May 9, 2014, p. 4.  In the spin-off, the common stock of SLM Corporation were spun off at a one-for-one basis into shares of Navient common stock.

[36]  Navient SEC Form 10-Q filed May 9, 2014, cover.

[37]  Navient SEC Forms 10-Q and 10-K filed August 1, 2014 (p. 28), October 30, 2014 (p. 28), February 27, 2015 (p. 35), April 30, 2015 (p. 22), August 3, 2015 (p. 26), and October 30, 2015 (p. 26).

[38]  Navient SEC Form 10-Q filed October 30, 2015, cover.

market for the security is an efficient one; one percent would justify a substantial presumption."[39]   A high trading volume indicates substantial investor interest in the security, and thus increases the likelihood that newly-available public and private information will be rapidly incorporated in the security price through trading.[40]  In addition, high volume suggests the possibility that investors will, all other factors staying constant, be able to reap greater profits from any information they may possess because they can more easily participate in the market.  This greater profit opportunity from the information they may possess then encourages investors to make greater investments in information gathering and processing.  This, in turn, will enhance the informational efficiency of the market.[41]

28.   To reliably determine whether the turnover fulfills the *Cammer* criterion, I calculated average weekly turnover over the Exchange Act Class Period, which is equal to the average of the ratio of weekly volume divided by the shares outstanding for that week.[42] **Exhibit I** contains the results of this analysis and shows that for the Exchange Act Class Period a total of 1.0 billion shares traded hands with an average weekly volume of 13.5 million shares.[43]  The ratio of the average weekly volume to shares outstanding was 3.4% – ***significantly more than*** the 2% threshold that *Cammer* held "would justify a strong

---

[39]   *Cammer*, 711 F. Supp. at 1286.

[40]   Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109, 112 (1987), surveys the literature on trading volume and absolute price changes.  Karpoff documents that higher volume results in greater absolute stock price reactions.  *See* also, Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285 (Winter 1994).

[41]   Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (Oxford University Press, 2003), pp. 70, 205, 215.

[42]   The trading volume I utilize for the turnover analysis is the composite daily reported trading volume, which I obtained from Bloomberg.  The source for shares outstanding is Navient SEC filings.

[43]   These figures include the entire weeks of the start date and end date of the Exchange Act Class Period.  In **Exhibit I,** I also provide the analysis excluding the weeks that include the start and end dates of the Exchange Act Class Period, which results in a similar median and average weekly turnover rates of 2.8% and 3.3%, respectively.

- 16 -

presumption that the market for the security is an efficient one"[44] – and the median was 2.8%. This analysis therefore "justif[ies] a strong presumption that the market for the security is an efficient one."[45]

29. Not only is Navient's average weekly turnover 1.7 times the level that supports a "strong presumption" of efficiency under *Cammer*, but the average and median weekly turnover measures here are greater than many of the turnover measures calculated in other litigation where the courts found the common stock to trade in an efficient market.[46] The relatively high average weekly turnover of Navient common stock provides substantial evidence supporting the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

## 2. *Cammer Factor II – Analyst Coverage*

30. The second operational factor is the number of security analysts who followed and reported on Navient's common stock. As discussed in *Cammer*: "It would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."[47] As more analysts follow and report on a company's securities, more information about the company is disseminated to a greater number of investors. The presence of such professionals means that more information is likely to be reflected in the price of these securities either through increased trading or simply through revaluation of the securities by the market participants.[48]

---

[44] *Cammer*, 711 F. Supp. at 1286.

[45] *Cammer*, 711 F. Supp. at 1286.

[46] *See, e.g.*, *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (S.D. Cal. 2010) (finding a stock with a weekly trading volume of 2.61% to have traded in an efficient market); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107 (E.D. Va. 2009) (finding an average weekly trading volume of 2-3.5% indicative of market efficiency).

[47] *Cammer*, 711 F. Supp. at 1286. *See also In Re Xcelera.com Securities Litigation*, 430 F.3d (1st Cir. 2005) at 514 ("[T]he greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors.").

[48] *See*, for example, Jill E. Fisch, *The Role and Regulation of the Research Analyst*, Research Handbook on the Economics of Corporate Law, Edgar Elgar Publishing, 2002, pp. 315, 317. ("The role of the research analyst…is to provide information to the marketplace. Analysts enhance capital market efficiency by enabling stock prices to reflect information and by

- 17 -

31.   As **Exhibit II** shows, as recorded by Bloomberg during the Exchange Act Class Period+ there were an average of 10 research analysts following the Company. Further, between 3 and 9 research analysts that were part of the Thomson Reuters I/B/E/S consensus EPS estimate for the current fiscal year.[49]   In-depth research analyst coverage included the following entities among others: Barclays; BMO Capital Markets; Bank of America/Merrill Lynch; Buckingham Research; CFRA Equity Research (S&P Capital IQ); Compass Point; Credit Suisse; Evercore ISI; Height Analytics; Janney Montgomery Scott; Keefe, Bruyette & Woods; and R.W. Pressprich.[50]   Navient was also covered by debt ratings agencies such as Moody's.  There were an additional 9 technical analyst firms that covered Navient and reported results.[51]  Thus, there were in excess of 20 analysts reporting on Navient.  *See* **Exhibit III-A** for a listing of the number of reports each year from these analysts.  This exhibit shows that there were 127 reports published from April 17, 2014 until December 31, 2014 and 160 reports published in from January 1, 2015 through October 1, 2015.

32.   The substantial coverage of Navient's stock by analysts can also be observed in analyst participation in conference calls held by Navient.  Many of these analysts participated in the regular earnings calls Navient hosted in conjunction with the release of its quarterly financial results throughout the Exchange Act Class Period.  Navient held 5 conference calls during the Exchange Act Class Period+.[52]  On these conference calls,

---

reducing the need for each investor individually to gather and analyze that information." "Research analysts collect information about specific firms and the overall market.  They then package that information for use by investors in trading decisions.")

Michael J. Brennan, Narasimhan Jegadeesh, and Bhaskaran Swaminathan, *Investment Analysis and the Adjustment of Stock Prices to Common Information*, 6 Rev. of Fin. Stds. 799, 800 (1993). ("Recent theory suggests that the number of analysts may have an effect on the speed of adjustment to new information…. this would suggest an association between the number of analysts and the speed of adjustment, if the number of analysts can be regarded as a proxy for the number of informed investors.")

[49]   Sources: Bloomberg and S&P Capital IQ.

[50]   Based on reports available on the S&P Capital IQ and Thomson Eikon databases.

[51]   Based on reports available on the S&P Capital IQ and Thomson Eikon databases.

[52]   During the Exchange Act Class Period, Navient held earnings calls after each quarterly earnings release except its first earnings release after the spin-off from SLM Corporation,

- 18 -

analysts and other investors were able to ask questions about Navient, with an average of almost 8 analysts who actively asked questions on each call.  *See* **Exhibit III-B** for a list of analysts who asked questions on Navient conference calls.  There were also 11 investor conferences hosted by analysts during the Exchange Act Class Period+ at which Navient participated.  *See* **Exhibit III-C** for a list of analysts hosting investor conferences at which Navient participated during the Exchange Act Class Period+.

33.    The number of analysts following Navient compares favorably to the number following other defendant companies at issue in other cases where the courts concluded that the common stock traded in efficient markets.[53]  In addition, I have examined the number of research analysts following all the common stocks on the NYSE and NASDAQ at the end of December 2014.  For these 3,300 companies the average and median number of research analysts covering the companies was 9.7 and 7.0 respectively, which compares favorably to those covering Navient (*i.e.*, which had, as noted above, an average and median of 10 analysts.  Further, as of December 31, 2014, Navient's analyst coverage was in the 63rd percentile of all NYSE and NASDAQ common stocks.  This means that the number of analysts following Navient was <u>greater</u> than 63% of the common stocks on the NYSE and NASDAQ.[54]

34.    In addition to the analyst reports, there were numerous press releases, news stories and other media coverage of Navient throughout the 533-day Exchange Act Class Period+ (368 trading days).  (*See* **Appendix C** for a chronology of information releases.)

_____

which was an update from the earnings released by SLM Corporation on April 16, 2014. Navient SEC Form 8-K filed May 9, 2014, pp. 2 and 3.

[53]    *See*, *e.g.*, *Luis Aranaz and Jared Pereira et al., v. Catalyst Pharmaceutical Partners, Inc. et al.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (finding at least four different securities analysts following Catalyst supported market efficiency); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153-54 (S.D.N.Y. 2012) ("*Billhofer*") (finding that eight separate firms issuing reports about Flamel and four additional firms participating in investor conference and more than two dozen articles and press releases being published about Flamel was sufficient to favor a finding of market efficiency).

[54]    For this analysis, I compared Navient's analyst coverage to that of the common stocks on the NYSE or NASDAQ as of the year ended December 31, 2014 that have a Bloomberg "Security Type" of "common stock" and "Primary Security Composite Exchange Code" of "US".  The Bloomberg data obtained for each member was "Total Analyst Recommendations."

I found approximately 1,400 articles (including approximately 800 articles from Bloomberg and 600 from Factiva[55]) that discussed Navient.[56]

35.    Finally, as a public company, Navient was required to file numerous information disclosures in SEC forms that contain new and possibly material information (*e.g.*, 10-K, 10-Q, Proxy and Registration forms) and others that were related to material changes in the Company (*e.g.*, 8-K).

36.    The continuous coverage of Navient by a substantial number of analysts, investment professionals, public press, and financial institutions, along with regular and frequent disclosures by the Company in the form of press releases and SEC filings, provides evidence supporting the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

### 3.    Cammer Factor III – Market Makers and Arbitrageurs

37.    The next operational factor is the presence of market makers and arbitrageurs. As discussed in *Cammer*, "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[57]  This factor, as suggested by the *Cammer* court related to a stock that was traded in the 1980's over-the-counter market or on the early version of NASDAQ (which, at the time, was not a national exchange, but instead was a reporting network in which transactions in securities are reported to the National Association of Securities Dealers for

---

[55]  Factiva is a Dow Jones company.

[56]  *See infra* note 97.

[57]  *Cammer*, 711 F. Supp. at 1286-87.  *See also In re Xcelera.com*, 430 F.3d at 515 (quoting Black's Law Dictionary (8th ed. 2004)) ("A market-maker is 'one who helps establish a market for securities by reporting bid-and-asked quotations' (the price a buyer will pay for a security and the price a seller will sell a security)."  A market-maker also "stands ready to buy or sell at these publicly quoted prices."); *Id.* (quoting *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 n.24 (S.D. Tex. 2004)); *In Re Polymedica Securities Litigation*, 453 F. Supp. 2d 260, 267-268 (D.C. Mass 2006) ("A market-maker is '[o]ne who helps establish a market for securities by reporting bid-and-asked quotations' (the price a buyer will pay for a security and the price a seller will sell a security) . . . .  A market-maker also 'stand[s] ready to buy or sell at these publicly quoted prices.'" (citations omitted)).

publication).[58]  The *Cammer* court understood that the market-making infrastructure of a stock market is indicative of its efficiency.[59]

38.    As explained below, consideration of this factor supports a finding of market efficiency for Navient stock because: (a) the stock was traded on the NASDAQ; (b) was actively traded by a large group of sophisticated investors;[60] and (c) there were opportunities for arbitrage.[61]

   a)    **Trading on the NASDAQ**

39.    Throughout the Exchange Act Class Period, Navient common stock traded on the NASDAQ Global Select Market.[62]   As discussed below, Courts (and expert economists) have generally presumed that common stocks traded on the NASDAQ trade in an efficient market.

40.    The NASDAQ National Market System is one of the most renowned, most liquid and most efficient forums for trading stocks in the world.  The NASDAQ exchange is decentralized and includes the participation of multiple *market makers*, dealers or financial intermediaries who stand ready to buy or sell in order to ensure there is adequate liquidity and orderly trading.[63]   Because market makers make it easier for investors to

---

[58]   *Cammer*, 711 F. Supp. at 1271 n.4.

[59]   *See also supra* note 21.

[60]   *Enron*, 529 F. Supp. 2d at 756.

[61]   *See*, *e.g.*, *PolyMedica*, 453 F. Supp. 2d at 273.

[62]   The NASDAQ consists of three tiers: the NASDAQ Global Select Market; the NASDAQ Global Market; and the NASDAQ Capital Market.  The listing requirements are most stringent for the Global Select Market (created in 2006), followed by the Global Market, and then the Capital Market.  *See* NASDAQ Initial Listing Guide, January 2019, p. 6, available at: https://listingcenter.nasdaq.com/assets/initialguide.pdf (last visited August 31, 2019); *see also* http://www.nasdaq.com/about/Top_Tier_Splash.stm (last visited August 31, 2019).

[63]   The difference in trading between the NYSE and NASDAQ has diminished.  A recent study concludes that: "This study provides evidence of the homogenization of trading in the United States.  The empirical results show that two significant characteristics of market quality—trading volume and transitory volatility—have become indistinguishable, on average, between NASDAQ stocks and those listed at the traditional listing [NYSE] exchanges.  These results provide concrete evidence of a reality that is obvious to most practitioners: The market structures used for trading stocks are now essentially the same regardless of their primary

execute trades in a timely fashion and with reasonable transaction costs, a larger number of market makers, not only signals widespread interest and participation in the market for the particular security, but results generally in a relatively higher degree of liquidity and narrower bid-ask spreads.  These are attributes of an efficient market.

41.  Today, NASDAQ is a national exchange that rivals the NYSE in size, liquidity and information dissemination.[64]  According to the 10-K filed by NASDAQ, Inc. for the year ended 2015, "[NASDAQ is] a leading provider of trading, clearing, exchange technology, regulatory, securities listing, information and public company services. … The Nasdaq Stock Market is the largest single venue of liquidity for trading U.S.-listed cash equities."[65]  "As of December 31, 2015, The NASDAQ Stock Market was home to 2,859 listed companies with a combined market capitalization of approximately $8.3 trillion."[66] Furthermore, like its competitor, the NYSE, "Companies seeking to list securities on The NASDAQ Stock Market must meet minimum listing requirements, including specified financial and corporate governance criteria.  Once listed, companies must meet continued listing standards."[67]

42.  Thus, there is a general presumption adopted by courts (and expert economists) that common stocks traded on the NASDAQ trade in an efficient market.[68] For example, in the *Groupon* decision, the court's opinion reflected this presumption, as it

---

listing markets."  *See* Lawrence Harris, *The Homogenization of US Equity Trading*, Working Paper, September 30, 2011, p. 2.

[64]  For example, in 2007, NASDAQ became "fully operational as an independent registered national securities exchange …."  Nasdaq, Inc., SEC Form 10-K for fiscal year ending December 31, 2015, p. 2.

[65]  *Id.* at 2-3.

[66]  *Id.* at F-9.

[67]  *Id.* at 5.

[68]  *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market . . ." (footnote omitted)); *Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al.,* 2015 U.S. Dist. LEXIS 110382 at *26 (S.D.N.Y. 2015) ("While other courts have been reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE or NASDAQ, most courts agree that such listing is a good indicator of efficiency.").

- 22 -

noted that even the Defendants' expert economist conceded that most securities traded on the NASDAQ exchange traded in an efficient market.[69]

### b)   The Existence of Market Makers

43.   Navient investors benefitted from having market makers, who competed against one another.  According to Bloomberg, there were at least 108 dealers during the months including the Exchange Act Class Period.[70]  These 108 financial intermediaries often risked their own capital and utilized the most advanced information technology and sophisticated research teams to assist investors by improving liquidity and information dissemination.[71]  Demonstrating that there was active participation by a substantial number of brokers, **Exhibit IV** shows that 10 brokers traded in excess of one percent of the total volume.

44.   Therefore, the fact that Navient was listed on the NASDAQ Global Select Market and had at least 10  active market makers, as well as many other less active market makers, standing ready to buy or sell, provides evidence supporting the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

### c)   Arbitrageurs and Institutional Holdings

45.   As noted above, some courts have also considered the number and activity of institutional investors, as well as the proportion of their holdings of the common stock as evidence of market efficiency.[72]  **Exhibit V** lists 648 institutions that filed SEC Form 13F and other documents, disclosing the combined sizes of their beneficial and non-beneficial

---

[69]   "Dr. Gompers, Defendants' expert, did not dispute Dr. Feinstein's conclusions that (1) the NASDAQ exchange—on which Groupon shares traded—was a well-developed exchange on which **most company's stocks traded efficiently** most of the time…."  *In re Groupon, Inc. Securities Litigation*, 2015 WL 1043321, at *5 (N.D. Ill. 2015) (emphasis added).

[70]   Based on monthly broker data obtained from Bloomberg.  Data for December 2014, January 2015 and August 2015 were not available.

[71]   Many market makers not only serve as intermediaries, but also trade for their own accounts.

[72]   *See, e.g., Enron*, 529 F. Supp. 2d at 756.

- 23 -

ownership positions of Navient common stock during the Exchange Act Class Period.[73] These data show that "there was active trading . . . during the Class Period, [and] there were a substantial number of institutional investors,"[74] including a large group of sophisticated investors, institutional investors and investment advisors, who participated in the market for Navient common stock either on their own behalf or on behalf of other beneficial owners. Further, the top 20 largest institutional holders of Navient common stock (in terms of relative size) as of June 30, 2014, September 30, 2014, December 31, 2014, March 31, 2015 or June 30, 2015, held a large proportion of the public float (I also report the position relative to outstanding shares). *See* **Exhibit VI**. This exhibit shows that the aggregate positions of these 29 institutions held between 66% and 72% of the public float (and between 66% and 72% of the outstanding shares) as of the listed dates.

46.   The active trading by a large number of sophisticated institutional investors and investment advisors, as well as the large proportion of the float they held offers further evidence that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.[75]

---

[73]   For securities traded on major U.S. exchanges, such as the NYSE, NASDAQ and AMEX, S&P Capital IQ gathers institutional ownership information via Form 13F filings and other sources. For 13F filings, the SEC's rules state: "Institutional investment managers that use the United States mail (or other means or instrumentality of interstate commerce) in the course of their business and that exercise investment discretion over $100 million or more in Section 13(f) securities must file Form 13F. . . . An institutional investment manager is an entity that either invests in, or buys and sells, securities for its own account. For example, banks, insurance companies, and broker/dealers are institutional investment managers. So are corporations and pension funds that manage their own investment portfolios. An institutional investment manager is also a natural person or an entity that exercises investment discretion over the account of any other natural person or entity. For example, an investment adviser that manages private accounts, mutual fund assets, or pension plan assets is an institutional investment manager. So is the trust department of a bank. A trustee is an institutional investment manager, but a natural person who exercises investment discretion over his or her own account is not an institutional investment manager." U.S. Securities and Exchange Commission: Division of Investment Management: Frequently Asked Questions About Form 13F, March 15, 2017, http://www.sec.gov/divisions/investment/13ffaq.htm (last visited August 31, 2019).

[74]   *See, e.g., Enron*, 529 F. Supp. 2d at 756.

[75]   *See* note 21. Other courts have noted the level of institutional investors in assessing market efficiency. *See e.g., In re Alstom*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *Ann Arbor*, 270 F.R.D. at 251; *Billhofer*, 281 F.R.D. at 153.

### d) Arbitrage Opportunities and Short Interest

47.    Some courts have also examined the issue of arbitrage opportunities by considering whether there is an availability of shares to borrow in order to enter into a short sale.[76]  Short selling enables market participants to trade on their perceived negative information about the company even if they do not hold a long position in the stock.  Thus, short selling assists in arbitrage activity when it is believed by investors that the stock is possibly mispriced and too high.  Short selling activity can therefore impact market prices and efficiency because it enables all traders who believe the price is going to decline, even if they do not hold a long position, to sell and possibly affect market prices.

48.    The amount of short interest in Navient common stock during the Exchange Act Class Period ranged from 5.2 million shares to 14.8 million shares (starting with the first reported short interest after regular way trading on May 15, 2014), with an average short interest of 8.0 million shares.  As a percentage of shares outstanding, short interest ranged from 1.33% to 3.51% and, as a percentage of public float, short interest ranged from 1.34% to 3.52%.  *See* **Exhibit VII**.  This supply and demand of short interest suggests that arbitrageurs and traders with negative views on Navient were able to remain active.  The empirical results suggest that there was sufficient arbitrage and trading activity, which offers further evidence that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

### 4.    *Cammer Factor IV – SEC Form S-3 Eligibility*

49.    Eligibility to register securities on SEC Form S-3 is another factor in the analysis of market efficiency.[77]  To be eligible to register on Form S-3, an issuer must (a)

---

[76]    *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006) at 273.

[77]    "Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."  *Cammer*, 711 F. Supp. at 1285, 1287.

be current in its SEC filings for at least 12 months and (b) have a public float of $75 million.[78]

50.    At all times throughout the Exchange Act Class Period, Navient easily met the public float requirement.  Indeed, on average, Navient's public float was more than 5 times the required threshold.  Indeed, Navient filed Forms S-3ASR on April 28, 2014 and July 18, 2014.[79]

51.    Thus, this *Cammer* Factor offers further evidence supporting the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

C.    Other Operational Factors to Weigh When Examining Market Efficiency

52.    In addition to the operational *Cammer* factors evaluated above, I have also considered additional operational factors that have sometimes been considered by courts. As with the operational *Cammer* factors, these additional operational factors support my conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

1.    *Krogman Factor – Market Capitalization*

53.    In *Krogman*, the court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[80]

---

[78]   SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions," updated November 2018, at 3.

The Form S-3ASR is an automatic shelf registration statement on Form S-3 filed by a Navient, which by definition was a "Well-Known Seasoned Issuer."  SEC Securities Act Release No. 6235, 45 FR 63,693 (1980)) ("This form [S-3] is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.") (Emphasis omitted).

[79]   Source: SEC EDGAR database.

[80]   *Krogman*, 202 F.R.D. at 478.

54.   At the start of the Exchange Act Class Period, Navient's market capitalization was $7.18 billion and peaked at $9.26 billion.[81]  Throughout the Exchange Act Class Period the market capitalization of Navient averaged over $7.3 billion.  *See* **Exhibit VIII**.

55.   Navient's market capitalization compares favorably to the market capitalization of defendant companies in other cases where the courts concluded that the common stock traded in efficient markets.  Indeed, courts have certified classes involving issuer-defendants with significantly lower market capitalization than Navient.[82]

56.   In addition, as of December 31, 2014, Navient's market capitalization as compared to other NYSE and NASDAQ listed common stocks placed it in the 88th percentile.  This means that Navient's market capitalization was <u>greater</u> than 88% of the common stocks on the NYSE and NASDAQ.[83]  Further, I also compare Navient's market capitalization to other common stocks on the NYSE and NASDAQ at the start and end of the Exchange Act Class Period.  At the start of the Exchange Act Class Period, Navient's market capitalization was in the 86th percentile, meaning it was greater than 86% of the common stocks on the NYSE and NASDAQ.[84]  On September 28, 2015, the last day before

---

[81]   Based on the $16.99 closing price and approximately 422.7 million shares outstanding as of April 17, 2014; and the $22.57 closing price and approximately 410.2 million shares outstanding as of December 22, 2014.

[82]   Certification has been granted in many class action securities matters where the market capitalization of defendant companies is far lower than the average market capitalization of Navient.  *See*, for example, *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), which was affirmed by the Third Circuit.  *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011), ("The market capitalization of DVI during the Class Period ranged between $300 million to $12 million, following DVI's negative disclosures.").  *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) ("The value of stock held by non-affiliates ranged from $29.5 million to $73.1 million during the Class Period."); *In Re Netbank, Inc. Securities Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009), ("market capitalization rates range from $246,386,421.36 to $432,150,737.31");  *The Pennsylvania Avenue Funds et al. against Inyx Inc., et al.*, 2011 U.S. Dist. LEXIS 72999, *28 (S.D.N.Y 2011), ("the market capitalization was consistently in excess of $22.4 million throughout the Class Period.)

[83]   For this analysis, I compared Navient's market capitalization to that of the common stocks on the NYSE or NASDAQ as of the year ended December 31, 2014 that have a Bloomberg "Security Type" of "common stock" and "Primary Security Composite Exchange Code" of "US" (the number of members are 3,960).  The Bloomberg data obtained for each member was "Current Market Cap."

[84]   For this analysis, I compared Navient's market capitalization to that of the 3,861 common stocks on the NYSE or NASDAQ as of April 17, 2014 that have a Bloomberg "Security Type"

the end of the Exchange Act Class Period, Navient's market capitalization was in the 82nd percentile, meaning it was greater than 82% of the common stocks on the NYSE and NASDAQ.[85]

## 2.   *Krogman Factor – The Size of the Float of Navient Common Stock*

57.   Float or public float refers to the number of shares of Navient stock that are <u>not</u> held by insiders of the corporation.[86]  Consequently, a larger float relative to the total number of outstanding shares of Navient stock indicates there are a large proportion of Navient shares that are available to non-insiders who can trade without restrictions and profit by trading on new information to the marketplace.

58.   On average, insiders held 1.1 million or 0.3% of the average shares outstanding during the Exchange Act Class Period.[87]  The public float was approximately 99.7% of Navient's shares during the Exchange Act Class Period.  The large proportion of Navient shares held by the public offers further evidence that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

## 3.   *Krogman Factor – Bid-Ask Spread*

59.   The size of the bid-ask spread (*i.e.*, ask quote minus bid quote) for a stock in the market is an indication of the liquidity in the market, and courts have considered it as a factor in determining whether the security trades in an efficient market.  In *Krogman*, the court stated that, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[88]

---

of "common stock" and "Primary Security Composite Exchange Code" of "US."  The Bloomberg data obtained for each member was "Current Market Cap."

[85]   For this analysis, I compared Navient's market capitalization to that of the 3,994 common stocks on the NYSE or NASDAQ as of September 28, 2015 that have a Bloomberg "Security Type" of "common stock" and "Primary Security Composite Exchange Code" of "US."  The Bloomberg data obtained for each member was "Current Market Cap."

[86]   "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders."  *Krogman*, 202 F.R.D. at 478.

[87]   Insider holdings were obtained for directors and officers as a group from Navient's SEC Forms S-1 (filed April 22, 2014, p. 179) and DEF14A (filed April 10, 2015, p. 40).

[88]   *Krogman*, 202 F.R.D. at 478.

60.   Here, the low bid-ask spread for Navient common stock supports market efficiency.  Using daily closing bid and ask quotes, I calculated the percent bid-ask spread for Navient common stock. The percent bid-ask spread was calculated as (i) the ask quote less the bid quote divided by (ii) the average of the bid and ask quotes.  **Exhibit IX** contains the results of the bid-ask spread analysis for each day of the Exchange Act Class Period. The average daily percent spread for Navient common stock was 0.07%. The daily average spread was one cent, which also happens to be the minimum allowable tick size.[89]

61.   These numbers compare favorably to the findings of the courts in other cases where the courts concluded that the common stocks traded in efficient markets.[90]  Further, they also compare favorably to academic research, which showed that in 2009 the bid-ask CRSP-based average spreads for all NYSE and AMEX stocks were 1.03%, while for all NASDAQ stocks the average spread was 2.55%.[91]  By comparison, the average daily spread for Navient common stock was approximately *one fourteenth* the size of the NYSE spreads and *one thirty-sixth* the size of the NASDAQ spreads.

62.   In addition, I have examined the bid-ask spreads over at the end of 2014 for all the common stocks on the NYSE and NASDAQ.  The mean bid-ask spread for the 3,902 companies was 0.78%, which was almost 16 times larger than Navient's bid-ask spread of 0.05% on the same date.  Overall, Navient's bid-ask spread was in the 26th percentile of all NYSE and NASDAQ common stocks, on average, over the Exchange Act Class Period,

---

[89]   Division of Market Regulation: Responses to Frequently Asked Questions Concerning Rule 612 (Minimum Pricing Increment) of Regulation NMS.  https://www.sec.gov/divisions/ marketreg/subpenny612faq.htm (last visited August 31, 2019).

[90]   *See Radient* 287 F.R.D. 563, 574 (finding a much larger bid-ask spread of 0.58 percent supported market efficiency); *In re Scientific-Atlanta*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (finding that a bid-ask spread that "never exceeded 1.9%" weighed heavily in favor of market efficiency); and *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding that average daily relative bid-ask spread of 2.44% weighed in favor of market efficiency).

[91]   Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014).  The paper compared data using closing CRSP (Center for Research in Security Prices) prices to intraday data and showed the spreads are very close. 2009 is the most recent year the authors examined.

which means that Navient's bid-ask spread was *narrower* than 74% of the common stocks on the NYSE and NASDAQ.[92]

63.   The size of the bid-ask spread of is further evidence offering further support for the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

## VI.   THE PRICE-RELATED FACTORS DESCRIBING MARKET EFFICIENCY OF NAVIENT COMMON STOCK

### A.   Background

64.   What is often referred to as the fifth *Cammer* factor is "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[93]   As stated in *Cammer*, "[o]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."[94]   As the *Krogman* court also noted, "in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information."[95]

65.   Below I present empirical evidence that Navient common stock exhibits the type of cause and effect relationship described in *Cammer* and *Krogman*, supporting a conclusion of market efficiency.   First, I examine the relationship between Navient common stock price movements on days when there are earnings announcements.   Next, I examine the relationship between price volatility and volume throughout the Exchange Act Class Period+.   Third, I compare the relationship between Navient common stock price

---

[92]   For this analysis, I compared Navient's bid-ask spread to that of the 3,902 common stocks on the NYSE or NASDAQ as of December 31, 2014 that have a Bloomberg "Security Type" of "common stock" and "Primary Security Composite Exchange Code" of "US".   The Bloomberg data obtained for each member was daily closing "Bid Price" and "Ask Price."

[93]   *Cammer*, 711 F. Supp. at 1287.

[94]   *Cammer*, 711 F. Supp. at 1291.

[95]   *Krogman*, 202 F.R.D. at 477.

movements on news days to "non-news" days. Finally, I demonstrate that there is no statistically significant autocorrelation of Navient common stock abnormal returns. This demonstrates that Navient's common stock price reacted quickly to all types of news. Finally, although not necessary to support my conclusions as to the efficiency of the market for Navient common stock, I also analyzed whether Navient's stock price reacted to the alleged corrective disclosures in a manner consistent with the type of response that would be expected in an efficient market. It did which, although not required to support my conclusions as to the efficiency of the market for Navient common stock, is also consistent with and further supports my conclusion that Navient's common stock traded in an efficient market. Overall, the empirical results presented below support the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

B.  Price Reaction to Unexpected New Information

### 1.    *Event Study Methodology Used to Test for Cause and Effect*

66.    To detect whether the price of Navient common stock rapidly reacted to disclosures of important unanticipated information, I ran a series of empirical tests using the results from an event study. Event studies are widely used in academia, securities litigation matters and investment practices, and have been a standard statistical procedure used by financial economists for over thirty years. They are generally used to measure the reaction of market participants (and thus the stock price) to the disclosure of new information. In an event study, generally-accepted statistical methods are used to test whether a stock price movement on a particular date is statistically significant – *i.e.*, is of a large enough magnitude to allow a statistician to conclude it is not the consequence of chance.

67.    As is explained in detail in **Appendix D**, to determine whether the Navient stock price movement on any given date is statistically significant, I use generally-accepted econometric methods and specify a regression model that removes the outside influences on the stock price movement. I then compare the remaining or residual firm-specific portion of the stock price movement on the date in question to the typical or normal volatility of the company's stock.

68.   Finally, as is typical in event studies performed in the context of class certification, I examine the relationship between the magnitudes of the abnormal returns, the statistical significance of those abnormal returns and the unexpected news related to the subject company.  In **Appendix C**, I present the voluminous daily chronology including Navient common stock prices, returns, volumes, abnormal returns and levels of statistical significance along with any company news.  This chronology also demonstrates the depth of the media coverage of Navient.[96],[97]  The abnormal returns and the measures of statistical significance are used in the analyses below.

### 2.   *Cause and Effect Analysis Examining Days with Earnings News – Background*

69.   In an efficient market, each disclosure of unanticipated material information will be expected to have an impact on the security price.  This is why the *Cammer* court concluded, "[I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected

---

[96]   During the Exchange Act Class Period, numerous news stories about Navient appeared in leading financial publications, including Bloomberg First Word, Bloomberg News, Business Wire, Dow Jones Institutional News, GlobeNewswire, Moody's Investors Service Press Release, PrimeZone Media Network, Reuters News, Reuters Significant Developments, SNL Financial Services Daily, and The Wall Street Journal.  As discussed above, the broad dissemination of information about Navient though the media, analyst reports and regular SEC filings is itself evidence supporting the conclusion that Navient common stock traded in an efficient market during the Exchange Act Class Period.  *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635 (N.D. Ala. 2009) ("The extensive coverage of HealthSouth in general and its bonds in particular by investment professionals, public media, and institutional investors reflects that HealthSouth notes traded in an efficient market.").

[97]   For the Navient chronology, I compiled lists of SEC filings, analyst reports, and news articles.  I compiled the list of all of Navient's SEC filings from April 17, 2014 to October 1, 2015 from the SEC website.  The list of analyst reports is based on reports available from the Thomson Eikon and Capital IQ electronic databases.  While some other reports may exist, this is a reasonably comprehensive list of the analyst reports issued concerning Navient.  For news articles, I searched Bloomberg and Factiva.  For Bloomberg, I used the ticker symbol "NAVI" and searched "medium" relevance for the sources Bloomberg News, Bloomberg First Word, GlobeNewswire, and Business Wire.  For Factiva, I searched all sources for the company code for "Navient Corp."  To eliminate duplicate stories for each of the news providers (Bloomberg and Factiva), a news story was considered a duplicate and eliminated if it had exactly the same date, timestamp, headline, news source, and lead paragraph as another news story from the same provider.

corporate events or financial releases and an immediate response in the stock price."[98]  In securities litigation, the event study for a single firm as described in detail in **Appendix D** examines the impact on stock prices from a confluence of different types of information that is disclosed and disseminated.  It is not unusual that over a class period a corporation will announce earnings, dividends, discoveries, new products, management changes, new issues of securities, lawsuits that it files, lawsuits filed against it, projections, regulatory changes that impact its business, and more.

70.    In an efficient market, academic research finds that there will be some large price movements with no news,[99] and conversely, that there will be news without large price movements.  On the latter point, for example, there will be news without large price movements when a company announces earnings that are in line with expectations and the announcement may be important to investors, but the mix of information would not have changed significantly enough to elicit a statistically significant stock price reaction.  Similarly, when a company's disclosure misleads investors by concealing important information, the effect of the concealment would generally not result in a significant stock price movement.  The concealment "news" would maintain the mix of information, so the appropriate price reaction would be a maintenance of the price level where it previously was.

---

[98]    *Cammer*, 711 F. Supp. at 1287.

[99]    For example, in a 2002 study of the general stock market, Prof. Fair observed that in the 4,417 trading days for the S&P 500 Index there were 220 days with abnormal returns. Of these days with significant returns, only 69 days had identifiable events or news. Thus, only 31.4 percent of the days had identifiable news, while 68.6 percent had no identifiable event or news. Notably, Prof. Fair did not conclude that the S&P 500 stocks traded in inefficient markets. *See*, Ray Fair, *Events That Shook the Market*, 75 Jnl. of Bus. 713, 714 (2002).

This result is also consistent with other studies, including an analysis that examined return predictability following large price changes and information releases. In this study the authors looked at all common stocks traded on the NYSE and AMEX from 1990 to 1992 and observed 23,459 events with large abnormal returns (*i.e.*, days for one or more stocks with large price movements). After employing certain defined data filters, the final sample included 4,873 events. They found, "Approximately one-third of the events had public announcements." Mahesh Pritamani and Vijay Singal, *Return Predictability Following Large Price Changes and Information Releases*, 25 Jnl. of Banking & Fin. 631, 636 (2001) ("Pritamani and Singal").

71.     Furthermore, there are *unobserved factors* that might lead to significant price movements without news.  These factors include, among others, unobserved changes in the market's expectations, imperfections in the statistical methods employed to evaluate the systematic cause-and-effect relationships of a single firm over a given period of time, and private trading activity—for example, insider trading, trading in advance of an offering or portfolio rebalancing.  These factors all might drive a large price response without an observed cause.

72.     Below I present empirical evidence that demonstrates that Navient common stock exhibits the type of cause and effect relationship described in *Cammer* and *Krogman*, supporting a conclusion that Navient common stock traded in an efficient market.  I first examine the relationship between Navient common stock price movements on days when there are company earnings announcements (excluding alleged corrective disclosures).  On days on which there are earnings disclosures, these disclosures typically (although not always) communicate to the market valuation information, which is considered to be material.[100]  Whether the material information disclosed on these days is unanticipated or anticipated will, in an efficient market, be reflected in the price movements observed in the days that follow.  When selecting events for inclusion in an event study, it is that ***group*** of events as a ***whole*** that is characterized as having greater likelihood that there is material, unanticipated information that is disclosed as compared to all other days.  One would not necessarily expect all of the individual events in a collective event study to have statistically significant returns.[101]  As will be discussed below, in a collective event study, statistical tests examine whether the incidence rate of statistically significant returns is greater on high information flow days than the incidence rate on lesser or no-news days.

73.     I first examine earnings disclosure dates because a company's financial results and forecasts are among the most important considerations market participants

---

[100] There is a voluminous academic literature examining price responses to earnings releases.  The pioneering work was completed by William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research 67 (1968).  *See* also, Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 *J. of Business, Finance and Accounting* 429 (2002).

[101] *See* footnote 99.

utilize in valuing the company's stock.[102]   While not every earnings announcement communicates new, *unexpected*, and material valuation information, the academic and trade literature in finance notes that unanticipated material information is generally, but not always, more frequently and more systematically disclosed on such earnings announcement dates rather than on other dates.   Indeed, earnings and revenue announcement dates are a highly studied area of the academic research related to news and price movements.

74.   I next examine the relationship between Navient's daily stock returns and trading volume over the Exchange Act Class Period+.   In addition, I compare the relationship between Navient's returns on news day versus days with no news.   This is followed by an empirical analysis of Navient's abnormal returns to determine whether there is persistent and systematic autocorrelation.   Finally, although not required for my conclusions, Counsel asked me to also analyze the dates of the alleged corrective disclosures.

### 3.   *Cause and Effect Analysis Examining Earnings Days That Are Not Corrective Disclosure Dates*

75.   In this section I present descriptive information related to the abnormal returns on the dates during the Exchange Act Class Period when there were earnings

---

[102] As mentioned above, there are a confluence of different types of material, unanticipated information that a company discloses that can impact a stock price.   There is a large body of academic literature that studies these different types of non-earnings related information. In one of the earliest papers, the author states, "Other types of information available to investors may be important to their valuation of securities. For instance, the *Wall Street Journal* routinely reports company announcements of dividend increases, large product sales, earnings forecasts, acquisitions, construction projects, stock splits, labor strikes and quarterly earnings figures. Do these events affect the price, hence volatility, of companies' securities?" Dale Morse, *Wall Street Journal Announcements and the Securities Markets*, 38 Fin. Analysts Jnl. 69, 69 (1982).

*See also*, Pritamani and Singal, 644-645 and Table 4, who "… divide the public announcement sample into several subsamples based on the type of news.   … Seven distinct types of announcements are listed …."   They examine the price impact of seven categories of news, including: actual earnings announcements by management;   forecast of earnings by management;   analyst recommendations;   capital structure related information (including stock/debt issues); restructuring related information; general business information (including product related information, business contracts, and joint ventures); and miscellaneous information.

disclosures that are not alleged corrective disclosures related to forbearance claim.  The dates of the price effects from these announcements are May 12, 2014, July 17, 2014, October 16, 2014, January 22, 2015, and April 22, 2015.[103]

### a)      May 12, 2014

76.   On Friday, May 9, 2014, after the market closed, Navient released a Form 8-K that updated SLM Corporation's previously announced results (on April 16, 2014) for the quarter ending March 31, 2014 to include an increase in the reserve for estimated amounts and costs for all regulatory matters of $103 million.[104]  Navient's stock closed down on May 12, 2014, falling 2.03%, which, after accounting for market and industry effects, is statistically significant at the 1% significance level. *See* **Appendix E**.

77.   According to Compass Point Research & Trading, LLC

> the company is taking an additional $103M charge (on top of the $70M already taken) to further reserve against regulatory matters with the FDIC and U.S. Department of Justice, as well as provide for the voluntary restitution that Navient has decided to make with respect to certain borrower late fees. While we are not surprised that charges have gone up, the magnitude of the increase is significant and the issue will likely continue to create negative headlines.[105]

78.   The statistically significant price decline following a disclosure of this type of unanticipated adverse material information is consistent with what would be expected in an efficient market.

### b)      July 17, 2014

79.   On July 16, 2014, after the market closed, Navient disclosed its earnings for the quarter ending June 30, 2014, with earnings per share only slightly above analyst

---

[103] Earnings announcements with price effects on July 14, 2015 and July 22, 2015 are alleged corrective disclosures related to the forbearance claim, which as noted I excluded from this analysis.

[104] SEC Form 8-K filed May 9, 2014, 5:11 pm.

[105] Compass Point Research & Trading, LLC. Trading Points, May 12, 2014.

expectations.[106]   Navient's stock closed down on July 17, 2014 by 0.67%, but after accounting for market and industry effects, Navient's stock price had an abnormal return of positive 0.25%, which is not statistically significant.  *See* **Appendix E**.

80.   The statistically insignificant price decline following a disclosure of this type of material information is consistent with what would be expected in an efficient market because it would have been anticipated.  It was anticipated because the earnings were generally in-line with expectations.

### c)   October 16, 2014

81.   On October 15, 2014, after the market closed, Navient disclosed its earnings for the quarter ending September 30, 2014, with earnings per share in line with analyst expectations.[107]   Navient's stock closed up on October 16, 2014 by 1.26% which, after accounting for market and industry effects, is not statistically significant.  *See* **Appendix E**.

82.   The statistically insignificant price decline following a disclosure of this type of material information is consistent with what would be expected in an efficient market because it would have been anticipated.  It was anticipated because the earnings were generally in-line with expectations.

### d)   January 22, 2015

83.   On January 21, 2015, after the market closed, Navient disclosed its earnings for the quarter and year ending December 31, 2014, with earnings per share below analyst expectations.[108]   Navient's stock closed down on January 22, 2015 by 1.35%.   After accounting for market and industry effects, Navient's stock price decline is statistically significant at the 5% significance level.  *See* **Appendix E**.

---

[106]  "NAVIENT 2Q CORE EPS 56C, EST. 54C :NAVI US," Bloomberg News, July 16, 2014, 4:20 pm.

[107]  "NAVIENT 3Q CORE EPS 52C, EST. 52C :NAVI US," Bloomberg First Word, October 15, 2014, 4:15 pm.

[108]  "NAVIENT 4Q CORE EPS 53C, EST. 54C :NAVI US," Bloomberg First Word, January 21, 2015, 4:15 pm.

84.   The statistically significant price decline here bears inquiry given that the earnings were slightly below expectations and there was no identifiable adverse information disclosed.  A closer examination of the data underlying the market model shows that, on January 22, 2015, the industry return (net of market) declined by over 4%, while the general market return increased by over 1.5%—both very large.  Given standard features inherent to the well-accepted market model used—specifically, the fixed coefficients (which by construction are based on an assumption that the past relationship offers the most accurate prediction of the future)—the empirical results with the relatively large positive predicted return resulted in an even larger negative abnormal return than Navient's actual negative return.[109]   Thus, this date is not inconsistent with market efficiency.

e)   **April 22, 2015**

85.   On April 21, 2015, after the market closed, Navient disclosed its earnings for the quarter ending March 31, 2015, with earnings per share only slightly below analyst expectations.[110]  Navient's stock closed up on April 21, 2015 by 0.39%, but after accounting for market and industry effects, Navient's stock price had an abnormal return of negative 0.13% which is not statistically significant.  *See* **Appendix E**.

---

[109]  My co-author, H. Nejat Seyhun, and I explained this issue in our article *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012).  ("Parties frequently present empirical analyses to courts based on a naïve assumption that 'theoretically, in a perfectly efficient market, there should be no significant price movements without some identifiable news event' or conversely, that there should be significant price movements only with some identifiable news event.  The courts have realistically concluded that markets are not perfect, suggesting that courts 'cannot decide efficiency based purely on theory, but must make a determination in the context of the real world.'"), p. 436. (footnotes omitted.)

("[T]o simplify the estimation process, regression parameters for market models are generally assumed to be linear, [and] with fixed coefficients, a substantial daily return of one of the explanatory variables might induce what is perceived to be significant abnormal daily return for the security under examination, whereas the cause of the estimated abnormal daily return has nothing whatsoever to do with the security under investigation." p. 440. (footnotes omitted).

[110]  "NAVIENT 1Q CORE EPS 48C, EST. 50C :NAVI US," Bloomberg First Word, April 21, 2015, 4:28 pm.

86.    The statistically insignificant price decline following a disclosure of this type of material information is consistent with what would be expected in an efficient market because it would have been anticipated.  It was anticipated because the earnings were generally in-line with expectations.

f)    **Summary**

87.    Each of the price reactions to the earnings disclosures are in line with what would be expected in an efficient market.  When expected and actual earnings are close, and there is no earnings or other material surprise, it would <u>not</u> be expected for there to be a statistically significant price reaction as there would be no unanticipated information.

### 4.    *Cause and Effect Analysis Examining the Relationship Between Abnormal Returns and Volume*

88.    As discussed below, based on academic research and tests commonly employed in securities fraud litigation, I also examine the overall relationship between price volatility and volume to empirically evaluate the impact of disclosures of information on the Navient stock price response throughout the Exchange Act Class Period+.[111]

89.    As noted in relevant academic literature, "[i]t is an old Wall Street adage that 'It takes volume to make prices move.'"[112]  This is consistent with Karpoff's conclusion that: "Although one can question the asserted causality, numerous empirical findings support what will be called here a 'positive volume-absolute price change correlation.'"[113]

90.    There has been a plethora of academic research on this issue dating back to at least the 1960s attempting to determine why in an efficient market one observes a positive

---

[111]   Any time when there is a relatively short class period and courts have to evaluate whether a stock trades in an efficient market, generally, the courts find the event study analysis to be helpful.  *See*, for example, *Wilson v. LSB Indus.*, 2018 U.S. Dist. LEXIS 138832, at *36 (S.D.N.Y. 2018) (accepting event study that used three news days); *Todd v. STAAR Surgical Co.*, 2017 U.S. Dist. LEXIS 1919, at *25-31 (C.D. Cal. 2017) (accepting event study that used three news days); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 n. 22 (N.D. Ala. 2009) (accepting event study that used two dates).

[112]   Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109-126, 112 (1987) ("Karpoff").

[113]   Karpoff at 112.

correlation between the size of absolute price changes and the magnitude of volume.  The answer has been attributed to the flow of information.  Differential pre-disclosure information among investors and differential interpretation of the disclosure itself will lead to greater than normal volume.

91.    Moreover, all else constant, abnormal security returns on earnings release dates or other news dates are significantly more volatile or are "more likely to move" on average than on other trading days – *i.e.*, the abnormal returns are more likely to be larger than average.  For example, academic economists agree that because earnings disclosures (on average) reveal more value-relevant information than is disseminated on all other days, it is expected that the security returns should be more volatile for earnings days as compared to other days.[114]  The expected volatility is driven by profit-motivated investors who have different opinions on what will be the price impact of the value-relevant earnings information.  Therefore, once the information is released, then it is expected, on average, that it will be reflected in greater changes in the stock price as compared to the normal movements observed on all other days.  The empirical findings in the academic literature are consistent with this implication.[115]

92.    Combine the expected impact on price of news to the impact on volume and one can see how information and price changes are linked, and one can see how new information will result in larger than average volume and price changes.  Professor Beaver states: "An important distinction between the price and volume tests is that the former reflects changes in the expectations of the market as a whole while the latter reflects changes in the expectations of individual investors."[116]  Thus, "price changes are

---

[114]  This does NOT suggest that there is an expected or systematic *direction* of abnormal returns and earnings, but instead understands that one must look at this in terms of whether the absolute return on earning dates is greater.

[115]  *See* William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research, 67-92 (1968) ("Beaver").  Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 J. of Bus., Fin. and Accounting, 429-456, 452 (2002) finds that, "[t]he tests on volatility changes around [earnings] announcements indicate that announcements that are easy to interpret or announcements of good news are both associated with a volatility peak on the day of the announcement itself."

[116]  Beaver at 69.

interpreted as the market evaluation of new information, while the corresponding volume is considered an indication of the extent to which investors disagree about the meaning of the information."[117]  The key is that volume and price movements have common ties to the flow of new information about the security.

93.    Therefore, using the Price-Volume Test, I examine the relationship between Navient's reported volume and its stock price changes by regressing the Company's absolute abnormal stock returns on the log of trading volume over the Exchange Act Class Period+.  As shown in **Exhibit X**, the relationship between the two variables is positive and highly statistically significant, and thus, supports the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

### *5.    Cause and Effect Analysis Examining Days with News versus Days with No News*

94.    In addition, I analyze Navient's stock price reaction on days with news versus days with no news.  As noted above, it is not unusual that over a class period for a corporation to disclose all types of news, other than earnings, that might have an impact on the security prices.  These types of news include among others: dividends, discoveries, new products, management changes, new issues of securities, lawsuits that it files, lawsuits filed against it, projections, regulatory changes that impact its business, and more.  Even so, the test of a stock price's response to news depends on classifying days into news days and non-news days.  To remove any possible subjectivity on my part as to which "news days" were selected for examination, I often perform an analysis by defining news days as days with Navient earnings announcements.  I examined the few days with earnings announcements in detail above.

95.    To err on the side of caution given the number of earnings dates without alleged corrective disclosures, and as another cross-check on efficiency here, I examine the relationship between price movements and the flow of information using a broader, objectively chosen set of news days.  In that regard, I have utilized my source of news, which generated the approximately 1,400 articles (including approximately 800 articles

---

[117]  Karpoff at 110 (footnote omitted).

from Bloomberg and 600 from Factiva) detailed in **Appendix C** (the chronology of information releases) to determine which dates have news of any type and which have no news.[118] My criteria for selecting news dates is as follows. First, because the timing of the release of the article is important to determine the expected date for price impact, I have used only articles that are time-stamped. In this way, for example, I can apply news on Monday that is disclosed after 4:00 P.M. to the price effect on Tuesday. Next, I have four numerical categories of news, three of which come from Bloomberg. The first category is all news articles with a time stamp. Bloomberg articles include two different Bloomberg categories, Bloomberg News and Bloomberg First Word, among others. So that I did not have make a judgment between the two Bloomberg categories, I created a fourth category which combines the two different Bloomberg categories. For each of the four categories (all news articles with a time stamp, Bloomberg News, Bloomberg First Word, and Bloomberg Combined) I select those dates which have an article count concerning Navient that are in the top 10 percent of the count for all dates in the Exchange Act Class Period+. Next, I find those dates that are in the top 10 percent for all four categories and objectively define these 15 dates as "news dates." I do so because this set of days should have a mix of all types of news that is of most importance to investors of Navient. Finally, I find all dates which have zero stories in all four categories, which constitute "no news dates." There are 91 dates that qualify as "no news dates."

96.     Using this breakdown of news/no-news dates, I find that out of the sample of 106 examined news and no-news days within the Exchange Act Class Period+, approximately 14.2% (=15/106) of the days are defined as news days and 85.8% (91/106) are defined as no news dates. Of this sample of 106 news and no news dates, I have also identified 10 dates with statistically significant abnormal returns. Therefore, 9.4% (=10/106) of the days have statistically significant abnormal returns. Based on the sample of news and no news dates, **Exhibit XI** shows that out of the 106 examined days, there were 6 days with significant returns and news, and 4 days with significant returns and no

---

[118] *See infra* note 97.

news that meets my objective criteria. There are 9 news days with non-significant returns, leaving 87 days with insignificant returns and no news.

97.     I first test whether there was a statistically significant *difference* between the observed proportions of statistically significant abnormal returns on news days as compared to no-news days. Here, Navient's common stock price exhibited a statistically significant abnormal price reaction on ***40.0%*** of news days (6 of 15), compared to ***just 4.4%*** of no-news days (4 of 91). Thus, I observe significant price movements on news days ***over 9 times*** more frequently than I observe significant movements on no-news days. The difference between these two rates is statistically significant with a p-value of less than 0.01 using Fisher's Exact Test.[119]   Thus, with over 99% confidence, I can reject the hypothesis that Navient's stock price reacted no differently on news days (or those dates with expected greater information flow) than on all other days.

98.     Alternatively, I can use the statistical tests to ask and answer the question of what number and percentage of days I would have expected to find matching between news and a statistically significant abnormal return, if the two were *unrelated*. Applying these tests, I find that, if the news and the statistically significant abnormal returns were unrelated, I would expect to observe *at most 2 dates out of the 15 days* when there is a significant abnormal return associated with a news day.[120]   Thus, the 6 days I observe is at least 4 times the expected number of days if there were <u>no</u> cause-and-effect relationship between stock returns and news.[121]

99.     These findings also reject the hypothesis that Navient common stock behaved no differently on news days than on all other days. They allow me to conclude that Navient-specific information and large price movements of Navient common stock during the Exchange Act Class Period+ were related and cannot be attributed to random volatility, or to market or sector factors.

---

[119]   Fisher's Exact Test is a statistical significance test used in the analysis of proportions such as the categories discussed above.

[120]   Specifically, I would expect to observe 1.42 days on average, equal to 9.4% multiplied by 15.

[121]   $6 / 1.42 \approx 4.24$.

100.  Finally, on the 91 days with no news, the average change in magnitude (*i.e.*, absolute value) of the common stock price is 0.80% after controlling for market and industry factors, while on the 15 news dates it was 2.49%.  In other words, the average magnitude of stock price movement on news days is over three times higher, which is also a statistically significant difference.[122]  This provides further evidence of a cause-and-effect relationship and support for the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period+.

### 6.    *Cause and Effect Analysis Examining Autocorrelation*

101.  I have demonstrated above that Navient stock reacted to earnings news, as expected in an efficient market.  Next, I demonstrate that it not only reacted as expected to earnings news, but that Navient's common stock price reacted quickly to all types of news.  I demonstrate this by showing there is <u>no</u> statistically significant autocorrelation of Navient abnormal returns.

102.  For this analysis, I conducted a statistical test to determine whether the daily abnormal returns of Navient common stock exhibit persistent and systematic autocorrelation using returns and lagged returns.[123]  Autocorrelation is a statistical property of the series of returns of a security wherein tomorrow's security price movement can be systematically predicted with a reasonable degree of statistical certainty based solely on the security price movement today (or some period in the past).  Some have argued that persistent and significant autocorrelation in the returns might indicate a violation of market

---

[122]  Based on a Wilcoxon Rank Sum test.

[123]  "Autocorrelation is usually found in time-series data.  Economic time series often display a 'memory' in that variation is not independent from one period to the next."  Greene, *supra* note 27.  In other words, autocorrelation is the measurement of the relationship between the security return at time t and the return of the same security at some fixed time in the past.  First-order autocorrelation would be found when there is a statistically significant relationship between the common stock return today and the common stock return yesterday.  Another way of looking at this concept is that if an observer can use the return from yesterday to predict with some level of certainty the return today, there exists autocorrelation.  *See Lehocky*, 220 F.R.D. at 506-507 n.20 (noting that both parties' experts agreed on the helpfulness of autocorrelation); *PolyMedica*, 453 F. Supp. 2d at 276–78.

- 44 -

efficiency in that it suggests that the security price does not react quickly, making available profit opportunities from naïve trading strategies that are sustained over time.

103.  My statistical analysis of Navient abnormal stock returns for 364 days of the Exchange Act Class Period (excluding April 17 and 21, 2014 because there were no prior day returns) shows there is no statistically significant autocorrelation.  This supports a conclusion of market efficiency.  Here, I ran a standard statistical model by regressing each trading day's abnormal return on the abnormal return from the prior trading day.  From this model, I derive a coefficient of -0.06 representing the measurement of the relationship between the abnormal current (*i.e.*, today) and lagged (*i.e.*, yesterday) returns and a *t*-statistic of -1.20.  A *t*-statistic of 1.96 or above would indicate a statistically significant relationship between yesterday's and today's abnormal returns.  Because the t-statistic I derive (again, -1.20) is well below the threshold for significance, I conclude that there is no statistically significant autocorrelation of Navient abnormal stock returns during the Exchange Act Class Period. This finding again supports the conclusion that the market for Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

104.  In summary, the statistical test I performed shows no statistically significant autocorrelation for Navient abnormal returns at the five percent level of statistical confidence, which is consistent with the conclusion that Navient common stock reacts quickly to news.  This result and the news, no-news tests above are strong support that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

### 7.    *Cause and Effect Analysis Examining Corrective Disclosure Dates*

105.  Although not necessary to support my conclusions as to the efficiency of the market for Navient common stock, I have been asked by Counsel to also analyze whether Navient's stock price reacted to the alleged corrective disclosures related to the loan portfolio claims in a way that would be expected of a stock that trades in an efficient market.  In **Appendix C** and **Appendix E**, I present empirical information related to the calculation of all the abnormal returns throughout the Exchange Act Class Period+, including those days when the Complaint alleges there were corrective disclosures related

to the loan portfolio claims: July 13, 2015 (price impact on July 14, 2015); July 21-22, 2015 (price impact on July 22, 2015); and September 29, 2015 (price impact on September 29, 2015, September 30, 2015, and October 1, 2015).[124]

106.  All five of the days with potential impacts from the disclosures have rapid price responses.  Three days (July 14, 2015, September 29, 2015, and September 30, 2015) have negative abnormal returns that are highly statistically significant (with p-values at or below 0.01, which denotes statistical significance with greater than 99% confidence).  A fourth day, October 1, 2015, has a negative abnormal return that is statistically significant with greater than 95% confidence (a p-value of 0.03).  The fifth day, July 22, 2015, has a negative abnormal return of 2.14% with a p-value of 0.0663, which denotes statistical significance at a 93.37% level of confidence that the abnormal return is not zero.

107.  Overall, the price reactions for Navient common stock on the corrective disclosure dates are consistent with what an economist would expect when a security trades in an efficient market.

### C.  Conclusion Based on the Basket of Factors the Courts Evaluate

108.  My empirical analyses in this section shows that the disclosure of Navient-specific news caused rapid and significant movements in the prices of Navient common stock.  These analyses strongly support the conclusion that the market for Navient common stock was efficient.  Moreover, using the empirical results for the evaluation of the eight operational factors in Section V, I have also presented strong support for my conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

109.  In summary, when examining the basket of factors that Courts generally rely upon for class certification decisions, which are also consistent with the fundamental principles of economics and finance that academics rely upon to evaluate market

---

[124]  Complaint ¶¶85-87, 90-91.  I note that the Complaint lists a price decline from July 21 to July 23, 2015 (Complaint, ¶87), but the price and return listed are for July 22, 2015; I therefore consider the alleged price impact date to be July 22, 2015.

efficiency, the evidence strongly supports the conclusion that Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

## VII. THE BASKET OF RELEVANT FACTORS USED TO EVALUATE THE MARKET EFFICIENCY OF NAVIENT COMMON STOCK APPLIES TO THE EXAMINATION OF WHETHER OPTIONS ON NAVIENT COMMON STOCK TRADED IN AN EFFICIENT MARKET

110. I have also been asked to determine whether options on Navient common stock traded in open, well-developed and efficient market. For this analysis, I examine only those stock options that were potentially held through one or more of the corrective disclosures.[125] In the following sub-sections, I provide a general overview of options and option terminology and provide my analysis of the efficiency of the market for options on Navient common stock.

### A. Overview of Options

111. An option on Navient common stock is a contract which gives the buyer the right, but not the obligation, to buy or sell Navient common stock at a specified *strike price* prior to or on a *specified date*. The strike price (also called the exercise price) is the amount paid or received upon exercise of the option and the specified date (also called the expiration or maturity date) is the termination date when the contract is no longer in force. There are two types of standard exchange-traded stock options: call options and put options. A call option gives the holder the right, but not the obligation, to purchase shares of Navient common stock at a specified strike or exercise price, on or before the specified expiration or maturity date. These shares are purchased from sellers, who are commonly referred to as the option writers. A put option gives the holder the right, but not the obligation, to sell shares of Navient common stock to the option writer at the specified exercise price on, or possibly before, the expiration date.

---

[125] These options are identified based on whether there are any alleged corrective disclosures between the first date of available bid-ask data and the expiration date of the option, which I understand would be the relevant options for purposes of this action.

- 47 -

112. It is critical to understand that stock options are considered "derivative" securities because they derive their value from the value of the underlying asset, which in the case of Navient put and call options is the share price of Navient common stock.  In other words, at any given point in time, the ultimate price of a particular option is dependent on the magnitude of the difference between the fixed strike price of that option and the variable price of Navient's common stock.[126]  Therefore, holding all else constant, as the price of Navient common stock changes, so too will the prices of the put and call option. Therefore, when the price of Navient common stock rises, all else constant, in an efficient market it is expected that the prices of call options will rise, while the prices of put options will fall.[127]  Conversely, when the price of Navient common stock falls, all else constant, in an efficient market it is expected that the prices of call options will fall, while the prices of put options will rise.

113. Standard exchange-traded option contract prices, such as those on Navient common stock, are quoted on the basis of purchasing (*i.e.,* calling) or selling (*i.e.,* putting) a share of Navient common stock, although a standard contract is generally for 100 underlying shares.[128]  Thus, if an option contract is quoted at $10, the cost of purchasing

---

[126] Because a stock option is forward-looking, during any point in time during its life, other determinants of its value include the risk-free interest rate, expected dividends to be paid on the stock, the time to maturity of the options, and the volatility of the underlying asset at that point in time.

The difference between the exercise price and the underlying stock price is called the "intrinsic value" of an option.  For a call option, the intrinsic value is equal to the underlying stock price less the exercise price of the option (*i.e.*, how much more the stock is worth than the price you have the option to buy it at), but not less than zero.  For a put option, the intrinsic value is equal to the exercise price less the underlying stock price (*i.e.*, how much less the stock is worth than the price you have the option to sell it at), but not less than zero.

During the life of an option, an option would also have "time value," which is the value inherent in holding the option over time and is generally determined by the length of the life of the option (the longer time to expiration, the higher the time value of the option) and the volatility of the underlying stock (the higher the volatility, the higher the time value of the option).

[127] Under certain conditions in an efficient market, an observable option price might not necessarily change if the stock price changes.  For example, the price of an out-of-the-money option with a very short time to expiration would not be expected to discernably change unless there is a sufficiently large price movement in the underlying stock.

[128] There can be exchange-traded options for different numbers of shares due to capital changes or different size contracts for stocks that have very high prices (such as Google).

such an option (referred to as the "premium") would be $1,000 (equal to $10 multiplied by 100). There are generally a variety of options available to trade at multiple expiration dates and strike prices. In general, there is a series of long-term options ("LEAPs") expiring in each January that begin to be traded approximately 2-1/2 years prior to the expiration of the specified contract.[129] There are also quarterly cycle expirations that begin trading approximately eight months prior to expiration.[130] In addition, other monthly and weekly expirations can begin trading more closely to the expiration date.[131]

114. There is no limitation to the number of put or call options because when a new option is "written," it creates one new contract, which adds to what is called "open interest." Open interest is the number of outstanding contracts of all combinations of the specified strike prices and the specified expiration dates that are being traded by investors. Open interest is reduced when an option is exercised or there is an offsetting trade (*i.e.*, if an option purchaser sells his or her option to an option writer or an option writer closes out his or her position by buying an option from an option holder). In the case of exercising a call option, the purchaser buys the 100 shares of common stock at the strike price (with the purchaser acquiring 100 shares of common stock and remitting to the option writer an amount equal to 100 times the strike price); while exercising a put option means the option purchaser sells or assigns 100 shares of common stock at the strike price to the writer of the put (with the writer receiving 100 shares of common stock and remitting to the purchaser an amount equal to 100 times the strike price).

---

[129] *See*, for example, "How LEAPS® Work," The Options Industry Council, FAQ 7.8, https://www.optionseducation.org/optionsoverview/how-leaps-work (last visited August 31, 2019).

[130] *See*, for example, "LEAPS® & Expiration Cycles, What are Expiration Cycles?" The Options Industry Council, FAQ 11.2.2, https://www.optionseducation.org/referencelibrary/faq/leaps-and-expiration-cycles (last visited August 31, 2019).

[131] *See*, for example, "LEAPS® & Expiration Cycles, What are Expiration Cycles?" The Options Industry Council, FAQ 11.2.2, https://www.optionseducation.org/referencelibrary/faq/leaps-and-expiration-cycles; "Weekly Options," The Options Industry Council, FAQ 11.2.10, https://www.optionseducation.org/referencelibrary/faq/weekly-options (last visited August 31, 2019).

B.  Efficiency of the Market for Options on Navient Common Stock

  **1.   *Operational Factors and Options***

115.  Academic and trade research supports the conclusion that the ultimate prices of Navient stock options would be primarily dependent on the price of Navient common stock, especially on a daily basis, and thus because the price of Navient common stock is determined by the flow of information about the performance of Navient, the efficiency of the prices of the Navient stock options would be determined by the efficiency of Navient's common stock, as measured by the basket of factors that were examined in Sections V and VI, above.[132]  Thus, whether the individuals are investors in Navient common stock or stock options, they generally will have the same access to the same information from the same sources (analysts, media, the Company filings, etc.).  Therefore, to the extent that the Navient share price reflects all publicly available information Navient, and the share price rapidly adjusts to account for new, material and unanticipated information, it would be expected that prices for Navient stock options would also reflect all publicly available information about Navient, and the stock options prices would rapidly adjust to account for new, material and unanticipated information.  Therefore, to the extent that the *Cammer* Factors, such as analyst and media coverage, the ability to file SEC Form S-3, and the fact that the common stock trades on a standardized exchange, support the conclusion that Navient common stock trades in an efficient market—which they do as discussed above— these factors also support the conclusion that Navient stock options trade in an efficient market.

116.  The only *minor* difference is that exchange-traded options, also known as "listed options," are not traded on the NASDAQ, but are mostly traded on other international exchanges, with the primary exchange being the Cboe Options Exchange

---

[132]  This is consistent with, for example, *Enron*, 529 F. Supp. 2d at 754 ("The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options."); *Marcus v. J.C. Penney Co., Inc.*, 2016 U.S. Dist. LEXIS 115795, at *30 (E.D. Tex. 2016) (relying on "[t]he Court in *Enron* [which] found that an experts' application of the *Cammer* factors to common stock was sufficient to trigger the presumption for options as well"), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 33257 (E.D. Tex. 2017).

("Cboe"), along with additional affiliated exchanges,[133] as well multiple other exchanges.[134]  Further, the Cboe uses a hybrid approach to attract its market makers.  First, there is a Designated Primary Market Maker ("DPM").[135]  For Navient the DPM is Citigroup.[136]  The DPM plays a similar role as the Designated Market Maker on the

---

[133]  According to the Cboe, "Cboe Options Exchanges: #1 U.S. Options Markets." http://www.cboe.com/us/options# (last visited August 31, 2019).  To be listed on the Cboe, among other criteria, "the security shall be characterized by a substantial number of outstanding shares which are widely held and actively traded." Rules of Cboe Exchange, Inc., updated as of May 17, 2019, p. 88 (available at https://www.cboe.com/publish/cboe-rules/cboe-exchange-inc-rule-book.pdf).

[134]  The Options Clearing Corporation ("OCC") 2017 Annual Report, p. 3, listing exchanges including, but not limited to, BATS, ISE, NASDAQ, NASDAQ OMX PHLX, NYSE AMEX, and NYSE ARCA.  The OCC "is the world's largest equity derivatives clearing organization. OCC is dedicated to promoting stability and financial integrity in the marketplaces that it serves by focusing on sound risk management principles. By acting as guarantor, OCC ensures that the obligations of the contracts it clears are fulfilled."  "What is OCC?" https://www.theocc.com/about/corporate-information/what-is-occ.jsp (last visited August 31, 2019).

[135]  "The DPM is a market-maker who is obligated to make continuous bid and ask prices in all option series in his appointed option classes. In return, the DPM is guaranteed certain rights to participate in each trade, either electronic or in open-outcry. In addition to, or in the absence of a DPM (e.g., those classes not traded on the Hybrid system) many option classes at Cboe also have independent market-makers who make bid and ask prices from either the trading floor or remotely. Ultimately, however, your orders are executed with the Cboe's current best available bid or offer. This party may be an option professional or an individual investor via an option order." *See*, http://www.cboe.com/education/getting-started/quick-facts/options-marketplace (last visited August 31, 2019).

[136]  http://www.cboe.com/trading-resources/symbol-directory/equity-index-leaps-options?sid=N (last visited August 31, 2019).

NYSE.[137]   Next, all exchange members are eligible market makers and there is a well-defined market makers program.[138]

117.  Because exchange-traded options have standardized strike prices, expiration dates and deliverables (the number of shares/contracts of the underlying asset), they attract and accommodate larger numbers of traders.  This increased volume benefits traders by providing improved liquidity and lower costs. The more traders there are for a specific options contract, the easier it is for interested buyers to identify willing sellers.

118.  The standardization of exchange-traded options also enables clearing houses to guarantee that options contract buyers will be able to exercise their options – and that options contract sellers will fulfill the obligations they take on when selling options contracts – because the clearing house can match any of a number of options contract

---

[137]   According to the NYSE:

> The cornerstone of the NYSE market model is the Designated Market Maker (DMM).  DMMs have obligations to maintain fair and orderly markets for their assigned securities.  They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability.  This high touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value.

> DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions.  A valuable resource for our listed company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery.

Designated Market Makers, https://www.nyse.com/market-model (last visited August 31, 2019).

The NYSE uses these well-capitalized DMMs to facilitate fair and orderly trading. According to the NYSE: "The NYSE's unique market model combines leading technology with human judgment to prioritize price discovery and stability over speed for our listed companies. Coupled with our electronic markets, we believe nothing can take the place of human insight and accountability.  It's the human element at NYSE that results in lower volatility, deeper liquidity and improved prices."  Market Model, https://www.nyse.com/market-model (last visited August 31, 2019).

[138]   *See*, http://www.cboe.com/us/options#.  *See also*, "Market-makers are exchange members who provide liquidity in the marketplace by risking their own capital in making bids and offers for their own accounts in the absence of public buy or sell orders. They are the backbone of the Cboe's trading system." http://www.cboe.com/education/getting-started/quick-facts/options-marketplace (last visited August 31, 2019).

buyers with any of a number of options contract sellers. Clearing houses can do this more easily because the terms of the contracts are all the same, making them interchangeable.[139]

119.  In addition, courts have held that a finding that the underlying stock trades on an efficient market suffices to establish that the options on that stock also trade in an efficient market.[140]

### 2.  *Cause and Effect Analysis for Navient Stock Options*

120.  As discussed previously, the price of an option is primarily derived from the underlying security's price.  Although it is expected that, holding all else constant, call

---

[139]  "The Options Clearing Corporation is the sole issuer of all options listed at the Cboe and other U.S. options exchanges, and is the entity through which all Cboe option transactions are ultimately cleared. As the issuer of all options, OCC essentially takes the opposite side of every option traded. Because OCC basically becomes the buyer for every seller and the seller for every buyer, it allows options traders to buy and sell in a secondary market without having to find the original opposite party.  The OCC substantially reduces the credit risk aspect of trading options, as the OCC requires that every buyer and every seller have a clearing member and that both sides of the transaction are matched. It also has the authority to make margin calls on firms during the trading day."  *See*,  http://www.cboe.com/education/getting-started/quick-facts/options-marketplace (last visited August 31, 2019).

[140]  For example, (1) the *Enron* Court applied the fraud-on-the-market presumption to options, reasoning that "[t]he value of these derivative securities depended upon the value of Enron common stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options…. The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' §10(b) claims based on the options."  *Enron*, 529 F.Supp.2d 754.

(2) "Moreover, insofar as the alleged Rule 10b–5 violations are predicated on put or call options transactions, the trading of Merck stock on the efficient NYSE suffices to establish that the options also traded on an efficient market.  Clearly, the security underlying the options contracts entered into by class members, that is Merck stock, traded on an efficient market. Thus, it is logical and appropriate to apply the same presumption of reliance to class members who exercised options that were derivatives of that stock and whose value depended on the value of the Merck stock."  *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, 2013 WL 396117 (D. N.J. 2013) at *12.

(3) In *Deutschman v. Beneficial,* a § 10(b) action, the Third Circuit observed that given the nature of an option to buy or sell a particular stock, the value of an option is related to the stock price and therefore, it further reasoned, material misstatements affecting the market price of the stock affect the "necessarily related market price of the option contract." It concluded that "[t]he market price for options is directly responsive, therefore, to changes in the market price of the underlying stock, and to information affecting that price."  *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir.1988).

option prices will move in the same direction as the price of the underlying stock and put option prices will move in the opposite direction, options are not expected to move by the same per-share dollar or percentage amount as the underlying stock price except under certain narrow circumstances.[141]

121. To understand the price movements of options relative to the underlying security, it is common to refer to a call (put) option as being "in the money" if its strike price is below (above) the current stock price (*i.e.*, it has an intrinsic value greater than zero). A call or put option is considered "at the money" if its strike price is equal to the current stock price. Finally, a call (put) option is considered "out of the money" if its strike price is above (below) the current stock price. As an option moves farther out of the money, it is expected that for any given price movement of the share price there will be less movement of the options price. The more an option is in the money, the more similarly its price will move relative to the stock price change.

122. Using this basic information, I first test for cause-and-effect analysis to determine if option price levels adjust to the implied Navient common stock price throughout the Exchange Act Class Period. I examine this using the "put-call parity" relationship.

a)    **Put-Call Parity**

123. In addition to trading "naked" or unhedged long and short positions in the common stock directly, arbitrageurs can also profit from common stock price movements by trading in call and put options on the common stock. In an efficient market, the various call and put options on a common stock will be priced relative to one another (and the common stock) so as to provide zero risk-free economic profit from arbitraging these securities against one another.[142] Economists refer to this no-arbitrage state as "put-call parity."

---

[141] As discussed above, options that are far out-of-the-money might not move in the same direction.

[142] Zero risk-free economic profit is an economic term that means no risk-free returns net of transaction costs.

124.   Put-call parity is a theoretical relation between call option prices, put option prices and share prices of the underlying common stock that should hold because a portfolio of put and call options plus risk-free bonds (accounting for borrowing money to pay for positions or lending the money garnered from the short sale) can be constructed to replicate the payoff from purchasing the underlying common stock (*i.e.,* you make money if the stock price increases and lose money if the stock price decreases).   For American-style options on stocks, the put-call parity relation implies a lower and an upper bound on the value of the put and call option prices such that the following condition is satisfied:[143]

$$S - X - D \le C - P \le S - Xe^{-rt}.$$

125.   In this equation, $S$ denotes the current price of the underlying common stock, $X$ denotes the exercise price of the option, $C$ is the call option price, $P$ is the put option price, $r$ is the risk-free interest rate,[144] $D$ is the present value of expected future dividends,[145] and $t$ is the time to expiration of the options.[146]

126.   When this relationship no longer holds and the condition is violated, there might exist arbitrage opportunities which can be exploited using profitable trading strategies.   In other words, persistent violations might suggest the lack of arbitrage activity or restrictions or high costs to trading that might inhibit the market response to new information.

---

[143]   For example, *see* John C. Hull, Options, Futures, and Other Derivatives, 211 (7th ed. 2009).

[144]   For the risk-free interest rate $r$ in the equation above, I used the U.S. Treasury constant maturity rate closest to the number of days to expiration for each respective option.   The interest rate data was obtained from the Federal Reserve Board database.   The following cut-offs were used in assigning interest rates to time to maturity: 1-60 days, 1-month rate; 61-136 days, 3- month rate; 137-273 days, 6-month rate; 274-547 days, 1-year rate; and 548-912 days, 2-year rate.   I converted the interest rates to continuous compounding using the formula: *2 x ln(1+r/2)*, where $r$ is the interest rate based on semiannual compounding.

[145]   For the present value of expected future dividends, I used the last known dividend as a proxy for future dividend expectations. I then created a series of constant dividends beginning on the next dividend ex-date and continuing quarterly through the expiration date of each respective option. Each dividend series was then discounted from its respective quarterly payable dates using the risk-free interest rates described above.

[146]   The number of days to expiration is equal to the expiration date less the trading date.

127. I conducted an empirical test to determine whether Navient common stock and exchange-traded options on Navient common stock (which were potentially held over an alleged corrective disclosure) violated this put-call parity condition on each day during the Exchange Act Class Period. A lack of violations implies that Navient option prices are set according to Navient's stock prices and adjust for movements in Navient's stock price.[147] For the analysis, I obtained end-of-day bid and ask data for options on Navient common stock from IVolatility. Using bid and ask quotes for Navient common stock and options, I created put-call pairs over which to test the put-call parity condition.

128. I then tested these multiple option pairs along with the stock price to determine if there were violations of the put-call parity condition. Because these bounds are derived from the economic assumption of no arbitrage, it is important to test the condition based on realistic buying and selling opportunities. Therefore, the lower bound of the equation above (*i.e.*, the left hand term in the equation above) is calculated using the ask quote for the call option, the bid quote for the put option and the bid quote of the stock; while the upper bound of the equation above (*i.e.*, the right hand term in the equation above) is calculated using the bid quote for the call option, the ask quote for the put option and the ask quote of the stock.

129. The magnitude of the violation in percentage terms was calculated for each option pair in relation to the bid-ask midpoint of Navient's common stock ($S_{bidask}$), specifically as the absolute value of:

$$\{\min[0, S_{ask} - (C_{bid} - P_{ask} + Xe^{-rt})] + \max[0, S_{bid} - (C_{ask} - P_{bid} + X + D)]\} / S_{bidask}.[148]$$

130. I found that during the Exchange Act Class Period there were no violations of this mathematical relationship out of the 4,876 valid option pairs. This means that when Navient common stock reacted to news, the options simultaneously responded to the news as well.

---

[147] At any given time, there are multiple put and call options that trade based on Navient's common stock. These put and call options can differ in terms of exercise price and expiration date.

[148] The result was also rounded to the nearest 0.01%.

C. Conclusion Based on the Basket of Factors the Courts Evaluate

131.   My empirical put-call analyses in this section shows that the disclosure of Navient-specific news caused rapid and significant movements in the prices of options on Navient common stock.  This analysis supports the conclusion that the market for options on Navient common stock was efficient, because as *Cammer* explains: "One of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."[149]  Moreover, the evaluation of the eight operational factors also support for my conclusion that options on Navient common stock traded in an efficient market throughout the Exchange Act Class Period.

132.   Therefore, when examining the *basket of factors* that Courts generally rely on for assessing market efficiency in the class certification context, which are also consistent with the fundamental principles of economics and finance that academics rely upon to evaluate market efficiency, the evidence supports the conclusion that options on Navient common stock traded in open, well-developed and efficient markets throughout the Exchange Act Class Period.

133.   Furthermore, as noted above, courts have determined that a finding that the underlying stock trades on an efficient market (as discussed above) suffices to establish that the options on that stock also trade in an efficient market.[150]

## VIII.  INTRODUCTION TO CORPORATE BONDS AND BOND PRICING THEORY

A. Background Information on Corporate Bonds

134.  A corporate bond is a security issued in connection with a corporation's borrowing activity.   The borrower (the corporation) receives a lump sum payment (generally denominated in $1,000 amounts per single bond)[151] in return for a promise to

---

[149]   *Cammer*, 711 F. Supp. at 1291.

[150]   *See supra* footnote 140 discussing the opinions in *Enron*, *Merck* and *Deutschman*.

[151]   The three Navient Debt Securities that were registered to trade on the NASDAQ Global Select Market: Medium Term Notes, Series A, CPI-Linked Notes due 2017; Medium Term Notes, Series A, CPI-Linked Notes due 2018; and 6% Senior Notes due December 15, 2043 (the "2043

make periodic payments to the lender in the future.  These periodic payments typically include semiannual payments of interest to lenders (called coupon payments), as well as a lump sum payment at maturity (called principal payment).[152]

135.  The corporate bond market is primarily an institutional market, meaning that most of the participants are large institutions rather than retail clients.  Furthermore, most trading takes place over-the-counter, where the bond trader cannot observe quotes on a centralized or electronic exchange.[153]  Instead, for quotes, the institution or customer contacts one or more dealers or alternatively accesses through Bloomberg or other price providers an electronic broadcast of a list of bonds and quotes.

136.  The price of a bond is calculated as the present value of the expected future cash flows it generates.[154]  In turn, the present-value calculation depends upon the magnitude and timing of promised bond payments and the likelihood of repayment, as well as the market interest rates for comparable securities.

137.  The value[155] of a corporate bond is then determined by six components:

(1)     The expected rate of return on similar maturity, riskless debt (*i.e.*, U.S. government bonds);

---

Note"), all had face values of $25.  I believe because of this lower face value, certain data sources (*e.g.*, Bloomberg) often refer to these notes as "preferred stock."

[152] Corporate bonds frequently have covenants or terms whereby the bond may be put to the company by the investor or called by the company.  They can also be convertible or secured by specified assets.

[153] Corporate bonds also trade on the NYSE, a centralized exchange where there are readily available price quotes.  Estimates suggest that only a small proportion of all corporate bond trades are made on the NYSE.

[154] Corporate bonds are generally issued with a par value (which is also sometimes referred to as face value or original principal balance) of $1,000.  Most corporate bonds (like the Navient Debt Securities) have a par value, face value or original principal balance that is fixed and does not change over the life of the corporate bond.  On the other hand, the market value of a bond will change based on the market price of the bond.  Bond pricing convention is such that bonds are priced relative to $100 par value, face value or original principal balance.  Therefore, a bond price of $96 represents a market value of a bond of $960 or 96% times $1,000.

[155] The value of a bond with a fixed coupon is expressed as a price relative to $100 par value.  This price relative to par value is inversely related to its yield.  This means that as the bond price falls, the yield rises.

(2)     The various provisions and restrictions associated with the particular bond (*e.g.*, call terms, convertibility features, seniority in the event of default, maturity date, etc.);

(3)     The default risk, or the probability that the company will be unable to satisfy some or all of the indenture requirements given current and expected future economic conditions;

(4)     The likely recovery rate of the bonds in case of bankruptcy or liquidation given current and expected future economic conditions;

(5)     The tax considerations of the bond payments; and

(6)     The likelihood of being able to sell the corporate bond in a liquid market.[156]

138.    Changes in these variables explain most of the variation in the prices and yields of corporate bonds.  However, *daily changes* in corporate bond prices and yields are most often a function of changes in risk-free rates of interest, in risk premia for similar-risk bonds, and in the company's likelihood of default on its obligations.[157]

139.    Furthermore, because the bondholder receives only a return of principal (in the case of a non-convertible bond or convertible bond[158] trading well below its conversion price), there is generally less upward movement in a bond price than downward movement.

---

[156] The first three components of the value of a corporate bond are discussed in detail in Robert C. Merton, *On the Pricing of Corporate Debt: The Risk Structure of Interest Rates*, 29 J. Fin., 449 (1974).  Other articles discuss tax effects, but that discussion is not important in this report, as taxes remained stable over the period.  With respect to components (4) and (6) above and general discussions on factors affecting corporate bonds, *see* Edwin J. Elton, Martin J. Gruber, Deepak Agrawal, and Christopher Mann, *Factors Affecting the Valuation of Corporate Bonds*, 28 J. Banking and Fin., 2747-67 (2004); Merton H. Miller, *Debt and Taxes*, 32 J. Fin., 261-75 (1977); Merton H. Miller and Myron S. Scholes, *Dividends and Taxes*, 6 J. Fin. Econ., 333-64 (1978); Harry DeAngelo and Ronald W. Masulis, *Leverage and Dividend Irrelevancy under Corporate and Personal Taxation*, 35 J. Fin., 453-64 (1980).

[157] Typically, tax, recovery rate, and liquidity factors are stable on a day-to-day basis.  Another variable that can affect the valuation of the bonds, the age of the bond, is deterministic (*i.e.*, known in advance).  Thus, while all of these factors affect bond prices, they will have only a small effect day-to-day.

[158] It is my understanding that none of Navient's unsecured public debt was convertible into Navient common stock.

In essence, unlike common stock, there can be an asymmetry of price movements – almost like something bumping up against a ceiling.

140.  While U.S. Government obligations are typically viewed as free from default risk, the same is not true for corporate bonds.  Corporations can and do default on their promises to make future payments, or otherwise abide by the bond indentures and covenants.  Bond default risk, also called credit risk, is measured by various rating agencies, such as Moody's Investors Service, Standard and Poor's Corporation, and Fitch Investors Service.[159]  Bonds are generally separated into two groups: investment-grade bonds, with Standard and Poor's ratings BBB- or higher, and speculative-grade bonds with ratings BB+ or lower.[160]  Certain bonds are not rated.[161]

141.  Highly rated investment-grade bonds rarely default.  In other words, firms issuing investment-grade bonds have adequate cash flows to cover interest payment obligations and sufficient assets to back up the principal payment obligations.  The relative safety of investment-grade bonds in effect separates the pricing of "straight" or non-convertible investment-grade bonds from day-to-day stock-price fluctuations of the issuing firm.  Consequently, in efficient capital markets, the price of a straight investment-grade bond is not very sensitive to day-to-day stock-price fluctuations of the issuer, nor will it always react to corporate announcements.

142. Hence, in efficient capital markets, most of the variation in the prices of straight investment-grade bonds comes from fluctuations in economy-wide interest rates, as opposed to firm-specific information.

---

[159]  *See* **Appendix J** for a description of the bond ratings provided by Moody's Investors Service, Fitch Investors Service, and Standard and Poor's Corporation.

[160]  An investment-grade bond is assigned a rating in the top categories by commercial credit rating companies. S&P classifies investment-grade bonds as BBB- or higher, and Moody's classifies investment-grade bonds as Baa or higher.  *See* Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, Ch. 14, 468-469 (McGraw-Hill, Irwin, 10th ed. 2013).

[161]  The rating agencies charge fees to issuing firms to rate corporate bonds, therefore some corporations choose not to have their corporate bond offerings rated.  In fact, according to data in the 2014 Issue Information from the TRACE Fact Book, in 2012, 2013 and 2014, 58.93%, 60.03%, 64.26% of the corporate convertible bond issues were not rated. http://www.finra.org/industry/trace/trace-fact-book.

143. Defaults on non-investment-grade, high-yield or speculative-grade bonds (also called junk bonds) are more common. About half of all bonds that are rated CCC by Standard and Poor's Corporation have defaulted within ten years.[162] Although high-yield bonds, like investment-grade bonds, are also sensitive to changes in interest rates and credit market conditions, in an efficient market stock-price behavior of the issuing firm and other firm-specific announcements are expected to have a greater impact on the value of high-yield bonds.

144. A hypothetical example will demonstrate how economic factors might differentially affect the prices of straight investment-grade and high-yield corporate bonds. Assume an investment-grade bond has a coupon of 10 percent and is priced at $100 (par value) and the principal of $100 will be paid off in full in one year. All else constant, if the stock price of the issuer doubles, there will be little if any impact on the price of the investment-grade bond, since the maximum payoff at maturity is $100. If interest rates double to 20 percent, however, the value of the bond with its fixed coupon is reduced and the bond price will fall. Alternatively, a speculative-grade bond with a coupon of 10 percent, a par value of $100, and a price of $50 will react to both of these events. A doubling of interest rates to 20 percent will, like its effect on the investment-grade bond, cause downward pressure on the price for the speculative-grade bond. But if the stock price doubles, there is a signal of an improved likelihood that the bond will be redeemed at $100, inducing upward pressure on the speculative-grade bond price.

145. This also demonstrates an important observation about corporate bonds. Straight investment-grade bond prices are expected to be sensitive only to bond-pricing factors, such as risk-free interest rates, the default premium and the term spread. Speculative-grade bond prices are expected to be sensitive not only to these same bond-pricing factors, but also to stock-market pricing factors, such as stock returns for the

---

[162] *See* Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, Ch. 14, 468-469 (McGraw-Hill, Irwin, 10th ed. 2013).

underlying firm. This dichotomy of variables that explain variations in bond prices is explained by Fama and French in their seminal article.[163]

146. Moreover, it is common for corporate bonds to trade less frequently than stocks because the outside influences and internal financial factors have less impact on pricing.[164]

B. Bond and Stock Prices Often Move in Different Directions in an Efficient Market

147. Simon Kwan has explained why a company's stock and bond prices may move in opposite directions in response to new company-specific information:

> Depending on the type of firm-specific information disseminated over time, individual stocks and bonds can be either positively or negatively correlated. Information about the mean value of the firm's underlying assets affects the values of the firm's stocks and bonds in similar directions, resulting in a negative [positive] relationship between individual stock returns and changes in individual bond yield [price]. On the other hand, if we view equity as similar to a call option on the firm's underlying assets, then information about the variance of the firm's asset return has opposite effects on the values of the firm's stocks and bonds, resulting in a positive [negative] relationship between individual stock returns and bond yield [price] changes. Hence, examining the correlation between individual stocks and bonds can reveal the dominant type of firm-specific information that drives these investments.[165]

---

[163] Eugene F. Fama and Kenneth R. French, *Common risk factors in the returns on stocks and bonds*, 33 J. Fin. Econ. 3-56 (1993).

[164] Sriketan Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko and Gaurav Mallik, *Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds*, 88 J. Fin. Econ. 272-298 (2008) ("*Latent Liquidity*"); *see also* Michael L. Hartzmark, Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 3 Colum. Bus. L. Rev., 654, 674-675 (2011).

[165] Simon H. Kwan, *Firm-Specific Information and the Correlation between Individual Stocks and Bonds*, 40 J. Fin. Econ. 63, 64 (1996) (citations omitted). In general, then, two factors affect the value of stocks and bonds.

Dr. Kwan asks, "What is the dominant type of firm-specific information that drives individual stocks and bonds?" (*Id.* at 65.) This is an understanding of the domination of one type over the other on average and does not conclude that if one type dominates the other on average that

- 62 -

148.  In addition to the widely accepted theory of the relationship between stock and bond returns being a function of the nature of the information, "[t]he wealth redistribution hypothesis, which stems from the conflict of interests between bondholders and stockholders, differs from the information content hypothesis by stating that an increase (decrease) in the equity market value is accompanied by a decrease (increase) in the debt market value.   Indeed, wealth can be redistributed from bondholders to stockholders by increasing the risk of the outstanding bonds.  Higher bond risk can result from increasing the variance of the firm's possible future values."[166]  Thus, "the wealth redistribution hypothesis predicts offsetting changes in the values of individual classes of securities and no change in firm value."[167]  This means that stock and bond returns will be inversely related.

---

it always dominates.  In other words, these factors include the business prospects of the firm and the business risks of the firm.  Economists use the mean value (or level) of the firm's assets to describe the business prospects of the firm.  If the business prospects improve or the value of the assets increase generally, that means that the value of both the firm's stock and bonds will rise.  Economists use the variance of the firm's assets to describe the business risks.  If the business risks or the variance of the assets increase this may mean an increase in the value of the firm's common stock (as the upside is enhanced, while the downside of zero dollars has not changed), while this may mean a decrease in the value of the firm's corporate bonds as the likelihood of bankruptcy rises.

Even if changes in the business prospects (or level of the assets) are more often the dominant type of firm-specific information, this does not preclude the changes in a firm's business risks (or the variance of assets) as being an important factor determining the directional relationship between a firm's stock and bond returns.  For example, the changes in the business prospects (or the level of assets) might dominate the changes in the business risks (or the variance of assets) in six of ten events, and thus be "dominant," such that one observes the prices of stocks and bonds moving in the same direction on six of ten days.  However, this does not preclude the business risks (or the variance of assets) from dominating the business prospects (or the level of assets) in the other four events and the prices of stocks and bonds moving in inverse relation on four of ten days.

[166]  George Handjinicolaou and Avner Kalay, *Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders around Dividend Announcements*, 13 J. Fin. Econ. 35, 38 (1984) (citations omitted) ("*Wealth Redistributions*").

[167]  Ronald W. Masulis, *The Effects of Capital Structure Change on Security Prices*, 8 J. Fin. Econ. 139, 143 (1980).

149.   One of the more common examples of the wealth redistribution effect that is important in examining the Notes, as well as why stock and bond returns may be inversely related, is that:

> An increase in the corporation's debt, keeping the total value of the corporation constant, will increase the probability of default and will thus reduce the market value of one of the corporation's bonds.   If the company changes its capital structure by issuing more bonds and using the proceeds to retire common stock, it will hurt the existing bond holders, and help the existing stockholders.   The bond price will fall, and the stock price will rise.   In this sense, changes in the capital structure of a firm may affect the price of its common stock. The price changes will occur when the change in the capital structure becomes certain, not when the actual change takes place.[168]

150.   Therefore, failing to account for the differential and complex interaction of the level and variance of assets – or the business prospects versus the business risks – can lead to misleading results.[169]   There does not need to be a corporate transaction or major event for these differential effects to emerge.   Every day there are both internal and external factors that affect the business risk and prospects of a firm.   Depending on the relative impacts, stock and bond returns might move in tandem or inversely.

C.   Differences in Price Movements between Notes with Different Coupons and Maturities

151.   As discussed above, a bond's price is determined by calculating the present value of all future cash flows.   When exogenous economic factors such as market interest rates change, two primary factors will differentially influence a bond's price. These are the coupon rates and time to maturity.   All else constant, bonds with higher coupon rates tend to fluctuate less in price as they have less interest-rate risk, while bonds with lower coupons

---

[168]   Fischer Black and Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. Political Econ. 637, 650 (1973) (citations omitted).

[169]   "In some combinations of wealth transfer and signaling effects, the suggested sign or correlation is ambiguous."   William F. Maxwell and Clifford P. Stephens, *The Wealth Effects of Repurchases on Bondholders*, 58 J. Fin. 895, 897 (2003).

have greater price sensitivity and interest-rate risk.  All else constant, longer-term bonds have greater risk, which results in greater price sensitivity than shorter-term bonds.

D.  Description of the Navient Debt Securities

152.  According to the SEC filings throughout the Exchange Act Class Period, Navient had between $16.2 billion and $17.9 billion face value unsecured senior public debt, which I refer to as Navient Debt Securities.[170]  On September 28, 2015, the day prior to the price decline at the end of the Exchange Act Class Period, Navient had 210 different U.S. dollars denominated Notes (*i.e.*, each had a unique CUSIP number),[171] with face value totaling approximately $15.2 billion.[172]

153.  At the start of the Exchange Act Class Period, all Navient Debt Securities had ratings of BBB-, Ba1, BB+ by S&P, Moody's and Fitch, respectively.  All three credit agencies downgraded the Navient Debt Securities further as of April 30, 2014 to non-investment grade ratings of BB, Ba3, BB for S&P, Moody's and Fitch, respectively.[173] Throughout the Exchange Act Class Period, the agencies all continuously monitored Navient Debt Securities.  There was, however, no change in any of the ratings after April 30, 2014.

### 1.    *2020B Note, 2021 Note and 2024B Note*

154.  On November 3, 2014, Navient "completed a public offering of $500 million aggregate principal amount of its 5.000% Senior Notes due 2020 and $500 million aggregate principal amount of its 5.875% Senior Notes due 2024."[174]  On March 27, 2015, Navient "completed a public offering of $500 million aggregate principal amount of its

---

[170]  Navient SEC Form 10-Q filed May 9, 2014, p. 84; Navient SEC Form 10-Q filed August 1, 2014, p. 95; Navient SEC Form 10-Q filed October 30, 2014, p. 90; Navient SEC Form 10-K filed February 25, 2015, p. 15; Navient SEC Form 10-Q filed April 30, 2015, p. 78; Navient SEC Form 10-Q filed August 3, 2015, p. 91.

[171]  According to Bloomberg, Navient had an additional six Notes issued in Japanese Yen, Hong Kong Dollars and Mexican Peso denominations. I do not examine these Notes as they were not denominated in U.S Dollars.

[172]  Source: Bloomberg.

[173]  Source: Bloomberg.  Based on set of Notes analyzed as described below.

[174]  Navient SEC Form 8-K filed November 6, 2014.

5.875% Senior Notes due 2021."[175]   The 2020B, 2021 and 2024B Notes were comparable with all other Navient unsecured senior debt that was publicly traded, the only differences being in coupon and maturity dates.[176]   In other words, these notes were a pool of homogenous debt with the $17.5 billion aggregate principal amount of unsecured senior indebtedness outstanding at the time of the November 2014 Offering.[177]

### 2.    *Other Navient Debt Securities*

155.   The Navient Debt Securities included 210 separate Navient Notes (also including the three notes described above), which ranged in outstanding face value between $79,000 and $2.5 billion.   All 210 Navient Notes had equal rank, seniority and security with all of the other Navient Debt Securities.[178]   Three of the Notes were exchange-traded on the NASDAQ Global Exchange,[179] while the other 207 Navient Notes were traded over-the-counter.

### E.   The Navient Debt Securities Were Comparable or Homogenous Corporate Bond Issues

156.   Academic research, the fundamental principles of economics and finance, as well as industry practice all support the conclusion that the pricing of comparable corporate bond issues can be undertaken with reference to a common risky yield curve.   This was emphasized in a highly influential paper in the academic finance literature that suggests that the prices of bonds with similar default and recovery rates can be fit to a common term

---

[175]   Navient SEC Form 8-K filed March 27, 2015.

[176]   Navient SEC Form 424B2 filed November 5, 2014, p. S-3. ("The notes will be our senior unsecured debt and will rank equally with all of our existing and future unsecured and unsubordinated debt. The notes will be effectively subordinated to all of our existing and future secured debt to the extent of the assets securing that debt and to all the debt and other liabilities of our subsidiaries.")

[177]   Navient SEC Form 424B2 filed November 5, 2014, p. S-3. ("As of September 30, 2014, (i) we had an approximately $17.5 billion aggregate principal amount of unsecured senior indebtedness outstanding with which the notes will rank pari passu and (ii) our subsidiaries had no unsecured senior indebtedness outstanding.")

[178]   According to Bloomberg, Navient had an additional six Notes issued in Japanese Yen, Hong Kong Dollars and Mexican Peso denominations. I do not examine these Notes.

[179]   Medium Term Notes, Series A, CPI-Linked Notes due 2017; Medium Term Notes, Series A, CPI-Linked Notes due 2018; and 6% Senior Notes due December 15, 2043 (the "2043 Note")

structure, and that departures from the common structure suggest arbitrage opportunities.[180] Bonds with identical credit ratings have similar default rates, and bonds of the same seniority and security type also have similar recovery rates.

157. Accordingly, all of the Navient Debt Securities—with the same credit ratings, default rates based on Navient's financial condition, seniority, rank and security— can be fit to the same risky yield curve; and are for all intents make comparable, the notes in the pool. In other words, the Navient Debt Securities represent a reasonably homogenous pool of debt instruments that will be influenced by the same economic factors, although the reactions to changes in those factors will not be expected to be identical.

158. Further confirmation for this conclusion is found in the following facts. One, credit ratings agencies like Moody's treated Navient's Debt Securities as a pool of comparable or homogenous debt. For example, on April 30, 2014, Moody's "downgraded the senior unsecured debt" of Navient without distinguishing between the different specific notes.[181] Two, *Navient itself* reported its "Senior Unsecured Debt" as a *single line item* in its SEC filings.[182]

### F. Analysis of the Exemplar Notes

159. Given the homogeneity of Navient's Debt Securities, to analyze them for market efficiency, it was necessary to analyze only one single exemplar note. For example, this was the approach endorsed by the court in the *Enron* securities litigation, where a class of debt securities purchasers was certified, and there were between 20 and 22 notes. In that case, the expert chose a single "Exemplar Note" with face value issued of $250 million was just 5.8% of the outstanding face value,[183] as a proxy for all $4.3 billion Enron debt

---

[180]  Darrell Duffie and Kenneth J. Singleton, *Modeling Term Structures of Defaultable Bonds*, 12 Rev. of Finl. Stds. 687 (1999).

[181]  *See* Moody's Investors Service "Rating Action:  Moody's concludes review of SLM Corp." dated April 30, 2014.

[182]  *See, e.g.,* Navient SEC Form 10-K filed February 25, 2016, p. 95 (reporting "Senior unsecured debt" as a single line item).

[183]  At its peak there was $4.3 billion in face value of debt that was issued by Enron.  Thus, 5.8% = $250,000,000 / $4,300,000,000.  *See*, Declaration of Blaine F. Nye, Ph.D., In Support Of

securities.[184]   The court agreed with this approach, the idea being that "'because information on one security can inform investors about the value of others,' . . . . [t]h[e] Court observe[d] that the *Cammer/Unger/Bell* factor approach, … is to a substantial degree a group analysis, as the factors would largely yield the same result no matter to what securities offering of a particular company they are applied, which lends legitimacy to [the] collective analysis approach."[185]

160.   As noted, analysis of a single Exemplar Note is all that is required in this context.   Nonetheless, while not necessary, I decided that, rather than evaluate a single "Exemplar Note," I would choose a larger subset of notes that met certain threshold criteria while representing a substantially greater portion of the value of the entire market.   My goal was simply to conduct an even more robust analysis than required.

161.   Based on my experience, expertise and training as a financial economist; as well as the actual composition of the population of Navient Debt Securities, I used information from Bloomberg and FINRA and constructed the subset as follows.   First, the Exemplar Notes had to be denominated in U.S. dollars.   Second, the Exemplar Notes had to individually constituted at least 1% of the outstanding Navient Debt Securities (*i.e.*, had

---

Lead Plaintiff's Amended Motion For Class Certification *In re Enron Corporation Securities, Derivative & "ERISA" Litigation,* January 6, 2006 (S.D. Tex. 2006).

[184]   "…if one of the Enron registered bonds is known to have traded in an efficient market, then one can infer that similar Enron bonds would have also traded in efficient markets because the bases for valuation, such as interest rate environment and default risk, are similar." He therefore selected a representative "exemplar" registered bond (the 6.625% Enron Bonds due Nov. 15, 2005), … as a proxy." *Enron*, 529 F. Supp. 2d at 746-747

[185]   *Enron*, 529 F. Supp. 2d at 748

an issued amount in face value of at least $150 million).[186]  And finally, the Exemplar Notes had to mature after December 31, 2017.[187]

162.   These criteria resulted in a subset of 13 Notes, which I refer to as the Exemplar Notes, that represents a reasonable number of notes that constitutes the supra-majority of the face value issued by Navient and likely were actively traded by investors.[188]  I refer to the other 197 notes as the "Non-Core Notes."  The Exemplar Notes, which include the 2020B, 2021 and 2024B Notes (the three notes that are part of both the Securities and Exchange Act claims), had outstanding face value of $11.53 billion (*see* **Exhibit XII**) or approximately 76% of the total outstanding face value as of September 28, 2015.[189]  The exchange-traded 2043 Note is also included as one of the Exemplar Notes that I examine.[190]  Again, my use of the  Exemplar Notes is more robust than the analysis accepted in *Enron* in both the number of debt securities analyzed (*i.e.,* one debt issue was analyzed in *Enron* whereas I analyzed thirteen notes here) and in the total face value of the securities analyzed (*i.e., Enron* involved the analysis of $250 million worth of $4.3 billion in outstanding debt

---

[186]  Based on my experience in and knowledge of other litigation where a class of bondholders was certified I believe the $150 million is a reasonable cut-off.  For example, in *DVI*, I examined $155 million in Notes, while in *HealthSouth Bond Litigation*, where, I was the consulting expert, I evaluated Notes with an average size of $260 million.  In *JFF* the court certified a class of debtholders with $200 million in Notes, while in *Enron* the expert chose as a "Exemplar Note" one with face value of $250 million; and in addition the average value per Note in Enron was between $170 million and $270 million.

[187]  I eliminated from my analysis Navient Debt Securities that matured prior to January 1, 2018, as these Notes had such a short duration that they were generally immune to economic factors as they were to be redeemed in the near future.  Thus, while investigating these short-term issues, I did not observe sufficient volatility to be able to reliably evaluate the Notes and the price-related factors.  Duration is a measure of the sensitivity of the price of a bond changes in general interest rates or other firm-specific factors.  It is a function of the fixed coupon and the amount of time to maturity.

[188]  As described below, based on a subpoena from Lead Counsel I received price and volume information for 15 Navient Notes.  After examining the information in the data files, I chose to not include three notes that were below the threshold face value or short maturity.

[189]  76% = $11.53 billion / $15.20 billion

[190]  There were also two exchange traded Notes that were of short duration or had an issued amount of less than $150 million, so I did not include those Notes in my analyses.

– or 5.8% of the outstanding face value – as opposed to the ***76% of outstanding face value analyzed here***).

## IX.  ANALYSIS OF OPERATIONAL FACTORS FOR THE EXEMPLAR NOTES

### A.  The Operational Factors Describing Market Efficiency

#### 1.  *Cammer Factor I – Average Weekly Trading Volume*

163.  Except for the exchange-traded 2043 Note, the trading volume data I utilize for the turnover analysis of the Notes come from FINRA's TRACE data.[191]  I will refer to the 12 Notes that are not exchange traded like the 2043 Note as the FINRA-based Notes. FINRA produced the data in response to a subpoena issued by Plaintiffs' Counsel.  The trading records in these data include, among other information, identification of the Note, the date and time of the transaction, the transaction price, the quantity of Notes traded and whether the reporting dealer is a buyer or a seller.

164.  From the TRACE data, I aggregated the intra-day transactions to calculate total daily volume of purchases and sales.  For the purposes of calculating average weekly turnover, there are a few data treatments that I undertook to account for certain indicators in the records, as well as certain adjustments I made to ensure only bona fide publicly disseminated transactions were used in the analysis, including removal of cancelled or reversed trades and trades not reported to the public.  Data treatments and certain other adjustments were made to the data for various empirical analyses, which are described in **Appendix I**.  I use data obtained from Bloomberg for the exchange-traded 2043 Note.

---

[191] The Trade Reporting and Compliance Engine (TRACE) is a FINRA-developed vehicle that facilitates the mandatory reporting of over-the-counter (OTC) secondary market transactions in eligible fixed income securities.  The system captures and disseminates consolidated information on secondary market transactions in publicly traded TRACE-eligible securities, including investment-grade, high-yield and convertible corporate debt.  This information represents all OTC activity in these bonds.  www.finra.org/industry/trace and www.finra.org/industry/trace/corporate-bond-data.  FINRA's TRACE data service provided separate transaction data for the Exemplar Notes from January 2013 through July 2019.

165. Using this approach, as shown in **Exhibit XIII**, the Exemplar Notes, in aggregate, had an average turnover level of 1.82%, with a median of 1.71%.[192]  Across these Exemplar Notes, the average weekly turnover rates range from 0.70% to 3.82%, with 11 of the Exemplar Notes having an average in excess of 1%.[193]  This relatively high level of turnover, especially for corporate bonds, is above that found to support a "substantial presumption" that the Exemplar Notes trade in an open, well-developed and efficient market.[194]  Moreover, for corporate bonds which trade less frequently, these figures are relatively large.

### a)    Transaction Size and Frequency

166. In a paper I co-authored, my co-authors and I pointed out that, in general, corporate bonds trade less frequently than stocks because of their different characteristics:

> Corporate bonds will likely trade less frequently than stocks because outside macro-economic and internal financial factors generally both have smaller effects on bond pricing than on stock pricing.  Unlike common stocks, corporate bonds have predictable cash flows, predictable terminal values, fixed upside opportunities—namely, redemption at par value or $100 in our example—and a priority on the corporation's assets.  As such, many corporate bonds are close substitutes for one another.  …On the other hand, corporate equity does not have predictable cash flows, predictable terminal values, fixed upside opportunities, or priority on the corporate assets.[195]

---

[192]  Aggregate weekly turnover is based on a weekly turnover series.  For each week, turnover is computed as total dollar value traded for all Exemplar Notes during a week divided by the total par value outstanding for all Exemplar Notes at the end of the week.

[193]  This excludes the partial first and last week of the Exchange Act Class Period and any partial weeks for the Notes that were offered during the Exchange Act Class Period.

[194]  "[A]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  *Cammer*, 711 F. Supp. at 1286.  *See also PolyMedica*, 453 F. Supp. 2d at 266 (quoting *Krogman*, 202 F.R.D. at 474) ("weekly trading volume has been called possibly 'one of the most important' of the *Cammer* factors").

[195]  Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 3 Colum. Bus. L. Rev. 654, 676-677 (2011) (citations omitted).

167. Therefore, given the risk-return trade-offs of corporate bonds and the structure of the corporate bond market, it is common for corporate bonds to trade far less frequently than every day.[196]   I have examined the transactions volume data from the transactions database to determine the activity of the Exemplar Notes relative to a sample of other bonds and notes.  In **Exhibits XIV** and **XV**, I present summary statistics describing the number of days between trades and frequency of trading of the Notes relative to other comparable bonds.  The set of data on the comparable corporate bonds come from an academic publication by Sriketan Mahanti, *et al*., which used the State Street Corporation custody-trades database.[197]

168. I found that from its start of trading to the end of the Exchange Act Class Period, the Exemplar Notes in aggregate traded on 93% of possible trading days, with the range across all the Notes to be between approximately 80% to 100% of possible trading days (*see* **Exhibit XIV**).

169. These frequencies of trading for the Exemplar Notes are high when compared to the trading activity of most other corporate bond issues, as presented in the Mahanti *et al*. paper, *Latent Liquidity*.[198]  **Exhibit XV** shows the percentile distribution of trades by time elapsed between successive trading days for a sample of nearly 20,000 corporate bonds for the time period 2003 through 2005, which shows that for the top decile of the most active corporate bonds there was on average one day between each subsequent date with trading activity.  For the Exemplar Notes, the average lapsed time is less than one day (*see* **Exhibit XV**).

---

[196]  *Latent Liquidity*, *supra*, at pp. 272-98.

[197]  *Id.*

[198]  Possible trading days is defined as all days on which the U.S. stock market is open and excluding days that are "Recommended Full Close" by SIFMA (*see* **Appendix I**; for the 2020-6.000, 2021-5.875 Note and 2024-5.875 Notes, the days are counted from the initial offering date).

I note that for *Enron*: "The number of transactions per issue during the Class Period ranged from 24 to 3,684 per issue, an average of 69, a median of 282. # 4390 at 38. The percentage of days on which the trades occurred and the issue was outstanding falls between 1% (11 days) to 36% (132 days), with an average of 12.2% and a median of 9.71%."  *Enron*, 529 F. Supp. 2d at 756.

170.  These results, when comparing the trading activity of the Exemplar Notes to the findings in the Mahanti *et al*. paper, *Latent Liquidity*, are consistent with the relatively high average weekly turnover shown in **Exhibit XIII**.

171.  Yet another way to examine the liquidity of the market for the Notes is by documenting the characteristics of typical transactions. These summary transaction statistics are shown in **Exhibit XVI**.  In the Exchange Act Class Period, the average dollar transaction size in par value for the 12 FINRA-based Notes in aggregate, was approximately $470,000,[199] with the range across the 12 FINRA-based Notes to be from approximately $39,000 to approximately $957,000 per transaction.[200]  The large average size of the individual transactions, along with the analysis of the bid-ask spreads below, suggests that the market for Notes had sufficient liquidity to absorb large transactions, which is also consistent with the likelihood that large institutions were generally participating in the market.  As will be discussed below, this suggests substantial participation of sophisticated institutional traders.  The participation of these institutional traders helps in price discovery and the efficiency of the market.

172.  Finally, the Exemplar Notes had much higher trading volume and frequency than the *Just for Feet* ("*JFF*") unregistered bonds, *Enron* bonds, and *DVI* bonds, which were all found by their respective courts to have traded in efficient markets.[201]

---

[199]  The exchange-traded 2043 Note had average dollar trading of approximately $586,000 per day, with a range of approximately $89,000 to $2.77 million (source: Bloomberg, variable "VWAP_TURNOVER."  Bloomberg does not report transaction data for the 2043 Note).

[200]  The next lowest average transaction size after the $0.039 million was $0.157 million.

[201]  The *JFF* court concluded: "The market for these bonds was informationally efficient notwithstanding that on some days the trading volume was low and on others, there was no trading at all."  *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 685 (N.D. Ala. 2005).  This was partially based on the following facts: "The trading volume of the JFF high yield bonds *was not thin.*  They traded on at least 75 of the 140 days between the initial offering and the Chapter 11 bankruptcy filing on November 3, 1999.  Excluding the first week of trading, the average daily trading amount of JFF bonds was $3,245,107....The total face amount purchased by investors over the 140 days was $138,205,000, and the total sales were $316,110,000."  *Id.* at 685 n.9.

The *Enron* court noted: "The underwriter data reflect over 15,800 trades for Enron Registered Bonds during the Class Period.  The number of transactions per issue during the Class Period ranged from 24 to 3,684 per issue, an average of 69, a median of 282....The percentage of days

b)        **Transparency**

173.   Corporate bond markets do not have the same pre-trade and post-trade
dissemination of pricing information that is often found in exchange-traded common stock
or even over-the-counter common stock.  However, it would be wrong to conclude based
on this institutional feature that all corporate bonds trade in inefficient markets.  This issue
is often referred to as "transparency":

> [T]ransparency means that price and volume information is
> readily available to potential traders at a relatively low cost.  For
> exchange-traded securities, exchanges collect and disseminate
> this information at a minimal cost to all interested parties.  For
> over-the-counter traded bonds, price and volume information
> are not available at zero cost.  At any given moment, however,
> this does not mean that interested investors are not
> communicating, or do not or cannot generate transparency
> (price and volume information for recently completed
> transactions or for future potential trades) ...[A]n efficient
> market does not require that price and volume information be
> available at zero cost.  Emails or a simple telephone call, or, for
> that matter, twenty simultaneous emails or telephone calls from
> the trading floor or web access to the buy/sell offers on the
> Bloomberg Terminal[202] will supply sufficient transparency.[203]

---

on which the trades occurred and the issue was outstanding falls between 1% (11 days) to 36%
(132 days), with an average of 12.2% and a median of 9.71%."  529 F. Supp. 2d at 756.

The *DVI* court noted: "Based on verifiable trade volume data, the Senior Notes had an average
weekly trading volume during the Class Period of 1.25%."  249 F.R.D. 196, 214 (E.D. Pa.
2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011).  In addition, the *DVI* court observed that "[t]he 1997
Notes were in the top 10% of all corporate bonds in terms of the fewest average days between
trades, ranging between 1.92 to 4.63 days during the Class Period....Though such trading
volume would not likely support a finding of an efficient market for equities, it is sufficient to
support such a finding for corporate bonds."  *Id.* at 215.

I cannot report turnover and frequency of the *HealthSouth* and *Cobalt* Notes, as the reports in
those matters were filed under seal.

[202]  Citation from Hartzmark *et al.*, *supra* note 203: "The Bloomberg Terminal is a computer
system provided by Bloomberg L.P. that enables financial professionals to access the
Bloomberg Professional service through which users can monitor and analyze real-time
financial market data movements and place trades.  *See* BLOOMBERG,
http://www.bloomberg.com/professional/ (last visited Dec. 1, 2011)."

[203]  Michael L. Hartzmark, Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market:  Analysis
of the Efficiency of the Corporate Bond Market*, 3 Colum. Bus. L. Rev., 654, 692-693 (2011).

174. I first note that the 2043 Note was traded on the NASDAQ Global Market, which means there is no issue of transparency regarding that Note.[204] For the 12 FINRA-based Notes, competition among over 343 dealers and market makers (*see* **Exhibit XVII**), with a range of 78 to 207 for the 12 Notes traded – who, minute-by-minute, day-by-day, risk their own capital and utilize the most advanced information technology and sophisticated research teams – supports transparency and, thus, market efficiency for the Exemplar Notes.

175. As shown in **Exhibit XVI**, the average dollar size of the trades during the Exchange Act Class Period for the 12 FINRA-based Notes was, in aggregate, approximately $470,000.  Hence, the cost of making a few or even twenty telephone calls relative to the dollar volume of these typical trades is minuscule.

176. It is important in a financial market where the security trades less frequently than in the common stock market to realize the distinction between the ability to trade a security and an actual trade in that security.  Even when a bond does not trade, that does not mean there are not interested parties sitting on the sideline ready to trade.  These interested investors can simply contact bond dealers and learn about dealers' buying and selling (bid and ask) prices and quantities.  The fact that there may be no trade on a given day does not mean that interested investors are not communicating or do not or cannot generate transparency.  Furthermore, an efficient market does not require that there be trades every day, or every hour, or every minute.  Unlike common stocks, corporate bonds have predictable cash flows, predictable terminal values, and fixed upside opportunities.  Thus, many corporate bonds are close substitutes for each other.  These critical differences in certain characteristics of these securities and the differential influence of firm-specific and external economic factors suggest there might be differences in the frequency of trades.

177. The courts have long recognized that simply because the over-the-counter corporate bond markets lack some of the elements of transparency found in centralized exchanges, does not mean that the trading markets for corporate bonds are per se

---

[204]  See the discussion in Section V.B.3 about market efficiency and trading on the NASDAQ Global Market.

inefficient.  This was clearly the case in the *Enron* matter, where the court stated that "no-cost efficiency, or for that matter transparency, has not been established as the standard for an informationally efficient, over-the-counter bond market.  Obviously 'transparency' is relative, involving consideration of numerous factors.  No standard of requisite transparency has been established by the courts."[205]  In *HealthSouth*, the court went even further and suggested it was illogical to conclude that the market for corporate bonds was not transparent.[206]

178.  In fact, in my opinion, courts have rightly determined that the measurable *Cammer* factors are appropriate benchmarks for both over-the-counter common stocks and corporate bonds because no requisite measure of transparency has been established by either judicial precedent or academic research to define when a security trades in an efficient market.

---

[205]  *Enron*, 529 F. Supp. 2d. at 767.

[206]  *HealthSouth Corp. Sec. Litig.*, 261 F.R.D. at 638-39 (quoting *Enron*, 529 F. Supp. 2d. at 768) ("The Defendants then argue that, unlike stock, bonds do not trade on a formal, impersonal, centralized exchange, like the NYSE; that over-the-counter transactions are conducted over the phone or by computer; that an investor has to seek out a dealer to get a quote on a bond and may in fact receive different quotes from different dealers; and that an investor would thus have difficulty determining the prevailing price for a specific corporate bond....In effect, the Defendants argue that the market for *all* bonds is inefficient because it does not function like the stock market.  If the court were to accept these challenges, it would be 'denying application of fraud on the market to the bond market because it does not operate in the same way as a national exchange or trade in the same volume, frequency, or manner as equity on those exchanges [and would be like] throwing out oranges because they are not apples.  The Court finds that the issue is not whether the market for equity is more efficient than the market for debt securities, but whether the market for debt securities is adequately informationally efficient (whether the price reflect[s] all publicly available information) to trigger the fraud-on-the-market presumption of reliance.'  …Bond traders at large institutions who make transactions of six figures or more simply do not trade on insufficient information, or information perceived to be unreliable, or on less than all publicly available information.  To argue that the investors in HealthSouth bonds did not have sufficient publicly available information in making their decisions about buying and/or selling HealthSouth bonds, and what would be a reasonable price for those bonds, defies logic and ignores the realities of the bond market in which billions of dollars trade hands.") (emphasis in original).  *See also HealthSouth*, 261 F.R.D. at 639 ("Transparency has not to date been recognized as a requirement for an efficient market.  In any event, transparency is relative and relative matters should be compared like to like.  In terms of the bond market the court, therefore, concludes that the HealthSouth bond market traded on all the publicly available information and thus meets the test for informational efficiency."); *In re DVI*, 249 F.R.D. at 214.

c)      **Summary and Conclusion**

179.  Thus, the relatively high frequency of trading of the Exemplar Notes, the high average weekly turnover and the large size of trading constitute substantial evidence justifying a strong presumption that the Exemplar Notes traded in an open, well-developed and efficient market throughout the Exchange Act Class Period.

**2.      *Cammer Factor II – Analyst Coverage***

180.  In Section V above, I discussed the importance of analyst coverage for disseminating information to traders of common stock and found that according to Bloomberg there were between 2 and 11 analysts who followed and made recommendations on Navient during the Exchange Act Class Period, with an average number of analysts of 10 (*see* **Exhibit II**).  Most analyst reports focused on Navient common stock, but these reports provide information directly useful for evaluating and valuing the Exemplar Notes – and, indeed, ***all*** publicly-traded Navient Debt Securities – especially for evaluating the credit risks of the Notes and for valuing their conversion options.  Therefore, even analyst reports focused exclusively on common stock provide useful financial information to debt investors.[207]  An important concern to debt investors is the overall financial health of the firm, which determines the ability of the firm to pay the promised series of coupons and the principal amount.  Equity reports provide information on many other financial factors, in addition to the outlook for stock prices and earnings.  Thus, the equity reports provide vital information on the overall health of the firm.[208]  While, as noted above, positive equity reports do not necessarily imply higher

---

[207]  The idea that only analyst reports that analyze the individual securities that are being evaluated are relevant was dismissed in a court ruling where there were no analyst reports on the specific bonds, only general reports on the industry.  *See In re Dynex Capital, Inc. Sec. Litig.*, U.S. Dist. LEXIS 22484, at *13-14 (S.D.N.Y. Mar. 7, 2011).

[208]  *See DVI*, 249 F.R.D. at 215 ("Though equity analyst coverage is not a perfect substitute for debt analyst coverage, the equity reports nevertheless provided substantial information to the Senior Notes investors. Such information, particularly forecasts of DVI's financial prospects and condition, would likewise have allowed bond investors to better understand DVI's risk profile and its potential for default."), *aff'd*, 639 F.3d 623 (3d Cir. 2011); *see also HealthSouth*, 261 F.R.D. at 635 ("The coverage by analysts of HealthSouth's equities also provided information of interest to the bond market when concerned with the overall financial health of the issuing firm.").

prices for the Notes trading around par, negative equity reports could imply lower Note prices. In particular, a substantial decline in stock prices could serve as an early warning sign for the bondholders. To this extent, equity reports provide important and useful information for Navient debt investors.

181. Moreover, during the Exchange Act Class Period Fitch Ratings, S&P Global Ratings, Moody's Corp., issued more than a dozen reports specifically addressing the Navient Debt Securities and other Navient debt.

182. For comparison purposes, in the *DVI* case, only 3 analysts provided continuous coverage.[209] This compares favorably here, as on average 10 analysts covered Navient during the Exchange Act Class Period (*see* **Exhibit III-A**).

183. The continuous coverage of Navient by credit rating agencies, analysts, investment professionals, public press, and financial institutions, along with regular and frequent disclosures by the Company in the form of press releases, teleconference earnings calls and SEC filings and regulatory authorities, supports my conclusion that the Exemplar Notes traded in an open, well-developed, and efficient market throughout the Exchange Act Class Period. Moreover, as discussed above, S&P, Moody's and Fitch all continually monitored and reported on the Navient Debt Securities.

### 3. *Cammer Factor III – Market Makers*

184. As discussed above in Section V, the presence of many dealers or market makers is another factor that supports the conclusion that securities trade in efficient markets. These professional traders have significant advantages over small individual investors in terms of the cost of gathering, processing and trading on information.

185. Furthermore, many of the dealers trade for their own accounts.[210] In **Exhibit XVII**, I have used the TRACE data to show that there were between 78 and 207 separately

---

[209] *DVI*, 249 F.R.D. at 209.

[210] The Exchange Act defines market makers as follows: "The term 'market maker' means any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a)(38).

identified reporting market makers for the 12 FINRA-based Notes throughout the Exchange Act Class Period, with a total for all 12 Notes of 343.[211]  This is a substantial number of market makers as compared to other matters where securities were deemed to have traded in an efficient market.  For instance, in the *China MediaExpress Holdings, Inc. Shareholder Litigation*, in which an investor class was certified, only an average of 20 market makers were identified.  Moreover, the *China MediaExpress* court also cited to three other cases where the securities were deemed to have traded efficiently wherein only 6, 10, and 14 market makers were observed.  In addition, as discussed previously, the 2043 Note traded to the NASDAQ Global Select Market.[212]

186.  In conclusion, the participation of this relatively large number of dealers, standing ready to buy or sell, made an active market in the Exemplar Notes.  This evidence supports my conclusion that the Exemplar Notes traded in an open, well-developed and efficient market throughout the Exchange Act Class Period

### 4.    *Cammer Factor IV – SEC Form S-3 Eligibility*

187.  In Section V above, I discussed the economic logic behind this *Cammer* factor.  The fact that Navient was eligible to file on SEC Form S-3, and actually did reference this form during the Exchange Act Class Period by issuing each of the Notes based on a shelf registration statement, supports my conclusion that the Exemplar Notes traded in an open, well-developed and efficient market during the Exchange Act Class Period

### B.   Other Operational Factors to Weigh When Examining Market Efficiency

### 1.    *Krogman Factor – Market Value*

188.  As discussed in Section V above, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock

---

[211]  I was unable to obtain data from Bloomberg for broker trades for the exchange-traded 2043 Note.

[212]  *In re China MediaExpress Holdings, Inc. S'holder Litig.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014).

purchasers to invest in more highly capitalized corporations."[213]   In my opinion, all else constant, the same "incentive ... to invest in more highly capitalized corporations" applies with equal force to bondholders.   In general, all else constant, the larger the size of the security, the more attention it will receive from brokers, analysts, individuals, institutions (especially if they have investment-size requirements), money managers, hedge funds and other financial entities.

189.   During the Exchange Act Class Period, the market value of the Exemplar Notes individually ranged from $187 million to $2.98 billion.   In aggregate, the daily combined market value of the Exemplar Notes ranged from $10.4 billion to $11.9 billion, with an average of $11.2 billion.   *See* **Exhibit  XVIII**.   The daily aggregate value of the Notes is shown graphically in **Exhibit XIX**.   As of October 1, 2015, the final day of the Exchange Act Class Period+, the aggregate market value of the Exemplar Notes declined to approximately $10.1 billion.

190.   As discussed above, in *Cobalt*, *Enron*, *HealthSouth*, *DVI* and *JFF* the courts concluded that the bonds were traded in efficient markets.   For comparison purposes, the aggregate values of the *Cobalt, Enron* and *HealthSouth* notes outstanding were all less than $6.0 billion in par value,[214] less than the aggregate amount in this matter of over $15 billion.

---

[213]   *Krogman*, 202 F.R.D. at 478.

[214]   "…at year-end 1998 the Enron Registered Bonds had a total market value of $3.416 billion (nineteen Enron Registered bonds outstanding with a total of $3.300 billion face value), with market values ranging from $51.6 million to $307.7 million per issue; in year-end 1999, a total market value of $3.627 billion (twenty bonds with a total face value of $3.8 billion) with market values ranging from $48.4 million to $470 million per issue; at year-end 2000 these bonds had a total value of $4.321 billion (twenty-two bonds with a total of $4.3000 billion face value), and market values ranging from $50.4 million to $498.3 million per issue; and at the end of the Class Period after disclosure of Enron's true financial condition, the bonds had a total value of $3.059 billion (twenty-two bonds outstanding with a total of $5.900 billion face amount), with market values ranging from $27.6 million to $636.5 million per issue."   *Enron*, 529 F. Supp. 2d at 756-757.

"The amount of debt securities offered to the market (over $3.4 billion), combined with the high trading volume of the debt securities (discussed infra), the large number of market makers and dealers, and the preliminary identification of hundreds of class members, supports the conclusion that joinder of such a large group of investors is presumptively impracticable." *HealthSouth*, 261 F.R.D. at 626.

Moreover, the aggregate levels of notes in *DVI* and *JFF* were only $155.0 million and $200.0 million in par value, respectively.[215]

191.  The Exemplar Notes' relatively large aggregate face value is evidence supporting the conclusion that the Exemplar Notes traded in an open, well-developed and efficient market throughout the Exchange Act Class Period.

### 2.  *Krogman Factor – The Size of the Float*

192.  As discussed above in Section V, float refers to the amount of outstanding securities that are not held by insiders of the corporation.[216]  While insiders are subject to trading restrictions and disclosure requirements with respect to their *stock* trades, there are no such restrictions or requirement on insiders with respect to publicly traded, non-convertible debt issues (other than Section 10(b) and Rule 10b-5).[217]

193.  Generally, insiders do not hold debt of the Company that they run.  There is no evidence in public reports, such as Navient proxy statements or institutional reporting data, that insiders in Navient held any positions in the Exemplar Notes.  This supports my conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period

---

*In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017) had two Notes with an aggregate face value of $2,680,000,000. Cobalt SEC Form 10-Q filed on November 4, 2014.

[215]  "[DVI] issued two tranches of 9 7/8% senior notes: the first, issued in 1997, totaled $100 million; the second, issued in 1998, totaled $55 million."  *DVI*, 639 F. 3d at 627.

"On April 14, 1999, the Company completed the private placement of $200.0 million, 11.0% senior subordinated notes…."  *Just for Feet*, SEC Form 10-K for the period ended January 30, 1999, p. 39.

[216]  Insiders cannot freely trade in the stock of their firm based on their privileged, nonpublic information.  They are subject to both trading restrictions (blackout periods, and restrictions under Exchange Act Sections 10(b), 16(b) and 16(c)) and reporting requirements of Section 16(a).

[217]  Insiders are subject to both reporting requirements and trading restrictions for securities convertible into common stock, such as the Navient Debt Securities.  Thus, insiders holding these Notes would be required to report their holdings and transactions, because these Notes are convertible into common stock.

### 3.    Krogman Factor – Bid-Ask Spread

194.    As discussed above in Section V, the size of the bid-ask spread in the market is an indication of the liquidity in the market and is sometimes considered a factor in determining whether the security trades in an efficient market.  In *Krogman*, the court suggested, "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[218]

195.    In corporate bond markets, there are no reported bid-ask spreads.  I employ a technique used by researchers in finance whereby I examine all *customer* trades with reporting dealers using the TRACE database (because the 2043 Note is traded on an exchange, I have standard closing bid and ask spreads for this note).[219]  As described in **Appendix I**, for each customer purchase, I calculate the spread based on all customer sales within a +/-15-minute window.  I also calculate the spread for each customer sale based on all customer purchases within a +/-15-minute window.   Since these transactions are a) confined to a reasonably narrow timeframe; and b) for transactions only with customers (as opposed to other dealers), this approach computes a conservative estimate of the bid-ask spread.  *See* **Appendix I** for details.

196.    The results in **Exhibit XX** show that for trades between dealers and their non-dealer customers (*i.e.*, eliminating all dealer-to-dealer trades), the average bid-ask spreads as a percentage of the spread mid-point range from 0.41% to 1.67% (based on customer transactions or, for the 2043 Note, closing bid-ask spreads), with an aggregate average of 0.85%.  The median bid-ask spreads as a percentage of the spread mid-point range from 0.22% to 1.29%, with an aggregate median of 0.51%.[220]  These are comparable to liquid stock spreads.[221]

---

[218]   *Krogman*, 202 F.R.D. at 478.

[219]   *See*, for example, Paul Schultz, *Corporate Bond Trading Costs: A Peek Behind the Curtain*, 56 J. Fin. 677-98 (2001).

[220]   *See*, for example, Table 6, panel C in Michael A. Goldstein, Edith S. Hotchkiss and Erik R. Sirri, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, 20 Rev. of Finl. Studies, 235-273 (2007).  A one percent bid-ask spread is relatively narrow.

[221]   Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014).  The paper compared data using closing prices from

197.  In calculating the bid-ask spreads, above, I have eliminated dealer-to-dealer trades, which are likely completed at substantially lower bid-ask spreads.  I also calculated the spreads realized by market makers for purchase and sale transactions made to either customers or other brokers by the same market maker within +/-15 minutes.  *See* **Appendix I** for details.

198.   The results in **Exhibit XX** show that for potential market-making trades by specific dealers, the average bid-ask spreads as a percentage of the spread mid-point range from 0.27% to  0.88% (based on broker transactions or, for the 2043 Note, closing bid-ask spreads), with an aggregate average of 0.57%.  The median bid-ask spreads as a percentage of the spread mid-point range from 0.11% to 0.76%, with an aggregate median of 0.32%. These too are comparable to liquid stock spreads.[222]  Further, larger transactions generally have substantially lower spreads than the average and I have not broken down the bid-ask spreads by transaction size.

199.  The relatively narrow bid-ask spread, suggesting that the Exemplar Notes traded in liquid markets, supports my conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.

### 4. *Other Operational Factors – Institutional Holdings*

200.  The corporate bond market is dominated by large, sophisticated institutions. Indeed, a recent paper by staff economists at the Board of Governors of the Federal Reserve stated the following:

> The market for the U.S. corporate bonds is large and dominated by institutional investors.  As of the end of 2010, *institutional investors held about three quarters of the $7.5 trillion (sic) outstanding corporate bonds issued by U.S. firms.*  In addition,

---

CRSP (Center for Research in Security Prices) to intraday data and showed the spreads are very close.  2009 is the most recent year the authors examined.

[222] *See* note 221.

institutional trades account for most of the dollar trading volume of corporate bonds.[223]

201.  In **Exhibit XXI**, I show that reporting traders who are generally considered to be the sophisticated investors make up a large proportion of the holdings of the Exemplar Notes, holding in aggregate over 50% of the Exemplar Notes.[224]  I obtained this data from Bloomberg and, per Bloomberg, the institutional data "may not represent all institutions, if they are not required to publicly disclose their holdings. Especially for fixed income securities, [Bloomberg] may not cover all holders, since public disclosure is not generally required."  Thus, there is likely larger institutional holdings (and insurance companies) than I was able to obtain from Bloomberg.  As discussed above in the analysis of Navient's common stock, the fact that the Exemplar Notes were held mostly by institutions further supports my conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.[225]

## X.    THE PRICE-RELATED FACTORS DESCRIBING MARKET EFFICIENCY FOR THE EXEMPLAR NOTES

### A.  Event Study for the Exemplar Notes

202.  As discussed above in Section VI, to perform an event study, one begins by separating the impact on security price movements of market- and industry-wide factors from the impact of firm-specific factors.  For bonds, an event study uses the same approach, but a slightly different specification of the regression model.  As with a single-issuer common stock, this approach uses a so-called market model to partition a single company's bond price movement on each trading day into various components.  For common stock,

---

[223]  Fang Cai, Song Han, and Dan Li, *Institutional Herding in the Corporate Bond Market*, Board of Governors of the Federal Reserve System, International Finance Discussion Papers, Number 1071, December 2012, p. 3 (emphasis added, citations omitted).

[224]  This exhibit contains the total institutional holdings obtained from Bloomberg as of June 30, 2014, December 31, 2014, and June 30, 2015

[225]  There were at least 307 reporting institutional investors that held one or more of the Exemplar Notes as of June 30, 2014, December 31, 2014 or June 30, 2015).  Many of these holders served as investment advisors for possibly hundreds or thousands of clients who were the beneficial owners.

- 84 -

there are three parts: the movement caused by market-wide factors, or the "market effect"; the movement caused by industry-wide factors, or the "industry effect"; and the movement caused by the "firm-specific effect."  For bonds, especially convertible bonds, these three components are relevant along with two other elements: the credit-risk effect and the time-to-maturity effect.

203.  Furthermore, as discussed above bond-pricing theory tells us that changes in prices will take place based on discounted cash flows.  The price is a function of these two factors (in addition to others):

(1)    The expected rate of return on similar maturity, riskless debt (*i.e.*, U.S. government bonds); and

(2)    The default risk or the probability that the company will be unable to satisfy some or all of the indenture requirements given current and expected future economic conditions.

204.  Therefore, to run the market model I add explanatory variables that account for these exogenous factors.  Thus, the specification is as follows:

$$N_t = a + \beta_1(Rm_t) + \beta_2(INDUSTRY_t) + \beta_3(CREDIT_t) + \beta_4(MATURITY_t) + e_t.$$

205.  In this equation, $N_t$ is the daily return to the Note, $Rm_t$ is a proxy for the daily market return, $INDUSTRY_t$ is a proxy for the daily industry return, $CREDIT_t$ is the daily return of an index of comparably risky bonds, and $MATURITY_t$ is the daily return of a treasury security with the same time-to-maturity as each of the Exemplar Notes.  In each of the two Navient Note regressions, the explanatory variables are:

$Rm_t$: the S&P 500 Total Return Index return (Bloomberg ticker "SPTR");

$INDUSTRY_t$: the S&P Supercomposite Consumer Finance Sub Industry Total Return Index (Bloomberg ticker "STRCFIN");

$CREDIT_t$: various ICE BofAML BB US Cash Pay High Yield Indexes with different term to maturity matched with Navient Exemplar Notes' term to maturity as of the start of the

> Exchange Act Class Period or as of their issue date (if issued during the Exchange Act Class Period);[226] and

> MATURITY$_t$: the return of a Treasury Notes with due date closest to the maturity date of each Navient Note.[227]

206.  The return for INDUSTRY$_t$ is net of the S&P 500 Total Return and the return for CREDIT$_t$ is net of the two Notes' respective Treasury Note returns.

207.  Econometric regression methods are used to estimate the parameters or coefficients in the equation above, namely a, $\beta_1$, $\beta_2$, $\beta_3$ and $\beta_4$.  For each Note, the first 120-day regression period is estimated using a single regression that uses the same sample of dates, while I begin the subsequent 120-day rolling regressions from that point onward.[228] Because of the limited timeframe for the 2021 Note, I run a single regression using data from the Note's initial issuance date through the end of the Exchange Act Class Period.  To estimate the parameters of the market model for each of the Notes on each of the days, I also include "dummy" variables to account for possible anomalous Note price reactions on

---

[226]  For the 2018A Note, 2018B Note, and 2019A Note, I use the ICE BofAML 3-5 Year BB US Cash Pay High Yield Index (Bloomberg ticker "J2A1"); for the 2019B Note, 2020A Note, 2020B Note, and 2021 Note, I use the ICE BofAML 5-7 Year BB US Cash Pay High Yield Index (Bloomberg ticker "J3A1"); for the 2022 Note, 2023 Note, 2024A Note, and 2024B Note, I use the ICE BofAML 7-10 Year BB US Cash Pay High Yield Index (Bloomberg ticker "J4A1"); for the 2033 Note and 2043 Note, I use the ICE BofAML 15+ Year BB US Cash Pay High Yield Index (Bloomberg ticker "J4A1").

[227]  The treasury note has to be issued as of the start of the Exchange Act Class Period, except for the 2020B Note, 2021 Note and 2024B Note, the treasury note has to be issued before these Notes were issued.  If multiple treasury notes matures at the same time, I use the treasury note with coupon rate closer to that of Navient.  The CUSIPs of treasury notes I used are as follows: 2018A Note: 912828QT0; 2018B Note: 912828QT0; 2019A Note: 912828B33; 2019B Note: 912828TC4; 2020A Note: 912828UV0; 2020B Note: 912828WC0; 2021 Note: 912828C57; 2022 Note: 912828SF8; 2023 Note: 912810EP9; 2024A Note: 912828B66; 2024B Note: 912810ES3; 2033 Note: 912810FP8; and 2043 Note: 912810RD2.

[228]  The last market model regression was estimated for 10/6/2015 for the 2024B Note (because it did not trade on 9/29/2015) and estimated for 9/29/2015 for all other Navient Exemplar Notes.  The last regression is also used for dates after that.

the impact dates of corrective disclosure dates alleged in the Complaint and days on which the Company announced earnings, earnings guidance, or updated earnings.[229]

208.   The 2043 exchange traded Note has volume-weighted average prices from Bloomberg ("VWAPs").   The VWAPs of the other 12 Exemplar Notes are based on transactions between 9:30 a.m. and 4:00 p.m.   In aggregate, the Exemplar Notes as a pool have VWAPs on 91% of the days.   Individually, the Exemplar Notes have VWAPs on 74% to 100% of the days.   For each Note, on those dates without prices, I calculate multi-day returns for both the Note and related explanatory variables.[230]

209.   As discussed above, corporate bonds do not generally trade as frequently as common stocks.   Therefore, it can often take longer for the bond price to respond to new information.   Although in a recent *Monroe County* Court decision the focus was on common stock, the court made clear that it is not uncommon for a financial security to take longer than a single trading day to absorb and reflect all publicly available information.[231] The *Monroe* Court laid out the arguments as follows:

> First, using exclusively one-day event windows does not change [] conclusion[s] concerning market efficiency. As a result, the debate about event windows in this case is largely academic. Second, there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions.[232]   Third, and more broadly, the

---

[229]   The impact dates for the 11 earnings-related or alleged corrective disclosure dates are: 5/12/2014, 7/17/2014, 10/16/2014, 1/22/2015, 3/2/2015, 4/22/2015, 4/27/2015, 7/8/2015, 7/14/2015, 7/22/2015, and 8/25/2015.   The alleged corrective disclosure date of 7/23/2015 in the Complaint appears to be a typo, which should be 7/22/2015.

[230]   By multi-day returns, I mean if the note does not trade on a day, then a two-day return is computed, as are the comparable variables used in the analysis.

[231]   *Monroe Cty Empls . Retirement Syst., et al. v. The Southern Co., et al.,*LEXIS 142360 (N.D. Ga. 2019) at 47-51.

[232]   *See, e.g., In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that a two-day event window is inconsistent with an efficient market); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3rd Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), abrogated on other grounds by *Amgen Inc. v. Connecticut Retirement Plains and Trust Funds*, 133 S. Ct. (2013); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for analysis); *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 249 (N.D. Cal. 2013) (citing defense expert's assertion that a "proper test of market efficiency" required analyzing whether

Supreme Court has expressly refused to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price."[233]  Fourth, academic literature supports the use of two-day (or more) event windows.[234]  Fifth, the Court finds, in accordance with the academic literature, that when the particular facts and circumstances justify investigating multi-day event windows, such analysis is appropriate. Finally, the Court rejects Defendants' suggestion that [multi-day] analysis should be disregarded because [it] did not analyze only one-day windows or only two-day windows. The Court is unaware of any rule, and Defendants cite none, requiring that one must commit at the outset, before analyzing the data, to investigate only one-day or

---

the market price reacted to new information over more than one trading day in order to "assess[] whether there are delayed price responses to the events of interest"); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window and rejecting argument that this rule only applied "where the timing of discrete events was [not] ascertainable"); *Aranaz*, 302 F.R.D. at 669 (citing significant two-day stock decline as "strong empirical evidence of market efficiency"). In another securities fraud case, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, the court explicitly considered and rejected Professor Gompers' exact same argument against two-day windows that he offers in this case, finding that "[a] two-to three-day window is *common* in event studies" because "it is standard for experts to utilize an event window including both the day of the event and the day following an event." 310 F.R.D. at 96. The *Barclays* court noted that Professor Gompers "agree[d] that event studies often use a two-day window, the date of the announcement and the day after." *Id.* at 96 n.183.

[233] *Basic*, 485 U.S. at 248 n.28. Following its decision in *Basic*, the Supreme Court in *Halliburton II* reiterated that it would not "enter the fray" of academic debates about the speed at which information is impounded into a stock price, and reconfirmed that market efficiency is based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton Co, et al. v. Erica P. John Fund, Inc*., 134 S.Ct. 2398, 2410 (2014). (quoting *Basic*, 485 U.S. at 247 n.24).

[234] For example, MacKinlay explains that two-day event windows are appropriate when analyzing earnings announcements.24 Professor Feinstein cited multiple other legal and academic papers endorsing the use of multi-day event windows and explaining that price reactions to news sometimes occur over two or more trading days, including a paper by David I. Tabak, who explains that "[i]n securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement." And although Defendants and Professor Gompers cite academic literature for the proposition that stock price reactions generally *begin* quickly, this does not necessarily mean that stock price reactions always *end* quickly. Rather, as Professor Feinstein explained, "[i]t is not settled science that an efficient market price reaction is over within a matter of minutes," and "the articles [Professor Gompers cites] do not conclude that the stock price reaction in an efficient market necessarily ends quickly and cannot continue on the day after an earnings announcement." [Doc. 113-2, ¶¶60, 65].

only two-day event windows. [An] event study analysis is "an investigation, and the results might compel you to look at a larger window."[235]

210.  It is clear from this decision, that many other courts have used this reasonable approach for evaluating whether a security trades in an efficient market.  They have realized, like academics, as well as the *Enron* Court, that there is no such thing as a perfectly efficient market and it might take more than a trading day for news to be disseminated and digested (or processed) by interested parties.

B.  Cammer Factor V – Price Reaction to Unexpected New Information

### 1. *Cause and Effect Analysis Examining the Relationship Between Abnormal Returns and Volume*

211. For the reasons discussed above when examining cause-and-effect for Navient common stock, I examine throughout the Exchange Act Class Period+[236] the overall relationship between the Exemplar Notes price volatility and common stock volume.  As explained above, I use Navient common stock volume as a proxy for the flow of Navient-specific information.  I use the commons stock volume instead of the Exemplar Notes volume for three reasons.  First, there is academic support to use this measure as a proxy for the flow of information.[237]   Second, in my view the measure of common stock volume over time is a more reliable proxy than the volume of the Exemplar Notes, which can be heavily influenced by idiosyncratic issues, such as the trading activities of a smaller group of investors.  And third, the common stock volume should be independent from the

---

[235]  *Id.*

[236]  Any time when there is a relatively short class period and courts have to evaluate whether a stock trades in an efficient market, generally, the courts find the event study analysis to be helpful.  *See*, for example, *Wilson v. LSB Indus.*, 2018 U.S. Dist. LEXIS 138832, at *36 (S.D.N.Y. 2018) (accepting event study that used three news days); *Todd v. STAAR Surgical Co.*, 2017 U.S. Dist. LEXIS 1919, at *25-31 (C.D. Cal. 2017) (accepting event study that used three news days; *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 n. 22 (N.D. Ala. 2009) (accepting event study that used two dates).

[237]  See, Section X.B.1 for academic articles discussing the relationship between volume and the flow of information.

Navient Debt Securities market unless there is a common factor, such as information flow; which is the common factor I am attempting to examine.

212. Therefore, using the Price-Volume Test described above, I examine the relationship between Navient's reported common stock volume and the price changes of the Exemplar Notes by regressing the Company's absolute abnormal the Exemplar Notes returns on the log of trading volume of the common stock over the Exchange Act Class Period+. For this test, I include only those debt returns for which a Note traded on consecutive stock-market trading days. As shown in **Exhibit XXII**, when all 13 Exemplar Notes are pooled, the relationship between the two variables is positive and highly statistically significant, and thus, supports the conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period. In addition, I note that the exchange-traded 2043 Note, which trades every day, also shows a highly statistically significant relationship between the two variables.

### 2. *Cause and Effect Analysis Examining Earnings Days That Are Not Corrective Disclosure Dates*

213. Based on my analysis of Navient's common stock price reaction to Navient's earnings releases that were not alleged corrective disclosures, I would not expect the Exemplar Notes to have significant price reactions. I reviewed the price reactions of the Exemplar Notes on the impact dates from the alleged corrective disclosures, and observed that there were not any consistent statistically significant price reactions to Navient's earnings releases that were not alleged corrective disclosures.[238] This is consistent with what I would expect in an efficient market.

### 3. *Cause and Effect Analysis Examining Days with News versus Days with No News*

214. For my analysis of news/no-news for the Exemplar Notes, I use the same test performed above to examine the relationship between news and Navient common stock price movements. As before, out of the 367 days of the Exchange Act Class Period+, there

---

[238] Because of the large amount of data, the return series for the Exemplar Notes is produced in my back-up materials.

are 15 days when there are assumed to be the disclosure of important Navient-specific information. I use this subset of dates as news dates where, as explained above, my objective criteria suggest that there *could have been* – although not necessarily that there *would have been* – announcements of unanticipated, material news. There are 91 dates that qualify as "no news dates." As before, I have pooled the Exemplar Notes. In addition, if an individual Note does not trade on a news day, I calculate the return based on the next available trading day.

215. Pooling all Exemplar Notes, I examined a sample of 1,049 news and no-news days within the Exchange Act Class Period+, approximately 16.7% (=175/1,049) of the days have such news releases. I have also identified 83 dates with statistically significant abnormal returns of Exemplar Notes in the sample of news and no-news days during the Exchange Act Class Period+. Therefore, 7.9% (=83/1,049) of the days have statistically significant abnormal returns. The information is summarized in **Exhibit XXIII**, which shows that out of the 1,049 examined pooled days in the Exchange Act Class Period+, there were 24 days with significant returns and news, and 59 days with significant returns and no news that meets my objective criteria.[239] There are 151 news days with non-significant returns, leaving 815 days with insignificant returns and no news.

216. I first test whether there was a statistically significant *difference* between the observed proportions of statistically significant abnormal returns of Exemplar Notes on news days as compared to no-news days. Here, Navient's 13 Note prices exhibited a statistically significant abnormal price reaction on *13.7%* of news days (24 of 175), compared to *just 6.8%* of no-news days (59 of 874). Thus, I observe significant price movements on news days *2 times* more frequently than I observe significant movements on no-news days. The difference between these two rates is statistically significant with a

---

[239] Note it is expected that there would be a large number of dates with significant returns and no news because the maximum number of dates with news is 175 days and the number of dates with statistically significant abnormal returns is 302. Therefore, the maximum number of dates when there would be news and statistically significant returns is 175, which means the minimum number of dates when there is no news and statistically significant returns is 127.

p-value of less than 0.01 using Fisher's Exact Test.[240]  Thus, with over 99% confidence, I can reject the hypothesis that the Exemplar Note prices reacted no differently on news days (or those dates with expected greater information flow) than on all other days.

217.  Alternatively, I can use the statistical tests to ask and answer the question of what number and percentage of days I would have expected to find matching between news and a statistically significant abnormal returns of the Exemplar Notes, if the two were *unrelated*.  Applying these tests, I find that, if the news and the statistically significant abnormal returns were unrelated, I would expect to observe *at most 14 dates out of the 175 pooled days* when there is a significant abnormal return associated with news.[241]  Thus, the 24 days I observe is at 1.7 times the expected number of days if there were <u>no</u> cause-and-effect relationship between the returns of the Exemplar Notes and news.[242]

218.  These findings also reject the hypothesis that the Exemplar Notes behaved no differently on news days than on all other days.  They allow me to conclude that Navient-specific information and large price movements of the Exemplar Notes during the Exchange Act Class Period+ were related and cannot be attributed to random volatility, or to market or sector factors.  This clearly provides support for the conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period+.

### 4.  *Cause and Effect Analysis Examining Autocorrelation*

219.  There has been a great deal of academic research on the microstructure of financial markets.  This has been motivated by observed 'anomalies' in price movements of financial instruments, especially those traded in the most efficient markets, such as the NYSE.  Many of these so-called return anomalies are explained by the accepted reality that securities markets are not perfect.  Whether securities are traded on the NYSE or the over-

---

[240]  Fisher's Exact Test is a statistical significance test used in the analysis of proportions such as the categories discussed above.

[241]  Specifically, I would expect to observe 13.85 days on average, equal to 7.9% multiplied by 175.

[242]  $24 / 13.85 \approx 1.73$.

the-counter markets, there are inevitable frictions and institutional structures that lead to bid-ask spreads, different timing of trades and various measurement problems.[243]

220.  Although in this matter there is more data and more trading information than throughout much of the history of academic research there are substantial advantages to using the type of high frequency data, such as the transactions data, that has been made available in this matter.  Unfortunately, high frequency data comes along with certain caveats.  To conduct a careful analysis, it is mandatory that various market microstructure effects must be taken into account in empirical analyses.  The combination of infrequent trading, along with such phenomenon as the nonsynchronous trading bias and the bid-ask bounce calls for careful evaluation of returns.   These microstructure issues introduce a variety of problems that simply due to the construction of the return series, make autocorrelation analyses less robust for corporate bonds than common stock.

221.  First, because there is less frequent trading of corporate bonds, I had to choose a method to compute a representative price for each day and thereby a return for that day. The approach I use and supported by academic research is the superior method.[244]

222.  Second, there is the issue of nonsynchronous trading. The nontrading or nonsynchronous trading effect arises when prices are taken to be recorded at time intervals of one length when they are recorded at time intervals of other possibly irregular lengths. For example, the daily prices of securities usually employed in event studies are generally 'closing' prices, prices at which the last transaction in each of those securities occurred during the trading day. These closing prices generally do not occur at the same time each day, but by calling them "daily" prices, we have implicitly and incorrectly assumed that

---

[243]  For a discussion of how different trading and markets might impact price discovery, see, for example, Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (Oxford University Press, 2003).

[244]  For example, see Hendrik Bessembinder, Kathleen M. Kahle, William F. Maxwell and Danielle Xu, Measuring Abnormal Bond Performance, 22 Rev. Finl Stds. 4219, 4219 (2009) ("Weighting individual trades by size while eliminating noninstitutional trades from the TRACE data also increases the power of the tests to detect abnormal performance, relative to using all trades or the last price of the day.").

they are equally spaced at 24-hour intervals.[245]   Because prices for most securities are reported at distinct random intervals, completely accurate calculation of returns over any fixed sequence of periods is virtually impossible.[246]   Scholes and Williams (1977) and Cohen et al. (1980) show how this nonsynchronous trading will induce spurious auto- and cross-correlations into individual-security and market-index returns.[247]

223.   Finally, most critically in this report is the issue of the bid-ask bounce.   The bid price represents the price at which a dealer is willing to buy a security; the ask price represents the price at which a dealer is willing to sell a security.   Because all else constant the bid price is generally lower than the ask price, the *bid-ask spread* represents the compensation the dealer earns by standing ready to provide immediate execution services.   This positive spread also offsets the costs the dealer incurs for maintaining a large inventory of bonds and serves to compensate him for the risk of adverse price movements between the time the dealer acquires the bond and subsequently sells it.   The bid-ask spread also compensates the dealer for the value of its time, specialized expertise and other opportunity costs.

224.   Bid-ask bounce occurs in all high-frequency transaction data as successive trades tend to bounce randomly between buys and sells. The bid-ask bounce can create the illusion of negative serial correlation in security returns when there is none in reality.   Bid-ask bounce can also lead to the mis-measurement of observed returns, as opposed to true returns, in that the anomaly can make it appear that the security price goes up when it is actually going down, and vice versa.   Hence, by ignoring the effect of the bid-ask bounce, an empiricist will incorrectly conclude that the bond returns are predictable because of the

---

[245]  J. Campbell, A. Lo and Craig MacKinlay, The Econometrics of Financial Markets (Princeton University Press, 1997), p. 177.

[246]  M. Scholes and J. Williams, *Estimating Betas From Nonsynchronous Data*,  5 Jnl. Fin. Econ., 309 (1977) at 309.

[247]  K. Cohen et al., *Implications of Microstructure Theory on Empirical Research on Stock Price Behavior*, 35 J. Fin., 249 (1980);  K. Cohen et al., *On the Existence of Serial Correlation in an Efficient Securities Market*, 11 TIMS Stds. Mngmt. Sci., 151 (1979); and M. Scholes and J. Williams, *Estimating Betas From Nonsynchronous Data*,  5 Jnl. Fin. Econ., 309 (1977).

observed negative first-order serial correlation.  However, this is an anomaly created by the trading activity in the market; it is just an illusion.  The negative first-order serial correlation is simply an artifact of the bid-ask bounce, and because investors are unable to earn arbitrage profits using the systematic, negative serial correlation of bond returns the market is still consistent with market efficiency.[248]

225. Therefore, as expected the individual FINRA-Notes all have first-order negative autocorrelation that is explained by the bid-ask bounce.  Therefore, for this analysis, I conducted a statistical test to determine whether the daily abnormal returns of Navient's 2043 Note exhibit persistent and systematic autocorrelation using returns and lagged returns.[249]

226. My statistical analysis of abnormal Navient 2043 Note returns for 364 days of the Exchange Act Class Period (excluding April 17 and 21, 2014 because there were no prior day returns) shows there is negative statistically significant autocorrelation. However, this autocorrelation is not persistent, nor systematic. I ran an alternative standard statistical model by regressing each trading day's abnormal return on the abnormal return from the prior trading day, but excluding three returns from the sample (i.e., less than 1% of the trading dates).[250]  From this model, I derive a coefficient of -0.02 representing the measurement of the relationship between the abnormal current (*i.e.*, today) and lagged (*i.e.*, yesterday) returns and a *t*-statistic of -0.48.  A *t*-statistic in absolute value of 1.96 or above would indicate a statistically significant relationship between yesterday's and today's

---

[248] *See* R. Roll, *A simple implicit measure of the effective bid-ask spread in an efficient market*, 39 J. Fin., 1127 (1984); and L. Harris, *Estimation of stock price variances and serial covariances from discrete observations*, 25 Journal of Financial and Quantitative Analysis, 291 (1990).

[249] "Autocorrelation is usually found in time-series data.  Economic time series often display a 'memory' in that variation is not independent from one period to the next."  Greene, *supra* note 27.  In other words, autocorrelation is the measurement of the relationship between the security return at time t and the return of the same security at some fixed time in the past.  First-order autocorrelation would be found when there is a statistically significant relationship between the common stock return today and the common stock return yesterday.  Another way of looking at this concept is that if an observer can use the return from yesterday to predict with some level of certainty the return today, there exists autocorrelation.  *See Lehocky*, 220 F.R.D. at 506-507 n.20 (noting that both parties' experts agreed on the helpfulness of autocorrelation); *PolyMedica*, 453 F. Supp. 2d at 276–78.

[250] I exclude abnormal returns from 8/24/2015 to 8/26/2015 regressed on 8/21/2015 to 8/25/2015.

abnormal returns.  Because the t-statistic I derive (again, -0.48) is well below the threshold for significance, I conclude that there is no statistically significant autocorrelation of Navient abnormal 2043 Note returns during the Exchange Act Class Period. This finding again supports the conclusion that the market for the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.

227.  In summary, the statistical test I performed shows no statistically significant autocorrelation for Navient abnormal 2043 Note returns at the five percent level of statistical confidence, which is consistent with the conclusion that the Exemplar Notes react quickly to news.  This result and the news, no-news tests above are support that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.

### 5.    *Analysis Examining Corrective Disclosure Dates*

228.  Although not necessary to support my conclusions as to the efficiency of the market for Navient common stock, I have been asked by Counsel to analyze whether the Exemplar Notes prices reacted to the alleged corrective disclosures related to the forbearance claims in a way that is consistent with the results of my test of news versus no-news days and as would be expected of a stock that trades in an efficient market.  In **Exhibits XXIVA, B and C**, I present empirical information related to the abnormal returns for those days when the Complaint alleges there were corrective disclosures related to the forbearance claim: July 13, 2015 (price impact on July 14, 2015); July 21-22, 2015 (price impact on July 22, 2015); and September 29, 2015 (price impact on September 29, 2015, September 30, 2015, and October 1, 2015).[251] Generally, all three disclosures with potential impacts have the expected statistically significant price responses.

### a)    July 14, 2015

229. As shown in **Exhibit XXIV-A**, on July 13, 2015, when examining the Exemplar Notes, all the prices decline, with 10 of the Exemplar Notes falling by statistically significant amounts.  The 2033 Notes, which declines by 3.36% is statistically

---

[251]  Complaint ¶¶85-87, 90-91.  I note that the Complaint lists a price decline from July 21 to July 23, 2015 (Complaint, ¶87), but the price and return listed are for July 22, 2015; I therefore consider the alleged price impact date to be July 22, 2015.

significant at the 7.55% level.  Thus, I can say with 92.45% confidence that the price decline is non-zero.

### b)  July 21-22, 2015

230.  As shown in **Exhibit XXIV-B**, on July 12, 2015 through July 24, 2015, as with the common stock price decline, there is less price impact.  In this case, other than the 2018A and 2021 Notes, the Exemplar Notes fall by more than 2%, although only seven of Exemplar Notes have either single day declines that are statistically significant, or three-day cumulative price declines that are statistically significant.

### c)  September 29 – October 2, 2015

231.  As shown in **Exhibit XXIV-C**, on September 29, 2015 through October 2, 2015, all 12 of the Exemplar Notes have either single day declines that are statistically significant, or three-day cumulative price declines that are statistically significant.  The only outlier is the shortest duration 2018A Note.  The other 12 Navient Debt Securities fall by between 3.33% to 13.44%.

232.  Overall, the price reactions for the at least 12 of the Exemplar Notes on the corrective disclosure dates are consistent with what an economist would expect when a security trades in an efficient market.

### C.  Conclusion Based on the Basket of Factors the Courts Evaluate

233.  My empirical analyses in this section shows that the disclosure of Navient-specific news caused reasonably rapid and significant movements in the prices of the Exemplar Notes.  Moreover, using the empirical results for the evaluation of the operational factors I have also presented support for my conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.  In summary, when examining the basket of factors that Courts generally rely upon for class certification decisions, which are also consistent with the fundamental principles of economics and finance that academics rely upon to evaluate market efficiency, the evidence supports the conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.

D.  Navient Debt Securities Traded in an Efficient Market

234.  My application of the *Cammer* and *Krogman* factors to the Exemplar Notes, supports the conclusion that the Exemplar Notes traded in an efficient market throughout the Exchange Act Class Period.  Because the Exemplar Notes are a robust proxy for the entire market for Navient Debt Securities (in fact, a significantly more than adequate proxy), I can reliably conclude that the that the existence of an efficient market for price discovery encompassing the Exemplar Notes implies that the other Non-Core Notes also traded in an efficient market throughout the Exchange Act Class Period.

235.  Support for the conclusion that the Exemplar Notes and the Non-Core Notes (*i.e.,* the Navigant Debt Securities) traded in an efficient market throughout the Exchange Act Class Period comes from a multiplicity of sources.  As described below several of the *Cammer* and *Krogman* factors apply similarly for the Exemplar Notes and the Non-Core Notes — and, thus, the entire market for Navient Debt Securities.  In addition, corporate bond pricing theory, rating agency practices, and Navient's financial reporting practices all imply that the Navient Debt Securities formed a single, homogenous pool of debt; and, further, that the demonstration above of the cause-and-effect relationship for the Exemplar Notes would extend to all Navient Debt Securities, including the Non-Core Notes.

236.  First, several *Cammer/Krogman* factors apply uniformly or substantially the same across all Navient Debt Securities and, thus, support market efficiency for all Navient Debt Securities.  The benefits of the dissemination and processing of information about Navient from extensive analyst and credit rating coverage (*Cammer*-2) extends to all Navient Debt Securities and supports market efficiency.  Second, the importance of the eligibility of Navient to file an SEC Form S-3 (*Cammer*-3) likewise extends to all Navient Debt Securities in support of efficiency.  Third, the large market capitalization of Navient unsecured senior debt (*Krogman*-1) — which is greater in dollar value than almost any other debt securities litigation that have been certified — would support the conclusion that Navient Debt Securities traded in an efficient market.[252]  Finally, there is no evidence that

---

[252] For bonds, courts have found that market capitalization for stocks is analogous to the total market value of the bonds calculated as the principal amount outstanding (the total face value) multiplied by the current price of the security.

any insiders held any Navient Debt Securities (*Krogman* 2-The Size of the Float), which would also support the conclusion that Navient Debt Securities trade in an efficient market. Thus, each of these features apply to all Navient Debt Securities and all are consistent with and strongly support a conclusion of market efficiency.

237.  Second, fundamental principles of economics and finance, and specifically corporate bond pricing theory, suggest that observing cause and effect (*Cammer*-5) for Navient's Exemplar Notes will extend to Navient's Non-Core Notes.  Finance theory shows that comparable corporate bond issues (such as the 210 Navient Notes) will be priced with reference to a common risky yield curve.  A highly influential paper in the academic finance literature suggests that the prices of bonds with similar default and recovery rates can be fit to a common term structure, and that departures from the common structure suggest arbitrage opportunities.[253] Therefore, because the Navient Debt Securities represent equivalent claims on Navient's cash flow, and thus have the same basic source of risk, the Navient Debt Securities with their identical credit ratings all have similar default rates.  Additionally, the Navient Debt Securities all have the same rank/seniority and thus have the same recovery rates. Accordingly all of the Navient Debt Securities can be fit to the same risky yield curve, since they share credit ratings and seniority/security properties, and the departure of any issue from this common curve would entail an arbitrage opportunity.  In other words, the Navient Debt Securities will be priced collectively, rather than individually.

238.  Third, academic research, as well as arbitrage and bond trading activities would also suggest that the observing cause and effect (*Cammer*-5) for Navient's Exemplar Notes will extend to Navient's Non-Core Notes.  If the pricing of the Non-Core Notes was not linked to the pricing of the Exemplar Notes, opportunities for arbitrage would exist because the notes have a common issuer and identical seniority.  This is the primary role of professional bond traders.  Especially for the Navient Debt Securities, with all the notes of equivalent seniority/rank and security, the relative pricing of each Navient Note is fairly

---

[253]  Darrell Duffie and Kenneth J. Singleton, *Modeling Term Structures of Defaultable Bonds*, 12 Rev. of Finl. Stds. 687 (1999).

mechanical, wherein a basic formula, possibly even managed by a computer algorithm, could price all the notes with the only difference being the maturity and coupon. This makes it easy for potential low-cost arbitrage, which prevents the valuation of the Non-Core Notes from decoupling with the pricing of the Exemplar Notes. It is also common practice among bond-market practitioners to price corporate bonds by reference to the price of comparable bonds. For instance, students in the Chartered Financial Analyst program learn "it is common to estimate the market discount rate and price based on the quoted or listed prices of more frequently traded comparable bonds. These comparable bonds have similar times-to-maturity, coupon rates, and credit quality. This estimation process is called matrix pricing."[254] It would be hard to find more comparable bonds than those issued by the same company with the same seniority and security. This process is demonstrated by the fact that I was able to download from Bloomberg prices for September 28, 2015 for every one of the 210 Navient Debt Securities.

239. Fourth, as previously noted, the credit rating agencies evaluated the Navigant Debt Securities as a single homogenous pool of debt securities. So did Navient itself in its SEC filings, which reported and described the Navient Debt Securities as a single line item. The fact these parties considered Navient Debt Securities to be connected, further reinforces that the existence of an efficient market for price discovery encompassing the Exemplar Notes implies that the other Non-Core Notes also traded in an efficient market throughout the Exchange Act Class Period

240. Finally, the courts have consistently found that for the purposes of examining securities markets, that related securities (such as options, preferred stock, different types

---

[254] James F. Adams and Donald J. Smith, *Introduction to Fixed Income Valuation*, CFA Institute Level I Refresher Reading (2019) at 17.

Matrix, derived and evaluated prices are critical factors in valuing financial instruments traded on capital markets throughout the developed world. For example, brokerage accounts, which might be margined, use these prices for daily valuation purposes to mark assets to the market price. Also, the major bond indexes, such as the Barclays and Merrill Lynch bond indexes use these matrix prices for second-by-second valuation purposes. These indexes are bought and sold by retail and institutional customers and are generally considered reliable prices for these transactions. Further, exchange traded funds based on indexes must use matrix prices because they are regularly valued even when their component parts do not trade. This valuation must take place so the financial instruments may be bought and sold.

of corporate bonds, etc.) are generally considered similar because the primary economic factors, such as the probability of default of Navient and the impact of the alleged fraud, influence the prices in a similar manner.  This is consistent with the arguments I made above as to why the Navient stock options trade in an efficient market when it is demonstrated that Navient common stock trades in an efficient market.  In the case of the pricing of options, the main ingredient is the price of the common stock.  This is similar to rationale as to why Navient Debt Securities prices must all be linked because the main ingredients are the same, which means the Exemplar Notes and the Non-Core Notes comprise a homogeneous pool of debt.

241.  Based on the foregoing, I conclude that Navient Debt Securities traded in an efficient market.

## XI.    ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

242.  As set forth in the Complaint, Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act.  As explained below, damages for each of these claims can be calculated on a class-wide basis using a common methodology for each of Navient's publicly-traded securities.[255]

### A.   Calculating Damages for Violation of § 10(b) of the Exchange Act For Both Common Stock and Navient Debt Securities

#### 1.    Summary

243.   The calculation of class-wide damages for a violation of Section 10(b) of the Exchange Act is subject to a common and broadly accepted methodology, which indeed is routinely applied and has become a virtual standard in federal securities litigation just like this Navient matter.  This class-wide damages methodology is generally referred to as the "out-of-pocket" ("OOP") method.  Using the OOP method, damages suffered by Class Members are measured based on the investors' inflation losses.

---

[255] As previously noted, I have not been asked to calculate or opine on the quantum of damages here.

244.   To implement the OOP method, which is based on a relatively straightforward, standard and commonly-used formula, inputs are calculated.  In the OOP method, the inputs are the daily levels of artificial inflation in the prices for the Navient securities caused by Defendants' alleged misrepresentations and/or omissions.   Daily levels of artificial inflation are calculated as the difference between the actual prices paid on that day for the Navient securities and the true or "but-for" values of the securities absent the alleged misrepresentations and omissions (*i.e.*, had the truth been disclosed the price would have been the true value).  Inflation losses are then calculated based on the inflation on the date the Class Member acquires their securities less the inflation on the date the Class member sells their securities (or if unsold, based on zero inflation following the Exchange Act Class Period).

245.   This common methodology and the related inputs are applied on a class-wide basis.   In the end, the inputs or the daily levels of artificial inflation (i.e., the artificial inflation ribbon) along with the actual trading activity of Class Members are used to calculate individual damages in a mechanical and formulaic manner.[256]

### 2.      Description of the OOP Method

246.   The common damages methodology I propose is almost universally applied in federal securities litigation.   One can think of the OOP method as a straightforward, standard and commonly-used formula — like the formula of the slope of a line taught in sixth grade algebra; namely $Y = a + bX$.   To solve this simple formula for Y, one uses information to estimate a and b, and then simply inputs X into the formula to solve for Y. To calculate the inputs for the OOP method or formula, an expert often begins with the same type of event study I used above in Sections VI and X to evaluate the price-related factors.   Using the results of the event study along with the disclosures of firm-specific information, daily abnormal returns or price movements are calculated.

---

[256]  In addition, the 90-day period following the end of the Exchange Act Class Period would also need to be examined.  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff may not recover more than the difference between the purchase price and the mean trading price of the stock during the 90-day look-back period.  *See* 15 U.S.C. § 78u-4(e)(1).

247.  Once the daily levels of artificial inflation or the inputs into the OOP formula are calculated and represented by what economists generally refer to as the" inflation ribbon."  This ribbon represents an estimate of the daily level of artificial inflation in the prices of the Navient securities caused by the Defendants' alleged misrepresentations and omissions, which are based on the price reactions to disclosures either related to or revealing the alleged misstatements and omissions.

248.  Calculating actual inputs into the OOP method by parsing and scaling the abnormal returns (if it were required) requires an analysis of *loss causation*. But the Supreme Court's *Halliburton I* Opinion determined that loss causation is a common issue that need not be analyzed at the class certification stage.[257] Thus, for present purposes, one need only realize that the above-described inputs (*i.e.*, the inflation ribbon) will be common to all class members and applied class-wide.  Thus, the OOP method does not involve any individualized issues.[258]  Indeed, in *Halliburton I*, the Supreme Court concluded that no matter which technique might be chosen at the merits stage of this litigation, the techniques used to estimate the true price (and thus calculate artificial inflation) are common to all putative class members and will be applied on a class-wide basis.[259]

249.  Moreover, in the merits stage when an expert identifies the level of artificial inflation in the Navient common stock attributable to the specific misrepresentations and omissions ultimately established by Plaintiffs, this "but-for" price does not depend on, nor does one need to consider, an individual investor's risk tolerance or expected returns. Rather it is common to all investors because it measures how the misrepresented

---

[257]  *Erica P. John Fund, Inc. v. Halliburton Co, et al.*, 131 S.Ct. 2179 (2011) ("*Halliburton I*").

[258]  This is also consistent with the recent *Signet* Court's conclusion that: "[Defendant's expert's] contention that Plaintiff's methodology did not adequately isolate the impact … is simply a **loss causation argument in disguise**, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument 'goes beyond the *Rule 23* inquiry.'" *Signet* at *59 (emphasis added and in original, citations omitted).

[259]  *See*, for example, Nicholas I. Crew, Kevin L. Gold and Marnie A. Moore, *Federal Securities Acts and Areas of Expert Analysis*, Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, Wiley (2012), 24.11-24.14.

- 103 -

information affected Navient's common stock price, which is of course the essence of fraud-on-the-market.

250. The OOP methodology would also be applied to calculate Exchange Act damages for Navient Debt Securities.

### 3.    *Damages Methodology for Options on Navient Common Stock*

251. I was also asked to determine whether damages can be calculated on a class-wide basis for the options on Navient common stock. Because option prices are derived from the share price of Navient common stock, if the price of Navient common stock is artificially inflated, then a call option would likewise be artificially inflated because the call option would be worth less if the Navient common stock price was lower. If the price of the Navient common stock is artificially inflated, a put option would be artificially deflated because the put option would be worth more if the Navient common stock price was lower.

252. A reasonable method of calculating damages on a class-wide basis would be to model the actual prices of options on Navient common stock using a widely used pricing model, such as the Black-Scholes option pricing model. Then, using the output of the model, re-calculate the theoretical price based on the true value of the common stock (holding other inputs to the options pricing model constant). The artificial inflation (deflation) for call (put) options would thus be the difference each day between the actual option price and the re-calculated "true" option price. This method would be formulaic, common to all class members and applied class-wide.

253. Because the measure of inflation/deflation would change on a daily basis, I would also calculate the effect of the abnormal price change in Navient's stock price due to the alleged corrective disclosures on the options on Navient's common stock, which could be used as an amount to limit recoverable damages consistent with *Dura*.[260] As with the common stock, the PSLRA limit would also apply.

---

[260] Some have argued that the U.S. Supreme Court decision in *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005) caps the amount of per share damages to the dollar drop in the security

B. Calculating Damages for Violations of § 11 and § 12(a)(2) of the Securities Act

### 1. *Section 11*

254.  The calculation of damages on a class-wide basis for violations of Section 11 of the Securities Act is also subject to a common methodology that is set by statute, common to all class members and applicable class-wide.  Damages for investors with Section 11 claims are calculated based on the statutory formula:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[261]

255.  Thus, Section 11 damage calculations are straightforward in that the damages are based on the offering price less (1) the investor's sale price, if sold prior to the filing date of the lawsuit; and (2) the price on the filing date if sold thereafter; with a cap of actual losses based on the actual sale price, or if sold at a price higher than the security's value on the filing date.  In the case of Navient's debt offerings, the offering prices for the 2020B Note, the 2021 Note and the 2024B Note were, per $100 face value, $99.379, $99.075 and

---

that was caused by the corrective disclosure of the alleged wrongdoing.  *See, e.g.*, David Tabak, *Inflation and Damages in a Post-Dura World*, NERA white paper, September 25, 2007.

[261]  15 U.S.C. § 77k(e).

$99.935, respectively.[262]   The cap is based on using the highest price by comparing the value on the filing date and the actual sales price.[263]

256.  Damage calculations for investors with Section 11 claims are also based on the part of the statute stating:

> *Provided*, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.[264]

257.  These calculations are common to all class members and applicable class-wide.

### 2.   *Section 12*

258.  The calculation of damages on a class-wide basis for violations of Section 12(a)(2) of the Securities Act is also subject to a methodology common to all class members.  Damage calculations for investors with Section 12(a)(2) claims are based on the statute providing for recovery of "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."[265]

259.  Thus, Section 12(a)(2) damage calculations are also made employing a straightforward formula based on either rescissionary damages or the offering price less

---

[262]  The offering prices are based on the FINRA data, specifically the "Entered Pr" variable for trades with "Market Indicator" of "P1," which trades all occurred on November 3, 2014 for the 2020B and 2024B Notes and March 25, 2015 for the 2021 Note.

[263]  It is my understanding that the relevant filing date is February 11, 2016.  Based on the VWAP prices described previously, the traded prices for the 2020B, 2021, and 2024B Notes were, per $100 face value, $85.56, $83.02, and $75.09 as of February 11, 2016, respectively.

[264]  *Id.*

[265]  15 U.S.C. § 77*l*(a)(2).

the investor's sale price.  In either case, the formula would also incorporate "the interest thereon, less the amount of any income received thereon."

260.  These calculations are common to all class members and applicable class-wide.

## XII.  CONCLUSIONS

261.  Based on the foregoing, my conclusions are as follows:

i.   Throughout the Exchange Act Class Period, Navient common stock traded in an efficient market.

ii.  Throughout the Exchange Act Class Period, options on Navient common stock traded in an efficient market.

iii. Throughout the Exchange Act Class Period, the Exemplar Notes — that made up more than 76% of the face value of the Navient Debt Securities— traded in an efficient market.

iv.  Throughout the Exchange Act Class Period, the entire family of Navigant Debt Securities traded in an efficient market.

v.   The calculations of damages for violations of Section 10(b) of the Exchange Act (and SEC Rule 10b-5) are subject to a common methodology and may be computed on a class-wide basis.

vi.  The calculations of damages for violations of Section 11 of the Securities Act are subject to a common methodology and may be computed on a class-wide basis.

vii. The calculations of damages for violations of Section 12(a)(2) of the Securities Act are subject to a common methodology and may be computed on a class-wide basis.

I declare under penalty of perjury that the foregoing is true and correct.

***RESPECTFULLY SUBMITTED THIS SIXTH DAY OF SEPTEMBER 2019***

Michael L. Hartzmark, Ph.D.

# APPENDIX A

# MICHAEL L. HARTZMARK, PH.D.

4950 S. Chicago Beach Drive, Suite 6A
Chicago, IL 60615
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITIONS

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
<u>President</u> (2013 - present)
Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW JERSEY
<u>Independent Contractor</u> (2015 - present)
MDA FINANCIAL, INC.
<u>President</u> (1981 - present)
FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
<u>Member Arbitrator</u> (2005 - present)

## EDUCATION

Ph.D.      Department of Economics, the University of Chicago, 1984
           (Doctoral Exams in Industrial Organization and Regulation; Public Finance)
M.A.       Department of Economics, the University of Chicago, 1982
B.A.       The University of Michigan (Economics, High Honors and Phi Beta Kappa), 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## GRANTS

Grant from the University of Chicago (1984).  Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

A-1

**PROFESSIONAL EXPERIENCE**

OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW YORK
<ins>Independent Contractor</ins> (2013 - 2019)
CRA INTERNATIONAL, INC.
<ins>Independent Contractor</ins> (2015)
NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
<ins>Academic Affiliate</ins> (2012 - 2013)
<ins>Principal/Director</ins> (2008 - 2012)
<ins>Vice President</ins> (2004 - 2007)
DARMA, LLC
<ins>President</ins> (2005 - 2008)
PACIFIC BIOMETRICS, INC.
<ins>Interim Chief Financial Officer</ins> (2004 - 2006)
CRAGAR INDUSTRIES, INC.
<ins>Chairman, CEO, President and Treasurer</ins> (1993 - 2004)
MDA FINANCIAL, INC.
<ins>President</ins> (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
<ins>Financial Consultant</ins> (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
<ins>President</ins> (1989 - 1992)
LEXECON INC.
<ins>Senior Economist</ins> (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the
Graduate School of Business (now the Chicago Booth School of Business)
<ins>John M. Olin Visiting Scholar</ins> (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M.
Ross School of Business) and Department of Economics
<ins>Assistant Professor</ins> (1984 - 1988)
<ins>Lecturer</ins> (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and
Education, Washington, D.C.
<ins>Financial Economist</ins> (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
<ins>Instructor for Economic Analysis</ins> (1981)
<ins>Research Assistant</ins> for A. C. Harberger (1982)
<ins>Research Assistant</ins> for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
<ins>Research Assistant</ins> (1981)

## PUBLICATIONS

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

"An Economist's View of Amgen," Law360, May 2, 2013.
    http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.

"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012.

"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Number 3, Volume 2011.

"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," Journal of Business, January 1991. Also reprinted in Classic Futures: Lessons from the Past for the Electronic Age, by Lester Telser, Risk Books, March 2000.

"Business Valuations for the Personal Lawyer," Law and Fact, September 1991.

"Is Risk Aversion a Theoretical Diversion?" The Review of Futures Markets, Volume 7, Number 1, 1988.

"Returns to Individual Traders of Futures: Aggregate Results," Journal of Political Economy, December 1987.

"Regulating Futures Margin Requirements," Review of Research on Futures Markets, Volume 5, Number 3, 1986.

"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," Journal of Business, April 1986.

"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), National Tax Journal, June 1981.


## BOARDS

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - 2016)

MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)

GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed); Director, Audit Committee Member (2004 - 2008);

THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)

SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)

PACIFIC BIOMETRICS, INC. (OTC BB: PBMC currently not listed and renamed as Pacific Biomarkers), Director and Chairman of Audit Committee (2002 - 2004)

CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold); Director and Chairman of the Board (1993 - 2004)

A-3

## EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS

In Re MF Global Holdings Limited Securities Litigation. U.S. District Court for the Southern District of
   New York; Report (9/15/2014); Damages Report (8/21/2015); Reply Report (9/21/2015);
   Deposition (11/23/2015).

Louisiana Firefighters' Retirement System, et al. v. Northern Trust Investments, N.A., and Northern
   Trust Company. U.S. District Court for the Northern District of Illinois; Report (6/8/2015);
   Deposition (7/14/2015); Rebuttal Report (12/7/2015).

New Jersey Carpenters Health Fund, et al v. Novastar Mortgage, Inc., et al. U.S. District Court for the
   Southern District of New York; Report (6/13/2015); Deposition (9/11/2015);
   Rebuttal Report (12/2/2015).

In Re DFC Global Corp. Securities Litigation. U.S. District Court for the Eastern District of
   Pennsylvania; Report (10/2/2015); Deposition (12/14/2015).

David M. Loritz, et al. v. Exide Technologies, et al. U.S. District Court for the Central District of
   California; Report (10/5/2012); Deposition (10/26/2015); Response Report (11/9/2015);
   Report (11/30/2015).

Public School Teachers' Pension and Retirement Fund of Chicago v. Gary S. Guthart, et al. Superior
   Court of the State of California, In and For the County of San Mateo. Deposition (4/6/2016).

In re Altisource Portfolio Solutions, S.A. Securities Litigation. U.S. District Court for the Southern
   District of Florida; Report (8/12/2016); Deposition (11/9/2016); Damages Report (12/30/2016);
   Rebuttal Report (1/2/2017).

Barry R. Lloyd, et al. v. CVB Financial Corp., et al. U.S. District Court for the Central District of
   California; Report (9/9/2016); Declaration (1/23/2017).

Fixed Income Shares: Series M, et al. v. Citibank N.A. U.S. District Court for the Southern District of
   New York; Report (9/16/2016); Rebuttal Report (11/14/2016); Damages Report (11/28/2016);
   Deposition (12/22/2016).

BlackRock Core Bond Portfolio, et al. v. U.S. Bank National Association. U.S. District Court for the
   Southern District of New York; Report (11/1/2016); Rebuttal Report (3/3/2017);
   Amended Report (6/21/2017); Supplemental Report (8/18/2017).

In Re Cobalt International Energy, Inc. Securities Litigation. U.S. District Court for the Southern
   District of Texas; Report (11/2/2016); Deposition (12/20/2016); Rebuttal Report (5/26/2017).

BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, National Association.  U.S.
   District Court for the Southern District of New York; Report (1/20/2017);
   Amended Report (5/4/2017); Amended Rebuttal Report (6/2/20017); Deposition (7/14/2017).

In Re CommVault Systems, Inc. Securities Litigation. U.S. District Court for the District of New Jersey;
   Report (5/12/2017).

In Re Finisar Corporation, Inc. Securities Litigation. U.S. District Court for the Northern District of
   California; Report (8/14/2017); Deposition (9/14/2017); Rebuttal Report (11/3/2017);
   Deposition (11/7/2018).

Robert Burke and Rachel Burke v. R.O. Reichel & Sons Trucking & Excavating, Inc., et al. Circuit
   Court of Cook County; Report (9/15/2017).

BlackRock Allocation Target Shares: Series S Portfolio, et al. v. Wells Fargo Bank, N.A.  U.S. District
   Court for the Southern District of New York; Report (10/30/2017); Deposition (11/16/2017);
   Rebuttal Report (1/26/2018).

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief
   of the New Jersey Bureau of Securities v. Credit Suisse Securities (USA) LLC, et al.  Superior Court
   of New Jersey, Chancery Division Mercer County; Report (12/1/2017);
   Opposition Report (5/14/2018); Reply Report (7/16/2018); Deposition (2/13/2019).

A-4

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. Superior Court of California in and for the County of Orange; Report (1/17/2018); Deposition (3/13/2018); Rebuttal Report (4/30/2018).

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. U.S. District Court for the Southern District of New York; Report (1/26/2018); Deposition (3/13/2018); Rebuttal Report (4/16/2018).

Brian J. O'Donoghue, as authorized representative vs. Inland Bank and Trust, et al. U.S. District Court for the Northern District of Illinois Eastern Division; Report (4/1/2008).

In Re TerraForm Global, Inc. Securities Litigation. U.S. District Court for the Southern District of New York; Report (7/30/2018); Updated Report (8/17/2018); Reply Report (11/1/2018).

In Re Illumina, Inc. Securities Litigation. U.S. District Court Southern District of California; Report (9/14/2018); Deposition (10/19/18).

John Cumming, derivatively on behalf of New Senior Investment Group, Inc., v. Wesley R. Edens, et al. Court of Chancery of the State of Delaware; Report (11/9/2018).

The Arbitrage Fund, on behalf of itself and all other similarly situated shareholders of Exactech, Inc. v. William Petty, et al. Circuit Court of Florida, Eleventh Judicial Circuit, Miami-Dade County; Report (12/6/2018).

Oklahoma Law Enforcement Retirement System vs. Adeptus Health Inc. U.S. Eastern District of Texas, Sherman Division; Report (12/7/2018); Rebuttal Report (3/22/19).

In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, et al. v. Appaloosa Investment L.P., et al. U.S. District Court for the Southern District of New York; Report (1/18/2019); Rebuttal Report (2/8/2019); Deposition (3/12/19).

Marc J. Muri, individually and on behalf of all others similarly situated v. National Indemnity Company. U.S. District Court District of Nebraska; Report (1/24/2019); Reply Report (2/14/2019); Deposition (3/4/2019).

In Re HD Supply Holdings, Inc. Securities Litigation. U.S. District Court for the Northern District of Georgia; Report (3/1/2019); Deposition (5/2/2019).

In Re Signet Jewelers Limited Securities Litigation. U.S. District Court for the Southern District of New York; Report (3/15/2019); Rebuttal Report (5/17/2019); Deposition (6/7/2019).

In Re U.S. Steel Consolidated Cases. U.S. District Court for the Western District of Pennsylvania; Report (4/19/2019); Deposition (6/4/2019) Rebuttal Report (7/18/2019).

Timber Hill LLC. v. Kraft Heinz Company et al. U.S. District Court for the Northern District of Illinois; Declaration (5/15/2019).

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al. U.S. District Court for the Southern District of Texas; Report (5/28/2019); Supplemental Report (8/26/2019).

**Appendix B**
**Materials Relied Upon**

<u>NAVIENT CORP. NEWS AND DISCLOSURES</u>
News Articles, April 17, 2014 – October 1, 2015, searched through Bloomberg and Factiva.
Transcripts of teleconference earnings calls and analyst conference presentations (source: Bloomberg):
    7/17/2014; 9/8/2014; 10/16/2014; 11/12/2014; 12/9/2014; 1/22/2015; 2/11/2015; 4/22/2015; 6/11/2015; 7/22/2015.
Navient Corp. filings with the U.S. Securities and Exchange Commission (SEC).
List of analyst reports on Navient Corp. April 17, 2014 – October 1, 2015, available through S&P Capital IQ and Thomson
    Eikon Databases.
Analyst reports provided by Counsel.

<u>COURT DOCUMENTS</u>
Second Amended Class Action Complaint, *Lord Abbett Affiliated Fund, Inc., et al. v. Navient Corporation, et al.*, Case No.
    1:16-cv-112-GMS (D. Del. November 17, 2017), ECF. 59.
Memorandum Opinion, January 29, 2019.
*AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005).
*Aranaz v. Catalyst Pharmaceutical Partners, Inc. et al.*, 302 F.R.D. 657 (S.D. Fla. 2014).
*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).
*Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150 (S.D.N.Y. 2012).
*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
*Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al.*, 2015 U.S. Dist. LEXIS 110382 (S.D.N.Y. 2015).
*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003).
*City of Ann Arbor Emps' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247 (D.S.C. 2010).
*Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir.1988).
*Erica P. John Fund, Inc. v. Halliburton Co, et al.*, 131 S.Ct. 2179 (2011).
*Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90 (S.D.N.Y. 2009).
*Halliburton Co, et al. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).
*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).
*In re Bridgepoint Educ. Inc. Sec. Litig.*, 2015 WL 224631, (S.D. Cal. Jan. 15, 2015).
*In re China MediaExpress Holdings, Inc. S'holder Litig.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014).
*In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017).
*In re Diamond Foods, Inc.*, 295 F.R.D. 240 (N.D. Cal. 2013).
*In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008).
*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).
*In re Dynex Capital, Inc. Sec. Litig.*, U.S. Dist. LEXIS 22484 (S.D.N.Y. Mar. 7, 2011).
*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006).
*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, Declaration Of Blaine F. Nye, Ph.D. In Support Of Lead Plaintiff's
    Amended Motion For Class Certification (Docket No. 1445), January 6, 2006, Case No. 4:01-cv-03624  (S.D. Tex.
    2006).
*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321 (N.D. Ill. 2015).
*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260 (N.D. Ala. 2009).
*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009).
*In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, 2013 WL 396117 (D. N.J. 2013).
*In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101 (E.D. Va. 2009).
*In re Netbank, Inc. Securities Litig.*, 259 F.R.D. 656 (N.D. Ga. 2009).
*In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006).
*In re Scientific-Atlanta*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007).
*In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.NY. July 10, 2019).
*In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009).
*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).
*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
*Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).
*Lumen v. Anderson*, 280 F.R.D. 451 (W.D. Mo. 2012).
*Marcus v. J.C. Penney Co., Inc.*, 2016 U.S. Dist. LEXIS 115795 (E.D. Tex. 2016); *report and recommendation adopted*,
    2017 U.S. Dist. LEXIS 33257 (E.D. Tex. 2017).
*Monroe Cty Empls. Retirement Syst., et al. v. The Southern Co., et al.*, LEXIS 142360 (N.D. Ga. 2019).
*Peil v. Speiser*, 806 F.2d 1154 (3d Cir. 1986).
*Pennsylvania Ave. Funds v. Inyx Inc.*, 2011 U.S. Dist. LEXIS 72999 (S.D.N.Y. 2011).
*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008).

**Appendix B**
**Materials Relied Upon**

**COURT DOCUMENTS, CONT'D.**

*Todd v. STAAR Surgical Co.*, 2017 U.S. Dist. LEXIS 1919 (C.D. Cal. 2017).

*Vinh Nguyen v. Radient Pharm. Corp.,* 287 F.R.D. 563 (C.D. Cal. 2012).

*W. Palm Beach Police Pension Fund v. DFC Global Corp., et al.*, 2016 WL 4138613 (E.D. Pa. 2016).

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).

*Wilson v. LSB Indus.*, 2018 U.S. Dist. LEXIS 138832 (S.D.N.Y. 2018).

**ACADEMIC PAPERS AND BOOKS**

Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 J. of Bus., Fin. and Accounting 429 (2002).

James F. Adams and Donald J. Smith, *Introduction to Fixed Income Valuation*, CFA Institute Level I Refresher Reading (2019).

Nihat Aktas, Eric de Bodt, and Jean-Gabriel Cousin, *Event Studies with a Contaminated Estimation Period*, 13 Jnl. Corp. Fin. 129 (2007).

Carol Alexander, *Market Models: A Guide to Financial Data Analysis* (John Wiley & Sons 2001).

Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stock Efficiency*, 19 J. Corp. L. 285 (Winter 1994).

William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research 67 (1968).

Hendrik Bessembinder, Kathleen M. Kahle, William F. Maxwell and Danielle Xu, *Measuring Abnormal Bond Performance*, 22 Rev. Finl Stds. 4219 (2009).

Fischer Black and Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. Political Econ. 637 (1973).

Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, Ch. 14, 468-469 (McGraw-Hill, Irwin, 10th ed. 2013).

Ekkehart Boehmer, Jim Masumeci, & Annette B. Poulsen. *Event-study methodology under conditions of event-induced variance*, 30 J. Fin. Econ. 253 (1991).

Michael J. Brennan, Narasimhan Jegadeesh, and Bhaskaran Swaminathan, *Investment Analysis and the Adjustment of Stock Prices to Common Information*, 6 Rev. of Fin. Stds. 799 (1993).

G. E. P. Box & G. C. Tiao, *Intervention Analysis with Applications to Economic and Environmental Problems*, 70 J. Am. Stat. Assn., 70 (1975).

Fang Cai, Song Han, and Dan Li, *Institutional Herding in the Corporate Bond Market*, Board of Governors of the Federal Reserve System, International Finance Discussion Papers, Number 1071, December 2012.

J. Campbell, A. Lo and Craig MacKinlay, The Econometrics of Financial Markets (Princeton University Press, 1997).

Kee H.Chung & Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. of Fin. Markets 94 (2014).

K. Cohen et al., *Implications of Microstructure Theory on Empirical Research on Stock Price Behavior*, 35 J. Fin., 249 (1980).

K. Cohen et al., *On the Existence of Serial Correlation in an Efficient Securities Market*, 11 TIMS Stds. Mngmt. Sci., 151 (1979).

Nicholas I. Crew, Kevin L. Gold and Marnie A. Moore, *Federal Securities Acts and Areas of Expert Analysis*, Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, Wiley (2012).

Harry DeAngelo and Ronald W. Masulis, *Leverage and Dividend Irrelevancy under Personal and Corporate Taxation*, 35 J. Fin., 453-64 (1980).

Darrell Duffie and Kenneth J. Singleton, *Modeling Term Structures of Defaultable Bonds*, 12 Rev. of Finl. Stds., 687 (1999).

Edwin J. Elton, Martin J. Gruber, Deepak Agrawal, and Christopher Mann, *Factors Affecting the Valuation of Corporate Bonds*, 28 J. Banking and Fin., 2747-67 (2004).

Frank J. Fabozzi and Steven V. Mann, The Handbook of Fixed Income Securities, Seventh Edition, McGraw-Hill Education (2005).

Ray Fair, *Events That Shook the Market*, 75 Jnl. of Bus. 713 (2002).

Eugene Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

Eugene Fama, *Efficient Capital Markets: II*, 46 J. Fin. 1575 (1991).

Eugene Fama, *Market Efficiency, Long-Term Returns, and Behavioral Finance*, 49 J. Fin. Econ. 283 (1998).

Eugene F. Fama and Kenneth R. French, *Common risk factors in the returns on stocks and bonds*, 33 J. Fin. Econ. 3-56 (1993).

Jill E. Fisch, *The Role and Regulation of the Research Analyst*, Research Handbook on the Economics of Corporate Law, Edgar Elgar Publishing (2012).

Michael A. Goldstein, Edith S. Hotchkiss and Erik R. Sirri, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, 20 Rev. of Finl. Studies, 235 (2007).

William H. Greene, Econometric Analysis (Prentice Hall, 2d ed. 1993).

**Appendix B**
**Materials Relied Upon**

<u>**ACADEMIC PAPERS AND BOOKS, CONT'D.**</u>

George Handjinicolaou and Avner Kalay, *Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders around Dividend Announcements*, 13 J. Fin. Econ. 35 (1984).

Lawrence Harris, *The Homogenization of US Equity Trading*, Working Paper, September 30, 2011.

Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (Oxford University Press, 2003).

L. Harris, *Estimation of stock price variances and serial covariances from discrete observations*, 25 Journal of Financial and Quantitative Analysis, 291 (1990).

Michael L. Hartzmark, Cindy A. Schipani, and H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev. 654 (2011).

Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415 (Winter 2012).

Michael L. Hartzmark and H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev. 149 (Spring 2014).

Glenn V. Henderson, Jr., *Problems and Solutions in Conducting Event Studies*, 57 Jnl. of Risk and Ins. 282 (June 1990).

John C. Hull, Options, Futures, and Other Derivatives, 211 (7th ed. 2009).

Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109 (1987).

Simon H. Kwan, *Firm-Specific Information and the Correlation between Individual Stocks and Bonds*, 40 J. Fin. Econ. 63 (1996).

David F. Larcker, Lawrence A. Gordon & George E. Pinches, *Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis*, 15 J. Fin. & Quant. Analysis 267 (1980).

Sriketan Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko and Gaurav Mallik, *Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds*, 88 J. Fin. Econ. 272-298 (2008).

Paul H. Malatesta, *Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares*, 21 J. Fin. & Quant. Analysis, 27 (1986).

Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives 59 (2003).

Ronald W. Masulis, *The Effects of Capital Structure Change on Security Prices*, 8 J. Fin. Econ. 139 (1980).

William F. Maxwell and Clifford P. Stephens, *The Wealth Effects of Repurchases on Bondholders*, 58 J. Fin. 895 (2003).

Robert C. Merton, *On the Pricing of Corporate Debt: The Risk Structure of Interest Rates*, 29 J. Fin., 449 (1974).

Merton H. Miller, *Debt and Taxes*, 32 J. Fin., 261-75 (1977).

Merton H. Miller and Myron S. Scholes, *Dividends and Taxes*, 6 J. Fin. Econ., 333-64 (1978).

Dale Morse, *Wall Street Journal Announcements and the Securities Markets*, 38 Fin. Analysts Jnl. 69 (1982).

Mahesh Pritamani and Vijay Singal, *Return Predictability Following Large Price Changes and Information Releases*, 25 Jnl. of Banking & Fin. 631 (2001).

R. Roll, *A simple implicit measure of the effective bid-ask spread in an efficient market*, 39 J. Fin., 1127 (1984).

M. Scholes and J. Williams, *Estimating Betas From Nonsynchronous Data*, 5 Jnl. Fin. Econ., 309 (1977).

Paul Schultz, *Corporate Bond Trading Costs: A Peek Behind the Curtain*, 56 J. Fin. 677 (2001).

G. William Schwert, *Anomalies and Market Efficiency*, in *Handbook of the Economics of Finance* (G. Constantinides, et al., eds., 2003).

David Tabak, *Inflation and Damages in a Post-Dura World*, NERA white paper, September 25, 2007.

<u>**DATA**</u>

Bloomberg stock price, dividend and volume data for Navient Corporation common stock, April 2014 – January 2016.

Bloomberg price, coupon and volume data for Navient Corporation 2043 Note (CUSIP 63938C405), April 2014 – January 2016.

Quarterly institutional holdings in Navient Corporation common stock, June 30, 2014 – September 30, 2015, from S&P Capital IQ.

Quarterly institutional holdings for CUSIPs 63938C405, 63938CAA6, 63938CAB4, 63938CAC2, 78442FAX6, 78442FAZ1, 78442FEH7, 78442FEJ3, 78442FEL8, 78442FEQ7, 78442FER5, 78442FES3, 78442FET1 (the "Navient Exemplar Notes") June 30, 2014 – September 30, 2015, from Bloomberg.

Miscellaneous stock return index data, April 2014 – January 2016, from Bloomberg: the S&P 500 Total Return Index (SPTR Index), the S&P Supercomposite Consumer Finance Sub Industry Total Return Index (STRCFIN Index), and the S&P 500 Financial Sector Total Return Index (SPTRFINL Index).

Miscellaneous bond index data, April 2014 – January 2016, from Bloomberg: the ICE BofAML 3-5 Year BB US Cash Pay High Yield Index (J2A1); the ICE BofAML 5-7 Year BB US Cash Pay High Yield Index (J3A1); the ICE BofAML 7-10 Year BB US Cash Pay High Yield Index (J4A1); the ICE BofAML 15+ Year BB US Cash Pay High Yield Index (J4A1).

**Appendix B**
**Materials Relied Upon**

**DATA, CONT'D.**

Bloomberg Treasury Notes prices: 912828QT0; 912828QT0; 912828B33; 912828TC4; 912828UV0; 912828WC0; 912828C57; 912828SF8; 912810EP9; 912828B66; 912810ES3; 912810FP8; and 912810RD2.

Daily weights of Navient Corporation common stock in the S&P Supercomposite Consumer Finance Sub Industry Total Return Index and the S&P 500 Financial Sector Total Return Index, April 2014 – January 2016, from Bloomberg.

Bloomberg short interest in Navient Corporation common stock, April 2014 – January 2016.

Bloomberg bid and ask prices for Navient Corporation common stock and CUSIP 63938C405, April 2014 – January 2016.

Bloomberg broker volume for Navient Corporation common stock, May 2014 – September 2015.

Bloomberg total analyst recommendations for Navient Corporation common stock, April 2014 – January 2016.

Number of analysts providing consensus I/B/E/S estimates for Navient Corporation common stock, April 2014 – January 2016, from S&P Capital IQ.

Date and time stamps for Navient Corporation earnings releases (including announcements of preliminary results and earnings updates), April 2014 – September 2015, from GlobeNewswire available on Factiva and SEC Form 8-Ks.

Daily option data (Individual Options Contracts Volatilities (RawIV)** dataset), May 1, 2014 – September 29, 2015, from Ivolatility.

Daily Interest Rate Data from Federal Reserve, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H.15.

List of common stocks on the NYSE or NASDAQ, market capitalization, bid price, ask price, total analyst recommendations, Primary Security Composite Exchange Code of members at the end of 2014 from Bloomberg.

List of common stocks on the NYSE or NASDAQ, market capitalization, Primary Security Composite Exchange Code of members on April 17, 2014, and September 28, 2015 from Bloomberg.

TRACE data supplied by FINRA (excel workbooks) pursuant to subpoena for CUSIPs 63938CAA6, 63938CAB4, 63938CAC2, 78442FAQ1, 78442FAX6, 78442FAZ1, 78442FCD8, 78442FEH7, 78442FEK0, 78442FEL8, 78442FEM6, 78442FEN4, 78442FEQ7, 78442FER5, 78442FES3, 78442FET1; excel workbook supplied by FINRA pursuant to subpoena entitled "Trade Data Fields and Definitions for CA Bonds (DIVER-CA Trade Details) May172019.xlsx."

Amount outstanding for Navient Exemplar Notes from Bloomberg, April 2014 – October 2015.

**MISCELLANEOUS**

Designated Market Makers, https://www.nyse.com/market-model.

Division of Market Regulation: Responses to Frequently Asked Questions Concerning Rule 612 (Minimum Pricing Increment) of Regulation NMS, https://www.sec.gov/divisions/marketreg/subpenny612faq.htm.

"How LEAPS® Work," The Options Industry Council, FAQ 7.8, https://www.optionseducation.org/optionsoverview/how-leaps-work.

http://www.cboe.com/education/getting-started/quick-facts/options-marketplace.

http://www.cboe.com/trading-resources/symbol-directory/equity-index-leaps-options?sid=U.

http://www.cboe.com/us/options#.

www.finra.org/industry/trace.

www.finra.org/industry/trace/corporate-bond-data.

http://www.finra.org/industry/trace/trace-fact-book.

http://www.nasdaq.com/about/Top_Tier_Splash.stm.

"LEAPS® & Expiration Cycles, What are Expiration Cycles?" The Options Industry Council, FAQ 11.2.2, https://www.optionseducation.org/referencelibrary/faq/leaps-and-expiration-cycles.

Market Model, https://www.nyse.com/market-model.

Miscellaneous Bloomberg information regarding Navient Corporation securities.

NASDAQ Initial Listing Guide, January 2019, https://listingcenter.nasdaq.com/assets/initialguide.pdf.

Nasdaq, Inc., SEC Form 10-K for fiscal year ending December 31, 2015.

Rules of Cboe Exchange, Inc., updated May 17, 2019, https://www.cboe.com/publish/cboe-rules/cboe-exchange-inc-rule-book.pdf.

SEC Form S-3, "Registration Statement under the Securities Act of 1933," General Instructions (updated November 2018).

SEC Securities Act Release No. 6235, 45 FR 63,693 (1980).

The Options Clearing Corporation ("OCC") 2017 Annual Report.

U.S. Securities and Exchange Commission: Division of Investment Management: Frequently Asked Questions About Form 13F, March 15, 2017, http://www.sec.gov/divisions/investment/13ffaq.htm.

"Weekly Options," The Options Industry Council, FAQ 11.2.10, https://www.optionseducation.org/referencelibrary/faq/weekly-options.

"What is OCC?" https://www.theocc.com/about/ corporate-information/what-is-occ.jsp.

**Appendix B**
**Materials Relied Upon**

**<u>MISCELLANEOUS, CONT'D.</u>**
Private Securities Litigation Reform Act of 1995.
Securities Act of 1933.
Securities Exchange Act of 1934.
17 C.F.R § 240.10b-5 (2011).
15 U.S.C. §§ 78p(b), 78p(c), 78p(a) (2011).
15 U.S.C. § 78u-4(e)(1).


All other specific materials and information otherwise described or set forth in the body of this Report, Exhibits or
      Appendices.

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 4/17/2014 Thu | 951,088 | $16.99 | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 04/17/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 04/17/2014) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 04/17/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 04/17/2014) |
| | | | | | | | | | | | **Fitch Plans to Withdraw SLM Corporation's Ratings** (Business Wire - Bloomberg, 04/17/2014 09:40 AM) |
| | | | | | | | | | | | ***TRADING HALTED:(NAVIV) Due to Limit-Up Limit-Down Trading Pause** (BLOOMBERG News - Bloomberg, 04/17/2014 09:53 AM) |
| | | | | | | | | | | | ***TRADING RELEASED/RESUMED:(NAVIV) Reason Not Available** (BLOOMBERG News - Bloomberg, 04/17/2014 09:58 AM) |
| 4/18/2014 Fri | | | | | | | | | | | **Fitch to withdraw SLM ratings** (SNL Financial Services Daily - Factiva, 04/18/2014) |
| | | | | | | | | | | | **Sallie Mae names CFO for stand-alone consumer banking business** (SNL Financial Services Daily - Factiva, 04/18/2014) |
| 4/19/2014 Sat | | | | | | | | | | | |
| 4/20/2014 Sun | | | | | | | | | | | |
| 4/21/2014 Mon | 444,213 | $16.82 | -1.00% | 0.38% | -0.09% | 0.27% | -1.27% | -1.35 | 18.12% | -$0.22 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 04/21/2014) |
| 4/22/2014 Tue | 576,707 | $16.80 | -0.12% | 0.41% | -0.14% | 0.28% | -0.40% | -0.42 | 67.36% | -$0.07 | **NAVIENT CORP S-1** (SEC - SEC Edgar, 04/22/2014) |
| | | | | | | | | | | | ***NAVIENT FILES TO OFFER 10M SHRS IN OMNIBUS INCENTIVE PLAN** (BLOOMBERG News - Bloomberg, 04/22/2014 09:22 AM) |
| 4/23/2014 Wed | 1,608,932 | $16.78 | -0.12% | -0.21% | 0.06% | -0.13% | 0.01% | 0.01 | 98.93% | $0.00 | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Predicted Abnormal | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 04/23/2014) |
| 4/24/2014 Thu | 368,892 | $16.63 | -0.89% | 0.17% | -0.10% | 0.11% | -1.01% | -1.07 | 28.74% | -$0.17 | **FORM 8-K: SLM FILES CURRENT REPORT** (US Fed News - Factiva, 04/24/2014) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 04/24/2014) |
| | | | | | | | | | | | **S&P Dow Jones Indices: Navient, Under Armour Set to Join the S&P 500; SLM, PolyOne to Join S&P MidCap 400; Aceto to Join S&P SmallCap 600** (India Banking News - Factiva, 04/24/2014) |
| | | | | | | | | | | | **S&P 500 Adds Navient, Under Armour; Navient Replaces SLM, Under Armour Replaces Beam in Index** (The Wall Street Journal Online - Factiva, 04/24/2014 01:52 PM) |
| | | | | | | | | | | | ***NAVIENT, UNDER ARMOUR TO JOIN S&P 500** (Bloomberg First Word - Bloomberg, 04/24/2014 05:16 PM) |
| | | | | | | | | | | | ***NAVIENT, UNDER ARMOUR SET TO JOIN THE S&P 500** (BLOOMBERG News - Bloomberg, 04/24/2014 05:16 PM) |
| | | | | | | | | | | | ***NAVIENT, UNDER ARMOUR SET TO JOIN S&P 500** (Bloomberg First Word - Bloomberg, 04/24/2014 05:16 PM) |
| | | | | | | | | | | | ***NAVIENT TO REPLACE SLM CORP IN THE S&P 500** (BLOOMBERG News - Bloomberg, 04/24/2014 05:17 PM) |
| | | | | | | | | | | | **Navient, Under Armour to Replace SLM, Beam in S&P 500** (Bloomberg First Word - Bloomberg, 04/24/2014 05:19 PM) |
| | | | | | | | | | | | **BRIEF-S&P 500 to add Under Armour, Navient** (Reuters News - Factiva, 04/24/2014 05:22 PM) |
| | | | | | | | | | | | ***S&P: Navient Corp. To Replace SLM Corp. in S&P 500 Index** (Dow Jones Institutional News - Factiva, 04/24/2014 05:28 PM) |
| | | | | | | | | | | | **MW Under Armour, Navient to join S&P 500** (MarketWatch - Factiva, 04/24/2014 05:44 PM) |
| | | | | | | | | | | | **S&P 500 Adds Navient, Under Armour** (Dow Jones Top News & Commentary - Factiva, 04/24/2014 05:53 PM) |
| | | | | | | | | | | | **Navient, Under Armour Set to Join the S&P 500; SLM, PolyOne to Join S&P MidCap 400; Aceto to Join S&P SmallCap 600** (PR Newswire (U.S.) - Factiva, 04/24/2014 06:06 PM) |
| | | | | | | | | | | | **Press Release: Navient, Under Armour Set to Join the S&P 500; SLM, PolyOne to Join S&P MidCap 400; Aceto to Join S&P SmallCap 600** (Dow Jones Institutional News - Factiva, 04/24/2014 06:06 PM) |
| 4/25/2014 Fri | 1,086,546 | $16.89 | 1.56% | -0.81% | -0.05% | -0.61% | 2.17% | 2.30 | 2.33% * | $0.36 | **U.S. PRE-MARKET MOVERS: CAMP CUDA CVLT CYTK GIMO MKTO P RGDO** (Bloomberg First Word - Bloomberg, 04/25/2014 08:40 AM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 4/26/2014 Sat | | | | | | | | | | | **M&A WATCH NORTH AMERICA: Clean Harbors, Nokia, Shire** (Bloomberg First Word - Bloomberg, 04/25/2014 09:29 AM) |
| | | | | | | | | | | | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 04/26/2014) |
| 4/27/2014 Sun | | | | | | | | | | | **Sallie Mae splits into two this week** (The Philadelphia Inquirer - Factiva, 04/27/2014) |
| 4/28/2014 Mon | 1,187,928 | $16.67 | -1.30% | 0.33% | -0.36% | 0.17% | -1.47% | -1.56 | 12.18% | -$0.25 | **NAVIENT CORP S-3ASR** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-8** (SEC - SEC Edgar, 04/28/2014) |
| | | | | | | | | | | | **\*NAVIENT FILES AUTOMATIC SHELF REGISTRATION** (BLOOMBERG News - Bloomberg, 04/28/2014 05:19 PM) |
| | | | | | | | | | | | **\*NAVIENT REGISTERS 10M SHRS UNDER 2014 OMNIBUS INCENTIVE PLAN** (BLOOMBERG News - Bloomberg, 04/28/2014 05:20 PM) |
| 4/29/2014 Tue | 648,522 | $16.68 | 0.06% | 0.48% | 0.13% | 0.39% | -0.33% | -0.35 | 72.46% | -$0.06 | **NAVIENT CORP EFFECT** (SEC - SEC Edgar, 04/29/2014) |
| | | | | | | | | | | | **NAVIENT CORP FILES FORM S-8 WITH SEC REGARDING SECURITIES TO BE OFFERED TO EMPLOYEES IN EMPLOYEE BENEFIT PLANS** (US Fed News - Factiva, 04/29/2014) |
| 4/30/2014 Wed | 26,746,201 | $16.55 | -0.78% | 0.30% | -0.33% | 0.15% | -0.93% | -0.99 | 32.47% | -$0.16 | **Compass Point Research Report** (Compass Point - Manual Entry, 04/30/2014) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 04/30/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 04/30/2014) |
| | | | | | | | | | | | **Moody's Research Report** (Moody's - Manual Entry, 04/30/2014) |
| | | | | | | | | | | | **Moody's concludes review of SLM Corp.** (Moody's Investors Service Press Release - Factiva, 04/30/2014) |
| | | | | | | | | | | | **\*NAVIENT CORP. RATED NEW BUY AT COMPASS POINT, PT $19** (Bloomberg First Word - Bloomberg, 04/30/2014 05:39 AM) |
| | | | | | | | | | | | **U.S. PRE-MARKET MOVERS: CBRL EBAY ENR GFIG HDS LVLT NCR PNRA POM** (Bloomberg First Word - Bloomberg, 04/30/2014 08:58 AM) |
| | | | | | | | | | | | **Navient Corp Rated New 'Buy' at Compass Point** (BLOOMBERG News - Bloomberg, 04/30/2014 09:20 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **\*MOODY'S CONCLUDES REVIEW OF SLM** (BLOOMBERG News - Bloomberg, 04/30/2014 04:32 PM) |
| | | | | | | | | | | | **\*NAVIENT CUT TO Ba3 FROM Ba1 BY MOODY'S** (BLOOMBERG News - Bloomberg, 04/30/2014 04:33 PM) |
| | | | | | | | | | | | **\*NAVIENT S-T RATING AFFIRMED BY MOODY'S** (BLOOMBERG News - Bloomberg, 04/30/2014 04:33 PM) |
| | | | | | | | | | | | **\*Fitch Rates Navient Corp 'BB'; Downgrades and Withdraws SLM Corp. at 'BB'** (Dow Jones Institutional News - Factiva, 04/30/2014 04:41 PM) |
| | | | | | | | | | | | **\*FITCH RATES NAVIENT CORP 'BB'; DWNGRS, W/DS SLM AT 'BB'** (BLOOMBERG News - Bloomberg, 04/30/2014 04:41 PM) |
| | | | | | | | | | | | **\*NAVIENT CORP. OUTLOOK STABLE BY FITCH** (BLOOMBERG News - Bloomberg, 04/30/2014 04:42 PM) |
| | | | | | | | | | | | **Fitch Rates Navient Corp 'BB'; Downgrades and Withdraws SLM Corp. at 'BB'** (Business Wire - Bloomberg, 04/30/2014 05:22 PM) |
| | | | | | | | | | | | **Fitch Rates Navient Corp 'BB'; Downgrades and Withdraws SLM Corp. at 'BB'** (Business Wire - Factiva, 04/30/2014 05:22 PM) |
| | | | | | | | | | | | **\*S&P Lowers Rtgs On SLM Corp. (Navient) To 'BB' From 'BBB-'** (Dow Jones Institutional News - Factiva, 04/30/2014 07:09 PM) |
| | | | | | | | | | | | **SLM Corp. Cut to Junk by S&P** (Bloomberg First Word - Bloomberg, 04/30/2014 07:13 PM) |
| 5/1/2014 Thu | 3,650,133 | $17.00 | 2.72% | -0.01% | 0.04% | 0.01% | 2.71% | 2.87 | 0.49% \*\* | $0.45 | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 05/01/2014) |
| | | | | | | | | | | | **\*NAVIENT CORP. RATED NEW EQUALWEIGHT AT EVERCORE, PT $17** (Bloomberg First Word - Bloomberg, 05/01/2014 04:53 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP. RATED NEW OUTPERFORM AT CREDIT SUISSE, PT $E19** (Bloomberg First Word - Bloomberg, 05/01/2014 07:30 AM) |
| | | | | | | | | | | | **UPDATE: Credit Suisse Initiates Coverage On SLM As Growth Engine Is Worth A Premium** (Benzinga.com - Factiva, 05/01/2014 08:49 AM) |
| | | | | | | | | | | | **U.S. PRE-MARKET MOVERS: ARII AVP ELX JDSU MACK PACB THRM WTW** (Bloomberg First Word - Bloomberg, 05/01/2014 08:56 AM) |
| | | | | | | | | | | | **Navient Celebrates Launch as New Leader in Loan Servicing and Asset Recovery, Dedicated to Helping Customers Navigate the Path to Financial Success** (GlobeNewswire - Factiva, 05/01/2014 08:58 AM) |
| | | | | | | | | | | | **Navient Celebrates Launch as New Leader in Loan Servicing and Asset Recovery, Dedicated to Helping Customers Navigate the Path** (PrimeZone Media Network - Bloomberg, 05/01/2014 08:58 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 5/2/2014 Fri | 2,995,032 | $16.95 | -0.29% | -0.14% | 0.87% | 0.12% | -0.41% | -0.44 | 66.38% | -$0.07 | *News On Navient Corp. (NAVIV) Now Under NAVI (Dow Jones Institutional News - Factiva, 05/01/2014 05:08 PM) |
| | | | | | | | | | | | Barclays Research Report (Barclays - Manual Entry, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | NAVIENT CORP 8-K (SEC - SEC Edgar, 05/02/2014) |
| | | | | | | | | | | | R.W. PRESSPRICH Research Report (R.W. PRESSPRICH - Manual Entry, 05/02/2014) |
| | | | | | | | | | | | *NAVIENT CORP. RATED NEW EQUALWEIGHT AT BARCLAYS, PT $18 (Bloomberg First Word - Bloomberg, 05/02/2014 04:54 AM) |
| | | | | | | | | | | | Navient Files 8K - Changes Exec Mgmt >NAVI (Dow Jones Institutional News - Factiva, 05/02/2014 05:28 PM) |
| | | | | | | | | | | | Navient Files 8K - Entry Into Definitive Agreement >NAVI (Dow Jones Institutional News - Factiva, 05/02/2014 05:28 PM) |
| | | | | | | | | | | | Navient Files 8K - Other Events >NAVI (Dow Jones Institutional News - Factiva, 05/02/2014 05:28 PM) |
| | | | | | | | | | | | Sallie Mae Files 8K - Entry Into Definitive Agreement >SLM (Dow Jones Institutional News - Factiva, 05/02/2014 05:29 PM) |
| | | | | | | | | | | | Slm Corp, 10% Owner, Disposes 422,739,339 NAVI US 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:52 PM) |
| | | | | | | | | | | | Torre Bates Ann, Director, Acquires 12,611 NAVI US 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:53 PM) |
| | | | | | | | | | | | Diefenderfer William M Iii, Director, Acquires 94,286 NAVI US 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:55 PM) |
| | | | | | | | | | | | Suitt Gilleland Diane, Director, Acquires 98,495 NAVI US 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:57 PM) |
| | | | | | | | | | | | Shapiro Steven L, Director, Acquires 151,175 NAVI 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:58 PM) |
| | | | | | | | | | | | Munitz Barry A, Director, Acquires 34,345 NAVI US 04/30/14 (BLOOMBERG News - Bloomberg, 05/02/2014 09:59 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 5/3/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-12B, Registration of Securities [Section 12(B)] [Amend] (Apr. 10, 2014)** (Investment Weekly News - Factiva, 05/03/2014) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Apr. 16, 2014)** (Investment Weekly News - Factiva, 05/03/2014) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form CERTNAS, Certification By The National Association of Securities Dealers Automated Quotation Approving Securities For Listing (Apr. 10, 2014)** (Investment Weekly News - Factiva, 05/03/2014) |
| 5/4/2014 Sun | | | | | | | | | | | |
| 5/5/2014 Mon | 3,978,423 | $16.81 | -0.83% | 0.19% | -0.02% | 0.15% | -0.97% | -1.03 | 30.39% | -$0.17 | **Fitch Rates Navient Corp 'BB'; Downgrades and Withdraws SLM Corp. at 'BB'** (Entertainment Close-Up - Factiva, 05/05/2014) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 05/05/2014) |
| | | | | | | | | | | | **KBW sees ways for Navient to beat expectations** (SNL Financial Services Daily - Factiva, 05/05/2014) |
| | | | | | | | | | | | **Moody's affirms ratings of 475 classes of notes issued in Sallie Mae's FFELP and private student loan securitizations** (Moody's Investors Service Press Release - Factiva, 05/05/2014) |
| | | | | | | | | | | | **Moody's downgrades Navient unit** (SNL Financial Services Daily - Factiva, 05/05/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2014) |
| | | | | | | | | | | | **Navient Corp announces William M. Diefenderfer III as chairman** (Reuters Significant Developments - Factiva, 05/05/2014) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 05/05/2014 09:34 AM) |
| | | | | | | | | | | | **Navient announces William M. Diefenderfer III as chairman, names directors** (GlobeNewswire - Factiva, 05/05/2014 01:15 PM) |
| | | | | | | | | | | | **\*NAVIENT REPORTS WILLIAM M. DIEFENDERFER III AS CHAIRMAN, NAMES** (BLOOMBERG News - Bloomberg, 05/05/2014 01:15 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Navient announces William M. Diefenderfer III as chairman, names directors** (PrimeZone Media Network - Bloomberg, 05/05/2014 01:15 PM) |
| | | | | | | | | | | | **\*MOODY'S AFFIRMS RATINGS OF 475 CLASSES OF NOTES ISSUED IN** (BLOOMBERG News - Bloomberg, 05/05/2014 04:06 PM) |
| | | | | | | | | | | | **Williams Barry Lawson, Director, Acquires 41,005 NAVI 04/30/14** (BLOOMBERG News - Bloomberg, 05/05/2014 05:19 PM) |
| | | | | | | | | | | | **Chivavibul Somsak, CFO, Acquires 145,532.47 NAVI US 04/30/14-05/01/14** (BLOOMBERG News - Bloomberg, 05/05/2014 05:21 PM) |
| | | | | | | | | | | | **Remondi John F, CEO, Acquires 927,350.97 NAVI US 04/30/14** (BLOOMBERG News - Bloomberg, 05/05/2014 05:22 PM) |
| | | | | | | | | | | | **Hynes Timothy J Iv, Chief Risk, Acquires 73,461.79 NAVI US 04/30/14-05/01/14** (BLOOMBERG News - Bloomberg, 05/05/2014 05:23 PM) |
| | | | | | | | | | | | **Kane John M, Chief Oper, Acquires 127,621.29 NAVI US 04/30/14-05/01/14** (BLOOMBERG News - Bloomberg, 05/05/2014 05:27 PM) |
| 5/6/2014 Tue | 14,309,226 | $16.34 | -2.80% | -0.90% | -0.20% | -0.70% | -2.09% | -2.22 | 2.86% * | -$0.35 | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 05/06/2014) |
| | | | | | | | | | | | **Navient names chairman, board members** (SNL Financial Services Daily - Factiva, 05/06/2014) |
| | | | | | | | | | | | **SLM ratings affirmed post-split** (Structured Credit Investor - Factiva, 05/06/2014) |
| | | | | | | | | | | | **Warren's Student Loan Bill Unlikely to Pass in 2014: Boltansky** (Bloomberg First Word - Bloomberg, 05/06/2014 09:26 AM) |
| | | | | | | | | | | | **Warren Introduces Student Loan Refinancing Bill** (Bloomberg First Word - Bloomberg, 05/06/2014 11:22 AM) |
| | | | | | | | | | | | **Sallie Mae Files 8K - Asset Acquisition Or Disposition >SLM** (Dow Jones Institutional News - Factiva, 05/06/2014 04:51 PM) |
| | | | | | | | | | | | **Sallie Mae Files 8K - Other Events >SLM** (Dow Jones Institutional News - Factiva, 05/06/2014 04:51 PM) |
| 5/7/2014 Wed | 5,692,881 | $16.60 | 1.59% | 0.60% | 1.32% | 0.77% | 0.82% | 0.87 | 38.85% | $0.13 | |
| 5/8/2014 Thu | 5,668,216 | $16.45 | -0.90% | -0.11% | 0.77% | 0.11% | -1.01% | -1.08 | 28.44% | -$0.17 | **FORM 8-K: SLM FILES CURRENT REPORT** (US Fed News - Factiva, 05/08/2014) |
| 5/9/2014 Fri | 2,797,016 | $16.28 | -1.03% | 0.17% | 0.14% | 0.17% | -1.20% | -1.27 | 20.53% | -$0.20 | **NAVIENT CORP 10-Q** (SEC - SEC Edgar, 05/09/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 05/09/2014) |
| | | | | | | | | | | | **ABS: SL Refi Bill Potential Hit on Navient 'Manageable,' Fitch** (Bloomberg First Word - Bloomberg, 05/09/2014 03:13 PM) |
| | | | | | | | | | | | **SLM, Navient to Pay More to Resolve Overcharges Case; Two Investigations Had Been Looking Into Loan Fees for Military Personnel, Other Consumers** (The Wall Street Journal Online - Factiva, 05/09/2014 03:20 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | *NAVI SEES FDIC REQUIRING LATE FEE REFUNDS (BLOOMBERG News - Bloomberg, 05/09/2014 05:16 PM) |
| | | | | | | | | | | | *NAVI TO FUND $30M RESTITUTION RESERVE ACCOUNT (BLOOMBERG News - Bloomberg, 05/09/2014 05:16 PM) |
| | | | | | | | | | | | *NAVI ESTIMATES VOLUNTARILY RESTITUTION REFUNDS AT $42M (BLOOMBERG News - Bloomberg, 05/09/2014 05:17 PM) |
| | | | | | | | | | | | *SLM CORP 1Q TO INCLUDE $103M CHARGE FOR PENDING SETTLEMENTS (BLOOMBERG News - Bloomberg, 05/09/2014 05:18 PM) |
| | | | | | | | | | | | *NAVI: NSI, SALLIE MAE BANK ENGAGED IN SETTLEMENT TALKS (BLOOMBERG News - Bloomberg, 05/09/2014 05:18 PM) |
| | | | | | | | | | | | *NAVI: NSI, SALLIE MAE BANK ENGAGED IN SETTLEMENT TALKS W/DOJ (BLOOMBERG News - Bloomberg, 05/09/2014 05:19 PM) |
| | | | | | | | | | | | *NAVI: NSI WOULD BE REQUIRED TO FUND $60M SETTLEMENT FUND (BLOOMBERG News - Bloomberg, 05/09/2014 05:20 PM) |
| 5/10/2014 Sat | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 3, Initial Statement of Beneficial Ownership of Securities (Apr. 23, 2014) (Investment Weekly News - Factiva, 05/10/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Apr. 17, 2014) (Investment Weekly News - Factiva, 05/10/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form S-1, General Form For Registration of Securities Under The Securities Act of 1933 (Apr. 22, 2014) (Investment Weekly News - Factiva, 05/10/2014) |
| 5/11/2014 Sun | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 05/11/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 05/11/2014) |
| 5/12/2014 Mon | 6,980,098 | $15.95 | -2.03% | 0.97% | 0.33% | 0.81% | -2.84% | -3.01 | 0.32% ** | -$0.46 | Additional Q1 charge of $103M hits Sallie Mae earnings (SNL Financial Services Daily - Factiva, 05/12/2014) |
| | | | | | | | | | | | Buckingham Research Research Report (Buckingham Research - Manual Entry, 05/12/2014) |
| | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 05/12/2014) |
| | | | | | | | | | | | Credit Suisse Research Report (Credit Suisse - Manual Entry, 05/12/2014) |
| | | | | | | | | | | | *NAVIENT CORP. RATED NEW BUY AT BUCKINGHAM, PT $22.50 (Bloomberg First Word - Bloomberg, 05/12/2014 08:29 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Industry Return | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 5/13/2014 Tue | 8,292,045 | $15.85 | -0.63% | 0.07% | -0.69% | -0.11% | -0.52% | -0.55 | 58.29% | -$0.08 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 05/12/2014 09:00 AM) |
| | | | | | | | | | | | **FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act** (Federal Deposit Insurance Corporation Documents - Factiva, 05/13/2014) |
| | | | | | | | | | | | **Height Analytics Research Report** (Height Analytics - Manual Entry, 05/13/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 05/13/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 05/13/2014) |
| | | | | | | | | | | | **Sallie Mae Bank settles regulatory matters** (Theflyonthewall.com - Factiva, 05/13/2014) |
| | | | | | | | | | | | **Sallie Mae Fined $96 Million for Bilking Military on Student Loans** (ThinkAdvisor - Factiva, 05/13/2014) |
| | | | | | | | | | | | **Technical Notes on Active Equities -- Research on CSX Corp., NII Holdings, Navient, and Symantec** (PR Newswire (U.S.) - Factiva, 05/13/2014 12:28 PM) |
| | | | | | | | | | | | **Sallie Mae Bank Settles Previously Reported Regulatory Matters** (Business Wire - Bloomberg, 05/13/2014 01:45 PM) |
| | | | | | | | | | | | **Navient reaches agreements with FDIC and DOJ on regulatory matters** (GlobeNewswire - Factiva, 05/13/2014 02:08 PM) |
| | | | | | | | | | | | **\*NAVIENT REACHES PACTS W/ FDIC, DOJ ON REGULATORY MATTERS** (BLOOMBERG News - Bloomberg, 05/13/2014 02:08 PM) |
| | | | | | | | | | | | **Navient reaches agreements with FDIC and DOJ on regulatory matters** (PrimeZone Media Network - Bloomberg, 05/13/2014 02:08 PM) |
| | | | | | | | | | | | **\*NAVIENT REACHES PACTS W/ FDIC, DOJ ON REGULATORY MATTERS** (Bloomberg First Word - Bloomberg, 05/13/2014 02:10 PM) |
| | | | | | | | | | | | **Sallie Mae, Navient Reach Student-Loan Settlement** (Dow Jones Institutional News - Factiva, 05/13/2014 02:11 PM) |
| | | | | | | | | | | | **Sallie Mae, Navient Reach Student-Loan Settlement** (Dow Jones Top News & Commentary - Factiva, 05/13/2014 02:13 PM) |
| | | | | | | | | | | | **Sallie Mae to refund military members on student loans** (Reuters News - Factiva, 05/13/2014 02:27 PM) |
| | | | | | | | | | | | **Sallie Mae, Navient Reach Student-Loan Settlement** (Dow Jones Top North American Equities Stories - Factiva, 05/13/2014 02:34 PM) |
| | | | | | | | | | | | **Sallie Mae, Navient Reach Student-Loan Settlement** (Dow Jones Top North American Financial Services Stories - Factiva, 05/13/2014 02:34 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/14/2014 Wed | 4,577,476 | $15.74 | -0.69% | -0.45% | -0.68% | -0.49% | -0.20% | -0.22 | 82.89% | -$0.03 | **Sallie Mae, Navient Reach Student-Loan Settlement With U.S. Government; Firms to Pay Combined $97 Million to Settle Charges of Overcharging Military Members, Excessive Fees** (The Wall Street Journal Online - Factiva, 05/13/2014 02:51 PM)<br><br>**UPDATE 1-Sallie Mae to refund military members $60 mln for student loans** (Reuters News - Factiva, 05/13/2014 04:21 PM)<br><br>**Sallie Mae, Navient Reach Student-Loan Settlement -- Update** (Dow Jones Institutional News - Factiva, 05/13/2014 06:19 PM)<br><br>**Settlement Reached In Student-Loan Case** (Dow Jones Institutional News - Factiva, 05/13/2014 07:12 PM)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 05/14/2014)<br><br>**Global Finance: Settlement Reached in Student-Loan Case --- Sallie Mae, Navient Agree to Pay $97 Million to U.S. Over Allegations They Overcharged Members of Military Service** (The Wall Street Journal - Factiva, 05/14/2014)<br><br>**NAVIENT CORP 8-K** (SEC - SEC Edgar, 05/14/2014)<br><br>**Porsche sells first auto loan deal since 2011** (Euroweek - Factiva, 05/14/2014)<br><br>**Sallie Mae Bank settles previous regulatory issues** (Global Banking News - Factiva, 05/14/2014)<br><br>**Sallie Mae Bank Settles Previously Reported Regulatory Matters** (Insurance Broadcasting - Factiva, 05/14/2014)<br><br>**Sallie Mae Bank, Navient settle with FDIC, DOJ** (SNL Bank and Thrift Daily - Factiva, 05/14/2014)<br><br>**Sallie Mae Bank, Navient settle with FDIC, DOJ** (SNL Financial Services Daily - Factiva, 05/14/2014)<br><br>**Sallie Mae, Navient Reach Student-Loan Settlement With U.S. Government** (Financial Services Monitor Worldwide - Factiva, 05/14/2014)<br><br>**Sallie Mae, Navient to Pay $97M for Overcharging Service Members** (PaymentsSource - Factiva, 05/14/2014)<br><br>**Student lenders to pay $97M over military member loans** (Washington Business Journal Online - Factiva, 05/14/2014)<br><br>**Navient Files 8K - Other Events >NAVI** (Dow Jones Institutional News - Factiva, 05/14/2014 06:01 AM)<br><br>**\*NAVIENT CORP. PLANS TO SELL FIRST FFELP STUDENT LOAN ABS** (Bloomberg First Word - Bloomberg, 05/14/2014 12:48 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/15/2014 Thu | 4,919,040 | $15.74 | 0.00% | -0.92% | 0.35% | -0.59% | 0.59% | 0.62 | 53.41% | $0.09 | **Navient Corp. Plans to Sell First FFELP Student Loan ABS** (Bloomberg First Word - Bloomberg, 05/14/2014 12:54 PM)<br><br>**FORM 8-K: SLM FILES CURRENT REPORT** (US Fed News - Factiva, 05/15/2014)<br><br>**United States : FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act** (Mena Report - Factiva, 05/15/2014) |
| 5/16/2014 Fri | 2,786,872 | $15.86 | 0.76% | 0.38% | -0.63% | 0.14% | 0.63% | 0.66 | 50.80% | $0.10 | **ABS PIPELINE: Navient, Westlake Next Week; Nelnet is Priced** (Bloomberg First Word - Bloomberg, 05/15/2014 07:44 AM)<br><br>**NAVIENT CORP 8-K** (SEC - SEC Edgar, 05/16/2014)<br><br>**Sallie Mae Bank Resolves Previously Reported Regulatory Matters** (Professional Services Close-Up - Factiva, 05/16/2014)<br><br>**Financial Results, IT Services Agreement, Stock Movements, and Upcoming Investors Conferences - Analyst Notes on Rackspace, IBM, Navient, Leidos and Syntel** (PR Newswire (U.S.) - Factiva, 05/16/2014 07:30 AM)<br><br>**ABS PIPELINE: EdSouth is Marketing; Navient, Westlake Coming** (Bloomberg First Word - Bloomberg, 05/16/2014 07:33 AM)<br><br>**S&P 500 Stocks With Biggest Gap Between Market Price, Estimate** (BLOOMBERG News - Bloomberg, 05/16/2014 12:53 PM)<br><br>**S&P 500 Stocks Biggest Weekly Changes in Target Price** (BLOOMBERG News - Bloomberg, 05/16/2014 12:53 PM)<br><br>**Navient Files 8K - Changes Exec Mgmt >NAVI** (Dow Jones Institutional News - Factiva, 05/16/2014 04:55 PM) |
| 5/17/2014 Sat | | | | | | | | | | | **Sallie Mae Settles FDIC, DOJ Probe - Analyst Blog** (Financial Services Monitor Worldwide - Factiva, 05/17/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form S-3ASR, Automatic Shelf Registration Statement of Securities of Well-known Seasoned Issuers (Apr. 28, 2014)** (Investment Weekly News - Factiva, 05/17/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form S-8, Securities To Be Offered To Employees in Employee Benefit Plans (Apr. 28, 2014)** (Investment Weekly News - Factiva, 05/17/2014) |
| 5/18/2014 Sun | | | | | | | | | | | |
| 5/19/2014 Mon | 4,532,436 | $16.02 | 1.01% | 0.39% | 0.26% | 0.36% | 0.65% | 0.68 | 49.48% | $0.10 | **MarketLine Research Report** (Marketline - Manual Entry, 05/19/2014)<br><br>**ABS PIPELINE: Blackstone Rental Homes, Navient SL Bonds Coming** (Bloomberg First Word - Bloomberg, 05/19/2014 07:55 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 05/19/2014 08:09 AM) |
| | | | | | | | | | | | **Navient Announces $747m FFELP Student Loan ABS** (Bloomberg First Word - Bloomberg, 05/19/2014 08:26 AM) |
| | | | | | | | | | | | **Navient names Northrop Grummanexecutive Linda A. Mills to board of directors** (GlobeNewswire - Factiva, 05/19/2014 10:01 AM) |
| | | | | | | | | | | | **Navient names Northrop Grumman executive Linda A. Mills to board of directors** (PrimeZone Media Network - Bloomberg, 05/19/2014 10:01 AM) |
| | | | | | | | | | | | **Navient Said to Market $747 Million of Student Loan-Backed Debt** (BLOOMBERG News - Bloomberg, 05/19/2014 11:34 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP. MAY SELL 6.8Y STUDENT LOAN ABS AT 1ML+53-55** (Bloomberg First Word - Bloomberg, 05/19/2014 05:15 PM) |
| | | | | | | | | | | | **Navient May Sell 6.8Y Student Loan ABS at 1mL+53-55** (Bloomberg First Word - Bloomberg, 05/19/2014 05:19 PM) |
| 5/20/2014 Tue | 9,754,753 | $15.94 | -0.50% | -0.65% | -0.36% | -0.56% | 0.06% | 0.06 | 95.14% | $0.01 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 05/20/2014) |
| | | | | | | | | | | | **Navient names director** (SNL Financial Services Daily - Factiva, 05/20/2014) |
| | | | | | | | | | | | **Navient Corp Rated New 'Buy' at Janney Montgomery** (BLOOMBERG News - Bloomberg, 05/20/2014 06:24 AM) |
| | | | | | | | | | | | **\*NAVIENT RATED NEW BUY AT JANNEY CAPITAL, PT $18** (Bloomberg First Word - Bloomberg, 05/20/2014 06:40 AM) |
| | | | | | | | | | | | **ABS PIPELINE: Blackstone, Navient, Exeter, Westlake This Week** (Bloomberg First Word - Bloomberg, 05/20/2014 07:50 AM) |
| | | | | | | | | | | | **Benzinga's Top Initiations** (Benzinga.com - Factiva, 05/20/2014 08:06 AM) |
| | | | | | | | | | | | **U.S. PRE-MARKET MOVERS: ARNA ARX CLVS DKS DNDN EJ LIVE NTLS OPHT** (Bloomberg First Word - Bloomberg, 05/20/2014 08:42 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP. TO SELL 6.8Y STUDENT LOAN ABS AT 1ML+51** (Bloomberg First Word - Bloomberg, 05/20/2014 10:41 AM) |
| | | | | | | | | | | | **Navient to Sell 6.8Y Student Loan ABS at 1mL+51** (Bloomberg First Word - Bloomberg, 05/20/2014 10:43 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP. PRICES 6.8Y STUDENT LOAN ABS AT +51, AT PAR** (Bloomberg First Word - Bloomberg, 05/20/2014 12:26 PM) |
| | | | | | | | | | | | **Navient Corp. Prices 6.8y Student Loan ABS at +51, at Par** (Bloomberg First Word - Bloomberg, 05/20/2014 12:31 PM) |
| 5/21/2014 Wed | 1,743,568 | $15.93 | -0.06% | 0.83% | 0.39% | 0.72% | -0.78% | -0.83 | 41.10% | -$0.12 | **Janney Montgomery Scott initiates coverage of Navient Corp. at 'buy'** (SNL Financial Services Daily - Factiva, 05/21/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market Return | [6]<br>Excess Industry Return | [7]<br>Predicted Return | [8]<br>Abnormal Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal Price Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/22/2014 Thu | 2,128,896 | $15.97 | 0.25% | 0.25% | 0.10% | 0.22% | 0.03% | 0.03 | 97.28% | $0.01 | **Navient's valuation to benefit from FFELP loan acquisitions, says Janney Capital Markets** (SNL Financial Services Daily - Factiva, 05/21/2014)<br><br>**Sallie Mae Bank Voluntarily Settles Previously Reported Regulatory Matters** (Health & Beauty Close-Up - Factiva, 05/21/2014)<br><br>**ABS PIPELINE: Blackstone, Barclays Dryrock to Price** (Bloomberg First Word - Bloomberg, 05/21/2014 07:38 AM)<br><br>**Student Loan Refi Bills Unlikely to Pass Congress: BI Analyst** (Bloomberg First Word - Bloomberg, 05/21/2014 02:13 PM)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 05/22/2014)<br><br>**Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 05/22/2014)<br><br>**Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 05/22/2014)<br><br>**Navient announces $400 million share repurchase program, declares common stock dividend** (Reuters Significant Developments - Factiva, 05/22/2014)<br><br>**NAVIENT CORP 3** (SEC - SEC Edgar, 05/22/2014)<br><br>**ABS PIPELINE: Barclays Is Priced; Blackstone Next** (Bloomberg First Word - Bloomberg, 05/22/2014 07:47 AM)<br><br>***Fitch: Navient's Expected Future Cash Flows Offer Degree of Downside Protection** (Dow Jones Institutional News - Factiva, 05/22/2014 11:27 AM)<br><br>**Fitch: Navient's Expected Future Cash Flows Offer Degree of Downside Protection** (Business Wire - Factiva, 05/22/2014 11:50 AM)<br><br>**Fitch: Navient's Expected Future Cash Flows Offer Degree of Downside Protection** (Business Wire - Bloomberg, 05/22/2014 11:50 AM)<br><br>**Newly released results show Navient helps more federal student loan borrowers avoid default** (GlobeNewswire - Factiva, 05/22/2014 02:00 PM)<br><br>**Newly released results show Navient helps more federal student loan borrowers avoid default** (PrimeZone Media Network - Bloomberg, 05/22/2014 02:00 PM)<br><br>**Navient announces $400 million share repurchase program, declares common stock dividend** (GlobeNewswire - Factiva, 05/22/2014 04:32 PM)<br><br>***NAVIENT REPORTS $400M SHR REPURCHASE PROGRAM, DECLARES STOCK** (BLOOMBERG News - Bloomberg, 05/22/2014 04:32 PM)<br><br>**Navient announces $400 million share repurchase program, declares common stock dividend** (PrimeZone Media Network - Bloomberg, 05/22/2014 04:32 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1]<br><br>Date | [2]<br><br>Volume | [3]<br><br>Price | [4]<br><br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br><br>t-stat | [10]<br><br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br><br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/23/2014 Fri | 2,826,416 | $16.07 | 0.63% | 0.43% | 0.26% | 0.39% | 0.24% | 0.25 | 80.10% | $0.04 | **\*NAVIENT SETS QTR DIV 15C/SHR :NAVI US** (BLOOMBERG News - Bloomberg, 05/22/2014 04:33 PM)<br><br>**\*NAVIENT DECLARES STOCK DIV $0.15-SHR** (BLOOMBERG News - Bloomberg, 05/22/2014 04:33 PM)<br><br>**\*NAVIENT DECLARES 2Q STOCK DIV 15C** (BLOOMBERG News - Bloomberg, 05/22/2014 04:33 PM)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 05/23/2014)<br><br>**Compass Point Research Report** (Compass Point - Manual Entry, 05/23/2014)<br><br>**Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 05/23/2014)<br><br>**Navient authorizes $400M share repurchase program, quarterly dividend** (SNL Financial Services Daily - Factiva, 05/23/2014)<br><br>**ABS PIPELINE: Blackstone Priced; Calendar Empty Ahead of Holiday** (Bloomberg First Word - Bloomberg, 05/23/2014 07:53 AM)<br><br>**S&P 500 Stocks With Biggest Gap Between Market Price, Estimate** (BLOOMBERG News - Bloomberg, 05/23/2014 11:55 AM) |
| 5/24/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (May. 5, 2014)** (Investment Weekly News - Factiva, 05/24/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 2, 2014)** (Investment Weekly News - Factiva, 05/24/2014) |
| 5/25/2014 Sun<br>5/26/2014 Mon | | | | | | | | | | | **Fitch: Navient's Expected Future Cash Flows Offer Degree of Downside Protection** (Thai News Service - Factiva, 05/26/2014) |
| 5/27/2014 Tue | 1,726,939 | $15.98 | -0.56% | 0.60% | 1.41% | 0.79% | -1.35% | -1.43 | 15.43% | -$0.22 | **Compass Point Research Report** (Compass Point - Manual Entry, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014)<br><br>**NAVIENT CORP 4** (SEC - SEC Edgar, 05/27/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] Date | [2] Volume | [3] Price | [4] Return | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] t-stat | [10] p-Value | [11] Abnormal Price Reaction | [12] Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 05/27/2014 08:37 AM) |
| | | | | | | | | | | | **Nasdaq Short Interest as of May 15** (BLOOMBERG News - Bloomberg, 05/27/2014 04:27 PM) |
| | | | | | | | | | | | **Largest Nasdaq Short Interest Changes as of May 15** (BLOOMBERG News - Bloomberg, 05/27/2014 04:28 PM) |
| | | | | | | | | | | | **S&P 500 Changes in Short Interest as Percentage of Float** (BLOOMBERG News - Bloomberg, 05/27/2014 04:28 PM) |
| | | | | | | | | | | | **Ann Torre Bates, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 05:19 PM) |
| | | | | | | | | | | | **William M Diefenderfer, Director, Acquires 9,392 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 05:25 PM) |
| | | | | | | | | | | | **Diane Suitt Gilleland, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 05:34 PM) |
| | | | | | | | | | | | **Linda A Mills, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 06:24 PM) |
| | | | | | | | | | | | **Barry A Munitz, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 06:33 PM) |
| | | | | | | | | | | | **Steven L Shapiro, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 06:35 PM) |
| | | | | | | | | | | | **Thompson Jane J , Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 06:36 PM) |
| | | | | | | | | | | | **Barry Lawson Williams, Director, Acquires 6,261 NAVI US 05/22/14** (BLOOMBERG News - Bloomberg, 05/27/2014 06:38 PM) |
| 5/28/2014 Wed | 4,219,138 | $15.68 | -1.88% | -0.10% | 0.38% | 0.03% | -1.91% | -2.02 | 4.57% * | -$0.30 | **ABS PIPELINE: PHEAA Plans to Tap Market Next Week** (Bloomberg First Word - Bloomberg, 05/28/2014 07:39 AM) |
| 5/29/2014 Thu | 3,463,351 | $15.68 | 0.00% | 0.55% | -0.37% | 0.33% | -0.33% | -0.35 | 72.97% | -$0.05 | **Sallie Mae; Sallie Mae Bank Settles Previously Reported Regulatory Matters** (Politics & Government Week - Factiva, 05/29/2014) |
| 5/30/2014 Fri | 5,260,986 | $15.80 | 0.77% | 0.19% | 0.16% | 0.18% | 0.58% | 0.62 | 53.91% | $0.09 | **S&P Global Ratings Research Report** (S&P Global Ratings - Manual Entry, 05/30/2014) |
| | | | | | | | | | | | **S&P Global Ratings Research Report** (S&P Global Ratings - Manual Entry, 05/30/2014) |
| 5/31/2014 Sat | | | | | | | | | | | **Sallie Mae; Sallie Mae Bank Settles Previously Reported Regulatory Matters** (Investment Weekly News - Factiva, 05/31/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-Q, Quarterly Report [Sections 13 Or 15(D)] (May. 9, 2014) (Investment Weekly News - Factiva, 05/31/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 14, 2014) (Investment Weekly News - Factiva, 05/31/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 9, 2014) (Investment Weekly News - Factiva, 05/31/2014) |
| 6/1/2014 Sun | | | | | | | | | | | |
| 6/2/2014 Mon | 2,986,807 | $15.81 | 0.06% | 0.08% | 0.24% | 0.13% | -0.06% | -0.07 | 94.64% | -$0.01 | Compass Point Research Report (Compass Point - Manual Entry, 06/02/2014) |
| | | | | | | | | | | | S&P 500 Stocks With Biggest Gap Between Market Price, Estimate (BLOOMBERG News - Bloomberg, 06/02/2014 08:45 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 06/02/2014 09:19 AM) |
| 6/3/2014 Tue | 3,483,548 | $15.83 | 0.13% | -0.03% | -0.06% | -0.03% | 0.16% | 0.17 | 86.91% | $0.02 | |
| 6/4/2014 Wed | 3,231,455 | $15.89 | 1.33% | 0.21% | 0.12% | 0.19% | 1.14% | 1.20 | 23.10% | $0.18 | Height Analytics Research Report (Height Analytics - Manual Entry, 06/04/2014) |
| | | | | | | | | | | | Navient wins 2014 Governor's ImPAct Award (GlobeNewswire - Factiva, 06/04/2014 08:00 AM) |
| | | | | | | | | | | | Navient wins 2014 Governor's ImPAct Award (PrimeZone Media Network - Bloomberg, 06/04/2014 08:00 AM) |
| | | | | | | | | | | | Navient Corp Goes Ex-Dividend, Trades Without Payout (BLOOMBERG News - Bloomberg, 06/04/2014 08:16 AM) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 06/04/2014 11:30 AM) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 06/04/2014 03:00 PM) |
| | | | | | | | | | | | Warren â€˜Deeply Concernedâ€™ About U.S. Student Loan Collectors (Bloomberg First Word - Bloomberg, 06/04/2014 03:15 PM) |
| | | | | | | | | | | | Warren Bill Would Refinance About Half of Student Debt: CBO (Bloomberg First Word - Bloomberg, 06/04/2014 04:28 PM) |
| | | | | | | | | | | | Warren Student Loan Bill Chances Below 10%: Compass Pt Analysts (Bloomberg First Word - Bloomberg, 06/04/2014 04:50 PM) |
| | | | | | | | | | | | United Way recognizes Navient and its employees (GlobeNewswire - Factiva, 06/04/2014 04:52 PM) |
| | | | | | | | | | | | United Way recognizes Navient and its employees (PrimeZone Media Network - Bloomberg, 06/04/2014 04:52 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Predicted Abnormal | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 6/5/2014 Thu | 4,582,403 | $16.67 | 4.91% | 0.66% | 0.28% | 0.57% | 4.34% | 4.60 | 0.00% ** | $0.69 | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 06/05/2014 11:30 AM) |
| | | | | | | | | | | | **U.S. WRAP: Stocks Climb After ECB, Ahead of U.S. Employment Data** (Bloomberg First Word - Bloomberg, 06/05/2014 04:37 PM) |
| 6/6/2014 Fri | 1,622,717 | $16.67 | 0.00% | 0.48% | 1.61% | 0.75% | -0.75% | -0.79 | 42.84% | -$0.12 | **S&P 500 Stocks With Biggest Gap Between Market Price, Estimate** (BLOOMBERG News - Bloomberg, 06/06/2014 09:29 AM) |
| 6/7/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 16, 2014)** (Investment Weekly News - Factiva, 06/07/2014) |
| 6/8/2014 Sun | | | | | | | | | | | |
| 6/9/2014 Mon | 3,169,291 | $16.81 | 0.84% | 0.10% | 0.75% | 0.26% | 0.58% | 0.61 | 54.12% | $0.10 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 06/09/2014) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 06/09/2014 08:39 AM) |
| | | | | | | | | | | | **Indianapolis-area's "newest" employer unveils new sign as it recruits 100 positions** (GlobeNewswire - Factiva, 06/09/2014 12:28 PM) |
| | | | | | | | | | | | **Indianapolis-area's "newest" employer unveils new sign as it recruits 100 positions** (PrimeZone Media Network - Bloomberg, 06/09/2014 12:28 PM) |
| 6/10/2014 Tue | 3,441,830 | $16.80 | -0.06% | -0.02% | -0.18% | -0.05% | -0.01% | -0.01 | 99.41% | $0.00 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 06/10/2014) |
| | | | | | | | | | | | **Nasdaq Short Interest as of May 30** (BLOOMBERG News - Bloomberg, 06/10/2014 04:38 PM) |
| | | | | | | | | | | | **Largest Nasdaq Short Interest Changes as of May 30** (BLOOMBERG News - Bloomberg, 06/10/2014 04:39 PM) |
| | | | | | | | | | | | **Largest Nasdaq Short Interest Percent Decreases as of May 30** (BLOOMBERG News - Bloomberg, 06/10/2014 04:39 PM) |
| 6/11/2014 Wed | 1,857,115 | $16.88 | 0.48% | -0.34% | -0.19% | -0.29% | 0.77% | 0.81 | 41.71% | $0.13 | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 06/11/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 06/11/2014) |
| 6/12/2014 Thu | 2,336,412 | $16.74 | -0.83% | -0.68% | 0.48% | -0.38% | -0.45% | -0.47 | 63.68% | -$0.08 | **Compass Point Research Report** (Compass Point - Manual Entry, 06/12/2014) |
| | | | | | | | | | | | **HY: HNZ 4.25%, DVA 5.125% Among Most Active Trades, Trace Shows** (Bloomberg First Word - Bloomberg, 06/12/2014 11:58 AM) |
| 6/13/2014 Fri | 1,485,582 | $16.67 | -0.42% | 0.32% | -0.50% | 0.12% | -0.54% | -0.57 | 56.79% | -$0.09 | **Muncie's "newest" employer unveils new sign** (GlobeNewswire - Factiva, 06/13/2014 02:09 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Industry | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 6/14/2014 Sat | | | | | | | | | | | Muncie's "newest" employer unveils new sign (PrimeZone Media Network - Bloomberg, 06/13/2014 02:09 PM) |
| 6/15/2014 Sun | | | | | | | | | | | |
| 6/16/2014 Mon | 804,878 | $16.78 | 0.66% | 0.08% | -0.08% | 0.05% | 0.61% | 0.65 | 51.96% | $0.10 | Compass Point Research Report (Compass Point - Manual Entry, 06/16/2014) |
| | | | | | | | | | | | Public Offerings, Appointments, New Initiatives, and Technical Updates - Analyst Notes on ARCP, Goldman Sachs, DDR, Navient and Weingarten Realty Investors (PR Newswire (U.S.) - Factiva, 06/16/2014 05:10 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 06/16/2014 09:01 AM) |
| 6/17/2014 Tue | 1,268,810 | $16.84 | 0.36% | 0.22% | 0.11% | 0.20% | 0.16% | 0.17 | 86.58% | $0.03 | Compass Point Research Report (Compass Point - Manual Entry, 06/17/2014) |
| | | | | | | | | | | | MarketLine Research Report (Marketline - Manual Entry, 06/17/2014) |
| | | | | | | | | | | | Consumer Finance Stocks Technical Data -- Research on SLM Corp., Navient, American Express, and Capital One Financial (PR Newswire (U.S.) - Factiva, 06/17/2014 07:00 AM) |
| | | | | | | | | | | | U.S. Extends Navient Corp Student Loan Contract; Navient Had Come Under Fire for Allegations It Overcharged Military Members, Hit Borrowers With Excessive Fees (The Wall Street Journal Online - Factiva, 06/17/2014 02:16 PM) |
| | | | | | | | | | | | *U.S. Extends Navient Corp Student Loan Contract - Official (Dow Jones Institutional News - Factiva, 06/17/2014 06:12 PM) |
| | | | | | | | | | | | *U.S. Extends Navient Corp Student Loan Contract - Official (Dow Jones Top News & Commentary - Factiva, 06/17/2014 06:12 PM) |
| | | | | | | | | | | | Navient Gets U.S. Student-Loan Contract Extension: WSJ (Bloomberg First Word - Bloomberg, 06/17/2014 06:22 PM) |
| | | | | | | | | | | | MEDIA-US extends Navient Corp student loan contract - WSJ (Reuters News - Factiva, 06/17/2014 11:26 PM) |
| 6/18/2014 Wed | 2,268,103 | $17.06 | 1.31% | 0.77% | 0.18% | 0.62% | 0.68% | 0.72 | 47.15% | $0.11 | Compass Point Research Report (Compass Point - Manual Entry, 06/18/2014) |
| | | | | | | | | | | | Janney Montgomery Scott Research Report (Janney Montgomery Scott - Manual Entry, 06/18/2014) |
| | | | | | | | | | | | IN THE U.S. MEDIA: FDX, LMT, NAVI, NEWCQ (Bloomberg First Word - Bloomberg, 06/18/2014 07:22 AM) |
| | | | | | | | | | | | U.S. PRE-MARKET MOVERS: ADBE APD BBRY CAG ECYT ETRM GDP INSM LZB (Bloomberg First Word - Bloomberg, 06/18/2014 08:35 AM) |
| 6/19/2014 Thu | 3,753,998 | $17.19 | 0.76% | 0.14% | -0.35% | 0.03% | 0.73% | 0.78 | 43.88% | $0.13 | |
| 6/20/2014 Fri | 3,907,893 | $17.46 | 1.57% | 0.17% | 0.76% | 0.32% | 1.25% | 1.33 | 18.71% | $0.22 | |
| 6/21/2014 Sat | | | | | | | | | | | |
| 6/22/2014 Sun | | | | | | | | | | | |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 6/23/2014 Mon | 4,459,996 | $17.68 | 1.26% | -0.01% | -0.06% | -0.02% | 1.28% | 1.35 | 17.88% | $0.22 | **Mid Cap New Highs: Agnico Eagle Mines (NYSE:AEM), NAVI, Nabors Industries (NYSE:NBR), Kodiak Oil & Gas (NYSE:KOG), Strategic Hotels and Resorts (NYSE:BEE)** (Energy Monitor Worldwide - Factiva, 06/23/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **HY: IMKTA 5.75%, VRS 11.375% Among Leading Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 06/23/2014 07:35 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 06/23/2014 08:43 AM) |
| 6/24/2014 Tue | 2,609,214 | $17.66 | -0.14% | -0.63% | -0.39% | -0.56% | 0.42% | 0.44 | 66.06% | $0.07 | **HY: VRS 11.75%, MAS 6.5% Among Leading Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 06/24/2014 07:35 AM) |
| 6/25/2014 Wed | 5,173,531 | $17.61 | -0.25% | 0.49% | -0.30% | 0.30% | -0.56% | -0.59 | 55.66% | -$0.10 | **HY: DYN 7%, TOY 10.375% Among Lagging Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 06/25/2014 07:51 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient closes financing facility** (GlobeNewswire - Factiva, 06/25/2014 04:15 PM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT CLOSES FINANCING FACILITY** (BLOOMBERG News - Bloomberg, 06/25/2014 04:15 PM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient closes financing facility** (PrimeZone Media Network - Bloomberg, 06/25/2014 04:15 PM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT NAVIENT CLOSES FINANCING FACILITY OF $1B** (BLOOMBERG News - Bloomberg, 06/25/2014 04:23 PM) |
| 6/26/2014 Thu | 931,667 | $17.67 | 0.34% | -0.10% | -0.01% | -0.07% | 0.41% | 0.44 | 66.41% | $0.07 | **Navient closes $1B financing facility** (SNL Financial Services Daily - Factiva, 06/26/2014) |
| 6/27/2014 Fri 6/28/2014 Sat 6/29/2014 Sun | 4,649,509 | $17.84 | 0.96% | 0.20% | 0.44% | 0.26% | 0.70% | 0.74 | 45.85% | $0.12 |  |
| 6/30/2014 Mon | 2,023,702 | $17.71 | -0.73% | -0.03% | -0.10% | -0.04% | -0.69% | -0.73 | 46.71% | -$0.12 | **Sallie Mae shareholders reject proposal on disclosure of lobbying expenditures, contributions** (SNL Financial Services Daily - Factiva, 06/30/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 06/30/2014 08:58 AM) |
| 7/1/2014 Tue | 2,274,049 | $17.77 | 0.35% | 0.69% | 0.08% | 0.54% | -0.19% | -0.20 | 84.30% | -$0.03 |  |
| 7/2/2014 Wed | 2,509,893 | $17.77 | -0.01% | 0.07% | 0.04% | 0.07% | -0.08% | -0.09 | 93.09% | -$0.01 | **Luzerne County employer unveils a new look** (GlobeNewswire - Factiva, 07/02/2014 11:49 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Luzerne County employer unveils a new look** (PrimeZone Media Network - Bloomberg, 07/02/2014 11:49 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient to announce second quarter 2014 results on July 16, host earnings call on July 17** (GlobeNewswire - Factiva, 07/02/2014 04:18 PM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient to announce second quarter 2014 results on July 16, host earnings call on July 17** (PrimeZone Media Network - Bloomberg, 07/02/2014 04:18 PM) |
| 7/3/2014 Thu | 1,953,706 | $17.70 | -0.39% | 0.55% | 0.38% | 0.51% | -0.90% | -0.96 | 34.13% | -$0.16 |  |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 7/4/2014 Fri | | | | | | | | | | | |
| 7/5/2014 Sat | | | | | | | | | | | |
| 7/6/2014 Sun | | | | | | | | | | | **3 new names in the Philly50** (The Philadelphia Inquirer - Factiva, 07/06/2014) |
| 7/7/2014 Mon | 1,747,251 | $17.65 | -0.28% | -0.39% | -0.35% | -0.37% | 0.08% | 0.09 | 93.02% | $0.01 | **\*NAVIENT AFFILIATE TO SUBMIT BIDS FOR SLM 2006-7 BONDS** (Bloomberg First Word - Bloomberg, 07/07/2014 11:32 AM) |
| 7/8/2014 Tue | 4,540,638 | $17.60 | -0.28% | -0.68% | -0.07% | -0.51% | 0.23% | 0.24 | 80.99% | $0.04 | **HY: TCMCN 7.375%, NAVI 6% Among Leading Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 07/08/2014 07:35 AM) |
| | | | | | | | | | | | **HY: RTSX 9.875%, STZ 7.25% Among Lagging Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 07/08/2014 07:50 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 07/08/2014 08:55 AM) |
| 7/9/2014 Wed | 2,496,945 | $17.72 | 0.68% | 0.47% | 0.35% | 0.44% | 0.24% | 0.26 | 79.86% | $0.04 | **MarketLine Research Report** (Marketline - Manual Entry, 07/09/2014) |
| | | | | | | | | | | | **Senate Democrats Investigate Navient Student Loan Contract; Sens. McCaskill, Warren and Others Say Education Department Must 'Negotiate Strong Consumer Protections'** (The Wall Street Journal Online - Factiva, 07/09/2014 08:47 AM) |
| | | | | | | | | | | | **Senate Democrats Investigate Navient Student Loan Contract** (Dow Jones Top North American Financial Services Stories - Factiva, 07/09/2014 10:49 AM) |
| 7/10/2014 Thu | 2,692,521 | $17.78 | 0.34% | -0.41% | -0.09% | -0.32% | 0.66% | 0.70 | 48.68% | $0.12 | **Barclays Research Report** (Barclays - Manual Entry, 07/10/2014) |
| | | | | | | | | | | | **Navient hosts comedy night to support United Way food drive** (GlobeNewswire - Factiva, 07/10/2014 10:52 AM) |
| | | | | | | | | | | | **Navient hosts comedy night to support United Way food drive** (PrimeZone Media Network - Bloomberg, 07/10/2014 10:52 AM) |
| 7/11/2014 Fri | 6,752,732 | $17.89 | 0.62% | 0.16% | -0.05% | 0.11% | 0.51% | 0.54 | 59.34% | $0.09 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 07/11/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/11/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/11/2014) |
| 7/12/2014 Sat | | | | | | | | | | | |
| 7/13/2014 Sun | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/13/2014) |
| 7/14/2014 Mon | 2,796,720 | $18.00 | 0.61% | 0.48% | -0.40% | 0.27% | 0.34% | 0.36 | 71.68% | $0.06 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 07/14/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/14/2014) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 07/14/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | Fitch Expects More Banks to Unload FFELP Portfolios (Asset Securitization Report - Factiva, 07/14/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 07/14/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 07/14/2014) |
| | | | | | | | | | | | Sallie Mae spinoff tries not to shrink (Indianapolis Business Journal - Factiva, 07/14/2014) |
| | | | | | | | | | | | Sallie Mae spinoff tries not to shrink (Indianapolis Business Journal - Factiva, 07/14/2014) |
| | | | | | | | | | | | *NAVIENT CORP. ADDED TO FOCUS LIST AT COMPASS POINT (Bloomberg First Word - Bloomberg, 07/14/2014 05:08 AM) |
| | | | | | | | | | | | U.S. PRE-MARKET MOVERS: ANV CDE EXEL GTAT HLIT KNDI NEM PARN (Bloomberg First Word - Bloomberg, 07/14/2014 08:43 AM) |
| | | | | | | | | | | | U.S. FINANCIALS PRE-MKT: Citi Up 3.6% on 2Q Beat, DoJ Settlement (Bloomberg First Word - Bloomberg, 07/14/2014 09:09 AM) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 07/14/2014 03:00 PM) |
| 7/15/2014 Tue | 3,716,181 | $17.70 | -1.67% | -0.19% | 0.66% | 0.02% | -1.69% | -1.79 | 7.57% | -$0.30 | FFELP portfolio sales anticipated (Structured Credit Investor - Factiva, 07/15/2014) |
| | | | | | | | | | | | Volatile Movements -Navient Corp (NASDAQ:NAVI), Seventy Seven Energy Inc (NYSE:SSE), McEwen Mining Inc (NYSE:MUX), Talisman Energy Inc. (USA) (NYSE:TLM) (Energy Monitor Worldwide - Factiva, 07/15/2014) |
| | | | | | | | | | | | U.S. AFTER-HOURS WRAP: Intel 2Q EPS, Rev. Beat (Bloomberg First Word - Bloomberg, 07/15/2014 06:16 PM) |
| 7/16/2014 Wed | 3,180,617 | $17.82 | 0.68% | 0.43% | -0.26% | 0.27% | 0.41% | 0.44 | 66.38% | $0.07 | Barclays Research Report (Barclays - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | Buckingham Research Research Report (Buckingham Research - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | CFRA Equity Research Research Report (CFRA Equity Research - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | Evercore ISI Research Report (Evercore ISI - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 07/16/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 07/16/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6]<br>Excess | [7] | [8] | [9] | [10] | [11]<br>Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market<br>Return | Industry<br>Return | Predicted<br>Return | Abnormal<br>Return | t-stat | p-Value | Price<br>Reaction | Events |
| 7/17/2014 Thu | 2,805,828 | $17.70 | -0.67% | -1.17% | -0.24% | -0.92% | 0.25% | 0.26 | 79.35% | $0.04 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 07/16/2014) |
| | | | | | | | | | | | **Navient Q2 Profit Declines** (RTT News - Factiva, 07/16/2014) |
| | | | | | | | | | | | **Navient Q2 Profit Down - Update** (RTT News - Factiva, 07/16/2014) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: BofA 2Q EPS Beats, Shrs Fall** (Bloomberg First Word - Bloomberg, 07/16/2014 07:58 AM) |
| | | | | | | | | | | | **Navient Profit Falls in First Post-Spinoff Reporting Period; Consumers With Student Loans Serviced by Sallie Mae Will Be Switched Over This Fall** (The Wall Street Journal Online - Factiva, 07/16/2014 01:22 PM) |
| | | | | | | | | | | | **Navient 2Q EPS 56c >NAVI** (Dow Jones Newswires Chinese (English) - Factiva, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **Navient Reports Second-Quarter 2014 Financial Results** (GlobeNewswire - Factiva, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **Navient Reports Second-Quarter 2014 Financial Results** (PrimeZone Media Network - Bloomberg, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q CORE EPS 56C :NAVI US** (BLOOMBERG News - Bloomberg, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q 2Q CORE EPS 56C** (BLOOMBERG News - Bloomberg, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q CORE EPS 56C, EST. 54C :NAVI US** (BLOOMBERG News - Bloomberg, 07/16/2014 04:20 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q CORE EPS 56C, EST. 54C :NAVI US** (Bloomberg First Word - Bloomberg, 07/16/2014 04:21 PM) |
| | | | | | | | | | | | **Navient Profit Falls in First Post-Spinoff Reporting Period** (Dow Jones Institutional News - Factiva, 07/16/2014 05:22 PM) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 07/17/2014) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 07/17/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/17/2014) |
| | | | | | | | | | | | **Navient earnings fall YOY in Q2** (SNL Financial Services Daily - Factiva, 07/17/2014) |
| | | | | | | | | | | | **Q2 2014 Navient Corp Earnings Call - Final** (CQ FD Disclosure - Factiva, 07/17/2014) |
| | | | | | | | | | | | **HY: AES 7.25%, VRS 11.375% Among Leading Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 07/17/2014 07:36 AM) |
| | | | | | | | | | | | **U.S. PRE-MARKET MOVERS: BX CFX DRC FRC MAT MSFT NTCT OWW SHW** (Bloomberg First Word - Bloomberg, 07/17/2014 08:52 AM) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: Morgan Stanley Beats, Shares +1.5%** (Bloomberg First Word - Bloomberg, 07/17/2014 09:04 AM) |
| | | | | | | | | | | | **Second Quarter of â€™14 S&P 500 Earnings Snapshot as of July 17** (BLOOMBERG News - Bloomberg, 07/17/2014 10:15 AM) |
| | | | | | | | | | | | **Second Quarter of â€™14 S&P 500 Sales Summary (Table)** (BLOOMBERG News - Bloomberg, 07/17/2014 10:15 AM) |
| | | | | | | | | | | | **S&P 2Q Update: 67 EPS Reports, 47 Beat, 5 Meet, 15 Miss Est** (Bloomberg First Word - Bloomberg, 07/17/2014 10:16 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 07/17/2014 03:00 PM) |
| 7/18/2014 Fri | 2,191,662 | $17.69 | -0.06% | 1.03% | -0.72% | 0.60% | -0.66% | -0.69 | 48.87% | -$0.12 | **Barclays Research Report** (Barclays - Manual Entry, 07/18/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/18/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/18/2014) |
| | | | | | | | | | | | **Despite slow pipeline, Navient still eager to acquire private student loans** (SNL Bank and Thrift Daily - Factiva, 07/18/2014) |
| | | | | | | | | | | | **Despite slow pipeline, Navient still eager to acquire private student loans** (SNL Financial Services Daily - Factiva, 07/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP S-3ASR** (SEC - SEC Edgar, 07/18/2014) |
| | | | | | | | | | | | **S&P 500 Stocks Biggest Weekly Changes in Target Price** (BLOOMBERG News - Bloomberg, 07/18/2014 09:08 AM) |
| | | | | | | | | | | | **Second Quarter of â€™14 S&P 500 Earnings Snapshot as of July 18** (BLOOMBERG News - Bloomberg, 07/18/2014 10:13 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1]<br><br>Date | [2]<br><br>Volume | [3]<br><br>Price | [4]<br><br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br><br>t-stat | [10]<br><br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br><br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Expected Earnings Growth for Industries in S&P 500 (BLOOMBERG News - Bloomberg, 07/18/2014 10:44 AM) |
| | | | | | | | | | | | Analyst Estimate Changes by Industry Groups in the S&P 500 (BLOOMBERG News - Bloomberg, 07/18/2014 11:04 AM) |
| | | | | | | | | | | | *S&P Rtgs On Navient Corp. Unchanged Following Q2 Results (Dow Jones Institutional News - Factiva, 07/18/2014 01:12 PM) |
| | | | | | | | | | | | *NAVIENT FILES AUTOMATIC MIXED SECURITIES SHELF (BLOOMBERG News - Bloomberg, 07/18/2014 04:34 PM) |
| | | | | | | | | | | | Navient Files Automatic Mixed Securities Shelf (Bloomberg First Word - Bloomberg, 07/18/2014 04:35 PM) |
| 7/19/2014 Sat | | | | | | | | | | | |
| 7/20/2014 Sun | | | | | | | | | | | |
| 7/21/2014 Mon | 2,268,473 | $17.86 | 0.96% | -0.23% | -0.42% | -0.26% | 1.22% | 1.30 | 19.72% | $0.22 | Janney Montgomery Scott Research Report (Janney Montgomery Scott - Manual Entry, 07/21/2014) |
| | | | | | | | | | | | Navient files mixed shelf (SNL Financial Services Daily - Factiva, 07/21/2014) |
| | | | | | | | | | | | U.S. PRE-MARKET MOVERS: ANAC BIOF CTIC EXTR ICLD PETS RAI (Bloomberg First Word - Bloomberg, 07/21/2014 08:50 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 07/21/2014 08:51 AM) |
| 7/22/2014 Tue | 1,774,509 | $17.97 | 0.62% | 0.50% | 0.12% | 0.41% | 0.21% | 0.22 | 82.75% | $0.04 | Stock Updates on Consumer Finance Industry -- Capital One Financial, SLM Corp., American Express, Discover Financial Services, and Navient (PR Newswire (U.S.) - Factiva, 07/22/2014 09:20 AM) |
| 7/23/2014 Wed | 1,414,425 | $17.98 | 0.06% | 0.18% | -0.51% | 0.02% | 0.04% | 0.04 | 96.81% | $0.01 | *Sallie Mae 2Q Adj EPS 10c >SLM (Dow Jones Institutional News - Factiva, 07/23/2014 05:15 PM) |
| | | | | | | | | | | | Sallie Mae Reports Second-Quarter 2014 Financial Results (Business Wire - Factiva, 07/23/2014 05:15 PM) |
| | | | | | | | | | | | Sallie Mae Reports Second-Quarter 2014 Financial Results (Business Wire - Bloomberg, 07/23/2014 05:15 PM) |
| 7/24/2014 Thu | 2,131,840 | $17.97 | -0.06% | 0.05% | 0.24% | 0.10% | -0.16% | -0.17 | 86.60% | -$0.03 | Sallie Mae sees 35% YOY rise in Q2 net interest income (SNL Financial Services Daily - Factiva, 07/24/2014) |
| | | | | | | | | | | | HIGH YIELD: New Micron Technology Dominates Trading (Bloomberg First Word - Bloomberg, 07/24/2014 11:59 AM) |
| | | | | | | | | | | | *MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT PRIVATE EDUCATION (BLOOMBERG News - Bloomberg, 07/24/2014 01:29 PM) |
| 7/25/2014 Fri | 1,967,620 | $17.87 | -0.56% | -0.48% | -0.61% | -0.50% | -0.06% | -0.06 | 94.90% | -$0.01 | Sallie Mae targets $1.2B in H2'14 private education loan sales amid strong investor demand (SNL Bank and Thrift Daily - Factiva, 07/25/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 7/26/2014 Sat 7/27/2014 Sun 7/28/2014 Mon | 2,900,432 | $17.99 | 0.67% | 0.03% | -0.04% | 0.02% | 0.65% | 0.69 | 49.08% | $0.12 | **Sallie Mae targets $1.2B in H2'14 private education loan sales amid strong investor demand** (SNL Financial Services Daily - Factiva, 07/25/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: VRS 11.375%, RTSX 9.875% Among Leading Movers** (Bloomberg First Word - Bloomberg, 07/25/2014 07:13 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **NAVIENT CORP 4** (SEC - SEC Edgar, 07/28/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: VRS 11.375%, KEM 10.5% Among Leading Movers** (Bloomberg First Word - Bloomberg, 07/28/2014 07:15 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: NIHD 8.875%, NAVI 5.625% Among Lagging Movers** (Bloomberg First Word - Bloomberg, 07/28/2014 07:26 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 07/28/2014 09:14 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Fitch: US Student Loan Sales May Raise ABS Servicer Risk** (Reuters News - Factiva, 07/28/2014 12:19 PM) |
|  |  |  |  |  |  |  |  |  |  |  | **Fitch: US Student Loan Sales May Raise ABS Servicer Risk** (Business Wire - Bloomberg, 07/28/2014 12:34 PM) |
| 7/29/2014 Tue | 3,500,376 | $17.70 | -1.61% | -0.45% | 0.20% | -0.28% | -1.33% | -1.41 | 15.98% | -$0.24 | **HIGH YIELD: RTSX 9.875%, CCMO 7.25% Among Lagging Movers** (Bloomberg First Word - Bloomberg, 07/29/2014 07:12 AM) |
| 7/30/2014 Wed | 3,032,346 | $17.58 | -0.68% | 0.02% | -0.14% | -0.01% | -0.67% | -0.71 | 47.87% | -$0.12 |  |
| 7/31/2014 Thu | 3,567,958 | $17.20 | -2.16% | -1.99% | -0.70% | -1.64% | -0.52% | -0.55 | 58.20% | -$0.09 | **Fitch Report Shows US Student Loan Sales May Raise ABS Servicer Risk** (Professional Services Close-Up - Factiva, 07/31/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Fitch: US Student Loan Sales May Raise ABS Servicer Risk** (Entertainment Close-Up - Factiva, 07/31/2014) |
| 8/1/2014 Fri | 1,832,520 | $17.34 | 0.81% | -0.29% | -0.79% | -0.39% | 1.21% | 1.28 | 20.26% | $0.21 | **NAVIENT CORP 10-Q** (SEC - SEC Edgar, 08/01/2014) |
| 8/2/2014 Sat 8/3/2014 Sun 8/4/2014 Mon | 1,700,359 | $17.17 | -0.98% | 0.72% | -0.01% | 0.54% | -1.52% | -1.61 | 10.96% | -$0.26 | **NAVIENT CORP 4** (SEC - SEC Edgar, 08/04/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 08/04/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: AM 7.375%, NAVI 6% Among Leading Movers** (Bloomberg First Word - Bloomberg, 08/04/2014 07:11 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: SGMS 6.25%, LGNS 10.75% Among Lagging Movers** (Bloomberg First Word - Bloomberg, 08/04/2014 07:21 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 08/04/2014 08:56 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 8/5/2014 Tue | 2,091,317 | $16.95 | -1.28% | -0.96% | -0.01% | -0.71% | -0.57% | -0.61 | 54.40% | -$0.10 | **Navient Files 8K - Regulation FD >NAVI** (Dow Jones Institutional News - Factiva, 08/04/2014 04:21 PM) |
| | | | | | | | | | | | **Barry Lawson Williams, Director, Sells 14,450 NAVI 08/01/14** (BLOOMBERG News - Bloomberg, 08/04/2014 08:39 PM) |
| | | | | | | | | | | | **HIGH YIELD: NRG 6.625%, NAVI 6% Among Lagging Movers** (Bloomberg First Word - Bloomberg, 08/05/2014 07:15 AM) |
| | | | | | | | | | | | **Navient Plans 2014-2 Through 2014-7 Student Loan ABS: Fitch** (Bloomberg First Word - Bloomberg, 08/05/2014 11:56 AM) |
| 8/6/2014 Wed | 2,538,550 | $16.99 | 0.24% | 0.03% | 0.01% | 0.03% | 0.20% | 0.21 | 83.02% | $0.03 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 08/06/2014) |
| | | | | | | | | | | | **HIGH YIELD: NAVI 8%, CGGFP 6.5% Among Leading Movers** (Bloomberg First Word - Bloomberg, 08/06/2014 07:34 AM) |
| | | | | | | | | | | | **Navient partners with Greater Indy Habitat for Humanity to build home for local family** (GlobeNewswire - Factiva, 08/06/2014 09:52 AM) |
| 8/7/2014 Thu | 1,392,808 | $16.86 | -0.77% | -0.53% | 0.05% | -0.38% | -0.39% | -0.41 | 68.02% | -$0.07 | **Navient partners with Greater Indy Habitat for Humanity to build home for local family** (PrimeZone Media Network - Bloomberg, 08/06/2014 09:52 AM) |
| | | | | | | | | | | | **Fitch: US Student Loan Sales May Raise ABS Servicer Risk** (Wireless News - Factiva, 08/07/2014) |
| | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 08/07/2014) |
| | | | | | | | | | | | **HIGH YIELD: NAVI 8%, OKE 6% Among Lagging Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 08/07/2014 07:15 AM) |
| | | | | | | | | | | | **Navient Prices Multiple Series of FFELP Student Loan ABS** (Bloomberg First Word - Bloomberg, 08/07/2014 12:32 PM) |
| 8/8/2014 Fri | 3,591,830 | $17.28 | 2.49% | 1.16% | 0.33% | 0.95% | 1.55% | 1.64 | 10.40% | $0.26 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 08/08/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/08/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/08/2014) |
| | | | | | | | | | | | **Sallie Mae Closes First Asset-Backed Securitization - Quick Facts** (RTT News - Factiva, 08/08/2014) |
| | | | | | | | | | | | **Sallie Mae Securitizes Some Private Student Loans, Sells Others** (Asset Securitization Report - Factiva, 08/08/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] Date | [2] Volume | [3] Price | [4] Return | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] t-stat | [10] p-Value | [11] Abnormal Price Reaction | [12] Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Sallie Mae Completes First Asset-Backed Securitization, Reaches Agreement for First Loan Sale as Standalone Consumer Banking (Business Wire - Bloomberg, 08/08/2014 09:04 AM) |
| | | | | | | | | | | | *SALLIE MAE REACHES PACT FOR FIRST LOAN SALE AS STANDALONE (BLOOMBERG News - Bloomberg, 08/08/2014 09:04 AM) |
| | | | | | | | | | | | *SALLIE MAE TO SELL $820M OF SMART OPTION STUDENT LOANS (BLOOMBERG News - Bloomberg, 08/08/2014 09:04 AM) |
| | | | | | | | | | | | *SALLIE MAE TO SELL LOANS TO NAVIENT (BLOOMBERG News - Bloomberg, 08/08/2014 09:04 AM) |
| 8/9/2014 Sat | | | | | | | | | | | Sallie Mae; Sallie Mae Reports Second-Quarter 2014 Financial Results (Investment Weekly News - Factiva, 08/09/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form S-3ASR, Automatic Shelf Registration Statement of Securities of Well-known Seasoned Issuers (Jul. 18, 2014) (Investment Weekly News - Factiva, 08/09/2014) |
| 8/10/2014 Sun | | | | | | | | | | | |
| 8/11/2014 Mon | 1,096,330 | $17.10 | -1.04% | 0.29% | -0.49% | 0.11% | -1.15% | -1.22 | 22.52% | -$0.20 | Buckingham Research Research Report (Buckingham Research - Manual Entry, 08/11/2014) |
| | | | | | | | | | | | Credit Suisse Research Report (Credit Suisse - Manual Entry, 08/11/2014) |
| | | | | | | | | | | | Sallie Mae closes first asset-backed securitization as stand-alone consumer banking biz (SNL Financial Services Daily - Factiva, 08/11/2014) |
| | | | | | | | | | | | SMB completes debut SLABS (Structured Credit Investor - Factiva, 08/11/2014) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 08/11/2014 08:44 AM) |
| | | | | | | | | | | | Largest Nasdaq Short Interest Changes as of July 31 (BLOOMBERG News - Bloomberg, 08/11/2014 05:59 PM) |
| | | | | | | | | | | | Largest Nasdaq Short Interest Percent Decreases as of July 31 (BLOOMBERG News - Bloomberg, 08/11/2014 05:59 PM) |
| 8/12/2014 Tue | 1,166,896 | $17.10 | 0.00% | -0.16% | 0.55% | 0.02% | -0.02% | -0.02 | 98.16% | $0.00 | NAVIENT CORP 4 (SEC - SEC Edgar, 08/12/2014) |
| | | | | | | | | | | | Fitch Affirms SLM Private Student Loan Trust 2003-B (Reuters News - Factiva, 08/12/2014 05:04 PM) |
| | | | | | | | | | | | Fitch Affirms SLM Private Student Loan Trust 2003-C (Reuters News - Factiva, 08/12/2014 05:05 PM) |
| | | | | | | | | | | | Fitch Affirms SLM Private Student Loan Trust 2003-B (Business Wire - Factiva, 08/12/2014 05:10 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] t-stat | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 8/13/2014 Wed | 940,892 | $17.17 | 0.41% | 0.70% | -0.15% | 0.49% | -0.08% | -0.08 | 93.26% | -$0.01 | **Fitch Affirms SLM Private Student Loan Trust 2003-B** (Business Wire - Bloomberg, 08/12/2014 05:10 PM) |
| | | | | | | | | | | | **John F Remondi, CEO, Relinquishes 3,248 NAVI US 08/08/14** (BLOOMBERG News - Bloomberg, 08/12/2014 05:18 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-C** (Business Wire - Factiva, 08/12/2014 05:20 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-C** (Business Wire - Bloomberg, 08/12/2014 05:20 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2005-B** (Reuters News - Factiva, 08/13/2014 02:42 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2005-B** (Business Wire - Factiva, 08/13/2014 03:08 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2005-B** (Business Wire - Bloomberg, 08/13/2014 03:08 PM) |
| 8/14/2014 Thu | 1,448,196 | $17.15 | -0.12% | 0.44% | -0.55% | 0.20% | -0.32% | -0.34 | 73.62% | -$0.05 | **Fitch Affirms SLM Private Student Loan Trust 2003-B** (Thai News Service - Factiva, 08/14/2014) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-C** (Thai News Service - Factiva, 08/14/2014) |
| | | | | | | | | | | | **Navient declares third quarter common stock dividend** (Reuters Significant Developments - Factiva, 08/14/2014) |
| | | | | | | | | | | | **Korea Investment Corporation Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 07:28 AM) |
| | | | | | | | | | | | **Navient declares third quarter common stock dividend** (GlobeNewswire - Factiva, 08/14/2014 08:31 AM) |
| | | | | | | | | | | | **\*NAVIENT DECLARES 3Q STOCK DIV** (BLOOMBERG News - Bloomberg, 08/14/2014 08:31 AM) |
| | | | | | | | | | | | **Navient declares third quarter common stock dividend** (PrimeZone Media Network - Bloomberg, 08/14/2014 08:31 AM) |
| | | | | | | | | | | | **TCW Group Incorporated Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 12:20 PM) |
| | | | | | | | | | | | **OMEGA ADVISORS Took Stakes in NAVI, KKR, AAPL, GULTU, QEP in 2Q** (Bloomberg First Word - Bloomberg, 08/14/2014 01:47 PM) |
| | | | | | | | | | | | **Omega Advisors Inc Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 02:01 PM) |
| | | | | | | | | | | | **CalPERS Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 02:02 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 8/15/2014 Fri | 1,595,089 | $17.02 | -0.76% | 0.01% | -0.65% | -0.14% | -0.61% | -0.65 | 51.58% | -$0.11 | **AQR Capital Management Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 02:57 PM) |
| | | | | | | | | | | | **D E Shaw & Co Holdings in 2nd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 08/14/2014 05:37 PM) |
| | | | | | | | | | | | **Navient to donate land for Kincaid House relocation** (GlobeNewswire - Factiva, 08/15/2014 06:00 AM) |
| | | | | | | | | | | | **Navient to donate land for Kincaid House relocation** (PrimeZone Media Network - Bloomberg, 08/15/2014 06:00 AM) |
| 8/16/2014 Sat | | | | | | | | | | | |
| 8/17/2014 Sun | | | | | | | | | | | |
| 8/18/2014 Mon | 2,932,780 | $17.38 | 2.12% | 0.86% | 0.19% | 0.69% | 1.42% | 1.51 | 13.44% | $0.24 | **Navient seeks to fill nearly 200 jobs by end of year** (GlobeNewswire - Factiva, 08/18/2014 08:00 AM) |
| | | | | | | | | | | | **Navient seeks to fill nearly 200 jobs by end of year** (PrimeZone Media Network - Bloomberg, 08/18/2014 08:00 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 08/18/2014 08:19 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2004-A; Outlook Stable** (Reuters News - Factiva, 08/18/2014 11:35 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2004-A; Outlook Stable** (Business Wire - Factiva, 08/18/2014 11:42 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2004-A; Outlook Stable** (Business Wire - Bloomberg, 08/18/2014 11:42 AM) |
| 8/19/2014 Tue | 1,413,903 | $17.32 | -0.35% | 0.52% | 0.15% | 0.43% | -0.78% | -0.82 | 41.30% | -$0.13 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 08/19/2014) |
| | | | | | | | | | | | **HIGH YIELD: NIHD 8.875, CZR 6.5% Among Leading Movers** (Bloomberg First Word - Bloomberg, 08/19/2014 07:06 AM) |
| | | | | | | | | | | | **Navient Files 8K - Changes Exec Mgmt >NAVI** (Dow Jones Institutional News - Factiva, 08/19/2014 04:43 PM) |
| 8/20/2014 Wed | 1,279,188 | $17.50 | 1.04% | 0.25% | 0.36% | 0.28% | 0.76% | 0.80 | 42.44% | $0.13 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 08/20/2014) |
| | | | | | | | | | | | **HIGH YIELD: CZR 6.5%, 12.75% Among Lagging Movers, Trace Shows** (Bloomberg First Word - Bloomberg, 08/20/2014 07:25 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 08/20/2014 03:00 PM) |
| 8/21/2014 Thu | 1,167,229 | $17.46 | -0.23% | 0.30% | 0.44% | 0.33% | -0.56% | -0.60 | 55.15% | -$0.10 | **10 cheapest Ã¢â‚¬ËœebuyÃ¢â‚¬â€ž¢-rated stocks as S&P 500 hits a high; HereÃ¢â‚¬â€ž¢s where you can begin your hunt for bargain stocks** (MarketWatch - Factiva, 08/21/2014 11:29 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 8/22/2014 Fri | 1,061,992 | $17.45 | -0.06% | -0.19% | -0.26% | -0.19% | 0.13% | 0.14 | 88.73% | $0.02 | **Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A** (Reuters News - Factiva, 08/21/2014 11:48 AM) |
| | | | | | | | | | | | **Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A** (Business Wire - Bloomberg, 08/21/2014 12:00 PM) |
| | | | | | | | | | | | **HIGH YIELD: ALISCI 10.25%, FES 9% Among Leading Movers** (Bloomberg First Word - Bloomberg, 08/22/2014 07:18 AM) |
| | | | | | | | | | | | **Navient to host ninth annual golf tournament to benefit Luzerne County Head Start Program** (GlobeNewswire - Factiva, 08/22/2014 08:02 AM) |
| | | | | | | | | | | | **Navient to host ninth annual golf tournament to benefit Luzerne County Head Start Program** (PrimeZone Media Network - Bloomberg, 08/22/2014 08:02 AM) |
| | | | | | | | | | | | **Consumer Finance Equities under Review -- SLM Corp., Capital One Financial, Navient, Discover Financial Services, and Ezcorp** (PR Newswire (U.S.) - Factiva, 08/22/2014 08:50 AM) |
| 8/23/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-Q, Quarterly Report [Sections 13 Or 15(D)] (Aug. 1, 2014)** (Investment Weekly News - Factiva, 08/23/2014) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Aug. 4, 2014)** (Investment Weekly News - Factiva, 08/23/2014) |
| 8/24/2014 Sun | | | | | | | | | | | |
| 8/25/2014 Mon | 769,614 | $17.63 | 1.03% | 0.48% | 0.36% | 0.45% | 0.58% | 0.61 | 54.00% | $0.10 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 08/25/2014 08:25 AM) |
| | | | | | | | | | | | **Navient participates in veterans job fair in Middletown** (GlobeNewswire - Factiva, 08/25/2014 02:17 PM) |
| | | | | | | | | | | | **Navient participates in veterans job fair in Middletown** (PrimeZone Media Network - Bloomberg, 08/25/2014 02:17 PM) |
| 8/26/2014 Tue | 917,005 | $17.61 | -0.11% | 0.11% | -0.36% | 0.00% | -0.11% | -0.12 | 90.45% | -$0.02 | **Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A** (Entertainment Close-Up - Factiva, 08/26/2014) |
| | | | | | | | | | | | **Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A** (Professional Services Close-Up - Factiva, 08/26/2014) |
| 8/27/2014 Wed | 840,227 | $17.71 | 0.57% | 0.03% | 0.18% | 0.07% | 0.50% | 0.53 | 59.87% | $0.09 | **Navient joins annual radiothon to help raise money for Nemours/ Alfred I. duPont Hospital for Children** (GlobeNewswire - Factiva, 08/27/2014 08:06 AM) |
| | | | | | | | | | | | **Navient joins annual radiothon to help raise money for Nemours/ Alfred I. duPont Hospital for Children** (PrimeZone Media Network - Bloomberg, 08/27/2014 08:06 AM) |
| 8/28/2014 Thu | 911,179 | $17.72 | 0.06% | -0.16% | -0.21% | -0.16% | 0.21% | 0.23 | 82.02% | $0.04 | **Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A** (Manufacturing Close-Up - Factiva, 08/28/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | | Events |
| 8/29/2014 Fri | 1,990,289 | $17.94 | 1.24% | 0.34% | 0.16% | 0.30% | 0.94% | 1.00 | 31.96% | $0.17 | Fitch Takes Various Rating Actions on SLM Private Student Loan Trust 2002-A (Wireless News - Factiva, 08/28/2014)<br>**MarketLine Research Report** (Marketline - Manual Entry, 08/29/2014)<br>***NAVIENT AFFILIATE TO SUBMIT BUY BIDS FOR CLASS A6C, A6B NOTES** (Bloomberg First Word - Bloomberg, 08/29/2014 10:22 AM)<br>***NAVIENT AFFILIATE TO SUBMIT BIDS FOR NOTES IT DOESN'T HOLD** (BLOOMBERG News - Bloomberg, 08/29/2014 10:23 AM)<br>***NAVIENT AFFILIATE TO SUBMIT BIDS AT LIBOR + 1.5%** (BLOOMBERG News - Bloomberg, 08/29/2014 10:23 AM)<br>**Education Department Revamps Contracts With Student Loan Servicers; Contracts Are In Response to Complaints From Consumer-Advocacy Groups** (The Wall Street Journal Online - Factiva, 08/29/2014 02:59 PM)<br>**Education Dept Revamps Contracts With Student Loan Servicers** (Dow Jones Top News & Commentary - Factiva, 08/29/2014 05:48 PM)<br>**Education Dept Revamps Contracts With Student Loan Servicers** (Dow Jones Top North American Equities Stories - Factiva, 08/29/2014 05:57 PM) |
| 8/30/2014 Sat | | | | | | | | | | | **Education Department Revamps Contracts With Student Loan Servicers** (Financial Services Monitor Worldwide - Factiva, 08/30/2014) |
| 8/31/2014 Sun<br>9/1/2014 Mon<br>9/2/2014 Tue | 1,560,694 | $17.98 | 0.22% | -0.05% | 0.71% | 0.14% | 0.08% | 0.09 | 93.17% | $0.01 | **HIGH YIELD: ALISCI 10.25%, CBB 8.75% Among Leading Movers** (Bloomberg First Word - Bloomberg, 09/02/2014 07:13 AM)<br>**Loan Changes Good for Nelnet, Mixed for Navient: Compass Point** (Bloomberg First Word - Bloomberg, 09/02/2014 07:29 AM)<br>**Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 09/02/2014 08:10 AM)<br>**Navient President and CEO to present at the 2014 Barclays Global Financial Services Conference on Sept. 8** (GlobeNewswire - Factiva, 09/02/2014 09:00 AM)<br>**Navient President and CEO to present at the 2014 Barclays Global Financial Services Conference on Sept. 8** (PrimeZone Media Network - Bloomberg, 09/02/2014 09:00 AM) |
| 9/3/2014 Wed | 1,309,433 | $17.98 | 0.00% | -0.06% | 0.32% | 0.04% | -0.04% | -0.04 | 96.52% | -$0.01 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 09/03/2014)<br>**HIGH YIELD: NAVI 4.625%, TOL 4% Among Lagging Movers** (Bloomberg First Word - Bloomberg, 09/03/2014 07:18 AM) |
| 9/4/2014 Thu | 1,609,867 | $17.96 | -0.11% | -0.15% | -0.13% | -0.14% | 0.02% | 0.03 | 97.96% | $0.00 | **HIGH YIELD: NSUS 4.75%, NAVI 8.45% Among Leading Movers** (Bloomberg First Word - Bloomberg, 09/04/2014 07:10 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 9/5/2014 Fri | 2,305,249 | $17.79 | -0.95% | 0.51% | -0.35% | 0.30% | -1.25% | -1.32 | 18.88% | -$0.22 | HIGH YIELD: ALISCI 10.25%, CLTDEF 8.75% Among Lagging Movers (Bloomberg First Word - Bloomberg, 09/04/2014 07:18 AM) |
| | | | | | | | | | | | Grads W/ Loans Need 34% More to Afford Home Purchase: RealtyTrac (Bloomberg First Word - Bloomberg, 09/04/2014 09:12 AM) |
| | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 09/05/2014) |
| | | | | | | | | | | | S&P Global Compustat Research Report (S&P Global Compustat - Manual Entry, 09/05/2014) |
| 9/6/2014 Sat | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Aug. 19, 2014) (Investment Weekly News - Factiva, 09/06/2014) |
| 9/7/2014 Sun | | | | | | | | | | | |
| 9/8/2014 Mon | 1,883,296 | $17.69 | -0.56% | -0.29% | -0.34% | -0.29% | -0.27% | -0.29 | 77.29% | -$0.05 | Navient Corp at Barclays Global Financial Services Conference - Final (CQ FD Disclosure - Factiva, 09/08/2014) |
| | | | | | | | | | | | U.S. FINANCIALS PRE-MKT: Barclays Conf.; BofA Upgrade at Goldman (Bloomberg First Word - Bloomberg, 09/08/2014 08:56 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 09/08/2014 09:22 AM) |
| | | | | | | | | | | | Fitch: Select Std Loan Servicers May Gain in New DOE Contracts (Reuters News - Factiva, 09/08/2014 12:47 PM) |
| | | | | | | | | | | | Fitch: Select Std Loan Servicers May Gain in New DOE Contracts (Business Wire - Bloomberg, 09/08/2014 12:59 PM) |
| 9/9/2014 Tue | 1,588,756 | $17.48 | -1.19% | -0.65% | -0.30% | -0.55% | -0.64% | -0.68 | 49.94% | -$0.11 | |
| 9/10/2014 Wed | 1,206,080 | $17.35 | 0.11% | 0.37% | -0.12% | 0.26% | -0.14% | -0.15 | 88.03% | -$0.02 | Agentur fÃ‚Â¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬Å“ USA Blue Chips - Factiva, 09/10/2014) |
| | | | | | | | | | | | Dividend Impact to the S&P 500 Index as of Sept. 10 (BLOOMBERG News - Bloomberg, 09/10/2014 08:00 AM) |
| | | | | | | | | | | | Ex-divs to Trim 0.206 Pts off S&P500 on Sept. 10 (Bloomberg First Word - Bloomberg, 09/10/2014 08:00 AM) |
| | | | | | | | | | | | Navient Corp Goes Ex-Dividend, Trades Without Payout (BLOOMBERG News - Bloomberg, 09/10/2014 08:17 AM) |
| | | | | | | | | | | | Fitch Affirms SLM Private Education Student Loan Trust 2013-C; Outlook Stable (Reuters News - Factiva, 09/10/2014 04:43 PM) |
| | | | | | | | | | | | Fitch Affirms SLM Private Education Student Loan Trust 2013-C; Outlook Stable (Business Wire - Factiva, 09/10/2014 04:56 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Industry | Predicted | Abnormal | | | Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 9/11/2014 Thu | 1,300,354 | $17.46 | 0.63% | 0.12% | -0.08% | 0.07% | 0.56% | 0.59 | 55.42% | $0.10 | Fitch Affirms SLM Private Education Student Loan Trust 2013-C; Outlook Stable (Business Wire - Bloomberg, 09/10/2014 04:56 PM) |
| | | | | | | | | | | | Top 4 Mid-Cap Stocks In The Credit Services Industry With The Highest EPS (Benzinga.com - Factiva, 09/11/2014 04:26 AM) |
| 9/12/2014 Fri | 1,343,128 | $17.62 | 0.92% | -0.59% | 0.00% | -0.43% | 1.35% | 1.43 | 15.52% | $0.24 | Compass Point Research Report (Compass Point - Manual Entry, 09/12/2014) |
| | | | | | | | | | | | Fitch Affirms SLM Private Education Student Loan Trust 2013-C; Outlook Stable (Thai News Service - Factiva, 09/12/2014) |
| | | | | | | | | | | | New data shows Navient continues to prevent more student loan defaults (GlobeNewswire - Factiva, 09/12/2014 02:52 PM) |
| | | | | | | | | | | | New data shows Navient continues to prevent more student loan defaults (PrimeZone Media Network - Bloomberg, 09/12/2014 02:52 PM) |
| 9/13/2014 Sat 9/14/2014 Sun | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 09/14/2014) |
| 9/15/2014 Mon | 1,394,414 | $17.36 | -1.48% | -0.07% | 0.23% | 0.01% | -1.49% | -1.58 | 11.79% | -$0.26 | Buckingham Research Research Report (Buckingham Research - Manual Entry, 09/15/2014) |
| | | | | | | | | | | | Credit Suisse Research Report (Credit Suisse - Manual Entry, 09/15/2014) |
| | | | | | | | | | | | Janney Montgomery Scott Research Report (Janney Montgomery Scott - Manual Entry, 09/15/2014) |
| | | | | | | | | | | | Compass Point Sees Good Things Ahead For Navient Corp (Benzinga.com - Factiva, 09/15/2014 08:41 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 09/15/2014 08:49 AM) |
| 9/16/2014 Tue | 981,544 | $17.50 | 0.81% | 0.75% | 0.23% | 0.62% | 0.19% | 0.20 | 84.33% | $0.03 | Pioneer Credit Recovery to host employment events this month (GlobeNewswire - Factiva, 09/16/2014 12:28 PM) |
| | | | | | | | | | | | Pioneer Credit Recovery to host employment events this month (PrimeZone Media Network - Bloomberg, 09/16/2014 12:28 PM) |
| 9/17/2014 Wed | 1,182,687 | $17.82 | 1.83% | 0.13% | 0.90% | 0.32% | 1.51% | 1.60 | 11.33% | $0.26 | Barclays Research Report (Barclays - Manual Entry, 09/17/2014) |
| | | | | | | | | | | | S&P 500 Yr-End Target Raised to 2,050 at Credit Suisse (Bloomberg First Word - Bloomberg, 09/17/2014 02:59 AM) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Leading Movers Yesterday (Bloomberg First Word - Bloomberg, 09/17/2014 07:25 AM) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Lagging Movers Yesterday (Bloomberg First Word - Bloomberg, 09/17/2014 07:43 AM) |
| | | | | | | | | | | | Navient announces job fair on Sept. 20 (GlobeNewswire - Factiva, 09/17/2014 08:45 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | Navient announces job fair on Sept. 20 (PrimeZone Media Network - Bloomberg, 09/17/2014 08:45 AM) |
| 9/18/2014 Thu | 1,817,421 | $17.85 | 0.17% | 0.50% | 0.72% | 0.56% | -0.39% | -0.41 | 68.21% | -$0.07 | HIGH YIELD: Top Ten Lagging Movers Yesterday (Bloomberg First Word - Bloomberg, 09/18/2014 07:48 AM) |
| 9/19/2014 Fri | 2,140,327 | $17.86 | 0.06% | -0.05% | -0.13% | -0.06% | 0.11% | 0.12 | 90.35% | $0.02 | MarketLine Research Report (Marketline - Manual Entry, 09/19/2014) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 09/19/2014 03:00 PM) |
| 9/20/2014 Sat | | | | | | | | | | | |
| 9/21/2014 Sun | | | | | | | | | | | |
| 9/22/2014 Mon | 1,560,020 | $17.82 | -0.22% | -0.80% | 0.09% | -0.57% | 0.34% | 0.36 | 71.76% | $0.06 | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 09/22/2014 08:58 AM) |
| 9/23/2014 Tue | 1,775,999 | $17.60 | -1.23% | -0.57% | -0.45% | -0.52% | -0.71% | -0.76 | 45.16% | -$0.13 | Credit Suisse Research Report (Credit Suisse - Manual Entry, 09/23/2014) |
| 9/24/2014 Wed | 1,968,623 | $17.91 | 1.76% | 0.79% | -0.27% | 0.53% | 1.23% | 1.31 | 19.31% | $0.22 | Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 09/24/2014) |
| | | | | | | | | | | | Navient helps improve the nation's student loan Cohort Default Rate (GlobeNewswire - Factiva, 09/24/2014 02:55 PM) |
| | | | | | | | | | | | Navient helps improve the nation's student loan Cohort Default Rate (PrimeZone Media Network - Bloomberg, 09/24/2014 02:55 PM) |
| 9/25/2014 Thu | 1,543,644 | $17.73 | -1.01% | -1.62% | -0.25% | -1.25% | 0.25% | 0.26 | 79.47% | $0.04 | |
| 9/26/2014 Fri | 956,200 | $17.68 | -0.28% | 0.88% | 0.67% | 0.82% | -1.10% | -1.17 | 24.57% | -$0.20 | Navient to attend Deutsche Bank 2014 Leveraged Finance Conference on Sept. 30 (GlobeNewswire - Factiva, 09/26/2014 09:00 AM) |
| | | | | | | | | | | | Navient to attend Deutsche Bank 2014 Leveraged Finance Conference on Sept. 30 (PrimeZone Media Network - Bloomberg, 09/26/2014 09:00 AM) |
| 9/27/2014 Sat | | | | | | | | | | | |
| 9/28/2014 Sun | | | | | | | | | | | |
| 9/29/2014 Mon | 1,386,657 | $17.65 | -0.17% | -0.25% | -0.09% | -0.20% | 0.03% | 0.03 | 97.86% | $0.00 | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 09/29/2014 08:29 AM) |
| | | | | | | | | | | | Consumer Finance Equities Coverage -- Capital One Financial, SLM Corp., Discover Financial Services, Navient, and Ally Financial (PR Newswire (U.S.) - Factiva, 09/29/2014 08:55 AM) |
| | | | | | | | | | | | *NAVIENT FUNDING AFFILIATE TO BID FOR STUDENT LOAN TRUST NOTES (Bloomberg First Word - Bloomberg, 09/29/2014 11:26 AM) |
| | | | | | | | | | | | *NAVIENT AFFILIATE TO BID FOR TRUST 2006-7 CLASS A-6B NOTES (BLOOMBERG News - Bloomberg, 09/29/2014 11:27 AM) |
| | | | | | | | | | | | *NAVIENT AFFILIATE TO BID FOR TRUST 2006-7 CLASS A-6C NOTES (BLOOMBERG News - Bloomberg, 09/29/2014 11:27 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 9/30/2014 Tue | 1,678,906 | $17.71 | 0.34% | -0.27% | -0.06% | -0.21% | 0.55% | 0.58 | 56.22% | $0.10 | **\*NAVIENT AFFILIATE TO BID AT AT A RATE EQUAL TO LIBOR+1.5%** (BLOOMBERG News - Bloomberg, 09/29/2014 11:28 AM) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: EBay, PayPal to Split; JMP Conference** (Bloomberg First Word - Bloomberg, 09/30/2014 07:58 AM) |
| | | | | | | | | | | | **Republican Senate Would Mean Less Risk for Ed Svcs: Compass Pt** (Bloomberg First Word - Bloomberg, 09/30/2014 09:36 AM) |
| 10/1/2014 Wed | 2,330,367 | $17.44 | -1.52% | -1.32% | 0.01% | -0.97% | -0.56% | -0.59 | 55.55% | -$0.10 | **Compass Point Research Report** (Compass Point - Manual Entry, 10/01/2014) |
| 10/2/2014 Thu | 1,741,525 | $17.40 | -0.23% | 0.01% | 0.39% | 0.11% | -0.34% | -0.36 | 72.00% | -$0.06 | |
| 10/3/2014 Fri | 1,739,285 | $17.43 | 0.17% | 1.12% | 0.43% | 0.94% | -0.77% | -0.81 | 41.73% | -$0.13 | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 10/03/2014) |
| 10/4/2014 Sat | | | | | | | | | | | |
| 10/5/2014 Sun | | | | | | | | | | | |
| 10/6/2014 Mon | 3,435,225 | $17.57 | 0.80% | -0.15% | 0.09% | -0.08% | 0.89% | 0.94 | 34.90% | $0.15 | **General Revenue Corporation to host open house for job seekers** (GlobeNewswire - Factiva, 10/06/2014 08:32 AM) |
| | | | | | | | | | | | **General Revenue Corporation to host open house for job seekers** (PrimeZone Media Network - Bloomberg, 10/06/2014 08:32 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 10/06/2014 08:32 AM) |
| | | | | | | | | | | | **Navient to announce third quarter 2014 results on Oct. 15, host earnings call on Oct. 16** (GlobeNewswire - Factiva, 10/06/2014 04:15 PM) |
| | | | | | | | | | | | **Navient to announce third quarter 2014 results on Oct. 15, host earnings call on Oct. 16** (PrimeZone Media Network - Bloomberg, 10/06/2014 04:15 PM) |
| 10/7/2014 Tue | 2,698,982 | $17.30 | -1.54% | -1.51% | -0.37% | -1.20% | -0.33% | -0.35 | 72.37% | -$0.06 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 10/07/2014) |
| 10/8/2014 Wed | 4,953,239 | $17.34 | 0.23% | 1.78% | 0.57% | 1.47% | -1.24% | -1.31 | 19.29% | -$0.21 | **Agentur fÃ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 10/08/2014) |
| | | | | | | | | | | | **Barclays Research Report** (Barclays - Manual Entry, 10/08/2014) |
| | | | | | | | | | | | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 10/08/2014) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 10/08/2014 07:23 AM) |
| | | | | | | | | | | | **Corinthian May Be Ed Sectorâ€™s â€˜Lehmanâ€™; Others Unlikely: BMO** (Bloomberg First Word - Bloomberg, 10/08/2014 09:39 AM) |
| 10/9/2014 Thu | 3,039,139 | $17.26 | -0.46% | -2.06% | 0.33% | -1.44% | 0.98% | 1.04 | 30.00% | $0.17 | **CORRECTION OFFICIAL - Navient declares fourth quarter common stock dividend** (Reuters Significant Developments - Factiva, 10/09/2014) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Predicted Abnormal | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 10/09/2014 07:24 AM) |
| | | | | | | | | | | | **\*NAVIENT DECLARES 4Q STOCK DIV** (BLOOMBERG News - Bloomberg, 10/09/2014 08:18 AM) |
| | | | | | | | | | | | **Navient declares fourth quarter common stock dividend** (PrimeZone Media Network - Bloomberg, 10/09/2014 08:18 AM) |
| | | | | | | | | | | | **CORRECTING and REPLACING -- Navient declares fourth quarter common stock dividend** (GlobeNewswire - Factiva, 10/09/2014 10:35 AM) |
| | | | | | | | | | | | **\*CORRECTING, REPLACING -- NAVIENT DECLARES 4Q STOCK DIV** (BLOOMBERG News - Bloomberg, 10/09/2014 10:35 AM) |
| | | | | | | | | | | | **CORRECTING and REPLACING -- Navient declares fourth quarter common stock dividend** (PrimeZone Media Network - Bloomberg, 10/09/2014 10:35 AM) |
| 10/10/2014 Fri | 4,295,154 | $17.13 | -0.78% | -1.13% | 0.05% | -0.75% | -0.03% | -0.03 | 97.56% | $0.00 | **Navient May Sell $663.9m Private Student Loan ABS Next Week** (Bloomberg First Word - Bloomberg, 10/10/2014 10:22 AM) |
| | | | | | | | | | | | **MORE: Navient May Sell $663.9m Private Student Loan ABS** (Bloomberg First Word - Bloomberg, 10/10/2014 10:33 AM) |
| 10/11/2014 Sat | | | | | | | | | | | |
| 10/12/2014 Sun | | | | | | | | | | | |
| 10/13/2014 Mon | 3,456,579 | $17.30 | 1.02% | -1.65% | -0.11% | -1.16% | 2.18% | 2.32 | 2.20% * | $0.37 | **Barclays Research Report** (Barclays - Manual Entry, 10/13/2014) |
| | | | | | | | | | | | **\*NAVIENT RAISED TO OVERWEIGHT VS EQUALWEIGHT AT BARCLAYS** (Bloomberg First Word - Bloomberg, 10/13/2014 03:42 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 10/13/2014 08:24 AM) |
| | | | | | | | | | | | **U.S. PRE-MKT MOVERS: ALNY APL APT ATLS CSX FOMX GTAT IBIO SFLY** (Bloomberg First Word - Bloomberg, 10/13/2014 08:51 AM) |
| | | | | | | | | | | | **Video Release -- Navient debuts services to 12 million student loan customers** (GlobeNewswire - Factiva, 10/13/2014 09:58 AM) |
| | | | | | | | | | | | **Video Release -- Navient debuts services to 12 million student loan customers** (PrimeZone Media Network - Bloomberg, 10/13/2014 09:58 AM) |
| | | | | | | | | | | | **U.S. EQUITY MOVERS: ALNY CSX DRYS GTAT HIVE IBIO JCP LAD NSX** (Bloomberg First Word - Bloomberg, 10/13/2014 10:33 AM) |
| 10/14/2014 Tue | 3,239,694 | $17.47 | 0.98% | 0.16% | 0.40% | 0.26% | 0.73% | 0.76 | 45.11% | $0.13 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 10/14/2014) |
| | | | | | | | | | | | **Moody's assigns provisional ratings to Navient Private Education Loan Trust 2014-A** (Moody's Investors Service Press Release - Factiva, 10/14/2014) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 10/15/2014 Wed | 3,793,116 | $17.42 | -0.29% | -0.80% | -0.65% | -0.62% | 0.33% | 0.34 | 73.13% | $0.06 | **Navient Plans to Sell $663.9m Private Student Loan ABS** (Bloomberg First Word - Bloomberg, 10/14/2014 08:55 AM) |
| | | | | | | | | | | | **\*MOODY'S ASSIGNS PROVISIONAL RATINGS TO NAVIENT PRIVATE** (BLOOMBERG News - Bloomberg, 10/14/2014 12:38 PM) |
| | | | | | | | | | | | **Barclays Research Report** (Barclays - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 10/15/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 10/15/2014) |
| | | | | | | | | | | | **Navient Plans $664M Private Student Loan ABS** (Asset Securitization Report - Factiva, 10/15/2014) |
| | | | | | | | | | | | **Navient Q3 Profit Rises** (RTT News - Factiva, 10/15/2014) |
| | | | | | | | | | | | **Navient Q3 Profit Up 38%** (RTT News - Factiva, 10/15/2014) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: BAC 3Q Adj. EPS Beats, KEY Rev. Trails** (Bloomberg First Word - Bloomberg, 10/15/2014 09:21 AM) |
| | | | | | | | | | | | **Navient Student Loan ABS 5.76Y AAA Guidance at IS+125-130** (Bloomberg First Word - Bloomberg, 10/15/2014 11:16 AM) |
| | | | | | | | | | | | **Navient Private Student Loan ABS 1Y AAA Priced at L+48** (Bloomberg First Word - Bloomberg, 10/15/2014 02:21 PM) |
| | | | | | | | | | | | **MORE: Navient Private SL ABS 5.7Y AAA Priced at 2.74% Cpn** (Bloomberg First Word - Bloomberg, 10/15/2014 03:01 PM) |
| | | | | | | | | | | | **Navient Reports Third-Quarter 2014 Financial Results** (GlobeNewswire - Factiva, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT 3Q CORE EPS 52C :NAVI US** (BLOOMBERG News - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT 3Q CORE EPS 52C , EST. 52C :NAVI US** (BLOOMBERG News - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT 3Q EPS 85C :NAVI US** (BLOOMBERG News - Bloomberg, 10/15/2014 04:15 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 10/16/2014 Thu | 3,868,309 | $17.64 | 1.26% | 0.02% | -0.68% | -0.11% | 1.37% | 1.46 | 14.58% | $0.24 | **Navient Reports Third-Quarter 2014 Financial Results** (PrimeZone Media Network - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 3Q CORE EPS 52C** (BLOOMBERG News - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 3Q CORE EPS 52C , EST. 52C :NAVI US** (Bloomberg First Word - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 3Q CORE EPS 52C , EST. 52C** (Bloomberg First Word - Bloomberg, 10/15/2014 04:15 PM) |
| | | | | | | | | | | | **Navient 3Q EPS 52c >NAVI** (Dow Jones Newswires Chinese (English) - Factiva, 10/15/2014 04:16 PM) |
| | | | | | | | | | | | **Navient 3Q Core EPS 52c, Est. 52c** (Bloomberg First Word - Bloomberg, 10/15/2014 04:24 PM) |
| | | | | | | | | | | | **Navient Profit Rises as Credit Performance Improves** (Dow Jones Institutional News - Factiva, 10/15/2014 05:47 PM) |
| | | | | | | | | | | | **Navient Profit Rises as Credit Performance Improves** (Dow Jones Top News & Commentary - Factiva, 10/15/2014 05:47 PM) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 10/16/2014) |
| | | | | | | | | | | | **Navient rebuffs servicing concerns on student loan ABS** (GlobalCapital - Factiva, 10/16/2014) |
| | | | | | | | | | | | **Navient sees net income rise YOY in Q3** (SNL Financial Services Daily - Factiva, 10/16/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Excess Industry | Predicted | Abnormal | | | Abnormal Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Q3 2014 Navient Corp Earnings Call - Final** (CQ FD Disclosure - Factiva, 10/16/2014) |
| | | | | | | | | | | | **Report: Private student borrowers can't get help** (Associated Press Newswires - Factiva, 10/16/2014 12:20 AM) |
| | | | | | | | | | | | **Navient May Buy Wells Fargo $9.3b FFELP Portfolio: Compass Point** (Bloomberg First Word - Bloomberg, 10/16/2014 06:41 AM) |
| | | | | | | | | | | | **US FINANCIALS PRE-MKT: AmEx, BofA, Citi Upgraded Post 3Q Results** (Bloomberg First Word - Bloomberg, 10/16/2014 08:58 AM) |
| | | | | | | | | | | | **U.S. PRE-MARKET MOVERS: BHI CHK CMRX ESI EXTR IBIO NFLX TZOO** (Bloomberg First Word - Bloomberg, 10/16/2014 09:11 AM) |
| | | | | | | | | | | | **Third Quarter of â€™14 S&P 500 Earnings Snapshot as of Oct. 16** (BLOOMBERG News - Bloomberg, 10/16/2014 10:09 AM) |
| | | | | | | | | | | | **Third Quarter of â€¯14 S&P 500 Sales Summary (Table)** (BLOOMBERG News - Bloomberg, 10/16/2014 10:10 AM) |
| | | | | | | | | | | | **S&P 3Q Update: 64 EPS Reports, 44 Beat, 8 Meet, 12 Miss Est** (Bloomberg First Word - Bloomberg, 10/16/2014 10:10 AM) |
| 10/17/2014 Fri | 4,878,778 | $18.61 | 5.50% | 1.29% | -0.45% | 0.84% | 4.66% | 5.00 | 0.00% ** | $0.82 | **Barclays Research Report** (Barclays - Manual Entry, 10/17/2014) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 10/17/2014) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 10/17/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 10/17/2014) |
| | | | | | | | | | | | **Navient Files 8K - Entry Into Definitive Agreement >NAVI** (Dow Jones Institutional News - Factiva, 10/17/2014 06:02 AM) |
| | | | | | | | | | | | **Navient Files 8K - Other Events >NAVI** (Dow Jones Institutional News - Factiva, 10/17/2014 06:02 AM) |
| | | | | | | | | | | | **\*NAVIENT LLC TO BE MERGED INTO NAVIENT CORP.** (BLOOMBERG News - Bloomberg, 10/17/2014 06:06 AM) |
| | | | | | | | | | | | **Expected Earnings Growth for Industries in S&P 500** (BLOOMBERG News - Bloomberg, 10/17/2014 10:37 AM) |
| | | | | | | | | | | | **Analyst Estimate Changes by Industry Groups in the S&P 500** (BLOOMBERG News - Bloomberg, 10/17/2014 10:38 AM) |
| | | | | | | | | | | | **Expected Revenue Growth for Industries in S&P 500** (BLOOMBERG News - Bloomberg, 10/17/2014 10:59 AM) |
| | | | | | | | | | | | **S&P 500 Stocks Biggest Weekly Changes in Target Price** (BLOOMBERG News - Bloomberg, 10/17/2014 12:10 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Abnormal Price Reaction | Events |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 10/17/2014 03:00 PM) |
| 10/18/2014 Sat | | | | | | | | | | | |
| 10/19/2014 Sun | | | | | | | | | | | |
| 10/20/2014 Mon | 2,515,974 | $18.64 | 0.16% | 0.92% | 0.16% | 0.89% | -0.73% | -0.71 | 47.92% | -$0.14 | S&P 500 Members Poised to Fall Based on RSI, Bollinger Data (BLOOMBERG News - Bloomberg, 10/20/2014 07:00 AM) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 10/20/2014 08:21 AM) |
| 10/21/2014 Tue | 3,410,493 | $18.79 | 0.80% | 1.96% | 0.38% | 1.76% | -0.96% | -0.94 | 34.97% | -$0.18 | |
| 10/22/2014 Wed | 4,271,022 | $18.53 | -1.38% | -0.72% | -1.48% | -0.56% | -0.82% | -0.83 | 40.99% | -$0.15 | Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢‚¬â€œ USA Blue Chips - Factiva, 10/22/2014) |
| | | | | | | | | | | | Post-Earnings Expert Insight - Navient (PR Newswire (U.S.) - Factiva, 10/22/2014 09:20 AM) |
| 10/23/2014 Thu | 2,624,968 | $18.71 | 0.97% | 1.23% | 0.32% | 1.10% | -0.12% | -0.13 | 90.06% | -$0.02 | Moody's assigns definitive ratings to Navient Private Education Loan Trust 2014-A (Moody's Investors Service Press Release - Factiva, 10/23/2014) |
| | | | | | | | | | | | *MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT PRIVATE EDUCATION (BLOOMBERG NEWS - Bloomberg, 10/23/2014 05:52 PM) |
| 10/24/2014 Fri | 1,436,577 | $18.90 | 1.02% | 0.71% | 0.26% | 0.68% | 0.34% | 0.34 | 73.50% | $0.06 | |
| 10/25/2014 Sat | | | | | | | | | | | |
| 10/26/2014 Sun | | | | | | | | | | | |
| 10/27/2014 Mon | 1,602,448 | $18.84 | -0.32% | -0.15% | 0.26% | 0.03% | -0.34% | -0.35 | 72.35% | -$0.06 | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 10/27/2014 08:44 AM) |
| 10/28/2014 Tue | 1,842,489 | $19.04 | 1.06% | 1.19% | 0.61% | 1.05% | 0.01% | 0.01 | 98.87% | $0.00 | |
| 10/29/2014 Wed | 1,961,049 | $19.26 | 1.16% | -0.13% | 0.54% | 0.06% | 1.09% | 1.14 | 25.79% | $0.21 | |
| 10/30/2014 Thu | 1,859,731 | $19.50 | 1.25% | 0.63% | -0.19% | 0.58% | 0.67% | 0.70 | 48.81% | $0.13 | NAVIENT CORP 10-Q (SEC - SEC Edgar, 10/30/2014) |
| 10/31/2014 Fri | 3,215,094 | $19.78 | 1.44% | 1.17% | 0.26% | 1.05% | 0.38% | 0.40 | 68.96% | $0.07 | MarketLine Research Report (Marketline - Manual Entry, 10/31/2014) |
| | | | | | | | | | | | Navient wins 2014 Healthy Workplace Continuing Excellence Award (GlobeNewswire - Factiva, 10/31/2014 10:36 AM) |
| | | | | | | | | | | | Navient wins 2014 Healthy Workplace Continuing Excellence Award (PrimeZone Media Network - Bloomberg, 10/31/2014 10:36 AM) |
| 11/1/2014 Sat | | | | | | | | | | | |
| 11/2/2014 Sun | | | | | | | | | | | |
| 11/3/2014 Mon | 2,863,163 | $20.00 | 1.11% | -0.01% | 0.45% | 0.18% | 0.94% | 0.98 | 32.89% | $0.19 | Credit Suisse Research Report (Credit Suisse - Manual Entry, 11/03/2014) |
| | | | | | | | | | | | Issuers Driving by with $1.3B HY; Total of $3.2B Launches (High Yield Report - Factiva, 11/03/2014) |
| | | | | | | | | | | | NAVIENT CORP 424B5 (SEC - SEC Edgar, 11/03/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Excess Industry | Predicted | Abnormal | | | Abnormal Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Navient introduces new Veterans Resource Group** (GlobeNewswire - Factiva, 11/03/2014 08:00 AM) |
| | | | | | | | | | | | **Navient introduces new Veterans Resource Group** (PrimeZone Media Network - Bloomberg, 11/03/2014 08:00 AM) |
| | | | | | | | | | | | **S&P 500 Rally May Be Juiced by Lagging Hedge Funds: Strategas** (Bloomberg First Word - Bloomberg, 11/03/2014 08:53 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 11/03/2014 09:11 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP PLANS TO SELL $1B 6Y, 10Y SR NOTES TODAY** (Bloomberg First Word - Bloomberg, 11/03/2014 09:20 AM) |
| | | | | | | | | | | | **Navient Corp Plans to Sell $1b 6NCL, 10NCL Sr Notes Today** (Bloomberg First Word - Bloomberg, 11/03/2014 09:28 AM) |
| | | | | | | | | | | | **HIGH YIELD: Secondary Levels for Announced Deals** (Bloomberg First Word - Bloomberg, 11/03/2014 09:44 AM) |
| | | | | | | | | | | | **HIGH YIELD: Eight Deals for $3.28b Added, $1.3b to Price Today** (Bloomberg First Word - Bloomberg, 11/03/2014 10:44 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP 6Y IPT 5.25% AREA, 10Y IPT 6.125% AREA** (Bloomberg First Word - Bloomberg, 11/03/2014 12:40 PM) |
| | | | | | | | | | | | **\*NAVIENT $500M 6Y TALK 5.25% AREA, $500M 10Y TALK 6.125% AREA** (Bloomberg First Word - Bloomberg, 11/03/2014 02:05 PM) |
| | | | | | | | | | | | **\*NAVIENT $500M 6Y LAUNCH AT 5.125%, $500M 10Y LAUNCH AT 6%** (Bloomberg First Word - Bloomberg, 11/03/2014 02:23 PM) |
| | | | | | | | | | | | **\*NAVIENT CORP SELLS $500M 6NCL AT 99.365 TO YIELD 5.125%** (Bloomberg First Word - Bloomberg, 11/03/2014 03:54 PM) |
| | | | | | | | | | | | **\*NAVIENT CORP SELLS $500M 10NCL AT 99.0075% TO YIELD 6%** (Bloomberg First Word - Bloomberg, 11/03/2014 03:55 PM) |
| | | | | | | | | | | | **Navient Corp Sells $500m 6NCL at 5.125%, 10NCL Sr Notes at 6%** (Bloomberg First Word - Bloomberg, 11/03/2014 03:58 PM) |
| | | | | | | | | | | | **Navient kicks off a busy week for US high-yield** (Reuters News - Factiva, 11/03/2014 06:24 PM) |
| 11/4/2014 Tue | 2,013,661 | $19.46 | -2.70% | -0.28% | 0.72% | 0.01% | -2.71% | -2.83 | 0.55% \*\* | -$0.54 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 11/04/2014) |
| | | | | | | | | | | | **NAVIENT CORP FWP** (SEC - SEC Edgar, 11/04/2014) |
| | | | | | | | | | | | **\*NAVIENT CUT TO NEUTRAL VS BUY AT GOLDMAN** (Bloomberg First Word - Bloomberg, 11/04/2014 03:40 AM) |
| | | | | | | | | | | | **HIGH YIELD: New NAVI, SPF Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/04/2014 08:05 AM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Navient Files 8K - Regulation FD >NAVI (Dow Jones Institutional News - Factiva, 11/04/2014 08:18 AM) |
| | | | | | | | | | | | U.S. PRE-MARKET MOVERS: BRDR CYTK HLF LF MWW ODP S SALE TBPH THC (Bloomberg First Word - Bloomberg, 11/04/2014 08:54 AM) |
| | | | | | | | | | | | HIGH YIELD: Sprint Dominates Secondary Trading, Trace Shows (Bloomberg First Word - Bloomberg, 11/04/2014 12:16 PM) |
| | | | | | | | | | | | HIGH YIELD: Recent New Issues Mostly Lower in Secondary (Bloomberg First Word - Bloomberg, 11/04/2014 01:23 PM) |
| | | | | | | | | | | | HIGH YIELD UPDATE: Most Active Trades, Index Snapshot (Bloomberg First Word - Bloomberg, 11/04/2014 04:17 PM) |
| 11/5/2014 Wed | 3,538,759 | $19.62 | 0.82% | 0.60% | -0.06% | 0.62% | 0.20% | 0.20 | 83.96% | $0.04 | Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 11/05/2014) |
| | | | | | | | | | | | FORM 8-K: NAVIENT FILES CURRENT REPORT (US Fed News - Factiva, 11/05/2014) |
| | | | | | | | | | | | NAVIENT CORP 424B2 (SEC - SEC Edgar, 11/05/2014) |
| | | | | | | | | | | | HIGH YIELD: Recent New Issues Trading in Narrow Ranges (Bloomberg First Word - Bloomberg, 11/05/2014 08:14 AM) |
| | | | | | | | | | | | HIGH YIELD: Recent New Issues Higher in Secondary, Trace Shows (Bloomberg First Word - Bloomberg, 11/05/2014 01:22 PM) |
| | | | | | | | | | | | Navient President and CEO to present at the 2014 Bank of America Merrill Lynch Banking & Financial Services Conference on Nov. 12 (GlobeNewswire - Factiva, 11/05/2014 05:56 PM) |
| | | | | | | | | | | | Navient President and CEO to present at the 2014 Bank of America Merrill Lynch Banking & Financial Services Conference on Nov. (PrimeZone Media Network - Bloomberg, 11/05/2014 05:56 PM) |
| 11/6/2014 Thu | 2,726,273 | $20.10 | 2.45% | 0.41% | -0.30% | 0.46% | 1.99% | 2.01 | 4.67% * | $0.39 | NAVIENT CORP 8-K (SEC - SEC Edgar, 11/06/2014) |
| | | | | | | | | | | | HIGH YIELD: New MSCI, NEXTHK, NCLH Higher in Secondary (Bloomberg First Word - Bloomberg, 11/06/2014 08:13 AM) |
| | | | | | | | | | | | HIGH YIELD: New DISH Active in Secondary, 10% of Total Volume (Bloomberg First Word - Bloomberg, 11/06/2014 01:08 PM) |
| | | | | | | | | | | | Student-loan servicers urged to offer more flexibility; TreasuryÃ¢â‚¬â„¢s Raskin criticizes firmsÃ¢â‚¬â„¢ Ã¢â‚¬Ëœpoor servicing tacticsÃ¢â‚¬â„¢ (MarketWatch - Factiva, 11/06/2014 02:45 PM) |
| | | | | | | | | | | | Navient Files 8K - Direct Or Off-Balance Sheet Financial Obligation >NAVI (Dow Jones Institutional News - Factiva, 11/06/2014 04:25 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 11/7/2014 Fri | 2,476,343 | $20.21 | 0.55% | 0.05% | 0.62% | 0.16% | 0.39% | 0.39 | 69.84% | $0.08 | **Navient Files 8K - Entry Into Definitive Agreement >NAVI** (Dow Jones Institutional News - Factiva, 11/06/2014 04:25 PM) |
|  |  |  |  |  |  |  |  |  |  |  | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 11/07/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient closes senior notes offering** (SNL Financial Services Daily - Factiva, 11/07/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Treasury Department Endorses Student Loan Deals Slammed By Elizabeth Warren** (Emerging Markets Business Information News - Factiva, 11/07/2014) |
| 11/8/2014 Sat |  |  |  |  |  |  |  |  |  |  |  |
| 11/9/2014 Sun |  |  |  |  |  |  |  |  |  |  |  |
| 11/10/2014 Mon | 2,319,392 | $20.20 | -0.05% | 0.32% | 0.15% | 0.40% | -0.45% | -0.45 | 65.36% | -$0.09 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 11/10/2014 08:57 AM) |
| 11/11/2014 Tue | 1,819,417 | $20.30 | 0.50% | 0.07% | -0.75% | 0.23% | 0.26% | 0.26 | 79.28% | $0.05 |  |
| 11/12/2014 Wed | 2,179,877 | $20.13 | -0.84% | -0.04% | -0.25% | 0.13% | -0.97% | -0.96 | 33.67% | -$0.20 | **NAVIENT CORP 4** (SEC - SEC Edgar, 11/12/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient Corp at Bank of America Merrill Lynch Banking & Financial Services Conference - Final** (CQ FD Disclosure - Factiva, 11/12/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: New GRSTAR, SVU Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/12/2014 08:21 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **U.S. FINANCIALS PRE-MKT: Currency-Rigging Fines; BBT to Buy SUSQ** (Bloomberg First Word - Bloomberg, 11/12/2014 08:52 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: New Issues Continue to Trade at or Above Issue Level** (Bloomberg First Word - Bloomberg, 11/12/2014 01:12 PM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT FILES TO OFFER $757.6M FLOATING RATE NOTES** (Bloomberg First Word - Bloomberg, 11/12/2014 03:36 PM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT FILES NOTE OFFER VIA BARC, JPM, BOFA, GS, RBS** (Bloomberg First Word - Bloomberg, 11/12/2014 03:37 PM) |
|  |  |  |  |  |  |  |  |  |  |  | **Steven L Shapiro, Director, Sells 31,575 NAVI US 11/07/14** (BLOOMBERG News - Bloomberg, 11/12/2014 04:47 PM) |
| 11/13/2014 Thu | 2,629,723 | $20.78 | 3.23% | 0.06% | -0.54% | 0.21% | 3.02% | 3.00 | 0.33% ** | $0.61 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Compass Point Research Report** (Compass Point - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 11/13/2014) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Market Return | Industry Return | Excess Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Abnormal Price Reaction | Events |

|  |  |  |  |  |  |  |  |  |  |  | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient to acquire $8.5 billion in federal student loans from Wells Fargo** (Reuters Significant Developments - Factiva, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient To Buy $8.5 Bln In Federal Student Loans From Wells Fargo** (RTT News - Factiva, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Smart Insider Ltd. Research Report** (Smart Insider Ltd. - Manual Entry, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Wells Fargo Sells Gov't-Type Student Loans To Navient** (Investor's Business Daily - Factiva, 11/13/2014) |
|  |  |  |  |  |  |  |  |  |  |  | **Wells Fargo to Sell Government-Backed Student Loans to Navient; Wells Fargo to Remain Largest Private Student Lender Among U.S. Banks** (The Wall Street Journal Online - Factiva, 11/13/2014 05:29 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **HIGH YIELD: New SLH, ETFC, KW Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/13/2014 08:00 AM) |
|  |  |  |  |  |  |  |  |  |  |  | ***WELLS FARGO SELLS FEDERAL STUDENT LOANS TO NAVIENT** (BLOOMBERG News - Bloomberg, 11/13/2014 08:30 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient to acquire $8.5 billion in federal student loans from Wells Fargo** (GlobeNewswire - Factiva, 11/13/2014 08:30 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Wells Fargo Sells Federal Student Loans to Navient** (Business Wire - Bloomberg, 11/13/2014 08:30 AM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT TO BUY $8.5B IN FEDERAL STUDENT LOANS FROM WELLS FARGO** (BLOOMBERG News - Bloomberg, 11/13/2014 08:30 AM) |
|  |  |  |  |  |  |  |  |  |  |  | **Navient to acquire $8.5 billion in federal student loans from Wells Fargo** (PrimeZone Media Network - Bloomberg, 11/13/2014 08:30 AM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT TO FUND DEAL IN PART BY NEW ABS CP LINE** (BLOOMBERG News - Bloomberg, 11/13/2014 08:31 AM) |
|  |  |  |  |  |  |  |  |  |  |  | ***NAVIENT TO BUY $8.5B IN FEDERAL STUDENT LOANS FROM WELLS FARGO** (Bloomberg First Word - Bloomberg, 11/13/2014 08:31 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 11/14/2014 Fri | 2,158,055 | $20.41 | -1.78% | 0.04% | -0.37% | 0.22% | -2.00% | -1.93 | 5.59% | -$0.42 | **\*WELLS FARGO TO SELL PRINCIPAL BALANCE OF $8.5B FFELP LOANS** (BLOOMBERG News - Bloomberg, 11/13/2014 08:34 AM) **\*WELLS FARGO SAYS TERMS UNDISCLOSED, SALE NOT MATERIAL** (BLOOMBERG News - Bloomberg, 11/13/2014 08:34 AM) **Navient Buying $8.5b in Federal Student Loans From Wells Fargo** (Bloomberg First Word - Bloomberg, 11/13/2014 08:42 AM) **Navient to buy $8.5 bln in student loans from Wells Fargo** (Reuters News - Factiva, 11/13/2014 08:44 AM) **UPDATE 1-Wells Fargo to sell $8.5 bln of federal student loans to Navient** (Reuters News - Factiva, 11/13/2014 10:02 AM) **Wells Fargo to Sell Government-Backed Student Loans to Navient** (Dow Jones Newswires Chinese (English) - Factiva, 11/13/2014 10:55 AM) **HIGH YIELD: New HCHC Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/13/2014 01:31 PM) **Odds IRS/Debt Collector Measure Passes Congress 50%: Boltansky** (Bloomberg First Word - Bloomberg, 11/13/2014 03:26 PM) **U.S. to Test New Way to Collect Student Loan Payments: Huff Post** (Bloomberg First Word - Bloomberg, 11/13/2014 03:59 PM) **Government's Student Loan Collections Pilot Could Doom Private Agency Program** (PaymentsSource - Factiva, 11/14/2014) **Navient buying $8.5B federal student loans from Wells Fargo** (SNL Bank and Thrift Daily - Factiva, 11/14/2014) **Navient buying $8.5B federal student loans from Wells Fargo** (SNL Financial Services Daily - Factiva, 11/14/2014) **Navient to acquire portfolio of federally guaranteed student loans from Wells Fargo** (MarketLine (a Datamonitor Company), Financial Deals Tracker - Factiva, 11/14/2014) **Wells sheds student lending** (Investor's Business Daily - Factiva, 11/14/2014) **HIGH YIELD: Recent New Issues Mostly Lower in Secondary** (Bloomberg First Word - Bloomberg, 11/14/2014 08:10 AM) **S&P 500 Stocks Biggest Weekly Changes in Target Price** (BLOOMBERG News - Bloomberg, 11/14/2014 11:03 AM) **Omega Advisors Inc Holdings in 3rd Quarter: 13F Alert** (BLOOMBERG News - Bloomberg, 11/14/2014 12:50 PM) **HIGH YIELD: Recent New Issues Little Changed in Secondary** (Bloomberg First Word - Bloomberg, 11/14/2014 01:08 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 11/15/2014 Sat 11/16/2014 Sun 11/17/2014 Mon | 1,436,762 | $20.81 | 1.96% | 0.08% | -0.53% | 0.22% | 1.74% | 1.67 | 9.71% | $0.35 | Owl Creek Asset Management Holdings in 3rd Quarter: 13F Alert (BLOOMBERG News - Bloomberg, 11/14/2014 04:41 PM) |
| | | | | | | | | | | | **$8.5B Wells Fargo FFELP book just 1 element of Navient's acquisition opportunity** (SNL Bank and Thrift Daily - Factiva, 11/17/2014) |
| | | | | | | | | | | | **$8.5B Wells Fargo FFELP book just 1 element of Navient's acquisition opportunity** (SNL Financial Services Daily - Factiva, 11/17/2014) |
| | | | | | | | | | | | **Navient Closes New $10 Bln Financing Facility** (RTT News - Factiva, 11/17/2014) |
| | | | | | | | | | | | **Navient Corp closes $10 bln financing facility** (Reuters Significant Developments - Factiva, 11/17/2014) |
| | | | | | | | | | | | **HIGH YIELD: New SGMS, RLGY Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/17/2014 07:56 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 11/17/2014 08:45 AM) |
| | | | | | | | | | | | **Navient closes $10 billion financing facility** (GlobeNewswire - Factiva, 11/17/2014 09:00 AM) |
| | | | | | | | | | | | **\*NAVIENT CLOSES $10B FINANCING FACILITY** (BLOOMBERG News - Bloomberg, 11/17/2014 09:00 AM) |
| | | | | | | | | | | | **Navient closes $10 billion financing facility** (PrimeZone Media Network - Bloomberg, 11/17/2014 09:00 AM) |
| | | | | | | | | | | | **\*NAVIENT CLOSES $10B STUDENT LOAN ASSET-BACKED CP FACILITY** (BLOOMBERG News - Bloomberg, 11/17/2014 09:00 AM) |
| | | | | | | | | | | | **Navient Gets $10 Billion Commercial-Paper Program to Buy Loans** (BLOOMBERG News - Bloomberg, 11/17/2014 10:25 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issues Mostly Lower in Secondary** (Bloomberg First Word - Bloomberg, 11/17/2014 01:12 PM) |
| 11/18/2014 Tue | 1,472,078 | $20.87 | 0.29% | 0.53% | -0.26% | 0.65% | -0.36% | -0.35 | 72.88% | -$0.08 | **Navient closes commercial paper financing facility** (SNL Financial Services Daily - Factiva, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 11/18/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 11/18/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| | | | | | | | | | | | **HIGH YIELD: New HII, EQIX, LVLT Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/18/2014 07:58 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issues Mixed in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/18/2014 01:33 PM) |
| | | | | | | | | | | | **Navient names three new directors** (GlobeNewswire - Factiva, 11/18/2014 05:57 PM) |
| | | | | | | | | | | | **Navient names three new directors** (PrimeZone Media Network - Bloomberg, 11/18/2014 05:57 PM) |
| | | | | | | | | | | | **Adams John K Jr, Director, Acquires 2,511 NAVI US 11/14/14** (BLOOMBERG News - Bloomberg, 11/18/2014 08:11 PM) |
| | | | | | | | | | | | **Lehman Katherine A, Director, Acquires 2,511 NAVI US 11/14/14** (BLOOMBERG News - Bloomberg, 11/18/2014 08:14 PM) |
| | | | | | | | | | | | **Laura S Unger, Director, Acquires 2,511 NAVI US 11/14/14** (BLOOMBERG News - Bloomberg, 11/18/2014 08:19 PM) |
| 11/19/2014 Wed | 1,031,334 | $20.71 | -0.77% | -0.14% | -0.26% | 0.08% | -0.84% | -0.80 | 42.29% | -$0.18 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢‚¬â€œ USA Blue Chips - Factiva, 11/19/2014) |
| | | | | | | | | | | | **Navient adds 3 board members** (SNL Financial Services Daily - Factiva, 11/19/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 11/19/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 11/19/2014) |
| | | | | | | | | | | | **United States : NAVIENT CORP. closes a $10 billion loan** (National Iraqi News Agency - Factiva, 11/19/2014) |
| | | | | | | | | | | | **Navient Files 8K - Changes Exec Mgmt >NAVI** (Dow Jones Institutional News - Factiva, 11/19/2014 06:05 AM) |
| | | | | | | | | | | | **HIGH YIELD: New MOGA, MERC Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/19/2014 08:10 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issues Little Changed in Secondary** (Bloomberg First Word - Bloomberg, 11/19/2014 01:27 PM) |
| | | | | | | | | | | | **Navient Files 8K - Entry Into Definitive Agreement >NAVI** (Dow Jones Institutional News - Factiva, 11/19/2014 04:34 PM) |
| 11/20/2014 Thu | 2,741,860 | $20.70 | -0.05% | 0.20% | -0.09% | 0.35% | -0.40% | -0.38 | 70.22% | -$0.08 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 11/20/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 11/20/2014) |
| | | | | | | | | | | | **HIGH YIELD: New ABG, HDSUPP Higher in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/20/2014 08:00 AM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 11/21/2014 Fri | 2,867,071 | $21.18 | 2.32% | 0.54% | -0.49% | 0.64% | 1.68% | 1.60 | 11.23% | $0.35 | **HIGH YIELD: Recent New Issues Mixed in Secondary, Trace Shows** (Bloomberg First Word - Bloomberg, 11/20/2014 01:09 PM)<br><br>**Kane John M, Chief Oper, Exer/Conv 127,273 NAVI US 11/19/14** (BLOOMBERG News - Bloomberg, 11/20/2014 05:44 PM)<br><br>**Fitch Affirms SLM Private Credit Student Loan Trust 2003-A; Outlook Negative** (Reuters News - Factiva, 11/21/2014 01:14 PM)<br><br>**Fitch Affirms SLM Private Credit Student Loan Trust 2003-A; Outlook Negative** (Business Wire - Bloomberg, 11/21/2014 01:32 PM)<br><br>**Fitch Affirms SLM Private Credit Student Loan Trust 2003-A; Outlook Negative** (Business Wire - Factiva, 11/21/2014 01:32 PM) |
| 11/22/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 424B2, Prospectus [Rule 424(B)(2)] (Nov. 5, 2014)** (Investment Weekly News - Factiva, 11/22/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 424B5, Prospectus [Rule 424(B)(5)] (Nov. 3, 2014)** (Investment Weekly News - Factiva, 11/22/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Nov. 4, 2014)** (Investment Weekly News - Factiva, 11/22/2014)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form FWP, Filing Under Securities Act Rules 163/433 of Free Writing Prospectuses (Nov. 4, 2014)** (Investment Weekly News - Factiva, 11/22/2014) |
| 11/23/2014 Sun | | | | | | | | | | | |
| 11/24/2014 Mon | 2,107,232 | $20.94 | -1.13% | 0.29% | 0.61% | 0.40% | -1.53% | -1.45 | 15.12% | -$0.32 | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 11/24/2014)<br><br>**Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 11/24/2014 08:37 AM)<br><br>**HIGH YIELD UPDATE: Most Active Trades, Index Snapshot** (Bloomberg First Word - Bloomberg, 11/24/2014 04:01 PM) |
| 11/25/2014 Tue | 2,540,107 | $20.95 | 0.05% | -0.10% | 0.57% | -0.02% | 0.07% | 0.07 | 94.46% | $0.01 | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 11/25/2014)<br><br>**116 S&P 500 stocks just hit record highs; Many factors are converging to push U.S. stocks higher and keep the bull market going** (MarketWatch - Factiva, 11/25/2014 11:48 AM) |
| 11/26/2014 Wed | 1,734,105 | $20.91 | -0.19% | 0.30% | -0.27% | 0.42% | -0.61% | -0.62 | 53.78% | -$0.13 | **Fitch Affirms SLM Private Credit Student Loan Trust 2003-A; Outlook Negative** (Thai News Service - Factiva, 11/26/2014) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Navient CFO to present at Bank of America Merrill Lynch 2014 Leveraged Finance Conference on Dec. 3** (GlobeNewswire - Factiva, 11/26/2014 08:30 AM) |
| | | | | | | | | | | | **Navient CFO to present at Bank of America Merrill Lynch 2014 Leveraged Finance Conference on Dec. 3** (PrimeZone Media Network - Bloomberg, 11/26/2014 08:30 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 11/26/2014 11:30 AM) |
| 11/27/2014 Thu | | | | | | | | | | | **Navient issues $1.02B student loan-backed notes** (SNL Financial Services Daily - Factiva, 11/27/2014) |
| 11/28/2014 Fri | 632,426 | $20.96 | 0.24% | -0.25% | 1.07% | -0.21% | 0.44% | 0.45 | 65.47% | $0.09 | |
| 11/29/2014 Sat | | | | | | | | | | | |
| 11/30/2014 Sun | | | | | | | | | | | |
| 12/1/2014 Mon | 2,833,376 | $20.91 | -0.24% | -0.68% | 0.15% | -0.43% | 0.19% | 0.19 | 85.13% | $0.04 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 12/01/2014 08:54 AM) |
| 12/2/2014 Tue | 1,333,695 | $20.97 | 0.29% | 0.64% | -0.11% | 0.67% | -0.38% | -0.38 | 70.11% | -$0.08 | **Navient CEO and CFO to present at Goldman Sachs U.S. Financial Services Conference on Dec. 9** (GlobeNewswire - Factiva, 12/02/2014 04:30 PM) |
| | | | | | | | | | | | **Navient CEO and CFO to present at Goldman Sachs U.S. Financial Services Conference on Dec. 9** (PrimeZone Media Network - Bloomberg, 12/02/2014 04:30 PM) |
| 12/3/2014 Wed | 2,045,715 | $20.90 | 0.38% | 0.40% | -1.44% | 0.58% | -0.20% | -0.20 | 84.23% | -$0.04 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 12/03/2014) |
| | | | | | | | | | | | **Navient Corp at Bank of America Merrill Lynch Leveraged Finance Conference - Final** (CQ FD Disclosure - Factiva, 12/03/2014) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: CBOE Cut to Sell at Citi** (Bloomberg First Word - Bloomberg, 12/03/2014 07:37 AM) |
| | | | | | | | | | | | **Dividend Impact to the S&P 500 Index as of Dec. 3** (BLOOMBERG News - Bloomberg, 12/03/2014 08:00 AM) |
| | | | | | | | | | | | **Ex-divs to Trim 0.540 Pts off S&P500 on Dec. 3** (Bloomberg First Word - Bloomberg, 12/03/2014 08:00 AM) |
| | | | | | | | | | | | **Navient Corp Goes Ex-Dividend, Trades Without Payout** (BLOOMBERG News - Bloomberg, 12/03/2014 08:15 AM) |
| | | | | | | | | | | | **Top U.S. Corporate Bond Offerings in November** (BLOOMBERG News - Bloomberg, 12/03/2014 09:03 AM) |
| 12/4/2014 Thu | 1,446,810 | $20.82 | -0.38% | -0.11% | 0.36% | 0.02% | -0.40% | -0.41 | 68.59% | -$0.08 | |
| 12/5/2014 Fri | 2,982,823 | $21.00 | 0.86% | 0.17% | 0.60% | 0.21% | 0.65% | 0.66 | 51.01% | $0.14 | |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 12/6/2014 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 3, Initial Statement of Beneficial Ownership of Securities (Nov. 18, 2014)** (Investment Weekly News - Factiva, 12/06/2014) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Nov. 18, 2014)** (Investment Weekly News - Factiva, 12/06/2014) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Nov. 19, 2014)** (Investment Weekly News - Factiva, 12/06/2014) |
| 12/7/2014 Sun | | | | | | | | | | | |
| 12/8/2014 Mon | 2,183,500 | $21.29 | 1.38% | -0.71% | 1.34% | -0.54% | 1.92% | 1.94 | 5.52% | $0.40 | **Consumer Finance Equities Coverage - American Express, SLM Corp., Capital One Financial, Navient, and Synchrony Financial** (PR Newswire (U.S.) - Factiva, 12/08/2014 08:40 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 12/08/2014 08:54 AM) |
| 12/9/2014 Tue | 2,398,485 | $21.49 | 0.94% | -0.02% | 0.04% | 0.14% | 0.80% | 0.80 | 42.56% | $0.17 | **Navient Corp at Goldman Sachs Financial Services Conference - Final** (CQ FD Disclosure - Factiva, 12/09/2014) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: Goldman Conf.; Fed SIFI Capital Meeting** (Bloomberg First Word - Bloomberg, 12/09/2014 07:59 AM) |
| 12/10/2014 Wed | 2,887,488 | $21.28 | -0.98% | -1.63% | 0.46% | -1.05% | 0.07% | 0.07 | 94.21% | $0.02 | |
| 12/11/2014 Thu | 4,588,901 | $21.49 | 0.99% | 0.48% | -0.14% | 0.51% | 0.48% | 0.48 | 63.17% | $0.10 | **NAVIENT CORP 3** (SEC - SEC Edgar, 12/11/2014) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 12/11/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 12/11/2014) |
| | | | | | | | | | | | **NAVIENT CORP 8-K/A** (SEC - SEC Edgar, 12/11/2014) |
| | | | | | | | | | | | **Navient appoints former U.S. Treasurer Anna Escobedo Cabral to its Board of Directors** (GlobeNewswire - Factiva, 12/11/2014 12:30 PM) |
| | | | | | | | | | | | **Navient appoints former U.S. Treasurer Anna Escobedo Cabral to its Board of Directors** (PrimeZone Media Network - Bloomberg, 12/11/2014 12:30 PM) |
| | | | | | | | | | | | **\*NAVIENT NAMES FORMER U.S. TREASURER ANNA ESCOBEDO CABRAL TO BOA** (BLOOMBERG News - Bloomberg, 12/11/2014 12:30 PM) |
| | | | | | | | | | | | **Navient Files 8K - Changes Exec Mgmt >NAVI** (Dow Jones Institutional News - Factiva, 12/11/2014 02:45 PM) |
| | | | | | | | | | | | **Cabral Anna Escobedo, Director, Acquires 2,059 NAVI US 12/09/14** (BLOOMBERG News - Bloomberg, 12/11/2014 08:48 PM) |
| 12/12/2014 Fri | 1,542,726 | $20.83 | -3.07% | -1.62% | -0.70% | -1.08% | -1.99% | -2.00 | 4.78% * | -$0.43 | **Navient increases board size, appoints director** (SNL Financial Services Daily - Factiva, 12/12/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 12/13/2014 Sat | | | | | | | | | | | *NAVIENT CORP. AFFIRMED BY S&P (BLOOMBERG News - Bloomberg, 12/12/2014 02:21 PM) |
| | | | | | | | | | | | FORM 8-K: NAVIENT FILES CURRENT REPORT (US Fed News - Factiva, 12/13/2014) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Nov. 20, 2014) (Investment Weekly News - Factiva, 12/13/2014) |
| 12/14/2014 Sun | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 12/14/2014) |
| 12/15/2014 Mon | 1,978,560 | $21.07 | 1.15% | -0.63% | -0.25% | -0.40% | 1.56% | 1.54 | 12.56% | $0.32 | Buckingham Research Research Report (Buckingham Research - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | Credit Suisse Research Report (Credit Suisse - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | Janney Montgomery Scott Research Report (Janney Montgomery Scott - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 12/15/2014) |
| | | | | | | | | | | | NAVIENT CORP 8-K (SEC - SEC Edgar, 12/15/2014) |
| | | | | | | | | | | | Navient Corp announces new $1 bln share repurchase authority (Reuters Significant Developments - Factiva, 12/15/2014) |
| | | | | | | | | | | | Performance of Bloomberg U.S. Spun-off Companies Index (Table) (BLOOMBERG News - Bloomberg, 12/15/2014 07:45 AM) |
| | | | | | | | | | | | Navient announces new $1 billion share repurchase authority (GlobeNewswire - Factiva, 12/15/2014 09:00 AM) |
| | | | | | | | | | | | *NAVIENT REPORTS NEW $1B SHR REPURCHASE AUTHORITY (BLOOMBERG News - Bloomberg, 12/15/2014 09:00 AM) |
| | | | | | | | | | | | Navient announces new $1 billion share repurchase authority (PrimeZone Media Network - Bloomberg, 12/15/2014 09:00 AM) |
| | | | | | | | | | | | Navient Files 8K - Other Events >NAVI (Dow Jones Institutional News - Factiva, 12/15/2014 09:50 AM) |
| | | | | | | | | | | | Navient Announces New Buyback Authorization Up to $1b (Earlier) (Bloomberg First Word - Bloomberg, 12/15/2014 10:50 AM) |
| 12/16/2014 Tue | 2,667,813 | $20.88 | -0.90% | -0.85% | -0.81% | -0.56% | -0.34% | -0.33 | 73.91% | -$0.07 | Navient approves $1B share repurchase authorization (SNL Financial Services Daily - Factiva, 12/16/2014) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 12/17/2014 Wed | 1,731,681 | $21.26 | 1.82% | 2.04% | 0.40% | 1.79% | 0.03% | 0.03 | 97.84% | $0.01 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 12/17/2014) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 12/17/2014) |
| 12/18/2014 Thu | 1,684,515 | $21.50 | 1.13% | 2.42% | 0.77% | 2.10% | -0.97% | -0.95 | 34.18% | -$0.21 | |
| 12/19/2014 Fri | 7,128,021 | $22.35 | 3.95% | 0.46% | -0.43% | 0.48% | 3.47% | 3.42 | 0.09% ** | $0.75 | |
| 12/20/2014 Sat | | | | | | | | | | | |
| 12/21/2014 Sun | | | | | | | | | | | |
| 12/22/2014 Mon | 2,311,778 | $22.57 | 0.98% | 0.40% | 0.42% | 0.45% | 0.53% | 0.50 | 61.85% | $0.12 | **S&P 500 Members Poised to Fall Based on RSI, Bollinger Data** (BLOOMBERG News - Bloomberg, 12/22/2014 08:00 AM) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 12/22/2014 08:44 AM) |
| 12/23/2014 Tue | 1,288,767 | $22.35 | -0.97% | 0.18% | 0.25% | 0.30% | -1.27% | -1.20 | 23.43% | -$0.29 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 12/23/2014) |
| | | | | | | | | | | | **Navient Files 8K - Changes Exec Mgmt >NAVI** (Dow Jones Institutional News - Factiva, 12/23/2014 05:09 PM) |
| 12/24/2014 Wed | 616,905 | $22.17 | -0.81% | -0.01% | 0.12% | 0.15% | -0.95% | -0.89 | 37.30% | -$0.21 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 12/24/2014) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Most Actively Traded Bonds Yesterday** (Bloomberg First Word - Bloomberg, 12/24/2014 07:28 AM) |
| 12/25/2014 Thu | | | | | | | | | | | |
| 12/26/2014 Fri | 836,280 | $21.96 | -0.95% | 0.33% | -0.10% | 0.43% | -1.38% | -1.29 | 20.04% | -$0.31 | **HIGH YIELD: CZR, IHRT Among Best Performing CDS** (Bloomberg First Word - Bloomberg, 12/26/2014 11:15 AM) |
| 12/27/2014 Sat | | | | | | | | | | | |
| 12/28/2014 Sun | | | | | | | | | | | |
| 12/29/2014 Mon | 1,055,440 | $21.84 | -0.55% | 0.10% | -0.03% | 0.23% | -0.78% | -0.72 | 47.32% | -$0.17 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 12/29/2014 09:38 AM) |
| 12/30/2014 Tue | 1,645,233 | $21.99 | 0.66% | -0.48% | 0.54% | -0.28% | 0.94% | 0.87 | 38.61% | $0.21 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 12/30/2014) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 12/30/2014 07:19 AM) |
| 12/31/2014 Wed | 1,057,798 | $21.61 | -1.71% | -1.03% | -0.10% | -0.68% | -1.02% | -0.95 | 34.62% | -$0.23 | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 12/31/2014) |
| 1/1/2015 Thu | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 01/01/2015) |
| 1/2/2015 Fri | 942,587 | $21.82 | 0.97% | -0.02% | -0.04% | 0.11% | 0.86% | 0.79 | 43.11% | $0.19 | |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 1/3/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 3, Initial Statement of Beneficial Ownership of Securities (Dec. 11, 2014)** (Investment Weekly News - Factiva, 01/03/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Dec. 11, 2014)** (Investment Weekly News - Factiva, 01/03/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Dec. 11, 2014)** (Investment Weekly News - Factiva, 01/03/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Dec. 15, 2014)** (Investment Weekly News - Factiva, 01/03/2015) |
| 1/4/2015 Sun | | | | | | | | | | | |
| 1/5/2015 Mon | 1,102,299 | $21.10 | -3.30% | -1.82% | -0.62% | -1.33% | -1.97% | -1.81 | 7.33% | -$0.43 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 01/05/2015 09:02 AM) |
| 1/6/2015 Tue | 1,419,926 | $20.90 | -0.95% | -0.89% | -1.16% | -0.68% | -0.27% | -0.25 | 80.53% | -$0.06 | **Navient to announce fourth quarter and full year 2014 results on Jan. 21, host earnings call on Jan. 22** (GlobeNewswire - Factiva, 01/06/2015 04:30 PM) |
| | | | | | | | | | | | **Navient to announce fourth quarter and full year 2014 results on Jan. 21, host earnings call on Jan. 22** (PrimeZone Media Network - Bloomberg, 01/06/2015 04:30 PM) |
| 1/7/2015 Wed | 2,889,334 | $20.92 | 0.10% | 1.19% | 0.51% | 1.17% | -1.08% | -0.98 | 32.76% | -$0.22 | **Moody's assigns provisional ratings to Navient Private Education Loan Trust 2015-A** (Moody's Investors Service Press Release - Factiva, 01/07/2015) |
| | | | | | | | | | | | **\*MOODY'S ASSIGNS PROVISIONAL RATINGS TO NAVIENT PRIVATE** (BLOOMBERG News - Bloomberg, 01/07/2015 01:20 PM) |
| | | | | | | | | | | | **Navient May Sell $689m Private Student Loan ABS, Moody's Says** (Bloomberg First Word - Bloomberg, 01/07/2015 01:31 PM) |
| 1/8/2015 Thu | 3,124,252 | $20.60 | -1.53% | 1.79% | -0.40% | 1.60% | -3.13% | -2.86 | 0.51% ** | -$0.65 | **Barclays Research Report** (Barclays - Manual Entry, 01/09/2015) |
| 1/9/2015 Fri | 1,664,465 | $20.54 | -0.29% | -0.84% | -0.62% | -0.60% | 0.31% | 0.28 | 78.36% | $0.06 | |
| | | | | | | | | | | | **Navient introduces three tips to tackle the FAFSA** (GlobeNewswire - Factiva, 01/09/2015 08:00 AM) |
| | | | | | | | | | | | **Navient introduces three tips to tackle the FAFSA** (PrimeZone Media Network - Bloomberg, 01/09/2015 08:00 AM) |
| | | | | | | | | | | | **OBAMA COLLEGE PLAN STREET WRAP: Congress Probably Won't Pass** (Bloomberg First Word - Bloomberg, 01/09/2015 09:33 AM) |
| | | | | | | | | | | | **Compass Point: Congress Unlikely To Pay For Free Community College Initiative** (Benzinga.com - Factiva, 01/09/2015 10:24 AM) |
| 1/10/2015 Sat | | | | | | | | | | | |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 1/11/2015 Sun | | | | | | | | | | | |
| 1/12/2015 Mon | 1,431,640 | $20.17 | -1.80% | -0.81% | 0.13% | -0.51% | -1.29% | -1.15 | 25.27% | -$0.26 | |
| 1/13/2015 Tue | 2,188,825 | $20.22 | 0.25% | -0.25% | -0.18% | -0.13% | 0.37% | 0.33 | 74.11% | $0.08 | |
| 1/14/2015 Wed | 1,753,463 | $20.14 | -0.40% | -0.58% | -1.50% | -0.49% | 0.10% | 0.09 | 93.17% | $0.02 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 01/14/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 01/14/2015 07:14 AM) |
| 1/15/2015 Thu | 1,608,205 | $20.11 | -0.15% | -0.92% | 0.01% | -0.63% | 0.48% | 0.43 | 67.06% | $0.10 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 01/15/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 01/15/2015) |
| | | | | | | | | | | | **ABS: Navient, Nelnet Likely Buyers of BofA SLs, Compass Point** (Bloomberg First Word - Bloomberg, 01/15/2015 10:36 AM) |
| | | | | | | | | | | | **NAVI, NNI Likely Buyers for BofA FFELP Portfolio: Compass Point** (Bloomberg First Word - Bloomberg, 01/15/2015 11:06 AM) |
| 1/16/2015 Fri | 1,804,628 | $20.15 | 0.20% | 1.34% | -1.20% | 1.04% | -0.84% | -0.75 | 45.70% | -$0.17 | **Compass Point Research Report** (Compass Point - Manual Entry, 01/16/2015) |
| | | | | | | | | | | | **Navient, Nelnet Likely Buyers of STI Student Loans: Compass Pt** (Bloomberg First Word - Bloomberg, 01/16/2015 09:09 AM) |
| 1/17/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Dec. 23, 2014)** (Investment Weekly News - Factiva, 01/17/2015) |
| 1/18/2015 Sun | | | | | | | | | | | |
| 1/19/2015 Mon | | | | | | | | | | | |
| 1/20/2015 Tue | 1,791,675 | $19.67 | -2.38% | 0.16% | 0.98% | 0.33% | -2.71% | -2.40 | 1.82% * | -$0.55 | **MarketLine Research Report** (Marketline - Manual Entry, 01/20/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Friday** (Bloomberg First Word - Bloomberg, 01/20/2015 07:20 AM) |
| | | | | | | | | | | | **Consumer Finance Equities Ahead of Market - SLM Corp., Discover Financial Services, Capital One Financial, Navient, and Santander Consumer USA Holdings** (PR Newswire (U.S.) - Factiva, 01/20/2015 08:45 AM) |
| 1/21/2015 Wed | 3,084,051 | $19.96 | 1.47% | 0.49% | -0.29% | 0.43% | 1.05% | 0.91 | 36.49% | $0.21 | **Barclays Research Report** (Barclays - Manual Entry, 01/21/2015) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 01/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 01/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 01/21/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 01/21/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 1/22/2015 Thu | 2,551,708 | $19.69 | -1.35% | 1.53% | -4.73% | 1.11% | -2.46% | -2.14 | 3.45% * | -$0.49 | **U.S FINANCIALS PRE-MKT: NTRS, FITB, USB 4Q Rev., EPS Top Ests.** (Bloomberg First Word - Bloomberg, 01/21/2015 08:33 AM)<br><br>**Fitch Affirms SLM Private Credit Student Loan Trust 2006-B and 2006-C** (Reuters News - Factiva, 01/21/2015 02:09 PM)<br><br>**Fitch Affirms SLM Private Credit Student Loan Trust 2006-B and 2006-C** (Business Wire - Bloomberg, 01/21/2015 02:30 PM)<br><br>**Navient 4Q EPS 53c >NAVI** (Dow Jones Newswires Chinese (English) - Factiva, 01/21/2015 04:15 PM)<br><br>**Navient Reports Fourth-Quarter and Full-Year 2014 Financial Results** (GlobeNewswire - Factiva, 01/21/2015 04:15 PM)<br><br>**Sallie Mae Reports Fourth-Quarter and Full-Year 2014 Financial Results** (Business Wire - Bloomberg, 01/21/2015 04:15 PM)<br><br>**\*NAVIENT 4Q CORE EPS 53C :NAVI US** (BLOOMBERG News - Bloomberg, 01/21/2015 04:15 PM)<br><br>**\*NAVIENT 4Q CORE EPS 53C , EST. 54C :NAVI US** (BLOOMBERG News - Bloomberg, 01/21/2015 04:15 PM)<br><br>**\*NAVIENT 4Q EPS 64C :NAVI US** (BLOOMBERG News - Bloomberg, 01/21/2015 04:15 PM)<br><br>**Navient Reports Fourth-Quarter and Full-Year 2014 Financial Results** (PrimeZone Media Network - Bloomberg, 01/21/2015 04:15 PM)<br><br>**\*NAVIENT 4Q CORE EPS 53C , EST. 54C** (Bloomberg First Word - Bloomberg, 01/21/2015 04:15 PM)<br><br>**Navient 4Q Core EPS 53c, Est 54c** (Bloomberg First Word - Bloomberg, 01/21/2015 04:22 PM)<br><br>**SLM, Navient Corp. Profits Fall Sharply -- Update** (Dow Jones Institutional News - Factiva, 01/21/2015 07:46 PM)<br><br>**SLM, Navient Corp. Profits Fall Sharply; Student-Loan ServicerÃ¢â‚¬â„¢s 2015 Core EPS Guidance Misses AnalystsÃ¢â‚¬â„¢ Expectations** (The Wall Street Journal Online - Factiva, 01/21/2015 07:46 PM)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 01/22/2015)<br><br>**Compass Point Research Report** (Compass Point - Manual Entry, 01/22/2015)<br><br>**Compass Point Research Report** (Compass Point - Manual Entry, 01/22/2015)<br><br>**FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 01/22/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6]<br>Excess<br>Market Industry | [7]<br>Predicted | [8]<br>Abnormal | [9] | [10] | [11]<br>Abnormal<br>Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 1/23/2015 Fri | 2,134,458 | $19.47 | -1.12% | -0.55% | 0.75% | -0.30% | -0.82% | -0.71 | 47.94% | -$0.16 | **Navient acquires $9.5B of FFELP loans in Q4'14** (SNL Financial Services Daily - Factiva, 01/22/2015)<br><br>**Q4 2014 Navient Corp Earnings Call - Final** (CQ FD Disclosure - Factiva, 01/22/2015)<br><br>**U.S. PRE-MARKET MOVERS: CYN FFIV LE NADL NERV SNDK XLNX** (Bloomberg First Word - Bloomberg, 01/22/2015 08:38 AM)<br><br>**U.S. FINANCIALS PRE-MKT: KEY, BBT, TRV Top Highest EPS Ests.** (Bloomberg First Word - Bloomberg, 01/22/2015 08:43 AM)<br><br>**\*MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT PRIVATE EDUCATION** (BLOOMBERG News - Bloomberg, 01/22/2015 07:03 PM)<br><br>**Barclays Research Report** (Barclays - Manual Entry, 01/23/2015)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 01/23/2015)<br><br>**Compass Point Research Report** (Compass Point - Manual Entry, 01/23/2015)<br><br>**Credit Suisse Research Report** (Credit Suisse - Manual Entry, 01/23/2015)<br><br>**Evercore ISI Research Report** (Evercore ISI - Manual Entry, 01/23/2015)<br><br>**Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 01/23/2015)<br><br>**Moody's assigns definitive ratings to Navient Private Education Loan Trust 2015-A** (Moody's Investors Service Press Release - Factiva, 01/23/2015)<br><br>**R.W. PRESSPRICH Research Report** (R.W. PRESSPRICH - Manual Entry, 01/23/2015)<br><br>**Regulation, resumption of growth seen driving banks to sell student loans** (SNL Bank and Thrift Daily - Factiva, 01/23/2015)<br><br>**Regulation, resumption of growth seen driving banks to sell student loans** (SNL Financial Services Daily - Factiva, 01/23/2015)<br><br>**Buy Home Builders, Banks on Housing Strength: Fundstrat's Lee** (Bloomberg First Word - Bloomberg, 01/23/2015 07:36 AM)<br><br>**HIGH YIELD: ATCNA 7.75% Among Most Active Today, Trace Shows** (Bloomberg First Word - Bloomberg, 01/23/2015 12:23 PM) |
| 1/24/2015 Sat<br>1/25/2015 Sun | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 01/25/2015)<br><br>**Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 01/25/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 1/26/2015 Mon | 2,113,521 | $19.55 | 0.41% | 0.26% | -0.44% | 0.27% | 0.14% | 0.13 | 90.03% | $0.03 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 01/26/2015) |
| | | | | | | | | | | | **Navient Corp announces 7 pct increase in quarterly dividend** (Reuters Significant Developments - Factiva, 01/26/2015) |
| | | | | | | | | | | | **Navient announces 7 percent increase in quarterly dividend** (GlobeNewswire - Factiva, 01/26/2015 04:15 PM) |
| | | | | | | | | | | | **Navient announces 7 percent increase in quarterly dividend** (PrimeZone Media Network - Bloomberg, 01/26/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT REPORTS 7% BOOST IN QTRLY DIV** (BLOOMBERG News - Bloomberg, 01/26/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT BOOSTS QTR DIV TO 16C/SHR FROM 15C, EST. 17C** (BLOOMBERG News - Bloomberg, 01/26/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT BOOSTS QTR DIV TO 16C/SHR FROM 15C, EST. 17C** (Bloomberg First Word - Bloomberg, 01/26/2015 04:16 PM) |
| | | | | | | | | | | | **Navient Files 8K - Other Events >NAVI** (Dow Jones Institutional News - Factiva, 01/26/2015 05:29 PM) |
| 1/27/2015 Tue | 3,047,923 | $19.80 | 1.28% | -1.34% | -0.16% | -0.94% | 2.22% | 1.94 | 5.50% | $0.43 | **Compass Point Research Report** (Compass Point - Manual Entry, 01/27/2015) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 01/27/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 01/27/2015 06:41 AM) |
| 1/28/2015 Wed | 2,721,528 | $19.47 | -1.67% | -1.34% | -0.27% | -0.85% | -0.81% | -0.70 | 48.44% | -$0.16 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 01/28/2015) |
| | | | | | | | | | | | **Navient raises Q1 dividend by 7%** (SNL Financial Services Daily - Factiva, 01/28/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 01/28/2015 07:29 AM) |
| 1/29/2015 Thu | 5,054,293 | $19.50 | 0.15% | 0.96% | -0.64% | 0.81% | -0.65% | -0.56 | 57.50% | -$0.13 | **Navient announces Cash Tender Offer for its 6.25% Medium Term Notes, Series A due Jan. 25, 2016** (GlobeNewswire - Factiva, 01/29/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT REPORTS CASH TENDER OFFER FOR 6.25% MEDIUM TERM NOTES,** (BLOOMBERG News - Bloomberg, 01/29/2015 09:00 AM) |
| | | | | | | | | | | | **Navient announces Cash Tender Offer for its 6.25% Medium Term Notes, Series A due Jan. 25, 2016** (PrimeZone Media Network - Bloomberg, 01/29/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT OFFERING UP TO $500M PRINCIPAL AMOUNT OF NOTES** (BLOOMBERG News - Bloomberg, 01/29/2015 09:01 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] Date | [2] Volume | [3] Price | [4] Return | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] t-stat | [10] p-Value | [11] Abnormal Price Reaction | [12] Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2007-A** (Reuters News - Factiva, 01/29/2015 10:49 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2007-A** (Business Wire - Bloomberg, 01/29/2015 11:00 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2006-A** (Reuters News - Factiva, 01/29/2015 11:46 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2006-A** (Business Wire - Bloomberg, 01/29/2015 11:53 AM) |
| 1/30/2015 Fri | 4,173,880 | $19.74 | 1.23% | -1.30% | -0.40% | -0.84% | 2.07% | 1.78 | 7.75% | $0.40 | **Fitch Affirms SLM Private Credit Student Loan Trust 2007-A** (Thai News Service - Factiva, 01/30/2015) |
| | | | | | | | | | | | **Navient commences cash tender offer for notes** (SNL Financial Services Daily - Factiva, 01/30/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 01/30/2015 07:15 AM) |
| | | | | | | | | | | | **Navient Announces Cash Tender Offer for 6.25% MTN** (Bloomberg First Word - Bloomberg, 01/30/2015 07:52 AM) |
| | | | | | | | | | | | **Navient CEO to present at 2015 Credit Suisse Financial Services Forum** (GlobeNewswire - Factiva, 01/30/2015 09:00 AM) |
| | | | | | | | | | | | **Navient CEO to present at 2015 Credit Suisse Financial Services Forum** (PrimeZone Media Network - Bloomberg, 01/30/2015 09:00 AM) |
| 1/31/2015 Sat | | | | | | | | | | | |
| 2/1/2015 Sun | | | | | | | | | | | |
| 2/2/2015 Mon | 3,120,747 | $20.05 | 1.57% | 1.30% | 0.48% | 1.00% | 0.58% | 0.49 | 62.38% | $0.11 | **Height Analytics Research Report** (Height Analytics - Manual Entry, 02/02/2015) |
| | | | | | | | | | | | **ValuEngine Research Report** (ValuEngine - Manual Entry, 02/02/2015) |
| | | | | | | | | | | | **Private Credit SL ABS at Widest Levels in Over a Year, JPM Says** (Bloomberg First Word - Bloomberg, 02/02/2015 11:57 AM) |
| 2/3/2015 Tue | 2,543,134 | $21.08 | 5.14% | 1.45% | 0.47% | 1.12% | 4.01% | 3.45 | 0.08% ** | $0.80 | **NAVIENT CORP SC 13G** (SEC - SEC Edgar, 02/03/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 02/03/2015 07:39 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 02/03/2015 11:30 AM) |
| 2/4/2015 Wed | 2,554,434 | $21.00 | -0.38% | -0.39% | 0.47% | -0.11% | -0.27% | -0.22 | 82.40% | -$0.06 | **Fitch Affirms SLM Private Credit Student Loan Trust 2006-A** (Thai News Service - Factiva, 02/04/2015) |
| | | | | | | | | | | | **Wells Fargo Should Explore Exiting Student Lending: Compass Pt** (Bloomberg First Word - Bloomberg, 02/04/2015 07:00 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 2/5/2015 Thu | 2,165,708 | $21.31 | 1.48% | 1.05% | 0.22% | 0.96% | 0.52% | 0.42 | 67.34% | $0.11 | **HIGH YIELD: Top Ten Most Active Trades Today** (Bloomberg First Word - Bloomberg, 02/04/2015 12:02 PM) |
| | | | | | | | | | | | **Compass Point analyst says Wells Fargo should exit student lending** (SNL Bank and Thrift Daily - Factiva, 02/05/2015) |
| | | | | | | | | | | | **Compass Point analyst says Wells Fargo should exit student lending** (SNL Financial Services Daily - Factiva, 02/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/05/2015) |
| | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 02/05/2015) |
| | | | | | | | | | | | **Jack Remondi, CEO, Relinquishes 5,915 NAVI US 02/03/15** (BLOOMBERG News - Bloomberg, 02/05/2015 06:09 PM) |
| | | | | | | | | | | | **Chivabivul Somsak, CFO, Relinquishes 2,997 NAVI US 02/03/15** (BLOOMBERG News - Bloomberg, 02/05/2015 06:10 PM) |
| | | | | | | | | | | | **Kane John M, Chief Oper, Relinquishes 4,095 NAVI US 02/03/15** (BLOOMBERG News - Bloomberg, 02/05/2015 06:11 PM) |
| | | | | | | | | | | | **Hynes Timothy J Iv, Chief Risk, Relinquishes 1,212 NAVI US 02/03/15** (BLOOMBERG News - Bloomberg, 02/05/2015 06:12 PM) |
| 2/6/2015 Fri | 1,764,050 | $21.35 | 0.19% | -0.32% | 0.97% | -0.05% | 0.24% | 0.20 | 84.56% | $0.05 | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/06/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/06/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/06/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/06/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS DISPOSITION BY CEO REMONDI (Delaware)** (US Fed News - Factiva, 02/06/2015) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2005-A** (Reuters News - Factiva, 02/06/2015 03:58 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Credit Student Loan Trust 2005-A** (Business Wire - Bloomberg, 02/06/2015 04:05 PM) |
| | | | | | | | | | | | **Jack Remondi, CEO, Relinquishes 29,005 NAVI US 02/04/15** (BLOOMBERG News - Bloomberg, 02/06/2015 05:08 PM) |
| | | | | | | | | | | | **Hynes Timothy J Iv, Chief Risk, Relinquishes 3,421 NAVI US 02/04/15** (BLOOMBERG News - Bloomberg, 02/06/2015 05:10 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | Chivavibul Somsak, CFO, Relinquishes 3,187 NAVI US 02/04/15 (BLOOMBERG News - Bloomberg, 02/06/2015 05:11 PM) |
| | | | | | | | | | | | Kane John M, Chief Oper, Relinquishes 3,826 NAVI US 02/04/15 (BLOOMBERG News - Bloomberg, 02/06/2015 05:12 PM) |
| 2/7/2015 Sat | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Jan. 21, 2015) (Investment Weekly News - Factiva, 02/07/2015) |
| 2/8/2015 Sun | | | | | | | | | | | |
| 2/9/2015 Mon | 2,107,723 | $21.57 | 1.03% | -0.42% | 0.61% | -0.13% | 1.16% | 0.96 | 34.08% | $0.25 | NAVIENT CORP SC 13G (SEC - SEC Edgar, 02/09/2015) |
| 2/10/2015 Tue | 1,598,800 | $21.67 | 0.46% | 1.07% | -0.41% | 0.97% | -0.50% | -0.42 | 67.89% | -$0.11 | NAVIENT CORP 4 (SEC - SEC Edgar, 02/10/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 02/10/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 02/10/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 02/10/2015) |
| | | | | | | | | | | | NAVIENT CORP SC 13G (SEC - SEC Edgar, 02/10/2015) |
| | | | | | | | | | | | Omegaâ€™s Cooperman Sees Europe, Japan Stock Markets Beating U.S. (Bloomberg First Word - Bloomberg, 02/10/2015 06:54 AM) |
| | | | | | | | | | | | Third Avenue Likes â€˜Newâ€™ GM, Exits Southern Pacific Resource (Bloomberg First Word - Bloomberg, 02/10/2015 11:26 AM) |
| | | | | | | | | | | | BMO Starts Coverage of 25 Financial Cos; WFC at Underperform (Bloomberg First Word - Bloomberg, 02/10/2015 07:18 PM) |
| | | | | | | | | | | | Jack Remondi, CEO, Relinquishes 4,880 NAVI US 02/07/15 (BLOOMBERG News - Bloomberg, 02/10/2015 09:11 PM) |
| | | | | | | | | | | | Chivavibul Somsak, CFO, Relinquishes 2,661 NAVI US 02/07/15 (BLOOMBERG News - Bloomberg, 02/10/2015 09:13 PM) |
| | | | | | | | | | | | Kane John M, Chief Oper, Relinquishes 3,189 NAVI US 02/07/15 (BLOOMBERG News - Bloomberg, 02/10/2015 09:16 PM) |
| | | | | | | | | | | | Hynes Timothy J Iv, Chief Risk, Relinquishes 2,560 NAVI US 02/07/15 (BLOOMBERG News - Bloomberg, 02/10/2015 09:22 PM) |
| 2/11/2015 Wed | 1,928,712 | $21.95 | 1.29% | 0.03% | 0.07% | 0.21% | 1.08% | 0.89 | 37.58% | $0.23 | Agentur fÃ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 02/11/2015) |
| | | | | | | | | | | | Navient Corp at Credit Suisse Group Financial Services Forum - Final (CQ FD Disclosure - Factiva, 02/11/2015) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Leading Movers Yesterday (Bloomberg First Word - Bloomberg, 02/11/2015 07:23 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Excess Industry | Predicted | Abnormal | | | Abnormal Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 2/12/2015 Thu | 2,427,991 | $22.21 | 1.18% | 0.99% | -3.05% | 0.83% | 0.36% | 0.30 | 76.84% | $0.08 | U.S. FINANCIALS PRE-MKT: CS Conference; Western Union Downgrade (Bloomberg First Word - Bloomberg, 02/11/2015 08:27 AM) |
| | | | | | | | | | | | Credit Suisse Research Report (Credit Suisse - Manual Entry, 02/12/2015) |
| | | | | | | | | | | | NAVIENT CORP 3 (SEC - SEC Edgar, 02/12/2015) |
| | | | | | | | | | | | Navient Corporation Announces Expiration of Early Tender Date and Withdrawal Date in Offer for its 6.25% Medium Term Notes, Series A due January 25, 2016 (GlobeNewswire - Factiva, 02/12/2015 09:00 AM) |
| | | | | | | | | | | | Press Release: Navient Corporation Announces Expiration of Early Tender Date and Withdrawal Date in Offer for its 6.25% Medium Term Notes, Series A due January 25, 2016 (Dow Jones Institutional News - Factiva, 02/12/2015 09:00 AM) |
| | | | | | | | | | | | *NAVIENT REPORTS EXPIRATION OF EARLY TENDER DATE, WITHDRAWAL (BLOOMBERG News - Bloomberg, 02/12/2015 09:00 AM) |
| | | | | | | | | | | | Navient Corporation Announces Expiration of Early Tender Date and Withdrawal Date in Offer for its 6.25% Medium Term Notes, (PrimeZone Media Network - Bloomberg, 02/12/2015 09:00 AM) |
| | | | | | | | | | | | *NAVIENT GOT VALID TENDERS FROM HOLDERS OF $1.54B NOTES (BLOOMBERG News - Bloomberg, 02/12/2015 09:00 AM) |
| 2/13/2015 Fri | 2,490,613 | $22.37 | 0.72% | 0.42% | -1.76% | 0.49% | 0.23% | 0.19 | 84.99% | $0.05 | NAVIENT CORP SC 13G (SEC - SEC Edgar, 02/13/2015) |
| | | | | | | | | | | | Navient discloses early tender offer results (SNL Financial Services Daily - Factiva, 02/13/2015) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Leading Movers Yesterday (Bloomberg First Word - Bloomberg, 02/13/2015 07:12 AM) |
| 2/14/2015 Sat | | | | | | | | | | | |
| 2/15/2015 Sun | | | | | | | | | | | |
| 2/16/2015 Mon | | | | | | | | | | | |
| 2/17/2015 Tue | 3,000,023 | $21.98 | -1.74% | 0.18% | 0.56% | 0.33% | -2.08% | -1.71 | 9.03% | -$0.46 | HIGH YIELD: Top Ten Lagging Movers Friday (Bloomberg First Word - Bloomberg, 02/17/2015 06:46 AM) |
| | | | | | | | | | | | Navient celebrates new headquarters in Wilmington (GlobeNewswire - Factiva, 02/17/2015 12:39 PM) |
| | | | | | | | | | | | Navient celebrates new headquarters in Wilmington (PrimeZone Media Network - Bloomberg, 02/17/2015 12:39 PM) |
| | | | | | | | | | | | Omega Advisors Holdings in 4th Qtr: 13F Alert (Correct) (BLOOMBERG News - Bloomberg, 02/17/2015 06:29 PM) |
| 2/18/2015 Wed | 1,882,322 | $21.65 | -1.50% | -0.03% | 0.37% | 0.15% | -1.65% | -1.34 | 18.25% | -$0.36 | |
| 2/19/2015 Thu | 1,418,279 | $21.66 | 0.05% | -0.09% | -0.50% | 0.12% | -0.08% | -0.06 | 94.95% | -$0.02 | |
| 2/20/2015 Fri | 1,670,522 | $21.72 | 0.28% | 0.63% | 1.00% | 0.58% | -0.30% | -0.25 | 80.59% | -$0.07 | NAVIENT CORP 4 (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 02/20/2015) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | | | t-stat | p-Value | | Events |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 02/20/2015) |
| | | | | | | | | | | | **Adams John K Jr, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:43 PM) |
| | | | | | | | | | | | **Ann Torre Bates, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:45 PM) |
| | | | | | | | | | | | **Cabral Anna Escobedo, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:47 PM) |
| | | | | | | | | | | | **Diane Suitt Gilleland, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:50 PM) |
| | | | | | | | | | | | **Lehman Katherine A, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:50 PM) |
| | | | | | | | | | | | **Barry A Munitz, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:54 PM) |
| | | | | | | | | | | | **Steven L Shapiro, Director, Acquires 4,618 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 04:57 PM) |
| | | | | | | | | | | | **Chivavibul Somsak, EVP & CFO, Acquires 42,157 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 05:03 PM) |
| | | | | | | | | | | | **Mark L Heleen, EVP & Chie, Acquires 21,761 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 05:04 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Kane John M, EVP & Chie, Acquires 52,913 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 05:15 PM) |
| | | | | | | | | | | | **Jack Remondi, CEO, Acquires 150,472 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 05:18 PM) |
| | | | | | | | | | | | **Hynes Timothy J Iv, EVP, Chief, Acquires 33,544 NAVI US 02/18/15** (BLOOMBERG News - Bloomberg, 02/20/2015 05:24 PM) |
| 2/21/2015 Sat | | | | | | | | | | | |
| 2/22/2015 Sun | | | | | | | | | | | |
| 2/23/2015 Mon | 1,290,575 | $21.81 | 0.41% | -0.03% | 0.26% | 0.13% | 0.29% | 0.23 | 81.59% | $0.06 | **NAVIENT REPORTS ACQUISITION BY DIRECTOR CABRAL (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR LEHMAN (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR MILLS (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR MUNITZ (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR SHAPIRO (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR SUITT (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR THOMPSON (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR TORRE (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR UNGER (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS ACQUISITION BY DIRECTOR WILLIAMS (Delaware)** (US Fed News - Factiva, 02/23/2015) |
| 2/24/2015 Tue | 1,657,127 | $21.68 | -0.60% | 0.28% | 0.28% | 0.35% | -0.94% | -0.76 | 44.64% | -$0.21 | **ValuEngine Research Report** (ValuEngine - Manual Entry, 02/24/2015) |
| 2/25/2015 Wed | 2,443,935 | $21.70 | 0.09% | -0.06% | 0.68% | 0.06% | 0.03% | 0.03 | 97.91% | $0.01 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 02/25/2015) |
| | | | | | | | | | | | **Barclays Research Report** (Barclays - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 02/25/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Excess Industry | Predicted | Abnormal | | | Abnormal Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 02/25/2015) |
| | | | | | | | | | | | **Navient acquires asset recovery firm serving state and local governments** (Reuters Significant Developments - Factiva, 02/25/2015) |
| | | | | | | | | | | | **Navient acquires Gila** (MarketLine (a Datamonitor Company), Financial Deals Tracker - Factiva, 02/25/2015) |
| | | | | | | | | | | | **Owner Resource Group sells Gila to Navient** (MarketLine (a Datamonitor Company), Financial Deals Tracker - Factiva, 02/25/2015) |
| | | | | | | | | | | | **Navient acquires leading asset recovery firm serving state and local governments** (GlobeNewswire - Factiva, 02/25/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT BUYS LEADING ASSET RECOVERY FIRM SERVING STATE, LOCAL** (BLOOMBERG News - Bloomberg, 02/25/2015 09:00 AM) |
| | | | | | | | | | | | **Navient acquires leading asset recovery firm serving state and local governments** (PrimeZone Media Network - Bloomberg, 02/25/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT BUYS GILA LLC** (BLOOMBERG News - Bloomberg, 02/25/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT BUYS GILA LLC, NO TERMS** (BLOOMBERG News - Bloomberg, 02/25/2015 09:00 AM) |
| | | | | | | | | | | | ***NAVIENT BUYS GILA LLC, NO TERMS** (Bloomberg First Word - Bloomberg, 02/25/2015 09:01 AM) |
| | | | | | | | | | | | **HIGH YIELD: PKD, CHK Among Worst Performing CDS** (Bloomberg First Word - Bloomberg, 02/25/2015 03:46 PM) |
| 2/26/2015 Thu | 1,742,617 | $21.85 | 0.69% | -0.13% | 0.62% | 0.01% | 0.68% | 0.55 | 58.49% | $0.15 | **Navient buys asset recovery, business process outsourcing firm** (SNL Financial Services Daily - Factiva, 02/26/2015) |
| | | | | | | | | | | | **Navient announces annual meeting of shareholders on May 21, 2015** (GlobeNewswire - Factiva, 02/26/2015 09:00 AM) |
| | | | | | | | | | | | **Navient announces annual meeting of shareholders on May 21, 2015** (PrimeZone Media Network - Bloomberg, 02/26/2015 09:00 AM) |
| | | | | | | | | | | | ***MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT STUDENT LOAN** (BLOOMBERG News - Bloomberg, 02/26/2015 02:48 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/27/2015 Fri | 2,271,775 | $21.40 | -2.06% | -0.29% | -1.02% | -0.01% | -2.05% | -1.65 | 10.07% | -$0.45 | **Hundreds of jobs in jeopardy at Pioneer Credit Recovery** (Buffalo Business First Online - Factiva, 02/27/2015) |
| | | | | | | | | | | | **NAVIENT CORP 10-K** (SEC - SEC Edgar, 02/27/2015) |
| | | | | | | | | | | | **Navient issues student loan-backed notes** (SNL Financial Services Daily - Factiva, 02/27/2015) |
| | | | | | | | | | | | **Owner Resource Group sells Gila Corporation to Navient** (Reuters Significant Developments - Factiva, 02/27/2015) |
| | | | | | | | | | | | **Owner Resource Group Sells Gila Corporation to Navient** (Business Wire - Bloomberg, 02/27/2015 09:00 AM) |
| | | | | | | | | | | | **\*OWNER RESOURCE GROUP SELLS GILA TO NAVIENT; NO TERMS** (BLOOMBERG News - Bloomberg, 02/27/2015 09:04 AM) |
| | | | | | | | | | | | **Owner Resource Group Sells Accounts-Receivable Service Company** (LBO Wire - Factiva, 02/27/2015 09:27 AM) |
| | | | | | | | | | | | **\*NAVIENT UNIT RECEIVED SUBPOENA FROM NY DFS IN DEC.: 10-K** (BLOOMBERG News - Bloomberg, 02/27/2015 07:17 PM) |
| | | | | | | | | | | | **\*NSI SUBPOENA PART OF DFS INQUIRY INTO POSSIBLE FRAUD/MISCONDUCT** (BLOOMBERG News - Bloomberg, 02/27/2015 07:21 PM) |
| | | | | | | | | | | | **\*NAVIENT HAS BEEN IN TALKS WITH NY DFS ON THIS MATTER** (BLOOMBERG News - Bloomberg, 02/27/2015 07:22 PM) |
| | | | | | | | | | | | **Navient Unit Received Subpoena From NY DFS in December** (Bloomberg First Word - Bloomberg, 02/27/2015 07:23 PM) |
| | | | | | | | | | | | **Education Department Will Wind Down Contracts With Five Collection Agencies** (Dow Jones Institutional News - Factiva, 02/27/2015 07:57 PM) |
| | | | | | | | | | | | **Education Dept. Ending Deals With 5 Collection Agencies: WSJ** (Bloomberg First Word - Bloomberg, 02/27/2015 08:15 PM) |
| | | | | | | | | | | | **Education Department Will Wind Down Contracts With Five Collection Agencies** (Dow Jones Institutional News - Factiva, 02/27/2015 08:57 PM) |
| | | | | | | | | | | | **Education Department Will Wind Down Contracts With Five Collection Agencies** (Dow Jones Institutional News - Factiva, 02/27/2015 09:11 PM) |
| | | | | | | | | | | | **Education Department Ending Some Collection Agency Contracts -- Update** (Dow Jones Institutional News - Factiva, 02/27/2015 09:56 PM) |
| | | | | | | | | | | | **Education Department Will Wind Down Contracts With Five Collection Agencies; Agency says Navient unit, others provided inaccurate information to student borrowers** (The Wall Street Journal Online - Factiva, 02/27/2015 09:56 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 2/28/2015 Sat | | | | | | | | | | | **U.S. Cuts Off Debt Collectors for Misleading Student Borrowers** (BLOOMBERG News - Bloomberg, 02/27/2015 10:45 PM) |
| | | | | | | | | | | | **Education Department Will Wind Down Contracts With Five Collection Agencies** (Emerging Markets Business Information News - Factiva, 02/28/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Feb. 10, 2015)** (Investment Weekly News - Factiva, 02/28/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Feb. 5, 2015)** (Investment Weekly News - Factiva, 02/28/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Feb. 6, 2015)** (Investment Weekly News - Factiva, 02/28/2015) |
| | | | | | | | | | | | **U.S. Cuts Off Student-Loan Collectors for Misleading Debtors (1)** (BLOOMBERG News - Bloomberg, 02/28/2015 09:13 AM) |
| 3/1/2015 Sun | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 03/01/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 03/01/2015) |
| | | | | | | | | | | | **\*NAVIENT'S ACQUISITION OF GILA IS CREDIT NEGATIVE, MOODY'S SAYS** (Bloomberg First Word - Bloomberg, 03/01/2015 05:48 PM) |
| 3/2/2015 Mon | 10,895,823 | $19.51 | -8.83% | 0.62% | -0.38% | 0.62% | -9.46% | -7.58 | 0.00% ** | -$2.02 | **Barclays Research Report** (Barclays - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **Evercore ISI Research Report** (Evercore ISI - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 03/02/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 03/02/2015) |
| | | | | | | | | | | | **\*NAVIENT CORP. CUT TO EQUALWEIGHT VS OVERWEIGHT AT BARCLAYS** (Bloomberg First Word - Bloomberg, 03/02/2015 04:51 AM) |
| | | | | | | | | | | | **\*NAVIENT CORP. CUT TO NEUTRAL VS BUY AT COMPASS POINT** (Bloomberg First Word - Bloomberg, 03/02/2015 05:30 AM) |
| | | | | | | | | | | | **Navient Corp Cut to 'Neutral' at Compass Point** (BLOOMBERG News - Bloomberg, 03/02/2015 05:33 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| | | | | | | | | | | | U.S FINANCIALS PRE-MKT: ARCP AFFO Overstated; Berkshire Earnings (Bloomberg First Word - Bloomberg, 03/02/2015 07:55 AM) |
| | | | | | | | | | | | *Navient Corp. Cut to Equalweight From Overweight by Barclays >NAVI (Dow Jones Institutional News - Factiva, 03/02/2015 08:26 AM) |
| | | | | | | | | | | | Compass Point Downgrades Navient To Neutral (Benzinga.com - Factiva, 03/02/2015 08:29 AM) |
| | | | | | | | | | | | TECHNICALS: Navient Falls as Much as 13.8%, 14-Day RSI Hits 26 (Bloomberg First Word - Bloomberg, 03/02/2015 09:53 AM) |
| | | | | | | | | | | | Morning Market Losers (Benzinga.com - Factiva, 03/02/2015 09:55 AM) |
| | | | | | | | | | | | U.S. EQUITY MOVERS: AKAO ATHX BIOS CLD ECYT EGO FSL GTI LXU MITL (Bloomberg First Word - Bloomberg, 03/02/2015 10:15 AM) |
| | | | | | | | | | | | NAVI Cut After ED Surprise Contract Termination: Compass Point (Bloomberg First Word - Bloomberg, 03/02/2015 10:26 AM) |
| | | | | | | | | | | | HIGH YIELD: FSL, SOGC Among Best Performing CDS (Bloomberg First Word - Bloomberg, 03/02/2015 12:12 PM) |
| | | | | | | | | | | | Navient Files 8K - Regulation FD >NAVI (Dow Jones Institutional News - Factiva, 03/02/2015 04:31 PM) |
| 3/3/2015 Tue | 4,902,313 | $20.05 | 2.77% | -0.45% | 0.34% | -0.19% | 2.96% | 2.36 | 1.97% * | $0.58 | Compass Point expects Navient to face greater scrutiny after education department terminates contract (SNL Financial Services Daily - Factiva, 03/03/2015) |
| | | | | | | | | | | | Education department terminates contract with Navient unit (SNL Financial Services Daily - Factiva, 03/03/2015) |
| 3/4/2015 Wed | 3,011,930 | $20.01 | 0.60% | -0.42% | -0.73% | -0.11% | 0.71% | 0.55 | 58.12% | $0.14 | FORM 8-K: NAVIENT FILES CURRENT REPORT (US Fed News - Factiva, 03/04/2015) |
| | | | | | | | | | | | Navient Corp Goes Ex-Dividend, Trades Without Payout (BLOOMBERG News - Bloomberg, 03/04/2015 08:15 AM) |
| 3/5/2015 Thu | 1,830,410 | $19.99 | -0.10% | 0.12% | 0.37% | 0.28% | -0.38% | -0.30 | 76.64% | -$0.08 | S&P Global Compustat Research Report (S&P Global Compustat - Manual Entry, 03/05/2015) |
| 3/6/2015 Fri | 2,117,156 | $19.64 | -1.75% | -1.40% | 0.88% | -0.84% | -0.91% | -0.71 | 47.82% | -$0.18 | NAVIENT CORP 4 (SEC - SEC Edgar, 03/06/2015) |
| | | | | | | | | | | | Jack Remondi, CEO, Relinquishes 49,233 NAVI US 03/03/15 (BLOOMBERG News - Bloomberg, 03/06/2015 04:16 PM) |
| 3/7/2015 Sat 3/8/2015 Sun 3/9/2015 Mon | 2,075,723 | $19.59 | -0.25% | 0.40% | 0.17% | 0.47% | -0.72% | -0.57 | 57.28% | -$0.14 | NAVIENT REPORTS DISPOSITION BY CEO REMONDI (Delaware) (US Fed News - Factiva, 03/09/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 3/10/2015 Tue | 4,398,944 | $19.37 | -1.12% | -1.69% | -0.33% | -1.06% | -0.06% | -0.05 | 96.02% | -$0.01 | **Education Policy Focus on HEA, Potential Actions: Compass Point** (Bloomberg First Word - Bloomberg, 03/09/2015 08:08 AM) <br><br> **HIGH YIELD: NAVI, TSO Among Best Performing CDS** (Bloomberg First Word - Bloomberg, 03/09/2015 11:35 AM) <br><br> **HIGH YIELD: Energy Dominated Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 03/10/2015 07:24 AM) <br><br> **Obama Student Lending Moves May Hurt Debt Collectors: BI** (Bloomberg First Word - Bloomberg, 03/10/2015 10:16 AM) <br><br> **Obama Signs Presidential Memorandum on Student Loans** (Bloomberg First Word - Bloomberg, 03/10/2015 10:18 AM) <br><br> **Obama Says Nation Must Treat Higher Education as Priority** (Bloomberg First Word - Bloomberg, 03/10/2015 02:29 PM) |
| 3/11/2015 Wed | 3,948,114 | $19.16 | -1.08% | -0.18% | 0.71% | 0.03% | -1.11% | -0.87 | 38.49% | -$0.21 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 03/11/2015) <br><br> **Compass Point Research Report** (Compass Point - Manual Entry, 03/11/2015) <br><br> **NAVIENT CORP 8-K** (SEC - SEC Edgar, 03/11/2015) <br><br> **Navient Files 8K - Other Events >NAVI** (Dow Jones Institutional News - Factiva, 03/11/2015 06:03 AM) <br><br> **Obama Boosts Student Loan Servicers, Lenders Risk: Guggenheim** (Bloomberg First Word - Bloomberg, 03/11/2015 06:58 AM) <br><br> **Navient Likely to Keep Most ED Contract 2015 Rev.: Compass Point** (Bloomberg First Word - Bloomberg, 03/11/2015 09:08 AM) |
| 3/12/2015 Thu | 2,605,666 | $19.54 | 1.98% | 1.29% | 1.87% | 0.96% | 1.02% | 0.81 | 42.24% | $0.20 | **Navient unit files bid protest after Education Department terminates contract** (SNL Financial Services Daily - Factiva, 03/12/2015) |
| 3/13/2015 Fri | 3,043,634 | $19.28 | -1.33% | -0.61% | -0.52% | -0.27% | -1.06% | -0.84 | 40.48% | -$0.21 | **Compass Point Research Report** (Compass Point - Manual Entry, 03/13/2015) <br><br> **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 03/13/2015) <br><br> **Navient recognized by 2020 Women on Boards as a leader in board gender diversity** (GlobeNewswire - Factiva, 03/13/2015 08:00 AM) <br><br> **Navient recognized by 2020 Women on Boards as a leader in board gender diversity** (PrimeZone Media Network - Bloomberg, 03/13/2015 08:00 AM) <br><br> **Democratsâ€™ Student Loan Bankruptcy Bill Has No Chance: BI** (Bloomberg First Word - Bloomberg, 03/13/2015 02:59 PM) |
| 3/14/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Feb. 20, 2015)** (Investment Weekly News - Factiva, 03/14/2015) |

## Appendix C
## Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 3/15/2015 Sun | | | | | | | | | | | |
| 3/16/2015 Mon | 2,566,837 | $19.66 | 1.97% | 1.36% | -0.24% | 1.20% | 0.77% | 0.60 | 54.66% | $0.15 | **Compass Point Research Report** (Compass Point - Manual Entry, 03/16/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 03/16/2015) |
| 3/17/2015 Tue | 2,691,388 | $20.11 | 2.29% | -0.33% | 0.00% | -0.09% | 2.38% | 1.87 | 6.42% | $0.47 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 03/17/2015) |
| | | | | | | | | | | | **Don't wait till the last minute** (GlobeNewswire - Factiva, 03/17/2015 09:35 AM) |
| | | | | | | | | | | | **Don't wait till the last minute** (PrimeZone Media Network - Bloomberg, 03/17/2015 09:35 AM) |
| | | | | | | | | | | | **Student Loan Refi Bill Faces Near-Certain Death: Height(Earlier)** (Bloomberg First Word - Bloomberg, 03/17/2015 12:41 PM) |
| 3/18/2015 Wed | 1,887,751 | $20.06 | -0.25% | 1.22% | -0.62% | 1.15% | -1.40% | -1.08 | 28.15% | -$0.28 | **HIGH YIELD: CLTDEF Tops Leaders, Hires Restructuring Adviser** (Bloomberg First Word - Bloomberg, 03/18/2015 07:20 AM) |
| | | | | | | | | | | | **House Democrats Unveil Bill to Cut U.S. Student Loan Rates** (Bloomberg First Word - Bloomberg, 03/18/2015 11:20 AM) |
| 3/19/2015 Thu | 2,907,554 | $20.67 | 3.04% | -0.49% | -0.09% | -0.18% | 3.22% | 2.49 | 1.42% * | $0.65 | **ValuEngine Research Report** (ValuEngine - Manual Entry, 03/19/2015) |
| | | | | | | | | | | | **HIGH YIELD UPDATE: Most Active Trades, Index Snapshot** (Bloomberg First Word - Bloomberg, 03/19/2015 04:15 PM) |
| 3/20/2015 Fri | 4,797,564 | $20.70 | 0.15% | 0.90% | 0.31% | 0.84% | -0.70% | -0.52 | 60.18% | -$0.14 | **American Legion Condemns Education Department Over Student Loan Investigation** (Emerging Markets Business Information News - Factiva, 03/20/2015) |
| 3/21/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-K, Annual Report [Section 13 And 15(D), Not S-K Item 405] (Feb. 27, 2015)** (Investment Weekly News - Factiva, 03/21/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Mar. 2, 2015)** (Investment Weekly News - Factiva, 03/21/2015) |
| 3/22/2015 Sun | | | | | | | | | | | |
| 3/23/2015 Mon | 2,750,105 | $20.75 | 0.24% | -0.17% | -0.10% | 0.08% | 0.16% | 0.12 | 90.38% | $0.03 | |
| 3/24/2015 Tue | 1,757,346 | $20.70 | -0.24% | -0.61% | -0.57% | -0.22% | -0.02% | -0.02 | 98.69% | $0.00 | |
| 3/25/2015 Wed | 2,999,606 | $20.33 | -1.79% | -1.45% | -0.09% | -0.84% | -0.95% | -0.72 | 47.57% | -$0.20 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬Å"œ USA Blue Chips - Factiva, 03/25/2015) |
| | | | | | | | | | | | **NAVIENT CORP 424B5** (SEC - SEC Edgar, 03/25/2015) |
| | | | | | | | | | | | **NAVIENT CORP FWP** (SEC - SEC Edgar, 03/25/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 03/25/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | *NAVIENT CORP TO SELL $500M 6Y SR NOTES TODAY (Bloomberg First Word - Bloomberg, 03/25/2015 09:24 AM) |
| | | | | | | | | | | | *NAVIENT FILES TO SELL NOTES (BLOOMBERG News - Bloomberg, 03/25/2015 09:24 AM) |
| | | | | | | | | | | | Navient Corp to Sell $500m 6Y Sr Notes Today (Bloomberg First Word - Bloomberg, 03/25/2015 09:26 AM) |
| | | | | | | | | | | | HIGH YIELD: $850m Added to Calendar, $1.89b Pricing Today (Bloomberg First Word - Bloomberg, 03/25/2015 11:19 AM) |
| | | | | | | | | | | | *NAVIENT CORP $500M 6Y GUIDANCE 5.875%-6% (Bloomberg First Word - Bloomberg, 03/25/2015 01:14 PM) |
| | | | | | | | | | | | *NAVIENT CORP $500M 6Y NOTES LAUNCH AT 6% (Bloomberg First Word - Bloomberg, 03/25/2015 02:26 PM) |
| | | | | | | | | | | | HIGH YIELD CLOSE: New Issues, Most Active Trades, Index Snapshot (Bloomberg First Word - Bloomberg, 03/25/2015 04:16 PM) |
| | | | | | | | | | | | Navient Corp Sells $500 million 5.875% 6-Year Sr Unsecured (BLOOMBERG News - Bloomberg, 03/25/2015 04:17 PM) |
| | | | | | | | | | | | Navient Corp Sells $500m 6Y Sr Notes at 99.379 to Yield 6% (Bloomberg First Word - Bloomberg, 03/25/2015 04:20 PM) |
| | | | | | | | | | | | US HY WRAP-High-yield issuers face choppy conditions (Reuters News - Factiva, 03/25/2015 05:05 PM) |
| 3/26/2015 Thu | 1,710,428 | $20.16 | -0.84% | -0.24% | -1.13% | 0.05% | -0.88% | -0.67 | 50.73% | -$0.18 | NAVIENT CORP 424B2 (SEC - SEC Edgar, 03/26/2015) |
| | | | | | | | | | | | NAVIENT CORP NO ACT (SEC - SEC Edgar, 03/26/2015) |
| | | | | | | | | | | | Over $3B Added to Domestic HY Totals (High Yield Report - Factiva, 03/26/2015) |
| | | | | | | | | | | | HIGH YIELD RECAP: $2b Priced; $4b WTD; Yields, Spreads Stable (Bloomberg First Word - Bloomberg, 03/26/2015 06:35 AM) |
| | | | | | | | | | | | HIGH YIELD: New CLF, NAVI, CNX, CACC Traded Higher Yesterday (Bloomberg First Word - Bloomberg, 03/26/2015 07:53 AM) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Most Active Trades (Bloomberg First Word - Bloomberg, 03/26/2015 12:05 PM) |
| | | | | | | | | | | | HIGH YIELD: Recent New Issue Performance (Bloomberg First Word - Bloomberg, 03/26/2015 01:08 PM) |
| | | | | | | | | | | | HIGH YIELD CLOSE: New Issues, Most Active Trades, Index Snapshot (Bloomberg First Word - Bloomberg, 03/26/2015 04:15 PM) |
| 3/27/2015 Fri | 1,749,064 | $20.16 | 0.00% | 0.26% | -0.54% | 0.38% | -0.38% | -0.29 | 77.57% | -$0.08 | Compass Point Research Report (Compass Point - Manual Entry, 03/27/2015) |
| | | | | | | | | | | | NAVIENT CORP 8-K (SEC - SEC Edgar, 03/27/2015) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 03/27/2015 07:31 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issues Hovering Around Pricing Levels** (Bloomberg First Word - Bloomberg, 03/27/2015 07:43 AM) |
| | | | | | | | | | | | **College Plan to Stay in Focus After Defeat: Compass (Earlier)** (Bloomberg First Word - Bloomberg, 03/27/2015 12:31 PM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issue Performance** (Bloomberg First Word - Bloomberg, 03/27/2015 02:08 PM) |
| | | | | | | | | | | | **Navient Files 8K - Direct Or Off-Balance Sheet Financial Obligation >NAVI** (Dow Jones Institutional News - Factiva, 03/27/2015 04:44 PM) |
| | | | | | | | | | | | **Navient Files 8K - Entry Into Definitive Agreement >NAVI** (Dow Jones Institutional News - Factiva, 03/27/2015 04:44 PM) |
| 3/28/2015 Sat | | | | | | | | | | | |
| 3/29/2015 Sun | | | | | | | | | | | |
| 3/30/2015 Mon | 2,021,002 | $20.08 | -0.40% | 1.23% | -0.87% | 1.09% | -1.49% | -1.12 | 26.52% | -$0.30 | **Navient closes senior notes offering** (SNL Financial Services Daily - Factiva, 03/30/2015) |
| | | | | | | | | | | | **HIGH YIELD: New SHAEFF, SUN, GNCMA Traded Higher on Break Friday** (Bloomberg First Word - Bloomberg, 03/30/2015 07:57 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issue Performance** (Bloomberg First Word - Bloomberg, 03/30/2015 01:29 PM) |
| 3/31/2015 Tue | 3,828,183 | $20.33 | 1.25% | -0.87% | 0.86% | -0.39% | 1.64% | 1.23 | 22.08% | $0.33 | **HIGH YIELD: Recent New Issues Traded Mostly Above Pricing Levels** (Bloomberg First Word - Bloomberg, 03/31/2015 07:40 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issue Performance** (Bloomberg First Word - Bloomberg, 03/31/2015 01:06 PM) |
| 4/1/2015 Wed | 2,074,275 | $20.24 | -0.44% | -0.38% | 1.74% | 0.07% | -0.51% | -0.38 | 70.35% | -$0.10 | **New analysis: Five habits of successful student loan borrowers** (GlobeNewswire - Factiva, 04/01/2015 08:00 AM) |
| | | | | | | | | | | | **New analysis: Five habits of successful student loan borrowers** (PrimeZone Media Network - Bloomberg, 04/01/2015 08:00 AM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issue Performance** (Bloomberg First Word - Bloomberg, 04/01/2015 01:06 PM) |
| 4/2/2015 Thu | 1,849,372 | $20.36 | 0.59% | 0.36% | 0.56% | 0.50% | 0.09% | 0.07 | 94.68% | $0.02 | **HIGH YIELD: New NBDCN, TAYMON, SABR Traded Higher Yesterday** (Bloomberg First Word - Bloomberg, 04/02/2015 07:50 AM) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Most Active Trades** (Bloomberg First Word - Bloomberg, 04/02/2015 12:03 PM) |
| | | | | | | | | | | | **HIGH YIELD: Recent New Issue Performance** (Bloomberg First Word - Bloomberg, 04/02/2015 01:09 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 4/3/2015 Fri | | | | | | | | | | | **Phillips 66, BNY Mellon May Raise Divs. Next Wk: BDVD Estimates** (Bloomberg First Word - Bloomberg, 04/02/2015 02:42 PM) |
| 4/4/2015 Sat | | | | | | | | | | | |
| 4/5/2015 Sun | | | | | | | | | | | |
| 4/6/2015 Mon | 1,347,582 | $20.32 | -0.20% | 0.66% | -0.70% | 0.65% | -0.84% | -0.63 | 52.75% | -$0.17 | **HIGH YIELD: New IILG, HXN, ROIAK Traded Higher Thursday** (Bloomberg First Word - Bloomberg, 04/06/2015 07:46 AM) |
| 4/7/2015 Tue | 1,593,250 | $20.11 | -1.03% | -0.20% | -0.90% | -0.01% | -1.02% | -0.77 | 44.46% | -$0.21 | **Technical Coverage on Consumer Finance Equities -- Discover Financial Services, SLM Corp., Capital One Financial, Ally Financial, and Navient Corp.** (PR Newswire (U.S.) - Factiva, 04/07/2015 08:40 AM) |
| | | | | | | | | | | | **Navient to announce first quarter 2015 results on April 21, host earnings call on April 22** (GlobeNewswire - Factiva, 04/07/2015 04:15 PM) |
| | | | | | | | | | | | **Navient to announce first quarter 2015 results on April 21, host earnings call on April 22** (PrimeZone Media Network - Bloomberg, 04/07/2015 04:15 PM) |
| 4/8/2015 Wed | 1,793,076 | $20.25 | 0.70% | 0.31% | 0.26% | 0.43% | 0.27% | 0.20 | 84.16% | $0.05 | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 04/08/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 04/08/2015) |
| | | | | | | | | | | | **Fitch Affirms Five US Consumer Finance Companies Following Peer Review** (India Banking News - Factiva, 04/08/2015) |
| | | | | | | | | | | | **NAVIENT CORP NO ACT** (SEC - SEC Edgar, 04/08/2015) |
| | | | | | | | | | | | **HIGH YIELD: CLF Dominated Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 04/08/2015 07:30 AM) |
| | | | | | | | | | | | ***Fitch Affirms Navient Corporation's L-T IDR at 'BB'; Outlook Stable** (Dow Jones Institutional News - Factiva, 04/08/2015 03:30 PM) |
| | | | | | | | | | | | **Fitch Affirms Navient Corporation's L-T IDR at 'BB'; Outlook Stable** (Reuters News - Factiva, 04/08/2015 03:30 PM) |
| | | | | | | | | | | | ***FITCH AFFIRMS NAVIENT CORP'S L-T IDR AT 'BB'; OUTLOOK STABLE** (BLOOMBERG News - Bloomberg, 04/08/2015 03:30 PM) |
| | | | | | | | | | | | **Fitch Affirms Navient Corporation's L-T IDR at 'BB'; Outlook Stable** (Business Wire - Factiva, 04/08/2015 03:55 PM) |
| | | | | | | | | | | | **Fitch Affirms Navient Corporation's L-T IDR at 'BB'; Outlook Stable** (Business Wire - Bloomberg, 04/08/2015 03:55 PM) |
| | | | | | | | | | | | **Fitch Affirms Five U.S. Consumer Finance Companies Following Peer Review** (Reuters News - Factiva, 04/08/2015 05:03 PM) |
| | | | | | | | | | | | **Fitch Affirms Five U.S. Consumer Finance Companies Following Peer Review** (Business Wire - Factiva, 04/08/2015 05:17 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 4/9/2015 Thu | 2,456,847 | $20.34 | 0.44% | 0.45% | -0.14% | 0.50% | -0.06% | -0.04 | 96.65% | -$0.01 | **Navient May Sell $747.7m Student Loan ABS, Filing Says** (Bloomberg First Word - Bloomberg, 04/08/2015 05:56 PM) |
| | | | | | | | | | | | **\*MOODY'S REVIEWS FOR DOWNGRADE SEVERAL TRANCHES IN FFELP STUDENT** (BLOOMBERG News - Bloomberg, 04/08/2015 09:13 PM) |
| | | | | | | | | | | | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 04/09/2015) |
| | | | | | | | | | | | **Fitch affirms 5 specialty lenders** (SNL Bank and Thrift Daily - Factiva, 04/09/2015) |
| | | | | | | | | | | | **Fitch affirms 5 specialty lenders** (SNL Financial Services Daily - Factiva, 04/09/2015) |
| | | | | | | | | | | | **Fitch Affirms Five U.S. Consumer Finance Companies Following Peer Review Endorsement Policy** (ENP Newswire - Factiva, 04/09/2015) |
| 4/10/2015 Fri | 1,910,766 | $20.26 | -0.39% | 0.52% | 0.02% | 0.57% | -0.96% | -0.73 | 46.78% | -$0.20 | **Navient May Sell $747.7m FFELP Student Loan ABS Next Week** (Bloomberg First Word - Bloomberg, 04/09/2015 09:57 AM) |
| | | | | | | | | | | | **Barclays Research Report** (Barclays - Manual Entry, 04/10/2015) |
| | | | | | | | | | | | **Fitch Affirms Five U.S. Consumer Finance Companies Following Peer Review** (Thai News Service - Factiva, 04/10/2015) |
| | | | | | | | | | | | **Fitch Affirms Navient Corporation's L-T IDR at 'BB'; Outlook Stable** (Thai News Service - Factiva, 04/10/2015) |
| | | | | | | | | | | | **NAVIENT CORP DEF 14A** (SEC - SEC Edgar, 04/10/2015) |
| | | | | | | | | | | | **NAVIENT CORP DEFA14A** (SEC - SEC Edgar, 04/10/2015) |
| 4/11/2015 Sat | | | | | | | | | | | **Jane J. Thompson - On Deck Capital Inc updates director's profile 07 April 2015** (People in Business - Factiva, 04/11/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 424B5, Prospectus [Rule 424(B)(5)] (Mar. 25, 2015)** (Investment Weekly News - Factiva, 04/11/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form FWP, Filing Under Securities Act Rules 163/433 of Free Writing Prospectuses (Mar. 25, 2015)** (Investment Weekly News - Factiva, 04/11/2015) |
| 4/12/2015 Sun | | | | | | | | | | | |
| 4/13/2015 Mon | 1,251,305 | $20.43 | 0.84% | -0.45% | 0.46% | -0.15% | 0.98% | 0.75 | 45.69% | $0.20 | **ValuEngine Research Report** (ValuEngine - Manual Entry, 04/13/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 04/13/2015) |
| | | | | | | | | | | | **Navient Plans to Sell $997m Student Loan ABS** (Bloomberg First Word - Bloomberg, 04/13/2015 08:33 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 4/14/2015 Tue | 1,517,674 | $20.39 | -0.20% | 0.16% | 0.30% | 0.29% | -0.48% | -0.39 | 70.04% | -$0.10 | **Navient AAA 6.37y Student Loan ABS Guidance at +58-60** (Bloomberg First Word - Bloomberg, 04/13/2015 02:08 PM) |
| | | | | | | | | | | | **Navient AAA 6.37y Student Loan ABS Launch at 1ML+57** (Bloomberg First Word - Bloomberg, 04/14/2015 03:38 PM) |
| | | | | | | | | | | | **Navient AAA 6.37y Student Loan ABS Priced at 1ML+57** (Bloomberg First Word - Bloomberg, 04/14/2015 04:26 PM) |
| 4/15/2015 Wed | 1,644,465 | $20.34 | -0.25% | 0.51% | 0.40% | 0.55% | -0.79% | -0.63 | 52.83% | -$0.16 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 04/15/2015) |
| | | | | | | | | | | | **Navient cautions borrowers about student loan "debt relief" companies** (GlobeNewswire - Factiva, 04/15/2015 09:00 AM) |
| | | | | | | | | | | | **Navient cautions borrowers about student loan "debt relief" companies** (PrimeZone Media Network - Bloomberg, 04/15/2015 09:00 AM) |
| 4/16/2015 Thu | 2,021,057 | $20.29 | -0.25% | -0.08% | 0.95% | 0.21% | -0.45% | -0.36 | 71.99% | -$0.09 | **HIGH YIELD: SandRidge Among Lagging Movers as Goldman Says Sell** (Bloomberg First Word - Bloomberg, 04/16/2015 07:38 AM) |
| 4/17/2015 Fri | 1,922,822 | $19.93 | -1.77% | -1.13% | -1.42% | -0.80% | -0.98% | -0.78 | 43.69% | -$0.20 | **Fitch Affirms SLM Private Education Loan Trust 2013-B** (Business Wire - Bloomberg, 04/17/2015 04:24 PM) |
| 4/18/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 424B2, Prospectus [Rule 424(B)(2)] (Mar. 26, 2015)** (Investment Weekly News - Factiva, 04/18/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Mar. 27, 2015)** (Investment Weekly News - Factiva, 04/18/2015) |
| 4/19/2015 Sun | | | | | | | | | | | |
| 4/20/2015 Mon | 1,566,051 | $20.49 | 2.81% | 0.93% | -0.58% | 0.73% | 2.08% | 1.66 | 10.00% | $0.42 | **Student Loan Giant Nears Settlement with Education Department** (PaymentsSource - Factiva, 04/20/2015) |
| 4/21/2015 Tue | 2,664,510 | $20.53 | 0.20% | -0.15% | -0.12% | 0.02% | 0.17% | 0.13 | 89.34% | $0.03 | **Barclays Research Report** (Barclays - Manual Entry, 04/21/2015) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 04/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 04/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 04/21/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 04/21/2015) |
| | | | | | | | | | | | **U.S. DAYBOOK: Verizon, Amgen, United Tech, Yahoo, Du Pont Earns** (Bloomberg First Word - Bloomberg, 04/21/2015 05:30 AM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 4/22/2015 Wed | 2,812,837 | $20.61 | 0.39% | 0.51% | -0.07% | 0.52% | -0.13% | -0.10 | 91.76% | -$0.03 | |

**HIGH YIELD: Hecla Mining Among Lagging Movers on M&A News** (Bloomberg First Word - Bloomberg, 04/21/2015 07:44 AM)

**U.S. FINANCIALS PRE-MKT: Northern Trust Beats; Futures Gain** (Bloomberg First Word - Bloomberg, 04/21/2015 08:41 AM)

**Navient Reports First-Quarter 2015 Financial Results** (GlobeNewswire - Factiva, 04/21/2015 04:28 PM)

**\*NAVIENT 1Q CORE EPS 48C :NAVI US** (BLOOMBERG News - Bloomberg, 04/21/2015 04:28 PM)

**\*NAVIENT 1Q CORE EPS 48C , EST. 50C :NAVI US** (BLOOMBERG News - Bloomberg, 04/21/2015 04:28 PM)

**\*NAVIENT 1Q EPS 72C :NAVI US** (BLOOMBERG News - Bloomberg, 04/21/2015 04:28 PM)

**Navient Reports First-Quarter 2015 Financial Results** (PrimeZone Media Network - Bloomberg, 04/21/2015 04:28 PM)

**Navient Reports First-Quarter 2015 Financial Results** (PrimeZone Media Network - Bloomberg, 04/21/2015 04:28 PM)

**\*NAVIENT BUYS $830M IN STUDENT LOANS DURING QUARTER** (BLOOMBERG News - Bloomberg, 04/21/2015 04:28 PM)

**\*NAVIENT 1Q CORE EPS 48C , EST. 50C :NAVI US** (Bloomberg First Word - Bloomberg, 04/21/2015 04:28 PM)

**Navient 1Q Core EPS Misses Ests.** (Bloomberg First Word - Bloomberg, 04/21/2015 04:35 PM)

**Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 04/22/2015)

**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 04/22/2015)

**CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 04/22/2015)

**Compass Point Research Report** (Compass Point - Manual Entry, 04/22/2015)

**Compass Point Research Report** (Compass Point - Manual Entry, 04/22/2015)

**Credit Suisse Research Report** (Credit Suisse - Manual Entry, 04/22/2015)

**Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 04/22/2015)

**Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 04/22/2015)

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market Return | [6] Excess Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price | [12] |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 04/22/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 04/22/2015) |
| | | | | | | | | | | | **MarketLine Research Report** (Marketline - Manual Entry, 04/22/2015) |
| | | | | | | | | | | | **Navient sees net income jump YOY in Q1** (SNL Financial Services Daily - Factiva, 04/22/2015) |
| | | | | | | | | | | | **Q1 2015 Navient Corp Earnings Call - Final** (CQ FD Disclosure - Factiva, 04/22/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 04/22/2015) |
| | | | | | | | | | | | **U.S. FINANCIALS PRE-MKT: RF, AMTD Downgrades; ZION UPGRADE** (Bloomberg First Word - Bloomberg, 04/22/2015 08:49 AM) |
| | | | | | | | | | | | **S&P 1Q Update: 120 EPS Reports, 88 Beat, 13 Meet, 19 Miss Est** (Bloomberg First Word - Bloomberg, 04/22/2015 10:19 AM) |
| | | | | | | | | | | | **Navient to Diversify Funding With More ABS; May Sell FFELP Pools** (Bloomberg First Word - Bloomberg, 04/22/2015 01:11 PM) |
| | | | | | | | | | | | **SLM Loan Performance Improves as Originations Rise; Sallie Mae increases estimate for full-year core earnings** (The Wall Street Journal Online - Factiva, 04/22/2015 08:19 PM) |
| 4/23/2015 Thu | 1,883,471 | $20.49 | -0.58% | 0.25% | 0.04% | 0.34% | -0.92% | -0.72 | 47.33% | -$0.19 | **Barclays Research Report** (Barclays - Manual Entry, 04/23/2015) |
| | | | | | | | | | | | **BMO Capital Markets Research Report** (BMO Capital Markets - Manual Entry, 04/23/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 04/23/2015) |
| | | | | | | | | | | | **Court throws out Navient case against Education Department over loan collections contract** (SNL Financial Services Daily - Factiva, 04/23/2015) |
| | | | | | | | | | | | **Navient must reduce need for unsecured debt, says CEO** (SNL Financial Services Daily - Factiva, 04/23/2015) |
| | | | | | | | | | | | **Navient Reports Q1 Financials** (PaymentsSource - Factiva, 04/23/2015) |
| 4/24/2015 Fri | 1,790,384 | $20.28 | -1.02% | 0.23% | -0.88% | 0.22% | -1.24% | -0.98 | 33.10% | -$0.25 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 04/24/2015) |
| | | | | | | | | | | | **Loan company to pay student-troops $60M after overcharge allegations** (U-Wire - Factiva, 04/24/2015) |
| | | | | | | | | | | | **S&P 500 Annual Meeting Calendar, Week of April 27 - May 22** (BLOOMBERG News - Bloomberg, 04/24/2015 09:00 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 4/25/2015 Sat | | | | | | | | | | | |
| 4/26/2015 Sun | | | | | | | | | | | |
| 4/27/2015 Mon | 1,487,952 | $19.85 | -2.12% | -0.41% | 0.18% | -0.16% | -1.96% | -1.53 | 12.88% | -$0.40 | **2nd ABS deal a 'major milestone' in Sallie Mae's transformation** (SNL Financial Services Daily - Factiva, 04/27/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 04/27/2015) |
| | | | | | | | | | | | **Bernstein Liebhard LLP Investigates Claims On Behalf Of Those Who Hold Navient Corporation Stock** (PR Newswire (U.S.) - Factiva, 04/27/2015 11:30 AM) |
| 4/28/2015 Tue | 2,135,871 | $19.90 | 0.25% | 0.29% | 0.05% | 0.33% | -0.08% | -0.06 | 95.31% | -$0.02 | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 04/28/2015) |
| | | | | | | | | | | | **HIGH YIELD: WIN, NAVI Among Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 04/28/2015 07:32 AM) |
| 4/29/2015 Wed | 1,755,813 | $19.71 | -0.95% | -0.37% | -0.13% | -0.17% | -0.78% | -0.61 | 54.34% | -$0.16 | **HIGH YIELD: ARMAUT Among Leading Movers on M&A News** (Bloomberg First Word - Bloomberg, 04/29/2015 07:33 AM) |
| | | | | | | | | | | | **Navient helps new college grads build a better budget** (GlobeNewswire - Factiva, 04/29/2015 08:00 AM) |
| | | | | | | | | | | | **Navient helps new college grads build a better budget** (PrimeZone Media Network - Bloomberg, 04/29/2015 08:00 AM) |
| 4/30/2015 Thu | 2,319,491 | $19.54 | -0.86% | -1.01% | 1.17% | -0.44% | -0.42% | -0.34 | 73.60% | -$0.08 | **NAVIENT CORP 10-Q** (SEC - SEC Edgar, 04/30/2015) |
| 5/1/2015 Fri | 2,618,453 | $19.74 | 1.02% | 1.09% | -0.07% | 0.90% | 0.13% | 0.10 | 91.89% | $0.03 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 05/01/2015) |
| | | | | | | | | | | | **OverEnrolled; Sallie Mae is making so many student loans it can't keep them all on its books; investors couldn't be happier** (Asset Securitization Report - Factiva, 05/01/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 05/01/2015 07:43 AM) |
| | | | | | | | | | | | **S&P 500 Annual Meeting Calendar, Week of May 4 - 29** (BLOOMBERG News - Bloomberg, 05/01/2015 09:00 AM) |
| | | | | | | | | | | | **Navient Files 8K - Regulation FD >NAVI** (Dow Jones Institutional News - Factiva, 05/01/2015 04:24 PM) |
| 5/2/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form DEF 14A, Other Definitive Proxy Statements (Apr. 10, 2015)** (Investment Weekly News - Factiva, 05/02/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form DEFA14A, Additional Definitive Proxy Soliciting Materials And Rule 14(A)(12) Material (Apr. 10, 2015)** (Investment Weekly News - Factiva, 05/02/2015) |
| 5/3/2015 Sun | | | | | | | | | | | |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 5/4/2015 Mon | 1,913,619 | $19.64 | -0.51% | 0.29% | 0.26% | 0.35% | -0.85% | -0.69 | 49.38% | -$0.17 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 05/04/2015) |
| 5/5/2015 Tue | 2,989,339 | $19.58 | -0.31% | -1.17% | 0.78% | -0.64% | 0.33% | 0.27 | 78.89% | $0.07 | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 05/05/2015) |
| | | | | | | | | | | | **Kane John M, EVP & Chie, Relinquishes 2,947 NAVI US 05/01/15** (BLOOMBERG News - Bloomberg, 05/05/2015 05:20 PM) |
| | | | | | | | | | | | **Hynes Timothy J Iv, EVP, Chief, Relinquishes 694 NAVI US 05/01/15** (BLOOMBERG News - Bloomberg, 05/05/2015 05:33 PM) |
| | | | | | | | | | | | **Chivavibul Somsak, EVP & CFO, Relinquishes 1,952 NAVI US 05/01/15** (BLOOMBERG News - Bloomberg, 05/05/2015 05:36 PM) |
| 5/6/2015 Wed | 1,883,639 | $19.58 | 0.00% | -0.41% | 0.56% | -0.11% | 0.11% | 0.09 | 92.74% | $0.02 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œe USA Blue Chips - Factiva, 05/06/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS DISPOSITION BY EXECUTIVE VP AND CHIEF OPERATING OFFICER KANE (Delaware)** (US Fed News - Factiva, 05/06/2015) |
| | | | | | | | | | | | **NAVIENT REPORTS DISPOSITION BY EXECUTIVE VP CHIVAVIBUL (Delaware)** (US Fed News - Factiva, 05/06/2015) |
| 5/7/2015 Thu | 1,753,565 | $19.78 | 1.02% | 0.40% | -0.11% | 0.36% | 0.66% | 0.53 | 59.69% | $0.13 | **ValuEngine Research Report** (ValuEngine - Manual Entry, 05/06/2015) |
| 5/8/2015 Fri | 1,442,255 | $20.02 | 1.21% | 1.35% | -0.24% | 1.03% | 0.19% | 0.15 | 88.05% | $0.04 | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 05/08/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Apr. 21, 2015)** (Investment Weekly News - Factiva, 05/08/2015) |
| | | | | | | | | | | | **Validea Research Report** (Validea - Manual Entry, 05/08/2015) |
| | | | | | | | | | | | **HIGH YIELD: Telecom Carriers Windstream, Sprint Among Laggards** (Bloomberg First Word - Bloomberg, 05/08/2015 07:42 AM) |
| | | | | | | | | | | | **Consumer Finance Equities Roundup - Discover Financial Services, Capital One Financial, Navient, Santander Consumer USA Holdings, and Synchrony Financial** (PR Newswire (U.S.) - Factiva, 05/08/2015 08:40 AM) |
| | | | | | | | | | | | **S&P 500 Annual Meeting Calendar, Week of May 11 - June 05** (BLOOMBERG News - Bloomberg, 05/08/2015 09:00 AM) |
| 5/9/2015 Sat | | | | | | | | | | | |
| 5/10/2015 Sun | | | | | | | | | | | |
| 5/11/2015 Mon | 3,269,881 | $19.97 | -0.25% | -0.49% | 1.10% | -0.08% | -0.17% | -0.14 | 88.86% | -$0.03 | |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 5/12/2015 Tue | 1,283,463 | $20.12 | 0.75% | -0.29% | -0.38% | -0.17% | 0.92% | 0.77 | 44.35% | $0.18 | |
| 5/13/2015 Wed | 2,002,389 | $19.79 | -1.64% | -0.01% | 1.04% | 0.25% | -1.89% | -1.60 | 11.25% | -$0.38 | **Navient helps student loan borrowers learn about income-driven repayment plans** (GlobeNewswire - Factiva, 05/13/2015 05:04 PM) |
| | | | | | | | | | | | **Navient helps student loan borrowers learn about income-driven repayment plans** (PrimeZone Media Network - Bloomberg, 05/13/2015 05:04 PM) |
| 5/14/2015 Thu | 3,173,318 | $19.83 | 0.20% | 1.09% | 0.04% | 0.85% | -0.64% | -0.54 | 59.12% | -$0.13 | **CFPB May Issue Student Loan Servicing Rules Within Months.: FBR** (Bloomberg First Word - Bloomberg, 05/14/2015 12:35 PM) |
| 5/15/2015 Fri | 2,791,140 | $19.16 | -3.38% | 0.09% | -0.80% | 0.03% | -3.41% | -2.85 | 0.51% ** | -$0.68 | **S&P 500 Annual Meeting Calendar, Week of May 18 - June 12** (BLOOMBERG News - Bloomberg, 05/15/2015 09:00 AM) |
| | | | | | | | | | | | **OMEGA Reports Reduced EBAY, ASPS, CZR, NAVI, TERP Stakes** (Bloomberg First Word - Bloomberg, 05/15/2015 10:22 AM) |
| 5/16/2015 Sat | | | | | | | | | | | |
| 5/17/2015 Sun | | | | | | | | | | | |
| 5/18/2015 Mon | 2,606,585 | $19.06 | -0.52% | 0.31% | 0.00% | 0.26% | -0.78% | -0.63 | 52.78% | -$0.15 | **Height Analytics Research Report** (Height Analytics - Manual Entry, 05/18/2015) |
| | | | | | | | | | | | **NAVI, NNI May Face Higher Costs on CFPB Changes: Height** (Bloomberg First Word - Bloomberg, 05/18/2015 09:42 AM) |
| 5/19/2015 Tue | 3,048,606 | $19.31 | 1.31% | -0.04% | 1.09% | 0.20% | 1.11% | 0.91 | 36.48% | $0.21 | |
| 5/20/2015 Wed | 1,788,827 | $19.34 | 0.16% | -0.08% | -0.16% | -0.05% | 0.20% | 0.17 | 86.83% | $0.04 | **N.Y. DFS Still Threat to Financial Cos. Post-Lawsky: Guggenheim** (Bloomberg First Word - Bloomberg, 05/20/2015 02:40 PM) |
| 5/21/2015 Thu | 2,003,130 | $19.45 | 0.57% | 0.25% | -0.61% | 0.08% | 0.49% | 0.40 | 69.08% | $0.09 | **Navient Corp declares Q2 common stock dividend** (Reuters Significant Developments - Factiva, 05/21/2015) |
| | | | | | | | | | | | **Over Enrolled: How Sallie Mae Manages Growth in its Balance Sheet** (Asset Securitization Report Online - Factiva, 05/21/2015) |
| | | | | | | | | | | | **Over Enrolled: How Sallie Mae Manages Growth in its Balance Sheet; Over Enrolled: How Sallie Mae Manages Growth in its Balance Sheet** (Asset Securitization Report Online - Factiva, 05/21/2015) |
| | | | | | | | | | | | **Warren, Durbin Press Education Dept on Navient, Lender Probe** (Bloomberg First Word - Bloomberg, 05/21/2015 12:10 PM) |
| | | | | | | | | | | | **Navient declares second quarter common stock dividend** (GlobeNewswire - Factiva, 05/21/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT DECLARES 2Q STOCK DIV** (BLOOMBERG News - Bloomberg, 05/21/2015 04:15 PM) |
| | | | | | | | | | | | **Navient declares second quarter common stock dividend** (PrimeZone Media Network - Bloomberg, 05/21/2015 04:15 PM) |
| | | | | | | | | | | | **BC-Dividends** (Associated Press Newswires - Factiva, 05/21/2015 04:52 PM) |
| 5/22/2015 Fri | 1,273,674 | $19.33 | -0.62% | -0.22% | 0.53% | 0.01% | -0.63% | -0.52 | 60.60% | -$0.12 | |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/23/2015 Sat | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-Q, Quarterly Report [Sections 13 Or 15(D)] (Apr. 30, 2015) (Investment Weekly News - Factiva, 05/23/2015) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (May. 5, 2015) (Investment Weekly News - Factiva, 05/23/2015) |
| | | | | | | | | | | | Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 1, 2015) (Investment Weekly News - Factiva, 05/23/2015) |
| 5/24/2015 Sun | | | | | | | | | | | |
| 5/25/2015 Mon | | | | | | | | | | | |
| 5/26/2015 Tue | 2,441,408 | $19.13 | -1.03% | -1.03% | -0.27% | -0.72% | -0.32% | -0.26 | 79.43% | -$0.06 | CFRA Equity Research Research Report (CFRA Equity Research - Manual Entry, 05/26/2015) |
| 5/27/2015 Wed | 1,625,358 | $19.37 | 1.25% | 0.93% | -0.42% | 0.60% | 0.65% | 0.53 | 59.45% | $0.12 | Buckingham Research Research Report (Buckingham Research - Manual Entry, 05/27/2015) |
| | | | | | | | | | | | Compass Point Research Report (Compass Point - Manual Entry, 05/27/2015) |
| 5/28/2015 Thu | 1,390,198 | $19.29 | -0.41% | -0.11% | -0.09% | -0.04% | -0.37% | -0.30 | 76.35% | -$0.07 | NAVIENT CORP 8-K (SEC - SEC Edgar, 05/28/2015) |
| | | | | | | | | | | | NEARLY 78,000 SERVICE MEMBERS TO BEGIN TO BEGIN RECEIVING $60 MILLION UNDER DEPARTMENT OF JUSTICE SETTLEMENT WITH NAVIENT FOR OVERCHARGING ON STUDENT LOANS (US Fed News - Factiva, 05/28/2015) |
| | | | | | | | | | | | Zacks Investment Research Research Report (Zacks Investment Research - Manual Entry, 05/28/2015) |
| | | | | | | | | | | | S&P 500 Breakouts Outpacing Breakdowns: BTIG, Lists Buys (Bloomberg First Word - Bloomberg, 05/28/2015 07:52 AM) |
| | | | | | | | | | | | Sallie Mae, Wells Fargo May Be Affected by Student Loan Rules (Bloomberg First Word - Bloomberg, 05/28/2015 08:25 AM) |
| 5/29/2015 Fri | 1,854,960 | $19.27 | -0.10% | -0.63% | -0.12% | -0.42% | 0.32% | 0.26 | 79.51% | $0.06 | FORM 8-K: NAVIENT FILES CURRENT REPORT (US Fed News - Factiva, 05/29/2015) |
| | | | | | | | | | | | Nearly 78,000 Service Members to Begin to Begin Receiving $60 Million Under Department of Justice Settlement with Navient for Overcharging on Student Loans (FARS News Agency - Factiva, 05/29/2015) |
| 5/30/2015 Sat | | | | | | | | | | | |
| 5/31/2015 Sun | | | | | | | | | | | |
| 6/1/2015 Mon | 1,257,553 | $19.34 | 0.36% | 0.22% | -0.37% | 0.12% | 0.24% | 0.20 | 84.43% | $0.05 | |
| 6/2/2015 Tue | 2,236,456 | $19.38 | 0.21% | -0.10% | 0.65% | 0.12% | 0.09% | 0.07 | 94.10% | $0.02 | |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1]<br><br>Date | [2]<br><br>Volume | [3]<br><br>Price | [4]<br><br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br><br>t-stat | [10]<br><br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br><br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/3/2015 Wed | 1,496,264 | $19.44 | 1.14% | 0.23% | 0.45% | 0.28% | 0.86% | 0.71 | 48.03% | $0.17 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 06/03/2015) |
| | | | | | | | | | | | **Ex-divs to Trim 0.394 Pts off S&P500 on June 3** (Bloomberg First Word - Bloomberg, 06/03/2015 08:00 AM) |
| | | | | | | | | | | | **Navient Corp Goes Ex-Dividend, Trades Without Payout** (BLOOMBERG News - Bloomberg, 06/03/2015 08:15 AM) |
| | | | | | | | | | | | **Navient CFO to present at Barclays High Yield Bond and Syndicated Loan Conference** (GlobeNewswire - Factiva, 06/03/2015 09:00 AM) |
| | | | | | | | | | | | **Navient CFO to present at Barclays High Yield Bond and Syndicated Loan Conference** (PrimeZone Media Network - Bloomberg, 06/03/2015 09:00 AM) |
| | | | | | | | | | | | ***MOODY'S ASSIGNS PROVISIONAL RATINGS TO NAVIENT STUDENT LOAN** (BLOOMBERG News - Bloomberg, 06/03/2015 03:36 PM) |
| | | | | | | | | | | | **Navient appoints John Kane and Jeff Whorley as group presidents to lead business growth** (GlobeNewswire - Factiva, 06/03/2015 04:15 PM) |
| | | | | | | | | | | | **Navient appoints John Kane and Jeff Whorley as group presidents to lead business growth** (PrimeZone Media Network - Bloomberg, 06/03/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVI NAMES KANE GROUP PRESIDENT ASSET RECOVERY, BUS. SERVICES** (BLOOMBERG News - Bloomberg, 06/03/2015 04:17 PM) |
| | | | | | | | | | | | ***NAVI NAMES WHORLEY GROUP PRESIDENT ASSET MANAGEMENT & SERVICING** (BLOOMBERG News - Bloomberg, 06/03/2015 04:18 PM) |
| 6/4/2015 Thu | 1,638,129 | $19.06 | -1.95% | -0.86% | -0.49% | -0.67% | -1.29% | -1.06 | 29.11% | -$0.25 | **Navient appoints group presidents** (SNL Financial Services Daily - Factiva, 06/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 3** (SEC - SEC Edgar, 06/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 06/04/2015) |
| | | | | | | | | | | | **NEARLY 78,000 SERVICE MEMBERS TO BEGIN TO BEGIN RECEIVING $60 MILLION UNDER DEPARTMENT OF JUSTICE SETTLEMENT WITH NAVIENT FOR OVERCHARGING ON STUDENT LOANS (CORRECTED)** (US Fed News - Factiva. 06/04/2015) |
| | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 06/04/2015) |
| | | | | | | | | | | | **John F Whorley, EVP, Servi, Acquires 15,511 NAVI US 06/01/15** (BLOOMBERG News - Bloomberg, 06/04/2015 05:17 PM) |
| 6/5/2015 Fri | 1,449,331 | $19.09 | 0.16% | -0.14% | 0.89% | 0.09% | 0.07% | 0.06 | 95.45% | $0.01 | **HIGH YIELD: BGC 5.75% Among Leaders for 3rd Time in 6 Sessions** (Bloomberg First Word - Bloomberg, 06/05/2015 07:31 AM) |
| 6/6/2015 Sat | | | | | | | | | | | |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 6/7/2015 Sun | | | | | | | | | | | |
| 6/8/2015 Mon | 1,276,347 | $19.06 | -0.16% | -0.63% | 0.13% | -0.42% | 0.26% | 0.21 | 83.22% | $0.05 | **HIGH YIELD: Top Ten Lagging Movers Friday** (Bloomberg First Word - Bloomberg, 06/08/2015 07:40 AM) |
| 6/9/2015 Tue | 1,779,443 | $18.90 | -0.84% | 0.04% | 0.41% | 0.14% | -0.97% | -0.81 | 42.08% | -$0.19 | |
| 6/10/2015 Wed | 1,741,554 | $19.40 | 2.65% | 1.21% | 0.34% | 0.92% | 1.73% | 1.44 | 15.26% | $0.33 | |
| 6/11/2015 Thu | 1,745,192 | $19.53 | 0.67% | 0.20% | 0.27% | 0.22% | 0.45% | 0.37 | 71.29% | $0.09 | **NAVIENT CORP 4** (SEC - SEC Edgar, 06/11/2015) |
| | | | | | | | | | | | **Navient Corp at Barclays High Yield Bond & Syndicated Loan Conference - Final** (CQ FD Disclosure - Factiva, 06/11/2015) |
| | | | | | | | | | | | **Mark L Heleen, EVP & Chie, Relinquishes 1,138 NAVI US 06/10/15** (BLOOMBERG News - Bloomberg, 06/11/2015 09:09 PM) |
| 6/12/2015 Fri | 972,312 | $19.43 | -0.51% | -0.69% | 0.30% | -0.41% | -0.10% | -0.08 | 93.53% | -$0.02 | **NAVIENT REPORTS DISPOSITION BY EXECUTIVE VP AND CHIEF LEGAL OFFICER HELEEN (Delaware)** (US Fed News - Factiva, 06/12/2015) |
| | | | | | | | | | | | **Join Navient for "9 Innings of Networking" in Wilmington** (GlobeNewswire - Factiva, 06/12/2015 12:01 PM) |
| | | | | | | | | | | | **Join Navient for "9 Innings of Networking" in Wilmington** (PrimeZone Media Network - Bloomberg, 06/12/2015 12:01 PM) |
| 6/13/2015 Sat | | | | | | | | | | | |
| 6/14/2015 Sun | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 06/14/2015) |
| 6/15/2015 Mon | 1,381,641 | $19.09 | -1.75% | -0.46% | 0.01% | -0.31% | -1.44% | -1.19 | 23.49% | -$0.28 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 06/15/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 06/15/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 06/15/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 06/15/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 06/15/2015) |
| 6/16/2015 Tue | 1,887,736 | $19.14 | 0.26% | 0.57% | -0.27% | 0.35% | -0.09% | -0.08 | 93.90% | -$0.02 | |
| 6/17/2015 Wed | 2,300,645 | $18.64 | -2.61% | 0.20% | 0.30% | 0.19% | -2.81% | -2.41 | 1.75% * | -$0.54 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢‚¬â€œ USA Blue Chips - Factiva, 06/17/2015) |
| | | | | | | | | | | | **Valu-Trac Investments Research Report** (Valu-Trac Investments - Manual Entry, 06/17/2015) |
| | | | | | | | | | | | **Gazprom, Societe Generale Top Corporate CDS Trading: DTCC** (Bloomberg First Word - Bloomberg, 06/17/2015 06:37 AM) |
| 6/18/2015 Thu | 2,723,891 | $18.99 | 1.85% | 1.00% | -0.21% | 0.65% | 1.20% | 1.01 | 31.62% | $0.22 | **HIGH YIELD: NCR Among Leading Movers on Buyout News** (Bloomberg First Word - Bloomberg, 06/18/2015 07:30 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 6/19/2015 Fri | 5,057,832 | $18.93 | -0.29% | -0.53% | 0.29% | -0.35% | 0.06% | 0.05 | 96.22% | $0.01 | *MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT STUDENT LOAN (BLOOMBERG News - Bloomberg, 06/18/2015 06:53 PM) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 06/19/2015) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT STUDENT LOAN TRUST 2015-3 FILES CURRENT REPORT** (US Fed News - Factiva, 06/19/2015) |
| | | | | | | | | | | | **Navient receives Best Board Diversity Initiative Award** (GlobeNewswire - Factiva, 06/19/2015 08:00 AM) |
| | | | | | | | | | | | **Navient receives Best Board Diversity Initiative Award** (PrimeZone Media Network - Bloomberg, 06/19/2015 08:00 AM) |
| 6/20/2015 Sat | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (May. 28, 2015)** (Investment Weekly News - Factiva, 06/20/2015) |
| 6/21/2015 Sun | | | | | | | | | | | |
| 6/22/2015 Mon | 1,546,264 | $19.06 | 0.69% | 0.61% | 0.53% | 0.56% | 0.13% | 0.11 | 91.48% | $0.02 | **HIGH YIELD: Oil Companies KOROIL, HKUS, PQ Among Lagging Movers** (Bloomberg First Word - Bloomberg, 06/22/2015 07:40 AM) |
| 6/23/2015 Tue | 1,635,551 | $19.10 | 0.21% | 0.07% | 0.35% | 0.13% | 0.08% | 0.07 | 94.53% | $0.02 | **BofA Merrill Lynch Research Report** (BofA Merrill Lynch - Manual Entry, 06/23/2015) |
| | | | | | | | | | | | **S&P Global Ratings Research Report** (S&P Global Ratings - Manual Entry, 06/23/2015) |
| | | | | | | | | | | | **S&P Global Ratings Research Report** (S&P Global Ratings - Manual Entry, 06/23/2015) |
| | | | | | | | | | | | **Heavy Trucks Face Higher Costs Under New Emissions Rules: BI** (Bloomberg First Word - Bloomberg, 06/23/2015 10:27 AM) |
| 6/24/2015 Wed | 2,881,345 | $18.83 | -1.41% | -0.73% | 0.21% | -0.51% | -0.90% | -0.76 | 44.84% | -$0.17 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 06/24/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 06/24/2015) |
| | | | | | | | | | | | **Millennials' Family, Car, House Delayed: Equifax (Earlier)** (Bloomberg First Word - Bloomberg, 06/24/2015 03:15 PM) |
| 6/25/2015 Thu | 1,487,690 | $18.56 | -1.46% | -0.29% | -0.46% | -0.31% | -1.15% | -0.98 | 33.12% | -$0.22 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 06/25/2015) |
| | | | | | | | | | | | **Navient Foundation awards $22,000 to Luzerne County Head Start** (GlobeNewswire - Factiva, 06/25/2015 09:37 AM) |
| | | | | | | | | | | | **Navient Foundation awards $22,000 to Luzerne County Head Start** (PrimeZone Media Network - Bloomberg, 06/25/2015 09:37 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Excess | | | | | Abnormal | |
| | | | | Market | Industry | Predicted | Abnormal | | | Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **ABS: FFELP Ratings Uncertainty 'Underserved,' Citi Says** (Bloomberg First Word - Bloomberg, 06/25/2015 11:08 AM) |
| 6/26/2015 Fri | 3,702,122 | $18.44 | -0.62% | -0.02% | 0.14% | -0.01% | -0.61% | -0.52 | 60.69% | -$0.11 | |
| 6/27/2015 Sat | | | | | | | | | | | |
| 6/28/2015 Sun | | | | | | | | | | | |
| 6/29/2015 Mon | 1,975,671 | $18.11 | -1.79% | -2.08% | -0.23% | -1.51% | -0.28% | -0.24 | 80.94% | -$0.05 | **NAVIENT CORP 11-K** (SEC - SEC Edgar, 06/29/2015) |
| 6/30/2015 Tue | 1,641,632 | $18.21 | 0.55% | 0.27% | 0.06% | 0.19% | 0.36% | 0.31 | 76.00% | $0.06 | |
| 7/1/2015 Wed | 2,452,605 | $18.45 | 1.32% | 0.72% | 0.26% | 0.57% | 0.75% | 0.64 | 52.31% | $0.14 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings â€œ USA Blue Chips - Factiva, 07/01/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 07/01/2015 07:30 AM) |
| 7/2/2015 Thu | 1,941,471 | $18.45 | 0.00% | -0.03% | -0.18% | -0.03% | 0.03% | 0.02 | 98.23% | $0.00 | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 07/02/2015) |
| 7/3/2015 Fri | | | | | | | | | | | |
| 7/4/2015 Sat | | | | | | | | | | | |
| 7/5/2015 Sun | | | | | | | | | | | |
| 7/6/2015 Mon | 2,253,678 | $18.61 | 0.87% | -0.38% | -0.26% | -0.33% | 1.20% | 1.05 | 29.37% | $0.22 | **Navient Foundation awards $6,000 to Nemours Foundation** (GlobeNewswire - Factiva, 07/06/2015) |
| | | | | | | | | | | | **Navient Foundation awards $6,000 to Nemours Foundation** (PrimeZone Media Network - Bloomberg, 07/06/2015 11:10 AM) |
| 7/7/2015 Tue | 2,724,954 | $18.97 | 1.93% | 0.61% | -0.47% | 0.45% | 1.48% | 1.30 | 19.64% | $0.28 | |
| 7/8/2015 Wed | 1,865,451 | $18.57 | -2.11% | -1.64% | -0.49% | -1.35% | -0.75% | -0.66 | 51.18% | -$0.14 | |
| 7/9/2015 Thu | 1,422,322 | $18.53 | -0.22% | 0.23% | 0.37% | 0.30% | -0.52% | -0.45 | 65.40% | -$0.10 | **Student Loan Bonds Likely to Be Downgraded, Citiâ€™s Kane Says** (Bloomberg First Word - Bloomberg, 07/09/2015 12:16 PM) |
| | | | | | | | | | | | **Citigroup Sees Student-Loan Bonds on Course for Big Disruptions** (BLOOMBERG News - Bloomberg, 07/09/2015 04:08 PM) |
| | | | | | | | | | | | **Citigroup Says Student-Loan Bonds May Face Cut to Junk (Correct)** (BLOOMBERG News - Bloomberg, 07/09/2015 04:43 PM) |
| | | | | | | | | | | | **Citigroup Sees Student-Loan Bonds on Course for Big Disruptions** (BLOOMBERG News - Bloomberg, 07/09/2015 04:48 PM) |
| | | | | | | | | | | | **Citigroup Sees Student-Loan Bonds on Course for Disruptions (1)** (BLOOMBERG News - Bloomberg, 07/09/2015 06:38 PM) |
| 7/10/2015 Fri | 2,492,940 | $18.37 | -0.86% | 1.23% | 0.07% | 1.07% | -1.94% | -1.68 | 9.54% | -$0.36 | **Citigroup Sees Student-Loan Bonds on Course for Disruptions (2)** (BLOOMBERG News - Bloomberg, 07/10/2015 10:47 AM) |
| | | | | | | | | | | | **Citigroup Sees Student-Loan Bonds on Course for Disruptions (3)** (BLOOMBERG News - Bloomberg, 07/10/2015 11:06 AM) |
| 7/11/2015 Sat | | | | | | | | | | | |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 7/12/2015 Sun | | | | | | | | | | | |
| 7/13/2015 Mon | 2,258,746 | $18.36 | -0.05% | 1.12% | 0.52% | 1.00% | -1.06% | -0.91 | 36.49% | -$0.19 | **Barclays Research Report** (Barclays - Manual Entry, 07/13/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/13/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/13/2015) |
| | | | | | | | | | | | **Navient Corp gives Q2 2015 EPS guidance; Revises FY 2015 EPS guidance** (Reuters Significant Developments - Factiva, 07/13/2015) |
| | | | | | | | | | | | **Navient Sees Q2 Earnings Below Street** (RTT News - Factiva, 07/13/2015) |
| | | | | | | | | | | | **Navient Sees Q2 Earnings Below Street; Cuts FY15 Outlook** (RTT News - Factiva, 07/13/2015) |
| | | | | | | | | | | | **Shares in student loan company Navient plunge 13% after guidance cut** (Investing.com - Factiva, 07/13/2015) |
| | | | | | | | | | | | **HIGH YIELD: Oil Companies SD, CRK, FGP Among Leading Movers** (Bloomberg First Word - Bloomberg, 07/13/2015 07:31 AM) |
| | | | | | | | | | | | **C, GOOGL, GS, JPM Are Buys Ahead of Their Earnings: Cornerstone** (Bloomberg First Word - Bloomberg, 07/13/2015 08:25 AM) |
| | | | | | | | | | | | **ABS: Wider Set of FFELP Bonds May Be Affected, Nomura Says** (Bloomberg First Word - Bloomberg, 07/13/2015 08:29 AM) |
| | | | | | | | | | | | **ABS: FFELP Investors Should â€˜Ride Out the Waves,â€™ JPMorgan Says** (Bloomberg First Word - Bloomberg, 07/13/2015 02:01 PM) |
| | | | | | | | | | | | ***TRADING HALTED:(NAVI) Halt News Pending** (BLOOMBERG News - Bloomberg, 07/13/2015 04:10 PM) |
| | | | | | | | | | | | ***TRADING HALTED:(NAVI) HALT NEWS PENDING** (Bloomberg First Word - Bloomberg, 07/13/2015 04:10 PM) |
| | | | | | | | | | | | **Navient previews second-quarter 2015 earnings, updates 2015 guidance** (GlobeNewswire - Factiva, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT PREVIEWS 2Q '15 EARNINGS, '15 GUIDANCE** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **Navient previews second-quarter 2015 earnings, updates 2015 guidance** (PrimeZone Media Network - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 2Q PRELIM CORE EPS 40C** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT PREVIEWS 2Q CORE EPS 40C, EST. 55C** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |

## Appendix C
## Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| | | | | | | | | | | | **\*NAVIENT 2Q PRELIM CORE EPS 40C, EST. 55C** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT SEES YEAR CORE EPS $1.85** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q PRELIM CORE EPS 40C, EST. 55C** (Bloomberg First Word - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT REMOVED FROM '15 VIEWS ADDED PRIVATE LOAN ACQUISITIONS** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT REDUCED FORECAST FOR NET INTEREST INCOME** (BLOOMBERG News - Bloomberg, 07/13/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT HAD RESTRUCTURING IN QTR** (BLOOMBERG News - Bloomberg, 07/13/2015 04:16 PM) |
| | | | | | | | | | | | **\*NAVIENT 2Q PRELIM NET INTEREST MARGIN 3.55% FOR PVT EDUCATION** (BLOOMBERG News - Bloomberg, 07/13/2015 04:16 PM) |
| | | | | | | | | | | | **\*NAVIENT SEES PVT EDUCATION LOAN LOSS PROVISION $191M FOR QTR** (BLOOMBERG News - Bloomberg, 07/13/2015 04:17 PM) |
| | | | | | | | | | | | **\*NAVIENT SEES YR CORE EPS $1.85, EST. $2.19** (BLOOMBERG News - Bloomberg, 07/13/2015 04:17 PM) |
| | | | | | | | | | | | **\*NAVIENT SEES YR PVT EDUCATION LOAN LOSS PROVISION $575M-$600M** (BLOOMBERG News - Bloomberg, 07/13/2015 04:17 PM) |
| | | | | | | | | | | | **\*NAVIENT SEES YR CORE EPS $1.85, SAW $2.20, EST. $2.19** (BLOOMBERG News - Bloomberg, 07/13/2015 04:21 PM) |
| | | | | | | | | | | | **Navient 2Q Prelim Core Eps 40c, Est. 55c; Cuts Yr Profit View** (Bloomberg First Word - Bloomberg, 07/13/2015 04:21 PM) |
| | | | | | | | | | | | **\*QUOTATION RESUMED:(NAVI) News and Resumption Times** (BLOOMBERG News - Bloomberg, 07/13/2015 04:40 PM) |
| | | | | | | | | | | | **U.S. Companies Issuing Earnings Outlooks for July 13 (Table)** (BLOOMBERG News - Bloomberg, 07/13/2015 04:40 PM) |
| | | | | | | | | | | | **\*TRADING RELEASED/RESUMED:(NAVI) Reason Not Available** (BLOOMBERG News - Bloomberg, 07/13/2015 04:45 PM) |
| | | | | | | | | | | | **MW Navient shares drop on cut outlook** (MarketWatch - Factiva, 07/13/2015 04:53 PM) |
| | | | | | | | | | | | **Navient Cuts Financial Projections** (Dow Jones Institutional News - Factiva, 07/13/2015 05:00 PM) |
| | | | | | | | | | | | **MW UPDATE: Navient shares drop on revised outlook** (MarketWatch - Factiva, 07/13/2015 05:31 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 7/14/2015 Tue | 8,538,103 | $16.42 | -10.57% | 0.45% | -0.15% | 0.37% | -10.94% | -9.60 | 0.00% ** | -$2.01 | **MW UPDATE: Navient shares drop on revised outlook** (MarketWatch - Factiva, 07/13/2015 06:37 PM) |
| | | | | | | | | | | | **Navient Cuts Financial Projections as Private-Loan Portfolio Disappoints; Student-loan company expects core earnings of 40 cents a share in second quarter** (The Wall Street Journal Online - Factiva, 07/13/2015 07:29 PM) |
| | | | | | | | | | | | **MW UPDATE: Navient shares drop on revised outlook** (Dow Jones Institutional News - Factiva, 07/13/2015 07:35 PM) |
| | | | | | | | | | | | **MW UPDATE: Navient shares drop on revised outlook** (MarketWatch - Factiva, 07/13/2015 07:35 PM) |
| | | | | | | | | | | | **Navient shares drop on revised outlook; Valero shares rise on buyback program** (MarketWatch - Factiva, 07/13/2015 07:35 PM) |
| | | | | | | | | | | | **NAVI INVESTOR ALERT: Investigation of Navient Corporation Announced by The Law Offices of Howard G. Smith** (Business Wire - Bloomberg, 07/13/2015 07:36 PM) |
| | | | | | | | | | | | **NAVI INVESTOR ALERT: Investigation of Navient Corporation Announced by The Law Offices of Howard G. Smith** (Business Wire - Factiva, 07/13/2015 07:36 PM) |
| | | | | | | | | | | | **Barclays Research Report** (Barclays - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 07/14/2015) |
| | | | | | | | | | | | **Navient issues Q2 guidance, revises FY'15 outlook** (SNL Financial Services Daily - Factiva, 07/14/2015) |
| | | | | | | | | | | | **Navient lowers estimates for 2015** (StockWatch - Factiva, 07/14/2015) |
| | | | | | | | | | | | **Navient lowers estimates for 2015** (TopNews.in - Factiva, 07/14/2015) |
| | | | | | | | | | | | **S&P Global Ratings Research Report** (S&P Global Ratings - Manual Entry, 07/14/2015) |
| | | | | | | | | | | | **MW J.P. Morgan, Wells Fargo, Yum Brands earnings in focus** (MarketWatch - Factiva, 07/14/2015 12:07 AM) |
| | | | | | | | | | | | **ABS: FFELP ABS Downgrade Risk â€Less Quantifiable,â€™ BofAML Says** (Bloomberg First Word - Bloomberg, 07/14/2015 08:08 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 7/15/2015 Wed | 4,133,519 | $16.56 | 0.85% | -0.07% | 0.23% | 0.03% | 0.83% | 0.72 | 47.00% | $0.14 | Morning Market Losers (Benzinga.com - Factiva, 07/14/2015 09:47 AM) |
| | | | | | | | | | | | Stocks Hitting 52-Week Lows (Benzinga.com - Factiva, 07/14/2015 10:10 AM) |
| | | | | | | | | | | | *S&PBulletin: Navient Corp. Rtgs Unaffected By Earnings Preview (Dow Jones Institutional News - Factiva, 07/14/2015 10:50 AM) |
| | | | | | | | | | | | INVESTOR ALERT: Investigation of Navient Corporation Announced by Glancy Prongay & Murray LLP (Business Wire - Bloomberg, 07/14/2015 11:31 AM) |
| | | | | | | | | | | | INVESTOR ALERT: Investigation of Navient Corporation Announced by Glancy Prongay & Murray LLP (Business Wire - Factiva, 07/14/2015 11:31 AM) |
| | | | | | | | | | | | Tuesday's Mid-Day Movers: Iran's Nuclear Deal Reached; Micron Technology Bid, Box Inc And More (Benzinga.com - Factiva, 07/14/2015 12:31 PM) |
| | | | | | | | | | | | Sallie Mae Spinoff Navient Falls as Bigger Loan Losses Forecast (BLOOMBERG News - Bloomberg, 07/14/2015 02:51 PM) |
| | | | | | | | | | | | WPX Energy and Navient are big market movers (Associated Press Newswires - Factiva, 07/14/2015 04:22 PM) |
| | | | | | | | | | | | Agentur fÃ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings Ã¢‚¬â€œ USA Blue Chips - Factiva, 07/15/2015) |
| | | | | | | | | | | | Barclays Research Report (Barclays - Manual Entry, 07/15/2015) |
| | | | | | | | | | | | BIG MOVERS (The Quad-City Times - Factiva, 07/15/2015) |
| | | | | | | | | | | | FORM 8-K: NAVIENT FILES CURRENT REPORT (US Fed News - Factiva, 07/15/2015) |
| | | | | | | | | | | | S&PÃ¢‚¬â„¢s ratings on Navient unaffected by earnings outlook (SNL Financial Services Daily - Factiva, 07/15/2015) |
| | | | | | | | | | | | Valu-Trac Investments Research Report (Valu-Trac Investments - Manual Entry, 07/15/2015) |
| | | | | | | | | | | | *NAVIENT RAISED TO OVERWEIGHT VS EQUALWEIGHT AT BARCLAYS (Bloomberg First Word - Bloomberg, 07/15/2015 05:02 AM) |
| | | | | | | | | | | | Barnes & Noble at Highest Since 2008, Among Most Overbought (Bloomberg First Word - Bloomberg, 07/15/2015 08:55 AM) |
| | | | | | | | | | | | ABS: Moodyâ€™s RFC â€˜Fundamental Reconsiderationâ€™ of FFELP, WF Says (Bloomberg First Word - Bloomberg, 07/15/2015 09:10 AM) |
| | | | | | | | | | | | NAVI SHAREHOLDER ALERT: Levi & Korsinsky, LLP Announces the Commencement of an Investigation Involving Possible Securities Fraud (Business Wire - Bloomberg, 07/15/2015 11:49 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1]<br>Date | [2]<br>Volume | [3]<br>Price | [4]<br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br>t-stat | [10]<br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/16/2015 Thu | 3,180,562 | $16.67 | 0.66% | 0.80% | -0.08% | 0.66% | 0.01% | 0.01 | 99.57% | $0.00 | **NAVI SHAREHOLDER ALERT: Levi & Korsinsky, LLP Announces the Commencement of an Investigation Involving Possible Securities Fraud Violations by the Board of Directors of Navient Corporation -- NAVI** (Business Wire - Factiva, 07/15/2015 11:49 AM)<br><br>**Barclays sees recent sell-off in Navient shares as overdone** (SNL Financial Services Daily - Factiva, 07/16/2015)<br><br>**Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 07/16/2015)<br><br>**SLM Corp. Named L-T Sell at Off Wall Street on Added Competition** (Bloomberg First Word - Bloomberg, 07/16/2015 12:28 PM)<br><br>**INVESTOR ALERT: Goldberg Law PC Announces An Investigation Of Claims Against Navient Corporation On Behalf Of Investors** (Business Wire - Bloomberg, 07/16/2015 10:04 PM)<br><br>**INVESTOR ALERT: Goldberg Law PC Announces An Investigation Of Claims Against Navient Corporation On Behalf Of Investors** (Business Wire - Factiva, 07/16/2015 10:04 PM) |
| 7/17/2015 Fri | 3,114,756 | $16.86 | 1.14% | 0.11% | 0.01% | 0.14% | 1.00% | 0.88 | 38.06% | $0.17 | **Marlette Funding secures $75 million in equity funding** (MarketLine (a Datamonitor Company), Financial Deals Tracker - Factiva, 07/17/2015)<br><br>**\*MARLETTE FUNDING WINS $75 MLN IN FINANCING** (Bloomberg First Word - Bloomberg, 07/17/2015 08:00 AM)<br><br>**\*MARLETTE TO KEEP SOME LOANS ORIGINATED ON MYBESTEGG.COM** (BLOOMBERG News - Bloomberg, 07/17/2015 08:00 AM)<br><br>**\*NAVIENT, INVUS GROUP INVEST IN MARLETTE** (BLOOMBERG News - Bloomberg, 07/17/2015 08:00 AM)<br><br>**As Treasury Weighs Risk of Online Lenders, One Puts Skin in Game** (BLOOMBERG News - Bloomberg, 07/17/2015 08:00 AM)<br><br>**Marlette Funding Raises $75 Million for Future Growth** (Business Wire - Bloomberg, 07/17/2015 10:00 AM)<br><br>**\*MARLETTE FUNDING RAISES $75M FOR FUTURE GROWTH** (BLOOMBERG News - Bloomberg, 07/17/2015 10:00 AM)<br><br>**\*MARLETTE SAYS ROUND LED BY INVUS OPPORTUNITIES INCL. NAVIENT** (BLOOMBERG News - Bloomberg, 07/17/2015 10:01 AM)<br><br>**U.S. FINANCIALS WEEKLY AGENDA: MS, AXP, V 2Q Earnings** (Bloomberg First Word - Bloomberg, 07/17/2015 10:33 AM)<br><br>**S&P 500 Stocks Biggest Weekly Changes in Target Price** (BLOOMBERG News - Bloomberg, 07/17/2015 01:37 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Predicted Abnormal | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **INVESTOR ALERT: Navient Corporation Shareholders Encouraged to Contact The Wagner Firm Regarding Investigation** (Business Wire - Bloomberg, 07/17/2015 03:07 PM) |
| | | | | | | | | | | | **INVESTOR ALERT: Navient Corporation Shareholders Encouraged to Contact The Wagner Firm Regarding Investigation** (Business Wire - Factiva, 07/17/2015 03:07 PM) |
| | | | | | | | | | | | **Law Firm Kirby McInerney LLP Investigating Potential Claims on Behalf of Navient Corporation Stockholders** (Business Wire - Bloomberg, 07/17/2015 05:30 PM) |
| | | | | | | | | | | | **Law Firm Kirby McInerney LLP Investigating Potential Claims on Behalf of Navient Corporation Stockholders** (Business Wire - Factiva, 07/17/2015 05:30 PM) |
| | | | | | | | | | | | **EQUITY ALERT: The Rosen Law Firm Announces Investigation of Securities Claims Against Navient Corporation** (Business Wire - Bloomberg, 07/17/2015 06:46 PM) |
| | | | | | | | | | | | **EQUITY ALERT: The Rosen Law Firm Announces Investigation of Securities Claims Against Navient Corporation** (Business Wire - Factiva, 07/17/2015 06:46 PM) |
| 7/18/2015 Sat | | | | | | | | | | | |
| 7/19/2015 Sun | | | | | | | | | | | |
| 7/20/2015 Mon | 4,692,554 | $16.42 | -2.61% | 0.08% | 0.24% | 0.17% | -2.78% | -2.44 | 1.61% * | -$0.47 | **Marlette Funding LLC receives equity funding from Invus Opportunities, Navient** (SNL Financial Services Daily - Factiva, 07/20/2015) |
| | | | | | | | | | | | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 07/20/2015 09:13 AM) |
| 7/21/2015 Tue | 3,615,854 | $16.60 | 1.10% | -0.42% | 0.28% | -0.28% | 1.37% | 1.20 | 23.31% | $0.23 | **Compass Point Research Report** (Compass Point - Manual Entry, 07/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/21/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/21/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 07/21/2015) |
| | | | | | | | | | | | **Navient Reports Second-Quarter 2015 Financial Results** (GlobeNewswire - Factiva, 07/21/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 2Q CORE EPS 40C :NAVI US** (BLOOMBERG News - Bloomberg, 07/21/2015 04:15 PM) |
| | | | | | | | | | | | ***NAVIENT 2Q CORE EPS 40C , EST. 40C :NAVI US** (BLOOMBERG News - Bloomberg, 07/21/2015 04:15 PM) |

Appendix C
Navient News Chronology with Daily Statistics

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 7/22/2015 Wed | 3,441,288 | $16.23 | -2.23% | -0.23% | 0.29% | -0.09% | -2.14% | -1.85 | 6.63% | -$0.35 | **\*NAVIENT 2Q EPS 47C :NAVI US** (BLOOMBERG News - Bloomberg, 07/21/2015 04:15 PM) |
| | | | | | | | | | | | **Navient Reports Second-Quarter 2015 Financial Results** (PrimeZone Media Network - Bloomberg, 07/21/2015 04:15 PM) |
| | | | | | | | | | | | **\*NAVIENT BUYS $1B IN STUDENT LOANS DURING QUARTER** (BLOOMBERG News - Bloomberg, 07/21/2015 04:16 PM) |
| | | | | | | | | | | | **\*NAVI SEES FUNDING ONGOING NEEDS W/ CASH, OPER CF, DEBT ISSUE** (BLOOMBERG News - Bloomberg, 07/21/2015 04:19 PM) |
| | | | | | | | | | | | **\*NAVIENT LAUNCHED A RESTRUCTURING INITIATIVE TO STREAMLINE MGMT** (BLOOMBERG News - Bloomberg, 07/21/2015 04:19 PM) |
| | | | | | | | | | | | **\*NAVI MAY DRAW DOWN ON SECURED FFELP LOAN&PRIVATE EDUCATION LOAN** (BLOOMBERG News - Bloomberg, 07/21/2015 04:19 PM) |
| | | | | | | | | | | | **Navient 2Q Core EPS in Line With Estimates** (Bloomberg First Word - Bloomberg, 07/21/2015 04:21 PM) |
| | | | | | | | | | | | **BMO Capital Markets Research Report** (BMO Capital Markets - Manual Entry, 07/22/2015) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 07/22/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/22/2015) |
| | | | | | | | | | | | **Credit Suisse Research Report** (Credit Suisse - Manual Entry, 07/22/2015) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 07/22/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 07/22/2015) |
| | | | | | | | | | | | **Navient sees net income drop YOY in Q2** (SNL Financial Services Daily - Factiva, 07/22/2015) |
| | | | | | | | | | | | **Q2 2015 Navient Corp Earnings Call - Final** (CQ FD Disclosure - Factiva, 07/22/2015) |
| | | | | | | | | | | | **NAVIENT SHAREHOLDER ALERT: Shareholder Rights Law Firm Johnson & Weaver, LLP Announces Investigation of Navient Corporation;** (Business Wire - Bloomberg, 07/22/2015 07:52 AM) |
| | | | | | | | | | | | **NAVIENT SHAREHOLDER ALERT: Shareholder Rights Law Firm Johnson & Weaver, LLP Announces Investigation of Navient Corporation; Investors Encouraged to Contact the Firm** (Business Wire - Factiva, 07/22/2015 07:52 AM) |
| | | | | | | | | | | | **Student Loan Servicers Face Scrutiny, Election Risk: Compass Pt** (Bloomberg First Word - Bloomberg, 07/22/2015 05:03 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | **Sallie Mae's Profit More Than Doubles** (Dow Jones Top News & Commentary - Factiva, 07/22/2015 05:59 PM) |
| | | | | | | | | | | | **Sallie Maeâ‚¬â„¢s Profit More Than Doubles; The rise was largely the result of the sale of $738 million of private-education loans** (The Wall Street Journal Online - Factiva, 07/22/2015 06:02 PM) |
| | | | | | | | | | | | **Sallie Mae's Profit More Than Doubles** (Dow Jones Top North American Equities Stories - Factiva, 07/22/2015 06:10 PM) |
| | | | | | | | | | | | **Sallie Mae's Profit More Than Doubles** (Dow Jones Top North American Financial Services Stories - Factiva, 07/22/2015 06:10 PM) |
| | | | | | | | | | | | **Sallie Mae's Profit More Than Doubles** (Dow Jones Top Global Market Stories - Factiva, 07/22/2015 06:11 PM) |
| 7/23/2015 Thu | 2,610,848 | $16.39 | 0.99% | -0.56% | -1.66% | -0.76% | 1.74% | 1.51 | 13.47% | $0.28 | **Barclays Research Report** (Barclays - Manual Entry, 07/23/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 07/23/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/23/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 07/23/2015) |
| | | | | | | | | | | | **Levi & Korsinsky, LLP; NAVI SHAREHOLDER ALERT: Levi & Korsinsky, LLP Announces the Commencement of an Investigation Involving Possible Securities Fraud Violations by the Board of Directors of Navient Corporation -- NAVI** (Investment Weekly News - Factiva, 07/23/2015) |
| | | | | | | | | | | | **Navient's student loan portfolio suffered from 'recession' higher-ed cohort** (SNL Financial Services Daily - Factiva, 07/23/2015) |
| | | | | | | | | | | | **ABS: Navient Addresses FFELP Maturity Risk in Call, DB Says** (Bloomberg First Word - Bloomberg, 07/23/2015 09:21 AM) |
| 7/24/2015 Fri | 2,282,239 | $16.22 | -1.04% | -1.07% | -4.21% | -1.58% | 0.55% | 0.48 | 63.49% | $0.09 | **HIGH YIELD: Top 5 Best & Worst Performing CDS** (Bloomberg First Word - Bloomberg, 07/24/2015 11:33 AM) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Most Active Trades** (Bloomberg First Word - Bloomberg, 07/24/2015 12:11 PM) |
| | | | | | | | | | | | ***GPM REPORTS EXPANDED PROBE OF NAVIENT** (BLOOMBERG News - Bloomberg, 07/24/2015 12:30 PM) |
| | | | | | | | | | | | **GPM Announces Expanded Investigation of Navient Corporation** (Business Wire - Bloomberg, 07/24/2015 12:30 PM) |
| | | | | | | | | | | | **GPM Announces Expanded Investigation of Navient Corporation** (Business Wire - Factiva, 07/24/2015 12:30 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 7/25/2015 Sat 7/26/2015 Sun | | | | | | | | | | | Lifshitz & Miller Law Firm Announces Investigation of Celladon Corporation, Edison International, Inc., Louisiana Bancorp, Inc., Navient Corp., On Deck Capital, Inc., Thoratec, and Vivint Solar (PR Newswire (U.S.) - Factiva, 07/24/2015 07:47 PM) |
| | | | | | | | | | | | Press Release: Lifshitz & Miller Law Firm Announces Investigation of Celladon Corporation, Edison International, Inc., Louisiana Bancorp, Inc., Navient Corp., On Deck Capital, Inc., Thoratec, and Vivint Solar (Dow Jones Institutional News - Factiva. 07/24/2015 07:47 PM) |
| 7/27/2015 Mon | 2,518,530 | $15.72 | -3.08% | -0.58% | -0.40% | -0.50% | -2.58% | -2.25 | 2.62% * | -$0.42 | ABS: â€˜Puzzledâ€™ by Navient; No Imminent Resolution, Nomura Says (Bloomberg First Word - Bloomberg, 07/27/2015 10:14 AM) |
| | | | | | | | | | | | HIGH YIELD: Top 5 Best & Worst Performing CDS (Bloomberg First Word - Bloomberg, 07/27/2015 11:30 AM) |
| 7/28/2015 Tue | 2,272,992 | $15.83 | 0.70% | 1.24% | -1.02% | 0.78% | -0.08% | -0.08 | 93.94% | -$0.01 | Valu-Trac Investments Research Report (Valu-Trac Investments - Manual Entry, 07/28/2015) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Lagging Movers Yesterday (Bloomberg First Word - Bloomberg, 07/28/2015 07:44 AM) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 07/28/2015 11:30 AM) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 07/28/2015 03:00 PM) |
| 7/29/2015 Wed | 2,008,183 | $15.77 | -0.38% | 0.74% | 0.19% | 0.56% | -0.94% | -0.84 | 40.05% | -$0.15 | Moodyâ€™s Research Report (Moodyâ€™s - Manual Entry, 07/29/2015) |
| | | | | | | | | | | | Moody's affirms Navient's Ba3 senior unsecured debt rating; outlook stable (Moody's Investors Service Press Release - Factiva, 07/29/2015) |
| | | | | | | | | | | | HIGH YIELD: VRS 11.75% Tops Lagging Movers Yesterday (Bloomberg First Word - Bloomberg, 07/29/2015 07:41 AM) |
| | | | | | | | | | | | ABS: Navient Release Gives â€˜Much-Needed Transparency,â€™ DB Says (Bloomberg First Word - Bloomberg, 07/29/2015 10:57 AM) |
| | | | | | | | | | | | *MOODY'S AFFIRMS NAVIENT'S Ba3 SR UNSECURED DEBT RATING; OUTLOOK (BLOOMBERG News - Bloomberg, 07/29/2015 02:32 PM) |
| | | | | | | | | | | | *NAVIENT'S OUTLOOK STABLE BY MOODY'S (BLOOMBERG News - Bloomberg, 07/29/2015 02:32 PM) |
| | | | | | | | | | | | Student Loan Pains Grip Navient Investors Seeing Funding Squeeze (BLOOMBERG News - Bloomberg, 07/29/2015 03:08 PM) |
| | | | | | | | | | | | Fitch Affirms SLM Private Credit 2005-B (Business Wire - Bloomberg, 07/29/2015 05:24 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 7/30/2015 Thu | 2,955,214 | $15.53 | -1.52% | 0.01% | 1.26% | 0.12% | -1.65% | -1.48 | 14.20% | -$0.26 | Fitch Affirms SLM Private Credit 2005-B (Business Wire - Factiva, 07/29/2015 05:24 PM) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 07/30/2015) |
| | | | | | | | | | | | Navient Corp approves Q3 dividend (Reuters Significant Developments - Factiva, 07/30/2015) |
| | | | | | | | | | | | Navient Declares Third Quarter Common Stock Dividend (GlobeNewswire - Factiva, 07/30/2015 09:00 AM) |
| | | | | | | | | | | | *NAVIENT DECLARES 3Q STOCK DIV (BLOOMBERG News - Bloomberg, 07/30/2015 09:00 AM) |
| | | | | | | | | | | | Navient Declares Third Quarter Common Stock Dividend (PrimeZone Media Network - Bloomberg, 07/30/2015 09:00 AM) |
| | | | | | | | | | | | Student Loan ABS Offer Lesson for GSE Reform: FTN's Vogel (Bloomberg First Word - Bloomberg, 07/30/2015 11:15 AM) |
| | | | | | | | | | | | Jack Remondi, CEO, Buys 20,250 NAVI US 07/28/15 (BLOOMBERG News - Bloomberg, 07/30/2015 04:51 PM) |
| 7/31/2015 Fri | 2,987,248 | $15.70 | 1.09% | -0.23% | 0.09% | -0.21% | 1.30% | 1.16 | 24.81% | $0.20 | NAVIENT REPORTS MULTIPLE TRANSACTIONS BY CEO REMONDI (Delaware) (US Fed News - Factiva, 07/31/2015) |
| 8/1/2015 Sat | | | | | | | | | | | |
| 8/2/2015 Sun | | | | | | | | | | | |
| 8/3/2015 Mon | 2,109,996 | $15.66 | -0.25% | -0.28% | 0.10% | -0.25% | -0.01% | -0.01 | 99.43% | $0.00 | Moody's assigns provisional ratings to Navient Private Education Loan Trust 2015-B (Moody's Investors Service Press Release - Factiva, 08/03/2015) |
| | | | | | | | | | | | NAVIENT CORP 10-Q (SEC - SEC Edgar, 08/03/2015) |
| | | | | | | | | | | | HIGH YIELD: Top Ten Leading Movers Friday (Bloomberg First Word - Bloomberg, 08/03/2015 07:32 AM) |
| | | | | | | | | | | | Insider Buying and Selling by Company for Week Ending July 31 (BLOOMBERG News - Bloomberg, 08/03/2015 08:00 AM) |
| | | | | | | | | | | | Insider Buying and Selling by Officer for Week Ending July 31 (BLOOMBERG News - Bloomberg, 08/03/2015 08:00 AM) |
| | | | | | | | | | | | Insider Buying, Selling by Industry for Week Ending July 31 (BLOOMBERG News - Bloomberg, 08/03/2015 08:00 AM) |
| | | | | | | | | | | | Technical Data on Credit Services Stocks -- Discover Financial Services, Capital One Financial, Navient, Synchrony Financial, and Springleaf Holdings (PR Newswire (U.S.) - Factiva, 08/03/2015 09:40 AM) |
| | | | | | | | | | | | Navient participates in veterans job fair in Delaware (GlobeNewswire - Factiva, 08/03/2015 03:45 PM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Market | Industry | Predicted | Abnormal | | | Price | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 8/4/2015 Tue | 1,749,373 | $15.58 | -0.51% | -0.22% | -0.02% | -0.22% | -0.29% | -0.26 | 79.32% | -$0.05 | **Navient participates in veterans job fair in Delaware** (PrimeZone Media Network - Bloomberg, 08/03/2015 03:45 PM) |
| | | | | | | | | | | | **\*MOODY'S ASSIGNS PROVISIONAL RATINGS TO NAVIENT PRIVATE** (BLOOMBERG News - Bloomberg, 08/03/2015 05:49 PM) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/04/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 08/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 08/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 4** (SEC - SEC Edgar, 08/04/2015) |
| | | | | | | | | | | | **NAVIENT CORP 8-K/A** (SEC - SEC Edgar, 08/04/2015) |
| | | | | | | | | | | | **COO KANE Acquires 493 Of NAVIENT CORP >NAVI** (Dow Jones Institutional News - Factiva, 08/04/2015 09:49 PM) |
| | | | | | | | | | | | **Kane John M, EVP & Grou, Exer/Conv 508 NAVI US 07/31/15** (BLOOMBERG News - Bloomberg, 08/04/2015 09:49 PM) |
| | | | | | | | | | | | **CFO CHIVAVIBUL Acquires 493 Of NAVIENT CORP >NAVI** (Dow Jones Institutional News - Factiva, 08/04/2015 09:51 PM) |
| | | | | | | | | | | | **Chivavibul Somsak, EVP & CFO, Exer/Conv 508 NAVI US 07/31/15** (BLOOMBERG News - Bloomberg, 08/04/2015 09:51 PM) |
| | | | | | | | | | | | **Mark L Heleen, EVP & Chie, Exer/Conv 490 NAVI US 07/31/15** (BLOOMBERG News - Bloomberg, 08/04/2015 09:58 PM) |
| 8/5/2015 Wed | 2,891,250 | $15.61 | 0.19% | 0.35% | -0.38% | 0.16% | 0.03% | 0.03 | 97.98% | $0.00 | **NAVIENT CORP 8-K** (SEC - SEC Edgar, 08/05/2015) |
| | | | | | | | | | | | **ABS: NCSLT Bonds Highly Probable for Upgrades, DB Says** (Bloomberg First Word - Bloomberg, 08/05/2015 08:34 AM) |
| | | | | | | | | | | | **\*MOODY'S: NO NEGATIVE RATING IMPACT ON NAVIENT STUDENT LOAN NOTE** (BLOOMBERG News - Bloomberg, 08/05/2015 01:44 PM) |
| 8/6/2015 Thu | 3,549,583 | $15.37 | -1.54% | -0.75% | -0.06% | -0.62% | -0.92% | -0.83 | 41.04% | -$0.14 | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 08/06/2015) |
| | | | | | | | | | | | **HIGH YIELD: CERPLC 11% Among Leading Movers, Most Active** (Bloomberg First Word - Bloomberg, 08/06/2015 07:28 AM) |
| | | | | | | | | | | | **Navient announces Wilkes-Barre job fair on Aug. 11** (GlobeNewswire - Factiva, 08/06/2015 09:00 AM) |
| | | | | | | | | | | | **Navient announces Wilkes-Barre job fair on Aug. 11** (PrimeZone Media Network - Bloomberg, 08/06/2015 09:00 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 8/7/2015 Fri | 2,263,907 | $15.61 | 1.56% | -0.28% | 3.35% | 0.15% | 1.41% | 1.27 | 20.83% | $0.22 | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 08/07/2015) |
| | | | | | | | | | | | **Hillary Clinton Set to Roll Out Student Loan Plan: Politico** (Bloomberg First Word - Bloomberg, 08/07/2015 09:29 AM) |
| 8/8/2015 Sat | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 08/08/2015) |
| 8/9/2015 Sun | | | | | | | | | | | |
| 8/10/2015 Mon | 1,713,108 | $15.91 | 1.92% | 1.28% | 0.71% | 1.02% | 0.91% | 0.82 | 41.49% | $0.14 | **Top Student Loan Servicer Sees No Need for Concern on Bond Risk** (BLOOMBERG News - Bloomberg, 08/10/2015 08:30 AM) |
| | | | | | | | | | | | **Navient announces call of $216 million in student loan trusts** (GlobeNewswire - Factiva, 08/10/2015 09:40 AM) |
| | | | | | | | | | | | **Press Release: Navient announces call of $216 million in student loan trusts** (Dow Jones Institutional News - Factiva, 08/10/2015 09:40 AM) |
| | | | | | | | | | | | **Navient announces call of $216 million in student loan trusts** (PrimeZone Media Network - Bloomberg, 08/10/2015 09:40 AM) |
| | | | | | | | | | | | ***NAVIENT REPORTS CALL OF $216M IN STUDENT LOAN TRUSTS** (BLOOMBERG News - Bloomberg, 08/10/2015 09:40 AM) |
| | | | | | | | | | | | **Clinton: â€˜No Studentâ€™ Should Borrow to Pay for Public College** (Bloomberg First Word - Bloomberg, 08/10/2015 02:32 PM) |
| | | | | | | | | | | | ***Fitch Affirms 6 Navient Student Loan Trusts; Outlook Stable** (Dow Jones Institutional News - Factiva, 08/10/2015 04:18 PM) |
| | | | | | | | | | | | ***Fitch Affirms SLM Private Student Loan Trust 2003-C** (Dow Jones Institutional News - Factiva, 08/10/2015 05:01 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-C** (Business Wire - Bloomberg, 08/10/2015 05:17 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-C** (Business Wire - Factiva, 08/10/2015 05:17 PM) |
| 8/11/2015 Tue | 2,697,594 | $15.39 | -3.27% | -0.94% | -0.08% | -0.75% | -2.51% | -2.29 | 2.42% * | -$0.40 | **NAVIENT CORP 4** (SEC - SEC Edgar, 08/11/2015) |
| | | | | | | | | | | | ***Fitch Affirms SLM Private Student Loan Trust 2003-B** (Dow Jones Institutional News - Factiva, 08/11/2015 09:16 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-B** (Business Wire - Bloomberg, 08/11/2015 09:24 AM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2003-B** (Business Wire - Factiva, 08/11/2015 09:24 AM) |
| | | | | | | | | | | | **Navient Foundation awards $6,000 to YMCA of Delaware** (GlobeNewswire - Factiva, 08/11/2015 10:53 AM) |

Appendix C
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Return | [7] | [8] | [9] | [10] | [11] Abnormal Price Reaction | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Predicted Return | Abnormal Return | t-stat | p-Value | | Events |
| | | | | | | | | | | | **Press Release: Navient Foundation awards $6,000 to YMCA of Delaware** (Dow Jones Institutional News - Factiva, 08/11/2015 10:53 AM) |
| | | | | | | | | | | | **Navient Foundation awards $6,000 to YMCA of Delaware** (PrimeZone Media Network - Bloomberg, 08/11/2015 10:53 AM) |
| | | | | | | | | | | | **Hedge Fund Seeing College Bubble Shorts Lending Servicer Navient** (BLOOMBERG News - Bloomberg, 08/11/2015 11:00 AM) |
| | | | | | | | | | | | **Jack F Remondi, CEO, Relinquishes 3,431 NAVI US 08/08/15** (BLOOMBERG News - Bloomberg, 08/11/2015 05:41 PM) |
| | | | | | | | | | | | **CEO REMONDI Acquires 3,675 Of NAVIENT CORP >NAVI** (Dow Jones Institutional News - Factiva, 08/11/2015 05:42 PM) |
| 8/12/2015 Wed | 2,995,734 | $15.31 | -0.52% | 0.12% | -0.40% | -0.07% | -0.45% | -0.40 | 68.83% | -$0.07 | **NAVIENT REPORTS DISPOSITION BY CEO REMONDI (Delaware)** (US Fed News - Factiva, 08/12/2015) |
| 8/13/2015 Thu | 3,443,567 | $14.79 | -3.40% | -0.11% | -0.13% | -0.19% | -3.21% | -2.85 | 0.52% ** | -$0.49 | **Moody's assigns definitive ratings to Navient Private Education Loan Trust 2015-B** (Moody's Investors Service Press Release - Factiva, 08/13/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 10-Q, Quarterly Report [Sections 13 Or 15(D)] (Aug. 3, 2015)** (Investment Weekly News - Factiva, 08/13/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Aug. 4, 2015)** (Investment Weekly News - Factiva, 08/13/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Aug. 5, 2015)** (Investment Weekly News - Factiva, 08/13/2015) |
| | | | | | | | | | | | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report [Amend] (Aug. 4, 2015)** (Investment Weekly News - Factiva, 08/13/2015) |
| | | | | | | | | | | | **Moody's Assigns Definitive Ratings To Navient Private Education Loan Trust 2015-B** (Dow Jones Institutional News - Factiva, 08/13/2015 02:45 PM) |
| | | | | | | | | | | | ***MOODY'S ASSIGNS DEFINITIVE RATINGS TO NAVIENT PRIVATE EDUCATION** (BLOOMBERG News - Bloomberg, 08/13/2015 02:45 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2002-A** (Business Wire - Bloomberg, 08/13/2015 03:34 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2002-A** (Business Wire - Factiva, 08/13/2015 03:34 PM) |
| | | | | | | | | | | | **Fitch Affirms SLM Private Student Loan Trust 2004-A** (Business Wire - Bloomberg, 08/13/2015 03:42 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | Fitch Affirms SLM Private Student Loan Trust 2004-A (Business Wire - Factiva, 08/13/2015 03:42 PM) |
| | | | | | | | | | | | *S&P Assigns Navient Private Education Loan Trust 2015-B Rtgs (Dow Jones Institutional News - Factiva, 08/13/2015 03:59 PM) |
| | | | | | | | | | | | Navient issues $700 million in Private Education Loan ABS (GlobeNewswire - Factiva, 08/13/2015 04:15 PM) |
| | | | | | | | | | | | Press Release: Navient issues $700 million in Private Education Loan ABS (Dow Jones Institutional News - Factiva, 08/13/2015 04:15 PM) |
| | | | | | | | | | | | *NAVIENT ISSUES $700M IN PRIVATE EDUCATION LOAN ABS (BLOOMBERG News - Bloomberg, 08/13/2015 04:15 PM) |
| | | | | | | | | | | | Navient issues $700 million in Private Education Loan ABS (PrimeZone Media Network - Bloomberg, 08/13/2015 04:15 PM) |
| 8/14/2015 Fri | 4,360,301 | $14.76 | -0.20% | 0.39% | 0.21% | 0.26% | -0.47% | -0.40 | 68.98% | -$0.07 | Agentur für Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp. (AfU Company Information: Mutual Fund Holdings â€œ USA Blue Chips - Factiva, 08/14/2015) |
| | | | | | | | | | | | Navient announces issuance of $700M in ABS (SNL Financial Services Daily - Factiva, 08/14/2015) |
| 8/15/2015 Sat | | | | | | | | | | | |
| 8/16/2015 Sun | | | | | | | | | | | |
| 8/17/2015 Mon | 3,502,979 | $14.83 | 0.47% | 0.54% | -0.39% | 0.23% | 0.24% | 0.21 | 83.73% | $0.04 | Zacks Investment Research Research Report (Zacks Investment Research - Manual Entry, 08/17/2015) |
| | | | | | | | | | | | Navient supports getaway for wounded soldiers and their families (GlobeNewswire - Factiva, 08/17/2015 10:17 AM) |
| | | | | | | | | | | | Navient supports getaway for wounded soldiers and their families (PrimeZone Media Network - Bloomberg, 08/17/2015 10:17 AM) |
| 8/18/2015 Tue | 2,603,689 | $14.77 | -0.40% | -0.24% | 0.25% | -0.23% | -0.18% | -0.15 | 87.98% | -$0.03 | HIGH YIELD: Top Ten Leading Movers Yesterday (Bloomberg First Word - Bloomberg, 08/18/2015 07:31 AM) |
| | | | | | | | | | | | ABS: 3 Possible Solutions to FFELP Maturity Risk, Fitch Says (Bloomberg First Word - Bloomberg, 08/18/2015 09:50 AM) |
| 8/19/2015 Wed | 1,921,647 | $14.62 | -1.02% | -0.82% | 0.29% | -0.69% | -0.32% | -0.28 | 78.01% | -$0.05 | Moody's Research Report (Moody's - Manual Entry, 08/19/2015) |
| | | | | | | | | | | | Moody's: Slowing FFELP repayment rates pose limited risk for Navient and Nelnet (Moody's Investors Service Press Release - Factiva, 08/19/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 08/19/2015) |
| | | | | | | | | | | | NAVIENT CORP 4 (SEC - SEC Edgar, 08/19/2015) |
| | | | | | | | | | | | HIGH YIELD: Energy Companies PVA, XCO, LINE Among Laggards (Bloomberg First Word - Bloomberg, 08/19/2015 07:40 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry Return | [7] Predicted Return | [8] Abnormal Return | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| | | | | | | | | | | | *MOODY'S: SLOWING FFELP REPAYMENT RATES POSE LIMITED RISK FOR (BLOOMBERG News - Bloomberg, 08/19/2015 01:06 PM) |
| | | | | | | | | | | | *MOODY'S:FFELP REPAYMENT RATES POSE LIMITED RISK FOR NAVIENT (BLOOMBERG News - Bloomberg, 08/19/2015 01:06 PM) |
| | | | | | | | | | | | *MOODY'S:FFELP REPAYMENT RATES POSE LIMITED RISK FOR NELNET (BLOOMBERG News - Bloomberg, 08/19/2015 01:06 PM) |
| | | | | | | | | | | | Chivavibul Somsak, EVP & CFO, Acquires 10,162.6 NAVI US 08/14/15 (BLOOMBERG News - Bloomberg, 08/19/2015 04:59 PM) |
| | | | | | | | | | | | Mark L Heleen, EVP & Chie, Acquires 3,387.53 NAVI US 08/14/15 (BLOOMBERG News - Bloomberg, 08/19/2015 05:07 PM) |
| 8/20/2015 Thu | 3,007,665 | $14.06 | -3.83% | -2.11% | 0.21% | -1.73% | -2.10% | -1.82 | 7.18% | -$0.31 | NAVIENT REPORTS ACQUISITION BY EXECUTIVE VP AND CHIEF LEGAL OFFICER HELEEN (Delaware) (US Fed News - Factiva, 08/20/2015) |
| | | | | | | | | | | | NAVIENT REPORTS ACQUISITION BY EXECUTIVE VP CHIVAVIBUL (Delaware) (US Fed News - Factiva, 08/20/2015) |
| 8/21/2015 Fri | 2,829,301 | $13.89 | -1.21% | -3.17% | 0.77% | -2.72% | 1.51% | 1.30 | 19.69% | $0.21 | Macyâ€™s, United Tech., Disney Among Most Oversold U.S. Stocks (Bloomberg First Word - Bloomberg, 08/21/2015 07:25 AM) |
| 8/22/2015 Sat 8/23/2015 Sun | | | | | | | | | | | Pechalas Report Research Report (Pechalas Report - Manual Entry, 08/23/2015) |
| 8/24/2015 Mon | 7,450,659 | $13.06 | -5.98% | -3.94% | 0.50% | -3.27% | -2.71% | -2.39 | 1.83% * | -$0.38 | Credit Suisse Research Report (Credit Suisse - Manual Entry, 08/24/2015) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 08/24/2015) |
| | | | | | | | | | | | Keefe, Bruyette & Woods Research Report (Keefe, Bruyette & Woods - Manual Entry, 08/24/2015) |
| | | | | | | | | | | | NAVIENT CORP 8-K (SEC - SEC Edgar, 08/24/2015) |
| | | | | | | | | | | | Navient unit receives NORA letter from CFPB (Theflyonthewall.com - Factiva, 08/24/2015) |
| | | | | | | | | | | | U.S. Stock Options With Biggest Changes in Implied Volatility (BLOOMBERG News - Bloomberg, 08/24/2015 03:00 PM) |
| | | | | | | | | | | | *NAVIENT: CFPB OFFICE CONSIDERING RECOMMENDING LEGAL ACTION (BLOOMBERG News - Bloomberg, 08/24/2015 04:44 PM) |
| | | | | | | | | | | | *NAVIENT UNIT RECEIVED NORA LETTER FROM CFPB (BLOOMBERG News - Bloomberg, 08/24/2015 04:44 PM) |
| | | | | | | | | | | | *NAVIENT: CFPB OFFICE CONSIDERING RECOMMENDING ACTION VS NSI (BLOOMBERG News - Bloomberg, 08/24/2015 04:45 PM) |
| | | | | | | | | | | | *NAVIENT: NORA LETTER RELATES TO NSI DISCLOSURES, LATE FEES (BLOOMBERG News - Bloomberg, 08/24/2015 04:45 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 8/25/2015 Tue | 9,032,839 | $12.04 | -7.81% | -1.35% | -0.29% | -1.50% | -6.31% | -5.49 | 0.00% ** | -$0.82 | **Navient Says CFPB Considering Recommending Legal Action** (Bloomberg First Word - Bloomberg, 08/24/2015 04:53 PM) |
| | | | | | | | | | | | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 08/25/2015) |
| | | | | | | | | | | | **CFPB Considers Suing Student Loan Giant Navient For Cheating Borrowers** (Jpost.com (The Jerusalem Post online edition) - Factiva, 08/25/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 08/25/2015) |
| | | | | | | | | | | | **Compass Point Research Report** (Compass Point - Manual Entry, 08/25/2015) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FILES CURRENT REPORT** (US Fed News - Factiva, 08/25/2015) |
| | | | | | | | | | | | **Navient subsidiary receives CFPB notice of possible legal action** (SNL Financial Services Daily - Factiva, 08/25/2015) |
| | | | | | | | | | | | **SHAREHOLDER ALERT: Pomerantz Law Firm Investigates Claims On Behalf of Investors of Navient Corporation - NAVI** (ACCESSWIRE - Factiva, 08/25/2015) |
| | | | | | | | | | | | **Student Lending Giant Could Face CFPB Lawsuit** (PaymentsSource - Factiva, 08/25/2015) |
| | | | | | | | | | | | **Student-Loan Servicer Navient May Face CFPB Lawsuit** (American Banker Online - Factiva, 08/25/2015) |
| | | | | | | | | | | | **ValuEngine Research Report** (ValuEngine - Manual Entry, 08/25/2015) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 08/25/2015 11:30 AM) |
| | | | | | | | | | | | **MW Navient hits 52-week low on disclosure of possible CFPB action** (MarketWatch - Factiva, 08/25/2015 01:47 PM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 08/25/2015 03:00 PM) |
| | | | | | | | | | | | **Largest Nasdaq Short Interest Changes as of Aug. 14** (BLOOMBERG News - Bloomberg, 08/25/2015 04:21 PM) |
| 8/26/2015 Wed | 4,831,183 | $12.52 | 3.99% | 3.91% | -0.74% | 3.43% | 0.56% | 0.49 | 62.85% | $0.07 | **Student-Loan Servicer Navient May Face CFPB Lawsuit** (American Banker - Factiva, 08/26/2015) |
| | | | | | | | | | | | **Navient Lays Off Managers in Delaware Headquarters: News Journal** (BLOOMBERG News - Bloomberg, 08/26/2015 01:49 PM) |
| | | | | | | | | | | | **SHAREHOLDER ALERT: Bronstein, Gewirtz & Grossman, LLC Announces Investigation of Navient Corporation** (PR Newswire (U.S.) - Factiva, 08/26/2015 04:07 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 8/27/2015 Thu | 4,580,211 | $13.00 | 3.83% | 2.44% | 0.04% | 2.24% | 1.60% | 1.38 | 16.89% | $0.20 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 08/27/2015) |
| | | | | | | | | | | | **Navient Foundation helps charity swing for the fences** (GlobeNewswire - Factiva, 08/27/2015 08:00 AM) |
| | | | | | | | | | | | **Navient Foundation helps charity swing for the fences** (PrimeZone Media Network - Bloomberg, 08/27/2015 08:00 AM) |
| | | | | | | | | | | | **MW A surefire strategy to keep calm and make -2-** (MarketWatch - Factiva, 08/27/2015 09:59 AM) |
| 8/28/2015 Fri | 2,634,685 | $13.05 | 0.38% | 0.07% | -0.29% | -0.11% | 0.50% | 0.43 | 66.92% | $0.06 | **Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities (Aug. 19, 2015)** (Investment Weekly News - Factiva, 08/28/2015) |
| | | | | | | | | | | | **Student-Loan Servicer Navient May Face CFPB Lawsuit** (Asset Securitization Report Online - Factiva, 08/28/2015) |
| | | | | | | | | | | | **MW UPDATE: A surefire strategy to keep calm and -2-** (MarketWatch - Factiva, 08/28/2015 07:00 AM) |
| 8/29/2015 Sat | | | | | | | | | | | |
| 8/30/2015 Sun | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/30/2015) |
| | | | | | | | | | | | **Keefe, Bruyette & Woods Research Report** (Keefe, Bruyette & Woods - Manual Entry, 08/30/2015) |
| 8/31/2015 Mon | 5,772,299 | $12.79 | -1.99% | -0.83% | 1.06% | -0.74% | -1.25% | -1.08 | 28.39% | -$0.16 | **Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 08/31/2015 08:39 AM) |
| | | | | | | | | | | | **Fitch Takes Various Rating Actions on SLM Private Education Loan Trust 2013-C** (Business Wire - Bloomberg, 08/31/2015 10:02 AM) |
| | | | | | | | | | | | **Fitch Takes Various Rating Actions on SLM Private Education Loan Trust 2013-C** (Business Wire - Factiva, 08/31/2015 10:02 AM) |
| 9/1/2015 Tue | 3,658,508 | $12.35 | -3.44% | -2.95% | -1.03% | -3.39% | -0.05% | -0.04 | 96.89% | -$0.01 | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/01/2015 07:34 AM) |
| 9/2/2015 Wed | 3,843,304 | $12.16 | -0.24% | 1.85% | -0.62% | 1.64% | -1.89% | -1.62 | 10.73% | -$0.23 | **HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/02/2015 07:43 AM) |
| | | | | | | | | | | | **Ex-divs to Trim 0.327 Pts off S&P500 on Sept. 2** (Bloomberg First Word - Bloomberg, 09/02/2015 08:00 AM) |
| | | | | | | | | | | | **Navient Corp Goes Ex-Dividend, Trades Without Payout** (BLOOMBERG News - Bloomberg, 09/02/2015 08:15 AM) |
| | | | | | | | | | | | **Navient Foundation donates $5,600 to Community Action for Wyoming County** (GlobeNewswire - Factiva, 09/02/2015 11:32 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1]<br><br>Date | [2]<br><br>Volume | [3]<br><br>Price | [4]<br><br>Return | [5]<br>Market<br>Return | [6]<br>Excess<br>Industry<br>Return | [7]<br>Predicted<br>Return | [8]<br>Abnormal<br>Return | [9]<br><br>t-stat | [10]<br><br>p-Value | [11]<br>Abnormal<br>Price<br>Reaction | [12]<br><br>Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/3/2015 Thu | 3,555,263 | $12.15 | -0.08% | 0.12% | 0.52% | 0.09% | -0.17% | -0.14 | 88.67% | -$0.02 | **Navient Foundation donates $5,600 to Community Action for Wyoming County** (PrimeZone Media Network - Bloomberg, 09/02/2015 11:32 AM)<br><br>**S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 09/03/2015)<br><br>**Student Lending Giant's Shares Fall to Record Low** (PaymentsSource - Factiva, 09/03/2015) |
| 9/4/2015 Fri | 3,019,932 | $11.94 | -1.73% | -1.52% | -0.07% | -1.67% | -0.06% | -0.05 | 96.14% | -$0.01 | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/03/2015 07:29 AM)<br><br>**Security Brokers, Dealers and Flotation Companies; Navient Corp. Files SEC Form 8-K, Current Report (Aug. 24, 2015)** (Investment Weekly News - Factiva, 09/04/2015)<br><br>**HIGH YIELD: Top Ten Lagging Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/04/2015 07:39 AM)<br><br>**S&P 500 With Biggest Gap Between Price and Estimate** (BLOOMBERG News - Bloomberg, 09/04/2015 12:34 PM) |
| 9/5/2015 Sat<br>9/6/2015 Sun<br>9/7/2015 Mon | | | | | | | | | | | |
| 9/8/2015 Tue | 5,676,822 | $12.30 | 3.02% | 2.52% | -0.21% | 2.28% | 0.73% | 0.64 | 52.13% | $0.09 | **Largest Weekly Put vs Call Skew Changes for S&P 500 Companies** (BLOOMBERG News - Bloomberg, 09/08/2015 08:53 AM)<br><br>**Performance of Bloomberg U.S. Spun-off Companies Index (Table)** (BLOOMBERG News - Bloomberg, 09/08/2015 09:00 AM)<br><br>**HIGH YIELD: Top 5 Best & Worst Performing CDS** (Bloomberg First Word - Bloomberg, 09/08/2015 11:45 AM)<br><br>**Navient President and CEO to present at 2015 Barclays Global Financial Services Conference on Sept. 17** (GlobeNewswire - Factiva, 09/08/2015 04:53 PM)<br><br>**Navient President and CEO to present at 2015 Barclays Global Financial Services Conference on Sept. 17** (PrimeZone Media Network - Bloomberg, 09/08/2015 04:53 PM) |
| 9/9/2015 Wed | 4,643,493 | $12.29 | -0.08% | -1.38% | 0.69% | -1.43% | 1.35% | 1.19 | 23.76% | $0.17 | **Agentur fÃƒÂ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 09/09/2015)<br><br>**ABS: Moodyâ€™s Extended RFC Period a Positive Development, DB Says** (Bloomberg First Word - Bloomberg, 09/09/2015 08:24 AM)<br><br>**Navient announces call of $636 million in student loan trusts** (GlobeNewswire - Factiva, 09/09/2015 04:20 PM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Reaction | Events |
| 9/10/2015 Thu | 5,694,657 | $12.64 | 2.85% | 0.54% | -0.26% | 0.31% | 2.54% | 2.33 | 2.14% * | $0.31 | **Navient announces call of $636 million in student loan trusts** (PrimeZone Media Network - Bloomberg, 09/09/2015 04:20 PM) |
| | | | | | | | | | | | ***NAVIENT REPORTS CALL OF $636M IN STUDENT LOAN TRUSTS** (BLOOMBERG News - Bloomberg, 09/09/2015 04:20 PM) |
| | | | | | | | | | | | ***NAVIENT CITES TRUSTS BACKED BY FEDERALLY GUARANTEED LOANS** (BLOOMBERG News - Bloomberg, 09/09/2015 04:21 PM) |
| | | | | | | | | | | | **Navient boards Battleship New Jersey for veterans job fair on Sept. 16** (GlobeNewswire - Factiva, 09/10/2015 09:00 AM) |
| | | | | | | | | | | | **Navient boards Battleship New Jersey for veterans job fair on Sept. 16** (PrimeZone Media Network - Bloomberg, 09/10/2015 09:00 AM) |
| 9/11/2015 Fri | 7,487,718 | $12.45 | -1.50% | 0.48% | -0.42% | 0.25% | -1.76% | -1.58 | 11.75% | -$0.22 | **Smart borrowing can save students money** (U-Wire - Factiva, 09/11/2015) |
| | | | | | | | | | | | **S&P 500 With Biggest Gap Between Price and Estimate** (BLOOMBERG News - Bloomberg, 09/11/2015 01:31 PM) |
| 9/12/2015 Sat | | | | | | | | | | | |
| 9/13/2015 Sun | | | | | | | | | | | |
| 9/14/2015 Mon | 4,123,232 | $12.44 | -0.08% | -0.40% | 0.22% | -0.54% | 0.46% | 0.41 | 68.22% | $0.06 | **Navient Ponders Expansion Into Tax Collection, Medical Bills** (Bloomberg First Word - Bloomberg, 09/14/2015 11:48 AM) |
| 9/15/2015 Tue | 4,440,029 | $12.37 | -0.56% | 1.28% | 0.12% | 1.18% | -1.74% | -1.55 | 12.33% | -$0.22 | **Compass Point Research Report** (Compass Point - Manual Entry, 09/15/2015) |
| | | | | | | | | | | | **Indiana awards Tax Amnesty 2015 contract to Navient** (Reuters Significant Developments - Factiva, 09/15/2015) |
| | | | | | | | | | | | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 09/15/2015) |
| | | | | | | | | | | | **HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/15/2015 07:29 AM) |
| | | | | | | | | | | | **Indiana Awards Tax Amnesty 2015 Contract To Navient** (Benzinga.com - Factiva, 09/15/2015 08:30 AM) |
| | | | | | | | | | | | **Indiana awards Tax Amnesty 2015 contract to Navient** (GlobeNewswire - Factiva, 09/15/2015 08:30 AM) |
| | | | | | | | | | | | ***IN AWARDS TAX AMNESTY '15 CONTRACT TO NAVIENT** (BLOOMBERG News - Bloomberg, 09/15/2015 08:30 AM) |
| | | | | | | | | | | | **Indiana awards Tax Amnesty 2015 contract to Navient** (PrimeZone Media Network - Bloomberg, 09/15/2015 08:30 AM) |
| | | | | | | | | | | | **Navient to present at Deutsche Bank's 23rd Annual Leveraged Finance Conference on Sept. 29** (GlobeNewswire - Factiva, 09/15/2015 09:00 AM) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] Market | [6] Excess Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 9/16/2015 Wed | 7,558,031 | $12.65 | 2.26% | 0.87% | 0.22% | 0.75% | 1.52% | 1.34 | 18.37% | $0.19 | **Navient to present at Deutsche Bank's 23rd Annual Leveraged Finance Conference on Sept. 29** (PrimeZone Media Network - Bloomberg, 09/15/2015 09:00 AM)<br><br>**Indiana tax amnesty begins, aims to collect at least $90M** (Associated Press Newswires - Factiva, 09/15/2015 04:59 PM)<br><br>**Buckingham Research Research Report** (Buckingham Research - Manual Entry, 09/16/2015)<br><br>**Compass Point Research Report** (Compass Point - Manual Entry, 09/16/2015)<br><br>**Credit Suisse Research Report** (Credit Suisse - Manual Entry, 09/16/2015)<br><br>**Credit Suisse Research Report** (Credit Suisse - Manual Entry, 09/16/2015)<br><br>**Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 09/16/2015)<br><br>**HIGH YIELD: Top Ten Leading Movers Yesterday** (Bloomberg First Word - Bloomberg, 09/16/2015 07:30 AM)<br><br>**Navient announces transaction agreement amendment for 16 ABS trusts** (GlobeNewswire - Factiva, 09/16/2015 09:00 AM)<br><br>**\*NAVIENT REPORTS TRANSACTION PACT AMENDMENT FOR 16 ABS TRUSTS** (BLOOMBERG News - Bloomberg, 09/16/2015 09:00 AM)<br><br>**Navient announces transaction agreement amendment for 16 ABS trusts** (PrimeZone Media Network - Bloomberg, 09/16/2015 09:00 AM)<br><br>**Navient announces online investor forum to facilitate communication with ABS bondholders** (GlobeNewswire - Factiva, 09/16/2015 04:51 PM)<br><br>**Navient announces online investor forum to facilitate communication with ABS bondholders** (PrimeZone Media Network - Bloomberg, 09/16/2015 04:51 PM) |
| 9/17/2015 Thu | 5,278,393 | $12.55 | -0.79% | -0.24% | -0.49% | -0.54% | -0.25% | -0.22 | 82.59% | -$0.03 | **CFRA Equity Research Research Report** (CFRA Equity Research - Manual Entry, 09/17/2015)<br><br>**Credit Suisse Research Report** (Credit Suisse - Manual Entry, 09/17/2015)<br><br>**Navient amends transaction agreements for 16 trusts** (SNL Financial Services Daily - Factiva, 09/17/2015)<br><br>**Navient Corp at Barclays Global Financial Services Conference - Final** (CQ FD Disclosure - Factiva, 09/17/2015)<br><br>**Navient Amendment Won't Hit Corp., FFELP ABS Ratings, Fitch Says** (Bloomberg First Word - Bloomberg, 09/17/2015 08:28 AM) |
| 9/18/2015 Fri | 9,403,097 | $12.66 | 0.88% | -1.62% | -0.30% | -1.91% | 2.79% | 2.44 | 1.64% * | $0.35 | **Buckingham Research Research Report** (Buckingham Research - Manual Entry, 09/18/2015) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess | [7] | [8] | [9] | [10] | [11] Abnormal | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Market Return | Industry Return | Predicted Return | Abnormal Return | t-stat | p-Value | Price Reaction | Events |
| 9/19/2015 Sat | | | | | | | | | | | |
| 9/20/2015 Sun | | | | | | | | | | | |
| 9/21/2015 Mon | 4,151,190 | $12.65 | -0.08% | 0.46% | 0.77% | 0.47% | -0.55% | -0.47 | 64.01% | -$0.07 | **Largest Weekly Put vs Call Skew Changes for S&P 500 Companies** (BLOOMBERG News - Bloomberg, 09/21/2015 08:49 AM) |
| 9/22/2015 Tue | 3,926,577 | $12.40 | -1.98% | -1.23% | -0.09% | -1.42% | -0.55% | -0.48 | 63.18% | -$0.07 | **Zacks Investment Research Research Report** (Zacks Investment Research - Manual Entry, 09/22/2015) |
| | | | | | | | | | | | **Navient organizes golf tournament to raise money for local charity** (GlobeNewswire - Factiva, 09/22/2015 02:45 PM) |
| | | | | | | | | | | | **Navient organizes golf tournament to raise money for local charity** (PrimeZone Media Network - Bloomberg, 09/22/2015 02:45 PM) |
| 9/23/2015 Wed | 3,997,011 | $12.47 | 0.56% | -0.20% | -0.02% | -0.38% | 0.94% | 0.82 | 41.60% | $0.12 | **Agentur fÃ¼r Unternehmensnachrichten GmbH, mutual fund holdings - Navient Corp.** (AfU Company Information: Mutual Fund Holdings Ã¢â‚¬â€œ USA Blue Chips - Factiva, 09/23/2015) |
| | | | | | | | | | | | **FORM 8-K: NAVIENT FUNDING FILES CURRENT REPORT** (US Fed News - Factiva, 09/23/2015) |
| | | | | | | | | | | | **Navient and the ghost of John Galt** (SNL Financial Extra - Factiva, 09/23/2015) |
| | | | | | | | | | | | **Debt Relief for Students Snarls Market for Their Loans** (Dow Jones Top Energy Stories - Factiva, 09/23/2015 03:11 PM) |
| | | | | | | | | | | | **Debt Relief for Students Snarls Market for Their Loans** (Dow Jones Top North American Financial Services Stories - Factiva, 09/23/2015 03:26 PM) |
| 9/24/2015 Thu | 4,376,088 | $12.50 | 0.24% | -0.34% | -0.54% | -0.60% | 0.84% | 0.72 | 47.04% | $0.10 | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 09/24/2015) |
| 9/25/2015 Fri | 4,674,003 | $12.44 | -0.48% | -0.05% | 0.94% | -0.05% | -0.43% | -0.37 | 71.06% | -$0.05 | |
| 9/26/2015 Sat | | | | | | | | | | | |
| 9/27/2015 Sun | | | | | | | | | | | |
| 9/28/2015 Mon | 5,161,008 | $12.16 | -2.25% | -2.54% | 0.02% | -2.72% | 0.47% | 0.40 | 68.68% | $0.06 | |
| 9/29/2015 Tue | 8,504,178 | $11.63 | -4.36% | 0.13% | -0.34% | -0.07% | -4.29% | -3.72 | 0.03% ** | -$0.52 | **Navient Corp at Deutsche Bank Leveraged Finance Conference - Final** (CQ FD Disclosure - Factiva, 09/29/2015) |
| | | | | | | | | | | | **CFPB May Overhaul Student Loan Payment Processing: WSJ** (Bloomberg First Word - Bloomberg, 09/29/2015 09:34 AM) |
| | | | | | | | | | | | **Consumer agency hears about student loan servicing problems** (Associated Press Newswires - Factiva, 09/29/2015 05:49 PM) |
| 9/30/2015 Wed | 10,417,236 | $11.24 | -3.35% | 1.91% | -0.51% | 1.70% | -5.06% | -4.38 | 0.00% ** | -$0.59 | **Compass Point Research Report** (Compass Point - Manual Entry, 09/30/2015) |
| | | | | | | | | | | | **Janney Montgomery Scott Research Report** (Janney Montgomery Scott - Manual Entry, 09/30/2015) |
| | | | | | | | | | | | **Navient issues statement regarding positive trends in national student loan cohort default rate** (SNL Financial Extra - Factiva, 09/30/2015) |

**Appendix C**
**Navient News Chronology with Daily Statistics**

| [1] | [2] | [3] | [4] | [5] | [6] Excess Market Industry | [7] Predicted | [8] Abnormal | [9] | [10] | [11] Abnormal Price | [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Volume | Price | Return | Return | Return | Return | Return | t-stat | p-Value | Reaction | Events |
| 10/1/2015 Thu | 11,040,348 | $10.96 | -2.49% | 0.20% | -0.37% | 0.01% | -2.50% | -2.16 | 3.28% * | -$0.28 | **CFPB Auto Lending Actions Among Most Contentious Items: FBR** (Bloomberg First Word - Bloomberg, 09/30/2015 07:37 AM) |
| | | | | | | | | | | | **More Bad News on Student Loan Servicing Likely Ahead: Compass Pt** (Bloomberg First Word - Bloomberg, 09/30/2015 10:38 AM) |
| | | | | | | | | | | | **Navient awards grant to Make-A-Wish** (GlobeNewswire - Factiva, 09/30/2015 10:47 AM) |
| | | | | | | | | | | | **Navient awards grant to Make-A-Wish** (PrimeZone Media Network - Bloomberg, 09/30/2015 10:47 AM) |
| | | | | | | | | | | | **Navient statement on positive trends in the national student loan Cohort Default Rate** (GlobeNewswire - Factiva, 09/30/2015 03:07 PM) |
| | | | | | | | | | | | ***NAVIENT STATEMENT ON POSITIVE TRENDS IN NATIONAL STUDENT LOAN** (BLOOMBERG News - Bloomberg, 09/30/2015 03:07 PM) |
| | | | | | | | | | | | **Navient statement on positive trends in the national student loan Cohort Default Rate** (PrimeZone Media Network - Bloomberg, 09/30/2015 03:07 PM) |
| | | | | | | | | | | | **S&P Global Compustat Research Report** (S&P Global Compustat - Manual Entry, 10/01/2015) |
| | | | | | | | | | | | **EQT Among Most Oversold as It Retraces Half of 6-Yr Rally** (Bloomberg First Word - Bloomberg, 10/01/2015 08:27 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 10/01/2015 11:30 AM) |
| | | | | | | | | | | | **U.S. Stock Options With Biggest Changes in Implied Volatility** (BLOOMBERG News - Bloomberg, 10/01/2015 03:00 PM) |

**Notes:**
[1] to [10] See Appendix E.
[11] = [8] * [3] on prior trading day.
[12] For the Navient chronology, I compiled lists of SEC filings, analyst reports, and news articles. I compiled the list of all of Navient's SEC filings from April 17, 2014 to October 1, 2015 from the SEC website. The list of analyst reports is based on reports available from the Thomson Eikon and Capital IQ electronic databases. While some other reports may exist, this is a reasonably comprehensive list of the analyst reports issued concerning Navient. For news articles, I searched Bloomberg and Factiva. For Bloomberg, I used the ticker symbol "NAVI" and searched "medium" relevance for the sources Bloomberg News, Bloomberg First Word, GlobeNewswire, and Business Wire. For Factiva, I searched all sources for the company code for "Navient Corp." To eliminate duplicate stories for each of the news providers (Bloomberg and Factiva), a news story was considered a duplicate and eliminated if it had exactly the same date, timestamp, headline, news source, and lead paragraph as another news story from the same provider.

**Appendix D**

A.  Regression Specification Used in the Event Study

1.      For event study analysis, I use generally-accepted econometric methods and specify a regression model that includes certain explanatory variables – *i.e.*, the variables that explain the outside influences on the variation in the daily returns to Navient common stock.  I use a widely-used market model that includes as explanatory variables the general market returns and the returns to an industry index.  This specification can be written as:

$$R_t = \alpha + \beta_1(Rm_t) + \beta_2(INDUSTRY_t) + e_t.[1]$$

2.      In this equation, $R_t$ is daily percentage return of Navient common stock, $Rm_t$ is a proxy for the daily market return (represented by the S&P 500 Total Return Index with Bloomberg identifier "SPTR") and $INDUSTRY_t$ is a proxy for the daily industry return (represented by the S&P Supercomposite Consumer Finance Sub Industry Total Return Index with Bloomberg identifier "STRCFIN").[2,3]    The parameters $\alpha$ represents the intercept coefficient or constant term, while the $\beta$ coefficients represent the empirical relationship between movements of Navient common stock prices and the movements of

---

[1]  This equation is a time-series where the variables are measured at comparable times.  In this case, the time interval is at the daily close of trading.

[2]  Navient used both the S&P 500 Index and the S&P 500 Financials Index to evaluate its investment performance.  *See* Navient Forms 10-K filed February 27, 2015 (p. 36). I use the S&P Supercomposite Consumer Finance Sub Industry Total Return Index as a proxy for the industry because the regression with this index has a better fit than using the S&P 500 Financial Sector Total Return Index.  The industry index is measured net of market.  To net the market return, I regress the industry return on the market return and use the obtained residual return (*i.e.*, the industry return netting out market effects) as the industry return in my market models for Navient.

[3]  From May 1, 2014 through the end of the Exchange Act Class Period, Navient was a member of the S&P Supercomposite Consumer Finance Sub Industry Total Return Index (with a weight ranging from 3% to 6%).  Source: Bloomberg.  I removed the impact of Navient's daily stock price movements from the changes in the daily value of the industry index.  I removed Navient's daily return based on its daily index weight (source: Bloomberg), where the daily industry return on date t is equal to: Return of the STRCFIN on date t minus the product of Navient's weight on date t-1 times U.S. Steel's daily return on date t, all divided by one minus Navient's weight on date t-1.

D-1

the market and industry indexes. The $e_t$ term represents an estimation error for each date. Data from a period immediately prior to each date when the firm-specific abnormal return is to be examined is generally used as the Control (or estimation) Period to estimate the parameters or coefficients of the regression, as it is here with the use of rolling regressions (described below).[4]

3.      For each trading day of the Exchange Act Class Period+[5], except the first 121 trading days (April 17, 2014 to October 8, 2014) and September 30 and October 1, 2015, I use a rolling period of 120 trading days before each date, to estimate a separate set of parameters or coefficients (namely $\alpha$, $\beta_1$, and $\beta_2$) used to calculate the abnormal return and the standard error for that date.  Therefore, for October 9, 2014 through September 29, 2015, I have run 245 separate market model regressions using 245 Control Periods, with each Control Period ending on the trading date immediately prior to the date for which I calculate the abnormal return.  For the first 120 trading days with returns, I use the initial 120 trading days with returns as a Control Period;[6] and, for September 30 and October 1, 2015, I use the market model used for September 29, 2015.

4.      In addition to the two explanatory variables, for the 245 regressions I include "dummy variables"[7] to account and adjust for atypical variation in the daily returns to the

---

[4]     "There are essentially four choices for the estimation period: before the event window, during the window, after the window, and around the window.  The majority of events studies use an estimation period before the event."  Glenn V. Henderson, Jr., *Problems and Solutions in Conducting Event Studies*, 57 J. of Risk and Ins., 282-306, 291 (June 1990).

[5]     I refer to the "Exchange Act Class Period+" to mean the Exchange Act Class Period plus the two additional alleged price impact days of September 30, and October 1, 2015 following the end of the Exchange Act Class Period.

[6]     That is, for April 21, 2014 to October 8, 2014, I use the same market model used for October 9, 2014, the 122nd day of the Exchange Act Class Period.  I do not estimate market model for April 17, 2015, the first day of the Exchange Act Class Period, because it is the first day with a price and therefore no return is calculated.

[7]     A dummy variable is an additional explanatory variable that takes on the value of 1 on the date indicated and 0 for all other dates.  In econometric time-series analysis, dummy variables are often used to indicate a non-recurring event that is unique, unusual or anomalous, such as a specific earnings announcement.

D-2

common stock that results from the disclosures during the Control Period of significant firm-specific information.  I use a dummy variable on 11 dates.[8] The 11 dates are the corrective disclosure dates alleged in the Complaint and days on which the Company announced earnings, earnings guidance, or updated earnings.  These are dates on which Navient's stock price might be affected by disclosures of unexpected firm-specific material information.  For each disclosure, I determined whether the disclosure was after the market closed and, if so, the following trading day was used as the price impact date.[9]

5.     I include a dummy variable when there is a release of important Navient-specific information, because should that single date have a large abnormal return caused not by chance, but by Navient's disclosure of material, unanticipated firm-specific information, this could possibly change the mix of information in the market that is important to investors.  The use of dummy, indicator, control, or intervention variables, as well as simply excluding anomalous dates or periods, is a widely used and generally accepted econometric technique employed in the academic finance literature.[10]   For example, Professor Carol Alexander states that "one might consider creating a dummy [variable] to model the timing of important news announcements… [or] whenever the data

---

[8]   The impact dates for the 11 earnings-related or alleged corrective disclosure dates are: 5/12/2014, 7/17/2014, 10/16/2014, 1/22/2015, 3/2/2015, 4/22/2015, 4/27/2015, 7/8/2015, 7/14/2015, 7/22/2015, and 8/25/2015.  The alleged corrective disclosure date of 7/23/2015 in the Complaint appears to be a typo, which should be 7/22/2015.

[9]   I obtained the time stamps and determined the impact date for the releases.  *See* **Appendix C**.

[10]   For example, *see*: Nihat Aktas, Eric de Bodt, & Jean-Gabriel Cousin, *Event Studies with a Contaminated Estimation Period*, 13 J. Corp. Fin., 129-145, 129 (2007); Ekkehart Boehmer, Jim Musumeci, & Annette B. Poulsen, *Event-study Methodology under Conditions of Event-Induced Variance*, 30 J. Fin. Econ., 253-272, 254 (1991); G. E. P. Box & G. C. Tiao, *Intervention Analysis with Applications to Economic and Environmental Problems*, 70 J. Am. Stat. Assn., 70-79, 71 (1975); David F. Larcker, Lawrence A. Gordon & George E. Pinches, *Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis*, 15 J. Fin. & Quant. Analysis, 267-287, 272 (1980); Paul H. Malatesta, *Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares*, 21 J. Fin. & Quant. Analysis, 27-38, 27-28 (1986).

D-3

period covers … a temporary shift due to an extreme market movement."[11] Prof. Alexander adds, "If dummies are omitted there will be residual problems that lead to inefficient parameter estimates on the real explanatory variables."[12]  It is also consistent with methods courts have relied upon to certify securities classes.[13]

6.    Using the specifications of the market model above, including the dummy variables, and a rolling period of 120 trading days prior to each date (except for the first 121 trading days for the start of the Exchange Act Class Period and September 30 to October 1, 2015), I estimate a set of parameters for each trading day of the Exchange Act Class Period+ starting from October 9, 2014.  For the second to the 121st trading days of the Exchange Act Class Period, I use the market model estimated for October 9, 2014.  For September 30 to October 1, 2015, I use the market model estimated for September 29, 2015.  For the 245 regressions I ran over the Exchange Act Class Period+, the coefficients

---

[11]   Carol Alexander, *Market Models: A Guide to Financial Data Analysis*, 440 (John Wiley & Sons 2001).  Carol Alexander is a Professor of Finance at the University of Sussex and Managing Editor of the Journal of Banking and Finance.

[12]   *Id*. at 441. Without accounting for these dates, atypical price movements would then be used for the subsequent 120 days to estimate 120 sets of regression parameters, 120 predicted returns, and thus 120 abnormal returns and 120 standard errors.  Therefore, if there is a large abnormal return caused by the release of material, unanticipated *firm-specific* important information, which is obviously not a random event, its influence on the Navient common stock price movement must be accounted for.  If it is not accounted for via a dummy variable, this non-random influence might contaminate the estimation process during the Control Period and induce a distortion or bias in the parameter estimates, predicted returns, and thus the abnormal returns and standard errors for all 120 subsequent days.  Using dummy variables to control for the price impact of potentially important non-random or atypical informational disclosures in each of the 557 different regression Control Periods, results in regression model coefficients that more precisely reflect the normal or typical return relationship between Navient and the market and industry indexes, and thus improves the efficiency of the estimated parameters, predicted returns and abnormal returns.

[13]   For example, *see In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *7: "Dr. Feinstein explained that dummy variables are widely used during a control period to extract atypical days.  Consistent with other experts, he used dummy variables to control for potentially abnormal returns related to earnings announcements.  Accordingly, he used dummy variables during the control period for all earnings-related trading dates, including the event days.  He also used a dummy variable for May 14, 2012, because it was not only an unusual trading day, but also because it was contemporaneously described as atypical by the news media." (citations omitted).

explaining the variation in the returns of Navient common stock range from 0.62 to 1.04 for $\beta_1$ and range from -0.14 to 0.27 for $\beta_2$. The 245 adjusted R-squared measures range from 17.5% to 67.0%. The average adjusted R-squared measure is approximately 37.0%. The results for each regression are provided in **Appendix E**.

    B.   Estimating Navient-Specific Price Movements

    7.    The second step of the event study methodology uses the estimated coefficients from the 245 regressions, namely 245 measures of $\alpha$, $\beta_1$, and $\beta_2$, and multiplies them by the actual observed daily return measures for their respective explanatory variables on the date immediately following the end of each Control Period (or the first rolling regression also applies to the first 120 days of the Exchange Act Class Period with returns, and the last rolling regression also apply to September 30, 2015 and October 1, 2015). On each day during the Exchange Act Class Period+, the products of these multiplications are summed to calculate the predicted daily return. On each of the 367 days of the Exchange Act Class Period+, the portion of Navient's stock price movement or the "firm-specific effect" is calculated as the *abnormal return* (also referred to as the excess return or residual). The abnormal return is calculated by subtracting the predicted daily return from the actual daily return. This subtraction yields the portion of the daily return (*i.e.*, the firm-specific portion of the return) that is *not* predicted or explained by market- and industry-wide influences.

    C.   Determining Whether Navient-Specific Price Movements Are Outside the Bounds of What Would Be Expected by Chance

    8.    In the third step of the event study, I determine whether the abnormal return on each date is outside the bounds of what would be expected by chance. I do this by presenting empirical evidence showing whether or not the 367 firm-specific abnormal returns are what economists call statistically significantly different from zero (hereinafter referred to as "significant returns").

    9.    A statistical test called the t-test is employed to assess the statistical significance of Navient's abnormal return for each date. The t-test is based on a t-statistic, which is calculated by taking the estimated abnormal return and dividing it by the standard

error of the regression.  The standard error represents the typical or normal volatility of the unexplained or residual price movements of the common stock.  This statistical test is used to determine whether the abnormal return is outside the bounds of what would be expected from random volatility alone; or, in other words, whether it is significantly different from zero with a specified degree of certainty.  I use the scientifically accepted level of certainty and declare statistical significance at a 95% level.  This means that when Navient's abnormal return is statistically significant, I can conclude that the Navient abnormal return is outside the bounds of what would be expected by chance, with at least 95% confidence.

10.    Finally, in the typical event study performed in the context of class certification, there is an examination of the relationship between the abnormal returns, the statistical significance of those abnormal returns and unexpected news related to the subject company.  I present such an analysis in my Report.

D-6

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | Navient Corporation | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 4/17/14 | 951,088 | $16.99 | $0.00 | | | | | | | | | | | |
| 4/21/14 | 444,213 | $16.82 | $0.00 | -1.00% | 0.38% | -0.09% | 0.00 | 0.74 | 0.24 | 0.27% | -1.27% | 0.009 | -1.35 | 18.12% |
| 4/22/14 | 576,707 | $16.80 | $0.00 | -0.12% | 0.41% | -0.14% | 0.00 | 0.74 | 0.24 | 0.28% | -0.40% | 0.009 | -0.42 | 67.36% |
| 4/23/14 | 1,608,932 | $16.78 | $0.00 | -0.12% | -0.21% | 0.06% | 0.00 | 0.74 | 0.24 | -0.13% | 0.01% | 0.009 | 0.01 | 98.93% |
| 4/24/14 | 368,892 | $16.63 | $0.00 | -0.89% | 0.17% | -0.10% | 0.00 | 0.74 | 0.24 | 0.11% | -1.01% | 0.009 | -1.07 | 28.74% |
| 4/25/14 | 1,086,546 | $16.89 | $0.00 | 1.56% | -0.81% | -0.05% | 0.00 | 0.74 | 0.24 | -0.61% | 2.17% | 0.009 | 2.30 | 2.33% * |
| 4/28/14 | 1,187,928 | $16.67 | $0.00 | -1.30% | 0.33% | -0.36% | 0.00 | 0.74 | 0.24 | 0.17% | -1.47% | 0.009 | -1.56 | 12.18% |
| 4/29/14 | 648,522 | $16.68 | $0.00 | 0.06% | 0.48% | 0.13% | 0.00 | 0.74 | 0.24 | 0.39% | -0.33% | 0.009 | -0.35 | 72.46% |
| 4/30/14 | 26,746,201 | $16.55 | $0.00 | -0.78% | 0.30% | -0.33% | 0.00 | 0.74 | 0.24 | 0.15% | -0.93% | 0.009 | -0.99 | 32.47% |
| 5/1/14 | 3,650,133 | $17.00 | $0.00 | 2.72% | -0.01% | 0.04% | 0.00 | 0.74 | 0.24 | 0.01% | 2.71% | 0.009 | 2.87 | 0.49% ** |
| 5/2/14 | 2,995,032 | $16.95 | $0.00 | -0.29% | -0.14% | 0.87% | 0.00 | 0.74 | 0.24 | 0.12% | -0.41% | 0.009 | -0.44 | 66.38% |
| 5/5/14 | 3,978,423 | $16.81 | $0.00 | -0.83% | 0.19% | -0.02% | 0.00 | 0.74 | 0.24 | 0.15% | -0.97% | 0.009 | -1.03 | 30.39% |
| 5/6/14 | 14,309,226 | $16.34 | $0.00 | -2.80% | -0.90% | -0.20% | 0.00 | 0.74 | 0.24 | -0.70% | -2.09% | 0.009 | -2.22 | 2.86% * |
| 5/7/14 | 5,692,881 | $16.60 | $0.00 | 1.59% | 0.60% | 1.32% | 0.00 | 0.74 | 0.24 | 0.77% | 0.82% | 0.009 | 0.87 | 38.85% |
| 5/8/14 | 5,668,216 | $16.45 | $0.00 | -0.90% | -0.11% | 0.77% | 0.00 | 0.74 | 0.24 | 0.11% | -1.01% | 0.009 | -1.08 | 28.44% |
| 5/9/14 | 2,797,016 | $16.28 | $0.00 | -1.03% | 0.17% | 0.14% | 0.00 | 0.74 | 0.24 | 0.17% | -1.20% | 0.009 | -1.27 | 20.53% |
| 5/12/14 | 6,980,098 | $15.95 | $0.00 | -2.03% | 0.97% | 0.33% | 0.00 | 0.74 | 0.24 | 0.81% | -2.84% | 0.009 | -3.01 | 0.32% ** |
| 5/13/14 | 8,292,045 | $15.85 | $0.00 | -0.63% | 0.07% | -0.69% | 0.00 | 0.74 | 0.24 | -0.11% | -0.52% | 0.009 | -0.55 | 58.29% |
| 5/14/14 | 4,577,476 | $15.74 | $0.00 | -0.69% | -0.45% | -0.68% | 0.00 | 0.74 | 0.24 | -0.49% | -0.20% | 0.009 | -0.22 | 82.89% |
| 5/15/14 | 4,919,040 | $15.74 | $0.00 | 0.00% | -0.92% | 0.35% | 0.00 | 0.74 | 0.24 | -0.59% | 0.59% | 0.009 | 0.62 | 53.41% |
| 5/16/14 | 2,786,872 | $15.86 | $0.00 | 0.76% | 0.38% | -0.63% | 0.00 | 0.74 | 0.24 | 0.14% | 0.63% | 0.009 | 0.66 | 50.80% |
| 5/19/14 | 4,532,436 | $16.02 | $0.00 | 1.01% | 0.39% | 0.26% | 0.00 | 0.74 | 0.24 | 0.36% | 0.65% | 0.009 | 0.68 | 49.48% |
| 5/20/14 | 9,754,753 | $15.94 | $0.00 | -0.50% | -0.65% | -0.36% | 0.00 | 0.74 | 0.24 | -0.56% | 0.06% | 0.009 | 0.06 | 95.14% |
| 5/21/14 | 1,743,568 | $15.93 | $0.00 | -0.06% | 0.83% | 0.39% | 0.00 | 0.74 | 0.24 | 0.72% | -0.78% | 0.009 | -0.83 | 41.10% |
| 5/22/14 | 2,128,896 | $15.97 | $0.00 | 0.25% | 0.25% | 0.10% | 0.00 | 0.74 | 0.24 | 0.22% | 0.03% | 0.009 | 0.03 | 97.28% |
| 5/23/14 | 2,826,416 | $16.07 | $0.00 | 0.63% | 0.43% | 0.26% | 0.00 | 0.74 | 0.24 | 0.39% | 0.24% | 0.009 | 0.25 | 80.10% |
| 5/27/14 | 1,726,939 | $15.98 | $0.00 | -0.56% | 0.60% | 1.41% | 0.00 | 0.74 | 0.24 | 0.79% | -1.35% | 0.009 | -1.43 | 15.43% |
| 5/28/14 | 4,219,138 | $15.68 | $0.00 | -1.88% | -0.10% | 0.38% | 0.00 | 0.74 | 0.24 | 0.03% | -1.91% | 0.009 | -2.02 | 4.57% * |
| 5/29/14 | 3,463,351 | $15.68 | $0.00 | 0.00% | 0.55% | -0.37% | 0.00 | 0.74 | 0.24 | 0.33% | -0.33% | 0.009 | -0.35 | 72.97% |
| 5/30/14 | 5,260,986 | $15.80 | $0.00 | 0.77% | 0.19% | 0.16% | 0.00 | 0.74 | 0.24 | 0.18% | 0.58% | 0.009 | 0.62 | 53.91% |
| 6/2/14 | 2,986,807 | $15.81 | $0.00 | 0.06% | 0.08% | 0.24% | 0.00 | 0.74 | 0.24 | 0.13% | -0.06% | 0.009 | -0.07 | 94.64% |
| 6/3/14 | 3,483,548 | $15.83 | $0.00 | 0.13% | -0.03% | -0.06% | 0.00 | 0.74 | 0.24 | -0.03% | 0.16% | 0.009 | 0.17 | 86.91% |
| 6/4/14 | 3,231,455 | $15.89 | $0.15 | 1.33% | 0.21% | 0.12% | 0.00 | 0.74 | 0.24 | 0.19% | 1.14% | 0.009 | 1.20 | 23.10% |
| 6/5/14 | 4,582,403 | $16.67 | $0.00 | 4.91% | 0.66% | 0.28% | 0.00 | 0.74 | 0.24 | 0.57% | 4.34% | 0.009 | 4.60 | 0.00% ** |
| 6/6/14 | 1,622,717 | $16.67 | $0.00 | 0.00% | 0.48% | 1.61% | 0.00 | 0.74 | 0.24 | 0.75% | -0.75% | 0.009 | -0.79 | 42.84% |
| 6/9/14 | 3,169,291 | $16.81 | $0.00 | 0.84% | 0.10% | 0.75% | 0.00 | 0.74 | 0.24 | 0.26% | 0.58% | 0.009 | 0.61 | 54.12% |
| 6/10/14 | 3,441,830 | $16.80 | $0.00 | -0.06% | -0.02% | -0.18% | 0.00 | 0.74 | 0.24 | -0.05% | -0.01% | 0.009 | -0.01 | 99.41% |
| 6/11/14 | 1,857,115 | $16.88 | $0.00 | 0.48% | -0.34% | -0.19% | 0.00 | 0.74 | 0.24 | -0.29% | 0.77% | 0.009 | 0.81 | 41.71% |
| 6/12/14 | 2,336,412 | $16.74 | $0.00 | -0.83% | -0.68% | 0.48% | 0.00 | 0.74 | 0.24 | -0.38% | -0.45% | 0.009 | -0.47 | 63.68% |
| 6/13/14 | 1,485,582 | $16.67 | $0.00 | -0.42% | 0.32% | -0.50% | 0.00 | 0.74 | 0.24 | 0.12% | -0.54% | 0.009 | -0.57 | 56.79% |
| 6/16/14 | 804,878 | $16.78 | $0.00 | 0.66% | 0.08% | -0.08% | 0.00 | 0.74 | 0.24 | 0.05% | 0.61% | 0.009 | 0.65 | 51.96% |
| 6/17/14 | 1,268,810 | $16.84 | $0.00 | 0.36% | 0.22% | 0.11% | 0.00 | 0.74 | 0.24 | 0.20% | 0.16% | 0.009 | 0.17 | 86.58% |
| 6/18/14 | 2,268,103 | $17.06 | $0.00 | 1.31% | 0.77% | 0.18% | 0.00 | 0.74 | 0.24 | 0.62% | 0.68% | 0.009 | 0.72 | 47.15% |
| 6/19/14 | 3,753,998 | $17.19 | $0.00 | 0.76% | 0.14% | -0.35% | 0.00 | 0.74 | 0.24 | 0.03% | 0.73% | 0.009 | 0.78 | 43.88% |
| 6/20/14 | 3,907,893 | $17.46 | $0.00 | 1.57% | 0.17% | 0.76% | 0.00 | 0.74 | 0.24 | 0.32% | 1.25% | 0.009 | 1.33 | 18.71% |
| 6/23/14 | 4,459,996 | $17.68 | $0.00 | 1.26% | -0.01% | -0.06% | 0.00 | 0.74 | 0.24 | -0.02% | 1.28% | 0.009 | 1.35 | 17.88% |
| 6/24/14 | 2,609,214 | $17.66 | $0.00 | -0.14% | -0.63% | -0.39% | 0.00 | 0.74 | 0.24 | -0.56% | 0.42% | 0.009 | 0.44 | 66.06% |
| 6/25/14 | 5,173,531 | $17.61 | $0.00 | -0.25% | 0.49% | -0.30% | 0.00 | 0.74 | 0.24 | 0.30% | -0.56% | 0.009 | -0.59 | 55.66% |
| 6/26/14 | 931,667 | $17.67 | $0.00 | 0.34% | -0.10% | -0.01% | 0.00 | 0.74 | 0.24 | -0.07% | 0.41% | 0.009 | 0.44 | 66.41% |
| 6/27/14 | 4,649,509 | $17.84 | $0.00 | 0.96% | 0.20% | 0.44% | 0.00 | 0.74 | 0.24 | 0.26% | 0.70% | 0.009 | 0.74 | 45.85% |
| 6/30/14 | 2,023,702 | $17.71 | $0.00 | -0.73% | -0.03% | -0.10% | 0.00 | 0.74 | 0.24 | -0.04% | -0.69% | 0.009 | -0.73 | 46.71% |
| 7/1/14 | 2,274,049 | $17.77 | $0.00 | 0.35% | 0.69% | 0.08% | 0.00 | 0.74 | 0.24 | 0.54% | -0.19% | 0.009 | -0.20 | 84.30% |
| 7/2/14 | 2,509,893 | $17.77 | $0.00 | -0.01% | 0.07% | 0.04% | 0.00 | 0.74 | 0.24 | 0.07% | -0.08% | 0.009 | -0.09 | 93.09% |
| 7/3/14 | 1,953,706 | $17.70 | $0.00 | -0.39% | 0.55% | 0.38% | 0.00 | 0.74 | 0.24 | 0.51% | -0.90% | 0.009 | -0.96 | 34.13% |
| 7/7/14 | 1,747,251 | $17.65 | $0.00 | -0.28% | -0.39% | -0.35% | 0.00 | 0.74 | 0.24 | -0.37% | 0.08% | 0.009 | 0.09 | 93.02% |
| 7/8/14 | 4,540,638 | $17.60 | $0.00 | -0.28% | -0.68% | -0.07% | 0.00 | 0.74 | 0.24 | -0.51% | 0.23% | 0.009 | 0.24 | 80.99% |
| 7/9/14 | 2,496,945 | $17.72 | $0.00 | 0.68% | 0.47% | 0.35% | 0.00 | 0.74 | 0.24 | 0.44% | 0.24% | 0.009 | 0.26 | 79.86% |
| 7/10/14 | 2,692,521 | $17.78 | $0.00 | 0.34% | -0.41% | -0.09% | 0.00 | 0.74 | 0.24 | -0.32% | 0.66% | 0.009 | 0.70 | 48.68% |
| 7/11/14 | 6,752,732 | $17.89 | $0.00 | 0.62% | 0.16% | -0.05% | 0.00 | 0.74 | 0.24 | 0.11% | 0.51% | 0.009 | 0.54 | 59.34% |
| 7/14/14 | 2,796,720 | $18.00 | $0.00 | 0.61% | 0.48% | -0.40% | 0.00 | 0.74 | 0.24 | 0.27% | 0.34% | 0.009 | 0.36 | 71.68% |
| 7/15/14 | 3,716,181 | $17.70 | $0.00 | -1.67% | -0.19% | 0.66% | 0.00 | 0.74 | 0.24 | 0.02% | -1.69% | 0.009 | -1.79 | 7.57% |
| 7/16/14 | 3,180,617 | $17.82 | $0.00 | 0.68% | 0.43% | -0.26% | 0.00 | 0.74 | 0.24 | 0.27% | 0.41% | 0.009 | 0.44 | 66.38% |

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess Industry | | Coefficient | | | | Root | | |
| | Navient Corporation | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 7/17/14 | 2,805,828 | $17.70 | $0.00 | -0.67% | -1.17% | -0.24% | 0.00 | 0.74 | 0.24 | -0.92% | 0.25% | 0.009 | 0.26 | 79.35% |
| 7/18/14 | 2,191,662 | $17.69 | $0.00 | -0.06% | 1.03% | -0.72% | 0.00 | 0.74 | 0.24 | 0.60% | -0.66% | 0.009 | -0.69 | 48.87% |
| 7/21/14 | 2,268,473 | $17.86 | $0.00 | 0.96% | -0.23% | -0.42% | 0.00 | 0.74 | 0.24 | -0.26% | 1.22% | 0.009 | 1.30 | 19.72% |
| 7/22/14 | 1,774,509 | $17.97 | $0.00 | 0.62% | 0.50% | 0.12% | 0.00 | 0.74 | 0.24 | 0.41% | 0.21% | 0.009 | 0.22 | 82.75% |
| 7/23/14 | 1,414,425 | $17.98 | $0.00 | 0.06% | 0.18% | -0.51% | 0.00 | 0.74 | 0.24 | 0.02% | 0.04% | 0.009 | 0.04 | 96.81% |
| 7/24/14 | 2,131,840 | $17.97 | $0.00 | -0.06% | 0.05% | 0.24% | 0.00 | 0.74 | 0.24 | 0.10% | -0.16% | 0.009 | -0.17 | 86.60% |
| 7/25/14 | 1,967,620 | $17.87 | $0.00 | -0.56% | -0.48% | -0.61% | 0.00 | 0.74 | 0.24 | -0.50% | -0.06% | 0.009 | -0.06 | 94.90% |
| 7/28/14 | 2,900,432 | $17.99 | $0.00 | 0.67% | 0.03% | -0.04% | 0.00 | 0.74 | 0.24 | 0.02% | 0.65% | 0.009 | 0.69 | 49.08% |
| 7/29/14 | 3,500,376 | $17.70 | $0.00 | -1.61% | -0.45% | 0.20% | 0.00 | 0.74 | 0.24 | -0.28% | -1.33% | 0.009 | -1.41 | 15.98% |
| 7/30/14 | 3,032,346 | $17.58 | $0.00 | -0.68% | 0.02% | -0.14% | 0.00 | 0.74 | 0.24 | -0.01% | -0.67% | 0.009 | -0.71 | 47.87% |
| 7/31/14 | 3,567,958 | $17.20 | $0.00 | -2.16% | -1.99% | -0.70% | 0.00 | 0.74 | 0.24 | -1.64% | -0.52% | 0.009 | -0.55 | 58.20% |
| 8/1/14 | 1,832,520 | $17.34 | $0.00 | 0.81% | -0.29% | -0.79% | 0.00 | 0.74 | 0.24 | -0.39% | 1.21% | 0.009 | 1.28 | 20.26% |
| 8/4/14 | 1,700,359 | $17.17 | $0.00 | -0.98% | 0.72% | -0.01% | 0.00 | 0.74 | 0.24 | 0.54% | -1.52% | 0.009 | -1.61 | 10.96% |
| 8/5/14 | 2,091,317 | $16.95 | $0.00 | -1.28% | -0.96% | -0.01% | 0.00 | 0.74 | 0.24 | -0.71% | -0.57% | 0.009 | -0.61 | 54.40% |
| 8/6/14 | 2,538,550 | $16.99 | $0.00 | 0.24% | 0.03% | 0.01% | 0.00 | 0.74 | 0.24 | 0.03% | 0.20% | 0.009 | 0.21 | 83.02% |
| 8/7/14 | 1,392,808 | $16.86 | $0.00 | -0.77% | -0.53% | 0.05% | 0.00 | 0.74 | 0.24 | -0.38% | -0.39% | 0.009 | -0.41 | 68.02% |
| 8/8/14 | 3,591,830 | $17.28 | $0.00 | 2.49% | 1.16% | 0.33% | 0.00 | 0.74 | 0.24 | 0.95% | 1.55% | 0.009 | 1.64 | 10.40% |
| 8/11/14 | 1,096,330 | $17.10 | $0.00 | -1.04% | 0.29% | -0.49% | 0.00 | 0.74 | 0.24 | 0.11% | -1.15% | 0.009 | -1.22 | 22.50% |
| 8/12/14 | 1,166,896 | $17.10 | $0.00 | 0.00% | -0.16% | 0.55% | 0.00 | 0.74 | 0.24 | 0.02% | -0.02% | 0.009 | -0.02 | 98.16% |
| 8/13/14 | 940,892 | $17.17 | $0.00 | 0.41% | 0.70% | -0.15% | 0.00 | 0.74 | 0.24 | 0.49% | -0.08% | 0.009 | -0.08 | 93.26% |
| 8/14/14 | 1,448,196 | $17.15 | $0.00 | -0.12% | 0.44% | -0.55% | 0.00 | 0.74 | 0.24 | 0.20% | -0.32% | 0.009 | -0.34 | 73.62% |
| 8/15/14 | 1,595,089 | $17.02 | $0.00 | -0.76% | 0.01% | -0.65% | 0.00 | 0.74 | 0.24 | -0.14% | -0.61% | 0.009 | -0.65 | 51.58% |
| 8/18/14 | 2,932,780 | $17.38 | $0.00 | 2.12% | 0.86% | 0.19% | 0.00 | 0.74 | 0.24 | 0.69% | 1.42% | 0.009 | 1.51 | 13.44% |
| 8/19/14 | 1,413,903 | $17.32 | $0.00 | -0.35% | 0.52% | 0.15% | 0.00 | 0.74 | 0.24 | 0.43% | -0.78% | 0.009 | -0.82 | 41.30% |
| 8/20/14 | 1,279,188 | $17.50 | $0.00 | 1.04% | 0.25% | 0.36% | 0.00 | 0.74 | 0.24 | 0.28% | 0.76% | 0.009 | 0.80 | 42.44% |
| 8/21/14 | 1,167,229 | $17.46 | $0.00 | -0.23% | 0.30% | 0.44% | 0.00 | 0.74 | 0.24 | 0.33% | -0.56% | 0.009 | -0.60 | 55.15% |
| 8/22/14 | 1,061,992 | $17.45 | $0.00 | -0.06% | -0.19% | -0.26% | 0.00 | 0.74 | 0.24 | -0.19% | 0.13% | 0.009 | 0.14 | 88.73% |
| 8/25/14 | 769,614 | $17.63 | $0.00 | 1.03% | 0.48% | 0.36% | 0.00 | 0.74 | 0.24 | 0.45% | 0.58% | 0.009 | 0.61 | 54.00% |
| 8/26/14 | 917,005 | $17.61 | $0.00 | -0.11% | 0.11% | -0.36% | 0.00 | 0.74 | 0.24 | 0.00% | -0.11% | 0.009 | -0.12 | 90.45% |
| 8/27/14 | 840,227 | $17.71 | $0.00 | 0.57% | 0.03% | 0.18% | 0.00 | 0.74 | 0.24 | 0.07% | 0.50% | 0.009 | 0.53 | 59.87% |
| 8/28/14 | 911,179 | $17.72 | $0.00 | 0.06% | -0.16% | -0.21% | 0.00 | 0.74 | 0.24 | -0.16% | 0.21% | 0.009 | 0.23 | 82.02% |
| 8/29/14 | 1,990,289 | $17.94 | $0.00 | 1.24% | 0.34% | 0.16% | 0.00 | 0.74 | 0.24 | 0.30% | 0.94% | 0.009 | 1.00 | 31.96% |
| 9/2/14 | 1,560,694 | $17.98 | $0.00 | 0.22% | -0.05% | 0.71% | 0.00 | 0.74 | 0.24 | 0.14% | 0.08% | 0.009 | 0.09 | 93.17% |
| 9/3/14 | 1,309,433 | $17.98 | $0.00 | 0.00% | -0.06% | 0.32% | 0.00 | 0.74 | 0.24 | 0.04% | -0.04% | 0.009 | -0.04 | 96.52% |
| 9/4/14 | 1,609,867 | $17.96 | $0.00 | -0.11% | -0.15% | -0.13% | 0.00 | 0.74 | 0.24 | -0.14% | 0.02% | 0.009 | 0.03 | 97.96% |
| 9/5/14 | 2,305,249 | $17.79 | $0.00 | -0.95% | 0.51% | -0.35% | 0.00 | 0.74 | 0.24 | 0.30% | -1.25% | 0.009 | -1.32 | 18.88% |
| 9/8/14 | 1,883,296 | $17.69 | $0.00 | -0.56% | -0.29% | -0.34% | 0.00 | 0.74 | 0.24 | -0.29% | -0.27% | 0.009 | -0.29 | 77.29% |
| 9/9/14 | 1,588,756 | $17.48 | $0.00 | -1.19% | -0.65% | -0.30% | 0.00 | 0.74 | 0.24 | -0.55% | -0.64% | 0.009 | -0.68 | 49.94% |
| 9/10/14 | 1,206,080 | $17.35 | $0.15 | 0.11% | 0.37% | -0.12% | 0.00 | 0.74 | 0.24 | 0.26% | -0.14% | 0.009 | -0.15 | 88.03% |
| 9/11/14 | 1,300,354 | $17.46 | $0.00 | 0.63% | 0.12% | -0.08% | 0.00 | 0.74 | 0.24 | 0.07% | 0.56% | 0.009 | 0.59 | 55.42% |
| 9/12/14 | 1,343,128 | $17.62 | $0.00 | 0.92% | -0.59% | 0.00% | 0.00 | 0.74 | 0.24 | -0.43% | 1.35% | 0.009 | 1.43 | 15.52% |
| 9/15/14 | 1,394,414 | $17.36 | $0.00 | -1.48% | -0.07% | 0.23% | 0.00 | 0.74 | 0.24 | 0.01% | -1.49% | 0.009 | -1.58 | 11.79% |
| 9/16/14 | 981,544 | $17.50 | $0.00 | 0.81% | 0.75% | 0.23% | 0.00 | 0.74 | 0.24 | 0.62% | 0.19% | 0.009 | 0.20 | 84.33% |
| 9/17/14 | 1,182,687 | $17.82 | $0.00 | 1.83% | 0.13% | 0.90% | 0.00 | 0.74 | 0.24 | 0.32% | 1.51% | 0.009 | 1.60 | 11.33% |
| 9/18/14 | 1,817,421 | $17.85 | $0.00 | 0.17% | 0.50% | 0.72% | 0.00 | 0.74 | 0.24 | 0.56% | -0.39% | 0.009 | -0.41 | 68.21% |
| 9/19/14 | 2,140,327 | $17.86 | $0.00 | 0.06% | -0.05% | -0.13% | 0.00 | 0.74 | 0.24 | -0.06% | 0.11% | 0.009 | 0.12 | 90.35% |
| 9/22/14 | 1,560,020 | $17.82 | $0.00 | -0.22% | -0.80% | 0.09% | 0.00 | 0.74 | 0.24 | -0.57% | 0.34% | 0.009 | 0.36 | 71.76% |
| 9/23/14 | 1,775,999 | $17.60 | $0.00 | -1.23% | -0.57% | -0.45% | 0.00 | 0.74 | 0.24 | -0.52% | -0.71% | 0.009 | -0.76 | 45.16% |
| 9/24/14 | 1,968,623 | $17.91 | $0.00 | 1.76% | 0.79% | -0.27% | 0.00 | 0.74 | 0.24 | 0.53% | 1.23% | 0.009 | 1.31 | 19.31% |
| 9/25/14 | 1,543,644 | $17.73 | $0.00 | -1.01% | -1.62% | -0.25% | 0.00 | 0.74 | 0.24 | -1.25% | 0.25% | 0.009 | 0.26 | 79.47% |
| 9/26/14 | 956,200 | $17.68 | $0.00 | -0.28% | 0.88% | 0.67% | 0.00 | 0.74 | 0.24 | 0.82% | -1.10% | 0.009 | -1.17 | 24.57% |
| 9/29/14 | 1,386,657 | $17.65 | $0.00 | -0.17% | -0.25% | -0.09% | 0.00 | 0.74 | 0.24 | -0.20% | 0.03% | 0.009 | 0.03 | 97.86% |
| 9/30/14 | 1,678,906 | $17.71 | $0.00 | 0.34% | -0.27% | -0.06% | 0.00 | 0.74 | 0.24 | -0.21% | 0.55% | 0.009 | 0.58 | 56.22% |
| 10/1/14 | 2,330,367 | $17.44 | $0.00 | -1.52% | -1.32% | 0.01% | 0.00 | 0.74 | 0.24 | -0.97% | -0.56% | 0.009 | -0.59 | 55.55% |
| 10/2/14 | 1,741,525 | $17.40 | $0.00 | -0.23% | 0.01% | 0.39% | 0.00 | 0.74 | 0.24 | 0.11% | -0.34% | 0.009 | -0.36 | 72.00% |
| 10/3/14 | 1,739,285 | $17.43 | $0.00 | 0.17% | 1.12% | 0.43% | 0.00 | 0.74 | 0.24 | 0.94% | -0.77% | 0.009 | -0.81 | 41.73% |
| 10/6/14 | 3,435,225 | $17.57 | $0.00 | 0.80% | -0.15% | 0.09% | 0.00 | 0.74 | 0.24 | -0.08% | 0.89% | 0.009 | 0.94 | 34.90% |
| 10/7/14 | 2,698,982 | $17.30 | $0.00 | -1.54% | -1.51% | -0.37% | 0.00 | 0.74 | 0.24 | -1.20% | -0.33% | 0.009 | -0.35 | 72.37% |
| 10/8/14 | 4,953,239 | $17.34 | $0.00 | 0.23% | 1.78% | 0.57% | 0.00 | 0.74 | 0.24 | 1.47% | -1.24% | 0.009 | -1.31 | 19.29% |
| 10/9/14 | 3,039,139 | $17.26 | $0.00 | -0.46% | -2.06% | 0.33% | 0.00 | 0.74 | 0.24 | -1.44% | 0.98% | 0.009 | 1.04 | 30.00% |
| 10/10/14 | 4,295,154 | $17.13 | $0.00 | -0.78% | -1.13% | 0.05% | 0.00 | 0.70 | 0.26 | -0.75% | -0.03% | 0.009 | -0.03 | 97.56% |
| 10/13/14 | 3,456,579 | $17.30 | $0.00 | 1.02% | -1.65% | -0.11% | 0.00 | 0.71 | 0.25 | -1.16% | 2.18% | 0.009 | 2.32 | 2.20% * |

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | Navient Corporation | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 10/14/14 | 3,239,694 | $17.47 | $0.00 | 0.98% | 0.16% | 0.40% | 0.00 | 0.62 | 0.27 | 0.26% | 0.73% | 0.010 | 0.76 | 45.11% |
| 10/15/14 | 3,793,116 | $17.42 | $0.00 | -0.29% | -0.80% | -0.65% | 0.00 | 0.63 | 0.27 | -0.62% | 0.33% | 0.010 | 0.34 | 73.13% |
| 10/16/14 | 3,868,309 | $17.64 | $0.00 | 1.26% | 0.02% | -0.68% | 0.00 | 0.66 | 0.26 | -0.11% | 1.37% | 0.009 | 1.46 | 14.58% |
| 10/17/14 | 4,878,778 | $18.61 | $0.00 | 5.50% | 1.29% | -0.45% | 0.00 | 0.68 | 0.22 | 0.84% | 4.66% | 0.009 | 5.00 | 0.00% ** |
| 10/20/14 | 2,515,974 | $18.64 | $0.00 | 0.16% | 0.92% | 0.16% | 0.00 | 0.83 | 0.07 | 0.89% | -0.73% | 0.010 | -0.71 | 47.92% |
| 10/21/14 | 3,410,493 | $18.79 | $0.00 | 0.80% | 1.96% | 0.38% | 0.00 | 0.83 | 0.05 | 1.76% | -0.96% | 0.010 | -0.94 | 34.97% |
| 10/22/14 | 4,271,022 | $18.53 | $0.00 | -1.38% | -0.72% | -1.48% | 0.00 | 0.80 | 0.05 | -0.56% | -0.82% | 0.010 | -0.83 | 40.99% |
| 10/23/14 | 2,624,968 | $18.71 | $0.00 | 0.97% | 1.23% | 0.32% | 0.00 | 0.80 | 0.11 | 1.10% | -0.12% | 0.010 | -0.13 | 90.06% |
| 10/24/14 | 1,436,577 | $18.90 | $0.00 | 1.02% | 0.71% | 0.26% | 0.00 | 0.80 | 0.11 | 0.68% | 0.34% | 0.010 | 0.34 | 73.50% |
| 10/27/14 | 1,602,448 | $18.84 | $0.00 | -0.32% | -0.15% | 0.26% | 0.00 | 0.76 | 0.11 | 0.03% | -0.34% | 0.010 | -0.35 | 72.35% |
| 10/28/14 | 1,842,489 | $19.04 | $0.00 | 1.06% | 1.19% | 0.61% | 0.00 | 0.76 | 0.05 | 1.05% | 0.01% | 0.010 | 0.01 | 98.87% |
| 10/29/14 | 1,961,049 | $19.26 | $0.00 | 1.16% | -0.13% | 0.54% | 0.00 | 0.76 | 0.09 | 0.06% | 1.09% | 0.010 | 1.14 | 25.79% |
| 10/30/14 | 1,859,731 | $19.50 | $0.00 | 1.25% | 0.63% | -0.19% | 0.00 | 0.75 | 0.12 | 0.58% | 0.67% | 0.010 | 0.70 | 48.81% |
| 10/31/14 | 3,215,094 | $19.78 | $0.00 | 1.44% | 1.17% | 0.26% | 0.00 | 0.76 | 0.11 | 1.05% | 0.38% | 0.010 | 0.40 | 68.96% |
| 11/3/14 | 2,863,163 | $20.00 | $0.00 | 1.11% | -0.01% | 0.45% | 0.00 | 0.77 | 0.09 | 0.18% | 0.94% | 0.010 | 0.98 | 32.89% |
| 11/4/14 | 2,013,661 | $19.46 | $0.00 | -2.70% | -0.28% | 0.72% | 0.00 | 0.76 | 0.09 | 0.01% | -2.71% | 0.010 | -2.83 | 0.55% ** |
| 11/5/14 | 3,538,759 | $19.62 | $0.00 | 0.82% | 0.60% | -0.06% | 0.00 | 0.81 | -0.01 | 0.62% | 0.20% | 0.010 | 0.20 | 83.96% |
| 11/6/14 | 2,726,273 | $20.10 | $0.00 | 2.45% | 0.41% | -0.30% | 0.00 | 0.81 | 0.00 | 0.46% | 1.99% | 0.010 | 2.01 | 4.67% * |
| 11/7/14 | 2,476,343 | $20.21 | $0.00 | 0.55% | 0.05% | 0.62% | 0.00 | 0.82 | -0.05 | 0.16% | 0.39% | 0.010 | 0.39 | 69.84% |
| 11/10/14 | 2,319,392 | $20.20 | $0.00 | -0.05% | 0.32% | 0.15% | 0.00 | 0.82 | -0.04 | 0.40% | -0.45% | 0.010 | -0.45 | 65.36% |
| 11/11/14 | 1,819,417 | $20.30 | $0.00 | 0.50% | 0.07% | -0.75% | 0.00 | 0.83 | -0.03 | 0.23% | 0.26% | 0.010 | 0.26 | 79.28% |
| 11/12/14 | 2,179,877 | $20.13 | $0.00 | -0.84% | -0.04% | -0.25% | 0.00 | 0.83 | -0.04 | 0.13% | -0.97% | 0.010 | -0.96 | 33.67% |
| 11/13/14 | 2,629,723 | $20.78 | $0.00 | 3.23% | 0.06% | -0.54% | 0.00 | 0.83 | -0.03 | 0.21% | 3.02% | 0.010 | 3.00 | 0.33% ** |
| 11/14/14 | 2,158,055 | $20.41 | $0.00 | -1.78% | 0.04% | -0.37% | 0.00 | 0.84 | -0.04 | 0.22% | -2.00% | 0.010 | -1.93 | 5.59% |
| 11/17/14 | 1,436,762 | $20.81 | $0.00 | 1.96% | 0.08% | -0.53% | 0.00 | 0.83 | 0.04 | 0.22% | 1.74% | 0.010 | 1.67 | 9.71% |
| 11/18/14 | 1,472,078 | $20.87 | $0.00 | 0.29% | 0.53% | -0.26% | 0.00 | 0.84 | -0.03 | 0.65% | -0.36% | 0.010 | -0.35 | 72.88% |
| 11/19/14 | 1,031,334 | $20.71 | $0.00 | -0.77% | -0.14% | -0.26% | 0.00 | 0.84 | -0.02 | 0.08% | -0.84% | 0.010 | -0.80 | 42.29% |
| 11/20/14 | 2,741,860 | $20.70 | $0.00 | -0.05% | 0.20% | -0.09% | 0.00 | 0.84 | -0.01 | 0.35% | -0.40% | 0.011 | -0.38 | 70.22% |
| 11/21/14 | 2,867,071 | $21.18 | $0.00 | 2.32% | 0.54% | -0.49% | 0.00 | 0.84 | -0.01 | 0.64% | 1.68% | 0.011 | 1.60 | 11.23% |
| 11/24/14 | 2,107,232 | $20.94 | $0.00 | -1.13% | 0.29% | 0.61% | 0.00 | 0.86 | -0.06 | 0.40% | -1.53% | 0.011 | -1.45 | 15.12% |
| 11/25/14 | 2,540,107 | $20.95 | $0.00 | 0.05% | -0.10% | 0.57% | 0.00 | 0.82 | -0.14 | -0.02% | 0.07% | 0.010 | 0.07 | 94.46% |
| 11/26/14 | 1,734,105 | $20.91 | $0.00 | -0.19% | 0.30% | -0.27% | 0.00 | 0.82 | -0.11 | 0.42% | -0.61% | 0.010 | -0.62 | 53.78% |
| 11/28/14 | 632,426 | $20.96 | $0.00 | 0.24% | -0.25% | 1.07% | 0.00 | 0.82 | -0.13 | -0.21% | 0.44% | 0.010 | 0.45 | 65.47% |
| 12/1/14 | 2,833,376 | $20.91 | $0.00 | -0.24% | -0.68% | 0.15% | 0.00 | 0.81 | -0.10 | -0.43% | 0.19% | 0.010 | 0.19 | 85.13% |
| 12/2/14 | 1,333,695 | $20.97 | $0.00 | 0.29% | 0.64% | -0.11% | 0.00 | 0.81 | -0.10 | 0.67% | -0.38% | 0.010 | -0.38 | 70.11% |
| 12/3/14 | 2,045,715 | $20.90 | $0.15 | 0.38% | 0.40% | -1.44% | 0.00 | 0.80 | -0.08 | 0.58% | -0.20% | 0.010 | -0.20 | 84.23% |
| 12/4/14 | 1,446,810 | $20.82 | $0.00 | -0.38% | -0.11% | 0.36% | 0.00 | 0.80 | -0.09 | 0.02% | -0.40% | 0.010 | -0.41 | 68.59% |
| 12/5/14 | 2,982,823 | $21.00 | $0.00 | 0.86% | 0.17% | 0.60% | 0.00 | 0.80 | -0.10 | 0.21% | 0.65% | 0.010 | 0.66 | 51.01% |
| 12/8/14 | 2,183,500 | $21.29 | $0.00 | 1.38% | -0.71% | 1.34% | 0.00 | 0.80 | -0.08 | -0.54% | 1.92% | 0.010 | 1.94 | 5.52% |
| 12/9/14 | 2,398,485 | $21.49 | $0.00 | 0.94% | -0.02% | 0.04% | 0.00 | 0.76 | 0.03 | 0.14% | 0.80% | 0.010 | 0.80 | 42.56% |
| 12/10/14 | 2,887,488 | $21.28 | $0.00 | -0.98% | -1.63% | 0.46% | 0.00 | 0.75 | 0.04 | -1.05% | 0.07% | 0.010 | 0.07 | 94.21% |
| 12/11/14 | 4,588,901 | $21.49 | $0.00 | 0.99% | 0.48% | -0.14% | 0.00 | 0.75 | 0.00 | 0.51% | 0.48% | 0.010 | 0.48 | 63.17% |
| 12/12/14 | 1,542,726 | $20.83 | $0.00 | -3.07% | -1.62% | -0.70% | 0.00 | 0.76 | 0.00 | -1.08% | -1.99% | 0.010 | -2.00 | 4.78% * |
| 12/15/14 | 1,978,560 | $21.07 | $0.00 | 1.15% | -0.63% | -0.25% | 0.00 | 0.81 | 0.05 | -0.40% | 1.56% | 0.010 | 1.54 | 12.56% |
| 12/16/14 | 2,667,813 | $20.88 | $0.00 | -0.90% | -0.85% | -0.81% | 0.00 | 0.80 | 0.03 | -0.56% | -0.34% | 0.010 | -0.33 | 73.91% |
| 12/17/14 | 1,731,681 | $21.26 | $0.00 | 1.82% | 2.04% | 0.40% | 0.00 | 0.81 | 0.04 | 1.79% | 0.03% | 0.010 | 0.03 | 97.84% |
| 12/18/14 | 1,684,515 | $21.50 | $0.00 | 1.13% | 2.42% | 0.77% | 0.00 | 0.81 | 0.03 | 2.10% | -0.97% | 0.010 | -0.95 | 34.18% |
| 12/19/14 | 7,128,021 | $22.35 | $0.00 | 3.95% | 0.46% | -0.43% | 0.00 | 0.77 | 0.01 | 0.48% | 3.47% | 0.010 | 3.42 | 0.09% ** |
| 12/22/14 | 2,311,778 | $22.57 | $0.00 | 0.98% | 0.40% | 0.42% | 0.00 | 0.81 | -0.06 | 0.45% | 0.53% | 0.011 | 0.50 | 61.85% |
| 12/23/14 | 1,288,767 | $22.35 | $0.00 | -0.97% | 0.18% | 0.25% | 0.00 | 0.81 | -0.05 | 0.30% | -1.27% | 0.011 | -1.20 | 23.43% |
| 12/24/14 | 616,905 | $22.17 | $0.00 | -0.81% | -0.01% | 0.12% | 0.00 | 0.81 | -0.05 | 0.15% | -0.95% | 0.011 | -0.89 | 37.30% |
| 12/26/14 | 836,280 | $21.96 | $0.00 | -0.95% | 0.33% | -0.10% | 0.00 | 0.81 | -0.06 | 0.43% | -1.38% | 0.011 | -1.29 | 20.04% |
| 12/29/14 | 1,055,440 | $21.84 | $0.00 | -0.55% | 0.10% | -0.03% | 0.00 | 0.81 | -0.05 | 0.23% | -0.78% | 0.011 | -0.72 | 47.32% |
| 12/30/14 | 1,645,233 | $21.99 | $0.00 | 0.66% | -0.48% | 0.54% | 0.00 | 0.81 | -0.05 | -0.28% | 0.94% | 0.011 | 0.87 | 38.61% |
| 12/31/14 | 1,057,798 | $21.61 | $0.00 | -1.71% | -1.03% | -0.10% | 0.00 | 0.80 | -0.03 | -0.68% | -1.02% | 0.011 | -0.95 | 34.62% |
| 1/2/15 | 942,587 | $21.82 | $0.00 | 0.97% | -0.02% | -0.04% | 0.00 | 0.82 | -0.03 | 0.11% | 0.86% | 0.011 | 0.79 | 43.11% |
| 1/5/15 | 1,102,299 | $21.10 | $0.00 | -3.30% | -1.82% | -0.62% | 0.00 | 0.81 | -0.03 | -1.33% | -1.97% | 0.011 | -1.81 | 7.33% |
| 1/6/15 | 1,419,926 | $20.90 | $0.00 | -0.95% | -0.89% | -1.16% | 0.00 | 0.85 | 0.05 | -0.68% | -0.27% | 0.011 | -0.25 | 80.53% |
| 1/7/15 | 2,889,334 | $20.92 | $0.00 | 0.10% | 1.19% | 0.51% | 0.00 | 0.85 | 0.06 | 1.17% | -1.08% | 0.011 | -0.98 | 32.76% |
| 1/8/15 | 3,124,252 | $20.60 | $0.00 | -1.53% | 1.79% | -0.40% | 0.00 | 0.83 | 0.05 | 1.60% | -3.13% | 0.011 | -2.86 | 0.51% ** |
| 1/9/15 | 1,664,465 | $20.54 | $0.00 | -0.29% | -0.84% | -0.62% | 0.00 | 0.77 | 0.09 | -0.60% | 0.31% | 0.011 | 0.28 | 78.36% |
| 1/12/15 | 1,431,640 | $20.17 | $0.00 | -1.80% | -0.81% | 0.13% | 0.00 | 0.77 | 0.10 | -0.51% | -1.29% | 0.011 | -1.15 | 25.27% |

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| | Navient Corporation | | | | Return | Return | | | | Return | Return | MSE | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | | t-statistic | p-Value |
| 1/13/15 | 2,188,825 | $20.22 | $0.00 | 0.25% | -0.25% | -0.18% | 0.00 | 0.78 | 0.09 | -0.13% | 0.37% | 0.011 | 0.33 | 74.11% |
| 1/14/15 | 1,753,463 | $20.14 | $0.00 | -0.40% | -0.58% | -1.50% | 0.00 | 0.78 | 0.09 | -0.49% | 0.10% | 0.011 | 0.09 | 93.17% |
| 1/15/15 | 1,608,205 | $20.11 | $0.00 | -0.15% | -0.92% | 0.01% | 0.00 | 0.78 | 0.08 | -0.63% | 0.48% | 0.011 | 0.43 | 67.06% |
| 1/16/15 | 1,804,628 | $20.15 | $0.00 | 0.20% | 1.34% | -1.20% | 0.00 | 0.78 | 0.08 | 1.04% | -0.84% | 0.011 | -0.75 | 45.70% |
| 1/20/15 | 1,791,675 | $19.67 | $0.00 | -2.38% | 0.16% | 0.98% | 0.00 | 0.76 | 0.12 | 0.33% | -2.71% | 0.011 | -2.40 | 1.82% * |
| 1/21/15 | 3,084,051 | $19.96 | $0.00 | 1.47% | 0.49% | -0.29% | 0.00 | 0.76 | 0.05 | 0.43% | 1.05% | 0.012 | 0.91 | 36.49% |
| 1/22/15 | 2,551,708 | $19.69 | $0.00 | -1.35% | 1.53% | -4.73% | 0.00 | 0.76 | 0.03 | 1.11% | -2.46% | 0.012 | -2.14 | 3.45% * |
| 1/23/15 | 2,134,458 | $19.47 | $0.00 | -1.12% | -0.55% | 0.13% | 0.00 | 0.75 | 0.02 | -0.30% | -0.82% | 0.012 | -0.71 | 47.94% |
| 1/26/15 | 2,113,521 | $19.55 | $0.00 | 0.41% | 0.26% | -0.44% | 0.00 | 0.76 | 0.02 | 0.27% | 0.14% | 0.012 | 0.13 | 90.03% |
| 1/27/15 | 3,047,923 | $19.80 | $0.00 | 1.28% | -1.34% | -0.16% | 0.00 | 0.77 | 0.01 | -0.94% | 2.22% | 0.011 | 1.94 | 5.50% |
| 1/28/15 | 2,721,528 | $19.47 | $0.00 | -1.67% | -1.34% | -0.27% | 0.00 | 0.72 | 0.02 | -0.85% | -0.81% | 0.012 | -0.70 | 48.44% |
| 1/29/15 | 5,054,293 | $19.50 | $0.00 | 0.15% | 0.96% | -0.64% | 0.00 | 0.74 | 0.02 | 0.81% | -0.65% | 0.012 | -0.56 | 57.50% |
| 1/30/15 | 4,173,880 | $19.74 | $0.00 | 1.23% | -1.30% | -0.40% | 0.00 | 0.72 | 0.04 | -0.84% | 2.07% | 0.012 | 1.78 | 7.75% |
| 2/2/15 | 3,120,747 | $20.05 | $0.00 | 1.57% | 1.30% | 0.48% | 0.00 | 0.67 | 0.01 | 1.00% | 0.58% | 0.012 | 0.49 | 62.38% |
| 2/3/15 | 2,543,134 | $21.08 | $0.00 | 5.14% | 1.45% | 0.47% | 0.00 | 0.69 | -0.01 | 1.12% | 4.01% | 0.012 | 3.45 | 0.08% ** |
| 2/4/15 | 2,554,434 | $21.00 | $0.00 | -0.38% | -0.39% | 0.47% | 0.00 | 0.75 | 0.03 | -0.11% | -0.27% | 0.012 | -0.22 | 82.40% |
| 2/5/15 | 2,165,708 | $21.31 | $0.00 | 1.48% | 1.05% | 0.22% | 0.00 | 0.75 | 0.03 | 0.96% | 0.52% | 0.012 | 0.42 | 67.34% |
| 2/6/15 | 1,764,050 | $21.35 | $0.00 | 0.19% | -0.32% | 0.97% | 0.00 | 0.76 | 0.02 | -0.05% | 0.24% | 0.012 | 0.20 | 84.56% |
| 2/9/15 | 2,107,723 | $21.57 | $0.00 | 1.03% | -0.42% | 0.61% | 0.00 | 0.76 | 0.00 | -0.13% | 1.16% | 0.012 | 0.96 | 34.08% |
| 2/10/15 | 1,598,800 | $21.67 | $0.00 | 0.46% | 1.07% | -0.41% | 0.00 | 0.74 | 0.03 | 0.97% | -0.50% | 0.012 | -0.42 | 67.89% |
| 2/11/15 | 1,928,712 | $21.95 | $0.00 | 1.29% | 0.03% | 0.07% | 0.00 | 0.74 | 0.04 | 0.21% | 1.08% | 0.012 | 0.89 | 37.58% |
| 2/12/15 | 2,427,991 | $22.21 | $0.00 | 1.18% | 0.99% | -3.05% | 0.00 | 0.74 | 0.03 | 0.83% | 0.36% | 0.012 | 0.30 | 76.84% |
| 2/13/15 | 2,490,613 | $22.37 | $0.00 | 0.72% | 0.42% | -1.76% | 0.00 | 0.75 | 0.01 | 0.49% | 0.23% | 0.012 | 0.19 | 84.99% |
| 2/17/15 | 3,000,023 | $21.98 | $0.00 | -1.74% | 0.18% | 0.56% | 0.00 | 0.75 | 0.00 | 0.33% | -2.08% | 0.012 | -1.71 | 9.03% |
| 2/18/15 | 1,882,322 | $21.65 | $0.00 | -1.50% | -0.03% | 0.37% | 0.00 | 0.74 | -0.03 | 0.15% | -1.65% | 0.012 | -1.34 | 18.25% |
| 2/19/15 | 1,418,279 | $21.66 | $0.00 | 0.05% | -0.09% | -0.50% | 0.00 | 0.75 | -0.05 | 0.12% | -0.08% | 0.012 | -0.06 | 94.95% |
| 2/20/15 | 1,670,522 | $21.72 | $0.00 | 0.28% | 0.63% | 1.00% | 0.00 | 0.75 | -0.05 | 0.58% | -0.30% | 0.012 | -0.25 | 80.59% |
| 2/23/15 | 1,290,575 | $21.81 | $0.00 | 0.41% | -0.03% | 0.26% | 0.00 | 0.75 | -0.06 | 0.13% | 0.29% | 0.012 | 0.23 | 81.59% |
| 2/24/15 | 1,657,127 | $21.68 | $0.00 | -0.60% | 0.28% | 0.28% | 0.00 | 0.74 | -0.06 | 0.35% | -0.94% | 0.012 | -0.76 | 44.64% |
| 2/25/15 | 2,443,935 | $21.70 | $0.00 | 0.09% | -0.06% | 0.68% | 0.00 | 0.74 | -0.06 | 0.06% | 0.03% | 0.012 | 0.03 | 97.91% |
| 2/26/15 | 1,742,617 | $21.85 | $0.00 | 0.69% | -0.13% | 0.62% | 0.00 | 0.74 | -0.06 | 0.01% | 0.68% | 0.012 | 0.55 | 58.49% |
| 2/27/15 | 2,271,775 | $21.40 | $0.00 | -2.06% | -0.29% | -1.02% | 0.00 | 0.74 | -0.05 | -0.01% | -2.05% | 0.012 | -1.65 | 10.07% |
| 3/2/15 | 10,895,823 | $19.51 | $0.00 | -8.83% | 0.62% | -0.38% | 0.00 | 0.75 | -0.02 | 0.62% | -9.46% | 0.012 | -7.58 | 0.00% ** |
| 3/3/15 | 4,902,313 | $20.05 | $0.00 | 2.77% | -0.45% | 0.34% | 0.00 | 0.75 | -0.03 | -0.19% | 2.96% | 0.013 | 2.36 | 1.97% * |
| 3/4/15 | 3,011,930 | $20.01 | $0.16 | 0.60% | -0.42% | -0.73% | 0.00 | 0.72 | -0.01 | -0.11% | 0.71% | 0.013 | 0.55 | 58.12% |
| 3/5/15 | 1,830,410 | $19.99 | $0.00 | -0.10% | 0.12% | 0.37% | 0.00 | 0.72 | -0.02 | 0.28% | -0.38% | 0.013 | -0.30 | 76.64% |
| 3/6/15 | 2,117,156 | $19.64 | $0.00 | -1.75% | -1.40% | 0.88% | 0.00 | 0.72 | -0.02 | -0.84% | -0.91% | 0.013 | -0.71 | 47.82% |
| 3/9/15 | 2,075,723 | $19.59 | $0.00 | -0.25% | 0.40% | 0.17% | 0.00 | 0.75 | -0.04 | 0.47% | -0.72% | 0.013 | -0.57 | 57.28% |
| 3/10/15 | 4,398,944 | $19.37 | $0.00 | -1.12% | -1.69% | -0.33% | 0.00 | 0.74 | -0.03 | -1.06% | -0.06% | 0.013 | -0.05 | 96.02% |
| 3/11/15 | 3,948,114 | $19.16 | $0.00 | -1.08% | -0.18% | 0.71% | 0.00 | 0.74 | -0.03 | 0.03% | -1.11% | 0.013 | -0.87 | 38.49% |
| 3/12/15 | 2,605,666 | $19.54 | $0.00 | 1.98% | 1.29% | 1.87% | 0.00 | 0.74 | -0.08 | 0.96% | 1.02% | 0.013 | 0.81 | 42.24% |
| 3/13/15 | 3,043,634 | $19.28 | $0.00 | -1.33% | -0.61% | -0.52% | 0.00 | 0.76 | -0.04 | -0.27% | -1.06% | 0.013 | -0.84 | 40.48% |
| 3/16/15 | 2,566,837 | $19.66 | $0.00 | 1.97% | 1.36% | -0.24% | 0.00 | 0.76 | -0.03 | 1.20% | 0.77% | 0.013 | 0.60 | 54.66% |
| 3/17/15 | 2,691,388 | $20.11 | $0.00 | 2.29% | -0.33% | 0.00% | 0.00 | 0.78 | -0.04 | -0.09% | 2.38% | 0.013 | 1.87 | 6.42% |
| 3/18/15 | 1,887,751 | $20.06 | $0.00 | -0.25% | 1.22% | -0.62% | 0.00 | 0.76 | -0.04 | 1.15% | -1.40% | 0.013 | -1.08 | 28.15% |
| 3/19/15 | 2,907,554 | $20.67 | $0.00 | 3.04% | -0.49% | -0.09% | 0.00 | 0.73 | -0.02 | -0.18% | 3.22% | 0.013 | 2.49 | 1.42% * |
| 3/20/15 | 4,797,564 | $20.70 | $0.00 | 0.15% | 0.90% | 0.31% | 0.00 | 0.72 | -0.02 | 0.84% | -0.70% | 0.013 | -0.52 | 60.18% |
| 3/23/15 | 2,750,105 | $20.75 | $0.00 | 0.24% | -0.17% | -0.10% | 0.00 | 0.72 | -0.01 | 0.08% | 0.16% | 0.013 | 0.12 | 90.38% |
| 3/24/15 | 1,757,346 | $20.70 | $0.00 | -0.24% | -0.61% | -0.57% | 0.00 | 0.72 | -0.01 | -0.22% | -0.02% | 0.013 | -0.02 | 98.69% |
| 3/25/15 | 2,999,606 | $20.33 | $0.00 | -1.79% | -1.45% | -0.09% | 0.00 | 0.72 | -0.01 | -0.84% | -0.95% | 0.013 | -0.72 | 47.57% |
| 3/26/15 | 1,710,428 | $20.16 | $0.00 | -0.84% | -0.24% | -1.13% | 0.00 | 0.72 | -0.01 | 0.05% | -0.88% | 0.013 | -0.67 | 50.73% |
| 3/27/15 | 1,749,064 | $20.16 | $0.00 | 0.00% | 0.26% | -0.54% | 0.00 | 0.72 | 0.01 | 0.38% | -0.38% | 0.013 | -0.29 | 77.57% |
| 3/30/15 | 2,021,002 | $20.08 | $0.00 | -0.40% | 1.23% | -0.87% | 0.00 | 0.73 | 0.02 | 1.09% | -1.49% | 0.013 | -1.12 | 26.52% |
| 3/31/15 | 3,828,183 | $20.33 | $0.00 | 1.25% | -0.87% | 0.86% | 0.00 | 0.71 | 0.04 | -0.39% | 1.64% | 0.013 | 1.23 | 22.08% |
| 4/1/15 | 2,074,275 | $20.24 | $0.00 | -0.44% | -0.38% | 1.74% | 0.00 | 0.68 | 0.07 | 0.07% | -0.51% | 0.013 | -0.38 | 70.35% |
| 4/2/15 | 1,849,372 | $20.36 | $0.00 | 0.59% | 0.36% | 0.56% | 0.00 | 0.71 | 0.07 | 0.50% | 0.09% | 0.013 | 0.07 | 94.68% |
| 4/6/15 | 1,347,582 | $20.32 | $0.00 | -0.20% | 0.66% | -0.70% | 0.00 | 0.73 | 0.06 | 0.65% | -0.84% | 0.013 | -0.62 | 52.75% |
| 4/7/15 | 1,593,250 | $20.11 | $0.00 | -1.03% | -0.20% | -0.90% | 0.00 | 0.72 | 0.07 | -0.01% | -1.02% | 0.013 | -0.77 | 44.46% |
| 4/8/15 | 1,793,076 | $20.25 | $0.00 | 0.70% | 0.31% | 0.26% | 0.00 | 0.77 | 0.09 | 0.43% | 0.27% | 0.013 | 0.20 | 84.16% |
| 4/9/15 | 2,456,847 | $20.34 | $0.00 | 0.44% | 0.45% | -0.14% | 0.00 | 0.77 | 0.08 | 0.50% | -0.06% | 0.013 | -0.04 | 96.65% |
| 4/10/15 | 1,910,766 | $20.26 | $0.00 | -0.39% | 0.52% | 0.02% | 0.00 | 0.77 | 0.09 | 0.57% | -0.96% | 0.013 | -0.73 | 46.78% |
| 4/13/15 | 1,251,305 | $20.43 | $0.00 | 0.84% | -0.45% | 0.46% | 0.00 | 0.77 | 0.09 | -0.15% | 0.98% | 0.013 | 0.75 | 45.69% |

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess Industry | | Coefficient | | | | Root | | |
| | Navient Corporation | | | | Market | | | | Excess | Predicted | Abnormal | | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 4/14/15 | 1,517,674 | $20.39 | $0.00 | -0.20% | 0.16% | 0.30% | 0.00 | 0.69 | 0.13 | 0.29% | -0.48% | 0.013 | -0.39 | 70.04% |
| 4/15/15 | 1,644,465 | $20.34 | $0.00 | -0.25% | 0.51% | 0.40% | 0.00 | 0.70 | 0.13 | 0.55% | -0.79% | 0.013 | -0.63 | 52.83% |
| 4/16/15 | 2,021,057 | $20.29 | $0.00 | -0.25% | -0.08% | 0.95% | 0.00 | 0.71 | 0.13 | 0.21% | -0.45% | 0.013 | -0.36 | 71.99% |
| 4/17/15 | 1,922,822 | $19.93 | $0.00 | -1.77% | -1.13% | -1.42% | 0.00 | 0.70 | 0.10 | -0.80% | -0.98% | 0.013 | -0.78 | 43.69% |
| 4/20/15 | 1,566,051 | $20.49 | $0.00 | 2.81% | 0.93% | -0.58% | 0.00 | 0.72 | 0.12 | 0.73% | 2.08% | 0.013 | 1.66 | 10.04% |
| 4/21/15 | 2,664,510 | $20.53 | $0.00 | 0.20% | -0.15% | -0.12% | 0.00 | 0.74 | 0.10 | 0.02% | 0.17% | 0.013 | 0.13 | 89.34% |
| 4/22/15 | 2,812,837 | $20.61 | $0.00 | 0.39% | 0.51% | -0.07% | 0.00 | 0.74 | 0.10 | 0.52% | -0.13% | 0.013 | -0.10 | 91.76% |
| 4/23/15 | 1,883,471 | $20.49 | $0.00 | -0.58% | 0.25% | 0.04% | 0.00 | 0.74 | 0.10 | 0.34% | -0.92% | 0.013 | -0.72 | 47.33% |
| 4/24/15 | 1,790,384 | $20.28 | $0.00 | -1.02% | 0.23% | -0.88% | 0.00 | 0.74 | 0.09 | 0.22% | -1.24% | 0.013 | -0.98 | 33.10% |
| 4/27/15 | 1,487,952 | $19.85 | $0.00 | -2.12% | -0.41% | 0.18% | 0.00 | 0.73 | 0.11 | -0.16% | -1.96% | 0.013 | -1.53 | 12.88% |
| 4/28/15 | 2,135,871 | $19.90 | $0.00 | 0.25% | 0.29% | 0.05% | 0.00 | 0.72 | 0.11 | 0.33% | -0.08% | 0.013 | -0.06 | 95.31% |
| 4/29/15 | 1,755,813 | $19.71 | $0.00 | -0.95% | -0.37% | -0.13% | 0.00 | 0.72 | 0.10 | -0.17% | -0.78% | 0.013 | -0.61 | 54.12% |
| 4/30/15 | 2,319,491 | $19.54 | $0.00 | -0.86% | -1.01% | 1.17% | 0.00 | 0.72 | 0.14 | -0.44% | -0.42% | 0.013 | -0.34 | 73.60% |
| 5/1/15 | 2,618,453 | $19.74 | $0.00 | 1.02% | 1.09% | -0.07% | 0.00 | 0.72 | 0.13 | 0.90% | 0.13% | 0.013 | 0.10 | 91.89% |
| 5/4/15 | 1,913,619 | $19.64 | $0.00 | -0.51% | 0.29% | 0.26% | 0.00 | 0.71 | 0.14 | 0.35% | -0.85% | 0.012 | -0.69 | 49.38% |
| 5/5/15 | 2,989,339 | $19.58 | $0.00 | -0.31% | -1.17% | 0.78% | 0.00 | 0.71 | 0.13 | -0.64% | 0.33% | 0.012 | 0.27 | 78.89% |
| 5/6/15 | 1,883,639 | $19.58 | $0.00 | 0.00% | -0.41% | 0.56% | 0.00 | 0.70 | 0.14 | -0.11% | 0.11% | 0.012 | 0.09 | 92.74% |
| 5/7/15 | 1,753,565 | $19.78 | $0.00 | 1.02% | 0.40% | -0.11% | 0.00 | 0.70 | 0.14 | 0.36% | 0.66% | 0.012 | 0.53 | 59.69% |
| 5/8/15 | 1,442,255 | $20.02 | $0.00 | 1.21% | 1.35% | -0.24% | 0.00 | 0.71 | 0.14 | 1.03% | 0.19% | 0.012 | 0.15 | 88.05% |
| 5/11/15 | 3,269,881 | $19.97 | $0.00 | -0.25% | -0.49% | 1.10% | 0.00 | 0.71 | 0.17 | -0.08% | -0.17% | 0.012 | -0.14 | 88.86% |
| 5/12/15 | 1,283,463 | $20.12 | $0.00 | 0.75% | -0.29% | -0.38% | 0.00 | 0.71 | 0.15 | -0.17% | 0.92% | 0.012 | 0.77 | 44.35% |
| 5/13/15 | 2,002,389 | $19.79 | $0.00 | -1.64% | -0.01% | 1.04% | 0.00 | 0.70 | 0.16 | 0.25% | -1.89% | 0.012 | -1.60 | 11.25% |
| 5/14/15 | 3,173,318 | $19.83 | $0.00 | 0.20% | 1.09% | 0.04% | 0.00 | 0.71 | 0.13 | 0.85% | -0.64% | 0.012 | -0.54 | 59.12% |
| 5/15/15 | 2,791,140 | $19.16 | $0.00 | -3.38% | 0.09% | -0.80% | 0.00 | 0.69 | 0.13 | 0.03% | -3.41% | 0.012 | -2.85 | 0.51% ** |
| 5/18/15 | 2,606,585 | $19.06 | $0.00 | -0.52% | 0.31% | 0.00% | 0.00 | 0.69 | 0.17 | 0.26% | -0.78% | 0.012 | -0.63 | 52.78% |
| 5/19/15 | 3,048,606 | $19.31 | $0.00 | 1.31% | -0.04% | 1.09% | 0.00 | 0.68 | 0.19 | 0.20% | 1.11% | 0.012 | 0.91 | 36.48% |
| 5/20/15 | 1,788,827 | $19.34 | $0.00 | 0.16% | -0.08% | -0.16% | 0.00 | 0.68 | 0.22 | -0.05% | 0.20% | 0.012 | 0.17 | 86.83% |
| 5/21/15 | 2,003,130 | $19.45 | $0.00 | 0.57% | 0.25% | -0.61% | 0.00 | 0.68 | 0.22 | 0.08% | 0.49% | 0.012 | 0.40 | 69.08% |
| 5/22/15 | 1,273,674 | $19.33 | $0.00 | -0.62% | -0.22% | 0.53% | 0.00 | 0.69 | 0.21 | 0.01% | -0.63% | 0.012 | -0.52 | 60.60% |
| 5/26/15 | 2,441,408 | $19.13 | $0.00 | -1.03% | -1.03% | -0.27% | 0.00 | 0.69 | 0.21 | -0.72% | -0.32% | 0.012 | -0.26 | 79.43% |
| 5/27/15 | 1,625,358 | $19.37 | $0.00 | 1.25% | 0.93% | -0.42% | 0.00 | 0.69 | 0.21 | 0.60% | 0.65% | 0.012 | 0.53 | 59.45% |
| 5/28/15 | 1,390,198 | $19.29 | $0.00 | -0.41% | -0.11% | -0.09% | 0.00 | 0.70 | 0.20 | -0.04% | -0.37% | 0.012 | -0.30 | 76.35% |
| 5/29/15 | 1,854,960 | $19.27 | $0.00 | -0.10% | -0.63% | -0.12% | 0.00 | 0.70 | 0.21 | -0.42% | 0.32% | 0.012 | 0.26 | 79.51% |
| 6/1/15 | 1,257,553 | $19.34 | $0.00 | 0.36% | 0.22% | -0.37% | 0.00 | 0.70 | 0.21 | 0.12% | 0.24% | 0.012 | 0.20 | 84.43% |
| 6/2/15 | 2,236,456 | $19.38 | $0.00 | 0.21% | -0.10% | 0.65% | 0.00 | 0.70 | 0.21 | 0.12% | 0.09% | 0.012 | 0.07 | 94.10% |
| 6/3/15 | 1,496,264 | $19.44 | $0.16 | 1.14% | 0.23% | 0.45% | 0.00 | 0.71 | 0.17 | 0.28% | 0.86% | 0.012 | 0.71 | 48.03% |
| 6/4/15 | 1,638,129 | $19.06 | $0.00 | -1.95% | -0.86% | -0.49% | 0.00 | 0.71 | 0.18 | -0.67% | -1.29% | 0.012 | -1.06 | 29.11% |
| 6/5/15 | 1,449,331 | $19.09 | $0.00 | 0.16% | -0.14% | 0.89% | 0.00 | 0.73 | 0.19 | 0.09% | 0.07% | 0.012 | 0.06 | 95.45% |
| 6/8/15 | 1,276,347 | $19.06 | $0.00 | -0.16% | -0.63% | 0.13% | 0.00 | 0.73 | 0.19 | -0.42% | 0.26% | 0.012 | 0.21 | 83.22% |
| 6/9/15 | 1,779,443 | $18.90 | $0.00 | -0.84% | 0.04% | 0.41% | 0.00 | 0.68 | 0.17 | 0.14% | -0.97% | 0.012 | -0.81 | 42.08% |
| 6/10/15 | 1,741,554 | $19.40 | $0.00 | 2.65% | 1.21% | 0.34% | 0.00 | 0.70 | 0.17 | 0.92% | 1.73% | 0.012 | 1.44 | 15.26% |
| 6/11/15 | 1,745,192 | $19.53 | $0.00 | 0.67% | 0.20% | 0.27% | 0.00 | 0.72 | 0.18 | 0.22% | 0.45% | 0.012 | 0.37 | 71.29% |
| 6/12/15 | 972,312 | $19.43 | $0.00 | -0.51% | -0.69% | 0.30% | 0.00 | 0.72 | 0.18 | -0.41% | -0.10% | 0.012 | -0.08 | 93.53% |
| 6/15/15 | 1,381,641 | $19.09 | $0.00 | -1.75% | -0.46% | 0.01% | 0.00 | 0.75 | 0.19 | -0.31% | -1.44% | 0.012 | -1.19 | 23.49% |
| 6/16/15 | 1,887,736 | $19.14 | $0.00 | 0.26% | 0.57% | -0.27% | 0.00 | 0.73 | 0.22 | 0.35% | -0.09% | 0.012 | -0.08 | 93.90% |
| 6/17/15 | 2,300,645 | $18.64 | $0.00 | -2.61% | 0.20% | 0.30% | 0.00 | 0.73 | 0.21 | 0.19% | -2.81% | 0.012 | -2.41 | 1.75% * |
| 6/18/15 | 2,723,891 | $18.99 | $0.00 | 1.85% | 1.00% | -0.21% | 0.00 | 0.72 | 0.20 | 0.65% | 1.20% | 0.012 | 1.01 | 31.62% |
| 6/19/15 | 5,057,832 | $18.93 | $0.00 | -0.29% | -0.53% | 0.29% | 0.00 | 0.74 | 0.20 | -0.35% | 0.06% | 0.012 | 0.05 | 96.22% |
| 6/22/15 | 1,546,264 | $19.06 | $0.00 | 0.69% | 0.61% | 0.53% | 0.00 | 0.75 | 0.20 | 0.56% | 0.13% | 0.012 | 0.11 | 91.48% |
| 6/23/15 | 1,635,551 | $19.10 | $0.00 | 0.21% | 0.07% | 0.35% | 0.00 | 0.75 | 0.20 | 0.13% | 0.08% | 0.012 | 0.07 | 94.53% |
| 6/24/15 | 2,881,345 | $18.83 | $0.00 | -1.41% | -0.73% | 0.21% | 0.00 | 0.75 | 0.19 | -0.51% | -0.90% | 0.012 | -0.76 | 44.84% |
| 6/25/15 | 1,487,690 | $18.56 | $0.00 | -1.46% | -0.29% | -0.46% | 0.00 | 0.75 | 0.19 | -0.31% | -1.15% | 0.012 | -0.98 | 33.12% |
| 6/26/15 | 3,702,122 | $18.44 | $0.00 | -0.62% | -0.02% | 0.14% | 0.00 | 0.76 | 0.20 | -0.01% | -0.61% | 0.012 | -0.52 | 60.50% |
| 6/29/15 | 1,975,671 | $18.11 | $0.00 | -1.79% | -2.08% | -0.23% | 0.00 | 0.70 | 0.17 | -1.51% | -0.28% | 0.012 | -0.24 | 80.94% |
| 6/30/15 | 1,641,632 | $18.21 | $0.00 | 0.55% | 0.27% | 0.06% | 0.00 | 0.71 | 0.17 | 0.19% | 0.36% | 0.012 | 0.31 | 76.00% |
| 7/1/15 | 2,452,605 | $18.45 | $0.00 | 1.32% | 0.72% | 0.26% | 0.00 | 0.73 | 0.18 | 0.57% | 0.75% | 0.012 | 0.64 | 52.31% |
| 7/2/15 | 1,941,471 | $18.45 | $0.00 | 0.00% | -0.03% | -0.18% | 0.00 | 0.82 | 0.17 | -0.03% | 0.03% | 0.011 | 0.02 | 98.23% |
| 7/6/15 | 2,253,678 | $18.61 | $0.00 | 0.87% | -0.38% | -0.26% | 0.00 | 0.82 | 0.18 | -0.33% | 1.20% | 0.011 | 1.05 | 29.37% |
| 7/7/15 | 2,724,954 | $18.97 | $0.00 | 1.93% | 0.61% | -0.47% | 0.00 | 0.80 | 0.17 | 0.45% | 1.48% | 0.011 | 1.30 | 19.64% |
| 7/8/15 | 1,865,451 | $18.57 | $0.00 | -2.11% | -1.64% | -0.49% | 0.00 | 0.81 | 0.16 | -1.35% | -0.75% | 0.011 | -0.66 | 51.18% |
| 7/9/15 | 1,422,322 | $18.53 | $0.00 | -0.22% | 0.23% | 0.37% | 0.00 | 0.82 | 0.17 | 0.30% | -0.52% | 0.012 | -0.45 | 65.40% |
| 7/10/15 | 2,492,940 | $18.37 | $0.00 | -0.86% | 1.23% | 0.07% | 0.00 | 0.82 | 0.17 | 1.07% | -1.94% | 0.012 | -1.68 | 9.54% |

**Appendix E**
**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | Root | | |
| | Navient Corporation | | | | Market | Industry | | | Excess | Predicted | Abnormal | | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 7/13/15 | 2,258,746 | $18.36 | $0.00 | -0.05% | 1.12% | 0.52% | 0.00 | 0.80 | 0.14 | 1.00% | -1.06% | 0.012 | -0.91 | 36.49% |
| 7/14/15 | 8,538,103 | $16.42 | $0.00 | -10.57% | 0.45% | -0.15% | 0.00 | 0.79 | 0.18 | 0.37% | -10.94% | 0.011 | -9.60 | 0.00% ** |
| 7/15/15 | 4,133,519 | $16.56 | $0.00 | 0.85% | -0.07% | 0.23% | 0.00 | 0.78 | 0.19 | 0.03% | 0.83% | 0.011 | 0.72 | 47.50% |
| 7/16/15 | 3,180,562 | $16.67 | $0.00 | 0.66% | 0.80% | -0.08% | 0.00 | 0.78 | 0.19 | 0.66% | 0.01% | 0.011 | 0.01 | 99.57% |
| 7/17/15 | 3,114,756 | $16.86 | $0.00 | 1.14% | 0.11% | 0.01% | 0.00 | 0.77 | 0.20 | 0.14% | 1.00% | 0.011 | 0.88 | 38.06% |
| 7/20/15 | 4,692,554 | $16.42 | $0.00 | -2.61% | 0.08% | 0.24% | 0.00 | 0.77 | 0.21 | 0.17% | -2.78% | 0.011 | -2.44 | 1.61% * |
| 7/21/15 | 3,615,854 | $16.60 | $0.00 | 1.10% | -0.42% | 0.38% | 0.00 | 0.83 | 0.21 | -0.28% | 1.37% | 0.011 | 1.20 | 23.31% |
| 7/22/15 | 3,441,288 | $16.23 | $0.00 | -2.23% | -0.23% | 0.29% | 0.00 | 0.80 | 0.21 | -0.09% | -2.14% | 0.012 | -1.85 | 6.63% |
| 7/23/15 | 2,610,848 | $16.39 | $0.00 | 0.99% | -0.56% | -1.66% | 0.00 | 0.81 | 0.20 | -0.76% | 1.74% | 0.012 | 1.51 | 13.47% |
| 7/24/15 | 2,282,239 | $16.22 | $0.00 | -1.04% | -1.07% | -4.21% | 0.00 | 0.85 | 0.17 | -1.58% | 0.55% | 0.011 | 0.48 | 63.49% |
| 7/27/15 | 2,518,530 | $15.72 | $0.00 | -3.08% | -0.58% | -0.40% | 0.00 | 0.83 | 0.13 | -0.50% | -2.58% | 0.011 | -2.25 | 2.62% * |
| 7/28/15 | 2,272,992 | $15.83 | $0.00 | 0.70% | 1.24% | -1.02% | 0.00 | 0.75 | 0.12 | 0.78% | -0.08% | 0.011 | -0.08 | 93.94% |
| 7/29/15 | 2,008,183 | $15.77 | $0.00 | -0.38% | 0.74% | 0.19% | 0.00 | 0.75 | 0.12 | 0.56% | -0.94% | 0.011 | -0.84 | 40.05% |
| 7/30/15 | 2,955,214 | $15.53 | $0.00 | -1.52% | 0.01% | 1.26% | 0.00 | 0.72 | 0.12 | 0.12% | -1.65% | 0.011 | -1.48 | 14.07% |
| 7/31/15 | 2,987,248 | $15.70 | $0.00 | 1.09% | -0.23% | 0.09% | 0.00 | 0.73 | 0.09 | -0.21% | 1.30% | 0.011 | 1.16 | 24.81% |
| 8/3/15 | 2,109,996 | $15.66 | $0.00 | -0.25% | -0.28% | 0.10% | 0.00 | 0.73 | 0.08 | -0.25% | -0.01% | 0.011 | -0.01 | 99.43% |
| 8/4/15 | 1,749,373 | $15.58 | $0.00 | -0.51% | -0.22% | -0.02% | 0.00 | 0.74 | 0.07 | -0.22% | -0.29% | 0.011 | -0.26 | 79.32% |
| 8/5/15 | 2,891,250 | $15.61 | $0.00 | 0.19% | 0.35% | -0.38% | 0.00 | 0.74 | 0.07 | 0.16% | 0.03% | 0.011 | 0.03 | 97.98% |
| 8/6/15 | 3,549,583 | $15.37 | $0.00 | -1.54% | -0.75% | -0.06% | 0.00 | 0.72 | 0.11 | -0.62% | -0.92% | 0.011 | -0.83 | 41.04% |
| 8/7/15 | 2,263,907 | $15.61 | $0.00 | 1.56% | -0.28% | 3.35% | 0.00 | 0.73 | 0.13 | 0.15% | 1.41% | 0.011 | 1.27 | 20.83% |
| 8/10/15 | 1,713,108 | $15.91 | $0.00 | 1.92% | 1.28% | 0.71% | 0.00 | 0.72 | 0.21 | 1.02% | 0.91% | 0.011 | 0.82 | 41.49% |
| 8/11/15 | 2,697,594 | $15.39 | $0.00 | -3.27% | -0.94% | -0.08% | 0.00 | 0.74 | 0.23 | -0.75% | -2.51% | 0.011 | -2.29 | 2.42% * |
| 8/12/15 | 2,995,734 | $15.31 | $0.00 | -0.52% | 0.12% | -0.40% | 0.00 | 0.78 | 0.23 | -0.07% | -0.45% | 0.011 | -0.40 | 68.83% |
| 8/13/15 | 3,443,567 | $14.79 | $0.00 | -3.40% | -0.11% | -0.13% | 0.00 | 0.79 | 0.24 | -0.19% | -3.21% | 0.011 | -2.85 | 0.52% ** |
| 8/14/15 | 4,360,301 | $14.76 | $0.00 | -0.20% | 0.39% | 0.21% | 0.00 | 0.79 | 0.25 | 0.26% | -0.47% | 0.012 | -0.40 | 68.98% |
| 8/17/15 | 3,502,979 | $14.83 | $0.00 | 0.47% | 0.54% | -0.39% | 0.00 | 0.80 | 0.25 | 0.23% | 0.24% | 0.012 | 0.21 | 83.73% |
| 8/18/15 | 2,603,689 | $14.77 | $0.00 | -0.40% | -0.24% | 0.25% | 0.00 | 0.80 | 0.25 | -0.23% | -0.18% | 0.011 | -0.15 | 87.98% |
| 8/19/15 | 1,921,647 | $14.62 | $0.00 | -1.02% | -0.82% | 0.29% | 0.00 | 0.80 | 0.24 | -0.69% | -0.32% | 0.012 | -0.28 | 78.01% |
| 8/20/15 | 3,007,665 | $14.06 | $0.00 | -3.83% | -2.11% | 0.21% | 0.00 | 0.80 | 0.22 | -1.73% | -2.10% | 0.012 | -1.82 | 7.18% |
| 8/21/15 | 2,829,301 | $13.89 | $0.00 | -1.21% | -3.17% | 0.77% | 0.00 | 0.87 | 0.21 | -2.72% | 1.51% | 0.012 | 1.30 | 19.69% |
| 8/24/15 | 7,450,659 | $13.06 | $0.00 | -5.98% | -3.94% | 0.50% | 0.00 | 0.82 | 0.21 | -3.27% | -2.71% | 0.011 | -2.39 | 1.83% * |
| 8/25/15 | 9,032,839 | $12.04 | $0.00 | -7.81% | -1.35% | -0.29% | 0.00 | 0.95 | 0.21 | -1.50% | -6.31% | 0.011 | -5.49 | 0.00% ** |
| 8/26/15 | 4,831,183 | $12.52 | $0.00 | 3.99% | 3.91% | -0.74% | 0.00 | 0.95 | 0.21 | 3.43% | 0.56% | 0.012 | 0.49 | 62.85% |
| 8/27/15 | 4,580,211 | $13.00 | $0.00 | 3.83% | 2.44% | 0.04% | 0.00 | 0.97 | 0.21 | 2.24% | 1.60% | 0.012 | 1.38 | 16.89% |
| 8/28/15 | 2,634,685 | $13.05 | $0.00 | 0.38% | 0.07% | -0.29% | 0.00 | 1.01 | 0.22 | -0.11% | 0.50% | 0.012 | 0.43 | 66.92% |
| 8/31/15 | 5,772,299 | $12.79 | $0.00 | -1.99% | -0.83% | 1.06% | 0.00 | 1.02 | 0.22 | -0.74% | -1.25% | 0.012 | -1.08 | 28.39% |
| 9/1/15 | 3,658,508 | $12.35 | $0.00 | -3.44% | -2.95% | -1.03% | 0.00 | 1.03 | 0.21 | -3.39% | -0.05% | 0.012 | -0.04 | 96.89% |
| 9/2/15 | 3,843,304 | $12.16 | $0.16 | -0.24% | 1.85% | -0.62% | 0.00 | 1.03 | 0.20 | 1.64% | -1.89% | 0.012 | -1.62 | 10.73% |
| 9/3/15 | 3,555,263 | $12.15 | $0.00 | -0.08% | 0.12% | 0.52% | 0.00 | 1.00 | 0.21 | 0.09% | -0.17% | 0.012 | -0.14 | 88.67% |
| 9/4/15 | 3,019,932 | $11.94 | $0.00 | -1.73% | -1.52% | -0.07% | 0.00 | 0.98 | 0.21 | -1.67% | -0.06% | 0.012 | -0.05 | 96.14% |
| 9/8/15 | 5,676,822 | $12.30 | $0.00 | 3.02% | 2.52% | -0.21% | 0.00 | 0.99 | 0.21 | 2.28% | 0.73% | 0.011 | 0.64 | 52.13% |
| 9/9/15 | 4,643,493 | $12.29 | $0.00 | -0.08% | -1.38% | 0.69% | 0.00 | 1.02 | 0.20 | -1.43% | 1.35% | 0.011 | 1.19 | 23.54% |
| 9/10/15 | 5,694,657 | $12.64 | $0.00 | 2.85% | 0.54% | -0.26% | 0.00 | 1.02 | 0.22 | 0.31% | 2.54% | 0.011 | 2.33 | 2.14% * |
| 9/11/15 | 7,487,718 | $12.45 | $0.00 | -1.50% | 0.48% | -0.42% | 0.00 | 1.04 | 0.22 | 0.25% | -1.76% | 0.011 | -1.58 | 11.75% |
| 9/14/15 | 4,123,232 | $12.44 | $0.00 | -0.08% | -0.40% | 0.22% | 0.00 | 1.03 | 0.23 | -0.54% | 0.46% | 0.011 | 0.41 | 68.22% |
| 9/15/15 | 4,440,029 | $12.37 | $0.00 | -0.56% | 1.28% | 0.12% | 0.00 | 1.03 | 0.24 | 1.18% | -1.74% | 0.011 | -1.55 | 12.33% |
| 9/16/15 | 7,558,031 | $12.65 | $0.00 | 2.26% | 0.87% | 0.22% | 0.00 | 1.01 | 0.23 | 0.75% | 1.52% | 0.011 | 1.34 | 18.37% |
| 9/17/15 | 5,278,393 | $12.55 | $0.00 | -0.79% | -0.24% | -0.49% | 0.00 | 1.03 | 0.23 | -0.54% | -0.25% | 0.011 | -0.22 | 82.59% |
| 9/18/15 | 9,403,097 | $12.66 | $0.00 | 0.88% | -1.62% | -0.30% | 0.00 | 1.03 | 0.24 | -1.91% | 2.79% | 0.011 | 2.44 | 1.64% * |
| 9/21/15 | 4,151,190 | $12.65 | $0.00 | -0.08% | 0.46% | 0.77% | 0.00 | 1.00 | 0.20 | 0.47% | -0.55% | 0.012 | -0.47 | 64.01% |
| 9/22/15 | 3,926,577 | $12.40 | $0.00 | -1.98% | -1.23% | -0.09% | 0.00 | 1.01 | 0.17 | -1.42% | -0.55% | 0.011 | -0.48 | 63.18% |
| 9/23/15 | 3,997,011 | $12.47 | $0.00 | 0.56% | -0.20% | -0.02% | 0.00 | 1.02 | 0.17 | -0.38% | 0.94% | 0.012 | 0.82 | 41.60% |
| 9/24/15 | 4,376,088 | $12.50 | $0.00 | 0.24% | -0.34% | -0.54% | 0.00 | 1.01 | 0.17 | -0.60% | 0.84% | 0.012 | 0.72 | 47.04% |
| 9/25/15 | 4,674,003 | $12.44 | $0.00 | -0.48% | -0.05% | 0.94% | 0.00 | 1.02 | 0.16 | -0.05% | -0.43% | 0.012 | -0.37 | 71.06% |
| 9/28/15 | 5,161,008 | $12.16 | $0.00 | -2.25% | -2.54% | 0.02% | 0.00 | 1.01 | 0.14 | -2.72% | 0.47% | 0.012 | 0.40 | 68.68% |
| 9/29/15 | 8,504,178 | $11.63 | $0.00 | -4.36% | 0.13% | -0.34% | 0.00 | 1.00 | 0.14 | -0.07% | -4.29% | 0.012 | -3.72 | 0.03% ** |
| 9/30/15 | 10,417,236 | $11.24 | $0.00 | -3.35% | 1.91% | -0.51% | 0.00 | 1.00 | 0.14 | 1.70% | -5.06% | 0.012 | -4.38 | 0.00% ** |
| 10/1/15 | 11,040,348 | $10.96 | $0.00 | -2.49% | 0.20% | -0.37% | 0.00 | 1.00 | 0.14 | 0.01% | -2.50% | 0.012 | -2.16 | 3.28% * |

**Notes:**
[1] Trading day.
[2] Reported composite U.S. volume.  Source: Bloomberg.

**Appendix E**

**Navient Corporation Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Navient Corporation | | | | Market | Excess Industry | Coefficient | | | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Excess Industry | Return | Return | MSE | t-statistic | p-Value |

[3] Reported composite U.S. price. Source: Bloomberg.

[4] Dividend. Source: Bloomberg.

[5] = ([3] + [4]) / [3] on previous trading day - 1.

[6] Daily return for the S&P 500 Total Return Index. Source: Bloomberg.

[7] Daily industry return is the daily return for the S&P Supercomposite Consumer Finance Sub Industry Total Return Index (after removing Navient Corporation's daily return based on its daily index weight from the index return). The Excess INDUSTRYt returns are used to account for industry-wide effects in the market model, after removing the effect of market returns. The formula for removing the effect of market returns from the industry return is {industry return – (intercept + beta * market return)}. The intercept (-0.0004) and beta (0.9799) are estimated by regressing daily industry returns on market returns over the period 4/21/2014 to 10/1/2015.

[8] Intercept from a market model regression estimated over the prior 120 trading days, starting on 10/9/2014. For days prior to 10/9/2014, intercept is equal to the intercept from a market model regression estimated for 10/9/2014. The model regresses Navient daily returns on the returns of the S&P 500 Total Return Index and the Excess INDUSTRYt returns. The following dummy dates are used based on earnings, earnings guidance or updated earnings dates and corrective disclosure dates alleged in the Complaint: 5/12/2014, 7/17/2014, 10/16/2014, 1/22/2015, 3/2/2015, 4/22/2015, 4/27/2015, 7/8/2015, 7/14/2015, 7/22/2015, and 8/25/2015.

[9] Coefficient for the market return from a market model regression estimated over the prior 120 trading days, starting on 10/9/2014. For days prior to 10/9/2014, coefficient for the market return is equal to the that from a market model regression estimated for 10/9/2014.

[10] Coefficient for the excess industry return from a market model regression estimated over the prior 120 trading days, starting on 10/9/2014. For days prior to 10/9/2014, coefficient for the excess industry return is equal to the that from a market model regression estimated for 10/9/2014.

[11] = [8] + {[9] x [6]} + {[10] x [7]}.

[12] = [5] - [11].

[13] Root MSE of a market model estimated over the prior 120 trading days, starting on 10/9/2014. For days prior to 10/9/2014, root MSE is equal to the that from a market model regression estimated for 10/9/2014.

[14] = [12] / [13].

[15] Two-tailed p-value associated with the t-statistic in [14]. ** denotes p-value is less than or equal to 1% and * denotes p-value is less than or equal to 5%.

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1]<br><br>Date | [2]<br>Daily<br>Volume | [3]<br>Weekly<br>Volume | [4]<br>Shares<br>Outstanding | [5]<br>Weekly<br>Turnover |
|---|---|---|---|---|
| 4/17/2014 Thu | 951,088 | 951,088 | 422,703,287 | 0.2% |
| 4/21/2014 Mon | 444,213 | --- | --- | --- |
| 4/22/2014 Tue | 576,707 | --- | --- | --- |
| 4/23/2014 Wed | 1,608,932 | --- | --- | --- |
| 4/24/2014 Thu | 368,892 | --- | --- | --- |
| 4/25/2014 Fri | 1,086,546 | 4,085,290 | 422,703,287 | 1.0% |
| 4/28/2014 Mon | 1,187,928 | | --- | --- |
| 4/29/2014 Tue | 648,522 | --- | --- | --- |
| 4/30/2014 Wed | 26,746,201 | --- | --- | --- |
| 5/1/2014 Thu | 3,650,133 | --- | --- | --- |
| 5/2/2014 Fri | 2,995,032 | 35,227,816 | 422,739,239 | 8.3% |
| 5/5/2014 Mon | 3,978,423 | --- | --- | --- |
| 5/6/2014 Tue | 14,309,226 | --- | --- | --- |
| 5/7/2014 Wed | 5,692,881 | --- | --- | --- |
| 5/8/2014 Thu | 5,668,216 | --- | --- | --- |
| 5/9/2014 Fri | 2,797,016 | 32,445,762 | 422,739,239 | 7.7% |
| 5/12/2014 Mon | 6,980,098 | --- | --- | --- |
| 5/13/2014 Tue | 8,292,045 | --- | --- | --- |
| 5/14/2014 Wed | 4,577,476 | --- | --- | --- |
| 5/15/2014 Thu | 4,919,040 | --- | --- | --- |
| 5/16/2014 Fri | 2,786,872 | 27,555,531 | 422,739,239 | 6.5% |
| 5/19/2014 Mon | 4,532,436 | --- | --- | --- |
| 5/20/2014 Tue | 9,754,753 | --- | --- | --- |
| 5/21/2014 Wed | 1,743,568 | --- | --- | --- |
| 5/22/2014 Thu | 2,128,896 | --- | --- | --- |
| 5/23/2014 Fri | 2,826,416 | 20,986,069 | 422,739,239 | 5.0% |
| 5/27/2014 Tue | 1,726,939 | --- | --- | --- |
| 5/28/2014 Wed | 4,219,138 | --- | --- | --- |
| 5/29/2014 Thu | 3,463,351 | --- | --- | --- |
| 5/30/2014 Fri | 5,260,986 | 14,670,414 | 422,739,239 | 3.5% |
| 6/2/2014 Mon | 2,986,807 | --- | --- | --- |
| 6/3/2014 Tue | 3,483,548 | --- | --- | --- |
| 6/4/2014 Wed | 3,231,455 | --- | --- | --- |
| 6/5/2014 Thu | 4,582,403 | --- | --- | --- |
| 6/6/2014 Fri | 1,622,717 | 15,906,930 | 422,739,239 | 3.8% |
| 6/9/2014 Mon | 3,169,291 | --- | --- | --- |
| 6/10/2014 Tue | 3,441,830 | --- | --- | --- |
| 6/11/2014 Wed | 1,857,115 | --- | --- | --- |
| 6/12/2014 Thu | 2,336,412 | --- | --- | --- |
| 6/13/2014 Fri | 1,485,582 | 12,290,230 | 422,739,239 | 2.9% |
| 6/16/2014 Mon | 804,878 | --- | --- | --- |
| 6/17/2014 Tue | 1,268,810 | --- | --- | --- |
| 6/18/2014 Wed | 2,268,103 | --- | --- | --- |
| 6/19/2014 Thu | 3,753,998 | --- | --- | --- |
| 6/20/2014 Fri | 3,907,893 | 12,003,682 | 422,739,239 | 2.8% |
| 6/23/2014 Mon | 4,459,996 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| | Daily | Weekly | Shares | Weekly |
| Date | Volume | Volume | Outstanding | Turnover |
| 6/24/2014 Tue | 2,609,214 | --- | --- | --- |
| 6/25/2014 Wed | 5,173,531 | --- | --- | --- |
| 6/26/2014 Thu | 931,667 | --- | --- | --- |
| 6/27/2014 Fri | 4,649,509 | 17,823,917 | 422,739,239 | 4.2% |
| 6/30/2014 Mon | 2,023,702 | --- | --- | --- |
| 7/1/2014 Tue | 2,274,049 | --- | --- | --- |
| 7/2/2014 Wed | 2,509,893 | --- | --- | --- |
| 7/3/2014 Thu | 1,953,706 | 8,761,350 | 419,438,459 | 2.1% |
| 7/7/2014 Mon | 1,747,251 | --- | --- | --- |
| 7/8/2014 Tue | 4,540,638 | --- | --- | --- |
| 7/9/2014 Wed | 2,496,945 | --- | --- | --- |
| 7/10/2014 Thu | 2,692,521 | --- | --- | --- |
| 7/11/2014 Fri | 6,752,732 | 18,230,087 | 419,438,459 | 4.3% |
| 7/14/2014 Mon | 2,796,720 | --- | --- | --- |
| 7/15/2014 Tue | 3,716,181 | --- | --- | --- |
| 7/16/2014 Wed | 3,180,617 | --- | --- | --- |
| 7/17/2014 Thu | 2,805,828 | --- | --- | --- |
| 7/18/2014 Fri | 2,191,662 | 14,691,008 | 419,438,459 | 3.5% |
| 7/21/2014 Mon | 2,268,473 | --- | --- | --- |
| 7/22/2014 Tue | 1,774,509 | --- | --- | --- |
| 7/23/2014 Wed | 1,414,425 | --- | --- | --- |
| 7/24/2014 Thu | 2,131,840 | --- | --- | --- |
| 7/25/2014 Fri | 1,967,620 | 9,556,867 | 419,438,459 | 2.3% |
| 7/28/2014 Mon | 2,900,432 | --- | --- | --- |
| 7/29/2014 Tue | 3,500,376 | --- | --- | --- |
| 7/30/2014 Wed | 3,032,346 | --- | --- | --- |
| 7/31/2014 Thu | 3,567,958 | --- | --- | --- |
| 8/1/2014 Fri | 1,832,520 | 14,833,632 | 419,438,459 | 3.5% |
| 8/4/2014 Mon | 1,700,359 | --- | --- | --- |
| 8/5/2014 Tue | 2,091,317 | --- | --- | --- |
| 8/6/2014 Wed | 2,538,550 | --- | --- | --- |
| 8/7/2014 Thu | 1,392,808 | --- | --- | --- |
| 8/8/2014 Fri | 3,591,830 | 11,314,864 | 419,438,459 | 2.7% |
| 8/11/2014 Mon | 1,096,330 | --- | --- | --- |
| 8/12/2014 Tue | 1,166,896 | --- | --- | --- |
| 8/13/2014 Wed | 940,892 | --- | --- | --- |
| 8/14/2014 Thu | 1,448,196 | --- | --- | --- |
| 8/15/2014 Fri | 1,595,089 | 6,247,403 | 419,438,459 | 1.5% |
| 8/18/2014 Mon | 2,932,780 | --- | --- | --- |
| 8/19/2014 Tue | 1,413,903 | --- | --- | --- |
| 8/20/2014 Wed | 1,279,188 | --- | --- | --- |
| 8/21/2014 Thu | 1,167,229 | --- | --- | --- |
| 8/22/2014 Fri | 1,061,992 | 7,855,092 | 419,438,459 | 1.9% |
| 8/25/2014 Mon | 769,614 | --- | --- | --- |
| 8/26/2014 Tue | 917,005 | --- | --- | --- |
| 8/27/2014 Wed | 840,227 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 8/28/2014 Thu | 911,179 | --- | --- | --- |
| 8/29/2014 Fri | 1,990,289 | 5,428,314 | 419,438,459 | 1.3% |
| 9/2/2014 Tue | 1,560,694 | --- | --- | --- |
| 9/3/2014 Wed | 1,309,433 | --- | --- | --- |
| 9/4/2014 Thu | 1,609,867 | --- | --- | --- |
| 9/5/2014 Fri | 2,305,249 | 6,785,243 | 419,438,459 | 1.6% |
| 9/8/2014 Mon | 1,883,296 | | --- | --- |
| 9/9/2014 Tue | 1,588,756 | --- | --- | --- |
| 9/10/2014 Wed | 1,206,080 | --- | --- | --- |
| 9/11/2014 Thu | 1,300,354 | --- | --- | --- |
| 9/12/2014 Fri | 1,343,128 | 7,321,614 | 419,438,459 | 1.7% |
| 9/15/2014 Mon | 1,394,414 | --- | --- | --- |
| 9/16/2014 Tue | 981,544 | --- | --- | --- |
| 9/17/2014 Wed | 1,182,687 | --- | --- | --- |
| 9/18/2014 Thu | 1,817,421 | --- | --- | --- |
| 9/19/2014 Fri | 2,140,327 | 7,516,393 | 419,438,459 | 1.8% |
| 9/22/2014 Mon | 1,560,020 | --- | --- | --- |
| 9/23/2014 Tue | 1,775,999 | --- | --- | --- |
| 9/24/2014 Wed | 1,968,623 | --- | --- | --- |
| 9/25/2014 Thu | 1,543,644 | --- | --- | --- |
| 9/26/2014 Fri | 956,200 | 7,804,486 | 419,438,459 | 1.9% |
| 9/29/2014 Mon | 1,386,657 | --- | --- | --- |
| 9/30/2014 Tue | 1,678,906 | --- | --- | --- |
| 10/1/2014 Wed | 2,330,367 | --- | --- | --- |
| 10/2/2014 Thu | 1,741,525 | --- | --- | --- |
| 10/3/2014 Fri | 1,739,285 | 8,876,740 | 410,219,225 | 2.2% |
| 10/6/2014 Mon | 3,435,225 | --- | --- | --- |
| 10/7/2014 Tue | 2,698,982 | --- | --- | --- |
| 10/8/2014 Wed | 4,953,239 | --- | --- | --- |
| 10/9/2014 Thu | 3,039,139 | --- | --- | --- |
| 10/10/2014 Fri | 4,295,154 | 18,421,739 | 410,219,225 | 4.5% |
| 10/13/2014 Mon | 3,456,579 | --- | --- | --- |
| 10/14/2014 Tue | 3,239,694 | --- | --- | --- |
| 10/15/2014 Wed | 3,793,116 | --- | --- | --- |
| 10/16/2014 Thu | 3,868,309 | --- | --- | --- |
| 10/17/2014 Fri | 4,878,778 | 19,236,476 | 410,219,225 | 4.7% |
| 10/20/2014 Mon | 2,515,974 | --- | --- | --- |
| 10/21/2014 Tue | 3,410,493 | --- | --- | --- |
| 10/22/2014 Wed | 4,271,022 | --- | --- | --- |
| 10/23/2014 Thu | 2,624,968 | --- | --- | --- |
| 10/24/2014 Fri | 1,436,577 | 14,259,034 | 410,219,225 | 3.5% |
| 10/27/2014 Mon | 1,602,448 | --- | --- | --- |
| 10/28/2014 Tue | 1,842,489 | --- | --- | --- |
| 10/29/2014 Wed | 1,961,049 | --- | --- | --- |
| 10/30/2014 Thu | 1,859,731 | --- | --- | --- |
| 10/31/2014 Fri | 3,215,094 | 10,480,811 | 410,219,225 | 2.6% |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 11/3/2014 Mon | 2,863,163 | --- | --- | --- |
| 11/4/2014 Tue | 2,013,661 | --- | --- | --- |
| 11/5/2014 Wed | 3,538,759 | --- | --- | --- |
| 11/6/2014 Thu | 2,726,273 | --- | --- | --- |
| 11/7/2014 Fri | 2,476,343 | 13,618,199 | 410,219,225 | 3.3% |
| 11/10/2014 Mon | 2,319,392 | --- | --- | --- |
| 11/11/2014 Tue | 1,819,417 | --- | --- | --- |
| 11/12/2014 Wed | 2,179,877 | --- | --- | --- |
| 11/13/2014 Thu | 2,629,723 | --- | --- | --- |
| 11/14/2014 Fri | 2,158,055 | 11,106,464 | 410,219,225 | 2.7% |
| 11/17/2014 Mon | 1,436,762 | --- | --- | --- |
| 11/18/2014 Tue | 1,472,078 | --- | --- | --- |
| 11/19/2014 Wed | 1,031,334 | --- | --- | --- |
| 11/20/2014 Thu | 2,741,860 | --- | --- | --- |
| 11/21/2014 Fri | 2,867,071 | 9,549,105 | 410,219,225 | 2.3% |
| 11/24/2014 Mon | 2,107,232 | --- | --- | --- |
| 11/25/2014 Tue | 2,540,107 | --- | --- | --- |
| 11/26/2014 Wed | 1,734,105 | --- | --- | --- |
| 11/28/2014 Fri | 632,426 | 7,013,870 | 410,219,225 | 1.7% |
| 12/1/2014 Mon | 2,833,376 | --- | --- | --- |
| 12/2/2014 Tue | 1,333,695 | --- | --- | --- |
| 12/3/2014 Wed | 2,045,715 | --- | --- | --- |
| 12/4/2014 Thu | 1,446,810 | --- | --- | --- |
| 12/5/2014 Fri | 2,982,823 | 10,642,419 | 410,219,225 | 2.6% |
| 12/8/2014 Mon | 2,183,500 | --- | --- | --- |
| 12/9/2014 Tue | 2,398,485 | --- | --- | --- |
| 12/10/2014 Wed | 2,887,488 | --- | --- | --- |
| 12/11/2014 Thu | 4,588,901 | --- | --- | --- |
| 12/12/2014 Fri | 1,542,726 | 13,601,100 | 410,219,225 | 3.3% |
| 12/15/2014 Mon | 1,978,560 | --- | --- | --- |
| 12/16/2014 Tue | 2,667,813 | --- | --- | --- |
| 12/17/2014 Wed | 1,731,681 | --- | --- | --- |
| 12/18/2014 Thu | 1,684,515 | --- | --- | --- |
| 12/19/2014 Fri | 7,128,021 | 15,190,590 | 410,219,225 | 3.7% |
| 12/22/2014 Mon | 2,311,778 | --- | --- | --- |
| 12/23/2014 Tue | 1,288,767 | --- | --- | --- |
| 12/24/2014 Wed | 616,905 | --- | --- | --- |
| 12/26/2014 Fri | 836,280 | 5,053,730 | 410,219,225 | 1.2% |
| 12/29/2014 Mon | 1,055,440 | --- | --- | --- |
| 12/30/2014 Tue | 1,645,233 | --- | --- | --- |
| 12/31/2014 Wed | 1,057,798 | --- | --- | --- |
| 1/2/2015 Fri | 942,587 | 4,701,058 | 401,734,806 | 1.2% |
| 1/5/2015 Mon | 1,102,299 | --- | --- | --- |
| 1/6/2015 Tue | 1,419,926 | --- | --- | --- |
| 1/7/2015 Wed | 2,889,334 | --- | --- | --- |
| 1/8/2015 Thu | 3,124,252 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|
| Date | | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 1/9/2015 | Fri | 1,664,465 | 10,200,276 | 401,734,806 | 2.5% |
| 1/12/2015 | Mon | 1,431,640 | --- | --- | --- |
| 1/13/2015 | Tue | 2,188,825 | | | |
| 1/14/2015 | Wed | 1,753,463 | --- | --- | --- |
| 1/15/2015 | Thu | 1,608,205 | --- | --- | --- |
| 1/16/2015 | Fri | 1,804,628 | 8,786,761 | 401,734,806 | 2.2% |
| 1/20/2015 | Tue | 1,791,675 | | | |
| 1/21/2015 | Wed | 3,084,051 | --- | --- | --- |
| 1/22/2015 | Thu | 2,551,708 | --- | --- | --- |
| 1/23/2015 | Fri | 2,134,458 | 9,561,892 | 401,734,806 | 2.4% |
| 1/26/2015 | Mon | 2,113,521 | --- | --- | --- |
| 1/27/2015 | Tue | 3,047,923 | --- | --- | --- |
| 1/28/2015 | Wed | 2,721,528 | --- | --- | --- |
| 1/29/2015 | Thu | 5,054,293 | --- | --- | --- |
| 1/30/2015 | Fri | 4,173,880 | 17,111,145 | 401,734,806 | 4.3% |
| 2/2/2015 | Mon | 3,120,747 | --- | --- | --- |
| 2/3/2015 | Tue | 2,543,134 | --- | --- | --- |
| 2/4/2015 | Wed | 2,554,434 | --- | --- | --- |
| 2/5/2015 | Thu | 2,165,708 | --- | --- | --- |
| 2/6/2015 | Fri | 1,764,050 | 12,148,073 | 401,460,484 | 3.0% |
| 2/9/2015 | Mon | 2,107,723 | --- | --- | --- |
| 2/10/2015 | Tue | 1,598,800 | --- | --- | --- |
| 2/11/2015 | Wed | 1,928,712 | --- | --- | --- |
| 2/12/2015 | Thu | 2,427,991 | --- | --- | --- |
| 2/13/2015 | Fri | 2,490,613 | 10,553,839 | 401,460,484 | 2.6% |
| 2/17/2015 | Tue | 3,000,023 | --- | --- | --- |
| 2/18/2015 | Wed | 1,882,322 | --- | --- | --- |
| 2/19/2015 | Thu | 1,418,279 | --- | --- | --- |
| 2/20/2015 | Fri | 1,670,522 | 7,971,146 | 401,460,484 | 2.0% |
| 2/23/2015 | Mon | 1,290,575 | --- | --- | --- |
| 2/24/2015 | Tue | 1,657,127 | --- | --- | --- |
| 2/25/2015 | Wed | 2,443,935 | --- | --- | --- |
| 2/26/2015 | Thu | 1,742,617 | --- | --- | --- |
| 2/27/2015 | Fri | 2,271,775 | 9,406,029 | 401,460,484 | 2.3% |
| 3/2/2015 | Mon | 10,895,823 | --- | --- | --- |
| 3/3/2015 | Tue | 4,902,313 | --- | --- | --- |
| 3/4/2015 | Wed | 3,011,930 | --- | --- | --- |
| 3/5/2015 | Thu | 1,830,410 | --- | --- | --- |
| 3/6/2015 | Fri | 2,117,156 | 22,757,632 | 401,460,484 | 5.7% |
| 3/9/2015 | Mon | 2,075,723 | --- | --- | --- |
| 3/10/2015 | Tue | 4,398,944 | --- | --- | --- |
| 3/11/2015 | Wed | 3,948,114 | --- | --- | --- |
| 3/12/2015 | Thu | 2,605,666 | --- | --- | --- |
| 3/13/2015 | Fri | 3,043,634 | 16,072,081 | 401,460,484 | 4.0% |
| 3/16/2015 | Mon | 2,566,837 | --- | --- | --- |
| 3/17/2015 | Tue | 2,691,388 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|
| | | **Daily** | **Weekly** | **Shares** | **Weekly** |
| **Date** | | **Volume** | **Volume** | **Outstanding** | **Turnover** |
| 3/18/2015 | Wed | 1,887,751 | --- | --- | --- |
| 3/19/2015 | Thu | 2,907,554 | --- | --- | --- |
| 3/20/2015 | Fri | 4,797,564 | 14,851,094 | 401,460,484 | 3.7% |
| 3/23/2015 | Mon | 2,750,105 | --- | --- | --- |
| 3/24/2015 | Tue | 1,757,346 | --- | --- | --- |
| 3/25/2015 | Wed | 2,999,606 | --- | --- | --- |
| 3/26/2015 | Thu | 1,710,428 | --- | --- | --- |
| 3/27/2015 | Fri | 1,749,064 | 10,966,549 | 401,460,484 | 2.7% |
| 3/30/2015 | Mon | 2,021,002 | --- | --- | --- |
| 3/31/2015 | Tue | 3,828,183 | --- | --- | --- |
| 4/1/2015 | Wed | 2,074,275 | --- | --- | --- |
| 4/2/2015 | Thu | 1,849,372 | 9,772,832 | 389,021,445 | 2.5% |
| 4/6/2015 | Mon | 1,347,582 | --- | --- | --- |
| 4/7/2015 | Tue | 1,593,250 | --- | --- | --- |
| 4/8/2015 | Wed | 1,793,076 | --- | --- | --- |
| 4/9/2015 | Thu | 2,456,847 | --- | --- | --- |
| 4/10/2015 | Fri | 1,910,766 | 9,101,521 | 389,021,445 | 2.3% |
| 4/13/2015 | Mon | 1,251,305 | --- | --- | --- |
| 4/14/2015 | Tue | 1,517,674 | --- | --- | --- |
| 4/15/2015 | Wed | 1,644,465 | --- | --- | --- |
| 4/16/2015 | Thu | 2,021,057 | --- | --- | --- |
| 4/17/2015 | Fri | 1,922,822 | 8,357,323 | 389,021,445 | 2.1% |
| 4/20/2015 | Mon | 1,566,051 | --- | --- | --- |
| 4/21/2015 | Tue | 2,664,510 | --- | --- | --- |
| 4/22/2015 | Wed | 2,812,837 | --- | --- | --- |
| 4/23/2015 | Thu | 1,883,471 | --- | --- | --- |
| 4/24/2015 | Fri | 1,790,384 | 10,717,253 | 389,021,445 | 2.8% |
| 4/27/2015 | Mon | 1,487,952 | --- | --- | --- |
| 4/28/2015 | Tue | 2,135,871 | --- | --- | --- |
| 4/29/2015 | Wed | 1,755,813 | --- | --- | --- |
| 4/30/2015 | Thu | 2,319,491 | --- | --- | --- |
| 5/1/2015 | Fri | 2,618,453 | 10,317,580 | 389,021,445 | 2.7% |
| 5/4/2015 | Mon | 1,913,619 | --- | --- | --- |
| 5/5/2015 | Tue | 2,989,339 | | --- | --- |
| 5/6/2015 | Wed | 1,883,639 | --- | --- | --- |
| 5/7/2015 | Thu | 1,753,565 | --- | --- | --- |
| 5/8/2015 | Fri | 1,442,255 | 9,982,417 | 389,021,445 | 2.6% |
| 5/11/2015 | Mon | 3,269,881 | --- | --- | --- |
| 5/12/2015 | Tue | 1,283,463 | --- | --- | --- |
| 5/13/2015 | Wed | 2,002,389 | --- | --- | --- |
| 5/14/2015 | Thu | 3,173,318 | --- | --- | --- |
| 5/15/2015 | Fri | 2,791,140 | 12,520,191 | 389,021,445 | 3.2% |
| 5/18/2015 | Mon | 2,606,585 | --- | --- | --- |
| 5/19/2015 | Tue | 3,048,606 | --- | --- | --- |
| 5/20/2015 | Wed | 1,788,827 | --- | --- | --- |
| 5/21/2015 | Thu | 2,003,130 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|
| Date | | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 5/22/2015 | Fri | 1,273,674 | 10,720,822 | 389,021,445 | 2.8% |
| 5/26/2015 | Tue | 2,441,408 | --- | --- | --- |
| 5/27/2015 | Wed | 1,625,358 | --- | --- | --- |
| 5/28/2015 | Thu | 1,390,198 | --- | --- | --- |
| 5/29/2015 | Fri | 1,854,960 | 7,311,924 | 389,021,445 | 1.9% |
| 6/1/2015 | Mon | 1,257,553 | --- | --- | --- |
| 6/2/2015 | Tue | 2,236,456 | --- | --- | --- |
| 6/3/2015 | Wed | 1,496,264 | --- | --- | --- |
| 6/4/2015 | Thu | 1,638,129 | --- | --- | --- |
| 6/5/2015 | Fri | 1,449,331 | 8,077,733 | 389,021,445 | 2.1% |
| 6/8/2015 | Mon | 1,276,347 | --- | --- | --- |
| 6/9/2015 | Tue | 1,779,443 | --- | --- | --- |
| 6/10/2015 | Wed | 1,741,554 | --- | --- | --- |
| 6/11/2015 | Thu | 1,745,192 | --- | --- | --- |
| 6/12/2015 | Fri | 972,312 | 7,514,848 | 389,021,445 | 1.9% |
| 6/15/2015 | Mon | 1,381,641 | --- | --- | --- |
| 6/16/2015 | Tue | 1,887,736 | --- | --- | --- |
| 6/17/2015 | Wed | 2,300,645 | --- | --- | --- |
| 6/18/2015 | Thu | 2,723,891 | --- | --- | --- |
| 6/19/2015 | Fri | 5,057,832 | 13,351,745 | 389,021,445 | 3.4% |
| 6/22/2015 | Mon | 1,546,264 | --- | --- | --- |
| 6/23/2015 | Tue | 1,635,551 | --- | --- | --- |
| 6/24/2015 | Wed | 2,881,345 | --- | --- | --- |
| 6/25/2015 | Thu | 1,487,690 | --- | --- | --- |
| 6/26/2015 | Fri | 3,702,122 | 11,252,972 | 389,021,445 | 2.9% |
| 6/29/2015 | Mon | 1,975,671 | --- | --- | --- |
| 6/30/2015 | Tue | 1,641,632 | --- | --- | --- |
| 7/1/2015 | Wed | 2,452,605 | --- | --- | --- |
| 7/2/2015 | Thu | 1,941,471 | 8,011,379 | 374,032,762 | 2.1% |
| 7/6/2015 | Mon | 2,253,678 | --- | --- | --- |
| 7/7/2015 | Tue | 2,724,954 | --- | --- | --- |
| 7/8/2015 | Wed | 1,865,451 | --- | --- | --- |
| 7/9/2015 | Thu | 1,422,322 | --- | --- | --- |
| 7/10/2015 | Fri | 2,492,940 | 10,759,345 | 374,032,762 | 2.9% |
| 7/13/2015 | Mon | 2,258,746 | --- | --- | --- |
| 7/14/2015 | Tue | 8,538,103 | --- | --- | --- |
| 7/15/2015 | Wed | 4,133,519 | --- | --- | --- |
| 7/16/2015 | Thu | 3,180,562 | --- | --- | --- |
| 7/17/2015 | Fri | 3,114,756 | 21,225,686 | 374,032,762 | 5.7% |
| 7/20/2015 | Mon | 4,692,554 | --- | --- | --- |
| 7/21/2015 | Tue | 3,615,854 | --- | --- | --- |
| 7/22/2015 | Wed | 3,441,288 | --- | --- | --- |
| 7/23/2015 | Thu | 2,610,848 | --- | --- | --- |
| 7/24/2015 | Fri | 2,282,239 | 16,642,783 | 374,032,762 | 4.4% |
| 7/27/2015 | Mon | 2,518,530 | --- | --- | --- |
| 7/28/2015 | Tue | 2,272,992 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 7/29/2015 Wed | 2,008,183 | --- | --- | --- |
| 7/30/2015 Thu | 2,955,214 | --- | --- | --- |
| 7/31/2015 Fri | 2,987,248 | 12,742,167 | 374,032,762 | 3.4% |
| 8/3/2015 Mon | 2,109,996 | --- | --- | --- |
| 8/4/2015 Tue | 1,749,373 | --- | --- | --- |
| 8/5/2015 Wed | 2,891,250 | --- | --- | --- |
| 8/6/2015 Thu | 3,549,583 | --- | --- | --- |
| 8/7/2015 Fri | 2,263,907 | 12,564,109 | 374,032,762 | 3.4% |
| 8/10/2015 Mon | 1,713,108 | --- | --- | --- |
| 8/11/2015 Tue | 2,697,594 | --- | --- | --- |
| 8/12/2015 Wed | 2,995,734 | --- | --- | --- |
| 8/13/2015 Thu | 3,443,567 | --- | --- | --- |
| 8/14/2015 Fri | 4,360,301 | 15,210,304 | 374,032,762 | 4.1% |
| 8/17/2015 Mon | 3,502,979 | --- | --- | --- |
| 8/18/2015 Tue | 2,603,689 | --- | --- | --- |
| 8/19/2015 Wed | 1,921,647 | --- | --- | --- |
| 8/20/2015 Thu | 3,007,665 | --- | --- | --- |
| 8/21/2015 Fri | 2,829,301 | 13,865,281 | 374,032,762 | 3.7% |
| 8/24/2015 Mon | 7,450,659 | --- | --- | --- |
| 8/25/2015 Tue | 9,032,839 | --- | --- | --- |
| 8/26/2015 Wed | 4,831,183 | --- | --- | --- |
| 8/27/2015 Thu | 4,580,211 | --- | --- | --- |
| 8/28/2015 Fri | 2,634,685 | 28,529,577 | 374,032,762 | 7.6% |
| 8/31/2015 Mon | 5,772,299 | --- | --- | --- |
| 9/1/2015 Tue | 3,658,508 | --- | --- | --- |
| 9/2/2015 Wed | 3,843,304 | --- | --- | --- |
| 9/3/2015 Thu | 3,555,263 | --- | --- | --- |
| 9/4/2015 Fri | 3,019,932 | 19,849,306 | 374,032,762 | 5.3% |
| 9/8/2015 Tue | 5,676,822 | --- | --- | --- |
| 9/9/2015 Wed | 4,643,493 | --- | --- | --- |
| 9/10/2015 Thu | 5,694,657 | --- | --- | --- |
| 9/11/2015 Fri | 7,487,718 | 23,502,690 | 374,032,762 | 6.3% |
| 9/14/2015 Mon | 4,123,232 | --- | --- | --- |
| 9/15/2015 Tue | 4,440,029 | --- | --- | --- |
| 9/16/2015 Wed | 7,558,031 | --- | --- | --- |
| 9/17/2015 Thu | 5,278,393 | --- | --- | --- |
| 9/18/2015 Fri | 9,403,097 | 30,802,782 | 374,032,762 | 8.2% |
| 9/21/2015 Mon | 4,151,190 | --- | --- | --- |
| 9/22/2015 Tue | 3,926,577 | --- | --- | --- |
| 9/23/2015 Wed | 3,997,011 | --- | --- | --- |
| 9/24/2015 Thu | 4,376,088 | --- | --- | --- |
| 9/25/2015 Fri | 4,674,003 | 21,124,869 | 374,032,762 | 5.6% |
| 9/28/2015 Mon | 5,161,008 | --- | --- | --- |
| 9/29/2015 Tue | 8,504,178 | --- | --- | --- |
| 9/30/2015 Wed | 10,417,236 | --- | --- | --- |
| 10/1/2015 Thu | 11,040,348 | --- | --- | --- |

**Appendix F**
**Weekly Trading Volume and Turnover of Navient Corporation Common Stock**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| Date | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
| 10/2/2015 Fri | 7,013,749 | 42,136,519 | 362,308,654 | 11.6% |

**Notes:**

[1] Trading date.

[2] Reported composite U.S. volume.  Source: Bloomberg.

[3] Volume over entire week of trading.

[4] Last available shares outstanding as of the end of each week.  Source: SEC filings.

[5] Weekly turnover = [3] / [4].

**Appendix G**
**Weekly Analyst Coverage of Navient Corporation**

| [1] | | [2] | [3] |
|---|---|---|---|
| Date | | Bloomberg Total Analyst Recommendations | Number of Analysts in Thomson Reuters I/B/E/S Consensus |
| Average | | 10 | 8 |
| Minimum | | 2 | 3 |
| Median | | 10 | 8 |
| Maximum | | 11 | 9 |

**Weekly Analyst Coverage during the Exchange Act Class Period**

| | | | |
|---|---|---|---|
| 4/17/2014 | Thu | n/a | n/a |
| 4/25/2014 | Fri | 2 | n/a |
| 5/2/2014 | Fri | 8 | 3 |
| 5/9/2014 | Fri | 8 | 6 |
| 5/16/2014 | Fri | 9 | 7 |
| 5/23/2014 | Fri | 10 | 8 |
| 5/30/2014 | Fri | 10 | 8 |
| 6/6/2014 | Fri | 10 | 8 |
| 6/13/2014 | Fri | 10 | 8 |
| 6/20/2014 | Fri | 10 | 8 |
| 6/27/2014 | Fri | 10 | 8 |
| 7/3/2014 | Thu | 10 | 8 |
| 7/11/2014 | Fri | 10 | 8 |
| 7/18/2014 | Fri | 10 | 8 |
| 7/25/2014 | Fri | 10 | 8 |
| 8/1/2014 | Fri | 10 | 8 |
| 8/8/2014 | Fri | 10 | 8 |
| 8/15/2014 | Fri | 10 | 8 |
| 8/22/2014 | Fri | 10 | 8 |
| 8/29/2014 | Fri | 10 | 8 |
| 9/5/2014 | Fri | 10 | 8 |
| 9/12/2014 | Fri | 10 | 8 |
| 9/19/2014 | Fri | 10 | 8 |
| 9/26/2014 | Fri | 10 | 8 |
| 10/3/2014 | Fri | 10 | 8 |
| 10/10/2014 | Fri | 10 | 8 |
| 10/17/2014 | Fri | 10 | 8 |
| 10/24/2014 | Fri | 10 | 8 |
| 10/31/2014 | Fri | 10 | 8 |
| 11/7/2014 | Fri | 10 | 8 |
| 11/14/2014 | Fri | 10 | 8 |
| 11/21/2014 | Fri | 10 | 8 |
| 11/28/2014 | Fri | 10 | 8 |
| 12/5/2014 | Fri | 10 | 8 |
| 12/12/2014 | Fri | 10 | 8 |
| 12/19/2014 | Fri | 10 | 8 |
| 12/26/2014 | Fri | 10 | 8 |
| 1/2/2015 | Fri | 10 | 8 |
| 1/9/2015 | Fri | 10 | 8 |
| 1/16/2015 | Fri | 10 | 8 |
| 1/23/2015 | Fri | 10 | 8 |

**Appendix G**
**Weekly Analyst Coverage of Navient Corporation**

| [1] | | [2] | [3] |
|---|---|---|---|
| **Date** | | **Bloomberg Total Analyst Recommendations** | **Number of Analysts in Thomson Reuters I/B/E/S Consensus** |
| 1/30/2015 | Fri | 10 | 8 |
| 2/6/2015 | Fri | 10 | 8 |
| 2/13/2015 | Fri | 11 | 9 |
| 2/20/2015 | Fri | 11 | 9 |
| 2/27/2015 | Fri | 11 | 9 |
| 3/6/2015 | Fri | 10 | 9 |
| 3/13/2015 | Fri | 10 | 9 |
| 3/20/2015 | Fri | 10 | 9 |
| 3/27/2015 | Fri | 10 | 9 |
| 4/2/2015 | Thu | 9 | 9 |
| 4/10/2015 | Fri | 9 | 8 |
| 4/17/2015 | Fri | 9 | 8 |
| 4/24/2015 | Fri | 9 | 8 |
| 5/1/2015 | Fri | 9 | 7 |
| 5/8/2015 | Fri | 9 | 7 |
| 5/15/2015 | Fri | 9 | 7 |
| 5/22/2015 | Fri | 9 | 7 |
| 5/29/2015 | Fri | 9 | 7 |
| 6/5/2015 | Fri | 9 | 7 |
| 6/12/2015 | Fri | 9 | 7 |
| 6/19/2015 | Fri | 9 | 7 |
| 6/26/2015 | Fri | 9 | 7 |
| 7/2/2015 | Thu | 9 | 7 |
| 7/10/2015 | Fri | 9 | 7 |
| 7/17/2015 | Fri | 9 | 7 |
| 7/24/2015 | Fri | 9 | 7 |
| 7/31/2015 | Fri | 9 | 7 |
| 8/7/2015 | Fri | 9 | 7 |
| 8/14/2015 | Fri | 9 | 7 |
| 8/21/2015 | Fri | 9 | 7 |
| 8/28/2015 | Fri | 9 | 7 |
| 9/4/2015 | Fri | 9 | 7 |
| 9/11/2015 | Fri | 9 | 7 |
| 9/18/2015 | Fri | 9 | 7 |
| 9/25/2015 | Fri | 9 | 7 |

**Notes:**
[1] Last trading day of a week during the Exchange Act Class Period.
[2] Most recent available Bloomberg total analyst recommendations.  Bloomberg defines "total analyst recommendations" as the total number of analysts making recommendations for the security.  Source: Bloomberg.
[3] Number of analysts in Thomson Reuters I/B/E/S consensus EPS estimates for current fiscal year.  Source: S&P Capital IQ.

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 4/17/2014 | $0.28 | 1.69% |
| 4/21/2014 | $0.15 | 0.90% |
| 4/22/2014 | $0.05 | 0.30% |
| 4/23/2014 | $0.08 | 0.48% |
| 4/24/2014 | $0.02 | 0.12% |
| 4/25/2014 | $0.11 | 0.65% |
| 4/28/2014 | $0.07 | 0.42% |
| 4/29/2014 | $0.09 | 0.54% |
| 4/30/2014 | $0.05 | 0.30% |
| 5/1/2014 | $0.02 | 0.12% |
| 5/2/2014 | $0.01 | 0.06% |
| 5/5/2014 | $0.01 | 0.06% |
| 5/6/2014 | $0.01 | 0.06% |
| 5/7/2014 | $0.01 | 0.06% |
| 5/8/2014 | $0.01 | 0.06% |
| 5/9/2014 | $0.01 | 0.06% |
| 5/12/2014 | $0.01 | 0.06% |
| 5/13/2014 | $0.01 | 0.06% |
| 5/14/2014 | $0.01 | 0.06% |
| 5/15/2014 | $0.01 | 0.06% |
| 5/16/2014 | $0.01 | 0.06% |
| 5/19/2014 | $0.01 | 0.06% |
| 5/20/2014 | $0.01 | 0.06% |
| 5/21/2014 | $0.01 | 0.06% |
| 5/22/2014 | $0.01 | 0.06% |
| 5/23/2014 | $0.01 | 0.06% |
| 5/27/2014 | $0.01 | 0.06% |
| 5/28/2014 | $0.01 | 0.06% |
| 5/29/2014 | $0.01 | 0.06% |
| 5/30/2014 | $0.01 | 0.06% |
| 6/2/2014 | $0.01 | 0.06% |
| 6/3/2014 | $0.01 | 0.06% |
| 6/4/2014 | $0.01 | 0.06% |
| 6/5/2014 | $0.01 | 0.06% |
| 6/6/2014 | $0.01 | 0.06% |
| 6/9/2014 | $0.01 | 0.06% |
| 6/10/2014 | $0.01 | 0.06% |
| 6/11/2014 | $0.01 | 0.06% |
| 6/12/2014 | $0.01 | 0.06% |
| 6/13/2014 | $0.01 | 0.06% |
| 6/16/2014 | $0.01 | 0.06% |
| 6/17/2014 | $0.01 | 0.06% |
| 6/18/2014 | $0.01 | 0.06% |
| 6/19/2014 | $0.01 | 0.06% |
| 6/20/2014 | $0.01 | 0.06% |
| 6/23/2014 | $0.01 | 0.06% |
| 6/24/2014 | $0.01 | 0.06% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 6/25/2014 | $0.01 | 0.06% |
| 6/26/2014 | $0.01 | 0.06% |
| 6/27/2014 | $0.01 | 0.06% |
| 6/30/2014 | $0.01 | 0.06% |
| 7/1/2014 | $0.01 | 0.06% |
| 7/2/2014 | $0.01 | 0.06% |
| 7/3/2014 | $0.01 | 0.06% |
| 7/7/2014 | $0.01 | 0.06% |
| 7/8/2014 | $0.01 | 0.06% |
| 7/9/2014 | $0.01 | 0.06% |
| 7/10/2014 | $0.01 | 0.06% |
| 7/11/2014 | $0.01 | 0.06% |
| 7/14/2014 | $0.01 | 0.06% |
| 7/15/2014 | $0.01 | 0.06% |
| 7/16/2014 | $0.02 | 0.11% |
| 7/17/2014 | $0.01 | 0.06% |
| 7/18/2014 | $0.01 | 0.06% |
| 7/21/2014 | $0.01 | 0.06% |
| 7/22/2014 | $0.01 | 0.06% |
| 7/23/2014 | $0.01 | 0.06% |
| 7/24/2014 | $0.01 | 0.06% |
| 7/25/2014 | $0.01 | 0.06% |
| 7/28/2014 | $0.01 | 0.06% |
| 7/29/2014 | $0.01 | 0.06% |
| 7/30/2014 | $0.01 | 0.06% |
| 7/31/2014 | $0.01 | 0.06% |
| 8/1/2014 | $0.01 | 0.06% |
| 8/4/2014 | $0.01 | 0.06% |
| 8/5/2014 | $0.01 | 0.06% |
| 8/6/2014 | $0.01 | 0.06% |
| 8/7/2014 | $0.01 | 0.06% |
| 8/8/2014 | $0.01 | 0.06% |
| 8/11/2014 | $0.01 | 0.06% |
| 8/12/2014 | $0.01 | 0.06% |
| 8/13/2014 | $0.01 | 0.06% |
| 8/14/2014 | $0.01 | 0.06% |
| 8/15/2014 | $0.01 | 0.06% |
| 8/18/2014 | $0.01 | 0.06% |
| 8/19/2014 | $0.01 | 0.06% |
| 8/20/2014 | $0.01 | 0.06% |
| 8/21/2014 | $0.01 | 0.06% |
| 8/22/2014 | $0.01 | 0.06% |
| 8/25/2014 | $0.01 | 0.06% |
| 8/26/2014 | $0.01 | 0.06% |
| 8/27/2014 | $0.01 | 0.06% |
| 8/28/2014 | $0.01 | 0.06% |
| 8/29/2014 | $0.01 | 0.06% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 9/2/2014 | $0.01 | 0.06% |
| 9/3/2014 | $0.01 | 0.06% |
| 9/4/2014 | $0.01 | 0.06% |
| 9/5/2014 | $0.01 | 0.06% |
| 9/8/2014 | $0.01 | 0.06% |
| 9/9/2014 | $0.01 | 0.06% |
| 9/10/2014 | $0.01 | 0.06% |
| 9/11/2014 | $0.01 | 0.06% |
| 9/12/2014 | $0.01 | 0.06% |
| 9/15/2014 | $0.01 | 0.06% |
| 9/16/2014 | $0.01 | 0.06% |
| 9/17/2014 | $0.01 | 0.06% |
| 9/18/2014 | $0.01 | 0.06% |
| 9/19/2014 | $0.01 | 0.06% |
| 9/22/2014 | $0.01 | 0.06% |
| 9/23/2014 | $0.01 | 0.06% |
| 9/24/2014 | $0.01 | 0.06% |
| 9/25/2014 | $0.01 | 0.06% |
| 9/26/2014 | $0.01 | 0.06% |
| 9/29/2014 | $0.01 | 0.06% |
| 9/30/2014 | $0.01 | 0.06% |
| 10/1/2014 | $0.01 | 0.06% |
| 10/2/2014 | $0.01 | 0.06% |
| 10/3/2014 | $0.01 | 0.06% |
| 10/6/2014 | $0.01 | 0.06% |
| 10/7/2014 | $0.01 | 0.06% |
| 10/8/2014 | $0.01 | 0.06% |
| 10/9/2014 | $0.01 | 0.06% |
| 10/10/2014 | $0.01 | 0.06% |
| 10/13/2014 | $0.01 | 0.06% |
| 10/14/2014 | $0.02 | 0.11% |
| 10/15/2014 | $0.01 | 0.06% |
| 10/16/2014 | $0.01 | 0.06% |
| 10/17/2014 | $0.01 | 0.05% |
| 10/20/2014 | $0.01 | 0.05% |
| 10/21/2014 | $0.01 | 0.05% |
| 10/22/2014 | $0.01 | 0.05% |
| 10/23/2014 | $0.01 | 0.05% |
| 10/24/2014 | $0.01 | 0.05% |
| 10/27/2014 | $0.01 | 0.05% |
| 10/28/2014 | $0.01 | 0.05% |
| 10/29/2014 | $0.01 | 0.05% |
| 10/30/2014 | $0.01 | 0.05% |
| 10/31/2014 | $0.02 | 0.10% |
| 11/3/2014 | $0.01 | 0.05% |
| 11/4/2014 | $0.01 | 0.05% |
| 11/5/2014 | $0.01 | 0.05% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 11/6/2014 | $0.01 | 0.05% |
| 11/7/2014 | $0.01 | 0.05% |
| 11/10/2014 | $0.01 | 0.05% |
| 11/11/2014 | $0.01 | 0.05% |
| 11/12/2014 | $0.01 | 0.05% |
| 11/13/2014 | $0.01 | 0.05% |
| 11/14/2014 | $0.01 | 0.05% |
| 11/17/2014 | $0.01 | 0.05% |
| 11/18/2014 | $0.01 | 0.05% |
| 11/19/2014 | $0.01 | 0.05% |
| 11/20/2014 | $0.01 | 0.05% |
| 11/21/2014 | $0.01 | 0.05% |
| 11/24/2014 | $0.01 | 0.05% |
| 11/25/2014 | $0.01 | 0.05% |
| 11/26/2014 | $0.01 | 0.05% |
| 11/28/2014 | $0.01 | 0.05% |
| 12/1/2014 | $0.02 | 0.10% |
| 12/2/2014 | $0.01 | 0.05% |
| 12/3/2014 | $0.01 | 0.05% |
| 12/4/2014 | $0.01 | 0.05% |
| 12/5/2014 | $0.01 | 0.05% |
| 12/8/2014 | $0.01 | 0.05% |
| 12/9/2014 | $0.01 | 0.05% |
| 12/10/2014 | $0.01 | 0.05% |
| 12/11/2014 | $0.01 | 0.05% |
| 12/12/2014 | $0.01 | 0.05% |
| 12/15/2014 | $0.01 | 0.05% |
| 12/16/2014 | $0.01 | 0.05% |
| 12/17/2014 | $0.01 | 0.05% |
| 12/18/2014 | $0.01 | 0.05% |
| 12/19/2014 | $0.01 | 0.04% |
| 12/22/2014 | $0.01 | 0.04% |
| 12/23/2014 | $0.01 | 0.04% |
| 12/24/2014 | $0.01 | 0.05% |
| 12/26/2014 | $0.01 | 0.05% |
| 12/29/2014 | $0.02 | 0.09% |
| 12/30/2014 | $0.01 | 0.05% |
| 12/31/2014 | $0.01 | 0.05% |
| 1/2/2015 | $0.01 | 0.05% |
| 1/5/2015 | $0.02 | 0.09% |
| 1/6/2015 | $0.01 | 0.05% |
| 1/7/2015 | $0.02 | 0.10% |
| 1/8/2015 | $0.01 | 0.05% |
| 1/9/2015 | $0.02 | 0.10% |
| 1/12/2015 | $0.02 | 0.10% |
| 1/13/2015 | $0.01 | 0.05% |
| 1/14/2015 | $0.01 | 0.05% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 1/15/2015 | $0.01 | 0.05% |
| 1/16/2015 | $0.01 | 0.05% |
| 1/20/2015 | $0.01 | 0.05% |
| 1/21/2015 | $0.01 | 0.05% |
| 1/22/2015 | $0.01 | 0.05% |
| 1/23/2015 | $0.01 | 0.05% |
| 1/26/2015 | $0.01 | 0.05% |
| 1/27/2015 | $0.02 | 0.10% |
| 1/28/2015 | $0.02 | 0.10% |
| 1/29/2015 | $0.01 | 0.05% |
| 1/30/2015 | $0.01 | 0.05% |
| 2/2/2015 | $0.02 | 0.10% |
| 2/3/2015 | $0.01 | 0.05% |
| 2/4/2015 | $0.01 | 0.05% |
| 2/5/2015 | $0.01 | 0.05% |
| 2/6/2015 | $0.01 | 0.05% |
| 2/9/2015 | $0.01 | 0.05% |
| 2/10/2015 | $0.01 | 0.05% |
| 2/11/2015 | $0.01 | 0.05% |
| 2/12/2015 | $0.01 | 0.05% |
| 2/13/2015 | $0.01 | 0.04% |
| 2/17/2015 | $0.01 | 0.05% |
| 2/18/2015 | $0.01 | 0.05% |
| 2/19/2015 | $0.01 | 0.05% |
| 2/20/2015 | $0.01 | 0.05% |
| 2/23/2015 | $0.01 | 0.05% |
| 2/24/2015 | $0.01 | 0.05% |
| 2/25/2015 | $0.01 | 0.05% |
| 2/26/2015 | $0.01 | 0.05% |
| 2/27/2015 | $0.01 | 0.05% |
| 3/2/2015 | $0.01 | 0.05% |
| 3/3/2015 | $0.01 | 0.05% |
| 3/4/2015 | $0.01 | 0.05% |
| 3/5/2015 | $0.01 | 0.05% |
| 3/6/2015 | $0.01 | 0.05% |
| 3/9/2015 | $0.01 | 0.05% |
| 3/10/2015 | $0.01 | 0.05% |
| 3/11/2015 | $0.01 | 0.05% |
| 3/12/2015 | $0.01 | 0.05% |
| 3/13/2015 | $0.01 | 0.05% |
| 3/16/2015 | $0.01 | 0.05% |
| 3/17/2015 | $0.01 | 0.05% |
| 3/18/2015 | $0.01 | 0.05% |
| 3/19/2015 | $0.01 | 0.05% |
| 3/20/2015 | $0.01 | 0.05% |
| 3/23/2015 | $0.01 | 0.05% |
| 3/24/2015 | $0.02 | 0.10% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1] Date | [2] Closing Bid-Ask Spread ($) | [3] Closing Bid-Ask Spread (%) |
|---|---|---|
| 3/25/2015 | $0.01 | 0.05% |
| 3/26/2015 | $0.01 | 0.05% |
| 3/27/2015 | $0.01 | 0.05% |
| 3/30/2015 | $0.01 | 0.05% |
| 3/31/2015 | $0.01 | 0.05% |
| 4/1/2015 | $0.01 | 0.05% |
| 4/2/2015 | $0.01 | 0.05% |
| 4/6/2015 | $0.01 | 0.05% |
| 4/7/2015 | $0.01 | 0.05% |
| 4/8/2015 | $0.01 | 0.05% |
| 4/9/2015 | $0.01 | 0.05% |
| 4/10/2015 | $0.01 | 0.05% |
| 4/13/2015 | $0.01 | 0.05% |
| 4/14/2015 | $0.01 | 0.05% |
| 4/15/2015 | $0.01 | 0.05% |
| 4/16/2015 | $0.01 | 0.05% |
| 4/17/2015 | $0.01 | 0.05% |
| 4/20/2015 | $0.01 | 0.05% |
| 4/21/2015 | $0.01 | 0.05% |
| 4/22/2015 | $0.01 | 0.05% |
| 4/23/2015 | $0.01 | 0.05% |
| 4/24/2015 | $0.01 | 0.05% |
| 4/27/2015 | $0.01 | 0.05% |
| 4/28/2015 | $0.02 | 0.10% |
| 4/29/2015 | $0.01 | 0.05% |
| 4/30/2015 | $0.01 | 0.05% |
| 5/1/2015 | $0.01 | 0.05% |
| 5/4/2015 | $0.01 | 0.05% |
| 5/5/2015 | $0.01 | 0.05% |
| 5/6/2015 | $0.01 | 0.05% |
| 5/7/2015 | $0.01 | 0.05% |
| 5/8/2015 | $0.01 | 0.05% |
| 5/11/2015 | $0.01 | 0.05% |
| 5/12/2015 | $0.01 | 0.05% |
| 5/13/2015 | $0.01 | 0.05% |
| 5/14/2015 | $0.02 | 0.10% |
| 5/15/2015 | $0.01 | 0.05% |
| 5/18/2015 | $0.01 | 0.05% |
| 5/19/2015 | $0.01 | 0.05% |
| 5/20/2015 | $0.01 | 0.05% |
| 5/21/2015 | $0.01 | 0.05% |
| 5/22/2015 | $0.01 | 0.05% |
| 5/26/2015 | $0.01 | 0.05% |
| 5/27/2015 | $0.01 | 0.05% |
| 5/28/2015 | $0.01 | 0.05% |
| 5/29/2015 | $0.01 | 0.05% |
| 6/1/2015 | $0.01 | 0.05% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 6/2/2015 | $0.01 | 0.05% |
| 6/3/2015 | $0.01 | 0.05% |
| 6/4/2015 | $0.01 | 0.05% |
| 6/5/2015 | $0.01 | 0.05% |
| 6/8/2015 | $0.01 | 0.05% |
| 6/9/2015 | $0.01 | 0.05% |
| 6/10/2015 | $0.01 | 0.05% |
| 6/11/2015 | $0.01 | 0.05% |
| 6/12/2015 | $0.01 | 0.05% |
| 6/15/2015 | $0.01 | 0.05% |
| 6/16/2015 | $0.01 | 0.05% |
| 6/17/2015 | $0.01 | 0.05% |
| 6/18/2015 | $0.01 | 0.05% |
| 6/19/2015 | $0.01 | 0.05% |
| 6/22/2015 | $0.01 | 0.05% |
| 6/23/2015 | $0.01 | 0.05% |
| 6/24/2015 | $0.01 | 0.05% |
| 6/25/2015 | $0.01 | 0.05% |
| 6/26/2015 | $0.01 | 0.05% |
| 6/29/2015 | $0.01 | 0.06% |
| 6/30/2015 | $0.01 | 0.05% |
| 7/1/2015 | $0.01 | 0.05% |
| 7/2/2015 | $0.01 | 0.05% |
| 7/6/2015 | $0.01 | 0.05% |
| 7/7/2015 | $0.01 | 0.05% |
| 7/8/2015 | $0.01 | 0.05% |
| 7/9/2015 | $0.01 | 0.05% |
| 7/10/2015 | $0.01 | 0.05% |
| 7/13/2015 | $0.01 | 0.05% |
| 7/14/2015 | $0.01 | 0.06% |
| 7/15/2015 | $0.01 | 0.06% |
| 7/16/2015 | $0.01 | 0.06% |
| 7/17/2015 | $0.01 | 0.06% |
| 7/20/2015 | $0.01 | 0.06% |
| 7/21/2015 | $0.01 | 0.06% |
| 7/22/2015 | $0.01 | 0.06% |
| 7/23/2015 | $0.01 | 0.06% |
| 7/24/2015 | $0.01 | 0.06% |
| 7/27/2015 | $0.01 | 0.06% |
| 7/28/2015 | $0.01 | 0.06% |
| 7/29/2015 | $0.01 | 0.06% |
| 7/30/2015 | $0.01 | 0.06% |
| 7/31/2015 | $0.01 | 0.06% |
| 8/3/2015 | $0.01 | 0.06% |
| 8/4/2015 | $0.01 | 0.06% |
| 8/5/2015 | $0.01 | 0.06% |
| 8/6/2015 | $0.01 | 0.07% |

**Appendix H**
**Daily Bid-Ask Spread in Navient Corporation Common Stock**

| [1]<br>Date | [2]<br>Closing Bid-Ask Spread ($) | [3]<br>Closing Bid-Ask Spread (%) |
|---|---|---|
| 8/7/2015 | $0.01 | 0.06% |
| 8/10/2015 | $0.01 | 0.06% |
| 8/11/2015 | $0.01 | 0.06% |
| 8/12/2015 | $0.01 | 0.07% |
| 8/13/2015 | $0.01 | 0.07% |
| 8/14/2015 | $0.01 | 0.07% |
| 8/17/2015 | $0.01 | 0.07% |
| 8/18/2015 | $0.01 | 0.07% |
| 8/19/2015 | $0.01 | 0.07% |
| 8/20/2015 | $0.01 | 0.07% |
| 8/21/2015 | $0.01 | 0.07% |
| 8/24/2015 | $0.01 | 0.08% |
| 8/25/2015 | $0.01 | 0.08% |
| 8/26/2015 | $0.01 | 0.08% |
| 8/27/2015 | $0.01 | 0.08% |
| 8/28/2015 | $0.01 | 0.08% |
| 8/31/2015 | $0.01 | 0.08% |
| 9/1/2015 | $0.01 | 0.08% |
| 9/2/2015 | $0.01 | 0.08% |
| 9/3/2015 | $0.01 | 0.08% |
| 9/4/2015 | $0.01 | 0.08% |
| 9/8/2015 | $0.01 | 0.08% |
| 9/9/2015 | $0.01 | 0.08% |
| 9/10/2015 | $0.01 | 0.08% |
| 9/11/2015 | $0.01 | 0.08% |
| 9/14/2015 | $0.01 | 0.08% |
| 9/15/2015 | $0.01 | 0.08% |
| 9/16/2015 | $0.01 | 0.08% |
| 9/17/2015 | $0.01 | 0.08% |
| 9/18/2015 | $0.01 | 0.08% |
| 9/21/2015 | $0.01 | 0.08% |
| 9/22/2015 | $0.01 | 0.08% |
| 9/23/2015 | $0.01 | 0.08% |
| 9/24/2015 | $0.01 | 0.08% |
| 9/25/2015 | $0.01 | 0.08% |
| 9/28/2015 | $0.01 | 0.08% |
| 9/29/2015 | $0.01 | 0.09% |

**Notes:**
The percent bid-ask spread was calculated as (i) the closing ask quote less the closing bid quote divided by (ii) the average of the bid and ask quotes.

**Source:**
Bloomberg.

**Appendix I**
**Methodology Employed to Use TRACE Data for Event Studies,**
**Calculations of Average Weekly Turnover and Estimates of the Bid-Ask Spreads**

1.      The Trade Reporting and Compliance Engine, better known as TRACE, is an over-the-counter real-time price dissemination service for the fixed income (*i.e.*, bond) market owned and operated by the Financial Industry Regulatory Authority ("FINRA").  I relied upon TRACE transaction data for several analyses of the Exemplar Notes (which excludes the exchange-traded 2043 Note), including event studies, calculations of average weekly turnover, determination of the number of brokers and market makers, and estimates of the bid-ask spreads.[1]

2.      Staff, at my direction, imported, closely examined, and evaluated the original TRACE records as described below.  Staff then organized the TRACE files to limit the dataset to include only those trade records that are relevant in determining whether the FINRA-based Exemplar Notes traded in open, developed and efficient markets.

3.      To determine which records would be included in the various analyses, I relied upon a TRACE Excel file[2] with data field definitions and prior experience working with similar TRACE data provided by FINRA.

4.      The TRACE data contains a field or variable called "Market Indicator."  I included in the analyses only trades with the code "S1," signifying "Trade was executed in

---

[1]     The datasets I relied upon in my analyses are Microsoft Excel files produced in response to a subpoena issued by the Lead Plaintiffs' Counsel.  The Excel files for the Exemplar Notes are all titled "TRACE Data [CUSIP of note] (DIVER).xlsx."  The Excel files contain data (where available) for the period January 2013 through July 2019.

[2]     The file with data field definitions I relied upon is a Microsoft Excel file produced in response to a subpoena issued by the Lead Plaintiffs' Counsel titled "Trade Data Fields and Definitions for CA Bonds (DIVER-CA Trade Details) May172019.xlsx."

the secondary market."  The only data without such a code are trades in the offerings of the 2020B Note, the 2021 Note, and the 2024B Note, which have the code "P1."[3]

5.      The TRACE data includes a field or variable called "Status" that indicates the *status* of entered transactions.  Records have the following *Status* codes:

   1)  T = Newly Reported Trade;

   2)  Y = Reversal (Historical Trade Cancels);

   3)  X = Cancelled;

   4)  C = Correction (cancelled portion); and

   5)  R = Correction (new trade portion).[4]

6.      I only included records with Status codes of "Newly Reported Trade" and "Correction (new trade portion)" (*i.e.*, observations where Status = "T" or Status = "R") and also removed the original records that I was able to match to a Correction (cancelled portion, Status = "C"), Cancelled trade (Status = "X"), or Reversal (Historical Trade Cancels, Status = "Y").[5]

7.      The data field "Media Report Indicator" identifies whether or not trade entries in the TRACE system are disseminated to the public.  There are two possible codes for this field, "Y" meaning Yes, the entry is reported to the public, and "N" meaning No, the

---

[3]   These trades are used to determine the offering price of the respective Notes.  None of the records in the data that I used have a Market Indicator code of "F1" denoting "Free Trading."

[4]   There are different status codes for "NYSE" trades, but the records in the data are for "MPP" trades.

[5]   I used the following algorithm to identify original records (status code equal to "T" or "R") that match to records with Status codes of C, X, or Y ("C/X/Y").  Original records were identified by matching the variable "First System Control ID" from a C/X/Y record to the "System Control ID" variable for the original record and also matching the variables "Execution Dt" and "Report Side MPID".  I applied this algorithm to transactions occurring between April 17, 2014 and January 31, 2016 for all the Exemplar Notes and also for transactions in the 2020B, 2021 and 2024B Notes through July 2019.  For these 83,643 transactions, 2.9% (2,421 transactions) had Status codes of C, X, or Y, which I matched to 2,336 original transactions.

transaction is not reported to the public. FINRA only disseminates one side of a trade when both parties report their transaction to TRACE (in the case of trades between two brokers).[6] Unless otherwise indicated, I include only publicly-reported trades in my analysis. For the date of the trade, I use the variable "Execution Dt." For time of the trade, I use the variable "Execution Tm."

8.      In addition, unless otherwise specified, I include only days on which the stock market was open for trading and I also exclude any additional dates that are "Recommended Full Close" by SIFMA (the Securities Industry and Financial Markets Association).[7]

<u>Calculation of daily volume and dollar amount traded series</u>

9.      I calculated daily volume by summing the volume for all records on a given day (subject to the conditions listed above). In other words, I summed up the "Entered Volume" for each transaction record on that day. In addition, I calculated the daily dollar amount traded by summing up the dollar amount (or market value) of each transaction record on that day. The market value of each trade is equal to the "Entered Volume" multiplied by "Entered Pr" and divided by 100. "Entered Pr" is the price per $100 in face value of the Note, while "Entered Volume" is equal to the total face value of the Notes traded (with each Note having a face value of $1,000 per bond).

---

[6]     In the data I analyzed (*see* note 5), there were only three instances of a trade that was not reported to the public where the Contra Side MPID was code "C" (Customer). In addition, less than 0.6% of the transactions had a non-customer Contra Side MPID, were not reported, and were report side sale transactions (Buy/Sell of "S").

[7]     The addition "Recommended Full Close Dates" are 10/13/2014, 11/11/2014, 10/12/2015, and 11/11/2015 (https://www.sifma.org/wp-content/uploads/2017/06/misc-us-historical-holiday-market-recommendations-sifma.pdf;  https://www.sifma.org/about/.; last visited August 26, 2019).

<u>Calculation of daily volume-weighted average price ("VWAP") series</u>

10.     Each day I calculated a volume-weighted average price (VWAP) by using all records for that specific day subject to the restrictions listed above and an additional restriction that the trade take place between 9:30 am and 4:00 pm (matching the standard trading hours of the US stock market).  For Price, I used "Entered Pr," which was then weighted by the "Entered Volume."

<u>Determination of unique brokers</u>

11.     To determine the list of brokers trading each Note, I extracted each unique broker name from the variable "Report Side MPID."[8]  I created this list without any restriction as to whether the trade was publicly reported.

<u>Calculation of daily bid-ask spread series</u>

12.     Because I do not have access to bid or ask quotation data, but only trade data, I created proxies for the market makers' bid-ask spreads based on actual purchase and sale prices.[9]  For this analysis, I restricted the trades to only those within the stock market trading hours of 9:30 am to 4:00 pm.

13.     I created two subsets of records.  For the first subset of records, I gathered all purchases and sales made by customers (non-brokers), which are all the records where the variable "Contra Side MPID" is identified with a code = "C".  I used this subset to create two proxies: one "ask proxy" based on each customer purchase record (which represents a market

---

[8]     Trades that are not publicly reported are generally between two brokers, who both report the trade. The sell-side report is then publicly disseminated.

[9]     It is my understanding of the TRACE data that the prices include mark-ups that substitute for fees and/or commissions.  For common stock transactions, fees and/or commissions are separate from the bid-ask spreads. Thus, to the extent that fees and/or commissions are included in the transaction prices, a bid-ask spread that includes only customer transactions would be wider than a spread that is associated with market making activities.

maker sale at the market maker ask price); and one "bid proxy" based on each customer sale record (which represents a market maker buy at the market maker bid price). For each record with a customer buy (sale),[10] I found whether there are any corresponding sale (buy) records that are within 15 minutes of the record of interest. I required that all matched records create a positive spread (*i.e.*, because the customer purchases from a market maker, the customer buys (sells) at the market maker's ask (bid) price that is greater than the customer sale (purchase) or market maker bid (ask) price).

14.    I then volume-weighted the matched customer sale (buy) records to determine the market makers' bid (ask) price proxy for use in calculating a bid-ask spread for the buy (sale) record. Once I determined the spread (measured in percentage terms)[11] for each buy (sale) record, for each date I then calculated a volume-weighted bid-ask spread (using as weight the volume for each buy (sale) transaction on that specific day).

15.    The second subset of records is based on gathering all purchases and sales made by brokers (*i.e.*, transactions between customers and broker, and between two brokers). For this analysis, I used broker trades within the stock market trading hours of 9:30 am to 4:00 pm, including those that were not publicly reported. As before, I created two proxies: one based on each broker purchase or bid record; and one based on each broker sale or ask record. For these proxies, I matched each buy (sale) transaction by a specific broker (based on the variable "Report Side MPID") to any sale (buy) transactions by <u>the same</u> broker

---

[10]    Using the variable "Buy/Sell," a customer buy is identified in the database with an "S," while a customer sale is identified with a "B". These codes are opposite to the customer action because they are based on the reporting broker's side of the trade – *i.e.*, when a customer buys, the broker sells and thus the broker reports the activity as an "S" transaction.

[11]    The percentage spread is equal to ask price less the bid price, then divided by the average of the bid and ask prices.

within 15 minutes of the record of interest.  I required that all matched records create a positive spread (*i.e.*, an ask price greater than a bid price).  I then volume-weighted the matched sale (buy) records to determine the ask (bid) price for use in calculating a bid-ask spread for the buy (sale) record.  Once I determined the spread (measured in percentage terms)[12] for each buy (sale) record, I then volume-weighted these spreads to obtain a volume weighted average daily bid-ask spread.

---

[12]  The percentage spread is equal to ask price less the bid price, then divided by the average of the bid and ask prices.

**Appendix J**
**Credit Rating Definitions**

**Moody's**
**Issuer Ratings**

**Foreign Currency:** Moody's Foreign Currency Issuer Ratings are opinions of the ability of entities to honor senior unsecured financial obligations and contracts denominated in foreign currency. These ratings are subject to Moody's Foreign Currency Country Ceilings. Issuer Ratings are unlike our long term debt ratings in that they are assigned to issuers rather than specific debt issues. Specific debt issues of the issuer may be rated differently, and are considered unrated unless individually rated by Moody's. Unless specified, obligations guaranteed by the issuer are considered unrated and are not covered by the issuer rating.

**Domestic Currency:** Moody's Domestic Currency Issuer Ratings are opinions of the ability of entities to honor senior unsecured financial obligations and contracts denominated in their domestic currency.

**Derivative Product Companies:** Issuer ratings that are assigned to derivative product companies are opinions of the financial capacity of an obligor to honor its senior obligations under financial contracts, given appropriate documentation and authorizations.

**Aaa**   Counterparties rated Aaa offer exceptional financial security and have the smallest degree of risk. While the financial strength of these entities may change, such changes as can be visualized are most unlikely  to impair the entities' strong position.

**Aa**   Counterparties rated Aa offer excellent financial security but are rated lower than Aaa counterparties because long-term risks appear somewhat larger. The margins of protection may not be as large as with Aaa counterparties, or fluctuations of protective elements may be of greater amplitude.

**A**   Counterparties rated A offer good financial security. However, elements may be present that suggest a susceptibility to impairment at some time in the future.

**Baa**   Counterparties rated Baa offer adequate financial security. However, certain protective elements may be lacking or may be characteristically unreliable over any great length of time.

**Ba**   Counterparties rated Ba offer questionable financial security. Often the  ability of these entities to meet counterparty obligations may be uncertain and thereby not well safeguarded in the future.

**B**   Counterparties rated B offer poor financial security. Assurance of punctual payment of obligations over any long period of time is small.

**Caa**   Counterparties rated Caa offer very poor financial security. Such counterparties may be in default, or there may be present elements of danger with regard to financial capacity.

**Ca**   Counterparties rated Ca offer extremely poor financial security. Such counterparties are often in default on their obligations.

**C**   Counterparties rated C are the lowest rated class of counterparties, are usually in default on their obligations, and potential recovery values are low.

**WR**   Withdrawn

Moody's applies numerical modifiers 1, 2, and 3 in each generic rating category from Aa to Caa. The modifier 1 indicates that the counterparty is in the higher end of its letter-rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates that the counterparty is in the lower end of the letter-rating category.

**Appendix J**
**Credit Rating Definitions**

**Moody's Investors Service**
**Long-Term Debt Ratings**

**Aaa**   Highest quality with minimal risk.

**Aa**   High quality, subject to very low default risk.

**A**   Upper-medium grade, subject to low credit risk.

**Baa**   Medium-grade, moderate credit risk, may have speculative characteristics.

**Ba**   Substantial credit risk, have speculative characteristics.

**B**   High credit risk, considered speculative.

**Caa**   Very high credit risk, poor standing.

**Ca**   Highly speculative. Likely in or very near default with some prospect of recovery of principal and interest.

**C**   Lowest rated class of bonds. Typically in default with little prospect for recovery of principal or interest.

**WR**   Withdrawn

**NR**   An unrated issuer, obligation, and/or program.

Ratings from Aaa to Baa3 are investment grade ratings. Ratings from Ba1 to C are non-investment grade ratings.

Moody's long-term obligation ratings are opinions of the relative credit risk of fixed-income obligations with an original maturity of one year or more. They address the possibility that a financial obligation will not be honored as promised. Such ratings reflect both the likelihood of default and any financial loss suffered in the event of default.

Moody's applies numerical modifiers 1, 2, and 3 in each generic rating classification from Aa through Caa. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic rating category.

**Appendix J**
**Credit Rating Definitions**

**Fitch**
**International Long-Term Credit**

**AAA**  Highest credit quality. 'AAA' ratings denote the lowest expectation of credit risk.  They are assigned only in case of exceptionally strong capacity for timely payment of financial commitments.  This capacity is highly unlikely to be adversely affected by foreseeable events.

**AA**  Very high credit quality. 'AA' ratings denote a very low expectation of credit risk.  They indicate very strong capacity for timely payment of financial commitments.  This capacity is not significantly vulnerable to foreseeable events.

**A**  High credit quality.  'A' ratings denote a low expectation of credit risk.  The capacity for timely payment of financial commitments is considered strong.  This capacity may, nevertheless, be more vulnerable to changes in circumstances or in economic conditions than is the case for higher ratings.

**BBB**  Good credit quality.  'BBB' ratings indicate that there is currently a low expectation of credit risk.  The capacity for timely payment of financial commitments is considered adequate, but adverse changes in circumstances and in economic conditions are more likely to impair this capacity.  This is the lowest investment-grade category.

**Speculative Grade**

**BB**  Speculative.  'BB' ratings indicate that there is a possibility of credit risk developing, particularly as the result of adverse economic change over time; however, business or financial alternatives may be available to allow financial commitments to be met.  Securities rated in this category are not investment grade.

**B**  Highly speculative.  'B' ratings indicate that significant credit risk is present, but a limited margin of safety remains.  Financial commitments are currently being met; however, capacity for continued payment is contingent upon a sustained, favorable business and economic environment.

**CCC, CC, C**  High default risk. Default is a real possibility.  Capacity for meeting financial commitments is solely reliant upon sustained, favorable business or economic developments.  A 'CC' rating indicates that default of some kind appears probable.  'C' ratings signal imminent default.

**RD**  An entity that has failed to make due payments (within the applicable grace period) on some but not all material financial obligations, but continues to honor other classes of obligations.

**D**  An issuer that in *Fitch Ratings'* opinion has entered into bankruptcy filings, administration, receivership, liquidation or other formal winding-up procedure, or which has otherwise ceased business.

**WD**  Rating has been removed and the issue is no longer rated by Fitch.

**PIF**  Trache has reached maturity, regardless of whether it was amortized or called early. Used for structured finance transactions. As the issue no longer exists, it is no longer rated.

**NR**  Not rated.

**"+" or "-"**   may be appended to a rating to denote relative status within major rating categories.  Such suffixes are not added to the 'AAA' long-term rating category or to categories below 'CCC'.

**Rating Watch and Rating Outlook**  Ratings are placed on Rating Watch or Rating Outlook to indicate that there is a reasonable likelihood of a rating change as well as the likely direction of such change.  Rating Watch is typically resolved over a relatively shorter period (12 months), than Rating Outlook (beyond 1 to 2 years).

Indicators are designated as "Positive", indicating a potential upgrade, "Negative", for a potential downgrade, or "Evolving", if ratings are raised, lowered, or maintained.

## Appendix J
## Credit Rating Definitions

### Standard & Poor's
### Long-Term Issue Ratings

**AAA** Highest rating assigned by S&P. The obligor's capacity to meet its financial commitment on the obligation is EXTREMELY STRONG.

**AA** Differs from the highest rated obligations only in small degree. The obligor's capacity to meet its financial commitment on the obligation is VERY STRONG.

**A** Somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions that obligations in higher rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still STRONG.

**BBB** ADEQUATE protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

Obligors rated 'BB', 'B', 'CCC', and 'CC' and 'C' are regarded as having significant speculative characteristics. 'BB' indicates the least degree of speculation and 'C' the highest. While such obligations will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions.

**BB** LESS VULNERABLE to non payment that other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation.

**B** MORE VULNERABLE to nonpayment than obligations rated 'BB,' but the obligor currently has the capacity to meet its financial commitment on the obligation. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitment on the obligation.

**CCC** CURRENTLY VULNERABLE to nonpayment, and it dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation. In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation.

**CC** Highly vulnerable to nonpayment. The 'CC' rating is used when a default has not yet occurred, but S&P expects default to be a virtual certainty, regardless of the anticipated time to default.

**C** Highly vulnerable to nonpayment, and the obligation is expected to have lower relative seniority or lower ultimate recovery compared to obligations that are rated higher.

**C** Withdrawn.

**D** In default or in breach of an imputed promise. For non-hybrid capital instruments, the 'D' rating category is used when payments on an obligation are not made on the date due, unless S&P believes that such payments will be made within 5 business days in the absence of a stated grace period or within the earlier of the stated grace period or 30 calendar days. The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty (e.g., due to automatic stay provisions). An obligation's rating is lowered to 'D' if it is subject to a distressed exchange offer.

**NR** No rating has been requested, or that there is insufficient information on which to base a rating, or that S&P does not rate a particular obligation as a matter of policy.

**Plus (+) or minus (-):** The ratings from 'AA' to 'CCC' may be modified by the addition of a plus or minus sign to show relative standing within the major rating categories.

**Public Information Ratings** Ratings with a 'pi' subscript are based on an analysis of an issuer's published financial information, as well as additional information in the public domain. They do not, however, reflect indepth meetings with an issuer's management and are therefore based on less comprehensive information than ratings without a 'pi' subscript. Ratings with a 'pi' subscript are reviewed annually based on a new year's financial statements, but may be reviewed on an interim basis if a major event occurs that may affect the issuer's credit quality. Outlooks are not provided for ratings with a 'pi' subscript, nor are they subject to potential CreditWatch listings. Ratings with a 'pi' subscript generally are not modified with '+' or '-' designations. However, such designations may be assigned when the issuer's credit rating is constrained by sovereign risk or the credit quality of a parent company or affiliated group.

**Appendix J**
**Credit Rating Definitions**

**Standard & Poor's**
**CreditWatch**

**CreditWatch** highlights the potential direction of a short- or long-term rating. It focuses on identifiable events and short-term trends that cause ratings to be placed under special surveillance by S&P analytical staff. These may include mergers, recapitalizations, voter referendums, regulatory action, or anticipated operating developments.  Ratings appear on CreditWatch when such an event or a deviation from an expected trend occurs and additional information is necessary to evaluate the current rating. A listing, however, does not mean a rating change is inevitable, and whenever possible, a range of alternative ratings will be shown. CreditWatch is not intended to include all ratings under review, and rating changes may occur without the ratings having first appeared on CreditWatch. The "positive" designation means that a rating may be raised; negative means a rating may be lowered; and "developing" means that a rating may be raised, lowered, or affirmed.

Source: Bloomberg as of October 2016.

**Exhibit I**

**Weekly Trading Volume and Turnover of Navient Corporation Common Stock
During the Exchange Act Class Period**

*"Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." [Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) at 1293.]*

| | Daily Volume | Weekly Volume | Shares Outstanding | Weekly Turnover |
|---|---|---|---|---|
| **Summary Statistics of Trading Volume and Turnover** | | | | |
| **Including All Days in the First and Last Weeks of the Exchange Act Class Period** | | | | |
| Total | 1,038,396,892 | 1,038,396,892 | | |
| Average | 2,814,084 | 13,485,674 | 401,791,959 | 3.4% |
| | | | | |
| Minimum | 368,892 | 951,088 | | 0.2% |
| Median | 2,271,775 | 11,252,972 | | 2.8% |
| Maximum | 26,746,201 | 42,136,519 | | 11.6% |
| | | | | |
| **Summary Statistics of Trading Volume and Turnover** | | | | |
| **Excluding All Days in the First and Last Weeks of the Exchange Act Class Period** | | | | |
| Total | 995,309,285 | 995,309,285 | | |
| Average | 2,741,899 | 13,270,790 | 402,039,586 | 3.3% |
| | | | | |
| Minimum | 368,892 | 4,085,290 | | 1.0% |
| Median | 2,268,103 | 11,252,972 | | 2.8% |
| Maximum | 26,746,201 | 35,227,816 | | 8.3% |

**Notes:**

*See* Appendix F for daily and weekly statistics.  The first week contains only one day (April 17, 2014).

Total traded volume over the Exchange Act Class Period was 1,001,421,381 shares with average daily volume of 2,743,620 shares.

**Exhibit II**
**Weekly Analyst Coverage of Navient Corporation**

| [1] | [2] | [3] |
|---|---|---|
| Date | Bloomberg Total Analyst Recommendations | Number of Analysts in Thomson Reuters I/B/E/S Consensus |
| Average | 10 | 8 |
| Minimum | 2 | 3 |
| Median | 10 | 8 |
| Maximum | 11 | 9 |

**Notes:**

*See* Appendix G for weekly statistics.

**Exhibit III-A**
**Numbers of Analyst Reports Issued for Navient During the Exchange Act Class Period+**
**Exchange Act Class Period+: April 17, 2014 - October 1, 2015**

| No. | Analyst | 2014 (Apr. 17 - Dec. 31) | 2015 (Jan. 1 - Oct. 1) | Total |
|---|---|---|---|---|
| 1 | Barclays | 9 | 12 | 21 |
| 2 | BMO Capital Markets | 0 | 2 | 2 |
| 3 | BofA Merrill Lynch | 0 | 1 | 1 |
| 4 | Buckingham Research Group Inc. | 18 | 15 | 33 |
| 5 | CFRA Equity Research | 4 | 4 | 8 |
| 6 | Compass Point Research & Trading LLC | 21 | 27 | 48 |
| 7 | Credit Suisse | 10 | 14 | 24 |
| 8 | Evercore ISI | 5 | 4 | 9 |
| 9 | Height Analytics, LLC | 2 | 2 | 4 |
| 10 | Janney Montgomery Scott LLC | 12 | 13 | 25 |
| 11 | Keefe, Bruyette & Woods North America | 30 | 24 | 54 |
| 12 | MarketLine | 6 | 2 | 8 |
| 13 | Moody's | 0 | 2 | 2 |
| 14 | Pechala's Reports | 0 | 3 | 3 |
| 15 | R.W. PRESSPRICH & CO | 1 | 1 | 2 |
| 16 | S&P Global Compustat | 4 | 10 | 14 |
| 17 | S&P Global Ratings | 3 | 3 | 6 |
| 18 | Smart Insider Ltd. | 1 | 0 | 1 |
| 19 | Validea | 0 | 1 | 1 |
| 20 | ValuEngine, Inc. | 0 | 6 | 6 |
| 21 | Valu-Trac Investments | 0 | 4 | 4 |
| 22 | Zacks Investment Research Inc. | 1 | 10 | 11 |
| **TOTAL** | | **127** | **160** | **287** |

**Note:**
For analysts available on Thomson EIKON, I count reports only from Thomson EIKON;
otherwise, I count reports available from Capital IQ.

**Exhibit III-B**
**Analyst Participation in Navient Conference Calls**
**Exchange Act Class Period+: April 17, 2014 - October 1, 2015**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] |
| | | Conference Calls | | | | |
| Analyst/Investor | Count of Conference Calls | 7/17/2014 | 10/16/2014 | 1/22/2015 | 4/22/2015 | 7/22/2015 |
|---|---|---|---|---|---|---|
| Barclays | 5 | x | x | x | x | x |
| Compass Point | 5 | x | x | x | x | x |
| KBW | 5 | x | x | x | x | x |
| Credit Suisse | 4 | x | x | | x | x |
| Goldman Sachs | 4 | x | x | | x | x |
| Janney Montgomery Scott | 4 | x | | x | x | x |
| Buckingham Research | 4 | x | x | | x | x |
| Schroder's | 4 | x | x | x | | x |
| Bank of America | 1 | | | | | x |
| Evercore | 2 | x | x | | | |

**Notes:**
[1] Analyst/Investor identified as asking a question during a conference call.
[2] Equals count of "x"s in [3] through [7].
[3] "Q2 2014 Earnings Call, " Bloomberg Transcripts, July 17, 2014.
[4] "Q3 2014 Earnings Call, " Bloomberg Transcripts, October 16, 2014.
[5] "Q4 2014 Earnings Call, " Bloomberg Transcripts, January 22, 2015.
According to the Bloomberg transcript, Mark DeVries and Conor Pigott both participated in the call and Mark DeVries was with Barclays. According to google search, Conor Pigott was also with Barclays as of 1/22/2015.
[6] "Q1 2015 Earnings Call, " Bloomberg Transcripts, April 22, 2015.
[7] "Q2 2015 Earnings Call, " Bloomberg Transcripts, July 22, 2015.

**Exhibit III-C**
**Investor Conferences Hosted by Analysts**
**Exchange Act Class Period+: April 17, 2014 - October 1, 2015**

|      | Date       | Analyst Firms                |
| ---- | ---------- | ---------------------------- |
| [1]  | 5/13/2014  | Barclays                     |
| [2]  | 9/8/2014   | Barclays                     |
| [3]  | 9/30/2014  | Deutsche Bank                |
| [4]  | 11/12/2014 | Bank of America Merrill Lynch |
| [5]  | 12/3/2014  | Bank of America Merrill Lynch |
| [6]  | 12/9/2014  | Goldman Sachs                |
| [7]  | 2/11/2015  | Credit Suisse                |
| [8]  | 2/23/2015  | JPMorgan                     |
| [9]  | 6/11/2015  | Barclays                     |
| [10] | 9/17/2015  | Barclays                     |
| [11] | 9/29/2015  | Deutsche Bank                |

**Notes:**

[1]  "Barclays Americas Select Franchise Conference," Bloomberg EVTS, May 13, 2014.

[2]  "Barclays Global Financial Services Conference," Bloomberg EVTS, September 8, 2014.

[3]  "Deutsche Bank Leveraged Finance Conference," Bloomberg EVTS, September 30, 2014.

[4]  "Bank of America Merrill Lynch Banking & Financial Services Conference," Bloomberg EVTS, November 12, 2014.

[5]  "Bank of America Merrill Lynch Leveraged Finance Conference," Bloomberg EVTS, December 3, 2014.

[6]  "Goldman Sachs U.S. Financial Services Conference," Bloomberg EVTS, December 9, 2014.

[7]  "Credit Suisse Financial Services Forum," Bloomberg EVTS, February 11, 2015.

[8]  "JPMorgan High Yield & Leveraged Finance Conference," Bloomberg EVTS, February 23, 2015.

[9]  "Barclays High Yield Bond and Syndicated Loan Conference," Bloomberg EVTS, June 11, 2015.

[10] "Barclays Global Financial Services Conference," Bloomberg EVTS, September 17, 2015.

[11] "Deutsche Bank Leveraged Finance Conference," Bloomberg EVTS, September 29, 2015.

**Exhibit IV**
**Broker Trades in Navient Corporation Common Stock**

| | |
|---|---|
| **Total reported volume:** | 815,933,225 |
| **Total broker volume:** | 321,242,267 |
| **Total broker volume / Total reported volume:** | 39.37% |
| **Number of brokers with volume > 1% of Reported Volume** | 10 |

| Broker Name | Broker Volume and Broker Volume as a Percent of Total Reported Volume | |
|---|---|---|
| | May 2014 - September 2015 | |
| [1] GOLDMAN SACHS | 46,131,325 | 5.65% |
| [2] MORGAN STANLEY & CO. LLC | 45,587,623 | 5.59% |
| [3] CREDIT SUISSE FIRST BOSTON LLC | 34,722,787 | 4.26% |
| [4] J.P. MORGAN SECURITIES INC. | 26,371,493 | 3.23% |
| [5] UBS SECURITIES LLC. | 25,198,816 | 3.09% |
| [6] BARCLAYS CAPITAL INC. | 24,405,861 | 2.99% |
| [7] Instinet | 19,453,737 | 2.38% |
| [8] DEUTSCHE BANK SECURITIES INC. | 15,979,059 | 1.96% |
| [9] VIRTU AMERICAS LLC | 8,514,004 | 1.04% |
| [10] TRADEBOT SYSTEMS, INC. | 8,163,827 | 1.00% |
| [11] Electronic Transaction Clearing, Inc. | 7,248,851 | 0.89% |
| [12] CITIGROUP GLOBAL MARKETS INC. | 7,150,356 | 0.88% |
| [13] JUMP TRADING, LLC | 5,376,972 | 0.66% |
| [14] LIME BROKERAGE LLC | 4,850,669 | 0.59% |
| [15] BAY CREST PARTNERS, LLC | 4,227,597 | 0.52% |
| [16] WEDBUSH SECURITIES INC | 4,030,027 | 0.49% |
| [17] ITG INC. | 3,524,289 | 0.43% |
| [18] Quantlab Securities LP | 3,342,844 | 0.41% |
| [19] BNP PARIBAS SECURITIES CORP. | 3,153,329 | 0.39% |
| [20] XAMBALA CAPITAL, LLC | 2,507,028 | 0.31% |
| [21] SANFORD C. BERNSTEIN AND CO. I | 2,154,915 | 0.26% |
| [22] INTERACTIVE BROKERS LLC | 1,745,102 | 0.21% |
| [23] CITADEL SECURITIES LLC | 1,711,206 | 0.21% |
| [24] Fox River Execution Tehnology, LLC | 1,309,784 | 0.16% |
| [25] JANE STREET CAPITAL | 993,905 | 0.12% |
| [26] Investors Exchange | 985,227 | 0.12% |
| [27] BTIG, LLC | 882,577 | 0.11% |
| [28] GOLDMAN SACHS EXECUTION & CLEARING, L.P. | 881,902 | 0.11% |
| [29] COWEN & CO., LLC | 791,794 | 0.10% |
| [30] Wells Fargo Securities, LLC | 725,764 | 0.09% |
| [31] FIMAT USA, INC. | 604,109 | 0.07% |
| [32] NATIONAL FINANCIAL SERVICES LL | 567,100 | 0.07% |
| [33] Automated Trading Desk Financial Services, LLC | 554,825 | 0.07% |
| [34] GTS SECURITIES LLC | 498,354 | 0.06% |
| [35] CLEARPOOL EXECUTION SERVICES | 480,146 | 0.06% |
| [36] COWEN CAPITAL LLC | 410,755 | 0.05% |
| [37] Electronic Brokerage Systems, LLC | 407,855 | 0.05% |
| [38] BNY MELLON CAPITAL MARKETS, LLC | 376,179 | 0.05% |
| [39] BMO CAPITAL MARKETS | 362,143 | 0.04% |
| [40] CANTOR FITZGERALD & CO. | 347,068 | 0.04% |
| [41] CUTLER GROUP, LP | 290,148 | 0.04% |
| [42] FIRST MANHATTAN CO | 255,750 | 0.03% |
| [43] JEFFERIES & COMPANY, INC. | 245,101 | 0.03% |
| [44] SJ LEVINSON LLC | 235,998 | 0.03% |
| [45] OPPENHEIMER & CO. INC. | 215,719 | 0.03% |
| [46] WEEDEN & CO.L.P. | 213,998 | 0.03% |
| [47] SOUTHWEST SECURITIES, INC. | 198,765 | 0.02% |
| [48] LEK SECURITIES CORPORATION | 189,242 | 0.02% |

**Exhibit IV**
**Broker Trades in Navient Corporation Common Stock**

| | | |
|---|---|---|
| **Total reported volume:** | 815,933,225 | |
| **Total broker volume:** | 321,242,267 | |
| **Total broker volume / Total reported volume:** | 39.37% | |
| **Number of brokers with volume > 1% of Reported Volume** | 10 | |

| Broker Name | Broker Volume and Broker Volume as a Percent of Total Reported Volume | |
|---|---|---|
| | May 2014 - September 2015 | |
| [49] TIMBER HILL LLC | 180,627 | 0.02% |
| [50] BATS TRADING, INC. | 176,839 | 0.02% |
| [51] Dart Executions, LLC | 157,252 | 0.02% |
| [52] WOLVERINE EXECUTION SERVICES | 146,909 | 0.02% |
| [53] DRESDNER KLEINWORT | 125,032 | 0.02% |
| [54] SPEEDROUTE LLC | 124,837 | 0.02% |
| [55] BRUT, LLC | 122,963 | 0.02% |
| [56] STIFEL NICOLAUS | 122,358 | 0.01% |
| [57] Raffensperger, Hughes & Co., Inc. | 116,420 | 0.01% |
| [58] E*TRADE CLEARING LLC | 95,507 | 0.01% |
| [59] FIRST CLEARING, LLC | 85,523 | 0.01% |
| [60] LEERINK SWANN & CO., INC. | 61,603 | 0.01% |
| [61] TD SECURITIES (USA) INC. | 60,372 | 0.01% |
| [62] KEEFE BRUYETTE AND WOODS INC. | 51,409 | 0.01% |
| [63] SANDLER O'NEILL & PARTNERS, L. | 49,671 | 0.01% |
| [64] PDQ ATS. Inc. | 47,255 | 0.01% |
| [65] W.R. HAMBRECHT + CO., LLC | 46,403 | 0.01% |
| [66] MISMI, Inc. | 30,628 | 0.00% |
| [67] Macquarie Capital (USA) Inc. | 30,000 | 0.00% |
| [68] CRT CAPITAL GROUP LLC | 29,297 | 0.00% |
| [69] POTAMUS TRADING, LLC | 26,634 | 0.00% |
| [70] Lightspeed Trading Llc | 25,650 | 0.00% |
| [71] PRINCETON SECURITIES GROUP, LLC | 25,000 | 0.00% |
| [72] WHITE BAY PT LLC | 22,292 | 0.00% |
| [73] FRIEDMAN, BILLINGS, RAMSEY & C | 20,783 | 0.00% |
| [74] TRADESTATION SECURITIES, INC. | 18,600 | 0.00% |
| [75] JONES AND ASSOCIATES INC. | 18,449 | 0.00% |
| [76] AMERITRADE, INC. | 17,840 | 0.00% |
| [77] GATES CAPITAL CORPORATION | 17,702 | 0.00% |
| [78] CLSA AMERICAS, LLC | 15,879 | 0.00% |
| [79] VANDHAM SECURITIES CORP | 15,717 | 0.00% |
| [80] SPOT TRADING L.L.C. | 12,988 | 0.00% |
| [81] Newedge USA, LLC | 11,791 | 0.00% |
| [82] MAPLE SECURITIES U.S.A. INC. | 10,252 | 0.00% |
| [83] GABELLI AND CO INC. | 10,000 | 0.00% |
| [84] WELLS FARGO PRIME SERVICES, LLC | 10,000 | 0.00% |
| [85] LIQUIDNET, INC. | 8,435 | 0.00% |
| [86] WALL STREET ACCESS | 7,227 | 0.00% |
| [87] COMPASS POINT RESEARCH & TRADI | 7,000 | 0.00% |
| [88] CMT TRADING LLC | 6,249 | 0.00% |
| [89] E*TRADE CAPITAL MKTS LLC | 5,378 | 0.00% |
| [90] GARBAN CORPORATES LLC | 5,338 | 0.00% |
| [91] THE BENCHMARK COMPANY, LLC | 5,193 | 0.00% |
| [92] LADENBURG, THALMANN & CO. INC. | 5,000 | 0.00% |
| [93] MIZUHO SECURITIES USA INC. | 4,647 | 0.00% |
| [94] MKM PARTNERS | 4,401 | 0.00% |
| [95] MAXIM GROUP, LLC | 4,035 | 0.00% |
| [96] DAIWA SECURITIES AMERICA INC. | 3,050 | 0.00% |

**Exhibit IV**
**Broker Trades in Navient Corporation Common Stock**

| | | |
|---|---|---|
| **Total reported volume:** | 815,933,225 | |
| **Total broker volume:** | 321,242,267 | |
| **Total broker volume / Total reported volume:** | 39.37% | |
| **Number of brokers with volume > 1% of Reported Volume** | 10 | |

| | Broker Volume and Broker Volume as a Percent of Total Reported Volume | |
|---|---|---|
| **Broker Name** | **May 2014 - September 2015** | |
| [97] SUN TRADING, LLC | 2,776 | 0.00% |
| [98] ROBERT W. BAIRD & CO. INCORPOR | 2,500 | 0.00% |
| [99] OLD MISSION CAPITAL, LLC | 2,300 | 0.00% |
| [100] JANNEY MONTGOMERY SCOTT  LLC | 2,238 | 0.00% |
| [101] R.W. PRESSPRICH & CO., INC. | 2,000 | 0.00% |
| [102] VIEWTRADE SECURITIES, INC. | 1,600 | 0.00% |
| [103] STEPHENS INC. | 1,200 | 0.00% |
| [104] STATE STREET GLOBAL MARKETS, L | 1,088 | 0.00% |
| [105] JNK SECURITIES CORP. | 871 | 0.00% |
| [106] PIPER JAFFRAY & CO. | 531 | 0.00% |
| [107] SCOTT AND STRINGFELLOW INC. | 300 | 0.00% |
| [108] CAPITAL INSTITUTIONAL SERVICES | 89 | 0.00% |
| [109] Others | 442,414 | 0.05% |

**Notes:**

[1] Data for May 2014 to September 2015 (except for December 2014, January 2015 and August 2015) are considered.  Broker volume for December 2014, January 2015 and August 2015 are not available from Bloomberg.  Total volume includes dates from May 1, 2014 to September 30, 2015, but excludes December 2014, January 2015 and August 2015.

[2] The following brokers (with similar names) were combined into one broker based on having the same Central Registration Depository number (CRD number available at https://brokercheck.finra.org/): Baypoint Trading LLC and BTIG, LLC have been combined as BTIG, LLC; Electronic Brokerage Systems I and Electronic Brokerage Systems, LLC have been combined as Electronic Brokerage Systems, LLC; Instinet Corporation and Instinet, LLC have been combined as Instinet; Morgan Stanley & Co. LLC adn Morgan Stanley & Co., Incorpor have been combined as Morgan Stanley & Co. LLC; Wedbush Morgan Securities Inc., Wedbush Securities Inc and Wedbush Securities Inc. have been combined as Wedbush Securities Inc; Wolverine Execution Services, and Wolverine Execution Services, LLC have been combined as Wolverine Execution Services; and data with missing broker name have been combined as Others (not included in count of brokers with >1% of reported volume).

**Source:**

Bloomberg.

**Exhibit V**
**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|----|-------------|----|-------------|
| 1 | 1919 Investment Counsel, LLC | 42 | American Money Management, LLC |
| 2 | 361 Capital LLC | 43 | Ameritas Investment Partners Inc. |
| 3 | 683 Capital Management, LLC | 44 | Amici Capital, LLC |
| 4 | A.R.T. Advisors, LLC | 45 | AMP Capital Investors Limited |
| 5 | AB Trust & Investment Services Group | 46 | Amundi Asset Management |
| 6 | Abbey Life Assurance Co Ltd, Insurance Investments | 47 | Analytic Investors, LLC |
| 7 | Aberdeen Asset Management PLC | 48 | AP Fonden 2 |
| 8 | ABN AMRO Investment Solutions | 49 | AP Fonden 4 |
| 9 | Abrams Capital Management LP | 50 | AP Fonden 7 |
| 10 | Absolute Return Capital, LLC | 51 | Aperio Group, LLC |
| 11 | Achievement Asset Management LLC | 52 | AQR Capital Management, LLC |
| 12 | Acker Finley Asset Management Inc. | 53 | Architas Multi-Manager Limited |
| 13 | ACR Alpine Capital Research, LLC | 54 | Arden Asset Management LLC |
| 14 | Ada Investment Management LP | 55 | Arizona State Retirement System |
| 15 | Adage Capital Management, L.P. | 56 | Aronson+Johnson+Ortiz, LP |
| 16 | Adams Diversified Equity Fund, Inc. (NYSE:ADX) | 57 | Arrow Investment Advisors, LLC |
| 17 | Addenda Capital Inc. | 58 | ArrowMark Colorado Holdings, LLC |
| 18 | Adi Capital Management LLC | 59 | Arrowstreet Capital, Limited Partnership |
| 19 | Advance Asset Management Limited | 60 | Ascend Capital, LLC |
| 20 | Advance Capital Management, Inc. | 61 | Aspiriant, LLC |
| 21 | Advenis Investment Managers | 62 | Asset Management Group of Bank of Hawaii |
| 22 | Advisors Asset Management, Inc. | 63 | Asset Management One Co., Ltd. |
| 23 | Advisory Services Network, LLC | 64 | Asset Management, Inc. |
| 24 | AGF Investments LLC | 65 | Aurora Investment Management L.L.C. |
| 25 | AHL Partners LLP, Asset Management Arm | 66 | Aviance Capital Management, LLC |
| 26 | AIMcapital AG, Asset Management Arm | 67 | Aviva Investors Global Services Limited |
| 27 | Airain Ltd. | 68 | AXA Equitable Funds Management Group, LLC |
| 28 | Alberta Investment Management Corporation | 69 | AXA Investment Managers S.A. |
| 29 | Alethea Capital Management, LLC | 70 | B. Riley Capital Management, LLC |
| 30 | Alexandria Capital, LLC | 71 | Baldwin Brothers, Inc. |
| 31 | Alfred Berg Kapitalförvaltning AB | 72 | Balentine, LLC |
| 32 | Allen Investment Management, LLC | 73 | Balter Liquid Alternatives, LLC |
| 33 | AllianceBernstein L.P. | 74 | Bank of America Corporation, Asset Management Arm |
| 34 | Allianz Asset Management AG | 75 | Bank Of Oklahoma, N.A., Asset Management Arm |
| 35 | Allianz Global Investors Fund Management LLC | 76 | Bankinter Gestion de Activos, SGIIC |
| 36 | Allra Pension AB, Asset Management Arm | 77 | Barclays Bank PLC,  Securities Investments |
| 37 | Alpenglow Capital Lp | 78 | Barclays Bank PLC, Wealth and Investment Management Division |
| 38 | Alpha Centauri Finanz-Beratungsgesellschaft mbH | 79 | Barclays PLC Private Banking & Investment Banking Investment |
| 39 | Alpine Partners VI, LLC | 80 | Barings LLC |
| 40 | Alyeska Investment Group, L.P. | 81 | Barrow, Hanley, Mewhinney & Strauss, Inc. |
| 41 | American Beacon Advisors, Inc. | 82 | Bartlett Wealth Management |

**Exhibit V**
**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|----|-------------|----|-------------|
| 83 | BB&T Asset Management, Inc. | 124 | Carlson Capital, L.P. |
| 84 | BBVA Asset Management, S.A., S.G.I.I.C. | 125 | Carroll Financial Associates, Asset Management Arm |
| 85 | BCV Asset Management | 126 | Cavanal Hill Investment Management, Inc. |
| 86 | Beech Hill Advisors, Inc. | 127 | CCM Partners, L.P. |
| 87 | Bellevue Asset Management AG | 128 | Centre Asset Management, LLC |
| 88 | Bessemer Investment Management LLC | 129 | CenturyLink Investment Management Company |
| 89 | BlackRock, Inc. (NYSE:BLK) | 130 | Certium Asset Management LLC |
| 90 | Bluefin Trading, Llc, Asset Management Arm | 131 | Charles Schwab Investment Management, Inc. |
| 91 | BlueMountain Capital Management LLC | 132 | Checchi Capital Advisers, LLC |
| 92 | BMO Global Asset Management | 133 | Chicago Equity Partners LLC |
| 93 | BNP Paribas Arbitrage Sa, Asset Management Arm | 134 | Chickasaw Capital Management, LLC |
| 94 | BNP Paribas Securities Corp, Asset Management Arm | 135 | CIBC Asset Management Inc. |
| 95 | BNPP Asset Management Holding | 136 | CIBC Private Wealth Advisors, Inc. |
| 96 | BNY Mellon Asset Management | 137 | Citadel Advisors, LLC |
| 97 | Bogle Investment Management, L.P. | 138 | Citigroup Inc.,Banking and Securities Investments |
| 98 | Bosera Asset Management Co., Ltd. | 139 | ClearArc Capital, Inc. |
| 99 | Boston Financial Management, Inc. | 140 | ClearBridge Investments, LLC |
| 100 | Boston Partners Global Investors, Inc. | 141 | Clinton Group, Inc |
| 101 | Boston Private Bank & Trust Company, Asset Management Arm | 142 | CMI Asset Management (Luxembourg) S.A. |
| 102 | Brandywine Global Investment Management, LLC | 143 | CNH Partners, LLC |
| 103 | Bridgeway Capital Management, Inc. | 144 | Colonial First State Asset Management (Australia) Limited |
| 104 | British Columbia Investment Management Corporation | 145 | Columbia Management Investment Advisers, LLC |
| 105 | Brompton Funds Limited | 146 | Columbia Partners, L.L.C. Investment Management |
| 106 | Brookstone Capital Management, LLC | 147 | Comerica Bank, Banking Investments |
| 107 | Brown Advisory Incorporated | 148 | Commerzbank AG, Asset Management Arm |
| 108 | Buckingham Capital Management, Inc. | 149 | Conning Asset Management Co. |
| 109 | Cable Hill Partners, LLC | 150 | Continental Advisors, LLC |
| 110 | Cadence Capital Management LLC | 151 | Convergence Investment Partners, LLC |
| 111 | Caisse de dépôt et placement du Québec | 152 | Cornerstone Advisors, Inc. |
| 112 | Calamos Advisors LLC | 153 | Counsel Portfolio Services Inc. |
| 113 | California Public Employees' Retirement System | 154 | Cowen Investment Management LLC |
| 114 | Calvert Investment Management, Inc. | 155 | Creative Planning, Inc. |
| 115 | Cambiar Investors, LLC | 156 | Credit Suisse Asset Management (Switzerland) |
| 116 | Canada Pension Plan Investment Board | 157 | Credit Suisse Fund Management S.A. |
| 117 | Canadian Imperial Bank of Commerce, Asset Management Arm | 158 | Credit Suisse, Investment Banking and Securities Investments |
| 118 | Candriam Luxembourg S.A. | 159 | Crosby Advisors LLC |
| 119 | Canoe Financial LP | 160 | Crossmark Global Investments, Inc. |
| 120 | Canso Investment Counsel Ltd. | 161 | D. E. Shaw & Co., L.P. |
| 121 | Capital Analysts, Inc. | 162 | Dacheng Fund Management Company Limited |
| 122 | Capital Group International Inc. | 163 | Daiwa Asset Management Co. Ltd. |
| 123 | Capital Management Associates, Inc. | 164 | Danske Capital AS |

**Exhibit V**

**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|---|---|---|---|
| 165 | Decatur Capital Management, Inc. | 206 | First Financial Bank, National Association, Asset Management Arm |
| 166 | Degroof Petercam Asset Management | 207 | First Horizon National Corp.,Asset Management Arm |
| 167 | Deka Investment GmbH | 208 | First Manhattan Co. |
| 168 | Delta Lloyd Asset Management N.V. | 209 | First National Investment Services |
| 169 | Denali Advisors, LLC | 210 | First Personal Financial Services Inc. |
| 170 | Desjardins Global Asset Management Inc. | 211 | First Trust Advisors L.P. |
| 171 | Deutsche Asset & Wealth Management | 212 | Florida State Board of Administration |
| 172 | Deutsche Bank, Private Banking and Investment Banking Investments | 213 | FMR LLC |
| 173 | Digilog Global Equity Llc | 214 | Fonds de Réserve pour les Retraites |
| 174 | Dimensional Fund Advisors L.P. | 215 | Fort Washington Investment Advisors, Inc. |
| 175 | DNB Asset Management AS | 216 | Frank Russell Company |
| 176 | Dreman Value Management, L.L.C. | 217 | French Wolf & Farr, Inc. |
| 177 | Dubuque Bank & Trust, Asset Management Arm | 218 | Frontier Capital Management Co., LLC |
| 178 | Dynamic Technology Lab Pte Ltd | 219 | FSC Securities Corporation, Asset Management Arm |
| 179 | E. Öhman J:or Fonder AB | 220 | FSI Group, LLC |
| 180 | Eagleclaw Capital Management LLC | 221 | Fukoku Mutual Life Insurance Co., Asset Management Arm |
| 181 | Eastspring Asset Management Korea Co. Ltd. | 222 | GAM Holding AG (SWX:GAM) |
| 182 | Eaton Vance Management | 223 | GAMCO Investors, Inc. (NYSE:GBL) |
| 183 | Ellington Management Group, L.L.C. | 224 | Gargoyle Investment Advisor L.L.C. |
| 184 | Emerson Investment Management, Inc. | 225 | Garrison Bradford & Associates Inc. |
| 185 | Employees Retirement System of Texas | 226 | Gateway Investment Advisers, LLC |
| 186 | Endeavour Capital Advisors Inc. | 227 | Gemmer Asset Management LLC |
| 187 | Engineers Gate Manager LP | 228 | General Motors Investment Management Corporation |
| 188 | Enigma Capital Markets, Ltd | 229 | Geode Capital Management, LLC |
| 189 | Enterprise Bank & Trust., Asset Management Arm | 230 | Gescooperativo S.A. SGIIC |
| 190 | Envestnet Asset Management, Inc. | 231 | GLG LLC |
| 191 | Epsilon Mutual Funds Management (1991) Ltd. | 232 | GLG Partners, Inc. |
| 192 | Equitec Group, LLC, Asset Management Arm | 233 | Global X Management Company LLC |
| 193 | Espalier Global Management LLC | 234 | Golden Capital Management, LLC |
| 194 | Euclid Advisors LLC | 235 | Goldman Sachs Asset Management Co.,Ltd. |
| 195 | Eurizon Capital S.A. | 236 | Goldman Sachs Asset Management, L.P. |
| 196 | Everence Capital Management, Inc. | 237 | Goldman Sachs Group, Investment Banking and Securities Investments |
| 197 | Exchange Traded Concepts, LLC | 238 | Gotham Asset Management, LLC |
| 198 | ExxonMobil Investment Management Inc. | 239 | Grantham Mayo Van Otterloo & Co. LLC |
| 199 | Federated Investors, Inc. (NYSE:FII) | 240 | Great-West Capital Management, LLC |
| 200 | Fideuram Asset Management (Ireland) Limited | 241 | Ground Swell Capital, LLC |
| 201 | Fiera Capital Corporation (TSX:FSZ) | 242 | Group One Trading LP, Asset Management Arm |
| 202 | Financeware, Inc., Asset Management Arm | 243 | Gruss Capital Management LP |
| 203 | Financial Architects, Inc. | 244 | GSA Capital Partners LLP |
| 204 | Finemark Holdings Inc., Asset Management Arm | 245 | Guardian Investor Services LLC |
| 205 | FinEx Capital Management LLP | 246 | Guggenheim Partners, LLC |

**Exhibit V**

**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|----|-------------|----|-------------|
| 247 | GuideStone Capital Management | 288 | Jane Street Group, LLC, Asset Management Arm |
| 248 | Gulf International Bank (UK) Limited | 289 | Janney Montgomery Scott LLC, Asset Management Arm |
| 249 | Gupta Wealth Management LLC | 290 | Janus Capital Management LLC |
| 250 | Gustavia Fonder AB | 291 | Janus Henderson Group plc (NYSE:JHG) |
| 251 | GWL Investment Management Ltd. | 292 | Jefferies Group LLC, Asset Management Arm |
| 252 | Hagin Capital, LLC | 293 | Jennison Associates LLC |
| 253 | Hamblin Watsa Investment Counsel Ltd. | 294 | Joel Isaacson & Co., Inc. |
| 254 | Handelsbanken Asset Management | 295 | Johnson Financial Group, Inc., Asset Management Arm |
| 255 | Hartford Funds Management Company, LLC | 296 | JPMorgan Chase & Co, Brokerage and Securities Investments |
| 256 | Hartford Investment Management Company | 297 | JPMorgan Chase & Co, Private Banking and Investment Banking Investments |
| 257 | Hatteras Capital Investment Management, LLC | 298 | Juristernes Og Økonomernes Pensionskasse |
| 258 | Hatteras Funds, LP | 299 | Kahn Brothers Advisors LLC |
| 259 | HBK Investments L.P. | 300 | Kathrein Privatbank Aktiengesellschaft |
| 260 | Heritage Investors Management Corp. | 301 | KBC Asset Management NV |
| 261 | Highbridge Capital Management, LLC | 302 | KBC Fund Management Limited |
| 262 | Highland Associates Inc | 303 | KBI Global Investors Ltd |
| 263 | Highmark Capital Management, Inc. | 304 | KCG Holdings Inc, Asset Management Arm |
| 264 | HighTower Advisors, LLC | 305 | Kentucky Retirement Systems |
| 265 | Hirtle, Callaghan & Co., LLC | 306 | Kentucky Retirement Systems Insurance Trust Fund |
| 266 | Hitachi Investment Management, Ltd. | 307 | Kestrel Investment Management Corporation |
| 267 | Howe and Rusling, Inc. | 308 | Keybank National Association, Asset Management Arm |
| 268 | Hoxton Financial, Inc, Asset Management Arm | 309 | Kingstown Capital Management, LP |
| 269 | HSBC Global Asset Management (UK) Limited | 310 | KLP Kapitalforvaltning AS |
| 270 | Hutchin Hill Capital, LP | 311 | Knightsbridge Asset Management LLC |
| 271 | IBM Retirement Fund | 312 | Korea Investment Corporation |
| 272 | ID-Sparinvest, Filial af Sparinvest S.A., Luxembourg | 313 | Kutxabank Gestion, SGIIC , S.A. |
| 273 | IG Investment Management, Ltd. | 314 | LA Banque Postale Asset Management |
| 274 | IM Gestão de Ativos, Sociedade Gestora de Fundos de Investimento, S.A. | 315 | Ladenburg Thalmann Asset Management Inc. |
| 275 | Independent Portfolio Consultants, Inc. | 316 | Landry Investment Management Inc. |
| 276 | Index Management Solutions, LLC | 317 | Landscape Capital Management, LLC |
| 277 | ING Groep NV, Insurance and Banking Investments | 318 | Lansforsakringar Fondforvaltning AB |
| 278 | ING Investment Management Asia Pacific (Hong Kong) Limited | 319 | LBBW Asset Management Investmentgesellschaft mbH |
| 279 | INTECH Investment Management LLC | 320 | Lebenthal Asset Management LLC |
| 280 | Integrated Wealth Management | 321 | Legal & General Investment Management Limited |
| 281 | Invesco Capital Management LLC | 322 | Lenox Wealth Advisors, Inc. |
| 282 | Invesco Ltd. (NYSE:IVZ) | 323 | Leuthold Weeden Capital Management, LLC |
| 283 | Invictus RG Pte. Ltd. | 324 | Liberty Mutual Insurance Company, Asset Management Arm |
| 284 | Iridian Asset Management LLC | 325 | Lincoln Investment Advisors Corporation |
| 285 | J.P. Morgan Asset Management, Inc. | 326 | Livforsakringsaktiebolaget Skandia AB, Asset Management Arm |
| 286 | J.P. Morgan Whitefriars LLC | 327 | LMR Partners LLP |
| 287 | James Alpha Advisors, Llc | 328 | Lockwood Advisors, Inc. |

**Exhibit V**
**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|---|---|---|---|
| 329 | Lombard Odier Asset Management (Switzerland) SA | 370 | MV Capital Management Inc |
| 330 | Loomis, Sayles & Company L.P. | 371 | myCIO Wealth Partners, LLC |
| 331 | Lord, Abbett & Co. LLC | 372 | National Asset Management, Inc. |
| 332 | Los Angeles Capital | 373 | National Pension Service |
| 333 | Louisiana State Employees' Retirement System | 374 | National Planning Corporation, Securities Investments |
| 334 | LS Investment Advisors, LLC | 375 | Nationwide Fund Advisors |
| 335 | LSV Asset Management | 376 | Natixis Advisors, L.P. |
| 336 | M&G Investment Management Limited | 377 | Natixis, Investment Banking and Corporate Banking Investments |
| 337 | Macquarie Investment Management Business Trust | 378 | Neuberger Berman BD LLC |
| 338 | Macquarie Investment Management Limited | 379 | New Mexico Educational Retirement Board |
| 339 | Madison Street Partners, LLC | 380 | New York Life Investment Management LLC |
| 340 | Managed Account Advisors LLC | 381 | New York State Common Retirement Fund |
| 341 | Manchester Capital Management, LLC | 382 | New York State Teachers' Retirement System |
| 342 | Manifold Fund Advisors, LLC | 383 | NFJ Investment Group LLC |
| 343 | Manulife Asset Management | 384 | Nikko Asset Management Co., Ltd. |
| 344 | Mariner Wealth Advisors-San Diego, LLC | 385 | NISA Investment Advisors, L.L.C. |
| 345 | Marshall Wace LLP | 386 | Nissay Asset Management Corporation |
| 346 | Mason Street Advisors, LLC | 387 | NN Investment Partners International Holdings B.V. |
| 347 | Massachusetts Financial Services Company | 388 | Nomura Asset Management Co., Ltd. |
| 348 | Maverick Capital, Ltd. | 389 | Nomura Holdings Inc, Securities & Investment Arm |
| 349 | MEAG MUNICH ERGO Kapitalanlagegesellschaft mbH | 390 | Nordea Investment Management AB |
| 350 | Mediolanum Asset Management Limited | 391 | Norges Bank Investment Management |
| 351 | Meeder Asset Management, Inc. | 392 | Norinchukin-Zenkyoren Asset Management Co., Ltd. |
| 352 | Meiji Yasuda Life Insurance Co., Asset Management Arm | 393 | North Star Asset Management, Inc. |
| 353 | Mellon Investments Corporation | 394 | North Star Investment Management Corporation |
| 354 | Mercer Limited,Asset Management Arm | 395 | NorthCoast Asset Management LLC |
| 355 | Merian Global Investors (UK) Limited | 396 | Northern Trust Global Investments |
| 356 | Merrill Lynch & Co. Inc., Banking Investments | 397 | Northwestern Mutual Investment Management Company, LLC |
| 357 | Metlife Investment Advisors, LLC | 398 | Northwestern Mutual Wealth Management Company |
| 358 | Michigan Department of Treasury, Bureau of Investments | 399 | Numeric Investors LLC |
| 359 | Millennium Management LLC | 400 | NumerixS Investment Technologies Inc. |
| 360 | Mirae Asset Global Investments Co., Ltd | 401 | Nuveen Investments, Inc. |
| 361 | Mitsubishi UFJ Kokusai Asset Management Co., Ltd. | 402 | Nykredit Asset Management A/S |
| 362 | Mitsubishi UFJ Trust and Banking Corporation, Asset Management Arm | 403 | OakBrook Investments LLC |
| 363 | Mizuho Asset Management Co., Ltd. | 404 | OFI Advisors, LLC |
| 364 | Moore Capital Management, LP | 405 | Ohio National Investments, Inc. |
| 365 | Morgan Stanley Investment Management Inc. | 406 | Ohio Public Employees Retirement System |
| 366 | Morgan Stanley, Investment Banking and Brokerage Investments | 407 | Old Mutual Customised Solutions (Pty) Limited |
| 367 | Mount Lucas Management Corporation | 408 | Omega Advisors, Inc. |
| 368 | Municipal Employees' Retirement System of Michigan | 409 | OMERS Administration Corp. |
| 369 | Mutual of America Capital Management LLC | 410 | Ontario Teachers' Pension Plan Board |

**Exhibit V**
**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|---|---|---|---|
| 411 | OP Varainhoito Oy | 452 | Public Employees Retirement Association of Colorado |
| 412 | OppenheimerFunds, Inc. | 453 | Public Sector Pension Investment Board |
| 413 | Oregon Public Employees Retirement System | 454 | Putnam LLC |
| 414 | O'Shaughnessy Asset Management, LLC | 455 | QCM Cayman, Ltd. |
| 415 | Owl Creek Asset Management, L.P. | 456 | QS Investors LLC |
| 416 | Pacific Investment Management Company LLC | 457 | Quaestio Capital Management SGR S.p.A Unipersonale |
| 417 | Pacific Life Fund Advisors LLC | 458 | Quantbot Technologies, LP |
| 418 | Palisade Capital Management LLC | 459 | Quantitative Investment Management, LLC |
| 419 | Paloma Partners Management Co | 460 | Quantitative Systematic Strategies, LLC |
| 420 | PanAgora Asset Management, Inc. | 461 | R.H. Bluestein & Company |
| 421 | Parallax Volatility Advisers, L.P. | 462 | Rafferty Asset Management, LLC |
| 422 | Parametric Portfolio Associates LLC | 463 | Rainier Investment Management, LLC |
| 423 | Park Avenue Institutional Advisers LLC | 464 | RAM Active Investments S.A. |
| 424 | Park National Bank, Asset Management Arm | 465 | Raymond James Financial Inc., Asset Management Arm |
| 425 | Parkwood Corporation, Asset Management Arm | 466 | RBC Dominion Securities Inc., Asset Management Arm |
| 426 | PartnerRe Asset Management Corporation | 467 | RBC Global Asset Management Inc. |
| 427 | PDT Partners, LLC | 468 | RBC Private Counsel (USA) Inc. |
| 428 | PEAK6 Investments, L.P. | 469 | Regal Investment Advisors LLC |
| 429 | Pendal Group Limited (ASX:PDL) | 470 | RegentAtlantic Capital, LLC |
| 430 | Pennsylvania Public School Employees' Retirement System | 471 | Regions Investment Management, Inc. |
| 431 | Perkins Investment Management LLC | 472 | Renaissance Technologies Corp. |
| 432 | PGGM | 473 | Renta 4 Gestora SGIIC S.A. |
| 433 | PGIM, Inc. | 474 | Retirement Systems Of Alabama |
| 434 | Pictet Asset Management Limited | 475 | Rhumbline Advisers Ltd Partnership |
| 435 | Pine River Capital Management L.P. | 476 | Riggs Asset Management Company, Inc. |
| 436 | PineBridge Investments LLC | 477 | Riverhead Capital Management LLC |
| 437 | Pioneer Global Asset Management S.p.A. | 478 | Ropes & Gray LLP, Private Client Group |
| 438 | Plante & Moran Financial Advisors | 479 | Royal Alliance Associates, Inc., Securities Investments |
| 439 | PNC Capital Advisors, LLC | 480 | Royal Bank of Canada Trust Company (Bahamas) Limited, Asset Management Arm |
| 440 | PNC Financial Services Group Inc., Banking Investments | 481 | Royal Bank of Canada, Banking & Securities Investments |
| 441 | Point72 Asset Management, L.P. | 482 | Royal London Asset Management Limited |
| 442 | Portolan Capital Management, LLC | 483 | RS Investment Management Co. LLC |
| 443 | Prescott Group Capital Management L.L.C. | 484 | Russell Investments Limited |
| 444 | Princeton Alpha | 485 | Saba Capital Management, L.P. |
| 445 | Principal Global Investors, LLC | 486 | Sagara Financière |
| 446 | ProFund Advisors LLC | 487 | SagePoint Financial Advisors, Inc., Securities Investments |
| 447 | Prognosia AB | 488 | San Francisco Sentry Investment Group |
| 448 | ProShare Advisors LLC | 489 | Sanlam Investment Management (Pty) Ltd. |
| 449 | Prospera Financial Services, Asset Management Arm | 490 | Santander Asset Management UK Limited |
| 450 | Prudential International Investments Advisers, LLC | 491 | Savant Capital, LLC |
| 451 | Prudential Trust Company, Trust Investments | 492 | Schaper, Benz & Wise Investment Counsel, Inc. |

**Exhibit V**
**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|---|---|---|---|
| 493 | Schroder Investment Management (Hong Kong) Limited | 534 | Strategic Global Advisors, LLC |
| 494 | Schroder Investment Management Limited | 535 | Strategic Investment Management, LLC |
| 495 | Schroder Investment Management North America Inc. | 536 | Stratos Wealth Partners Ltd |
| 496 | Seawolf Capital, LLC | 537 | Sumitomo Mitsui DS Asset Management Company, Limited |
| 497 | SEB Investment Management AB | 538 | Sumitomo Mitsui Trust Asset Management Co., Ltd. |
| 498 | SECOR Capital Advisors, LP | 539 | SunAmerica Asset Management, LLC |
| 499 | Securian Asset Management Inc. | 540 | SunTrust Banks Inc, Asset Management Arm |
| 500 | Securities America Advisors, Inc. | 541 | Susquehanna Fundamental Investments, LLC |
| 501 | Security Investors, LLC | 542 | Susquehanna International Group, LLP, Asset Management Arm |
| 502 | Security Kapitalanlage AG | 543 | Swedbank Robur Fonder AB |
| 503 | SEI Investments Company (NasdaqGS:SEIC) | 544 | Swiss Life Asset Management Limited |
| 504 | Sentry Investment Management, L.L.C. | 545 | Swisscanto Asset Management AG |
| 505 | Seven Canyons Advisors, LLC | 546 | Systematic Financial Management LP |
| 506 | Seven Eight Capital, LLC | 547 | T&D Asset Management Co., Ltd. |
| 507 | Shell Asset Management Company B.V. | 548 | T. Rowe Price Group, Inc. (NasdaqGS:TROW) |
| 508 | Shinko Asset Management Co., Ltd. | 549 | Tangerine Investment Management Inc. |
| 509 | Siemens Fonds Invest GmbH | 550 | Tarbox Group, Inc., Asset Management Arm |
| 510 | SignatureFD, LLC | 551 | TCI Wealth Advisors, Inc., Asset Management Arm |
| 511 | Simplex Trading, LLC, Asset Management Arm | 552 | TD Asset Management, Inc. |
| 512 | Skandia Fonder AB | 553 | Teacher Retirement System of Texas |
| 513 | Smead Capital Management, Inc. | 554 | Teachers Insurance and Annuity Association of America - College Retirement Equities Fund |
| 514 | Societe Generale, Securities Investments | 555 | Teachers' Retirement System of the State of Kentucky |
| 515 | Sompo Japan Nipponkoa Asset Management Co., Ltd. | 556 | Tegean Capital Management, LLC |
| 516 | Source for Alpha (Deutschland) AG | 557 | Tennessee Department of Treasury, Investment Division |
| 517 | Spark Investment Management LLC | 558 | Terrain- und Finanzgesellschaft Basel |
| 518 | Spiderrock Trading Llc | 559 | Texas Education Agency, Endowment Arm |
| 519 | Spot Trading L.L.C., Asset Management Arm | 560 | The Boston Company Asset Management, LLC |
| 520 | SPP Fonder AB | 561 | The California State Teachers Employees' Retirement System |
| 521 | Squarepoint Ops LLC | 562 | The Colony Group, LLC |
| 522 | SSN Advisory, Inc. | 563 | The Dai-Ichi Life Insurance Company, Limited, Asset Management Arm |
| 523 | Standard Life Investments Limited | 564 | The Glenmede Trust Company, N.A. |
| 524 | State Farm Insurance Companies, Asset Management Arm | 565 | The Huntington Trust Company, National Association |
| 525 | State Street Global Advisors, Inc. | 566 | The Index Group, Inc |
| 526 | State Teachers Retirement System of Ohio | 567 | The London Company of Virginia, LLC |
| 527 | Sterling Capital Management LLC | 568 | The MassMutual Trust Company, F.S.B. , Trust Investments |
| 528 | Stevens Capital Management LP | 569 | The State of Wisconsin Investment Board |
| 529 | Stichting Pensioenfonds ABP | 570 | The TCW Group, Inc. |
| 530 | Stifel Asset Management Corp. | 571 | The Vanguard Group, Inc. |
| 531 | Stone Toro Asset Management, LLC | 572 | THEAM SAS |
| 532 | Storebrand Asset Management AS | 573 | Third Avenue Management, LLC |
| 533 | Strategic Advisers, Inc | 574 | Third Swedish National Pension Fund |

**Exhibit V**

**Institutions that Held Navient Corporation Common Stock at Some Point During the Exchange Act Class Period**

| No | Institution | No | Institution |
|---|---|---|---|
| 575 | Thompson Davis Asset Management | 612 | Visionary Asset Management, Inc. |
| 576 | Thompson, Siegel & Walmsley LLC | 613 | Visium Asset Management, LP |
| 577 | Thrivent Investment Management, Inc. | 614 | Voya Investment Management LLC |
| 578 | Tillar-Wenstrup Advisors, LLC | 615 | Walleye Trading Advisors, LLC |
| 579 | Timber Hill LLC, Asset Management Arm | 616 | Warburg Invest AG |
| 580 | TOBAM | 617 | Warren Averett Asset Management LLc |
| 581 | Tocqueville Asset Management LP | 618 | Wasatch Advisors Inc. |
| 582 | Tompkins Investment Services | 619 | Washington Trust Bank, Asset Management Arm |
| 583 | Toronto-Dominion Bank, Banking Investments | 620 | Wealthfront Inc. |
| 584 | Toronto-Dominion Bank, Securities Investments | 621 | Wealthtrust Fairport, LLC |
| 585 | Toscafund Asset Management LLP | 622 | Wellington Management Group LLP |
| 586 | Tower Research Capital LLC | 623 | Wellington Shields Capital Management, LLC |
| 587 | Transamerica Asset Management, Inc. | 624 | Wells Capital Management Incorporated |
| 588 | Transtrend BV | 625 | Wells Fargo & Company, Private Banking and Investment Banking Arm |
| 589 | Trexquant Investment LP | 626 | Wells Fargo & Company, Securities and Brokerage Investments |
| 590 | Tudor Investment Corporation | 627 | Welzia Management SGIIC SA |
| 591 | Turner Investments, LP | 628 | Westchester Capital Management, LLC |
| 592 | Two Sigma Advisers, LP | 629 | Westfield Capital Management Company, L.P. |
| 593 | Two Sigma Investments, LP | 630 | Westport Resources, A Division Of United Capital |
| 594 | U.S. Bancorp Asset Management, Inc. | 631 | Westwood Management Corp. |
| 595 | UBS Asset Management | 632 | WFG Advisors, LP |
| 596 | UBS O'Connor LLC | 633 | White Bay Pt Llc, Asset Management Arm |
| 597 | Union Investment Management Group | 634 | Wilcoxson Wealth Management |
| 598 | United Capital Financial Advisers LLC | 635 | Wilmington Funds Management Corporation |
| 599 | USAA Asset Management Company | 636 | Wilmington Trust Company, Banking & Trust Investments |
| 600 | USAA Investment Management Company | 637 | Wilmington Trust Investment Management, LLC |
| 601 | Utah Retirement Systems | 638 | Winslow, Evans & Crocker, Inc., Asset Management Arm |
| 602 | Van Eck Associates Corporation | 639 | Wolverine Asset Management, LLC |
| 603 | Venor Capital Management LP | 640 | World Asset Management |
| 604 | Veritable LP | 641 | XACT Fonder AB |
| 605 | VG Asset Management S.A. | 642 | Xact Kapitalförvaltning AB |
| 606 | Victory Capital Management Inc. | 643 | Zacks Investment Management, Inc. |
| 607 | Vident Investment Advisory, LLC | 644 | Zebra Capital Management, LLC |
| 608 | Virginia Retirement System | 645 | Zenit Asset Management AB |
| 609 | Virtus Alternative Investment Advisers, Inc. | 646 | Zions Capital Advisors, Inc. |
| 610 | Virtus Fund Advisers, LLC | 647 | ZKB Asset Management |
| 611 | Virtus Investment Advisers, Inc. | 648 | Zweig-DiMenna Associates, Inc. |

**Note:**

Institutions with positive holdings of Navient Corporation common stock for quarters during the Exchange Act Class Period (6/30/2014 - 6/30/2015).

**Source:**

S&P Capital IQ.

**Exhibit VI**

**Positions of Large Institutions as of the End of Each Quarter during the Exchange Act Class Period**

| No. | Institution | 6/30/2014 | 9/30/2014 | 12/31/2014 | 3/31/2015 | 6/30/2015 |
|---|---|---|---|---|---|---|
| 1 | Abrams Capital Management LP | 5,170,518 | 0 | 0 | 0 | 0 |
| 2 | Allianz Asset Management AG | 9,803,529 | 22,025,360 | 18,778,691 | 18,839,239 | 15,277,150 |
| 3 | AQR Capital Management, LLC | 4,719,475 | 4,620,689 | 5,096,898 | 5,683,308 | 6,355,047 |
| 4 | Barrow, Hanley, Mewhinney & Strauss, Inc. | 39,996,056 | 38,169,283 | 38,756,362 | 39,166,547 | 35,835,726 |
| 5 | BlackRock, Inc. (NYSE:BLK) | 23,361,475 | 22,302,467 | 22,512,878 | 21,802,633 | 20,973,076 |
| 6 | BNY Mellon Asset Management | 6,847,639 | 6,636,205 | 6,919,441 | 6,732,172 | 6,470,594 |
| 7 | Boston Partners Global Investors, Inc. | 6,341,392 | 6,769,173 | 7,126,873 | 7,566,325 | 8,519,245 |
| 8 | Citadel Advisors, LLC | 2,455,147 | 4,561,244 | 325,350 | 791,293 | 43,349 |
| 9 | Columbia Management Investment Advisers, LLC | 4,664,421 | 5,100,346 | 9,229,969 | 9,323,120 | 10,481,164 |
| 10 | D. E. Shaw & Co., L.P. | 11,559,516 | 7,484,702 | 8,419,738 | 7,516,294 | 8,929,543 |
| 11 | FMR LLC | 17,359,383 | 19,285,380 | 18,406,825 | 18,353,825 | 16,434,065 |
| 12 | Geode Capital Management, LLC | 3,319,977 | 3,291,391 | 3,562,585 | 3,857,456 | 3,980,516 |
| 13 | Goldman Sachs Asset Management, L.P. | 33,813,104 | 35,444,295 | 32,736,087 | 28,399,455 | 27,013,949 |
| 14 | Goldman Sachs Group, Investment Banking and Securities Inves | 3,012,968 | 5,098,552 | 5,225,699 | 2,074,556 | 1,876,453 |
| 15 | INTECH Investment Management LLC | 3,144,107 | 1,823,698 | 1,761,898 | 6,083,387 | 6,506,970 |
| 16 | Jennison Associates LLC | 2,629,871 | 2,604,030 | 2,001,130 | 5,244,026 | 5,256,184 |
| 17 | Managed Account Advisors LLC | 3,839,823 | 4,313,601 | 4,050,979 | 3,976,076 | 3,676,060 |
| 18 | Morgan Stanley, Investment Banking and Brokerage Investments | 4,511,313 | 2,865,111 | 3,138,929 | 2,340,888 | 2,990,322 |
| 19 | Norges Bank Investment Management | 4,562,049 | 4,914,218 | 3,724,053 | 3,763,694 | 3,972,116 |
| 20 | Northern Trust Global Investments | 5,289,746 | 5,250,976 | 5,286,131 | 5,175,897 | 5,135,846 |
| 21 | Numeric Investors LLC | 2,073,366 | 3,166,072 | 3,689,405 | 1,907,586 | 374,833 |
| 22 | Omega Advisors, Inc. | 10,135,751 | 9,834,251 | 9,578,247 | 8,178,979 | 7,729,839 |
| 23 | OppenheimerFunds, Inc. | 2,480,977 | 2,511,917 | 2,567,267 | 6,446,786 | 6,608,033 |
| 24 | SEB Investment Management AB | 318,762 | 318,762 | 4,611,293 | 4,666,893 | 4,529,493 |
| 25 | State Street Global Advisors, Inc. | 19,066,782 | 14,082,390 | 19,731,303 | 18,836,211 | 17,552,606 |
| 26 | T. Rowe Price Group, Inc. (NasdaqGS:TROW) | 4,612,468 | 4,347,907 | 2,372,496 | 718,243 | 733,033 |
| 27 | The TCW Group, Inc. | 5,065,777 | 5,613,325 | 6,778,774 | 5,733,485 | 5,632,300 |
| 28 | The Vanguard Group, Inc. | 31,795,005 | 33,437,132 | 35,360,055 | 37,226,102 | 37,149,044 |
| 29 | Westchester Capital Management, LLC | 5,024,964 | 2,457,115 | 0 | 0 | 0 |
| | **Positions of the 29 Institutions on Each Date** | **276,975,361** | **283,329,592** | **281,749,356** | **280,404,476** | **270,036,556** |
| | **Shares Outstanding** | **419,438,459** | **410,219,225** | **401,734,806** | **389,021,445** | **374,032,762** |
| | **29 Institutional Positions as a % of Shares Outstanding** | **66%** | **69%** | **70%** | **72%** | **72%** |
| | **Public Float** | **418,381,036** | **409,161,802** | **400,677,383** | **387,765,760** | **372,777,077** |
| | **29 Institutional Positions as a % of Public Float** | **66%** | **69%** | **70%** | **72%** | **72%** |
| | **Number of Institutions with Positive Positions on Each Date** | **433** | **459** | **470** | **464** | **491** |

**Note:**

To be included in this list, the institution positions ranked in the top 20 of all institutional positions as of any one of the five dates: 6/30/2014, 9/30/2014, 12/31/2014, 3/31/2015, and 6/30/2015.

**Source:**

S&P Capital IQ and SEC filings.



**Sources:**
Bloomberg and SEC filings.



**Exhibit VIII**
**Market Capitalization of Navient Corporation Common Stock**
**April 17, 2014 - October 1, 2015**

**Sources:**
Bloomberg and SEC filings.

**Exhibit IX**
**Bid-Ask Spread in Navient Corporation Common Stock**

| | Navient Common Stock Daily Bid-Ask Spread | | NYSE/AMEX Common Stocks | | NASDAQ Common Stocks | |
| | 4/17/2014 - 9/29/2015 | | Monthly Data | Yearly Data | Monthly Data | Yearly Data |
| | $ Spread | % Spread | 2009 CRSP % Spread | | 2009 CRSP % Spread | |
|---|---|---|---|---|---|---|
| Average | $0.01 | 0.07% | 1.03% | 1.15% | 2.55% | 2.91% |
| Median | $0.01 | 0.06% | 0.35% | 0.40% | 0.69% | 0.92% |

**Notes:**

See Appendix H for Navient Corporation daily statistics and methodology.

Statistics for 2009 CRSP spread for NYSE/AMEX and NASDAQ common stocks are obtained from Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data,* 17 J. Fin. Markets, 94, Table 2 (2014).

**Exhibit X**

**Relationship Between Volume and Abnormal Returns for Navient Common Stock**

| Date Range | Coefficient | t-stat | Observations | R-Squared |
|---|---|---|---|---|
| 04/21/2014 - 10/01/2015 | 0.01 | 7.40 | 367 | 13.05% |

**Note:**

Based on a regression of absolute value of daily abnormal returns on the natural log of daily trading volume.

See Appendix E for daily abnormal returns and volume.

**Exhibit XI**

**Analysis of the Relationship between News and Abnormal Returns for Navient Common Stock**

| Observation on a Date | ACTUAL NUMBER OF DAYS | | EXPECTED NUMBER OF DAYS [A] | | RATIO OF ACTUAL TO EXPECTED NUMBER OF DAYS | | Total |
|---|---|---|---|---|---|---|---|
| | No-News [B] | News [B] | No-News [B] | News [B] | No-News [B] | News [B] | |
| [1] Number of Days | 91 | 15 | 91 | 15 | 1 | 1 | 106 |
| [2] No Statistically Significant Abnormal Return | 87 | 9 | 82.42 | 13.58 | 1.06 | 0.66 | 96 |
| [3] Statistically Significant Abnormal Return | 4 | 6 | 8.58 | 1.42 | 0.47 | 4.24 | 10 |
| [4] Percent of Statistically Significant Abnormal Return Days of Total Days | 4.4% | 40.0% | 9.4% | 9.4% | | | 9.4% |

**Notes:**

[A] Expected number of statistically significant days and no statistically significant days are based on their relative proportion in total multiplied by number of days in respective news and no-news groups.

[B] News released after 4 pm or during non-trading days are treated as impacting the following stock trading day.  The "no-news" days are defined as days without any news with a time stamp.  "News" days are defined as days that meet all of the following criteria: (1) total number of news with a time stamp is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 7 news articles); (2) number of news articles with a time stamp and "Bloomberg News" source is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 3 news articles); (3) number of news articles with a time stamp and "Bloomberg First Word" source is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 2 news articles); and (4) number of news articles with a time stamp and either "Bloomberg News" or "Bloomberg First Word" sources is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 4 news articles).  Source: Appendix C.

[1] Number of news/no-news trading days for Navient common stock.

[2] Number of news/no-news trading days without significant abnormal returns for Navient common stock.  Source: Appendix E.

[3] Number of news/no-news trading days with significant abnormal returns for Navient common stock.  Source: Appendix E.

[4] = [3] / [1].

**Exhibit XII**
**Descriptive Data of Navient Exemplar Notes**

| Defined Note Name | Maturity Date | Coupon | CUSIP | Issue Date | Issued Amount | Amount Outstanding as of 9/28/2015 |
|---|---|---|---|---|---|---|
| 2018A Note | 6/15/2018 | 5.000 | 78442FAX6 | 6/16/2003 | $200,000,000 | $200,000,000 |
| 2018B Note | 6/15/2018 | 8.450 | 78442FEH7 | 6/18/2008 | $2,500,000,000 | $2,500,000,000 |
| 2019A Note | 1/15/2019 | 5.500 | 78442FER5 | 9/20/2013 | $1,250,000,000 | $1,250,000,000 |
| 2019B Note | 6/17/2019 | 4.875 | 78442FES3 | 12/16/2013 | $1,000,000,000 | $1,000,000,000 |
| 2020A Note | 3/25/2020 | 8.000 | 78442FEJ3 | 3/22/2010 | $1,500,000,000 | $1,500,000,000 |
| 2020B Note | 10/26/2020 | 5.000 | 63938CAA6 | 11/3/2014 | $500,000,000 | $500,000,000 |
| 2021 Note | 3/25/2021 | 5.875 | 63938CAC2 | 3/25/2015 | $500,000,000 | $500,000,000 |
| 2022 Note | 1/25/2022 | 7.250 | 78442FEL8 | 1/27/2012 | $750,000,000 | $750,000,000 |
| 2023 Note | 1/25/2023 | 5.500 | 78442FEQ7 | 1/28/2013 | $1,000,000,000 | $1,000,000,000 |
| 2024A Note | 3/25/2024 | 6.125 | 78442FET1 | 3/27/2014 | $850,000,000 | $850,000,000 |
| 2024B Note | 10/25/2024 | 5.875 | 63938CAB4 | 11/3/2014 | $500,000,000 | $500,000,000 |
| 2033 Note | 8/1/2033 | 5.625 | 78442FAZ1 | 7/21/2003 | $750,000,000 | $676,492,000 |
| 2043 Note | 12/15/2043 | 6.000 | 63938C405 | 12/15/2003 | $300,000,000 | $300,000,000 |
| **Aggregate** | | | | | **$11,600,000,000** | **$11,526,492,000** |

**Notes:**

The 2043 Note (CUSIP: 63938C405) was issued at $25 per note. Others were issued at $1,000 per note.

All descriptive data are obtained from Bloomberg, except for the issue dates for the 2020B Note, 2021 Note, and 2024B Note, for which FINRA TRACE Data is available since issuance. Based on FINRA TRACE Data, the issue date for the 2020B Note and 2024B Note is 11/3/2014 (Bloomberg issue date is 11/6/2014) and the issue date for the 2021 Note is 3/25/2015 (Bloomberg issue date is 3/27/2015).

**Sources:**

Bloomberg and FINRA TRACE Data.

**Exhibit XIII**

**Weekly Trading Volume and Turnover of Navient Exemplar Notes**

*"Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." [Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) at 1293.]*

| Note | [1] Daily Volume | | | [2] Weekly Volume | | | [3] Weekly Turnover | |
|---|---|---|---|---|---|---|---|---|
| | Total | Average | Median | Total | Average | Median | Average | Median |
| 2018A Note | 105,253,000 | 289,157 | 98,500 | 105,173,000 | 1,402,307 | 905,000 | 0.70% | 0.45% |
| 2018B Note | 2,988,092,000 | 8,209,044 | 3,247,500 | 2,978,726,000 | 39,716,347 | 28,064,000 | 1.59% | 1.12% |
| 2019A Note | 1,735,821,000 | 4,768,739 | 2,100,000 | 1,729,708,000 | 23,062,773 | 17,620,000 | 1.85% | 1.41% |
| 2019B Note | 1,121,366,000 | 3,080,676 | 995,000 | 1,111,216,000 | 14,816,213 | 12,281,000 | 1.48% | 1.23% |
| 2020A Note | 2,052,852,000 | 5,639,703 | 2,599,000 | 2,042,667,000 | 27,235,560 | 21,003,000 | 1.82% | 1.40% |
| 2020B Note | 849,148,000 | 3,740,740 | 1,345,000 | 847,122,000 | 18,023,872 | 12,630,000 | 3.60% | 2.53% |
| 2021 Note | 481,490,000 | 3,675,496 | 965,000 | 382,810,000 | 14,723,462 | 11,187,500 | 2.94% | 2.24% |
| 2022 Note | 705,298,000 | 1,937,632 | 400,000 | 696,538,000 | 9,287,173 | 5,695,000 | 1.24% | 0.76% |
| 2023 Note | 1,471,032,000 | 4,041,297 | 1,572,000 | 1,465,685,000 | 19,542,467 | 15,554,000 | 1.95% | 1.56% |
| 2024A Note | 1,837,157,000 | 5,047,135 | 1,495,500 | 1,833,745,000 | 24,449,933 | 18,016,000 | 2.88% | 2.12% |
| 2024B Note | 897,356,000 | 3,953,110 | 1,000,000 | 897,308,000 | 19,091,660 | 12,390,000 | 3.82% | 2.48% |
| 2033 Note | 458,490,000 | 1,259,588 | 124,500 | 458,336,000 | 6,111,147 | 3,310,000 | 0.84% | 0.46% |
| 2043 Note | 252,031,525 | 688,611 | 593,800 | 246,088,875 | 3,281,185 | 3,177,900 | 1.09% | 1.06% |
| **Aggregate** | | | | | | | **1.82%** | **1.71%** |

**Sources:**

FINRA TRACE Data and Bloomberg.

**Notes:**

Weekly turnover is computed as total volume traded over a week divided by the amount outstanding at the end of the week.  Volume and amount outstanding are in par value.  For the exchange-traded 2043 Note, the reported volume is the number of notes traded multiplied by par value of $25 per note.  Source: Bloomberg.  For other Notes, see Appendix I for methodology to compute the reported volume.  Source: FINRA TRACE Data.  Daily volume statistics are summarized over the Exchange Act Class Period.  Weekly volume and turnover are summarized over the full weeks within the Exchange Act Class Period.  For the notes issued on Monday, November 3, 2014 (the 2020B Note and the 2024B Note), the first full week starts on November 3, 2014.  For the the 2021 Note issued on Wednesday, March 25, 2015, the first full week starts on Monday, March 30, 2015. Aggregate weekly turnover is based on a weekly turnover series.  For each week, turnover is computed as total dollar value traded for Navient Exemplar Notes during a week divided by the total par value outstanding for Navient Exemplar Notes at the end of the week.  Notes issued during the Exchange Act Class Period are included into the aggregate analysis starting from the first full week since their trading.

**Exhibit XIV**
**Trade Frequency for Navient Exemplar Notes**

**Panel A: Number of Trade Days**

| Note | 2014 | | | 2015 | | | 2014 and 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Potential Bond Traded Days | Actual Traded Days | Annualized Actual Traded Days | Potential Bond Traded Days | Actual Traded Days | Annualized Actual Traded Days | Potential Bond Traded Days | Actual Traded Days | Annualized Actual Traded Days |
| 2018A Note | 177 | 163 | 232 | 187 | 162 | 218 | 364 | 325 | 225 |
| 2018B Note | 177 | 175 | 249 | 187 | 182 | 245 | 364 | 357 | 247 |
| 2019A Note | 177 | 163 | 232 | 187 | 178 | 240 | 364 | 341 | 236 |
| 2019B Note | 177 | 169 | 241 | 187 | 179 | 241 | 364 | 348 | 241 |
| 2020A Note | 177 | 170 | 242 | 187 | 180 | 243 | 364 | 350 | 242 |
| 2020B Note | 40 | 31 | 195 | 187 | 175 | 236 | 227 | 206 | 229 |
| 2021 Note | n/a | n/a | n/a | 131 | 122 | 235 | 131 | 122 | 235 |
| 2022 Note | 177 | 138 | 196 | 187 | 159 | 214 | 364 | 297 | 206 |
| 2023 Note | 177 | 176 | 251 | 187 | 186 | 251 | 364 | 362 | 251 |
| 2024A Note | 177 | 171 | 243 | 187 | 183 | 247 | 364 | 354 | 245 |
| 2024B Note | 40 | 36 | 227 | 187 | 173 | 233 | 227 | 209 | 232 |
| 2033 Note | 177 | 147 | 209 | 187 | 143 | 193 | 364 | 290 | 201 |
| 2043 Note | 179 | 179 | 252 | 187 | 187 | 252 | 366 | 366 | 252 |
| Aggregate | 1,852 | 1,718 | 234 | 2,375 | 2,209 | 234 | 4,227 | 3,927 | 234 |

**Panel B: Percent of Actual Traded Days to Potential Bond Traded Days**

| Note | 2014 | 2015 | 2014 and 2015 |
|---|---|---|---|
| 2018A Note | 92% | 87% | 89% |
| 2018B Note | 99% | 97% | 98% |
| 2019A Note | 92% | 95% | 94% |
| 2019B Note | 95% | 96% | 96% |
| 2020A Note | 96% | 96% | 96% |
| 2020B Note | 78% | 94% | 91% |
| 2021 Note | n/a | 93% | 93% |
| 2022 Note | 78% | 85% | 82% |
| 2023 Note | 99% | 99% | 99% |
| 2024A Note | 97% | 98% | 97% |
| 2024B Note | 90% | 93% | 92% |
| 2033 Note | 83% | 76% | 80% |
| 2043 Note | 100% | 100% | 100% |
| Aggregate | 93% | 93% | 93% |

**Sources:**
FINRA TRACE Data and Bloomberg.

**Notes:**
For the 2043 Note, the potential bond traded days is the same as the stock trade days. For the other notes, potential bond traded days is based on "SIFMA U.S. Holiday Recommendations." During the Exchange Act Class Period, SIFMA recommended two full day close on which the stock market traded (10/13/2014 and 11/11/2014).
For the 2020B Note and 2024B Note issued on 11/3/2014, trading for year 2014 covers trading between 11/3/2014 and 12/31/2014. For the other notes, trading for year 2014 covers trading between 4/17/2014 and 12/31/2014. For the 2021 Note issued on 3/25/2015, trading for year 2015 covers trading between 3/25/2015 and 9/29/2015. For other notes, trading for year 2015 covers trading between 1/1/2015 and 9/29/2015.
Annualized actual traded days is equal to actual traded days divided by potential bond traded days, multiplied by 252 trading days.
Aggregate statistics are computed as the sum of actual traded days for the Navient Exemplar Notes divided by the sum of potential bond traded days for the Navient Exemplar Notes.

p. 1 of 1

**Exhibit XV**
**Average Days Elapsed Between Trades for Navient Exemplar Notes**
**as Compared to That from Academic Paper**

**Panel A: Average Days Elapsed Between Trades for Navient Exemplar Notes**

| Note | 2014* | 2015** |
|---|---|---|
| 2018A Note | 0.086 | 0.154 |
| 2018B Note | 0.011 | 0.027 |
| 2019A Note | 0.086 | 0.051 |
| 2019B Note | 0.048 | 0.045 |
| 2020A Note | 0.041 | 0.039 |
| 2020B Note | 0.233 | 0.080 |
| 2021 Note | n/a | 0.074 |
| 2022 Note | 0.277 | 0.182 |
| 2023 Note | 0.006 | 0.005 |
| 2024A Note | 0.029 | 0.027 |
| 2024B Note | 0.086 | 0.081 |
| 2033 Note | 0.205 | 0.308 |
| 2043 Note | 0.000 | 0.000 |
| **Aggregate** | **0.076** | **0.077** |

**Panel B: Distribution of Time Elapsed between Trades in Academic Paper**

This table presents the distribution of time elapsed between trades (in days) in dollar-denominated US corporate bonds in the State Street Corporation custody trades database during the period from January 2003 to December 2005.  The time elapsed is defined as the number of days between successive trades of a given bond.  Bonds that trade in a given year are sorted in the order of increasing time elapsed and the decile cut-off values are computed.  The values shown are the average time elapsed of the bond for the given percentile range.  For example, the data shows that the median trade had an elapsed time of 13 days in 2003 between successive trades and 12 days in 2005. (Mahanti et al., p. 282).

| Percentile | 2003 | 2004 | 2005 |
|---|---|---|---|
| 10 | 1 | 1 | 1 |
| 20 | 2 | 2 | 2 |
| 30 | 4 | 4 | 4 |
| 40 | 7 | 8 | 8 |
| 50 | 13 | 13 | 12 |
| 60 | 24 | 23 | 21 |
| 70 | 42 | 40 | 39 |
| 80 | 82 | 79 | 78 |
| 90 | 184 | 187 | 188 |

**Sources:**
FINRA TRACE Data; Bloomberg; and Sriketani Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko and Gaurav Mallik, "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," Journal of Financial Economics, Volume 88, Issue 2, pp. 272–298 (May 2008).

**Notes:**
* For  the 2020B Note and the 2024B Note, which were issued on 11/3/2014, the average statistics cover 11/4/2014 to 12/31/2014.  For the other notes, the average statistics covers 4/21/2014, which is the second trading day in the Exchange Act Class Period, to 12/31/2014.
** For  the 2021 Note, which was issued on 3/25/2015, the average statistics covers 3/26/2015 to 9/29/2015.  For the other notes, the average statistics cover 1/1/2015 to 9/29/2015.
Aggregate statistics are aggregate average of days elapsed between trades for all Navient Exemplar Notes.

**Exhibit XVI**
**Navient Exemplar Notes Trade Size**

| Note | Average Daily Trade Size | | | |
|------|---------|---------|---------|---------|
| | **Minimum** | **Average** | **Median** | **Max** |
| 2018A Note | $2,000 | $38,929 | $19,932 | $1,685,057 |
| 2018B Note | $3,468 | $957,023 | $494,613 | $8,999,524 |
| 2019A Note | $2,040 | $801,876 | $455,449 | $9,738,693 |
| 2019B Note | $3,090 | $483,538 | $166,284 | $5,187,694 |
| 2020A Note | $3,336 | $861,945 | $450,099 | $11,690,534 |
| 2020B Note | $4,378 | $554,251 | $159,242 | $14,014,208 |
| 2021 Note | $5,019 | $536,480 | $204,044 | $4,376,555 |
| 2022 Note | $2,227 | $615,581 | $218,730 | $9,354,613 |
| 2023 Note | $3,697 | $157,405 | $62,982 | $1,602,635 |
| 2024A Note | $4,038 | $483,303 | $175,500 | $6,658,577 |
| 2024B Note | $3,770 | $510,248 | $121,068 | $15,108,938 |
| 2033 Note | $840 | $350,262 | $47,815 | $13,869,063 |
| 2043 Note | n/a | n/a | n/a | n/a |
| **Aggregate** | **$21,784** | **$469,891** | **$366,119** | **$2,732,216** |

**Source:**
FINRA TRACE Data.

**Note:**
Daily trade size is computed as total value ($) traded during stock market hours divided by the number of transactions during stock market hours.

Aggregate statistics are based on daily aggregate trade size for the Navient Exemplar Notes, except for the 2043 Note. Data for the exchange-traded 2043 Note is not available.

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note<br>Totals | 2018A<br>110 | 2018B<br>139 | 2019A<br>113 | 2019B<br>98 | 2020A<br>147 | 2020B<br>90 | 2021<br>78 | 2022<br>101 | 2023<br>207 | 2024A<br>132 | 2024B<br>91 | 2033<br>101 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] BCAP | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [2] BKCM | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [3] BNDS | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [4] BOFA | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [5] CHAS | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [6] CITI | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [7] DEAN | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [8] FIBS | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [9] GSCO | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [10] JANY | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [11] JPMS | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [12] JVBG | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [13] MADV | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [14] MKTX | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [15] MSCO | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [16] NFSC | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [17] PERS | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [18] PWJC | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [19] TDAR | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [20] TMCC | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [21] UBSW | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [22] VGRD | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [23] WCHV | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [24] WRET | 12 | X | X | X | X | X | X | X | X | X | X | X | X |
| [25] BGCF | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [26] CGWM | 11 | X | X | X | --- | X | X | X | X | X | X | X | X |
| [27] DBKS | 11 | X | X | X | X | X | X | X | X | X | X | X | --- |
| [28] EDFC | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [29] FBCO | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [30] FCCP | 11 | X | X | X | X | X | X | X | X | X | X | --- | X |
| [31] FNET | 11 | X | --- | X | X | X | X | X | X | X | X | X | X |
| [32] GFIG | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [33] JEFF | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [34] JSCA | 11 | --- | X | X | X | X | X | X | X | X | X | X | X |
| [35] MLCO | 11 | X | X | X | X | X | X | X | X | X | X | --- | X |
| [36] ODNC | 11 | X | X | X | X | X | X | --- | X | X | X | X | X |
| [37] RBCD | 11 | X | X | X | X | X | X | --- | X | X | X | X | X |
| [38] SMRD | 11 | X | X | X | X | X | X | --- | X | X | X | X | X |
| [39] STFL | 11 | X | X | X | X | X | X | X | X | X | X | X | --- |
| [40] VABD | 11 | X | X | X | X | X | X | X | X | X | X | --- | X |
| [41] YLPL | 11 | X | X | X | X | X | X | --- | X | X | X | X | X |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note / Totals | 2018A | 2018B | 2019A | 2019B | 2020A | 2020B | 2021 | 2022 | 2023 | 2024A | 2024B | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Totals* | *110* | *139* | *113* | *98* | *147* | *90* | *78* | *101* | *207* | *132* | *91* | *101* |
| [42] ETRS | 11 | X | X | X | X | X | --- | X | X | X | X | X | X |
| [43] BGCX | 10 | --- | X | X | X | X | X | X | X | X | X | X | --- |
| [44] BGIS | 10 | --- | X | X | X | X | X | --- | X | X | X | X | X |
| [45] BIGG | 10 | --- | X | X | X | X | X | --- | X | X | X | X | X |
| [46] INGS | 10 | --- | X | X | --- | X | X | X | X | X | X | X | X |
| [47] NATL | 10 | --- | X | X | X | X | X | --- | X | X | X | X | X |
| [48] NMRA | 10 | --- | X | X | X | X | X | X | X | X | X | X | --- |
| [49] PATR | 10 | --- | X | X | X | X | X | X | X | X | X | X | --- |
| [50] GARB | 10 | --- | X | X | X | X | --- | X | X | X | X | X | X |
| [51] PARI | 10 | --- | X | X | X | X | --- | X | X | X | X | X | X |
| [52] CSTI | 9 | X | X | --- | --- | X | X | X | X | X | X | --- | X |
| [53] MZHO | 9 | --- | --- | X | --- | X | X | X | X | X | X | X | X |
| [54] RSSE | 9 | --- | X | X | X | X | X | --- | X | X | X | --- | X |
| [55] SEID | 9 | --- | X | --- | X | X | X | --- | X | X | X | X | X |
| [56] SSIC | 9 | X | X | X | X | --- | X | --- | --- | X | X | X | X |
| [57] ZDNF | 9 | X | X | X | X | X | X | X | --- | X | X | --- | --- |
| [58] MESF | 9 | X | X | X | X | X | --- | X | --- | X | X | X | --- |
| [59] SWST | 9 | X | X | X | --- | X | --- | --- | X | X | X | X | X |
| [60] AEFA | 8 | X | --- | X | X | X | X | --- | X | X | --- | X | --- |
| [61] BBNT | 8 | X | X | X | --- | X | X | X | X | X | --- | --- | --- |
| [62] FBPC | 8 | --- | X | --- | X | X | X | X | --- | X | X | X | --- |
| [63] HRBF | 8 | X | --- | X | X | X | X | --- | X | X | --- | X | --- |
| [64] IBCO | 8 | --- | X | X | X | X | X | --- | X | X | X | --- | --- |
| [65] MURF | 8 | --- | X | X | X | X | X | --- | X | X | X | --- | --- |
| [66] RCMA | 8 | --- | X | X | X | X | X | --- | X | X | X | --- | --- |
| [67] SSLL | 8 | X | --- | X | X | --- | X | --- | --- | X | X | X | X |
| [68] TMBR | 8 | --- | X | X | X | X | X | --- | X | X | X | --- | --- |
| [69] WUND | 8 | X | --- | X | --- | X | X | X | X | X | X | --- | --- |
| [70] BDDK | 8 | X | X | X | --- | X | --- | --- | X | X | X | X | --- |
| [71] CFCS | 8 | --- | X | X | X | X | --- | --- | X | X | X | X | --- |
| [72] IBKR | 8 | --- | X | X | X | X | --- | --- | --- | X | X | X | X |
| [73] MLMA | 8 | X | X | --- | --- | X | --- | --- | X | X | X | X | X |
| [74] BDTR | 8 | X | X | X | X | X | --- | --- | --- | X | X | --- | X |
| [75] RAJA | 8 | X | X | X | X | X | --- | --- | --- | X | X | --- | X |
| [76] CFCO | 7 | --- | X | X | --- | X | X | --- | --- | --- | X | X | X |
| [77] FATS | 7 | --- | X | --- | X | X | X | X | --- | X | --- | X | --- |
| [78] LATG | 7 | --- | X | --- | X | X | X | --- | X | X | X | --- | --- |
| [79] OPCO | 7 | --- | X | --- | --- | X | X | X | --- | X | X | X | --- |
| [80] SCSI | 7 | --- | X | --- | X | --- | X | X | --- | X | --- | X | X |
| [81] SPGS | 7 | --- | --- | X | X | --- | X | X | --- | X | X | --- | X |
| [82] CFSC | 7 | --- | X | --- | --- | X | --- | --- | X | X | X | X | X |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note Totals | 2018A 110 | 2018B 139 | 2019A 113 | 2019B 98 | 2020A 147 | 2020B 90 | 2021 78 | 2022 101 | 2023 207 | 2024A 132 | 2024B 91 | 2033 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [83] RWPS | 7 | --- | X | X | --- | X | --- | --- | --- | X | X | X | X |
| [84] VMEX | 7 | --- | --- | X | --- | X | --- | X | --- | X | X | X | X |
| [85] MAXC | 7 | --- | X | X | X | X | --- | --- | X | X | X | --- | --- |
| [86] GATS | 6 | --- | X | --- | --- | X | X | X | --- | --- | X | --- | X |
| [87] NTRC | 6 | --- | X | --- | --- | X | X | --- | X | X | --- | --- | X |
| [88] WBLR | 6 | --- | X | X | --- | X | X | X | X | --- | --- | --- | --- |
| [89] DCSD | 6 | X | --- | --- | --- | X | --- | X | --- | X | X | X | --- |
| [90] EBKR | 6 | --- | X | X | --- | X | --- | --- | --- | X | X | X | --- |
| [91] HBCO | 6 | X | X | --- | --- | X | --- | --- | --- | X | X | X | --- |
| [92] SUFI | 6 | --- | X | X | X | --- | --- | --- | X | X | --- | X | --- |
| [93] MAXM | 6 | --- | X | --- | X | X | --- | X | --- | X | X | --- | --- |
| [94] NBLB | 6 | X | --- | X | X | --- | --- | X | --- | X | X | --- | --- |
| [95] CSMI | 6 | X | X | --- | X | --- | --- | --- | X | X | X | --- | --- |
| [96] EDJO | 6 | X | X | X | --- | --- | --- | --- | --- | X | X | --- | X |
| [97] ESPO | 6 | X | X | X | --- | X | --- | --- | --- | X | X | --- | --- |
| [98] FISB | 6 | X | X | --- | --- | X | --- | --- | X | X | X | --- | --- |
| [99] RJFS | 6 | X | X | X | X | --- | --- | --- | --- | X | --- | --- | X |
| [100] MACC | 6 | --- | X | X | --- | X | --- | --- | --- | X | X | --- | X |
| [101] ROYL | 6 | --- | X | X | --- | X | --- | --- | --- | X | X | --- | X |
| [102] BARD | 5 | --- | X | X | --- | --- | X | X | --- | X | --- | --- | --- |
| [103] DOTC | 5 | X | X | --- | --- | X | X | --- | --- | --- | --- | --- | X |
| [104] MWIL | 5 | X | --- | --- | --- | --- | X | X | --- | X | --- | X | --- |
| [105] WEGI | 5 | X | --- | X | --- | X | X | --- | --- | X | --- | --- | --- |
| [106] WTKR | 5 | --- | --- | X | X | --- | X | X | --- | X | --- | --- | --- |
| [107] NESC | 5 | --- | --- | --- | --- | X | --- | --- | --- | X | X | X | X |
| [108] FUND | 5 | --- | X | --- | --- | --- | --- | X | --- | X | X | --- | X |
| [109] CRTS | 5 | X | X | --- | --- | X | --- | --- | X | X | --- | --- | --- |
| [110] TAFI | 5 | X | --- | --- | --- | X | --- | --- | X | X | --- | --- | X |
| [111] WEDB | 5 | X | --- | X | X | --- | --- | --- | --- | X | --- | --- | X |
| [112] EFGC | 5 | --- | --- | --- | X | X | --- | --- | X | X | --- | --- | X |
| [113] CREW | 4 | X | --- | X | --- | X | X | --- | --- | --- | --- | --- | --- |
| [114] SALC | 4 | --- | X | --- | --- | --- | X | X | --- | --- | --- | X | --- |
| [115] VFIN | 4 | --- | --- | --- | --- | --- | X | --- | X | --- | X | --- | X |
| [116] AGIS | 4 | X | --- | --- | --- | --- | --- | --- | X | X | --- | X | --- |
| [117] FINW | 4 | --- | --- | --- | --- | X | --- | X | --- | X | X | --- | --- |
| [118] LISI | 4 | --- | --- | --- | --- | X | --- | X | --- | X | X | --- | --- |
| [119] NITE | 4 | --- | X | X | X | --- | --- | X | --- | --- | --- | --- | --- |
| [120] WMBU | 4 | --- | --- | --- | X | --- | --- | X | --- | X | X | --- | --- |
| [121] BOSC | 4 | X | X | --- | --- | X | --- | --- | --- | X | --- | --- | --- |
| [122] JNFS | 4 | X | X | --- | --- | X | --- | --- | --- | --- | X | --- | --- |
| [123] NORC | 4 | X | --- | --- | --- | --- | --- | --- | X | X | X | --- | --- |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note Totals | 2018A 110 | 2018B 139 | 2019A 113 | 2019B 98 | 2020A 147 | 2020B 90 | 2021 78 | 2022 101 | 2023 207 | 2024A 132 | 2024B 91 | 2033 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [124] WAYN | 4 | X | --- | X | --- | --- | --- | --- | X | --- | X | --- | --- |
| [125] CMCA | 4 | --- | --- | X | --- | --- | --- | --- | --- | X | X | --- | X |
| [126] CMMW | 4 | --- | X | --- | --- | --- | --- | --- | X | X | --- | --- | X |
| [127] ULAT | 4 | --- | --- | --- | X | X | --- | --- | --- | X | --- | --- | X |
| [128] KRTH | 4 | --- | X | --- | --- | X | --- | --- | --- | X | X | --- | --- |
| [129] STTT | 4 | --- | X | X | --- | --- | --- | --- | --- | X | X | --- | --- |
| [130] CICI | 4 | --- | --- | --- | --- | X | --- | --- | X | X | X | --- | --- |
| [131] AJCO | 3 | --- | X | --- | --- | --- | X | --- | --- | --- | --- | --- | X |
| [132] BDBS | 3 | --- | --- | --- | --- | --- | X | --- | --- | --- | X | X | --- |
| [133] TDSI | 3 | --- | --- | --- | --- | --- | X | --- | --- | --- | X | X | --- |
| [134] LATN | 3 | X | --- | X | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [135] SALI | 3 | --- | --- | --- | --- | X | --- | --- | --- | X | --- | X | --- |
| [136] BANK | 3 | --- | --- | --- | --- | --- | --- | X | --- | X | X | --- | --- |
| [137] FNIC | 3 | --- | --- | --- | --- | --- | --- | X | --- | X | X | --- | --- |
| [138] AALC | 3 | X | --- | X | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [139] CALT | 3 | X | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [140] CSAI | 3 | X | --- | --- | X | --- | --- | --- | --- | X | --- | --- | --- |
| [141] DAVA | 3 | X | --- | --- | --- | --- | --- | --- | X | --- | X | --- | --- |
| [142] FBLT | 3 | X | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | X |
| [143] ICCP | 3 | X | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [144] LTCO | 3 | X | --- | --- | --- | --- | --- | --- | X | X | --- | --- | --- |
| [145] RGLS | 3 | X | --- | --- | --- | --- | --- | --- | X | --- | X | --- | --- |
| [146] RJFI | 3 | X | X | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [147] SBRO | 3 | X | --- | --- | X | X | --- | --- | --- | --- | --- | --- | --- |
| [148] STOS | 3 | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| [149] WISI | 3 | X | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | X |
| [150] WRIS | 3 | X | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [151] BTSS | 3 | --- | --- | --- | --- | X | --- | --- | --- | X | --- | --- | X |
| [152] MUFG | 3 | --- | X | --- | --- | X | --- | --- | --- | --- | --- | --- | X |
| [153] OXPS | 3 | --- | --- | X | --- | --- | --- | --- | --- | X | --- | --- | X |
| [154] SEIC | 3 | --- | X | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| [155] SEMT | 3 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | X | X |
| [156] HSBK | 3 | --- | X | --- | --- | X | --- | --- | --- | X | --- | --- | --- |
| [157] IESI | 3 | --- | X | --- | --- | X | --- | --- | --- | X | --- | --- | --- |
| [158] SAIN | 3 | --- | X | --- | --- | X | --- | --- | X | --- | --- | --- | --- |
| [159] SUSQ | 3 | --- | X | X | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [160] TRNP | 3 | --- | X | --- | --- | X | --- | --- | --- | --- | X | --- | --- |
| [161] WHCG | 3 | --- | X | --- | X | --- | --- | --- | --- | X | --- | --- | --- |
| [162] BWEL | 3 | --- | --- | --- | --- | X | --- | --- | --- | X | X | --- | --- |
| [163] CGDN | 3 | --- | --- | X | --- | X | --- | --- | --- | X | --- | --- | --- |
| [164] LNKS | 3 | --- | --- | X | X | X | --- | --- | --- | --- | --- | --- | --- |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| | Note | 2018A | 2018B | 2019A | 2019B | 2020A | 2020B | 2021 | 2022 | 2023 | 2024A | 2024B | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Broker** | *Totals* | *110* | *139* | *113* | *98* | *147* | *90* | *78* | *101* | *207* | *132* | *91* | *101* |
| **[165]** RAYG | *3* | --- | --- | X | --- | X | --- | --- | --- | X | --- | --- | --- |
| **[166]** BECM | *3* | --- | --- | --- | --- | --- | --- | --- | X | X | X | --- | --- |
| **[167]** GFSI | *3* | --- | --- | --- | X | --- | --- | --- | X | X | --- | --- | --- |
| **[168]** SIIW | *3* | --- | --- | --- | --- | --- | --- | --- | X | X | X | --- | --- |
| **[169]** FLTU | *3* | --- | --- | X | X | --- | --- | --- | --- | X | --- | --- | --- |
| **[170]** ASLB | *2* | --- | --- | --- | --- | --- | X | X | --- | --- | --- | --- | --- |
| **[171]** LNCL | *2* | X | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- |
| **[172]** ANDG | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | X | --- |
| **[173]** CTSC | *2* | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- |
| **[174]** FORE | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | X | --- |
| **[175]** MITR | *2* | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | X | --- |
| **[176]** SSPR | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | X | --- |
| **[177]** STOV | *2* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| **[178]** FALC | *2* | --- | X | --- | --- | --- | --- | X | --- | --- | --- | --- | --- |
| **[179]** HTDX | *2* | --- | --- | --- | --- | --- | --- | X | --- | --- | X | --- | --- |
| **[180]** CCMM | *2* | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[181]** CGAM | *2* | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[182]** DADA | *2* | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[183]** FFEC | *2* | X | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **[184]** HJSC | *2* | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[185]** IMPC | *2* | X | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **[186]** JPTC | *2* | X | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[187]** NWML | *2* | X | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| **[188]** ADSO | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[189]** GSIL | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[190]** LMKO | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[191]** MOLO | *2* | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | X |
| **[192]** POLI | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[193]** SSCO | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[194]** WPCC | *2* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | X |
| **[195]** BGHT | *2* | --- | X | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[196]** CTLA | *2* | --- | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| **[197]** FAST | *2* | --- | X | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[198]** KING | *2* | --- | X | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| **[199]** PICE | *2* | --- | X | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| **[200]** PPSL | *2* | --- | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| **[201]** PRBC | *2* | --- | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| **[202]** PRGI | *2* | --- | X | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| **[203]** SGAS | *2* | --- | X | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| **[204]** ICMI | *2* | --- | --- | --- | --- | X | --- | --- | X | --- | --- | --- | --- |
| **[205]** SEEL | *2* | --- | --- | --- | --- | X | --- | --- | X | --- | --- | --- | --- |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note Totals | 2018A 110 | 2018B 139 | 2019A 113 | 2019B 98 | 2020A 147 | 2020B 90 | 2021 78 | 2022 101 | 2023 207 | 2024A 132 | 2024B 91 | 2033 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [206] SPAC | 2 | --- | --- | --- | --- | X | --- | --- | --- | X | --- | --- | --- |
| [207] UPLN | 2 | --- | --- | X | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [208] WBFS | 2 | --- | --- | --- | X | X | --- | --- | --- | --- | --- | --- | --- |
| [209] FBSB | 2 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [210] BRGE | 2 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [211] DOMK | 2 | --- | --- | --- | X | --- | --- | --- | --- | X | --- | --- | --- |
| [212] FDSC | 2 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [213] INTA | 2 | --- | --- | X | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [214] MULT | 2 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [215] SMPR | 2 | --- | --- | --- | --- | --- | --- | --- | --- | X | X | --- | --- |
| [216] TSPI | 2 | --- | --- | X | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [217] FFCB | 1 | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- |
| [218] REGR | 1 | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- |
| [219] VSRF | 1 | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- |
| [220] WCSC | 1 | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- |
| [221] EXCS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [222] NHWI | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [223] TRIP | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [224] VNDM | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [225] WING | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- |
| [226] FCST | 1 | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- |
| [227] SABS | 1 | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- | --- |
| [228] ASPN | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [229] BFEC | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [230] CBTD | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [231] DOVE | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [232] EKRI | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [233] GLYN | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [234] HAZL | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [235] HENN | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [236] INSC | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [237] JWCF | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [238] MISL | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [239] MJDW | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [240] RAIN | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [241] RILY | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [242] SEMQ | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [243] SGLC | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [244] SSET | 1 | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [245] IPAC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |
| [246] IRMD | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note | 2018A | 2018B | 2019A | 2019B | 2020A | 2020B | 2021 | 2022 | 2023 | 2024A | 2024B | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Totals* | *110* | *139* | *113* | *98* | *147* | *90* | *78* | *101* | *207* | *132* | *91* | *101* |
| [247] LAKE | *1* | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |
| [248] LEBO | *1* | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |
| [249] NTBC | *1* | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |
| [250] WEGE | *1* | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | X |
| [251] AGFA | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [252] ALAC | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [253] CBSE | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [254] FISA | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [255] INPR | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [256] ISCN | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [257] MHSI | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [258] MIAM | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [259] MWRI | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [260] NESS | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [261] SUMI | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [262] WBRO | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [263] WELD | *1* | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [264] ACSL | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [265] APFS | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [266] AVIL | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [267] CPFS | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [268] CREF | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [269] CSPI | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [270] CTAS | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [271] CUNA | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [272] EFSP | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [273] INST | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [274] ITCC | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [275] KOVP | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [276] KOVS | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [277] LPSP | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [278] ROAR | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [279] SSIN | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [280] TRYN | *1* | --- | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- |
| [281] BCCS | *1* | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- |
| [282] BFFI | *1* | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [283] CIRI | *1* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [284] LASS | *1* | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [285] RAFF | *1* | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [286] BOKI | *1* | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- |
| [287] IPGR | *1* | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note | 2018A | 2018B | 2019A | 2019B | 2020A | 2020B | 2021 | 2022 | 2023 | 2024A | 2024B | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | | 110 | 139 | 113 | 98 | 147 | 90 | 78 | 101 | 207 | 132 | 91 | 101 |
| [288] JKRC | 1 | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- |
| [289] TITL | 1 | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- | --- |
| [290] CARC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [291] GWWD | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [292] MORA | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [293] NEXT | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [294] TFSS | 1 | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [295] GACC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [296] ACII | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [297] ACPL | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [298] AISG | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [299] BLTK | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [300] CATE | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [301] CNSI | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [302] COSL | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [303] DRSC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [304] FINT | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [305] FNSJ | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [306] HIAI | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [307] HSAI | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [308] IATS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [309] IVEX | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [310] JEFM | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [311] KEYB | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [312] KMSF | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [313] LQNF | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [314] LYON | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [315] MWMS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [316] NAPK | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [317] OHIO | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [318] PNCC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [319] PNCM | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [320] PWPR | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [321] SSGR | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [322] STSE | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [323] SUMT | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [324] TRID | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [325] VBSL | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [326] VSIN | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [327] WISC | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [328] WOOD | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |

**Exhibit XVII**
**Brokers for Navient Exemplar Notes at Some Point during the Exchange Act Class Period**

| Broker | Note Totals | 2018A 110 | 2018B 139 | 2019A 113 | 2019B 98 | 2020A 147 | 2020B 90 | 2021 78 | 2022 101 | 2023 207 | 2024A 132 | 2024B 91 | 2033 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [329] WYNS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- | --- |
| [330] ALEN | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [331] CGAT | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [332] GARR | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [333] JHDI | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [334] ROTH | 1 | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| [335] CNFI | 1 | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [336] LDLW | 1 | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [337] MKTI | 1 | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [338] WHBB | 1 | --- | --- | --- | X | --- | --- | --- | --- | --- | --- | --- | --- |
| [339] ARTI | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [340] DSIS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [341] FMAT | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [342] MSII | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |
| [343] TRNS | 1 | --- | --- | --- | --- | --- | --- | --- | --- | --- | X | --- | --- |

Source:
FINRA TRACE Data.

Notes:
Broker data for the exchange-traded 2043 Note is not available.  For other notes, *see*  Appendix I for methodology for determining the brokers.

**Exhibit XVIII**
**Market Value of Navient Exemplar Notes Outstanding**

| Note | Market Value of Notes Outstanding | | | |
|------|----------|---------|--------|-----|
| | Minimum | Average | Median | Max |
| 2018A Note | $187,027,786 | $198,845,888 | $199,461,358 | $203,818,000 |
| 2018B Note | $2,587,541,778 | $2,827,115,248 | $2,820,649,650 | $2,976,368,346 |
| 2019A Note | $1,178,823,594 | $1,286,307,413 | $1,288,376,744 | $1,354,687,500 |
| 2019B Note | $914,509,560 | $1,005,849,460 | $1,010,316,121 | $1,055,500,000 |
| 2020A Note | $1,452,257,651 | $1,675,581,090 | $1,686,895,393 | $1,786,275,000 |
| 2020B Note | $423,750,000 | $487,628,130 | $495,023,333 | $514,673,750 |
| 2021 Note | $431,173,889 | $485,971,921 | $497,857,143 | $518,526,440 |
| 2022 Note | $670,365,458 | $804,108,983 | $816,296,250 | $858,525,075 |
| 2023 Note | $813,073,276 | $957,710,132 | $970,005,377 | $1,005,188,207 |
| 2024A Note | $682,635,000 | $829,142,675 | $839,996,032 | $882,178,333 |
| 2024B Note | $408,585,185 | $469,049,858 | $476,091,000 | $507,450,000 |
| 2033 Note | $411,421,294 | $586,284,761 | $582,894,322 | $689,542,500 |
| 2043 Note | $217,440,000 | $259,809,770 | $262,620,000 | $276,120,000 |
| **Aggregate** | **$10,403,643,055** | **$11,202,259,608** | **$11,173,432,579** | **$11,945,536,479** |

**Sources:**
FINRA TRACE Data and Bloomberg.

**Notes:**
For the 2043 Note, market value of notes outstanding is equal to number of notes outstanding (12,000,000 notes) from Bloomberg multiplied by the volume weighted average price (VWAP) per note obtained from Bloomberg.

For the other notes, market value of notes outstanding is equal to notes outstanding (in par value) from Bloomberg multiplied by the VWAP between 9:30 am and 4:00 pm, divided by 100. See Appendix I for methodology to compute VWAP for all Navient Exemplar Notes except for the 2043 Note. Source: FINRA TRACE Data. For days on which VWAP is not available, prior VWAP is used. If VWAP is not available on the first day in the Exchange Act Class Period (i.e., 4/17/2014 or issuance day for notes issued during the Exchange Act Class Period), the first available VWAP is used.

Aggregate market value of notes outstanding is the total market value of all Navient Exemplar Notes.



**Exhibit XIX**
**Market Value of Navient Exemplar Notes**

**Sources:** Bloomberg and FINRA Trade Data.
**Notes:** The total amount of notes outstanding (in par value) has changed over the Exchange Act Class Period due to the issuance of the 2020B Note, the 2021 Note and the 2024B Note; as well as multiple debt repurchases of the 2033 Note.

**Exhibit XX**

**Navient Exemplar Notes Bid-Ask Spread during the Exchange Act Class Period**

| Note | Customer-Based Bid-Ask Spreads | | | Broker-Based Bid-Ask Spreads | | |
|---|---|---|---|---|---|---|
| | Mean % | Median % | Daily Observations | Mean % | Median % | Daily Observations |
| 2018A Note | 0.97% | 0.85% | 46 | 0.52% | 0.27% | 187 |
| 2018B Note | 0.41% | 0.22% | 109 | 0.27% | 0.11% | 211 |
| 2019A Note | 0.69% | 0.30% | 54 | 0.42% | 0.17% | 141 |
| 2019B Note | 0.93% | 0.49% | 54 | 0.51% | 0.24% | 140 |
| 2020A Note | 0.56% | 0.24% | 94 | 0.42% | 0.22% | 196 |
| 2020B Note | 1.67% | 1.04% | 31 | 0.68% | 0.28% | 79 |
| 2021 Note | 0.87% | 0.27% | 21 | 0.77% | 0.26% | 63 |
| 2022 Note | 0.92% | 0.26% | 32 | 0.44% | 0.12% | 108 |
| 2023 Note | 1.40% | 1.29% | 202 | 0.68% | 0.53% | 332 |
| 2024A Note | 1.21% | 0.77% | 75 | 0.66% | 0.28% | 201 |
| 2024B Note | 0.81% | 0.28% | 33 | 0.88% | 0.76% | 141 |
| 2033 Note | 1.24% | 0.37% | 24 | 0.81% | 0.48% | 137 |
| 2043 Note | 0.56% | 0.51% | 366 | 0.56% | 0.51% | 366 |
| **Aggregate** | **0.85%** | **0.51%** | **1141** | **0.57%** | **0.32%** | **2302** |

**Sources:**

FINRA TRACE Data and Bloomberg.

**Notes:**

For the 2043 Note, bid-ask spread is equal to closing ask price less closing bid price divided by the average of ask and bid prices.  For the other notes, see Appendix I for methodology to compute the bid-ask spreads.  "Daily observations" counts each day only once.

**Exhibit XXI**
**Institution Positions in Navient Exemplar Notes**

| Note | Positions of All Institutions | | | Institution Positions as a % of Notes Outstanding | | | Number of Institutions with Positive Positions | | |
|---|---|---|---|---|---|---|---|---|---|
| | 6/30/2014 | 12/31/2014 | 6/30/2015 | 6/30/2014 | 12/31/2014 | 6/30/2015 | 6/30/2014 | 12/31/2014 | 6/30/2015 |
| 2018A Note | 113,561,000 | 111,387,000 | 111,799,000 | 57% | 56% | 56% | 23 | 22 | 22 |
| 2018B Note | 1,418,362,000 | 1,488,851,000 | 1,471,112,000 | 57% | 60% | 59% | 110 | 115 | 109 |
| 2019A Note | 723,938,000 | 758,617,000 | 780,422,000 | 58% | 61% | 62% | 71 | 75 | 81 |
| 2019B Note | 590,257,000 | 577,238,000 | 600,490,000 | 59% | 58% | 60% | 59 | 59 | 59 |
| 2020A Note | 845,905,000 | 862,215,000 | 836,996,000 | 56% | 57% | 56% | 93 | 93 | 95 |
| 2020B Note | n/a | 228,263,000 | 215,009,000 | n/a | 46% | 43% | n/a | 67 | 64 |
| 2021 Note | n/a | n/a | 196,462,000 | n/a | n/a | 39% | n/a | n/a | 30 |
| 2022 Note | 362,066,000 | 394,458,000 | 416,147,000 | 48% | 53% | 55% | 52 | 54 | 55 |
| 2023 Note | 441,063,000 | 501,149,000 | 540,089,000 | 44% | 50% | 54% | 50 | 51 | 46 |
| 2024A Note | 522,974,000 | 547,291,000 | 527,891,000 | 62% | 64% | 62% | 53 | 65 | 67 |
| 2024B Note | n/a | 214,371,000 | 283,697,000 | n/a | 43% | 57% | n/a | 41 | 55 |
| 2033 Note | 365,248,000 | 332,917,000 | 311,345,000 | 49% | 46% | 46% | 37 | 42 | 35 |
| 2043 Note | 24,007,900 | 23,813,300 | 23,201,500 | 8% | 8% | 8% | 17 | 16 | 15 |
| **Aggregate** | | | | **54%** | **55%** | **55%** | **239** | **264** | **269** |

**Source:**
Bloomberg.

**Notes:**
Positions of institutions are in par value.  Institution positions as a % of notes outstanding is computed as positions of all institutions divided by the notes outstanding (in par value) for each note.  Aggregate institution position as a % of notes outstanding is computed as total par value held by institutions for all Navient Exemplar Notes divided by total amount of notes outstanding (in par value) for all Navient Exemplar Notes.  If same institution held more than one note, it is counted only once in the aggregate number of institutions with positive positions.
Per Bloomberg, the institution data "may not represent all institutions, if they are not required to publicly disclose their holdings.  Especially for fixed income securities, [Bloomberg] may not cover all holders, since public disclosure is not generally required."

**Exhibit XXII**

**Relationship Between Stock Volume and Navient Exemplar Notes Abnormal Returns**

| Date Range | Coefficient | t-stat | Observations | R-Squared |
|---|---|---|---|---|
| 04/21/2014 - 10/01/2015 | 0.0013 | 5.63 | 3,535 | 0.89% |

**Note:**

Based on a regression of absolute value of daily abnormal returns for Navient Exemplar Notes on the natural log of daily trading volume of Navient common stock, where single day abnormal return is available during the Exchange Act Class Period+.  Multiday returns are excluded from the analysis.  Daily abnormal returns and volume are provided in backups.

**Exhibit XXIII**

**Analysis of the Relationship between News and Abnormal Returns for Navient Exemplar Notes**

| Observation on a Date | ACTUAL NUMBER OF DAYS | | EXPECTED NUMBER OF DAYS [A] | | RATIO OF ACTUAL TO EXPECTED NUMBER OF DAYS | | Total |
|---|---|---|---|---|---|---|---|
| | No-News [B] | News [B] | No-News [B] | News [B] | No-News [B] | News [B] | |
| [1] Number of Days | 874 | 175 | 874 | 175 | 1 | 1 | 1049 |
| [2] No Statistically Significant Abnormal Return | 815 | 151 | 804.85 | 161.15 | 1.01 | 0.94 | 966 |
| [3] Statistically Significant Abnormal Return | 59 | 24 | 69.15 | 13.85 | 0.85 | 1.73 | 83 |
| [4] Percent of Statistically Significant Abnormal Return Days of Total Days | 6.8% | 13.7% | 7.9% | 7.9% | | | 7.9% |

**Notes:**

[A] Expected number of statistically significant days and no statistically significant days are based on their relative proportion in total multiplied by number of days in respective news and no-news groups.

[B] News released after 4 pm or during non-trading days are treated as impacting the following stock trading day. The "no-news" days are defined as days without any news with a time stamp. "News" days are defined as days that meet all of the following criteria: (1) total number of news with a time stamp is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 7 news articles); (2) number of news articles with a time stamp and "Bloomberg News" source is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 3 news articles); (3) number of news articles with a time stamp and "Bloomberg First Word" source is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 2 news articles); and (4) number of news articles with a time stamp and either "Bloomberg News" or "Bloomberg First Word" sources is at or greater than the 90th percentile of all days during Exchange Act Class Period+ (i.e., greater than or equal to 4 news articles). If a bond does not trade on one day, a multiday trade window is used. A multiday window is considered a "no-news" day if every day during this window is a "no-news" day. A multiday window is considered a "news" day if any day in this window is a "news" day. Source: Appendix C.

[1] Number of news/no-news trading days for all Navient Exemplar Notes.
[2] Number of news/no-news trading days without significant abnormal returns for all Navient Exemplar Notes.
[3] Number of news/no-news trading days with significant abnormal returns for all Navient Exemplar Notes.
[4] = [3] / [1].

**Exhibit XXIV-A**
**Navient Exemplar Notes Reaction to the July 13, 2015 Disclosure**

| Note | Date | Price | Return | Abnormal Return | t-stat | p-value | Sig |
|------|------|-------|--------|-----------------|--------|---------|-----|
| 2018A Note | 7/13/2015 | 99.74 | | | | | |
| | 7/14/2015 | 98.82 | -0.92% | -0.68% | -0.93 | 35.51% | |
| 2018B Note | 7/13/2015 | 111.48 | | | | | |
| | 7/14/2015 | 110.36 | -1.00% | -0.89% | -2.82 | 0.57% | ** |
| 2019A Note | 7/13/2015 | 102.26 | | | | | |
| | 7/14/2015 | 100.67 | -1.55% | -1.52% | -4.28 | 0.00% | ** |
| 2019B Note | 7/13/2015 | 102.15 | | | | | |
| | 7/14/2015 | 98.55 | -3.53% | -3.59% | -4.09 | 0.01% | ** |
| 2020A Note | 7/13/2015 | 111.73 | | | | | |
| | 7/14/2015 | 110.21 | -1.35% | -1.45% | -3.34 | 0.11% | ** |
| 2020B Note | 7/13/2015 | 98.51 | | | | | |
| | 7/14/2015 | 96.19 | -2.35% | -2.30% | -2.22 | 2.82% | * |
| 2021 Note | 7/10/2015 | 102.77 | | | | | |
| | 7/14/2015 | 98.49 | -4.16% | -4.70% | -3.42 | 0.09% | ** |
| 2022 Note | 7/13/2015 | 105.03 | | | | | |
| | 7/14/2015 | 103.72 | -1.25% | -1.19% | -1.04 | 30.13% | |
| 2023 Note | 7/13/2015 | 95.73 | | | | | |
| | 7/14/2015 | 92.78 | -3.09% | -3.08% | -4.53 | 0.00% | ** |
| 2024A Note | 7/13/2015 | 97.21 | | | | | |
| | 7/14/2015 | 93.70 | -3.61% | -3.80% | -4.00 | 0.01% | ** |
| 2024B Note | 7/13/2015 | 94.26 | | | | | |
| | 7/14/2015 | 91.23 | -3.22% | -3.44% | -2.55 | 1.23% | * |
| 2033 Note | 7/8/2015 | 80.30 | | | | | |
| | 7/14/2015 | 77.60 | -3.36% | -3.51% | -1.79 | 7.55% | |
| 2043 Note | 7/13/2015 | 21.68 | | | | | |
| | 7/14/2015 | 21.35 | -1.50% | -1.56% | -2.89 | 0.47% | ** |

**Sources:**
Bloomberg and FINRA TRACE Data.

**Notes:**
Daily statistics are computed based on the event study method described in Section X of the report. Only days with volume weighted average prices (VWAP) between 9:30 am and 4:00 pm are included. VWAP for the 2043 Note is obtained from Bloomberg. The methodology to compute VWAP for other notes are described in Appendix I.

**Exhibit XXIV-B**
**Navient Exemplar Notes Reaction to the July 21-22, 2015 Disclosure**

| Note | Date | Price | Note | Abnormal Return | t-stat | p-value | Sig |
|---|---|---|---|---|---|---|---|
| 2018A Note | 7/21/2015 | 99.32 | | | | | |
| | 7/22/2015 | 98.26 | -1.07% | -0.90% | -1.29 | 20.03% | |
| | 7/23/2015 | 99.85 | 1.62% | 1.56% | 2.22 | 2.82% | * |
| | 7/24/2015 | 99.58 | -0.27% | -0.41% | -0.58 | 56.01% | |
| | Cumulative | | 0.26% | 0.23% | 0.20 | 83.98% | |
| 2018B Note | 7/21/2015 | 110.04 | | | | | |
| | 7/22/2015 | 109.84 | -0.18% | 0.13% | 0.41 | 68.41% | |
| | 7/23/2015 | 109.40 | -0.40% | -0.37% | -1.21 | 23.06% | |
| | 7/24/2015 | 108.84 | -0.51% | -0.24% | -0.76 | 44.63% | |
| | Cumulative | | -1.09% | -0.48% | -0.90 | 36.91% | |
| 2019A Note | 7/21/2015 | 100.63 | | | | | |
| | 7/22/2015 | 100.02 | -0.60% | -0.22% | -0.61 | 54.14% | |
| | 7/23/2015 | 99.98 | -0.05% | -0.09% | -0.25 | 80.16% | |
| | 7/24/2015 | 98.14 | -1.83% | -1.69% | -4.70 | 0.00% | ** |
| | Cumulative | | -2.47% | -2.00% | -3.21 | 0.17% | ** |
| 2019B Note | 7/21/2015 | 97.57 | | | | | |
| | 7/22/2015 | 96.95 | -0.63% | -0.12% | -0.17 | 86.90% | |
| | 7/23/2015 | 96.18 | -0.80% | -0.38% | -0.51 | 61.26% | |
| | 7/24/2015 | 94.56 | -1.68% | -0.50% | -0.66 | 50.82% | |
| | Cumulative | | -3.08% | -1.00% | -0.77 | 44.18% | |
| 2020A Note | 7/21/2015 | 107.96 | | | | | |
| | 7/22/2015 | 107.28 | -0.62% | -0.30% | -0.72 | 47.12% | |
| | 7/23/2015 | 107.14 | -0.13% | -0.10% | -0.25 | 80.34% | |
| | 7/24/2015 | 104.89 | -2.10% | -1.98% | -4.76 | 0.00% | ** |
| | Cumulative | | -2.84% | -2.37% | -3.31 | 0.13% | ** |
| 2020B Note | 7/21/2015 | 95.01 | | | | | |
| | 7/22/2015 | 93.86 | -1.21% | -0.88% | -0.95 | 34.55% | |
| | 7/23/2015 | 94.10 | 0.25% | 0.03% | 0.04 | 97.20% | |
| | 7/24/2015 | 92.51 | -1.68% | -2.34% | -2.72 | 0.75% | ** |
| | Cumulative | | -2.63% | -3.17% | -2.10 | 3.81% | * |
| 2021 Note | 7/21/2015 | 95.83 | | | | | |
| | 7/22/2015 | 95.57 | -0.27% | 0.03% | 0.02 | 98.30% | |
| | 7/23/2015 | 96.79 | 1.27% | 1.43% | 1.04 | 30.16% | |
| | 7/24/2015 | 96.78 | -0.01% | 0.14% | 0.10 | 91.96% | |
| | Cumulative | | 0.99% | 1.60% | 0.67 | 50.42% | |
| 2022 Note | 7/21/2015 | 102.87 | | | | | |
| | 7/22/2015 | 100.50 | -2.30% | -1.88% | -1.62 | 10.78% | |
| | 7/23/2015 | 100.26 | -0.24% | -0.31% | -0.26 | 79.23% | |
| | 7/24/2015 | 98.54 | -1.72% | -2.18% | -1.89 | 6.14% | |
| | Cumulative | | -4.21% | -4.31% | -2.18 | 3.14% | * |

**Exhibit XXIV-B**
**Navient Exemplar Notes Reaction to the July 21-22, 2015 Disclosure**

| Note | Date | Price | Note | Abnormal Return | t-stat | p-value | Sig |
|------|------|-------|------|--------|--------|---------|-----|
| 2023 Note | 7/21/2015 | 91.73 | | | | | |
| | 7/22/2015 | 90.50 | -1.35% | -1.02% | -1.48 | 14.06% | |
| | 7/23/2015 | 89.02 | -1.64% | -1.34% | -1.94 | 5.44% | |
| | 7/24/2015 | 88.12 | -1.01% | -0.22% | -0.31 | 75.49% | |
| | Cumulative | | -3.94% | -2.56% | -2.16 | 3.29% | * |
| | | | | | | | |
| 2024A Note | 7/21/2015 | 93.75 | | | | | |
| | 7/22/2015 | 93.75 | 0.00% | 0.55% | 0.58 | 56.51% | |
| | 7/23/2015 | 91.75 | -2.13% | -2.04% | -2.12 | 3.62% | * |
| | 7/24/2015 | 89.64 | -2.30% | -1.55% | -1.58 | 11.65% | |
| | Cumulative | | -4.39% | -3.03% | -1.80 | 7.39% | |
| | | | | | | | |
| 2024B Note | 7/21/2015 | 91.53 | | | | | |
| | 7/22/2015 | 90.17 | -1.49% | -1.11% | -0.84 | 40.08% | |
| | 7/23/2015 | 89.13 | -1.15% | -1.16% | -0.87 | 38.56% | |
| | 7/24/2015 | 87.56 | -1.76% | -1.33% | -1.00 | 31.87% | |
| | Cumulative | | -4.34% | -3.55% | -1.57 | 11.97% | |
| | | | | | | | |
| 2033 Note | 7/21/2015 | 76.10 | | | | | |
| | 7/22/2015 | 74.05 | -2.69% | -2.85% | -1.45 | 14.86% | |
| | 7/23/2015 | 72.61 | -1.94% | -1.40% | -0.71 | 47.83% | |
| | 7/24/2015 | 72.97 | 0.49% | 1.91% | 0.97 | 33.33% | |
| | Cumulative | | -4.11% | -2.38% | -0.69 | 49.19% | |
| | | | | | | | |
| 2043 Note | 7/21/2015 | 21.45 | | | | | |
| | 7/22/2015 | 21.40 | -0.23% | -0.04% | -0.06 | 94.85% | |
| | 7/23/2015 | 21.27 | -0.59% | -0.84% | -1.54 | 12.76% | |
| | 7/24/2015 | 21.00 | -1.28% | -1.59% | -2.91 | 0.43% | ** |
| | Cumulative | | -2.10% | -2.46% | -2.61 | 1.04% | * |

**Sources:**
Bloomberg and FINRA TRACE Data.

**Notes:**
Daily statistics are computed based on the event study method described in Section X of the report.  Only days with volume weighted average prices (VWAP) between 9:30 am and 4:00 pm are included.  VWAP for the 2043 Note is obtained from Bloomberg. The methodology to compute VWAP for other notes are described in Appendix I. For cumulative statistics, return and abnormal return are computed as compounded return from 7/22/2015 to 7/24/2015; t-statistic is the sum of daily t-statistics divided by the squared root of number of days with bond returns;  p-value is computed based on the degrees of freedom for the market model estimated for the first impact date, July 22, 2015; p-values less than or equal to 1% and 5% are denoted by ** and *, respectively.

**Exhibit XXIV-C**
**Navient Exemplar Notes Reaction to the September 29, 2015 Disclosure**

| Note | Date | Price | Note | Abnormal Return | t-stat | p-value | Sig |
|---|---|---|---|---|---|---|---|
| 2018A Note | 9/24/2015 | 93.51 | | | | | |
| | 9/29/2015 | 94.56 | 1.12% | 2.95% | 3.00 | 0.33% | ** |
| | 9/30/2015 | 93.74 | -0.87% | -0.82% | -0.84 | 40.43% | |
| | 10/1/2015 | 94.00 | 0.28% | 0.98% | 1.00 | 31.93% | |
| | 10/2/2015 | 94.54 | 0.57% | 1.70% | 1.73 | 8.61% | |
| | Cumulative | | 1.09% | 4.86% | 2.45 | 1.60% | * |
| | | | | | | | |
| 2018B Note | 9/25/2015 | 104.81 | | | | | |
| | 9/29/2015 | 103.50 | -1.25% | 0.37% | 1.18 | 24.12% | |
| | 9/30/2015 | 102.84 | -0.64% | -0.80% | -2.56 | 1.20% | * |
| | 10/1/2015 | 101.74 | -1.07% | -0.55% | -1.76 | 8.20% | |
| | 10/5/2015 | 99.00 | -2.69% | -3.10% | -9.92 | 0.00% | ** |
| | Cumulative | | -5.54% | -4.04% | -6.53 | 0.00% | ** |
| | | | | | | | |
| 2019A Note | 9/28/2015 | 95.00 | | | | | |
| | 9/29/2015 | 94.31 | -0.73% | -0.37% | -0.86 | 39.37% | |
| | 9/30/2015 | 94.35 | 0.05% | -0.18% | -0.42 | 67.72% | |
| | 10/1/2015 | 90.28 | -4.32% | -3.92% | -9.13 | 0.00% | ** |
| | 10/2/2015 | 87.23 | -3.38% | -3.05% | -7.10 | 0.00% | ** |
| | Cumulative | | -8.18% | -7.36% | -8.75 | 0.00% | ** |
| | | | | | | | |
| 2019B Note | 9/28/2015 | 92.54 | | | | | |
| | 9/29/2015 | 91.45 | -1.18% | -0.77% | -0.86 | 39.44% | |
| | 9/30/2015 | 91.05 | -0.44% | -0.73% | -0.81 | 42.25% | |
| | 10/1/2015 | 86.18 | -5.35% | -4.92% | -5.46 | 0.00% | ** |
| | 10/2/2015 | 84.23 | -2.26% | -1.78% | -1.97 | 5.10% | |
| | Cumulative | | -8.98% | -8.00% | -4.55 | 0.00% | ** |
| | | | | | | | |
| 2020A Note | 9/28/2015 | 97.00 | | | | | |
| | 9/29/2015 | 96.82 | -0.19% | 0.24% | 0.44 | 66.01% | |
| | 9/30/2015 | 96.02 | -0.83% | -0.98% | -1.83 | 6.95% | |
| | 10/1/2015 | 96.13 | 0.11% | 0.52% | 0.98 | 33.06% | |
| | 10/2/2015 | 89.41 | -6.98% | -6.46% | -12.06 | 0.00% | ** |
| | Cumulative | | -7.82% | -6.67% | -6.24 | 0.00% | ** |
| | | | | | | | |
| 2020B Note | 9/28/2015 | 90.50 | | | | | |
| | 9/29/2015 | 84.75 | -6.35% | -6.39% | -5.81 | 0.00% | ** |
| | 9/30/2015 | 84.10 | -0.77% | -1.45% | -1.32 | 18.98% | |
| | 10/1/2015 | 82.25 | -2.20% | -2.10% | -1.91 | 5.94% | |
| | 10/2/2015 | 80.46 | -2.17% | -2.66% | -2.41 | 1.75% | * |
| | Cumulative | | -11.09% | -12.09% | -5.72 | 0.00% | ** |
| | | | | | | | |
| 2021 Note | 9/28/2015 | 86.50 | | | | | |
| | 9/29/2015 | 86.23 | -0.30% | -0.05% | -0.04 | 96.89% | |
| | 9/30/2015 | 84.18 | -2.39% | -3.14% | -2.28 | 2.46% | * |
| | 10/1/2015 | 81.00 | -3.77% | -3.68% | -2.68 | 0.86% | ** |
| | 10/2/2015 | 75.97 | -6.21% | -6.36% | -4.63 | 0.00% | ** |
| | Cumulative | | -12.17% | -12.68% | -4.81 | 0.00% | ** |
| | | | | | | | |
| 2022 Note | 9/28/2015 | 90.00 | | | | | |
| | 9/29/2015 | 89.38 | -0.69% | -0.32% | -0.37 | 71.16% | |
| | 10/1/2015 | 87.35 | -2.28% | -2.36% | -2.71 | 0.79% | ** |
| | 10/2/2015 | 87.00 | -0.39% | -0.21% | -0.25 | 80.61% | |
| | Cumulative | | -3.33% | -2.88% | -1.92 | 5.76% | |

**Exhibit XXIV-C**
**Navient Exemplar Notes Reaction to the September 29, 2015 Disclosure**

| Note | Date | Price | Note | Abnormal Return | t-stat | p-value | Sig |
|---|---|---|---|---|---|---|---|
| 2023 Note | 9/28/2015 | 81.99 | | | | | |
| | 9/29/2015 | 81.31 | -0.84% | -0.35% | -0.47 | 63.95% | |
| | 9/30/2015 | 79.40 | -2.35% | -2.89% | -3.85 | 0.02% | ** |
| | 10/1/2015 | 77.58 | -2.30% | -1.99% | -2.66 | 0.90% | ** |
| | 10/5/2015 | 75.35 | -2.87% | -4.16% | -5.55 | 0.00% | ** |
| | Cumulative | | -8.10% | -9.11% | -6.27 | 0.00% | ** |
| 2024A Note | 9/28/2015 | 80.31 | | | | | |
| | 9/29/2015 | 80.95 | 0.79% | 1.16% | 0.96 | 34.06% | |
| | 9/30/2015 | 81.48 | 0.66% | -0.15% | -0.12 | 90.36% | |
| | 10/1/2015 | 78.90 | -3.17% | -2.66% | -2.20 | 3.00% | * |
| | 10/5/2015 | 76.50 | -3.04% | -5.27% | -4.36 | 0.00% | ** |
| | Cumulative | | -4.74% | -6.86% | -2.86 | 0.51% | ** |
| 2024B Note | 9/28/2015 | 82.92 | | | | | |
| | 10/6/2015 | 78.53 | -5.29% | -6.04% | -4.63 | 0.00% | ** |
| 2033 Note | 9/25/2015 | 61.70 | | | | | |
| | 9/29/2015 | 62.42 | 1.16% | 1.67% | 0.79 | 42.99% | |
| | 9/30/2015 | 64.88 | 3.94% | 4.30% | 2.04 | 4.36% | * |
| | 10/1/2015 | 56.71 | -12.59% | -12.37% | -5.87 | 0.00% | ** |
| | 10/2/2015 | 54.95 | -3.10% | -2.56% | -1.22 | 22.65% | |
| | Cumulative | | -10.95% | -9.45% | -2.13 | 3.58% | * |
| 2043 Note | 9/28/2015 | 18.10 | | | | | |
| | 9/29/2015 | 18.10 | 0.03% | 0.31% | 0.36 | 72.16% | |
| | 9/30/2015 | 17.89 | -1.19% | -2.02% | -2.30 | 2.34% | * |
| | 10/1/2015 | 16.41 | -8.25% | -8.10% | -9.22 | 0.00% | ** |
| | 10/2/2015 | 15.67 | -4.55% | -4.99% | -5.68 | 0.00% | ** |
| | Cumulative | | -13.44% | -14.18% | -8.42 | 0.00% | ** |

**Sources:**
Bloomberg and FINRA TRACE Data.

**Notes:**
Daily statistics are computed based on the event study method described in Section X of the report. Only days with volume weighted average prices (VWAP) between 9:30 am and 4:00 pm are included. VWAP for the 2043 Note is obtained from Bloomberg. The methodology to compute VWAP for other notes are described in Appendix I.
For cumulative statistics, return and abnormal return are computed as compounded returns from 9/29/2015 to 10/2/2015 (or if a bond does not trade on 10/2/2015, then the first day with trade after 10/2/2015); t-statistic is the sum of daily t-statistics divided by the squared root of number of days with bond returns (multiday return due to no trading counts as one day); p-value is computed based on the degreess of freedom for the market model estimated for the first impact date, 9/29/2015, or 10/6/2015 for the 2024B Note; p-values less than or equal to 1% and 5% are denoted by ** and *, respectively.

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

LORD ABBETT AFFILIATED FUND, INC., *et al.*, Individually and on Behalf of All Others Similarly Situated,

<div style="text-align:center">*Plaintiffs,*</div>

v.

NAVIENT CORPORATION, *et al.*,
<div style="text-align:right">*Defendants.*</div>

C.A. No. 16-112-MN

Judge Maryellen Noreika

**<u>ORAL ARGUMENT REQUESTED</u>**

## DECLARATION OF LAWRENCE B. STOLLER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

I, Lawrence B. Stoller, declare as follows:

1.      I respectfully submit this declaration on behalf of Plaintiffs Lord Abbett Affiliated Fund, Inc., Lord Abbett Equity Trust – Lord Abbett Calibrated Mid Cap Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett Investment Trust – Lord Abbett High Yield Fund (collectively, the "Lord Abbett Funds"). I have personal knowledge of the statements herein and, if called upon as a witness, could and would competently testify thereto.

2.      I am Partner and General Counsel at Lord, Abbett & Co. LLC, investment adviser to the Lord Abbett Funds, and am authorized to make this declaration on behalf of the Lord Abbett Funds.

3.      Each of the Lord Abbett Funds is a mutual fund and registered investment company under the Investment Company Act. Collectively, the Lord Abbett Funds have more than $20 billion in total assets.

4.      The Lord Abbett Funds purchased shares of Navient Corporation ("Navient") common stock and Navient bonds between April 17, 2014 and September 29, 2015. *See* D.I. 15.

5.      The Lord Abbett Funds understand that the Private Securities Litigation Reform Act of 1995 ("PSLRA") was intended to encourage institutional investors and others with meaningful losses to direct securities class actions. Since getting involved in this litigation in November 2017, the Lord Abbett Funds have been committed to vigorously prosecuting this litigation. The Lord Abbett Funds intend to obtain the largest recovery for the proposed class consistent with good faith and sound judgment.

6.      On behalf of the Lord Abbett Funds, I have reviewed and monitored the progress of this litigation and the prosecution of this litigation by Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"). For example, on behalf of the Lord Abbett Funds, I have, or my delegatee has, received and reviewed periodic updates and other correspondence from

Lead Counsel regarding the case, and have participated in discussions with counsel regarding litigation strategy and significant developments in the litigation. In addition, the Lord Abbett Funds have worked with Lead Counsel to search for, collect, and produce documents relevant to the case.

7.      The Lord Abbett Funds are committed to continuing to vigorously prosecute this litigation and to maximize the recovery for the proposed class by, among other things, designating a representative to attend depositions, and/or trial, as appropriate. Further, the Lord Abbett Funds understand that, as a class representative, they would owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation and would continue to work with Lead Counsel to prosecute the case vigorously, consistent with good faith and meritorious advocacy.

8.      The Lord Abbett Funds believe that Lead Counsel possesses the necessary financial and human resources to prosecute this case vigorously and effectively on behalf of the proposed class.

9.      The Lord Abbett Funds also approve Lead Counsel's selection of Friedlander & Gorris P.A. as Liaison Class Counsel, based on that firm's reputation in this District and experience litigating complex actions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of September 2019.

Lawrence B. Stoller
*Partner and General Counsel*
*Lord, Abbett & Co. LLC*

# EXHIBIT K





Bernstein Litowitz Berger & Grossmann LLP

Attorneys at Law

# Firm Resume

**New York**
1251 Avenue of the Americas
44th Floor
New York, NY 10020
Tel: 212-554-1400
Fax: 212-554-1444

**California**
2121 Avenue of the Stars
Suite 2575
Los Angeles, CA 90067
Tel: 310-819-3470

**Louisiana**
2727 Prytania Street
Suite 14
New Orleans, LA 70130
Tel: 504-899-2339
Fax: 504-899-2342

**Illinois**
875 North Michigan Avenue
Suite 3100
Chicago, IL 60611
Tel: 312-373-3880
Fax: 312-794-7801

**Delaware**
500 Delaware Avenue
Suite 901
Wilmington, DE 19801
Tel: 302-364-3600



# TABLE OF CONTENTS

FIRM OVERVIEW .................................................................................................................1
   More Top Securities Recoveries...................................................................................1
   Giving Shareholders a Voice and Changing Business Practices for the Better ...........2
   Advocacy for Victims of Corporate Wrongdoing........................................................2
PRACTICE AREAS ...............................................................................................................4
   Securities Fraud Litigation ...........................................................................................4
   Corporate Governance and Shareholders' Rights .........................................................4
   Employment Discrimination and Civil Rights ..............................................................4
   General Commercial Litigation and Alternative Dispute Resolution ...........................5
   Distressed Debt and Bankruptcy Creditor Negotiation ................................................5
   Consumer Advocacy......................................................................................................5
THE COURTS SPEAK ..........................................................................................................6
RECENT ACTIONS & SIGNIFICANT RECOVERIES ......................................................7
   Securities Class Actions ...............................................................................................7
   Corporate Governance and Shareholders' Rights .......................................................13
   Employment Discrimination and Civil Rights ............................................................18
CLIENTS AND FEES ..........................................................................................................19
IN THE PUBLIC INTEREST ..............................................................................................20
   Bernstein Litowitz Berger & Grossmann Public Interest Law Fellows .....................20
   Firm sponsorship of Her Justice .................................................................................20
   The Paul M. Bernstein Memorial Scholarship ...........................................................20
   Firm sponsorship of City Year New York ..................................................................20
   Max W. Berger Pre-Law Program ..............................................................................20
   New York Says Thank You Foundation .......................................................................20
OUR ATTORNEYS .............................................................................................................21
   Members ......................................................................................................................21
      Max W. Berger ......................................................................................................21
      Gerald H. Silk .......................................................................................................23
      Salvatore J. Graziano ............................................................................................24
      John C. Browne .....................................................................................................25
      Mark Lebovitch .....................................................................................................26
      Hannah Ross ..........................................................................................................28
      Timothy A. DeLange .............................................................................................29
      David L. Wales ......................................................................................................29
      Avi Josefson ..........................................................................................................31
      John Rizio-Hamilton .............................................................................................31
      James A. Harrod ....................................................................................................32
      Jeroen van Kwawegen ..........................................................................................33
      Katherine M. Sinderson ........................................................................................34
      Jonathan D. Uslaner ..............................................................................................35
      Jeremy P. Robinson ...............................................................................................35
      Adam H. Wierzbowski ..........................................................................................36
      Michael D. Blatchley ............................................................................................37
      Lauren McMillen Ormsbee ..................................................................................38
      Gregory V. Varallo ...............................................................................................38
   Of Counsel ..................................................................................................................40
      G. Anthony Gelderman, III ...................................................................................40
      Kurt Hunciker .......................................................................................................40
      Peter Russell .........................................................................................................41
   Senior Counsel ............................................................................................................42



Jai K. Chandrasekhar ............42
Richard D. Gluck ............43
Rebecca Boon ............43
Adam Hollander ............44
Abe Alexander ............45
Associates ............46
Kate Aufses ............46
Andrew Blumberg ............46
Lauren M. Cruz ............46
David L. Duncan ............47
R. Ryan Dykhouse ............47
James M. Fee ............48
Scott R. Foglietta ............48
Tamara Gavrilova ............48
Mathew Hough ............49
Jesse L. Jensen ............49
Rebecca N. Kim ............50
Jacqueline Y. Ma ............50
Michael Mathai ............50
John J. Mills ............51
Brenna Nelinson ............51
Christopher J. Orrico ............51
Kyle Panton ............52
Julia Tebor ............52
Edward G. Timlin ............53
Matthew Traylor ............54
Catherine E. van Kampen ............54
Alla Zayenchik ............55
Staff Associate ............55
David Steacie ............55

Since our founding in 1983, Bernstein Litowitz Berger & Grossmann LLP has obtained many of the largest monetary recoveries in history – over $33 billion on behalf of investors. Unique among our peers, the firm has obtained the largest settlements ever agreed to by public companies related to securities fraud, including three of the ten largest in history.  Working with our clients, we have also used the litigation process to achieve precedent-setting reforms which have increased market transparency, held wrongdoers accountable and improved corporate business practices in groundbreaking ways.

## FIRM OVERVIEW

Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), a national law firm with offices located in New York, California, Louisiana and Illinois, prosecutes class and private actions on behalf of individual and institutional clients.  The firm's litigation practice areas include securities class and direct actions in federal and state courts; corporate governance and shareholder rights litigation, including claims for breach of fiduciary duty and proxy violations; mergers and acquisitions and transactional litigation; alternative dispute resolution; distressed debt and bankruptcy; civil rights and employment discrimination; consumer class actions and antitrust.  We also handle, on behalf of major institutional clients and lenders, more general complex commercial litigation involving allegations of breach of contract, accountants' liability, breach of fiduciary duty, fraud, and negligence.

We are the nation's leading firm in representing institutional investors in securities fraud class action litigation.  The firm's institutional client base includes the New York State Common Retirement Fund; the California Public Employees' Retirement System (CalPERS); the Ontario Teachers' Pension Plan Board (the largest public pension funds in North America); the Los Angeles County Employees Retirement Association (LACERA); the Chicago Municipal, Police and Labor Retirement Systems; the Teacher Retirement System of Texas; the Arkansas Teacher Retirement System; Forsta AP-fonden ("AP1"); Fjarde AP-fonden ("AP4"); the Florida State Board of Administration; the Public Employees' Retirement System of Mississippi; the New York State Teachers' Retirement System; the Ohio Public Employees Retirement System; the State Teachers Retirement System of Ohio; the Oregon Public Employees Retirement System; the Virginia Retirement System; the Louisiana School, State, Teachers and Municipal Police Retirement Systems; the Public School Teachers' Pension and Retirement Fund of Chicago; the New Jersey Division of Investment of the Department of the Treasury; TIAA-CREF and other private institutions; as well as numerous other public and Taft-Hartley pension entities.

## MORE TOP SECURITIES RECOVERIES

Since its founding in 1983, Bernstein Litowitz Berger & Grossmann LLP has litigated some of the most complex cases in history and has obtained over $33 billion on behalf of investors.  Unique among its peers, the firm has negotiated the largest settlements ever agreed to by public companies related to securities fraud, and obtained many of the largest securities recoveries in history (including 6 of the top 13):



- *In re WorldCom, Inc. Securities Litigation* – $6.19 billion recovery
- *In re Cendant Corporation Securities Litigation* – $3.3 billion recovery
- *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation* – $2.43 billion recovery
- *In re Nortel Networks Corporation Securities Litigation* ("Nortel II") – $1.07 billion recovery
- *In re Merck & Co., Inc. Securities Litigation* – $1.06 billion recovery
- *In re McKesson HBOC, Inc. Securities Litigation* – $1.05 billion recovery*

*Source: ISS Securities Class Action Services

For over a decade, ISS Securities Class Action Services has compiled and published data on securities litigation recoveries and the law firms prosecuting the cases.  BLB&G has been at or near the top of their rankings every year – often with the highest total recoveries, the highest settlement average, or both.

BLB&G also eclipses all competitors on ISS SCAS's "Top 100 Settlements of All Time" report, having recovered nearly 40% of all the settlement dollars represented in the report (over $25 billion), and having prosecuted over a third of all the cases on the list (35 of 100).

## GIVING SHAREHOLDERS A VOICE AND CHANGING BUSINESS PRACTICES FOR THE BETTER

BLB&G was among the first law firms ever to obtain meaningful corporate governance reforms through litigation.  In courts throughout the country, we prosecute shareholder class and derivative actions, asserting claims for breach of fiduciary duty and proxy violations wherever the conduct of corporate officers and/or directors, as well as M&A transactions, seek to deprive shareholders of fair value, undermine shareholder voting rights, or allow management to profit at the expense of shareholders.

We have prosecuted seminal cases establishing precedents which have increased market transparency, held wrongdoers accountable, addressed issues in the boardroom and executive suite, challenged unfair deals, and improved corporate business practices in groundbreaking ways.

From setting new standards of director independence, to restructuring board practices in the wake of persistent illegal conduct; from challenging the improper use of defensive measures and deal protections for management's benefit, to confronting stock options backdating abuses and other self-dealing by executives; we have confronted a variety of questionable, unethical and proliferating corporate practices.  Seeking to reform faulty management structures and address breaches of fiduciary duty by corporate officers and directors, we have obtained unprecedented victories on behalf of shareholders seeking to improve governance and protect the shareholder franchise.

## ADVOCACY FOR VICTIMS OF CORPORATE WRONGDOING

While BLB&G is widely recognized as one of the leading law firms worldwide advising institutional investors on issues related to corporate governance, shareholder rights, and securities litigation, we have also prosecuted some of the most significant employment discrimination, civil rights and consumer protection cases on record.  Equally important, the firm has advanced novel and socially beneficial principles by developing important new law in the areas in which we litigate.



The firm served as co-lead counsel on behalf of Texaco's African-American employees in *Roberts v. Texaco Inc.*, which resulted in a recovery of $176 million, the largest settlement ever in a race discrimination case.  The creation of a Task Force to oversee Texaco's human resources activities for five years was unprecedented and served as a model for public companies going forward.

In the consumer field, the firm has gained a nationwide reputation for vigorously protecting the rights of individuals and for achieving exceptional settlements.  In several instances, the firm has obtained recoveries for consumer classes that represented the entirety of the class's losses – an extraordinary result in consumer class cases.



# PRACTICE AREAS

## SECURITIES FRAUD LITIGATION

Securities fraud litigation is the cornerstone of the firm's litigation practice. Since its founding, the firm has had the distinction of having tried and prosecuted many of the most high-profile securities fraud class actions in history, recovering billions of dollars and obtaining unprecedented corporate governance reforms on behalf of our clients. BLB&G continues to play a leading role in major securities litigation pending in federal and state courts, and the firm remains one of the nation's leaders in representing institutional investors in securities fraud class and derivative litigation.

The firm also pursues direct actions in securities fraud cases when appropriate. By selectively opting out of certain securities class actions, we seek to resolve our clients' claims efficiently and for substantial multiples of what they might otherwise recover from related class action settlements.

The attorneys in the securities fraud litigation practice group have extensive experience in the laws that regulate the securities markets and in the disclosure requirements of corporations that issue publicly traded securities. Many of the attorneys in this practice group also have accounting backgrounds. The group has access to state-of-the-art, online financial wire services and databases, which enable it to instantaneously investigate any potential securities fraud action involving a public company's debt and equity securities.

## CORPORATE GOVERNANCE AND SHAREHOLDERS' RIGHTS

The Corporate Governance and Shareholders' Rights Practice Group prosecutes derivative actions, claims for breach of fiduciary duty, and proxy violations on behalf of individual and institutional investors in state and federal courts throughout the country. The group has obtained unprecedented victories on behalf of shareholders seeking to improve corporate governance and protect the shareholder franchise, prosecuting actions challenging numerous highly publicized corporate transactions which violated fair process and fair price, and the applicability of the business judgment rule. We have also addressed issues of corporate waste, shareholder voting rights claims, workplace harassment, and executive compensation. As a result of the firm's high-profile and widely recognized capabilities, the corporate governance practice group is increasingly in demand by institutional investors who are exercising a more assertive voice with corporate boards regarding corporate governance issues and the board's accountability to shareholders.

The firm is actively involved in litigating numerous cases in this area of law, an area that has become increasingly important in light of efforts by various market participants to buy companies from their public shareholders "on the cheap."

## EMPLOYMENT DISCRIMINATION AND CIVIL RIGHTS

The Employment Discrimination and Civil Rights Practice Group prosecutes class and multi-plaintiff actions, and other high-impact litigation against employers and other societal institutions that violate federal or state employment, anti-discrimination, and civil rights laws. The practice group represents diverse clients on a wide range of issues including Title VII actions: race, gender, sexual orientation and age discrimination suits; sexual harassment, and "glass ceiling" cases in which otherwise qualified employees are passed over for promotions to managerial or executive positions.

Bernstein Litowitz Berger & Grossmann LLP is committed to effecting positive social change in the workplace and in society. The practice group has the necessary financial and human resources to ensure that the class action approach to discrimination and civil rights issues is successful. This


Bernstein Litowitz
Berger & Grossmann LLP

litigation method serves to empower employees and other civil rights victims, who are usually discouraged from pursuing litigation because of personal financial limitations, and offers the potential for effecting the greatest positive change for the greatest number of people affected by discriminatory practice in the workplace.

## GENERAL COMMERCIAL LITIGATION AND ALTERNATIVE DISPUTE RESOLUTION

The General Commercial Litigation practice group provides contingency fee representation in complex business litigation and has obtained substantial recoveries on behalf of investors, corporations, bankruptcy trustees, creditor committees and other business entities. We have faced down powerful and well-funded law firms and defendants – and consistently prevailed. However, not every dispute is best resolved through the courts. In such cases, BLB&G Alternative Dispute practitioners offer clients an accomplished team and a creative venue in which to resolve conflicts outside of the litigation process. BLB&G has extensive experience – and a marked record of successes – in ADR practice. For example, in the wake of the credit crisis, we successfully represented numerous former executives of a major financial institution in arbitrations relating to claims for compensation. Our attorneys have led complex business-to-business arbitrations and mediations domestically and abroad representing clients before all the major arbitration tribunals, including the American Arbitration Association (AAA), FINRA, JAMS, International Chamber of Commerce (ICC) and the London Court of International Arbitration.

## DISTRESSED DEBT AND BANKRUPTCY CREDITOR NEGOTIATION

The BLB&G Distressed Debt and Bankruptcy Creditor Negotiation Group has obtained billions of dollars through litigation on behalf of bondholders and creditors of distressed and bankrupt companies, as well as through third-party litigation brought by bankruptcy trustees and creditors' committees against auditors, appraisers, lawyers, officers and directors, and other defendants who may have contributed to client losses. As counsel, we advise institutions and individuals nationwide in developing strategies and tactics to recover assets presumed lost as a result of bankruptcy. Our record in this practice area is characterized by extensive trial experience in addition to completion of successful settlements.

## CONSUMER ADVOCACY

The Consumer Advocacy Practice Group at Bernstein Litowitz Berger & Grossmann LLP prosecutes cases across the entire spectrum of consumer rights, consumer fraud, and consumer protection issues. The firm represents victimized consumers in state and federal courts nationwide in individual and class action lawsuits that seek to provide consumers and purchasers of defective products with a means to recover their damages. The attorneys in this group are well versed in the vast array of laws and regulations that govern consumer interests and are aggressive, effective, court-tested litigators. The Consumer Practice Advocacy Group has recovered hundreds of millions of dollars for millions of consumers throughout the country. Most notably, in a number of cases, the firm has obtained recoveries for the class that were the entirety of the potential damages suffered by the consumer. For example, in actions against MCI and Empire Blue Cross, the firm recovered all of the damages suffered by the class. The group achieved its successes by advancing innovative claims and theories of liabilities, such as obtaining decisions in Pennsylvania and Illinois appellate courts that adopted a new theory of consumer damages in mass marketing cases. Bernstein Litowitz Berger & Grossmann LLP is, thus, able to lead the way in protecting the rights of consumers.



## THE COURTS SPEAK

Throughout the firm's history, many courts have recognized the professional excellence and diligence of the firm and its members. A few examples are set forth below.

### IN RE WORLDCOM, INC. SECURITIES LITIGATION

**THE HONORABLE DENISE COTE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

> *"I have the utmost confidence in plaintiffs' counsel...they have been doing a superb job.... The Class is extraordinarily well represented in this litigation."*
>
> *"The magnitude of this settlement is attributable in significant part to Lead Counsel's advocacy and energy.... The quality of the representation given by Lead Counsel...has been superb...and is unsurpassed in this Court's experience with plaintiffs' counsel in securities litigation."*
>
> *"Lead Counsel has been energetic and creative. . . . Its negotiations with the Citigroup Defendants have resulted in a settlement of historic proportions."*

### IN RE CLARENT CORPORATION SECURITIES LITIGATION

**THE HONORABLE CHARLES R. BREYER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

> *"It was the best tried case I've witnessed in my years on the bench . . ."*
>
> *"[A]n extraordinarily civilized way of presenting the issues to you [the jury]. . . . We've all been treated to great civility and the highest professional ethics in the presentation of the case...."*
>
> *"These trial lawyers are some of the best I've ever seen."*

### LANDRY'S RESTAURANTS, INC. SHAREHOLDER LITIGATION

**VICE CHANCELLOR J. TRAVIS LASTER OF THE DELAWARE COURT OF CHANCERY**

> *"I do want to make a comment again about the excellent efforts . . . put into this case. . . . This case, I think, shows precisely the type of benefits that you can achieve for stockholders and how representative litigation can be a very important part of our corporate governance system . . . you hold up this case as an example of what to do."*

### MCCALL V. SCOTT (COLUMBIA/HCA DERIVATIVE LITIGATION)

**THE HONORABLE THOMAS A. HIGGINS OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE**

> *"Counsel's excellent qualifications and reputations are well documented in the record, and they have litigated this complex case adeptly and tenaciously throughout the six years it has been pending. They assumed an enormous risk and have shown great patience by taking this case on a contingent basis, and despite an early setback they have persevered and brought about not only a large cash settlement but sweeping corporate reforms that may be invaluable to the beneficiaries."*



## RECENT ACTIONS & SIGNIFICANT RECOVERIES

Bernstein Litowitz Berger & Grossmann LLP is counsel in many diverse nationwide class and individual actions and has obtained many of the largest and most significant recoveries in history. Some examples from our practice groups include:

### SECURITIES CLASS ACTIONS

**CASE:**          **IN RE WORLDCOM, INC. SECURITIES LITIGATION**

**COURT:**         United States District Court for the Southern District of New York

**HIGHLIGHTS:**    $6.19 billion securities fraud class action recovery – the second largest in history; unprecedented recoveries from Director Defendants.

**CASE SUMMARY:**  Investors suffered massive losses in the wake of the financial fraud and subsequent bankruptcy of former telecom giant WorldCom, Inc.  This litigation alleged that WorldCom and others disseminated false and misleading statements to the investing public regarding its earnings and financial condition in violation of the federal securities and other laws.  It further alleged a nefarious relationship between Citigroup subsidiary Salomon Smith Barney and WorldCom, carried out primarily by Salomon employees involved in providing investment banking services to WorldCom, and by WorldCom's former CEO and CFO.  As Court-appointed Co-Lead Counsel representing Lead Plaintiff the **New York State Common Retirement Fund**, we obtained unprecedented settlements totaling more than $6 billion from the Investment Bank Defendants who underwrote WorldCom bonds, including a $2.575 billion cash settlement to settle all claims against the Citigroup Defendants.  On the eve of trial, the 13 remaining "Underwriter Defendants," including J.P. Morgan Chase, Deutsche Bank and Bank of America, agreed to pay settlements totaling nearly $3.5 billion to resolve all claims against them.  Additionally, the day before trial was scheduled to begin, all of the former WorldCom Director Defendants had agreed to pay over $60 million to settle the claims against them.  An unprecedented first for outside directors, $24.75 million of that amount came out of the pockets of the individuals – 20% of their collective net worth.  *The Wall Street Journal*, in its coverage, profiled the settlement as literally having "shaken Wall Street, the audit profession and corporate boardrooms."  After four weeks of trial, Arthur Andersen, WorldCom's former auditor, settled for $65 million.  Subsequent settlements were reached with the former executives of WorldCom, and then with Andersen, bringing the total obtained for the Class to over $6.19 billion.

**CASE:**          **IN RE CENDANT CORPORATION SECURITIES LITIGATION**

**COURT:**         United States District Court for the District of New Jersey

**HIGHLIGHTS:**    $3.3 billion securities fraud class action recovery – the third largest in history; significant corporate governance reforms obtained.

**CASE SUMMARY:**  The firm was Co-Lead Counsel in this class action against Cendant Corporation, its officers and directors and Ernst & Young (E&Y), its auditors, for their role in disseminating materially false and misleading financial statements concerning the company's revenues, earnings and expenses for its 1997 fiscal year.  As a result of company-wide accounting irregularities, Cendant restated its financial results for its 1995, 1996 and 1997 fiscal years and all fiscal quarters therein.  Cendant agreed to settle the action for $2.8 billion to adopt some of the most extensive corporate governance changes in history.  E&Y settled for $335 million.  These settlements remain the largest sums ever recovered from a public company and a public accounting firm through securities class action litigation.  BLB&G represented Lead Plaintiffs **CalPERS – the California Public Employees' Retirement System**, the **New York State Common Retirement Fund** and the **New York City Pension Funds**, the three largest public pension funds in America, in this action.



Bernstein Litowitz
Berger & Grossmann LLP

CASE:   **IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION**

COURT:   United States District Court for the Southern District of New York

HIGHLIGHTS:   $2.425 billion in cash; significant corporate governance reforms to resolve all claims. This recovery is by far the largest shareholder recovery related to the subprime meltdown and credit crisis; the single largest securities class action settlement ever resolving a Section 14(a) claim – the federal securities provision designed to protect investors against misstatements in connection with a proxy solicitation; the largest ever funded by a single corporate defendant for violations of the federal securities laws; the single largest settlement of a securities class action in which there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct; and one of the 10 largest securities class action recoveries in history.

DESCRIPTION:   The firm represented Co-Lead Plaintiffs the **State Teachers Retirement System of Ohio**, the **Ohio Public Employees Retirement System**, and the **Teacher Retirement System of Texas** in this securities class action filed on behalf of shareholders of Bank of America Corporation ("BAC") arising from BAC's 2009 acquisition of Merrill Lynch & Co., Inc. The action alleges that BAC, Merrill Lynch, and certain of the companies' current and former officers and directors violated the federal securities laws by making a series of materially false statements and omissions in connection with the acquisition. These violations included the alleged failure to disclose information regarding billions of dollars of losses which Merrill had suffered before the BAC shareholder vote on the proposed acquisition, as well as an undisclosed agreement allowing Merrill to pay billions in bonuses before the acquisition closed despite these losses. Not privy to these material facts, BAC shareholders voted to approve the acquisition.

CASE:   **IN RE NORTEL NETWORKS CORPORATION SECURITIES LITIGATION ("NORTEL II")**

COURT:   United States District Court for the Southern District of New York

HIGHLIGHTS:   Over $1.07 billion in cash and common stock recovered for the class.

DESCRIPTION:   This securities fraud class action charged Nortel Networks Corporation and certain of its officers and directors with violations of the Securities Exchange Act of 1934, alleging that the Defendants knowingly or recklessly made false and misleading statements with respect to Nortel's financial results during the relevant period. BLB&G clients the **Ontario Teachers' Pension Plan Board** and the **Treasury of the State of New Jersey and its Division of Investment** were appointed as Co-Lead Plaintiffs for the Class in one of two related actions (Nortel II), and BLB&G was appointed Lead Counsel for the Class. In a historic settlement, Nortel agreed to pay $2.4 billion in cash and Nortel common stock (all figures in US dollars) to resolve both matters. Nortel later announced that its insurers had agreed to pay $228.5 million toward the settlement, bringing the total amount of the global settlement to approximately $2.7 billion, and the total amount of the Nortel II settlement to over $1.07 billion.

CASE:   **IN RE MERCK & CO., INC. SECURITIES LITIGATION**

COURT:   United States District Court, District of New Jersey

HIGHLIGHTS:   $1.06 billion recovery for the class.

DESCRIPTION:   This case arises out of misrepresentations and omissions concerning life-threatening risks posed by the "blockbuster" Cox-2 painkiller Vioxx, which Merck withdrew from the market in 2004. In January 2016, BLB&G achieved a $1.062 billion settlement on the eve of trial after more than 12 years of hard-fought litigation that included a successful decision at the United States Supreme Court. This settlement is the second largest recovery ever obtained in the Third Circuit, one of the top 11 securities recoveries of all time, and the largest securities recovery ever achieved against a pharmaceutical company. BLB&G represented Lead Plaintiff the **Public Employees' Retirement System of Mississippi**.



| CASE: | *IN RE MCKESSON HBOC, INC. SECURITIES LITIGATION* |
|---|---|
| **COURT:** | **United States District Court for the Northern District of California** |
| **HIGHLIGHTS:** | $1.05 billion recovery for the class. |
| **DESCRIPTION:** | This securities fraud litigation was filed on behalf of purchasers of HBOC, McKesson and McKesson HBOC securities, alleging that Defendants misled the investing public concerning HBOC's and McKesson HBOC's financial results.  On behalf of Lead Plaintiff the **New York State Common Retirement Fund**, BLB&G obtained a $960 million settlement from the company; $72.5 million in cash from Arthur Andersen; and, on the eve of trial, a $10 million settlement from Bear Stearns & Co. Inc., with total recoveries reaching more than $1 billion. |

| CASE: | *IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION* |
|---|---|
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | $735 million in total recoveries. |
| **DESCRIPTION:** | Representing the **Government of Guam Retirement Fund**, BLB&G successfully prosecuted this securities class action arising from Lehman Brothers Holdings Inc.'s issuance of billions of dollars in offerings of debt and equity securities that were sold using offering materials that contained untrue statements and missing material information.
After four years of intense litigation, Lead Plaintiffs achieved a total of $735 million in recoveries consisting of: a $426 million settlement with underwriters of Lehman securities offerings; a $90 million settlement with former Lehman directors and officers; a $99 million settlement that resolves claims against Ernst & Young, Lehman's former auditor (considered one of the top 10 auditor settlements ever achieved); and a $120 million settlement that resolves claims against UBS Financial Services, Inc.  This recovery is truly remarkable not only because of the difficulty in recovering assets when the issuer defendant is bankrupt, but also because no financial results were restated, and that the auditors never disavowed the statements. |

| CASE: | *HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION* |
|---|---|
| **COURT:** | **United States District Court for the Northern District of Alabama** |
| **HIGHLIGHTS:** | $804.5 million in total recoveries. |
| **DESCRIPTION:** | In this litigation, BLB&G was the appointed Co-Lead Counsel for the bond holder class, representing Lead Plaintiff the **Retirement Systems of Alabama**.  This action arose from allegations that Birmingham, Alabama based HealthSouth Corporation overstated its earnings at the direction of its founder and former CEO Richard Scrushy.  Subsequent revelations disclosed that the overstatement actually exceeded over $2.4 billion, virtually wiping out all of HealthSouth's reported profits for the prior five years.  A total recovery of $804.5 million was obtained in this litigation through a series of settlements, including an approximately $445 million settlement for shareholders and bondholders, a $100 million in cash settlement from UBS AG, UBS Warburg LLC, and individual UBS Defendants (collectively, "UBS"), and $33.5 million in cash from the company's auditor.  The total settlement for injured HealthSouth bond purchasers exceeded $230 million, recouping over a third of bond purchaser damages. |



**CASE:**  **IN RE CITIGROUP, INC. BOND ACTION LITIGATION**

**COURT:**  United States District Court for the Southern District of New York

**HIGHLIGHTS:**  $730 million cash recovery; second largest recovery in a litigation arising from the financial crisis.

**DESCRIPTION:**  In the years prior to the collapse of the subprime mortgage market, Citigroup issued 48 offerings of preferred stock and bonds. This securities fraud class action was filed on behalf of purchasers of Citigroup bonds and preferred stock alleging that these offerings contained material misrepresentations and omissions regarding Citigroup's exposure to billions of dollars in mortgage-related assets, the loss reserves for its portfolio of high-risk residential mortgage loans, and the credit quality of the risky assets it held in off-balance sheet entities known as "structured investment vehicles." After protracted litigation lasting four years, we obtained a $730 million cash recovery – the second largest securities class action recovery in a litigation arising from the financial crisis, and the second largest recovery ever in a securities class action brought on behalf of purchasers of debt securities.  As Lead Bond Counsel for the Class, BLB&G represented Lead Bond Plaintiffs **Minneapolis Firefighters' Relief Association**, **Louisiana Municipal Police Employees' Retirement System**, and **Louisiana Sheriffs' Pension and Relief Fund**.

**CASE:**  **IN RE WASHINGTON PUBLIC POWER SUPPLY SYSTEM LITIGATION**

**COURT:**  United States District Court for the District of Arizona

**HIGHLIGHTS:**  Over $750 million – the largest securities fraud settlement ever achieved at the time.

**DESCRIPTION:**  BLB&G was appointed Chair of the Executive Committee responsible for litigating the action on behalf of the class in this action.  The case was litigated for over seven years, and involved an estimated 200 million pages of documents produced in discovery; the depositions of 285 fact witnesses and 34 expert witnesses; more than 25,000 introduced exhibits; six published district court opinions; seven appeals or attempted appeals to the Ninth Circuit; and a three-month jury trial, which resulted in a settlement of over $750 million – then the largest securities fraud settlement ever achieved.

**CASE:**  **IN RE SCHERING-PLOUGH CORPORATION/ENHANCE SECURITIES LITIGATION; IN RE MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION**

**COURT:**  United States District Court for the District of New Jersey

**HIGHLIGHTS:**  $688 million in combined settlements (Schering-Plough settled for $473 million; Merck settled for $215 million) in this coordinated securities fraud litigations filed on behalf of investors in Merck and Schering-Plough.

**DESCRIPTION:**  After nearly five years of intense litigation, just days before trial, BLB&G resolved the two actions against Merck and Schering-Plough, which stemmed from claims that Merck and Schering artificially inflated their market value by concealing material information and making false and misleading statements regarding their blockbuster anti-cholesterol drugs Zetia and Vytorin. Specifically, we alleged that the companies knew that their "ENHANCE" clinical trial of Vytorin (a combination of Zetia and a generic) demonstrated that Vytorin was no more effective than the cheaper generic at reducing artery thickness.  The companies nonetheless championed the "benefits" of their drugs, attracting billions of dollars of capital.  When public pressure to release the results of the ENHANCE trial became too great, the companies reluctantly announced these negative results, which we alleged led to sharp declines in the value of the companies' securities, resulting in significant losses to investors.  The combined $688 million in settlements (Schering-Plough settled for $473 million; Merck settled for $215 million) is the second largest securities recovery ever in the Third Circuit, among the top 25 settlements of all time, and among the ten largest recoveries ever in a case where there was no financial restatement.  BLB&G represented Lead Plaintiffs **Arkansas Teacher Retirement System,** the **Public Employees' Retirement System of Mississippi,** and the **Louisiana Municipal Police Employees' Retirement System**.


Bernstein Litowitz
Berger & Grossmann LLP

| | |
|---|---|
| **CASE:** | *IN RE LUCENT TECHNOLOGIES, INC. SECURITIES LITIGATION* |
| **COURT:** | **United States District Court for the District of New Jersey** |
| **HIGHLIGHTS:** | $667 million in total recoveries; the appointment of BLB&G as Co-Lead Counsel is especially noteworthy as it marked the first time since the 1995 passage of the Private Securities Litigation Reform Act that a court reopened the lead plaintiff or lead counsel selection process to account for changed circumstances, new issues and possible conflicts between new and old allegations. |
| **DESCRIPTION:** | BLB&G served as Co-Lead Counsel in this securities class action, representing Lead Plaintiffs the **Parnassus Fund**, **Teamsters Locals 175 & 505 D&P Pension Trust**, **Anchorage Police and Fire Retirement System** and the **Louisiana School Employees' Retirement System.** The complaint accused Lucent of making false and misleading statements to the investing public concerning its publicly reported financial results and failing to disclose the serious problems in its optical networking business. When the truth was disclosed, Lucent admitted that it had improperly recognized revenue of nearly $679 million in fiscal 2000. The settlement obtained in this case is valued at approximately $667 million, and is composed of cash, stock and warrants. |

| | |
|---|---|
| **CASE:** | *IN RE WACHOVIA PREFERRED SECURITIES AND BOND/NOTES LITIGATION* |
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | $627 million recovery – among the 20 largest securities class action recoveries in history; third largest recovery obtained in an action arising from the subprime mortgage crisis. |
| **DESCRIPTION:** | This securities class action was filed on behalf of investors in certain Wachovia bonds and preferred securities against Wachovia Corp., certain former officers and directors, various underwriters, and its auditor, KPMG LLP. The case alleges that Wachovia provided offering materials that misrepresented and omitted material facts concerning the nature and quality of Wachovia's multi-billion dollar option-ARM (adjustable rate mortgage) "Pick-A-Pay" mortgage loan portfolio, and that Wachovia's loan loss reserves were materially inadequate. According to the Complaint, these undisclosed problems threatened the viability of the financial institution, requiring it to be "bailed out" during the financial crisis before it was acquired by Wells Fargo. The combined $627 million recovery obtained in the action is among the 20 largest securities class action recoveries in history, the largest settlement ever in a class action case asserting only claims under the Securities Act of 1933, and one of a handful of securities class action recoveries obtained where there were no parallel civil or criminal actions brought by government authorities. The firm represented Co-Lead Plaintiffs **Orange County Employees Retirement System** and **Louisiana Sheriffs' Pension and Relief Fund** in this action. |

| | |
|---|---|
| **CASE:** | *BEAR STEARNS MORTGAGE PASS-THROUGH LITIGATION* |
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | $500 million recovery - the largest recovery ever on behalf of purchasers of residential mortgage-backed securities. |
| **DESCRIPTION:** | BLB&G served as Co-Lead Counsel in this securities action, representing Lead Plaintiffs the **Public Employees' Retirement System of Mississippi.** The case alleged that Bear Stearns & Company, Inc.'s sold mortgage pass-through certificates using false and misleading offering documents. The offering documents contained false and misleading statements related to, among other things, (1) the underwriting guidelines used to originate the mortgage loans underlying the certificates; and (2) the accuracy of the appraisals for the properties underlying the certificates. After six years of hard-fought litigation and extensive arm's-length negotiations, the $500 million recovery is the largest settlement in a U.S. class action against a bank that packaged and sold mortgage securities at the center of the 2008 financial crisis. |



BLB&G    Bernstein Litowitz
         Berger & Grossmann LLP

| | |
|---|---|
| *CASE:* | ***GARY HEFLER ET AL. V. WELLS FARGO & COMPANY ET AL*** |
| *COURT:* | **United States District Court for the Northern District of California** |
| *HIGHLIGHTS:* | $480 million recovery - the fourth largest securities settlement ever achieved in the Ninth Circuit and the 31st largest securities settlement ever in the United States. |
| *DESCRIPTION:* | BLB&G served as Lead Counsel for the Court-appointed Lead Plaintiff Union Asset Management Holding, AG in this action, which alleged that Wells Fargo and certain current and former officers and directors of Wells Fargo made a series of materially false statements and omissions in connection with Wells Fargo's secret creation of fake or unauthorized client accounts in order to hit performance-based compensation goals. After years of presenting a business driven by legitimate growth prospects, U.S. regulators revealed in September 2016 that Wells Fargo employees were secretly opening millions of potentially unauthorized accounts for existing Wells Fargo customers. The Complaint alleged that these accounts were opened in order to hit performance targets and inflate the "cross-sell" metrics that investors used to measure Wells Fargo's financial health and anticipated growth. When the market learned the truth about Wells Fargo's violation of its customers' trust and failure to disclose reliable information to its investors, the price of Wells Fargo's stock dropped, causing substantial investor losses. |

| | |
|---|---|
| *CASE:* | ***OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM V. FREDDIE MAC*** |
| *COURT:* | **United States District Court for the Southern District of Ohio** |
| *HIGHLIGHTS:* | $410 million settlement. |
| *DESCRIPTION:* | This securities fraud class action was filed on behalf of the **Ohio Public Employees Retirement System** and the **State Teachers Retirement System of Ohio** alleging that Federal Home Loan Mortgage Corporation ("Freddie Mac") and certain of its current and former officers issued false and misleading statements in connection with the company's previously reported financial results. Specifically, the Complaint alleged that the Defendants misrepresented the company's operations and financial results by having engaged in numerous improper transactions and accounting machinations that violated fundamental GAAP precepts in order to artificially smooth the company's earnings and to hide earnings volatility.  In connection with these improprieties, Freddie Mac restated more than $5 billion in earnings.  A settlement of $410 million was reached in the case just as deposition discovery had begun and document review was complete. |

| | |
|---|---|
| *CASE:* | ***IN RE REFCO, INC. SECURITIES LITIGATION*** |
| *COURT:* | **United States District Court for the Southern District of New York** |
| *HIGHLIGHTS:* | Over $407 million in total recoveries. |
| *DESCRIPTION:* | The lawsuit arises from the revelation that Refco, a once prominent brokerage, had for years secreted hundreds of millions of dollars of uncollectible receivables with a related entity controlled by Phillip Bennett, the company's Chairman and Chief Executive Officer. This revelation caused the stunning collapse of the company a mere two months after its initial public offering of common stock.  As a result, Refco filed one of the largest bankruptcies in U.S. history. Settlements have been obtained from multiple company and individual defendants, resulting in a total recovery for the class of over $407 million.  BLB&G represented Co-Lead Plaintiff **RH Capital Associates LLC**. |



## CORPORATE GOVERNANCE AND SHAREHOLDERS' RIGHTS

**CASE:** *CITY OF MONROE EMPLOYEES' RETIREMENT SYSTEM, DERIVATIVELY ON BEHALF OF TWENTY-FIRST CENTURY FOX, INC. V. RUPERT MURDOCH, ET AL.*

**COURT:** Delaware Court of Chancery

**HIGHLIGHTS:** Landmark derivative litigation establishes unprecedented, independent Board-level council to ensure employees are protected from workplace harassment while recouping $90 million for the company's coffers.

**DESCRIPTION:** Before the birth of the #metoo movement, BLB&G led the prosecution of an unprecedented shareholder derivative litigation against Fox News parent 21st Century Fox, Inc. arising from the systemic sexual and workplace harassment at the embattled network. After nearly 18 months of litigation, discovery and negotiation related to the shocking misconduct and the Board's extensive alleged governance failures, the parties unveil a landmark settlement with two key components: 1) the first ever Board-level watchdog of its kind – the "Fox News Workplace Professionalism and Inclusion Council" of experts (WPIC) – majority independent of the Murdochs, the Company and Board; and 2) one of the largest financial recoveries – $90 million – ever obtained in a pure corporate board oversight dispute. The WPIC is expected to serve as a model for public companies in all industries. The firm represented 21st Century Fox shareholder the **City of Monroe (Michigan) Employees' Retirement System.**

**CASE:** *IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION*

**COURT:** United States District Court for the Central District of California

**HIGHLIGHTS:** Litigation recovered over $250 million for investors in challenging unprecedented insider trading scheme by billionaire hedge fund manager Bill Ackman.

**DESCRIPTION:** As alleged in groundbreaking litigation, billionaire hedge fund manager Bill Ackman and his Pershing Square Capital Management fund secretly acquire a near 10% stake in pharmaceutical concern Allergan, Inc. as part of an unprecedented insider trading scheme by Ackman and Valeant Pharmaceuticals International, Inc. What Ackman knew – but investors did not – was that in the ensuing weeks, Valeant would be launching a hostile bid to acquire Allergan shares at a far higher price. Ackman enjoys a massive instantaneous profit upon public news of the proposed acquisition, and the scheme works for both parties as he kicks back hundreds of millions of his insider-trading proceeds to Valeant after Allergan agreed to be bought by a rival bidder. After a ferocious three-year legal battle over this attempt to circumvent the spirit of the U.S. securities laws, BLB&G obtains a $250 million settlement for Allergan investors, and creates precedent to prevent similar such schemes in the future. The Plaintiffs in this action were the **State Teachers Retirement System of Ohio**, the **Iowa Public Employees Retirement System**, and **Patrick T. Johnson.**



<table>
<tr><td><em>CASE:</em></td><td><strong><em>UNITEDHEALTH GROUP, INC. SHAREHOLDER DERIVATIVE LITIGATION</em></strong></td></tr>
<tr><td><em>COURT:</em></td><td><strong>United States District Court for the District of Minnesota</strong></td></tr>
<tr><td><em>HIGHLIGHTS:</em></td><td>Litigation recovered over $920 million in ill-gotten compensation directly from former officers for their roles in illegally backdating stock options, while the company agreed to far-reaching reforms aimed at curbing future executive compensation abuses.</td></tr>
<tr><td><em>DESCRIPTION:</em></td><td>This shareholder derivative action filed against certain current and former executive officers and members of the Board of Directors of UnitedHealth Group, Inc. alleged that the Defendants obtained, approved and/or acquiesced in the issuance of stock options to senior executives that were unlawfully backdated to provide the recipients with windfall compensation at the direct expense of UnitedHealth and its shareholders. The firm recovered over $920 million in ill-gotten compensation directly from the former officer Defendants – the largest derivative recovery in history. As feature coverage in <em>The New York Times</em> indicated, "investors everywhere should applaud [the UnitedHealth settlement]…. [T]he recovery sets a standard of behavior for other companies and boards when performance pay is later shown to have been based on ephemeral earnings." The Plaintiffs in this action were the <strong>St. Paul Teachers' Retirement Fund Association</strong>, the <strong>Public Employees' Retirement System of Mississippi</strong>, the <strong>Jacksonville Police & Fire Pension Fund</strong>, the <strong>Louisiana Sheriffs' Pension & Relief Fund</strong>, the <strong>Louisiana Municipal Police Employees' Retirement System</strong> and <strong>Fire & Police Pension Association of Colorado</strong>.</td></tr>
</table>

<table>
<tr><td><em>CASE:</em></td><td><strong><em>CAREMARK MERGER LITIGATION</em></strong></td></tr>
<tr><td><em>COURT:</em></td><td><strong>Delaware Court of Chancery – New Castle County</strong></td></tr>
<tr><td><em>HIGHLIGHTS:</em></td><td>Landmark Court ruling orders Caremark's board to disclose previously withheld information, enjoins shareholder vote on CVS merger offer, and grants statutory appraisal rights to Caremark shareholders. The litigation ultimately forced CVS to raise offer by $7.50 per share, equal to more than $3.3 billion in additional consideration to Caremark shareholders.</td></tr>
<tr><td><em>DESCRIPTION:</em></td><td>Commenced on behalf of the <strong>Louisiana Municipal Police Employees' Retirement System</strong> and other shareholder of Caremark RX, Inc. ("Caremark"), this shareholder class action accused the company's directors of violating their fiduciary duties by approving and endorsing a proposed merger with CVS Corporation ("CVS"), all the while refusing to fairly consider an alternative transaction proposed by another bidder. In a landmark decision, the Court ordered the Defendants to disclose material information that had previously been withheld, enjoined the shareholder vote on the CVS transaction until the additional disclosures occurred, and granted statutory appraisal rights to Caremark's shareholders—forcing CVS to increase the consideration offered to shareholders by $7.50 per share in cash (over $3 billion in total).</td></tr>
</table>

<table>
<tr><td><em>CASE:</em></td><td><strong><em>IN RE PFIZER INC. SHAREHOLDER DERIVATIVE LITIGATION</em></strong></td></tr>
<tr><td><em>COURT:</em></td><td><strong>United States District Court for the Southern District of New York</strong></td></tr>
<tr><td><em>HIGHLIGHTS:</em></td><td>Landmark settlement in which Defendants agreed to create a new Regulatory and Compliance Committee of the Pfizer Board that will be supported by a dedicated $75 million fund.</td></tr>
<tr><td><em>DESCRIPTION:</em></td><td>In the wake of Pfizer's agreement to pay $2.3 billion as part of a settlement with the U.S. Department of Justice to resolve civil and criminal charges relating to the illegal marketing of at least 13 of the company's most important drugs (the largest such fine ever imposed), this shareholder derivative action was filed against Pfizer's senior management and Board alleging they breached their fiduciary duties to Pfizer by, among other things, allowing unlawful promotion of drugs to continue after receiving numerous "red flags" that Pfizer's improper drug marketing was systemic and widespread. The suit was brought by Court-appointed Lead Plaintiffs <strong>Louisiana Sheriffs' Pension and Relief Fund</strong> and <strong>Skandia Life Insurance Company, Ltd.</strong> In an unprecedented settlement reached by the parties, the Defendants agreed to create a new Regulatory</td></tr>
</table>

14



and Compliance Committee of the Pfizer Board of Directors (the "Regulatory Committee") to oversee and monitor Pfizer's compliance and drug marketing practices and to review the compensation policies for Pfizer's drug sales related employees.

| | |
|---|---|
| **CASE:** | ***MILLER ET A. V. IAC/INTERACTIVECORP ET AL.*** |
| **COURT:** | **Delaware Court of Chancery** |
| **HIGHLIGHTS:** | Litigation shuts down efforts by controlling shareholders to obtain "dynastic control" of the company through improper stock class issuances, setting valuable precedent and sending strong message to boards and management in all sectors that such moves will not go unchallenged. |
| **DESCRIPTION:** | BLB&G obtained this landmark victory for shareholder rights against IAC/InterActiveCorp and its controlling shareholder and chairman, Barry Diller. For decades, activist corporate founders and controllers seek ways to entrench their position atop the corporate hierarchy by granting themselves and other insiders "supervoting rights." Diller lays out a proposal to introduce a new class of non-voting stock to entrench "dynastic control" of IAC within the Diller family. BLB&G litigation on behalf of IAC shareholders ends in capitulation with the Defendants effectively conceding the case by abandoning the proposal. This becomes critical corporate governance precedent, given trend of public companies to introduce "low" and "no-vote" share classes, which diminish shareholder rights, insulate management from accountability, and can distort managerial incentives by providing controllers voting power out of line with their actual economic interests in public companies. |

| | |
|---|---|
| **CASE:** | ***IN RE DELPHI FINANCIAL GROUP SHAREHOLDER LITIGATION*** |
| **COURT:** | **Delaware Court of Chancery – New Castle County** |
| **HIGHLIGHTS:** | Dominant shareholder is blocked from collecting a payoff at the expense of minority investors. |
| **DESCRIPTION:** | As the Delphi Financial Group prepared to be acquired by Tokio Marine Holdings Inc., the conduct of Delphi's founder and controlling shareholder drew the scrutiny of BLB&G and its institutional investor clients for improperly using the transaction to expropriate at least $55 million at the expense of the public shareholders. BLB&G aggressively litigated this action and obtained a settlement of $49 million for Delphi's public shareholders. The settlement fund is equal to about 90% of recoverable Class damages – a virtually unprecedented recovery. |

| | |
|---|---|
| **CASE:** | ***QUALCOMM BOOKS & RECORDS LITIGATION*** |
| **COURT:** | **Delaware Court of Chancery – New Castle County** |
| **HIGHLIGHTS:** | Novel use of "books and records" litigation enhances disclosure of political spending and transparency. |
| **DESCRIPTION:** | The U.S. Supreme Court's controversial 2010 opinion in *Citizens United v. FEC* made it easier for corporate directors and executives to secretly use company funds – shareholder assets – to support personally favored political candidates or causes. BLB&G prosecuted the first-ever "books and records" litigation to obtain disclosure of corporate political spending at our client's portfolio company – technology giant Qualcomm Inc. – in response to Qualcomm's refusal to share the information. As a result of the lawsuit, Qualcomm adopted a policy that provides its shareholders with comprehensive disclosures regarding the company's political activities and places Qualcomm as a standard-bearer for other companies. |


Bernstein Litowitz
Berger & Grossmann LLP

| | |
|---|---|
| **CASE:** | **IN RE NEWS CORP. SHAREHOLDER DERIVATIVE LITIGATION** |
| **COURT:** | **Delaware Court of Chancery – Kent County** |
| **HIGHLIGHTS:** | An unprecedented settlement in which News Corp. recoups $139 million and enacts significant corporate governance reforms that combat self-dealing in the boardroom. |
| **DESCRIPTION:** | Following News Corp.'s 2011 acquisition of a company owned by News Corp. Chairman and CEO Rupert Murdoch's daughter, and the phone-hacking scandal within its British newspaper division, we filed a derivative litigation on behalf of the company because of institutional shareholder concern with the conduct of News Corp.'s management.  We ultimately obtained an unprecedented settlement in which News Corp. recouped $139 million for the company coffers, and agreed to enact corporate governance enhancements to strengthen its compliance structure, the independence and functioning of its board, and the compensation and clawback policies for management. |
| **CASE:** | **IN RE ACS SHAREHOLDER LITIGATION (XEROX)** |
| **COURT:** | **Delaware Court of Chancery – New Castle County** |
| **HIGHLIGHTS:** | BLB&G challenged an attempt by ACS CEO to extract a premium on his stock not shared with the company's public shareholders in a sale of ACS to Xerox.  On the eve of trial, BLB&G obtained a $69 million recovery, with a substantial portion of the settlement personally funded by the CEO. |
| **DESCRIPTION:** | Filed on behalf of the **New Orleans Employees' Retirement System** and similarly situated shareholders of Affiliated Computer Service, Inc., this action alleged that members of the Board of Directors of ACS breached their fiduciary duties by approving a merger with Xerox Corporation which would allow Darwin Deason, ACS's founder and Chairman and largest stockholder, to extract hundreds of millions of dollars of value that rightfully belongs to ACS's public shareholders for himself.  Per the agreement, Deason's consideration amounted to over a 50% premium when compared to the consideration paid to ACS's public stockholders. The ACS Board further breached its fiduciary duties by agreeing to certain deal protections in the merger agreement that essentially locked up the transaction between ACS and Xerox. After seeking a preliminary injunction to enjoin the deal and engaging in intense discovery and litigation in preparation for a looming trial date, Plaintiffs reached a global settlement with Defendants for $69 million.  In the settlement, Deason agreed to pay $12.8 million, while ACS agreed to pay the remaining $56.1 million. |
| **CASE:** | **IN RE DOLLAR GENERAL CORPORATION SHAREHOLDER LITIGATION** |
| **COURT:** | **Sixth Circuit Court for Davidson County, Tennessee; Twentieth Judicial District, Nashville** |
| **HIGHLIGHTS:** | Holding Board accountable for accepting below-value "going private" offer. |
| **DESCRIPTION:** | A Nashville, Tennessee corporation that operates retail stores selling discounted household goods, in early March 2007, Dollar General announced that its Board of Directors had approved the acquisition of the company by the private equity firm Kohlberg Kravis Roberts & Co. ("KKR"). BLB&G, as Co-Lead Counsel for the **City of Miami General Employees' & Sanitation Employees' Retirement Trust**, filed a class action complaint alleging that the "going private" offer was approved as a result of breaches of fiduciary duty by the board and that the price offered by KKR did not reflect the fair value of Dollar General's publicly-held shares.  On the eve of the summary judgment hearing, KKR agreed to pay a $40 million settlement in favor of the shareholders, with a potential for $17 million more for the Class. |

16



**BLB&G** Bernstein Litowitz
Berger & Grossmann LLP

| | |
|---|---|
| *CASE:* | ***LANDRY'S RESTAURANTS, INC. SHAREHOLDER LITIGATION*** |
| *COURT:* | **Delaware Court of Chancery – New Castle County** |
| *HIGHLIGHTS:* | Protecting shareholders from predatory CEO's multiple attempts to take control of Landry's Restaurants through improper means.  Our litigation forced the CEO to increase his buyout offer by four times the price offered and obtained an additional $14.5 million cash payment for the class. |
| *DESCRIPTION:* | In this derivative and shareholder class action, shareholders alleged that Tilman J. Fertitta – chairman, CEO and largest shareholder of Landry's Restaurants, Inc. – and its Board of Directors stripped public shareholders of their controlling interest in the company for no premium and severely devalued remaining public shares in breach of their fiduciary duties.  BLB&G's prosecution of the action on behalf of Plaintiff **Louisiana Municipal Police Employees' Retirement System** resulted in recoveries that included the creation of a settlement fund composed of $14.5 million in cash, as well as significant corporate governance reforms and an increase in consideration to shareholders of the purchase price valued at $65 million. |


Bernstein Litowitz
Berger & Grossmann LLP

## EMPLOYMENT DISCRIMINATION AND CIVIL RIGHTS

**CASE:**     *ROBERTS V. TEXACO, INC.*

**COURT:**    United States District Court for the Southern District of New York

**HIGHLIGHTS:**   BLB&G recovered $170 million on behalf of Texaco's African-American employees and engineered the creation of an independent "Equality and Tolerance Task Force" at the company.

**DESCRIPTION:**   Six highly qualified African-American employees filed a class action complaint against Texaco Inc. alleging that the company failed to promote African-American employees to upper level jobs and failed to compensate them fairly in relation to Caucasian employees in similar positions. BLB&G's prosecution of the action revealed that African-Americans were significantly under-represented in high level management jobs and that Caucasian employees were promoted more frequently and at far higher rates for comparable positions within the company. The case settled for over $170 million, and Texaco agreed to a Task Force to monitor its diversity programs for five years – a settlement described as the most significant race discrimination settlement in history.

**CASE:**     *ECOA - GMAC/NMAC/FORD/TOYOTA/CHRYSLER - CONSUMER FINANCE DISCRIMINATION LITIGATION*

**COURT:**    Multiple jurisdictions

**HIGHLIGHTS:**   Landmark litigation in which financing arms of major auto manufacturers are compelled to cease discriminatory "kick-back" arrangements with dealers, leading to historic changes to auto financing practices nationwide.

**DESCRIPTION:**   The cases involve allegations that the lending practices of General Motors Acceptance Corporation, Nissan Motor Acceptance Corporation, Ford Motor Credit, Toyota Motor Credit and DaimlerChrysler Financial cause African-American and Hispanic car buyers to pay millions of dollars more for car loans than similarly situated white buyers. At issue is a discriminatory kickback system under which minorities typically pay about 50% more in dealer mark-up which is shared by auto dealers with the Defendants.

*NMAC:* The United States District Court for the Middle District of Tennessee granted final approval of the settlement of the class action against Nissan Motor Acceptance Corporation ("NMAC") in which NMAC agreed to offer pre-approved loans to hundreds of thousands of current and potential African-American and Hispanic NMAC customers, and limit how much it raises the interest charged to car buyers above the company's minimum acceptable rate.

*GMAC:* The United States District Court for the Middle District of Tennessee granted final approval of a settlement of the litigation against General Motors Acceptance Corporation ("GMAC") in which GMAC agreed to take the historic step of imposing a 2.5% markup cap on loans with terms up to 60 months, and a cap of 2% on extended term loans. GMAC also agreed to institute a substantial credit pre-approval program designed to provide special financing rates to minority car buyers with special rate financing.

*DAIMLERCHRYSLER:* The United States District Court for the District of New Jersey granted final approval of the settlement in which DaimlerChrysler agreed to implement substantial changes to the company's practices, including limiting the maximum amount of mark-up dealers may charge customers to between 1.25% and 2.5% depending upon the length of the customer's loan. In addition, the company agreed to send out pre-approved credit offers of no-markup loans to African-American and Hispanic consumers, and contribute $1.8 million to provide consumer education and assistance programs on credit financing.

*FORD MOTOR CREDIT:* The United States District Court for the Southern District of New York granted final approval of a settlement in which Ford Credit agreed to make contract disclosures informing consumers that the customer's Annual Percentage Rate ("APR") may be negotiated and that sellers may assign their contracts and retain rights to receive a portion of the finance charge.



## CLIENTS AND FEES

We are firm believers in the contingency fee as a socially useful, productive and satisfying basis of compensation for legal services, particularly in litigation.  Wherever appropriate, even with our corporate clients, we will encourage retention where our fee is contingent on the outcome of the litigation.  This way, it is not the number of hours worked that will determine our fee, but rather the result achieved for our client.

Our clients include many large and well known financial and lending institutions and pension funds, as well as privately-held companies that are attracted to our firm because of our reputation, expertise and fee structure. Most of the firm's clients are referred by other clients, law firms and lawyers, bankers, investors and accountants.  A considerable number of clients have been referred to the firm by former adversaries.  We have always maintained a high level of independence and discretion in the cases we decide to prosecute.  As a result, the level of personal satisfaction and commitment to our work is high.



# IN THE PUBLIC INTEREST

Bernstein Litowitz Berger & Grossmann LLP is guided by two principles: excellence in legal work and a belief that the law should serve a socially useful and dynamic purpose. Attorneys at the firm are active in academic, community and *pro bono* activities, as well as participating as speakers and contributors to professional organizations. In addition, the firm endows a public interest law fellowship and sponsors an academic scholarship at Columbia Law School.

## BERNSTEIN LITOWITZ BERGER & GROSSMANN PUBLIC INTEREST LAW FELLOWS

COLUMBIA LAW SCHOOL – BLB&G is committed to fighting discrimination and effecting positive social change. In support of this commitment, the firm donated funds to Columbia Law School to create the Bernstein Litowitz Berger & Grossmann Public Interest Law Fellowship. This newly endowed fund at Columbia Law School will provide Fellows with 100% of the funding needed to make payments on their law school tuition loans so long as such graduates remain in the public interest law field. The BLB&G Fellows are able to begin their careers free of any school debt if they make a long-term commitment to public interest law.

## FIRM SPONSORSHIP OF HER JUSTICE

NEW YORK, NY – BLB&G is a sponsor of Her Justice, a non-profit organization in New York City dedicated to providing *pro bono* legal representation to indigent women, principally battered women, in connection with the myriad legal problems they face. The organization trains and supports the efforts of New York lawyers who provide *pro bono* counsel to these women. Several members and associates of the firm volunteer their time to help women who need divorces from abusive spouses, or representation on issues such as child support, custody and visitation. To read more about Her Justice, visit the organization's website at www.herjustice.org.

## THE PAUL M. BERNSTEIN MEMORIAL SCHOLARSHIP

COLUMBIA LAW SCHOOL – Paul M. Bernstein was the founding senior partner of the firm. Mr. Bernstein led a distinguished career as a lawyer and teacher and was deeply committed to the professional and personal development of young lawyers. The Paul M. Bernstein Memorial Scholarship Fund is a gift of the firm and the family and friends of Paul M. Bernstein, and is awarded annually to one or more second-year students selected for their academic excellence in their first year, professional responsibility, financial need and contributions to the community.

## FIRM SPONSORSHIP OF CITY YEAR NEW YORK

NEW YORK, NY – BLB&G is also an active supporter of City Year New York, a division of AmeriCorps. The program was founded in 1988 as a means of encouraging young people to devote time to public service and unites a diverse group of volunteers for a demanding year of full-time community service, leadership development and civic engagement. Through their service, corps members experience a rite of passage that can inspire a lifetime of citizenship and build a stronger democracy.

## MAX W. BERGER PRE-LAW PROGRAM

BARUCH COLLEGE – In order to encourage outstanding minority undergraduates to pursue a meaningful career in the legal profession, the Max W. Berger Pre-Law Program was established at Baruch College. Providing workshops, seminars, counseling and mentoring to Baruch students, the program facilitates and guides them through the law school research and application process, as well as placing them in appropriate internships and other pre-law working environments.

## NEW YORK SAYS THANK YOU FOUNDATION

NEW YORK, NY – Founded in response to the outpouring of love shown to New York City by volunteers from all over the country in the wake of the 9/11 attacks, The New York Says Thank You Foundation sends volunteers from New York City to help rebuild communities around the country affected by disasters. BLB&G is a corporate sponsor of NYSTY and its goals are a heartfelt reflection of the firm's focus on community and activism.



## OUR ATTORNEYS

### MEMBERS

**MAX W. BERGER**, the firm's senior founding partner, supervises BLB&G's litigation practice and prosecutes class and individual actions on behalf of the firm's clients.

He has litigated many of the firm's most high-profile and significant cases, and has negotiated seven of the largest securities fraud settlements in history, each in excess of a billion dollars: *Cendant* ($3.3 billion); *Citigroup–WorldCom* ($2.575 billion); *Bank of America/Merrill Lynch* ($2.4 billion); *JPMorgan Chase–WorldCom* ($2 billion); *Nortel* ($1.07 billion); *Merck* ($1.06 billion); and *McKesson* ($1.05 billion). In addition, he has prosecuted seminal cases establishing precedents which have increased market integrity and transparency; held corporate wrongdoers accountable; and improved corporate business practices in groundbreaking ways.

Most recently, before the #metoo movement came alive, on behalf of an institutional investor client, he handled the prosecution of an unprecedented shareholder derivative litigation against Fox News parent 21st Century Fox, Inc. arising from the systemic sexual and workplace harassment at the embattled network. After nearly 18 months of litigation, discovery and negotiation related to the shocking misconduct and the Board's extensive alleged governance failures, the parties unveiled a landmark settlement with two key components: 1) the first-ever Board-level watchdog of its kind – the "Fox News Workplace Professionalism and Inclusion Council" of experts (WPIC) – majority independent of the Murdochs, the Company and Board; and 2) one of the largest financial recoveries – $90 million – ever obtained in a pure corporate board oversight dispute. The WPIC is expected to serve as a model for public companies in all industries.

Mr. Berger's work has garnered him extensive media attention, and he has been the subject of feature articles in a variety of major media publications. Unique among his peers, *The New York Times* highlighted his remarkable track record in an October 2012 profile entitled "Investors' Billion-Dollar Fraud Fighter," which also discussed his role in the *Bank of America/Merrill Lynch Merger* litigation. In 2011, Mr. Berger was twice profiled by *The American Lawyer* for his role in negotiating a $627 million recovery on behalf of investors in the *In re Wachovia Corp. Securities Litigation*, and a $516 million recovery in *In re Lehman Brothers Equity/Debt Securities Litigation*. Previously, Mr. Berger's role in the WorldCom case generated extensive media coverage including feature articles in *BusinessWeek* and *The American Lawyer*. For his outstanding efforts on behalf of WorldCom investors, *The National Law Journal* profiled Mr. Berger (one of only eleven attorneys selected nationwide) in its annual 2005 "Winning Attorneys" section. He was subsequently featured in a 2006 *New York Times* article, "A Class-Action Shuffle," which assessed the evolving landscape of the securities litigation arena.

**One of the "100 Most Influential Lawyers in America"**

Widely recognized as the "Dean" of the US plaintiff securities bar for his remarkable career and his professional excellence, Mr. Berger has a distinguished and unparalleled list of honors to his name.

He was selected one of the "100 Most Influential Lawyers in America" by The National Law Journal for being "front and center" in holding Wall Street banks accountable and obtaining over $5 billion in cases arising from the subprime meltdown, and for his work as a "master negotiator" in obtaining numerous multi-billion dollar recoveries for investors.



Described as a "standard-bearer" for the profession in a career spanning over 40 years, he was the recipient of *Chambers USA*'s award for Outstanding Contribution to the Legal Profession. In presenting this prestigious honor, *Chambers* recognized Mr. Berger's "numerous headline-grabbing successes," as well as his unique stature among colleagues – "warmly lauded by his peers, who are nevertheless loath to find him on the other side of the table."

*Benchmark Litigation* recently inducted him into its exclusive "Hall of Fame" in recognition of his career achievements and impact on the field of securities litigation.

Upon its tenth anniversary, *Lawdragon* named Mr. Berger a "Lawdragon Legend" for his accomplishments.

*Law360* published a special feature discussing his life and career as a "Titan of the Plaintiffs Bar," named him one of only six litigators selected nationally as a "Legal MVP," and selected him as one of "10 Legal Superstars" nationally for his work in securities litigation.

Since their various inceptions, Mr. Berger has been recognized as a litigation "star" and leading lawyer in his field by *Chambers USA* and the *Legal 500 US Guide*, as well as being named one of the "500 Leading Lawyers in America" and "100 Securities Litigators You Need to Know" by *Lawdragon* magazine. Further, *The Best Lawyers in America*® guide has named Mr. Berger a leading lawyer in his field.

Mr. Berger has lectured extensively for many professional organizations, and is the author and co-author of numerous articles on developments in the securities laws and their implications for public policy. He was chosen, along with several of his BLB&G partners, to author the first chapter – "Plaintiffs' Perspective" – of Lexis/Nexis's seminal industry guide *Litigating Securities Class Actions*. An esteemed voice on all sides of the legal and financial markets, in 2008 the SEC and Treasury called on Mr. Berger to provide guidance on regulatory changes being considered as the accounting profession was experiencing tectonic shifts shortly before the financial crisis.

Mr. Berger also serves the academic community in numerous capacities. A long-time member of the Board of Trustees of Baruch College, he is now the President of the Baruch College Fund. A member of the Dean's Council to Columbia Law School, he has taught Profession of Law, an ethics course at Columbia Law School, and serves on the Advisory Board of Columbia Law School's Center on Corporate Governance. In May 2006, he was presented with the Distinguished Alumnus Award for his contributions to Baruch College, and in February 2011, Mr. Berger received Columbia Law School's most prestigious and highest honor, "The Medal for Excellence." This award is presented annually to Columbia Law School alumni who exemplify the qualities of character, intellect, and social and professional responsibility that the Law School seeks to instill in its students. As a recipient of this award, Mr. Berger was profiled in the Fall 2011 issue of *Columbia Law School Magazine.*

Mr. Berger is currently a member of the New York State, New York City and American Bar Associations, and is a member of the Federal Bar Council. He is also a member of the American Law Institute and an Advisor to its Restatement Third: Economic Torts project. In addition, Mr. Berger is a member of the Board of Trustees of The Supreme Court Historical Society.

Mr. Berger lectures extensively for many professional organizations. In 1997, Mr. Berger was honored for his outstanding contribution to the public interest by Trial Lawyers for Public Justice, where he was a "Trial Lawyer of the Year" Finalist for his work in *Roberts, et al. v. Texaco*, the celebrated race discrimination case, on behalf of Texaco's African-American employees.



Among numerous charitable and volunteer works, Mr. Berger is an active supporter of City Year New York, a division of AmeriCorps, dedicated to encouraging young people to devote time to public service. In July 2005, he was named City Year New York's "Idealist of the Year," for his long-time service and work in the community. He and his wife, Dale, have also established The Dale and Max Berger Public Interest Law Fellowship at Columbia Law School and the Max Berger Pre-Law Program at Baruch College.

EDUCATION: Baruch College-City University of New York, B.B.A., Accounting, 1968; President of the student body and recipient of numerous awards. Columbia Law School, J.D., 1971, Editor of the *Columbia Survey of Human Rights Law*.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Court of Appeals for the Second Circuit; U.S. Supreme Court.

**GERALD H. SILK**'S practice focuses on representing institutional investors on matters involving federal and state securities laws, accountants' liability, and the fiduciary duties of corporate officials, as well as general commercial and corporate litigation. He also advises creditors on their rights with respect to pursuing affirmative claims against officers and directors, as well as professionals both inside and outside the bankruptcy context.

Mr. Silk is a member of the firm's Management Committee. He also oversees the firm's New Matter department in which he, along with a group of attorneys, financial analysts and investigators, counsels institutional clients on potential legal claims. In December 2014, Mr. Silk was recognized by *The National Law Journal* in its inaugural list of "Litigation Trailblazers & Pioneers" — one of several lawyers in the country who have changed the practice of litigation through the use of innovative legal strategies — in no small part for the critical role he has played in helping the firm's investor clients recover billions of dollars in litigation arising from the financial crisis, among other matters.

In addition, *Lawdragon* magazine, which has named Mr. Silk one of the "100 Securities Litigators You Need to Know," one of the "500 Leading Lawyers in America" and one of America's top 500 "rising stars" in the legal profession, also recently profiled him as part of its "Lawyer Limelight" special series, discussing subprime litigation, his passion for plaintiffs' work and the trends he expects to see in the market. Recognized as one of an elite group of notable practitioners by *Chambers USA*, he is also named as a "Litigation Star" by *Benchmark,* is recommended by the *Legal 500 USA* guide in the field of plaintiffs' securities litigation, and has been selected as a New York *Super Lawyer* every year since 2006.

In the wake of the financial crisis, he advised the firm's institutional investor clients on their rights with respect to claims involving transactions in residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs). His work representing Cambridge Place Investment Management Inc. on claims under Massachusetts state law against numerous investment banks arising from the purchase of billions of dollars of RMBS was featured in a 2010 *New York Times* article by Gretchen Morgenson titled, "Mortgage Investors Turn to State Courts for Relief."

Mr. Silk also represented the New York State Teachers' Retirement System in a securities litigation against the General Motors Company arising from a series of misrepresentations concerning the quality, safety, and reliability of the Company's cars which resulted in a $300 million settlement. He was also a member of the litigation team responsible for the successful prosecution of *In re Cendant Corporation Securities Litigation* in the District of New Jersey, which was resolved for $3.2 billion. In addition, he is actively involved in the firm's prosecution of highly successful M&A litigation, representing shareholders in widely publicized lawsuits, including the litigation arising from the proposed acquisition of Caremark Rx, Inc. by CVS Corporation — which led to an increase of approximately $3.5 billion in the consideration offered to shareholders.



A graduate of the Wharton School of Business, University of Pennsylvania and Brooklyn Law School, in 1995-96, Mr. Silk served as a law clerk to the Hon. Steven M. Gold, U.S.M.J., in the United States District Court for the Eastern District of New York.

Mr. Silk lectures to institutional investors at conferences throughout the country, and has written or substantially contributed to several articles on developments in securities and corporate law, including "Improving Multi-Jurisdictional, Merger-Related Litigation," American Bar Association (February 2011); "The Compensation Game," *Lawdragon*, Fall 2006; "Institutional Investors as Lead Plaintiffs: Is There A New And Changing Landscape?," 75 *St. John's Law Review* 31 (Winter 2001); "The Duty To Supervise, Poser, Broker-Dealer Law and Regulation," 3rd Ed. 2000, Chapter 15; "Derivative Litigation In New York after Marx v. Akers," *New York Business Law Journal*, Vol. 1, No. 1 (Fall 1997).

He has also been a commentator for the business media on television and in print. Among other outlets, he has appeared on NBC's *Today,* and CNBC's *Power Lunch, Morning Call,* and *Squawkbox* programs, as well as being featured in *The New York Times, Financial Times, Bloomberg*, *The National Law Journal,* and the *New York Law Journal*.

EDUCATION: Wharton School of the University of Pennsylvania, B.S., Economics, 1991. Brooklyn Law School, J.D., *cum laude,* 1995.

BAR ADMISSIONS: New York; U.S. District Courts for the Southern and Eastern Districts of New York.

**SALVATORE J. GRAZIANO** is widely recognized as one of the top securities litigators in the country. He has served as lead trial counsel in a wide variety of major securities fraud class actions, recovering billions of dollars on behalf of institutional investors and hedge fund clients.

Over the course of his distinguished career, Mr. Graziano has successfully litigated many high-profile cases, including: *Merck & Co., Inc. (Vioxx) Sec. Litig.* (D.N.J.); *In re Schering-Plough Corp./ENHANCE Sec. Litig.* (D.N.J.); *New York State Teachers' Retirement System v. General Motors Co*. (E.D. Mich.); *In re MF Global Holdings Limited Sec. Litig.* (S.D.N.Y); *In re Raytheon Sec. Litig.* (D. Mass.); *In re Refco Sec. Litig.* (S.D.N.Y.); *In re MicroStrategy, Inc. Sec. Litig.* (E.D. Va.); *In re Bristol Myers Squibb Co. Sec. Litig.* (S.D.N.Y.); and *In re New Century Sec. Litig.* (C.D. Cal.).

Industry observers, peers and adversaries routinely honor Mr. Graziano for his accomplishments. He is one of the "Top 100 Trial Lawyers" in the nation according to *Benchmark Litigation*, which credits him for performing "top quality work." *Chambers USA* describes Mr. Graziano as "wonderfully talented…a smart, aggressive lawyer who works hard for his clients," while Legal 500 praises him as a "highly effective litigator." Heralded multiple times as one of a handful of Securities Litigation and Class Action "MVPs" in the nation by *Law360*, he is also one of *Lawdragon*'s "500 Leading Lawyers in America," and named as a leading mass tort and plaintiff class action litigator by *Best Lawyers*®, as well as a New York "Super Lawyer" by Thomson Reuters.

A highly esteemed voice on investor rights, regulatory and market issues, in 2008 he was called upon by the Securities and Exchange Commission's Advisory Committee on Improvements to Financial Reporting to give testimony as to the state of the industry and potential impacts of proposed regulatory changes being considered. He is the author and co-author of numerous articles on developments in the securities laws, and was chosen, along with several of his BLB&G partners, to author the first chapter – "Plaintiffs' Perspective" – of Lexis/Nexis's seminal industry guide *Litigating Securities Class Actions*.



A managing partner of the firm, Mr. Graziano has previously served as the President of the National Association of Shareholder & Consumer Attorneys, and has served as a member of the Financial Reporting Committee and the Securities Regulation Committee of the Association of the Bar of the City of New York. He regularly lectures on securities fraud litigation and shareholder rights.

Prior to entering private practice, Mr. Graziano served as an Assistant District Attorney in the Manhattan District Attorney's Office.

EDUCATION: New York University College of Arts and Science, B.A., psychology, *cum laude,* 1988. New York University School of Law, J.D., *cum laude,* 1991.

BAR ADMISSIONS: New York; U.S. District Courts for the Southern and Eastern Districts of New York; U.S. Courts of Appeals for the First, Second, Third, Fourth, Ninth and Eleventh Circuits.

**JOHN C. BROWNE**'s practice focuses on the prosecution of securities fraud class actions. He represents the firm's institutional investor clients in jurisdictions throughout the country and has been a member of the trial teams of some of the most high-profile securities fraud class actions in history.

Mr. Browne was Lead Counsel in the *In re Citigroup, Inc. Bond Action Litigation,* which resulted in a $730 million cash recovery – the second largest recovery ever achieved for a class of purchasers of debt securities. It is also the second largest civil settlement arising out of the subprime meltdown and financial crisis. Mr. Browne was also a member of the team representing the New York State Common Retirement Fund in *In re WorldCom, Inc. Securities Litigation*, which culminated in a five-week trial against Arthur Andersen LLP and a recovery for investors of over $6.19 billion – one of the largest securities fraud recoveries in history.

Other notable litigations in which Mr. Browne served as Lead Counsel on behalf of shareholders include *In re Refco Securities Litigation,* which resulted in a $407 million settlement, *In re Reserve Fund Securities and Derivative Litigation,* which settled for more than $54 million, *In re King Pharmaceuticals Litigation*, which settled for $38.25 million, *In re RAIT Financial Trust Securities Litigation*, which settled for $32 million, and *In re SFBC Securities Litigation,* which settled for $28.5 million.

Most recently, Mr. Browne served as lead counsel in the *In re BNY Mellon Foreign Exchange Securities Litigation,* which settled for $180 million, *In re State Street Corporation Securities Litigation*, which settled for $60 million, and the *Anadarko Petroleum Corporation Securities Litigation*, which settled for $12.5 million. Mr. Browne also represents the firm's institutional investor clients in the appellate courts, and has argued appeals in the Second Circuit, Third Circuit and, most recently, the Fifth Circuit, where he successfully argued the appeal in the *In re Amedisys Securities Litigation*.

In recognition of his achievements and legal excellence, *Law360* named Mr. Browne a "Class Action MVP" (one of only four litigators selected nationally), and he was selected by legal publication *Lawdragon* to its exclusive list as one of the "500 Leading Lawyers in America." He is ranked a New York *Super Lawyer* by Thomson Reuters, and is recommended by *Legal 500* for his work in securities litigation.

Prior to joining BLB&G, Mr. Browne was an attorney at Latham & Watkins, where he had a wide range of experience in commercial litigation, including defending corporate officers and directors in securities class actions and derivative suits, and representing major corporate clients in state and federal court litigations and arbitrations.



Mr. Browne has been a panelist at various continuing legal education programs offered by the American Law Institute ("ALI") and has authored and co-authored numerous articles relating to securities litigation.

EDUCATION: James Madison University, B.A., Economics, *magna cum laude*, 1994.  Cornell Law School, J.D., *cum laude,* 1998; Editor of the *Cornell Law Review.*

BAR ADMISSIONS: New York; U.S. District Court for the Southern District of New York; U.S. Courts of Appeals for the Second, Third and Fifth Circuits.

**MARK LEBOVITCH** heads the firm's corporate governance litigation practice, focusing on derivative suits and transactional litigation.  Working with his institutional investor clients, he fights to hold management accountable, pursuing meaningful and novel challenges to alleged corporate governance-related misconduct and anti-shareholder practices. His cases have created key legal precedents while helping recoup billions of dollars for investors and improving corporate governance practices in numerous industries.

Most recently, Mr. Lebovitch led the *Allergan Proxy Violation Litigation*, alleging an unprecedented insider trading scheme by billionaire hedge fund manager Bill Ackman, Ackman's Pershing Square Capital Management fund and Valeant Pharmaceuticals International, Inc.  After a ferocious three-year legal battle over this attempt to circumvent the spirit of the U.S. securities laws, defendants accepted a $290 million settlement for Allergan investors. Last year, before the birth of the #metoo movement, he led the prosecution of an unprecedented shareholder derivative litigation against Fox News parent 21st Century Fox, Inc. arising from the systemic sexual and workplace harassment at the embattled network.  The case resulted in one of the largest financial recoveries – $90 million – ever obtained in a pure corporate board oversight dispute; and the creation of an independent council of experts – named the "Fox News Workplace Professionalism and Inclusion Council" – which is expected to serve as a model for public companies in all industries.

Other select current and past representations include:

- *In re DISH Corp. Shareholder Litigation:* derivative suit challenging misappropriation and front-running by a controlling shareholder, costing investors over $800 million;

- *Insys Derivative Litigation*: challenging a board-approved illegal marketing scheme that actively encouraged off-label marketing of a deadly opioid fentanyl drug;

- *In re TIBCO Software Stockholder Litigation:* pursued novel and precedent-setting merger agreement reformation claims and received 33% of potential damages shortly before trial;

- *In re Freeport-McMoRan Derivative Litigation:* settled for a cash recovery of nearly $154 million, plus corporate governance reforms;

- *In re Jefferies, Inc. Stockholder Litigation:* settled for a $75 million net payment paid entirely to a class of former Jefferies investor through a first-of-its-kind dividend;

- *Safeway Appraisal Litigation*: provided clients with a nearly 30% increase in value above the negotiated merger consideration;

- *In re News Corp. Shareholder Derivative Litigation*: settled for a $139 million cash recovery, and an unprecedented package of corporate governance and oversight enhancements;

- *In re El Paso Corp. Shareholder Litigation*: resulted in a $110 million post-closing settlement and a ruling that materially improved the way M&A financial advisors address conflicts of interest;

- *In re Delphi Financial Group Shareholder Litigation*: challenged the controlling shareholder's unlawful demand for an additional $55 million in connection with the sale of the company, resulting in the recovery of $49 million;



- *In re Pfizer Derivative Litigation*: resulted in a $75 million payment and creation of a new Healthcare Law Regulatory Committee, which sets an improved standard for regulatory compliance oversight by a public company board of directors; and

- *In re ACS Shareholder Litigation:* settled on the eve of trial for a $69 million cash payment to ACS shareholders.

Mr. Lebovitch pioneered challenges to the improper but widespread practice of using "Proxy Put" provisions in corporate debt agreements, obtaining pro-shareholder rulings in cases like *In re Amylin Shareholders Litigation*, *In re SandRidge Energy, Inc. Shareholder Litigation*, and *In re Healthways, Inc. Shareholder Litigation*, which have caused the industry to materially change its use of such provisions. He also prosecutes securities litigations, and in that capacity, was the lead litigation attorney in *In re Merrill Lynch Bondholders Litigation*, which settled for $150 million; and a member of the team prosecuting *In re Bank of America Securities Litigation*, which settled for $2.425 billion. Currently, he is the lead attorney prosecuting *In re Allergan Proxy Securities Litigation.*

Mr. Lebovitch has received national recognition for his work in securities and M&A litigation. *The National Law Journal* named Mr. Lebovitch, as a "Plaintiffs' Lawyers Trailblazer," recognizing him among the top practitioners in the nation. He was selected 2016 national "Plaintiff Attorney of the Year" by *Benchmark Litigation* and is regularly honored as a New York "Litigation Star" by *Benchmark* in its exclusive annual list of top practitioners. Named a leading lawyer in M&A litigation by *Best Lawyers*®, Mr. Lebovitch was selected as its 2016 M&A Litigation "Lawyer of the Year" for New York City. He is one of *Lawdragon*'s "500 Leading Lawyers in America," a New York *Super Lawyer*, and is recognized by *Chambers USA* and *Legal 500* as one of an elite group of notable practitioners in securities and M&A litigation. In 2013, *Law360* named him as one of its five "Rising Stars" nationally in the area of securities litigation – the only plaintiff-side attorney so selected, and in 2018 honored him as a "Titan of the Plaintiffs Bar." In 2012, *The Deal* magazine prominently profiled Mr. Lebovitch as one of the top three lawyers nationally representing shareholder plaintiffs in M&A litigation in its feature article, "The Troika Atop the M&A Plaintiffs' Bar."

Mr. Lebovitch serves as an Adviser on the prestigious American Law Institute's Restatement of the Law, Corporate Governance project. He is also a member of the Board of Advisors for both the Institute for Law and Economics and the NYU Institute for Corporate Governance and Finance, and is an author and a frequent speaker and commentator at industry events on a wide range of corporate governance and securities related issues. His publications include "Of Babies and Bathwater: Deterring Frivolous Stockholder Suits Without Closing the Courthouse Doors to Legitimate Claims" (*Delaware Journal of Corporate Law*, Vol. 40, 2015), "Making Order Out of Chaos: A Proposal To Improve Organization and Coordination in Multi-Jurisdictional Merger-Related Litigation" (*ABA Journal*), "'Novel Issues' or a Return to Core Principles? Analyzing the Common Link Between the Delaware Chancery Court's Recent Rulings in Option Backdating and Transactional Cases" *(NYU Journal of Law & Business*, Volume 4, Number 2), "Calling a Duck a Duck: Determining the Validity of Deal Protection Provisions in Merger of Equals Transactions" (2001 *Columbia Business Law Review* 1) and "Practical Refinement" (*The Daily Deal*, January 2002), each of which discussed evolving developments in the law of directors' fiduciary duties.

Mr. Lebovitch clerked for Vice Chancellor Stephen P. Lamb on the Court of Chancery of the State of Delaware, and was a litigation associate at Skadden, Arps, Slate, Meagher & Flom in New York, where he represented clients in a variety of corporate governance, commercial and federal securities matters.

EDUCATION:  Binghamton University – State University of New York, B.A., *cum laude*, 1996. New York University School of Law, J.D., *cum laude,* 1999.

BAR ADMISSIONS: New York; U. S. District Courts for the Southern and Eastern Districts of New York.



**HANNAH ROSS** is involved in a variety of the firm's litigation practice areas, focusing in particular on securities fraud, shareholder rights and other complex commercial matters. She has two decades of experience as a civil and criminal litigator, and represents the firm's institutional investor clients as counsel in a number of major pending actions.

A key member and leader of trial teams that have recovered billions of dollars for investors, Ms. Ross is widely recognized by industry observers for her professional achievements.  *Euromoney/ Legal Media Group* named her one of the top female litigators in the country (1 of 9 finalists for its "Best in Litigation" category).  Named a "Litigation Star" and one of the "Top 250 Women in Litigation" in the nation by *Benchmark*, she has earned praise as one of a small elite of notable practitioners from Legal 500 US for her achievements, and is one of the "500 Leading Lawyers in America," part of an exclusive list of the top practitioners in the nation as compiled by leading legal journal *Lawdragon*.

In addition to her direct litigation responsibilities, she is one of the senior partners at the firm responsible for client development and client relations.  A significant part of her practice is dedicated to initial case evaluation and counseling the firm's institutional investor clients on potential claims.  Ms. Ross is also one of the partners who oversees the firm's Foreign Securities and Litigation Monitoring Team, which monitors global equities traded in non-U.S. jurisdictions on prospective and pending international securities matters.  In that capacity, she advises the firm's institutional investor clients on their options to recover losses incurred on securities purchased in non-U.S. markets.

Ms. Ross was a senior member of the team that prosecuted *In re Bank of America Securities Litigation*, which resulted in a landmark settlement shortly before trial of $2.425 billion, one of the largest securities recoveries ever obtained, and by far the largest recovery achieved in a litigation arising from the financial crisis.  Most recently, she was the lead partner in the securities class action arising from the failure of major mid-Atlantic bank Wilmington Trust, which settled for $210 million.  Ms. Ross was also a senior member of the trial team that prosecuted the litigation arising from the collapse of former leading brokerage MF Global, which recovered $234.3 million on behalf of investors. In addition, she led the prosecution against Washington Mutual and certain of its former officers and directors for alleged fraudulent conduct in the thrift's home lending operations, an action which settled for $216.75 million and represents one of the largest settlements achieved in a case related to the fallout of the subprime crisis and the largest recovery ever achieved in a securities class action in the Western District of Washington. Ms. Ross was also a key member of the team prosecuting *In re The Mills Corporation Securities Litigation*, which settled for $202.75 million, the largest recovery ever achieved in a securities class action in Virginia and the second largest recovery ever in the Fourth Circuit.

She has been a member of the trial teams in numerous other major securities litigations resulting in recoveries for investors in excess of $2 billion.  These include securities class actions against Nortel Networks, New Century Financial Corporation, and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), as well as *In re Altisource Portfolio Solutions S.A. Securities Litigation, In re DFC Global Corp. Securities Litigation, In re Tronox Securities Litigation, In re Delphi Corporation Securities Litigation, In re Affiliated Computer Services, Inc. Derivative Litigation, In re OM Group, Inc. Securities Litigation,* and *In re BioScrip, Inc. Securities Litigation.*

Ms. Ross serves on the Corporate Leadership Committee of the New York Women's Foundation and has also served as an adjunct faculty member in the trial advocacy program at the Dickinson School of Law of the Pennsylvania State University.



Before joining BLB&G, Ms. Ross was a prosecutor in the Massachusetts Attorney General's Office as well as an Assistant District Attorney in the Middlesex County (Massachusetts) District Attorney's Office.

EDUCATION: Cornell University, B.A., *cum laude,* 1995. The Dickinson School of Law of the Pennsylvania State University, J.D., *with distinction*, 1998; Woolsack Honor Society; Comments Editor of the *Dickinson Law Review;* D. Arthur Magaziner Human Services Award.

BAR ADMISSIONS:  Massachusetts; New York; U.S. District Court for the Southern District of New York.


**TIMOTHY A. DELANGE** practices in the firm's California office, where he focuses on complex litigation in state and federal courts nationwide.  He has extensive experience representing prominent private and public institutional investors in class actions, individual actions and derivative cases. Mr. DeLange is a senior member of the firm's team representing investors who were harmed by the abusive practices of the many players in the mortgage lending arena.  He is currently in charge of litigation on behalf of numerous institutions that invested directly in mortgage-backed securities, including litigation involving *Morgan Stanley*, *Bear Stearns*, *JPMorgan*, and others.

Since joining the firm, Mr. DeLange has prosecuted and successfully resolved a number of prominent securities class actions, recovering billions of dollars on behalf of investors.  Most recently, along with his partners, Mr. DeLange led the litigation against Washington Mutual, which settled for $216.75 million, the largest recovery ever achieved in a securities class action in the Western District of Washington.  In addition, he served as co-lead counsel on behalf of institutional investors in *In re Maxim Integrated Products, Inc. Securities Litigation,* which settled for $173 million and represents the largest stock option backdating settlement reached in the Ninth Circuit and the third largest backdating settlement overall.  Among other major cases are *In re McKesson Securities Litigation*, which settled before trial for a total of over $1.04 billion, the largest settlement amount in history for any securities class action within the Ninth Circuit; *In re Accredo Health, Inc.,* which settled less than 6 weeks before trial for $33 million; *In re HCA, Inc.,* which settled for $20 million; and *In re Network Associates Securities Litigation*, which settled for $70 million.

Mr. DeLange lectures on securities litigation and institutional investor interests and has authored and co-authored several articles concerning securities litigation and class actions.

EDUCATION: University of California, Riverside, B.A., 1994.  University of San Diego School of Law, J.D., 1997; Recipient of the American Jurisprudence Award in Contracts.

BAR ADMISSIONS:  California; U.S. District Courts for the Central, Eastern, Northern and Southern Districts of California.


**DAVID L. WALES,** one of the leaders of the firm's Corporate Governance litigation practice, prosecutes a variety of derivative, class and private litigation arising from breaches of fiduciary duty and other misconduct by boards of directors and senior executives at public companies.

He is an experienced trial attorney who has recovered billions of dollars on behalf of his institutional investor clients.  A former Assistant United States Attorney for the Southern District of New York, Mr. Wales has tried numerous cases both as a prosecutor and in private practice.



His current and recent cases including the following:

- *In re 21st Century Fox Derivative Action* – derivative action against the Board of Directors and controlling stockholders, and a senior executive, for breach of fiduciary duty for a systemic culture of sexual harassment and discrimination; a landmark settlement with two key components: 1) the first-ever Board-level watchdog of its kind – the "Fox News Workplace Professionalism and Inclusion Council" of experts (WPIC) – majority independent of the Murdochs, the Company and Board; and 2) one of the largest financial recoveries – $90 million – ever obtained in a pure corporate board oversight dispute; the WPIC is expected to serve as a model for public companies in all industries;

- *In re Alphabet Shareholder Derivative Action* – derivative action against the Board of Directors and senior executives of Alphabet for violating anti-trust laws, including for the recent European Commission fine of $2.7 billion;

- *In re Sorrento Therapeutics, Inc. Derivative Litigation* – derivative action alleging a scheme to grant large amounts of options and warrants in subsidiaries of the Company to the board of directors and executives of the Company, without shareholder approval;

- *In re Yahoo!, Inc. Derivative Litigation* – action alleging that the Board and senior executives of Yahoo breached their duties by failing to disclose large hacks of Yahoo email users, resulting in the price of the sale of internet business being reduced by $350 million, as well as numerous consumer lawsuits; and

- *In re New Senior Investment Group, Inc. Derivative Litigation* – derivative action alleging that a conflicted board of directors allowed a self-dealing and over-priced transaction with entities controlled by Fortress Investment Group.

As lead counsel in numerous major securities litigations, some of Mr. Wales's significant recoveries include:

- *In re Merck & Co., Inc. Securities Litigation* – a recovery of $1.06 billion in a certified class action on behalf of investors in Merck Securities;

- *In re Citigroup Inc. Bond Litigation* – a class action on behalf of investors in numerous securities offerings which resulted in $730 million recovery;

- *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.* – $315 million settlement in a class action on behalf of investors in residential mortgage-backed securities;

- *In re Pfizer Inc. Shareholder Derivative Action* – $75 million settlement and substantial corporate governance changes in a derivative action that set new benchmark for highly regulated businesses;

- *In re Jefferies Group, Inc. Shareholders Litigation* – $70 million settlement on behalf of shareholders in the sale of the company;

- *In re Sepracor Corp. Securities Litigation* – $52.5 million recovery in a certified class action; and

- *In re Cablevision Systems Corp. Derivative Litigation* – $34.4 million recovery in a back-dated stock option action.

Mr. Wales is rated AV, the highest rating possible from Martindale-Hubbell®.  He has also been regularly recognized by Legal 500 as a top practitioner, and by Thomson Reuters as a New York *Super Lawyer* for his work in securities litigation.  In addition, he is a frequent speaker and author on corporate governance and securities fraud matters.

EDUCATION:  State University of New York at Albany, B.A., *magna cum laude*, 1984. Georgetown University Law Center, J.D., *cum laude*, 1987; Notes and Comments Editor for the *Journal of Law and Technology*.



BAR ADMISSIONS:  New York; District of Columbia; U.S. Courts of Appeals for the Second, Third and Fourth Circuits; U.S. District Courts for the Eastern, Northern, Southern and Western Districts of New York; U.S. District Court for the Eastern District of Michigan; U.S. District Court for the District of Columbia; U.S. District Court for the Northern District of Illinois and Trial Bar.

**AVI JOSEFSON** prosecutes securities fraud litigation for the firm's institutional investor clients, and has participated in many of the firm's significant representations, including *In re SCOR Holding (Switzerland) AG Securities Litigation*, which resulted in a recovery worth in excess of $143 million for investors. He was also a member of the team that litigated the *In re OM Group, Inc. Securities Litigation*, which resulted in a settlement of $92.4 million.

As a member of the firm's New Matter department, Mr. Josefson counsels institutional clients on potential legal claims.  He has presented argument in several federal and state courts, including an appeal he argued before the Delaware Supreme Court.

Mr. Josefson is also actively involved in the M&A litigation practice, and represented shareholders in the litigation arising from the proposed acquisitions of Ceridian Corporation and Anheuser-Busch.  A member of the firm's subprime litigation team, he has participated in securities fraud actions arising from the collapse of subprime mortgage lender American Home Mortgage and the actions against Lehman Brothers, Citigroup and Merrill Lynch, arising from those banks' multi-billion-dollar loss from mortgage-backed investments.  Mr. Josefson has prosecuted actions against Deutsche Bank and Morgan Stanley arising from their sale of mortgage-backed securities, and is advising U.S. and foreign institutions concerning similar claims arising from investments in mortgage-backed securities.

Mr. Josefson practices in the firm's Chicago and New York Offices.

EDUCATION: Brandeis University, B.A., *cum laude,* 1997.  Northwestern University, J.D., 2000; *Dean's List*; Justice Stevens Public Interest Fellowship (1999); Public Interest Law Initiative Fellowship (2000).

BAR ADMISSIONS: Illinois, New York; U.S. District Courts for the Southern District of New York and the Northern District of Illinois.

**JOHN RIZIO-HAMILTON** is involved in a variety of the firm's litigation practice areas, focusing specifically on securities fraud, corporate governance, and shareholder rights. He currently represents the firm's institutional investor clients as counsel in a number of major pending actions.

Mr. Rizio-Hamilton was a member of the trial team prosecuting *In re Bank of America Securities Litigation*, which settled for $2.425 billion, the single largest securities class action recovery ever resolving violations of Sections 14(a) and 10(b) of the Securities Exchange Act, and one of the top securities litigation recoveries in history.  He also served as counsel on behalf of the institutional investor plaintiffs in *In re Citigroup, Inc. Bond Action Litigation*, which settled for $730 million, the second largest recovery ever in a securities class action brought on behalf of purchasers of debt securities.  In addition, Mr. Rizio-Hamilton was a member of the team that prosecuted the *In re Wachovia Corp. Bond/Notes Litigation*, in which the firm recovered a total of $627 million on behalf of investors, one of the 15 largest securities class action recoveries in history.  Most recently, he served as a key member of the team that recovered $150 million for investors in *In re JPMorgan Chase & Co. Securities Litigation*, a securities fraud class action arising out of misrepresentations and omissions concerning JPMorgan's Chief Investment Office, the company's risk management systems, and the trading activities of the so-called "London Whale."



Mr. Rizio-Hamilton has also been a member of the trial teams in several additional securities litigations through which the firm has successfully recovered hundreds of millions of dollars on behalf of injured investors.  Among other matters, he was part of the trial teams that prosecuted *Eastwood Enterprises LLC v. WellCare*, *In re MBIA, Inc. Securities Litigation*, and *In re RAIT Financial Trust Securities Litigation*.

In addition to his direct litigation responsibilities, Mr. Rizio-Hamilton is also responsible for the firm's client outreach in Canada, where he advises institutional investor clients on potential securities fraud and investor claims.  He is one of the partners who oversees the firm's Foreign Securities and Litigation Monitoring Team, which monitors global equities traded in non-U.S. jurisdictions on prospective and pending international securities matters, and provides critical analysis of options to recover losses incurred on securities purchased in non-U.S. markets.

For his remarkable accomplishments, Mr. Rizio-Hamilton was recognized by *Law360* as one of the country's "Top Attorneys Under 40," and a national "Rising Star" in the area of class action litigation.

Before joining BLB&G, Mr. Rizio-Hamilton clerked for the Honorable Chester J. Straub of the United States Court of Appeals for the Second Circuit, and the Honorable Sidney H. Stein of the United States District Court for the Southern District of New York.

EDUCATION: The Johns Hopkins University, B.A., *with honors*, 1997.  Brooklyn Law School, J.D., *summa cum laude;* Editor-in-Chief of the *Brooklyn Law Review;* first-place winner of the J. Braxton Craven Memorial Constitutional Law Moot Court Competition.

BAR ADMISSIONS: New York; U.S. District for the Southern District of New York.

**JAMES A. HARROD**'s practice focuses on representing the firm's institutional investor clients in securities fraud-related matters.  He has over seventeen years' experience prosecuting complex litigation in federal courts.

Over the course of his career, he has obtained over a billion dollars on behalf of investor classes.  His high-profile cases include *In re Motorola Securities Litigation*, in which he was a key member of the team that represented the State of New Jersey's Division of Investment and obtained a $190 million recovery three days before trial.  Recently, Mr. Harrod represented the class of investors in the securities litigation against General Motors arising from GM's recall of vehicles with defective ignition switches, and recovered $300 million for investors – the second largest securities class action recovery in the Sixth Circuit.

Mr. Harrod represented institutional investors in several cases concerning the issuance of residential mortgage-backed securities prior to the financial crisis.  He worked on the team that recovered $500 million for investors in *In re Bear Stearns Mortgage Pass-Through Certificates Litigation,* which brought claims related to the issuance of mortgage pass-through certificates during 2006 and 2007.  In a similar action, *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I,* he recovered $280 million on behalf of a class of investors.  Other mortgage-backed securities cases that Mr. Harrod worked on include *In re Lehman Bros. Mortgage-Backed Securities Litigation* ($40 million recovery), and *Tsereteli v. Residential Asset Securitization Trust 2006-A8 (*$10.9 million recovery).

Among his other notable recoveries are *The Department of the Treasury of the State of New Jersey and its Division of Investment v. Cliffs Natural Resources Inc.* (class recovery of $84 million); *Anwar, et al., v. Fairfield Greenwich Limited* (settlement valued at $80 million); *In re Service Corporation International* ($65 million recovery); *Danis v. USN Communications, Inc.* ($44.6 million recovery*); In re Tower Group International, Ltd. Securities Litigation* ($20.5 million recovery); *In re Navistar International Securities Litigation* ($13 million recovery); and *In re Sonus Networks, Inc. Securities Litigation-II* ($9.5 million recovery).



In connection with his representation of institutional investors, he is a frequent speaker to public pension fund organizations and trustees concerning fiduciary duties, emerging issues in securities litigation and the financial markets.

Mr. Harrod is recognized as a New York *Super Lawyer* for his securities litigation achievements.

EDUCATION: Skidmore College, B.A.; George Washington University Law School, J.D.

BAR ADMISSIONS:  New York; U.S. Courts of Appeals for the Second, Third, Sixth and Seventh Circuits; U.S. District Courts for the Eastern and Southern Districts of New York.

**JEROEN VAN KWAWEGEN** is one of America's top shareholder litigators and serves as the co-head of the firm's Department of Governance, focusing on the fiduciary duties of boards of directors and senior executives, including in the context of mergers and acquisitions, shareholder voting rights and shareholder activism, and board oversight.  He is also the head of the firm's European client development efforts and devotes a significant part of his practice to initial case evaluation and counseling the firm's European institutional investor clients in all shareholder litigation matters, including securities class actions and fiduciary duty matters. Jeroen is one of the partners who oversees the firm's Foreign Securities and Litigation Monitoring Team, which monitors securities class and group actions around the world, and advises institutional clients on potential avenues for recovering damages in those actions.

Jeroen has been widely recognized within the legal industry for his accomplishments. Most recently, *Lawdragon* named Jeroen one of the "500 Leading Lawyers" in America in 2019 – the only shareholder litigator from Europe to receive that professional recognition.  Jeroen has also been lauded by *The National Law Journal* as a "Plaintiffs' Lawyers Trailblazer," including him among the top 26 practitioners in the nation "who continue to make their mark in various aspects of legal work on the Plaintiffs' side." He has also been recognized as a leading practitioner in his field by *Legal 500* and *Super Lawyers*, and was named a New York "Rising Star" by Thomson Reuters.

Jeroen has served as lead counsel in securities class actions and in class and derivative actions involving breaches of fiduciary duty by boards of directors and senior executives in courts across the United States.  Over the course of his career, Jeroen has recovered hundreds of millions of dollars for investors, improving corporate governance practices at numerous companies, and vindicating fundamental shareholder voting and franchise rights, including *Public Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.* (U.S. District Court for the Southern District of New York), *In re Pfizer Inc. Shareholder Derivative Litigation* (U.S. District Court for the Southern District of New York), *In re Starz Stockholder Litigation* (Delaware Chancery Court), and *Teamsters Local 443 Health Servs. & Ins. Plan v. Darden Restaurants, Inc.* (Florida Circuit Court).

Among other cases, Jeroen is currently prosecuting *In re Scana Corp. Securities Litigation* (U.S. District Court of South Carolina), *In re Symantec Corp. Securities Litigation* (U.S. District Court for the Northern District of California), *In re Qualcomm Inc. Securities Litigation* (U.S. District Court for the Southern District of California), *In re NVIDIA Corp. Securities Litigation* (U.S. District Court for the Northern District of California),  *In re DXC Technology Co. Securities Litigation* (U.S. District Court for the Eastern District of Virginia), and *In re Synchrony Financial Corp. Securities Litigation* (U.S. District Court of Connecticut). In addition, Jeroen is prosecuting *In re Straight Path Communications Shareholder Litig.* (Delaware Chancery Court), *In re BGC Partners, Inc. Derivative Litigation* (Delaware Chancery Court), *In re Appraisal of Columbia Pipeline Group, Inc.* (Delaware Chancery Court), and *In re Sinclair Broadcast Corp. Derivative Litigation* (U.S. District Court of Maryland).

33



Jeroen is a frequent speaker at industry events on a wide range of corporate governance and securities related issues, and co-authored "Of Babies and Bathwater: Deterring Frivolous Stockholder Suits Without Closing the Courthouse Doors to Legitimate Claims" that was published in the *Delaware Journal of Corporate Law* (DJCL), Vol. 40, 2015.

Before joining BLB&G, Jeroen was a litigator at Latham & Watkins (New York) and Schut & Grosheide (Amsterdam).

EDUCATION: University of Amsterdam School of Law, LLM, 1998.  Columbia University Law School, J.D., 2003; Harlan Fiske Stone Scholar.

BAR ADMISSIONS: New York; U.S. Courts of Appeals for the Second and Third Circuits; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. District Court for the District of Colorado.

**KATHERINE M. SINDERSON** is involved in a variety of the firm's practice areas, including securities fraud, corporate governance, and advisory services.  She is currently leading the teams prosecuting securities class actions against FleetCor Technologies, Frontier Communications, and Novo Nordisk, as well as litigation arising from the failure of SunEdison, Inc.

Ms. Sinderson played a key role in two of the largest cases in the firm's history, both of which settled shortly before trial for billions of dollars on behalf of investors.  In *In re Merck Securities Litigation*, she was a member of the small trial team that achieved a $1.062 billion settlement. This settlement is twelfth largest in history, and the largest recovery ever achieved against a pharmaceutical company. She was also a member of the trial team prosecuting *In re Bank of America Securities Litigation*, which resulted in a recovery of $2.425 billion, the single largest securities class action recovery ever resolving violations of Sections 14(a) and 10(b) of the Securities Exchange Act and one of the largest shareholder recoveries in history. Most recently, Ms. Sinderson was a senior member of the team that led the securities litigation concerning Wilmington Trust, which resulted in a $210 million recovery for the class.

Ms. Sinderson has also been part of the trial teams in numerous other securities litigations that have successfully recovered hundreds of millions of dollars on behalf of injured investors.  She served as a senior member of the teams that recovered $210 million in *In re Salix Pharmaceuticals, Ltd. Securities Litigation*, and $74 million in the take-private merger litigation *San Antonio Fire and Police Pension Fund et al v. Dole Food Co. et al*.  She was also a member of the trial team that prosecuted the action against Washington Mutual, Inc. and certain of its former officers and directors for alleged fraudulent conduct in the thrift's home lending operations.  The action resulted in a recovery of $216.75 million, the largest recovery ever achieved in a securities class action in the Western District of Washington.  Some of her other prominent prosecutions include the *In re Bristol-Myers Squibb Co. Securities Litigation*, which resulted in a recovery of $125 million; and *In re Biovail Corporation Securities Litigation*, which resulted in a recovery of $138 million for defrauded investors and represents the second largest recovery in any securities case involving a Canadian issuer.

In 2016, Ms. Sinderson was recognized as a national "Rising Star" by *Law360* for her work in securities litigation and, in 2016, 2017, 2018, and 2019 was named to *Benchmark Litigation*'s "Under 40 Hot List," which recognizes her as one the nation's most accomplished legal partners under the age of 40.  She is also regularly selected as a New York "Rising Star" by *Super Lawyers*.

EDUCATION: Baylor University, B.A., *cum laude,* 2002.  Georgetown University, J.D., *cum laude*, 2006; Dean's Scholar; Articles Editor for *The Georgetown Journal of Gender and the Law*.

BAR ADMISSIONS: New York; U.S. District Court for the Southern District of New York; U.S. Court of Appeals for the Second Circuit.



**JONATHAN D. USLANER** prosecutes class and direct actions on behalf of the firm's institutional investor clients.

Mr. Uslaner has litigated many of the firm's most high-profile litigations. These include, among others, *In re Bank of America Securities Litigation*, which resulted in a historic settlement shortly before trial of $2.43 billion, one of the largest shareholder recoveries ever obtained; *In re Genworth Financial, Inc. Securities Litigation,* which settled for $219 million, the largest recovery ever obtained in a securities class action in Virginia; *In re JPMorgan Chase & Co. Securities Litigation*, which settled for $150 million; *In re Wells Fargo Mortgage-Backed Certificates Litigation*, which settled for $125 million; and *In re Rayonier Securities Litigation*, which settled for $73 million.

Mr. Uslaner is also actively involved in the firm's direct action opt-out practice. He currently represents the Firm's clients in direct actions brought against American Realty Capital Properties and Valeant Pharmaceuticals International Inc.

Mr. Uslaner has been a member of the Board of Governors of the Association of Business Trial Lawyers (ABTL). He is also a member of the Federal Bar Association (FBA) and the San Diego County Bar Association (SDCBA).

Mr. Uslaner is an editor of the American Bar Association's Class Actions and Derivative Suits Committee's Newsletter. He has authored multiple articles relating to class actions and the federal securities laws, including "Much More Than 'Housekeeping': Rule 23(c)(4) in Action," "Keeping Plaintiffs in the Driver's Seat: The Supreme Court Rejects 'Pick-off' Settlement Offers," and "Combating Objectionable Objections."

For his achievements, Mr. Uslaner was featured by Law360 as a national "Rising Star" and has been named among the "Top 40 Under 40" legal professionals in California by the *Daily Journal*. He was also featured by Benchmark Litigation in its "Under 40 Hot List," which honors the nation's most accomplished legal partners under the age of 40.

Mr. Uslaner is also a board member of Home of Guiding Hands, a non-profit organization that serves individuals with developmental disabilities and their families in the San Diego community. For his work and contributions to the organization, he was named "Volunteer of the Year."

Prior to joining BLB&G, Mr. Uslaner was a senior litigation associate at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, where he successfully prosecuted and defended claims from the discovery stage through trial. He also gained significant trial experience as a volunteer prosecutor for the City of Inglewood, California, as well as a judicial extern for Justice Steven Wayne Smith of the Supreme Court of Texas.

EDUCATION: Duke University, B.A., *magna cum laude*, 2001, William J. Griffith Award for Leadership; Chairperson, Duke University Undergraduate Publications Board. The University of Texas School of Law, J.D., 2005; University of Texas Presidential Academic Merit Fellowship; Articles Editor, *Texas Journal of Business Law*.

BAR ADMISSIONS: California; New York; U.S. District Courts for the Central and Northern Districts of California; U.S. District Court for the Southern District of New York.

**JEREMY P. ROBINSON** has extensive experience in securities and civil litigation. Since joining BLB&G, Mr. Robinson has been involved in prosecuting many high-profile securities cases. He was an integral member of the teams that prosecuted significant securities cases such as *In re Refco Securities Litigation* (total recoveries in excess of $425 million) and *In re WellCare Health Plans, Inc. Securities Litigation* ($200 million settlement, representing the second largest



settlement of a securities case in Eleventh Circuit history). He served as counsel on behalf of the institutional investor plaintiffs in *In re Citigroup, Inc. Bond Action Litigation*, which settled for $730 million, representing the second largest recovery ever in a securities class action brought on behalf of purchasers of debt securities and ranking among the fifteen largest recoveries in the history of securities class actions. He also recently represented investors in *In re Bank of New York Mellon Corp. Forex Transactions Litigation*, which settled for $180 million, and in *In re Freeport-McMoRan Derivative Litigation*, which settled for a cash recovery of nearly $154 million plus corporate governance reforms. He is presently a member of the teams prosecuting *In re Allergan, Inc. Proxy Violation Securities Litigation; Fernandez et al. v. UBS AG et al.;* and *The Department of the Treasury of the State of New Jersey and its Division of Investment v. Cliffs Natural Resources Inc.*

In 2000-01, Mr. Robinson spent a year working with barristers and judges in London, England as a recipient of the Harold G. Fox Education Fund Scholarship. In 2005, Mr. Robinson completed his Master of Laws degree at Columbia Law School where he was honored as a Harlan Fiske Stone Scholar.

EDUCATION: Queen's University, Faculty of Law in Kingston, Ontario, Canada, LL.B., 1998; Best Brief in the Niagara International Moot Court Competition; David Sabbath Prizes in Contract Law and in Wills & Trusts Law. Columbia Law School, LL.M., 2005; Harlan Fiske Stone Scholar.

BAR ADMISSIONS: Ontario, Canada; New York; U.S. District Court for the Eastern District of Michigan; U.S. District Court for the Southern District of New York.

**ADAM H. WIERZBOWSKI** was a senior member of the team that recovered over $1.06 billion on behalf of investors in *In re Merck Vioxx Securities Litigation*, which arose out of the Defendants' alleged misrepresentations about the cardiovascular safety of Merck's painkiller Vioxx. The case was settled just months before trial and after more than 10 years of litigation, during which time plaintiffs achieved a unanimous and groundbreaking victory for investors at the U.S. Supreme Court. The settlement is the second largest recovery ever obtained in the Third Circuit, among the 15 largest recoveries of all time, and the largest securities recovery ever achieved against a pharmaceutical company.

Mr. Wierzbowski was also a senior member of the team that achieved a total settlement of $688 million on behalf of investors in *In re Schering-Plough Corp./ENHANCE Securities Litigation* and *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation,* which related to Schering and Merck's alleged misrepresentations about the multi-billion dollar blockbuster drugs Vytorin and Zetia. The combined $688 million in settlements is the third largest securities class action settlement in the Third Circuit and among the top 25 securities class action settlements of all time. The cases settled after nearly five years of litigation and less than a month before trial.

Most recently, Mr. Wierzbowski was a senior member of the team that obtained $480 million for investors in the securities class action against Wells Fargo & Co. related to its fake accounts scandal. The settlement, if approved by the Court, would be the fourth largest settlement in the Ninth Circuit.

In the *UnitedHealth Derivative Litigation*, which involved executives' illegal backdating of UnitedHealth stock options, Mr. Wierzbowski helped recover in excess of $920 million from the individual Defendants. He also represented investors in the securities litigation against General Motors and certain of its senior executives stemming from that company's delayed recall of vehicles with defective ignition switches, where the parties recovered $300 million for investors, in the second largest securities class action recovery in the Sixth Circuit.



Mr. Wierzbowski also helped obtain significant recoveries on behalf of investors in *Minneapolis Firefighters' Relief Association v. Medtronic, Inc. et al*. ($85 million recovery); *Bach v. Amedisys, et al.* ($43.75 million recovery); *In re Facebook, Inc., IPO Securities and Derivative Litigation* ($35 million recovery); *In re Altisource Portfolio Solutions, S.A. Securities Litigation* ($32 million recovery), and the *Monster Worldwide Derivative Litigation* (recovery valued at $32 million). He is currently a member of the teams prosecuting *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc. Securities Litigation* and *In re Stericycle, Inc. Securities Litigation*.

In 2016, Mr. Wierzbowski was named to *Benchmark Litigation's* "Under 40 Hot List," in recognition of his achievements as one of the nation's most accomplished legal partners under the age of 40. He is also regularly named as one of *Super Lawyers'* New York "Rising Stars." No more than 2.5% of the lawyers in New York are selected to receive this honor each year.

EDUCATION: Dartmouth College, B.A., *magna cum laude*, 2000. The George Washington University Law School, J.D., *with honors*, 2003; Notes Editor for *The George Washington International Law Review*; Member of the Moot Court Board.

BAR ADMISSIONS: New York; U.S. Supreme Court; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. District Court for the Eastern District of Michigan; U.S. Courts of Appeals for the Third, Fifth and Sixth Circuits.

**MICHAEL D. BLATCHLEY**'s practice focuses on securities fraud litigation. He is currently a member of the firm's New Matter department in which he, along with a team of attorneys, financial analysts, forensic accountants, and investigators, counsels the firm's clients on their legal claims.

Mr. Blatchley has also served as a member of the litigation teams responsible for prosecuting a number of the firm's significant cases. For example, Mr. Blatchley was a key member of the team that recovered $150 million for investors in *In re JPMorgan Chase & Co. Securities Litigation*, a securities fraud class action arising out of misrepresentations and omissions concerning JPMorgan's Chief Investment Office, the company's risk management systems, and the trading activities of the so-called "London Whale." He was also a member of the litigation team in *In re Medtronic, Inc. Securities Litigation*, an action arising out of allegations that Medtronic promoted the Infuse bone graft for dangerous "off-label" uses, which resulted in an $85 million recovery for investors. In addition, Mr. Blatchley prosecuted a number of cases related to the financial crisis, including several actions arising out of wrongdoing related to the issuance of residential mortgage-backed securities and other complex financial products. Currently, Mr. Blatchley is a member of the team prosecuting *In re Allergan, Inc. Proxy Violation Securities Litigation*.

Mr. Blatchley was recently named to *Benchmark Litigation's* "Under 40 Hot List," which recognizes him as one the nation's most accomplished legal partners under the age of 40.

While attending Brooklyn Law School, Mr. Blatchley held a judicial internship position for the Honorable David G. Trager, United States District Judge for the Eastern District of New York. In addition, he worked as an intern at The Legal Aid Society's Harlem Community Law Office, as well as at Brooklyn Law School's Second Look and Workers' Rights Clinics, and provided legal assistance to victims of Hurricane Katrina in New Orleans, Louisiana.

EDUCATION: University of Wisconsin, B.A., 2000. Brooklyn Law School, J.D., *cum laude,* 2007; Edward V. Sparer Public Interest Law Fellowship, William Payson Richardson Memorial Prize, Richard Elliott Blyn Memorial Prize, Editor for the *Brooklyn Law Review,* Moot Court Honor Society.

BAR ADMISSIONS: New York, New Jersey; U.S. District Courts for the Southern District of New York and the District of New Jersey.



**LAUREN MCMILLEN ORMSBEE** practices out of the firm's New York office, focusing on complex commercial and securities litigation. She has prosecuted a variety of class and direct actions involving securities fraud and other fiduciary violations, obtaining hundreds of millions of dollars in recoveries on behalf of the firm's institutional and private investor clients.

Ms. Ormsbee has been an integral part of trial teams in numerous major actions, including: *In re HealthSouth Bondholder Litigation*, which obtained $230 million for the HealthSouth bondholder Class; *In re New Century Securities Litigation*, which resulted in $125 million for its investors after the mortgage originator became one of the first casualties of the subprime crisis; *In re State Street Corporation Securities Litigation*, which obtained $60 million in the wake of a series of alleged misrepresentations about the company's own internal portfolio; *In re Ambac Financial Group Securities Litigation*, which obtained $33 million from the now-bankrupt insurer; *In re Altisource Portfolio Solutions, S.A. Securities Litigation*, which obtained $32 million from the mortgage loan servicer*; In re Goldman Sachs Mortgage Pass-Through Litigation*, which obtained $26.6 million for the benefit of the class of RMBS purchasers; and *Barron v. Union Bancaire Privée*, which recovered $8.9 million on behalf of the class of investors harmed by investments with Bernard Madoff, among others.

Ms. Ormsbee graduated from the University of Pennsylvania Law School, where she was an editor of the Law Review. Following law school, she served as a law clerk for the Honorable Colleen McMahon of the Southern District of New York. Prior to joining the firm in 2007, Ms. Ormsbee was a litigation associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP, where she had extensive experience in securities litigation and complex commercial litigation.

EDUCATION: Duke University, B.A., History, 1996. University of Pennsylvania Law School, J.D., *cum laude*, 2000; Research Editor for the *University of Pennsylvania Law Review.*

BAR ADMISSIONS: New York; U. S. District Courts for the Eastern and Southern Districts of New York; U.S. Courts of Appeals for the Second and Third Circuits.

**GREGORY V. VARALLO** heads BLB&G's Delaware office. Greg focuses his practice on protecting investor rights, trying cases in Delaware and around the US. Greg's cases, while primarily derivative and class actions, also include plaintiffs' side business-to-business disputes, fiduciary litigation in Bankruptcy Court, and, where appropriate, ADR.

Prior to joining the firm, Greg spent a distinguished 36-year career with elite corporate defense firm Richards, Layton & Finger, capped by a three-year term as its President, where he represented top U.S. and global corporations on various Delaware business matters. He has litigated hundreds of complex business disputes in state and federal courts throughout the United States, including Delaware, and has earned a reputation as one of the country's leading corporate governance experts and trial lawyers.

Greg brings a unique and varied background to his practice. As an active director of both for-profit and not-for-profit companies, and the past CEO of a large defense firm who has also prosecuted cases from the plaintiffs' side, his experience crosses traditional boundaries. That unusually wide perspective helps shape BLB&G's creative approach to problem solving for its clients.

Greg is widely recognized by the industry for his many accomplishments. Hailed as one of the nation's leading business litigators by *Chambers USA*, *Legal 500 USA*, *Benchmark Litigation*, *Best Lawyers*, Thomson Reuters' *Super Lawyers* and *Lawdragon*, he was named a "Top Lawyer" by *Delaware Today.*



Bernstein Litowitz
Berger & Grossmann LLP

Significant representative matters in which Greg has served as lead counsel or co-lead counsel include:

- Lead counsel for 21st Century Fox and its directors in settlement of derivative litigation arising from sexual abuse scandal;

- Lead counsel for News Corp. and its board in settlement of derivative litigation arising from hacking scandal;

- Lead trial and appellate counsel for Goldman Sachs Group in connection with challenge to worldwide compensation in *In Re Goldman Sachs Group, Inc. Litig.*, Del, Ch., C.A. No. 5215-VCG (Oct. 12, 2011), aff'd., No. 608, 2011 (Del. May 3, 2012);

- Lead counsel in first confidential Chancery arbitrations;

- Lead counsel for the tobacco industry in Delaware in connection with the entry of the landmark consent decree between that industry and the state attorneys general; and

- Lead counsel in *PL Capital, LLC v. Central Bancorp, Inc.*, No. 03-0554 BLS, Van Gestel, J. (Mass. Super. June 30, 2003), in which the client succeeded in enjoining and then defeating the first attempted use of the "poison pill" or stockholder rights plan against a stockholder.

A frequent speaker and author on a wide range of corporate governance and securities related issues, Greg was involved in the drafting and passage of the 2018 Delaware Certification of Adoption of Transparency and Sustainability Standards Act and the 2015 Delaware Rapid Arbitration Act. He has been published in *The Business Lawyer*, *The Securities Regulation Law Journal*, *M&A Lawyer*, *Corporate Governance Advisor*, *Insights*, and *Business Law Today*. He is co-author of several publications, including *The Practitioner's Guide to the Delaware Rapid Arbitration Act*, *Special Committees*: *Law and Practice*, and *Fundamentals of Corporate Governance*.

Greg is an active member in various respected legal organizations. He currently serves on the Delaware Supreme Court Rules Committee and is the Founding Trustee, Vice President and Secretary of the American College of Governance Counsel. He is also a fellow of the American College of Trial Lawyers, the Litigation Counsel of America and the Salzburg Global Seminar, Corporate Governance. Greg also served as a past Chair and Co-Chair on several committees and forums with the American Bar Association.

Among his charitable and volunteer works, Greg currently serves as President of the Board of Directors for the Ministry of Caring, Inc., and is a Trustee for The American University of Rome.

EDUCATION:  University of Pennsylvania, B.A., 1980.  Temple University School of Law, J.D., 1983; President, Moot Court.

BAR ADMISSIONS:  Delaware; U.S. Courts of Appeals for the Second, Third, and Fifth Circuits; Certified Superior Court Mediator.



## Of Counsel

**G. ANTHONY GELDERMAN, III** is a trusted advisor to the public pension fund community and a leading voice on shareholder rights and corporate governance issues.  He heads the firm's Louisiana office and is responsible for the firm's institutional investor and client outreach.  He is a frequent speaker at U.S. investor conferences and has written numerous articles on securities litigation and asset protection.

Earlier in his career, Mr. Gelderman served as Chief of Staff and General Counsel to the Treasurer of the State of Louisiana, (1992-1996) and prior to that served as General Counsel to the Louisiana Department of the Treasury.  Mr. Gelderman also coordinated all legislative matters for the State Treasurer during his tenure with the Treasury Department.  Earlier in Mr. Gelderman's legal career, he served as law clerk to U.S. District Judge Charles Schwartz, Jr., Eastern District of Louisiana (1986-1987).

Mr. Gelderman is a former adjunct professor of law at the Tulane Law School where he has taught a course in legislative process.

Mr. Gelderman is a member of the Louisiana State Bar Association, where he served as Chairman for the Young Lawyers Continuing Legal Education Committee between 1990 and 1993, and the American Bar Association.

BAR ADMISSIONS: Louisiana; U.S. District Courts for the Eastern and Middle Districts of Louisiana.


**KURT HUNCIKER**'s practice is concentrated in complex business and securities litigation.  Prior to joining BLB&G, Mr. Hunciker represented clients in a number of class actions and other actions brought under the federal securities laws and the Racketeer Influenced and Corrupt Organizations Act.  He has also represented clients in actions brought under intellectual property laws, federal antitrust laws, and the common law governing business relationships.

Mr. Hunciker served as a member of the trial team for the *In re WorldCom, Inc. Securities Litigation* and, more recently, teams that prosecuted various litigations arising from the financial crisis, including *In re Citigroup, Inc. Bond Litigation, In re Wachovia Preferred Securities and Bond/Notes Litigation, In re MBIA Inc. Securities Litigation* and, *In re Ambac Financial Group, Inc. Securities Litigation.*  Mr. Hunciker also was a member of the team that prosecuted the *In re Schering-Plough Corp./Enhance Securities Litigation* and *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation.*  He presently is a member of the team prosecuting the *In re Merck & Co., Inc. Securities Litigation,* which arises out of Merck's alleged failure to disclose adverse facts to investors regarding the risks of Vioxx.

EDUCATION:  Stanford University, B.A.; Phi Beta Kappa.  Harvard Law School, J.D., Founding Editor of the *Harvard Environmental Law Review*.

BAR ADMISSIONS:  New York; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Courts of Appeals for the Second, Fourth and Ninth Circuits.



**PETER RUSSELL**, a trusted legal advisor to dozens of public pension and labor union funds, works on the firm's institutional investor outreach and is an active member of several institutional investor advocacy organizations.

An experienced litigator and prosecutor, earlier in his career he served as an Assistant Attorney General in the Massachusetts Attorney General's office.  Prior to that served as an Assistant District Attorney in Middlesex County where he prosecuted major felonies in Superior Court.  Mr. Russell was a Director in the Attorney General's Office where he tried cases in both state superior and federal courts, as well as arguing numerous matters before the Massachusetts Appeals Court. He also served in the Executive Bureau where he was the Attorney General's liaison to all of the Mayors in the Commonwealth and Union Business Managers.  In addition, he coordinated legislative matters for the Attorney General during his time in the Executive Bureau. Prior to the joining the firm, he was a leading criminal defense attorney practicing throughout New England and New York.

Mr. Russell is a frequent lecturer at Boston College Law School and Suffolk Law School. He is recognized as a top practitioner by Best Lawyers, and as a Super Lawyer by Thomson Reuters, for his many professional achievements.

A former semi-professional soccer player, he coaches youth league soccer, and trains young players to be collegiate scholarship level athletes, as he was. (He captained the Providence College Varsity Soccer team as a scholar athlete.)

EDUCATION:  Providence College, B.A.  Boston College Law School, J.D.

BAR ADMISSION:  Massachusetts.



## SENIOR COUNSEL

**JAI K. CHANDRASEKHAR** prosecutes securities fraud litigation for the firm's institutional investor clients.  He has been a member of the litigation teams on many of the firm's high-profile securities cases, including *In re JPMorgan Chase & Co. Securities Litigation*, in which a settlement of $150 million was achieved for the class; *In re MF Global Holdings Ltd. Securities Litigation*, in which settlements totaling $234.3 million were achieved for the class; *In re Refco, Inc. Securities Litigation*, in which settlements totaling $367.3 million were achieved for the class; *In re Bristol Myers Squibb Co. Securities Litigation*, in which a settlement of $125 million was achieved for the class; *In re Schering-Plough Corp./ENHANCE Securities Litigation*, in which a settlement of $473 million was achieved for the class; *In re comScore, Inc. Securities Litigation*, in which a settlement of $27 million in cash and $83 million in stock was achieved for the class; and *In re Volkswagen AG Securities Litigation*, in which a settlement of $48 million was achieved on behalf of purchasers of Volkswagen AG American Depositary Receipts ("ADRs").

Mr. Chandrasekhar is currently counsel for the plaintiffs in *In re Evoqua Water Technologies Corp. Securities Litigation*, a securities class action arising from misrepresentations in the registration statement for Evoqua's initial public offering of common stock and subsequent statements to investors. Plaintiffs allege that the registration statement and subsequent statements included false and misleading statements about Evoqua's numerous purportedly successful acquisitions and purportedly effective salesforce. He is also counsel for the plaintiffs in *In re Micro Focus International, plc Securities Litigation*, a securities class action arising from misrepresentations in the registration statement for shares issued in Micro Focus's acquisition of the software business of Hewlett Packard Enterprise and in subsequent statements to investors. Plaintiffs allege that the registration statement and subsequent statements included false and misleading statements about the impact of the acquisition, including disruptions in customer accounts, worsening revenue trends, and massive employee attrition.

Mr. Chandrasekhar is also a member of the firm's Foreign Securities Litigation Team, which monitors global equities traded in non-U.S. jurisdictions for prospective and pending international securities matters, and provides critical analysis of options to recover losses incurred on securities purchased in non-U.S. markets.

Before joining BLB&G, Mr. Chandrasekhar was a Staff Attorney with the Division of Enforcement of the United States Securities and Exchange Commission, where he investigated securities law violations and coordinated investigations involving multiple SEC offices and other government agencies. Before his tenure at the SEC, he was an associate at Sullivan & Cromwell LLP, where he represented corporate issuers and underwriters in public and private offerings of stocks, bonds, and complex securities and advised corporations on periodic reporting under the Securities Exchange Act of 1934, compliance with the Sarbanes-Oxley Act of 2002, and other corporate and securities matters.

Mr. Chandrasekhar is a member of the New York County Lawyers Association, where he serves as Secretary and is a member of the Federal Courts Committee and the Board of Directors of the New York County Lawyers Association Foundation. He is also a member of the New York City Bar Association, where he serves on the Professional Responsibility Committee, and the New York State Bar Association.

EDUCATION: Yale University, B.A., *summa cum laude,* 1987; Phi Beta Kappa. Yale Law School, J.D., 1997; Book Review Editor of the *Yale Law Journal*.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Courts of Appeals for Second, Third, Fifth, and Federal Circuits.



**RICHARD D. GLUCK** has almost 30 years of litigation and trial experience in bet-the-company cases. His practice focuses on securities fraud, corporate governance, and shareholder rights litigation. He has been named a *Super Lawyer* in securities litigation, recognized for achieving "the highest levels of ethical standards and professional excellence" by Martindale Hubbell®, and named one of San Diego's "Top Lawyers" practicing complex business litigation.

Since joining BLB&G, Mr. Gluck has been a key member of the teams prosecuting a number of high-profile cases, including several RMBS class and direct actions against a number of large Wall Street Banks. He was a senior attorney on the team prosecuting the *In re Lehman Brothers Equity/Debt Securities Litigation*, which resulted in over $615 million for investors and is

considered one of the largest total recoveries for shareholders in any case arising from the financial crisis. Specifically, he was instrumental in developing important evidence that led to the $99 million settlement with Lehman's former auditor, Ernst & Young – one of the top 10 auditor settlements ever achieved. He also was a senior member of the teams that prosecuted the RMBS class actions against Bear Stearns, which settled for $500 million; JPMorgan, which settled for $280 million; Wilmington Trust, which settled for $210 million; and Morgan Stanley, which settled for $95 million. He was also a key member of the trial teams that prosecuted the litigations against MF Global, which recovered $234.3 million on behalf of investors; and Genworth, which settled for $219 million.

Before joining BLB&G, Mr. Gluck represented corporate and individual clients in securities fraud and consumer class actions, SEC investigations and enforcement actions, and in actions involving claims of fraud, breach of contract and misappropriation of trade secrets in state and federal courts and in arbitration. He has substantial trial experience, having obtained verdicts or awards for his clients in multi-million dollar lawsuits and arbitrations. Prior to entering private practice, Mr. Gluck clerked for Judge William H. Orrick of the United States District Court for the Northern District of California.

Mr. Gluck currently is a senior member of the teams prosecuting *In re Vale, S.A. Securities Litigation, In re Intel Securities Litigation, Qualcomm, Inc. Securities Litigation,* and a number of direct actions against Valeant Pharmaceuticals International, Inc. on behalf of almost two dozen institutional investors and government retirement systems. He practices out of the firm's San Diego office.

Mr. Gluck is a former President of the San Diego Chapter of the Association of Business Trial Lawyers and currently is a member of its Board of Governors.

EDUCATION: California State University Sacramento, B.S., Business Administration, *with honors*, 1987. Santa Clara University, J.D., *summa cum laude*, 1990; Articles Editor of the *Santa Clara Computer and High Technology Law Journal.*

BAR ADMISSIONS: California; U.S. District Courts for the Central, Northern and Southern Districts of California.

**REBECCA BOON** has been litigating securities fraud and shareholder rights actions for over 10 years, recovering more than a billion dollars for the Firm's institutional investor clients.

Among numerous other of her notable recoveries, Ms. Boon was a senior member of the team that obtained $480 million for investors in the securities class action against Wells Fargo & Co. related to its fake accounts scandal, one of the largest settlements in Ninth Circuit history. Ms. Boon also represented the New York State Teachers' Retirement System in a securities litigation against the General Motors Company arising from a series of misrepresentations concerning the quality, safety, and reliability of the Company's cars, which resulted in a $300 million settlement — the second largest securities class action recovery in the Sixth Circuit.



Recently, Ms. Boon was a senior member of the trial team that prosecuted an unprecedented shareholder derivative litigation against Fox News parent 21st Century Fox, Inc. arising from the systemic sexual and workplace harassment at the embattled network. After nearly 18 months of litigation, the team obtained a landmark settlement with two key components: 1) the first ever Board-level watchdog of its kind – the "Fox News Workplace Professionalism and Inclusion Council" of experts – majority independent of the Murdochs, the Company, and Board; and 2) one of the largest financial recoveries – $90 million –  ever obtained in a pure corporate board oversight dispute. Because of her work on the case, Ms. Boon subsequently narrated a feature documentary by Dow Jones' MarketWatch discussing both the Fox litigation and the ways that investors can harness their power to create meaningful social change through shareholder litigation.  Ms. Boon has lectured at Columbia Law School and multiple conferences on the topics of social change, sexual harassment, and shareholder litigation.

Ms. Boon is currently prosecuting securities class actions against Signet Jewelers Limited and Qualcomm, Inc.  She has been recognized by *Super Lawyers* for her accomplishments.

EDUCATION: Vassar College, B.A., 2004 (History, Correlate in Women's Studies); Social Justice Community Fellow.  Hofstra University School of Law, 2007**,** J.D., *cum laude;* Charles H. Revson Foundation Law Students Public Interest Fellow; *Hofstra Law Review;* Distinguished Contribution to the School and Excellence in International Law Awards; Merit Scholarship.

BAR ADMISSIONS: New York; U.S. District Court for the Southern District of New York, U.S. Courts of Appeals for the Second, Fourth, and Sixth Circuits.

**ADAM HOLLANDER** prosecutes securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's clients.

Mr. Hollander has represented investors and corporations in state and federal trial and appellate courts throughout the country. He was an integral member of the teams that prosecuted, among other cases, *In re Salix Pharmaceuticals Ltd.*, recovering $210 million for investors; *San Antonio Fire & Police Pension Fund v. Dole Food Company, Inc.*, recovering $74 million for investors; and *Bach v. Amedisys, Inc.*, recovering $43.75 million for investors after a successful appeal to the U.S. Court of Appeals for the Fifth Circuit following a previous dismissal.

Currently, Mr. Hollander represents clients in a number of disputes relating to corporate misconduct and alleging harm to investors, including a securities-fraud class action against Volkswagen which recently resulted in a $48 million recovery for Volkswagen investors arising out of the "Dieselgate" emissions-cheating scandal; a securities-fraud class action on behalf of investors in the now-bankrupt renewable energy company SunEdison, Inc.; a securities-fraud class action against Novo Nordisk concerning pricing of its insulin drugs; and a class action on behalf of Puerto Rico investors to whom UBS improperly recommended risky Puerto Rico securities.

Prior to joining BLB&G, Mr. Hollander clerked for the Honorable Barrington D. Parker, Jr. of the U.S. Court of Appeals for the Second Circuit, and for the Honorable Stefan R. Underhill of the U.S. District Court for the District of Connecticut.  He has also been associated with two New York defense firms, where he gained significant experience representing clients in various civil, criminal, and regulatory matters, including white-collar and complex commercial litigation.

EDUCATION:  Brown University, A.B., *magna cum laude*, 2001, Urban Studies.  Yale Law School, J.D., 2006; Editor, *Yale Law and Policy Review.*

BAR ADMISSIONS:  New York; Connecticut; U.S. District Courts for the Southern District of New York and the District of Connecticut; U.S. Court of Appeals for the Second Circuit.



**ABE ALEXANDER** practices out of the New York office, where he focuses on securities fraud, corporate governance and shareholder rights litigation.

As a principal member of the trial team prosecuting *In re Merck Vioxx Securities Litigation*, Mr. Alexander helped recover over $1.06 billion on behalf of injured investors. The case, which asserted claims arising out of the Defendants' alleged misrepresentations concerning the safety profile of Merck's pain-killer, VIOXX, was settled shortly before trial and after more than 10 years of litigation, during which time plaintiffs achieved a unanimous and groundbreaking victory for investors at the U.S. Supreme Court. The settlement is the largest securities recovery ever achieved against a pharmaceutical company and among the 15 largest recoveries of all time.

Mr. Alexander was also a principal member of the trial team that prosecuted *In re Schering-Plough Corp./ENHANCE Securities Litigation* and *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation*, which settled on the eve of trial for a combined $688 million. This $688 million settlement represents the second largest securities class action recovery against a pharmaceutical company in history and is among the largest securities class action settlements of any kind.

Mr. Alexander has also obtained several additional significant recoveries on behalf of investors in pharmaceutical and life sciences companies, including a $142 million recovery in *Medina v. Clovis Oncology, Inc.*, a securities fraud class action arising from Defendants' alleged misstatements about the efficacy and safety of its most important drug, and a $55 million recovery in *In re HeartWare International, Inc. Securities Litigation*, a case arising from Defendants' alleged misstatements about the device-maker's compliance with FDA regulations and the performance of its key heart pump in clinical and bench testing.

As lead associate on the firm's trial team, Mr. Alexander helped achieve a $150 million settlement of investors' claims against JPMorgan Chase arising from alleged misrepresentations concerning the trading activities of the so-called "London Whale." Mr. Alexander also played a key role in obtaining a substantial recovery on behalf of investors in *In re Penn West Petroleum Ltd. Securities Litigation*. He is currently prosecuting *In re Cognizant Technology Solutions Corp. Securities Litigation; In re Equifax, Inc. Securities Litigation; In re Akorn, Inc. Securities Litigation; In re Adeptus Health, Inc. Securities Litigation; and City of Sunrise Firefighters' Pension Fund v. Oracle Corp.,* among others.

Prior to joining the firm, Mr. Alexander represented institutional clients in a number of high-profile securities, corporate governance, and antitrust matters.

Mr. Alexander was an award-winning member of his law school's national moot court team. Following law school, he served as a judicial clerk to Chief Justice Michael L. Bender of the Colorado Supreme Court.

*Super Lawyers* has regularly selected Mr. Alexander as a New York "Rising Star" in recognition of his accomplishments.

EDUCATION: New York University – The College of Arts and Science, B.A., Analytic Philosophy, *cum laude*, 2003. University of Colorado Law School, J.D., 2008; Order of the Coif.

BAR ADMISSIONS: Delaware; New York; U.S. District Court for the District of Delaware; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Court of Appeals for the First Circuit.



## ASSOCIATES

**KATE AUFSES** prosecutes securities fraud, corporate governance and shareholder rights litigation out of the firm's New York office. She is currently a member of the teams prosecuting securities class actions against Insulet Corporation and Volkswagen AG – which recently resulted in a recovery of $48 million for Volkswagen investors, among others.

In addition to her direct litigation responsibilities, Ms. Aufses is also a member of the firm's Foreign Securities and Litigation Monitoring Team, which monitors global equities traded in non-U.S. jurisdictions on prospective and pending international securities matters, and provides critical analysis of options to recover losses incurred on securities purchased in non-U.S. markets.

Prior to joining the firm, Ms. Aufses was an associate at Hughes Hubbard & Reed, where she worked on complex commercial litigation.  Prior to graduating law school, she also served as a judicial intern for the Honorable Jack B. Weinstein.

EDUCATION:  Kenyon College, B.A., English, *magna cum laude*, 2008.  University of Cambridge, MPhil, American Literature, 2009.  University of Cambridge, MPhil, History of Art, 2010.  University of Michigan Law School, J.D., 2015; Managing Symposium Editor, *Michigan Journal of Law Reform*.

BAR ADMISSIONS:  New York; U.S. District Courts for the Eastern and Southern Districts of New York.


**ANDREW BLUMBERG** practices out of the New York office, where he prosecutes corporate governance and fiduciary duty litigation on behalf of the firm's institutional investor clients.

Prior to joining the firm, Mr. Blumberg was a securities litigation associate at Weil, Gotshal & Manges LLP, where he, among other things, represented clients in corporate governance and securities actions.  Prior to joining Weil, Mr. Blumberg clerked for Chancellor Andre G. Bouchard of the Delaware Court of Chancery.

Mr. Blumberg is currently a member of the teams prosecuting *In re BGC Partners, Inc. Derivative Litigation* and *In re Pilgrim's Pride Corporation Derivative Litigation*.

EDUCATION:  Johns Hopkins University, B.A., Economics, 2007.  Washington University Business School, MBA, 2014.  Washington University School of Law, J.D., 2014.

BAR ADMISSION:  New York


**LAUREN M. CRUZ** practices out of the firm's Los Angeles office, where she prosecutes class and direct actions on behalf of the firm's institutional investor clients.  She is currently a member of the teams prosecuting securities class actions against NVIDIA Corporation, Impinj, Inc., and Qualcomm, Inc.



Prior to joining BLB&G, Ms. Cruz was a litigation associate at Sullivan & Cromwell LLP, where she represented domestic and international clients in complex civil litigation and alternative dispute resolution.  She also gained considerable experience advising company boards following internal investigations of shareholder demands.  In addition, Ms. Cruz's practice included substantial *pro bono* civil rights work on behalf of detainees with mental health concerns.

While attending New York University School of Law, Ms. Cruz worked at the Legal Aid Society, Juvenile Rights Practice as part of NYU Law's Children's Rights Clinic and served as a Senior Articles Editor for the *Journal of Law and Liberty* and a Staff Editor for the *Environmental Law Journal*.

EDUCATION:  California State University Channel Islands, B.A., Business, *summa cum laude,* 2008.  New York University School of Law, J.D., 2014.  Senior Articles Editor, *Journal of Law and Liberty;* Staff Editor, *Environmental Law Journal.*

BAR ADMISSIONS:  California; U.S. District Courts for the Central, Eastern, Northern, and Southern Districts of California; US. Court of Appeals for the Ninth Circuit.

**DAVID L. DUNCAN**'s practice concentrates on the settlement of class actions and other complex litigation and the administration of class action settlements.

Prior to joining BLB&G, Mr. Duncan worked as a litigation associate at Debevoise & Plimpton, where he represented clients in a wide variety of commercial litigation, including contract disputes, antitrust and products liability litigation, and in international arbitration.  In addition, he has represented criminal defendants on appeal in New York State courts and has successfully litigated on behalf of victims of torture and political persecution from Sudan, Côte d'Ivoire and Serbia in seeking asylum in the United States.

While in law school, Mr. Duncan served as an editor of the *Harvard Law Review*.  After law school, he clerked for Judge Amalya L. Kearse of the U.S. Court of Appeals for the Second Circuit.

EDUCATION:  Harvard College, A.B., Social Studies, *magna cum laude*, 1993.  Harvard Law School, J.D., *magna cum laude*, 1997.

BAR ADMISSIONS:  New York; Connecticut; U.S. District Court for the Southern District of New York.

**R. RYAN DYKHOUSE** practices out of the firm's New York office and prosecutes securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's institutional investor clients.

Prior to joining the firm, he was a Disputes Resolution Associate with Freshfields Bruckhaus Deringer, where he represented public and private companies on internal and government investigations, sanctions compliance, and litigation matters.

While attending Harvard Law School, Mr. Dykhouse served as the Executive Managing Editor of the *Harvard Civil Rights-Civil Liberties Law Review*.  He also represented clients in housing eviction cases as counsel with the Harvard Legal Aid Bureau, and served as a Legal Intern for the Civil Division of the United States Attorney's Office, Southern District of New York.



EDUCATION:  Olivet Nazarene University, B.A., 2012.  Hunter College, M.S.Ed., 2014. Harvard Law School, J.D. 2017; Executive Managing Editor, *Harvard Civil Rights-Civil Liberties Law Review*.

BAR ADMISSION:  New York.


**JAMES M. FEE** practices out of the firm's New York office where he works on complex commercial and securities litigation matters on behalf of the firm's institutional investor clients.

Before joining the firm, Mr. Fee served as an associate at Cadwalader, Wickersham & Taft, where he represented clients in securities class actions, business disputes, bankruptcy matters, and corporate governance litigation.

While attending Boston College Law School, Mr. Fee served as the Executive Articles Editor for the *Boston College International & Comparative Law Review*.  Prior to law school, he served as a financial services legislative aide in the United States Senate.

EDUCATION:  University of Pennsylvania, B.A., 2010.  Boston College Law School, J.D., 2015.

BAR ADMISSIONS:  New York; Massachusetts.


**SCOTT R. FOGLIETTA** focuses his practice on securities litigation and is a member of the firm's New Matter group, in which he, as part of a team of attorneys, financial analysts, and investigators, counsels institutional investors on potential legal claims.

Mr. Foglietta also serves as a member of the litigation team responsible for prosecuting *In re Lumber Liquidators Holdings, Inc. Securities Litigation*.  For his accomplishments, Mr. Foglietta was recently named a New York "Rising Star" in the area of securities litigation.

Before joining the firm, Mr. Foglietta represented institutional and individual clients in a wide variety of complex litigation matters, including securities class actions, commercial litigation, and ERISA litigation.  While in law school, Mr. Foglietta served as a legal intern in the Financial Industry Regulatory Authority's (FINRA) Enforcement Division, and in the general counsel's office of NYSE Euronext.  Prior to law school, Mr. Foglietta earned his M.B.A. in finance from Clark University and worked as a capital markets analyst for a boutique investment banking firm.

EDUCATION:  Clark University, B.A., Management, *cum laude*, 2006.  Clark University, Graduate School of Management, M.B.A., Finance, 2007.  Brooklyn Law School, J.D., 2010.

BAR ADMISSIONS:  New York; New Jersey.


**TAMARA GAVRILOVA** prosecutes securities fraud, corporate governance and shareholder rights litigation for the firm's institutional investor clients.

Prior to joining the firm, she represented institutional and individual investors in takeover cases involving violations of federal securities laws and corporate governance rules, before being recruited to clerk for the Honorable Daphne Barak-Erez of the Supreme Court of Israel.  Ms. Gavrilova subsequently practiced in Israel where she represented and advised local and international clients on U.S. securities and governance related matters, including with respect to mergers and acquisitions, venture capital and capital markets transactions.

During law school, she was a full-time extern in the enforcement division of the U.S. Securities & Exchange Commission, supporting primary liability prosecutions and compliance investigations of brokers and IPOs.



EDUCATION:  Baruch College, B.B.A., Finance & Investments, *magna cum laude*, 2010.
Cornell Law School, J.D., 2013; Articles Editor, *Cornell Journal of Law and Public Policy*.

BAR ADMISSIONS:  New York; New Jersey; Pennsylvania.

LANGUAGES:  Hebrew, Russian.

**MATHEW HOUGH**'s practice focuses on securities litigation, corporate governance, and
shareholder rights litigation.  As a member of the firm's New Matter department, he counsels
institutional clients on potential legal claims as part of a team of attorneys, financial analysts, and
investigators.

Prior to joining the firm, Mr. Hough was an associate at Sullivan & Cromwell LLP, where he
worked extensively on complex commercial litigation, securities litigation, enforcement, and
internal investigations.  While in law school, he also served as a legal intern with the King County
Northwest Defenders Division.

EDUCATION:  Washington State University, B.A., *Distinguished Writing Academic Scholar*,
2012.  Boston University School of Law, J.D., 2017; Staff Editor, *Boston University Law Review;
G. Joseph Tauro Distinguished Scholar.*

BAR ADMISSION:  New York.

**JESSE L. JENSEN** prosecutes securities fraud, corporate governance and shareholder rights
litigation on behalf of the firm's institutional clients.

Prior to joining the firm, Mr. Jensen was a litigation associate at Hughes Hubbard & Reed, where
he represented accounting firms, banks, investment firms and high-net-worth individuals in
complex commercial, securities, commodities and professional liability civil litigation and
alternative dispute resolution.  He also gained considerable experience in responding to
investigations and inquiries by government regulators such as the SEC and CFTC.  In addition,
Mr. Jensen actively litigated several *pro bono* civil rights cases, including a federal suit in which
he secured a favorable settlement for an inmate alleging physical abuse by corrections officers.
Since joining the firm, he has helped investors achieve hundreds of millions in recoveries,
including a $110 million settlement in *Fresno County Employees' Retirement Association v.
comScore, Inc.*; a $32 million cash settlement in an action against real estate service provider
Altisource Portfolio Solutions, S.A.; a $210 million dollar settlement in *In re Wilmington Trust
Securities Litigation*; and a $22 million settlement in an action against mutual fund company
Virtus Investment Partners, Inc. (pending court approval).  He is currently assisting the firm in its
prosecution of *In re Frontier Communications Corp. Sec. Litig.*; *Roofer's Pension Fund v. Papa et
al.*; *In re Bristol-Myers Squibb Company Sec. Litig.*; and *In re Cognizant Technology Solutions
Co. Sec. Litig.*

In recognition of his professional achievements and reputation, Mr. Jensen has been named a
"Rising Star" for the past five years by Thomson Reuters *Super Lawyers* (no more than 2.5% of
the lawyers in New York are selected to receive this honor each year).

EDUCATION:  New York University School of Law, J.D., 2009; Staff Editor, *NYU Journal of
Law and Business.*

BAR ADMISSIONS:  New York; U.S. District Courts for the Eastern and Southern Districts of
New York; U.S. Court of Appeals for the Second Circuit.



**REBECCA N. KIM** practices out of the firm's New York office, prosecuting securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's institutional investor clients.

She is a member of the firm's New Matter Department, in which she, as part of a team of attorneys, financial analysts, and investigators, counsels public pension funds and other institutional investors on potential legal claims.

Prior to joining the firm, Ms. Kim was an associate at Wollmuth Maher & Deutsch where she focused primarily on securities, antitrust, bankruptcy, and reinsurance litigation.

While attending Columbia Law School, Ms. Kim was honored as a Harlan Fiske Stone Scholar. Additionally, she completed an internship at the Securities and Exchange Commission, Enforcement Division; participated in the Immigrants' Rights Clinic; and served as Articles Editor for the *Columbia Journal of Tax Law* and Submissions Editor for the *Columbia Journal of Race and Law*.

EDUCATION:  Columbia Law School, J.D., 2017; Harlan Fiske Stone Scholar.  University of California, Berkeley, B.A., 2011.

BAR ADMISSIONS:  New York; U.S. District Courts for the Eastern and Southern District of New York.

LANGUAGE:  Korean

**JACQUELINE Y. MA** practices out of the firm's New York office, where she prosecutes corporate governance and fiduciary duty litigation on behalf of the firm's institutional investor clients.

Prior to joining BLB&G, Ms. Ma was a dispute resolution associate at Linklaters LLP, where she represented financial institutions, companies, and individuals in complex commercial litigation and shareholder rights cases, including a Delaware appraisal trial.  While attending Columbia Law School, she served as the Executive Managing Editor of the *Columbia Journal of Gender and Law,* as the Student Director of the CLS Writing Center, and as a judicial extern for the Honorable Lorna G. Schofield.

EDUCATION:  University of Washington, B.A., *magna cum laude,* 2011.  Columbia Law School, J.D., 2016; Harlan Fiske Stone Scholar; Executive Managing Editor, *Columbia Journal of Gender and Law.*

BAR ADMISSIONS:  New York; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Court of Appeals for the Second Circuit.

**MICHAEL MATHAI**'s practice focuses on securities fraud, corporate governance and shareholder rights litigation.

Prior to joining the firm, Mr. Mathai was a litigation associate at O'Melveny & Myers LLP, where he represented financial services and other companies in securities class action, shareholder rights, antitrust, and commercial litigation matters in state and federal court.  He also gained considerable experience representing companies and individuals in investigations and inquiries by regulatory bodies including the SEC, DOJ, FTC, and FINRA.

He is currently a member of the teams prosecuting securities class actions against Wells Fargo & Company, Signet Jewelers Limited, CenturyLink, Inc., and Henry Schein, Inc., among others.

EDUCATION: Harvard University, A.B., *cum laude*, 2006, Economics. London School of Economics and Political Science, 2008, M.Sc., Economics. Columbia Law School, J.D., 2012; Harlan Fiske Stone Scholar.

BAR ADMISSION: New York.

**JOHN J. MILLS**' practice concentrates on Class Action Settlements and Settlement Administration. Mr. Mills also has experience representing large financial institutions in corporate finance transactions.

EDUCATION: Duke University, B.A., 1997. Brooklyn Law School, J.D., *cum laude,* 2000; Member of *The Brooklyn Journal of International Law;* Carswell Merit Scholar recipient.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York.

**BRENNA NELINSON**'s practice focuses on securities fraud, corporate governance and shareholder rights litigation.

She is currently a member of the firm's teams prosecuting securities class actions against Virtus Investment Partners and Signet Jewelers.

Prior to joining the firm, Ms. Nelinson was a Litigation Associate at Hogan Lovells US LLP. She represented a variety of defendants in all aspects of corporate litigation.

EDUCATION: New York University, B.A., 2011, Individualized Study – Psychology and Philosophy. American University Washington College of Law, J.D., *cum laude,* 2014; Note & Comment Editor, *American University International Law Review;* Moot Court Honor Society.

BAR ADMISSION: Maryland.

**CHRISTOPHER J. ORRICO**'s practice is focused on complex litigation, including matters involving securities fraud, corporate governance and shareholder rights litigation on behalf of the firm's institutional investor clients.

Mr. Orrico has significant experience in complex litigation, representing investor plaintiffs in major securities, antitrust and ERISA litigation, as well as a variety of other business tort litigation. He has also represented insurers in matters involving directors and officers liability policies, errors and omissions, and fiduciary liability.

Mr. Orrico obtained his joint J.D. and M.B.A. from Villanova University School of Law and School of Business. He completed the four-year joint degree program in only three years and has since served as a guest lecturer on securities litigation for the school. Additionally, Mr. Orrico obtained his B.A. in Economics from Yale University where he was Captain of the Varsity Baseball Team. He is the co-author of "Entire Fairness Or Business Judgment? It's Anyone's Guess," which was published by *Law360.com* in 2015 and "The X's and O's of Football's Offseason of Discontent," which was published by the *New York Law Journal* in 2011. He is the author of "If You Ain't Cheating You Ain't Trying!" and "The Shifting Meaning of 'Fair Value,' From Corwin to Dell: Recent Rulings and Reversals in Delaware's Courts May Spell Trouble for Investors" which were published by *The Advocate for Institutional Investors* in 2016 and 2018, respectively.



EDUCATION: Harvard University, A.B., *cum laude*, 2006, Economics. London School of Economics and Political Science, 2008, M.Sc., Economics. Columbia Law School, J.D., 2012; Harlan Fiske Stone Scholar.

BAR ADMISSION: New York.

**JOHN J. MILLS**' practice concentrates on Class Action Settlements and Settlement Administration. Mr. Mills also has experience representing large financial institutions in corporate finance transactions.

EDUCATION: Duke University, B.A., 1997. Brooklyn Law School, J.D., *cum laude,* 2000; Member of *The Brooklyn Journal of International Law;* Carswell Merit Scholar recipient.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York.

**BRENNA NELINSON**'s practice focuses on securities fraud, corporate governance and shareholder rights litigation.

She is currently a member of the firm's teams prosecuting securities class actions against Virtus Investment Partners and Signet Jewelers.

Prior to joining the firm, Ms. Nelinson was a Litigation Associate at Hogan Lovells US LLP. She represented a variety of defendants in all aspects of corporate litigation.

EDUCATION: New York University, B.A., 2011, Individualized Study – Psychology and Philosophy. American University Washington College of Law, J.D., *cum laude,* 2014; Note & Comment Editor, *American University International Law Review;* Moot Court Honor Society.

BAR ADMISSION: Maryland.

**CHRISTOPHER J. ORRICO**'s practice is focused on complex litigation, including matters involving securities fraud, corporate governance and shareholder rights litigation on behalf of the firm's institutional investor clients.

Mr. Orrico has significant experience in complex litigation, representing investor plaintiffs in major securities, antitrust and ERISA litigation, as well as a variety of other business tort litigation. He has also represented insurers in matters involving directors and officers liability policies, errors and omissions, and fiduciary liability.

Mr. Orrico obtained his joint J.D. and M.B.A. from Villanova University School of Law and School of Business. He completed the four-year joint degree program in only three years and has since served as a guest lecturer on securities litigation for the school. Additionally, Mr. Orrico obtained his B.A. in Economics from Yale University where he was Captain of the Varsity Baseball Team. He is the co-author of "Entire Fairness Or Business Judgment? It's Anyone's Guess," which was published by *Law360.com* in 2015 and "The X's and O's of Football's Offseason of Discontent," which was published by the *New York Law Journal* in 2011. He is the author of "If You Ain't Cheating You Ain't Trying!" and "The Shifting Meaning of 'Fair Value,' From Corwin to Dell: Recent Rulings and Reversals in Delaware's Courts May Spell Trouble for Investors" which were published by *The Advocate for Institutional Investors* in 2016 and 2018, respectively.



Mr. Orrico is a member of the American Bar Association, the New York State Bar Association and the Connecticut Bar Association, as well as the National Italian American Foundation. He is also a member of the Villanova Law Alumni Mentoring Program.

Mr. Orrico was a key member of the teams that successfully litigated: *In re Appraisal of Towers Watson & Co.* (n/k/a *WTW Delaware Holding LLC*); *Williams v. Ji, et al.* (*Sorrento Therapeutics, Inc.*); *California Public Employees' Retirement System v. IAC/InterActiveCorp, et al.*; *3-Sigma Value Financial Opportunities LP, et al. v. Jones* (*CertusHoldings, Inc.*); *In re Globe Specialty Metals, Inc. Stockholders Litigation; In re Appraisal of Diamond Resorts International, Inc.*; *In re Vaalco Energy, Inc. Consolidated Stockholder Litigation* and *In re Sanchez Energy Derivative Litigation.* He is currently a member of the teams prosecuting: *In re Appraisal of Columbia Pipeline Group, Inc.* and *In re Starz Stockholder Litigation*.

EDUCATION: Yale University, B.A., Economics, 2005. Villanova University School of Law and School of Business, J.D., MBA, 2009.

BAR ADMISSIONS: New York; Connecticut.

**KYLE PANTON** focuses his practice on securities fraud, corporate governance, and shareholder rights litigation.

Prior to joining the firm, he was a Litigation Associate with Fried Frank Harris Shriver & Jacobson, where he practiced broad-based litigation, including general commercial litigation, internal investigations, securities litigation, and white-collar litigation.

While attending the University of Chicago Law School, he served as a Representative on the Vice-President's Advisory Council on Diversity and Inclusion and as President of the law school's Black Law Students Association

EDUCATION: University of Chicago, B.A., 2014. University of Chicago Law School, J.D., MBA, 2017.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York.

**JULIA TEBOR** practices out of the New York office and prosecutes securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's institutional investor clients. She was a member of the trial team that recovered $210 million on behalf of defrauded investors in *In re Wilmington Trust Securities Litigation*. She is currently a member of the teams prosecuting *In re Green Mountain Coffee Roasters, Inc. Securities Litigation,* and *St. Paul Teachers' Retirement Fund Association v. HeartWare International, Inc.*

A former litigation associate with Seward & Kissel, Ms. Tebor also has broad experience in white-collar, general commercial, and employment litigation matters on behalf of clients in the financial services industry, as well as in connection with SEC and DOJ investigations.

EDUCATION: Tufts University, B.A., Spanish and English, 2006; *Dean's List*. Boston University School of Law, J.D., *cum laude,* 2012; Notes Editor, *American Journal of Law and Medicine.*

BAR ADMISSIONS: Massachusetts; New York.



**EDWARD G. TIMLIN** practices out of the firm's New York office, where he prosecutes securities fraud, corporate governance and shareholder rights litigation on behalf of the firm's institutional clients.

He has been a senior member of the trial teams prosecuting a number of the firm's most significant recent litigations, including the *Allergan Proxy Violation Litigation*, in which the team obtained a $250 million settlement for Allergan, Inc. investors after fighting a ferocious three-year legal battle to stop an unprecedented and sophisticated insider-trading scheme by billionaire hedge fund manager Bill Ackman.

Some of his other representative litigations include:

- *In re TIBCO Software Stockholder Litigation*, where the team pursued novel and precedent-setting merger agreement reformation claims and recovered 33% of potential damages shortly before trial;

- *In re Jefferies, Inc. Stockholder Litigation*, which challenged Leucadia's 2013 acquisition of Jefferies Financial Group, and settled for a $75 million net payment paid entirely to a class of former Jefferies investors;

- *In re Intuitive Surgical Shareholder Derivative Litigation*, a corporate misconduct case alleging that insiders at the robotic surgical platforms manufacturer sold hundreds of millions of dollars' worth of stock at near highs, while hiding safety defects in its electrified instruments that were causing deaths, burns, and other injuries – the suit resulted in $15 million recovery from the insiders and a variety of critical corporate governance reforms to improve the Company's FDA and insider-trading compliance;

- *In re GFI Group Inc. Stockholder Litigation*, which challenged a transaction whereby the company's founder would take a valuable piece of the business private for a pittance, while the balance was sold to the Chicago Mercantile Exchange – by challenging the transaction, the team forced the insiders to allow a far superior sale to BGC Partners and secured a $10.75 net recovery to the class;

- *In re Appraisal of Diamond Resorts*, which secured a confidential recovery for appraisal petitioners in connection with Apollo Global Management's 2016 acquisition of Diamond Resorts;

- *In re Appraisal of Jarden Corporation*, which secured a confidential recovery for appraisal petitioners in connection with Newell Brands' 2016 acquisition of Jarden Corporation.

Mr. Timlin is currently a member of the teams prosecuting *In re AmTrust Financial Services, Inc.*; *Cummings v. Edens* (New Senior Investment Group); *In re Pilgrim's Pride*; *Dieckman v. Regency GP LP*; *West Palm Beach Firefighters v. Spectrum Brands Holdings, Inc.*; *In re Straight Path Communications, Inc.*; and *In re Xerox Corporation*.

Prior to joining BLB&G, Mr. Timlin was a senior litigation associate at a major corporate law firm. Among other matters, he successfully represented corporate clients in complex litigation, including securities class actions, derivative actions, and merger and acquisitions matters. Mr. Timlin received his law degree from Columbia Law School in 2009 and bachelor's degree from Cornell University in 2006, both with academic honors.

EDUCATION: Cornell University, B.A., Philosophy and History, 2006. Columbia Law School, J.D., 2009; Harlan Fiske Stone Scholar.

BAR ADMISSION: New York.



**MATTHEW TRAYLOR** practices out of the firm's New York office, prosecuting securities fraud litigation on behalf of the firm's institutional investor clients.

Prior to joining the firm, Mr. Traylor was an associate at Cahill Gordon & Reindel where he specialized in complex litigation and investigations, including: securities, antitrust and complex commercial litigation, as well as FCPA compliance and internal investigations.

While attending law school, Mr. Traylor served as Vice President of the Black Law Student Association.  In addition, he was also a member of the Public Interest Law Union, and a 2L Representative for the American Constitutional Society.

EDUCATION:  Cornell Law School, J.D., 2017; General Editor, *Cornell Journal of Law and Public Policy.*  Binghamton University, B.A., *magna cum laude,* 2014.

BAR ADMISSION: New York.


**CATHERINE E. VAN KAMPEN**'s practice concentrates on class action settlement administration.  She has extensive experience in complex litigation and litigation management, having overseen attorney teams in many of the firm's most high-profile cases.  Fluent in Dutch, she has served as lead investigator and led discovery efforts in several actions involving international corporations and financial institutions headquartered in Belgium and the Netherlands.

Prior to joining BLB&G, Ms. van Kampen focused on complex litigation initiated by institutional investors and the Federal Government.  She has worked on litigation and investigations related to regulatory enforcement actions, corporate governance and compliance matters as well as conducted extensive discovery in English and Dutch in cross-border litigation.

A committed humanitarian, Ms. van Kampen was honored as the 2018 Ambassador Medalist at the New Jersey Governor's Jefferson Awards for Outstanding Public Service for her international humanitarian and *pro bono* work with refugees.  The Jefferson Awards, issued by the Jefferson Awards Foundation that was founded by Jacqueline Kennedy Onassis, are awarded by state governors and are considered America's highest honor for public service bestowed by the United States Senate.  Ms. van Kampen was also honored in Princeton, New Jersey by her high school alma mater, Stuart Country Day School, in its 2018 Distinguished Alumnae Gallery for her humanitarian and *pro bono* efforts on behalf of women and children afflicted by war in Iraq and Syria.

Ms. van Kampen clerked for the Honorable Mary M. McVeigh in the Superior Court of New Jersey, where she was also trained as a court-certified mediator. While in law school, she was a legal intern at the Center for Social Justice's Immigration Law Clinic at Seton Hall University School of Law.

EDUCATION:  Indiana University, B.A., Political Science, 1988.  Seton Hall University School of Law, J.D., 1998.

BAR ADMISSION:  New Jersey

LANGUAGES:  Dutch, German



**ALLA ZAYENCHIK** practices out of the firm's New York office, where she prosecutes securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's institutional investor clients. She was a key member of the trial team that successfully litigated *In re Starz Stockholder Litigation*, a breach of fiduciary duty action arising from Starz's sale to Lionsgate, which led to a $92.5 million recovery. She has successfully litigated numerous representative actions, including *In re TIBCO Software Stockholder Litigation; In re DreamWorks Animation SKG, Inc.*; *Williams v. Ji, et al. (Sorrento Therapeutics, Inc.); In re Sanchez Energy Derivative Litigation; In re Appraisal of Towers Watson & Co.*; and *In Re Appraisal of Diamond Resorts International, Inc.* Among other cases, Ms. Zayenchik is currently prosecuting *Dieckman v. Regency GP LP* and *In re Straight Path Communications, Inc.*

Prior to joining BLB&G, Ms. Zayenchik was a litigation associate at a New York law firm, where she successfully represented clients in class action and corporate governance litigation. While in law school, Ms. Zayenchik was a Symposium Editor for the Cardozo Public Law, Policy, and Ethics Journal. She also served as a judicial intern for the Honorable Melvin L. Schweitzer of the New York Supreme Court, Commercial Division, and as a legal intern for The Innocence Project.

EDUCATION: Baruch School of the City College of New York, B.A., *summa cum laude*, Philosophy, 2010. Benjamin N. Cardozo School of Law, J.D., 2013.

BAR ADMISSION: New York.


## STAFF ASSOCIATE

**DAVID STEACIE** has represented institutional investors in numerous securities fraud class actions. He was a member of the teams that prosecuted *In re Refco Securities Litigation* (total recoveries in excess of $400 million), *Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al.* ($410 million settlement) and *In re Biovail Corp. Securities Litigation* ($138 million settlement). Mr. Steacie also supervises the attorneys at BLB&G who are primarily focused on electronic discovery.

Prior to joining BLB&G, Mr. Steacie was an attorney in private practice where he focused on securities and consumer fraud class action litigation.

EDUCATION: University of Massachusetts at Amherst, B.B.A., *cum laude*, 1986. Suffolk University Law School, J.D., 1994.

BAR ADMISSION: Massachusetts.

# EXHIBIT L

# Friedlander & Gorris, P.A.

1201 N. Market Street, Suite 2200
Wilmington, Delaware 19801
(302) 573-3500
www.friedlandergorris.com

**The Firm**

Friedlander & Gorris, P.A. is a litigation boutique focusing on corporate law litigation, alternative entity disputes, commercial litigation, and federal securities law cases in Delaware state and federal courts.

The firm was founded in 1996 as Lamb & Bouchard, P.A.  It was renamed Bouchard & Friedlander, P.A. in 1997, when Stephen Lamb became Vice Chancellor of the Delaware Court of Chancery.  The firm's current name dates to 2014, when Andre Bouchard became Chancellor of the Court of Chancery.

From its inception, the firm has litigated against, and worked as co-counsel with, the most prestigious national law firms.  Our clients are typically referred to us by counsel knowledgeable about the Delaware legal market and the Delaware Court of Chancery. We bring to every case a high level of partner involvement, devotion to the highest standards of written and oral advocacy, and a willingness to litigate cases through trial.

*Benchmark Litigation* recognized us as "Delaware Firm of the Year" for 2015 and 2017, and rates us as "Highly Recommended."  *Chambers USA* designates us as "Band 1," describes us as an "esteemed litigation boutique," and has compiled the following quotes about the firm:

- *"The firm put everything into cases and will find the winning argument.  The lawyers have an encyclopedic knowledge of Delaware law and good instincts."*

- *"a top-tier plaintiffs and defense firm"*

- *"All the attorneys are very smart and very good writers."*

Notable representations:

- obtained largest-ever cash settlement in the Court of Chancery and largest-ever cash settlement of a stockholder derivative action in the United States, $275 million, on behalf of Activision Blizzard, Inc.

- obtained and collected $98 million final judgment, after affirmance on appeal, against RBC Capital Markets, LLC

- defended the members of the Court of Chancery in their official capacity in litigation challenging the constitutionality of a state statute

- defended the Governor of Delaware in litigation brought by the major sports leagues to invalidate sports betting in Delaware

- represented Trinity Wall Street in an action under SEC Rule 14a-8 against Wal-Mart Stores, Inc. respecting the sale of guns with high-capacity magazines; while the litigation was pending before the United States Supreme Court, Wal-Mart discontinued the sale of such products

Various representations in which the current partners of the firm have had a substantial role are described on the practice area sections of our website in reverse chronological order.  We invite you to learn more about us by browsing this site, or by contacting us by phone or email. We are always willing to discuss retentions on a contingent or non-traditional basis that aligns our compensation with the client's economic objectives.

**Defending Officers, Directors and Corporations**

The firm often works with leading law firms in defending officers, directors or corporations in stockholder litigation, or in representing directors, officers and corporations in advancement and indemnification litigation.  Such representations include the defense of:

- The former CEO of 21st Century Oncology Holdings, Inc., in advancement and indemnification litigation
- Members of Esco Advisors, LLC, in advancement litigation
- TransCanada Corporation, in litigation arising out of its acquisition of Columbia Pipeline Group, Inc.
- Envestnet, Inc., in litigation arising out of its acquisition of Yodlee, Inc.
- Affiliates of Coca-Cola Iberian Partners, S.A., in litigation arising out of the acquisition of Coca-Cola Enterprises, Inc.
- NTELOS Holdings Corp. in an action challenging its merger with Shenandoah Telecommunications Company
- Aligned Founders, LLC, in a books and records action filed by an equityholder
- Certain directors and officers of Prospect Medical Holdings, Inc., in litigation challenging the acquisition of the company
- The CEO of El Paso Corporation, in litigation challenging the acquisition of the company
- Harbinger Group Inc., as nominal defendant in a stockholder derivative action over its acquisition of a majority interest in Spectrum Brands Holdings, Inc.
- A member of the board of directors of GSI Commerce, Inc., in litigation challenging a proposed transaction with eBay Inc.
- Bioalliance Pharma SA and one of its officers, in a case against them dismissed by the Third Circuit Court of Appeals
- Former directors and officers of Advanced Polymer Sciences, Inc., in a case against them dismissed by the Delaware District Court
- The members of the board of directors of Atmel Corporation, in litigation challenging modifications to a shareholder rights plan
- The members of a special committee of directors of XO Holdings, Inc., in litigation arising out of a proposed sale of assets by the company
- Jos. A. Bank Clothiers, Inc., in a stockholder action for inspection of books and records
- Citigroup Global Markets, Inc., in a stockholder class and derivative action
- Certain former directors of Tele-Communications, Inc., in litigation arising out of its merger with a subsidiary of AT&T Corp.
- UBS Securities, LLC, in shareholder litigation challenging its investment in the Philadelphia Stock Exchange
- The Walt Disney Corporation, as nominal defendant in a shareholder derivative action arising from the hiring and termination of Michael Ovitz
- Certain former directors of HBOC, Inc., in litigation arising out of its merger with McKesson Corporation

3

**Prosecuting Stockholder Actions**

The firm represents individuals and institutions in prosecuting a wide variety of stockholder actions, such as access to corporate books and records, election disputes, dissolution actions, appraisal and valuation disputes, and corporate control litigation, including hostile acquisitions and proxy fights.  In select situations, we represent stockholders on a contingent basis.  We only undertake a contingent stockholder representation if the firm will have a lead role in devising and implementing litigation strategy.

**Monetary Recoveries and Value Creation ($975 Million in the Aggregate):**

**Class and Derivative Actions:**

*Cumming v. Edens*

- Derivative settlement of ***$53 million*** for claims challenging $640 million acquisition by New Senior Investment Group, Inc.
- Vice Chancellor Slights characterized the settlement as "impressive" and described the litigation as "hard fought, but fought in the right way"

*In re Calamos Asset Management, Inc. Stockholder Litigation*

- Settlement of over ***$22 million***, which represents nearly a 23% premium to the buyout price
- Vice Chancellor McCormick stated: "***In this case, plaintiffs' counsel have only built a considerable track record, never burned it, which gave them the credibility necessary to extract the benefits achieved.***"

*Mesirov v. Enbridge Energy Co., Inc.*

- Special committee of directors of Enbridge Energy Partners, L.P. valued derivative claims at ***$111.2 million*** when conducting merger negotiations with Enbridge Inc.

*In re Good Technology Corporation Stockholder Litigation*

- Settlement of ***$35 million*** for claim against J.P. Morgan Securities LLC and proposed settlement of ***$17 million*** for claims against director defendants and their affiliated venture capital funds arising out of challenge to dual-track sale/IPO process that resulted in sale of company to BlackBerry Limited

*In re Third Avenue Trust Shareholder and Derivative Litigation*

- Settlement of ***$25 million*** arising out of collapse of open-end mutual fund

*3-Sigma Value Financial Opportunities LP v. Jones*

- Settlement of ***$19.2 million*** arising out of collapse of Certus Holdings, Inc.

- Vice Chancellor Glasscock stated: "*I think, in fact, it was a rather extraordinary result for the class…. I commend those involved here*."

*Laborers' Local #231 Pension Fund v. Merrill Lynch, Pierce, Fenner & Smith Inc.*

- Obtained additional class settlement consideration of *$28 million* following assertion of aiding and abetting claim against financial advisor to the board of directors of Websense, Inc.

*Virtus Capital L.P. v. Eastman Chemical Company*

- Class settlement two months before trial of *$17.5 million,* or $14.125 per share, for minority stockholders who had received $3.1 million, or $2.50 per share, in the challenged transaction
- Vice Chancellor Laster stated: "*It's hard to be understated about this recovery. This amounts to a 565 percent premium over what the common stock received in the merger…. [T]he representation provided by class counsel was … excellent*."

*In re Activision Blizzard, Inc. Stockholders Litigation*

- Derivative settlement on eve of trial of *$275 million*, by far the largest settlement in the history of the Court of Chancery and the largest cash derivative settlement in the country
- Vice Chancellor Laster stated: *"Lead Counsel brought a particular blend of expertise, initiative, and ingenuity to the case. In my view, few litigation teams could have achieved this result against the determined, well-represented, and aggressive adversaries that Lead Counsel faced."*
- Corporate governance reforms discussed below

*In re Rural/Metro Corporation Stockholders Litigation*

- Successfully objected to a proposed disclosure-only settlement
- Settled on eve of trial with Moelis & Company for *$5 million* and with director defendants for *$6.6 million*
- Successfully litigated the case through trial, final judgment, and appeal against sole non-settling defendant RBC Capital Markets LLC, and collected *$97.8 million*, the full amount of the judgment, based on a fair value determination 24% above the merger price

*In re Gardner Denver, Inc. Shareholders Litigation*

- Obtained settlement of ***$29 million*** and elimination of "Don't Ask, Don't Waive" standstill provisions in confidentiality agreements with prospective bidders
- Vice Chancellor Noble stated: "***a $29 million cash settlement* ...*, frankly, is an outstanding result*.... *When I first looked at the case, I concede that I did not expect plaintiff to recover anything along the lines of the cash settlement presented today. Recoveries of this size don't just happen. The lawyers took a case and made something of it*.... *The litigation was not easy. Some of it may be fairly characterized as novel*.*"*

*In re Chaparral Resources, Inc. Shareholders Litigation*

- Obtained settlement of ***$41 million*** (45% above merger price) after trial in shareholder class action against Lukoil; successfully intervened on behalf of a group of individual investors at outset of litigation
- Vice Chancellor Lamb stated: "***I think the performance was outstanding, and frankly, without the efforts of counsel, nothing would have been achieved. The class would have gotten zero. I don't think that can be more clear*.*"*

*In re Prime Hospitality, Inc. Shareholders' Litigation*

- Successfully objected to a proposed disclosure-only settlement
- Subsequently settled the case for ***$25 million***
- Chancellor Chandler described the successful objection to the initial settlement as "***quite an achievement***" and described the ultimate settlement as an "***outstanding benefit***" to the class

*Berger v. Ford*

Recovered ***$13.4 million*** in a settlement of a shareholder derivative demand regarding the allocation of IPO shares to William Clay Ford, Jr.; settlement amount approximated first-day unrealized gains plus pre-judgment interest

*Joseph v. Heisley*

Co-lead counsel in shareholder derivative action challenging repurchase of control block in WorldPort Communications, Inc. The case settled after trial on terms that effected acquisition of the public stockholders' interests at 38% above market price.

*In re TeleCorp PCS Inc. Shareholders Litigation*

- settled shortly before trial for ***$47.5 million***

- Then-Vice Chancellor Strine described the settlement as a "***very, very, high quality result***" in a case "***very complexly, aggressively defended, ably litigated, efficiently litigated***"

**Appraisal Actions:**

*Virtus Capital L.P. v. Sterling Chemicals, Inc.*

Settlement of appraisal case converted to class action; recovery for appraisal shares estimated to be ***597% premium*** above merger price

*Merion Capital LP et al. v. Safeway Inc.*

Obtained appraisal settlement, as reported in *The Wall Street Journal*, of approximately ***$102.8 million*** representing ***26% premium*** above merger price

*Merion Capital LP v. Emergency Medical Services Corp.*

Obtained appraisal settlement, as reported in SEC filings, of approximately ***$13.7 million*** representing ***35% premium*** above merger price

**Significant Corporate Governance Reforms:**

*Williams v. Ji*

Obtained cancellation of insider subsidiary options and warrants and equity grants, rescission of super-voting shares, neutralization of voting agreement, and procedural protections respecting any future subsidiary stock awards and related-party transactions at Sorrento Therapeutics, Inc.

*In re IAC/InterActivCorp Class C Reclassification Litigation*

Obtained abandonment of proposed issuance of a new class of non-voting stock, which would have secured dynastic control for the family of Barry Diller

*In re VAALCO Energy, Inc. Consolidated Stockholder Litigation*

Invalidated charter and bylaw provisions that purported to prevent stockholder removal without cause of directors of an unstaggered board

*In re Activision Blizzard, Inc. Stockholders Litigation*

As part of settlement on eve of trial, CEO Robert Kotick, Chairman Brian Kelly and entities they control agreed to expand Activision's Board by two spots to be filled by persons independent of and unaffiliated with them (thereby making independent, unaffiliated directors a Board majority) and agreed to reduce their voting power from 24.9% to 19.9%

*Arris Group, Inc.*
*B/E Aerospace, Inc.*
*Healthways, Inc.*
*Joy Global Inc.*
*MGM Resorts International*
*Microsemi, Inc.*
*Patterson-UTI Energy, Inc.*
*QEP Resources, Inc.*

In breach of fiduciary duty litigation involving each of the above companies and their bank lenders, the firm obtained elimination in each company's credit agreement of a "Dead Hand Proxy Put" – an acceleration provision triggered by the election of a new board majority nominated by dissident stockholders

*Oklahoma Firefighters Pension & Retirement System v. Steven A. Davis*

Obtained elimination of supermajority bylaw provision that impeded potential consent solicitation to change control of board of directors of Bob Evans Farms, Inc.

*Kurz v. Holbrook*

- Obtained rescission of transaction that conferred 28% voting power and other rights on preferred stockholder; obtained post-trial ruling upheld on appeal invalidating bylaw amendments that would have given preferred stockholder control over Board of Directors
- Chief Justice Steele stated:  "***As the Vice Chancellor found, this case presented complex and novel legal issues, made more difficult by the fact that plaintiff's counsel faced five large law firms and a rapidly evolving case.  Counsel worked on a contingency basis, and the Vice Chancellor credited counsel's standing and ability.  Finally, he found the benefits were sizeable: 'This was a strong challenge brought to a transaction where there was . . . real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.'***"

*San Antonio Fire & Police Pension Fund v. Amylin Pharmaceuticals, Inc.*

- Obtained relief from acceleration provisions in debt instruments triggered by a change in the composition of the board of directors
- Vice Chancellor Noble stated: "***Because of the fundamental importance to the shareholder franchise of having a choice of candidates for election to the board, significant and substantial benefits unquestionably accrued to Amylin's stockholders from this litigation….  This was a complex engagement.  The quality of the work was excellent.  The standing and ability of Plaintiff's Counsel cannot be questioned***."

*In re Yahoo! Inc. Shareholders Litigation*

- Obtained comprehensive changes to Yahoo's Change In Control Employee Severance Plans, which were adopted in response to merger proposal from Microsoft Corporation
- Chancellor Chandler found that the settlement "***amounted to a substantial benefit to Yahoo's shareholders because the key terms of the settlement made it less expensive to sell Yahoo, making the company a more attractive target to potential suitors***."

*Walker v. American International Group, Inc.*

Obtained public commitment that AIG would obtain the consent of common stockholders prior to converting into common stock the Series C Preferred Stock that had been issued for the benefit of the U.S. Treasury in the original bailout of AIG

*Minneapolis Firefighters' Relief Ass'n v. Ceridian Corp.*

- Settled expedited litigation on terms that eliminated a "Don't Ask, Don't Waive" standstill with a disappointed bidder, broadened superior proposal definition, and eliminated "election walkaway" provision in merger agreement
- Chancellor Chandler described the settlement as "***a fairly remarkable achievement and a very successful achievement" by "serious lawyers, seriously litigating some rather interesting and novel claims***."

*Hollinger International, Inc. v. Black*

Represented Tweedy, Browne Company LLC in its landmark efforts to investigate, challenge, and force dramatic reform of the "corporate kleptocracy" at Hollinger International, Inc.

*In re PeopleSoft, Inc. Shareholder Litigation*

Successfully objected to proposed compromise of class claims arising from takeover defenses by PeopleSoft, Inc. to thwart an acquisition by Oracle Corp.

*In re Dairy Mart Convenience Stores, Inc.*

- Settled after trial on terms that effected a change of control from insiders to the public stockholders
- Chancellor Chandler described the firm's efforts as "***truly an amazing performance***" and "***very well lawyered***" and described counsel fees as "***not only deserved; they were earned***"

**Other Notable Stockholder Plaintiff Representations:**

- New York State Common Retirement Fund, in Section 220 litigation against Oracle Corporation and Qualcomm Incorporated to obtain books and records concerning political expenditures; obtained books and records from Oracle

Corporation; obtained Qualcomm's agreement to implement an industry-leading political spending disclosure policy

- Third Point LLC, in connection with a Section 220 demand on Yahoo! Inc. that led to the resignation of Yahoo's then-CEO

- Pentwater Capital Management, LP, in settlement of advance notice bylaw litigation against Leap Wireless International, Inc., obtained the appointment of certain persons as new directors

**Commercial Litigation**

We often represent corporations involved in significant commercial disputes, serving both as primary and Delaware counsel.  Sample representations include:

- The Chemours Company, in a declaratory judgment action relating to its spinoff
- Eisai Inc., in a dispute with SpePharm AG
- Trimble Inc., in an action for damages concerning an acquisition
- Affiliates of Zurich Insurance Company, in a dispute with other insurance companies
- Nestlé Purina PetCare Company, in an action to enforce a post-closing determination by an accounting arbitrator
- The Related Companies, L.P. in an action for damages against individuals and entities involved in a joint venture
- Roche Diagnostics Corp. and affiliates in multi-forum litigation to enforce patent and contractual rights against Meso Scale Diagnostics LLC and affiliates
- CHA, LLC, in an action to enforce drag-along rights in an LLC agreement
- Plaza Management Overseas S.A., in a dispute with The Carlyle Group and certain of its affiliates
- Strategic Value Partners, LLC and affiliates, in seeking a temporary restraining order enjoining a recapitalization of Bicent Power LLC
- Wypie Investments, LLC in a fraud and breach of contract action against the former executive of a restaurant franchise
- TBI Overseas Holdings, Inc., in a dispute over indemnification under a purchase agreement
- Harland Financial Solutions, Inc., in an earn-out dispute
- Certain Underwriters At Lloyd's, London, in a coverage dispute with Oracle Corporation
- Bloomberg News, in various actions to enforce access to court documents
- El Paso Corporation, in a contractual dispute with the co-owner of a pipeline transmission company
- American Centuries Companies, Inc., in a contractual dispute with its former 40% stockholder, JP Morgan Chase & Co.
- Orbital Sciences Corporation, in a purchase price adjustment and breach of representations dispute with General Dynamics Corporation
- Transocean Offshore Deepwater Drilling, Inc., in a dispute arising out of the Deepwater Horizon oil spill
- Certain holders of a junior participation in a loan securitization, in a dispute over the proposed restructuring of a loan secured by the Atlantis Resort and Casino
- Lerner Master Fund, LLC, an investment vehicle of the Lerner family, in an action that obtained post-trial redemption of its seed investment in a hedge fund
- The Bank of New York Mellon Trust Company, N.A., as indenture trustee
- Alliance Data Systems, in an action to collect a termination fee
- SLM Corporation, in an action to collect a termination fee
- Horizon Personal Communications Inc., Bright Personal Communication Services, LLC, and iPCS Wireless, Inc. in litigations against Sprint Corporation
- A landowner in Argentina, in litigation through jury trial on claims against an oil company for damage to its property

11

**Major Local Disputes**

Some of our cases involve companies or persons based in Delaware.  Local representations in which one or both current partners of the firm have had a substantial role include:

- The State of Delaware and the members of the Court of Chancery, in their official capacity, to defend the constitutionality of a statute authorizing confidential arbitration by members of the Court of Chancery
- Delaware's Governor and Lottery Director, in litigation brought by major sports leagues challenging the Delaware Sports Lottery Act
- Family members and real estate companies in litigation arising from the retirement of a co-owner
- Appointment by Delaware Supreme Court to brief and argue position in response to Governor's request for an advisory opinion
- Obtained $3.8 million judgment in a breach of contract and unjust enrichment action against a local Internet payment gateway
- Family members in dispute over governance of a limited partnership that owns a large tract of land

**Special Committee Representations**

We bring our litigation expertise to bear in advising special committees and performing internal investigations.  We represented a special committee of a Fortune 50 company for purposes of an internal investigation in response to a stockholder demand.  We acted as Delaware counsel to special committees of independent directors of infoGROUP, Inc., Brocade Communications Systems, Inc. and Union Pacific Corporation.  For the special committee of Union Pacific Corporation, the firm performed an internal investigation respecting oversight issues related to railroad safety and wrote a 150-page report that became the basis for a motion to dismiss and subsequent settlement of the action.

**Attorneys**

**Joel Friedlander**
jfriedlander@friedlandergorris.com
Office: (302) 573-3502
Cell:    (302) 593-3007

Mr. Friedlander has 25 years of experience litigating breach of fiduciary duty actions and contract disputes relating to the control of Delaware entities.  The 2020 and 2017 editions of *The Best Lawyers in America* recognized him as "Litigation – Mergers and Acquisitions 'Lawyer of the Year' for Wilmington, Delaware."  The current edition of *Chambers USA* designates him as "Band 1" and states:

> Joel Friedlander is considered to be "*the toughest plaintiff lawyer there is*" by market sources. He comes highly recommended for his work representing clients in litigation involving contract disputes and breach of fiduciary duty actions.  Interviewees reveal: "*He has an encyclopedic knowledge and is well respected by judges*."

Mr. Friedlander has been profiled in *The Wall Street Journal* and named "Litigator of the Week" in *The Am Law Litigation Daily*.  He repeatedly has been selected for annual inclusion in *The Best Lawyers in America*, *Benchmark Litigation*, *Chambers & Partners*, and Delaware "Super Lawyers".

Education:

University of Pennsylvania Law School, J.D., 1992
        Executive Editor, University of Pennsylvania Law Review
        Recipient, Fred G. Leebron Award for Constitutional Law
The Wharton School of the University of Pennsylvania, B.S., *cum laude*, 1988
        Benjamin Franklin Scholar; General Honors Program

Professional and Community Activities:

Lecturer on Law, Harvard Law School
Intermittent Lecturer, University of Michigan Law School
Adviser, American Law Institute, Restatement of the Law, Corporate Governance
Board of Advisors, University of Pennsylvania Institute of Law and Economics
Chairman of the Board and President, Rodney Street Tennis & Tutoring Association
World Chairman's Council, Jewish National Fund
Member, Delaware Supreme Court Rules Committee (2009-2016)
Member, Delaware State Advisory Committee,
        U.S. Commission on Civil Rights (2014-2015)
Past President, The Milton & Hattie Kutz Home, Inc., a skilled nursing facility
Delaware State Bar Association
        Nominating Committee (2015-2018)
        Executive Committee (2005-2006)
        Assistant to the President (1998-1999)
Master, Richard S. Rodney Inn of Court (2002-2005)
Associate Member, Delaware Board of Bar Examiners (1998-2003)
Editorial Board, *Delaware Lawyer* (1998-2003)

13

President, Delaware Chapter, Lawyers Division,
      Federalist Society for Law & Public Policy Studies (1994-1999)
Adjunct Professor, Widener Law School (1998)

Publications and Public Speaking:

"Confronting the Problem of Fraud on the Board,"
Business Lawyer (forthcoming Winter 2019-2020)

"Vindicating the Duty of Loyalty: Using Data Points of Successful Stockholder
Litigation As a Tool for Reform,"
72(3) Business Lawyer 623 (Summer 2017)

"Is Delaware's 'Other Major Political Party' Really Entitled To Half of Delaware's
Judiciary?,"
58 Arizona Law Review 1139 (2016)

"How *Rural/Metro* Exposed the Systemic Problem of Disclosure Settlements,"
40 Delaware Journal of Corporate Law 877 (2016)

"Overturn *Time-Warner* Three Different Ways,"
33 Delaware Journal of Corporate Law 631 (2008)

"The Rule of Law at Century's End,"
5 Texas Review of Law & Politics 317 (2001)

"Corporation and *Kulturkampf*: Time Culture as Illegal Fiction,"
29 University of Connecticut Law Review 31 (1996)

"Constitution and *Kulturkampf*: A Reading of the Shadow Theology of Justice Brennan,"
140 University of Pennsylvania Law Review 1049 (1992)

Mr. Friedlander has spoken on corporate law issues at University of Pennsylvania Law
School; Harvard Law School, New York University School of Law, University of
Michigan Law School, Columbia Law School, Yale Law School Center for the Study of
Corporate Law, University of Colorado Law School, James E. Rogers College of Law at
the University of Arizona, Widener University Delaware Law School, Mercatus Center at
George Mason University, Hebrew University of Jerusalem, Salzburg Forum on Global
Developments in Corporate Governance, Practising Law Institute, and Tulane University
Law School Corporate Law Institute.

Prior Experience:

Skadden, Arps, Slate, Meagher & Flom, 1993-1995
Law Clerk to The Honorable Jack B. Jacobs, Delaware Court of Chancery, 1992-1993

State Bar Admission:

Delaware, 1993

**Jeffrey M. Gorris**
jgorris@friedlandergorris.com
Office: (302) 573-3508
Cell: (302) 545-8211

Education:

University of Pennsylvania Law School, J.D., *cum laude*, 2007
    Levy Scholar
    Editor, University of Pennsylvania Law Review
University of Notre Dame, B.B.A., *summa cum laude*, 2000

Publications:

"Delaware Corporate Law and the Model Business Corporation Act: A Study in Symbiosis,"
74 Law and Contemporary Problems 107 (2011)(with Leo E. Strine, Jr. and Lawrence A. Hamermesh)

"A Practical Response to a Hypothetical Analysis of Section 203's Constitutionality,"
65 The Business Lawyer 771 (2010) (with Stephen P. Lamb)

"Loyalty's Core Demand:  The Defining Role of Good Faith in Corporation Law,"
98 Georgetown Law Journal 629 (2010)
(with Leo E. Strine, Jr., Lawrence A. Hamermesh & R. Franklin Balotti)

"Recent Delaware Law Developments in Advancement and Indemnification:  An Analytical Guide,"
6 New York University Journal of Law & Business (2009)
(with Andy Johnston & Amy Simmerman)

"Waivers of ERISA Plan Benefits:  Preventing Judicial Interpretations of a Complex Statute from Frustrating the Statute's Simple Purpose,"
155 University of Pennsylvania Law Review 717 (2007)

Prior Experience:

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 2009-2010
Morris, Nichols, Arsht & Tunnell LLP, 2008-2009
Law Clerk to The Honorable Leo E. Strine, Jr., Delaware Court of Chancery, 2007-2008

State Bar Admission:

Delaware, 2007

**Christopher M. Foulds (Partner)**
cfoulds@friedlandergorris.com
Office: (302) 573-3509
Cell: (302) 559-8526

Education:

University of Pennsylvania Law School, J.D., 2008
      Editor, University of Pennsylvania Law Review
      Recipient, Award for Civil Procedure
University of Sussex (U.K.), M.A., *highest distinction*, 2003
Muhlenberg College, B.A., *summa cum laude*, 2000

Professional Activities:

Recipient, 2014 Delaware State Bar Association Christopher W. White Distinguished
      Access to Justice Achievement Award
University of Pennsylvania Institute of Law and Economics
The Richard S. Rodney American Inn of Court
2016-2018 Delaware Super Lawyers Rising Star

Publications:

Board of Editors, *Folk on the Delaware General Corporation Law* (6th ed.)

"For Whom Should the Corporation Be Sold? Diversified Investors and Efficient Breach
in *Omnicare v. NCS*,"
38 Journal of Corporate Law 733 (2013)

"My Banker's Conflicted and I Couldn't Be Happier:  The Curious Durability of Staple
Financing,"
34 Delaware Journal of Corporate Law 519 (2009)

Prior Experience:

Skadden, Arps, Slate, Meagher & Flom LLP, 2009-2014
Law Clerk to The Honorable Donald F. Parsons, Jr., Delaware Court of Chancery, 2008-
2009

State Bar Admissions:

Delaware and Pennsylvania, 2008

**Christopher P. Quinn (Associate)**
cquinn@friedlandergorris.com
Office: (302) 573-3506

Education:

Villanova University School of Law, J.D., *cum laude*, 2012
        Staff Writer and Associate Editor, Villanova Law Review
University of Delaware, B.S., 2009

Prior Experience:

Morris, Nichols, Arsht & Tunnell LLP, 2012-2016

State Bar Admission:

Delaware, 2013

# EXHIBIT M

**Phil Weiser**
COLORADO ATTORNEY GENERAL



FILE A COMPLAINT

# Attorney General Phil Weiser joins bipartisan coalition fighting for student borrowers

Sept. 3, 2019 (DENVER, Colo.) – Attorney General Phil Weiser has joined a bipartisan coalition of 32 state attorneys general in defending the states' ability to enforce state and federal consumer protection laws against student loan servicers. In an **amicus brief** filed in the U.S. Court of Appeals for the Third Circuit, the attorneys general argue that the case brought by the Commonwealth of Pennsylvania against student loan servicer Navient for exploiting student loan borrowers should be permitted to go forward in the federal courts.

"Many student loan servicers have engaged in a broad range of unfair, deceptive, and abusive practices such as overcharging borrowers and steering them into expensive repayment plans," said Weiser, whose office is investigating Navient. "The U.S. Department of Education has abandoned students and is shielding companies like Navient from accountability; we in Colorado are going to hold them accountable. I am committed to defending Colorado's laws that protect students who have crippling debt. The level of student debt and improper student loan servicing is cause for alarm, as it makes it difficult for people to start families, buy homes, or open businesses."

The 32 state attorneys general argue that states have a substantial interest in protecting their residents from all unfair and deceptive business practices committed by businesses operating within their borders, including federal student loan servicers. Consumer protection is and has always been an area of traditional state enforcement.

Over half of Colorado students graduate with debt, with an average balance of $26,530 per student. There are approximately 734,000 student loan borrowers in the state, and the total student loan debt outstanding for Coloradans is approximately $26.4 billion. Private student loan servicing companies are responsible for collecting payments, facilitating payoff, and otherwise assisting borrowers.

In Colorado, the Student Loan Servicers Act, which was enacted in May of this year, not only requires student loan servicers to be licensed by Colorado's Uniform Consumer Credit Code (UCCC) Administrator, but also directly prohibits servicers from misleading borrowers. The law also created a Student Loan Ombudsman position within the Colorado Attorney General's office, which is responsible for enforcing this law and processing complaints about student loan servicers in the state.

Other states joining the amicus brief include: Alaska, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, Virginia, Washington, Wisconsin, and the District of Columbia.

### 

## Attachments

Pa v. Navient — States Amicus Brief

## Related Posts

**Attorney General Phil Weiser calls on Education Department to automatically discharge student loans for totally or permanently disabled veterans**

Learn More →

**Attorney General Phil Weiser Secures $1.6 million in Debt Relief for 168 Former ITT Tech Students**

**Learn More →**

## Most Recent

### State asks full 10th Circuit Court of Appeals to hear TABOR challenge

Sept. 4, 2019 (DENVER, Colo.)—Attorney General Phil Weiser today filed a petition with the U.S. 10th Circuit Court of Appeals asking the full court to reconsider Kerr v. Polis. In 2011, several state legislators and others sued in federal court [...]

### Attorney General Phil Weiser joins bipartisan coalition fighting for student borrowers

Sept. 3, 2019 (DENVER, Colo.) – Attorney General Phil Weiser has joined a bipartisan coalition of 32 state attorneys general in defending the states' ability to enforce state and federal consumer protection laws against student loan servicers. In an amicus [...]

### Attorney General Phil Weiser vows to challenge federal rollback of methane standards

Aug. 29, 2019 (DENVER, Colo.)— Colorado Attorney General Phil Weiser released the following statement regarding the U.S. Environmental Protection Agency's (EPA) announcement that it will rollback standards for reducing methane emissions from oil and gas operations: "In Colorado, we are [...]

Office of the Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000

Contact the Office of the Attorney General

**CONTACT**

Copyright 2019 The Office of the Attorney General. All rights reserved.

CORA | WEBSITE PRIVACY POLICY