# EXHIBIT 1

**EXHIBIT 1 REDACTED IN ITS ENTIRETY**

# EXHIBIT 2

**EXHIBIT 2 REDACTED IN ITS ENTIRETY**

# EXHIBIT 3



# 310 Receivables
## 10 Overall
### S99 SEC Materials

# General

**>    SEC Staff Guidance**

**> >    Staff Accounting Bulletins**

**> > >    SAB Topic 1.I, Financial Statements of Properties Securing Mortgage Loans**

**S99-1**

The following is the text of SAB Topic 1.I, Financial Statements of Properties Securing Mortgage Loans.

- Facts: A registrant files a Securities Act registration statement covering a maximum of $100 million of securities. Proceeds of the offering will be used to make mortgage loans on operating residential or commercial property. Proceeds of the offering will be placed in escrow until $1 million of securities are sold at which point escrow may be broken, making the proceeds immediately available for lending, while the selling of securities would continue.

- Question 1: Under what circumstances are the financial statements of a property on which the registrant makes or expects to make a loan required to be included in a filing?

- Interpretive Response: Rule 3-14 of Regulation S-X specifies the requirements for financial statements when the registrant has acquired one or more properties which in the aggregate are significant, or since the date of the latest balance sheet required has acquired or proposes to acquire one or more properties which in the aggregate are significant.

- Included in the category of properties acquired or to be acquired under Rule 3-14 are operating properties underlying certain mortgage loans, which in economic substance represent an investment in real estate or a joint venture rather than a loan. Certain characteristics of a lending arrangement indicate that the "lender" has the same risks and potential rewards as an owner or joint venturer. Those characteristics are set forth in the Acquisition, Development, and Construction Arrangements (ADC Arrangements)

Subsections of FASB ASC Subtopic 310-10, Receivables—Overall FN6 FN7. In September 1986 the EITF FN8 reached a consensus on this issue FN9 to the effect that, although the guidance in the ADC Arrangements Subsections of FASB ASC Subtopic 310-10 was issued to address the real estate ADC arrangements of financial institutions, preparers and auditors should consider that guidance in accounting for shared appreciation mortgages, loans on operating real estate and real estate ADC arrangements entered into by enterprises other than financial institutions.

- o FN6 [Original footnote removed by SAB 114.]

- o FN7 [Original footnote removed by SAB 114.]

- o FN8 The Emerging Issues Task Force ("EITF") was formed in 1984 to assist the Financial Accounting Standards Board in the early identification and resolution of emerging accounting issues. Topics to be discussed by the EITF are publicly announced prior to its meetings and minutes of all EITF meetings are available to the public.

- o FN9 FASB ASC paragraph 310-10-05-9.

- FASB ASC Topic 815, Derivatives and Hedging—Embedded Derivatives, generally requires that embedded instruments meeting the definition of a derivative and not clearly and closely related to the host contract be accounted for separately from the host instrument. If the embedded expected residual profit component of an ADC arrangement need not be separately accounted for as a derivative under FASB ASC Topic 815, then the disclosure requirements discussed below for ADC loans and similar arrangements should be followed. FN10

  - o FN10 The equity kicker (the expected residual profit) would typically not be separated from the host contract and accounted for as a derivative because FASB ASC subparagraph 815-15-25-1(c) exempts a hybrid contract from bifurcation if a separate instrument with the same terms as the embedded equity kicker is not a derivative instrument subject to the requirements of FASB ASC Topic 815.

- In certain cases the "lender" has virtually the same potential rewards as those of an owner or a joint venturer by virtue of participating in expected residual profit. FN11 In addition, the ADC Arrangements Subsections of FASB

ASC Subtopic 310-10 include a number of other characteristics which, when considered individually or in combination, would suggest that the risks of an ADC arrangement are similar to those associated with an investment in real estate or a joint venture or, conversely, that they are similar to those associated with a loan. Among those other characteristics is whether the lender agrees to provide all or substantially all necessary funds to acquire the property, resulting in the borrower having title to, but little or no equity in, the underlying property. The staff believes that the borrower's equity in the property is adequate to support accounting for the transaction as a mortgage loan when the borrower's initial investment meets the criteria in FASB ASC paragraph 360-20-40-18 (Property, Plant, and Equipment Topic) FN12 and the borrower's payments of principal and interest on the loan are adequate to maintain a continuing investment in the property which meets the criteria in FASB ASC paragraph 360-20-40-19. FN13

- o  FN11 Expected residual profit is defined in the ADC Arrangements Subsections of FASB ASC Subtopic 310-10 as the amount of profit, whether called interest or another name, such as equity kicker, above a reasonable amount of interest and fees expected to be earned by the "lender."

- o  FN12 FASB ASC Subtopic 360-20 establishes standards for the recognition of profit on real estate sales transactions. FASB ASC paragraph 360-20-40-18 states that the buyer's initial investment shall be adequate to demonstrate the buyer's commitment to pay for the property and shall indicate a reasonable likelihood that the seller will collect the receivable. Guidance on minimum initial investments in various types of real estate is provided in FASB ASC paragraphs 360-20-55-1 and 360-20-55-2.

- o  FN13 FASB ASC paragraph 360-20-40-19 states that the buyer's continuing investment in a real estate transaction shall not qualify unless the buyer is contractually required to pay each year on its total debt for the purchase price of the property an amount at least equal to the level annual payment that would be needed to pay that debt and interest on the unpaid balance over not more than (a) 20 years for debt for land and (b) the customary amortization term of a first mortgage loan by an independent established lending institution for other real estate.

- The financial statements of properties which will secure mortgage loans made or to be made from the proceeds of the offering which have the characteristics of real estate investments or joint ventures should be included as required by Rule 3-14 in the registration statement when such properties secure loans previously made, or have been identified as security for probable loans prior to effectiveness, and in filings made pursuant to the undertaking in Item 20D of Securities Act Industry Guide 5.

- Rule 1-02(w) of Regulation S-X includes the conditions used in determining whether an acquisition is significant. The separate financial statements of an individual property should be provided when a property would meet the requirements for a significant subsidiary under this rule using the amount of the "loan" as a substitute for the "investment in the subsidiary" in computing the specified conditions. The combined financial statements of properties which are not individually significant should also be provided. However, the staff will not object if the combined financial statements of such properties are not included if none of the conditions specified in Rule 1-02(w), with respect to all such properties combined, exceeds 20% in the aggregate.

- Under certain circumstances, information may also be required regarding operating properties underlying mortgage loans where the terms do not result in the lender having virtually the same risks and potential rewards as those of owners or joint venturers. Generally, the staff believes that, where investment risks exist due to substantial asset concentration, financial and other information should be included regarding operating properties underlying a mortgage loan that represents a significant amount of the registrant's assets. Such presentation is consistent with Rule 3-13 of Regulation S-X and Rule 408 under the Securities Act of 1933.

- Where the amount of a loan exceeds 20% of the amount in good faith expected to be raised in the offering, disclosures would be expected to consist of financial statements for the underlying operating properties for the periods contemplated by Rule 3-14. Further, where loans on related properties are made to a single person or group of affiliated persons which in the aggregate amount to more than 20% of the amount expected to be raised, the staff believes that such lending arrangements result in a sufficient concentration of assets so as to warrant the inclusion of financial and other information regarding the underlying properties.

- Question 2: Will the financial statements of the mortgaged properties be required in filings made under the 1934 Act?

- Interpretive Response: Rule 3-09 of Regulation S-X specifies the requirement for significant, as defined, investments in operating entities, the operations of which are not included in the registrant's consolidated financial statements. FN14 Accordingly, the staff believes that the financial statements of properties securing significant loans which have the characteristics of real estate investments or joint ventures should be included in subsequent filings as required by Rule 3-09. The materiality threshold for determining whether such an investment is significant is the same as set forth in paragraph (a) of that Rule. FN15

    - FN14 Rule 3-14 states that the financial statements of an acquired property should be furnished if the acquisition took place during the period for which the registrant's income statements are required. Paragraph (b) of the Rule states that the information required by the Rule is not required to be included in a filing on Form 10-K. That exception is consistent with Item 8 of Form 10-K which excludes acquired company financial statements, which would otherwise be required by Rule 3-05 of Regulation S-X, from inclusion in filings on that Form. Those exceptions are based, in part, on the fact that acquired properties and acquired companies will generally be included in the registrant's consolidated financial statements from the acquisition date.

    - FN15 Rule 3-09(a) states, in part, that "[i]f any of the conditions set forth in [Rule] 1-02(w), substituting 20 percent for 10 percent in the tests used therein to determine significant subsidiary, are met... separate financial statements... shall be filed."

- Likewise, the staff believes that filings made under the 1934 Act should include the same financial and other information relating to properties underlying any loans which are significant as discussed in the last paragraph of Question 1, except that in the determination of significance the 20% disclosure threshold should be measured using total assets. The staff believes that this presentation would be consistent with Rule 12b-20 under the Securities Exchange Act of 1934.

- Question 3: The interpretive response to question 1 indicates that the staff believes that the borrower's equity in an operating property is adequate to support accounting for the transaction as a mortgage loan when the borrower's initial investment meets the criteria in FASB ASC paragraph 360-20-40-18 and the borrower's payments of principal and interest on the loan are adequate to maintain a continuing investment in the property which meets the criteria in FASB ASC paragraph 360-20-40-19. Is it the staff's view that meeting these criteria is the only way the borrower's equity in the property is considered adequate to support accounting for the transaction as a mortgage loan?

- Interpretive Response: No. It is the staff's position that the determination of whether loan accounting is appropriate for these arrangements should be made by the registrant and its independent accountants based on the facts and circumstances of the individual arrangements, using the guidance provided in the ADC Arrangements Subsections of FASB ASC Subtopic 310-10. As stated in those Subsections, loan accounting may not be appropriate when the lender participates in expected residual profit and has virtually the same risks as those of an owner, or joint venturer. In assessing the question of whether the lender has virtually the same risks as an owner, or joint venturer, the essential test that needs to be addressed is whether the borrower has and is expected to continue to have a substantial amount at risk in the project. FN16 The criteria described in FASB ASC Subtopic 360-20, Property, Plant, and Equipment—Real Estate Sales, provide a "safe harbor" for determining whether the borrower has a substantial amount at risk in the form of a substantial equity investment. The borrower may have a substantial amount at risk without meeting the criteria described in FASB ASC Subtopic 360-20.

  - FN16 Regarding the composition of the borrower's investment, FASB ASC paragraph 310-10-25-20 indicates that the borrower's investment may include the value of land or other assets contributed by the borrower, net of encumbrances. The staff emphasizes that such paragraph indicates, "...recently acquired property generally should be valued at no higher than cost.. " Thus, for such recently acquired property, appraisals will not be sufficient to justify the use of a value in excess of cost.

- Question 4: What financial statements should be included in filings made under the Securities Act regarding investment-type arrangements that individually amount to 10% or more of total assets?

- Interpretive Response: In the staff's view, separate audited financial statements should be provided for any investment-type arrangement that constitutes 10% or more of the greater of (i) the amount of minimum proceeds or (ii) the total assets of the registrant, including the amount of proceeds raised, as of the date the filing is required to be made. Of course, the narrative information required by items 14 and 15 of Form S-11 should also be included with respect to these investment-type arrangements.

- Question 5: What information must be provided under the Securities Act for investment-type arrangements that individually amount to less than 10%?

- Interpretive Response: No specific financial information need be presented for investment-type arrangements that amount to less than 10%. However, where such arrangements aggregate more than 20%, a narrative description of the general character of the properties and arrangements should be included that gives an investor an understanding of the risks and rewards associated with these arrangements. Such information may, for example, include a description of the terms of the arrangements, participation by the registrant in expected residual profits, and property types and locations.

- Question 6: What financial statements should be included in annual reports filed under the Exchange Act with respect to investment-type arrangements that constitute 10% or more of the registrant's total assets?

- Interpretive Response: In annual reports filed with the Commission, the staff has advised registrants that separate audited financial statements should be provided for each nonconsolidated investment-type arrangement that is 20% or more of the registrant's total assets. While the distribution is on-going, however, the percentage may be calculated using the greater of (i) the amount of the minimum proceeds or (ii) the total assets of the registrant, including the amount of proceeds raised, as of the date the filing is required to be made. In annual reports to shareholders registrants may either include the separate audited financial statements for 20% or more nonconsolidated investment-type arrangements or, if those financial statements are not

included, present summarized financial information for those arrangements in the notes to the registrant's financial statements.

- The staff has also indicated that separate summarized financial information (as defined in Rule 1-02(bb) of Regulation S-X) should be provided in the footnotes to the registrant's financial statements for each nonconsolidated investment-type arrangement that is 10% or more but less than 20%. Of course, registrants should also make appropriate textural disclosure with respect to material investment-type arrangements in the "business" and "property" sections of their annual reports to the Commission. FN17

  - FN17 Registrants are reminded that in filings on Form 8-K that are triggered in connection with an acquisition of an investment-type arrangement, separate audited financial statements are required for any such arrangement that individually constitutes 10% or more.

- Question 7: What information should be provided in annual reports filed under the Exchange Act with respect to investment-type arrangements that do not meet the 10% threshold?

- Interpretive Response: The staff believes it will not be necessary to provide any financial information (full or summarized) for investment-type arrangements that do not meet the 10% threshold. However, in the staff's view, where such arrangements aggregate more than 20%, a narrative description of the general character of the properties and arrangements would be necessary. The staff believes that information should be included that would give an investor an understanding of the risks and rewards associated with these arrangements. Such information may, for example, include a description of the terms of the arrangements, participation by the registrant in expected residual profits, and property types and locations. Of course, disclosure regarding the operations of such components should be included as part of the Management's Discussion and Analysis where there is a known trend or uncertainty in the operations of such properties, either individually or in the aggregate, which would be reasonably likely to result in a material impact on the registrant's future operations, liquidity or capital resources.

## > > >    SAB Topic 4.E, Receivables from Sale of Stock

**S99-2**

The following is the text of SAB Topic 4.E, Receivables from Sale of Stock.

- (Replaced by SAB 107)

- Facts: Capital stock is sometimes issued to officers or other employees before the cash payment is received.

- Question: How should the receivables from the officers or other employees be presented in the balance sheet?

- Interpretive Response: The amount recorded as a receivable should be presented in the balance sheet as a deduction from stockholders' equity. This is generally consistent with Rule 5-02.30 of Regulation S-X which states that accounts or notes receivable arising from transactions involving the registrant's capital stock should be presented as deductions from stockholders' equity and not as assets.

- It should be noted generally that all amounts receivable from officers and directors resulting from sales of stock or from other transactions (other than expense advances or sales on normal trade terms) should be separately stated in the balance sheet irrespective of whether such amounts may be shown as assets or are required to be reported as deductions from stockholders' equity.

- The staff will not suggest that a receivable from an officer or director be deducted from stockholders' equity if the receivable was paid in cash prior to the publication of the financial statements and the payment date is stated in a note to the financial statements. However, the staff would consider the subsequent return of such cash payment to the officer or director to be part of a scheme or plan to evade the registration or reporting requirements of the securities laws.

### > > >    SAB Topic 4.G, Notes and Other Receivables from Affiliates

**S99-3**

The following is the text of SAB Topic 4.G, Notes and Other Receivables from Affiliates.

- Facts: The balance sheet of a corporate general partner is often presented in a registration statement. Frequently, the balance sheet of the general partner discloses that it holds notes or other receivables from a parent or another affiliate. Often the notes or other receivables were created in order

to meet the "substantial assets" test which the Internal Revenue Service utilizes in applying its "Safe Harbor" doctrine in the classification of organizations for income tax purposes.

- Question: How should such notes and other receivables be reported in the balance sheet of the general partner?

- Interpretive Response: While these notes and other receivables evidencing a promise to contribute capital are often legally enforceable, they seldom are actually paid. In substance, these receivables are equivalent to unpaid subscriptions receivable for capital shares which Rule 5-02.30 of Regulation S-X requires to be deducted from the dollar amount of capital shares subscribed.

- The balance sheet display of these or similar items is not determined by the quality or actual value of the receivable or other asset "contributed" to the capital of the affiliated general partner, but rather by the relationship of the parties and the control inherent in that relationship. Accordingly, in these situations, the receivable must be treated as a deduction from stockholders' equity in the balance sheet of the corporate general partner.

### > > >   SAB Topic 6.L, Financial Reporting Release 28—Accounting for Loan Losses by Registrants Engaged in Lending Activities

**S99-4**

The following is the text of SAB Topic 6.L, Financial Reporting Release 28—Accounting for Loan Losses by Registrants Engaged in Lending Activities.

- 1. Accounting for loan losses

  - General: GAAP for recognition of loan losses is provided by FASB ASC Subtopic 450-20, Contingencies—Loss Contingencies, and FASB ASC Subtopic 310-10, Receivables—Overall. FN6 An estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued when, based on information available prior to the issuance of the financial statements, it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated. FN7 FASB ASC Subtopic 310-10 provides more specific guidance on measurement of loan impairment and related disclosures but does not

change the fundamental recognition criteria for loan losses provided by FASB ASC 450-20.

- ▪ FN6 [Original footnote removed by SAB 114.]

- ▪ FN7 FASB ASC paragraph 450-20-25-2.

- o Further guidance for SEC registrants is provided by FRR 28, which added subsection (b), Procedural Discipline in Determining the Allowance and Provision for Loan Losses to be Reported, of Section 401.09, Accounting for Loan Losses by Registrants Engaged in Lending Activities, to the Codification of Financial Reporting Policies (hereafter referred to as FRR 28). Additionally, public companies are required to comply with the books and records provisions of the Securities Exchange Act of 1934 (Exchange Act). Under Sections 13(b)(2) - (7) of the Exchange Act, registrants must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant. Registrants also must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

- o This staff interpretation applies to all registrants that are creditors in loan transactions that, individually or in the aggregate, have a material effect on the registrant's financial statements. FN8.

- ▪ FN8 For purposes of this interpretation, a loan is defined (consistent with the FASB ASC Master Glossary) as a contractual right to receive money on demand or on fixed or determinable dates that is recognized as an asset in the creditor's statement of financial position. For purposes of this interpretation, loans do not include trade accounts receivable or notes receivable with terms less than one year or debt securities subject to the provisions of FASB ASC Topic 320, Investments—Debt and Equity Securities.

- • 2. Developing and documenting a systematic methodology

  - o a. Developing a systematic methodology.

- Facts: Registrant A, or one of its consolidated subsidiaries, engages in lending activities and is developing or performing a review of its loan loss allowance methodology.

- Question: What are some of the factors or elements that the staff normally would expect Registrant A to consider when developing (or subsequently performing an assessment of) its methodology for determining its loan loss allowance under GAAP?

- Interpretive Response: The staff normally would expect a registrant that engages in lending activities to develop and document a systematic methodology FN9 to determine its provision for loan losses and allowance for loan losses as of each financial reporting date. It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. A registrant's loan loss allowance methodology is influenced by entity-specific factors, such as an entity's size, organizational structure, business environment and strategy, management style, loan portfolio characteristics, loan administration procedures, and management information systems.

  - FN9 FRR 28 states that " the Commission's staff normally would expect to find that the books and records of registrants engaged in lending activities include documentation of [the]: (a) systematic methodology to be employed each period in determining the amount of the loan losses to be reported, and (b) rationale supporting each period's determination that the amounts reported were adequate."

- However, as indicated in the AICPA Audit and Accounting Guide, Depository and Lending Institutions with Conforming Changes as of June 1, 2009 (Audit Guide), while different institutions may use different methods, there are certain common elements that should be included in any [loan loss allowance]

==methodology for it to be effective. FN10 A registrant's loan loss allowance methodology generally should: FN11.==

- FN10 See paragraph 9.05 of the Audit Guide.

- FN11 Ibid.

- ==Include a detailed analysis of the loan portfolio, performed on a regular basis;==

- **==Consider all loans (whether on an individual or group basis);==**

- Identify loans to be evaluated for impairment on an individual basis under FASB ASC Subtopic 310-10 and segment the remainder of the portfolio ==into groups of loans with similar risk characteristics for evaluation and analysis== under FASB ASC Subtopic 450-20;

  - Consider all known relevant internal and external factors that may affect loan collectibility;

  - Be applied consistently but, when appropriate, be ==modified for new factors affecting collectibility==;

  - Consider the particular risks inherent in different kinds of lending;

  - Consider current collateral values (less costs to sell), where applicable;

  - Require that analyses, estimates, reviews and other loan loss allowance methodology functions be performed by competent and well-trained personnel;

  - ==Be based on current and reliable data;==

  - Be well documented, in writing, with clear explanations of the supporting analyses and rationale (see Question 2 below for staff views on documenting a loan loss allowance methodology); and

- Include a systematic and logical method to consolidate the loss estimates and ensure the loan loss allowance balance is recorded in accordance with GAAP.

- For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.

- Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses. FN12 Additionally, for registrants that have audit committees, the staff believes that oversight of the financial reporting and auditing of the loan loss allowance by the audit committee can strengthen the registrant's control system and process for determining its allowance for loan losses. FN13

  - FN12 For federally insured depository institutions, the December 21, 1993 "Interagency Policy Statement on the Allowance for Loan and Lease Losses (ALLL)" (the 1993 Interagency Policy Statement) indicates that boards of directors and management have certain responsibilities for the ALLL process and amounts reported. For example, as indicated on page 4 of that statement, "the board of directors and management are expected to: Ensure that the institution has an effective loan review system and controls[;] Ensure the prompt charge-off of loans, or portions of loans, that available information confirms to be uncollectible[; and] Ensure that the institution's process for determining an adequate level for the ALLL is based on a comprehensive, adequately documented, and consistently applied analysis of the institution's loan and lease portfolio."

  - FN13 SAS 61 (as amended by SAS 90) states, in part: "In connection with each SEC engagement the auditor should discuss with the audit committee the auditor's judgments about the quality, not just the acceptability, of the entity's accounting principles as applied in its financial reporting.

The discussion should include items that have a significant impact on the representational faithfulness, verifiability, and neutrality of the accounting information included in the financial statements. [Footnote omitted.] Examples of items that may have such an impact are the following: Selection of new or changes to accounting policies. Estimates, judgments, and uncertainties. Unusual transactions. Accounting policies relating to significant financial statement items, including the timing or transactions and the period in which they are recorded."

- Selection of new or changes to accounting policies

- Estimates, judgments, and uncertainties

- Unusual transactions.

- Accounting policies relating to significant financial statement items, including the timing or transactions and the period in which they are recorded."

- A systematic methodology that is properly designed and implemented should result in a registrant's best estimate of its allowance for loan losses. FN14 Accordingly, the staff normally would expect registrants to adjust their loan loss allowance balance, either upward or downward, in each period for differences between the results of the systematic determination process and the unadjusted loan loss allowance balance in the general ledger. FN15

  - FN14 Registrants should also refer to FASB ASC Section 450-20-30, Contingencies—Loss Contingencies—Initial Measurement, which provides accounting and disclosure guidance for situations in which a range of loss can be reasonably estimated but no single amount within the range appears to be a better estimate than any other amount within the range.

- ▪ FN15 Registrants should refer to the guidance on materiality in SAB Topic 1.M.

- ○ b. Documenting a systematic methodology.

  - ▪ Question 1: Assume the same facts as in the previous question in Section 2(a). What would the staff normally expect Registrant A to include in its documentation of its loan loss allowance methodology?

  - ▪ Interpretive Response: In FRR 28, the Commission provided guidance for documentation of loan loss provisions and allowances for registrants engaged in lending activities. The staff believes that appropriate written supporting documentation for the loan loss provision and allowance facilitates review of the loan loss allowance process and reported amounts, builds discipline and consistency into the loan loss allowance determination process, and improves the process for estimating loan losses by helping to ensure that all relevant factors are appropriately considered in the allowance analysis.

  - ▪ The staff, therefore, normally would expect a registrant to document the relationship between the findings of its detailed review of the loan portfolio and the amount of the loan loss allowance and the provision for loan losses reported in each period. FN16

    - ▪ FN16 FRR 28 states: "The specific rationale upon which the [loan loss allowance and provision] amount actually reported is based - i. e., the bridge between the findings of the detailed review [of the loan portfolio] and the amount actually reported in each period—would be documented to help ensure the adequacy of the reported amount, to improve auditability, and to serve as a benchmark for exercise of prudent judgment in future periods."

  - ▪ The staff normally would expect to find that registrants maintain written supporting documentation for the following decisions, strategies, and processes: FN17

- FN17 Paragraph 9.64 in the Audit Guide outlines specific aspects of effective internal control related to the allowance for loan losses. These specific aspects include the control environment ("management communication of the need for proper reporting of the allowance"); management reports that summarize loan activity and the institution's procedures and controls ("accumulation of relevant, sufficient, and reliable data on which to base management's estimate of the allowance"); "independent loan review;" review of information and assumptions ("adequate review and approval of the allowance estimates by the individuals specified in management's written policy"); and assessment of the process ("comparison of prior estimates related to the allowance with subsequent results to assess the reliability of the process used to develop the allowance").

- Policies and procedures:

    - Over the systems and controls that maintain an appropriate loan loss allowance, and

    - Over the loan loss allowance methodology;

- Loan grading system or process;

- Summary or consolidation of the loan loss allowance balance;

- Validation of the loan loss allowance methodology; and

- Periodic adjustments to the loan loss allowance process.

- Question 2: The Interpretive Response to Question 2 indicates that the staff normally would expect to find that registrants maintain written supporting documentation for their loan loss allowance policies and procedures. In the staff's view, what aspects of a registrant's loan loss allowance internal accounting control systems and processes would appropriately be addressed in its written policies and procedures?

- Interpretive Response: The staff is aware that registrants utilize a wide range of policies, procedures, and control systems in their loan loss allowance processes, and these policies, procedures, and systems are tailored to the size and complexity of the registrant and its loan portfolio. However, the staff believes that, in order for a registrant's loan loss allowance methodology to be effective, the registrant's written policies and procedures for the systems and controls that maintain an appropriate loan loss allowance would likely address the following:

  - The roles and responsibilities of the registrant's departments and personnel (including the lending function, credit review, financial reporting, internal audit, senior management, audit committee, board of directors, and others, as applicable) who determine or review, as applicable, the loan loss allowance to be reported in the financial statements; FN18

    - FN18 Paragraph 9.64 of the Audit Guide discusses "management communication of the need for proper reporting of the allowance." As indicated in that paragraph, the "control environment strongly influences the effectiveness of the system of controls and reflects the overall attitude, awareness, and action of the board of directors and management concerning the importance of control."

  - The registrant's accounting policies for loans and loan losses, including the policies for charge-offs and recoveries and for estimating the fair value of collateral, where applicable; FN19

    - FN19 Paragraph 9.56 of the Audit Guide refers to the documentation, for disclosure purposes, that an entity should include in the notes to the financial statements describing the accounting policies the

entity used to estimate its allowance and related provision for loan losses.

- The description of the registrant's systematic methodology, which should be consistent with the registrant's accounting policies for determining its loan loss allowance (see Question 4 below for further discussion); FN20 and

  - FN20 Ibid. As indicated in paragraph 9.56, "[s]uch a description should identify the factors that influenced management's judgment (for example, historical losses and existing economic conditions) and may also include discussion of risk elements relevant to particular categories of financial instruments."

- The system of internal controls used to ensure that the loan loss allowance process is maintained in accordance with GAAP. FN21

  - FN21 See also paragraph 9.64 in the Audit Guide which provides information about specific aspects of effective internal control related to the allowance for loan losses.

- The staff normally would expect an internal control system FN22 for the loan loss allowance estimation process to:

  - 
  - FN22 Ibid. Public companies are required to comply with the books and records provisions of the Exchange Act. Under Sections 13(b)(2) - (7) of the Exchange Act, registrants must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant. Registrants also must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions

are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

- Include measures to provide assurance regarding the reliability FN23 and integrity of information and compliance with laws, regulations, and internal policies and procedures; FN24

  - FN23 Concepts Statement 2, *Qualitative Characteristics of Accounting Information*, provides guidance on "reliability" as a primary quality of accounting information.

  - FN24 Section 13(b)(2) - (7) of the Exchange Act.

- Reasonably assure that the registrant's financial statements are prepared in accordance with GAAP; and

- Include a well-defined loan review process. FN25

  - FN25 As indicated in paragraph 9.05, item a, in the Audit Guide, a loan loss allowance methodology should "include a detailed and regular analysis of the loan portfolio." Paragraphs 9.06 to 9.13 provide additional information on how creditors traditionally identify and review loans on an individual basis and review or analyze loans on a group or pool basis.

- A well-defined loan review process FN26 typically contains:

  - FN26 Ibid. Additionally, paragraph 9.64 in the Audit Guide provides guidance on the loan review process. As stated in that paragraph, "[m]anagement reports summarizing loan activity, renewals, and delinquencies are vital to the timely identification of problem loans." The paragraph further states: "Loan reviews should be conducted by institution personnel who are independent of the underwriting, supervision, and collections functions. The specific lines of reporting depend on the complexity of the

institution's organizational structure, but the loan reviewers should report to a high level of management that is independent from the lending process in the institution."

- An effective loan grading system that is consistently applied, identifies differing risk characteristics and loan quality problems accurately and in a timely manner, and prompts appropriate administrative actions; FN27

  - FN27 Ibid.

- **Sufficient internal controls to ensure that all relevant loan review information is appropriately considered in estimating losses. This includes maintaining appropriate reports, details of reviews performed, and identification of personnel involved**; FN28 and

  - FN28 Ibid.

- Clear formal communication and coordination between a registrant's credit administration function, financial reporting group, management, board of directors, and others who are involved in the loan loss allowance determination or review process, as applicable (e. g., written policies and procedures, management reports, audit programs, and committee minutes). FN29

  - FN29 Ibid.

- Question 3: The Interpretive Response to Question 3 indicates that the staff normally would expect a registrant's written loan loss allowance policies and procedures to include a description of the registrant's systematic allowance methodology, which should be consistent with its accounting policies for determining its loan loss allowance. What elements of a registrant's loan loss allowance methodology would the staff normally expect to be described in the registrant's written policies and procedures?

- Interpretive Response: The staff normally would expect a registrant's written policies and procedures to describe the primary elements of its loan loss allowance methodology, including portfolio segmentation and impairment measurement. The staff normally would expect that, in order for a registrant's loan loss allowance methodology to be effective, the registrant's written policies and procedures would describe the methodology:

  - For segmenting the portfolio:

  - How the segmentation process is performed (i. e., by loan type, industry, risk rates, etc.); FN30

    - FN30 Paragraph 9.07 in the Audit Guide states that "creditors have traditionally identified loans that are to be evaluated for collectibility by dividing the loan portfolio into different segments. Loans with similar risk characteristics, such as risk classification, past-due status, and type of loan should be grouped together." Paragraph 9.08 provides additional guidance on classifying individual loans and paragraph 9.13 indicates considerations for groups or pools of loans.

  - When a loan grading system is used to segment the portfolio:

    - The definitions of each loan grade;

    - A reconciliation of the internal loan grades to supervisory loan grades, if applicable; and

    - The delineation of responsibilities for the loan grading system.

  - For determining and measuring impairment under FASB ASC Subtopic 310-10: FN31

    - FN31 See FASB ASC paragraphs 310-10-35-16 through 310-10-35-19 on recognition of

impairment and FASB ASC paragraphs 310-10-35-20 through 310-10-35-37 on measurement of impairment.

- The methods used to identify loans to be analyzed individually;

- For individually reviewed loans that are impaired, how the amount of any impairment is determined and measured, including:

    - Procedures describing the impairment measurement techniques available; and

    - Steps performed to determine which technique is most appropriate in a given situation.

- The methods used to determine whether and how loans individually evaluated under FASB ASC Subtopic 310-10, but not considered to be individually impaired, should be grouped with other loans that share common characteristics for impairment evaluation under FASB ASC Subtopic 450-20. FN32

    - FN32 See FASB ASC paragraph 310-10-35-36.

- For determining and measuring impairment under FASB ASC Subtopic 450-20: FN33

    -
    - FN33 See FASB ASC paragraph 450-20-25-2 on accrual of loss contingencies and FASB ASC paragraphs 310-10-35-5 through 310-10-35-11 on collectibility of receivables.

