**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LORD ABBETT AFFILIATED FUND, INC., *et al.*, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NAVIENT CORPORATION, *et al.*,<br><br>Defendants. | Case No. 1:16-cv-112-MN |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND AUTHORIZATION TO PROVIDE NOTICE OF SETTLEMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. RELEVANT BACKGROUND ..... 5

A. The Commencement and Nature of the Action ..... 5

B. Fact And Expert Discovery ..... 6

C. Class Certification, Notice and The Opt-Out Opportunity ..... 7

D. Summary Judgment and *Daubert* Motions ..... 7

E. The Mediation/Settlement Process ..... 7

III. ARGUMENT ..... 8

A. The Settlement Was Reached Through Arm's-Length Negotiations ..... 9

B. The Proposed Settlement Is Within The Range Of Possible Approval ..... 10

C. The Settlement Treats All Class Members Fairly ..... 13

D. The Settlement Does Not Excessively Compensate Plaintiffs' Counsel ..... 15

E. Plaintiffs Have Identified All Agreements Relevant To The Settlement ..... 16

IV. THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS ..... 16

A. Retention Of JND Legal Administration as Claims Administrator ..... 16

B. Proposed Notice Procedures ..... 16

C. The Court Should Not Require A Second Opt-Out Period ..... 18

V. PROPOSED SCHEDULE OF SETTLEMENT EVENTS ..... 20

VI. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Alves v. Main*,
2012 WL 6043272 (D.N.J. Dec. 4, 2012)....9, 10

*In re Amer. Bus. Fin. Servs. Inc. Noteholders Litig.*,
2008 WL 4974782 (E.D. Pa. Nov. 21, 2008)....13

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)....13, 15

*In re CommVault Sys. Inc. Sec. Litig.*,
No. 14-5628 (D.N.J.), ECF Nos. 125, 130....13

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)....19

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010)....8

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)....8

*In re Ins. Brokerage Antitrust Litig.*,
297 F.R.D. 136 (D.N.J. 2013)....15

*Jones v. Commerce Bancorp, Inc.*,
2007 WL 2085357 (D.N.J. July 16, 2007)....18

*Low v. Trump Univ., LLC*,
246 F. Supp. 3d 1295 (S.D. Cal. 2017), *aff'd*, 881 F.3d 1111 (9th Cir. 2018)....19

*Low v. Trump Univ., LLC*,
881 F.3d 1111 (9th Cir. 2018)....19

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig*,
2016 WL 7486326 (D.N.J. Feb. 11, 2016)....19

*In re Nat'l Football League Players' Concussion Injury Litig.*,
301 F.R.D. 191 (E.D. Pa. 2014)....10

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015)....19

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016)....9

*Officers for Justice v. Civ. Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982) ....................................................................................19

*Pro v. Hertz Equipment Rental Corp.*,
2013 WL 12157826 (D.N.J. Mar. 18, 2013)...............................................................19

*In re Sch. Asbestos Litig.*,
921 F.2d 1330 (3d Cir. 1990)..........................................................................................8

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)..........................................................................11

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004).....................................................................................8, 9

*In re Wilmington Trust Sec. Litig.*,
Master File No. 10-cv-00990-ER, slip op. (D. Del. Jul. 10, 2018)...........................19

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)..........................................................................20

**STATUTES**

15 U.S.C. § 77.....................................................................................................................17

15 U.S.C. § 78.....................................................................................................................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23..........................................................................................8, 9, 10, 17, 19

Court-appointed Class Representatives the Lord Abbett Funds ("Plaintiffs") respectfully move under Federal Rule 23(e)(1) for preliminary approval of the proposed Settlement set forth in the Stipulation and Agreement of Settlement dated November 16, 2021 (the "Stipulation").[1]

## I. INTRODUCTION

Plaintiffs are pleased to report that, after over five years of hard-fought litigation, they have negotiated an agreement to settle this securities class action in exchange for a cash payment of $35 million for the benefit of the Classes, subject to the Court's approval. Plaintiffs respectfully submit that the Settlement is a favorable result for the Classes and ultimately should be approved by this Court given the significant risks, costs, and delays of continued litigation. Plaintiffs now move for *preliminary* approval so that notice of the Settlement can be disseminated to Class Members and a hearing on *final* approval can be scheduled. The Motion is unopposed, and all Parties agree that it may be decided on the papers, subject to the Court's approval.

The Settlement is the product of extensive arms'-length negotiations supervised by an experienced mediator who is one of the preeminent securities neutrals in the nation, former District Court Judge Layn R. Phillips. The Parties held a full day mediation session by Zoom during which Judge Phillips had to make two mediator's proposals before the Parties could reach a resolution. The first proposal brought the Parties within a narrowed negotiating range and the second proposed a settlement in full for $35 million, which Judge Phillips independently viewed as reasonable. A few days after the mediation, the Parties agreed to settle the Action in full for $35 million in cash.