  - How loans with similar characteristics are grouped to be evaluated for loan collectibility (such as loan type, past-due status, and risk);

  - How loss rates are determined (e. g., historical loss rates adjusted for environmental factors or

migration analysis) and what factors are considered when establishing appropriate time frames over which to evaluate loss experience; and

- Descriptions of qualitative factors (e. g., industry, geographical, economic, and political factors) that may affect loss rates or other loss measurements.

- 3. Applying a systematic methodology - measuring and documenting loan losses under FASB ASC Subtopic 310-10

  - a. Measuring and documenting loan losses under FASB ASC Subtopic 310-10.

    - Facts: Approximately one-third of Registrant B's commercial loan portfolio consists of large balance, non-homogeneous loans. Due to their large individual balances, these loans meet the criteria under Registrant B's policies and procedures for individual review for impairment under FASB ASC Subtopic 310-10.

    - Upon review of the large balance loans, Registrant B determines that certain of the loans are impaired as defined by FASB ASC Subtopic 310-10. FN34

      - FN34 FASB ASC paragraph 310-10-35-8 provides that a loan is impaired when, based on current information and events, it is probable that all amounts due will not be collected pursuant to the terms of the loan agreement.

    - Question: For the commercial loans reviewed under FASB ASC Subtopic 310-10 that are individually impaired, how would the staff normally expect Registrant B to measure and document the impairment on those loans? Can it use an impairment measurement method other than the methods allowed by FASB ASC Subtopic 310-10?

    - Interpretive Response: For those loans that are reviewed individually under FASB ASC Subtopic 310-10 and considered individually impaired, Registrant B must use one of the methods

for measuring impairment that is specified by FASB ASC Subtopic 310-10 (that is, the present value of expected future cash flows, the loan's observable market price, or the fair value of collateral). FN35 Accordingly, in the circumstances described above, for the loans considered individually impaired under FASB ASC Subtopic 310-10, it would not be appropriate for Registrant B to choose a measurement method not prescribed by FASB ASC Subtopic 310-10. For example, it would not be appropriate to measure loan impairment by applying a loss rate to each loan based on the average historical loss percentage for all of its commercial loans for the past five years.

- FN35 See FASB ASC paragraph 310-10-35-22.

- The staff normally would expect Registrant B to maintain as sufficient, objective evidence FN36 written documentation to support its measurement of loan impairment under FASB ASC Subtopic 310-10. FN37 If Registrant B uses the present value of expected future cash flows to measure impairment of a loan, it should document the amount and timing of cash flows, the effective interest rate used to discount the cash flows, and the basis for the determination of cash flows, including consideration of current environmental factors FN38 and other information reflecting past events and current conditions. If Registrant B uses the fair value of collateral to measure impairment, the staff normally would expect to find that Registrant B had documented how it determined the fair value, including the use of appraisals, valuation assumptions and calculations, the supporting rationale for adjustments to appraised values, if any, and the determination of costs to sell, if applicable, appraisal quality, and the expertise and independence of the appraiser. FN39 Similarly, the staff normally would expect to find that Registrant B had documented the amount, source, and date of the observable market price of a loan, if that method of measuring loan impairment is used.

  - FN36 Under GAAS, auditors should obtain "sufficient competent evidential matter" to support its audit opinion. See AU Section 326. The staff normally would expect

registrants to maintain such evidential matter for its allowances for loan losses for use by the auditors in conducting their annual audit.

▪ FN37 Paragraph 9.74 in the Audit Guide outlines sources of information, available from management, that the independent accountant should consider in identifying loans that contain high credit risk or other significant exposures and concentrations. These sources of information would also likely include documentation of loan impairment under FASB ASC Subtopic 310-10 or FASB ASC Subtopic 450-20. Additionally, as indicated in paragraphs 9.85 to 9.97 of the Audit Guide, the independent accountant, in conducting an audit, may perform a detailed loan file review for selected loans. A registrant's loan files may contain documentation about borrowers' financial resources and cash flows (see paragraph 9.92) or about the collateral securing the loans, if applicable (see paragraphs 9.94 and 9.95).

▪ FN38 FASB ASC paragraph 310-10-35-27 indicates that environmental factors include existing industry, geographical, economic, and political factors.

▪ FN39 See paragraphs 9.94 and 9.95 in the Audit Guide for additional information about documentation of loan collateral.

○ b. Measuring and documenting loan losses under FASB ASC Subtopic 310-10 for a collateral dependent loan.

▪ Facts: Registrant C has a $10 million loan outstanding to Company X that is secured by real estate, which Registrant C individually evaluates under FASB ASC Subtopic 310-10 due to the loan's size. Company X is delinquent in its loan payments under the terms of the loan agreement. Accordingly, Registrant C determines that its loan to Company X is impaired, as defined by FASB ASC Subtopic 310-10. Because the loan is collateral dependent, Registrant C measures impairment of the loan based

on the fair value of the collateral. Registrant C determines that the most recent valuation of the collateral was performed by an appraiser eighteen months ago and, at that time, the estimated value of the collateral (fair value less costs to sell) was $12 million.

▪ Registrant C believes that certain of the assumptions that were used to value the collateral eighteen months ago do not reflect current market conditions and, therefore, the appraiser's valuation does not approximate current fair value of the collateral.

▪ Several buildings, which are comparable to the real estate collateral, were recently completed in the area, increasing vacancy rates, decreasing lease rates, and attracting several tenants away from the borrower. Accordingly, credit review personnel at Registrant C adjust certain of the valuation assumptions to better reflect the current market conditions as they relate to the loan's collateral. FN40 After adjusting the collateral valuation assumptions, the credit review department determines that the current estimated fair value of the collateral, less costs to sell, is $8 million. FN41 Given that the recorded investment in the loan is $10 million, Registrant C concludes that the loan is impaired by $2 million and records an allowance for loan losses of $2 million.

   ▪ FN40 When reviewing collateral dependent loans, Registrant C may often find it more appropriate to obtain an updated appraisal to estimate the effect of current market conditions on the appraised value instead of internally estimating an adjustment.

   ▪ FN41 An auditor who uses the work of a specialist, such as an appraiser, in performing an audit in accordance with GAAS should refer to the guidance in SAS 73 (AU Section 336).

▪ Question: What documentation would the staff normally expect Registrant C to maintain to support its determination of the

allowance for loan losses of $2 million for the loan to Company X?

- Interpretive Response: The staff normally would expect Registrant C to document that it measured impairment of the loan to Company X by using the fair value of the loan's collateral, less costs to sell, which it estimated to be $8 million. FN42 This documentation FN43 should include the registrant's rationale and basis for the $8 million valuation, including the revised valuation assumptions it used, the valuation calculation, and the determination of costs to sell, if applicable.

    - FN42 See paragraphs 9.94 to 9.95 in the Audit Guide for further information about documentation of loan collateral and associated audit procedures that may be performed by the independent accountant.

    - FN43 As stated in paragraph 9.14 of the Audit Guide, "[t]he approach for determination of the allowance should be well documented."

- Because Registrant C arrived at the valuation of $8 million by modifying an earlier appraisal, it should document its rationale and basis for the changes it made to the valuation assumptions that resulted in the collateral value declining from $12 million eighteen months ago to $8 million in the current period.

- c. Measuring and documenting loan losses under FASB ASC Subtopic 310-10 - fully collateralized loans.

    - Question: In the staff's view, what is an example of an acceptable documentation practice for a registrant to adequately support its determination that no allowance for loan losses should be recorded for a group of loans because the loans are fully collateralized?

    - Interpretive Response: Consider the following fact pattern: Registrant D has $10 million in loans that are fully collateralized by highly rated debt securities with readily determinable market values. The loan agreement for each of these loans requires the

borrower to provide qualifying collateral sufficient to maintain a loan-to-value ratio with sufficient margin to absorb volatility in the securities' market prices. Registrant D's collateral department has physical control of the debt securities through safekeeping arrangements. In addition, Registrant D perfected its security interest in the collateral when the funds were originally distributed. On a quarterly basis, Registrant D's credit administration function determines the market value of the collateral for each loan using two independent market quotes and compares the collateral value to the loan carrying value. If there are any collateral deficiencies, Registrant D notifies the borrower and requests that the borrower immediately remedy the deficiency. Due in part to its efficient operation, Registrant D has historically not incurred any material losses on these loans. Registrant D believes these loans are fully-collateralized and therefore does not maintain any loan loss allowance balance for these loans.

▪ Registrant D's management summary of the loan loss allowance includes documentation indicating that, in accordance with its loan loss allowance policy, the collateral protection on these loans has been verified by the registrant, no probable loss has been incurred, and no loan loss allowance is necessary.

▪ Documentation in Registrant D's loan files includes the two independent market quotes obtained each quarter for each loan's collateral amount, the documents evidencing the perfection of the security interest in the collateral, and other relevant supporting documents. Additionally, Registrant D's loan loss allowance policy includes a discussion of how to determine when a loan is considered "fully collateralized" and does not require a loan loss allowance. Registrant D's policy requires the following factors to be considered and its findings concerning these factors to be fully documented:

  ▪ Volatility of the market value of the collateral;

  ▪ Recency and reliability of the appraisal or other valuation;

- Recency of the registrant's or third party's inspection of the collateral;

- Historical losses on similar loans;

- Confidence in the registrant's lien or security position including appropriate:

  - Type of security perfection (e. g., physical possession of collateral or secured filing);

  - Filing of security perfection (i. e., correct documents and with the appropriate officials); and

  - Relationship to other liens; and

- Other factors as appropriate for the loan type.

- In the staff's view, Registrant D's documentation supporting its determination that certain of its loans are fully collateralized, and no loan loss allowance should be recorded for those loans, is acceptable under FRR 28.

- 4. Applying a systematic methodology - measuring and documenting loan losses under FASB ASC Subtopic 450-20

  - a. Measuring and documenting loan losses under FASB ASC Subtopic 450-20.

    - Question 1: In the staff's view, what are some general considerations for a registrant in applying its systematic methodology to measure and document loan losses under FASB ASC Subtopic 450-20?

    - Interpretive Response: For loans evaluated on a group basis under FASB ASC Subtopic 450-20, the staff believes that a registrant should segment the loan portfolio by identifying risk characteristics that are common to groups of loans. FN44 Registrants typically decide how to segment their loan portfolios based on many factors, which vary with their business strategies as well as their information system capabilities.

Regardless of the segmentation method used, the staff normally would expect a registrant to maintain documentation to support its conclusion that the loans in each segment have similar attributes or characteristics. As economic and other business conditions change, registrants often modify their business strategies, which may result in adjustments to the way in which they segment their loan portfolio for purposes of estimating loan losses. The staff normally would expect registrants to maintain documentation to support these segmentation adjustments. FN45

- FN44 Paragraph 9.07 of the Audit Guide indicates that "loans with similar risk characteristics, such as risk classification, past-due status, and type of loan, should be grouped together."

- FN45 Segmentation of the loan portfolio is a standard element in a loan loss allowance methodology. As indicated in paragraph 9.05 of the Audit Guide, the loan loss allowance methodology "should be well documented, with clear explanations of the supporting analyses and rationale."

- Based on the segmentation of the loan portfolio, a registrant should estimate the FASB ASC Subtopic 450-20 portion of its loan loss allowance. For those segments that require an allowance for loan losses, FN46 the registrant should estimate the loan losses, on at least a quarterly basis, based upon its ongoing loan review process and analysis of loan performance. FN47 The registrant should follow a systematic and consistently applied approach to select the most appropriate loss measurement methods and support its conclusions and rationale with written documentation. FN48

  - FN46 An example of a loan segment that does not generally require an allowance for loan losses is a group of loans that are fully secured by deposits maintained at the lending institution.

- ▪ FN47 FRR 28 refers to a "systematic methodology to be employed each period" in determining provisions and allowances for loan losses. As indicated in FRR 28, the staff normally would expect that the systematic methodology would be documented "to help ensure that all matters affecting loan collectibility will consistently be identified in the detailed [loan] review process."

- ▪ FN48 Ibid. Also, as indicated in paragraph 9.05 of the Audit Guide, the loan loss allowance methodology "should be well documented, with clear explanations of the supporting analyses and rationale." Further, as indicated in paragraph 9.14 of the Audit Guide, "[t]he approach for determination of the allowance should be well documented."

- ▪ Facts: After identifying certain loans for evaluation under FASB ASC Subtopic 310-10, Registrant E segments its remaining loan portfolio into five pools of loans. For three of the pools, it measures loan impairment under FASB ASC Subtopic 450-20 by applying historical loss rates, adjusted for relevant environmental factors, to the pools' aggregate loan balances. For the remaining two pools of loans, Registrant E uses a loss estimation model that is consistent with GAAP to measure loan impairment under FASB ASC Subtopic 450-20.

- ▪ Question 2: What documentation would the staff normally expect Registrant E to prepare to support its loan loss allowance for its pools of loans under FASB ASC Subtopic 450-20?

- ▪ Interpretive Response: Regardless of the method used to determine loan loss measurements under FASB ASC 450-20, Registrant E should demonstrate and document that the loss measurement methods used to estimate the loan loss allowance for each segment of its loan portfolio are determined in accordance with GAAP as of the financial statement date. FN49

  - ▪ FN49 Refer to FASB ASC paragraph 450-20-25-2(b). Also, as indicated in FASB ASC paragraph 310-10-35-4(c),

"[t]he approach for determination of the allowance shall be well documented and applied consistently from period to period."

▪ As indicated for Registrant E, one method of estimating loan losses for groups of loans is through the application of loss rates to the groups' aggregate loan balances. Such loss rates typically reflect the registrant's historical loan loss experience for each group of loans, adjusted for relevant environmental factors (e.g., industry, geographical, economic, and political factors) over a defined period of time. If a registrant does not have loss experience of its own, it may be appropriate to reference the loss experience of other companies in the same business, provided that the registrant demonstrates that the attributes of the loans in its portfolio segment are similar to those of the loans included in the portfolio of the registrant providing the loss experience. FN50 Registrants should maintain supporting documentation for the technique used to develop their loss rates, including the period of time over which the losses were incurred. If a range of loss is determined, registrants should maintain documentation to support the identified range and the rationale used for determining which estimate is the best estimate within the range of loan losses. FN51

> ▪ FN50 Refer to FASB ASC paragraphs 310-10-35-10 through 310-10-35-11.

> ▪ FN51 Registrants should also refer to FASB ASC Subtopic 450-20, which provides guidance for situations in which a range of loss can be reasonably estimated but no single amount within the range appears to be a better estimate than any other amount within the range. Also, paragraph 9.14 of the Audit Guide notes the use of "a method that results in a range of estimates for the allowance," except for impairment measurement under FASB ASC Subtopic 310-10, which is based on a single best estimate and not a range of estimates. Paragraph 9.14 also states that "[t]he approach for determination of the allowance should be well documented."

- The staff normally would expect that, before employing a loss estimation model, a registrant would evaluate and modify, as needed, the model's assumptions to ensure that the resulting loss estimate is consistent with GAAP. In order to demonstrate consistency with GAAP, registrants that use loss estimation models should typically document the evaluation, the conclusions regarding the appropriateness of estimating loan losses with a model or other loss estimation tool, and the objective support for adjustments to the model or its results. FN52

    - FN52 The systematic methodology (including, if applicable, loss estimation models) used to determine loan loss provisions and allowances should be documented in accordance with FRR 28, paragraph 9.05 of the Audit Guide, and FASB ASC Subtopic 310-10.

- In developing loss measurements, registrants should consider the impact of current environmental factors and then document which factors were used in the analysis and how those factors affected the loss measurements. Factors that should be considered in developing loss measurements include the following: FN53

    - 
        - FN53 Refer to paragraph 9.13 in the Audit Guide.

    - Levels of and trends in delinquencies and impaired loans;

    - Levels of and trends in charge-offs and recoveries;

    - Trends in volume and terms of loans;

    - Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;

    - Experience, ability, and depth of lending management and other relevant staff;

    - National and local economic trends and conditions;

- Industry conditions; and

- Effects of changes in credit concentrations.

- For any adjustment of loss measurements for environmental factors, a registrant should maintain sufficient, objective evidence FN54 (a) to support the amount of the adjustment and (b) to explain why the adjustment is necessary to reflect current information, events, circumstances, and conditions in the loss measurements.

  - FN54 AU 326 describes the "sufficient competent evidential matter" that auditors must consider in accordance with GAAS.

- b. Measuring and documenting loan losses under FASB ASC Subtopic 450-20 - adjusting loss rates.

  - Facts: Registrant F's lending area includes a metropolitan area that is financially dependent upon the profitability of a number of manufacturing businesses. These businesses use highly specialized equipment and significant quantities of rare metals in the manufacturing process. Due to increased low-cost foreign competition, several of the parts suppliers servicing these manufacturing firms declared bankruptcy. The foreign suppliers have subsequently increased prices and the manufacturing firms have suffered from increased equipment maintenance costs and smaller profit margins.

  - Additionally, the cost of the rare metals used in the manufacturing process increased and has now stabilized at double last year's price. Due to these events, the manufacturing businesses are experiencing financial difficulties and have recently announced downsizing plans.

  - Although Registrant F has yet to confirm an increase in its loss experience as a result of these events, management knows that it lends to a significant number of businesses and individuals whose repayment ability depends upon the long-term viability of the manufacturing businesses. Registrant F's management has

identified particular segments of its commercial and consumer customer bases that include borrowers highly dependent upon sales or salary from the manufacturing businesses. Registrant F's management performs an analysis of the affected portfolio segments to adjust its historical loss rates used to determine the loan loss allowance. In this particular case, Registrant F has experienced similar business and lending conditions in the past that it can compare to current conditions.

▪ Question: How would the staff normally expect Registrant F to document its support for the loss rate adjustments that result from considering these manufacturing firms' financial downturns? FN55

　　▪ FN55 This question and response would also apply to other registrant fact patterns in which the registrant adjusts loss rates for environmental factors.

▪ Interpretive Response: The staff normally would expect Registrant F to document its identification of the particular segments of its commercial and consumer loan portfolio for which it is probable that the manufacturing business' financial downturn has resulted in loan losses. In addition, the staff normally would expect Registrant F to document its analysis that resulted in the adjustments to the loss rates for the affected portfolio segments. FN56 The staff normally would expect that, as part of its documentation, Registrant F would maintain copies of the documents supporting the analysis, which may include relevant economic reports, economic data, and information from individual borrowers.

　　▪ FN56 Paragraph 9.56 of the Audit Guide refers to the documentation, for disclosure purposes, that an entity should include in the notes to the financial statements describing the accounting policies and methodology the entity used to estimate its allowance and related provision for loan losses. As indicated in paragraph 9.56, "[s]uch a description should identify the factors that influenced management's judgment (for example,

historical losses and existing economic conditions) and may also include discussion of risk elements relevant to particular categories of financial instruments."

- Because in this case Registrant F has experienced similar business and lending conditions in the past, it should consider including in its supporting documentation an analysis of how the current conditions compare to its previous loss experiences in similar circumstances. The staff normally would expect that, as part of Registrant F's effective loan loss allowance methodology, it would create a summary of the amount and rationale for the adjustment factor for review by management prior to the issuance of the financial statements. FN57

  - FN57 Paragraph 9.64 in the Audit Guide indicates that effective internal control related to the allowance for loan losses should include "accumulation of relevant, sufficient, and reliable data on which to base management's estimate of the allowance."

- c. Measuring and documenting loan losses under FASB ASC Subtopic 450-20 estimating losses on loans individually reviewed for impairment but not considered individually impaired.

  - Facts: Registrant G has outstanding loans of $2 million to Company Y and $1 million to Company Z, both of which are paying as agreed upon in the loan documents. The registrant's loan loss allowance policy specifies that all loans greater than $750,000 must be individually reviewed for impairment under FASB ASC Subtopic 310-10. Company Y's financial statements reflect a strong net worth, good profits, and ongoing ability to meet debt service requirements. In contrast, recent information indicates Company Z's profitability is declining and its cash flow is tight. Accordingly, this loan is rated substandard under the registrant's loan grading system. Despite its concern, management believes Company Z will resolve its problems and determines that neither loan is individually impaired as defined by FASB ASC Subtopic 310-10.

- Registrant G segments its loan portfolio to estimate loan losses under FASB ASC Subtopic 450-20. Two of its loan portfolio segments are Segment 1 and Segment 2. The loan to Company Y has risk characteristics similar to the loans included in Segment 1 and the loan to Company Z has risk characteristics similar to the loans included in Segment 2. FN58

  - FN58 These groups of loans do not include any loans that have been individually reviewed for impairment under FASB ASC Section 310-10-35, Receivables—Overall— Subsequent Measurement, and determined to be impaired as defined by FASB ASC Section 310-10-35.

- In its determination of its loan loss allowance under FASB ASC Subtopic 450-20, Registrant G includes its loans to Company Y and Company Z in the groups of loans with similar characteristics (i. e., Segment 1 for Company Y's loan and Segment 2 for Company Z's loan). FN59 Management's analyses of Segment 1 and Segment 2 indicate that it is probable that each segment includes some losses, even though the losses cannot be identified to one or more specific loans. Management estimates that the use of its historical loss rates for these two segments, with adjustments for changes in environmental factors, provides a reasonable estimate of the registrant's probable loan losses in these segments.

  - FN59 FASB ASC paragraph 310-10-35-36 states that if a creditor concludes that an individual loan specifically identified for evaluation is not impaired under FASB ASC Subtopic 310-10, that loan may be included in the assessment of the allowance for loan losses under FASB ASC Subtopic 450-20, but only if specific characteristics of the loan indicate that it is probable that there would be an incurred loss in a group of loans with those characteristics.

- Question: How would the staff normally expect Registrant G to adequately document a loan loss allowance under FASB ASC

Subtopic 450-20 for these loans that were individually reviewed for impairment but are not considered individually impaired?

▪ Interpretive Response: The staff normally would expect that, as part of Registrant G's effective loan loss allowance methodology, it would document its decision to include its loans to Company Y and Company Z in its determination of its loan loss allowance under FASB ASC Subtopic 450-20. FN60 The staff also normally would expect that Registrant G would document the specific characteristics of the loans that were the basis for grouping these loans with other loans in Segment 1 and Segment 2, respectively. FN61 Additionally, the staff normally would expect Registrant G to maintain documentation to support its method of estimating loan losses for Segment 1 and Segment 2, which typically would include the average loss rate used, the analysis of historical losses by loan type and by internal risk rating, and support for any adjustments to its historical loss rates. FN62 The registrant would typically maintain copies of the economic and other reports that provided source data.

  ▪ FN60 Paragraph 9.05 in the Audit Guide indicates that an entity's method of estimating credit losses should "include a detailed and regular analysis of the loan portfolio," "consider all loans (whether on an individual or pool-of-loans basis)," "be based on current and reliable data," and "be well documented, with clear explanations of the supporting analyses and rationale." FASB ASC paragraph 310-10-35-36 provides guidance as to the analysis to be performed when determining whether a loan that is not individually impaired under FASB ASC Subtopic 310-10 should be included in the assessment of the loan loss allowance under FASB ASC Subtopic 450-20.

  ▪ FN61 Ibid.

  ▪ FN62 Ibid.

▪ When measuring and documenting loan losses, Registrant G should take steps to prevent layering loan loss allowances.

Layering is the inappropriate practice of recording in the allowance more than one amount for the same probable loan loss. Layering can happen when a registrant includes a loan in one segment, determines its best estimate of loss for that loan either individually or on a group basis (after taking into account all appropriate environmental factors, conditions, and events), and then includes the loan in another group, which receives an additional loan loss allowance amount.

- 5. Documenting the results of a systematic methodology

  - a. Documenting the results of a systematic methodology - general.

    - Facts: Registrant H has completed its estimation of its loan loss allowance for the current reporting period, in accordance with GAAP, using its established systematic methodology.

    - Question: What summary documentation would the staff normally expect Registrant H to prepare to support the amount of its loan loss allowance to be reported in its financial statements?

    - Interpretive Response: The staff normally would expect that, to verify that loan loss allowance balances are presented fairly in accordance with GAAP and are auditable, management would prepare a document that summarizes the amount to be reported in the financial statements for the loan loss allowance. FN63 Common elements that the staff normally would expect to find documented in loan loss allowance summaries include: FN64

      - 
      - FN63 FRR 28 states: "[t]he specific rationale upon which the [loan loss allowance and provision] amount actually reported is based-i. e., the bridge between the findings of the detailed review [of the loan portfolio] and the amount actually reported in each period-would be documented to help ensure the adequacy of the reported amount, to improve auditability, and to serve as a benchmark for exercise of prudent judgment in future periods."

- FN64 See also paragraph 9.14 of the Audit Guide.

- The estimate of the probable loss or range of loss incurred for each category evaluated (e. g., individually evaluated impaired loans, homogeneous pools, and other groups of loans that are collectively evaluated for impairment);

- The aggregate probable loss estimated using the registrant's methodology;

- A summary of the current loan loss allowance balance;

- The amount, if any, by which the loan loss allowance balance is to be adjusted; FN65 and

  - FN65 Subsequent to adjustments, the staff normally would expect that there would be no material differences between the consolidated loss estimate, as determined by the methodology, and the final loan loss allowance balance reported in the financial statements. Registrants should refer to SAB 99 and SAS 89 and their amendments to AU Section 310.

- Depending on the level of detail that supports the loan loss allowance analysis, detailed subschedules of loss estimates that reconcile to the summary schedule.

- Generally, a registrant's review and approval process for the loan loss allowance relies upon the data provided in these consolidated summaries. There may be instances in which individuals or committees that review the loan loss allowance methodology and resulting allowance balance identify adjustments that need to be made to the loss estimates to provide a better estimate of loan losses. These changes may be due to information not known at the time of the initial loss estimate (e. g., information that surfaces after determining and adjusting, as necessary, historical loss rates, or a recent decline in the marketability of property after conducting a FASB ASC

Subtopic [310-10](#) valuation based upon the fair value of collateral). It is important that these adjustments are consistent with GAAP and are reviewed and approved by appropriate personnel. FN66 Additionally, it would typically be appropriate for the summary to provide each subsequent reviewer with an understanding of the support behind these adjustments. Therefore, the staff normally would expect management to document the nature of any adjustments and the underlying rationale for making the changes. FN67

- FN66 Paragraph 9.64 in the Audit Guide indicates that effective internal control related to the allowance for loan losses should include "adequate review and approval of the allowance estimates by the individuals specified in management's written policy."

- FN67 See the guidance in paragraph 9.14 of the Audit Guide ("[t]he approach for determination of the allowance should be well documented") and in FRR 28 ("the specific rationale upon which the amount actually reported in each individual period is based would be documented").

- The staff also normally would expect this documentation to be provided to those among management making the final determination of the loan loss allowance amount. FN68

  - FN68 Ibid.

o b. Documenting the results of a systematic methodology allowance adjustments.

- Facts: Registrant I determines its loan loss allowance using an established systematic process. At the end of each reporting period, the accounting department prepares a summary schedule that includes the amount of each of the components of the loan loss allowance, as well as the total loan loss allowance amount, for review by senior management, including the Credit Committee. Members of senior management meet to discuss the loan loss allowance. During these discussions, they identify changes that are required by GAAP to be made to certain of the

loan loss allowance estimates. As a result of the adjustments made by senior management, the total amount of the loan loss allowance changes. However, senior management (or its designee) does not update the loan loss allowance summary schedule to reflect the adjustments or reasons for the adjustments. When performing their audit of the financial statements, the independent accountants are provided with the original loan loss allowance summary schedule reviewed by senior management, as well as a verbal explanation of the changes made by senior management when they met to discuss the loan loss allowance.

▪ Question: In the staff's view, are Registrant I's documentation practices related to the balance of its loan loss allowance in compliance with existing documentation guidance in this area?

▪ Interpretive Response: No. A registrant should maintain supporting documentation for the loan loss allowance amount reported in its financial statements. FN69 As illustrated above, there may be instances in which loan loss allowance reviewers identify adjustments that need to be made to the loan loss estimates. The staff normally would expect the nature of the adjustments, how they were measured or determined, and the underlying rationale for making the changes to the loan loss allowance balance to be documented. FN70 The staff also normally would expect appropriate documentation of the adjustments to be provided to management for review of the final loan loss allowance amount to be reported in the financial statements. This documentation should also be made available to the independent accountants. If changes frequently occur during management or credit committee reviews of the loan loss allowance, management may find it appropriate to analyze the reasons for the frequent changes and to reassess the methodology the registrant uses. FN71

  ▪ FN69 Ibid.

  ▪ FN70 Ibid.

- ▪ FN71 As outlined in paragraph 9.64 of the Audit Guide, effective internal controls related to the allowance for loan losses should include adequate review and approval of allowance estimates, including review of sources of relevant information, review of development of assumptions, review of reasonableness of assumptions and resulting estimates, and consideration of changes in previously established methods to arrive at the allowance.

- 6. Validating a systematic methodology

  - o Question: What is the staff's guidance to a registrant on validating, and documenting the validation of, its systematic methodology used to estimate loan loss allowances?

  - o Interpretive Response: The staff believes that a registrant's loan loss allowance methodology is considered valid when it accurately estimates the amount of loss contained in the portfolio. Thus, the staff normally would expect the registrant's methodology to include procedures that adjust loan loss estimation methods to reduce differences between estimated losses and actual subsequent charge-offs, as necessary. To verify that the loan loss allowance methodology is valid and conforms to GAAP, the staff believes it is appropriate for management to establish internal control policies, FN72 appropriate for the size of the registrant and the type and complexity of its loan products. These policies may include procedures for a review, by a party who is independent of the allowance for loan losses estimation process, of the allowance for loan losses methodology and its application in order to confirm its effectiveness.

    - ▪ FN72 Ibid.

  - o In practice, registrants employ numerous procedures when validating the reasonableness of their loan loss allowance methodology and determining whether there may be deficiencies in their overall methodology or loan grading process. Examples are:

    - ▪ A review of trends in loan volume, delinquencies, restructurings, and concentrations.

- ▪ A review of previous charge-off and recovery history, including an evaluation of the timeliness of the entries to record both the charge-offs and the recoveries.

- ▪ A review by a party that is independent of the loan loss allowance estimation process. This often involves the independent party reviewing, on a test basis, source documents and underlying assumptions to determine that the established methodology develops reasonable loss estimates.

- ▪ An evaluation of the appraisal process of the underlying collateral. This may be accomplished by periodically comparing the appraised value to the actual sales price on selected properties sold.

- ○ It is the staff's understanding that, in practice, management usually supports the validation process with the workpapers from the loan loss allowance review function. Additional documentation often includes the summary findings of the independent reviewer. The staff normally would expect that, if the methodology is changed based upon the findings of the validation process, documentation that describes and supports the changes would be maintained. FN73

  - ▪ FN73 See paragraph 9.64 of the Audit Guide.

# EXHIBIT

# 4

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR PART 241**

**[RELEASE NOS. 33-8810; 34-55929; FR-77; File No. S7-24-06]**

**Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934**

**AGENCY:**  Securities and Exchange Commission.

**ACTION:**  Interpretation.

**SUMMARY:**  The SEC is publishing this interpretive release to provide guidance for management regarding its evaluation and assessment of internal control over financial reporting.  The guidance sets forth an approach by which management can conduct a top-down, risk-based evaluation of internal control over financial reporting.  An evaluation that complies with this interpretive guidance is one way to satisfy the evaluation requirements of Rules 13a-15(c) and 15d-15(c) under the Securities Exchange Act of 1934.

**EFFECTIVE DATE:**  June 27, 2007.

**FOR FURTHER INFORMATION CONTACT:**  Josh K. Jones, Professional Accounting Fellow, Office of the Chief Accountant, at (202) 551-5300, or N. Sean Harrison, Special Counsel, Division of Corporation Finance, at (202) 551-3430,  U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION**:  The amendments to Rules 13a-15(c)[1] and 15d-15(c)[2] under the Securities Exchange Act of 1934[3] (the "Exchange Act"), which

---

[1] 17 CFR 240.13a-15(c).

[2] 17 CFR 240.15d-15(c).