Throughout this Action, Plaintiffs and Lead Counsel zealously represented Class Members' interests and, through their extensive litigation efforts, gained a thorough understanding

[1] All capitalized terms not otherwise defined shall have the meanings given to them in the Stipulation, which is attached as Exhibit 1 to the Motion.

of the strengths and weaknesses of the case. Indeed, when the Settlement was reached, Plaintiffs had conducted an extensive investigation, including interviews of multiple former Navient employees and the filing of two detailed amended complaints. They litigated Defendants' motions to dismiss, which first resulted in the dismissal of all claims. Subsequently, Plaintiffs were successful in resurrecting certain claims, while others were dismissed with prejudice. Plaintiffs and Lead Counsel completed extensive fact discovery, which included contested discovery motions, the analysis of over 6 million pages of documents, and the depositions of 18 fact witnesses, including Navient's top executives. They also litigated a contested class certification motion, which involved 3 depositions and resulted in the Court certifying the Classes. Further, Plaintiffs and Lead Counsel completed extensive expert discovery, which between the Parties involved the submission and analysis of 22 expert reports from a total of 11 experts, as well as 12 expert depositions. They also fully briefed Defendants' summary judgment motion and the Parties' respective *Daubert* motions, which involved the submission of over 300 pages of briefing and 20,000 pages of exhibits. As a result, Plaintiffs and Lead Counsel had a well-developed understanding of the merits and risks of the claims when they agreed to the Settlement.

Plaintiffs and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Classes and is in the best interests of Class Members considering the serious risks faced in continuing to litigate, including the significant possibility that there might be no recovery at all. There were many material risks attendant to continued litigation. For example, Defendants insisted that the issuance of Navient common stock (the "Spin Shares") in Navient's 2014 spin-off from Sallie Mae could not as a matter of fact or law constitute a "purchase" under the Exchange Act. If successful, Defendants' argument would have eliminated damages for the Spin Shares. Plaintiffs also faced serious risks on the merits of their claims. For instance, Plaintiffs faced risk in

proving that Defendants misstated Navient's loan loss provisions. Indeed, Defendants and their experts argued vehemently that Navient's accounting for loan loss reserves was consistent with GAAP. As additional support, Defendants pointed to unqualified audit opinions issued by Navient's independent auditor and the lack of any restatement. Similarly, Defendants insisted that they did not misrepresent Navient's forbearance practices, arguing that there was no misuse, the Company described its practices accurately, and those practices helped borrowers avoid default.

Defendants also argued that, even if they made misstatements, they lacked the requisite knowledge or intent to establish securities fraud. For example, Defendants claimed that they were unaware of any need to increase reserves until the loans at issue started underperforming and, once that happened, they appropriately increased Navient's provision. Defendants also contended that they had no financial motive to misuse forbearance and, even if there was minor overuse, they were unaware of it. Moreover, Defendants also raised several serious challenges to loss causation and damages. For instance, they argued that Plaintiffs could not establish loss causation for their forbearance allegations because the September 29, 2015 corrective disclosure was not specific to Navient and revealed nothing new about Navient's forbearance practices. Considering these and myriad other risks, as well as the costs and delays of further litigation, Plaintiffs and Lead Counsel believe the $35 million Settlement is a very favorable result for the Classes.

Plaintiffs respectfully request that this Court enter the proposed Preliminary Approval Order attached as Exhibit A to the Stipulation and as Exhibit 2 to the Motion. The Preliminary Approval Order, among other things: (i) schedules a final hearing to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses (the "Settlement Hearing"); (ii) preliminarily approves the Settlement as fair, reasonable, and adequate to the Classes, pending the final hearing; (iii) approves

the form and method of disseminating notice to the Classes; and (iv) establishes procedures and deadlines for Class Members to submit Claim Forms for payments from the Net Settlement Fund and object to the Settlement, Plan of Allocation, and/or requested fees and expenses.