[3] 15 U.S.C. 78a et seq.

clarify that an evaluation of internal control over financial reporting that complies with this interpretive guidance is one way to satisfy those rules, are being made in a separate release.[4]

## I. Introduction

Management is responsible for maintaining a system of internal control over financial reporting ("ICFR") that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The rules we adopted in June 2003 to implement Section 404 of the Sarbanes-Oxley Act of 2002[5] ("Sarbanes-Oxley") require management to annually evaluate whether ICFR is effective at providing reasonable assurance and to disclose its assessment to investors.[6] Management is responsible for maintaining evidential matter, including documentation, to provide reasonable support for its assessment. This evidence will also allow a third party, such as the company's external auditor, to consider the work performed by management.

ICFR cannot provide absolute assurance due to its inherent limitations; it is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. ICFR also can be circumvented by collusion or improper management override. Because of such limitations, ICFR cannot prevent or detect all misstatements, whether unintentional errors or fraud. However, these inherent limitations are known features of the financial

---

[4] Release No. 34-55928 (Jun. 20, 2007).

[5] 15 U.S.C. 7262.

[6] Release No. 33-8238 (Jun. 5, 2003) [68 FR 36636] (hereinafter "Adopting Release").

reporting process, therefore, it is possible to design into the process safeguards to reduce, though not eliminate, this risk.

The "reasonable assurance" referred to in the Commission's implementing rules relates to similar language in the Foreign Corrupt Practices Act of 1977 ("FCPA").[7] Exchange Act Section 13(b)(7) defines "reasonable assurance" and "reasonable detail" as "such level of detail and degree of assurance as would satisfy prudent officials in the conduct of their own affairs."[8]  The Commission has long held that "reasonableness" is not an "absolute standard of exactitude for corporate records."[9]  In addition, the Commission recognizes that while "reasonableness" is an objective standard, there is a range of judgments that an issuer might make as to what is "reasonable" in implementing Section 404 and the Commission's rules.  Thus, the terms "reasonable," "reasonably," and "reasonableness" in the context of Section 404 implementation do not imply a single conclusion or methodology, but encompass the full range of appropriate potential conduct, conclusions or methodologies upon which an issuer may reasonably base its decisions.

Since companies first began complying in 2004, the Commission has received significant feedback on our rules implementing Section 404.[10]  This feedback included requests for further guidance to assist company management in complying with our ICFR

---

[7] Title 1 of Pub. L. 95-213 (1977).

[8] 15 U.S.C. 78m(b)(7).  The conference committee report on the 1988 amendments to the FCPA also noted that the standard "does not connote an unrealistic degree of exactitude or precision. The concept of reasonableness of necessity contemplates the weighing of a number of relevant factors, including the costs of compliance."  Cong. Rec. H2116 (daily ed. Apr. 20, 1988).

[9] Release No. 34-17500 (Jan. 29, 1981) [46 FR 11544].

[10] Release Nos. 33-8762; 34-54976 (Dec. 20, 2006) [71 FR 77635] (hereinafter "Proposing Release").  For a detailed history of the implementation of Section 404 of Sarbanes-Oxley, see Section I., Background, of the Proposing Release.  An analysis of the comments we received on the Proposing Release is included in Section III of this release.

evaluation and disclosure requirements.  This guidance is in response to those requests and reflects the significant feedback we have received, including comments on the interpretive guidance we proposed on December 20, 2006.  In addressing a number of the commonly identified areas of concerns, the interpretive guidance:

- Explains how to vary evaluation approaches for gathering evidence based on risk assessments;

- Explains the use of "daily interaction," self-assessment, and other on-going monitoring activities as evidence in the evaluation;

- Explains the purpose of documentation and how management has flexibility in approaches to documenting support for its assessment;

- Provides management significant flexibility in making judgments regarding what constitutes adequate evidence in low-risk areas; and

- Allows for management and the auditor to have different testing approaches.

The Interpretive Guidance is organized around two broad principles.  The first principle is that management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner.  The guidance describes a top-down, risk-based approach to this principle, including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls.  The guidance promotes efficiency by allowing management to focus on those controls that are needed to adequately address the risk of a material misstatement of its financial statements.  The guidance does not require management to identify every control in a process or document the business processes impacting ICFR.  Rather, management can focus its evaluation

process and the documentation supporting the assessment on those controls that it determines adequately address the risk of a material misstatement of the financial statements.  For example, if management determines that a risk of a material misstatement is adequately addressed by an entity-level control, no further evaluation of other controls is required.

The second principle is that management's evaluation of evidence about the operation of its controls should be based on its assessment of risk.  The guidance provides an approach for making risk-based judgments about the evidence needed for the evaluation.  This allows management to align the nature and extent of its evaluation procedures with those areas of financial reporting that pose the highest risks to reliable financial reporting (that is, whether the financial statements are materially accurate).  As a result, management may be able to use more efficient approaches to gathering evidence, such as self-assessments, in low-risk areas and perform more extensive testing in high-risk areas.  By following these two principles, we believe companies of all sizes and complexities will be able to implement our rules effectively and efficiently.

The Interpretive Guidance reiterates the Commission's position that management should bring its own experience and informed judgment to bear in order to design an evaluation process that meets the needs of its company and that provides a reasonable basis for its annual assessment of whether ICFR is effective.  This allows management sufficient and appropriate flexibility to design such an evaluation process.[11]

---

[11] Exchange Act Rules 13a-15 and 15d-15 [17 CFR 240.13a-15 and 15d-15] require management to evaluate the effectiveness of ICFR as of the end of the fiscal year.  For purposes of this document, the term "evaluation" or "evaluation process" refers to the methods and procedures that management implements to comply with these rules.  The term "assessment" is used in this document to describe the disclosure required by Item 308 of Regulations S-B and S-K [17 CFR 228.308 and 229.308].  This disclosure must include discussion of any material weaknesses

Smaller public companies, which generally have less complex internal control systems than larger public companies, can use this guidance to scale and tailor their evaluation methods and procedures to fit their own facts and circumstances.  We encourage smaller public companies[12] to take advantage of the flexibility and scalability to conduct an evaluation of ICFR that is both efficient and effective at identifying material weaknesses.

The effort necessary to conduct an initial evaluation of ICFR will vary among companies, partly because this effort will depend on management's existing financial reporting risk assessment and control monitoring activities.  After the first year of compliance, management's effort to identify financial reporting risks and controls should ordinarily be less, because subsequent evaluations should be more focused on changes in risks and controls rather than identification of all financial reporting risks and the related controls.  Further, in each subsequent year, the documentation of risks and controls will only need to be updated from the prior year(s), not recreated anew.  Through the risk and control identification process, management will have identified for testing only those controls that are needed to meet the objective of ICFR (that is, to provide reasonable assurance regarding the reliability of financial reporting) and for which evidence about their operation can be obtained most efficiently.  The nature and extent of procedures

---

which exist as of the end of the most recent fiscal year and management's assessment of the effectiveness of ICFR, including a statement as to whether or not ICFR is effective.  Management is not permitted to conclude that ICFR is effective if there are one or more material weaknesses in ICFR.

[12]  While a company's individual facts and circumstances should be considered in determining whether a company is a smaller public company and the resulting implications to management's evaluation, a company's public market capitalization and annual revenues are useful indicators of its size and complexity.  The Final Report of the Advisory Committee on Smaller Public Companies to the United States Securities and Exchange Commission (Apr. 23, 2006), available at http://www.sec.gov/info/smallbus/acspc/acspc-finalreport.pdf, defined smaller companies, which included microcap companies, and the SEC's rules include size characteristics for "accelerated filers" and "non-accelerated filers" which approximately fit the same definitions.

implemented to evaluate whether those controls continue to operate effectively can be tailored to the company's unique circumstances, thereby avoiding unnecessary compliance costs.

The guidance assumes management has established and maintains a system of internal accounting controls as required by the FCPA. Further, it is not intended to explain how management should design its ICFR to comply with the control framework management has chosen. To allow appropriate flexibility, the guidance does not provide a checklist of steps management should perform in completing its evaluation.

The guidance in this release shall be effective immediately upon its publication in the Federal Register.[13]

As a companion[14] to this interpretive release, we are adopting amendments to Exchange Act Rules 13a-15(c) and 15d-15(c) and revisions to Regulation S-X.[15] The amendments to Rules 13a-15(c) and 15d-15(c) will make it clear that an evaluation that is conducted in accordance with this interpretive guidance is one way to satisfy the annual management evaluation requirement in those rules. We are also amending our rules to define the term "material weakness" and to revise the requirements regarding the auditor's attestation report on ICFR. Additionally, we are seeking additional comment on the definition of the term "significant deficiency."[16]

---

[13] The Commission finds good cause under 5 U.S.C. 808(2) for this interpretation to take effect on the date of Federal Register publication. Further delay would be unnecessary and contrary to the public interest because following the guidance is voluntary. Additionally, delay may deter companies from realizing all the efficiencies intended by this guidance, and immediate effectiveness will assist in preparing for 2007 evaluations and assessments of internal control over financial reporting.

[14] Release No. 34-55928.

[15] 17 CFR 210.1-01 et seq.

[16] Release No. 34-55930 (Jun. 20, 2007).

**II. Interpretive Guidance – Evaluation and Assessment of Internal Control Over Financial Reporting**

The interpretive guidance addresses the following topics:

A.  The Evaluation Process

    1.  Identifying Financial Reporting Risks and Controls

        a.    Identifying Financial Reporting Risks

        b.    Identifying Controls that Adequately Address Financial Reporting Risks

        c.    Consideration of Entity-Level Controls

        d.    Role of Information Technology General Controls

        e.    Evidential Matter to Support the Assessment

    2.  Evaluating Evidence of the Operating Effectiveness of ICFR

        a.    Determining the Evidence Needed to Support the Assessment

        b.    Implementing Procedures to Evaluate Evidence of the Operation of ICFR

        c.    Evidential Matter to Support the Assessment

    3.  Multiple Location Considerations

B.  Reporting Considerations

    1.  Evaluation of Control Deficiencies

    2.  Expression of Assessment of Effectiveness of ICFR by Management

    3.  Disclosures about Material Weaknesses

    4.  Impact of a Restatement of Previously Issued Financial Statements on Management's Report on ICFR

    5.  Inability to Assess Certain Aspects of ICFR

### A. The Evaluation Process

The objective of internal control over financial reporting[17] ("ICFR") is to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP").  The purpose of the evaluation of ICFR is to provide management with a reasonable basis for its annual assessment as to whether any material weaknesses[18] in ICFR exist as of the end of the fiscal year.[19]  To accomplish this, management identifies the risks to reliable financial reporting, evaluates whether controls exist to address those risks, and evaluates evidence about the operation of the controls

---

[17] Exchange Act Rules 13a-15(f) and 15d-15(f) [17 CFR 240.13a-15(f) and 15d-15(b)] define internal control over financial reporting as:

> A process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the registrant; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

[18] As defined in Exchange Act Rule 12b-2 [17 CFR 240.12b-2] and Rule 1-02 of Regulation S-X [17 CFR 210.1-02], a material weakness is a deficiency, or a combination of deficiencies, in ICFR such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis.  See Release No. 34-55928.

[19] This focus on material weaknesses will lead to a better understanding by investors about the company's ICFR, as well as its inherent limitations.  Further, the Commission's rules implementing Section 404, by providing for public disclosure of material weaknesses, concentrate attention on the most important internal control issues.

included in the evaluation based on its assessment of risk.[20]  The evaluation process will vary from company to company; however, the top-down, risk-based approach which is described in this guidance will typically be the most efficient and effective way to conduct the evaluation.

The evaluation process guidance is described in two sections.  The first section explains the identification of financial reporting risks and the evaluation of whether the controls management has implemented adequately address those risks.  The second section explains an approach for making judgments about the methods and procedures for evaluating whether the operation of ICFR is effective.  Both sections explain how entity-level controls[21] impact the evaluation process, as well as how management should focus its evaluation efforts on the highest risks to reliable financial reporting. [22]

---

[20] If management's evaluation process identifies material weaknesses, but all material weaknesses are remediated by the end of the fiscal year, management may conclude that ICFR is effective as of the end of the fiscal year.  However, management should consider whether disclosure of such remediated material weaknesses is appropriate or required under Item 307 or Item 308 of Regulations S-K or S-B or other Commission disclosure rules.

[21] The term "entity-level controls" as used in this document describes aspects of a system of internal control that have a pervasive effect on the entity's system of internal control such as controls related to the control environment (for example, management's philosophy and operating style, integrity and ethical values; board or audit committee oversight; and assignment of authority and responsibility); controls over management override; the company's risk assessment process; centralized processing and controls, including shared service environments; controls to monitor results of operations; controls to monitor other controls, including activities of the internal audit function, the audit committee, and self-assessment programs; controls over the period-end financial reporting process; and policies that address significant business control and risk management practices.  The terms "company-level" and "entity-wide" are also commonly used to describe these controls.

[22] Because management is responsible for maintaining effective ICFR, this interpretive guidance does not specifically address the role of the board of directors or audit committee in a company's evaluation and assessment of ICFR.  However, we would ordinarily expect a board of directors or audit committee, as part of its oversight responsibilities for the company's financial reporting, to be reasonably knowledgeable and informed about the evaluation process and management's assessment, as necessary in the circumstances.

Under the Commission's rules, management's annual assessment of the effectiveness of ICFR must be made in accordance with a suitable control framework's[23] definition of effective internal control.[24]  These control frameworks define elements of internal control that are expected to be present and functioning in an effective internal control system.  In assessing effectiveness, management evaluates whether its ICFR includes policies, procedures and activities that address the elements of internal control that the applicable control framework describes as necessary for an internal control system to be effective.  The framework elements describe the characteristics of an internal control system that may be relevant to individual areas of the company's ICFR, pervasive to many areas, or entity-wide.  Therefore, management's evaluation process includes not only controls involving particular areas of financial reporting, but also the entity-wide and other pervasive elements of internal control defined by its selected control framework.  This guidance is not intended to replace the elements of an effective system of internal control as defined within a control framework.

---

[23] In the Adopting Release, the Commission specified characteristics of a suitable control framework and identified the Internal Control—Integrated Framework (1992) created by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") as an example of a suitable framework.  We also cited the Guidance on Assessing Control published by the Canadian Institute of Chartered Accountants ("CoCo") and the report published by the Institute of Chartered Accountants in England & Wales Internal Control: Guidance for Directors on the Combined Code (known as the Turnbull Report) as examples of other suitable frameworks that issuers could choose in evaluating the effectiveness of their ICFR.  We encourage companies to examine and select a framework that may be useful in their own circumstances; we also encourage the further development of existing and alternative frameworks.

[24] For example, both the COSO framework and the Turnbull Report state that determining whether a system of internal control is effective is a subjective judgment resulting from an assessment of whether the five components (that is, control environment, risk assessment, control activities, monitoring, and information and communication) are present and functioning effectively.  Although CoCo states that an assessment of effectiveness should be made against twenty specific criteria, it acknowledges that the criteria can be regrouped into different structures, and includes a table showing how the criteria can be regrouped into the five-component structure of COSO.

**1. Identifying Financial Reporting Risks and Controls**

Management should evaluate whether it has implemented controls that will achieve the objective of ICFR (that is, to provide reasonable assurance regarding the reliability of financial reporting). The evaluation begins with the identification and assessment of the risks to reliable financial reporting (that is, materially accurate financial statements), including changes in those risks. Management then evaluates whether it has controls placed in operation (that is, in use) that are designed to adequately address those risks. Management ordinarily would consider the company's entity-level controls in both its assessment of risks and in identifying which controls adequately address the risks.

The evaluation approach described herein allows management to identify controls and maintain supporting evidential matter for its controls in a manner that is tailored to the company's financial reporting risks (as defined below). Thus, the controls that management identifies and documents are those that are important to achieving the objective of ICFR. These controls are then subject to procedures to evaluate evidence of their operating effectiveness, as determined pursuant to Section II.A.2.

**a. Identifying Financial Reporting Risks**

Management should identify those risks of misstatement that could, individually or in combination with others, result in a material misstatement of the financial statements ("financial reporting risks"). Ordinarily, the identification of financial reporting risks begins with evaluating how the requirements of GAAP apply to the company's business, operations and transactions. Management must provide investors with financial statements that fairly present the company's financial position, results of operations and cash flows in accordance with GAAP. A lack of fair presentation arises

when one or more financial statement amounts or disclosures ("financial reporting elements") contain misstatements (including omissions) that are material.

Management uses its knowledge and understanding of the business, and its organization, operations, and processes, to consider the sources and potential likelihood of misstatements in financial reporting elements. Internal and external risk factors that impact the business, including the nature and extent of any changes in those risks, may give rise to a risk of misstatement. Risks of misstatement may also arise from sources such as the initiation, authorization, processing and recording of transactions and other adjustments that are reflected in financial reporting elements. Management may find it useful to consider "what could go wrong" within a financial reporting element in order to identify the sources and the potential likelihood of misstatements and identify those that could result in a material misstatement of the financial statements.

The methods and procedures for identifying financial reporting risks will vary based on the characteristics of the company. These characteristics include, among others, the size, complexity, and organizational structure of the company and its processes and financial reporting environment, as well as the control framework used by management. For example, to identify financial reporting risks in a larger business or a complex business process, management's methods and procedures may involve a variety of company personnel, including those with specialized knowledge. These individuals, collectively, may be necessary to have a sufficient understanding of GAAP, the underlying business transactions and the process activities, including the role of computer technology, that are required to initiate, authorize, record and process transactions. In contrast, in a small company that operates on a centralized basis with less complex

business processes and with little change in the risks or processes, management's daily involvement with the business may provide it with adequate knowledge to appropriately identify financial reporting risks.

Management's evaluation of the risk of misstatement should include consideration of the vulnerability of the entity to fraudulent activity (for example, fraudulent financial reporting, misappropriation of assets and corruption), and whether any such exposure could result in a material misstatement of the financial statements.[25] The extent of activities required for the evaluation of fraud risks is commensurate with the size and complexity of the company's operations and financial reporting environment.[26]

Management should recognize that the risk of material misstatement due to fraud ordinarily exists in any organization, regardless of size or type, and it may vary by specific location or segment and by individual financial reporting element. For example, one type of fraud risk that has resulted in fraudulent financial reporting in companies of all sizes and types is the risk of improper override of internal controls in the financial reporting process. While the identification of a fraud risk is not necessarily an indication that a fraud has occurred, the absence of an identified fraud is not an indication that no

---

[25] For example, COSO's Internal Control Over Financial Reporting – Guidance for Smaller Public Companies (2006), Volume 1: Executive Summary, Principle 10: Fraud Risk (page 10) states, "The potential for material misstatement due to fraud is explicitly considered in assessing risks to the achievement of financial reporting objectives."

[26] Management may find resources such as "Management Antifraud Programs and Controls – Guidance to Help Prevent, Deter, and Detect Fraud," which was issued jointly by seven professional organizations and is included as an exhibit to AU Sec. 316, Consideration of Fraud in a Financial Statement Audit (as adopted on an interim basis by the PCAOB in PCAOB Rule 3200T) helpful in assessing fraud risks. Other resources also exist (for example, the American Institute of Certified Public Accountants' (AICPA) Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention (2005)), and more may be developed in the future.

fraud risks exist.  Rather, these risk assessments are used in evaluating whether adequate controls have been implemented.

### b. Identifying Controls that Adequately Address Financial Reporting Risks

Management should evaluate whether it has controls[27] placed in operation (that is, in use) that adequately address the company's financial reporting risks.  The determination of whether an individual control, or a combination of controls, adequately addresses a financial reporting risk involves judgments about whether the controls, if operating properly, can effectively prevent or detect misstatements that could result in material misstatements in the financial statements.[28]  If management determines that a deficiency in ICFR exists, it must be evaluated to determine whether a material weakness exists.[29]  The guidance in Section II.B.1. is designed to assist management with that evaluation.

Management may identify preventive controls, detective controls, or a combination of both, as adequately addressing financial reporting risks.[30]  There might

---

[27] A control consists of a specific set of policies, procedures, and activities designed to meet an objective.  A control may exist within a designated function or activity in a process.  A control's impact on ICFR may be entity-wide or specific to an account balance, class of transactions or application.  Controls have unique characteristics – for example, they can be: automated or manual; reconciliations; segregation of duties; review and approval authorizations; safeguarding and accountability of assets; preventing or detecting error or fraud.  Controls within a process may consist of financial reporting controls and operational controls (that is, those designed to achieve operational objectives).

[28] Companies may use "control objectives," which provide specific criteria against which to evaluate the effectiveness of controls, to assist in evaluating whether controls can prevent or detect misstatements.

[29] A deficiency in the design of ICFR exists when (a) necessary controls are missing or (b) existing controls are not properly designed so that, even if the control operates as designed, the financial reporting risks would not be addressed.

[30] Preventive controls have the objective of preventing the occurrence of errors or fraud that could result in a misstatement of the financial statements.  Detective controls have the objective of detecting errors or fraud that has already occurred that could result in a misstatement of the

be more than one control that addresses the financial reporting risks for a financial reporting element; conversely, one control might address the risks of more than one financial reporting element.  It is not necessary to identify all controls that may exist or identify redundant controls, unless redundancy itself is required to address the financial reporting risks.  To illustrate, management may determine that the risk of a misstatement in interest expense, which could result in a material misstatement of the financial statements, is adequately addressed by a control within the company's period-end financial reporting process (that is, an entity-level control).  In such a case, management may not need to identify, for purposes of the ICFR evaluation, any additional controls related to the risk of misstatement in interest expense.

Management may also consider the efficiency with which evidence of the operation of a control can be evaluated when identifying the controls that adequately address the financial reporting risks.  When more than one control exists and each adequately addresses a financial reporting risk, management may decide to select the control for which evidence of operating effectiveness can be obtained more efficiently. Moreover, when adequate information technology ("IT") general controls exist and management has determined that the operation of such controls is effective, management may determine that automated controls are more efficient to evaluate than manual controls.  Considering the efficiency with which the operation of a control can be evaluated will often enhance the overall efficiency of the evaluation process.

In addition to identifying controls that address the financial reporting risks of individual financial reporting elements, management also evaluates whether it has

---

financial statements.  Preventive and detective controls may be completely manual, involve some degree of computer automation, or be completely automated.

controls in place to address the entity-level and other pervasive elements of ICFR that its chosen control framework prescribes as necessary for an effective system of internal control. This would ordinarily include, for example, considering how and whether controls related to the control environment, controls over management override, the entity-level risk assessment process and monitoring activities,[31] controls over the period-end financial reporting process,[32] and the policies that address significant business control and risk management practices are adequate for purposes of an effective system of internal control. The control frameworks and related guidance may be useful tools for evaluating the adequacy of these elements of ICFR.

When identifying the controls that address financial reporting risks, management learns information about the characteristics of the controls that should inform its judgments about the risk that a control will fail to operate as designed. This includes, for example, information about the judgment required in its operation and information about the complexity of the controls. Section II.A.2. discusses how these characteristics are considered in determining the nature and extent of evidence of the operation of the controls that management evaluates.

At the end of this identification process, management has identified for evaluation those controls that are needed to meet the objective of ICFR (that is, to provide

---

[31] Monitoring activities may include controls to monitor results of operations and controls to monitor other controls, including activities of the internal audit function, the audit committee, and self-assessment programs.

[32] The nature of controls within the period-end financial reporting process will vary based on a company's facts and circumstances. The period-end financial reporting process may include matters such as: procedures to enter transaction totals into the general ledger; the initiation, authorization, recording and processing of journal entries in the general ledger; procedures for the selection and application of accounting policies; procedures used to record recurring and non-recurring adjustments to the annual and quarterly financial statements; and procedures for preparing annual and quarterly financial statements and related disclosures.

reasonable assurance regarding the reliability of financial reporting) and for which evidence about their operation can be obtained most efficiently.

### c. Consideration of Entity-Level Controls

Management considers entity-level controls when identifying financial reporting risks and related controls for a financial reporting element.  In doing so, it is important for management to consider the nature of the entity-level controls and how those controls relate to the financial reporting element.  The more indirect the relationship to a financial reporting element, the less effective a control may be in preventing or detecting a misstatement. [33]

Some entity-level controls, such as certain control environment controls, have an important, but indirect, effect on the likelihood that a misstatement will be prevented or detected on a timely basis.  These controls might affect the other controls management determines are necessary to adequately address financial reporting risks for a financial reporting element.  However, it is unlikely that management will identify only this type of entity-level control as adequately addressing a financial reporting risk identified for a financial reporting element.

Other entity-level controls may be designed to identify possible breakdowns in lower-level controls, but not in a manner that would, by themselves, adequately address financial reporting risks.  For example, an entity-level control that monitors the results of operations may be designed to detect potential misstatements and investigate whether a breakdown in lower-level controls occurred.  However, if the amount of potential

---

[33] Controls can be either directly or indirectly related to a financial reporting element.  Controls that are designed to have a specific effect on a financial reporting element are considered directly related.  For example, controls established to ensure that personnel are properly counting and recording the annual physical inventory relate directly to the existence of the inventory.

misstatement that could exist before being detected by the monitoring control is too high, then the control may not adequately address the financial reporting risks of a financial reporting element.

Entity-level controls may be designed to operate at the process, application, transaction or account-level and at a level of precision that would adequately prevent or detect on a timely basis misstatements in one or more financial reporting elements that could result in a material misstatement of the financial statements. In these cases, management may not need to identify or evaluate additional controls relating to that financial reporting risk.

**d. Role of Information Technology General Controls**

Controls that management identifies as addressing financial reporting risks may be automated,[34] dependent upon IT functionality,[35] or a combination of both manual and automated procedures.[36] In these situations, management's evaluation process generally considers the design and operation of the automated or IT dependent application controls and the relevant IT general controls over the applications providing the IT functionality. While IT general controls alone ordinarily do not adequately address financial reporting risks, the proper and consistent operation of automated controls or IT functionality often depends upon effective IT general controls. The identification of risks and controls within IT should not be a separate evaluation. Instead, it should be an integral part of

---

[34] For example, application controls that perform automated matching, error checking or edit checking functions.

[35] For example, consistent application of a formula or performance of a calculation and posting correct balances to appropriate accounts or ledgers.

[36] For example, a control that manually investigates items contained in a computer generated exception report.

management's top-down, risk-based approach to identifying risks and controls and in determining evidential matter necessary to support the assessment.

Aspects of IT general controls that may be relevant to the evaluation of ICFR will vary depending upon a company's facts and circumstances. For purposes of the evaluation of ICFR, management only needs to evaluate those IT general controls that are necessary for the proper and consistent operation of other controls designed to adequately address financial reporting risks. For example, management might consider whether certain aspects of IT general control areas, such as program development, program changes, computer operations, and access to programs and data, apply to its facts and circumstances.[37] Specifically, it is unnecessary to evaluate IT general controls that primarily pertain to efficiency or effectiveness of a company's operations, but which are not relevant to addressing financial reporting risks.

**e. Evidential Matter to Support the Assessment**

As part of its evaluation of ICFR, management must maintain reasonable support for its assessment.[38] Documentation of the design of the controls management has placed in operation to adequately address the financial reporting risks, including the entity-level and other pervasive elements necessary for effective ICFR, is an integral part of the reasonable support. The form and extent of the documentation will vary depending on the size, nature, and complexity of the company. It can take many forms (for example, paper documents, electronic, or other media). Also, the documentation

---

[37] However, the reference to these specific IT general control areas as examples within this guidance does not imply that these areas, either partially or in their entirety, are applicable to all facts and circumstances. As indicated, companies need to take their particular facts and circumstances into consideration in determining which aspects of IT general controls are relevant.

[38] See instructions to Item 308 of Regulations S-K and S-B.

can be presented in a number of ways (for example, policy manuals, process models, flowcharts, job descriptions, documents, internal memorandums, forms, etc). The documentation does not need to include all controls that exist within a process that impacts financial reporting. Rather, the documentation should be focused on those controls that management concludes are adequate to address the financial reporting risks.[39]

In addition to providing support for the assessment of ICFR, documentation of the design of controls also supports other objectives of an effective system of internal control. For example, it serves as evidence that controls within ICFR, including changes to those controls, have been identified, are capable of being communicated to those responsible for their performance, and are capable of being monitored by the company.

## 2. Evaluating Evidence of the Operating Effectiveness of ICFR

Management should evaluate evidence of the operating effectiveness of ICFR. The evaluation of the operating effectiveness of a control considers whether the control is operating as designed and whether the person performing the control possesses the necessary authority and competence to perform the control effectively. The evaluation procedures that management uses to gather evidence about the operation of the controls it identifies as adequately addressing the financial reporting risks for financial reporting elements (pursuant to Section II.A.1.b) should be tailored to management's assessment of the risk characteristics of both the individual financial reporting elements and the related controls (collectively, ICFR risk). Management should ordinarily focus its evaluation of the operation of controls on areas posing the highest ICFR risk. Management's

---

[39] Section II.A.2.c also provides guidance with regard to the documentation required to support management's evaluation of operating effectiveness.

assessment of ICFR risk also considers the impact of entity-level controls, such as the relative strengths and weaknesses of the control environment, which may influence management's judgments about the risks of failure for particular controls.

Evidence about the effective operation of controls may be obtained from direct testing of controls and on-going monitoring activities. The nature, timing and extent of evaluation procedures necessary for management to obtain sufficient evidence of the effective operation of a control depend on the assessed ICFR risk. In determining whether the evidence obtained is sufficient to provide a reasonable basis for its evaluation of the operation of ICFR, management should consider not only the quantity of evidence (for example, sample size), but also the qualitative characteristics of the evidence. The qualitative characteristics of the evidence include the nature of the evaluation procedures performed, the period of time to which the evidence relates, the objectivity[40] of those evaluating the controls, and, in the case of on-going monitoring activities, the extent of validation through direct testing of underlying controls. For any individual control, different combinations of the nature, timing, and extent of evaluation procedures may provide sufficient evidence. The sufficiency of evidence is not necessarily determined by any of these attributes individually.

---

[40] In determining the objectivity of those evaluating controls, management is not required to make an absolute conclusion regarding objectivity, but rather should recognize that personnel will have varying degrees of objectivity based on, among other things, their job function, their relationship to the control being evaluated, and their level of authority and responsibility within the organization. Personnel whose core function involves permanently serving as a testing or compliance authority at the company, such as internal auditors, normally are expected to be the most objective. However, the degree of objectivity of other company personnel may be such that the evaluation of controls performed by them would provide sufficient evidence. Management's judgments about whether the degree of objectivity is adequate to provide sufficient evidence should take into account the ICFR risk.

**a.   Determining the Evidence Needed to Support the Assessment**

Management should evaluate the ICFR risk of the controls identified Section II.A.1.b as adequately addressing the financial reporting risks for financial reporting elements to determine the evidence needed to support the assessment.  This evaluation should consider the characteristics of the financial reporting elements to which the controls relate and the characteristics of the controls themselves.  This concept is illustrated in the following diagram.

Determining the Sufficiency of Evidence Based on ICFR Risk



\* The references to "more" or "less" include both the quantitative and qualitative characteristics of the evidence (that is, its sufficiency).

Management's consideration of the misstatement risk of a financial reporting element includes both the materiality of the financial reporting element and the susceptibility of the underlying account balances, transactions or other supporting information to a misstatement that could be material to the financial statements.  As the materiality of a financial reporting element increases in relation to the amount of misstatement that would be considered material to the financial statements, management's assessment of misstatement risk for the financial reporting element generally would correspondingly increase.  In addition, management considers the extent to which the financial reporting elements include transactions, account balances or other supporting information that are prone to material misstatement.  For example, the extent to which a financial reporting element: (1) involves judgment in determining the recorded amounts; (2) is susceptible to fraud; (3) has complex accounting requirements; (4) experiences change in the nature or volume of the underlying transactions; or (5) is sensitive to changes in environmental factors, such as technological and/or economic developments, would generally affect management's judgment of whether a misstatement risk is higher or lower.

Management's consideration of the likelihood that a control might fail to operate effectively includes, among other things:

- The type of control (that is, manual or automated) and the frequency with which it operates;

- The complexity of the control;

- The risk of management override;

- The judgment required to operate the control;

- The competence of the personnel who perform the control or monitor its performance;

- Whether there have been changes in key personnel who either perform the control or monitor its performance;

- The nature and materiality of misstatements that the control is intended to prevent or detect;

- The degree to which the control relies on the effectiveness of other controls (for example, IT general controls); and

- The evidence of the operation of the control from prior year(s).

For example, management's judgment of the risk of control failure would be higher for controls whose operation requires significant judgment than for non-complex controls requiring less judgment.