Plaintiffs (with Defendants' consent) respectfully propose a schedule for proceeding with final approval of the Settlement that is the same (or close to) the schedule set forth below. This will promptly schedule the Settlement Hearing 110 days from the date of entry of the Preliminary Approval Order in order to accommodate the 100 days required by the Class Act Fairness Act ("CAFA") to mail the CAFA notice and enter the judgment finally approving the Settlement. The illustrative schedule provided below assumes that the Court enters the Preliminary Approval Order by December 1, 2021 and schedules the Settlement Hearing for March 21, 2022. Please note that the Court need only enter the date of the Settlement Hearing at ¶2 of the proposed Preliminary Approval Order, as all other dates/deadlines referenced below will be set based on either (a) the date of entry of the Preliminary Approval Order or (b) the date chosen by the Court for the Settlement Hearing.

| **Event** | **Proposed Timing** | **Example Date** |
|---|---|---|
| Deadline for mailing the Settlement Notice and Claim Form to Class Members (which date shall be the "Notice Date") | No later than 15 business days after entry of Preliminary Approval Order (Preliminary Approval Order ¶ 4(a)) | December 22, 2021 |
| Deadline for publishing the Summary Settlement Notice | No later than 10 business days after the Notice Date (Preliminary Approval Order ¶ 4(c)) | January 7, 2022 |
| Deadline for filing of papers in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's motion for attorneys' fees and expenses) | 35 calendar days before the date set for the Settlement Hearing (Preliminary Approval Order ¶ 22) | February 14, 2022 |

| Event | Proposed Timing | Example Date |
|---|---|---|
| Deadline for receipt of objections | 21 calendar days before the date set for the Settlement Hearing (Preliminary Approval Order ¶ 13) | February 28, 2022 |
| Deadline for filing reply papers | 7 calendar days before the Settlement Hearing (Preliminary Approval Order ¶ 22) | March 14, 2022 |
| Settlement Hearing | 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter (Preliminary Approval Order ¶ 2) | March 21, 2022 |
| Postmark deadline for submitting Claim Forms | 120 calendar days after the Notice Date (Preliminary Approval Order ¶ 8) | April 21, 2022 |

## II. RELEVANT BACKGROUND

### A. The Commencement and Nature of the Action

Beginning on February 11, 2016, several related securities class actions were filed against Navient and certain executives. On June 30, 2016, the Court appointed the Lord Abbett Funds as Lead Plaintiffs; approved their selection of counsel—then, Lieff Cabraser Heimann & Bernstein, LLP and Morris & Morris—and consolidated all related actions.

On September 28, 2016, Plaintiffs filed their first complaint. D.I. 36 (the "FAC"). Plaintiffs alleged that Defendants made material misrepresentations concerning, *inter alia*, (1) Navient's loan portfolios, including Navient's reported provisions for loan losses and related metrics (the "Loan Loss Provisions Statements"); (2) Navient's forbearance practices (the "Forbearance Statements"); (3) Navient's credit facilities (the "Credit Facility Statements"); and (4) Navient's compliance with legal and regulatory requirements (the "Compliance Statements"). Defendants have vigorously denied and continue to deny each and all of the claims asserted against them and deny that Class Members were harmed or suffered any damages as a result of the alleged conduct.

Defendants moved to dismiss, which was fully submitted by January 30, 2017. D.I. 38-40, 42-44, 46-48. On September 6, 2017, the Court dismissed the FAC in its entirety. The Court, however, also granted leave to file an amended complaint. D.I. 56. On November 17, 2017, Plaintiffs filed the Second Amended Complaint (the "SAC" or the "Complaint"). D.I. 59. On January 16, 2018, all Defendants moved to dismiss, which was fully briefed by April 16, 2018. D.I. 63-65, 67-68, 69-70. On September 20, 2018, the Action was reassigned to this Court.

On January 29, 2019, the Court granted-in-part and denied-in-part the second motion to dismiss, dismissing the Compliance Statements and Exchange Act claims for the Credit Facility Statements, but otherwise denying the motion. D.I. 76. On April 26, 2019, the Court substituted Bernstein Litowitz as Lead Counsel and Friedlander & Gorris as Liaison Counsel. D.I. 87, 89.

**B. Fact And Expert Discovery**

Fact discovery commenced in May 2019. Pursuant to detailed document requests and substantial negotiations, Defendants and third parties produced more than 600,000 documents, totaling more than 6 million pages. Plaintiffs produced more than 75,000 documents, totaling more than 530,000 pages. Plaintiffs also subpoenaed and negotiated discovery from six third-parties, including Navient's outside auditor, KPMG. The Parties also served and responded to extensive interrogatories and requests for admission and exchanged numerous discovery letters. In addition, Plaintiffs noticed and deposed 15 fact witnesses, including Defendants Remondi (CEO), Chivavibul (CFO), and Kane (COO), and actively examined an additional 3 fact witnesses noticed by Defendants—for a total of 18 fact depositions.

Expert discovery commenced on November 3, 2020. Over the next several months, the Parties exchanged 22 expert reports from a total of 11 experts, engaged in multiple disputed motions, including two motions to strike and a contested amendment to the trial schedule, and conducted a total of 12 expert depositions.