Financial reporting elements that involve related party transactions, critical accounting policies,[41] and related critical accounting estimates[42] generally would be assessed as having a higher misstatement risk. Further, when the controls related to these financial reporting elements are subject to the risk of management override, involve

---

[41] "Critical accounting policies" are defined as those policies that are most important to the financial statement presentation, and require management's most difficult, subjective, or complex judgments, often as the result of a need to make estimates about the effect of matters that are inherently uncertain. See Release No. 33-8040 (Dec. 12, 2001) [66 FR 65013].

[42] "Critical accounting estimates" relate to estimates or assumptions involved in the application of generally accepted accounting principles where the nature of the estimates or assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change and the impact of the estimates and assumptions on financial condition or operating performance is material. See Release No. 33-8350 (Dec. 19, 2003) [68 FR 75056]. For additional information, see, for example, Release No. 33-8098 (May 10, 2002) [67 FR 35620].

significant judgment, or are complex, they should generally be assessed as having higher ICFR risk.

When a combination of controls is required to adequately address the risks related to a financial reporting element, management should analyze the risk characteristics of the controls. This is because the controls associated with a given financial reporting element may not necessarily share the same risk characteristics. For example, a financial reporting element involving significant estimation may require a combination of automated controls that accumulate source data and manual controls that require highly judgmental determinations of assumptions. In this case, the automated controls may be subject to a system that is stable (that is, has not undergone significant change) and is supported by effective IT general controls and are therefore assessed as lower risk, whereas the manual controls would be assessed as higher risk.

The consideration of entity-level controls (for example, controls within the control environment) may influence management's determination of the evidence needed to sufficiently support its assessment of ICFR. For example, management's judgment about the likelihood that a control fails to operate effectively may be influenced by a highly effective control environment and thereby impact the evidence evaluated for that control. However, a strong control environment would not eliminate the need to evaluate the operation of the control in some manner.

**b. Implementing Procedures to Evaluate Evidence of the Operation of ICFR**

Management should evaluate evidence that provides a reasonable basis for its assessment of the operating effectiveness of the controls identified in Section II.A.1. Management uses its assessment of ICFR risk, as determined in Section II.A.2 to

determine the evaluation methods and procedures necessary to obtain sufficient evidence. The evaluation methods and procedures may be integrated with the daily responsibilities of its employees or implemented specifically for purposes of the ICFR evaluation. Activities that are performed for other reasons (for example, day-to-day activities to manage the operations of the business) may also provide relevant evidence. Further, activities performed to meet the monitoring objectives of the control framework may provide evidence to support the assessment of the operating effectiveness of ICFR.

The evidence management evaluates comes from direct tests of controls, on-going monitoring, or a combination of both. Direct tests of controls are tests ordinarily performed on a periodic basis by individuals with a high degree of objectivity relative to the controls being tested. Direct tests provide evidence as of a point in time and may provide information about the reliability of on-going monitoring activities. On-going monitoring includes management's normal, recurring activities that provide information about the operation of controls. These activities include, for example, self-assessment[43] procedures and procedures to analyze performance measures designed to track the operation of controls.[44] Self-assessment is a broad term that can refer to different types of procedures performed by individuals with varying degrees of objectivity. It includes assessments made by the personnel who operate the control as well as members of management who are not responsible for operating the control. The evidence provided

---

[43] For example, COSO's 1992 framework defines self-assessments as "evaluations where persons responsible for a particular unit or function will determine the effectiveness of controls for their activities."

[44] Management's evaluation process may also consider the results of key performance indicators ("KPIs") in which management reconciles operating and financial information with its knowledge of the business. The procedures that management implements pursuant to this section should evaluate the effective operation of these KPI-type controls when they are identified pursuant to Section II.A.1.b. as addressing financial reporting risk.

by self-assessment activities depends on the personnel involved and the manner in which the activities are conducted.  For example, evidence from self-assessments performed by personnel responsible for operating the control generally provides less evidence due to the evaluator's lower degree of objectivity.

As the ICFR risk increases, management will ordinarily adjust the nature of the evidence that is obtained.  For example, management can increase the evidence from on-going monitoring activities by utilizing personnel who are more objective and/or increasing the extent of validation through periodic direct testing of the underlying controls.  Management can also vary the evidence obtained by adjusting the period of time covered by direct testing.  When ICFR risk is assessed as high, the evidence management obtains would ordinarily consist of direct testing or on-going monitoring activities performed by individuals who have a higher degree of objectivity.  In situations where a company's on-going monitoring activities utilize personnel who are not adequately objective, the evidence obtained would normally be supplemented with direct testing by those who are independent from the operation of the control.  In these situations, direct testing of controls corroborates evidence from on-going monitoring activities as well as evaluates the operation of the underlying controls and whether they continue to adequately address financial reporting risks.  When ICFR risk is assessed as low, management may conclude that evidence from on-going monitoring is sufficient and that no direct testing is required.  Further, management's evaluation would ordinarily consider evidence from a reasonable period of time during the year, including the fiscal year-end.

In smaller companies, management's daily interaction with its controls may provide it with sufficient knowledge about their operation to evaluate the operation of ICFR. Knowledge from daily interaction includes information obtained by on-going direct involvement with and direct supervision of the execution of the control by those responsible for the assessment of the effectiveness of ICFR. Management should consider its particular facts and circumstances when determining whether its daily interaction with controls provides sufficient evidence to evaluate the operating effectiveness of ICFR. For example, daily interaction may be sufficient when the operation of controls is centralized and the number of personnel involved is limited. Conversely, daily interaction in companies with multiple management reporting layers or operating segments would generally not provide sufficient evidence because those responsible for assessing the effectiveness of ICFR would not ordinarily be sufficiently knowledgeable about the operation of the controls. In these situations, management would ordinarily utilize direct testing or on-going monitoring-type evaluation procedures to obtain reasonable support for the assessment.

Management evaluates the evidence it gathers to determine whether the operation of a control is effective. This evaluation considers whether the control operated as designed. It also considers matters such as how the control was applied, the consistency with which it was applied, and whether the person performing the control possesses the necessary authority and competence to perform the control effectively. If management determines that the operation of the control is not effective, a deficiency exists that must be evaluated to determine whether it is a material weakness.

**c. Evidential Matter to Support the Assessment**

Management's assessment must be supported by evidential matter that provides reasonable support for its assessment.  The nature of the evidential matter may vary based on the assessed level of ICFR risk of the underlying controls and other circumstances. Reasonable support for an assessment would include the basis for management's assessment, including documentation of the methods and procedures it utilizes to gather and evaluate evidence.

The evidential matter may take many forms and will vary depending on the assessed level of ICFR risk for controls over each of its financial reporting elements.  For example, management may document its overall strategy in a comprehensive memorandum that establishes the evaluation approach, the evaluation procedures, the basis for management's conclusion about the effectiveness of controls related to the financial reporting elements and the entity-level and other pervasive elements that are important to management's assessment of ICFR.

If management determines that the evidential matter within the company's books and records is sufficient to provide reasonable support for its assessment, it may determine that it is not necessary to separately maintain copies of the evidence it evaluates.  For example, in smaller companies, where management's daily interaction with its controls provides the basis for its assessment, management may have limited documentation created specifically for the evaluation of ICFR.  However, in these instances, management should consider whether reasonable support for its assessment would include documentation of how its interaction provided it with sufficient evidence.

This documentation might include memoranda, e-mails, and instructions or directions to and from management to company employees.

Further, in determining the nature of supporting evidential matter, management should also consider the degree of complexity of the control, the level of judgment required to operate the control, and the risk of misstatement in the financial reporting element that could result in a material misstatement of the financial statements. As these factors increase, management may determine that evidential matter supporting the assessment should be separately maintained. For example, management may decide that separately maintained documentation in certain areas will assist the audit committee in exercising its oversight of the company's financial reporting.

The evidential matter constituting reasonable support for management's assessment would ordinarily include documentation of how management formed its conclusion about the effectiveness of the company's entity-level and other pervasive elements of ICFR that its applicable framework describes as necessary for an effective system of internal control.

**3. Multiple Location Considerations**

Management's consideration of financial reporting risks generally includes all of its locations or business units.[45] Management may determine that financial reporting risks are adequately addressed by controls which operate centrally, in which case the evaluation approach is similar to that of a business with a single location or business unit. When the controls necessary to address financial reporting risks operate at more than one

---

[45] Consistent with the guidance in Section II.A.1., management may determine when identifying financial reporting risks that some locations are so insignificant that no further evaluation procedures are needed.

location or business unit, management would generally evaluate evidence of the operation of the controls at the individual locations or business units.

Management may determine that the ICFR risk of the controls (as determined through Section II.A.2.a) that operate at individual locations or business units is low. In such situations, management may determine that evidence gathered through self-assessment routines or other on-going monitoring activities, when combined with the evidence derived from a centralized control that monitors the results of operations at individual locations, constitutes sufficient evidence for the evaluation.  In other situations, management may determine that, because of the complexity or judgment in the operation of the controls at the individual location, the risk that controls will fail to operate is high, and therefore more evidence is needed about the effective operation of the controls at the location.

Management should generally consider the risk characteristics of the controls for each financial reporting element, rather than making a single judgment for all controls at that location when deciding whether the nature and extent of evidence is sufficient. When performing its evaluation of the risk characteristics of the controls identified, management should consider whether there are location-specific risks that might impact the risk that a control might fail to operate effectively.  Additionally, there may be pervasive risk factors that exist at a location that cause all controls, or a majority of controls, at that location to be considered higher risk.

## B. Reporting Considerations

## 1. Evaluation of Control Deficiencies

In order to determine whether a control deficiency, or combination of control deficiencies, is a material weakness, management evaluates the severity of each control deficiency that comes to its attention.  Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR.  Control deficiencies that are considered to be significant deficiencies are reported to the company's audit committee and the external auditor pursuant to management's compliance with the certification requirements in Exchange Act Rule 13a-14. [46]

Management may not disclose that it has assessed ICFR as effective if one or more deficiencies in ICFR are determined to be a material weakness.  As part of the evaluation of ICFR, management considers whether each deficiency, individually or in combination, is a material weakness as of the end of the fiscal year.  Multiple control deficiencies that affect the same financial statement amount or disclosure increase the likelihood of misstatement and may, in combination, constitute a material weakness if there is a reasonable possibility[47] that a material misstatement of the financial statements

---

[46] Pursuant to Exchange Act Rules 13a-14 and 15d-14 [17 CFR 240.13a-14 and 240.15d-14], management discloses to the auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function) all material weaknesses and significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data.  The term "material weakness" is defined in the Commission's rules in Exchange Act Rule 12b-2 and Rule 1-02 of Regulation S-X.  See Release No. 34-55928.  The Commission is seeking additional comment on the definition of the term "significant deficiency" in the Commission's rules in Exchange Act Rule 12b-2 and Rule 1-02 of Regulation S-X.  See Release No. 34-55930.

[47] There is a reasonable possibility of an event when the likelihood of the event is either "reasonably possible" or "probable" as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies.  The use of the phrase "reasonable

would not be prevented or detected in a timely manner, even though such deficiencies may be individually less severe than a material weakness.  Therefore, management should evaluate individual control deficiencies that affect the same financial statement amount or disclosure, or component of internal control, to determine whether they collectively result in a material weakness.

The evaluation of the severity of a control deficiency should include both quantitative and qualitative factors.  Management evaluates the severity of a deficiency in ICFR by considering whether there is a reasonable possibility that the company's ICFR will fail to prevent or detect a misstatement of a financial statement amount or disclosure; and the magnitude of the potential misstatement resulting from the deficiency or deficiencies.  The severity of a deficiency in ICFR does not depend on whether a misstatement actually has occurred but rather on whether there is a reasonable possibility that the company's ICFR will fail to prevent or detect a misstatement on a timely basis.

Risk factors affect whether there is a reasonable possibility[48] that a deficiency, or a combination of deficiencies, will result in a misstatement of a financial statement amount or disclosure. These factors include, but are not limited to, the following:

- The nature of the financial reporting elements involved (for example, suspense accounts and related party transactions involve greater risk);

---

possibility that a material misstatement of the financial statements would not be prevented or detected in a timely manner" is intended solely to assist management in identifying matters for disclosure under Item 308 of Regulation S-K.  It is not intended to interpret or describe management's responsibility under the FCPA or modify a control framework's definition of what constitutes an effective system of internal control**.**

[48] The evaluation of whether a deficiency in ICFR presents a reasonable possibility of misstatement can be made without quantifying the probability of occurrence as a specific percentage or range.

- The susceptibility of the related asset or liability to loss or fraud (that is, greater susceptibility increases risk);

- The subjectivity, complexity, or extent of judgment required to determine the amount involved (that is, greater subjectivity, complexity, or judgment, like that related to an accounting estimate, increases risk);

- The interaction or relationship of the control with other controls, including whether they are interdependent or redundant;

- The interaction of the deficiencies (that is, when evaluating a combination of two or more deficiencies, whether the deficiencies could affect the same financial statement amounts or disclosures); and

- The possible future consequences of the deficiency.

Factors that affect the magnitude of the misstatement that might result from a deficiency or deficiencies in ICFR include, but are not limited to, the following:

- The financial statement amounts or total of transactions exposed to the deficiency; and

- The volume of activity in the account balance or class of transactions exposed to the deficiency that has occurred in the current period or that is expected in future periods.

In evaluating the magnitude of the potential misstatement, the maximum amount that an account balance or total of transactions can be overstated is generally the recorded amount, while understatements could be larger.  Also, in many cases, the probability of a small misstatement will be greater than the probability of a large misstatement.

Management should evaluate the effect of compensating controls[49] when determining whether a control deficiency or combination of deficiencies is a material weakness.  To have a mitigating effect, the compensating control should operate at a level of precision that would prevent or detect a misstatement that could be material.

In determining whether a deficiency or a combination of deficiencies represents a material weakness, management considers all relevant information.  Management should evaluate whether the following situations indicate a deficiency in ICFR exists and, if so, whether it represents a material weakness:

- Identification of fraud, whether or not material, on the part of senior management;[50]

- Restatement of previously issued financial statements to reflect the correction of a material misstatement;[51]

- Identification of a material misstatement of the financial statements in the current period in circumstances that indicate the misstatement would not have been detected by the company's ICFR; and

- Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

When evaluating the severity of a deficiency, or combination of deficiencies, in ICFR, management also should determine the level of detail and degree of assurance that

---

[49] Compensating controls are controls that serve to accomplish the objective of another control that did not function properly, helping to reduce risk to an acceptable level.

[50] For purposes of this indicator, the term "senior management" includes the principal executive and financial officers signing the company's certifications as required under Section 302 of Sarbanes Oxley as well as any other members of senior management who play a significant role in the company's financial reporting process.

[51] See FAS 154, Accounting Changes and Error Corrections, regarding correction of a misstatement.

would satisfy prudent officials in the conduct of their own affairs that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  If management determines that the deficiency, or combination of deficiencies, might prevent prudent officials in the conduct of their own affairs from concluding that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, then management should treat the deficiency, or combination of deficiencies, as an indicator of a material weakness.

## 2. Expression of Assessment of Effectiveness of ICFR by Management

Management should clearly disclose its assessment of the effectiveness of ICFR and, therefore, should not qualify its assessment by stating that the company's ICFR is effective subject to certain qualifications or exceptions.  For example, management should not state that the company's controls and procedures are effective except to the extent that certain material weakness(es) have been identified.  In addition, if a material weakness exists, management may not state that the company's ICFR is effective. However, management may state that controls are ineffective for specific reasons.

## 3. Disclosures about Material Weaknesses

The Commission's rule implementing Section 404 was intended to bring information about material weaknesses in ICFR into public view.  Because of the significance of the disclosure requirements surrounding material weaknesses beyond specifically stating that the material weaknesses exist, companies should also consider including the following in their disclosures:[52]

---

[52] Significant deficiencies in ICFR are not required to be disclosed in management's annual report on its evaluation of ICFR required by Item 308(a).

- The nature of any material weakness,

- Its impact on the company's financial reporting and its ICFR, and

- Management's current plans, if any, or actions already undertaken, for remediating the material weakness.

Disclosure of the existence of a material weakness is important, but there is other information that also may be material and necessary to form an overall picture that is not misleading.[53]  The goal underlying all disclosure in this area is to provide an investor with disclosure and analysis that goes beyond describing the mere existence of a material weakness.  There are many different types of material weaknesses and many different factors that may be important to the assessment of the potential effect of any particular material weakness.  While management is required to conclude and state in its report that ICFR is ineffective when there are one or more material weaknesses, companies should also consider providing disclosure that allows investors to understand the cause of the control deficiency and to assess the potential impact of each particular material weakness.  This disclosure will be more useful to investors if management differentiates the potential impact and importance to the financial statements of the identified material weaknesses, including distinguishing those material weaknesses that may have a pervasive impact on ICFR from those material weaknesses that do not.

### 4.  Impact of a Restatement of Previously Issued Financial Statements on Management's Report on ICFR

Item 308 of Regulation S-K requires disclosure of management's assessment of the effectiveness of the company's ICFR as of the end of the company's most recent fiscal year.  When a material misstatement of previously issued financial statements is

---

[53] See Exchange Act Rule 12b-20 [17 CFR 240.12b-20].

discovered, a company is required to restate those financial statements. However, the restatement of financial statements does not, by itself, necessitate that management consider the effect of the restatement on the company's prior conclusion related to the effectiveness of ICFR.

While there is no requirement for management to reassess or revise its conclusion related to the effectiveness of ICFR, management should consider whether its original disclosures are still appropriate and should modify or supplement its original disclosure to include any other material information that is necessary for such disclosures not to be misleading in light of the restatement. The company should also disclose any material changes to ICFR, as required by Item 308(c) of Regulation S-K.

Similarly, while there is no requirement that management reassess or revise its conclusion related to the effectiveness of its disclosure controls and procedures, management should consider whether its original disclosures regarding effectiveness of disclosure controls and procedures need to be modified or supplemented to include any other material information that is necessary for such disclosures not to be misleading. With respect to the disclosures concerning ICFR and disclosure controls and procedures, the company may need to disclose in this context what impact, if any, the restatement has on its original conclusions regarding effectiveness of ICFR and disclosure controls and procedures.

5.    **Inability to Assess Certain Aspects of ICFR**

In certain circumstances, management may encounter difficulty in assessing certain aspects of its ICFR. For example, management may outsource a significant process to a service organization and determine that evidence of the operating

effectiveness of the controls over that process is necessary.  However, the service organization may be unwilling to provide either a Type 2 SAS 70 report or to provide management access to the controls in place at the service organization so that management could assess effectiveness.[54]  Finally, management may not have compensating controls in place that allow a determination of the effectiveness of the controls over the process in an alternative manner.  The Commission's disclosure requirements state that management's annual report on ICFR must include a statement as to whether or not ICFR is effective and do not permit management to issue a report on ICFR with a scope limitation.[55]  Therefore, management must determine whether the inability to assess controls over a particular process is significant enough to conclude in its report that ICFR is not effective.

---

[54] AU Sec. 324, Service Organizations (as adopted on an interim basis by the Public Company Accounting Oversight Board ("PCAOB") in PCAOB Rule 3200T), defines a report on controls placed in operation and test of operating effectiveness, commonly referred to as a "Type 2 SAS 70 report."  This report is a service auditor's report on a service organization's description of the controls that may be relevant to a user organization's internal control as it relates to an audit of financial statements, on whether such controls were suitably designed to achieve specified control objectives, on whether they had been placed in operation as of a specific date, and on whether the controls that were tested were operating with sufficient effectiveness to provide reasonable, but not absolute, assurance that the related control objectives were achieved during the period specified.

[55] See Item 308(a)(3) of Regulations S-K and S-B [17 CFR 229.308(a)(3) and 228.308(a)(3)].

### III.  Discussion of Comments on the Proposing Release

The Proposing Release proposed for public comment interpretive guidance for management regarding the annual evaluation of ICFR required by Rules 13a-15(c) and 15d-15(c) under the Exchange Act.  We received letters from 211 commenters in response to the Proposing Release.[56]  The majority of commenters were supportive of the Commission's efforts in developing this Interpretive Guidance.  We have reviewed and considered all of the comments received on the proposal, and we discuss our conclusions with respect to the comments in more detail in the following sections.

### A.  Alignment between Management's Evaluation and Assessment and the External Audit

Commenters expressed concern that confusion and inefficiencies may arise from differences between the proposed guidance for management's evaluation of ICFR and the PCAOB's proposed auditing standard for ICFR.[57]  Commenters cited a lack of alignment between the two with regard to the terminology and definitions used[58] as well as

---

[56] Of the 211 commenters, 43 were issuers, 33 professional associations and business groups, 19 foreign private issuers and foreign professional associations, 10 investor advocacy and other similar groups, 8 major accounting firms, 11 smaller accounting firms and Section 404 service providers, 8 banks and banking associations, 4 law firms and law associations, and 75 other interested parties including students, academics, and other individuals.  The comment letters are available for inspection in the Commission's Public Reference Room at 100 F Street, NE, Washington DC 20549 in File No. S7-24-06, or may be viewed at http://www.sec.gov/comments/s7-24-06/s72406.shtml.

[57] In PCAOB Release No. 2006-007 the PCAOB proposed for public comment An Audit of Internal Control Over Financial Reporting That Is Integrated With An Audit of Financial Statements and Considering and Using the Work of Others in an Audit.  See http://www.pcaobus.org/Rules/Docket_021/2006-12-19_Release_No._2006-007.pdf (hereinafter "Proposed Auditing Standard").

[58] See, for example, letters from American Bar Association's Committees on Federal Regulation of Securities and Law and Accounting of the Section of Business Law (ABA), Association of Chartered Certified Accountants (ACCA), Edison Electric Institute (EEI), European Federation of Accountants (FEE), Financial Executives International Committee on Corporate Reporting (FEI CCR), Frank Gorrell (F. Gorrell), Society of Corporate Secretaries and Governance Professionals, and The Institute of Chartered Accountants in England and Wales (ICAEW).

differences in the overall approach.  Some commenters that were supportive of the

principles-based approach to the proposed interpretive guidance expressed concern that

improvements in the efficiency of management's evaluation of ICFR would be limited by

what they viewed as comparatively more prescriptive guidance for external auditors in

the Proposed Auditing Standard.[59]  Other commenters suggested that maximizing their

auditor's ability to rely on the work performed in management's evaluation would require

aligning the evaluation approach for management with the Proposed Auditing Standard.[60]

Even so, some of these commenters still viewed the interpretive guidance as an

improvement because it provides management the ability to choose whether, and to what

extent, it should align its evaluation with the auditing standard; whereas commenters said

that management feels compelled to align with the auditing standard under the current

rules.  Other commenters suggested that the proposed interpretive guidance was

compatible with the Proposed Auditing Standard and that improvements in

implementation could be attained with close coordination between management and

auditors.[61]

     In response to the comment letters, we have revised our proposal to more closely

align it with how we anticipate the PCAOB will revise its proposed auditing standard.

For example, the definition of a material weakness and the related guidance for

---

[59] See, for example, letters from Eli Lilly and Company (Eli Lilly), FEI CCR, Hutchinson Technology Inc. (Hutchinson), Independent Community Bankers of America (ICBA), MetLife Inc. (MetLife), Procter & Gamble Company (P&G), and Supervalu Inc. (Supervalu).

[60] See, for example, letters from Heritage Financial Corporation and Southern Company.

[61] See, for example, letters from BDO Seidman LLP (BDO), McGladrey & Pullen LLP (M&P), and PricewaterhouseCoopers LLP (PwC).

evaluating deficiencies, including indicators of a material weakness, have been revised.[62]

In addition, alignment revisions were made to the guidance for evaluating whether controls adequately address financial reporting risks, including entity-level controls, the factors to consider when identifying financial reporting risks and the factors for assessing the risk associated with individual financial reporting elements and controls.

However, some differences between our final interpretive guidance for management and the PCAOB's audit standard remain. These differences are not necessarily contradictions or misalignment; rather they reflect the fact that management and the auditor have different roles and responsibilities with respect to evaluating and auditing ICFR. Management is responsible for designing and maintaining ICFR and performing an evaluation annually that provides it with a reasonable basis for its assessment as to whether ICFR is effective as of fiscal year-end. Management's daily involvement with its internal control system provides it with knowledge and information that may influence its judgments about how best to conduct the evaluation and the sufficiency of evidence it needs to assess the effectiveness of ICFR. In contrast, the auditor is responsible for conducting an independent audit that includes appropriate professional skepticism. Moreover, the audit of ICFR is integrated with the audit of the company's financial statements. While there is a close relationship between the work performed by management and its auditor, the ICFR audit will not necessarily be limited to the nature and extent of procedures management has already performed as part of its evaluation of ICFR. There will be differences in the approaches used by management and the auditor because the auditor does not have the same information and

---

[62] The revisions made to the proposed definition of material weakness and the related guidance, including the strong indicators, are discussed in Section III.F. of this document.

understanding as management and because the auditor will need to integrate its tests of ICFR with the financial statement audit. We agree with those commenters that suggested coordination between management and auditors on their respective efforts will ensure that both the evaluation by management and the independent audit are completed in an efficient and effective manner.

## B. Principles-based Nature of Guidance for Conducting the Evaluation

The guidance is intended to assist management in complying with two broad principles: (1) evaluate whether controls have been implemented to adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner and (2) evaluate evidence about the operation of controls based on an assessment of risk. We believe the guidance will enable companies of all sizes and complexities to comply with our rules effectively and efficiently.

Commenters expressed support for the proposed guidance's principles-based approach.[63] However, some requested that the proposal be revised to include additional guidance and illustrative examples in the following areas:[64]

- the identification of controls that address financial reporting risks;[65]

- the assessment of ICFR risk, including how evidence gained over prior periods should impact management's assessment of risks associated with

---

[63] See, for example, letters from ACE Limited (ACE), American Electric Power Company, Inc. (AEP), Business Roundtable (BR), Canadian Bankers Association, Center for Audit Quality (Center), Ernst & Young LLP (EY), Grant Thornton LLP (GT), ING Groep N.V. (ING), Manulife Financial (Manulife), PwC, P&G, and Reznick Group, P.C. (Reznick).

[64] See, for example, letters from Brown-Forman, Ford Motor Company, MasterCard Incorporated (MasterCard), Northrop Grumman Corporation, Supervalu, UFP Technologies (UFP), and UnumProvident Corporation (UnumProvident).

[65] See, for example, letter from Nina Stofberg (N. Stofberg).

controls identified and therefore, the evidence needed to support its assessment;[66]

- how varying levels of risk impact the nature of the evidence necessary to support its assessment;[67]

- when on-going monitoring activities, including self-assessments, could be used to support management's assessment and reduce direct testing;[68]

- sampling techniques, sample sizes, and testing methods;[69]

- the type and manner in which supporting evidence should be maintained;[70] including specific guidelines regarding the amount, form and medium of evidence;[71] and

- how management should document the effectiveness of monitoring activities utilized to support its assessment, as well as how management should support the evidence obtained from its daily interaction with controls as part of its assessment.[72]

---

[66] See, for example, letters from ISACA and IT Governance Institute (ISACA), Manulife, and Ohio Society of Certified Public Accountants (Ohio).

[67] See, for example, letters from Cardinal Health, Inc. (Cardinal), Cleary Gottlieb Steen & Hamilton LLP (Cleary), and ISACA.

[68] See, for example, letters from BASF Aktiengesellschaft (BASF), Cardinal, Computer Sciences Corporation (CSC), ING, ISACA, Ohio, PPL Corporation (PPL), R. Malcolm Schwartz, N. Stofberg, and UnumProvident.

[69] See, for example, letters from BDO, National Association of Real Estate Investment Trusts, Reznick, and UFP.

[70] See, for example, letters from AEP, BDO, Center, EEI, Frank Consulting, PLLP (Frank), The Hundred Group of Finance Directors (100 Group), Institut Der Wirtschaftsprufer [Institute of Public Auditors in Germany] (IDW), Managed Funds Association (MFA), Nasdaq Stock Market, Inc. (Nasdaq), Ohio, N. Stofberg, and UFP.

[71] See, for example, letter from Nasdaq.

[72] See, for example, letters from BDO and Center.

We have considered the requests for additional guidance and decided to retain the principles-based nature of the proposed guidance.  We believe an evaluation of ICFR will be most effective and efficient when management makes use of all available facts and information to make reasonable judgments about the evaluation methods and procedures that are necessary to have a reasonable basis for the assessment of the effectiveness of ICFR and the evidential matter maintained in support of the assessment.  Additional guidance and examples in the areas requested would likely have the negative consequence of establishing "bright line" or "one-size fits all" evaluation approaches. Such an outcome would be contrary to our view that the evaluations must be tailored to a company's individual facts and circumstances to be both effective and efficient. Moreover, an evaluation by management that is focused on compliance with detailed guidance, rather than the risks to the reliability of its financial reporting, would likely lead to evaluations that are inefficient, ineffective or both.

Detailed guidance and examples from the Commission may also limit or hinder the natural evolution and further development of control frameworks and evaluation methodologies as technology, control systems, and financial reporting evolve.  As we have previously stated, the Commission supports and encourages the further development of control frameworks and related implementation guidance.  For example, the July 2006 small business guidance issued by COSO addresses the identification of financial reporting risks and the related controls.  Additionally, we note that COSO is currently working on a project to further define how the effectiveness of control systems can be

monitored.[73]  As such, companies may find that there are other sources for the additional guidance in the areas they are seeking.

      Commenters also expressed the view that companies may abuse the flexibility afforded by the proposed principles-based guidance to perform inadequate evaluations, thereby undermining the intended investor protection benefits.[74]  Other commenters have observed that material weakness disclosures to investors are too often simultaneous with, rather than in advance of, the restatement of financial statements, which undermines the usefulness of the disclosures.[75]  In response to these comments, we note that this principles-based guidance enables management to tailor its evaluation so that it focuses on those areas of financial reporting that pose the highest risk to reliable financial reporting.  We believe that a tailored evaluation approach that focuses resources on areas of highest risk will improve, rather than degrade, the effectiveness of many company's evaluations and improve the timeliness of material weakness disclosures to investors.

### C. Scalability and Small Business Considerations

      Commenters believed that the proposed interpretive guidance can be scaled to companies of all sizes and will benefit smaller public companies in completing their

---

[73] In a press release on January 8, 2007, COSO announced that Grant Thornton LLP had been commissioned to develop guidance to help organizations monitor the quality of their internal control systems.  According to that press release, the guidance will serve as a tool for effectively monitoring internal controls while complying with Sarbanes-Oxley.  The press release is available at http://www.coso.org/Publications/COSO%20Monitoring%20GT%20Final%20Release_1.8.07.pdf.

[74] See, for example, letters from Joseph V. Carcello, Consumer Federation of America, Consumer Action, U.S. Public Interest Research Group (CFA), and Moody's Investors Service (Moody's).

[75] See, for example, letters from CFA and Moody's.

assessments.[76]  However, some commenters requested more guidance to enable them to conduct the evaluation in an effective and efficient manner.  For example, commenters requested more guidance on how some of the unique characteristics of smaller companies, including a lack of segregation of duties, should be considered in the evaluation.[77]

Other commenters, mostly comprised of investor groups, requested that the guidance emphasize that scaled or tailored evaluation methods and procedures for smaller public companies should be based on both the size and complexity of the business and do not imply less rigorous evaluation methods and procedures.[78]

Some commenters indicated that smaller public companies should continue to be exempt at least until a thorough examination is conducted of both the Interpretive Guidance and the new Auditing Standard to ensure that smaller companies are not disproportionately burdened.[79]  Some commenters requested that the SEC further delay

---

[76] See, for example, letters from American Bankers Association (American Bankers), Anthony S. Chan, Chandler (U.S.A.), Inc. (Chandler), CNB Corporation & Citizens National Bank of Cheboygan (CNB), Financial Services Forum, GT, Greater Boston Chamber of Commerce, Minn-Dak Farmers Cooperative (MDFC), RAM Energy Resources, Inc., and San Jose Water Company.

[77] See, for example, letters from American Electronics Association (AeA), EY, Financial Executives International Small Public Company Task Force (FEI SPCTF), Frank, Institute of Management Accountants (IMA), MFA, U.S. Chamber of Commerce (Chamber), and U.S. Small Business Administration's Office of Advocacy (SBA).