### C. Class Certification, Notice and The Opt-Out Opportunity

On September 6, 2019, Plaintiffs filed their Class Certification Motion. D.I. 104-06. The Parties took 3 depositions and filed multiple briefs. D.I. 118-19, 129-30, 157-58, 161. The Court granted-in-part and denied-in-part certification (D.I. 172) and then entered an Order certifying the Classes and appointing Plaintiffs as Class Representatives and Bernstein Litowitz as Class Counsel. D.I. 174. On April 12, 2021, the Court approved the Parties' proposed Class Notice, which provided Class Members with the opportunity to request exclusion from the Classes and set forth the deadline and procedures for doing so. D.I. 226. The Class Notice specifically informed Class Members that they may not have another opportunity to opt-out and that, if they chose to remain in the Action, they would "be bound by any settlement or judgment in this Action," including "any unfavorable judgment which may be rendered in favor of Defendants." D.I. 283. The Class Notice deadline for opting-out was July 9, 2021. Ten opt-outs were received. *Id.*

### D. Summary Judgment and *Daubert* Motions

On July 20, 2021, Defendants filed their motion for summary judgment and both sides filed *Daubert* motions, which were all fully briefed by September 13, 2021. D.I. 250-54, 255-57, 258-67, 284-88, 289-95, 315-23. These motions were a substantial undertaking and, all told, comprised 310 pages of briefing and tens of thousands of pages of exhibits.

### E. The Mediation/Settlement Process

The Parties retained former U.S. District Court Judge Layn R. Phillips as mediator and participated in a full-day mediation session via Zoom on September 28, 2021. Judge Phillips is one of the nation's preeminent mediators and has significant experience mediating securities class actions. During the mediation, Judge Phillips made a mediator's recommendation for the Parties to negotiate within a narrowed range, which successfully brought them closer together. After additional negotiations, Judge Phillips made a mediator's proposal to settle the Action in full for

$35 million in cash, which he independently thought was a reasonable amount. After a few more days, on October 1, 2021, the Parties agreed to the mediator's proposal and reached an agreement in principle to settle for $35 million in cash. The Parties continued to negotiate the Term Sheet until October 8, 2021, when it was executed. The Parties then negotiated the Stipulation, which reflects the final and binding agreement between the Parties and supersedes the Term Sheet. The Stipulation was signed on November 16, 2021.

## III. ARGUMENT

In the Third Circuit, there is a "strong presumption in favor of voluntary settlement agreements," which is "especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)); *see also, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990).

Under Federal Rule of Civil Procedure 23(e), Court approval of a proposed class action settlement is a well-established, two-step process. *First*, the Court determines whether to grant preliminary approval of the Settlement and allow notice of the Settlement to be disseminated to class members. *See* Fed. R. Civ. P. 23(e)(1). *Second*, following notice, the Court determines whether to approve the Settlement at a final approval hearing. *See* Fed. R. Civ. P. 23(e)(2).

The Federal Rules of Civil Procedure provide that a court should grant preliminary approval based on a finding that it "will likely be able" to (i) finally approve the Settlement under Rule 23(e)(2), and (ii) certify the class for purposes of the settlement. *See* Fed. R. Civ. P. 23(e)(1)(B). Here, the Court has already certified the Classes. D.I. 172, 174. In considering final

approval of the Settlement, Federal Rule 23(e)(2) provides that the Court consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As detailed below, the Settlement warrants preliminary approval.

**A. The Settlement Was Reached Through Arm's-Length Negotiations**

A proposed class action settlement is considered presumptively fair where, as here, the parties have engaged in arm's-length negotiations. *See In re Nat'l Football League Players Concussion Injury Litig.,* 821 F.3d 410, 436 (3d Cir. 2016); *Warfarin*, 391 F.3d at 535. As noted above, after the close of fact and expert discovery and while Defendants' summary judgment motion and the Parties' *Daubert* motions were pending, the Parties participated in mediation before Judge Phillips, a preeminent securities mediator. The mediation involved the Parties' submission of their summary judgment briefing and an all-day mediation session before Judge Phillips. Before the Parties reached the Settlement, Judge Phillips had to make two mediator's proposals. First, Judge Phillips made a mediator's proposal for the Parties to negotiate within a narrowed range, which the Parties accepted. Second, Judge Phillips made a mediator's proposal to settle the Action for $35 million in cash, which was within the negotiating range and which Judge Phillips independently viewed to be reasonable. The Parties considered the second proposal for several days before accepting it on October 1, 2021. *See supra* Section II.C. The good faith, arm's-length negotiations and the involvement of an experienced mediator support the conclusion that the Settlement is fair and was achieved free of collusion. *See Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) ("[t]he participation of an independent mediator in settlement

negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties").

In addition, the Lord Abbett Funds, institutional investors of the type favored by Congress to lead securities class actions under the PSLRA, supervised this litigation throughout and recommend that the Settlement be approved. Likewise, Lead Counsel Bernstein Litowitz, a nationwide leader in securities class actions, which has a thorough understanding of the factual and legal issues in the Action, also supports the Settlement. These facts weigh strongly in favor of preliminary approval. *See Alves*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) ("[C]ourts in this Circuit traditionally attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class.") (internal quotations omitted).