[78] See, for example, letters from California Public Employees' Retirement System (CalPERS), CFA, Council of Institutional Investors, Ethics Resource Center, International Brotherhood of Teamsters, and Pension Reserves Investment Management Board (PRIMB).

[79] See, for example, letters from AeA, Biotechnology Industry Organization, Committee on Capital Markets Regulation (CCMR), Financial Reporting Committee of the Association of the Bar of the City of New York (NYC Bar), International Association of Small Broker Dealers and Advisers, National Venture Capital Association, SBA, Silicon Valley Leadership Group (SVLG), Small Business Entrepreneurship Council, TechNet, and Telecommunications Industry Association.

the implementation for one additional year[80] or continued to call for a complete exemption from Section 404 for smaller public companies.[81]  Other commenters requested that smaller public companies not be exempted.[82]

We believe the principles-based guidance permits flexible and scalable evaluation approaches that will enable management of smaller public companies to evaluate and assess the effectiveness of ICFR without undue cost burdens.  The guidance recognizes that internal control systems and the methods and procedures necessary to evaluate their effectiveness may be different in smaller public companies than in larger companies.  However, the flexibility provided in the guidance is not meant to imply that evaluations for smaller public companies be conducted with less rigor, or to provide anything less than reasonable assurance as to the effectiveness of ICFR at such companies.  Rather, smaller public companies should utilize the flexibility provided in the guidance to cost-effectively tailor and scale their methods and approaches for identifying and documenting financial reporting risks and the related controls and for evaluating whether operation of controls is effective (for example, by utilizing evidence gathered through management's daily interaction with its controls), so that they provide the evidence needed to assess whether ICFR is effective.

In addition, as previously mentioned, companies may find that there are other sources for guidance, such as the July 2006 guidance for applying the COSO framework to smaller public companies.  We believe our guidance, when used in conjunction with

---

[80] See, for example, letters from American Bankers, America's Community Bankers, Chandler, CNB, FEI SPCTF, F. Gorrell, ICBA, MFA, and Washington Legal Foundation (WLF).

[81] See, for example, letters from American Stock Exchange, ICBA, UFP, and WLF.

[82] See, for example, letters from American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), CalPERS, Frank, F. Gorrell, PRIMB, and WithumSmith+Brown Global Assurance, LLC.

other such guidance, will enable smaller public companies to have a better understanding of the requirements of a control framework, its role in effective internal control systems and the relationship to our evaluation and disclosure requirements. This should enable management to plan and conduct its evaluation in an effective and efficient manner.

The Commission believes that compliance with the ICFR evaluation and assessment requirements by smaller public companies will further the primary goal of Sarbanes-Oxley which is to enhance the quality of financial reporting and increase investor confidence in the fairness and integrity of the securities markets. We note that all financial statements filed with the Commission, even those by smaller public companies, result from a system of internal controls. Such systems are required by the FCPA to operate at a level that provides "reasonable assurance" about the reliability of financial reporting. Our rules implementing Section 404 direct management of all companies to evaluate and assess whether the company's system of internal controls is effective at achieving reasonable assurance. Our guidance is intended to help them do so in a cost-effective manner. Given the principles-based nature of our guidance and the flexibility it provides, we do not believe further postponement of the evaluation requirements are needed for smaller companies. We believe that the timing of the issuance of the Interpretive Guidance is adequate to allow for its effective implementation in 2007 evaluations.

**D.  Identifying Financial Reporting Risks and Controls**

**1.  Summary of the Proposal**

The proposal directed management to consider the sources and potential likelihood of misstatements, including those arising from fraudulent activity, and identify

those that could result in a material misstatement of the financial statements (that is, financial reporting risks).  The proposal indicated that management's consideration of the risk of misstatement generally includes all of its locations or business units and that the methods and procedures for identifying financial reporting risks will vary based on the characteristics of the individual company.  The proposal discussed factors for management to consider in selecting methods and procedures for evaluating financial reporting risks and in identifying the sources and potential likelihood of misstatement.

The proposal directed management to evaluate whether controls were placed in operation to adequately address the financial reporting risks it identifies.  The proposal indicated that controls were not adequate when their design was such that there was a reasonable possibility that a misstatement in a financial reporting element that could result in a material misstatement of the financial statements would not be prevented or detected in a timely manner.  The proposal discussed the fact that some controls may be automated or may depend upon IT functionality.  In these situations, the proposal stated that management's evaluation should consider not only the design and operation of the automated or IT dependent controls, but also the aspects of IT general controls necessary to adequately address financial reporting risks.

The proposal also indicated that entity-level controls should be considered when identifying financial reporting risks and related controls for a financial reporting element. The proposal discussed the nature of entity-level controls, how they relate to a financial reporting element and the need to consider whether they would prevent or detect material misstatements.  If a financial reporting risk for a financial reporting element is adequately addressed by an entity-level control, the proposal indicated that no further controls

needed to be identified and tested by management for purposes of the evaluation of ICFR.

### 2. Comments on the Proposal and Revisions Made

The Commission received a number of comments on the proposed guidance for identifying financial reporting risks and controls. As discussed in Section III.B above, many of these commenters requested more examples or more detailed guidance. Other comments received related to the identification of fraud risks and related controls; entity-level controls; and IT general controls.

<u>Identification of fraud risks and related controls</u>

Commenters suggested the guidance be revised to more strongly emphasize management's responsibility to identify and evaluate fraud risks and the related controls that address those risks.[83] Commenters also discussed the nature of fraud risks that most often lead to materially misstated financial statements and requested additional guidance regarding which fraud related controls are within the scope of the evaluation;[84] whether management can consider the risk of fraud through the overall risk assessment or if a specific fraud threat analysis is required;[85] and examples of the types of fraud that should be considered.[86] Other commenters noted that there is existing guidance for management, beyond what was referenced in the proposal, for assessing fraud risks and

---

[83] See, for example, letters from ACE, ACCA, BDO, Center, CSC, Deloitte & Touche LLP (Deloitte), GT, IMA, KPMG LLP (KPMG), M&P, Moody's, and PwC.

[84] See, for example, letters from BASF, BDO, and GT.

[85] See, for example, letter from Tatum LLC (Tatum).

[86] See, for example, letters from FEI CCR, P&G, and N. Stofberg.

the related controls.  These commenters suggested that the proposal be revised to directly incorporate the most relevant elements of such guidance.[87]

In response to the comments, the proposal was revised to clarify that fraud risks are expected to exist at every company and that the nature and extent of the fraud risk assessment activities should be commensurate with the size and complexity of the company.  Additionally, we expanded the references to existing guidance to include the AICPA's 2005 Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention and COSO's July 2006 Guidance for Smaller Public Companies.  Given the availability of existing information and guidance on fraud and consistent with the principles-based nature of the interpretive guidance, we determined that it was unnecessary to provide a list of fraud risks expected to be present at every company or a list of the areas of financial reporting expected to have a risk of material misstatement due to fraud.  Moreover, providing such a list may result in a "checklist" type approach to fraud risk assessments that would likely be ineffective as financial reporting changes over time, or given the wide variety of facts and circumstances that exist in different companies and industries.  While management may find such checklists a useful starting point, effective fraud risk assessments will require sound and thoughtful judgments that reflect a company's individual facts and circumstances.

Entity-Level Controls

Commenters requested further clarification of how entity-level controls can address financial reporting risks in a top-down, risk based approach.[88]  Commenters also

---

[87] See, for example, letters from Center, GT, KPMG, and M&P.

[88] See, for example, letters from EY, Frank, MetLife, and UnumProvident.

suggested that the guidance place more emphasis on entity-level controls given their pervasive impact on all other aspects of ICFR.[89]

In response to the comments received, we expanded the discussion of entity-level controls and how they relate to financial reporting elements. This discussion further clarifies that some entity-level controls, such as controls within the control environment, have an important, but indirect, effect on the likelihood that a misstatement will be prevented or detected on a timely basis. While these controls might affect the other controls management determines are necessary to address financial reporting risks for a financial reporting element, it is unlikely management will identify only this type of entity-level control as adequately addressing a financial reporting risk. Further, the guidance clarifies that some entity-level controls may be designed to identify possible breakdowns in lower-level controls, but not in a manner that would, by themselves, adequately address financial reporting risks. In these cases, management would identify the additional controls needed to adequately address financial reporting risks, which may include those that operate at the transaction or account balance level. Consistent with the proposal, management does not need to identify or evaluate additional controls relating to a financial reporting risk if it determines that the risk is being adequately addressed by an entity-level control.

We have also revised the proposed guidance to further clarify that the controls management identifies in Section II.A.1 should include the entity-level and pervasive elements of its ICFR that are necessary to have a system of internal control that provides reasonable assurance as to the reliability of financial reporting. Management can use the

---

[89] See, for example, letters from ACCA, ACE, Eli Lilly, European Association of Listed Companies (EALIC), and PwC.

existing control frameworks and related guidance to assist them in evaluating the adequacy of these aspects of their ICFR.

<u>Information Technology General Controls</u>

Commenters expressed concern that the proposal's guidance on IT general controls was too vague or that it lacked sufficient clarity[90] and requested further guidance and illustrative examples[91] to clarify the extent to which IT general controls are within the scope of the ICFR evaluation.[92]  Commenters also suggested that the Commission directly incorporate the May 16, 2005 Staff Guidance[93] on IT general controls[94] and that we clarify that IT general controls alone, without consideration of application controls, will not sufficiently address the risk of material misstatement.[95]  One commenter noted that providing such guidance could have the unintended consequence of setting a precedent for providing more detailed guidance in other areas of the evaluation.[96]

Commenters also suggested that we revise the proposal to clarify how a top-down approach considers IT general controls,[97] that we encourage a "benchmarking" approach for evaluating automated controls,[98] and that we permit companies who implement IT

---

[90] See, for example, letters from Aerospace Industries Association, MasterCard, and Nasdaq.

[91] See, for example, letter from Microsoft Corporation (MSFT).

[92] See, for example, letters from Faisal Danka, ISACA, MSFT, Rod Scott, and The Travelers Companies, Inc. (Travelers).

[93] Division of Corporation Finance and Office of the Chief Accountant: <u>Staff Statement on Management's Report on Internal Control Financial Reporting</u> (May 16, 2005), available at http://www.sec.gov/spotlight/soxcomp/.htm.

[94] See, for example, letters from FEI CCR and P&G.

[95] See, for example, letter from IDW.

[96] See, for example, letter from ICAEW.

[97] See, for example, letters from Cardinal and ISACA.

[98] See, for example, letter from CSC.

systems late in the year to do so while still being able to satisfy their ICFR responsibilities.[99]

We made several revisions to the proposed guidance based on the comment letters. We revised the proposal to explain that the identification of risks and controls within IT should be integral to, and not separate from, management's top-down, risk-based approach to evaluating ICFR and in determining the necessary supporting evidential matter. We clarified that controls which address financial reporting risks may be automated, dependent upon IT functionality, or require a combination of both manual and automated procedures and that IT general controls alone, without consideration of application controls, ordinarily do not adequately address financial reporting risks. We also incorporated guidance from the May 16, 2005 Staff Statement which explains that it is unnecessary to evaluate IT general controls that primarily pertain to efficiency or effectiveness of operations, but which are not relevant to addressing financial reporting risks.

We have declined to further specify categories or areas of IT general controls that will be relevant to the ICFR evaluation for all companies. We continue to believe that such determinations require consideration of each company's individual facts and circumstances. Moreover, we have concluded it is not necessary to include a discussion of a "benchmarking" approach to evaluating automated controls. The lack of such discussion in our guidance does not preclude management from taking such an approach if they believe it to be both efficient and effective.

---

[99] See, for example, letter from Chamber.

Additionally, we did not revise the proposed guidance to discuss implementation of IT systems, or changes thereto, late in the year because we do not believe such decisions should be impacted by the requirement to evaluate and assess the effectiveness of ICFR. Even without the evaluation and assessment requirements, the implementation of an IT system late in the year does not change management's responsibility to maintain a system of internal control that provides reasonable assurance regarding the reliability of financial reporting. Allowing an exclusion from the evaluation for controls placed in operation late in the year could have the unintended consequence of negatively impacting the reliability of financial reporting. Management has the ability to mitigate the risk of material misstatement that arises from ineffective controls in a new IT system. For example, management may perform pre-implementation testing of the IT controls needed to adequately address financial reporting risks. Additionally, management may implement compensating controls, such as manual reconciliations and verification, until such time that management has concluded that the IT controls within the system are adequate. Accordingly, we do not believe it is necessary or appropriate to exclude new IT systems or changes to existing systems from the scope of the evaluation of ICFR.

## E. Evaluating Evidence of the Operating Effectiveness of ICFR

### 1. Summary of the Proposal

Our proposal indicated that management should consider both the risk characteristics of the financial reporting elements to which the controls relate and the risk characteristics of the controls themselves (collectively, ICFR risk) in making judgments about the nature and extent of evidence necessary to provide a reasonable basis for the assessment of whether the operation of controls is effective. The proposal identified

significant accounting estimates, related party transactions and critical accounting policies as examples of financial reporting areas that generally would be assessed as having a higher risk of misstatement and control failure.  However, the proposed guidance recognizes that since not all controls have the same risk characteristics, when a combination of controls is required to adequately address the risks to a financial reporting element, management should analyze the risk characteristics of each control separately. Further, under the proposed guidance, when evaluating risks in multi-location environments, management should generally consider the risk characteristics of the controls related to each financial reporting element, rather than making a single judgment for all controls at a particular location when determining the sufficiency of evidence to support its assessment.

Our proposal indicated that the evidence of the operation of controls that management evaluates may come from a combination of on-going monitoring and direct testing and that management should vary the nature, timing and extent of these based on its assessment of the ICFR risk.  Our proposal stated that this evidence would ordinarily cover a reasonable period of time during the year and include the fiscal year-end.  The proposal also acknowledged that, in smaller companies, those responsible for assessing the effectiveness of ICFR may, through their on-going direct knowledge and supervision of the operation of controls (that is, daily interaction) have a reasonable basis to evaluate the effectiveness of some controls without performing direct tests specifically for purposes of the evaluation.

The proposal explained that the evidential matter constituting reasonable support for the assessment would generally include the basis for management's assessment and

documentation of the evaluation methods and procedures for gathering and evaluating evidence.  Additionally, the proposal indicated that the nature of the supporting evidential matter, including documentation, may take many forms and may vary based on management's assessment of ICFR risk.  For example, management may determine that it is not necessary to maintain separate copies of the evidence evaluated if such evidence already exists in the company's books and records.  The proposal also indicates that as the degree of complexity of the control, the level of judgment required to operate the control, and the risk of misstatement in the financial reporting element increase, management may determine that separate evidential matter supporting a control's operation should be maintained.

### 2.  Comments on the Proposal and Revisions Made

The Commission received a number of comments on the proposed guidance for evaluating whether the operation of controls was effective.  As discussed in Section III.B above, many of these commenters requested more examples or more detailed guidance.  Other comments received related to the appropriateness of various "rotational" approaches to evaluating evidence of whether the operation of controls was effective; the nature of on-going monitoring activities, including self-assessments and daily interaction; the time period to be covered by evaluation procedures; and supporting evidential matter.

<u>Rotational Approaches to Evaluating Evidence</u>

Commenters requested that the guidance explicitly allow management to rotate its evaluation of evidence of the operation of controls and a variety of different approaches for doing so were suggested.  These approaches included, for example, a rotational

approach for lower risk controls,[100] a rotational approach in areas where management determines there are no changes in the controls since the previous assessment,[101] or a rotational approach where there is both lower risk and no changes in controls.[102]  In addition, some suggested a "benchmarking" approach, similar to that used for IT controls, be allowed for non-IT controls.[103]  Other commenters agreed with the proposal's requirement that management consider evidence of the operation of controls each year.[104]  Others noted that while they believed it is appropriate for management to consider the results of its prior year assessments, the guidance should make it clear that the evaluation of operating effectiveness is an annual requirement.[105]

Other commenters raised the issue of a rotational approach specific to multi-location considerations.  For example, commenters suggested that the guidance allow for rotation of locations based upon risk (for example, once every three years).[106]  However, some commenters suggested that the risk-based approach provided in the proposed guidance would appropriately allow companies to vary testing in locations based more on risk than coverage, which would improve the efficiency of their assessment.[107]

After considering the comments, the Commission has retained the guidance substantially as proposed.  We did not introduce a concept that allows management to

---

[100] See, for example, letters from CSC, EALIC, ING, MasterCard, and NYC Bar.

[101] See, for example, letters from P&G and Travelers.

[102] See, for example, letters from EEI and Supervalu.

[103] See, for example, letters from Eli Lilly and FEI CCR.

[104] See, for example, letters from CCMR, Deloitte, and KPMG.

[105] See, for example, letters from AFL-CIO, Center, CFA, Deloitte, and PwC.

[106] See, for example, letter from CSC.

[107] See, for example, letters from MSFT, New York State Society of Certified Public Accountants, and Plains Exploration & Production Company.

eliminate from its annual evaluation those controls that are necessary to adequately address financial reporting risks.  For example, management cannot decide to include controls for a particular location or process within the scope of its evaluation only once every three years or exclude controls from the scope of its evaluation based on prior year evaluation results.  To have a reasonable basis for its assessment of the effectiveness of ICFR, management must have sufficient evidence supporting the operating effectiveness of all aspects of its ICFR as of the date of its assessment.  The guidance provides a framework to assist management in making judgments regarding the nature, timing and extent of evidence needed to support its assessment.  Management can use this framework to scale its evaluation methods and procedures in response to the risks associated with both the financial reporting elements and related controls in its particular facts and circumstances.

However, the guidance has been clarified to reflect that management's experience with a control's operation both during the year and as part of its prior year assessment(s) may influence its decisions regarding the risk that controls will fail to operate as designed.  This, in turn, may have a corresponding impact on the evidence needed to support management's conclusion that controls operated effectively as of the date of management's assessment.

### Nature of On-Going Monitoring Activities

Commenters expressed concern that, as defined in the proposal, some on-going monitoring activities would not be deemed to provide sufficient evidence.[108]  Other commenters were concerned that the guidance placed too much emphasis on the amount

---

[108] See, for example, letters from BASF and Cees Klumper & Matthew Shepherd (C. Klumper & M. Shepherd).

of evidence that could be obtained from on-going monitoring activities and called for further examples of when they may provide sufficient evidence and when direct testing would be required.[109]  With regard to self-assessments, commenters suggested that self-assessments can be an integral source of evidence when their effective operation is verified by direct testing over varying periods of time based on the manner in which the self-assessments were conducted and on the level of risk associated with the controls.[110]  Other commenters requested the proposed guidance be revised to clarify how, based on the definitions provided, self-assessments differed from direct testing.[111]

Some commenters questioned the sufficiency of evidence that would result from management's daily interaction with controls and requested more specifics on when it would be appropriate as a source of evidence[112] and how management should demonstrate that its daily interaction with controls provided it with sufficient evidence to have a reasonable basis to assess whether the operation of controls was effective.[113]

Based on the feedback received, we modified the discussion of on-going monitoring activities, including self-assessments, and direct testing to clarify how the evidence obtained from each of the activities can vary.  As commenters in this area noted, on-going monitoring, including self-assessments, encompasses a wide array of activities that can be performed by a variety of individuals within an organization.  These individuals have varying degrees of objectivity, ranging from internal auditors to the personnel involved in business processes, and can include both those responsible for

---

[109] See, for example, letters from Center and EY.

[110] See, for example, letters from GT and C. Klumper & M. Shepherd.

[111] See, for example, letter from Cardinal.

[112] See, for example, letters from BDO, EY, Ohio, and Tatum.

[113] See, for example, letter from Ohio.

executing a control as well as those responsible for overseeing its effective operation. Because of the varying degrees of objectivity, the sufficiency of the evidence management obtains from on-going monitoring activities is determined by the nature of the activities (that is, what they entail and how they are performed).

We clarified the proposed guidance to indicate that when evaluating the objectivity of personnel, management is not required to make an absolute conclusion regarding objectivity, but rather should recognize that personnel will have varying degrees of objectivity based on, among other things, their job function, their relationship to the control being evaluated, and their level of authority and responsibility within the organization. Management should consider the ICFR risk of the controls when determining whether the objectivity of the personnel involved in the monitoring activities results in sufficient evidence. For example, for areas of high ICFR risk, management's on-going monitoring activities may provide sufficient evidence when the monitoring activities are carried out by individuals with a high degree of objectivity. However, when management's support includes evidence obtained from activities performed by individuals who are not highly objective, management would ordinarily supplement the evidence with some degree of direct testing by individuals who are independent from the operation of the control to corroborate the information from the monitoring activity.

With regard to requests for more guidance related to management's daily interaction, we have adopted the guidance substantially as proposed. We believe that in smaller companies, management's daily interaction with the operation of controls may provide it with sufficient evidence to assess whether controls are operating effectively. The guidance is not intended to limit management's flexibility with regard to the areas of

ICFR where its interaction can provide it with sufficient evidence or the manner by which management obtains knowledge of the operation of the controls.  However, as noted in the guidance, daily interaction as a source of evidence for the operation of controls applies to management who are responsible for assessing the effectiveness of ICFR and whose knowledge about the effective operation is gained from its on-going direct knowledge and direct supervision of controls.  In addition, the evidence management maintains in support of its assessment should include the design of the controls that adequately address the financial reporting risks as well as how its interaction provides an adequate basis for its assessment of the effectiveness of ICFR.

<u>Time Period Covered by Evaluation Procedures</u>

Commenters requested that the guidance allow for, and encourage, management to gather evidence throughout the year to support its assessment in lieu of having to gather some evidence close to or as-of year-end.[114]  These commenters believed that such guidance would encourage companies to better integrate their evaluation procedures into the normal activities of their daily operations, spread the effort more evenly throughout the year, and help reduce the strain on resources at year-end when company personnel are preparing the annual financial statements and complying with other financial reporting activities.

We agree with the comments received in this area with respect to allowing management the flexibility to gather evidence in support of its assessment during the year.  Since management's assessment is performed as of the end of its fiscal year-end, the evidence management utilizes to support its assessment would ordinarily include a

---

[114] See, for example, letters from Eli Lilly, The Financial Services Roundtable, and Neenah Paper, Inc.

reasonable period of time during the year, including some evidence as of the date of its assessment. However, the proposal was not intended to limit management's flexibility to conduct its evaluation activities during the year. Rather, the proposed guidance was intended to provide management with the ability to perform a variety of activities covering periods of time that vary based on its assessment of risk in order to provide it with a sufficient basis for its evaluation. This could include, for example, a strategy that employs direct testing over a control during the year (but prior to year-end), that is supplemented with a self-assessment activity at year-end. As a result, we have adopted the guidance related to the period of time for which management should obtain evidence of the operation of controls substantially as proposed.

<u>Supporting Evidential Matter</u>

Commenters expressed support for the guidance in the proposal related to the supporting evidential matter and believed it would allow management to make better judgments and allow for sufficient flexibility to vary the nature and extent of evidence based on the company's particular facts and circumstances.[115] Other commenters observed that a certain level of documentation was required in order to facilitate an efficient and effective audit and suggested the guidance explicitly state this fact and/or clarify how the guidance for management was intended to interact with the requirements provided to auditors.[116] One commenter requested that we clarify our intention related to

---

[115] See, for example, letters from BR, EY, Hudson Financial Solutions (HFS), and MSFT.

[116] See, for example, letters from Center, Deloitte, EY, GT, M&P, MetLife, MDFC, PwC, and N. Stofberg.

the audit committee's involvement in the review of evidential matter prepared by management in support of its assessment.[117]

After consideration of the comments, we are adopting the guidance substantially as proposed.  We continue to believe that management should have considerable flexibility as to the nature and extent of the documentation it maintains to support its assessment, while at the same time maintaining sufficient evidence to provide reasonable support for its assessment.  Providing specific guidelines and detailed examples of various types of documentation would potentially limit the flexibility we intended to afford management.

With respect to the concerns raised regarding the interaction of the proposed guidance and the audit requirements, we determined that no changes were necessary. Similar to an audit of the financial statements, the nature and extent of evidential matter maintained by management may impact how an auditor conducts the audit and the efficiency of the audit.  We believe that the most efficient implementation by management and the auditor is achieved when flexibility exists to determine the appropriate manner by which to complete their respective tasks.  However, we also believe that the Proposed Auditing Standard allows auditors sufficient flexibility to consider various types of evidence utilized by management.  The audit standard allows auditors to adjust their approach in certain circumstances, if necessary, so that audit procedures should not place any undue burden or expense on management's evaluation process.

---

[117] See, for example, letter from ABA.

**F. Evaluation of Control Deficiencies**

    **1.  Summary of the Proposal**

    The proposal directed management to evaluate each control deficiency that comes to its attention in order to determine whether the deficiency, or combination of control deficiencies, is a material weakness. The proposal defined a material weakness as a deficiency, or combination of deficiencies, in ICFR such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis by the company's ICFR. The proposal contained guidance on the aggregation of deficiencies by indicating that multiple control deficiencies that affect the same financial reporting element increase the likelihood of misstatement and may, in combination, constitute a material weakness, even though such deficiencies may be individually insignificant. The proposal also highlighted four circumstances that were strong indicators that a material weakness in ICFR existed. In summary, the following four items were listed:

- An ineffective control environment, including identification of fraud of any magnitude on the part of senior management; significant deficiencies that remain unaddressed after some reasonable period of time; and ineffective oversight by the audit committee (or entire board of directors if no audit committee exists).

- Restatement of previously issued financial statements to reflect the correction of a material misstatement.

- Identification by the auditor of a material misstatement of financial statements in the current period under circumstances that indicate the misstatement would not have been discovered by the company's ICFR.

- For complex entities in highly regulated industries, an ineffective regulatory compliance function.

### 2. Comments on the Proposal and Revisions Made

<u>Definition of Material Weakness</u>

Commenters expressed concern about differences between our proposed definition of material weakness and that proposed by the PCAOB in its Proposed Auditing Standard and requested that the two definitions be aligned.[118]  Commenters provided feedback on the reasonably possible threshold for determining the likelihood of a potential material misstatement as well as the reference to interim financial statements for determining whether a potential misstatement could be material.  Commenters also suggested that a single definition of material weakness be established for use by both auditors and management and that definition be established by the SEC in its rules.[119]  Based on comments on the proposal, we are amending Exchange Act Rule 12b-2 and Rule 1-02 of Regulation S-X to define the term material weakness.  Further discussion and analysis of the definition of material weakness and commenter feedback can be found in that rule release.[120]

---

[118] See, for example, letters from EEI, FEI CCR, FEI SPCTF, ICAEW, N. Stofberg, and SVLG.

[119] See, for example, letters from FEE and ICAEW.

[120] Release No. 34-55928.

Strong Indicators of a Material Weakness

Commenters noted there were differences in the list of strong indicators included in the proposal and the list of strong indicators included in the Proposed Auditing Standard, raising concern that the failure of the two proposals to provide similar guidance would cause unnecessary confusion between management and auditors.[121]  Commenters also provided suggested changes, additions or deletions to circumstances that were included on the list of strong indicators.  For example, commenters raised questions about the "identification of fraud of any magnitude on the part of senior management," questioning the appropriateness of the term "of any magnitude" or which individuals were encompassed in the term "senior management."[122]  Commenters also felt the Commission's proposed list of indicators should be expanded to include the indicator relating to an ineffective internal audit function or risk assessment function that was included in the Proposed Auditing Standard.[123]  One commenter felt that the list of strong indicators needed to be made more specific, and should include more illustrative examples.[124]  Another commenter stated that the indicator of "significant deficiencies that have been identified and remain unaddressed after some reasonable period of time" should be clarified to mean unremediated deficiencies.[125]  Other commenters suggested that the list of strong indicators be eliminated completely, stating that designating these items as strong indicators creates a presumption that such items are, in fact, material

---

[121] See, for example, letters from BDO, BR, Center, Cleary, CSC, Deloitte, KPMG, M&P, and Schneider Downs & Co., Inc. (Schneider).

[122] See, for example, letters from 100 Group, Eli Lilly, FEI CCR, and P&G.

[123] See, for example, letters from BR, Crowe Chizek & Company LLC (Crowe), Deloitte, and M&P.

[124] See, for example, letter from Chamber.

[125] See, for example, letter from EEI.

weaknesses, and may impede the use of judgment to properly evaluate the identified

control deficiency in light of the individual facts and circumstances.[126]  Commenters also

felt the Commission should clearly indicate that a company may determine that no

deficiency exists despite the fact that one of the identified strong indicators was

present.[127]

       After consideration of the comments, we have decided to modify the proposed

guidance.  We believe judgment is imperative in determining whether a deficiency is a

material weakness and that the guidance should encourage management to use that

judgment.  As a result, we have modified the guidance to emphasize that the evaluation

of control deficiencies requires the consideration of all of the relevant facts and

circumstances.  We agreed with the concerns that an overly detailed list may create a list

of de facto material weaknesses or inappropriately suggest that identified control

deficiencies not included in the list are of lesser importance.  At the same time, however,

we continue to believe that highlighting certain circumstances that are indicative of a

material weakness provides practical information for management.  As a result, rather

than referring to "strong indicators," the final guidance refers simply to "indicators."

This change should further emphasize that the presence of one of the indicators does not

mandate a conclusion that a material weakness exists.  Rather management should apply

professional judgment in this area.  These examples include indicators related to the

results of the financial statement audit, such as material audit adjustments and

restatements, and indicators related to the overall evaluation of the company's oversight

of financial reporting, such as the effectiveness of the audit committee and incidences of

---

[126] See, for example, letters from Cleary, Institute of Internal Auditors (IIA), and NYC Bar.

[127] See, for example, letters from Chamber, Cleary, CSC, PPL, and Schneider.

fraud among senior management. These examples are by no means an exhaustive list. For example, under COSO, risk assessment and monitoring are two of the five components of an effective system of internal control.  If management concludes that an internal control component is not effective, or if required entity-level or pervasive elements of ICFR are not effective, it is likely that internal control is not effective.

Lastly, we agreed with commenters that it is appropriate for the Commission's guidance in this area to mirror the PCAOB's auditing standard.  As a result, we have worked with the PCAOB in reaching conclusions regarding the guidance in this area, and we anticipate the PCAOB's auditing standard will align with our final management guidance.

**G.  Management Reporting and Disclosure**

Comment letters expressed various viewpoints regarding the information management provides as part of its report on the effectiveness of ICFR.  For example, commenters raised concerns regarding the "point in time" assessment and suggested various alternative approaches.[128]  Commenters also made suggestions regarding the disclosures management provides when a material weakness has occurred.  Certain commenters felt the suggested disclosures indicated in the proposing release should be mandatory,[129] while other commenters wanted the Commission to specify where in the Form 10-K management must provide its disclosures.[130]  Commenters also requested that

---

[128] See, for example, letters from BHP Billiton Limited, Eli Lilly, and IIA.

[129] See, for example, letters from HFS, IDW, and Tatum.

[130] See, for example, letters from Crowe and KPMG.

the Commission include in its release additional possible disclosures for consideration by management to include in its report.[131]

In addition, commenters expressed concerns regarding the language in the Proposing Release with respect to management's ability to determine that ICFR is ineffective due solely to, and only to the extent of, the identified material weakness(es). Some commenters felt that this language was essentially the same as a qualified opinion, which is prohibited by the guidance,[132] while two others stated that the Commission needed to provide additional guidance around the circumstances under which this approach would be appropriate.[133]

Based on the feedback we received, we have eliminated this from the final interpretive guidance and revised the proposed guidance to simply state that management may not state that the company's ICFR is effective.  However, management may state that controls are ineffective for specific reasons.

Additionally, certain of the requests received seemed inconsistent with the statutory obligation.  For example, Section 404(a)(2) of Sarbanes-Oxley requires that management perform the assessment as of the end of its most recent fiscal year.  As a result, we do not believe any further changes to the proposed guidance around management's expression of its assessment of the effectiveness of ICFR are necessary.

---

[131] See, for example, letters from PCG Worldwide Limited and PepsiCo, Inc. (Pepsi).

[132] See, for example, letters from BDO and CFA.

[133] See, for example, letters from Crowe and Deloitte.