**B. The Proposed Settlement Is Within The Range Of Possible Approval**

At the preliminary approval stage, the Court need only determine whether it will likely be able to approve the Settlement, Fed. R. Civ. P. 23(e)(1), or, in other words, whether the Settlement is "within the range of possible approval." *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014). Here, Plaintiffs and Lead Counsel respectfully submit that the proposed Settlement represents a favorable recovery for the Classes considering the risks and delays of further litigation. Indeed, as summarized below, Plaintiffs faced significant risks on all elements of their claims.

**First**, even aside from issues of liability and damages, Plaintiffs faced significant risk as to whether the Spin Shares issued in connection with Navient's 2014 spin-off from Sallie Mae were properly included in the Action. Defendants argued vigorously that the acquisition of Spin Shares did not and could not, as a matter of fact and law, qualify as a "purchase" under the Exchange Act. They further argued that investors suffered no damages in acquiring the Spin Shares because any price inflation present in the Spin Shares was equally present in the prior Sallie Mae

shares. Given Defendants' arguments, there was significant risk that the Spin Shares might not give rise to cognizable or compensable securities law claims.

**Second**, Plaintiffs faced significant risks in proving that Defendants made misrepresentations. For example, Defendants argued that Navient's loan loss reserve accounting ***was*** appropriate, which they backed up with two expert accountants. Defendants also pointed out that KPMG, Navient's independent auditor, issued unqualified audit opinions throughout the Class Period and did not require Navient to issue a restatement. Further, both sides relied on their accounting experts to challenge or defend Navient's loss reserve accounting, setting up a "battle of the experts" for which "it is virtually impossible to predict with any certainty which testimony would be credited." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008).

Plaintiffs likewise faced similar risk from an unpredictable "battle of the experts" concerning Defendants' alleged forbearance misstatements. Even aside from this unpredictable expert contest, Plaintiffs faced further risk from Defendants' arguments that the quantitative evidence established that Navient's forbearance use did not contradict any public statements, but actually *helped*—not harmed—student borrowers by, *e.g.*, avoiding default.

And, with respect to Plaintiffs' claims that Navient failed to disclose the risk that a proposed rule change presented to its credit facilities, Defendants argued that those credit facilities and rule change were publicly disclosed, and that no further disclosure was required.

**Third**, Plaintiffs faced material risks in proving Defendants' scienter or intent to defraud with respect to their Exchange Act claims. For example, on the Loan Loss Provisions Statements, Defendants argued that Navient's executives were not aware of any need to increase Navient's provisions, and that they were told—and believed—that Navient properly accounted for the actual

performance of its loans. Further, Defendants argued that they increased their provisions as soon as they learned that loans were performing poorly in compliance with GAAP.

Likewise, as to Plaintiffs' forbearance claims, Defendants argued that they did not have scienter because they were helping borrowers avoid default and asserted that, to the extent that Plaintiffs could prove any misuse of forbearance, Navient's executives were not aware of it. Defendants also argued that they had no incentive to misuse forbearance because the relevant loans were guaranteed by the Federal Government and Navient earned more from avoiding forbearance.

**Fourth**, Plaintiffs also faced significant risks to proving loss causation and damages. To start, Defendants argued that Plaintiffs could not establish loss causation as to several of the alleged corrective disclosures. For example, Defendants disputed that the alleged corrective disclosure on July 22, 2015 caused any statistically significant decline in the price of Navient common stock. Defendants also argued that another alleged corrective disclosure—the Consumer Financial Protection Bureau report released on September 29, 2015—did not specifically address Navient and did not reveal any new fraud related information at all. While Plaintiffs believe that they had meaningful responses, Defendants' arguments presented significant risks at summary judgment and trial—for which resolution likely would require another unpredictable "battle of the experts."

**Finally**, the Settlement is also reasonable when considered in relation to the range of potential recoveries for the Settlement Class. To start, Defendants contended that Class Members suffered no compensable damages at all, which if successful would have resulted in zero recovery. If Plaintiffs succeeded in establishing liability, but Defendants prevailed on their Spin Share arguments, Plaintiffs' expert estimated that the reasonably likely maximum recoverable damages were approximately $365 million. Under this scenario, the $35 million Settlement represents over 9.58% of the maximum likely damages. Moreover, even if Plaintiffs overcame all the significant

risks to liability and damages and prevailed on every single disputed issue in the Action, then Plaintiffs' expert estimated that the maximum likely recoverable damages were $687 million. Even under this extreme scenario, the Settlement is more than 5% of these absolute maximum likely recoverable damages. This level of recovery significantly exceeds the recovery percentage of settlements approved by courts within the Third Circuit. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (noting "a range of recoveries . . . for securities class action settlements," including as low as 1.6%); *In re CommVault Sys. Inc. Sec. Litig.*, No. 14-5628 (D.N.J.), ECF Nos. 125, 130 (approving settlement recovering 2.2% of maximum damages); *In re Amer. Bus. Fin. Servs. Inc. Noteholders Litig.*, 2008 WL 4974782, at *13 (E.D. Pa. Nov. 21, 2008) (approving settlement recovering 2.5% of maximum damages).