## H.  Previous Staff Guidance and Staff Frequently Asked Questions

Commenters raised questions regarding the status of guidance previously issued by the Commission and its staff, on May 16, 2005,[134] as well as the Frequently Asked Questions ("FAQs").[135]  Some commenters requested the FAQs be retained in their entirety,[136] while others requested that some particular FAQs be retained.[137]  As we indicated in the proposed guidance, the May 2005 guidance remains relevant. Additionally, we have instructed the staff to review the FAQs and, as a result of the final issuance of this guidance, update them as appropriate.

## I.  Foreign Private Issuers

The Commission received comments directed towards the information included in the proposed guidance related to foreign private issuers.  While three commenters noted that no additional guidance for foreign private issuers was necessary,[138] other commenters suggested changes.  Commenters raised concerns regarding potential duplicative efforts and costs foreign registrants are subject to, as a result of similar regulations in their local jurisdictions.[139]  These commenters requested that the Commission attempt to minimize or remove any duplicative requirements, with some

---

[134] Commission Statement on Implementation of Internal Control Reporting Requirements, Press Release No. 2005-74 (May 16, 2005); Division of Corporation Finance and Office of the Chief Accountant: Staff Statement on Management's Report on Internal Control Financial Reporting (May 16, 2005), available at http://www.sec.gov/spotlight/soxcom/.htm.

[135] Office of the Chief Accountant and Division of Corporation Finance: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports Frequently Asked Questions (revised Oct. 6, 2004), available at http://www.sec.gov/info/accountants/controlfaq1004.htm.

[136] See, for example, letters from BP p.l.c. (BP), GT, IIA, ISACA, MSFT, and Tatum.

[137] See, for example, letters from BDO, EY, KPMG, and Stantec Inc.

[138] See, for example, letters from BP, Manulife, and Pepsi.

[139] See, for example, letters from 100 Group, Banco Itaú Holding Financeira SA, CCMR, Eric Fandrich, and FEI CCR.

requesting the Commission exempt foreign registrants entirely from the ICFR reporting requirements if the registrant was subject to similar regulations in their home country. Other commenters raised concerns relating to the unique challenges that foreign registrants face in evaluating their ICFR, including language and cultural differences and international legal differences.[140]

Commenters also made suggestions regarding how the reconciliation to U.S. GAAP should be handled in the evaluation of ICFR. Certain commenters expressed support for the Commission's position that foreign private issuers should scope their evaluation effort based on the financial statements prepared in accordance with home country GAAP, rather than based on the reconciliation to U.S. GAAP.[141] However, other commenters requested that the Commission exempt the reconciliation to U.S. GAAP from the scope of the evaluation altogether,[142] while others sought further clarification as to whether and how the reconciliation was included in the evaluation of ICFR,[143] with one commenter suggesting the Commission staff publish additional Frequently Asked Questions to address any implementation issues.[144] One commenter requested the Commission exclude from the evaluation process those financial statement disclosures that are required by home country GAAP but not under U.S. GAAP to minimize the differences in the ICFR evaluation efforts between U.S. registrants and foreign filers as much as possible.[145]

---

[140] See, for example, letters from IIA and GT.

[141] See, for example, letters from 100 Group, BDO, and ICAEW.

[142] See, for example, letters from CCMR, Cleary, EALIC, and NYC Bar.

[143] See, for example, letters from Deloitte, EY, KPMG, and N. Stofberg.

[144] See, for example, letter from Ohio.

[145] See, for example, letter from ING.

After considering the comments received, the Commission has determined not to exempt foreign registrants from the ICFR reporting requirements, regardless of whether they are subject to similar home country requirements.  The Commission's requirement for all issuers to complete an evaluation of ICFR is not derived from the Commission's Interpretive Guidance for Management; this requirement has been established by Congress.  Further, the Commission does not believe it is appropriate to exclude the U.S. GAAP reconciliation from the scope of the evaluation as long as it is a required element of the financial statements.  Currently, however, the Commission is evaluating, as part of another project, the acceptance of International Financial Reporting Standards ("IFRS") as published by the International Accounting Standards Board ("IASB") without reconciliation to U.S. GAAP.[146]

In light of the comment letters, the Commission realizes that there are certain implementation concerns and issues that are unique to foreign private issuers.  As a result, the Commission has instructed the staff to consider whether these items should be addressed in a Frequently Asked Questions document.

---

[146] In a press release on April 24, 2007, the Commission announced its next steps pertaining to acceptance of IFRS without reconciliation to U.S. GAAP.  In that press release, the Commission stated that it anticipates issuing a Proposing Release in summer 2007 that will request comments on proposed changes to the Commission's rules which would allow the use of IFRS, as published by the IASB, without reconciliation to U.S. GAAP in financial reports filed by foreign private issuers that are registered with the Commission.  The press release is available at http://www.sec.gov/news/press/2007/2007-72.htm.

**List of Subjects**

17 CFR Part 241

    Securities.

**TEXT OF AMENDMENTS**

    For the reasons set out in the preamble, the Commission is amending Title 17,

chapter II, of the Code of Federal Regulations as follows:


**PART 241 – INTERPRETATIVE RELEASES RELATING TO THE SECURITIES**

**EXCHANGE ACT OF 1934 AND GENERAL RULES AND REGULATIONS**

**THEREUNDER**

    Part 241 is amended by adding Release No. 34-55929 and the release date of June

20, 2007 to the list of interpretative releases.


    By the Commission.


                                        Nancy M. Morris
                                        Secretary

Dated: June 20, 2007

# EXHIBIT 5

**EXHIBIT 5 REDACTED IN ITS ENTIRETY**

# EXHIBIT

# 6

**EXHIBIT 6 REDACTED IN ITS ENTIRETY**

# EXHIBIT

# 7

**EXHIBIT 7 REDACTED IN ITS ENTIRETY**

# EXHIBIT

# 8

**EXHIBIT 8 REDACTED IN ITS ENTIRETY**

# EXHIBIT 9

**EXHIBIT 9 REDACTED IN ITS ENTIRETY**

# EXHIBIT 10

**EXHIBIT 10 REDACTED IN ITS ENTIRETY**

# EXHIBIT 11

**EXHIBIT 11 REDACTED IN ITS ENTIRETY**

# EXHIBIT 12

**EXHIBIT 12 REDACTED IN ITS ENTIRETY**

# EXHIBIT 13

**EXHIBIT 13 REDACTED IN ITS ENTIRETY**

# EXHIBIT 14

**EXHIBIT 14 REDACTED IN ITS ENTIRETY**

# EXHIBIT 15

| | |
|---|---|
| **From:** | Ryan Dykhouse |
| **Sent:** | Monday, September 21, 2020 11:13 AM |
| **To:** | Rebekah.Soule@lw.com; Christopher.Turner@lw.com; ABID.QURESHI@LW.com; Lilit.Edwards@lw.com; Farnan@rlf.com |
| **Cc:** | Jeremy Robinson; Jesse Jensen; cfoulds@friedlandergorris.com |
| **Subject:** | Lord Abbett Affiliated Fund, Inc., et al. v. Navient Corp., et al. / Call Recordings |

Rebekah:

Thank you for the call on Friday. We are pleased that Navient has finally identified a code associated with forbearance that will allow us to identify the relevant call recordings in Plaintiffs' selected sample. On Friday's call, you explained that "TFO9" was a "communication event" code that was associated with a borrower entering into verbal forbearance and was used by Navient to collect forbearance-related call recordings for purposes of FSA audits. This is exactly the type of information that we have been requesting for months. Thank you also for confirming that Navient can apply the same approach to identify call recordings for Plaintiffs' sample of loan accounts, i.e., by searching for calls associated with the TF09 communication event code.

While we still want to see the remaining communication event codes and "translation table" – which we understand you will try to produce by tomorrow – we have considered this information and anticipate that applying the TF09 code will work for Plaintiffs' purposes. Given the tight timing, we ask that you start preparing this production right away. We further understand that, by using an automated code to identify relevant call recordings from the sample, Navient's production of the relevant call recordings should be greatly expedited. Please provide us with both the list of calls identified as TF09 communication events for our sample of loan accounts, as well as the call recordings associated with those calls by no later than 6pm on September 24, 2020. Please immediately let us know if Navient cannot meet this deadline. Plaintiffs reserve all rights.

Regards,
Ryan

_____

Ryan Dykhouse
**BLB&G**
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY  10020
Direct:  (212) 554-1413
Fax:  (212) 554-1444
Ryan.Dykhouse@blbglaw.com

# EXHIBIT 16

# Federal **Student**
*An* OFFICE *of the* U.S. DEPARTMENT *of* EDUCATION

PROUD SPONSOR *of*
*the* AMERICAN MIND®

Navient Use of Forbearance
Site Visit Review

**Report Date:** May 18, 2017
**On Site Date:** March 20 – 24, 2017

PREPARED FOR:
FSA Business Operations
Washington, DC

ON-SITE REVIEW TEAM:
Colby Jennings, Soo Kang, George Moghaddam,
Lisa Oldre, Jason Vann and Michael Wood

## Table of Contents

Site Visit Observations ................................................................................................................................ 2

Servicer Response ........................................................................................................................................ 5

Review Methodology .................................................................................................................................. 10

**EXHIBIT 61**

Donna Pfiester
12-17-19
Lord Abbett v. Navient
TGHudson RPR CRR

This presentation, document or report and analyses are provided for Internal-Use only and may not be shared outside of Federal Student Aid without the permission of FSA-Operations Services. This presentation, document, report or analysis was created to aid the Department of Education in complying with its legal obligation to collect federal student loan debt. These work products may also be used to inform the creation of future Department and FSA policies.

| Site Visit Observations |
| --- |

During the site visit, the FSA Review Team listened to recorded inbound calls and evaluated accounts based solely on a review of the servicing histories for some of those calls. The review team also did a side-by-side review with representatives to listen to live inbound calls. As part of the review, Navient also presented their inbound and outbound call processes. While on-site, the FSA Review Team discovered Navient inadvertently provided only inbound calls, even though the team requested all calls as part of the sample; Navient provided the requested outbound call recordings shortly thereafter. Because of this, the Call Monitoring Team completed the review off-site.

**CALL CENTER REVIEW**

FSA listened to 388 inbound and 2,000 outbound calls, for a total of 2,388 calls. Of these, FSA determined that 13 inbound and 207 outbound calls did not provide the borrowers with all of their options. For these 220 calls, Navient offered only forbearance.

Observation 1: For 220 of the calls, Navient CSRs neglected to offer the borrower an option other than forbearance. In several instances, this occurred after the borrower made a promise to pay within a short time of the call – usually within a time frame that would cause no additional detriment to the borrower. While this isn't a contractual requirement, these borrowers were not given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it.

*Recommendation:* FSA recommends that Navient asks questions so the borrower is able to determine which option (like promise to pay) would be most beneficial to resolve the delinquency. If the borrower is willing and able to make a payment to resolve the delinquency on the account, and can continue to make payments, FSA does not believe a borrower should use unnecessary forbearance time that will result in interest capitalization.

Observation 2: Similar to the first observation, many CSRs did not offer alternative or beneficial options when attempting to assist borrowers with bringing their account current or managing repayment. CSRs did not ask probing questions to determine if it would be more beneficial for the borrower to enter a deferment or to change to one of the Income Driven Repayment (IDR) options.

*Recommendation:* FSA recommends that Navient provide borrowers with all options available so that the borrower may make an informed decision based on their current situation. The use of forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term.

**SERVICING HISTORY REVIEW**

When reviewing accounts in Navient's CLASS system, it isn't always easy to determine exactly what happened on a given call. Of the forty accounts, the review team was able to determine that 21 of them offered the borrower an option other than forbearance. For the other nineteen accounts, FSA asked for Navient to provide the call that resulted in the notation on the account; eight of those did not offer the borrower any other option.

Observation #1: On twenty percent of the samples (8 out of 40 accounts), Navient offered the borrower *only* forbearance. In a few of these instances, borrowers offered information that suggested their income had changed (like going through a divorce, recently lost job or was in the process of taking a new job). However, Navient did not suggest a new repayment plan or an unemployment deferment. In other instances, the borrower requested a month or two of forbearance and Navient provided the forbearance without probing to see if there was a better option available to the borrower.

*Recommendation*: Six out of eight of the forbearance only accounts were for calls occurring before July 1, 2015. Since then, Navient has less turnover/higher staff retention (due to various adjustments within their training process). This could explain why the calls had a higher success rate after that date (2 out of 40, or five percent, of the calls offered only forbearance). However, FSA recommends that Navient provide communication/on-going training to their agents so that borrowers consistently receive all of their options – repay, IDR, deferment and forbearance.

Observation #2: About half of the time (21 out of 40 accounts), Navient's notes were not clear enough to determine what happened on the account. For example, entries on the same day would have a comment suggesting that the borrower both accepted and rejected the forbearance. It was unclear whether this was the same call or a different call. One reason for this is the CLASS system does not provide the timestamp to show when a transaction happened, unless the call was routed through the IVR. Another reason for this is because Navient's CARES system used to notate the account that the borrower rejected the forbearance when CSRs went to a different section of the CARES system. This issue of "rejecting forbearance" was resolved with a system upgrade in June 2016. In other examples, the phone agent clearly provided several options (repay, IDR, deferment) before ultimately giving the borrower the forbearance option. However, the note only displayed that the forbearance was processed without a discussion of the other options.

*Recommendation*: In June 2016, Navient updated their system so that the CARES screens don't "reject" forbearance when a phone agent goes to another screen. However, it is still not clear what happens on each call based on the notes left in the CLASS system. FSA recommends Navient notate each account so that the notes match exactly what happens on each call.

Observation #3: The review team was not able to determine what happened on four of the accounts because Navient was not able to provide all of the calls requested for the servicing history review. For two of the samples, Navient provided calls; however, they were not the calls matching the date of requested

3

sample. For two other samples, Navient was not able to provide calls at all. This is because the CARES calls have to be provided manually, and it is difficult for Navient to identify calls within a reasonable timeframe. For example, they needed to provide five calls for one borrower just to get the call matching the requested date.

*Recommendation*: To prevent confusion and promote accuracy, FSA recommends that Navient perform a level of QC on each request to ensure Navient is providing FSA with the information requested.

## LIVE SIDE-BY-SIDE REVIEW

For the side-by-side reviews, the review team listened to live calls as they entered the system. The agents were friendly and polite. However, Navient CSRs have varying degrees of skill when navigating calls. For example, one of the agents recently finished the eleven week training course and did a good job navigating the call. However, a more seasoned agent was not able to provide the next steps for a disabled borrower wanting to apply for discharge based on a determination by the Social Security Administration. After the review team left site, Navient provided CR 3294 (SSA match for TPD) to their staff for additional education.

| Servicer Response |
| --- |

Navient' s response:

Thank you for your assessment. Navient listened to and evaluated all the calls and reviewed all servicing history accounts deemed as servicing opportunities by FSA. Our review entailed a holistic evaluation of not only the call, but of all pertinent servicing history and other account information. Before addressing the three specific review categories, we would like to share a few general comments.

- We disagree with 168 of the 228 servicing opportunity determinations (call review and servicing history review). In most cases, we believe the representatives appropriately followed our call flow procedures and found the best solution for the borrowers.

- Servicers have not been provided with FSA specific preferences relative to call center scripting that prescribes in what instances to offer long term solutions such as IDR, when to offer other options such as graduated repayment or forbearance, and whether the servicer should counsel the borrower "away from" options requested by the borrower. Nor are we aware of any requirement that borrowers receive all of their repayment options- IDR, deferment and forbearance- on each and every call. As such, we do not believe a rating of pass or fail is appropriate for this review. Servicers are required to provide numerous disclosures to borrowers on the various repayment options and Navient complies with those requirements. These disclosures and call center interactions result in the borrower receiving information concerning their options when you look at them in their totality. We have developed extensive training programs and call flow procedures to guide representative discussions with borrowers, and regularly assess representative adherence with our policies and practices. Our practices and policies serve borrowers well as evidence by the lower delinquency and default rates experienced by Navient-serviced borrowers, and the rates in which borrowers serviced by Navient enroll in IDR and other nonstandard plans. Our assessment of the calls and "agree" or "disagree" is based on whether the representative followed our internal procedures. If FSA chooses to require all servicers to discuss IDR to all borrowers on all calls or to require all servicer representatives follow a common call flow, specific requirements should be provided in an approved Change Request.

- Including the presentation on March 21, we have discussed our call flow and probing questions with FSA on several occasions. We believe our call flow results in borrowers being offered the best solutions for their current situations.   We have scripting, tools, and training geared to provide consistent borrower information on the myriad of student loan repayment solutions. As depicted in the attached training graphic, our agent training and available tools promote IDR when appropriate as a long-term solution. This

is also monitored in ongoing call calibration sessions, mentoring, and quality control activities.



Repayment Options
Conversation.pdf

- Every borrower who receives a verbal forbearance was advised during the call of the terms of the forbearance and that they may be eligible for other repayment options, which include standard, graduated, extended or income driven repayment plans. Every borrower was required to accept the terms of the forbearance following this verbal disclosure.

- Every borrower who received a verbal forbearance also received a letter with enclosures that confirms the forbearance transaction and provides a clear and conspicuous disclosure of other repayment options like IDR, loan consolidation and deferment. The option to shorten or cancel the forbearance along with an example of the effects of capitalized interest during deferment or forbearance are provided in the letter.

- In 2016, Navient provided more than 154 million communications promoting IDR and other repayment options to our 10 million federal loan borrowers. In addition, in 2016 we educated and modeled repayment plans for 2.4 million borrowers.

- As demonstrated by the examples below, we believe the calls were appropriately handled in accordance with Navient's internal procedures. A detailed response for each call identified by FSA a servicing opportunity is attached- Appendix A.



Appendix A -
Navient Detailed Rev

- The sampling criteria of calls less than 5 minutes is not a representative sample of all calls. While calls that end in forbearance are on average longer than calls that end in IDR, in both cases the average call length is greater than 5 minutes. Therefore, a sample of only calls under 5 minutes would include more calls that ended in something other than forbearance or IDR. In short, the sampling methodology is not representative of all Navient calls and thus it would be inappropriate for users of this report to draw conclusions or compliance ratings based on the data in this report. We suggest that the report clarify that this is a sample of only a subset of Navient calls, specifically calls of a lower duration.

- Given the scope of our comments, we request the opportunity to review another draft of this report before it is issued as a final report.

## CALL CENTER REVIEW

FSA Observation 1 & 2: Navient agrees that in some limited instances agents offered forbearance when probing for IDR would have been a better approach and consistent with our internal procedures; however, we believe in the majority of instances representatives handled the call appropriately and in accordance with calls scripts and flows.

While a complete summary of the specific call findings and our call-by-call analysis is included in Appendix A, below are some examples of our differing analysis:

[(b)(6)] The borrower was prequalified for an Unemployment Deferment by an outbound default prevention associate.  The associate took the Unemployment Deferment path vs. the IDR path because the borrower stated the loans should be paid in the future by the Veteran's Administration. Consequently, the associate resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower.  We believe we found the best solution for this borrower.

[(b)(6)] The borrower had a $508 outstanding balance. The borrower indicated he couldn't afford his monthly payment due to unemployment. The default prevention associate did share that Income Driven Repayment was an option. However, the associate informed the borrower that this option would significantly extend the repayment terms due to the low balance. A level standard repayment plan will pay the loan off in 8 months vs. 23 months in an IDR plan. The associate prequalified the borrower for an Unemployment Deferment. The associate resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower.  We believe we found the best solution for this borrower.

[(b)(6)] The borrower called to check the status of her account.  She submitted an Unemployment Deferment but received a bill in the mail and was questioning if she needed to remit payment.  At the time of the call, the Unemployment Deferment had already been applied and the agent advised the bill could be disregarded.  Given that the Unemployment Deferment had already been applied, we believe the agent interacted appropriately during this call.

[(b)(6)] The borrower called to confirm she completed the Student Loan Debt Forbearance correctly.  Based on a review of the account, IDR was modeled on a prior call (July 18, 2014) and the calculated payment amount did not provide relief so Student Loan Debt Forbearance was offered.  IDR would not have been discussed on this call again as the borrower was not seeking additional relief.  She was merely confirming she had done everything correctly prior to sending the deferment, which was received and processed by September 10, 2014.

## SERVICING HISTORY REVIEW

7

FSA Observation 1: In mid-2015 agents from the Inbound Borrower Call Center completed an 8-hour IDR refresher class, which focused not only on program and processing rules but also scenario based activities intended to mirror common issues and call types. Information from this refresher module was also incorporated into our New Hire Curriculum. Our agents are trained to probe to assess whether the customer needs short term or long term payment relief and then proceed down the resulting path to qualify the customer for repayment options, deferment or forbearance based on their individual circumstances and needs.

In addition, IDR related items are frequent topics in our team meeting agendas where we routinely highlight items such as call flow, probing questions and best practices for customers who are experiencing financial hardship.

Navient reviewed all the accounts identified by FSA as servicing opportunities in the Servicing History Review category. In our evaluation of the pertinent servicing history, other account information and the associated call, we disagree with the assessment that eight accounts "failed".

Some examples where the accounts and call were handled appropriately and in accordance with our calls scripts and flows include:

(b)(6)　 - At the onset of the call, the borrower specifically requested forbearance "just for one month". The borrower did not indicate hardship making the scheduled payment or that long-term relief was necessary. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower. The borrower made all scheduled payments since this forbearance ended and has sought no additional relief.

(b)(6)　 - The borrower requested temporary relief (2-months) as he was changing jobs and returning to school. The borrower did return to school as indicated during the call and enrollment information was received and a school deferment was applied beginning on September 30, 2014. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option for this borrower.

(b)(6)

Our agents are trained to utilize system generated correspondence history messages where appropriate to document reasons for our highest volume call types. They are also trained to include specific "free form" messages where needed to ensure that important elements of the conversation are documented for future reference.

Additionally, in October 2015 we modified CARES (the GUI used by call center agents) so that any Repayment Option modeling completed by the agent writes a correspondence note to the system of record (CLASS) and details the information

8

collected related to income, spousal status and dependents as well as the resulting payment amount calculated under an IDR plan.

Further, in October, 2016 we launched a redesigned CARES Repayment Options Calculator that provides all eligible repayment plans to the agent in a grid view, which allows them to comprehensively calculate and review all eligible options at once. This provides for more efficient and effective discussion on repayment options with our customers.

Regarding the observation related to "rejected forbearance", there was a time when a correspondence history message indicating the customer declined forbearance would write to the system of record (CLASS) if an agent accessed the Forbearance window in CARES without processing a forbearance. For example, if an agent accessed the Forbearance window to determine if time was available, this correspondence history message would write to history even if forbearance was not discussed outright or discussed as an option and the borrower opted for another option. This was corrected in June 2016 and no longer occurs.

FSA Observation 3: Due to the age of some of the accounts requested for review in this category, Navient acknowledges that some call recordings were difficult to find as they were outside the call recording retention period required by FSA (30 days from date of call or 12 months if selected by FSA for monitoring). Regarding the missing calls, FSA requested call recordings on 19 accounts to facilitate the Servicing History Review. Of those 19 accounts, FSA noted that we were unable to provide call recordings on 4 accounts. We reviewed these four calls noted and made the following determinations:

- One recording (the 03/02/15 call for SSN [(b)(4),(b)(6)]    was a supplemental call and was not the recording associated with the forbearance processing in question.
- One recording (the 02/26/15 call for SSN [(b)(4),(b)(6)]    was noted with an incorrect date; Navient provided the call recorded on 03/06/14 which coincided with the date the forbearance in question was processed.
- Two recordings (the 08/03/15 call for SSN [(b)(4),(b)(6)]    and the 11/09/15 call for SSN [(b)(4),(b)(6)]    were located post-review.

## LIVE SIDE-BY-SIDE REVIEW

Navient provided feedback to the representative who handled the TPD related call. Our procedures and standard call handling protocol is to direct customers who have specific TPD-related questions to the designated TPD servicer for assistance from a subject matter expert. While our agents are trained in general eligibility guidelines, they are not trained to handle specific application or detailed eligibility questions. Moreover, we believe it is a better customer service experience to have a borrower contact the servicer who is empowered to assist the borrower, i.e. the designated TBD servicer, rather than have a lengthy conversation with a customer and only then tell them they need to talk to another servicer.

| Review Methodology |
| --- |

## SITE VISIT REVIEW OBJECTIVE

The objective of the site visit was to assess whether the use of forbearance by Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Requests (CR).  More specifically, the review team evaluated whether or not the Navient agents offered all the applicable options before placing a borrower in forbearance.

## STANDARDS

### Statutory & Regulatory

The regulations and requirements governing IDR are:

- Direct Loans − 34 CFR 685.205, 685.208-210 and 685.221
- FFEL − 34 CFR 682.211 and 682.215

### Change Requests

The implementation of Change Requests:

- CR 3290 − Call Center Branch-Specialty and Other Monitored Calls
- CR 3373 − Revised Recorded Call Data Selection and Volume

## METHODOLOGY

### Materials Requested

Navient granted the review team access to their CLASS servicing system and Citrix environment where the stored calls are located.  Navient also provided CSRs for the team to sit with in order to evaluate live phone calls.

### Sampling

Navient provided over two million inbound calls from 01/01/14 through 03/01/17.  From this list, the team randomly selected 700 phone calls − 200 each from 2014, 2015 and 2016, and 100 from 2017.  For the servicing history review, Navient queried the list of two million calls for calls that resulted in forbearance.  This resulted in a list of over 219,000 calls; the review team randomly selected fifty (50) accounts from that list.  Navient also provided six CSRs for side-by-sides.  For the outbound calls, Navient provided outbound calls from 3/23/2015 through 03/23/17.  The team randomly selected 2,000 calls and listened to all of those calls.

### Testing

10

The review team listened to phone calls and reviewed CLASS to determine if Navient CSRs properly handled phone calls.

The reviewers evaluated forbearance usage—

- Based on agents handling calls—
    - Providing repayment plans (including IDR);
    - Providing all options; and
- Based on servicing history—
    - Notations on account to determine what happened on calls; and
    - Accuracy of information provided in account history and on calls.

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) requested deferment due to short term disability. As a result the agent attempted to qualify him for deferment but determined he was not eligible, at which point forbearance was offered and accepted.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | (b)(4),(b)(6) |
| (b)(6) | | Disagree | (b)(6) requested a 2-month extension of his forbearance as he was changing jobs and returning to school. Due to the specific request from the customer for short term relief and the pending enrollment, forbearance was the best option. (b)(6) did return to school as indicated during the call; enrollment information was received and a school deferment was applied beginning on September 30, 2014.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | (b)(4),(b)(6) |
| (b)(6) | | Disagree | (b)(6) advised she needed to postpone her payments for 3-months. Due to short term nature defined by customer, the agent did not pursue longer term options as the customer said she could continue to make payments after the temporary hold.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) dvised that while she was waiting on tax information to send to us for IDR purposes (she was denied in 12/2013 as her income was too high), she recently lost her job and needed to postpone payments. The agent attempted to qualify her for an unemployment deferment but the customer advised she was in a "train to hire" program and would be working within a month or two. Due to the short term nature, forbearance was offered and accepted.<br><br>Note: The spreadsheet provided by FSA indicates this call took place on 02/26/15; however, there are no agent notes nor is there a forbearance applied on that date. The call with the agent noted on the spreadsheet and heard on recording ID 893947289 took place on 02/06/14.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) dvised she moved and needed to change her address and also that she needed to defer her payment for the month. The agent asked the customer if she wanted to resume payments in July and the customer confirmed that was accurate. Due to the specific, short term relief request from the customer, forbearance was applied as requested.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) requested forbearance "just for one month". Due to the specific and short term relief request from the customer, forbearance was applied as requested. The customer did not indicate hardship making the scheduled payment and did not convey that long-term relief was necessary.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |

2 of 34

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | N/A | FSA spreadsheet indicated calls were not provided; however, they were located post-visit and call ID was inserted in Column E. No response provided as no feedback/analysis received from FSA | (b)(4),(b)(6) | |
| (b)(6) | | N/A | FSA spreadsheet indicated calls were not provided; however, they were located post-visit and call ID was inserted in Column E. No response provided as no feedback/analysis received from FSA | (b)(4),(b)(6) | |
| (b)(6) | | Agree | (b)(6) dvised she was going through a divorce that should be settled in a few month and asked to postpone payments. Prior to the call, the customer had temporary hold expire that was applied after we qualified her for hardship deferment and were awaiting the required documentation. The customer was also in IDR (ICR, but in the permanent standard payment) and these should have been clues to the agent to ask if payment amount was affordable after forbearance expired or other probing questions to ensure hardship was in fact temporary and not long term. Although other options were not discussed, a letter was sent to the customer after the call that did include other options, including IDR.  Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) requested deferment for a couple of months and based on this request, the agent went down the short term postponement path. The agent did collect income for the purposes as qualifying the customer for Student Loan Debt Forbearance, which was not an option due to income. As a result, forbearance was offered and accepted. When the agent asked how much time was needed (b)(6) advised 2-months, again supporting the short term nature of the hardship.  Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| Total Disagree | 7 | | | | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| Total Agree | 1 | | | | |
| N/A | 2 | | | | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Agree | (b)(6) equested 2-months of postponement due to other obligations and advised that she would likely be able to resume payments in August or September making the relief temporary in nature. However, because (b)(6) was already in IDR (processed in 04/2014) the agent should have reminded the customer that she have the option of recalculating her IDR payment if needed. In addition, the agent should have asked probing questions to determine if deferment was an option given the short term nature of the requested relief.<br><br>Difficulty Making Payments disclosure letter sent post-call. IDR renewal letters/applications also sent annually but not returned | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) alled to confirm she completed the Student Loan Debt Forbearance correctly. Based on a review of the account, IDR was modeled on a prior call (July 18, 2014) and the calculated payment amount did not provide relief so Student Loan Debt Forbearance was offered. IDR would not have been discussed on this call again as (b)(6) y was not seeking additional relief. She was merely confirming she had done everything correctly prior to sending the deferment, which was received and processed by September 10, 2014. | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) requested forbearance for a few months in order to save a little bit of money due to other financial obligations.  The customer said she could resume making payments in October and the agent did  ask the customer if when the temporary hardship was over if she could afford her scheduled payment, to which the customer advised "yes".  As such, the agent proceeded with forbearance as the best short term option for the customer<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Agree | (b)(6) was in IDR at the time of the call (processed on 03/25/2015) and requested postponement for 3-month due to financial issues.  Since this was short term, the agent offered forbearance.  Customer did not indicate there was an overall change in financial circumstance, just a temporary inability to pay but he agent could have confirmed that recalculation of current payment amount wasn't needed before offering forbearance.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) called to question why he received a bill when his daughter was still in school. Based on pending school enrollment information for dependent student, short term solution of forbearance was offered. Enrollment information was received on 03/24/815 and forbearance was removed so enrollment information could be applied.<br><br>Note: At the time of this call it was not our procedure to apply administrative forbearance while awaiting electronic enrollment information from the school. Today, administrative forbearance would be applied in this situation.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) called to question why he received a bill when he was still in school. The agent did confirm with the customer that he started school in January and was enrolled at least half time. Agent checked school reporting schedule and found that enrollment reporting was scheduled for April 13th. Based on this information, the agent advised that he could wait until the update was received because it was expected in less than 30 days and would be posted retroactively. The agent would not have discussed a long term solution based on the specific information provided by the customer.<br><br>Note: At the time of this call it was not our procedure to apply administrative forbearance while awaiting electronic enrollment information from the school. Today, administrative forbearance would be applied in this situation. | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) advised his mother attempted to log into his account the prior day and got locked out so he needed to reset the account. His mother had called earlier in they day for this same reason but was advised the borrower needed to call. He advised his mother handled the payments and could not even provide his online user ID. The agent advise the customer he was past due for one payment and asked if he wanted a forbearance and he just needed the account unlocked, which the agent did. It appears the mother makes the payments every month and an online payment was made a few days after this call. This was not a call for payment relief. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) called to ask if we had a program where she could skip a payment. The agent did ask if the customer wanted to talk about repayment options and the customer advised she talked to someone a few months ago and did not think she qualified for IDR. Upon review of the account, the customer was denied IDR in 09/2014. Since the customer advised they only needed to "skip a payment" and the customer did not indicate there were any changes to her financial situation that may have changed her eligibility, IDR was not discussed. We believe this call was handled appropriately based on the prior account history and customer request.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) called to check on status of her unemployment deferment as she had received a bill in the mail. At the time of the call, the deferment had already been received and processed. Agent would not have requalified the customer for an IDR plan if the account was already "resolved" | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| (b)(6) | | Disagree | (b)(6) was transferred to Navient by school FAO, who specifically requested that we help her out with verbal forbearance. FAO advised the customer was not working but looking for work and he sent her an unemployment deferment. FAO stayed on line with customer - since FAO handled the postponement piece the agent only pursued what was specifically requested on the call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) called to confirm status/payment dates; she had loans in Grace and Repayment. The agent did advise that we could process forbearance to align due dates and proceeded to answer questions about prior enrollment history at which time the call recording ended. While forbearance was ultimately applied, since the entire call recording is not available it cannot be definitively determined that other options were not discussed.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Agree | (b)(6) requested forbearance, which the agent granted based on available time. Since the customer wanted 6-months of forbearance the agent should have asked probing questions to definitively rule out other options.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |
| (b)(6) | | Disagree | (b)(6) called to request a deferment. IDR was not discussed but agent collected information needed to model the plan and determined current payment amount was the lowest available based on income. Forbearance was the only option available and the customer confirmed that she only needed to skip one month and would be able to make payments in February.<br><br>Difficulty Making Payments disclosure letter sent post-call. | (b)(4),(b)(6) | |

| Borrower Name | Borrower last 4 of SSN | Agree/Disagree | Comments | Call Recording # | Call Source |
|---|---|---|---|---|---|
| Total Disagree | 10 | | | | |
| Total Agree | 3 | | | | |
| N/A | 0 | | | | |

| Fall | Tab 1 | Tab 2 | Tab 3 | Tab 4 | Total |
|------|-------|-------|-------|-------|-------|
| No | 27 | 26 | 60 | 36 | 149 |
| Yes | 17 | 15 | 6 | 18 | 56 |
| N/A | | | 2 | | 2 |
| Total | 44 | 41 | 68 | 54 | 207 |

| Fall | Tab 1 | Tab 2 | Tab 3 | Tab 4 | Total |
|------|-------|-------|-------|-------|-------|
| No | 1% | 1% | 3% | 2% | 7% |
| Yes | 1% | 1% | 0% | 1% | 3% |
| N/A | 0% | 0% | 3% | 0% | 1% |

| | |
|---|---|
| FSA indicates failed | 10.35% |
| Navient agrees | 2.80% |

| Account | recordingID | NAVI Comments | Should Call be a fail? (Y, or N) |
|---|---|---|---|
| (b)(6) | (b)(4) (b)(6) | | Y |
| (b)(6) | | The borrower had a low outstanding balance. The borrower couldn't afford her monthly payment due to unemployment. The default prevention associate did share that Income Driven Repayment was an option. However, the associate informed the borrower that this option would significantly extend the repayment terms due to the low balance. A level standard repayment plan will pay the loan off in 8 months vs. 23 months in an IDR plan. The associate prequalified the borrower for an Unemployment Deferment. The associate resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower. We believe we found the best solution for this borrower. | N |
| (b)(6) | | | Y |
| (b)(6) | | The borrower indicated she was temporarily unemployed but returning to work soon. She confirmed that she could afford her payment going forward. As a result, a temporary hardship forbearance was used to bring the borrower current so she could resume payments. | N |
| | | | Y |
| (b)(6) | | The borrower indicated he was entering the military in the near future. The agent encouraged the borrower to continue making payments until he was active duty. The agent determined that a lower Graduated Repayment payment plan was affordable. The borrower agreed they could afford the lower payment. The agent encouraged a return call to the Navient Military once he was sworn into duty. | N |
| (b)(6) | | | Y |
| | | | Y |
| (b)(6) | | The borrower actually requested to go down the forbearance path. The agent suggested an Income Driven Repayment plan and prequalified the borrower. The borrower was brought current with an administrative forbearance and the borrower received an additional 60 days of forbearance to complete the IDR process. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The agent prequalifed the borrower for an unemployment deferment. The form was sent to the borrower. | N |
| (b)(6) | | The borrower specifically requested a forbearance because his wife is wrapping up school. He wanted to set up Auto Pay starting in February and begin making payments. | N |
| (b)(6) | | The borrower was in the process of returning to school and work as a result of an illness. The borrower requested forbearnce. Once the borrower returns to school, Navient will receive the enrollment information and provide an in school deferment. | N |
| (b)(6) | | The borrower indicated they had just obtained a new job and would start the following week. The borrower agreed the new lower payment amount was affordable. The borrower was brought curent with an administrative forbearance. | N |
| | | | Y |
| (b)(6) | | The borrower indicated the payment would be more affordable in a month due to recent legal issues. The agent offered to move the due date to a different point in the month to help balance bills. The agent processed a forbearance to allow the borrower to resolve the delinquency. | N |
| (b)(6) | | The borrower advised the agent he was returning to school in the coming months. Due to the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The borrower agreed that the modeled lower repayment amount was acceptable. The agent resolved the delinquency with administrative forbearance. | N |
| (b)(6) | | Borrower's PLUS loans were in an in-school status. Associate began to ask qualifying questions, however the borrower interrupted the questioning to indicate that she has been denied previously and all situation was the same. We believe the agent interacted | N |
| (b)(6) | | Borrower indicated that she had been unemployed for several months but was resuming employment in the next couple of weeks and would be able to resume the MPA. Borrower requested that the payment be deferred. We believe the agent interacted appropriately in this circumstance. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4) (b)(6) | Borrower indicated that he has been unemployed but would resume employment in January, at which time he would be able to make the MPA. Borrower asked if the due date could be pushed back to January. We believe the agent interacted appropriately in this circumstance. | N |
| (b)(6) | | The borrower was offered a forbearance by an outbound default prevention associate. The borrower was not working and in the process of obtaining disability. The associate resolved the past due balance with an administrative forbearance and provided prospective administrative forbearance. The associate referenced the disability process and also discussed that the borrower may be eligible for a $0 IDR plan and forwarded documentation for IDR & TDP. We believe the agent interacted appropriately in this circumstance. | N |
| (b)(6) | | The borrower spoke to a Commercial associate on the previous day and indicated that he was having a financial hardship and currently receiving food stamps. The associate confirmed that conversation and | N |
| (b)(6) | | | Y |
| (b)(6) | | The borrower indicated that they were not in a position to make a payment until the following month. Borrower had picked up an additional job and should be back on his feet soon. We believe the agent interacted appropriately in this circumstance. | N |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | The borrower was 21 days delinquent and indicated that she was trying to get a forbearance and requested it to go through January 2017. We believe the agent interacted appropriately in this circumstance. | N |
| (b)(6) | | The borrower indicated that she was delinquent due to emergencies/unexpected bills and the MPA was not affordable. Associate offered a Graduate Repayment of $63.54 and the borrower agreed. The associate also offered autopay option, however the borrower refused. We believe the agent interacted appropriately in | N |
| (b)(6) | | The borrower was unable to make a payment due to being the only person in the household that was working at the moment, but did indicate that the MPA was affordable. We believe the agent interacted appropriately in this circumstance. | N |
| | | | Y |

| | | | | Y |
|---|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | | | |
| | | (b)(6) The borrower said that she could make her payment, but not for a few weeks. The borrower is currently unemployed, but has a job starting soon and is willing and able to pay | | N |
| (b)(6) | | | | Y |
| | | | | Y |
| | | (b)(6) - The borrower couldn't make a payment at the time of the call. He was on a short term workers compensation leave only receiving half of his income. The borrower mentioned that he would be returning to work in a couple of weeks. The borrower's monthly payment amount was low due to the outstanding balance of the loan ($12.56/month). Due to these factors, the default prevention associate suggested a short forbearance to allow the borrower to get back to work, he agreed. | | |
| (b)(6) | | | | N |
| | | (b)(6) The borrower was unable to make a payment to bring the account current and could not afford the regularly scheduled monthly payment "right now". The default prevention associate asked if a graduated repayment plan resulting in a payment of roughly half of the scheduled amount would be more affordable, the borrower said that it would be "a lot more affordable". Our associate inquired about the reason for delinquency. The borrower mentioned that he was not working at the time of the call, but was actively seeking new employment. | | |
| (b)(6) | | | | N |
| | | (b)(6) The borrower was not able to make a payment to bring the account current and the monthly payment amount was not affordable. The default prevention associate suggested graduated repayment and asked if a monthly payment of $33.67 (roughly half) would be more manageable. The borrower agreed that it would. | | |
| (b)(6) | | | | N |
| | | (b)(6) - The borrower made a payment the prior week, but the check payment failed. The borrower mentioned that he would have to go to the bank before being able to make another payment as he just started a new job and has a physical check. The default prevention associate confirmed that the monthly payments are affordable going forward and processed forbearance to allow the borrower time to get to bank to make his payment. | | N |
| (b)(6) | | | | Y |
| | | | | Y |
| | | (b)(6) The borrower mentioned that he didn't have the money to bring the account current. The default prevention associate asked if the monthly payment amount is affordable, the borrower said that it is not and would like something lower. Our associate offered graduated repayment in the amount of $30.00/month. The borrower said that the new payment amount would work for him. When our associate inquired about the reason for delinquency, the borrower mentioned that he was not working. | | |
| (b)(6) | | | | N |
| | | (b)(6) - The borrower could not make a payment to bring the account current. She mentioned that she just started her new job that day and would be able to pay in a few weeks. The default prevention associate asked if the monthly payments are affordable moving forward. The borrower said that they were higher than she remembered and that the amount was not affordable. Our associate suggested graduated repayment ($63.22/month), the borrower said that it sounded "really good". The borrower was also interested in signing up for auto pay. | | |
| (b)(6) | | | | N |
| | | | | Y |

| Account | recordingID | Comments | Should Call be a fail? (Y or N) |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower specifically requested forbearance. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower.  The borrower did not indicate hardship making the scheduled payment and did not convey that long-term relief was necessary.  The borrower was already in an IDR repayment plan. | N |
| (b)(6) | | The borrower requested temporary relief untill February, the specialist asked if the scheduled payment was affordable, the customer specified short term relief was feasible, forbearance was the best option. | N |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Income Sensitive Repayment then resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account.  We believe we found the best solution for this borrower. | N |
| (b)(6) | | The borrower advised he could resume making the payments when he returned to work.  The borrower indicated he was able to continue making the MPA. Due to the specific request from the borrower for short term relief, the agent resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an In school Deferment then resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the enrollment information to be received. | N |
| (b)(6) | | The borrower requested temporary relief (2-months) as she was on IBR but unable to afford the payments. Borrower is submitting updated POI in order to further reduce her MPA. Due to the specific request from the borrower for short term relief, forbearance was the best option. | N |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | | Y |

| | | | |
|---|---|---|---|
| 548550219 | (b)(4) (b)(6) | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Unemployment Deferment then resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account. We believe we found the best solution for this borrower. | N |
| 493588383 | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for and then processed a Grad Repay resolving the past due balance with an administrative forbearance. The borrower agreed to the option but said he did not quite understand.  The call was disconnected before the agent could explain further. | N |
| 332720528 | | The borrower specifically requested forbearance. The agent did send IDR information to the customer. | N |
| 316641391 | | The borrower was already in a lower payment option.  Borrower requested temporary relief (3-months) and would be able to make payments after. Consequently, the associate resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account until the date the borrower advised payment could be made. | N |
| 192703362 | | The borrower specifically requested forbearance.  Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower.  The borrower was already on IBR. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower was contacted by an outbound default prevention associate. The borrower advised on maternity leave and unsure when she would return to work and be able to begin making the MPA and needed short term relief. Consequently, the associate resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account. We believe we found the best solution for this borrower. | N |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an In school Deferment then resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the enrollment information to be received. We believe we found the best solution for this borrower. | N |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The borrower advised would pay the loan in full within 10 days. Consequently, the associate resolved the past due balance with a voluntary forbearance. We believe we found the best solution for this borrower. NOTE: The SSN placed on sheet by FSA is incorrect. See Column B. | N |
| (b)(6) | | The borrower stated they could make his next payment if brought current. The borrower was in a hurry due to being at work. | N |
| (b)(6) | | The borrower specifically requested forbearance. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower. The borrower was already on IBR. | N |
| (b)(6) | | The borrower specifically requested forbearance. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower. The borrower was already on IBR. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4) (b)(6) | | Y |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | The borrower indicated they could make their next payment if brought current. | N |
| (b)(6) | | | Y |
| (b)(6) | | The customer seemed to allude to the possibilities of making payments , the customer seemed to need a short term break in order to catch up, the account is on a Graduated Repayment Plan. | N |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | The borrower specifically requested forbearance.  Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower.  The borrower was already on Grad Repay. | N |

| (b)(6) | (b)(4),(b)(6) | | Y |
| --- | --- | --- | --- |
| (b)(6) | | The borrower request temporary relief till returning to school.   Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | | Y |
| (b)(6) | | | Y |
| (b)(6) | | The borrower was not prequalified for any options because she was at work. The agent quickly brought the account current and advised the borrower about alternate payment options and suggested she call back at her convenience to discuss.   We believe we | N |
| (b)(6) | | | Y |
| (b)(6) | | The borrower request temporary relief stating he was going to pay the loan off when he received his tax return, short term relief and the near-term possibility of paying in full, forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief (2-months) as she was on bed rest but could resume payments in 2 or 3 months.  Due to the borrower advising short term relief was possible, forbearance was the best option. | N |

| (b)(6) | (b)(4),(b)(6) | The borrower had an outstanding balance less than $2000. The borrower stated he could afford his monthly payment but not on the call, the specialist offered to place a forbearance on the account until April. | N |
|---|---|---|---|
| (b)(6) | | The borrower specifically requested forbearance. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower. The borrower was already on Grad Repay. | N |
| (b)(6) | | | Y |

| Account | File Name + .wav | COMMENTS | Should Call be a fail? (Y, N, or N/A) |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The call dropped, the possibility of resolution was limited. | N |
| | | | Y |
| (b)(6) | | The borrower requested temporary relief and was in school. Due to the specific request from the borrower for short term relief and the possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The customer was under the assumption both sides of the account were in forbearance. The customer needed tempory relief she was returning to school. Forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The borrower repeatedly indicated that he will never be able to pay this loan. Forb was not the best option. The agent might have attempted to prequalify the borrower for IBR. | Y |
| (b)(6) | | The customer stated she could resume her scheduled payment at the end of the month requesting temporary relief, the forbearance was the best option. | N |
| (b)(6) | | The specialist offered to lower the payment at the onset of the call where the customer asked for a hold on the loans, the borrower requested temporary relief having a baby, the customer stated she was receiving food stamps which qualified the customer for a deferment. Due to the specific request from the borrower for relief and the possibility of a hardship deferment, forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief she was returning to school. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The borrower indicated that she would be able to make the monthly payments moving forward but has only made 1 payment to date. The agent might have explored alternate options, but based on the borrowers response to the question, did not explore alternatives. The agent acted in the best interest of the borrower based on the stated ability to continue making payments. | N |
| (b)(6) | | The borrower requested temporary relief he was returning to school. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The borrower stated he was moving, the customer was in a Graduated Repayment Plan, the specialist suggested a forbearance to provide a temporary suspension of payments, the borrower stated "that would be great", forbearance was a good option for the borrower. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4) (b)(6) | The borrower was only 17 days past due and indicated she had the payment ready to send. Agent did not ask if the MPA was affordable.  There was not a repayment plan on the account but payments have been fairly steady since the call.  The borrower only needed a week to make the payment. | N |
| (b)(6) | | Recording cut off. | N/A |
| | | | Y |
| (b)(6) | | The customer stated the payments were affordable and would be able to resume the scheduled payment, the forbearance brought the account out of delinquency so the scheduled payments could resume. | N |
| (b)(6) | | The borrower requested temporary relief he was returning to school and previously requested an application for an in-school deferment which was not received and asked for another application.  Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief, she switched jobs and gets paid once a month, she asked to be brought up to date stating she could resume the regular scheduled payments, due to the specific request from the borrower for short term relief forbearance was the best option. | N |
| (b)(6) | | The specialist confirmed that the scheduled payments are affordable keeping the loan's pay off time frame within ten years, since the customer stated the payments are affordable a temporary forbearance was the best option. | N |
| (b)(6) | | The borrower stated he was wating on approval for an unemployment deferment.  Due to the specific request from the borrower for short term relief and the near-term possibility of an unemployment deferment, forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief stating she was returning to school.  Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The borrower specifically stated the account should be in an in-school deferment, the specialist processed a forbearance to bring the account current.  Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The customer stated the forbearance was fine to stop the account from being reported to the collection agencies, the customer was able to resume payments but needed a temporary break, forbearance was the best option. | N |

| | | | | |
|---|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borr is not on IBR. The borrower was not prequalified for any options because he was at work, teaching, and was irritated that he continues to get calls during school hours. The agent quickly brought the account current and advised he sent information about alternate payment options. From a customer service viewpoint, given the irritation level of the borrower, the agent provided the best service for that particular call. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA the following month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA the following month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA the following month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The borrower requested temporary relief, she stated she was wating on loan forgiveness. Due to the specific request from the borrower for short term relief and the statement regarding loan forgiveness, forbearance was the best option. | | N |
| (b)(6) | | The borrower requested temporary relief, she returning to school the upcoming semester. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | | N |
| | | | | y |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need, the customer stated the temporary break was very beneficial. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The borrower requested temporary relief stating she was school. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | | N |
| (b)(6) | | The borrower specifically requested an in-school deferment. The customer stated she was starting school in August. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | | N |
| (b)(6) | | The associate took the Deferment path because the customer stated she was receiving food stamps, the associate resolved the past due balance with an administrative forbearance and future forbearance for the forms to be completed by the borrower... We believe we found the best solution for this borrower. | | N |
| (b)(6) | | The borrower had a death in the family, she stated she needed temporary relief. Due to the circumstances the specialist processed a forbearance was the best option. | | N |

| | | | | |
|---|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| | | Recording cut off. | | N/A |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The customer indicated she needed lower payments, the agent began taking the callers information to determine eligibilty for a deferment or repayment option. The agent provided information regarding IBR. The customer stated she just wanted to pay twenty dollars a month and the call ended, the specialist was unable to resolve the account due to technical issues. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The specialist specifically asked the customer if she wanted the option of a lower payment, the customer stated she wanted to put the payments off. The associate took the Unemployment Deferment path vs. the IDR path because the borrower stated her husband earns approximately $7500 a month which is above the poverty guideline. The specialist resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower... We believe we found the best solution for this borrower. | | N |
| (b)(6) | | The customer stated she was working with her school couselor to have her loans placed into a deferment/repayment plan. The specialist sent out the application for deferment and processed a FORA/FORM on the account providing a temporary hold on payments till the application was complete and submitted. Forbearance was the best option. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The borrower requested temporary relief (3-months) as she was in the process of paying off other debt and would be able to resume the affordable MPA in January 2016. Due to the specific request from the borrower for short term relief, forbearance was the best option. | | N |
| (b)(6) | | The borrower requested temporary relief (1-month) as he just changed jobs. Due to the specific request from the borrower for short term relief and the indication that the Level plan MPA is affordable, forbearance was the best option. | | N |

| | (b)(4),(b)(6) | The borrower questioned why he is still delinquent after just having a forbearance placed on his account. The agent discovered that the previous day, an agent processed forbearance only on 2 of the 4 loans. The agent processed forbearance on the remaining loans per borower request. If the agent had not spoken to the borrower, the Interrogation report would have picked up the discrepancy and the Forb would have been processed. The agent did the best option based on borrower request. | |
|---|---|---|---|
| (b)(6) | | | N |
| (b)(6) | | After being asked if she could make the payment to bring current, the borrower Indicated she would be able to make that payment in 1 week. Due to the specific request from the borrower for short term relief, forbearance was the best option available to the borrower. The borrower did not indicate hardship making the scheduled payment and did not convey that long-term relief was necessary. The borrower has made all scheduled payments since this forbearance ended and has sought no additional relief. | N |
| | | The initial call apparently dropped and this segment is a call back, it is unable to determine what happened on the initial call with this segment. I tried to find the previous call but was unsuccessful | N |
| (b)(6) | | The specialist provided information regarding forbearance, the customer replied the option was "great". The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief because he was consolidating the loans and needed time to get everything together. Due to the specific request from the borrower for short term relief and the loans being consolidated, forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The payment was submitted aprox 13 days prior to the call, payments normally post within 3 business days. The specialist provided information and instructions regarding the missing payment. The specialist offered a forbearance to hold the account till the payment was found, the forbearance script did not complete, the verbal forbearance was not processed. The payment was found on 9/29. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist asked the customer if she wanted a different payment, the customer stated she needed more time agreeing to pick up the payments in March. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA the following month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |

| (b)(6) | (b)(4),(b)(6) | The specialist granted a forbearance as borrower stated they could meet their full MPA within three months. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |

| Account | File Name + .wav | Revised Comments | Should Call be a fail? (Y or N) |
|---|---|---|---|
| (b)(6) | (b)(4) (b)(6) | The customer stated he spoke to someone the previous day and was sending a payment out, he could resume his scheduled payment at the end of the month requesting temporary relief, the forbearance was the best option. | N |
| (b)(6) | | The customer stated he made a payment, he was aware of the delinquency and stated he could make a payment next week then could resume his scheduled payment at the end of the month requesting temporary relief, the forbearance was the best option. | N |
| (b)(6) | | The customer was previously prequalified for an Income Based Repayment Plan. Given that the Income Based Repayment Option has already been pre-qualified the specialist resent the application, the forbearance was applied to bring the account current till the IBR was applied. Forbearance was the best option to bring the account current and to supress delinquent calls. | N |
| | | | Y |
| (b)(6) | | The account was 88 days past due, credit reporting starts at 90 days past due at the end of the month, the agent offered to bring the account current, the customer agreed to bring he account current which would end the possiblity of having the customer reported negatively to the reporting agencies and to bring the account current to supress delinquency and calls. | N |
| (b)(6) | | The borrower requested temporary relief (3-months). Due to the specific request from the borrower for short term relief, forbearance was the best option. | N |
| (b)(6) | | The customer was previously prequalified for an Income Based Repayment Plan. The customer went delinquent prior to the IBR being processed, the specialist removed the delinqency with a forbearance. Given that the Income Based Repayment Option has already been pre-qualified the specialist resent the application, the forbearance was applied to bring the account current till the IBR was applied. Forbearance was the best option to bring the account current and to supress delinquent calls. | N |
| (b)(6) | | The customer stated was wating on a check to make the payment, he was aware of the delinquency and stated he did not want a deferment, the forbearance was the best option. | N |
| (b)(6) | | The borrower stated she would call back Friday to make the payment, the borrower made no indication she was unable to make future payments and stated she would make her decision when she calls back. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower requested temporary relief and was in school. Due to the specific request from the borrower for short term relief and the possibility of an in-school deferment, forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The customer stated she was not employed and had no income, the agent provided information regarding the income based repayment plan and processed a forbearance to bring the account current and to push payments off while the application was completed. Forbearance was the best option for this circumstance. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could possibly make their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | Y |
| (b)(6) | | The specialist granted a forbearance as borrower stated they needed a short term relief. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could make their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| (b)(6) | | The borrower requested temporary relief due to school enrollment. Due to the specific request from the borrower for short term relief and the near-term possibility of an in-school deferment, forbearance was the best option. | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate was advised by the borrower that she should not owe the loan due to having only gone to school for one day. The agent | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N |
| | | | Y |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Inschool Deferment then resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account. We believe we found the best solution for this borrower. | N |

| | | | |
|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Inschool Deferment then resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account.  We believe we found the best solution for this borrower. | N |
| | | | Y |
| | | | Y |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The borrower immediately requested forbearance due to spouse being seriously ill in the ICU.  Agent then resolved the past due balance and placed voluntary forbearance on the account.  The K305 letter explaining repayment options was sent to the borrower. | N |
| | | | Y |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Inschool Deferment then resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account.  We believe we found the best solution for this borrower. | N |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Unemployment Deferment then resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower.  We believe we found the best solution for this borrower. | N |
| (b)(6) | | The borrower was contacted by an outbound default prevention associate. The associate prequalified the borrower for an Unemployment Deferment then resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower.  We believe we found the best solution for this borrower. | N |
| | | | Y |
| | | | Y |
| (b)(6) | | The borrower advised he should be in forbearance because he was in the process of consolidation.  Due to the specific request from the borrower, forbearance was the best option. | N |
| (b)(6) | | The borrower was prequalified for Military deferment by an outbound default prevention associate.  The associate gave the borrower information on how to contact the Military department at Navient. Consequently, the associate resolved the past due balance with an administrative forbearance and placed voluntary forbearance on the account.  We believe we found the best solution for this borrower. | N |

| | | | | |
|---|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower was contacted by an outbound default prevention associate. The borrower indicated she would make the payment in a few days. The agent attempted to offer to post date the payment and suggested Auto Debit but the borrower ended the call. Making payments is the best option for the borrower and the initial path the agent took. | N | |
| | | | Y | |
| | | | Y | |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N | |
| | | | Y | |
| (b)(6) | | At the onset of the call the borrower specifically requested forbearance. The borrower did not indicate hardship but inquired about consolidation. The forbearance brought the account current and provided a temporary hold for the customer to research consolidation. | N | |
| (b)(6) | | The borrower advised he could make the payment within a month. The borrower indicated he was able to continue making the MPA. Due to the specific request from the borrower for short term relief, forbearance was the best option. | N | |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | N | |
| (b)(6) | | At the onset of the call the borrower specifically stated she thought the forbearance was active till June and wanted the payments temporarily post-poned till June. The borrower did not indicate hardship making the scheduled payment past June and did not convey that long-term relief was necessary. | N | |
| | | | Y | |
| | | | Y | |
| (b)(6) | | The customer assured the specialist she could make payments and needed to figure out exactly how long it takes for payments to process. The customer stated if the payment was not made she would make the payment. The customer stated she would provide the resolution to the account. | N | |

| | | | | |
|---|---|---|---|---|
| (b)(6) | (b)(4),(b)(6) | The borrower was prequalified for IBR and TPD by an outbound default prevention associate. The associate took the path of the IBR and TPD because the TPD qualification would be a longer process. Consequently, the associate resolved the past due balance with an administrative forbearance and provided 60 days of prospective administrative forbearance for the forms to be completed by the borrower. We believe we found the best solution for this borrower. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA at month's end. The customer requested the specialist process the forbearance on both sides of the account. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| | | | | Y |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA at the end of the month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| (b)(6) | | The specialist granted a forbearance as borrower stated they could meet their full MPA the following month. The solution offered addressed customers need. There was no mention from customer of need for longer term payment relief. Forbearance was the best option. | | N |
| | | | | Y |
| (b)(6) | | The borrower advised he could make the payment within the week but was at work and unable to do so over the phone. The borrower indicated he was able to continue making the MPA. Due to the specific request from the borrower for short term relief, forbearance was the best option. | | N |
| | | | | Y |



Page 46 of 48

Withheld pursuant to exemption

(b)(4)

of the Freedom of Information and Privacy Act

# EXHIBIT 17

**EXHIBIT 17 REDACTED IN ITS ENTIRETY**

# EXHIBIT 18

**EXHIBIT 18 REDACTED IN ITS ENTIRETY**

# EXHIBIT 19

Rebekah L. Soule
Direct Dial: +1.202.637.3360
rebekah.soule@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

October 2, 2020

**VIA EMAIL**

Jeremy Robinson
Salvatore Graziano
Jesse Jensen
Ryan Dykhouse
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Re:     *Lord Abbett Affiliated Fund, Inc., et al., v. Navient Corporation, et al.*, No. 1:16-cv-00112-MN (D. Del.)

Dear Counsel:

We are making a production of materials on behalf of the Navient Defendants in the above-referenced matter in accordance with the agreed-upon proposal described in Sian Jones' July 12, 2019 email and the Protocol described in our Responses and Objections to the Requests for Production, served on June 24, 2019.

We have transmitted the production, labeled LRDABT_031 via secure file transfer. The production documents are Bates labeled, respectively, NAV-LRD-ABT-005503530 - NAV-LRD-ABT-005504000. These files include the call recordings requested in Plaintiffs' September 23, 2020 email, confirmed in our email exchanges on September 29, 2020, and in accordance with the Order regarding Production of Call Recordings dated September 30, 2020. All of these records are, of course, subject to our Confidentiality Agreement and Protective Order, which was entered by the Court on April 4, 2019.

Please let us know if you have any questions.

Sincerely,

*Rebekah Soule*

Rebekah Soule

Cc:   Peter A. Wald
      Abid R. Qureshi
      Christopher S. Turner
      Jordan D. Cook
      Lilit S. Edwards
      Kelly E. Farnan

# EXHIBIT 20

**EXHIBIT 20 REDACTED IN ITS ENTIRETY**

# EXHIBIT 21

Evaluation and Program Planning 65 (2017) 113–116



Contents lists available at ScienceDirect

# Evaluation and Program Planning

journal homepage: www.elsevier.com/locate/evalprogplan



# Values in evaluation – The use of rubrics



Pauline Dickinson\*, Jeffery Adams

*SHORE & Whāriki Research Centre, College of Health, Massey University, Auckland, New Zealand*

## ARTICLE INFO

*Keywords:*
Rubrics
Evaluation
Valuing performance
Quality
Success

## ABSTRACT

Rubrics are used by evaluators who seek to move evaluations from being mere descriptions of an evaluand (i.e., the programme, project or policy to be evaluated) to determining the quality and success of the evaluand. However, a problem for evaluators interested in using rubrics is the literature relating to rubric development is scattered and mostly located in the education field with a particular focus on teaching and learning. In this short article we review and synthesise key points from the literature about rubrics to identify best practice. In addition we draw on our rubric teaching experience and our work with a range of stakeholders on a range of evaluation projects to develop evaluation criteria and rubrics. Our intention is to make this information readily available and to provide guidance to evaluators who wish to use rubrics to make value judgements as to the quality and success of evaluands.

## 1. Introduction

In Aotearoa New Zealand the use of rubrics in evaluation has been stimulated by the work of Jane Davidson (Davidson, 2005). Our team of evaluators at the SHORE & Whāriki Research Centre have adopted the use of rubrics and have incorporated this into a Easy Evaluation approach (see Fig. 1) (Dickinson, Adams, Asiasiga, & Borell, 2014). This approach which draws on the CDC evaluation framework (CDC Evaluation Working Group, 1999) forms the basis of national evaluation training we provide for the public and community health workforce as well as for many of the evaluation projects we undertake.

A key strength of using rubrics when working with stakeholders is the development evaluation criteria and rubrics facilitates explicit process of determining the quality and success of the evaluand at the start of an evaluation (Oakden, 2013).

## 2. Evaluation and valuing

Within the evaluation community there is growing consensus that "evaluation is an enterprise that involves valuing" (Alkin & Christie, 2008, p. 131). Some have even labelled this increased interest a rubric revolution (Davidson, Wehipeihana, & Mckegg, 2011). The values that enable evaluations to be moved beyond mere descriptions come from credible and well-tried standards, research evidence, needs assessment and analysis of the function of something rather than evaluator and/or stakeholder assumptions (Scriven, 1991). Typically the role of values in evaluation refers to evaluators taking responsibility for making

judgements about the merit or worth of an evaluand. When using a rubrics-based approach these judgements are based on a certain set of criteria which help define how good or bad a programme is in relation to the quality of its interventions and the success of its outcomes (Davidson, 2005).

Evaluation criteria and standards are determined by the evaluation objectives and questions posed (Nunns, Peace, & Witten, 2015) and criteria provide the grounds on which the evaluator reasons towards an evaluative conclusion/judgement (Fournier, 1995; Valovirta, 2002). Once criteria have been established to define quality and/or success, performance standards are set in the form of a rubric. Standards act as benchmarks against which the performance of the evaluand can be compared and rated (Arens, 2005).

## 3. What is a rubric?

The term 'rubric' originally signified the red earth used by carpenters to mark on wood the line to follow when cutting and it has evolved to mean "an established custom or rule of procedure" (Bertaux, 1981). In the early 1980s the term rubric was adopted by the education sector to refer to an assessment tool which consisted of a set of standards and/or directions for assessing student outcomes and to guide student learning. Several reviews relating to the use of rubrics in education describe the features of rubrics as having evaluation criteria and performance standards (Dawson, 2017; Jonsson & Svingby, 2007; Panadero & Jonsson, 2013; Reddy & Andrade, 2010).