In sum, if the Settlement had not been achieved, there was a serious risk that Defendants could have prevailed on one or more of their arguments and substantially reduced the possible recovery or even eliminated it entirely. And, even if Plaintiffs fully prevailed at summary judgment and at trial, they would also have had to prevail on these risky issues ***again*** in the appeals that would inevitably have followed—raising meaningful additional risk and also delaying any recovery by the Classes for years further. The Settlement avoids these risks and delays and instead provides a prompt and certain benefit to the Classes in the form of a $35 million cash recovery.

**C. The Settlement Treats All Class Members Fairly**

The Settlement does not improperly grant preferential treatment to Plaintiffs or any segment of the Classes. Rather, all Class Members will receive a distribution from the Net Settlement Fund in accordance with a plan of allocation to be approved by the Court.

At the final Settlement Hearing, Plaintiffs will ask the Court to approve the proposed Plan of Allocation (the "Plan"), which is set forth in the Settlement Notice. The Plan provides for distribution of the Net Settlement Fund to Class Members demonstrating a loss on their

transactions in eligible Navient securities. The methodology to apportion the Net Settlement Fund was developed by Lead Counsel in consultation with Plaintiffs' damages expert. Under the Plan, Recognized Loss Amounts for purchases and acquisitions of Navient Senior Notes, which have Securities Act claims only, are calculated based on the statutory formula for damages under Section 11 of the Securities Act, 15 U.S.C. § 77k(e). The Plan of Allocation also increases the Recognized Loss Amounts for these Securities Act Claims by 15% to account for the fact that these claims faced reduced risks compared to other claims in the Action, as Plaintiffs did not have to prove scienter or loss causation for the Securities Act claims.

For purchases and acquisitions of Navient common stock and call options, as well as sales of Navient put options, which have Exchange Act claims only, the Recognized Loss Amounts are calculated principally based on the difference between the amount of estimated alleged artificial inflation in Navient common stock and call options (and artificial deflation for put options) at the time of purchase/acquisition and at the time of sale, or the difference between the actual purchase/acquisition price and sales price of the stock, whichever is less. This is the typical method for calculating damages under the Exchange Act. With respect to the Spin Shares, the Plan of Allocation applies a 50% discount to account for the unique and increased risk associated with the acquisition of these shares, which as noted above Defendants argued could not, as a matter of fact and law, give rise to cognizable or compensable Exchange Act claims. Once the Claims Administrator has processed all submitted claims, it will make *pro rata* distributions to eligible Class Members until additional redistributions are not cost effective. Any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court.

The proposed Plan is thus a fair and reasonable method for allocating the Net Settlement Fund to eligible Class Members and merits approval at the Settlement Hearing.

### D. The Settlement Does Not Excessively Compensate Plaintiffs' Counsel

The proposed Settlement does not grant excessive compensation to Plaintiffs' Counsel, who will be compensated solely out of the Settlement Fund, subject to the Court's approval.[2]

In their fee and expense application, Lead Counsel will seek a fee of no more than 20% of the Settlement Fund for all Plaintiffs' Counsel—an amount that is well within the fee percentage range that courts in the Third Circuit approve in securities class actions. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) ("Courts within the Third Circuit often award fees of 25% to 33% of the recovery"). The requested fee is also made pursuant to a retainer agreement negotiated at the outset of Lead Counsel's involvement in this litigation, which enhances its reasonableness. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) (*ex ante* fee agreements in securities class actions enjoy "a presumption of reasonableness"). Further, based on an initial review of contemporaneous time records, Plaintiffs' Counsel have devoted over 50,000 hours to this Action with an estimated lodestar of more than $23 million. As such, the requested 20% fee or $7 million will represent a ***negative*** lodestar multiplier of less than 0.3. In other words, a 20% fee will represent a substantial ***discount*** on Plaintiffs' Counsel's lodestar such that they will recover less than 30% of their total time devoted to this case. Plaintiffs' Counsel will also seek payment of litigation-related expenses in an amount not to exceed $3 million.