A rubric is commonly defined as denoting "a type of matrix that

\* Corresponding author at: SHORE & Whāriki Research Centre, College of Health, PO Box 6137, Wellesley Street, Auckland, New Zealand.
*E-mail addresses:* p.m.dickinson@massey.ac.nz (P. Dickinson), j.b.adams@massey.ac.nz (J. Adams).

http://dx.doi.org/10.1016/j.evalprogplan.2017.07.005
Received 21 February 2017; Received in revised form 14 June 2017; Accepted 14 July 2017
Available online 18 July 2017
0149-7189/ © 2017 Elsevier Ltd. All rights reserved.

P. Dickinson, J. Adams

*Evaluation and Program Planning 65 (2017) 113–116*



**Fig. 1.** Easy evaluation framework.

provides scaled levels or achievement or understanding for a set of criteria or dimensions of quality for a given type of performance" (Allen & Tanner, 2006, p. 197) As used in education, rubrics describe levels of performance and provide information to teachers, parents and others interested in what students know and are able to do (Dawson, 2017). They also provide a clear statement as to what is considered important and worth learning (evaluation criteria), even before learning has occurred (Brookhart & Chen, 2015). The use of rubrics is now embedded in education sector student assessment and learning practices.

At the same time, a general logic of evaluation was being advanced by Scriven (1991, 1995) and further developed by Fournier (Fournier, 1995; Valovirta, 2002) to include the following four steps: (a) establishing criteria of merit (On what dimensions must the evaluand do well?); (b) constructing standards (How well should the evaluand perform?); (c) measuring performance and comparing with standards (How well did the evaluand perform?); and (d) synthesising and integrating data into a judgement of merit or worth. What sets general evaluation logic apart from other types of inquiry such as research, monitoring and audit is the evaluator is setting evaluation criteria and performance standards against which the evaluand is assessed. This approach was viewed by Scriven (1994) as a move towards a more disciplined evaluation practice intended to move evaluators away from making judgements based on their intuition or personal impressions about the merit of an evaluand.

## 4. Why use rubrics in evaluation?

Evaluation has been defined as the systematic determination of the quality, value, or importance of something (Scriven, 1991). Rubrics are powerful tools for assessing these aspects and help stakeholders draw evaluative conclusions about performance (Bargainnier, 2003). When evaluation criteria and rubrics are established at the start of a project and its evaluation, it is clear to staff and stakeholders what high quality interventions (i.e., their content, design and delivery) and successful outcomes (i.e., how successfully the outcomes were achieved) will look like. Through making values explicit performance can improve due to quality and success being well-defined.

Rubrics help stakeholders to articulate the criteria (or vital features) they are looking for and make those features explicit to those engaged in programme implementation. This avoids the gap between what the evaluator knows and what stakeholders know. For example, the guidance of a rubric can help programme staff clarify what constitutes quality and success. When we actually describe performance behaviours the guesswork is taken out of what the evaluand needs to do to achieve excellent performance. Rubrics allow the communication of specific goals or intentions to key stakeholders so that everyone knows what is expected and what behaviour or characteristics constitute the different levels of performance. Evaluand strengths and weaknesses can be highlighted through the use of rubrics which allows for changes to be made to what is being implemented (Arter & Mctighe, 2001; Stevens & Levi, 2005; Truemper, 2004). Otherwise measuring performance can be challenging without an appropriate measurement tool.

## 5. Designing rubrics

There are two basic elements to a rubric – the evaluation criteria to be rated and the performance standards (rubrics). The evaluation criteria serve as identifying the dimensions of interest that will be used as the basis for judging how well the programme has performed on particular interventions or outcomes. The criteria should define a comprehensive set of behaviours that make up the performance (Tierney & Simon, 2004). Evaluation criteria need to go beyond the goals and objectives of a programme to include other possible effects. To start with, the list of criteria must be comprehensive and can be refined to include the most important criteria for the evaluand to focus on. Criteria can also be weighted according to their importance.

A rubric must contain rich descriptive language that differentiates quality and/or success and is user friendly to stakeholders. Different levels of performance are described in tangible, qualitative terms using positive language (Bargainnier, 2003). Rubrics can have any number of points along a scale depending on the evaluand. For example, Davidson (2005) suggests that six categories "tend to be workable in most cases" with "not much to be gained from trying for greater precision (e.g., 10 categories of merit) unless the evaluand really lends itself to that" (p. 136).

Features of rubrics described by Dodge and Pickett (2007) are that they: indicate stated performance, behaviour or quality; use a range of

Table 1
Example of a generic rubric for a multi-site project.
Adapted from Davidson (2005, p. 137).

| Rating | Explanation (How merit is determined) |
| --- | --- |
| Excellent | Project reports and interview data provide evidence of **outstanding** performance in this area given resources allocated and timeframes; no weaknesses |
| Very good | Project reports and interview data provide evidence of **sound** performance in this area given resources and timeframes but performance is not outstanding; no weaknesses of any consequence |
| Good | Project reports and interview data provide evidence of **reasonable** performance in this area given resources and timeframes; might have a few slight weaknesses but nothing serious |
| Poor | Project reports and interview data provide evidence of **weak or fair** performance in this area given resources and timeframes; some serious weaknesses on a few aspects |
| Very poor | Project reports and interview data provide **little evidence of satisfactory** performance in this area; serious flaws |

P. Dickinson, J. Adams

Evaluation and Program Planning 65 (2017) 113–116

**Table 2**
Example of a coherent specific rubric for the intervention: Implement Fundamental Movement Skills for teachers and children.
Authors (2010).

| Rating | Explanation (how you will determine merit) |
| --- | --- |
| Excellent | Teachers were very actively engaged in the sessions and found the content of the sessions very relevant and appropriate for implementation in the kindergarten. The adviser provided on-going support and creative FMS activities. Children were very keen to participate in the FMS activities and had the opportunity to practice their FMS regularly. |
| Very good | Teachers were actively engaged in the sessions and found the content of the sessions relevant and appropriate for implementation in the kindergarten. The adviser provided on-going support and creative FMS activities. Children were keen to participate in the FMS activities and had the opportunity to practice their FMS regularly. |
| Good | Teachers were engaged in the sessions and found the content of the sessions mostly relevant and appropriate for implementation in the kindergarten. The adviser mostly provided on-going support and some creative FMS activities. Children were mostly keen to participate in the FMS activities and had some opportunity to practice their FMS. |
| Poor | Only a few teachers were engaged in the sessions and/or the content was not relevant and appropriate for implementation in the kindergarten. The adviser did not provide regular support and the FMS activities lacked creativity. Children struggled to participate in the FMS activities and had very little opportunity to practice their FMS. |
| Very poor | There was lack of engagement by teachers and children in the FMS programme. |

ratings to indicate performance; and contain performance criteria arranged in levels indicating the degree to which a standard has been met. Valid rubrics have descriptors (scores or levels) that reflect a continuity in the degree of difference between a rating or level of one and a two and a five or excellent, very good, good, poor, very poor, or inadequate.

When developing rubrics Goodrich Andrade (2005) recommended avoiding the use of unnecessarily negative language. For example, she suggests the use of "boring" to describe a student's speech could be changed to "does not attempt to gain attention of audience, just starts speech" (p. 5).

Rubrics can also be generic and/or specific. A generic rubric requires evaluators and stakeholders to score the overall evaluand as a whole (see Table 1) A specific rubric outlines each of the evaluation criteria at each level of performance and each criteria is then rated (Nitko, 2001).

A generic rubric is a useful starting point for determining merit and would still require substantial discussion to define the general terms used. It is important if using generic rubrics to define what is meant by "outstanding, sound, reasonable, weak or fair and satisfactory" performance. The meaning of these terms will need to be developed in consultation with key stakeholders.

A specific rubric is coherent and focuses on the same criteria throughout and therefore refers to the variance of quality or success for the criteria. It is important that the language remains the same. New criteria may be introduced if these emerge during the evaluation (see Table 2 for an example of a specific rubric developed for an intervention: Fundamental Movements Skills for teachers and children).

Rubric design should involve key stakeholders and their knowledge. Evidence from literature, experts and local knowledge can also help determine what comprises good and not so good work. In our evaluation projects we begin the rubric design process by establishing evaluation criteria with programme implementation staff and other stakeholders. To initiate the idea of criteria, we use an everyday example such as shopping for breakfast cereal and ask stakeholders to discuss what they would look for when they are choosing a breakfast cereal (e.g., price, fat content, packaging, ingredients, nutrient value). We then use an exercise based on Preskill and Russ-Eft's (2005) Chocolate Chip Cookie exercise where rather than using chocolate chip cookies, participants develop performance standards against which a universal object [a ballpoint pen] is used. Participants work to develop criteria and performance standards. For example, the criteria "grip" could be assessed on a one to five scale with one being excellent grip and five being very poor grip. Participants' scores are totalled and averaged to determine the best performing pen.

These initial exercises help stakeholders grasp these concepts before embarking on developing evaluation criteria for the evaluand. The next step is to develop a rubric. We have followed Goodrich Andrade's (2005) suggestion of starting the process by asking the question "What

do the best and worst performances look like with regard to quality and success? The middle levels of the rubric are then filled in.

## 6. Performance synthesis – drawing evaluative conclusions

Making evaluative conclusions or judgement is the intended endpoint of the evaluative reasoning process (Nunns et al., 2015). While there are "no clear professional rules" (House & Howe, 1999) about how to do so, making judgements of quality and success is considered by some evaluators to be fundamental to the evaluation process (Stake & Schwandt, 2006).

Once evaluation criteria and performance standards have been established, evidence or descriptive facts are collected against the evaluation criteria and are used to answer the key evaluation questions. Our approach involves a robust process of facilitating sense making sessions with key stakeholders where they are presented with descriptive facts against each evaluation criteria and are involved in a process of determining how well criteria have been achieved. This process increases "transparency about how evaluative judgements are made" (King, McKegg, Oakden, & Wehipeihana, 2013, p. 13).

This process takes evaluation beyond simply presenting descriptive facts about outcomes and interventions and stopping there, thus leaving the client to place a value on these facts. Evaluators using this approach have been described by Scriven (1995) as minimalists and he stated this has been a dominant feature of evaluation whereby evaluators fail to draw evaluative conclusions. He even suggested they are not really evaluators as "they do no evaluation" (p. 55). In contrast he described a purist evaluator as one who believes that evaluation "does not end until the merit, worth, or significance of the evaluand has been determined" (p. 55).

## 7. Conclusion

Rubrics are one possible solution to determining the merit and/or worth of an evaluand. They are adaptable and can be specific or general as needed and can be evenly or unevenly weighted. The evaluator makes value judgements based on descriptive facts rather than evaluator assumptions and the credibility of the evaluator remains intact (Scriven, 1991). As a team of evaluators we see considerable merit in the development of evaluation criteria and rubrics for our evaluation practice and in the training we do with the public health workforce. The process helps facilitate a deeper engagement and understanding with our stakeholders and helps focus the evaluation on what is important.

## References

Alkin, M., & Christie, C. (2008). An evaluation theory tree revisited. In M. Alkin (Ed.), Evaluation roots. Thousand Oaks, CA: Sage.
Allen, D., & Tanner, K. (2006). Rubrics: Tools for making learning goals and evaluation

P. Dickinson, J. Adams

Evaluation and Program Planning 65 (2017) 113–116

criteria explicit for both teachers and learners. *CBE – Life Sciences Education, 5*, 197–203.

Arens, S. (2005). *A study of evaluative reasoning in evaluation studies judged "outstanding"*(Unpublished doctoral thesis). Indiana University.

Arter, J., & Mctighe, J. (2001). *Scoring rubrics in the classroom: using performance criteria for assessing and improving student performance.* Thousand Oaks, CA: Corwin Press.

Bargainnier, S. (2003). *Fundamentals of rubrics. Pacific crest faculty development series* Retrieved from http://www.webs1.uidaho.edu/ele/Scholars/Practices/Evaluating_Projects/Resources/Using_Rubrics.pdf.

Bertaux, D. (1981). Introduction. In D. Bertaux (Ed.), *The life history approach in the social sciences* (pp. 5–15). Beverly Hills: Sage.

Brookhart, S., & Chen, F. (2015). The quality and effectiveness of descriptive rubrics. *Educational Review, 67*(3), 343–368.

CDC Evaluation Working Group (1999). *Overview of the.* (Revision: November 2). Retrieved from https://www.cdc.gov/eval/materials/frameworkoverview.pdf.

Davidson, E. J. (2005). *Evaluation methodology basics: The nuts and bolts of sound evaluation.* Thousand Oaks, CA: Sage.

Davidson, E. J., Wehipeihana, N., & Mckegg, K. (2011). *The rubric revolution.* Paper presented at the Australasian Evaluation Society.

Dawson, P. (2017). Assessment rubrics: Towards clearer and more replicable design, research and practice. *Assessment and Evaluation in Higher Education, 42*(3), 347–360.

Dickinson, P., Adams, J. B., Asiasiga, L., & Borell, B. (2014). *Easy Evaluation: A practical approach to programme evaluation.* Auckland: SHORE & Whariki Research Centre.

Dodge, B., & Pickett, N. (2007). *Rubrics for web lessons.* Retrieved from http://webquest.sdsu.edu/rubrics/weblessons.htm.

Reasoning in evaluation: Inferential links and leaps. New directions for evaluation, no. 68. In D. Fournier (Ed.), San Francisco, CA: Jossey-Bass.

Goodrich Andrade, H. (2005). Teaching with rubrics: The good, the bad and the ugly. *College Teaching, 53*(1), 27–30.

House, E., & Howe, K. (1999). *Values in evaluation and social research.* Thousand Oaks, CA: Sage.

Jonsson, A., & Svingby, G. (2007). The use of scoring rubrics: Reliability, validity and educational consequences. *Educational Research Review, 2,* 130–144.

King, J., McKegg, K., Oakden, J., & Wehipeihana, N. (2013). Evaluative rubrics: A method for surfacing values and improving the credibility of evaluation. *Journal of MultiDisciplinary Evaluation, 9*(21), 11–20.

Nitko, A. J. (2001). *Educational assessment of students* (3rd ed.). NJ: Merrill: Upper Saddle River.

Nunns, H., Peace, R., & Witten, K. (2015). Evaluative reasoning in public-sector evaluation in Aotearoa New Zealand: How are we doing? *Evaluation Matters—He Take Tō Te Aromatawai, 1.* http://dx.doi.org/10.18296/em.10007.

Oakden, J. (2013). *Evaluation rubrics: How to ensure transparent and clear assessment that respects diverse lines of evidence.* Retrieved from http://betterevaluation.org/sites/

default/files/Evaluation%20rubrics.pdf.

Panadero, E., & Jonsson, A. (2013). The use of scoring rubrics for formative assessment purposes revisited: A review. *Educational Research Review, 9,* 129–144.

Preskill, H., & Russ-Eft, D. (2005). *Building evaluation capacity: 72 activities for teaching and training.* Thousand Oaks, CA: Sage.

Reddy, Y., & Andrade, H. (2010). A review of rubric use in higher education. *Assessment & Evaluation in Higher Education, 35*(4), 435–448.

Scriven, M. (1991). *Evaluation thesaurus* (4th ed.). Newbury Park, CA: Sage.

Scriven, M. (1994). The final synthesis. *Evaluation Practice, 15*(3), 367–382.

Scriven, M. (1995). The logic of evaluation and evaluation practice. *New Directions for Evaluation, 68,* 49–70.

Stake, R., & Schwandt, T. (2006). On discerning quality in evaluation. In I. Shaw, & J. Greene (Eds.), *The Sage handbook of evaluation.* London: Sage.

Stevens, D. D., & Levi, A. (2005). *Introduction to rubrics: An assessment tool to save grading time, convey effective feedback, and promote student learning.* Sterling, VA: Stylus Publishing.

Tierney, R., & Simon, M. (2004). What's still wrong with rubrics: Focusing on the consistency of performance criteria across scale levels. *Practical Assessment, Research & Evaluation, 9*(2) Retrieved from http://PAREonline.net/getvn.asp?v = 9&n = 2.

Truemper, C. M. (2004). Using scoring rubrics to facilitate assessment and evaluation of graduate-level nursing students. *Journal of Nursing Education, 43*(12), 562–564.

Valovirta, V. (2002). Evaluation utilization as argumentation. *Evaluation, 8*(1), 60–80.

**Pauline Dickinson**, Ph.D., is a senior researcher and Evaluation Team Leader at SHORE & Whariki. She has academic qualifications in public health, counselling and teaching. Pauline has been involved in programme development and formative, process and outcome evaluations of a range of community and school-based public health and mental health promotion initiatives, including the evaluation of training programmes. She is committed to the use of evidence-informed evaluation methodologies and particularly to evaluation methodologies that focus on valuing. Pauline leads the delivery of the New Zealand National Public Health Evaluation Training Service which builds evaluation capacity and capability in the public health workforce.

**Jeffery Adams**, M.A. (Applied), Ph.D., is a senior researcher and evaluator with the SHORE & Whariki Research Centre. He has led many research and evaluation projects and contributed to evaluation and research across a broad range of public and community health and social service initiatives. He has a strong background in the evaluation of community-focused projects/strategies. Jeff is involved in providing evaluation training and consultancy services to community and public health workers through the National Public Health Evaluation Training Service. He was a co-developer of the *Easy Evaluation* approach.

# EXHIBIT 22

# SAGE researchmethods

# Rubrics

## In: Encyclopedia of Research Design

**By:** Vicki L. Schmitt

**Edited by:** Neil J. Salkind

Book Title: Encyclopedia of Research Design

Chapter Title: "Rubrics"

Pub. Date: 2012

Access Date: August 12, 2021

Publishing Company: SAGE Publications, Inc.

City: Thousand Oaks

Print ISBN: 9781412961271

Online ISBN: 9781412961288

DOI: https://dx.doi.org/10.4135/9781412961288

Print pages: 1292-1294

© 2010 SAGE Publications, Inc. All Rights Reserved.

This PDF has been generated from SAGE Research Methods. Please note that the pagination of the online version will vary from the pagination of the print book.

**SAGE**    SAGE Research Methods

2010 SAGE Publications, Ltd. All Rights Reserved.

Rubrics are descriptive scoring systems that allow observers to assign a numeric value to a piece of work or a performance. While rubrics or scoring guides are most often associated with the field of measurement, specifically performance assessment, the use of such assessment tools can be applied more generally to any research endeavor in which one intends to apply a rating or a score to a complex task, product, or process. Rubrics provide a set of guidelines or criteria that allow researchers or evaluators to describe a set of characteristics that represent an underlying continuum of performance. The use of order categories that represent the different levels associated with a given performance or product allows for subjective judgments to become more objective in nature. This entry focuses on developing and assessing the quality of rubrics.

## Rubric Development

Rubrics may be characterized as general or task-specific and may use an analytic or holistic scoring system. The purpose of the assessment determines the type of rubric most appropriate for use. For example, if the purpose is to gather information regarding specific components of performance, then a task-specific rubric may be the most appropriate tool. On the other hand, if the purpose is to examine a broader range of tasks, then the evaluator may select a more general rubric for scoring. In much the same way, the scoring system itself can be either analytic or holistic in nature. When a product or performance comprises a variety of criteria on which judgment is made and each of these criteria is set along a continuum for scoring, the rubric is considered to be analytic. In cases in which only one score is assigned without the emphasis on specific criteria associated with the performance or product, the rubric is considered to be holistic. An example of a commonly used holistic scoring system is the assignment of grades, such as A, B, C, D, and F. Again, the format of the rubric is determined by the purpose of the evaluation.

General guidelines have been established in an effort to assist in the development of scoring rubrics. The first step is to identify the objective of the evaluation. Once this has been determined, the evaluator should identify a series of observable attributes and then thoroughly describe characteristics associated with each. Once the attributes have been identified and the characteristics determined, narratives are written along the continuum (either holistic or analytic), and score points are assigned at each interval. Prior to full implementation of the scoring system, anchors of performance are gathered to ensure that all levels of performance have been identified. Finally, rubrics are revised as needed. The key to the development of any rubric is clearly identifying the goals and objectives to be evaluated. Clear objectives for scoring the product or performance will help determine the format as well as the levels of performance to be scored.

Rubrics can be either too task-specific or too general, having the potential to make scoring difficult. Because rubrics are a measurement tool, attention must be paid to the reliability and validity of the scoring system. Development of a quality rubric is based primarily on the ability of a judge or rater to apply the performance criteria in an objective and consistent manner, ensuring that the scoring criteria adequately measure the objectives of the assessment. The descriptive characteristics of each score point along the scoring continuum may need to be reexamined and sometimes rewritten so that raters can accurately and consistently identify

SAGE
2010 SAGE Publications, Ltd. All Rights Reserved.

the level of performance based on the descriptors provided. Consistency within and across raters is crucial to the reliability of the rubric. In addition, the degree to which the content or the attributes of performance are aligned with stated goals and objectives should be examined. In some cases, comparisons with existing measures may be useful in helping one determine the quality of the rubric. As with any measurement tool, the overall goal is to collect validity evidence that supports the rubric's ability to accurately measure the underlying psychological construct for which it was intended.

## Rubric Quality

When assessing the quality of a rubric, one might consider four components: (1) purpose, (2) criteria, (3) scoring, and (4) organization of the instrument. The purpose of the assessment should be clearly stated and objectives identified. Evaluators must also determine whether the use of a rubric is the best method of measurement for any given situation. Once the purpose or objective(s) are clearly delineated, one must determine whether the performance criteria are clearly written. Clarity and detail increase the objectivity of the rubric for evaluators. The degrees of performance must also be precisely measured through an accurate scoring system that represents a continuum of performance represented by significant differences among score points. Finally, the overall organizational structure of the rubric must be examined to be sure that spelling, grammar, and physical layout are appropriate and user friendly.

Although rubrics may be developed for any situation in which one wishes to judge a performance or product, they have become most popular among educators, especially classroom teachers. The use of rubrics in educational settings has the potential to influence learning by providing formative feedback to learners on their progress as well as providing feedback to instructors on teaching.

**Vicki L. Schmitt**

http://dx.doi.org/10.4135/9781412961288.n394

See also

- Criterion Variable
- Standardization

## Further Readings

Goodrich, H. *Understanding rubrics.* (1996).54(3),14–17.

Mertler, C. A. *Designing scoring rubrics for your classroom.* (2001).7(25).Retrieved March 1, 2010, from http://pareonline.net/getvn.asp?v=7&n=25

SAGE

SAGE Research Methods

2010 SAGE Publications, Ltd. All Rights Reserved.

**Moskal, B. M.** *Scoring rubrics: What, when and how?* (2000).7(3).Retrieved March 1, 2010, from http://pareonline.net/getvn.asp?v=7&n=3

**Moskal, B. M. , & Leydens, J. A.** *Scoring rubric development: Validity and reliability.* (2000).7(10).Retrieved March 1, 2010, from http://pareonline.net/getvn.asp?v=7&n=10

**Popham, W. J.** *What's wrong and what's right with rubrics.* (1997).55(2),72–76.

**Tierney, R. , & Simon, M.** *What's still wrong with rubrics: Focusing on the consistency of performance criteria across scale levels.* (2004).9(2).Retrieved March 1, 2010, from http://pareonline.net/getvn.asp?v=9&n=2

# EXHIBIT 23

**EXHIBIT 23 REDACTED IN ITS ENTIRETY**

# EXHIBIT 24

**EXHIBIT 24 REDACTED IN ITS ENTIRETY**

# EXHIBIT 25

**EXHIBIT 25 REDACTED IN ITS ENTIRETY**

# EXHIBIT 26

**EXHIBIT 26 REDACTED IN ITS ENTIRETY**

# EXHIBIT 27

**EXHIBIT 27 REDACTED IN ITS ENTIRETY**

# EXHIBIT 28

**EXHIBIT 28 REDACTED IN ITS ENTIRETY**

# EXHIBIT 29

**EXHIBIT 29 REDACTED IN ITS ENTIRETY**

# EXHIBIT 30

**EXHIBIT 30 REDACTED IN ITS ENTIRETY**

# EXHIBIT 31

**EXHIBIT 31 REDACTED IN ITS ENTIRETY**

# EXHIBIT 32

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

ATTORNEYS AT LAW

NEW YORK ● DELAWARE ● CALIFORNIA ● ILLINOIS ● LOUISIANA

July 19, 2021

**Via Email**

Abid R. Qureshi, Esq.
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, D.C. 20004

Re:  *Lord Abbett Affiliated Fund, Inc. v. Navient Corp., et al.*, No. 16-cv-00112-MN

Dear Counsel:

We write regarding Navient's assertion made earlier today that, **separate and apart from its Daubert motion,** it now suddenly intends to file a motion under Federal Rule 37 to strike parts of Dr. Hillman's November 3, 2020 report. As set forth below, this appears to be a transparent effort by Navient to perform an end-run around the Court's July 16, 2021 order (the "Order") limiting *Daubert* briefing pages to a total of 30 pages per side. As described below, we object to this maneuver and intend to file a cross-motion to strike Navient's improper effort to secure extra pages in violation of the Court's Order. We request a prompt meet and confer regarding this relief.

## 1.  Navient's New Request For Individual Reviewer Scoring Information

By way of brief background, on November 3, 2020, Plaintiffs produced the expert report of Dr. Hillman (the "November 2020 Report"), which described among other things an analysis of a sample of call recordings collected and produced by Navient. The November Report explains that Dr. Hillman "trained and utilized a team of 6 research assistants," that included five "PhD students" and "one … full-time researcher with a doctorate" to "assist" him "in reviewing the 471 call recordings" in the sample produced by Navient. *See, e.g.,* November 2020 Report at 23. Shortly thereafter, by November 20, 2020, Plaintiffs produced to Defendants the back-up data with the final analyses used in Dr. Hillman's November 2020 Report, which included the final scoring data for the call recording analysis. The final data did not have individual reviewer names associated with the scores and, until now, Defendants made no indication that they wanted that information.

As you know, in February 2021, Plaintiffs moved to strike a large amount of forbearance-related data (the "Withheld Data") belatedly produced by Navient, and the portions of Defendants' expert rebuttal reports that relied on that data. Navient had failed to produce this data until long after the close of discovery and, given the massive volume of data and complications with accessing it, it was inaccessible and unusable for several months. The Court denied Plaintiffs' motion to strike the data and the related expert opinions, but granted additional discovery, provided additional time to address the data, and permitted Plaintiffs to file a supplemental expert report on May 28, 2021.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Abid R. Qureshi, Esq.
July 19, 2021
Page 2

During this time, following the initial backup production in November 2020, Defendants did not make a *single* request for additional information concerning Dr. Hillman's November 2020 Report. After Plaintiffs served Dr. Hillman's May 28, 2021 supplemental report, Defendants made several requests for information, which Plaintiffs promptly addressed. But Defendants still said nothing about the November 2020 Report.

Instead, Defendants waited until the June 30, 2021 deposition of Dr. Hillman. At that deposition, Defendants requested a reliability assessment that Dr. Hillman performed separate and apart from his analysis of the final data. But, even with that request pending, Defendants elected to use their full deposition hours allotment with Dr. Hillman.

Nevertheless, Plaintiffs considered Defendants' request in good faith and, on July 6, 2021, produced on a "no-waiver" basis the document requested, which was a *two-page* excel spreadsheet. As a further gesture of good faith and as a courtesy, Plaintiffs offered to produce Dr. Hillman for another deposition, which was subject to two conditions: (1) it would be limited to 30 minutes on the record; and (2) the examination would be limited to the 2-page document recently requested by Defendants. Defendants objected to the time limitation—not the subject-matter limitation—but nonetheless chose to proceed with the deposition knowing full well that it was subject to these two conditions. Further, Plaintiffs offered multiple days for this second deposition—Defendants voluntarily chose the last day offered.

At Dr. Hillman's second deposition on July 12, 2021, Defendants attempted to ask about topics other than the agreed document, including draft materials protected under the Federal Rules. We objected and reminded Defendants of the limitation, noting that the deposition would conclude if and when Defendants were finished with the two-page document (or after 30 minutes on the record). Defendants accordingly moved on with their questioning, as they were required to do. After the deposition, Defendants vaguely requested even more additional data, including draft scores that were **not** used for Dr. Hillman's November 2020 Report and drafting-related communications between Dr. Hillman and his team. While the specifics of Defendants' request were unclear, we responded that you were seeking draft materials that are protected from disclosure—the same types of information that Defendants themselves withheld for their own experts. Nevertheless, on July 15, 2021, we offered to work with you try and get you the information you wanted, while still maintaining the protections under the Federal Rules, if Defendants would only specify what exact information they wanted.

Defendants repeatedly declined to cooperate and consistently rejected our requests to confer. After multiple communications over the past weekend, on July 19 (today), Defendants requested for the first time the "scoring of individual call recordings by each reviewer." As noted, Defendants could have requested this information eight months ago, as they knew about the involvement of reviewers and that the final data produced did not have individual viewer names. But Defendants chose not to make that request. Indeed, Defendants took two separate depositions of Dr. Hillman without ever raising the issue or requesting this information.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Abid R. Qureshi, Esq.
July 19, 2021
Page 3

Nonetheless, having considered Defendants' request, Plaintiffs are willing to produce this information—provided that Defendants agree to accept it on a non-waiver basis and that this will resolve Defendants' motion to strike Dr. Hillman's report under Federal Rule 37. During our call today, you indicated that ***regardless*** of whether Plaintiffs provide this information, Defendants will still move to strike. This obviously raises questions about whether Defendants truly want the information that they waited until the eleventh hour to request. Nevertheless, our good faith offer stands. Please let us know if we can resolve this dispute by producing the newly requested information on the above terms.

### 2.   Navient's Plan Designed To Circumvent The Court's Order

On July 16, 2021, the Court entered the Order, which restricted Navient's dispositive motion page limit to 30 pages and likewise restricted *Daubert* motion page limits to 30 pages per side. Navient quickly sought an emergency extension to allow it to revise its briefs. The Court granted that extension request on July 16, 2021.

As noted above, Navient informed Plaintiffs for the first time today that it now intends to also file a motion to strike Dr. Hillman's report under Federal Rule 37 separate and apart from its *Daubert* motion. This is inconsistent with Navient's prior communications and correspondence, which clearly indicated that Navient address this issue in connection with its *Daubert* motion (skipping even a necessary motion to compel). *See, e.g.,* Defendants' Ltr. dated July 15, 2021. Indeed, at no point during our calls on July 13 or July 15 did Navient mention that it intended to file a ***separate*** motion apart from its *Daubert* motion. Likewise, Navient said nothing about this maneuver to the Court in its July 16, 2021 letter. If it had, Plaintiffs would have objected.

It is clear that Navient's new plan is designed to circumvent the *Daubert* page limitations set by the Court in the Order. This is especially concerning given that Defendants secured an extension by representing to the Court that they needed "additional time to shorten their briefs"— without any mention of a separate motion directed at experts. Defendants then apparently used the extension granted by the Court to concoct a plan designed to perform an end-run around the Court's Order. This is improper.

We continue to hope that the Parties can agree to resolve Defendants' motion to strike through Plaintiffs' good faith offer to produce the information that Defendants have just today requested for the first time. But, if Defendants reject this offer and file a separate motion, Plaintiffs intend to file a cross-motion to strike Defendants' motion as well as other appropriate remedies. Further, Plaintiffs reserve all rights to also move to strike Defendants' *Daubert* motion to the extent that it seeks to incorporate Defendants' unauthorized effort to secure additional briefing pages in violation of the Court's Order. We also note that we are reserving all rights concerning Defendants' conduct at depositions, including improperly cutting off Plaintiffs' questioning and instructing the witnesses not to answer valid questions.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Abid R. Qureshi, Esq.
July 19, 2021
Page 4

We propose a call tomorrow morning to complete our meet-and-confer concerning Defendants' improper Rule 37 motion, as well as our cross-motion to strike, as discussed above. Please let us know your availability tomorrow morning.

We look forward to hearing back from you promptly.

Sincerely,

*/s/ Jeremy P. Robinson*
Jeremy P. Robinson