Lead Counsel's fee and expense application will be filed with the Court and also posted on the case website, www.NavientSecuritiesLitigation.com, where Class Members can review them. By granting preliminary approval, the Court does not decide the reasonableness of the fee or expense application, which will be decided on a full record at the final Settlement Hearing.

---

[2] Plaintiffs' Counsel consists of Lead Counsel, Bernstein Litowitz; liaison counsel, Friedlander & Gorris; and Plaintiffs' prior counsel who were previously counsel of record in this Action.

### E. Plaintiffs Have Identified All Agreements Relevant To The Settlement

In addition to the Stipulation (which subsumes and supersedes the Term Sheet), the only other agreement entered into by the Parties regarding the Settlement is a confidential Supplemental Agreement regarding requests for exclusion, or opt-outs, from the Classes. *See* Stipulation ¶ 35.[3] This agreement provides that, only if the Court allows a second opportunity to opt-out, the Navient Defendants will have the right to terminate the Settlement if timely and valid opt-outs exceed the threshold set in the Supplemental Agreement. However, as set forth in Section IV.C (*infra*), there is no reason for the Court to order a second opportunity for Class Members to exclude themselves from the Classes as they already had ample opportunity to do so in connection with the Class Notice. The Supplemental Agreement will be null and void if the Court does not order a second opt-out opportunity. These are the only agreements between the Parties relevant to the Settlement.

## IV. THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS

### A. Retention Of JND Legal Administration as Claims Administrator

Plaintiffs propose that the settlement notice and claims process be administered by JND Legal Administration ("JND"). JND is an independent settlement and claims administrator with extensive experience. *See* www.jndla.com. The Court already approved JND to serve as Notice Administrator for the Class Notice in this Action, which it has done since then. D.I. 226, ¶ 3.

### B. Proposed Notice Procedures

Plaintiffs respectfully submit that the Court should approve the form and content of the proposed Settlement Notice and Summary Settlement Notice. *See* Stipulation, Exs. A-1 and A-3. The Settlement Notice is written in plain language and clearly sets out the relevant information and

[3] As is customary and standard in securities class actions, the Supplemental Agreement is not made public to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging the threshold to extract individual settlements. At the Court's request, it will be filed *in camera*.

answers to most questions that Class Members will have. Consistent with Rule 23(e), the Settlement Notice apprises Class Members of the terms of the Settlement and the options available to them. The Settlement Notice also satisfies the requirements imposed by the PSLRA, *see* 15 U.S.C. §§ 77z-1, 78u-4, in that it *inter alia* states the amount of the Settlement on an absolute and per-security basis; states the maximum amount of attorneys' fees and Litigation Expenses that Lead Counsel will seek; provides the names, address, and telephone number of Lead Counsel who will be available to answer questions from Class Members; and provides a brief statement explaining the reasons why the Parties are proposing the Settlement. *Id*. The Settlement Notice will also disclose the date, time, and location of the Settlement Hearing and the procedures and deadlines for the submission of Claim Forms, and objections to any aspect of the Settlement, the Plan of Allocation, and/or the requested attorneys' fees and expenses.

The proposed method for disseminating notice, which is set forth in the Preliminary Approval Order submitted herewith, also readily meets the standards under the Federal Rules and due process. Federal Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members who would be bound" by a proposed settlement. Fed. R. Civ. P. 23(e)(1).

If the Motion is granted, JND will mail the Settlement Notice and Claim Form (the "Settlement Notice Packet") to all identified potential Class Members. JND will also cause the Summary Settlement Notice, which summarizes the nature of the Action and the proposed Settlement and explains how to obtain the more detailed Notice, to be published once in the *Wall Street Journal* and transmitted once over the *PR Newswire*, a national wire service, and will publish the Settlement Notice Packet on the case website, www.NavientSecuritiesLitigation.com.

The proposed plan for providing notice is the same method used in numerous other securities class actions, including for the Class Notice in this Action. D.I. 226. Courts routinely

find that comparable notice programs represent the best notice practicable in the circumstances and satisfy the requirements of due process and Rule 23. *See, e.g.*, *Jones v. Commerce Bancorp, Inc.*, 2007 WL 2085357, at *5 (D.N.J. July 16, 2007) ("the proposed distribution of notice to class members by first class mail is reasonable because no alternative method of distribution is more likely to notify class members"). The proposed notice procedures should be approved.

### C. The Court Should Not Require A Second Opt-Out Period

On September 2, 2020, the Court certified the Classes (D.I. 174) and, thereafter, approved the proposed form and manner for providing notice of the pendency of the Action as a class action to potential Class Members—*i.e.*, the Class Notice. D.I. 226. Beginning in May 2021, the Class Notice was disseminated to potential Class Members to inform them of the pendency of the Action as well as their right to request exclusion from one or both of the Classes and the procedures for doing so. *See* D.I. 283, at ¶¶ 2-8 and Exs. A-C. The Class Notice advised recipients that it was within the Court's discretion to allow a second opt-out opportunity, which was not guaranteed, and that the Class Notice may be Class Members' "only chance to opt out of the lawsuit." *E.g.*, D.I. 283, Ex. A at 4 ("It is within the Court's discretion whether to allow a second opportunity to request exclusion from the Classes if the Action is resolved by a settlement. In other words, this may be your only chance to opt out of the lawsuit."). The Class Notice also made clear that any Class Members who did not request exclusion would "be bound by any settlement or judgment in this Action," including "any unfavorable judgment which may be rendered in favor of Defendants." *Id.* As reported by JND, over 100,000 copies of the Class Notice were mailed to potential Class Members and 10 requests for exclusion were received in connection with that notice. D.I. 283, ¶¶ 7, 11.

Given the extensive notice program already undertaken and the ample opportunity provided to Class Members to opt-out, the Parties respectfully propose that a second opportunity

to opt out need not be provided now, subject to the Court's approval. The decision whether to grant a second opt-out period pursuant to Rule 23(e)(4) is "confided to the [district] court's discretion," and courts are "under no obligation" to do so. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) (affirming decision to not provide a second opt-out period); *Low v. Trump Univ., LLC*, 881 F.3d 1111, 1121 (9th Cir. 2018) ("[There is] no authority of any kind suggesting that due process requires that members of a Rule 23(b)(3) class be given a second chance to opt out.") (quoting *Officers for Justice v. Civ. Serv. Comm'n*, 688 F.2d 615, 635 (9th Cir. 1982)).

Courts frequently find an additional opt-out period unnecessary where, as here, Class members were already given ample opportunity to opt out following class certification and will receive notification of the settlement and the opportunity to object at a formal fairness hearing. *E.g.*, *In re Wilmington Trust Sec. Litig.*, Master File No. 10-cv-00990-ER, slip op. at 11 (D. Del. Jul. 10, 2018) (exercising discretion to not require a second opt-out period in securities class action); *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 423 (E.D. Pa. 2015) ("Due process does not require a second opt-out period."); *Pro v. Hertz Equipment Rental Corp.*, 2013 WL 12157826, *4 (D.N.J. Mar. 18, 2013) (denying "a second opportunity" to opt-out); *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig*, 2016 WL 7486326 (D.N.J. Feb. 11, 2016) (denying "a second opportunity" to opt-out); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1310 (S.D. Cal. 2017) (rejecting all of objector's arguments as to why a second opt-out period at settlement should be granted), *aff'd*, 881 F.3d 1111 (9th Cir. 2018); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 342 (S.D.N.Y. 2005) (holding there was "no reason . . . to permit a second opportunity to opt out" because class members received full opportunity to opt out following class certification and to object to settlement at fairness hearing).

As noted above, the Classes were fully informed of the nature of this litigation and the right to opt-out in connection with the Court-approved Class Notice. Moreover, the only new developments that have occurred since Class Members made their decision on whether to opt out—namely, continued litigation that culminated in a substantial recovery—provide a clear benefit to the Classes and negate any potential prejudice from not allowing a second opt-out. Accordingly, the Court should not require a second opt-out period.[4]

## V. PROPOSED SCHEDULE OF SETTLEMENT EVENTS

The Parties respectfully request that the Court order the schedule proposed *supra* at 4-5, which schedules the Settlement Hearing for 110 calendar days after entry of the Preliminary Approval Order—in order to accommodate the 100-day period required by CAFA—or at the Court's earliest convenience thereafter.

## VI. CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court (i) preliminarily approve the proposed Settlement, (ii) approve the proposed form and manner of notice to putative Class Members, and (iii) schedule a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters.

Dated: November 17, 2021

Respectfully submitted,

/s/ *Christopher M. Foulds*
Joel Friedlander (#3163)
Christopher M. Foulds (#5169)
**FRIEDLANDER & GORRIS, P.A.**

[4] While the Parties respectfully submit that a second opt-out is unnecessary, the proposed Settlement is not contingent on that approach. On the contrary, if the Court decides to allow a second opt-out period, the proposed Settlement will proceed. The Parties would need only to submit revised versions of the Preliminary Approval Order, Settlement Notice, and Summary Settlement Notice that include a second opt-out period.

1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
cfoulds@friedlandergorris.com

*Liaison Counsel for Lead Plaintiffs and the Classes*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore Graziano (Admitted *pro hac vice*)
Jeremy P. Robinson (Admitted *pro hac vice*)
Jesse L. Jensen (Admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400
salvatore@blbglaw.com
jeremy@blbglaw.com
jesse.jensen@blbglaw.co

*Lead Counsel for Lead Plaintiffs and the Classes*